```
1                   BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2


3    UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-32
4              Plaintiff,               .
                                        .
5         vs.                           .
                                        .
6    GUY WESLEY REFFITT,                .  March 15, 2021
                                        .  3:46 p.m.
7              Defendant.               .
     - - - - - - - - - - - - - - - - -

8

9                      TRANSCRIPT OF DETENTION HEARING
                    BEFORE THE HONORABLE ZIA M. FARUQUI
10                    UNITED STATES DISTRICT JUDGE


11

12   APPEARANCES:

13   For the United States:       JEFFREY NESTLER, AUSA
                                  RISA BERKOWER, AUSA
14                                United States Attorney's Office
                                  555 Fourth Street Northwest
15                                Washington, D.C. 20530

16

17   For the Defendant:          WILLIAM WELCH, III, ESQ.
                                  5305 Village Center Drive
18                                Suite 142
                                  Columbia, Maryland 21044
19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
22                                U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
23                                202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

1                          C O N T E N T S

2

3                              TESTIMONY

4

5      PEYTON REFFITT            Direct Examination................  23
                                Cross-Examination.................  26
6                               Redirect Examination..............  32

7

8      CAYDEN MITCHELL           Direct Examination................  37
                                Cross-Examination.................  41
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          (All participants present via video conference.)

 3              THE COURTROOM DEPUTY:  This is Criminal Case 21-32,

 4    the United States of America versus Guy Wesley Reffitt.  The

 5    defendant is present by video.  This matter is set for a

 6    detention hearing.

 7          Will the parties please introduce yourselves for the

 8    record, starting with the government.

 9              MR. NESTLER:  Good afternoon, Your Honor.  Jeff

10    Nestler on behalf of the United States.

11              MS. BERKOWER:  Good afternoon, Your Honor.  Risa

12    Berkower, also for the United States.

13              MR. WELCH:  Hello, Your Honor.  This is Bill Welch on

14    behalf of Mr. Reffitt, who was with us a moment ago, and I don't

15    see him anymore.

16              PRETRIAL SERVICES OFFICER:  Your Honor, this is Andre

17    Sidbury for Pretrial Services.

18              THE COURTROOM DEPUTY:  Let me see if I can get him

19    back.

20              MR. WELCH:  In the meantime, I have a couple of

21    questions that perhaps someone else can answer.

22          I've been in touch with my client's proposed third-party

23    custodian -- there he is.  Mr. Reffitt, can you mute that,

24    please?  Thank you.

25              THE COURT:  Can we start with whether your client is
```

1    waiving his appearance?

2              MR. WELCH:  Yes, Your Honor.  For the sake of trying

3    to proceed and trying to get him released, we would like to

4    proceed virtually and remotely today pursuant to the CARES Act.

5              THE COURT:  Thanks so much.  We will proceed

6    virtually.

7         Mr. Reffitt, you are on mute, of course, but if you at any

8    point have any questions or concerns, please unmute yourself.

9    Just let me know.  I am happy to put you into a breakout room so

10   you can speak to your attorney without any of the eyes and ears

11   of the government or myself and speak in a private

12   attorney-client conversation.  If you have any issues or

13   concerns, unmute yourself at any time and let me know.  Okay?

14             THE DEFENDANT:  Okay.  Thank you, Your Honor.

15             THE COURT:  Thanks so much.

16        All right.  Mr. Welch, go ahead.

17             MR. WELCH:  Two issues.  One is that I had proposed my

18   client's wife, Mrs. Nicole Reffitt, as a third-party custodian,

19   and my understanding is she has not been contacted by Pretrial

20   Services.  So I don't know whether that is going to be a

21   potential problem to proceeding today.

22        In addition, I made arrangements to have her available, but

23   I know that she is not on the line.  She could not get the link

24   that I was trying to forward to her, and I do not see her

25   telephone number on here either.  So unfortunately, I don't have

the witnesses that I was going to present unless that resolves

in the next few minutes.

THE COURT:  Okay.  Are you able to get her directly on

a phone call where we could then try to assist her?

MR. WELCH:  I had been texting with her today.  I

believe she had to work earlier in the day, but she has been

responding back and forth, and we have also been e-mailing each

other.  We had also spoken on the phone over the weekend at the

same number.

So I did forward the link that the government had forwarded

to me, but Mrs. Reffitt indicated that even after I sent it to

her twice she did not see the link in the message.  I then

included the dial-in information with the meeting number and

password.  And I still don't see her number on the line -- or on

the Zoom screen.

THE COURT:  I see two phone numbers that are on.  Can

we identify -- I'm assuming that's not her, the 6519.

MR. WELCH:  That's a Virginia number, because it's a

703 area code.

COURT REPORTER:  Your Honor, this is Sara, the court

reporter.  The 6519 is me.

THE COURT:  Got it.  Thank you, Sara.

And then the 908 number?

MS. ROSBOROUGH:  This is Danielle Rosborough from the

National Security Division.  I am on the 908 number.

1          THE COURT:  Great to hear from you, Ms. Rosborough.

2    So that answered that question.

3       Mr. Nestler, why don't I hear from you, Ms. Berkower or

4    Mr. Nestler, whoever wants to speak, regarding detention.  Part

5    of this is more or less relevant, depending on are you intending

6    to seek continued detention, or are you seeking to release to a

7    third-party custodian, or do you want some time to talk or think

8    about this?

9          MR. NESTLER:  Yes, Your Honor.  This is Jeff Nestler

10   on behalf of the United States.

11      We are intending to seek Mr. Reffitt's continued detention.

12   We did speak with Mr. Welch over the weekend and again this

13   morning and informed him of that fact.  If the Court and

14   Mr. Welch wants a further continuance in order to get

15   Mr. Reffitt's wife available, that's fine with the government.

16   But we are seeking his continued detention, and I am happy to

17   explain the reasons therefor at this time, Your Honor.

18          THE COURT:  So Mr. Welch, I am happy to defer to you.

19          THE COURTROOM DEPUTY:  Your Honor, I think his wife is

20   calling in now.

21          MR. WELCH:  I think so.

22          THE COURTROOM DEPUTY:  Ms. Nestler -- I'm sorry.

23   Ms. Reffitt?

24          MR. WELCH:  It looks like it's connecting.

25          THE COURTROOM DEPUTY:  Okay.  There we go.  She is

1    connecting now.

2        Ms. Reffitt, can you hear us?

3            MS. JODI REFFITT:  Yes, I can.  Do you (distorted

4    audio)?

5            THE COURTROOM DEPUTY:  I'm sorry.  You're breaking up.

6            THE COURT:  Ms. Reffitt, if you can turn off your

7    video and just keep it on audio.

8            MS. JODI REFFITT:  That's what I was asking.  Is that

9    you, Mr. Welch?

10            MR. WELCH:  Yes.

11            MS. JODI REFFITT:  Oh, I see you.  Okay.  So I am

12    going to turn the audio off now.

13            THE COURT:  No, the video.  Keep your audio on.  Turn

14    off the video.  You're good.  That's way better.  Can you

15    introduce yourself again?  It was very hard to hear you before.

16            MS. JODI REFFITT:  Yes.  My name is Jodi Nicole

17    Reffitt, R-e-f-f-i-t-t.

18            THE COURT:  Okay.  Great.

19        Mr. Welch, I think given that she is on the phone, I am

20    fine with going forward.  Pretrial, I think, typically would vet

21    the address and things like that, but I don't know that -- here

22    that is not going to be dispositive one way or the other, but I

23    am happy to hear from you.

24            MR. WELCH:  I am ready to proceed now.  The only

25    question was whether Pretrial had been able to screen her and is

1   in a position to make a recommendation.  I heard through the

2   grapevine, I was speaking to another pretrial officer over the

3   weekend, that she alone had 106 cases to review this weekend,

4   and I have no idea whether they would have actually gotten to

5   Ms. Reffitt and whether they could have done anything.  But I'm

6   happy to proceed.  We want to proceed.

7           THE COURT:  Mr. Sidbury?

8           PRETRIAL SERVICES OFFICER:  Your Honor, I did not

9   screen the defendant's wife as a third-party custodian.

10          THE COURT:  That's okay.  I'm fine to go forward.  If

11  I decide in favor of having her released as a third-party

12  custodian, I can survive doing that.  I don't think that that in

13  any way impacts my decision going forward.

14      So Mr. Nestler --

15          MS. JODI REFFITT:  What does that mean, Judge?  I'm

16  sorry to interrupt you, sir.  But if that does not include your

17  decision going forward, then does that mean you have already

18  made a decision?

19          THE COURT:  Sure, no problem, Ms. Reffitt.  No, it

20  just means that -- Pretrial Services is a part of the court

21  staff.  So typically before someone becomes a third-party

22  custodian, what happens is that the Pretrial Services will call

23  and screen and make sure you don't have any felony convictions

24  or cases pending against you.

25          MS. JODI REFFITT:  No problem.

1          THE COURT:  And so I'm just saying that I'm going to

2     assume that all of those things are fine, that you are in good

3     standing order.  If I decide to have you as a third-party

4     custodian, after the hearing is over I will speak to you

5     directly and have you sworn in, and you will testify under oath

6     to me that, you know, you don't have any of those issues and

7     things like that.  Okay?

8          MS. JODI REFFITT:  Yes.  I understand.  Thank you.

9          THE COURT:  Okay.  And you need to go on mute now.  It

10    is important, if we are in court, the parties are not supposed

11    to speak unless I call on them.  Please let me know if you have

12    a question, and I will get to you.  Okay?

13         MS. JODI REFFITT:  I am finding the mute button as we

14    speak because I am a dinosaur when it comes to Zoom, but I have

15    obviously over the last year caught up.  So I do know where the

16    mute button is, and as long as you notify me when I need to

17    press it, obviously, I will.

18         THE COURT:  Great.  Thank you.  No problem.

19     Okay.  So everyone should be on mute except Mr. Nestler.

20    Mr. Nestler, please proceed.

21         MS. JODI REFFITT:  Okay.  I'm muting now.

22         MR. NESTLER:  Just two small housekeeping matters,

23    Your Honor.  One is that I believe that Ms. Reffitt was

24    interviewed by Pretrial in Texas, according to the pretrial

25    report that the Texas officers had sent, in case Your Honor was

curious about that, even if she hasn't been interviewed by the
D.C. Pretrial.

     And two is that Mr. Welch indicated to the government that
he intended to call Ms. Reffitt and potentially two others as
witnesses at today's hearing.  And of course, that's fine with
the government.  I just wanted to flag that for the rule on
witnesses purposes.  If that was still the case, that we might
need to have Ms. Reffitt or if anyone else is listening who is
going to be a substantive witness, not a third-party custodian
witness, not being able to hear this part of the proceeding.

               THE COURT:  Sure.  Mr. Welch?

               MR. WELCH:  Yes, agreed, Your Honor.  And so what I
would just say directly to Mrs. Reffitt right now is to please
make sure that Cayden Mitchell and Peyton Reffitt cannot hear
anything that we are talking about until it is time that they
are called as a witness, and then they may not hear each other's
testimony of what they say.  That way, nobody's testimony is
influenced from what they hear from somebody else.  Okay?

               THE COURT:  Ms. Reffitt, if you could unmute and
confirm that.

               MS. JODI REFFITT:  Yes, Your Honor.  I'm in a separate
room contained from anyone else that is in the household at this
moment.  So what I say to you now no one else is hearing, and
they also agreed, including the minor, that she understands what
is happening, because as a minor she has already been brought

1    before a federal grand jury and she held herself well.  So yes,

2    we are in agreement that everything will be kept on mute unless

3    you ask us to turn it off.

4            THE COURT:  Okay.  Great.  It sounds like you have the

5    main directions.  Just everyone has to be sealed off so they

6    don't hear what is going on.  So the other two witnesses will

7    stay out of the room and won't hear what is going on.  So I will

8    ask them before they testify to confirm that they have not heard

9    anything.

10        Thank you for taking those precautions.  You can go back on

11   mute, Mrs. Reffitt.

12           MS. JODI REFFITT:  Thank you, Your Honor.

13           THE COURT:  Mr. Nestler, thank you so much for

14   flagging that.  You can go ahead and proceed.

15           MR. NESTLER:  No problem.  One more clarification.

16   Mr. Welch indicated that Ms. Reffitt, Ms. Jodi Reffitt, may also

17   be a substantive witness.  I didn't know if that was still the

18   case or that is no longer the case.

19           MR. WELCH:  I think for the sake of actually

20   administering this, I will forego calling her as a substantive

21   witness.  We will keep her as third-party custodian.  We will

22   rely on the two eye witnesses.

23           MR. NESTLER:  Thank you, Your Honor.  The government

24   is satisfied.  And thank you, Mr. Welch.  I know we talked

25   earlier about logistics.  This is very helpful that we are

1    working very well together on these logistical points.

2        Your Honor, on behalf of the United States, we are seeking

3    Mr. Reffitt's continued detention in this case.  We did file a

4    memorandum on Saturday laying out our position and some of the

5    facts in order to support that position, but let me briefly

6    summarize, Your Honor.

7        Mr. Reffitt is a member of and in some sense is a leader of

8    a Texas malitia organization known as a Three Percenters

9    organization.  He conducts intel and vetting for the Three

10   Percenters organization in Texas.  He made plans with other

11   individuals who are a part of this organization, TTP, or Texas

12   Three Percenters, to travel across the country from the Dallas

13   area and drove eastward to D.C. in advance of January 6th.  He

14   got to January 6th with another individual.

15       In the car on the way from Texas to D.C., Mr. Reffitt

16   talked about his desire to take people who were sitting in

17   Congress at the Capitol building out of the building by their

18   ankles.  Mr. Reffitt had with him two firearms, at least two

19   firearms, an AR-15 firearm and a handgun.

20       While in D.C. on January 6th, Mr. Reffitt went to the

21   Capitol, and he is captured in photographs at the Capitol, and

22   we also have location data from his phone from an application

23   called Life360 showing him at the Capitol.

24       At around 1:50 or so in the afternoon, Mr. Reffitt arrived

25   at the west side of the Capitol.  Based on the evidence that the

government has right now, he charged up the Capitol steps
towards Capitol police officers who were protecting or trying to
protect the Capitol from people trying to break in and in fact
disrupt Congress and disrupt Congress from committing what it
was doing lawfully, which was certifying the congressional --
certifying the vote from the Electoral College.

Mr. Reffitt charged up the steps and appears to have been
hit with bear spray or mace several times and also with several
rounds of rubber bullets from the antiriot police, from the
Capitol police.  There's several photographs that the government
included in its pleading showing Mr. Reffitt washing his eyes
out after apparently being hit with spray, that bear spray or
mace on the Capitol steps.

The government's information at this time, Your Honor, is
that Mr. Reffitt was armed with his firearm at the time he
charged up the Capitol steps.  He did not brandish his firearm.
We are not alleging he did or use his firearm in any way, but he
did have it with him at the time he was unlawfully on the
Capitol grounds.

Mr. Reffitt left the Capitol after about 45 minutes or so
and went back to his hotel and then drove back across the
country.

At this point Mr. Reffitt's actions are far different from
many of the other individuals who were present at the Capitol
that day, and as Your Honor is probably aware, the government is

1    not seeking detention for the vast majority of the individuals

2    who were at the Capitol on January 6th.  Mr. Reffitt is

3    different.

4        So in advance of his plans to storm the Capitol in D.C. or

5    his actual doing so, he had talked about his plans of what he

6    wanted to do to the government, so much so that a member of his

7    family became alarmed at his actions and had gotten in contact

8    with the FBI back in December of 2020 because that individual

9    was alarmed at Mr. Reffitt's plans and what he was planning to

10   do as a part of his organization of Texas Three Percenters.

11       Mr. Reffitt came back and was bragging about what he did.

12   And we provided Mr. Welch over the weekend, after we were able

13   to access from Mr. Reffitt's phone and some of his devices, some

14   of his Telegram chats and some of his chats on encrypted

15   applications talking with other members of this group about what

16   he had done and what he wanted to continue to do, how he stormed

17   the Capitol, how he was armed, how he was sprayed with bear

18   spray or mace, how he was hit with rubber bullets, and how he

19   accomplished in some sense what he wanted, which is that he

20   helped the other rioters actually break into the building and

21   actually disrupt Congress from doing its duty and certifying the

22   electoral vote.

23       And he said these things from the night he arrived back on

24   January 8th and for the next couple of days through that

25   weekend.  And in fact, the government provided transcripts of

this.  Several of his conversations with his family were
covertly recorded, and we can hear, and we quoted some of those
in our pleading, Your Honor, Mr. Reffitt talking about his
actions and what he also had planned to do in the future.  He
talked about how what had happened before was the preface, was
the preface of the book, was the beginning, and now he had more
plans.  And now that Congress and the Capitol seemed to be more
secure in light of his actions and his compatriots' actions, he
was going to focus on other targets, notably the mainstream
media and Facebook.

So on the weekend of January 9th after he got back to Texas
and was with his family and had unloaded his firearms back into
his house and he had his clothes that were covered with the bear
spray and his body was still riddled with the bruises from the
rubber bullets that he had been hit with, he said to his
family, "I don't care if you turn me in."  His wife was there;
Ms. Jodi Nicole Reffitt was there.  "I don't care if you turn me
in.  Do whatever you want to do."

But later that weekend, as we see from some of the
encrypted communications on Mr. Reffitt's phone, the leader of
his organization was arrested, and that appears to have made
Mr. Reffitt very concerned, because you see at that point
Mr. Reffitt telling other members of his organization on these
encrypted apps "deleted everything, delete it now."  And we do
see indication that Mr. Reffitt appeared to have been deleting

materials and telling other people to delete materials and these communications.

At this point Mr. Reffitt was also talking with his children about how these three-letter organizations were watching him, presumably the FBI or CIA, were watching him and he was nervous.  And of course, as we all know from watching the news that weekend of January 9 and 10, all over the news there were indications of people being arrested all over the country for participating in the riot on January 6th.  That appears to have made Mr. Reffitt quite concerned for his own safety.

And on January 11th when his wife, Ms. Jodi Nicole Reffitt, was at work, Mr. Reffitt told his children, his 18-year-old son, his 16-year-old daughter, and there's another young man who was present at the time, that Mr. Reffitt did not want them to turn him in, and he made it very clear to them that if they did turn him in or cooperate with law enforcement they would be traitors and traitors get shot.

And we have quoted Mr. Reffitt's statements and some of what his children and wife have said about those statements. But at least at the time they were made, those statements were taken literally in the sense that at least his son and in some sense his daughter were intimidated.

His son was scared for his life, as he reported to the FBI. His son has since moved out of the house and is now in a location that is undisclosed because he was scared that

1    Mr. Reffitt might act on his actions.

2         Mr. Reffitt's daughter indicated that she loves her dad and

3    didn't think he would do anything bad to her but she was

4    intimidated and she did think that her dad was trying to

5    intimidate her and her brother and convince them to not

6    cooperate with law enforcement and not turn him in.  At the same

7    time she had been playing on her phone, she indicated, and

8    Mr. Reffitt said to her, "If you're recording this or putting

9    this out there, I will put a bullet through that phone."

10        These are not idle threats and are not idle words, Your

11   Honor, especially in light of Mr. Guy Reffitt's indication that

12   he thought he was being watched, he knew people were being

13   arrested, he knew that the leader of his organization had been

14   arrested, and also the fact that he had five firearms in his

15   house at the time he uttered these statements, including the two

16   firearms he had with him in D.C. and including that one that we

17   believe he had on him when he did actually storm the Capitol.

18        After that, Your Honor, Mr. Reffitt indicated he still was

19   not done.  After he returned back from D.C., Your Honor, part of

20   his plans for why he wasn't done was that he had actually went

21   out and bought a riot shield on eBay, and he told others that

22   they should buy these materials and bear spray or mace or riot

23   shields to protect themselves in order to be ready for the next

24   incursion that they were potentially planning for.

25        And just to clarify, Your Honor, I think I might have

1    indicated that the leader of his organization had been arrested.

2    I believe he was not arrested at that time.  He was questioned

3    by law enforcement that weekend of January 9th and 10th.

4        This information, Your Honor, makes Guy Reffitt a danger to

5    the community and to his family and also makes Guy Reffitt a

6    risk of obstructing justice.  Not only did Guy Reffitt try to

7    obstruct Congress from performing its lawful duty and did in

8    fact succeed that way, but he tried to obstruct law enforcement

9    and the grand jury from gathering the evidence necessary in

10   order to do its duty by threatening his children, by

11   intimidating his children, and by encouraging others to delete

12   their messages and by trying to delete his own messages.

13       For those reasons, Your Honor, the government believes that

14   there is no condition that would assure the safety of the

15   community or that Mr. Reffitt would not continue to try to

16   obstruct justice.

17           THE COURT:  Thank you, Mr. Nestler.  That was very

18   thorough.  I really appreciate it.

19       Mr. Sidbury, I will hear from you before I hear from

20   Mr. Welch.

21           PRETRIAL SERVICES OFFICER:  Your Honor, based on the

22   information that was provided to Pretrial, we were recommending

23   that the defendant be supervised initially -- excuse me,

24   supervised by courtesy supervision.

25       However, based off of the information that was provided to

1    the Court, at this particular point, we don't know that there

2    are any recommendations we can make that would assure the safety

3    of the community.

4          THE COURT:  Okay.  Thank you, Mr. Sidbury.

5      Mr. Welch, go ahead.  Let me know how you want to proceed.

6    Mr. Welch, you're on mute.

7          MR. WELCH:  I'm sorry.  That fouls everything up when

8    I do that.

9      I think it would be appropriate to begin with testimony

10   from Ms. Peyton Reffitt, and then I would ask once the testimony

11   part is completed and we are just getting into arguments, if the

12   witnesses want to listen that they be allowed to do so, but I

13   think if I do it that way, then, because they've contacted me

14   and they've taken an interest and would like to hear things, I

15   would like to do it that way.

16     So at this time I would ask Mrs. Reffitt if she could

17   please put Peyton Reffitt on the line.

18         MS. JODI REFFITT:  I am now unmuted, Mister -- Your

19   Honor and Mr. Welch.  I will go get Peyton out of the other

20   room.  Is it appropriate if I stay in the room with her because

21   she is 16, or would y'all prefer to speak with her alone?  She

22   is her own person.

23         MR. WELCH:  I am not calling you as a fact witness.

24   So if you would like to remain, that is fine.  Just make sure

25   that Cayden cannot hear anything.

1      MS. JODI REFFITT:  Oh, no, of course.  We, according

2  to what y'all have asked, have separated ourselves in different

3  parts of the house.

4      MR. WELCH:  Okay.  Why don't you get Peyton on the

5  line, please.

6      MS. JODI REFFITT:  Yes.  If y'all could just give me

7  one hot second, I will go get her.  Okay?

8      THE COURT:  Not a problem.  Take your time.

9      MS. JODI REFFITT:  Thank you.

10      MR. NESTLER:  Your Honor, if it's technically

11  possible, the government would prefer that she testify via video

12  rather than just audio.

13      THE COURT:  Very well.

14      MS. JODI REFFITT:  Do you want me to turn the video

15  back on?

16      THE COURT:  Not until you come back with the witness.

17      MS. JODI REFFITT:  Okay.  I was just clarifying, sir.

18      THE COURT:  No problem.  Thank you.  Good question.

19      (Pause.)

20      MS. JODI REFFITT:  She's nervous, and she has to pee.

21  So give us one second.

22      THE COURT:  No problem.  I understand.

23      MS. JODI REFFITT:  And she's breathing.  So that works

24  too; right?

25      I'm going to be on the line for one second while I get the

video started.  Your Honor, I'm just going to make sure that we are together.  So this is my daughter, Peyton Reffitt.  She is 16 years old.  And I am now going to leave the room so she can speak.

THE COURT:  You don't need to leave the room, you're fine, because you won't be testifying.

MS. JODI REFFITT:  Okay.  So do you want me to leave?

MS. PEYTON REFFITT:  No, you can stay.

MS. JODI REFFITT:  Would it make you comfortable if I left?

MS. PEYTON REFFITT:  No, you can leave.

MS. JODI REFFITT:  I can leave?

MS. PEYTON REFFITT:  Yes, you can leave.

MS. JODI REFFITT:  I have an unconditional issue of making my children nervous.  I think all parents feel that way.  So I will step out, but if she needs me, do y'all mind her pausing to come back and get me?

MS. PEYTON REFFITT:  I will be okay.

MS. JODI REFFITT:  She's my baby.

THE COURT:  I've got two kids.  I understand.

MS. JODI REFFITT:  Okay.  So I am now leaving the room, and Peyton is going to speak on her own accord.

MS. PEYTON REFFITT:  Hi.

THE COURT:  Hi.

MR. WELCH:  I believe that perhaps the courtroom

1    deputy or Your Honor should put Ms. Peyton Reffitt under oath.

2              THE COURT:  I just want to make sure, Peyton.  I'm

3    worried that moving the phone we've lost you again.  It's

4    frozen.

5              MS. PEYTON REFFITT:  Do you want me to set it down?

6              THE COURT:  It seems like wherever it was it was

7    working well.  So let's try it there.

8              MS. PEYTON REFFITT:  It's just so awkward, but --

9    okay.  Is that fine?

10             THE COURT:  That's great.  That seems like that's a

11   good spot to be in.  Can you hear me okay?  This is Judge

12   Faruqui.

13             MS. PEYTON REFFITT:  Hi, Judge Faruqui.  I'm Peyton.

14             THE COURT:  So what we're going to do, my courtroom

15   deputy, Ms. Lavigne-Rhodes, is going to swear you in.  That

16   means you will raise your right hand and promise that you are

17   going to testify truthfully.

18       If you have any questions -- not yet.  Just wait.  I love

19   it.  You're on point.  If you have any questions or you are

20   concerned about anything, here's the things we can do.  First, I

21   can put you in a breakout room with Mr. Welch, and he can talk

22   to you.  If you need to just talk to me, we can go into a room.

23   We can also go into a room with any combination of people you

24   see here on the screen.  If you would like to take a break,

25   that's not a problem either.

1    Obviously, you seem like a very intelligent person.  You

2    know that there's nothing to be nervous about, but that being

3    said, I find any time I'm on a Zoom camera I'm nervous because

4    I'm always afraid I'm going to forget to unmute myself or mute

5    myself or I might think out loud, which sometimes is not good.

6         MS. PEYTON REFFITT:  Yeah.

7         THE COURT:  So if you've got any concerns, just let me

8    know.  Okay?  I'm here to help you.

9         MS. PEYTON REFFITT:  Okay.  Thank you, Your Honor.

10        THE COURT:  Okay.  Go ahead, Ms. Lavigne-Rhodes.

11      PEYTON REFFITT, WITNESS FOR THE DEFENDANT, SWORN

12        THE COURT:  Go ahead, Mr. Welch.

13                     DIRECT EXAMINATION

14        BY MR. WELCH:

15   Q.   Peyton, I am Bill Welch, and I am going to ask you some

16   questions.  If you don't hear me or if you need me to repeat

17   something, just let me know.  Okay?

18   A.   Yes, sir.

19   Q.   And when I am done asking some questions, one of the other

20   lawyers and possibly Judge Faruqui might ask you some questions

21   as well.

22        Do you understand?

23   A.   Yes, I understand.

24   Q.   I'm going to ask you some questions about an argument that

25   happened in your house --

1    A.    Uh-huh.

2    Q.    -- between your dad, Guy Reffitt, and your brother, Jackson

3    Reffitt.  Do you remember that?

4    A.    Yes.  And I was also a part of the argument on Jackson's

5    side, but I had a very different point of view of the argument.

6    Q.    I understand.

7    A.    The quotes are exact, that's correct.

8    Q.    Okay.  So understanding that whatever your dad said he

9    said, how did you take that at the time?  Did you believe that

10   he was going to shoot your phone?

11   A.    Absolutely not.  So I mean, he paid for that phone.  That's

12   basically not my phone.  That's not something he has ever done.

13   He does things out of line, and he says things that go too far,

14   but I know his true heart.

15   Q.    Did you have any concern then or at any time since then

16   that your dad would hurt you?

17   A.    Absolutely not.

18   Q.    Did you have any concern since then or at any time since

19   then that he would try to prevent you from speaking to anybody?

20           MR. NESTLER:  Judge, I'm sorry.  I know this is very

21   awkward on Zoom, but would it be possible to ask Mr. Welch to

22   lead a little bit less?  I understand we are on Zoom and

23   Ms. Reffitt is young.

24           THE COURT:  Okay.  Mr. Welch, I understand you are

25   trying to keep this moving and also be thoughtful, but I get

1    where Mr. Nestler is going.  So thank you, Mr. Welch.

2              BY MR. WELCH:

3    Q.   What, if any, fears did you have about your dad on the day

4    when he said he would shoot the phone and that traitors get

5    shot?

6    A.   I told my mom about it only because he said words that

7    crossed the line, but I knew that there were no -- there was

8    zero intention behind those words.

9    Q.   How did you feel about what your dad had said?

10   A.   I wasn't in fear.  It was just, I guess, annoying in a way.

11   I mean, he says things that cross the line all the time, but I

12   didn't feel threatened at all.

13   Q.   Has what your dad said either then or at any time since

14   then prevented you from talking to anyone?

15   A.   No, because I never -- what's the word?  I never, like, had

16   a concern to consult another person about my father because I

17   never -- I have never thought of him as a violent person.

18   Q.   And so would it be fair to say that in the past your dad

19   has not used violence or threats of violence against you?

20   A.   Well, I mean, in a fatherly figure way, like discipline.

21   He is very open to my political views.  He supports my own --

22   like, my own views.  He doesn't try to convince me of anything,

23   and I never made judgment about him about his political views

24   because I know who he is.  So I don't feel like it's -- can you

25   repeat the question?

```
1    Q.   Sure.  Now if I can remember it.  I got stuck by the fact

2    that I couldn't hear you for a moment.

3    A.   I'm sorry.

4         THE COURT:  If we could get the court reporter to

5    repeat the question.

6         (Record read by court reporter as requested.)

7         THE WITNESS:  Yes, he has never used threats or

8    violence against me ever.

9         BY MR. WELCH:

10   Q.   If the Court were to release your father and he were to

11   come home to live with you, what, if any, concerns do you have

12   about anything?

13   A.   I have absolutely no concerns.  I feel less safe home when

14   he's not here and gone, and that's the God honest truth.

15        MR. WELCH:  At this time I pass the witness, Your

16   Honor.

17        THE COURT:  Mr. Nestler, any questions?

18        MR. NESTLER:  Yes, Your Honor, just briefly.

19                       CROSS-EXAMINATION

20        BY MR. NESTLER:

21   Q.   Good afternoon, Ms. Reffitt.

22   A.   Good afternoon.

23   Q.   Can you hear me okay?

24   A.   Yeah, I can hear everyone perfectly.

25   Q.   Great.  And so when you started off talking, you said that
```

1    the quotes were exact.  What do you mean by that?

2    A.   I mean word for word they were exact.  But the voices were

3    not raised.  Jackson walked out of -- I think he left the house

4    after, or he left the room, and he didn't show any signs of him

5    feeling threatened or, you know, scared for his life.  He never

6    talked to me about that either.  I'm very blindsided by all of

7    this and my brother.

8    Q.   So your dad did say that if you or Jackson were to turn him

9    in or cooperate with law enforcement you would be traitors and

10   traitors get shot; is that right?

11   A.   That is exactly what he said.

12   Q.   And he also --

13   A.   He is dramatic.  He's a drama queen.  He is very

14   egotistical.  He is just an alpha male.

15              THE COURT:  Peyton, I know it's hard.  But first of

16   all, I will tell you you would do a great job as a lawyer

17   because you know how to scope any questions --

18              THE WITNESS:  I've read so many documents at this

19   point --

20              THE COURT:  You're doing great.  Just let Mr. Nestler

21   ask the questions.  Try to stay to answering the questions that

22   he is asking.  I know it's hard because it's somebody you care

23   about.  But trust me, Mr. Welch, if there is something that

24   needs to be explained, that he will follow up that.  Okay?

25              THE WITNESS:  Yes, Your Honor.

1          THE COURT:  You're doing great.

2     Go ahead, Mr. Nestler.

3          BY MR. NESTLER:

4   Q.   And when you were on your phone during this conversation in

5   your house, your dad did say to you if you were recording him or

6   putting this out there that he would put a bullet through your

7   phone; is that correct?

8   A.   Yes, sir, that is correct.

9   Q.   And you knew that your dad had guns in the house; is that

10  right?

11  A.   Yes, but -- yes, I did know that, but it did not at any

12  point concern me that he would do that.

13  Q.   And did you believe that Jackson at the time interpreted

14  what your dad had said as a threat?

15  A.   That's not for me to say.  That's my brother.  And his

16  point of view is a lot different than mine because he isn't home

17  as much, and he doesn't understand my father as much as I do,

18  because the relationship is different.

19  Q.   Got it.  And I know that you and I had previously spoken

20  about six weeks or so ago; is that right?

21  A.   Yes.

22  Q.   Also on this awkward video experience?

23  A.   Yes.

24  Q.   So when you -- and you testified in the grand jury on that

25  day; is that correct?

1    A.    Yes, sir.

2    Q.    And so do you remember in the grand jury the AUSA had asked

3    you -- and this is on page 10 just for the record, and I can get

4    Your Honor and Mr. Welch a copy.  This is all, of course,

5    awkward doing this via Zoom.

6         You were asked by the prosecutor there, "Based on Jackson's

7    response, do you believe Jackson interpreted that to be a threat

8    when he said 'are you threatening us?'"  And you responded, "I

9    don't think he felt threatened, but he definitely interpreted

10   that as a stated threat."

11        Does that sound about what you said back when you were in

12   the grand jury in January?

13   A.    Can you repeat that?

14   Q.    Sure.  So when you were in the grand jury in January, did

15   you say, "I don't think he felt threatened, but he definitely

16   interpreted that as a stated threat"?

17   A.    Yes, absolutely.  And my father also said the quote that's

18   in the affidavit and everything, "Don't (distorted audio),"

19   right after my brother asked, "Is this a threat?"

20   Q.    Sure.  And did you think that --

21             THE COURT:  Mr. Nestler, it cut out for a second.

22   Sorry.

23        Can you say again, Peyton, what did he say after that?  It

24   cut out, the audio.

25             THE WITNESS:  After my brother asked, "Is that a

1    threat?" my father replied with, "Don't put words in my mouth."

2         THE COURT:  Thank you.

3       Go ahead, Mr. Nestler.

4         BY MR. NESTLER:

5    Q.   And when your dad was saying these things to you and

6    Jackson that day in your house, did you think that your dad was

7    trying to intimidate you and/or your brother Jackson?

8    A.   Umm, I would say yes, the intent of the threat was to

9    intimidate, not to pursue, I guess.

10   Q.   Understood.  And is it fair to say, Ms. Reffitt, that your

11   relationship with your dad is different than your brother's

12   relationship with your dad?

13   A.   Yes.  But their relationship has changed over the years.

14   My father just doesn't let down his guard as much in front of

15   his son.

16   Q.   The relationship -- and so their relationship, meaning your

17   dad's and your brother's, it's a little bit more strained than

18   yours is with your dad; is that right?

19   A.   Yes.  The straining did come from political tension, and

20   that is a fact.

21   Q.   Understood.  And when Mr. Welch was asking you questions,

22   you said that your dad's statements didn't really have any

23   effect on you; is that right?

24   A.   Well, they did -- I did tell my mother about the threats,

25   only because I felt that those words are crossing the line.

Q.   And you wanted your mom to know what your dad had done that crossed the line?

A.   Yeah, and my mom -- if I tell my mom something that my father has said that crosses the line, she talks to him about it, and he cares that I feel uncomfortable by the words he says. Sometimes he does go too far, but not in a violent way.  Those are his words.

Q.   And after your dad made these comments to you and to Jackson, did you reach out to the FBI or the police to talk about what your dad had done on January 6th?

A.   No, absolutely not, because -- well, it wasn't my thing.  I tried to distance myself from that just because I didn't support it, you know.  It angered me.  Me and my father have very different political views.  So obviously, I was not in support of him going.  And when he came back, I obviously had arguments, small arguments with him about it, like debating --

Q.   It's okay.  Do you need a second?

A.   Yeah, I just have to breathe for a second.

Q.   That's okay.  He did tell you that he had gone to D.C. on January 6th; is that right?

A.   Yes, sir.

Q.   And in fact, when he got back from D.C., he talked with you about how he had been in D.C. and actually at the Capitol; right?

A.   Yes, and he showed us his rubber bullet bruises, and he did

```
1    brag about it, but that's just him being a drama queen.

2              MR. NESTLER:  Thank you.  No further questions.  Thank

3    you.

4              THE COURT:  Mr. Welch, any redirect?

5              MR. WELCH:  Just a couple based on questions from

6    Mr. Nestler.

7              THE COURT:  Sure.

8                         REDIRECT EXAMINATION

9              BY MR. WELCH:

10   Q.   Ms. Reffitt, Mr. Nestler had asked you about what you

11   thought about whether your brother Jackson had taken the threats

12   seriously.  And let me ask you, what, if any, concerns do you

13   have, not only for yourself but for anyone else in your family

14   or anyone in the community at all, that your father would do

15   anything, take action based on his words?

16   A.   Absolutely not.  Especially after he gets out, he is

17   grounded or something.  I don't know.  He is definitely -- he is

18   not a violent person.  He just says things.  He talks a lot, and

19   he -- sorry.  I lost my train of thought.  Can you ask that

20   again?

21   Q.   Sure.  I was just asking, what, if any, concerns do you

22   have, not only for your own safety but your brother's, anyone

23   else in the house, or anyone in the community at all, that your

24   dad would take action and hurt anyone based on his words?

25   A.   Absolutely not; absolutely not.
```

1      MR. WELCH:  Your Honor, I don't have anymore

2  questions.  I don't know if perhaps the Court has any questions

3  or the government has any questions of this witness.  I would

4  propose to call the next one if nobody does.

5      THE COURT:  I don't think there's any need for any

6  further questions.

7      Peyton, I just want to tell you how appreciative I am for

8  you coming here and being so thoughtful.  I imagine it's -- no

9  matter what, it's stressful.  It's stressful to be in court,

10  even in this way that you're here.  But I just want you to

11  remember, you should be proud of yourself.  I can tell seeing

12  your dad that he is incredibly proud of you, and I will be sure

13  to tell your mom that she should be as well.  I have a daughter,

14  and I hope that she could do half the job that you did today of

15  being honest and truthful and kind.  And honesty is so

16  important.  You didn't try to change it or, it sounds like,

17  sugar coat any of the facts.  You are just truthful.

18      So I know both of your parents are extremely proud of you,

19  but I also want you to be proud of yourself and remember this

20  moment, that when you have challenges in the future, no matter

21  what they are, you are a strong, smart, thoughtful, and kind

22  person, and no one can take that away from you.  So great job

23  today.

24      THE WITNESS:  Thank you, Your Honor.  That really

25  means so much.

1          THE COURT:  Yeah, it's my pleasure.  I'm so impressed

2     by you.

3          THE WITNESS:  Thank you.

4          THE COURT:  If you can please get your mom, and then

5     we will get our next witness.  Okay?

6          THE WITNESS:  Okay.  What do I do?

7          THE COURT:  Just leave the phone where it is, and go

8     ahead and get your mom back, and then we will go from there.

9          THE WITNESS:  Okay.  Thank you, everybody.

10         (Pause.)

11         MR. WELCH:  You're on mute, Mrs. Reffitt.  Could you

12    unmute yourself?

13         MS. JODI REFFITT:  Hi.  I'm back.  I'm back.  I truly

14    appreciate if there was a pause, because we're at other ends of

15    the house.

16         THE COURT:  What we are going to ask, Mrs. Reffitt,

17    now that we will take -- you take your time to go get our next

18    witness.  But I want to make sure you know your daughter did a

19    great job.  She was extremely thoughtful, and she was very

20    responsive.  She is obviously very intelligent, so -- and she

21    said that came all from her mom.

22         MS. JODI REFFITT:  Liar.  Not really, but --

23         THE COURT:  She did a great job.  You should be very

24    proud of her.  So take your time.  Why don't we do this.  We

25    will just take a five-minute recess so you can go make sure your

1    daughter's all right, and then we will go get our next witness.

2    Okay?

3              MS. JODI REFFITT:  Okay.  So I will put you on mute --

4              THE COURT:  Leave it exactly where it is.  Don't touch

5    it, because it seems to work best where it was.  So you can just

6    click mute and get the other witness.  And we will start back up

7    in about four or five minutes.

8              MS. JODI REFFITT:  Okay.  Thank you, Your Honor.

9              THE COURT:  Thank you.

10        All right.  Everyone else, you can go on mute.

11        Mr. Welch, would you like to go for five minutes into a

12   breakout room with Mr. Reffitt?  Is that helpful?

13             MR. WELCH:  Please.

14             THE COURT:  Ms. Lavigne-Rhodes, if you could do that,

15   please.

16             THE COURTROOM DEPUTY:  Yes, Your Honor.

17             THE COURT:  Thank you.

18        (Recess taken from 4:34 p.m. to 4:50 p.m.)

19             THE COURTROOM DEPUTY:  Recalling Criminal Case 21-32,

20   the United States of America versus Guy Wesley Reffitt.

21             MR. WELCH:  At this time, Your Honor, Mr. Reffitt

22   would like to call Mr. Cayden Mitchell as a witness.

23        And Cayden, you're muted.

24             MR. MITCHELL:  Hi, Your Honor.

25             THE COURT:  Hi.  Can you introduce yourself, please?

1  We're having a little trouble hearing you.  Can you introduce

2  yourself?

3          MR. MITCHELL:  Yeah, I'm Cayden Mitchell.  Can you --

4          THE COURT:  You're a little choppy.

5          MR. MITCHELL:  All right.  Is this better right here?

6          THE COURT:  Yeah, stay where you are and don't move.

7          MR. MITCHELL:  Okay.

8          THE COURT:  So my courtroom deputy,

9  Ms. Lavigne-Rhodes, will go ahead and swear you in.  Before

10 that, I just want to tell you a little bit about the process.

11     So I am Judge Faruqui.  If you have any questions, you can

12 always talk to me.  If you need to speak to Mr. Welch, we can

13 always put either of you in a breakout room.  I can get into one

14 with you as well.  The main thing is just if you have anything

15 you feel uncomfortable about, just let me know, and I will make

16 sure we find a way to just keep things moving forward but making

17 sure we're not doing anything ever that puts you in an awkward

18 position.

19          MR. MITCHELL:  Sure.

20          THE COURT:  The thing is that you will be under oath.

21 So of course, you need to be truthful.  But I just don't want

22 you to feel like you're under any pressure.  So if you're having

23 some issues, you've just got to let me know, and I am here to

24 help you.  Okay?

25          MR. MITCHELL:  Yeah, sure.  Thank you.

```
 1            THE COURT:  Great.

 2        Ms. Lavigne-Rhodes, could you go ahead and swear in the

 3   witness.

 4            CAYDEN MITCHELL, WITNESS FOR THE DEFENDANT, SWORN

 5            THE COURT:  Go ahead, Mr. Welch.

 6            MR. WELCH:  Thank you, Your Honor.

 7                        DIRECT EXAMINATION

 8        BY MR. WELCH:

 9   Q.    Mr. Mitchell, my name is Bill Welch.  I know we haven't

10   seen each other before, but we did speak on the phone

11   previously, and I am going to ask you some questions.

12   A.    Of course.

13   Q.    Do you know Guy Reffitt?

14   A.    Yeah.

15   Q.    How is it that you know him?

16   A.    Well, I recently moved to Wylie where they stay, obviously,

17   and my -- I just started staying here because my girlfriend, she

18   lives here, Peyton, and I've just been staying here.  I'm in and

19   out most of the time.  I moved to my apartment that's like five

20   minutes away.  But I'm here most of the time during school and

21   stuff.  But yeah.

22   Q.    Okay.  I'm going to direct your attention back to, I think

23   it was, either the 12th or 13th of January and ask you whether

24   you were present when Guy Reffitt and his son Jackson were

25   having an argument.
```

1    A.    Yes.  I was sitting at the kitchen table.

2    Q.    Okay.  And who else was there?

3    A.    It was me, Peyton, Guy, and Jackson.  That's it.

4    Q.    Okay.  You indicated that you were sitting at the kitchen

5    table.  Where were the other people?

6    A.    Jackson was standing to the left of me.  He was standing

7    the whole time talking.  Guy was about 6 feet away from me to

8    the right.  And then Peyton was sitting right next to me.  And

9    that's where our conversation happened.

10   Q.    At some point did it become an argument?

11   A.    Yeah, a little bit of an argument, but I never felt

12   threatened or intimidated.  It was just a normal family

13   argument, I felt like.

14   Q.    And at some point were there words to the effect that Guy

15   was going to shoot Peyton's phone?

16   A.    He said that, but it was clear there was no intention that

17   he would do that.

18   Q.    Were there words to the effect that Guy would -- that

19   traitors get shot?

20   A.    Yeah.

21   Q.    Okay.  And --

22   A.    Wait.  Can you rephrase that question?  I didn't understand

23   it.

24   Q.    Absolutely.  And please, if you don't hear me, let me know.

25   A.    Okay.

1    Q.   Were there words to the effect that traitors get shot?

2    A.   Yes, he did say that.

3    Q.   All right.  And when you heard that, how did you take it?

4    A.   Oh, I just feel like he was just saying that because he was

5    just saying that.  I mean, it wasn't really a thought process

6    because I knew he wouldn't shoot or kill anyone because he's

7    like the nicest guy in the world.  He's done so much for me.

8         But no, I didn't think he was going to shoot or kill

9    anyone.  Jackson went back to his room after the conversation

10   and played video games, and he giggled about it as he left.

11   Q.   Okay.  Now, as I understand it, at some point Jackson has

12   moved out of the house; is that right?

13   A.   Yes.

14   Q.   How long after this argument was it until Jackson moved

15   out?

16   A.   Well, the day the FBI came, that's the last time we saw

17   him, and then he left, because nobody knew that -- none of us in

18   the house knew that Jackson turned him in until two weeks later

19   on CNN in an interview.  So he was acting like he didn't know it

20   was happening, but he walked in, and that's the last time we saw

21   him.  He collected some of his belongings and left.

22   Q.   So approximately how long was it from the argument when

23   those words were said until he actually left?

24   A.   Wait.  Can you repeat that?  I didn't hear you.

25   Q.   Sure.  Approximately how long was it from when the argument

1   when these words were said until Jackson moved out?

2   A.   Oh, this was said probably -- I don't know exactly the

3   date.  It was -- well, he turned him in on Christmas Day.  He

4   said it in between then -- he said it like a week before the

5   whole FBI thing.

6   Q.   Okay.  So is it fair to say that Jackson continued living

7   in the house for a week after the words --

8   A.   Oh, yeah, yeah, yeah, after -- no, after we figured out he

9   turned him in to the FBI, he lived there for two weeks, and on

10  the day the FBI came, he left, and we haven't seen him since.

11  Q.   Okay.  What, if any, concerns do you have for your safety

12  from Guy Reffitt?

13  A.   None at all; none at all.  He -- I've never felt

14  threatened.  I never -- like the night that whole argument

15  happened about traitors get shot, I spent the night.  I felt

16  completely safe.  And Jackson spent the night also.  He went to

17  his room to play video games, and that was it.  It was just a

18  family argument, and then he just took it to a way extra level.

19  Q.   Have Guy's words prevented you from talking to anybody?

20  A.   No, not at all, no.

21  Q.   Have Guy's words prevented you from doing anything?

22  A.   No, not at all.

23  Q.   Have you changed anything about your life or that you do as

24  a result of hearing Guy's words?

25  A.   No.

```
 1    Q.   Have you observed Peyton change anything about her life or
 2    things that she does as a result of Guy's words?
 3    A.   No.  No one has ever felt threatened about that whole
 4    conversation or about Guy ever.
 5    Q.   So what, if any, concerns do you have for yourself, anyone
 6    else in that house, or anyone in the community --
 7    A.   None at all.
 8    Q.   -- from Guy Reffitt --
 9    A.   None at all.
10    Q.   -- as a result of his words?
11    A.   None.  Everyone loves him.  The neighbors love him.
12    Everyone loves him.  I have never met someone that has not liked
13    Guy except for Jackson.
14              MR. WELCH:  Okay.  I pass the witness, Your Honor.
15              THE COURT:  Thank you so much.
16         We will hear from the government.  Go ahead, Mr. Nestler.
17                        CROSS-EXAMINATION
18         BY MR. NESTLER:
19    Q.   Hi, Mr. Mitchell.  Can you hear me okay?
20    A.   Yeah.
21    Q.   Great.  So you said after you heard these words from Guy it
22    didn't affect you at all; correct?
23    A.   No, not at all.
24    Q.   And you don't think it affected Peyton at all?
25    A.   No.
```

```
1    Q.   But within a week, Jackson moved out of the house, and you
2    haven't seen him; correct?
3    A.   Yes.
4    Q.   And at the time this conversation was happening in
5    Mr. Reffitt's house, Mr. Reffitt was talking to Jackson and
6    Peyton; right?
7    A.   Yes.
8    Q.   And Mr. Reffitt said that if they turned him in they would
9    be traitors; is that correct?
10   A.   Yes.
11   Q.   And that traitors get shot?
12   A.   Traitors get shot, but not -- he said it to everybody in
13   the room.  He was focusing it to everyone in the room, not just
14   them two.  Do you understand?
15   Q.   And you just told your lawyer -- I'm sorry, Mr. Welch, when
16   he was asking you questions, that Jackson had turned Guy in on
17   Christmas; is that right?
18   A.   Yes.
19   Q.   And what's the basis for you thinking that?
20   A.   Because he didn't want any of us to know until the FBI
21   came.
22   Q.   But you believe that Jackson turned Guy in on Christmas
23   because you read about it; right?
24   A.   Read about what?
25   Q.   Jackson doing that.
```

```
 1   A.    Well, yeah, of course.

 2   Q.    Right.  In other words, Jackson never told you he turned

 3   Guy in on Christmas?

 4   A.    No, but we found out later.

 5   Q.    Right.  And so when this whole conversation was happening

 6   in the house, you didn't know that Jackson had already contacted

 7   the FBI; right?

 8   A.    No.

 9   Q.    And you're staying in Guy's house; right?

10   A.    Yes, sir.

11   Q.    And he gives you money?

12   A.    No.

13   Q.    Guy does not give you any money?

14   A.    No, he has never given me money in my life except for gas

15   sometimes whenever I need to drive Peyton to work.

16   Q.    Do you remember speaking with an FBI agent on January 25th

17   of this year?

18   A.    Agent Hightower?

19   Q.    Correct.

20   A.    Yes.

21   Q.    And did you tell Agent Hightower that Guy gives you money?

22   A.    Yes, for gas.  And he even offered to buy me a car, but I

23   said no.

24   Q.    Got it.  And you are dating Guy's daughter; is that

25   correct?
```

1    A.    Yes.

2    Q.    And you would like Guy to come back home and live with you

3    in the house; is that right?

4    A.    Yes.

5              MR. NESTLER:  Okay.  No further questions.

6              THE COURT:  Thanks, Mr. Nestler.

7         Mr. Welch, anything on your end?

8              MR. WELCH:  No, Your Honor.  Unless you have any

9    questions for Mr. Mitchell, I don't have anything else.

10             THE COURT:  Mr. Mitchell, the lesson here is be nice

11   to your daughter's boyfriend.  I will remember that going

12   forward for myself.

13        You did a great job.  Thank you for being so thoughtful.

14   It's clear you have a very good memory.  You're very smart, just

15   like Peyton.  So the two of you, I appreciate for both of you

16   how thoughtful and kind you have been in this process.  It's not

17   easy.  There are a lot of adults who couldn't and have not done,

18   frankly, half as good as you did.  So thanks for being so

19   cooperative.  I'm sure Mr. Reffitt appreciates it and

20   Mrs. Reffitt appreciates it.

21        If you can go back and get her and Peyton, because I know

22   they want to listen in.

23        So let's give them a minute to come back.  And then

24   Mr. Welch, I assume we will just go to argument from you next?

25             MR. WELCH:  Yes.

1          THE COURT:  Okay.  Great.  We will let them come back

2     in.

3          MR. NESTLER:  Your Honor, I have one housekeeping

4     matter.  Can the government please make a motion to have

5     permission under Rule 6(e) to provide grand jury material to the

6     defense?

7          THE COURT:  Absolutely, yeah.  That's granted.

8          MR. NESTLER:  Thank you, Your Honor.

9          THE COURT:  Mrs. Reffitt, so we're done with the

10    witnesses now.  So if you want to go back on mute, and your

11    family can come in if they would like, if they would like to

12    hear.  Again, if you can just go on mute.  You can turn off the

13    camera, too.  That's really up to you.

14         MS. JODI REFFITT:  We can leave it on, or if it makes

15    the connection bad, we can turn it off.

16         THE COURT:  The connection is sounding bad.  I believe

17    for the record she said that she could leave it on or for the

18    connection, if it was bad, turn it off.  So Ms. Reffitt, I think

19    you may want to turn it off again.  It was pretty hard to hear

20    you.  So you may want to turn it off.  But again, you can turn

21    it off and on.  You won't be speaking now until I come back to

22    you if I have questions about a third-party custodian.  But you

23    can stay on mute.  Okay?

24         MS. JODI REFFITT:  Yes, sir.

25         THE COURT:  Okay.  Great.  I will just let you know

1    that Mr. Mitchell did a great job as well.  He was extremely

2    thoughtful and diligent and very honest, it was very clear to

3    me.  So I appreciate what a great job they did.  So thank you.

4         Okay.  Mr. Welch, let's go back to you.

5              MR. WELCH:  Okay.  Your Honor, Mr. Reffitt has been

6    held in the government's custody since January 19th of this

7    year.  That's according to paper 5 in the record.  He might have

8    been arrested a day or so before that, but that's what I can

9    actually establish from the record.  So he has been in custody

10   now nearly two months.

11        As you know, I've proposed a third-party custodian to

12   Pretrial Services, that is, Mr. Reffitt's wife, Nicole.

13        I think the thing that is the most concerning in terms of

14   the risk of danger in this case would be the allegation in

15   Count 3 about threats of violence.  And the witnesses were to

16   put in context what that risk really is.  These are the very

17   folks who were present.  These are the folks that it was

18   directed at.  And they're telling you that you should not take

19   it the way the government asks you to take it.

20        Generally speaking, and I believe that Mr. Nestler already

21   told you this, that the government has not been seeking

22   detentions in cases arising out of the Capitol riot on

23   January 6th but that they're looking at this one differently.

24   And it's understandable why someone on the outside looking in

25   might do so and might want to do so in just an abundance of

1    caution.

2         But the testimony you have heard should make clear that no

3    force was ever used or even attempted, regardless of the claims

4    otherwise, and that these were words.

5         And granted, sometimes words can have disastrous

6    consequences.  We're not allowed to scream "fire" in a crowded

7    theater, even though that's just a word.  But sometimes words

8    are just words, and sometimes they're inappropriate.  There are

9    offenses that cross the line, but it still does not mean that

10   they are an actual threat.

11        It's important to know that the Reffitts own firearms, none

12   were ever brought out and used, and they don't -- the government

13   doesn't allege that they were.  And on top of that, when the

14   house was raided and Mr. Reffitt was arrested, the government

15   seized all the firearms.  So there aren't any firearms in the

16   house anymore.

17        As you heard, as you read, my client likes to talk.  He's

18   got a bit of an ego.  He brags.  He exaggerates.  His daughter

19   knows him as well as anybody, and that's how she characterizes

20   him.  So she did not take those words literally as a threat to

21   her or anyone else's safety.  It has not stopped her from doing

22   anything, has not prevented her from talking to anyone.

23        The government has also in its paper relied on comments in

24   the media.  And I know you will do this anyway, but I just want

25   to remind you to be extremely skeptical of things that are

posted on the Internet, because anybody can post any darn thing they want on the Internet.  But people do brag.  And even when people are speaking to the media, there are really no consequences for being untruthful to the media, to lying to the media, to even bragging to the media.  Yet, both Peyton and Cayden were under oath today when they told you what they told you.

It is important to note that Guy has been hospitalized.  He was in intensive care for three days during this detention because he was not given prescribed medication that he is supposed to have.  I have confirmed with him in my conferences with him since that he is receiving the medication that he feels he needs at D.C. Jail.  I don't believe that is an issue presently, currently.  I will let you know and make the appropriate motion if I thought it was.  I do want you to know that he was hospitalized and that that had an effect on his family, too, because they were unable to even find out where he was, whether he was okay until after he was released and he was able to speak to them.  That is having an effect on his family as well.

Not only do they still care; they love him.  But they're not willing to lie for him, and when I asked his wife, and she will confirm for you right now, that if he were released on conditions and she were his third-party custodian and he starts acting a fool and he is not following the rules, she is not

going to cover for him, because she understands what her

responsibility would be as a third-party custodian.

Given all of that, what I would like the Court to consider

is that there is no presumption of detention in this case.   In

addition, presently no formal evidence has been introduced,

although -- other than the witnesses that have been called

today.   According to case law in *Stack v. Boyle*, a Supreme Court

case, inferring the need for detention from the fact of an

indictment would be arbitrary.

So consider that the Court has appointed me because it has

found Mr. Reffitt to be indigent.   He doesn't have the resources

to flee.   He has a passport, but he would surrender it.   He has

worked as a rig manager, as a consultant in the petroleum

industry, but unfortunately, as a result of COVID restrictions

over the last year on international travel in particular, it's

effectively shut his business down.   He has continued trying to

earn a living by doing home improvement work for people.   He

does require medication for anxiety, high blood pressure, high

cholesterol, and according to the Centers for Disease Control,

high blood pressure is a high risk factor for serious disease if

someone were to contract the coronavirus.

Your Honor, I submit that a combination of conditions would

not only guarantee Guy's appearance before the Court and also

the safety of any witnesses, of anyone else in Guy's house, the

larger community, and indeed Guy himself.   Specifically, have

1    him in the custody of a third-party custodian.  Require him to

2    seek employment or actively maintain employment.  You could

3    require him to stay home, to put him on electronic monitoring,

4    and you would know exactly where he was.  According to the

5    government, they relied on an app. called Life360, which is

6    essentially the same thing.  It tracks you wherever your phone

7    goes.  You could require him to report to Pretrial Services.

8    You could restrict his travel.  You could place him on a curfew.

9    You could order him not to get another firearm, not to possess a

10   firearm.  You could order him not to drink, not use drugs, take

11   his medication as prescribed.  You could order him to have

12   psychological/psychiatric evaluations and drug screening in

13   order to confirm that he is not using any drugs or medication

14   that's not prescribed.  And then if a health professional were

15   to recommend treatment, you could order him to comply.

16       He certainly understands at this point what happens, where

17   he would be, what the consequences are for violating an order.

18   He would satisfy any other condition that you would order.

19       The government said that these were not idle threats.

20   Yet -- and it took the trouble to point out that there were five

21   firearms in the house when the words were spoken.  And yet, no

22   one has said that those firearms were ever taken out and

23   displayed, brandished, or used.  So I would submit that they are

24   in fact idle threats.

25       And one of the things that I recall in looking at what I've

seen so far or perhaps one of the witnesses might have said it,
was that even Jackson said, "Are you threatening me?" and the
response was, "Don't put words in my mouth."

So at this point I think that the government's request for
total and complete detention until who knows when this case
might be over would violate the Eighth Amendment and would also
exceed the requirements of -- sorry, I have the case here --
*Salerno versus United States*, a Supreme Court case.  I'm citing
page 754 in the copy that I have.

So what, if any, questions does the Court have for me?

THE COURT:  Well, I think that you've covered
everything I need to hear from you, Mr. Welch.  Thank you for
your diligence and your thoroughness.  This is certainly very
important, given the nature of the allegations, to hear from
witnesses.  We don't typically have those, Mr. Reffitt, but
Mr. Welch obviously demonstrating, as I said, his diligence in
bringing them here.  I think that was -- certainly added some
needed color to understand what was going on.

Mr. Nestler, if you want to respond briefly, keep it brief,
but I think that I've heard largely everything that I need to
hear so far.

MR. NESTLER:  Yes, Your Honor.

My only point is Mr. Welch has focused Your Honor's
attention on the threats that Mr. Reffitt made to his children.
And those are concerning, of course, for the government, and we

1     want to highlight for Your Honor that once we satisfied

2     3142(f)(1), we're at a part of the hearing where all of the (g)

3     factors are relevant, meaning that all of Mr. Reffitt's conduct,

4     all of the charges are relevant, not just the threats to his

5     family.  And we believe that while those threats are significant

6     and are concerning, it's the entirety of his conduct, planning

7     to go to the Capitol, going to the Capitol, being armed, and

8     then his messages afterwards, which are all concerning enough

9     that warrant detention.

10           THE COURT:  Thanks so much.

11       Give me a minute.  I'm going to just pause for a second,

12     and if the parties can just wait one minute.

13       (Pause.)

14           THE COURT:  Okay.  Thank you, everybody.

15       What I am going to do, Mr. Welch, Mr. Reffitt, government

16     counsel, is we will talk about the factors and my decision and

17     kind of the process going forward.  As we've heard, you know --

18     the Bail Reform Act and the factors, we will go through all of

19     that, but first I just want to just speak to Mrs. Reffitt.

20       I'm very appreciative for the fact that you have a

21     wonderful and beautiful family, Mrs. Reffitt, and again, I can't

22     imagine how difficult this must be for you.  But as a parent, I

23     also must tell you how much I admire you for pulling your family

24     together and being so strong in this difficult time.  I think

25     it's just -- it's abundantly clear to me that you are an

1    incredible parent and that you are doing a great job with your

2    family.  So thank you, Mrs. Reffitt, for everything that you are

3    doing.  This has been -- as I said, I can't even imagine.  So

4    thank you for getting everyone together and making sure they're

5    here.  I can tell it's very difficult for Mr. Reffitt, and I am

6    sorry to have to even see that for all of you that this is

7    difficult for you, and I appreciate, you know, how much courage

8    it took to be here.

9         I don't want to minimize anything also.  Obviously, I'm

10   sure even from Mr. Reffitt's perspective, Jackson is his son,

11   and I know he's your son, Mr. Reffitt, I'm sure that you love

12   and care about him.  So I don't want to minimize anything that's

13   been said here.  He hasn't had the opportunity to be here, and I

14   don't think -- nor should he need to be on here.  I don't think

15   it really bears on the things that we're talking about today.

16   But my heart goes out to Jackson, too.  I know it does for all

17   of you.  He is someone you all care and love for, and as I said,

18   this is just a very challenging situation that you all are

19   handling with incredible dignity, and I just really admire you

20   for that.

21        So we will talk now next about the Bail Reform Act.  The

22   Bail Reform Act tells me that I am to consider the different

23   bases on which the government is seeking detention.  As I

24   understand it here, the government is seeking detention under

25   two grounds, 3142(f)(1)(A) and (f)(2)(B).

1    I'm not really considering the question of whether or not

2    the defendant is a flight risk.  I don't think that I need to

3    get into that.  I don't think there is really much of an

4    indication, if any, that I have to consider it.

5    So what I have to then consider is at a higher standard,

6    which is whether there is clear and convincing evidence that the

7    defendant is a danger to the community.  And to do that, I look

8    at four factors.  I look at -- and I will go through each one of

9    them, but just generally speaking, they are the nature and

10   circumstances of the offense, the history and characteristics of

11   the defendant, the weight of the evidence, and the danger to any

12   person or the community.

13   As Mr. Welch noted, Mr. Reffitt is innocent.  That is what

14   the law mandates that I believe.  It is what the district judge

15   will believe in this matter when and if the case is formally

16   charged.  And so it's important that we understand that in our

17   society that we have not only the presumption of innocence, but

18   relatedly, we don't want to keep innocent people in custody

19   unless it's truly an extraordinary circumstance.

20   Now, that's what the government is saying, is that this is

21   that extraordinary circumstance, and I think the government

22   deserves some credit on this, because as Mr. Welch noted and as

23   Mr. Nestler stated, in very few of these cases has the

24   government sought detention, and many, let's just say, they have

25   not.  They found ways that they could release the defendant

1      under a condition or combination of conditions that could

2      reasonably assure the safety of the community.

3          But here, the government is saying that we are in that

4      extraordinary circumstance.  And so I have to weigh the four

5      factors as I considered it and think about whether or not it

6      warrants detention, this extraordinary outcome.

7          Mr. Reffitt, unfortunately, I do believe that detention is

8      appropriate here.  I am sorry to say that.  It is not an easy

9      thing for me to say.  It is, however, what I think the law

10     dictates that I have to do in this instance.

11         I will go through the factors, but I don't want to keep you

12     waiting while I think about and as I go through this.  Know that

13     this was not an easy decision.  It has caused a tremendous

14     burden, it's very clear to me, on your family, and I am so sorry

15     to see that.  I see the burden it has put you in, and I am sorry

16     for that as well.

17             MS. PEYTON REFFITT:  I'm sorry, Your Honor.  Can you

18     give us just one moment?

19             THE COURT:  Sure.

20         (Pause.)

21             THE COURT:  I'm going to continue.

22             MS. JODI REFFITT:  I apologize.

23             THE COURT:  Mrs. Reffitt, you're fine.

24             MS. JODI REFFITT:  I have my children here, and --

25             THE COURT:  Mrs. Reffitt, I've got to go through my

findings, and I'm going to do that.  And then we can see if
there's an opportunity -- normally in court we wouldn't have you
speaking.  But I understand this is very challenging.  So I just
need you to stay on mute now, but I promise I will come back to
you and you can talk afterwards with Mr. Welch in a breakout
room.  Thank you.  You guys are doing -- I'm sorry again.  I
know this must be incredibly difficult, but thank you.

So Mr. Reffitt, as I was saying, you have the opportunity
to appeal.  This is just my decision.  It's not the final
decision.  You will speak to Mr. Welch.  He is, as you can tell,
a very talented attorney, and he will talk to you about when and
at what time it makes sense to make that appeal.  It may not be
right away.  It might be as you get additional evidence, because
that's what I have to look at is the evidence in the case.  And
as I look at the evidence, even though you're presumed innocent,
I look at some evidence that gives me grave concerns about the
danger to the community.

So while I do this, again, it's not the final decision, but
I am going to make a record to say what I believe is right, and
Mr. Welch will work hard about making sure to see how he thinks
he can rebut that.  If it's possible, there's an opportunity to
go to our chief judge, and she will then start again, and she
will consider all of the evidence here, but she will start on a
clean slate.  Just because I say something, trust me, she is
going to follow her -- where the law takes her, and she is a

1   very smart person.  So she will be very thoughtful.  I'm sorry.

2   There's a district judge on this matter.  So it will be your

3   district judge who will take this case.

4        Ms. Lavigne-Rhodes, who is the district judge?

5             THE COURTROOM DEPUTY:  It's Judge Friedrich.

6             THE COURT:  Okay.  So Judge Friedrich would be the

7   person who will, I'm sure, review the transcript and everything

8   else.  But let me first explain why I ruled as I did, and then I

9   will hear from Mr. Welch, and we can go forward after that.

10       So I am going to start with the nature and circumstances of

11  the charged offense.  This offense -- unfortunately, there's no

12  appropriate way that I can effectively describe how troubling

13  the nature and circumstance of the charged offenses are.  This

14  is -- as Chief Judge Howell has said in a previous hearing,

15  really, the gravity of the offense is not captured by the

16  offenses because it was an attack upon the democracy and the

17  lawful administration of that democracy as there was a

18  transition of power.

19       But that in and of itself is not what troubles me the

20  greatest.  I mean, I've seen many of those cases.  Some people

21  have been released; some have been detained.  But I'm concerned

22  about the specific nature and circumstances of your offense,

23  Mr. Reffitt.  I'm concerned that you were armed with firearms,

24  not one but what appears to be at least the government's proffer

25  of firearms.

I will note for the record as well that you made statements
afterwards, and I understand statements can be made and they can
be boastful or they can just be things that people are saying.
But I have to go on the evidence that the government is
proffering, and they are proffering that I should rely upon the
statements that you have made.

So first they proffer themselves that they believe you
traveled to Washington, D.C., with two firearms, and then they
said that after that, when you were interviewed, that you noted
that when you were there, you noted, "Even though this gun was
right here loaded, all I had to do was (mechanical noise) that
and shoot.  But I didn't have to do that.  I chose and everyone
chose not to."  And you did later also state that "I did bring a
weapon on property that we own."

And so I go on those statements.  Frankly, I think carrying
a firearm and what may be and appears at least by the
government's estimation two firearms to a rally where you had
stated beforehand that you were going to do -- I believe it
was stated you were going to do recon and that you were going to
make sure -- that you wanted to do some serious damage and that
you were going to come back -- you said afterwards that you were
going to come back with weapons -- for weapons hot.

So all of the nature and circumstances of this offense
indicate to me that this is not merely just -- it might have
started in your mind as a peaceful protest, and it didn't

continue after in your mind as a peaceful protest.  This was
what you thought incorrectly that there was something
inappropriate going on and that you felt that you had to stand
up to stop that.  I'm not sure why you thought that.  It's just
very unfortunate you did.  It appeared to be a belief held prior
to the -- January 6th and continued afterwards as well.  You
didn't appear to show any remorse afterwards.

        And so the nature and circumstances of the offense
demonstrate to me that you are in a different category than the
people that I typically see related to these cases and that your
unique facts give me grave concern about how serious this
offense is and about the possible chance that the offense will
continue on.

        Your statements that you -- afterwards indicating again
that you wanted to -- that basically your work wasn't done and
that you said that, you know, there was going to be an
opportunity through your security business to circumvent the
Second Amendment and you're going to get ammo and weapons and
that you want people to join you and "let's take back our
country, the fight has only just begun."

        And I know that people say things on social media.  This
wasn't all social media.  These were private messages that were
recovered from your phone with other people that you had
recruited to join your malitia group that you were a part of.

        And so we can talk about that as well.  This is evidence

1    that the government has stated.  I have to go forward on it.

2    And it's not that Mr. Welch can't -- he can't refute it frankly

3    at this point.  That's why maybe he will want to take some time

4    to try to review the evidence and find things to respond to it.

5        But the nature and circumstance again of the offense, it

6    weighs in favor of detention, not only because of the grave

7    seriousness of the offense itself but all the facts that

8    surround it.

9        I will note here, if it makes sense, I did not consider any

10   of the threats that were made that day of the discussion with

11   your son.  I want to be clear.  I believe that your son was

12   afraid, and I believe your son, what he said.  I also believe

13   your daughter.  I think she is incredibly compelling as a

14   witness, and I can tell, you are obviously very proud of her, as

15   you should be.  She is so smart and thoughtful, and her

16   boyfriend as well, frankly.  All kidding aside, he seems like

17   just a genuinely good person as well who was honest and

18   thoughtful.

19       And so I think they made compelling evidence as to why they

20   should be believed that the statements that you made were over

21   the line, to use your daughter's words.  There's no doubt about

22   that.  You should never make those statements.  I don't doubt

23   that you know that now.  I think you had come back from a place

24   where you've made one bad decision and it cascaded.

25   Unfortunately, it's cascading now.  And you're not the only one

suffering from it, and I can tell how much that upsets you, and I'm sorry.

But the statements that occurred that day aren't germane to my decision of detention.  I'm focusing exclusively on the facts of -- as more related to what happened with the riots, your status as an armed person going there, and statements that you made, and I will talk a little bit more about that.

It's very hard, Mr. Reffitt.  It's hard to see your family in this situation, frankly.  I admire your daughter's wisdom that people can have differing political views and that we still have to be, you know, a family, as she said, and frankly still an American family.  So my heart is broken, because I see people in your family suffering.  I see an American family suffering.

But there has to be -- but the law dictates that I have to look at the facts and follow the law here as it states.  And so I think that while I don't consider what happened with your family that day, I look more at the nature of the statements that were made and again the things I've already described.

The weight of the evidence, I don't want to belabor this, but I think the evidence is very strong.  There's recovered media from search warrants that had been executed of the defendant's devices.  The defendant has made admissions to himself.  There's, I think, electronic evidence that places him at the riot, and I think that in addition the just visual evidence collected by the government at the time of the riot

1    appears to show again that it is the defendant.

2         So I think the weight of the evidence is very strong.  It

3    does favor detention, but I think that's the least important of

4    the factors.

5         As to the defendant's history and characteristics, I will

6    here discuss -- the defendant's role in the Texas Three

7    Percenters malitia I think is of great concern.  Chief Judge

8    Howell has in her decisions reviewing previous detention orders,

9    one of the things -- we look at several factors.  We're trying

10   to -- if anything, judges want to be consistent in how we apply

11   the law.  Every case has different facts and so sometimes what

12   seemingly may be the same case with a different outcome.

13        But here I think that there is the presence of the

14   firearms, these statements beforehand, these statements

15   afterwards.  But then in addition, the defendant being a devout

16   member of a malitia, as well as when -- his history and

17   characteristics I consider, that he spoke with other malitia

18   members or recruited people after he came back, even after the

19   horror and tragedy of January 6th, that he still recruited

20   people and tried to get them to join his malitia and to continue

21   on in the stated mission and indicated how he could -- how they

22   would use Telegram chats so that -- encrypted communications

23   that couldn't be monitored and that he was expecting patriots to

24   join him in what he was doing.

25        So the history and characteristics, I look strongly --

while I weigh the defendant's family and the support that they
provide and the lack of criminal history, his pressing rioters
to join his malitia, promising them, quote, ammo and weapons
available to law enforcement and that the fight has only just
begun, quote unquote, that gives me great concerns about his
characteristics, and that photographs, you know, and things that
he sent to other members through Telegram bragging about what
happened makes me think that the history and characteristics of
the defendant warrant detention.  I think that mixing firearms
with the riot and his membership in the malitia makes him a
danger to the community.  That's really what this all at bottom
boils down to.  I think that's why it weighs in favor of
detention.

Finally, danger to the community, I think this weighs in
favor of detention.  It's my greatest concern.  I think that
setting aside and not considering, as I said, concern of danger
to his family, I think Mr. Reffitt, I believe that, you know,
it's very likely he would be, you know -- that with his family,
he would be safe.  I believe Ms. Reffitt absolutely would
contact law enforcement if anything went wrong, if he made one
bad decision.  As his daughter said, I think he would be
grounded, and I think Mr. Reffitt understands, when it comes to
his family, they are too important to do anything to harm.

My concern is not about Mr. Reffitt's family.  My concern
is that he still harbors the belief even after the election

results were certified, the Electoral College was processed,
that he continued to harbor the belief, the false belief that
something untoward was happening with the democratic process and
that he was obligated to continue to recruit members,
referencing Second Amendment rights and using his business to
circumvent the laws of the land.  In fact, he even told people
to destroy evidence.

So all of those things indicate to me that while he may
make good decisions about maybe his family, even in the best
case scenario -- again, I do not want to do anything to undercut
or impugn what his son has felt or said, but I am giving him the
benefit of the doubt here, and I think that's my obligation to
do so, is that I'm concerned about the danger to the American
democracy, the people that he -- that Mr. Reffitt, again, I'm
sure it was words that he now regrets saying, but that he had
described in very pejorative terms, very unkind terms, let's
say, at a minimum, very hateful terms arguably someone could say
of members of Congress and that this still is a risk for people
there, that they are in danger, that there is a danger that is
demonstrated by -- the fact that the Capitol building is still
surrounded by armed National Guard indicates that there's a
great threat still.

My concern is that all it takes is one -- my concern is
that it takes one person to bring Mr. Reffitt into a frenzy or a
concern, and that will lead him to making a bad decision again

1    while he harbors these beliefs.

2        I will note also in terms of danger, things that concern me

3    is that the defendant came with not only weapons but also

4    plastic zip ties.  He was also in body armor.  Again, this shows

5    to me premeditation that he was coming with the intent to fight.

6    This was not the intent to peacefully assemble as promised by

7    our Constitution but instead was someone who came armed and

8    ready for battle.

9        And so for those reasons, I can't imagine that there's any

10   evidence to indicate to me otherwise that he wouldn't yet do

11   that again and pose a danger to the community.

12       I will also note that there was an unregistered silencer in

13   a safe in his house, which again gives me great concern that he

14   will find ways -- he's already demonstrated, he said he knows

15   how to get around the Second Amendment and he could do it again.

16       So for those reasons, it is with a heavy heart that I say

17   that we must detain the defendant here.  As I stated before, he

18   has the opportunity to appeal.

19       Mr. Welch, is there anything you would like to add, or

20   should we talk about the next date?  I believe you're in front

21   of Judge Friedrich.

22           MR. WELCH:  That's tomorrow afternoon.  She already

23   reached out, and she scheduled a status hearing with us.  So we

24   already have that.

25       I would like the opportunity when we are done today, if

1      Ms. Lavigne-Rhodes could accommodate us as to put my client and

2      me and his family in a breakout room just so we can discuss what

3      they should expect next.

4              THE COURT:  Yeah, that's absolutely fine by me.

5          Mr. Nestler, anything else on your end?

6              MR. NESTLER:  Just one clarification, Your Honor.  I

7      know you made extensive findings.  Just to be clear, the

8      government's allegation is that Mr. Reffitt traveled from Texas

9      to D.C. with two firearms and took one of those firearms to the

10     Capitol.  I believe you said that, but I wanted to make sure

11     that was clear.

12             THE COURT:  Thank you.  I understand that the

13     government's memorandum said that there were two firearms, and

14     then the defendant's statement was that he only had one on him,

15     and I think that you did proffer that as well.  So thank you.

16             MR. NESTLER:  Thank you, Your Honor.  There's nothing

17     further from the government.  We are before Judge Friedrich

18     tomorrow, and we can address any additional scheduling or other

19     matters with her tomorrow.

20             THE COURT:  Okay.  Thank you.  Mr. Nestler, I

21     appreciate your thoroughness.  Mr. Welch, I am extremely

22     grateful for all of the work that you have done to get this

23     through.

24         Mr. Reffitt, I can't emphasize enough, I still believe that

25     you are innocent.  I know it must not feel like that.  This is a

1   different standard I have to consider, just the weight of the

2   evidence.  But that doesn't mean that I no longer consider you

3   innocent.  That doesn't mean Judge Friedrich doesn't consider

4   you are innocent.  She believes you are innocent because the law

5   demands that she believe that.

6       So I am sure you are understandably unhappy with this

7   result, and I am sorry for that, and I am sorry for your family.

8   There is still a lawful process that will go on while you

9   continue to be innocent where you will have an opportunity to

10  exercise your rights.

11      Mr. Welch is going to be in a breakout room with you.  It

12  has a clock for 10 minutes.  Ms. Lavigne-Rhodes, if I can impose

13  on you to just stay on.  I will be available as well.

14      Mrs. Reffitt, thank you for your patience.  You will have

15  an opportunity to talk to Mr. Reffitt.  Please continue to take

16  care of your family.  Do everything that you are doing.  Thank

17  you for everything.

18          MS. JODI REFFITT:  Thank you, Your Honor.  I

19  appreciate your insight and your compassion.

20          THE COURT:  Okay.  Thank you.  The parties are

21  excused.  And Mr. Welch, Mr. Reffitt, and Mr. Reffitt's family,

22  if you can put them in a breakout room.

23          THE COURTROOM DEPUTY:  Yes, Your Honor.

24      (Proceedings adjourned at 5:42 p.m.)

25

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Sara A. Wick, certify that the foregoing is a

 4   correct transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7          Please Note:  This hearing occurred during the

 8   COVID-19 pandemic and is, therefore, subject to the

 9   technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                  April 14, 2021

13   SIGNATURE OF COURT REPORTER       DATE

14

15

16

17

18

19

20

21

22

23

24

25
```