UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-cr-32-DLF |
| | : | |
| v. | : | Detention Hearing:  May 13, 2021 |
| | : | |
| GUY WESLEY REFFITT, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
REVOCATION OF DETENTION ORDER**

Defendant Guy Reffitt should remain detained pending trial, and his motion under 18 U.S.C. § 3145(b) to revoke Magistrate Judge Faruqui's detention order (ECF 18) should be denied.

The government incorporates its memorandum in support of detention (ECF 10 ("Detention Memo")), and will not repeat all the facts or arguments contained therein.

**I.     FACTUAL BACKGROUND**

The defendant played a significant and dangerous role in the January 6, 2021 attack on the U.S. Capitol.  He was at the front of the first group of rioters to challenge a police line that was trying to secure the U.S. Capitol building from being breached.  The defendant led a group of rioters up the Capitol steps, confronted law enforcement, and was thwarted only after two U.S. Capitol Police Officers employed three escalating non-lethal means (including pepper balls, impact projectiles, and finally pepper spray) to slow his advances.

Defendant Reffitt's actions caused the police line guarding the building to retreat closer to the building itself; soon after, law enforcement was overwhelmed, and rioters breached and flooded the building.

After the defendant returned home to Texas, he was emboldened by what he had done.  He told his children that they would be traitors if they reported him to law enforcement, and that

1

"traitors get shot." He predicted future political violence in statements both to his family and to fellow militia members, bragged to fellow militia members about his involvement in the riot, recruited other rioters into the militia, and ordered bear spray and riot shields to his home to prepare for further violence.

On January 27, 2021, as a result of Defendant Reffitt's actions, a grand jury returned a three-count indictment charging him with Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); and Obstruction of Justice – Hindering Communication Through Physical Force or Threat of Physical Force, in violation of 18 U.S.C. § 1512(a)(2)(C).

On March 15, 2021, after hearing a proffer from the government and testimony from defense witnesses Peyton Reffitt (the defendant's sixteen-year-old daughter) and Cayden Mitchell (Ms. Reffitt's eighteen-year-old boyfriend), Magistrate Judge Faruqui found that there were no combination of conditions that would adequately protect the community and ensure the defendant's future presence in court. Judge Faruqui ordered Defendant Reffitt detained pending trial, pursuant to 18 U.S.C. § 3142(e).

On April 14, 2021, Defendant Reffitt filed the instant motion to revoke Judge Faruqui's detention order, pursuant to 18 U.S.C. § 3145(b).

II.     **LEGAL STANDARD**

The court's review of a magistrate judge's detention decision is likely *de novo*. "Although the D.C. Circuit has yet to opine on the question, substantial precedent supports the view that a magistrate judge's detention order is subject to *de novo* review by the district court." *United States v. Cua*, No. CR 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (citation omitted). Indeed, the D.C. Circuit recently noted that Chief Judge Howell conducted a *de novo* review of a

release order under Section 3145(a), and that district courts have "broad discretion" to review magistrate judges' detention decisions. *United States v. Munchel*, 991 F.3d 1273, 1280 & n.3 (D.C. Cir. 2021) (citation omitted).

Upon holding a detention hearing, the Court "shall order" a defendant detained if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Here, there are no conditions that could assure the latter; in other words, releasing the defendant would present a "danger to the community." *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," the Supreme Court has explained, "a court may disable the arrestee from executing that threat." *United States v. Salerno*, 481 U.S. 739, 751 (1987). Notably, "the threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Munchel*, 991 F.3d at 1283 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)). "In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the person,' (3) 'the history and characteristics of the person,' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the persons' release.'" *Id*. at 1279 (quoting 18 U.S.C. § 3142(g)).

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

### III.  ARGUMENT

Defendant Reffitt, armed with an AR-15 rifle and a Smith & Wesson pistol, drove halfway across the continental United States to participate in an armed insurrection with the intent to interrupt the peaceful transfer of power by the United States Congress. By his own admission — which has been corroborated by witness accounts and media photographs and videos — the defendant led the charge that pushed back U.S. Capitol Police who were defending the Capitol building, and that allowed other rioters to rush inside, putting hundreds of lives at risk. Afterward, the defendant was emboldened. He touted his own conduct, predicted (and prepared for) further political violence, and recruited other rioters to join his militia. And, of course, he threatened to harm his own children if they did anything to stop him. Given these facts, the factors the Court must weigh under § 3142(g) strongly favor detention here. There simply is no release condition or combination of conditions that can ensure the safety of the community if this defendant is released pre-trial. He must therefore be detained.

**A.  *Munchel* re-affirms that Judge Faruqui's detention decision was correct.**

The D.C. Circuit's recent decision in *Munchel* — issued 11 days after Judge Faruqui's detention decision in this case — only confirms the need for the defendant's continued detention.

The D.C. Circuit stated that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284. Defendant Reffitt clearly falls into the former camp. He planned for violence, transported firearms, and discussed breaching the Capitol prior to January 6, 2021. (*See* Detention Memo at 4 (referencing December 2020 tip that the defendant intended to "do some serious damage" to legislators and noting that

while en route to Washington, D.C., he discussed "dragging those people out of the Capitol by their ankles").) When January 6 arrived, the defendant proved his words were not idle chatter; rather, he charged to the front lines where he confronted law enforcement officers and led the way for others to overrun the officers and the Capitol itself. In the defendant's own words, he "started the fire" that led the rioters to press forward. (Detention Memo at 5.) And, as described in more detail below, the defendant's role in the initial charge against law enforcement has now been confirmed by officers' accounts of their confrontation with him, as well as media recordings and photographs of the defendant's actions.

One of the D.C. Circuit's primary concerns in *Munchel* — that a defendant's conduct on January 6 alone may in some cases be insufficient to support a finding of future dangerousness, *id.* at 1283 — is not present here. Both Judge Faruqui and this Court have evidence of Defendant Reffitt's future dangerousness in addition to his actions on January 6. (*See* Detention Memo at 4 (describing the defendant's plans and actions in advance of and on the morning of January 6); 10-11 (describing the defendant's threats to his children if they turned him in to the FBI); 12-14 (describing the defendant's future plans for violence with other members of his militia and his efforts to recruit others who had stormed the Capitol to join his militia); and 14 (describing the defendant's post-January 6 purchases of riot shields and bear spray).)

Finally, the D.C. Circuit made clear that, to support a detention decision, the district court or magistrate must find that the defendant poses an "identified and articulable threat to the community" if released. *Munchel*, 991 F.3d at 1282. Here, Judge Faruqui already made that finding, articulating that Defendant Reffitt's statements about his intent before January 6, coupled with his plans and actions after January 6, pose a danger to the community in that he continues to believe the election was stolen and that he is using his militia membership and access to firearms

5

to further threaten American democracy.  (3/15/21 Tr. at 62-65.)  Given these findings and the facts that support them, *Munchel* supports affirmance of Judge Faruqui's detention order.

**B.  Additional evidence supports detention.**

In addition to the evidence presented to Judge Faruqui and in the government's Detention Memo, the government proffers the following facts about Defendant Reffitt's actions on January 6 and intended plans afterwards, all of which support a finding of his future dangerousness.  These additional facts have been obtained by the government since the prior detention proceeding.

1. *Video evidence from January 6.*

Some of the defendant's attack on the Capitol Police officers was captured on video by a Reuters videographer.[1]  Below are two screenshots:



---

[1] The original video is available on Reuters' website, but access requires the creation of a free account.  It is available at:  https://www.reutersconnect.com/all?id=tag%3Areuters.com%2C2021%3Anewsml_VADU2HZK7&share=true.  Clips of the video were published by CBS-Dallas/Ft. Worth on January 18, 2021.  *See* https://dfw.cbslocal.com/2021/01/18/wylie-texas-guy-reffitt-arrested-deadly-capitol-riot/.



2. *Capitol Police officers' statements.*

The government has interviewed two of the Capitol Police personnel (a female officer and a male sergeant) who repelled the defendant's attack, as partially captured on the video described above. According to the officers, the group of at least 50 people was on a landing below when the defendant, alone, advanced higher up the stairs directly towards the officers. The officer shot the defendant with "Pepperball" projectiles (which are primarily designed to irritate the recipient), but they had no apparent effect because the defendant appeared to have padding in his pants and shirt to absorb any impact. The sergeant then shot the defendant with a more aggressive type of projectile (which is primarily designed to have an impact-pain compliance effect) — but it also did not slow his advances. Eventually, the sergeant, after recognizing that the defendant was not wearing a gas mask, and understanding that the two prior projectile methods had been ineffective, deployed a pepper spray canister. The pepper spray finally stopped the defendant's advances.

According to the USCP officers, throughout this encounter the defendant antagonized the officers, making statements like "you can't stop us all." And the officers believed that the defendant was "taunting" them, by continuing to advance after each time he was hit with a

7

projectile and making a show to demonstrate to the officers and the crowd below that the projectiles did not work.

While the USCP officers stated that Defendant Reffitt did not appear to have a formal leadership role with respect to the other rioters on the landing below him, he certainly opened the door for them and gave them the encouragement and idea to advance forward. Indeed, as the USCP officers were preoccupied with stopping this defendant's advances, other rioters started ascending elsewhere, quickly overwhelming the police line. And another man, who seemed to have been instigated by the defendant's actions, and who was wearing a gas mask, charged forward from the crowd and physically attacked the two USCP officers who had already been engaged with this defendant.

3. *The defendant's own statements on a Zoom recording.*

The government obtained a recording of a Zoom meeting that Defendant Reffitt conducted with two other 3%er militia members, on the night of January 10, 2021, after he returned to Texas. The defendant told his comrades the following about his own actions on January 6:

- Referring to his preparation for the assault on the Capitol by wearing tactical plates under his clothes and carrying a firearm on his side:

  - I had my Spartan Armor plates, my kidney plates, and my .40 on my side.

- Referring to conversations he was having at the rally at the Ellipse before heading to the Capitol:

  - I said, "Well I'm not done till we drag them out screaming and kicking. I don't care if Pelosi's head is hitting every step while I drag her by her ankles – she's coming out."

- Referring to his advances on the USCP officers:

  - I started going up the bannister of the stairs, and that chick was standing there with that clay pellet gun – it looked like a paintball

8

>gun – she was going, "No, no, no!  Go back! Go Back!"  And I grabbed a megaphone and I said, "This is our house.  You need to stand down or you're gonna get tried for treason. Stand down."  She said, "I can't.  I can't."  So then I stepped forward and she started pelting my bulletproof armor with clay balls, and they were just going, pop pop pop.  And I'm looking, and I looked at her and said, "Sorry, darling.  You better get a bigger damn gun."
>
>. . . .
>
>I was almost close enough to dive for her and take the gun away from her when a man come around the corner with bear spray . . . .
>
>When everybody saw me get bear sprayed and shot, and go down on the bannister rail, it was a full onslaught move forward.  No one stopped from that moment on . . . .
>
>Nobody was moving forward until I climbed up that bannister and got wrecked the hell out and then everybody ---.  I just kept going, "Go forward!  Go forward! … Take the House!"

The remainder of the militia meeting — which lasted about an hour and forty minutes — consisted of the defendant and his comrades discussing their future criminal activity.  The defendant laid out his plan to attack "mainstream media," "Silicon Valley," and "Big Tech." Specifically, he described a prominent social media company's facility in a nearby Texas town and how its backup generators could be disabled with properly placed gunshots from a sniper's rifle.  According to the defendant's plan, shutting down this particular company's servers would "make them feel it back in the Capital.  And then they won't know we're coming next time." Notably, for months the defendant had been threatening to attack social media companies, (*see* Detention Memo at 13-14), and the events at the Capitol appear to have only solidified his violent desire.

In sum, these additional facts add both to the weight of the evidence against the defendant with respect to the charged offenses and also provide strong support for a finding of future dangerousness.

9

### C. The defense witnesses actually support detention.

Finally, both Ms. Reffitt and Mr. Mitchell testified at the detention hearing before Judge Faruqui. Neither witness undercuts the government's detention argument — in fact, both support continued detention.

At the prior hearing, both witnesses testified that the defendant did, in fact, utter the words that the government has alleged to be threats against his children for the purpose of obstructing this investigation. (*See* 3/15/21 Tr. at 26-27 (Ms. Reffitt), 42 (Mr. Mitchell); *see also* Detention Memo at 10 (government's proffer of the defendant's threats to his children that constituted the obstructive conduct).) Indeed, there is seemingly no dispute that the defendant made these statements to Ms. Reffitt, Mr. Mitchell, and to his son, who at the time (unbeknownst to the defendant) had already reported the defendant to the FBI. As detailed in the government's Detention Memo, the defendant's son understood this to be a threat on his life because he already had talked to the FBI, and, in response, he moved out of his parents' home and has taken substantial steps to secure his own safety. (Detention Memo at 11.)

At the same time, the testimony of Ms. Reffitt and Mr. Mitchell does not negate the threatening nature of the defendant's words. Ms. Reffitt testified that she believed the defendant intended his words as a threat, and she thought the defendant was trying to intimidate her and her brother. (3/15/21 Tr. at 29-30.) And Mr. Mitchell testified that while he may not have personally felt threatened or intimidated, he was not aware at the time that the defendant's son had already contacted the FBI (*id.* at 42-43) — and thus Mr. Mitchell was not in a position to know how seriously the defendant's son had interpreted the defendant's words, and why he had good reason to do so. On balance, this evidence further supports a finding of the defendant's future dangerousness.

## **CONCLUSION**

There are no condition or combination of conditions that would ensure the safety of the community if the defendant were released. Therefore, he should be detained pending trial.

        Respectfully submitted,

        CHANNING D. PHILLIPS
        Acting United States Attorney
        DC Bar No. 415793

By: _____
        Jeffrey S. Nestler
        Assistant United States Attorney
        D.C. Bar No. 978296
        Risa Berkower
        Assistant United States Attorney
        NY Bar No. 4536538
        U.S. Attorney's Office for the District of Columbia
        555 4th Street, N.W.
        Washington, D.C. 20530
        Phone: 202-252-7277
        Email: Jeffrey.Nestler@usdoj.gov