**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-00032 (DLF)** |
| | : | |
| **v.** | : | |
| | : | |
| **GUY WESLEY REFFITT,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR CHANGE OF VENUE**

This Court should try this case here, in the District of Columbia.   The Court should reject the defendant's motion to transfer venue.

**I.     BACKGROUND**

On January 6, 2021, Congress assembled in a Joint Session at the United States Capitol to declare the winner of the 2020 presidential election by reviewing and certifying the Electoral College ballots.   The defendant was aware of this proceeding, and he wanted to stop it.

He travelled from his home in Wylie, Texas, to Washington, D.C., with an AR-15 rifle and a Smith & Wesson .40 caliber handgun.   On the afternoon of January 6, the defendant went to the Capitol to participate in the riot and to obstruct Congress from meeting to certify the vote.   While at the Capitol, the defendant, armed with his handgun in a holster on his waist, confronted U.S. Capitol Police officers on the west side stairs, just north of the temporary scaffolding.   The defendant charged at the officers, who unsuccessfully tried to repel him with two different types of less-than-lethal projectiles before successfully halting his advances with pepper spray.   The defendant encouraged other rioters to charge forward at the officers, which they did.   The officers were forced to fall back, the Capitol was invaded, and for several hours Congress was prevented from continuing with its constitutionally and statutorily required Joint Session.

On January 11, 2021, the defendant threatened his children if they reported him to law enforcement for his crimes on January 6.

On January 16, 2021, the FBI arrested the defendant at his home in Wylie, Texas.

On June 16, 2021, the grand jury returned a superseding indictment, charging the defendant with five felony counts:

(1)     18 U.S.C. § 231(a)(2) – Civil Disorder (Transportation);

(2)     18 U.S.C. §§ 1512(c)(2), 2 – Obstruction of Official Proceeding and Aiding and Abetting;

(3)     18 U.S.C. § 1752(a)(1) and (b)(1)(A) – Restricted Building or Grounds While Armed;

(4)     18 U.S.C. § 231(a)(3) – Civil Disorder (Interference)[1]; and

(5)     18 U.S.C. § 1512(a)(2)(C) (Obstruction of Justice – Hindering Communication Through Physical Force or Threat of Physical Force).

Each count charges that the alleged conduct took place at least "within the District of Columbia" (with counts 1, 2, and 5 also alleging "and elsewhere").

Defendant Reffitt moved to transfer venue of the trial to the district in which he lives, the Eastern District of Texas.   (ECF 37 ("Motion").)   He filed the motion pursuant to both Federal Rule of Criminal Procedure 21(a) ("for prejudice") and Rule 21(b) ("for convenience").

The case is currently scheduled for trial before this Court in Washington, D.C., on November 15, 2021.

---

[1] On September 15, 2021, the grand jury returning a second superseding indictment, slightly modifying the charging language for this count.

2

II.    **ARGUMENT**

A.  **Legal Standard**

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI.   These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place."   *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) (noting that the "Constitution requires that local crimes be prosecuted locally").   And they give rise to "a general presumption that a criminal prosecution should be retained in the original district."   *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011).

1.     **Rule 21(a): Transfer for prejudice**

Federal Rule of Criminal Procedure 21(a) allows a court to transfer venue of a case "if the court is satisfied that so great a prejudice against the defendant exists" such that "the defendant cannot obtain a fair and impartial trial" in the local District.   *See Skilling v. United States*, 561 U.S. 358, 378 n.11 (2010) (noting that Rule 21(a) allows venue transfer only if "extraordinary local prejudice will prevent a fair trial").   This is an exacting standard, and one that is infrequently met.

It is the defendant's burden to establish his entitlement to a transfer of venue under Rule 21(a).   *United States v. Caldwell*, 543 F.2d 1333, 1342 (D.C. Cir. 1974).   The en banc D.C. Circuit has explained that a pre-voir dire request for a change of venue may be warranted only in "extreme circumstances," and that an "extensive voir dire" can usually assure that the defendant

3

is "tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *United States v. Haldeman*, 559 F.2d 31, 60, 70 (D.C. Cir. 1976) (en banc) (per curiam).

Many court cases have generated significant publicity, both locally and nationally.   But "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original).   Indeed, appellate courts have uniformly affirmed the denial of pre-trial transfer motions in some of the most notorious cases in this country's recent history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal.   *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003); *Haldeman*, 559 F.2d at 70.

The same holds true here.   The defendant's pre-voir dire motion to transfer venue should be denied as premature.   As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that defendant receives a fair trial by an unbiased jury.

### 2.        Rule 21(b): Transfer for convenience

Rule 21(b) allows a court to transfer venue of a case "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."

The Supreme Court articulated ten factors for a court to consider in making this discretionary decision:

> (1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minn. Min. & Mfg. Co.*, 376 U.S. 240, 243-44 (1964).[2]

"The defendant, as the only possible moving party under Rule 21(b), bears the burden of proving that all things considered, the case would be better off transferred to another district." *United States v. Quinn*, 401 F. Supp. 2d 80, 85 (D.D.C. 2005) (internal citation and quotation marks omitted).   "[I]f consideration of the *Platt* factors leaves the Court in equipoise, the Court should err on the side of denying the motion to transfer."   *Id.*

The *Platt* factors do not support transfer of this case for trial.

**B.   The Case Should Not Be Transferred for Prejudice.**

**1.      The motion is premature.**

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudicial pretrial publicity is after voir dire.   In the overwhelming majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all seated jurors can be fair and impartial and to provide criminal defendants with the fair trial to which they are entitled.

As the D.C. Circuit has explained, "[t]he ultimate question" on a motion to transfer venue based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial jury,

---

[2] While Rule 21(b) was slightly amended after *Platt* was decided in 1964, the D.C. Circuit has explained that "the 'interest of justice' standard . . . remains about the same after the amendment as it did before."   *Jones v. Gasch*, 404 F.2d 1231, 1241 n.43 (D.C. Cir. 1967).

and the proper occasion for such a determination is upon the voir dire examination." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (internal citation and quotation omitted). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant[s] will then be entitled to any actions necessary to assure that [they] receive[] a fair trial." *Haldeman*, 559 F.2d at 63. Consistent with this approach, notwithstanding the "extraordinarily heavy coverage in both national and local news media" that the Watergate scandal received, the court in *Haldeman* held that "the District Court was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire. *See United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled that a trial court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (internal quotation omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial

publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure.").   As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors."  *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

The D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity, and the Supreme Court has not barred a court from deferring the decision on a change of venue motion until voir dire.   If the jury pool might not be impartial, voir dire will lead to that determination.  *See United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants.").   Indeed, it is unlikely that any significant segment of this District's population knows the Defendant Reffitt by name, much less the crimes he is accused of committing.  *See id.* ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from the media, much less formed an opinion about their guilt.").   Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity."  *Id.*   And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of the defendants and their crimes and have formed an opinion of the defendants' guilt.   559 F.2d at 70, 144.

The defendant cites several decades-old cases to support his argument that a pre-voir dire transfer is warranted, (*see* Motion at 2), but the cases are generally distinguishable.  In the Oklahoma City bombing case, the parties did not disagree about transferring venue out of the district encompassing Oklahoma City (whose federal courthouse was itself damaged during the bombing).  *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996).  The court stressed that "[o]rdinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination.   That is the preferred practice." *Id.*   In other cases cited by the defendant, the district judges had the benefit of facts to support the presumption of prejudice—something Defendant Reffitt's motion is sorely lacking.   For instance, in *United States v. Tokars*, 839 F. Supp. 1578, 1583 (N.D. Ga. 1993), the defendant proffered the results from a university-conducted survey showing that two-thirds of the respondents had an opinion about the defendant's guilt or innocence, and of those 97.9% believed the defendant to be guilty.   And in *United States v. Ebens*, 654 F. Supp. 144, 145 (E.D. Mich. 1987), the court granted a motion to transfer the *retrial* of a case, having had the benefit of the voir dire from the first trial.

Indeed, Judge Mehta recently denied a similar motion to transfer venue of the Capitol riot case *United States v. Caldwell*, No. 21-cr-28 (D.D.C. Sept. 14, 2021) (ECF 415), finding a lack of evidence to support the defendant's bald assertion of prejudice.   Citing *Skilling* and *Haldeman*, Judge Mehta concluded that the defendant had "not satisfied his heavy burden of establishing that the jury pool in the District of Columbia is presumptively biased against him, or any other Defendant."   *Id.*   Because the defendant had failed to put forth any evidence to demonstrate "*actual* bias in the jury pool," the court denied his motion.   *Id.* (emphasis in original).

8

In any event, because the question whether it is possible to select a fair and impartial jury is one that can only be answered after a thorough voir dire, this Court should follow the D.C. Circuit's well-established procedure and deny the defendant's pretrial motion to transfer venue.

> **2.    The defendant has not established a circumstance so extreme as to warrant a presumption of prejudice.**

The Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381. "[N]ews accounts of the crime" do not "alone presumptively deprive[] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Jurors are not required to be "totally ignorant of the facts and issues involved," as "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history, as cited above.

In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes. Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption. And the Supreme Court has done so in only three "extreme" cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000

individuals in a parish of approximately 150,000 people.   *See Skilling*, 561 U.S. at 379 (describing *Rideau*).   The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder."   *Rideau*, 373 U.S. at 726.   In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'"   *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536).   And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'"   *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"— did not by itself deny the defendant his right to due process.   384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process.") (internal citation omitted). Nor has either the Supreme Court or the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided.   To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that,

126, or 77%, admitted they would carry an opinion into the jury box."   467 U.S. at 1029, 1032
(1984).   In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial"
pretrial publicity that "w[as] not favorable" to the defendant.   500 U.S. 415, 429 (1991).   And in
*Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone
of media attention directed at Enron" because of the "large, diverse pool of potential jurors" in the
Houston area; the fact that, "although news stories about Skilling were not kind, they contained no
confession or other blatantly prejudicial information of the type readers or viewers could not
reasonably be expected to shut from sight;" "over four years [had] elapsed between Enron's
bankruptcy and Skilling's trial;" and "Skilling's jury acquitted him of nine insider-trading counts."
561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process
rights were violated by the District Court's refusal to grant . . . a change of venue prior to
attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and
accusatory in content," pretrial publicity.   559 F.2d at 61-62.   The court explained that, "unlike
the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave
the court "no reason for concluding that the population of Washington, D.C. was so aroused against
[the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis
of the evidence presented at trial that their due process rights were violated."   *Id*.   The D.C.
Circuit has similarly refused to presume prejudice in numerous other cases involving both national
crimes such as Watergate and notorious local criminals.   *See, e.g.*, *United States v. Childress*, 58
F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the
most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the

11

publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument [] that no voir dire would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity.  The news stories about Defendant Reffitt have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382. Indeed, given the sheer number of people involved in the attack on the Capitol, it is unlikely that more than a handful of District residents could identify him by name.   Reporting on the defendant contains nothing resembling a confession, and thus is entirely dissimilar from *Rideau*, where "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff."   373 U.S. at 725.   Whereas "Rideau's dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 561 U.S. at 382-83, the defendant provides no reason to believe that, by the time his trial begins, jurors in this District are likely to be able to remember and distinguish the reporting about him from that involving the many hundreds of other people charged

as part of the attack on the Capitol.   And even if they could, "[p]rominence does not necessarily produce prejudice."   *Id.* at 381.

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice.   The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724.   Indeed, the District is more populous than the 600,000-resident Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn."   501 U.S. 1030, 1044 (1991).

Although there has been substantial publicity surrounding the attack on the Capitol, that reporting has largely focused on the attack generally—publicity has also been nationwide, not merely "local."   *Skilling*, 561 U.S. at 378; *see, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally.   But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia").   Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading the defendant's trial and denying him "judicial serenity and calm" to which he is entitled.   *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

The defendant complains about publicity surrounding this case.   (Motion at 5-6.)   But many of the news articles he cites are about the Capitol riots more generally, not him specifically. (*Id.* (citing a *Guardian* article and a *60 Minutes* story).)   And even the articles that the mention the defendant by name are by and large factually neutral reports about the status of the case.   The government also notes the irony in the defendant's argument that "the government contributed to the pretrial publicity," (*see* Motion at 5), given that the defendant was the party communicating with the press.   In May 2021, the government filed a notice (ECF 24) and proffered in open court about an article in ProPublica about a jailhouse manifesto written by the defendant.   While at the hearing the defense did not concede that the defendant was at least one of the authors of the manifesto, the government has since corroborated that fact.[3]

As the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.   High-profile individuals such as Oliver North, John Poindexter, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries.   *See United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United*

---

[3]On May 7, 2021, the defendant had a text-message exchange with his wife using the jail's monitored-and-recorded text-messaging system.   First, his wife forwarded him a message from "Joaquin," "pass[ing] on a couple more questions to Guy," including "How did they pass the letter around" and "Is the January Sixers just what they call themselves or is it some kind of formal organization?"   Later that same day, the defendant responded to his wife: "No more questions will be answered.   We do not give consent to use individual names in reference to that letter as there are no names on it."   He also wrote: "And to clarify about the 1/6ers.   Nobody here will admit to any discussions or letters."

Four days later, on May 11, 2021, ProPublica published the article about the letter and provided a snippet of it.   (*See* ECF 24, Ex. 1.)   One of the authors of the ProPublica article has the same first name as the person who was passing questions about the letter to the defendant through his wife.   And the article itself asserts that ProPublica "was able to ask a few questions of [Reffitt] via text from the D.C. Jail, with his wife, Nicole Reffitt, acting as a relay."

*States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020).   Indeed, in *Stone*, the court rejected an argument similar to the one the defendant makes here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too. While there is no evidence that proves this hypothesis, there is evidence that contradicts it . . . .   At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. . . . But there is no basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31.   The court went on to explain that "[t]he case law in this Circuit makes it clear that one cannot assume that people in the community—even those who follow the news—have a deep understanding of the facts of a particular case.   During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention."   *Id.* at *31.   The same is true here.

Ultimately, the defendant misplaces his reliance on *Skilling* in an attempt to demonstrate that this Court should presume prejudice and transfer his case without even attempting to choose an impartial jury here.   The Supreme Court identified four "[i]mportant differences" in Skilling's prosecution from cases with a "presumption of juror prejudice": (1) size and characteristics of the community, (2) type of information being reported about the defendant, (3) time elapsed between the crime and the trial, and (4) whether the jury's verdict in that case or related cases indicates

impartiality.  *Skilling*, 561 U.S. at 381-84.  As discussed above, the first two factors weigh heavily against presuming prejudice.  The third factor also weighs against presuming prejudice: the trial date of November 15, 2021, will occur over 10 months after the attack on the Capitol.  *Cf. Rideau*, 373 U.S. at 728 (Clark, J., dissenting) (noting that trial commenced within two months of the murder).  The fourth factor—whether the jury's verdict indicates impartiality—is unknowable at this stage.

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes.  This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling.  561 U.S. at 377.  This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)."  *Tsarnaev*, 968 F.3d at 42.  It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon."  *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613.  It was true in the World Trade Center Bombing case.  *See Yousef*, 327 F.3d at 155.  It was true in the post-Watergate prosecutions.  *See Haldeman*, 559 F.2d at 70-71.  And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for the defendant's trial is one that the Court need not answer today.  Rather, the only question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, the defendant cannot possibly receive a fair trial in this jurisdiction.  Because such a presumption has no legal or factual support in this case and runs counter to the D.C. Circuit's "well

16

established procedure" against answering that question before conducting voir dire, the Court should deny the defendant's motion.

### C.  **The Case Should Not Be Transferred for Convenience.**

The *Platt* factors do not support a transfer of the case for convenience.   Importantly, "it is obvious that some amount of inconvenience—to Government or to [the defendant], and perhaps to both—will inevitably accompany [a defendant's] trial, wherever it might occur."   *Jones v. Gasch*, 404 F.2d 1231, 1241 (D.C. Cir. 1967).  "[T]o warrant a transfer the defendant must demonstrate and the Court must be satisfied that the prosecution in the district where the indictment was properly returned will result in a substantial balance of inconvenience to himself."   *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011).   This is a high burden, and the defendant does not come close to meeting it here.

Examination of each *Platt* factor shows that the defendant has not met his burden to justify a transfer:

*Factor 1: location of defendant.*   This factor does not support transfer.   The defendant is located in this District, as he is incarcerated here.  Also, "*Platt* itself specifically stated that a defendant is not entitled to a case in his home district."   *Bowdoin*, 770 F. Supp. 2d at 138.

*Factor 2: location of possible witnesses.*   This factor does not support transfer.   The defendant here nakedly alleges that "five or more" witnesses are located in Texas.   (Motion at 9.) But there is no indication of those witnesses' identities or importance.   While there are some government witnesses who are currently physically located in Texas, several additional witness (including the two victim Capitol Police officers and the witnesses who will testify to the obstruction of Congress) are located here.   And the government has already made arrangements

for its Texas-based witnesses to travel to this district for the trial.   Moreover, a defendant who

"offers only a naked allegation that his witnesses will be inconvenienced, those witnesses are not

otherwise identified by name or type, and no proffer of the nature of their testimony has been

made, . . . has not satisfied the Court that transfer based on this factor is warranted."   *Id.* at 139.

  *Factor 3: location of events*.   This factor weighs strongly against transfer.   The defendant

is alleged to have obstructed Congress and federal law enforcement officers here, in Washington,

D.C.

  *Factor 4: location of documents and records*.   This factor does not support transfer.   The

documents and records related to the defendant's crimes are mostly in this District.   Moreover,

"[i]n light of the availability of electronic storage and transfer of the documents," this factor does

not carry much weight.   *Quinn*, 401 F. Supp. 2d at 87.

  *Factor 5: disruption of the defendant's business*.   This factor is not well applied to an

individual rather than corporate defendant, but it does not support transfer.   The defendant is

detained, and thus any business interest is nil regardless of the location of the trial.

  *Factors 6 and 7: expense to the parties and location of counsel*.   These factors weigh

strongly against transfer, as the parties and their counsel are located here, and thus a trial here

would be far less expensive and inconvenient than travel to Texas.

  *Factor 8: accessibility of place of trial*.   Given that the defendant bears the burden on this

motion, and that he points to no superior accessibility at the Texas courthouse, the relative

accessibility of the courthouse here weighs against transfer.

  *Factor 9: the courts' respective docket conditions*.   This factor weighs slightly against

transfer.   This Court's docket has undoubtedly increased in light of the cases arising from the

18

attack on the Capitol.   But the defense, which bears the burden on the motion, has not cited the *lack* of congestion in the Texas court.   Moreover, this Court's familiarity with this case, as well as the Capitol riots cases more generally, makes trying the case here far more efficient than trying the case in Texas.   *See Bowdoin*, 770 F. Supp. 2d at 142 (citing the court's "familiarity with the background, facts, legal arguments and parties" as weighing against transfer under this factor).

     *Factor 10: any other special element*.   This factor weighs strongly against transfer:   the defendant's crimes were primarily committed against the seat of the government, in Washington, D.C.   He deserves to stand trial for those crimes in the place he committed them.

     In short, "to obtain a transfer under Rule 21(b) a defendant's convenience must overcome the rights of a prosecutor to try its case in the jurisdiction where the grand jury returned the indictment."   *Id.*   The defendant has plainly failed to carry that burden here.

## CONCLUSION

     The government respectfully submits that the Court should not transfer venue of this case.

     Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:_____

Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Risa Berkower
Assistant United States Attorney
NY Bar No. 4536538
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Phone: 202-252-7277
Email: Jeffrey.Nestler@usdoj.gov