```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,          .
                                          .  Case Number 21-cr-32
 4               Plaintiff,               .
                                          .
 5           vs.                          .
                                          .
 6     GUY WESLEY REFFITT,                .  October 15, 2021
                                          .  10:13 a.m.
 7               Defendant.               .
       - - - - - - - - - - - - - - - - -

 8

 9              TRANSCRIPT OF ARRAIGNMENT AND MOTIONS HEARING
                 BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                     UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:        JEFFREY NESTLER, AUSA
                                     RISA BERKOWER, AUSA
14                                   United States Attorney's Office
                                     555 Fourth Street Northwest
15                                   Washington, D.C. 20530

16     For the Defendant:           WILLIAM WELCH, III, ESQ.
                                     5305 Village Center Drive
17                                   Suite 142
                                     Columbia, Maryland 21044
18

19

20

21     Official Court Reporter:     SARA A. WICK, RPR, CRR
                                     333 Constitution Avenue Northwest
22                                   U.S. Courthouse, Room 4704-B
                                     Washington, D.C. 20001
23                                   202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2          (All participants present via video conference.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4      Action 21-32, the United States of America versus Guy Reffitt.

 5          If I can have the parties identify themselves for the

 6      record, beginning with the United States.

 7              MR. NESTLER:  Good morning, Your Honor.  Jeff Nestler

 8      on behalf of the United States.

 9              THE COURT:  Good morning, Mr. Nestler.

10              MS. BERKOWER:  Good morning, Your Honor.  Risa

11      Berkower on behalf of the government.

12              MR. WELCH:  Good morning, Your Honor.  William Welch

13      on behalf of Guy Reffitt.

14              THE COURT:  Good morning, Mr. Welch.  Good morning,

15      Mr. Reffitt.

16          We are here for -- can everyone hear me?  I'm hearing an

17      echo.  Not great?

18              MR. WELCH:  Not great.

19              THE COURT:  All right.  I apologize.  I'm having

20      issues in this new chambers.

21          Mr. Hopkins, is there background noise that we can mute on

22      the public line or otherwise?

23              COURTROOM DEPUTY:  I've muted the public line.  I will

24      look and see if there's anything else that can be or should be

25      muted.  Do you hear an echo?
```

1          THE COURT:  I don't hear it now.  I was hearing it.

2    So that's helpful.  I will try to keep my voice up.  If you're

3    having trouble hearing me, just raise your hand.

4          All right.  So this is a video conference hearing to both

5    arraign Mr. Reffitt on the superseding indictment and also to

6    address the pretrial motions Mr. Reffitt has filed, as well as

7    the government's motion to vacate the November 15 trial date.

8          Mr. Hopkins, if I can have you please first arraign

9    Mr. Reffitt on the superseding indictment.

10          COURTROOM DEPUTY:  Absolutely, Your Honor.

11          Mr. Guy Reffitt, you are being charged with violating Title

12    18 of the U.S. Code Section 231(a)(2), civil disorder; Title 18

13    of the U.S. Code Section 1512(c)(2)(ii), obstruction of an

14    official proceeding and aiding and abetting; Title 18 of the

15    U.S. Code Section 1752(a)(1) and (b)(1)(A), entering and

16    remaining in a restricted building or grounds with a deadly or

17    dangerous weapon; Title 18 of the U.S. Code Section 231(a)(3),

18    civil disorder; and Title 18 of the U.S. Code Section

19    1512(a)(2)(C), obstruction of justice, hindering communication

20    through physical force or threat of physical force.

21          Mr. Welch, do you waive the formal reading of the charge,

22    and if so, how does your client plead?

23          MR. WELCH:  We do waive formal reading.  Please enter

24    a not guilty plea to all the charges, and we assert and reserve

25    all of Mr. Reffitt's constitutional rights.

1        THE COURT:  All right.  Thank you, Mr. Welch.

2     I know that previously you said that Mr. Reffitt was

3  prepared to proceed by video conference, but I do want to make

4  sure that I make the requisite findings under the CARES Act.  So

5  can you articulate for me why both this arraignment and motions

6  hearing needs to proceed now rather than waiting until a later

7  date and why doing so would cause a serious harm to the interest

8  of justice.

9        MR. WELCH:  Well, my client is detained.  He has not

10  waived his right to a speedy trial or the requirements of the

11  Speedy Trial Act or the speedy trial rule in this district.  He

12  is detained.  These motions are ripe and ready to be litigated.

13  And he consents pursuant to the CARES Act and the Court's

14  standing order to proceed virtually this morning.

15        THE COURT:  And is that at least in part because of

16  the pandemic and the health concerns for him?

17        MR. WELCH:  Yes.

18        THE COURT:  All right.  Okay.  I do find it is

19  appropriate to proceed by way of video consistent with the CARES

20  Act and Chief Judge Howell's standing order relating to the

21  pandemic.

22     So moving on to the motions, Mr. Welch, I would like to

23  start with the more straightforward motion that you filed, and

24  that is your motion to change venue.

25     You argue that trying the case here will be prejudicial

1    because of negative pretrial publicity Mr. Reffitt has received

2    and that trying the case in Texas would be more convenient for

3    him and for the trial witnesses.

4        Let me start with the pretrial publicity argument.  Even if

5    I were to agree with you on the pretrial publicity, which I'm

6    not sure I do, but even if I were to agree, why isn't this

7    motion premature?  Why isn't this something that could be

8    addressed in voir dire if there's a need to do so?

9        MR. WELCH:  Well, it certainly could be and certainly

10   precedent in this district says that that is the preferred way

11   to do it.

12       What is different, though, in this case compared to some

13   others is that it's one thing to have a high-profile case that

14   people in the community would be aware of.  It's another thing

15   to take that to an even more serious level to say that those

16   same folks' lives are being impacted and disrupted by the

17   allegations in that same case.

18       And by that, I mean that after January 6 the District of

19   Columbia was occupied by troops who were armed to maintain

20   order, and that is something that residents of the District

21   would have had to see as they tried to go about their daily

22   lives.  Streets were blocked.  Indeed, the Capitol was

23   surrounded for a period of time by an iron fence.  That was

24   removed for a period of time and put back up again more

25   recently.

1          That's a visual remainder of the events that happened on

2     January 6, and all of that would prejudice the very same people

3     who would then be the likely jury pool, and none of whom live

4     more than eight miles from where the events of January 6 took

5     place.  So that is something that they have to live with.  That

6     is in their face, so to speak, as a daily reminder, and it's not

7     just that okay, this is something that is in the news.

8               THE COURT:  Well, two points there.  Wasn't that also

9     the case with the Boston marathon bombing case and some of the

10    terrorism cases that have been tried in certain venues?

11         And number 2, to the extent residents of the District have

12    been inconvenienced, isn't that now restricted pretty much to

13    the Capitol area?

14              MR. WELCH:  I didn't hear the last part about the

15    Capitol.

16              THE COURT:  Isn't that restricted now pretty much to

17    the Capitol area?

18              MR. WELCH:  Yes, my understanding is that there are no

19    longer National Guard troops patrolling the city.  They were for

20    a long time, though, and while things have subsided to a degree,

21    the interruption to the community of Boston in the Tsarnaev case

22    was certainly widespread when there was an active manhunt for

23    Mr. Tsarnaev.  But once that manhunt concluded -- and I'm not

24    sure off the top of my head whether it was days, maybe a week or

25    so later -- that was it.

1      The troops patrolling the Capitol lasted for a much longer

2   period of time.  The fence around the Capitol building itself

3   lasted for a much longer period of time than the manhunt in

4   Boston did.

5          THE COURT:  All right.  Well, you would agree with me

6   that at least in this circuit trial courts routinely deny

7   requests absent extreme cases of adverse publicity?

8          MR. WELCH:  That is -- that is what the precedent

9   says, Your Honor, and I would just respond to that that I think

10   this is such an extreme case in that it's not just pretrial

11   publicity.  My understanding of pretrial publicity is that would

12   be news coverage, the radio, the television, the papers type of

13   thing.

14      And this has all of that, but it also has that additional

15   dimension that the prospective jurors are being reminded as they

16   go about their daily lives about January 6 because of their

17   ability to either go somewhere or not go somewhere.

18          THE COURT:  With respect to the publicity, Mr. Welch,

19   you would agree that many of the articles that you cite in your

20   brief are articles that have received national attention,

21   including, I would suspect, in the Eastern District of Texas

22   where Mr. Reffitt resided; correct?

23          MR. WELCH:  Correct, and there have been stories

24   there, too, but the stories there have been fewer and older.

25   Whereas, I think once you get outside the Beltway, you don't get

the constant daily coverage of January 6.  I think that is just the characteristic of the District of Columbia.

Granted, you know, there's a congressional committee that's actively investigating, and so that's going to garner some news coverage.  But that is going to focus people here on January 6 more than people elsewhere.  It's not that people elsewhere haven't heard of it or wouldn't care about it, but it's not in their face to the degree that it would be for residents of the District of Columbia.

THE COURT:  But won't voir dire, jury selection give you and the government an opportunity to suss out who is so influenced by this that they can't be impartial in this case?

MR. WELCH:  It might, Your Honor, but our point is that because of the added dimension of physical inconvenience for the jurors' daily lives while the city was being patrolled by armed troops and the fence around the Capitol, that that added dimension is likely to take it to the point that most of the jurors, when they're asked, are going to indicate that they have been affected by that.

THE COURT:  You think physically affected?  You think it really affects the daily lives of the vast majority of residents in the District of Columbia?

MR. WELCH:  Well, when troops are blocking streets and they've got checkpoints of people trying to come downtown, the fence around the Capitol, meaning that you can't walk on that

1     side of the street, you have to cross over to the other side of

2     the street, or you might not be able to drive down a street that

3     you ordinarily would, that's going to be a reminder to folks

4     that January 6 happened.

5          THE COURT:  All right.  Let me address your

6     convenience argument.  Looking at the factors the Supreme Court

7     has identified in *Platt* that courts should consider, it looks to

8     me like they overwhelmingly favor keeping this case here.

9          You point to witnesses and records.  You don't provide any

10    detail about the identity of the witnesses or their testimony or

11    the nature of the documents.  Aren't the vast majority of the

12    documents likely to be electronic in nature, and is that really

13    a factor that puts a lot of weight on the scale here when

14    looking at these ten or so factors the Court's identified?

15         MR. WELCH:  Well, I don't think that they all have to

16    be weighed equally.  I think they all have to be considered.

17    And I will concede that some of them are neutral, such as the

18    documents.  Things being electronic in nature, it wouldn't

19    really matter whether you tried it here or there, so to speak.

20         But I will point out that Counts 1, 2, and 5 all allege

21    conduct not only within the District of Columbia, but elsewhere,

22    which means the venue would be proper in either place.  Granted,

23    Mr. Reffitt is present in the District of Columbia.

24         Now, what I wanted to be very careful of in terms of

25    identifying witnesses, number 1, there is a protective order in

this case.  Number 2, even if there weren't, in my experience,

having cases involving cooperators, which this one does, and of

course, we've just talked about the publicity, and I think

everyone can acknowledge that politics is the elephant in the

room as we do all this.  Naming names would put people's

physical safety at risk.  I don't want to do that.

THE COURT:  Tell me, how many witnesses are you saying

live in the Eastern District of Texas who you intend to call?

MR. WELCH:  It's not that I necessarily intend to call

them.  I'm looking through the discovery that I've been given.

And by my count, there are more witnesses who would be nearer --

because I don't know where they actually live, I don't have all

their home addresses, but that would actually live in Texas at

least, and the Eastern District of Texas would be easier for

them, if I'm correct, and there would be, say, five or six of

them, there might be more, I don't know, and then I would

believe that there are probably two or three who are residents

of the District of Columbia.

Either way, people are going to have to travel.  It would

appear that more people are going to have to travel to the

District of Columbia for a trial in terms of witnesses.

THE COURT:  Sorry to interrupt.  You're talking about

what you can glean from the discovery about the government's

case-in-chief?

MR. WELCH:  Yes.

1          THE COURT:  You don't think a large percentage of that

2     case-in-chief will include law enforcement officers who were

3     present that day at the Capitol?

4          MR. WELCH:  There are two that have been specifically

5     identified as actually having contact with Mr. Reffitt, and

6     there is a case agent, although I'm not sure whether that case

7     agent who interviewed them did so from Texas or from Washington,

8     D.C.  I assume for this that there is a case agent in

9     Washington, D.C.

10         THE COURT:  All right.  Well, help me understand your

11    argument that keeping the case here in the District disrupts

12    Mr. Reffitt's efforts to resume his business.  He would be

13    incarcerated in either district.  So help me understand that.

14         MR. WELCH:  Well, that is true, and certainly, that is

15    among the weaker arguments in terms of the factors that I'm

16    addressing.  I wanted to be complete.  I wanted to address them

17    all.

18         But certainly, Mr. Reffitt would like to resume working and

19    helping to support his family.  That's not something that he can

20    do easily while detained, granted, in either district, but

21    certainly, if he were closer to home, he would be able to visit

22    family and friends and business acquaintances who -- you know,

23    sometimes people are able to carry on some level of business

24    activity even while they're incarcerated, and I'm talking about

25    legitimate business activity.

1      THE COURT:  You don't have any evidence for the Court

2  that the Eastern District of Texas's docket is less congested

3  than our docket, do you?

4      MR. WELCH:  I don't have cases, Your Honor.  I don't

5  have a docket calendar to present.  What I'm looking at is what

6  is available on the courts', both District of Columbia's web

7  site and the Eastern District of Texas's web site and what is

8  covered in the media.  And it certainly appears from that that

9  they have not had the kind of constraints, operating constraints

10  on their docket that have been in place in this district due to

11  the pandemic.  I'm not criticizing.  I'm just saying it's

12  different.

13      And it is absolutely clear that there have been over 600

14  cases at this point that have been brought in the federal court

15  in the District of Columbia just related to January 6.  That is

16  more than twice what I understand the District of Columbia

17  normally sees per year on its criminal docket, and that is on

18  top of the backlog of cases that existed due to the pandemic.

19      So there should be no question that this court's docket

20  right now is more backed up and more heavily constrained than

21  probably any other courts in the country, but specifically the

22  Eastern District of Texas.

23      THE COURT:  We're going to talk about the government's

24  motion to vacate the trial date in a minute, but right now, you

25  have a trial date, November 15.  I'm not sure you could get that

1    in the Eastern District of Texas.

2         Moreover, I suspect that this courthouse will be opening

3    more for just the very reason that you identified, that there

4    are so many cases that need to go to trial, that restrictions in

5    this courthouse I don't think you can assume are going to

6    continue as they are at the moment.

7              MR. WELCH:  Well, you might know that better than I.

8              THE COURT:  No, I don't know for sure, but it's common

9    sense to suggest that the court in time has to become more open

10   in order to get to honor defendants' speedy trial rights.  And I

11   think the court has been very careful in trying to ensure that

12   we follow the appropriate safety protocols that the experts have

13   suggested.

14        But right now, Mr. Reffitt does have a trial date in a

15   month.

16             MR. WELCH:  Right, and you're right, and if so, great,

17   as long as that holds.  But there could be things that are

18   beyond our control that could --

19             THE COURT:  We're going to talk about that in a moment

20   and what happens if that does happen.  But at least what you've

21   told me right now doesn't suggest that in the near future the

22   Eastern District of Texas is going to do any better at managing

23   this case than this district.

24             MR. WELCH:  And I would agree that if the current

25   trial date holds, then certainly, that would in all likelihood

```
 1    be faster than it could be done in Texas.

 2             THE COURT:  All right.  Mr. Nestler, let me hear from

 3    you.  First, if you can start with the defense's initial

 4    argument about pretrial publicity and about the inconvenience to

 5    residents of the District of Columbia.

 6             MR. NESTLER:  Yes, Your Honor.

 7        As Your Honor indicated, the D.C. Circuit's precedent talks

 8    about how these issues about pretrial publicity can be

 9    adequately addressed at voir dire, and we believe they will be

10    adequately addressed at voir dire here.  We don't believe any

11    pretrial publicity was overly specific to this defendant or

12    overly negative or, as we pointed out in our pleading, not

13    factually accurate or included things like in some of the

14    Supreme Court cases, a confession from the defendant.  We don't

15    have that information here.  So we don't believe that factor

16    would affect the analysis.

17        The Supreme Court has been clear that prominence does not

18    mean prejudice, and impartiality does not mean ignorance.  And

19    so just because residents here of the District are aware of what

20    happened at the Capitol on January 6 or it may have been

21    prominent in both the local news and the national news at the

22    time does not mean that the defendant would be prejudiced by

23    having a trial here or could not get a fair jury here.

24        We also want to point out to the Court some of the

25    questions Your Honor indicated to Mr. Welch.  The large fence
```

around the Capitol is no longer up.  We don't believe there's

any daily reminder to the citizens of the District of what

happened on January 6.  And physical reminders about an

incident, that factor does not appear in any of the Supreme

Court case law on Rule 21, whether prejudice exists just because

jurors might have seen part of the crime scene or where the

incident happened.

On the convenience factors, Your Honor, we pointed out in

our pleading that almost all of the factors weigh against

transfer.  Plus, the defendant is the one who bears the burden.

So any factor that is neutral actually weighs against transfer,

because the defendant has to come forward with evidence

arguments in support of the transfer.  So some of the case law

talks about how when the factors are equitable as to any

particular interest, equitable actually weighs against transfer.

In terms of witnesses, we're very comfortable talking about

the number of witnesses and who they will be.  We will have law

enforcement witnesses here from D.C.  We will have people who

worked at the Capitol, were present at the Capitol on January 6

testifying, as well as summary witnesses on the video systems

and those kinds of things and how Congress works to support our

various charges like the civil disorder charge and the official

proceeding charge, as well as the officers that Mr. Reffitt

actually interacted with.

In terms of other civilians, Mr. Welch is right, there are

a couple of civilians or a few civilians from Texas, and we've disclosed all of their information to Mr. Welch in discovery. And if Your Honor would like, I can go through generally the category they would fall into and their numbers.

THE COURT:  Go ahead.

MR. NESTLER:  Sure.  So Mr. Reffitt's wife and two children who were present when he uttered his threat after he returned from the Capitol are under subpoena, as well as the individual that Mr. Reffitt traveled from Texas to D.C. with, who, by the way, is not a cooperator but will be a government witness at trial, and all of his *Jencks* information has been provided to the defense already.

THE COURT:  Was that individual charged as well?

MR. NESTLER:  No.

And so those people are under subpoena.  The government is going to arrange and has already arranged for plane flights for those four individuals I just indicated and can easily arrange for travel.  I note that the *Platt* factors were enunciated more than 50 years ago when it was more complicated to travel across the country.  The government submits that it is not particularly complicated to fly from Texas to D.C. and put them in a hotel to testify and not out of the ordinary.

There is also a case agent both in Texas and in D.C., and so the case agent in Texas will also be traveling to D.C. for the trial.  Again, the government is comfortable paying for that

1    and coordinating that, and we don't believe that's going to --

2    that inconvenience to that agent, who is a federal employee, an

3    FBI agent, should affect the analysis.

4           THE COURT:  All right.  Okay.  I'm going to rule on

5    the motion to change venue now.

6        I will deny without prejudice Mr. Reffitt's motion to

7    change venue to the Eastern District of Texas pursuant to

8    Federal Rule of Criminal Procedure 21 based on prejudice and

9    convenience.

10       As I've stated already, in this circuit, it's

11   well-established procedure to refuse pre-voir dire requests for

12   change of venue.  See *U.S. v. Haldeman*, 559 F.2d 31 at 63

13   through 64.  That's a D.C. Circuit case.  And only in extreme

14   circumstances may prejudice to the defendant's rights be

15   presumed before voir dire.  Again *Haldeman* at 60.  Also

16   *Skilling v. United States*, 561 U.S. 358 at 381.

17       Mr. Reffitt has not demonstrated that this is such an

18   extreme circumstance in which extraordinary local prejudice will

19   prevent a fair trial.  *Skilling,* 561 at 378.  Nor has he

20   demonstrated that the jury pool in this district is

21   presumptively biased against him.

22       The fact that news articles have been printed in local

23   newspapers and other news outlets does not inevitably lead to an

24   unfair trial.  Most of these articles consist primarily of

25   factual accounts of events, and as Judge Mehta recently noted

1   when denying a similar motion to change venue, most of these

2   articles were consumed by national audiences and say nothing

3   about the jury pool in the District of Columbia specifically.

4   And that was in *U.S. v. Caldwell*.  That's 21-28, docket 415.

5        With respect to Mr. Reffitt's argument regarding the level

6   of awareness of residents and the extent to which they've been

7   inconvenienced, I believe that can be addressed at voir dire,

8   and any extent to which those jurors might be biased against

9   Mr. Reffitt can also be explored at voir dire.

10       At this stage, the Court can't conclude that a large number

11  of jurors will be dismissed for cause because voir dire has not

12  yet occurred.  And if this ends up being the case, Mr. Reffitt

13  can renew his motion following voir dire.

14       Turning to his convenience argument and considering the

15  various factors the Supreme Court identified in *Platt v.*

16  *Minnesota Mining & Manufacturing Company*, 376 U.S. at 240, the

17  factors the Court should consider when deciding Rule 12(b)

18  motions, Mr. Reffitt has not come close to satisfying his burden

19  to show that this case should be transferred to the Eastern

20  District of Texas.

21       Mr. Reffitt himself is located in this district, as he is

22  incarcerated here.  The alleged events charged in the indictment

23  primarily occurred in this district.  While Mr. Reffitt claims

24  that some witnesses and records are located in Texas and the

25  government confirms that some witnesses will come from Texas,

1    Mr. Reffitt provides no additional detail about other witnesses

2    or records, and the government has the four Texas residents

3    under subpoena.  So that should not be a problem here, and they

4    can make travel arrangements for them to be here for trial.

5    Because most of the records in this case are electronic, their

6    location is not significant.  Also, counsel for both parties are

7    in this district.  Any expense to the parties would not be

8    substantially different in either location, and both are

9    accessible.

10        Though Mr. Reffitt claims that keeping the case here could

11   disrupt his efforts to resume his business, as we've discussed,

12   he remains incarcerated.  So it's unlikely that he can resume

13   much work even in the Eastern District of Texas.

14        As I've noted already, there's little or no evidence that

15   the Eastern District of Texas's docket is less congested than

16   the docket in this district.

17        So for all those reasons, I deny Mr. Reffitt's motion to --

18   without prejudice.

19        All right.  Mr. Welch, moving on to the motion to dismiss,

20   unlike a number of the other defendants in the January 6 cases,

21   Mr. Welch, you've moved to dismiss the indictment on only two

22   grounds, and that is, first, that Congress's certification of

23   the electoral results did not constitute an official proceeding

24   as defined by Title 18 United States Code Section 1512(c)(2) and

25   that the term "corruptly" is unconstitutionally vague.

Other defendants have argued that the "otherwise obstruct, influence, or impede" portion of the statute must be understood in light of (c)(1)'s focus on documents and evidence and, thus, does not encompass any and all acts of obstruction, such as forcibly halting Congress's certification of electoral results.

You've not raised that argument here; correct?

MR. WELCH:  Correct.  And Your Honor, I'm only moving to dismiss Count 2, not the entire indictment.

THE COURT:  Sorry, Count 2.  All right.

So you're just proceeding on these -- with these two arguments alone?

MR. WELCH:  Correct.

THE COURT:  All right.  So Section 1515(a)(1) defines "official proceeding" to include a proceeding before Congress. And why isn't the joint session to certify the electoral votes an official proceeding?  It seems to me it has all the trappings of a formal hearing before an official body.

MR. WELCH:  Well, because the Ninth Circuit took a look at a very similar issue in *Ermoian* and concluded that it's not the lay meaning of the term "proceeding," it is the legal meaning of "official proceeding" that should control.  And specifically, what they went on to examine and define in *Ermoian* is that it needs to be something like an investigation, that not everything that Congress does has the same character.  And what 1512(c) specifically would involve is something to do with the

administration of justice.

And I'm not saying that certification of the Electoral College is not important.  I'm just saying it's not what this statute was designed to regulate.  This statute was to protect witnesses, prevent someone from, you know -- basically to hold someone accountable who prevents someone from testifying before Congress if Congress were investigating something like what happened in the Enron case.

That's what this statute is really designed to do.  It's not -- it doesn't give notice to someone that oh, it also covers certification of the Electoral College count.  And that's what the legislative history, that's what the Department of Justice would also tend to indicate.  It's not that it might not be a violation of some law.  It's not a violation of this law.

THE COURT:  But you say, Mr. Welch, that I need to look at the definition of "proceeding" in a legal sense, and it is defined as, quote, the business conducted by a court or other official body or a hearing.  And that's Black's Law Dictionary.

So I still don't get why this doesn't meet that definition.  And you talk about the need for this to be a proceeding akin to -- you mentioned investigation, but that's not quite right; right?  You're talking about a court hearing; right?

MR. WELCH:  That is what it clearly would be certainly looking at *Ermoian*.  There are some types of proceedings, perhaps an administrative body or administrative agency who was

1    conducting an investigation and calling witnesses.  Congress

2    does subpoena witnesses sometimes, but that's not what they were

3    doing in this situation.

4          THE COURT:  But where do you get that from the text of

5    Section 1515?

6          MR. WELCH:  It would not be necessarily obvious from

7    the text, but the text is the starting point, and then looking

8    at it in the context of Chapter 73 and saying okay, what is

9    obstruction of justice, obstruction of justice typically has to

10   do with a court proceeding or even an investigation.

11        And even *Ermoian* -- are you still there, Your Honor?  I

12   think we might have lost the judge.

13          MR. NESTLER:  I think that's right, Mr. Welch.

14          MR. WELCH:  Where did you go?

15          THE COURT:  I don't know.  I thought I lost all of

16   you.  All right.  I don't know what happened.  It says my

17   Internet connection is unstable.  Can you hear me, Mr. Welch?

18          MR. WELCH:  I can.  I was just going to ask, what was

19   the last thing that you heard me to say?

20          THE COURT:  You were starting to answer my question,

21   and you were saying that this proceeding has to be like a court

22   proceeding.

23          MR. WELCH:  Yes.  And there can be some hearings that

24   Congress might conduct when it subpoenas witnesses when it's

25   investigating that would be like a court proceeding.  This was

not one.  There might even be other things such as you could

have an administrative agency that might be doing the same kind

of thing, subpoena witnesses, take evidence, that kind of thing.

So interfering with Congress's investigative function if it

were holding a hearing and subpoenaing witnesses, that might be

covered under 1512(c).  But obstructing certification of the

Electoral College count is not -- and the Supreme Court has

distinguished between different activities that Congress has in

terms of, you know, what types of things flow from it, and the

Electoral College certification is just not something that when

you look at the legislative history, when you look at the court

cases, and you look at the statutory scheme as a whole, this is

not something that would fall within that.

THE COURT:  But based on the Constitution and the

Electoral Count Act, there are all kinds of requirements here

that are akin to a court hearing.  You have a presiding officer.

You have a process by which objections can be heard and debated

and ruled upon.  You have a decision on the certification of the

results that has to be reached before the session can be

adjourned.  The certificates are like records or documents that

are produced during judicial proceedings, and objections to

these certificates can be analogized to evidentiary objections,

can't they?

MR. WELCH:  True, but what I would point out is the

Supreme Court precedence distinguishing between Congress's

legislative and investigative powers, specifically *Kilbourn v.*
*Thomas*, 103 U.S. 168, and later *McGrain v. Daugherty*, 273 U.S.
136.  And in that analysis, it's basically saying that there
aren't formal distinctions between Congress's legislative and
investigative powers.  This is certainly a formal responsibility
that Congress has, but it wasn't conducting an investigation.

THE COURT:  Mr. Welch, you make arguments based on
Section 1503 and 1505; right?

MR. WELCH:  Yes.

THE COURT:  Isn't 1512(c), though, broader than both
of those statutes?  Doesn't "official proceeding" mean something
different than -- with respect to 1503, it talks about the due
administration of justice.  1505 talks about an inquiry or
investigation.

Doesn't this statute cover something different than these
provisions that you've relied upon?

MR. WELCH:  What I understand it to -- and by citing
those, I was trying to show that this statutory scheme deals
with obstruction of justice.  It was specifically involved and
this specific statute was passed to address the destruction of
documents that were incriminating specifically.  That is what
had happened after Enron, and Congress was attempting to address
that.  So it's targeted.  It's not that it says proceeding, so
proceeding can be absolutely anything that the government wants
it to be.

1          THE COURT:  I understand some of that sentiment here,

2     and I will talk to Mr. Nestler about the scope of how this is

3     being interpreted.  But simply because this was enacted in the

4     wake of Enron, obviously that's correct, that doesn't mean the

5     words of the statute can't plainly apply to a different type of

6     conduct that triggered the enactment of the statute; right?

7          MR. WELCH:  Well, true, but that's what *Ermoian* was

8     looking into.  The question there was, you know, that is an FBI

9     investigation, although it hadn't gotten to, you know, the

10    charging stage yet, was an FBI investigation and proceeding.

11         THE COURT:  But that's because it wasn't formal.

12         MR. WELCH:  Well, and that ends up opening up the

13    question of well, when exactly does something become formal and

14    how can you tell that it's become formal.  I guess once an

15    indictment is filed, I guess we can all agree that's formal

16    charging.  But it does not fit -- the certification of the

17    Electoral College does not fit within the scheme of Chapter 73

18    in that it is not some sort of a judicial proceeding, it is not

19    an investigation where witnesses are summoned and documents

20    subpoenaed.

21         THE COURT:  Well, I don't know how you can quibble

22    with it being a formal proceeding.  It's extremely formal in

23    nature, the way in which the procedures work.  There's a

24    presiding officer, and there's very much a process here.  I get

25    that it's not like exactly a court proceeding, but I just don't

1    see that in the language of the statute.

2         MR. WELCH:  Well, right, it's not obvious just within

3    the text of the statute, and that's why the Court should be

4    looking, as the Ninth Circuit did when it dealt with *Ermoian*,

5    and saying well, all right, looking at the statutory scheme as a

6    whole, looking at the legislative history, and looking at the

7    case law for *Ermoian* and some other cases, that this is not --

8    although it is important, although there might have been, you

9    know, a formal rule laid out as to who has to be there and who

10   sits where and what order they do things, it is not an official

11   proceeding as that has been defined by the case law.

12        THE COURT:  All right.  Mr. Nestler?

13        MR. NESTLER:  Yes, Your Honor.

14   *Ermoian* was interpreting 1515(a)(1)(C).  In that case the

15   Ninth Circuit was focused on whether the FBI investigation was

16   a, quote, proceeding authorized by law.  And so when we're

17   talking about the definition the Ninth Circuit provided about

18   formality, that's a different provision.

19        No Court appears to have interpreted 1515(a)(1)(B), which

20   is a proceeding before Congress, and that's the provision we're

21   dealing with here.

22        So the arguments about the formalities are not applicable,

23   even if there were formalities.  As Your Honor indicated, the

24   Congress's joint session on January 6 would obviously qualify.

25   But we don't even have to get to that point.  Mr. Welch talked

about how the text was only the starting point.  The government

disagrees, Your Honor.  The text here is both the starting point

and the ending point.  The Supreme Court has been clear when the

text is unambiguous, the Court looks no further to look for

other contextual clues, including the things that Mr. Welch

pointed out in his brief in terms of legislative history or how

other statutes might be construed.

The language is clear.  "Official proceeding" means a

proceeding before Congress.  This would be a proceeding before

Congress.  That is the end of the analysis.

And as Your Honor indicated, the language Congress used was

clear.  They used a very broad language, a proceeding before the

Congress.  If it wanted to use more narrow language, it could

have used language that had already existed like in 1505, an

inquiry or investigation being had before Congress.  It didn't.

It just said proceeding before Congress.  That is much broader

than the definition in 1505.

THE COURT:  In the government's view, Mr. Nestler, is

there any restriction on the type of proceeding before Congress?

Does this statute apply to anything, a congressional hearing, a

floor vote?  What are the limits?

MR. NESTLER:  Well, a proceeding needs to be a

proceeding, an officer presiding.  We don't -- there are other

definitions in other statutes about Congress conducting official

business.

1          THE COURT:  What about a committee hearing, a vote on
2    a nominee, a hearing on legislation?  Do those qualify as
3    proceedings before Congress that would be subject to this
4    statute?
5          MR. NESTLER:  If Congress is in session, then there's
6    a presiding officer, and they've gavelled into session, and
7    Congress is meeting, it's being recorded, it has the trappings
8    of a formal proceeding before the Congress, whether it's a
9    committee or whether it's the full House or the Senate or here a
10   joint session, then yes.
11         THE COURT:  So markup of legislation, a nominations
12   hearing, all of those things would be covered?
13         MR. NESTLER:  Yes, Your Honor.
14         THE COURT:  Debate on the floor about legislation,
15   that's covered as well?
16         MR. NESTLER:  It depends on the circumstances, Your
17   Honor.  The government submits that here we don't need to reach
18   all those different hypotheticals about where the limits may
19   exist, but here, it's quite clear that a formal joint session is
20   a proceeding.
21      What Congress does is sometimes it does official business.
22   Sometimes it meets as a formal body or via committee.  Each of
23   those circumstances would be evaluated on their own terms.
24         THE COURT:  All right.  Anything else you would like
25   to add, Mr. Nestler?

1        MR. NESTLER:  No, Your Honor.

2        THE COURT:  Mr. Welch, anything in response?  If not,

3    can you address your vagueness argument.

4        MR. WELCH:  Sure.  I did notice that the government

5    used the term "official business" in concluding its response.

6    And while I would agree that certification of the Electoral

7    College count would be official business, that is not what the

8    statute says, and I think that these terms have different

9    meanings, and the Court should consider that.  I don't think

10   it's just wide open to mean anything.  Certainly in *Ermoian*, and

11   maybe the government is contending that *Ermoian* was wrongly

12   decided, but in that case they said an official proceeding was

13   the FBI investigation.

14       THE COURT:  All right.  So just to make sure I

15   understand your position, Mr. Welch, your position is this

16   language, "official proceeding," only covers those proceedings

17   before Congress that are akin to a court hearing such as an

18   impeachment trial or what else?

19       MR. WELCH:  I would say it has to be something

20   involving the subpoenaing of witnesses, Your Honor, an

21   investigation.  So that way, it would fit squarely within

22   obstruction of justice.  I mean, that is where certainly the

23   Enron investigation was going.  It's that kind of thing, that if

24   you interfere with a witness appearing, if you destroy documents

25   which you know are going to be evidence before a congressional

1     committee or something like that, that would be covered, but not

2     certification of the Electoral College vote.

3              THE COURT:  It has to be tied to an investigation?

4              MR. WELCH:  Yes, that's our position.

5              THE COURT:  All right.  Okay.  If you can address your

6     vagueness arguments.

7              MR. WELCH:  Certainly.

8        There is a D.C. Circuit case on point, *Poindexter*, and the

9     issue involved the word "corruptly."  Court's indulgence,

10    please.

11             THE COURT:  Sorry.  I don't mean to interrupt your

12    thought there.  I just want to clarify.  You're making an

13    as-applied challenge; correct?

14             MR. WELCH:  Correct.

15             THE COURT:  Okay.  Go ahead.

16             MR. WELCH:  "Corruptly," as used in Section 1512(c),

17    is not defined.  And that is the same kind of problem that came

18    up in the *Poindexter* case, and ultimately, the D.C. Circuit

19    ruled in *Poindexter* that it had not been defined, and Congress

20    went back to amend it to include a definition for "corruptly,"

21    but they only did so with application to Section 1505.  They did

22    not apply that definition of "corruptly" throughout the chapter

23    or specifically to 1512.

24        So ultimately, we have the same problem here that

25    "corruptly," as it's used in this statute, is undefined.  So it

then becomes a problem that, you know, how do we know when it's
going to be applied.  It could end up being arbitrarily applied
because someone doesn't like someone else's politics.  There's
no meaningful standard that is involved in a situation like
that.  It would violate the due process clause of the Fifth
Amendment and potentially, if it's being applied in the context
of political speech, the First Amendment.

THE COURT:  But haven't many courts post-Poindexter
limited that case to its particular facts within that case
related to lying to Congress, and since then, haven't numerous
courts applied it in other contexts and given definition to that
term?

Courts use the phrase "motivated by improper person."  The
Supreme Court has explained that "corruptly" is normally
associated with wrongful, immoral, depraved, or evil conduct.
That's the *Arthur Andersen* case.

And so to convict Mr. Reffitt of this offense, the
government would have to establish beyond a reasonable doubt
that he acted intentionally and with some consciousness of his
wrongdoing.  Isn't that the standard that prevents arbitrary
enforcement?

MR. WELCH:  Well, Your Honor, unfortunately, though,
it -- I don't think any of those were a 1512 case.  And so it
wouldn't then be defined within the context of 1512.  It's
specifically limited to 1505, that definition.

1          THE COURT:  I thought even the D.C. Circuit rejected a

2     vagueness challenge to "corruptly" as used in 1512(b).

3          MR. WELCH:  I'm sorry, but I don't know that case.

4          THE COURT:  Okay.  I think it's *U.S. v. Morrison*,

5     98 F.3d 619 at 630.

6          MR. WELCH:  98 F.3d what?

7          THE COURT:  619 at 630.

8          MR. WELCH:  What I can do, Your Honor, is take a look

9     and file something in response to that perhaps, but

10    unfortunately, I missed the *Morrison* case.

11         THE COURT:  All right.  And I think the Eleventh

12    Circuit in *Shotts*, 145 F.3d 1289 at 1300, declined extending

13    *Poindexter* to "corruptly" in 1512(b), and it determined

14    *Poindexter* should not be read as a broad indictment on the use

15    of the word "corruptly" in the various obstruction of justice

16    statutes.  And also, *U.S. v. Thompson*, 76 F.3d 442 at 452, the

17    Second Circuit said much the same.

18       So I'm wondering, is that authority just limited to the

19    facts of that particular case?

20         MR. WELCH:  I don't think that *Poindexter* is limited

21    specifically to the facts of that case.  I mean, one of the

22    basic problems there was that "corruptly" hadn't been defined at

23    all, and that's what the D.C. Circuit ruled on.  Even when

24    Congress went back and defined it, it only has defined it in the

25    context of Section 1505.

1          THE COURT:  Because it was responding to that case.

2          MR. WELCH:  Right.  I understand that.  But that

3    doesn't then create a definition for 1512 when Congress has said

4    that it's specifically defining it with respect to 1505.

5          THE COURT:  All right.  So it would define it with

6    respect to an adjacent provision, but then it means something

7    else in the -- the very same language in an adjacent provision

8    means something different?

9          MR. WELCH:  Well, we would have to ask ourselves why

10   did Congress limit it specifically to 1505.  If the intent was

11   to say all right, we have failed to define "corruptly" within an

12   entire chapter, then they could have said "as used in this

13   chapter 'corruptly' shall mean," and then we wouldn't be having

14   this discussion, because it would be defined.

15         THE COURT:  They could have, but they also could have

16   just felt like this is an erroneous case we need to fix.

17         MR. WELCH:  And we don't know, and that, I think, is

18   the problem.  So our position is that as of right

19   now "corruptly" hasn't been defined as far as 1512 is concerned

20   because Congress, for whatever reason, decided to limit it to

21   1505.

22         THE COURT:  All right.  Mr. Nestler?  Again, what's

23   the limiting principle here?  How far does this go?

24         MR. NESTLER:  Yes, Your Honor.

25        So first on the definition of "corruptly," Your Honor is

correct, and we cited the *Morrison* case in our opposition brief.
That was a 1512(b) case, and the D.C. Circuit rejected a
vagueness challenge to the word "corruptly" in 1512(b).  It's
not 1512(c), but "corruptly" is used throughout 1512, and many
courts have rejected vagueness challenges to 1512, including the
*Holloway* case, which was the District Court case before the case
had appealed and was renamed *Ermoian,* where the District Court
rejected the *Poindexter*-based challenge to the word "corruptly"
in 1512(b)(2), the exact statute we're dealing with here.

      The limiting principle, Your Honor, is -- there are two for
how the government interprets 1512(c)(2).  The first is a nexus
to an official proceeding, and the government derived that
primarily from the *Arthur Andersen* case, and even going back
further to the *Aguilar* case, that defendant's conduct has to
have a nexus to the official proceeding.

      The government believes that it can easily satisfy that
burden here, given that Mr. Reffitt was on the steps of the
Capitol as Congress was meeting.  But in general, we believe
that that is a meaningful limitation and restriction.  If
Mr. Reffitt's actions took place weeks or months earlier from a
different location, perhaps the jury would not find that there
was a sufficient nexus to the official proceeding itself.

            THE COURT:  So does the government not believe that
January 6 defendants who were yelling from outside the Capitol
and encouraging those who either tried like Mr. Reffitt to get

in the Capitol, as you've alleged, or actually got into the
Capitol, are those not covered by this statute?

MR. NESTLER:  So they certainly are, could be covered
by the statute.  It's a question ultimately for the jury whether
the government has proved beyond a reasonable doubt that the
defendant's actions had a nexus to the official proceeding.  And
the further the defendant is removed both geographically and
temporally from the official proceeding, it might be harder for
the government to prove that or for a jury to find that.  But
that is a --

THE COURT:  What about a defendant who -- could an
individual who is yelling from the Senate gallery be charged
under 1512(c)?

MR. NESTLER:  Under 1512(c)(2), if the person has the
correct mens rea, if they have a corrupt intent.

THE COURT:  So someone yelling and being obstructive
and not listening to the guards to quiet down, is that, in the
government's view, an adequate corrupt intent?

MR. NESTLER:  It's a question for the jury, Your
Honor, whether that person's intent would be corrupt.

THE COURT:  So you believe you could charge it, but a
jury might not find it based on the evidence?  Is that your
position?

MR. NESTLER:  If Your Honor is indicating whether
somebody who is just yelling during a congressional proceeding

could be charged under 1512(c)(2), it depends on the facts.
It's not what we have here, obviously, but it depends on the
facts about what that person was intending to accomplish by
their yelling.

THE COURT:  An example of yelling that you would think
would meet the statute?

MR. NESTLER:  Well, an example of yelling in that
situation is yelling some sort of threatening or other type of
language at the people who were actually conducting the
proceeding.  Yelling to get a point across is different than
yelling in order to intimidate the people who are actually
making the decision, and that goes to the definition of
"corrupt," whether the intent of the person who was making the
obstructive conduct was intending to act corruptly.  Was it
wrongful?  Was it depraved?  Was it evil?  Those are ultimately
words that are known in common parlance and that a jury could
determine.

And a person who stands up and says don't vote on this bill
or I don't like what you're doing here, that probably would not
be charged, and the jury probably wouldn't find that person was
acting corruptly.

A person who stands up and yells everybody better leave the
chamber right now because otherwise we're going to jump onto the
House floor and kill you or hurt you or rip up all your papers,
that person is probably acting corruptly.

1    There is, of course, in-between scenarios, but we would

2    have to go through each scenario to tell.

3    Here, we don't need to get into those hypotheticals.

4    Mr. Reffitt's own statements indicated his corrupt intent, that

5    he was going to the Capitol to find Nancy Pelosi to drag her out

6    by her ankles so that she wouldn't vote to certify the Electoral

7    College in favor of his preferred presidential candidate.

8    So we believe we can prove that to a jury, but ultimately,

9    that's up to a jury to decide whether we met our burden to prove

10   that he acted with corrupt intent.

11             THE COURT:  Anything else, Mr. Nestler?

12             MR. NESTLER:  No, Your Honor.

13             THE COURT:  Mr. Welch?

14             MR. WELCH:  The problem with that, Your Honor, is it

15   ultimately leaves up to a jury the question of what the law

16   means in that situation, that basically they'll know it when

17   they see it.

18             THE COURT:  No, no, no.  You're going to fight this

19   out at the time of jury instructions.  They'll receive a

20   standard, and they'll have to determine whether the facts meet

21   that standard.  It's not the jury looking at corruptly in a

22   vacuum and trying to each figure out what that means to him or

23   her.  There will be an instruction that would be in line with

24   what other courts have done that would guide the jury.

25             MR. WELCH:  The ultimate problem here even still, Your

1    Honor, would be that that is not something that 1512 has

2    defined.  It's still going to be a vague thing, because we can't

3    say that whatever definition might have applied in another

4    situation would apply here.

5            THE COURT:  But we can look to the definition Congress

6    has given in a related provision.  We can look to case law.  But

7    that's often the case.  Statutes don't define every word.

8    That's what we do frequently.

9            MR. WELCH:  And I understand that, but as I was

10   thinking about some of Mr. Nestler's examples, I was thinking

11   about well, you know, what if a person is just screaming

12   nonsense, you know.  Then it could be just as obstructive, but

13   apparently, that would not be a crime.  Whereas, if the person

14   were explicit about their goals, it is a crime.  That is not a

15   meaningful standard to then leave it up to a jury to decide

16   well, that's the law or that isn't the law.

17           THE COURT:  The Supreme Court has explained corruptly

18   is normally associated with wrongful, immoral, depraved, or evil

19   conduct.  And I think that means that the government will have

20   to establish beyond a reasonable doubt that Mr. Reffitt acted

21   intentionally and with consciousness of wrongdoing.

22           MR. WELCH:  Well, then our position ultimately comes

23   back to the fact that that term "corruptly" has not been defined

24   as far as 1512 is concerned.  It might be defined in other

25   contexts, but not in 1512.

1          THE COURT:  All right.  Understood.

2      So I am going to take this motion under advisement, but I

3  do want to discuss the government's motion to vacate the trial

4  date, and I would like you all to assume -- I haven't decided

5  how I will rule, but I want you to assume for purposes of

6  discussing this motion that the Court would deny the motion to

7  dismiss, because we need to proceed as though that could be the

8  case, and we're a month away from trial right now.

9      So Mr. Welch, you've objected.  You've tied your objection

10  to the change of venue, which the Court has denied, suggesting

11  that if I were to change venue here, that you wouldn't have an

12  objection to the trial date being vacated.  But I've denied that

13  motion, and so we are where we are.

14      I certainly appreciate that Mr. Reffitt has a

15  constitutional right and a statutory right to a speedy trial,

16  and he has asserted that right.  And based on that, I am

17  inclined to keep the November 15th trial date as scheduled, but

18  I do have concerns about whether proceeding on that date is in

19  his best interest and the public's interest.

20      So can you address, you know, are you ready to go to trial?

21  I had ordered -- and we will talk about this in a moment.  I had

22  ordered both sides to file motions in limine on or before

23  September 17th.  Neither side has filed any.  I can't help but

24  think that there are objections to exhibits and witness

25  testimony that both sides could have anticipated, and those are

1    issues that I had hoped to address if not today, at the initial

2    pretrial.

3         But no motions have been filed.  And these are issues that

4    we have to resolve in front of trial.  If I am keeping this

5    week -- and by the way, I'm keeping -- I'm slotted in -- based

6    on what the parties have told me, my understanding is that the

7    government's case and the defense case together, you do not

8    expect this trial to last more than five days.

9         Is that the case?  Mr. Nestler?

10              MR. NESTLER:  Yes, Judge.

11              THE COURT:  And Mr. Welch?

12              MR. WELCH:  That's my understanding, Your Honor.

13              THE COURT:  All right.  Because that would be all that

14   we have.  If we start on November 15th, we will start jury

15   selection on that date.  The 16th we would not have access to

16   the ceremonial courtroom.  So we would not be able to continue

17   any voir dire on that date.  We would have to come back on the

18   17th and hope to finish up jury selection and have opening

19   statements.  And then that would give us exactly five days, the

20   18th, 19th, 22nd, 23rd, and the 24th, the Wednesday before

21   Thanksgiving.  That's all we will have.  There are trials boxed

22   on either side.

23        So that's a tight window, and in order to try this case in

24   that amount of time, we have to tee up issues, legal issues that

25   can be resolved before trial.  We cannot have lengthy recesses.

1    This will not work.

2         So you haven't filed any motions in limine.  I'm concerned

3    that neither side has.  You know, for that reason, if we're

4    sticking with this trial date, I'm moving up the date for

5    exhibits and witness lists to be exchanged and jury instructions

6    and everything else, because we have to suss out where those

7    arguments are.  And some no doubt relate to the definition of

8    the word "corruptly," and we have limited time to do a lot of

9    things here, Mr. Welch.

10        So I'm pressing on this because I don't want to keep this

11   trial date and keep another defendant who has been waiting for

12   trial away from trying their case and getting prepared in

13   anticipation of trying their case only to find out in two weeks

14   or three weeks that the defense wants more time.

15        And the government is telling us you don't have all the

16   evidence you're entitled to.  So far as I can tell, the

17   government is acting with due diligence and in good faith, but

18   there is evidence forthcoming that might be helpful to

19   Mr. Reffitt that you will not have if you go on November 15.

20        So I want you to address these points and why you're

21   insisting on going on November 15, and are you waiving his right

22   to receive potential *Brady* evidence?  Is that what you're doing?

23   You can't come back later and say well, I didn't have that.

24   You're making a choice to go on that date.

25             MR. WELCH:  Your Honor, first, my client has given me

explicit instructions not to waive his right to a speedy trial and to get him to trial as soon as possible. He is detained.

Second of all, I don't think that the Due Process Protections Act or the Speedy Trial Act require a defendant to waive either one. There is a potentially ridiculous amount of disclosure that might be made in this case. As I understand it, investigations are ongoing. We have no idea when that might conclude. And Mr. Reffitt should not have to sit at D.C. Jail for however many weeks, months, potentially years that it might take for the government to be satisfied that it's looked at everything and turn that over.

There has been some sort of an arrangement that the government has made with a private company, evidence.com, to make disclosures. And my understanding is the government is taking the position that once they've done that they're off the hook. I don't know that that's the case.

And I don't know that Mr. Reffitt has to waive anything. He has both a right to a speedy trial and a right to the evidence. And if the government is unable to disclose all of the evidence before the trial date, then that potentially becomes a 2255 issue, I think, down the road. But I don't think he has to pick and choose here which rights he wants to exercise. I don't think this is like okay, if you plead, then you can't have your trial rights, and if you go to trial, you can't have the plea. I don't think it's an either/or situation

1    like that.

2           THE COURT:  And I don't mean to suggest that it is.

3    I'm just concerned that there could be information that's

4    forthcoming that would be helpful.

5           MR. WELCH:  There certainly could be.  I don't deny

6    that.  I don't know what else is out there.  I do know that as

7    of now I have -- at the government's request, I have contacted

8    the Federal Public Defender's Office and asked about access to

9    evidence.com, and it's not available to me yet.  So whatever

10   they think they've disclosed to me by putting it on evidence.com

11   has not been disclosed.  I don't have it.

12       Now, that said, I don't know how long it might take

13   somebody to get through all of the terabytes of data that might

14   be out there in terms of video.

15          THE COURT:  Mr. Reffitt's situation should be a little

16   bit different than many of the January 6 defendants because he

17   never got in the Capitol.  Right?

18          MR. WELCH:  That's correct.  He never went inside the

19   Capitol, Your Honor, and my understanding is -- and it seems

20   like I have the information that is specifically available to

21   him.  It seems like whatever else might be out there that the

22   government has not disclosed is hypothetical as to whether it

23   might have any helpful value to Mr. Reffitt.

24          THE COURT:  Right.  But it still doesn't answer my

25   question.  Why have you not filed any motions in limine?  Are

you not objecting to any of this evidence?  You don't have

concerns about the witnesses or the evidence at this point?

MR. WELCH:  I always have concerns about the witnesses

and the evidence, but it ends up being more a question of unless

there is something that I obviously see ahead of time that I

know is contrary to law, then I don't want to necessarily jump

out and highlight something.

For instance, you know, one of the motions in limine that I

would have filed would have been regarding whether there was any

403(b) evidence that was more prejudicial than probative, but I

haven't received a 403(b) notice.  None's on file in the docket.

THE COURT:  All right.  Well, Mr. Welch, you say you

don't want to highlight issues.  What I'm telling you now is you

can't sandbag on issues that you're aware of now that we need to

resolve, because if there are complicated legal issues, we need

to address them up front, pretrial.

MR. WELCH:  Understood.  And I didn't mean to create

that impression.  What I meant was, I don't want to highlight

for the government things that they would then want to follow-up

on.  For instance, you know, since there is a notice requirement

with respect to 403(b), I don't want to file a motion in limine

about 403(b) evidence when they haven't filed notice.

THE COURT:  I'm sure they're arguing that all of this

stuff is intertwined with his defense.  And do they have to file

it, if that's their perspective, that he started in Texas and

1    did X, Y, and Z on his way to D.C.?  Does that, in your view,

2    require a 403(b) notice?

3                MR. WELCH:  I think I was thinking more about whether

4    there were any, for instance, prior allegations in terms of

5    something indicating a lack of honesty, a prior perjury charge,

6    even if it wasn't --

7                THE COURT:  Are you talking about 404(b)?

8                MR. WELCH:  I'm sorry.  Yes, I meant 404(b), and I

9    would be responding with 403.

10               THE COURT:  Okay.  But there are other, surely --

11   aside from that, assuming there's no 404(b) evidence here, other

12   alleged bad acts that the government seeks to introduce here,

13   are you telling me that based on the evidence that you've

14   received in discovery you're not going to have objections to any

15   category of that evidence or testimony or cooperator or

16   anything?  This is hard to believe.

17               MR. WELCH:  There might be.  I'm looking at it.  I'm

18   thinking -- and I'm not trying to sandbag the Court.  I'm also

19   not trying to telegraph a road map to government about what my

20   defense strategy is likely to be.

21               THE COURT:  Again, Mr. Welch, this is not a situation

22   where we can start the trial and then bump everyone back after

23   me.  I've asked the court for an amount of time that both sides

24   have told me is the amount of time needed to try this case, and

25   that's all we have.  And as you've heard, we've lost one of

1    those days, and we have -- the second week is Thanksgiving week.

2    So we really have five business days to try this case.

3        And if in the middle of trial there are big surprises, this

4    is not going to inure to your benefit if you haven't confronted

5    some of this, if not to the government then to me so that I can

6    be prepared.

7            MR. WELCH:  I understand that, and I understand what

8    the government has disclosed to me in discovery.  It seems

9    relatively straightforward to me.  I don't necessarily feel,

10   after having considered what motions in limine might have been

11   filed by the motions deadline, that it would have been helpful

12   to my client's defense at this point to have filed them.

13           THE COURT:  But you're telling me they're coming?  Is

14   that what you're saying?

15           MR. WELCH:  No.  I do not -- if I had a motion in

16   limine, Your Honor, that I intend to file, I would have filed it

17   by the due date.  I took Your Honor's order very seriously.

18           THE COURT:  All right.

19           MR. WELCH:  I'm not seeing that.  There's always stuff

20   that -- and I'm not trying to sandbag anyone.  There's always

21   stuff that comes up during a trial.  In looking at this and

22   thinking about if I was a prosecutor, out of everything that's

23   been disclosed, I don't think that, given the universe of

24   discovery that the government has proclaimed, they're going to

25   present it all in five days.  So clearly, they're going to have

to take a more targeted approach, and then my response to that

would be based upon the government's first move.

I don't see anything jumping out at me saying I need to

file a motion in limine on this or that.  I have considered it.

THE COURT:  All right.  So Mr. Nestler, there's been

no 404(b) notice.  Is it fair to conclude that there is no

404(b) evidence the government will seek to introduce against

Mr. Reffitt?

MR. NESTLER:  Yes, Your Honor.  I think we addressed

this at our last hearing when we discussed this issue.  Your

Honor had imposed an earlier, I think in September, 404(b)

notice deadline, and we indicated that there is nothing that we

consider to be 404(b) evidence.  There is evidence about

Mr. Reffitt's trip to D.C., and we believe all of that evidence

and what he did afterwards would all be inextricably intertwined

with this crime.

THE COURT:  All right.  Well, Mr. Nestler, I know the

government wants more time, but it does seem like Mr. Reffitt is

in a somewhat unique category here, having not breached the

Capitol.

And am I correct you've provided all of the

defendant-specific evidence with regard to Mr. Reffitt?

MR. NESTLER:  We have substantially completed

defendant- and case-specific discovery with regard to

Mr. Reffitt and the witness who traveled to D.C. with

1    Mr. Reffitt.  We continue to go through our files, and there may

2    be some additional small *Jencks* productions or some other sort

3    of small productions, but we believe we have substantially

4    completed all case-specific discovery.

5                    THE COURT:  All right.  Well, I'm going to encourage

6    you to continue to press on that, because last-minute

7    disclosures will derail this.

8                    MR. NESTLER:  Understood, Judge.  We have been going

9    through, and I hope Mr. Welch would agree, we have been

10   producing materials on a frequent basis.  We filed our notice of

11   discovery this morning, all the discovery letters we have

12   provided, and we are looking through the FBI's holdings to try

13   to find any additional material that might be out there related

14   specifically to Mr. Reffitt.  If we find anything, we will, of

15   course, get it to Mr. Welch as soon as we can.

16      But in terms of --

17                    THE COURT:  Sorry.  Go ahead.

18                    MR. NESTLER:  In terms of categories of materials,

19   Mr. Welch has all the grand jury materials.  He has all the

20   defendant's custodial statements.  He has the Capitol Police

21   radio runs, the search warrant photos, all of the search

22   warrants, all of the arrest warrants, all of the videos that

23   were recovered from the defendant's phone, defendant's devices,

24   the GoPro camera on defendant's head, news media videos of the

25   defendant, Capitol Police surveillance video showing the

1    defendant.  So we believe we've covered the ground in terms of

2    materials related to Mr. Reffitt.

3        Of course, I can't promise that we've gone through every

4    last thing, but we continue to look for it, and we believe we

5    are substantially complete.

6        That's with regard to Mr. Reffitt and the witness who was

7    under investigation who traveled with him.  We have provided all

8    of those materials, including the extractions from that

9    witness's devices and interviews and other materials of that

10   witness's statements that are in our hold.

11       THE COURT:  So Mr. Reffitt has all of the evidence

12   that was extracted from his electronic devices, his computers,

13   his GoPro, all of that?

14       MR. NESTLER:  Yes.

15       THE COURT:  And have you turned over at this point --

16   it sounds like you may have turned over all the *Jencks*?

17       MR. NESTLER:  Not all of the *Jencks*.  We have to go

18   through e-mails from other sort of smaller categories of things,

19   but in terms of -- for FBI personnel.  But in terms of *Jencks*

20   material for civilian witnesses, yes, it has all been provided.

21       THE COURT:  All right.  When can you provide the rest?

22       MR. NESTLER:  We can -- two weeks, Your Honor, should

23   be sufficient for us to try to collect the remainder of any

24   *Jencks* material for the law enforcement witnesses.

25       THE COURT:  All right.  And in terms of the

1    government, no motions in limine you anticipate?

2           MR. NESTLER:  We don't anticipate any motions in

3    limine.  And I hear what Mr. Welch is saying.  There is a large

4    universe of materials we've provided.  We were trying to be

5    overinclusive.  That was the point of our filing the motion,

6    Your Honor.  We believe it's large swaths of material that could

7    be considered Rule 16 or could be considered *Brady* material.  We

8    don't know.  We haven't gone through it all yet.

9           But I will say we have had conversations with Mr. Welch on

10   a frequent basis, including just two days ago, and have asked

11   him if there's specific categories of information or types of

12   information or things he wants us to look for and provide him,

13   we will do so, and we've had those conversations.

14          I'm happy to ask him through the Court now if there's any

15   other categories or things he thinks are missing, some other

16   category of something, and we will try to track it down.  We've

17   been trying to do that for him for the past several months in

18   order to get everything.

19          In terms of our evidence, I think it would make sense for

20   us to provide Mr. Welch with our witness list and our exhibit

21   list and discuss with him our theory of admissibility of all the

22   pieces of evidence.  And if he has objections -- I hope he would

23   not, but he might, and we would have to address that in a motion

24   in limine posture for a potential business record or some sort

25   of government record if he objected.

1          THE COURT:  That would be helpful if you all are

2     willing to meet and confer upfront to try and identify any of

3     those issues.

4          But what I will say, the government and the defense, you

5     have obligations that you all should be exchanging exhibits and

6     witness lists by noon on November 1st, no later.  Obviously, if

7     you can -- and I will put this out in an order as well.

8          And *Giglio* materials, Mr. Nestler?

9          MR. NESTLER:  Yes, Judge, that same deadline ought to

10    be sufficient for any law enforcement *Giglio*.  We are not

11    currently aware of any, but we continue to run that down.  In

12    terms of civilian *Giglio* information, we believe we've provided

13    a large amount of it.  We will continue to run those conflicts

14    down.

15          THE COURT:  Okay.  Great.

16          So that we can address as many issues as possible at the

17    initial pretrial conference on November 3rd, I would ask that

18    the parties file joint jury instructions, voir dire, and a

19    statement of the case the week before, by close of business on

20    the 29th of October.  If you can't agree on jury instructions

21    and you're not submitting, you know, standard pattern

22    instructions, you need to provide authority that supports your

23    view.  Don't just give your alternative without explaining why

24    the Court should give that alternative instruction.

25          Should either party change its mind about motions in

1  limine, I will extend the time to file any until the close of

2  business on October 21, any oppositions by October 28, any

3  replies by noon on November 1.

4       You should know that the courtroom itself will be open to

5  the public.  There will also be an overflow courtroom and/or,

6  probably both, a media courtroom.  But Mr. Welch, Mr. Reffitt

7  needs to understand -- I know it sounds like some family members

8  will be witnesses at trial, but if other family members or

9  family want to view his trial, they will need to come to D.C.

10 and be present in one of these courtrooms, either the courtroom

11 that I will be in, the trial will be, the jurors and the

12 attorneys, Mr. Reffitt will be in, or the overflow courtroom.

13 And then like I said, there will be, in all likelihood, a media

14 courtroom.  But they should not presume that they can listen on

15 the public line to his trial.

16      Understood?

17           MR. WELCH:  Understood.

18           MR. NESTLER:  Your Honor, can I ask a clarifying

19 question about the schedule?

20           THE COURT:  Yes.

21           MR. NESTLER:  Your Honor indicated that you believe

22 that voir dire would take two days.  That's that Monday and that

23 Wednesday?

24           THE COURT:  It would be great if it didn't, but I

25 think we've got to complete it on the 17th.

1          MR. NESTLER:  We're just planning witness travel and

2     the other related topics.  I didn't know if Your Honor wanted to

3     make that sort of formal, that we would open on the 18th?

4          THE COURT:  No, I think the parties need to be

5     prepared to open on the 17th.

6          MR. NESTLER:  Okay, prepared to open on the 17th.

7          THE COURT:  We may not get there, but that's my hope,

8     is that we complete voir dire and you do opening statements on

9     the 17th.  So both sides need to be prepared for that.  It might

10    be too ambitious to think we could start witness testimony on

11    that date, but certainly, the morning of the 18th.  And if the

12    government could have someone on standby if we surprise

13    ourselves and somebody could be called the afternoon on the

14    17th, that would be great.

15     I just really don't want to get into a situation for the

16    parties or the jurors that this is extending into -- I don't

17    know what will happen if we go into the following week after

18    Thanksgiving.  So I'm really trying to avoid that.

19          MR. NESTLER:  I just wanted to make sure you weren't

20    expecting anything on the 16th.  That was the reason why I was

21    asking.

22          THE COURT:  Well, I will check, and I will let you

23    know if there's any alternative to jury selection on the 16th.

24    I don't think there is, but I will make that inquiry.  If there

25    is, that would be very helpful.  But I've been informed that the

ceremonial courtroom is not available on that date, which makes me think there's not, but I will check on that.

MR. NESTLER:  Thank you.  That helps with scheduling.

THE COURT:  Of course.

MR. NESTLER:  And in terms of jury selection, does Your Honor know the size of the panel, so we are prepared with how many jurors to expect?

THE COURT:  I don't.  I will check on that.  I will have conversations and through Mr. Hopkins let you know about that.

We will go over pretrial procedures.  There are some additional COVID protocols that we will all need to be familiar with.  So I will try to review some of those on November 3rd and also make sure court staff is available to answer questions you all might have about logistics and where witnesses can be and that kind of thing.

MR. NESTLER:  We appreciate that.

THE COURT:  All right.

MR. NESTLER:  Can I ask, Judge, I know Your Honor had a colloquy with Mr. Welch about understanding that if we go to trial now Mr. Reffitt is not going to have access -- or go to trial on November 15th, he is not going to have access to the larger swaths of discovery or the additional terabytes.  And we don't know what's in there.  I didn't know if it made sense for Your Honor to ask that question of Mr. Reffitt, if Your Honor

was willing, to make sure he understood that that was going to
be happening, assuming Your Honor denies our motion?

THE COURT:  I will.  And Mr. Welch, I'm also going to
ask you to, after this hearing -- and Mr. Hopkins can facilitate
a breakout room right now for you and Mr. Reffitt.  I would
encourage an in-person visit, if possible.  I just want to make
sure that you've -- he's had enough time to think through this.
A lot has happened today in this hearing.  I just want -- I want
him to have the opportunity to think about this and be certain
about it.

But I understand what you're saying here.  I'm not trying
to talk him out of this.  I just want to make sure he's thought
it through completely.  This is a big decision.

I will tell you this:  While I can't tell you -- if
Mr. Reffitt did want to continue this trial for some limited
period of time, I can't guarantee a future court date, but what
I can tell you is if he made that decision soon, I can't be 100
percent confident, but I think there might be a way to try this
case in January.  Again, there are no guarantees here, but I've
made an inquiry, and I think that there's a potential for that,
so if that's something you want to explore.

I'm not going to set another status hearing date right now
for you, Mr. Welch, to come back, but I want you to have that
conversation in the next week or so with him and let me know,
file something, reach out to Mr. Nestler, Mr. Hopkins.  If

1    necessary, we can schedule a status hearing to discuss it

2    further.  But I'm not going to set that now.  It's hard enough

3    for everyone to get video time to do that.  But I want to make

4    sure.

5         All right.  So Mr. Reffitt, I know you're on mute right

6    now.  Can you unmute yourself?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.  So I know you've heard this

9    discussion, Mr. Reffitt, and you're well aware that there is

10   additional evidence that has not been produced by the government

11   that will not be produced before your trial date on November 15,

12   and that evidence could well be helpful to you at your trial.

13        And I understand from your counsel that you are asserting

14   your right to a speedy trial and you want to proceed on

15   November 15.  I just want to make sure that that is, in fact,

16   the decision you want to make, that you want to proceed knowing

17   that you will not have all of the evidence at that point.  It

18   sounds like the government's provided a great deal of evidence

19   that relates specifically to you, and I'm sure you've seen that

20   with Mr. Welch.  But there is other evidence that they have that

21   could end up being helpful to you at trial.

22        And your attorney is telling me that despite that, you

23   still want to go to trial on November 15th, and I want to make

24   sure as you sit here now that's your decision.  Again, as I just

25   mentioned, I want your attorney to have additional conversation

with you about this.  This is an important decision to make.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor, I understand.

THE COURT:  And is it your desire to proceed on November 15, knowing that you will not have all the discovery that's in the government's possession?

THE DEFENDANT:  It is my desire for the November 15th.

THE COURT:  Is to go to trial on November 15?

THE DEFENDANT:  Yes, ma'am.  I will also consult with my counsel to confirm that decision, but it is my desire.

THE COURT:  All right.  Well, do understand, if in talking to Mr. Welch there are additional pretrial motions you would like to file or additional challenges to the evidence that's been produced to date or statements you may have made, I don't know what might be out there, but you could certainly do that.  And having additional time would give you the chance to do that, if there are other legal arguments you would like to make.

And it also would give you additional time to review the discovery, the voluminous discovery that Mr. Welch has in his possession now and to plan your defense with Mr. Welch, as well as receive additional discovery, in all likelihood, from the government.

You've heard me explain.  I can't at this point say if you don't go on November 15 you can go on January 23 or whatever the

case may be, but at least right now, I think that there would be a decent chance that that could happen.  But I don't want to create an expectation I can't meet.

So right now, we are, as always, tentatively confirmed for November 15.  So unless I hear from you, Mr. Welch, or Mr. Reffitt, if you're changing your mind now, speak up.  You're not.  All right.

THE DEFENDANT:  That is correct.  I have not had a mind change.  November 15 is my desired date.

THE COURT:  Very well.

Mr. Nestler, are there any further colloquy questions you would like me to pose to Mr. Reffitt?

MR. NESTLER:  Likely yes, but I'm not prepared to offer them to you now, Your Honor.  I think that if we have Mr. Welch and Mr. Reffitt agree and don't tell us they want to change, we may have some other colloquy questions to suggest.

THE COURT:  Just because it is so difficult to schedule things, why don't we go ahead and set a status hearing in the next week if we can, Mr. Hopkins, to give both sides an opportunity to consider this issue.

COURTROOM DEPUTY:  I will see what's available, obviously dependent on which dates are good with counsel.

THE COURT:  For me, it would be helpful if counsel could be available -- and I don't know if D.C. Jail is available, but 11:00 a.m. -- I'm sorry.  11:30 a.m. on the 21st,

would that work for counsel and, Mr. Hopkins, with D.C. Jail or noon?

COURTROOM DEPUTY:  Noon is their lunchtime.  So they never let us have that.  12:30, we have a case with two defendants that's taking up that slot.

THE COURT:  What about 11:30?

COURTROOM DEPUTY:  No, 11:30 won't work.

THE COURT:  What about 3:30 or 4:00 p.m. on that day?

COURTROOM DEPUTY:  That won't work either, Your Honor.

THE COURT:  What will work on that day?

COURTROOM DEPUTY:  The earliest that we could potentially get somebody in, maybe 1:30.  Honestly, Your Honor, that probably won't work either.  Because we're taking up two slots and 2:00 most likely will be taken, that won't work.

THE COURT:  Is the 2:00 -- it's not a telephone status?

COURTROOM DEPUTY:  The 2:00 for us, yes, it is a telephone status, but for D.C. Jail, one of the rooms is designated for magistrate court, and the other room is taken up by another judge.

THE COURT:  And 2:30 won't work?

COURTROOM DEPUTY:  2:30 won't work because they build in buffer time to clean the rooms in between the hearings.

THE COURT:  Mr. Hopkins, I'm wondering --

COURTROOM DEPUTY:  We have a 3:00 set for that day.

1          THE COURT:  I know, but is it possible, do you think,

2     to change the 2:00 p.m., or that won't work?

3          COURTROOM DEPUTY:  Actually, Your Honor, since that's

4     Northern Neck, we might be able to get in at --

5          THE COURT:  Speak up if we're talking about times that

6     won't work for you.

7          MR. WELCH:  Thursday, the 23rd is good.

8          THE COURT:  Mr. Hopkins, could we work around that

9     2:00, even if it means moving it?  I know that's complicated.

10          COURTROOM DEPUTY:  No, unfortunately, no.  4:00 we

11     can't do either.  Potentially, there's a gap between 2:30 and

12     3:00, but they're going to need to clean the rooms.  So really,

13     the 21st is not a good day.  Too much legal -- too much

14     logistics, and there's no way they could do it.

15          THE COURT:  All right.  How about late in the day on

16     October 20th?

17          MR. WELCH:  That's bad on my calendar, unfortunately,

18     Your Honor.

19          THE COURT:  The whole day is?

20          MR. WELCH:  I have a witness in Baltimore who is

21     prepping, a government witness who is prepping for a trial.

22          THE COURT:  How about 9:00 a.m. on October 25th?

23          COURTROOM DEPUTY:  That won't work.  Both slots are

24     taken.

25          THE COURT:  All right.  I tell you what.  This is a

1    big puzzle, and this could take all day.  So I'm going to let

2    Mr. Hopkins work on that with you all offline, but the goal

3    would be roughly in a week or so to set this for a status

4    hearing.

5          MR. NESTLER:  Your Honor, if the point is to have a

6    full colloquy with Mr. Reffitt, I take Mr. Welch at his word and

7    Mr. Reffitt as well that they are persisting in the trial date.

8    We're comfortable proceeding without a status hearing so long as

9    we're not -- I don't want to use the word "sandbag," but at the

10   last second we're told the defendant has changed his mind.  So

11   if I could suggest perhaps setting a deadline next week to have

12   a confirmation from the defense that this is what they want.

13   That way, we're not in the throws of trial preparation --

14         THE COURT:  That's fine with me.  That was my

15   inclination initially, but you suggested perhaps wanting to do

16   more of an inquiry.

17       But Mr. Welch, perhaps you can file something making clear

18   what you've explained to Mr. Reffitt, what his desires are, and

19   we can go with that.

20         MR. WELCH:  I understand.

21       Your Honor, one quick scheduling thing that I personally

22   need to confirm.  On the 3rd, Judge Bates has been trying to

23   schedule another matter with me, and I did consult with

24   Mr. Hopkins the other day, and I just want to confirm that you

25   anticipate our pretrial conference will just be during the

1    morning, because Judge Bates needed to schedule a Rule 11

2    hearing with me for 2:00 in the afternoon, and I wanted to make

3    sure that I could tell him that I'm available for that.

4              THE COURT:  I sure hope so.

5              MR. WELCH:  Thank you.

6              THE COURT:  But you all should -- and Mr. Hopkins,

7    just looking at what's on the calendar, we probably should see

8    if we can get more time than what you have scheduled for that.

9              COURTROOM DEPUTY:  I can do that.  I just saw that you

10   have something in the middle of the day.  So I didn't want to --

11             THE COURT:  No, that's fine.  Just get as much time as

12   we can on the 3rd.

13        But yes, Mr. Welch, that's not --

14             COURTROOM DEPUTY:  That's an in-person hearing, too,

15   Your Honor.

16             THE COURT:  Oh, it's in person.  Great.  All right.

17   So that won't be a problem with D.C. Jail.

18        So yes, Mr. Welch, I will let you go in time for, what,

19   2:00?  You might not have lunch before then, but --

20             MR. WELCH:  2:00.

21             THE COURT:  I will give you 15 minutes for lunch.

22             MR. WELCH:  You're too generous.

23             THE COURT:  No, I'm kidding.  The more organized you

24   all are, the more seamless and the quicker that will go.

25             MR. WELCH:  Okay.

1           MR. NESTLER:  Understood, Judge.

2       And I guess if Your Honor wanted to give Mr. Welch a

3   deadline, we just want to make sure that if we're going -- I

4   take it Your Honor -- is Your Honor denying the motion, or is

5   Your Honor holding it in abeyance, just so we understand?

6           THE COURT:  Well, at this time I'm denying the

7   government's motion.  If the defense wants to continue this

8   matter, then I obviously will entertain that.

9           MR. NESTLER:  Understood.  Thank you, Your Honor.

10          THE COURT:  So Mr. Welch, I want to give you the time

11  you need.  In the next week, no later than October 22nd, can you

12  file something, and if you know for certain before, file it

13  sooner so that resources are being expended in the proper way.

14          MR. WELCH:  Understood.

15          THE COURT:  All right.  So we will not set a status

16  hearing, but next time I will see you is for the pretrial on

17  November 3rd.

18      In addition, I believe we reserved a second pretrial.  Can

19  you all remind me of that date?  I want to make sure we have it

20  on the calendar.

21          MR. NESTLER:  Yes, November 9th.  We also have that

22  one in person, Judge, at 10:00 a.m.  I have it on my calendar

23  for November 9th at 10:00 a.m.

24          COURTROOM DEPUTY:  That is correct.

25          THE COURT:  Mr. Hopkins, we might need to move that

1    11:00 matter.

2         All right.  So any effort to --

3              COURTROOM DEPUTY:  I'm sorry, Your Honor.  Forgive me.

4    Do you mean the 12:00 matter?  I see something at 12:00.

5              THE COURT:  Yes.  Sorry.

6         Mr. Nestler, I do appreciate, I can tell the government is

7    making efforts to try to confer and work collaboratively with

8    Mr. Welch.  So I encourage that.  I appreciate it.  And to the

9    extent issues percolate, you all file those motions, please.

10             MR. NESTLER:  Yes, Judge.

11             THE COURT:  So we can resolve as much as possible at

12   that initial pretrial hearing.

13             MR. WELCH:  Understood.  The only thing that I can

14   think of that would prompt something like that, Your Honor, is

15   if the government discloses something that I don't have and it

16   generates some sort of motion.  That is why I would anticipate

17   then suddenly filing a motion in limine.

18        But looking at what I have had disclosed to me thus far,

19   considering the government's case and the time in which we have

20   to try it, I have considered the issue of motions in limine to

21   this point, and I have not filed any because I did not see

22   any --

23             THE COURT:  Understood.  It sounds like, based on what

24   Mr. Nestler has said, there aren't any surprises coming.

25        Right, Mr. Nestler?

1          MR. NESTLER:  No surprises, Judge.  We are informed by

2     our discovery team that there will be another large, voluminous

3     production coming in the next couple of days, and I'm also

4     working to make sure Mr. Welch gets access to the evidence.com.

5          THE COURT:  All right.  It probably would be helpful

6     to him to the extent you can talk to someone who is familiar

7     with the content of that.

8          MR. NESTLER:  And I will put it here on the record,

9     and we told this to Mr. Welch.  If he wants us to help him walk

10    through any evidence and point out things that we think are

11    important, we are always happy to do so.  I think we've actually

12    worked quite well together up to this point.

13         THE COURT:  That's great to hear.  I encourage you to

14    keep that up.

15       Thank you.  And we will be back on November 3rd.

16       Anything else, Mr. Welch?

17         MR. WELCH:  Yes.  If Mr. Hopkins could put my client

18    and me in a breakout room for a little bit, we would appreciate

19    it.

20         THE COURT:  Of course.

21         COURTROOM DEPUTY:  I have it ready to go as soon as we

22    conclude the hearing.

23         MR. WELCH:  Thank you.

24         THE COURT:  All right.  Thank you.

25       (Proceedings adjourned at 12:00 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Please Note:  This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.



/s/ Sara A. Wick                    October 24, 2021

SIGNATURE OF COURT REPORTER           DATE