1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,         .
                                       .   Case Number 21-cr-32
4              Plaintiff,              .
                                       .
5         vs.                          .
                                       .
6    GUY WESLEY REFFITT,               .   May 13, 2021
                                       .   2:36 p.m.
7              Defendant.              .
     - - - - - - - - - - - - - - - - -

8

9          TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16   For the Defendant:         WILLIAM WELCH, III, ESQ.
                                5305 Village Center Drive
17                              Suite 142
                                Columbia, Maryland 21044

18

19

20   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 United States District Court
21                                  for the District of Columbia
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                        P R O C E E D I N G S

 2            (All participants present via video conference.)

 3            COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4      Action 21-32, United States of America versus Guy Reffitt.

 5            If I can have the parties identify themselves for the

 6      record, beginning with the United States.

 7            MR. NESTLER:  Good afternoon, Your Honor.  Jeff

 8      Nestler on behalf of the United States.

 9            THE COURT:  Good afternoon, Mr. Nestler.

10            MS. BERKOWER:  Good afternoon, Your Honor.  Risa

11      Berkower, also for the United States.

12            THE COURT:  Good afternoon.

13            MR. WELCH:  Good afternoon, Your Honor.  My name is

14      William Welch, and I'm representing Guy Reffitt.

15            THE COURT:  Good afternoon, Mr. Welch, Mr. Reffitt.

16          Are we prepared to proceed with the detention hearing,

17      Mr. Welch?

18            MR. WELCH:  Yes, Your Honor.

19            THE COURT:  Rather, the review of the detention order

20      of the magistrate?

21            MR. WELCH:  Yes, Your Honor.

22            THE COURT:  All right.  Do you intend to put forth any

23      additional evidence?

24          I have reviewed the record, including the magistrate's

25      decision and hearing and evidence produced before him, as well
```

1    as all the briefs and exhibits the parties have submitted.

2        Are there any additional testimony -- I don't see the need

3    to hear again from Mr. Reffitt's children or wife, but I want to

4    certainly give you the opportunity to present any additional

5    witness testimony if you desire.

6        MR. WELCH:  Your Honor, we don't need to do that.  I

7    am prepared to argue.

8        THE COURT:  All right.  Anything from the United

9    States?

10        MR. NESTLER:  No, Your Honor.  We did file a notice

11    last night with regard to a letter that was recently made

12    available to us, but aside from that, we don't have any evidence

13    to put forth today, Your Honor.

14        THE COURT:  Yes, I saw that.

15        And on that front, Mr. Welch, does the defense dispute that

16    this is a letter written by Mister --

17        MR. WELCH:  I would dispute it, Your Honor.  I have

18    seen it, but I don't know what it is.  It could be anything.

19        THE COURT:  Okay.  All right, then.  Go ahead,

20    Mr. Welch.

21        MR. WELCH:  Your Honor, Mr. Reffitt has moved for the

22    Court to revoke the order of detention pending trial presented

23    March 16.  He maintains that proposed conditions of release

24    would reasonably assure his appearance and everyone's safety

25    because the government has not shown otherwise by clear and

 1   convincing evidence.

 2        Preventive detention requires identification of an

 3   articulable threat and consideration of that context.   Context

 4   is the nature of the identified threat and considering that in

 5   conjunction with the defendant's resources and capabilities.

 6        Despite the magistrate judge's finding about a firearm,

 7   none of the government's video recordings or photographs show

 8   one, not even when force was being used against Mr. Reffitt.

 9   And I say that because an ordinary person would expect that if

10   they were being shot at and they were themselves armed, that

11   they would draw a weapon in response.   There is no evidence that

12   that happened, nor has the government charged any weapons

13   offenses.

14        Either way, the government has not shown by clear and

15   convincing evidence that the defendant carried a loaded firearm.

16   We can agree that there were firearms found at his house

17   pursuant to a consent search, his consent, two weeks later and

18   1,300 miles away from the Capitol.

19        The record reflects no evidence that the defendant

20   vandalized any property, used any force, or physically harmed

21   anyone.   Indeed, two witnesses whose testimony you've already

22   reviewed testified under oath that they never feared, have never

23   feared for their safety, and they understood his statements to

24   be idle threats.   Even the magistrate judge concluded he did not

25   believe the defendant would harm his family.   The government

1    just claims that Mr. Reffitt is a threat but does not identify

2    an articulable one.

3         In addition, the government's seizure of firearms and

4    electronics has eliminated any resources and capabilities that

5    he would have to carry out their claimed threats.

6         In addition, you should consider that the Court has already

7    made a finding that Mr. Reffitt is indigent, because I'm

8    appointed for him in this case.  So that further limits his

9    resources and capabilities.

10        The Court of Appeals has said in *Munchel* that January 6 was

11   a unique opportunity to obstruct democracy because Congress was

12   gathered that day to tally the Electoral College votes and

13   rallies and protests were also concurrently scheduled for that

14   day.

15        There are a variety of conditions that we have proposed.

16   Certainly, the Court could add to or change those conditions,

17   and we believe that doing so would guarantee that Mr. Reffitt

18   would appear and the safety of the community.

19        Your Honor, the authority that a threat must be considered

20   in context is *United States versus Tortora*, 922 F.2d 880, and

21   also *Munchel*, which cites *Tortora* and indicates that whether a

22   defendant poses a particular threat depends on the nature of the

23   threat identified and the resources and capabilities of the

24   defendant.

25        There is no presumption of detention in this case.  I would

1      remind the Court to be extremely skeptical of just believing

2      whatever is posted on the Internet.

3             THE COURT:  Mr. Welch, sorry to interrupt, but let me

4      ask you, in terms of the future threat, putting aside for now

5      the threats to the children -- I understand your point that they

6      themselves did not feel that he would -- at least the daughter,

7      that he would hurt her.  But what about what he did with the

8      malitia group, the recruiting people to join the group, about

9      what he stated during the Zoom meeting after January 6 about

10     what his plans were to this group?  What about his purchases of

11     tactical gear and bear spray?  What am I to make of all of that,

12     a articulable threat that he's presenting?

13            MR. WELCH:  Well, what you could make of it, I would

14     argue, Your Honor, is that that has already been mitigated by

15     the seizure of those things by the government.  So he no longer

16     has those resources to use, and then we're just left with words.

17            THE COURT:  That's not the only way he can be in

18     contact with those folks is by computer.

19            MR. WELCH:  Well, certainly as a condition of release,

20     the Court can restrict somebody's associations.  You can tell

21     somebody not to be in the company of a particular person.  You

22     could say other members of any Three Percenters organization.

23     You could also say that someone is not allowed to use e-mail or

24     not allowed to use the phone except for communication with

25     counsel or Pretrial Services, and effectively, the person is

1   shut down.

2       Indeed, the government has seized all of the phones.  They

3   seized almost 30 devices.  So he doesn't have those resources to

4   use either.

5       Someone could be told you can only have a basic so-called

6   dumb phone, which would be one that -- basically like a flip

7   phone, could not use the Internet.  There would be no access to

8   e-mail.  And indeed, a person could be placed on electronic

9   monitoring.  You would know exactly where a person is.

10      The government made the point in its original motion for

11  detention that they have evidence that his phone was on to track

12  him.  It was set up to track him, and that's how they know he

13  was there.  So this is not someone who is trying to hide from

14  anybody.

15      I hope that answers your question.

16          THE COURT:  Go ahead.

17          MR. WELCH:  I want to remind the Court to be extremely

18  skeptical of just swallowing whatever somebody feeds you off the

19  Internet, because there is no way to know whether something is

20  what it purports to be or not.  No one is verifying any of this,

21  and indeed, anyone can post anything they please on the

22  Internet.

23      Your Honor, he needs to work to help support his family.  I

24  mean, he has -- lost his job last year because of the pandemic.

25  He would like to help contribute to their support.  They're

1    struggling right now, and indeed, they want him home.

2         Court's indulgence, please.

3         Another thing that I think you should consider is that the

4    agent in this case, FBI Agent Hightower, interviewed two Capitol

5    police officers.  Officer Kerkhoff said that she told defendant

6    to get back, warned him before she shot him in the chest with

7    five to ten pepper balls and shot him in the leg with five to

8    ten more.  Agent Hightower interviewed a second Capitol police

9    officer, Sergeant DeCamp, who told Agent Hightower that he shot

10   at the defendant with what are called less-than-lethal impact

11   projectiles.  And then after that, Officer Kerkhoff used pepper

12   spray on the defendant, at which point he sat down on the

13   bannister, and that was the end of it.

14        That's what this case is about.  Sergeant DeCamp said that

15   Mr. Reffitt did not appear to be overly aggressive or wanting to

16   attack, nor did he make a threat of bodily harm.  Rather, he

17   made statements like, "You can't stop us all.  What are you

18   doing?  They're trying to take our country."  He was trying to

19   talk the officers down and stop them from doing their job.

20   Sergeant DeCamp estimated that the entire interaction with

21   Mr. Reffitt lasted approximately five minutes.

22        Two weeks later, he consented to a search of his phone and

23   the seizure of his firearms by the government.  Nothing,

24   including the government's videos, show otherwise.  If they even

25   had probable cause for everything that they claim about weapons,

1    then you would see those charges.  Yet, the government argues

2    for Your Honor finding clear and convincing evidence of what

3    they have not even shown by the lower probable cause standard.

4    Doing so would violate the text of Section 3142 and *Munchel*.

5        And so Mr. Reffitt asks the Court to set appropriate

6    conditions of release.

7        THE COURT:  All right.  Mr. Welch, obviously, you

8    don't dispute that he wore a helmet and body armor?  You dispute

9    the gun but not the body armor?

10        MR. WELCH:  Correct.

11        THE COURT:  All right.  And again, you do dispute that

12    this is his writing in this letter?

13        MR. WELCH:  I would, Your Honor.  I haven't seen any

14    evidence that it is.

15        THE COURT:  All right.  Mr. Nestler?

16        MR. NESTLER:  Thank you, Your Honor.

17        THE COURT:  Let's start with this letter.  Beyond this

18    article, do you have any evidence that this is Mr. Reffitt's

19    handwriting or any other evidence that supports the conclusion

20    that he wrote this letter?

21        MR. NESTLER:  Not yet, Your Honor.  We only obtained

22    the letter yesterday, but we do anticipate being able to

23    authenticate the letter.  But at this point we have the

24    *ProPublica* article which excerpts the letter and says they had

25    spoken with Mr. Reffitt's wife and confirmed its authenticity

1    that he was the author.

2            THE COURT:  I'm sorry.  You've spoken to the author?

3            MR. NESTLER:  Sorry.  The author of the -- the

4    article's author said they had spoken with Mr. Reffitt's wife

5    and with Mr. Reffitt and confirmed that Mr. Reffitt was the

6    author of the letter.

7            THE COURT:  All right.

8            MR. NESTLER:  That's according to the article.  But

9    no, Your Honor, we have not yet been able to authenticate it.

10   We only obtained the letter itself yesterday.

11           THE COURT:  But that's according to the article and

12   your conversation with the author of the article; correct?

13           MR. NESTLER:  Not -- it's according to reading the

14   article.

15           THE COURT:  Oh, you just know this from reading the

16   article, not from having had discussions with the author of the

17   article?

18           MR. NESTLER:  Correct, Your Honor.

19           THE COURT:  Okay.

20           MR. NESTLER:  And from the context of the letter,

21   obviously, about what it says, the letter itself.  But if that

22   is important to the Court, of course, the government will

23   undertake efforts to authenticate the letter.

24           THE COURT:  I was just interested, and to the extent

25   you could do so now, in understanding what you had done to date.

1            MR. NESTLER:  Not enough yet, Your Honor.  We will get

2     there.

3            THE COURT:  All right.

4            MR. NESTLER:  In terms of some of the points that

5     Mr. Welch made, I just want to make sure I -- I have a few

6     factual corrections.

7        The first is the FBI's search of the defendant's house.  It

8     was done pursuant to a search warrant.  He didn't consent to the

9     search of his house.  The FBI search warrant did not allow the

10    recovery of firearms until Mr. Reffitt did consent to the

11    removal of those firearms at the FBI's request after they were

12    located in the house, but we can drill down on that further with

13    Mr. Welch, but I do not believe it's correct to say that he

14    consented to the search of his house.

15       When we talk about whether Mr. Reffitt was armed, there is

16    substantial evidence that Mr. Reffitt was armed when he both

17    came into D.C. and when he came on the Capitol, approached the

18    Capitol police officers.  I have informed Mr. Welch that if we

19    were not able to reach a pre-trial, pre-indictment resolution on

20    these points, we would be expecting to pursue additional charges

21    against Mr. Reffitt relating to him being armed.

22       And it sounds like, based on the defense's position today,

23    that that will be the defense's position, that they are not

24    interested in a pretrial resolution here.  So we would expect to

25    go forward with pursuing additional charges related to the

1   firearm.

2       And we have additional evidence, as I believe Mr. Welch is

3   aware, in addition to Mr. Reffitt's statements, his repeated

4   statements about him being armed, but we have another individual

5   who was with Mr. Reffitt in D.C. who indicates that that

6   individual's understanding is that Mr. Reffitt was armed.  And

7   Mr. Reffitt's firearms were taken out of his car after he came

8   back to Texas two days after leaving D.C.

9           THE COURT:  Sorry, Mr. Nestler.  Let me ask you about

10  that.  There was an individual who was with him when he went up

11  the Capitol steps who has told the government that Mr. Reffitt

12  was armed?

13          MR. NESTLER:  There is an individual who was with

14  Mr. Reffitt in D.C. and spent time with Mr. Reffitt in D.C. who

15  indicated that that individual believed Mr. Reffitt was armed.

16          THE COURT:  But brought the firearms to the D.C. area

17  or also believed that he was armed when he approached the

18  Capitol?

19          MR. NESTLER:  Both, both brought an AR-style rifle to

20  the D.C. area and a pistol to the D.C. area and also had the

21  pistol on his person when he was at the Capitol area.

22          THE COURT:  All right.

23          MR. NESTLER:  Mr. Reffitt, of course, made repeated

24  statements about him being armed.  We've quoted several of them

25  in our pleadings to date, Your Honor, and we have an additional

one from that same Zoom call.  Mr. Reffitt is telling his fellow

patriot members -- excuse me, malitia members from the Texas

Three Percenters malitia group about his experience.  And he

says -- and I'm going to quote his words, Your Honor, if it's

okay with the Court.  He's talking about the female officer who

had initially pepper sprayed him.  Mr. Reffitt said, "I didn't

go after the bitch that shot me, although I would have loved to

have pulled my weapon and shot her right then, but that's not

what patriots do.  We do it without shooting.  We showed

restraint.  They have no idea how much restraint was shown.

There were thousands of weapons."

So Mr. Welch's argument doesn't really carry much weight,

Your Honor, that Mr. Reffitt was shot with pepper balls and

nonlethal mechanisms from the Capitol Police.  That does not

indicate that he was not armed.  He likely saw the fact that

there were lots of police presence around, and it is a testament

both to the Capitol Police especially that they did not take out

real firearms to shoot at Mr. Reffitt and they were using

less-than-lethal means.  And as we indicated, there were three

different less-than-lethal means that they had to use on

Mr. Reffitt in order to repel his attack up those stairs.

Mr. Welch quoted from a 302 interview done with one of the

Capitol police officers, but the full extent of those

interviews -- and of course, the government provided both of

those interviews, memoranda to the defense -- shows that both of

the officers, the female officer and the male sergeant, both
indicated that they thought that Mr. Reffitt was a threat.  He
was, according to Officer Kerkhoff, Mr. Reffitt was the ring
leader, and he was taunting the officers, and he seemed to be
trying to whip up the crowd below him, encouraging them.

And in fact, as we indicated in our pleading, Your Honor,
after Mr. Reffitt did his attack, that seemed to have emboldened
the other 50-plus people who were on the landing below
Mr. Reffitt to charge ahead, one of whom was wearing a gas mask
and was able to cut through the pepper spray and actually get to
the officers.

This kind of conduct from the defendant is not typical.
Mr. Welch talked about whether -- from the *Munchel* case whether
there needs to be unique circumstances.  This defendant is
unique.  His conduct here is unique amongst many of the other
Capitol rioting defendants.  He falls squarely within what the
D.C. Circuit said in the *Munchel* case makes him a particular
danger to the community based on his level of planning in
advance, coming across the country with weapons, all of his
statements in advance that we have about what he intended to do
and why he was here in D.C., and then what he did afterwards in
terms of trying to intimidate and threaten his family, making
additional plans with his malitia members, using what we believe
is some sort of alter ego for his malitia group to get around
Second Amendment restrictions about firearms, buying bear spray

1    and riot shields after he went home.

2        There is -- and Mr. Welch indicated and talked about the

3    case law on threats, Your Honor.  Mr. Reffitt has not been

4    charged with threats.  He has been charged with obstruction.

5    And the obstruction here occurred via intimidation.  He

6    intimidated and he intended to intimidate his children to not

7    cooperate with the government or not call the FBI and not work

8    to make sure that he suffered the consequences for his actions

9    on January 6.

10       That is what is going on here, and he did, in fact,

11   intimidate his children.  His daughter admitted to being

12   intimidated, and the son said much more.  He felt both

13   threatened and intimidated.

14       There is no indication, Your Honor, that the defendant

15   could abide by any conditions set by this Court.  He appears to

16   believe that the government is unjust, that the government is

17   tyrannical.  He appears to not have any respect for the Capitol,

18   for Washington, D.C., and for the work that Congress does.  It

19   doesn't appear that he respects the system here, given that as

20   soon as he got home from being in D.C. on the 6th and got home

21   later on the 8th he continued to make plans, told people this

22   was just the beginning, people don't know what's coming, made

23   plans to attack Silicon Valley, media companies, big tech, and

24   continued to try to recruit other people into his malitia.

25       Those are exactly the identifiable and articulable threats

1    that the D.C. Circuit indicated in *Munchel* would give the Court

2    basis to continue his detention.

3            THE COURT:  Mr. Nestler, in terms of the zip ties, is

4    the source of the government's evidence there also this

5    individual who was with Mr. Reffitt the day of the Capitol

6    attack?

7            MR. NESTLER:  There were zip ties recovered from

8    Mr. Reffitt's home after he -- when the FBI executed the search

9    warrant on his house.  In terms of his presence of having zip

10   ties here in Washington, D.C., when he went to the Capitol, I'm

11   not prepared to answer that question right now, Your Honor.

12           THE COURT:  Anything else?

13           MR. NESTLER:  That's all, Your Honor.

14           THE COURT:  All right.  Mr. Welch, would you like to

15   respond?  You're on mute.

16           MR. WELCH:  Thank you for pointing that out.

17       Your Honor, I want to point out that when Agent Hightower

18   interviewed Officer Kerkhoff, that would have been the person --

19   she's the female officer who these statements that the

20   government just brought up were directed at.  She said when she

21   was shown those posts -- they're supposed to describe his

22   encounter with her and the dialogue between them.  She told

23   Agent Hightower that she did not recall any of those discussions

24   and only that she ordered Mr. Reffitt to get back or that he

25   would be hit with pepper ball if he failed to comply.  So this

1   sounds like a fish tale.

2        And in addition, I haven't heard anything from the

3   government about an anticipated future threat.  That is the

4   issue for preventive detention.  It is not about what happened

5   on January 6.  That is the subject of charges.  The question at

6   this point is whether the seizure of firearms, the seizure of

7   all of his electronic devices, and his indigency basically

8   mitigate any risk of any hypothetical threat that the government

9   is talking about.

10       They still haven't said what is the threat.  It's not like

11  if you release him he's going to show up at the State of the

12  Union tomorrow and we're going to have this happen all over

13  again.

14            THE COURT:  Certainly, they do have the threats in the

15  home.

16            MR. WELCH:  And even the magistrate judge said that

17  after hearing testimony, the same testimony that you reviewed,

18  that he concluded that Mr. Reffitt is not a threat to his

19  family.

20       So the question is, what is the future threat that we can

21  articulate right now?  Even if there is one, then you still have

22  to consider the context and say that he doesn't have his weapons

23  anymore, he doesn't have any communication devices anymore.

24  Certainly, that stuff could be appropriately restricted by

25  conditions of release, including restricted association.  He can

1    be put on electronic monitoring and house arrest.  He couldn't

2    do anything at that point except stay home.

3        But the bottom line is that it's the government's burden to

4    prove by clear and convincing evidence, not probable cause,

5    clear and convincing evidence.  It's not my burden to prove that

6    he wasn't armed.  It's their burden to prove by clear and

7    convincing evidence that he was armed, and they haven't done

8    that.  And I don't see how, if they can't even show probable

9    cause --

10            THE COURT:  They have to show by clear and convincing

11   evidence that he is a danger to the community.

12            MR. WELCH:  Correct, that he would be armed.  Well, he

13   can't be.

14            THE COURT:  No, that no condition or set of conditions

15   can reasonably assure the safety of the community.

16            MR. WELCH:  And our position is, our argument to you

17   is, Your Honor, that basically because the firearms have all

18   been seized, because he is indigent, because he could be put on

19   total house arrest and monitored with electronic monitoring,

20   that that addresses the threat.

21            THE COURT:  I still have to believe he will abide by

22   those conditions, electronic monitoring or not.

23            MR. WELCH:  There's no reason to believe that he

24   wouldn't, and indeed, there was a case that I cited, I think

25   *Munchel* might have been the case, which talked about the law

requires reasonable assurance but not absolute certainty that a defendant will comply with conditions.  And that was *Munchel* quoting *United States versus Alston*, which is a 1969 decision from the D.C. Circuit, 420 F.2d 176 at pincite 178.

THE COURT:  Understood.  But it's still difficult -- given the lengths he went to after January 6 in terms of attempting to intimidate his family and in terms of his conversations with militia groups about what he intended to do in the future, it's very difficult as I sit here to trust and to be reasonably assured that he will abide by whatever conditions I put in place.

MR. WELCH:  Well, there were no restrictions on him at that time.  So it's not like he was doing those things in violation of a court order.  Then I would say well, yeah, you should have concerns.  But at the same time, there's no reason to believe that and the government hasn't pointed to any reason to believe that he would not comply with Your Honor's release conditions.

THE COURT:  His actions on January 6, do you dispute that he was one of the ring leaders?  You're taking issue with what the government said with regard to the interviews of the Capitol Police.  Do you dispute what they said, that he was encouraging others, he was one of the first to run up the stairs and try to get past them, and that it took three different methods to restrain him from doing so, from going farther?

1          MR. WELCH:  I would not dispute facts, Your Honor,

2     such as who went up the set of stairs first, what methods were

3     used basically to subdue Mr. Reffitt.

4          However, I will take issue with people's opinions such as

5     who was the ring leader.  I don't have any discovery at this

6     point, and I have received a lot, but if the government has some

7     proof that Mr. Reffitt was a ring leader, that he was

8     interacting with other people on January 6 in order to organize

9     them, I have not seen that, and indeed, there are no charges to

10     that effect either.

11          THE COURT:  Well, the reports that you've been given,

12     I assume, do indicate that he was encouraging those around him

13     after he had been subdued by the pepper spray to go on and take

14     down the House of Representatives and wherever else they were

15     going.

16          MR. WELCH:  It would not have been after he was pepper

17     sprayed.  At that point the sergeant indicates this was over.

18     There was nothing further that happened after that.  Now,

19     whether other people decided to follow Mr. Reffitt, that remains

20     to be proven.  That might have been the perception and opinion

21     of the sergeant, maybe of the other officer, too.  But I have

22     not seen any evidence of that.  There's no one that's come

23     forward and said yep, Mr. Reffitt led me to do this.

24          THE COURT:  Mr. Nestler, am I incorrect?  I thought

25     that there was some evidence the government had proffered that

1   Mr. Reffitt was, in fact, on that date encouraging people to go

2   and to take the House of Representatives.

3           MR. NESTLER:  You're exactly correct, Your Honor, and

4   that -- I'm sorry.

5           THE COURT:  Sorry.  At what point did he do that?

6           MR. NESTLER:  Prior to going to the Capitol, he had

7   made comments to other people about what he wanted to do that

8   day.  And so at the Ellipse, he was recounting to others -- he

9   was recounting on the Zoom call later about what he had told

10  others at the Ellipse about what he wanted to do that day in

11  terms of taking the House and getting Nancy, which we assume is

12  a reference to Nancy Pelosi, Your Honor.

13      But then while he was actually at the Capitol -- Mr. Welch

14  was talking about not disputing facts, but the facts here are

15  the perceptions of the officers.  The officers said Mr. Reffitt

16  appeared to be encouraging the others, he appeared to be acting

17  like a ring leader, he appeared to be taunting the officers, he

18  appeared to be riling up the crowd below to show them that they

19  could also push forward.

20      Of course, Mr. Reffitt --

21          THE COURT:  Even after he was subdued, I thought that

22  that was the proffer.

23          MR. NESTLER:  While he was, during that process.  It

24  was a several-minute process where he would apparently,

25  according to the officers, Mr. Reffitt would go forward, would

1    be subdued, would back up, would make a big show to the crowd

2    below that it was not stopping him because he was wearing

3    padding, and he would make another charge and would be subdued

4    again and go back.  So the subduing was an iterative process,

5    Your Honor.

6          THE COURT:  All right.  Understood.

7          So Mr. Welch, my point still stands.  Yes, Mr. Reffitt at

8    that point wasn't going against conditions imposed by a court.

9    But surely -- after the officers' multiple efforts to stop him

10   from doing, at a minimum, trespassing, he continued to persist.

11   That's not -- that doesn't give me a lot of confidence that he

12   is going to treat my orders differently.  They were deterring

13   him with pepper spray and projectiles, and he persisted.

14         MR. WELCH:  And according to the sergeant, that took

15   five minutes.  He's now been in jail, because the government has

16   taken all this time just to bring him from Texas to Washington,

17   D.C.  He now knows that the government means business.  He now

18   knows what the inside of the D.C. Jail looks like and where you

19   will put him if he were to violate conditions of release.  Plus,

20   there would be additional criminal sanctions that he would be

21   exposed to were he to violate the release conditions.

22         The statements that the government points to were made

23   prior to the five-minute altercation at the Capitol.  Once he

24   was pepper sprayed, as the sergeant said, this was over.

25         For those reasons, we believe that you ought to set

1    conditions of release in this case, Your Honor.

2         THE COURT:  Your proposed conditions would be that he

3    live in his home with his wife and his children and that he be

4    subject to electronic monitoring?

5         MR. WELCH:  In addition to the other ones that I

6    included in my papers.  Certainly, you know, you could impose

7    house arrest if you chose.  You can have him reporting regularly

8    to the Pretrial office in the Eastern District of Texas where he

9    lives.  He could be required to find work, which he wants to do

10   anyway.  There are any number of conditions.  I suggested some,

11   but certainly, those are not all the conditions that the Court

12   might impose.

13        THE COURT:  Understood.  Anything else, Mr. Welch?

14        MR. WELCH:  I don't think so, Your Honor.

15        THE COURT:  Mr. Nestler?

16        MR. NESTLER:  Your Honor, in terms of when the

17   defendant stopped his activities, that is correct, he sat down

18   on the bannister once he was finally held, and the other people

19   in the crowd rushed forward and were able to overtake the

20   officers and then eventually overtake the Capitol a short time

21   afterwards.

22        But Mr. Reffitt wasn't done because he went home and

23   continued to brag about what he had done and recruit fellow

24   malitia members to join him in his future activities.  So it's

25   not like the officers' actions that day had an impact on him and

made him stop him what he wanted to do and what he intended to
do going forward.

THE COURT:  Mr. Nestler, the comments he made to the
malitia group, his ideas about what he intended to do in the
future, they related to social media companies, and were there
other statements that he made?

MR. NESTLER:  Sure.  So there was talk about going to
California.  There was talk about how it would be hard to get
back to D.C. because of all of the National Guard presence in
D.C. after the events of January 6.  But he had very specific
plans, at least in part, about a social media company that had a
server farm or an area that had servers near his house that he
had talked with his malitia members about taking a rifle, he
knew the description of the generator there, and how a well-
placed sniper shot could take out that generator and how much
impact that would have on that company and, therefore, on
American society.  And so that's some of the specifics.

In general, he kept talking, both with his family and with
the malitia group, about how January 6 was the preface of the
book, it was the beginning.  So the government submits that the
remainder of the book is where the danger lies with Mr. Reffitt
being on release.

THE COURT:  And Mr. Nestler, this malitia group, I
take it these folks are located near Mr. Reffitt's residence?
Is this a local group, or is this national?

1          MR. NESTLER:  They are in Texas, Your Honor.  They're

2    not around the corner.  They're -- Texas is a large state, but

3    they are in Texas.  They're a part of the Texas Three

4    Percenters.

5          THE COURT:  Do you know whether some are actually

6    local in his town in which he lives, the city in which he lives?

7          MR. NESTLER:  The two individuals who he was on the

8    Zoom call with are an hour to two hours away, I believe.

9          THE COURT:  So I'm going to take a brief recess of

10   about 15 minutes, and I will come back and deliver my ruling.

11       Are there other issues that we need to address today beyond

12   the detention revocation motion?  Mr. Welch?

13         MR. WELCH:  Well, it kind of all hinges on that.  I

14   guess we will discuss scheduling after we know how you rule,

15   Your Honor.

16         THE COURT:  All right.  Is discovery proceeding?

17         MR. WELCH:  I've been receiving discovery.  I don't

18   know if there's any additional stuff that the government

19   anticipates.

20         MR. NESTLER:  We have some additional materials, but

21   we've produced a very large volume of discovery, including phone

22   returns and the Zoom call and the FBI materials, and I believe

23   Mr. Welch sent us a two-terabyte hard drive which we filled up

24   fairly well and sent back to him.

25         MR. WELCH:  I have that.

1          MR. NESTLER:  Discovery is proceeding at pace, Your

2    Honor.

3          THE COURT:  All right.  Let's resume at 3:35.  You all

4    can take a break and rejoin the call.  I don't want to keep you

5    all waiting online.  Thank you.

6        (Recess taken from 3:15 p.m. to 3:39 p.m.)

7          THE COURT:  All right.  I am prepared to rule on the

8    defendant's motion to revoke the detention order of Magistrate

9    Judge Faruqui.  He previously determined that Mr. Reffitt should

10   be held without bond pending trial, finding that no combination

11   of conditions could reasonably assure the appearance or the

12   safety of the community if he were released.  Mr. Reffitt seeks

13   revocation of that decision, contending that release to a third

14   party would reasonably assure his appearance and the safety of

15   the community.

16      I have reviewed the entire record, including the arguments

17   raised in the brief and during the hearing before Magistrate

18   Judge Faruqui, as well as the exhibits and Magistrate Judge

19   Faruqui's order of detention.

20       In the interest of time, I am not going to review all of

21   the standards under the Bail Reform Act which we are all

22   familiar with, nor am I going to describe the general events

23   that took place on January 6.  Instead, I will focus on those

24   that relate specifically to Mr. Reffitt and the detention

25   determination.

At the outset, let me make clear that I do believe the government has presented evidence that justifies holding a detention hearing on the basis of the serious risk of obstruction.  Mr. Reffitt is charged with three offenses, two of which are obstruction charges.  One stems from his alleged conduct on January 6 and a second that specifically relates to alleged efforts to conceal evidence and threaten potential witnesses.

Though the offenses with which Mr. Reffitt is charged are very serious offenses, none give rise to a presumption of detention under the Bail Reform Act.

In deciding whether to detain Mr. Reffitt, I must weigh four factors under Section 3142(g) of the Bail Reform Act. First, the nature of the offenses charged, while Mr. Reffitt is innocent unless and until he is proven guilty, a grand jury has found probable cause that he attempted to obstruct an official proceeding of Congress and attempted to use the threat of physical force to prevent his family members from cooperating with law enforcement upon his return home to Texas.

The government has produced evidence that shows that Mr. Reffitt drove from Texas to Washington, D.C., with another member of a Texas militia group, bringing two firearms with him, including one AR-15 rifle and one Smith & Wesson pistol.

While the Court appreciates that the government has not produced video or photographic evidence that Mr. Reffitt carried

a gun to the Capitol on January 6, nor has the government

charged Mr. Reffitt, at least as of today, with a weapons

offense, nonetheless, the government has proffered evidence that

he did so, and the defendant's own statements strongly suggest

that he carried at least one firearm with him on January 6.  For

instance, in a recorded conversation after the riot, Mr. Reffitt

stated, "I had my Spartan armor plates, my kidney plates, and my

.40 on my side."  At any rate, Mr. Reffitt clearly wore a

helmet, body armor, and a coat big enough to cover his gear.

This is strong evidence that Mr. Reffitt did not come to

D.C. to engage in a peaceful protest but, rather, to engage in

violence.

The Court is particularly troubled that Mr. Reffitt stated

that he intended to drag those people, our nation's elected

representatives, including the vice president of the United

States, out of the Capitol by their ankles.

Though Mr. Reffitt did not succeed in breaching the Capitol

building on January 6, that was not for lack of trying.  The

evidence shows clearly that he charged the Capitol police

officers wearing what he described as armor.  The evidence also

shows that he encouraged others that day to do the same.  He was

thwarted only after an officer shot him repeatedly with rubber

bullets and sprayed him with chemical spray.

After Mr. Reffitt returned home, he described in detail his

conduct, and he stated he did not intend to engage -- that he

did intend to engage in future actions of violence.

The defense urges the Court to ignore these statements as mere boasts, but Mr. Reffitt backed up his comments with actions.  He did, in fact, attempt to recruit new malitia members to his cause, and he stated that the events of January 6 were just the preface to what was coming.  He recommended that members of the malitia group target the mainstream media and big tech next, and he ordered additional supplies to help realize this goal.

And once Mr. Reffitt realized that he faced legal consequences, he attempted to conceal evidence of his involvement in the Capitol riot.  He directed other members of his malitia group to delete evidence, stating, "Clear all chats immediately.  All groups need cleared immediately," and he told them to purge all previous conversations.

As a result, I find that both the nature and circumstances of the charged offenses and the way in which Mr. Reffitt committed them weigh in favor of detention.

The second factor, the weight of evidence, also weighs in favor of detention.  Video footage, photographs, social media posts, private messages, witness testimony, and even geolocation applications on Mr. Reffitt's cell phone document the events of January 6, including Mr. Reffitt's advanced planning, his actions at the Capitol, and his attempts to destroy evidence against him.

1        Against these two factors that weigh in favor of detention,

2    I must also consider Mr. Reffitt's history and characteristics

3    and the nature and seriousness of the danger to the community

4    that his release would pose.

5        Mr. Reffitt's history and characteristics weigh slightly in

6    favor of detention.  Mr. Reffitt is middle aged and has several

7    risk factors related to COVID-19, including high blood pressure

8    and high cholesterol.  He likely lacks the resources to flee,

9    given his status as an indigent defendant.

10       Though Mr. Reffitt's business has been shut down over the

11   past year due to COVID-19, he has worked as a rig manager and a

12   consultant in the petroleum industry, and he has continued to

13   try to support his family by working in construction.

14       He has prior misdemeanor convictions for carrying a weapon

15   and a DUI charge, but his criminal record is otherwise minimal.

16       Mr. Reffitt is married with a family, and his family has

17   shown him strong support throughout these proceedings,

18   especially during the initial detention hearing before

19   Magistrate Judge Faruqui.  Defense counsel has also provided the

20   Court with numerous letters of support from Mr. Reffitt's

21   community and family, which the Court credits.

22       Even so, the Court cannot conclude that these factors

23   outweigh other troubling factors.  For example, the evidence

24   demonstrates that Mr. Reffitt made threatening statements to his

25   children, which played a role in his son leaving his home, and

it is noted the government has also produced evidence that Mr. Reffitt is a member of a militia group that coordinated the events of January 6 before and after that date.

The government has further produced evidence that Mr. Reffitt has used his business, TTP Security, LLC, to circumvent firearms laws to arm his militia.  As the government argues, Mr. Reffitt's use of his business as a front to funnel high-grade weapons to his militia all while misleading the FBI about the true relationship between that business and his militia show that his history and characteristics warrant detention.

The final factor I must consider is the nature and seriousness of the danger to the community that Mr. Reffitt's release would pose.

As the defense argues and as the D.C. Circuit recently made clear in *U.S. v. Munchel*, 991 F.3d 1273, to detain a defendant on dangerousness grounds, the government must show that the defendant poses a concrete prospective threat to public safety, in other words, an identified and articulable threat to the community.  And the government must prove this by clear and convincing evidence.

The government argues, based on Mr. Reffitt's actions before, during, and after the events of January 6, that he presents both a threat of future dangerousness and of obstruction in this case, and the Court agrees.

1    Whether a defendant poses a particular threat depends both

2    on the nature of the threat identified and the resources and the

3    capabilities of the defendant.  *Munchel*, 991 F.3d at 1283.

4    Looking first at the nature of the threat, as noted, video

5    footage shows that Mr. Reffitt himself attempted to push past

6    Capitol Police stationed on the Capitol steps on January 6.  He

7    also encouraged others to do the same.  These actions put him in

8    a very different category than those who simply cheered on the

9    violence or entered the Capitol after others cleared the way.

10   See *Munchel*, 991 F.3d at 1284.

11   Moreover, it is clear that the events of January 6 were not

12   a singular event in which Mr. Reffitt merely got caught up in

13   the atmosphere.  Instead, Mr. Reffitt came to D.C. prepared to

14   fight, carried tactical gear and weapons, facts that demonstrate

15   premeditation.  And as he stated, he intended to do the recon

16   and then come back with weapons hot.  And indeed, after

17   returning home, he attempted to recruit new members to his

18   militia, and he encouraged members to plan more violent

19   assaults, and he purchased bear spray and a riot shield so he

20   could be better equipped for his next battle, stating, "I will

21   not be taken down again like in D.C."

22   The government also proffers that Mr. Reffitt discussed

23   disabling a prominent social media company's generators with

24   gunfire.

25   The government points to specific evidence of obstruction,

some of which is more compelling than others.  I won't go
through each argument that the government has advanced here
except to note that the evidence shows that after January 6
Mr. Reffitt used encrypted messaging applications to communicate
with other members of his malitia, and he encouraged them to
delete evidence that might incriminate them.

As noted, there is also evidence that Mr. Reffitt made
statements that at least one member of his family interpreted as
a threat sufficient to move out of the home.

Together, the evidence of Mr. Reffitt's general
dangerousness and his acts of obstruction lead the Court to
conclude that he presents a danger to the community.

Looking next to Mr. Reffitt's resources and capabilities,
the Court agrees with the government that Mr. Reffitt's ability
to commit future acts of violence or obstruction is substantial,
and the Court is not convinced, based on Mr. Reffitt's actions
before, during, and after January 6, that if placed in the
custody of a third-party custodian or in home confinement or
detention that he would not pose a significant and continued
risk to the community.

As I've noted already, there is little question that
Mr. Reffitt came to the Capitol prepared to fight and use
violence if necessary, and unlike other Capitol riot defendants
who have been released, Mr. Reffitt engaged in substantial
planning before the January 6 attack on the Capitol.  He acted

with premeditation by bringing armor and weapons.  He coordinated with participants before the riot, and he arguably assumed a leadership role with respect to advancing up the Capitol steps.

I note in *United States v. Pezzola*, 2021 Westlaw 1026125, Judge Kelly ordered pretrial detention for a defendant that engaged in planning and coordination with other Proud Boys, including by arranging concealed means of communication by radio during the riot.  See *U.S. v. Chrestman*.

Chief Judge Howell ordered pretrial detention for a defendant who marched with the Proud Boys to the Capitol, urged the crowd to take the Capitol, and then led his four co-conspirators in deliberate efforts to prevent Capitol Police from closing the barriers.

In this instance, the Court finds home detention is less appropriate because Mr. Reffitt engaged in premeditated coordination and obstruction from his home.  See *Chrestman*. Chief Judge Howell rejected the feasibility of home detention where the defendant engaged in the planning in his home, harbored weapons there, and destroyed evidence of his involvement in the January 6 events.  Judge Kelly did the same in Pezzola or similar in *Pezzola*.

Finally, following January 6, Mr. Reffitt took steps to encourage and plan for additional violence and obstructing the investigation into his conduct.

1    So even taking into account the uniqueness of the events of

2    January 6, as well as Mr. Reffitt's relatively marginal criminal

3    record, lack of prior violence, and record of employment, the

4    Court cannot conclude based on the aggravating facts that the

5    proposed conditions of release will reasonably assure the safety

6    of the community.  In short, the Court lacks confidence, given

7    the evidence the government has presented, that Mr. Reffitt will

8    follow conditions of release this Court might impose.

9        So considering all of the factors under Section 3142(g),

10   the Court finds clear and convincing evidence that Mr. Reffitt

11   poses a concrete prospective threat to public safety that cannot

12   be mitigated by pretrial supervision and conditions of release.

13   Accordingly, the Court denies the motion.

14       This does, Mr. Welch, constitute my bench ruling and

15   opinion on the defendant's motion.  I will put out just a short

16   paper order on the docket reflecting that I have denied the

17   motion, but that is my ruling.

18       All right.  So have the parties had a chance to talk about

19   next steps?

20       MR. WELCH:  We have not, but I think what our position

21   would be at this time, Your Honor, and I don't know what the

22   overall operating status is, is that Mr. Reffitt asserts his

23   Fourth, Fifth, and Sixth Amendment rights, and he demands a

24   speedy trial.

25       THE COURT:  All right.  Should we set this for a

```
 1    motions hearing?  Do you intend to file any --

 2              MR. WELCH:  I'm contemplating some pretrial motions.

 3    I think it would be appropriate to set a motions hearing date

 4    and schedule for motions.

 5              THE COURT:  All right, then.  What do you propose,

 6    Mr. Welch?

 7              MR. WELCH:  I think I could file what I would need to

 8    file within 30 days.

 9              THE COURT:  Okay.  So the defense will file any

10    pretrial motions by June 14 and oppositions by the government to

11    be filed by June 28, any replies by July 5, although that may be

12    a holiday of the court, so July 6.

13        I could set a hearing for this matter, perhaps, during the

14    week of July 19.  What's counsel's schedules like on July 21?

15              MR. WELCH:  I am available.

16              MR. NESTLER:  That's fine for the government, Your

17    Honor.

18              THE COURT:  Okay.  So let's set this for a motions

19    hearing on July 21 at 11:00 a.m.

20        All right.  So given the -- we've still got discovery

21    coming, Mr. Nestler?

22              MR. NESTLER:  Yes, Your Honor.  As I've indicated,

23    we've produced substantial discovery, but there still is

24    additional discovery.

25              THE COURT:  You said you anticipate a superseding
```

1  indictment?

2          MR. NESTLER:  Yes, Your Honor.

3          THE COURT:  Any idea when that might be returned?  I

4  would imagine that could impact, perhaps, the motions.

5          MR. NESTLER:  Yes, Your Honor.

6          THE COURT:  I'm not going to hold you to a date.  I'm

7  just trying to get a sense of how realistic it is to have the

8  defense file motions by June 14.

9          MR. NESTLER:  I cannot promise a superseding

10  indictment will be returned by June 14, Your Honor, given a

11  bunch of factors outside of our --

12          THE COURT:  Understood.

13      Mr. Welch, are you interested in having me set a trial date

14  at this point?

15          MR. WELCH:  We would like to do that, Your Honor.

16          THE COURT:  All right.  What would you propose?

17          MR. WELCH:  I would propose -- how about beginning

18  August 9th or the 10th?  The 9th is a Monday.  Sometimes people

19  want to start on a Tuesday.

20          THE COURT:  I can't do that week.  I could potentially

21  do something the week of -- would the week of August 23rd work,

22  Mr. Welch?

23          MR. WELCH:  Unfortunately, that does not, nor does the

24  week of the 30th.  I've already got a trial that week.

25          THE COURT:  I don't know at that point whether we are

1  in our own courtroom.  Right now, we are having to work with a

2  master trial calendar, and I need to check on that.

3      Mr. Hopkins, do you happen to know how far the master trial

4  calendar goes?

5          COURTROOM DEPUTY:  It goes to the week of August 30,

6  and it doesn't go beyond then.

7          THE COURT:  Mr. Welch, I'm going to need to look at

8  that calendar if you're interested in slotting this in in

9  August, if that's your wish.  If we're talking about September,

10 we can go ahead and set a date.  Unless something changes

11 dramatically with the pandemic, I think the expectation is we

12 will be in our own courtrooms at that point.  So I could set a

13 date in September.  If you would like a date in August, I will

14 need to check that and get back to you through Mr. Hopkins.

15         MR. WELCH:  I know what Mr. Reffitt will want is a

16 speedy jury trial.  So I would ask that the Court check and see

17 when we can do it as soon as possible.

18         THE COURT:  All right.  I will do that.  And I will

19 have Mr. Hopkins be in touch with both of you.

20     But just to help in that regard, Mr. Welch, you said the

21 weeks that would not work for you would be?

22         MR. WELCH:  The week of August 23 does not, and the

23 following week beginning August 30 does not.

24         THE COURT:  All right, then.  So we will check on that

25 and get back to you in short order.

1        And Mr. Welch, given that there's forthcoming discovery, do

2    you object to me excluding time?

3        MR. WELCH:  We would, Your Honor.  Unfortunately, if

4    the supplementary discovery is more than *Jencks* material,

5    then -- I suppose if it raises something on which I have to file

6    a motion, then I will have to file a motion, and we might have

7    to readdress scheduling at that time.  What I know now and what

8    my client has instructed me to pursue, he wants a speedy jury

9    trial.

10       The other thing that I would ask, when we do ultimately

11   schedule a trial date in this case, I'm getting the sense from

12   what the government has been telling me, including what

13   Mr. Nestler represented to the Court earlier today, that there

14   is likely to be *Jencks* material in this case and there's likely

15   to be at least one cooperator in this case.  I just have the

16   sense of that.

17       So with that being said, so that I don't end up asking for

18   a continuance immediately after these folks' direct testimony

19   before I cross them, it would be appropriate to have a *Jencks*

20   disclosure shortly before trial.

21       THE COURT:  I think that makes sense.  I thought you

22   were suggesting now.

23       MR. WELCH:  Oh, I would love it now.

24       THE COURT:  I thought that's where you were headed.  I

25   can appreciate that, but I think we're far enough away from

1    that, we don't need to address that now.  Do you disagree?

2         MR. WELCH:  I would ask that it be, say, at least two

3    weeks before whatever the ultimate jury trial date is.

4         THE COURT:  All right.  At this point I'm not going to

5    commit to more than a week, but let's wait and see where things

6    go with this case.

7         And Mr. Nestler, in terms of the forthcoming discovery, it

8    sounds to me like there's more than *Jencks* material coming to

9    the defense.

10        MR. NESTLER:  There certainly is, Your Honor.  So I do

11   have concerns about the ability to get this done in time.

12        There are a couple of different buckets of discovery that

13   are coming to the defense.  One is the extractions from the

14   defendant's devices.  Mr. Welch referenced several times the

15   20-plus devices recovered from the defendant's house.  The

16   government is still in the process of going through the

17   extractions from all of those.  We provided Mr. Reffitt's

18   primary cell phone extraction.  That, of course, seemed to be

19   the most important.  But there are other devices that we already

20   told Mr. Welch we would be providing on a rolling basis as the

21   FBI is able to process them.  That process and some of those

22   devices have encryption, and it's not necessarily as easy as

23   just pressing a button.  So that process is ongoing.

24        And then there's also another very large bucket of

25   materials which I assume Your Honor is aware, which is the

Capitol riot writ large, all of the discovery related to

surveillance video and other witness statements that may not

have specific applicability to this case but it is the

government's desire to get to the defense so the defense has it

for whatever use the defense wants to make of it.

And we're still, my understanding is, in the process of

speaking with vendors and getting all of that lined up with FPD

in order to get all of that out the door.

I don't have any estimate at all, Your Honor, on when that

is happening, but I find it a little bit premature to plug in a

hard trial date in August or even September without knowing when

all that material is going to be able to be made available to

the defense.

THE COURT:  All right.  I can appreciate the position

the government is in.  However, Mr. Reffitt does have a right to

a speedy trial.  The government did bring these charges.  You're

going to have to act quickly to try to get that done.  At this

point, because he's requesting a trial, I'm going to slot in a

trial date, and we can address that.

Mr. Welch, do you have any response to what the government

is saying here?  It does sound to me like it would be in your

interest to get some of this forthcoming discovery.

MR. WELCH:  Your Honor, given the situation that I'm

in now, I'm on the horns of a different dilemma now than the

last time I talked to you.  This time, you know, I've got a

client who is detained, who is demanding a speedy trial, and this seems like a fairly straightforward case to me at this point.  So I can be ready by August to try this case.

If there's some other development that we haven't seen yet, we will cross that bridge when we come to it.  But for now, we demand a speedy trial.

THE COURT:  All right.  Mr. Nestler, I think the government has got to move expeditiously.

At this point I will set a speedy trial date.  The defense objects to excluding time under the Speedy Trial Act.  I will order the defense to file any pretrial motions by June 14.

MR. WELCH:  Your Honor, you're fading in and out.

THE COURT:  I'm sorry.  Here's my concern, Mr. Welch. I'm going to order you file any pretrial motions by June 14, and the filing of that motion automatically would exclude time under the Speedy Trial Act.  We've got a gap until then.  And if the government were to return a superseding indictment or something to that effect and we're not back in court again until July 21, that's a long time.  If you decide not to file the motion (distorted audio).

MR. NESTLER:  Your Honor, you're cutting out. Mr. Hopkins, I don't know if you can hear her.

COURTROOM DEPUTY:  I'm going to give her the number. She may have to call in while she does the video.

(Pause.)

1    THE COURT:  Sorry, everyone.  I'm having real Internet

2  issues, believe it or not, in chambers of all places.  My

3  apologies for having to rejoin telephonically.

4    And for the record, I don't know that I ever said at the

5  outset that this was a video conference hearing until this

6  point.  I was kicked out of the video conference.  It is being

7  conducted by video conference pursuant to the Chief Judge's

8  standing order relating to the pandemic.

9    All right.  So as we were discussing, Mr. Welch, you are

10  objecting to me excluding time under the Speedy Trial Act until

11  the next hearing that I've set, which is July 21.  What I'm

12  going to do is I'm going to set a status conference in the

13  meantime.

14    And Mr. Nestler, how long -- do you think in two weeks you

15  could give me a better sense of, one, whether a superseding

16  indictment is, in fact, coming and roughly when that might be?

17  Would two weeks give you enough time to give me that kind of

18  information?

19    MR. NESTLER:  I don't believe so, Your Honor.  I

20  believe four weeks might be more realistic, given some

21  logistical issues I'm happy to discuss with the Court ex parte

22  if you want.  But if we came back in mid-June, I believe we

23  would be able to have an answer for you.

24    THE COURT:  All right.  So Mr. Welch, I do appreciate

25  what you're saying, that at least as to Mr. Reffitt the case you

1    might put on would be relatively straightforward.  But there's

2    no doubt this is a -- the overall investigation is complex, and

3    it's complicated in this case by the fact that the government

4    has devices of Mr. Reffitt's that are encrypted, and that's

5    taking the government time to get that discovery to you.

6        So I think in these circumstances, given the complexity of

7    the overall investigation, giving the government the time,

8    perhaps not as much as time as it wants but nonetheless

9    appreciating the government is having difficulty providing the

10   discovery it needs to provide to you due to the encrypted

11   devices, I do think that it is in the interest of justice to

12   exclude time for a limited period.

13       And Mr. Nestler, I'm not going to give you four weeks, but

14   I will give you three weeks.

15           MR. NESTLER:  Sorry.  I think we lost you, Your Honor.

16   You said you would give us three weeks.

17           THE COURT:  Three weeks, until June 3, and I want to

18   set a status conference.  At that time, Mr. Nestler, I am

19   hopeful that the government will have a clear picture of where

20   this case is headed.  You mentioned that you could share

21   something with me ex parte.  If there's a need to do that before

22   then, you can do that, but I would like to set a status for

23   June 3, and I will exclude time from today until June 3 in

24   calculating the date for speedy trial.  I do believe that the

25   ends of justice here do outweigh the best interests of the

defendant and the public in a speedy trial.

Mr. Welch, I understand it's over your objection, but I do think, given the facts of this case here, that it is appropriate to exclude time for that limited period of time.

And Mr. Nestler, I would encourage you to do all that you can both to provide the defense the discovery that you're working on and to give me some sense of where this case is headed and the timing so that we can adjust the date for filing of motions and motions hearing and trial date and all that if Mr. Welch thinks he needs more time and we're not in a situation where we're addressing all of this just a couple of weeks before trial.

So that's what we're going to do for now.  We will return on June 3.  What are the parties' availability on June 3 at 10:00 a.m.?

COURTROOM DEPUTY:  Pardon me for interrupting, but D.C. Jail's availability for that day is pretty limited.  12:30 is about the only time we really could have a hearing.

THE COURT:  Okay.  What about June 4, Mr. Hopkins?

COURTROOM DEPUTY:  June 4 looks a lot better.

THE COURT:  Mr. Welch, are you available on June 4?

MR. WELCH:  I am, but I do have a request, because in the District of Maryland that is the day they're having their virtual CJA panel training that I attend.  So I would ask, because it is a status hearing and I don't imagine will be that

1    long, to either do so at 9:00 or after 2:00.

2              MR. NESTLER:  And the government is available.

3              THE COURT:  Okay.  Mr. Hopkins, how does 9:00 a.m. on

4    June 4 work for the D.C. Jail?

5              COURTROOM DEPUTY:  The earliest we can do is 9:30, and

6    9:30 looks like it works.

7              THE COURT:  All right.  I assume, Mr. Welch, you would

8    prefer 2:00 p.m., then; is that correct?

9              MR. WELCH:  Actually, let's try to make it work at

10   9:30.  If I have to join a few minutes late -- the CJA virtual

11   thing is going to begin at 10:00, but I am hoping the status

12   hearing won't be protracted.

13             THE COURT:  Yes, this should be 15 minutes at most, I

14   would hope.  We will do it June 4 at 9:30 a.m.

15        And again, for all the reasons I've stated, I will exclude

16   time from today until June 4, 2021, in calculating the date for

17   a speedy trial.

18        All right.  Is there anything else?  Oh, and I assume,

19   Mr. Welch, that Mr. Reffitt continues to consent to have these

20   proceedings by video conference?  If not, I can make

21   arrangements to have him brought to court for in-person

22   proceedings, but I just want to confirm once again that he does

23   consent.

24             MR. WELCH:  Yes, he does, for purposes of today, and

25   we will for the purpose of the status hearing.  I would even

1    say, if it turns out the motions hearing just ends up being

2    argument, we could also do that virtually if that is still the

3    operating posture.  However, I think it's going to be too

4    difficult, and I'm worried about various constitutional issues

5    and 2255 if we get into the taking of testimony, say, in a

6    motion hearing virtually.  Then I would say we'd have to do that

7    in person.

8              THE COURT:  No, I understand.  Of course.  All right.

9    But at least for the next status conference, you do consent?

10             MR. WELCH:  Yes, Your Honor.

11             THE COURT:  All right, then.  Mr. Nestler, anything

12   else?

13             MR. NESTLER:  No, Your Honor.  Thank you.

14             THE COURT:  All right.  Thank you all.  See you back

15   on June 4.

16        (Proceedings adjourned at 4:19 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7          Please Note:  This hearing occurred during the

 8    COVID-19 pandemic and is, therefore, subject to the

 9    technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                    January 5, 2022

13    SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25
```