```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-32
 4            Plaintiff,              .
                                      .
 5        vs.                         .
                                      .
 6   GUY WESLEY REFFITT,              .  January 20, 2022
                                      .  1:12 p.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - - -

 8

 9                  TRANSCRIPT OF PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16   For the Defendant:         WILLIAM WELCH, III, ESQ.
                                 5305 Village Center Drive
17                               Suite 142
                                 Columbia, Maryland 21044
18

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

<pre>
 1                    P R O C E E D I N G S

 2        (All participants present via telephone or video

 3   conference.)

 4             COURTROOM DEPUTY:  Your Honor, we are in Criminal

 5   Action 21-32, United States of America versus Guy Reffitt.

 6        If I could have the parties identify themselves for the

 7   record, beginning with the United States.

 8             MR. NESTLER:  Good afternoon, Your Honor.  Jeff

 9   Nestler on behalf of the United States.

10             MS. BERKOWER:  Good afternoon, Your Honor.  Risa

11   Berkower for the United States.

12             MR. WELCH:  Good afternoon, Your Honor.  William Welch

13   on behalf of Guy Reffitt, who joins us by telephone.  And he

14   consents to doing so pursuant to the CARES Act and the court's

15   standing order.

16             THE COURT:  All right.  Thank you all.

17        And Mr. Reffitt is appearing by telephone because he's

18   still in quarantine?  Is that correct, Mr. Welch?

19             MR. WELCH:  My understanding was that his specific

20   quarantine was over, but this is the way that he could join us

21   today, and we didn't want to put things off any longer.

22             COURTROOM DEPUTY:  Forgive me for interrupting, Your

23   Honor.  I'm sorry.  Mr. Reffitt is still in the -- he just came

24   out of the breakout room.  He just came out.

25        Mr. Reffitt, I just called the case --  I'm sorry.  Go
</pre>

1    ahead, Your Honor.

2            THE COURT:  Good afternoon, Mr. Reffitt.  The

3    courtroom deputy just called the case, and the attorneys just

4    announced their appearance.  And your attorney just stated that

5    you did consent to appear by telephone this morning.  The rest

6    of us are on video.  And you're on telephone, I understand,

7    because of issues with quarantine that should be resolved soon.

8        Is he correct that you do consent to appear for this

9    hearing by telephone?

10           THE DEFENDANT:  Yes, Your Honor, that is correct.

11           THE COURT:  Okay, then.  So before the Court right now

12   is the defendant's motion to reconsider the detention order, as

13   well as several motions in limine that I will take up in a

14   moment.

15       I'm not going to focus on jury instructions today.  I know

16   that, Mr. Welch, you just filed something last night relating to

17   the 1512 charge, which I'm reviewing, and Mr. Nestler and

18   Ms. Berkower, I will give you until -- I will give you a week.

19   Originally, I had proposed that both sides file proposed jury

20   instructions and both sides file any opposition.  Mr. Welch

21   didn't file at the beginning.  So I will give the government a

22   chance to respond to what he filed if you choose to.  You don't

23   have to, but I will give you a week to do that.  And I will

24   discuss those at the next hearing that we set.

25       But today I did want to address particularly the detention

1    motion that's been pending for some time and the motions in

2    limine.  Any need for additional argument on that, Mr. Welch?

3    I've read the briefs of both sides.  Anything new you would like

4    to add?

5               MR. WELCH:  No.  Those are the additional facts that

6    we are asking the Court to consider as far as the detention

7    order is concerned.  Beyond that, we don't have any additional

8    testimony or evidence to present, just those additional facts in

9    the paper.

10              THE COURT:  Okay.  Anything additional from you,

11   Mr. Nestler or Ms. Berkower?

12              MR. NESTLER:  No, Your Honor.

13              THE COURT:  All right.  So let me rule on that first,

14   and then we will move on to the motions in limine.

15        Before the Court is Mr. Reffitt's motion to reconsider the

16   detention order.  Under the Bail Reform Act, the defendant shall

17   be released before trial unless a judicial officer determines

18   after a hearing that no condition or combination of conditions

19   will reasonably assure the appearance of the person and the

20   safety of any other person in the community.  That's 18 U.S.C.

21   Section 3142(e)(1).

22        In making this determination, the Court must consider four

23   factors:  First, the nature and circumstances of the offense

24   charged; second, the weight of the evidence against the person;

25   third, the history and characteristics of the person; and

fourth, the nature and seriousness of the danger to any person or the community that would be posed by the person's release. That's Section 3142(g).

On May 13, 2021, the Court denied Mr. Reffitt's motion to revoke the Magistrate Judge's detention order, Magistrate Judge Faruqui, finding that the 3142(g) factors supported his continued detention.

In particular, the Court found that Mr. Reffitt presents a danger to the community in light of his general dangerousness and his acts of obstruction.

Under Section 3142(f) of the Bail Reform Act, a detention decision may be reopened at any time prior to trial if new information surfaces that has a material bearing on the issue of whether there are conditions of release that would reasonably assure the appearance of such person as required and the safety of any other person in the community.  18 U.S.C. Section 3142(f).

New and material information must consist of truly changed circumstances rather than simply a defendant's own evaluation of his character or the strength of the case against him.  *United States v. Lee*, 451 F.Supp.3d.  That's at 5, a D.D.C. case.  And to be material, the new information must affect the analysis of one or more of the Section 3142(g) factors.

In his motion, Mr. Reffitt has not presented new information that casts doubt on the Court's previous findings on

the Section 3142(g) factors.  He points primarily to the

continuing COVID-19 pandemic and the rising numbers in the D.C.

Jail.  The pandemic has no bearing on any of the 3142(g)

factors, and Mr. Reffitt has since caught COVID-19.

Mr. Reffitt also refers to the U.S. Marshals Service's

findings about the unsanitary conditions at the D.C. Jail.

Mr. Reffitt is housed in the Central Treatment Facility, not the

Central Detention Facility which the Marshals Service's report

highlighted as not meeting appropriate conditions.  In contrast,

the Marshals Service described the conditions at CTF where

Mr. Reffitt is housed as largely appropriate and consistent with

federal prisoner detention standards.

Finally, to the extent that Mr. Reffitt argues that his

continued detention violates the Eighth Amendment, the Supreme

Court has upheld the constitutionality of the Bail Reform Act.

*U.S. v. Salerno*, 4081 U.S. 739.  And to satisfy the Act, the

District Court must identify an articulable threat posed by the

defendant to an individual or the community before ordering the

defendant's detention.  *U.S. v. Munchel*, 991 F.3d at 1283.

This Court did so in its May 13, 2021, ruling.  Nothing

Mr. Reffitt presents in this motion alters the Court's previous

conclusion.  Therefore, the Court denies the motion.

Moving on to the motions in limine, there are three to

consider:  First, the defendant's motion in limine to exclude

certain language from captions in Government Exhibit 204, then

1  the government's motion in limine to permit the government to

2  elicit lay opinion testimony, and finally, the government's

3  motion in limine to limit the cross-examination of Secret

4  Service agent witness.

5       I will start with the more straightforward ones first.  It

6  appears that the parties are in agreement with respect to

7  Mr. Reffitt's motion in limine to exclude certain language from

8  captions in Government Exhibit 204.

9       Mr. Welch, am I right?  Given that the government has

10  agreed to remove explanatory captions from the exhibit, do you

11  agree your objection has been addressed?

12       MR. WELCH:  That would be acceptable, Your Honor.  My

13  understanding is that I'm going to be provided with a corrected

14  copy of that exhibit so that I will be able to satisfy myself

15  that whatever we're objecting to is gone.  I don't have it yet,

16  but --

17       THE COURT:  Understood.  I will leave that open, but

18  assuming you're provided that, then you have no objection to me

19  denying the motion as moot?

20       MR. WELCH:  Correct.

21       THE COURT:  Okay.  All right.  Turning next to the

22  government's motion in limine to limit the cross-examination of

23  Secret Service agency witnesses, the government seeks to limit

24  the scope of the cross-examination of a Secret Service witness

25  to include only whether the Capitol breach interfered with a

federally protected function and whether the Capitol was
restricted on January 6 of 2021.  The government also moves to
preclude the defense from cross-examining the witness about
Secret Service safety protocols and the nature of Secret Service
protected details.

Mr. Welch, have I read your response accurately?  You do
agree that so long as the government does not raise questions
about the Secret Service protocols and protective details in the
direct examination, that you will not elicit testimony about,
one, where the vice president or his family or their motorcade
were taken on January 6 after the Capitol riot began; two, you
won't elicit testimony about where protectees or their
motorcades are taken at the Capitol or any other government
building whenever an emergency occurs; and three, you won't
elicit testimony about the number and type of agents the Secret
Service assigns to protectees?  Am I reading your response
correctly?

MR. WELCH:  That is correct.

THE COURT:  Okay.  But you would like to ask the
agents about whether Mr. Reffitt's actions on January 6 affected
their protection of the vice president or his family or any
other actions that day by the Secret Service agents; is that
right?

MR. WELCH:  Correct.

THE COURT:  And Mr. Nestler, you do agree that that's

1      appropriate cross-examination by Mr. Welch?

2                MR. NESTLER:  Yes, if he wants to ask that question,

3      that's fine.  We believe the answer will be no.

4                THE COURT:  Okay.  Understood.

5          Mr. Welch, you can ask the question, but because the

6      government need not prove that Mr. Reffitt himself personally

7      interfered with the Secret Service agents' performance of their

8      federal functions that day, I'm not going to allow a lot of

9      cross-examination on this point.

10         You do agree?  I think the joint jury instructions -- you

11     do agree that the government need not do that to convict

12     Mr. Reffitt of violating Section 231; right?  So you're talking

13     about asking a question or two and no more; right?

14               MR. WELCH:  Correct.  As you know, I had listed, you

15     know, areas -- you know, there is the suggestion in some of the

16     government's papers that, you know, Mr. Reffitt would have been

17     a threat to the Vice President of the United States, and we want

18     to make the point to the jury that no, he wasn't, that they

19     never saw each other, he never reached out and touched the vice

20     president.  Because a jury might, hearing that, think that he

21     was.  We just want to make sure that it's clear he wasn't.

22               THE COURT:  Again, a question or two along those

23     lines, but there's not a need to dwell on this and, perhaps,

24     confuse the jury about what the government has to prove.  They

25     don't have to prove that he personally interfered with the

1    Secret Service that day; right?

2          MR. WELCH:  Right.  I understand that, yeah.

3          THE COURT:  All right.  Okay.  So I think we're all on

4    the same page there.

5       Mr. Nestler, anything else you would like to say in

6    response to what I've said?

7          MR. NESTLER:  No, Your Honor.  Thank you.

8          THE COURT:  Okay.  With respect to Mr. Reffitt's

9    supplemental memorandum that requests to seek photographs of

10   Vice President Pence waiting in an underground garage on

11   January 6 because they allegedly proved that the Capitol grounds

12   were not, quote, restricted for purposes of Section 1752(a)(1)

13   while Mr. Reffitt was on the Capitol grounds, explain to me,

14   Mr. Welch, why is this relevant, given how the statute defines

15   "restricted grounds" where a Secret Service protectee is or will

16   be temporarily visiting?  Why is this relevant here?

17         MR. WELCH:  Well, this is relevant because of the

18   concern that we have with what I mentioned previously about the

19   government having mentioned it in some papers, creating the idea

20   that Mr. Reffitt created a threat, was a threat to the Vice

21   President of the United States, that if that somehow came up, I

22   would want to be able to show the photograph that apparently

23   might even be something that a news agency has, to show that

24   they don't depict Mr. Reffitt in the company of the vice

25   president ever.

1          THE COURT:  Mr. Nestler, despite what's in your

2     papers, is this an evidentiary point that the government is

3     going to be pressing at trial, that Mr. Reffitt personally,

4     personally did threaten the vice president or his security

5     detail?

6          MR. NESTLER:  We're not planning to argue that

7     Mr. Reffitt himself personally threatened the vice president.

8     We're planning to argue that Mr. Reffitt and the mob itself

9     threatened the vice president.

10         We are -- I think we've been very clear from the outset,

11    Your Honor, that Mr. Reffitt never actually entered the Capitol

12    building, but he did stand on the Capitol building stairs.  So

13    no, we're not planning to make that argument that Mr. Welch is

14    saying, that Mr. Reffitt personally threatened the vice

15    president.

16         THE COURT:  And again, Mr. Welch, given the statute

17    defines "restricted grounds" as those where a Secret Service

18    protectee is or will be temporarily visiting -- and that's

19    Section 1752(c)(1)(B) -- and this is the definition you all have

20    accepted in your jury instructions, they need not show that

21    there's any interaction between the two.

22         I get your point.  To the extent there's a suggestion made

23    that he engaged with the vice president's security detail, that

24    would be legitimate cross.  But they're not going there, and I

25    don't see the relevance of this photograph.  I don't see --

given that the government has proffered that the evidence will show that Mr. Reffitt and Mr. Pence were at the Capitol at the same time, at 1:47 p.m.  The government's proffered also that even if they weren't on the Capitol grounds at the same time, the vice president intended to return to the Capitol grounds later that day until the Electoral College results were certified.

So, you know, any photograph showing that the vice president temporarily left the Capitol grounds seems to me irrelevant here.

MR. WELCH:  Right.  And generally speaking, in that context, I would agree.  My concern was that even though the government need not show that Mr. Reffitt personally was a threat, if somehow the testimony were to come out otherwise, if somehow the evidence were presented otherwise, I don't want the jury getting the false impression that my client posed an immediate threat personally to the Vice President of the United States.

Even if they don't have to show it, I don't want that kind of evidence somehow coming up and then being caught flat-footed and not being able to show that hey, he was never in the presence, in the company of the vice president.

THE COURT:  All right.  I think that there's a distinction between what you're worried about and what the government intends to bring out at trial.  And if that's not

1  borne out, then we will revisit this.  All right?

2          MR. WELCH:  Okay.  And I hope that the Court is

3  correct about that, because --

4          THE COURT:  Mr. Nestler, I trust you all are going to

5  be careful not to insinuate that Mr. Reffitt himself was engaged

6  with the security detail?  It seems as though he was far removed

7  from those folks.

8          MR. NESTLER:  Correct.  To be clear, Mr. Reffitt was

9  engaged with Capitol police officers on the west side of the

10  Capitol building, and that's where we're focused as to

11  Mr. Reffitt's actions.  We do plan to have at least two

12  witnesses, probably three witnesses, talk about the riot itself

13  and the vice president had to evacuate, the effect on the

14  official proceeding and Congress.  But that is not focused on

15  Mr. Reffitt.  That's focused on proving up the 231 charge and

16  the 1512(c)(2) charge.

17          THE COURT:  Okay.  All right.  So I don't see the

18  relevance based on what's being proffered here, Mr. Welch.

19  Again, we can revisit it if the evidence at trial shows

20  something else, but I'm taking the government at its word here.

21      All right.  So the final motion in limine is the

22  government's motion in limine to permit the government to elicit

23  lay opinion testimony from an FBI agent who the government wants

24  to testify about the firearm holster that's visible in

25  photograph exhibits of Mr. Reffitt at the Capitol.

1    And as I understand it, Mr. Nestler, the government wants

2    that witness to be able to compare the holster in those

3    photographs to the holster that was found in Mr. Reffitt's

4    bedroom; is that correct?

5              MS. BERKOWER:  Your Honor, it will be me speaking to

6    this.

7              THE COURT:  Sorry, Ms. Berkower.

8              MS. BERKOWER:  No problem.

9    Yes, Your Honor.  We would like -- there's sort of two

10   pieces to this.  There are photographs of Mr. Reffitt at the

11   Capitol in which what appears to be a holster is visible on his

12   person, and there's a photograph of a holster that was found on

13   a nightstand in his bedroom when his home in Texas was searched.

14             THE COURT:  By the way, do you also have the holster,

15   and is that something that you will be introducing as evidence?

16             MS. BERKOWER:  We only have a photograph of the

17   holster found in the bedroom.  We don't have the physical item.

18             THE COURT:  Why?  It wasn't seized?

19             MS. BERKOWER:  It was not seized.  It was photographed

20   but not seized.  There's a loaded firearm inside of the holster

21   that was seized, but the holster itself was only photographed.

22             THE COURT:  But the firearm was seized?

23             MS. BERKOWER:  Correct.

24             THE COURT:  And are you -- is that an exhibit, the

25   firearm, that you will show to the jury?

1          MS. BERKOWER:  It is, Your Honor.  I believe we -- we

2     had been in talks with Mr. Welch back when the case was set for

3     trial in October about scheduling a time for him to come in and

4     review that evidence.  We do have it here in Washington at the

5     Washington Field Office.  But we do plan to introduce it, and we

6     will give Mr. Welch the opportunity to examine it.

7          THE COURT:  Okay.  So you are -- you're basically

8     asking me to allow the agent to look at two photographs and say

9     that the holster in the two photographs is the same?

10          MS. BERKOWER:  Well, I don't think we actually even

11     are asking to go that far, Your Honor.  What we're asking is a

12     little bit different, which is we're asking him to look at the

13     photograph of Mr. Reffitt on January 6 and give his view that he

14     recognizes the holster to be a particular kind of holster.

15          We're also asking him --

16          THE COURT:  Okay.  Stop on that.  So based on the

17     photographs you've provided in your briefing, he is going to be

18     able to identify this particular holster?

19          MS. BERKOWER:  So I understand that the photographs in

20     the brief may not be as clear -- I think we can get a better

21     photograph.  It was hard to get a photograph --

22          THE COURT:  Let me hold this up.  It's -- that's what

23     you're talking about?

24          MS. BERKOWER:  I think the one on the next page is a

25     little bit clearer.

1          THE COURT:  This one?

2          MS. BERKOWER:  It was hard to format it large enough

3    and clearly enough in the brief, but in our exhibit, it is -- I

4    believe one of those is at least -- is a higher quality photo

5    that we can blow up, and there is a certain characteristic of

6    this holster.  It has a particular kind of finger lock --

7          THE COURT:  And what -- sorry I keep interrupting, but

8    it's hard to see in this photograph, but you're saying that

9    finger lock is visible in a better photograph of this, copy of

10   this photograph?

11         MS. BERKOWER:  The case agent, when he saw the photo

12   and zoomed in on it, that he knew immediately based on the way

13   it was configured that it was that particular kind of holster.

14   And I think he could better explain the specific, like, details

15   of why that is.  I know one of them had to do with the finger

16   lock mechanism on it.

17         THE COURT:  Okay.  Well, one of the struggles I have

18   with your request is that you're asking him to identify this

19   holster, you say, based on, first of all, his work as a case

20   agent in this case, and that's -- of course, special agents can

21   talk about the work they do in a case.  He could talk about the

22   photograph that was taken of the holster that wasn't seized.  He

23   can talk about all of that as a case agent.

24         But his understanding of what type of holster this is is

25   stemming not from that, not what he did in this case other than

looking at the photograph, but rather, it's based on two things. One, you say he has expertise, a certain degree of expertise as an FBI agent who is, quote, trained in firearms.  That sounds pretty specialized to me, and that seems, based on the cases I've reviewed, like it's on the line, you know, the 702 line, the specialized knowledge.  Two, you say you want him to testify based on his personal experience as a owner of this holster.

And I don't think the government can have it both ways.  I don't think you get to lump in his expertise that he has as a firearms trainer and as a FBI agent who uses firearms and has a level of knowledge about them that far exceeds what the normal gun owner might have.

That's really stepping over the line, I think, and I think the case law in the circuit makes clear that courts should be concerned about jurors giving too much weight to that kind of testimony, particularly when it's a law enforcement agent.

So I don't understand why the government thinks that that prong of his knowledge can be brought out at all.  The other one's a closer issue, but explain to me why that's not crossing the line to let him testify based on his experience as a firearms trainer at the FBI that this is a particular type of holster because of the finger lock on the gun.

That seems very specialized knowledge.  That's not -- that extends beyond what he should be permitted to testify as a lay witness as opposed to an expert.

1          MS. BERKOWER:  Yes, Your Honor.

2      For clarity's sake, we may not have been as clear about

3  this as we should in the briefing.  He has a long experience in

4  the FBI with firearms and being a firearms trainer.  This

5  particular type of holster, it's available to anybody

6  commercially, as Mr. Reffitt, we believe, had it himself, not

7  just to law enforcement witnesses.  And the FBI used to use this

8  type of holster.  They discontinued it.  And this agent

9  continues to use it in his personal life.

10     So that's --

11         THE COURT:  But some of his knowledge about this stems

12  from his work in the FBI with firearms; right?  He's not just

13  someone who bought this holster from a gun store and had a gun

14  and recognized it.  It seems to me that you're wanting to elicit

15  more from him, not just you're a gun owner who has this holster

16  and knows what guns fit in this holster and knows what this

17  holster looks like.  But you're, it seems to me, awfully close

18  to an expert who is trained in firearms, who has used this

19  particular holster in your many years with the FBI.  That

20  doesn't seem like a normal lay witness testimony.

21         MS. BERKOWER:  Well, Your Honor, I think the case law

22  really stems, when it comes to the distinction between lay and

23  expert testimony, on the level of personal knowledge that the

24  witness has.  And I don't think the case law distinguishes

25  between the manner in which you get the personal knowledge, so

long as it is through -- results from a process of reasoning familiar in everyday life.

And at the end of the day, what we're asking the Court to permit is for this witness to recognize a product that he has used in his life.  And I think that it is a process that's family to everybody.  It's not asking him to use a holster in any particular or specialized way, but really just based on his experience with this product to say whether he recognizes it based on his familiarity with its attributes.

And I understand the Court is concerned that the jury may draw extra, you know, special inferences about it if we were to elicit that he recognizes it because he has experience with it in the FBI.  If the Court would prefer, we could just limit the questioning about how much experience he had with it in the FBI to instead elicit how many years of experience he's had with this particular holster just by handling it and owning it and using it, and that may de-emphasize the fact that some of his personal knowledge comes from law enforcement experience.

THE COURT:  Do you intend to bring out that he's a firearms trainer at the FBI when you introduce the witness to the jury?

MS. BERKOWER:  I think if the Court would find that to be giving undue weight to his testimony, we wouldn't have to do that.  Really, the key for us is that he has personal experience with this product, he knows the ins and outs of this product,

1    and he recognized the photo of it when he saw it.

2         I understand that when it comes to firearms not everyone

3    has as much knowledge of certain kinds of products as others, as

4    other people may.  But I think a good analogy would be something

5    like a hammer.  Anybody could own a hammer.  A hammer that's

6    available, a certain brand of hammer that's available in a

7    hardware store, anyone could own it.  A carpenter would probably

8    have more familiarity with recognizing it, but the average

9    person who owns it and has it in their home tool box also could

10   recognize it.

11        And that's really what we're asking the Court to permit

12   this agent to do, is he says, oh, I recognize that product that

13   Mr. Reffitt is carrying because I'm so familiar with it, I see

14   that little detail on the side of it, level-one finger retention

15   device -- that's the technical word for it; I don't think I

16   characterized it correctly earlier -- because I've seen this and

17   I've used it myself before.  We're not asking him to draw any

18   inferences about it.  We're not asking him to draw inferences

19   about how Mr. Reffitt got it.

20        And unlike some of the opinion from law enforcement that I

21   think troubled the D.C. Circuit, where the officer is using

22   training to be able -- law enforcement training, specialized

23   training to make inferences about everyday observation.  So for

24   instance, I saw a bulge in a pocket, and the inference I drew

25   from my law enforcement training was that that may be a weapon.

1      We're really instead just asking for something much more

2  basic and something far less specialized to law enforcement

3  training, which is he recognized a brand of product that he

4  personally had familiarity with.

5              THE COURT:  You're also asking him, though, to link

6  the two, are you not, the two photographs?

7              MS. BERKOWER:  Well, I think our plan was just to

8  point out that he found -- that the FBI found this type of

9  holster in his bedroom and he found -- and this type of holster

10  is visible on Mr. Reffitt's person on January 6.  I don't think

11  we would be asking the witness to opine that it's the same

12  holster.

13              THE COURT:  Okay.

14              MS. BERKOWER:  Or the exact holster.

15              THE COURT:  How long has this agent himself personally

16  owned firearms versus, you know, been exposed to this in his job

17  at the FBI?

18              MS. BERKOWER:  To make sure I understand Your Honor's

19  question --

20              THE COURT:  If he were restricted to just his personal

21  ownership of the gun, how long has he owned -- I'm sorry, the

22  holster?  Do you know the answer to that question?

23              MS. BERKOWER:  I don't, Your Honor.  I could find that

24  out.

25              THE COURT:  I was just curious.  Let's say he's owned

1    it for five years hypothetically.  Is it the government's

2    position that the government could call any individual, non-law

3    enforcement officer to the stand to say, I've owned this holster

4    for five years, and it looks like it's -- the one in the

5    photograph looks like it's the one I own?  Is that the

6    government's position?  It's just like any gun owner taking the

7    stand and testifying?

8         MS. BERKOWER:  I think -- I could see why Mr. Welch

9    might object to us doing that based on the relevance of that

10    witness in any other way.

11         THE COURT:  But is the relevance not the same?  You're

12    basically wanting a person to identify the holster that appears

13    in that photograph to the extent anyone can.

14         MS. BERKOWER:  I think the answer to your question is

15    yes.

16         THE COURT:  All right.  So all you seek to have this

17    agent do is identify the holster in the photograph by name?

18         MS. BERKOWER:  Yes.

19         THE COURT:  And nothing more than that?  Do you expect

20    the agent to then say this holster holds these types of guns?

21         MS. BERKOWER:  Well, the agent, I think, would say

22    that this type of holster is designed to specially hold a

23    particular type of handgun.  My understanding, and I think we

24    did include this in our brief, is that that brand contains small

25    variations to fit different brands of firearms.  But I don't

1    think he would say anything more than that, just he knows that's

2    the case from owning one.  But I don't think we would elicit

3    much more than that.

4           THE COURT:  And why can't the jurors look at these two

5    pictures and draw the same conclusions?

6       I guess you don't have the holster.  You need somebody to

7    give the holster a name; is that right?

8           MS. BERKOWER:  I think that's the idea, Your Honor.

9           THE COURT:  So you're really using this agent who is

10   familiar with this holster to do that, to say this is X type of

11   holster?  I forget the name of it.

12          MS. BERKOWER:  Correct.

13          THE COURT:  And you're using it to say it holds

14   various guns, including the gun that will be introduced in

15   evidence?

16          MS. BERKOWER:  Yes.  I think he would say that this

17   brand of holster can be used for a Smith & Wesson handgun,

18   period.  We would separately introduce the fact that a

19   Smith & Wesson handgun was found on a nightstand in

20   Mr. Reffitt's bedroom.

21          THE COURT:  Does he have -- in his private life, does

22   he also own the specific handgun, so he knows it fits that

23   holster?

24          MS. BERKOWER:  This agent personally uses these

25   holsters for Glock-branded handguns, not Smith & Wesson

1  handguns.

2  THE COURT:  So how does he know the other fact?  Is

3  that because of his experience as an agent?

4  MS. BERKOWER:  I think it's because of his

5  experience -- that's a good question.  I'm not entirely sure.  I

6  don't think it's from being an agent, because I know that the

7  agents use Glock handguns.  I don't -- I'm not fully sure how he

8  knows that.  It may just be as a gun enthusiast, but we could

9  certainly find that out.

10  THE COURT:  Okay.  That would be helpful to know.

11  All right.  I interrupted you at one point, Ms. Berkower,

12  if there's more that you want to explain in terms of how you

13  intend to use this agent's testimony if I permit it.

14  MS. BERKOWER:  I think only just to finish the thought

15  that the extent that the D.C. Circuit has expressed concern

16  about agents drawing upon their law enforcement experience to

17  give lay testimony that then draws inferences for the jury,

18  that's not what we're trying to do here.

19  So for instance, an agent who would testify that they saw a

20  particular bulge or individual walking in a certain way that

21  might indicate -- that was an observation from which they drew

22  the inference based on their law enforcement training that the

23  person was carrying a weapon or was concealing drugs or other

24  contraband.  That's not the type of testimony that we're trying

25  to elicit here.  And we understand why that would be

1    problematic, because that is drawing on specialized law

2    enforcement training to make that inference, and that's not a

3    lay opinion.  That's not the kind of process of reasoning

4    familiar in everyday life to people.

5          Instead, like I think we've already discussed, we're really

6    just asking the agent to identify a product.  And the Rules

7    Committee in 2000, the 2000 Explanatory Notes noted that they

8    were not trying to exclude some lay opinion testimony.  I think

9    one of the prototypical types of lay opinion testimony that they

10   identified was the appearance of things and identifying things.

11         And one of the cases that they cited which we included in

12   our supplemental authority for the Court gave a good example of

13   that, that people who are familiar with narcotics by using them

14   and having personal experience with them could testify that

15   something was a particular narcotic.  That was, if not an

16   experience that jurors may have had, at least a reasoning

17   process that would be familiar to them.

18         THE COURT:  One other thing that was brought out by

19   the cases is that the courts look at whether the facts that a

20   witness is observing is requiring that witness to apply the

21   knowledge that's greater than the average layperson or, in this

22   case, the average gun owner.

23         So when you start talking about things like not just a

24   holster, there's a name of it, but this holster can hold all

25   these different types of guns, is that getting, you know,

farther beyond what a gun enthusiast would know, a regular

layperson?  Is that crossing that line in some way?

MS. BERKOWER:  Well, Your Honor, I don't think that we

are going to try to go much further than just asking what type

of firearm would this holster hold and how do you know that.  We

could ask that.  I think we would ask what -- how do you

recognize this, what makes you able to recognize this, because I

think that is a question that the jury may have, and I think he

would identify the level-one finger retention device as a unique

feature that allowed him to recognize it.

THE COURT:  But is a regular gun owner going to know

that?  I mean, this agent has been exposed presumably to a lot

of different firearms and a lot of different gun holsters in his

job.  So he's almost like a gun shop owner maybe, not the

neighbor next door who has a firearm.

And would a gun shop owner testify as an expert, or would

he or she just testify based on, you know, his -- it seems like

that person might be more of an expert who knows all the

different holsters and knows that this is the only one out of

all these thousands of holsters that has this finger lock or is

visible?

I don't know.  I'm asking.  I don't know the answers to

these questions.

MS. BERKOWER:  I think we do plan for this testimony

to be pretty limited, and I don't -- I think probably there are

circumstances under which a gun shop owner could qualify as an
expert and other testimony that would simply -- would still be
within the category of lay testimony and really would come down
to personal knowledge and experience.

And here, we're really drawing on the agent's personal
experience with this particular product that would allow him to
identify the product.  And I don't think it's outside the realm
of the average experience of a person who owns this holster to
recognize it through the level-one finger retention device.

I know there could be other circumstances in which a wider
set of questions would be asked that might, you know, get into
territory that would be more specialized, but really, this is
just about identifying -- the ability to identify a product that
you have personal knowledge of from using it during your life
for several years.

THE COURT:  And again, the special characteristics --
characteristic that makes this holster unique is what?  The
finger --

MS. BERKOWER:  The level-one finger retention device.
You have to push it down by the user's index finger in order to
remove the gun.  That's a feature that anybody who employed this
would know about, because in order to get the gun out you have
to push down on the retention device to get the gun out.  It's
not like a tiny feature on the side that only someone would know
if they've examined it closely.  It's a primary feature of the

1    product.

2              THE COURT:  So are you going to try to put the gun in

3    the holster?  I know you don't have that holster, but are you

4    going to introduce that style of holster?

5              MS. BERKOWER:  I think that --

6              THE COURT:  How are you going to present his testimony

7    saying this gun fits this holster?

8              MS. BERKOWER:  We do have a -- we do have that style

9    of holster in the possession of the FBI that we were going to

10   make available to Mr. Welch to inspect, and we were going to

11   potentially try to introduce that separate item with, of course,

12   making it clear that that's not something -- this was not the

13   same one that was found in the defendant's bedroom.

14             THE COURT:  Necessary to his testimony is knowledge

15   that a lot of other holsters don't have the same level-one

16   finger retention device; right?

17             MS. BERKOWER:  Yes.

18             THE COURT:  And again, is that something a normal

19   layperson knows, or is it someone with the long history of being

20   a federal agent and trained in firearms knows that this is a

21   unique feature of this holster?

22             MS. BERKOWER:  I think it's knowledge that anyone who

23   has used this holster would know, be that through your

24   experience in law enforcement owning it or be that through your

25   experience of having bought it on Amazon or from a gun shop.

1    That's personal knowledge that anyone who owns the holster would

2    know, and it doesn't have to come from specialized training.

3        Whether there are special ways to use the holster above and

4    beyond that basic feature, I honestly don't know, but we

5    certainly wouldn't be seeking to elicit it here.  It's more

6    just, how do you know that this is the product that you saw?  I

7    know it because it has this very unique feature, that's one of

8    the primary features of the product that anybody who owns it

9    would know about, because you can't use it unless you are

10   familiar with how to use that feature.

11       THE COURT:  Why wouldn't the government just seek to

12   qualify someone as an expert and have an expert testify about

13   this?

14       MS. BERKOWER:  Well, I think if Your Honor -- if Your

15   Honor isn't going to permit this as lay opinion, that's

16   something we will consider doing.  This just seemed to fall

17   clearly enough on the line of lay opinion that we believed that

18   we could proceed this way.

19       THE COURT:  So if I deny this, then you're going to

20   file -- you're going to give notice of expert testimony and --

21       MS. BERKOWER:  I think we would consider doing that.

22   This is a relatively -- we believe this is relevant testimony --

23       THE COURT:  I definitely agree it's relevant, yeah.

24       MS. BERKOWER:  But in our view, it's basic enough

25   to -- a composition of this product -- which again, I think we

1    would be in a different spot, Your Honor, if this was equipment

2    that was only available to law enforcement or to the military

3    and, therefore, was not something you could go out and purchase

4    in any gun store or online or sporting goods store, and

5    therefore, how to use a product of this type or how to recognize

6    a product of this type is something that you could only know

7    through law enforcement training, which is the kind of testimony

8    that the D.C. Circuit has had a problem with, only law

9    enforcement would know to draw this inference from that

10   observation.

11        And that's just not the case here.  This is really, I

12   think, as simple as being able to identify a specific tool that

13   is available to the general public that this particular witness

14   has personal familiarity with.

15             THE COURT:  But is the fact that the level-one finger

16   retention device is unique to this holster, is that -- that's

17   also a question.  Is that known to the general layperson?  Would

18   a layperson be able to competently testify like this agent will

19   about this holster without the breadth and training and

20   experience that this agent possesses?

21             MS. BERKOWER:  I don't think we need to even go that

22   far, Your Honor.  I understand what the Court is saying, and to

23   be honest, I don't actually know the answer.  But I don't think

24   that's the testimony we would be eliciting.

25             THE COURT:  But the problem is, on cross, Mr. Welch is

going to go after him, how can you possibly say this holster,

based on this three-inch view of this holster, is the same as

whatever the name is.  In order to answer the questions, he's

going to have to explain -- if I'm inclined to admit this, I

really do have concerns about, as I've stated, about getting

into the fact that this agent is a trainer in firearms and

getting into all of that just because of the statements that the

circuit has made about concerns with crossing that line with a

law enforcement agent who is not qualified as an expert.

So that's a concern.  I think we have to anticipate that

your two questions are not just the end of the discussion; there

will continue to be probing on this on cross.  And if an agent's

going to honestly answer those questions, he's probably -- you

can't tell me now how he knows about the level-one finger

retention device and how prevalent it is than other holsters?

It's possible the defense goes there, and then we will have a

situation where we have an agent sharing all of his highly

specialized knowledge in order to answer the questions

truthfully, and that's a concern.

I will hear from Mr. Welch, but I think what I need is more

specifics based on some of the questions I've asked here, and if

not this witness, then is the government -- the government would

seek then to qualify Agent Hightower as an expert?

MS. BERKOWER:  Your Honor, maybe I'm getting a little

ahead of myself.  I know one thing we did want to ask the Court

1    for was a scheduling order for the lead-up to trial.  So I think

2    we would -- if we were to -- if Your Honor was to require expert

3    and not lay opinion on this, we would certainly consider that.

4            THE COURT:  I mean, at this point, we're, what, six

5    weeks away from trial?  I think the government needs to be

6    giving notice immediately.  And I'm not ready to resolve this

7    today.  So I think by Monday you need to provide that, if that's

8    a backup position you want, so that Mr. Welch has time to get

9    his competing expert.  All right?

10           MS. BERKOWER:  Yes, Your Honor.

11           THE COURT:  Anything else you would like to add,

12   Ms. Berkower?

13           MS. BERKOWER:  Not at this time.  Thank you.

14           THE COURT:  All right.  Mr. Welch?

15           MR. WELCH:  Your Honor, in its papers, the government

16   has said that what it wants to elicit from the agent was that

17   the defendant was, quote, wearing a holster.  So they're going

18   to ask the agent to look at that picture that you have in the

19   paper before you and say that Mr. Reffitt was wearing a holster.

20       That's not something that the jurors could not look at and

21   decide for themselves.  They don't need a law enforcement agent

22   who the government concedes, based on his experience --

23           THE COURT:  Well, they are talking about more than

24   just is he wearing a holster.  It talked about this holster has

25   this name.

1          MR. WELCH:  Well, they do, but the issue ends up

2     becoming is the picture of Mr. Reffitt on the Capitol steps, is

3     he wearing a holster in that picture.  And that's what they're

4     asking the agent, relying on his experience --

5          THE COURT:  Is that what you're objecting to?

6     Clearly, in the picture he is wearing a holster.  That's not

7     prejudicial.  The photograph shows this.

8          MR. WELCH:  The photograph shows whatever the

9     photograph shows.  The jury doesn't need a law enforcement

10    witness who is a firearms trainer to come in and tell them what

11    they're looking at in a picture.

12         If Your Honor is saying that it is obvious to you that that

13    picture shows Mr. Reffitt wearing a holster, then the government

14    doesn't need this lay opinion testimony at all, because the

15    jurors should be able to draw that conclusion for themselves.

16         THE COURT:  But the government is saying more than

17    that.  It wants to try to identify this holster, and the way it

18    does that is by this special level-one finger retention device

19    that they say is observed on a better blown-up picture, I guess,

20    of this photograph.

21         MR. WELCH:  Well, number 1, I haven't seen that, and

22    number 2, they've also told you today that this agent gained

23    whatever knowledge that he has of his own because he owned the

24    same brand -- or used, excuse me, used the same brand through

25    his law enforcement experience, and then after whatever agency

he was working for was no longer using that particular weapon,

he happens to like weapons, so he continues to have the stuff.

So he is absolutely relying on his specialized experience

in order to then say yeah, I personally know this.  Yeah, he

personally knows it, because he has expertise that he has

gained.

THE COURT:  So you agree, Mr. Welch, this is relevant

testimony?

MR. WELCH:  It's relevant.

THE COURT:  Okay.  But you just think that the

government should have to produce an expert to elicit it?

MR. WELCH:  I'm saying that, number 1, it would be

necessary for the person to be an expert, yes, in direct answer

to Your Honor's question, yes.

But furthermore, even then, he's not supposed to be

testifying and telling the jury what they're seeing in the

picture of Mr. Reffitt on the steps of the Capitol, which is

what they're asking him to do.  They say so.

THE COURT:  He can say this appears to be a holster.

Presumably, his testimony is not --

MR. WELCH:  Quoting from their papers, they want the

agent to say, quote, he was wearing a holster and thus likely a

firearm.

THE COURT:  Well, this is not the key point.  The crux

of the matter is how far they can go with trying to identify the

particular type of holster.  If he sees this and it appears to

him that that's a holster and a certain type of holster, you're

objecting to that testimony even coming from an expert?

MR. WELCH:  Yes, because that's the ultimate issue.  A

couple of the charges are that the obligation is that the

defendant was armed.  So basically --

THE COURT:  The holster doesn't mean that he's armed.

MR. WELCH:  Well, but they're saying in their papers

and thus likely he was.  I mean, that's their point.  That's

what they're trying to prove.  They're trying to have this agent

come in and tell the jury what they're seeing and what to

conclude.

THE COURT:  Ms. Berkower, is the agent going to

testify that that holster is loaded with a firearm?

MS. BERKOWER:  Your Honor, I think the agent will

testify that he sees the holster, as Your Honor has said, and in

the photograph, we would ask him if there's anything -- what is

significant about that holster to him.  In the photograph, you

can see there's something silver in it.  And so he would say

there's something silver in it.

The firearm that was recovered from the holster in

Mr. Reffitt's bedroom, in the photograph that I think we had on

the screen earlier that's in our brief, it's at a different

angle, and you can only see black, but in other photographs that

we have that have all been provided to Mr. Welch, you can see

1    that the top of it is silver.

2         And so while I doubt that we would say "Is there a gun in

3    there?" we would ask him what's significant about it, and he

4    would say, "Well, there's silver in the top.  It looks like

5    there's something in it."  And we would show the actual firearm.

6    The jury could see it.  And they would see that the top of it is

7    silver.

8              THE COURT:  And you will place it in a holster that

9    you say is the same that was not seized from his bedroom?

10             MS. BERKOWER:  As a demonstrative exhibit, yes.

11             THE COURT:  Okay.  These are the kinds of things that

12   I've been pressing on you all need to be anticipating.  There

13   are a lot of issues here.  I think the government needs to give

14   clear photographs to the defense and to the Court on this.  I

15   think the government needs to be showing the holster that it

16   intends to introduce; it's not the one that was seized from

17   Mr. Reffitt's bedroom but you say matches.  I think the

18   government needs, as a backup if it wants to go down this route,

19   to be prepared with expert notice by Monday, and Mr. Welch, I

20   will give you time to get a competing expert, if that's what you

21   want to do.

22        But we're arguing about very picky items in these motions,

23   and there's some big ones that are being ignored, and this

24   motion illustrates it's much more complicated than just this

25   determination.

1    So I'm going to ask that you all confer, that you provide a

2    better version of this photo that illustrates what you're going

3    to be trying to show, that you show Mr. Welch the holster, that

4    you provide expert testimony, and I am going to also ask you,

5    Ms. Berkower, to say more specifically than you've done in this

6    brief what it is exactly that you seek to elicit so that we're

7    all really clear.

8    If I permit this either as lay testimony -- and I haven't

9    decided this issue.  It's just we're up close to trial now, and

10   we need to proceed with notice if that's necessary so that

11   Mr. Welch can be prepared and we don't have to bump this case

12   again, because I know Mr. Reffitt wants to be tried at the end

13   of February.

14   And I think there's still time for the defense to get its

15   own expert if that's what it wants to do, but you need to -- how

16   quickly can you file a supplemental brief that is more granular

17   in terms of the specific testimony you seek to elicit from Agent

18   Hightower or any other witness you might call as an expert?

19   MS. BERKOWER:  Your Honor, is Wednesday too late?

20   That would be, I believe, the 26th.

21   THE COURT:  All right.  I will give you until the

22   26th, and I will give Mr. Welch until the 2nd to respond to

23   that.

24   And again, Ms. Berkower, you all need to -- if you're going

25   to as a backup have an expert, you need to provide that notice

1    by Monday.

2              MS. BERKOWER:  Understood, Your Honor.  Thank you.

3              THE COURT:  And Mr. Welch, why couldn't, say, a gun

4    owner who has familiarity be an expert in this case or maybe

5    even a lay -- provide lay testimony or somebody who has -- owns

6    a lot of guns him- or herself?

7              MR. WELCH:  Well, anybody with the qualifications

8    could be an expert.  On the other hand -- and this is the

9    problem.  This is like a scrambled egg.  The agent is like a

10   scrambled egg in this situation, because, granted, anybody could

11   be a lay witness.  I mean, if we were just saying what's that

12   sound and he said well, that's a gunshot, that would be one

13   thing.  Anybody might be able to recognize the sound of a

14   gunshot.

15      But this agent gained the knowledge that they're asking for

16   through his specialized experience as an agent.  He might

17   continue to have this stuff, you know.  Someone might continue

18   to collect old patrol cars that they drove, and everybody drives

19   a car, so that might not end up being something that's really,

20   you know, expertise.

21      But in this situation, this guy is an experienced firearms

22   trainer, and you can't separate that.  He gained his experience

23   in a particular way.  He gained his knowledge in a particular

24   way.

25              THE COURT:  Do you think that there could be lay

testimony from a nonagent who just happens to own this holster

and be familiar with firearms generally but maybe not an expert?

MR. WELCH:  I suppose if somebody owned the exact same

firearm and holster themselves and say yeah, I happen to own the

same one, then perhaps.

THE COURT:  Why the firearm as well?

MR. WELCH:  Well, because the holsters would be

unique, from what I heard, to the actual firearm.

THE COURT:  She's saying that this holster holds a lot

of different firearms, one of which is the one that was seized

from Mr. Reffitt's bedroom; correct?

MS. BERKOWER:  Oh, maybe I should clarify that.  The

manufacturer makes this holster with minor specifications for

different brands.  But it's the same style; it's the same

product.  It just has minor specifications, I think, on the

inside to hold different brands.  So the Glock handgun won't fit

in the one that you buy for the Smith & Wesson, but it's the

same product other than the minor differences for different

brands.

THE COURT:  Okay.  But Mr. Welch, would you object if

they called in some person who's not an agent who owns this same

holster and firearm to testify and say that that picture looks

like it shows the holster I own and here's why?  Is that

legitimate layperson testimony?

MR. WELCH:  I don't think that would be when you're

1    talking about the picture of Mr. Reffitt on the steps, because

2    anybody who would do that would ultimately be giving ultimate

3    issue testimony to say yes, that is a picture of a particular

4    person wearing a holster with a firearm in it.  That's exactly

5    what the charge is.  That's what the jury is being asked to

6    decide, and they're telling the jury what to conclude in that

7    situation.

8           THE COURT:  This is the container for the firearm.  So

9    I don't understand why they can't testify that they observed a

10    holster in the photograph, assuming they get a better picture

11    than this.  Not definite.  It appears -- "What do you see that's

12    significant in the photograph?"  "It looks like there's a

13    holster, and it looks like one I own."  "Well, why is that?"

14    "Well, it has this special feature."

15     Why is that testifying about the ultimate issue in the

16    case?

17           MR. WELCH:  Well, because as the government proffered

18    in its papers, basically they want the person to say he's

19    wearing a holster and likely armed, and they're going to say

20    that oh, what I see in there is silver, and he had a gun with

21    some silver on it, so therefore, he's got a gun in his holster.

22    That's what the jury is supposed to decide.

23           THE COURT:  Ms. Berkower?

24           MS. BERKOWER:  I mean, the witness would not be

25    drawing the inferences that Mr. Welch is drawing.  I think those

are things that the government would argue based on the facts that were admitted.  And to the extent that the witness can provide the basis for facts that are useful to the government's case, that's the nature of testimony, that's the nature of evidence.

THE COURT:  Mr. Welch, I don't understand your point. In a drug case, if the government is prosecuting somebody for possession of crack cocaine and they call a witness who saw the defendant snort the cocaine, they would be allowed to elicit that testimony.  And if he had a picture of it, they would be allowed to admit that.

MR. WELCH:  What they could say is that the defendant snorted something, it was white powder.  But if you have the witness do exactly what you just said, that you saw the defendant snort cocaine, that is the ultimate issue.  That is for the jury to decide, whether it was cocaine.

THE COURT:  Ms. Berkower?

MS. BERKOWER:  Your Honor, I think Mr. Welch is actually not quite right on this point.  And the Rules Committee gave a very similar example to what Your Honor gave in one of the cases that it cited.  They specifically said it is appropriate for a lay witness with personal knowledge of a narcotic to testify that that was the narcotic at issue in the transaction that the defendant was engaged in because they have personal experience of it.

1    And so I would agree with Your Honor and respectfully

2    disagree with Mr. Welch that a witness actually could testify

3    that they had personal knowledge of a certain substance that was

4    being used in a particular situation and recognized it to be

5    cocaine.  They could testify.  That is the essence of lay

6    opinion testimony, and that's exactly the kind of thing we're

7    trying to elicit here, identification of a particular product

8    based on personal experience.

9         MR. WELCH:  If someone is looking at a picture or

10   someone is watching someone snort powder, unless you test it or

11   unless the person actually used it themselves, you wouldn't know

12   whether it was baking soda or cocaine or some other powdery

13   substance.  That's an expert conclusion.

14        THE COURT:  Okay.  Have I been clear about what the

15   government needs to do?

16        MS. BERKOWER:  Yes, Your Honor, I believe so.

17        THE COURT:  All right.  And Mr. Welch, while we're on

18   the subject of experts, do you intend to introduce any expert

19   testimony at trial?

20   To the extent you do, you also -- although this is not in a

21   written order yet, I will put it in a minute order today, you

22   need to provide notice of experts.  Now, if you're responding to

23   theirs, obviously, you can have additional time to identify that

24   expert.  I will give you -- how long would you need to identify

25   an expert if they give notice on Monday that they're seeking to

1    admit expert testimony relating to this issue?

2              MR. WELCH:  I think we need a week, Your Honor.  I'll

3    have to make the appropriate inquiries and --

4              THE COURT:  Okay.  So the government will give notice

5    of any potential expert testimony on this issue or anything

6    else.  And tell me now if you all are contemplating any other

7    expert testimony on any issue in this case, both government and

8    defense.  Ms. Berkower or Mr. Nestler, anything else other than

9    this?

10             MS. BERKOWER:  No, Your Honor.

11             THE COURT:  Okay.  So that is the deadline.

12        Mr. Welch, any expert testimony from you?

13             MR. WELCH:  No.

14             THE COURT:  All right.  So the deadline for giving

15   notice is Monday, the 24th, and Mr. Welch, your deadline for any

16   competing expert is one week later.

17        Let's talk about setting some future dates to address --

18   pick up with this issue and address the jury instructions and

19   other issues.  I had some dates in front of me.  I think I was

20   going to suggest February 4.  Is that a date that would work for

21   both sides?

22             MR. NESTLER:  That should be fine for the government,

23   Your Honor.

24             MR. WELCH:  I think it will be a question of when.  I

25   have an in-person sentencing hearing before Judge Bredar in

1    Baltimore that morning.

2              THE COURT:  Okay.  Let me just check my calendar.

3    What time do you think you could be available, Mr. Welch?

4              MR. WELCH:  Probably by 1:00.

5              THE COURT:  Okay.  Does that work for the government?

6              MR. NESTLER:  Could we do it a little bit later, Your

7    Honor, or on maybe even the prior day, the 3rd?

8              THE COURT:  Mr. Hopkins, the 2nd and the 3rd are

9    pretty packed.  Is there any room that we could fit this in on

10   those two days with D.C. Jail?

11             COURTROOM DEPUTY:  We could do 12:30 on the 3rd.

12             MR. NESTLER:  That's fine for the government, Your

13   Honor.

14             MR. WELCH:  That's fine, Your Honor.

15             THE COURT:  Okay.  So let's set this for 12:30 on

16   February 3rd.

17         Actually, Ms. Berkower, you needed until Wednesday to

18   supplement your briefing here, and I'm just wondering,

19   Mr. Welch, can you respond by Tuesday, February 1st?  To the

20   extent you need to, and you may not, but to the extent you want

21   to respond to the supplemental briefing that they give me on

22   this issue on February --

23             MR. WELCH:  I think that's fine.  I can bump that up a

24   day.  I think you had given me until the 2nd before, but bumping

25   it up to the 1st shouldn't be a problem.

1          THE COURT:  If you can, so I have time to take a look

2     at it before the 3rd, that would be helpful.  So any

3     supplemental briefing by the government by next Wednesday and

4     any response to that by Tuesday.

5          And in terms of -- since everyone's schedules fill up and

6     it's difficult to get time with D.C. Jail, I am inclined to set

7     some periodic hearings moving forward just so that as issues

8     arise we have cleared schedules and the ability to meet and have

9     Mr. Reffitt present.  And if there's nothing to address on those

10    dates, then we can certainly vacate them later.  But I would

11    like to go ahead and set -- is it possible to set time, say, on

12    February 18th at 9:00 a.m.?

13          MR. NESTLER:  That's fine for the government.

14          MR. WELCH:  I'm available.

15          THE COURT:  Let's set another hearing for

16    February 18th at 9:00 a.m.  And what about Wednesday,

17    February 23rd, at 10:00 a.m.?  Would that work for everyone?

18          MR. NESTLER:  Yes, Your Honor.

19          MR. WELCH:  I'm checking.  You said the 23rd; correct?

20          THE COURT:  Yes.

21          MR. WELCH:  At what time?  Sorry.

22          THE COURT:  Would 10:00 a.m. work for everyone?

23          MR. WELCH:  Yes.

24          THE COURT:  Mr. Hopkins, do those dates and times work

25    for D.C. Jail?

1      COURTROOM DEPUTY:  D.C. Jail can accommodate both of

2  those dates, Your Honor.

3      THE COURT:  Okay.  So we will do that, and then let's

4  also set a time on Friday, the 25th.  Does 10:00 a.m. work for

5  everybody, just last-minute issues?

6      And again, we can vacate any of these if we need to.  I

7  just don't want to get in a situation where something comes up

8  and we can't get your schedules free and Mr. Reffitt present.

9      COURTROOM DEPUTY:  10:00 a.m. won't work for D.C. Jail

10  on the 25th.

11      THE COURT:  What time will work on the 25th?

12      COURTROOM DEPUTY:  11:30.

13      MR. WELCH:  That's a problem.  I have an in-person

14  sentencing before Judge Chasanow in Baltimore that day.

15      THE COURT:  Let's just set a time, then, on the 24th.

16  11:00 a.m. on the 24th?  We probably don't need it.

17      MR. WELCH:  That's fine.

18      MR. NESTLER:  That's fine.

19      THE COURT:  Does that work, Mr. Hopkins?

20      COURTROOM DEPUTY:  That does work, Your Honor.

21      MR. NESTLER:  Can I ask, Your Honor, are these all

22  going to be virtual hearings, or did Your Honor want to have a

23  in-person hearing to make sure we're all on the same page in the

24  courtroom before the trial?

25      THE COURT:  I do know that court staff will want to

1    have you all come in and walk you through the logistics of

2    whichever courtrooms we're in.  I would suspect it will be the

3    Ceremonial Courtroom for jury selection and then perhaps my

4    courtroom thereafter.  But that's something that I need to

5    confirm with the court staff and the jury office and all that.

6        I apologize for the background noise here.

7            COURTROOM DEPUTY:  I'm sorry, Your Honor.  The 24th,

8    was that 11:00 or 10:00?

9            THE COURT:  I can't recall.  I think we said 11:00.

10           MR. WELCH:  We said 11:00.

11           THE COURT:  Mr. Nestler, to your point, we may want to

12   come in for one of those in person, but for now let's assume

13   they're virtual, and we will talk at the next hearing what makes

14   sense.  I think you can do this with court staff, though.

15           MR. NESTLER:  That's fine, Your Honor.  It was only to

16   the extent the D.C. Jail wasn't available, we could do something

17   live.  We will follow the Court's lead on how this works.

18           THE COURT:  Yeah, that's an interesting thought.  Let

19   me think about that, Mr. Nestler.  I wonder in terms of

20   transporting Mr. Reffitt back and forth, whether that's -- I

21   think that could be helpful.

22        Mr. Welch, do you have a view?  Talk to Mr. Reffitt about

23   this.  We can certainly turn any of these into in-person

24   hearings as we get closer, but I would like to minimize the

25   unnecessary in-person hearings, so long as we're in the current

1    environment, but that may change.

2         MR. WELCH:  I will talk to my client about that, Your

3    Honor.  I know that sometimes it results in mandatory

4    quarantines for folks when they get pulled out and have to go

5    back.

6         THE COURT:  So Mr. Welch, I'm going to ask you to

7    inquire about that issue with D.C. Jail, because as trial

8    approaches, of course, we can't have him quarantined and unable

9    to come.  I'll check on my end as well.  That's something to

10   think about.  He needs to be present for trial.

11        MR. WELCH:  Right.  But what I meant by that was, I

12   don't think it's been an issue with them -- not necessarily them

13   bringing someone back to trial.  What I'm saying is that I think

14   a lot of times they then get put in some sort of isolation when

15   they're returned to the jail, and they're unable to --

16        THE COURT:  Right.  All of that, yes.  So you check

17   into the logistics of when you are able to meet with Mr. Reffitt

18   and what limitations will be placed on that if we bring him to

19   court pretrial.  All right?  You should look into that.  That's

20   a good point.

21        And then also just to be clear, I still intend to not have

22   the public line open through trial.  All right?  There will be

23   overflow rooms for those who want to be present, Mr. Welch, to

24   view the trial.  Mr. Reffitt's friends and family, all right,

25   need to be present, as I've said before.  Okay?

1          MR. WELCH:  Yes.

2          THE COURT:  All right.  Anything else?

3          MR. NESTLER:  Yes, Your Honor.  There's one additional

4    piece that involves discovery.  We have arranged, and I don't

5    know if Your Honor has heard, to make sure the defendant has

6    access to evidence.com at the jail.  And we've talked to

7    Mr. Welch about this.  In order to do the final step, we need

8    Mr. Reffitt to either sign an acknowledgment on the protective

9    order or be admonished on the record that he agrees to be bound

10   by the protective order, and that will allow the contractor in

11   the jail to give him access to evidence.com.

12      Given his quarantine status, Mr. Welch was not able to meet

13   with him and get a signature.  So we wanted to do that today on

14   the record so we can facilitate him having his own access.

15         THE COURT:  Okay.  So what's the problem?  We don't

16   have the ability to have Mr. Reffitt actually sign the

17   protective order?

18         MR. WELCH:  What we've come up with is we have an

19   attachment that we have agreed to.  We've ironed out our

20   differences on that.  And that's what I spoke with my client

21   about just before the hearing, and he is agreeable to this.  I

22   can certainly read it, because it's in my hand right now, and my

23   expectation is that Mr. Reffitt would say that he agrees to

24   these terms.

25         THE COURT:  Okay.  I clearly can't review this.  I

don't have a copy of it.  So if we need to do this today -- is
this something that can wait until --

MR. WELCH:  You're muted, Your Honor.

THE COURT:  I don't have this document.  Is this
something that we need to do today, Mr. Nestler and Mr. Welch?

MR. NESTLER:  We were hopeful to give the defendant
access to it sooner rather than later.  I'm sorry.  We don't
actually need Your Honor to do any of the reading.  Mr. Welch
can read it, and as long as Mr. Reffitt on the record agrees to
be bound by it --

MR. WELCH:  I've already gone over this with him, Your
Honor.

THE COURT:  Okay.  Go ahead, Mr. Welch.

MR. WELCH:  All right.  This is the defendant's
acknowledgment:  "I have reviewed this protective order in its
entirety and have been given the opportunity to ask any
questions I may have had.  I am satisfied that I fully
understand this protective order, and I agree to abide by its
terms.  No threats have been made to me, nor am I under the
influence of anything that could impede my ability to understand
this protective order fully.  My agreement to abide by this
order shall not be construed as a waiver of any of my
constitutional or statutory rights as a defendant before this
court."

And then there is a signature line for Mr. Reffitt.  And

what I would be willing to do, if Mr. Reffitt indicates that
this is agreeable to him, I could sign it on his behalf and then
file it in ECF.

THE COURT:  Mr. Reffitt, you've heard what Mr. Welch,
your counsel, has just said.  Do you agree to the terms of that
protective order addendum?

THE DEFENDANT:  Yes, Your Honor, I agree to that.

THE COURT:  And do you agree to have him sign on your
behalf until he can give the paperwork to you in person?

THE DEFENDANT:  Yes, Your Honor, I agree to him
signing it, putting his name on it and signing it as agreeing to
it.

THE COURT:  What are the potential effects if he were
to violate this protective order, Mr. Nestler?

MR. NESTLER:  There are no sanctions put in the
protective order itself.  It's an order of the Court.  So we
would apply to the Court for sanctions.

THE COURT:  Okay.  Mr. Reffitt, you understand that
sanctions could be imposed for your failure to abide by the
conditions to which you've agreed?

THE DEFENDANT:  Yes, Your Honor, I understand.

THE COURT:  All right.  Is there anything else,
Mr. Nestler, that you would like to add to that?

MR. NESTLER:  No, Your Honor.  Thank you.  We
appreciate the indulgence.  Nothing else from the government's

1   perspective.

2           THE COURT:  Mr. Welch?

3           MR. WELCH:  No, Your Honor.

4           THE COURT:  All right.  Thank you all.

5       (Proceedings adjourned at 2:30 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

1          I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

          Please Note:  This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.


/s/ Sara A. Wick          February 14, 2022

SIGNATURE OF COURT REPORTER     DATE