1               BEFORE THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

2

3  UNITED STATES OF AMERICA,      .
                        .  Case Number 21-cr-32

4        Plaintiff,     .
                        .

5      vs.                .
                        .

6  GUY WESLEY REFFITT,        .  February 3, 2022
                        .  12:40 p.m.

7        Defendant.     .
  - - - - - - - - - - - - - - - - - -

8

9       PUBLIC TRANSCRIPT OF CONTINUED PRETRIAL CONFERENCE
              (SEALED PORTION REDACTED)

10      BEFORE THE HONORABLE DABNEY L. FRIEDRICH
            UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the United States:    JEFFREY NESTLER, AUSA
                        RISA BERKOWER, AUSA

14                    United States Attorney's Office
                    555 Fourth Street Northwest

15                    Washington, D.C. 20530

16  For the Defendant:        WILLIAM WELCH, III, ESQ.
                    5305 Village Center Drive

17                    Suite 142
                    Columbia, Maryland 21044

18

19

20

21  Official Court Reporter:    SARA A. WICK, RPR, CRR
                    333 Constitution Avenue Northwest

22                    U.S. Courthouse, Room 4704-B
                    Washington, D.C. 20001

23                    202-354-3284

24

25  Proceedings recorded by stenotype shorthand.
  Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present via video conference.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-32, United States of America versus Guy Reffitt.

Representing the United States, we have Mr. Jeffrey Nestler and Ms. Risa Berkower, and representing Mr. Reffitt, we have Mr. William Welch.  And Mr. Reffitt is appearing via video.

THE COURT:  All right.  Good afternoon again, everyone.  For the record, this is a video conference hearing being conducted pursuant to the Chief Judge's standing order relating to the pandemic.

So I have reviewed the parties' supplemental briefs that were filed in connection with the government's motion in limine to allow Special Agent Hightower to provide lay witness testimony about the firearm holster at issue in this case.

I am prepared to rule, but before I do so, I just wanted to ask both sides if there's any additional argument, new arguments that you would like to make.  Mr. Welch?

MR. WELCH:  No, Your Honor.  As long as you received -- I believe my latest paper on that was paper number 96 that was filed on the 1st.  It's called "Amended Supplemental Response."

THE COURT:  Yes, I did see that.  Thank you.  Can you tell me what the difference was between the two?

MR. WELCH:  Sure.  I'm happy to do that.

1          What I realized is that there was some additional

2     information that I wanted to cite from the government's paper

3     number 93 that basically related to Agent Hightower's

4     professional experience.  So I added that on page 3, basically

5     an additional paragraph.  The first full paragraph on page 3 of

6     paper number 96 is the only difference.  And so that's it.

7               THE COURT:  Okay.  And just to be clear, Mr. Welch,

8     you are not seeking to call your own expert in this case if the

9     Court were to qualify Hightower as an expert?

10              MR. WELCH:  That's correct.

11              THE COURT:  So you would not?

12              MR. WELCH:  We would not.

13              THE COURT:  Okay.  Anything from you, Mister --

14    Ms. Berkower?  This is your motion.

15              MS. BERKOWER:  Nothing more, Your Honor.  We will just

16    rest on what we filed.

17              THE COURT:  Okay.  All right.  Having carefully

18    reviewed the supplemental filings, particularly the

19    government's, I have a clearer sense now of what Special Agent

20    Hightower's proposed trial testimony is, and I do agree with the

21    government that it falls on the lay rather than the expert side

22    of the line.

23         But I will say that I do believe, based on the information

24    the government has provided about the special agent's education,

25    training, and experience, I do think that he could qualify as a

firearms expert, but I don't believe it's necessary to do so, given the nature of his testimony.  I think it falls, as I said, on the lay rather than expert side of the line.  His testimony is certainly helpful to determining a fact in issue, namely whether Mr. Reffitt was carrying a gun at the Capitol. Consistent with Rule 703, it's also rationally based on the special agent's perceptions rather than any specialized knowledge about firearms.

I also -- so let me just review so we are clear on what the ruling is.  I will permit the special agent to provide testimony in certain respects, but I will limit it in others.

So first, the special agent can testify that he recognized the holster in the bedroom because he owned several Blackhawk SERPA holsters and he has used them for firearms both in his work and at home.  He can testify that he -- in the decade plus he's served as special agent he's used this holster to carry his service weapon.

Unless the defense opens the door to this on cross-examination and the agent needs to say this in order to answer the question truthfully, I don't think there's any need for the government to elicit testimony about the agent's role as a special firearms trainer for 15 years, nor do I think there's a need to elicit the fact that he's a firearms enthusiast.

Based on what the government has represented, it appears to the Court that the basis of his testimony is simply his daily

1   use of the holster.

2       Have I read that correctly, Ms. Berkower?

3           MS. BERKOWER:  Yes, that's right, Your Honor.  I think

4   I -- we included the fact that he is a firearms enthusiast to

5   explain why he may know some of the things about -- like he has

6   shopped for these items.  So that's why he knows what the

7   material -- what it's made of, what the options are, that you

8   can buy it in matte black or a shinier black, things of that

9   nature.

10      So that was the only basis in our mind for the relevance of

11  the fact that he's a firearms enthusiast, because that's the

12  kind of knowledge you might get if you were shopping for this

13  product.  We just wanted to explain why he knew that.

14      So we don't have to elicit that fact, that he's a firearms

15  enthusiast.

16          THE COURT:  Okay.  I don't want to heighten his

17  testimony, and I don't want -- I think that could be prejudicial

18  to Mr. Reffitt.

19      So again, as I've said, the special agent can testify based

20  on his personal observations that the holster he saw in

21  Mr. Reffitt's bedroom was a Blackhawk SERPA holster.  He can

22  talk about the distinctive features of the holster, namely that

23  the holster has an L-shaped auto-locking finger retention device

24  that a user has to push to release the weapon; that the holster

25  comes with an attachment that can flip to a user's pants; and I

1  think it's fine that he testify based on his knowledge of this

2  gun and what he's seen in stores and owned himself that it comes

3  in a matte black.

4       With respect to the photo in the bedroom, he can testify

5  that the photo of the holster, you know, fairly and accurately

6  depicts what he saw in Mr. Reffitt's bedroom.

7       I assume that that's the case, Ms. Berkower?  He was a part

8  of the search?

9            MS. BERKOWER:  Yes, Your Honor.  He was not the agent

10  who collected the item, but he observed it in place and would

11  say that what's in the photograph is a fair and accurate

12  depiction of what he saw in the bedroom.

13            THE COURT:  And you will introduce the photo through

14  him?

15            MS. BERKOWER:  I think we actually have another

16  witness who will be introducing the photograph, but yes, he will

17  testify about the photograph.

18            THE COURT:  Okay.  He can also -- with respect to the

19  photo of Mr. Reffitt at the Capitol, he can also testify that

20  the photo appears to show a holster on his right --

21  Mr. Reffitt's right hip, and he can explain why it looks like a

22  Blackhawk SERPA to him.

23       Based on -- I did look at the blown-up photograph, and I

24  can see more clearly what the government's trying to elicit in

25  terms of the finger retention device and the attachment that can

1    be seen in the photo.  So I think that's appropriate as well.

2        He is the witness that would also deal with the

3    demonstrative exhibit, not the Blackhawk SERPA holster that

4    Mr. Reffitt owned that wasn't seized but the one that's

5    identical to it?

6        MS. BERKOWER:  Correct.

7        THE COURT:  Okay.  And he can point out the

8    distinctive features on the demonstrative exhibit.  He can show

9    how the holster and the attachment work with clothing.  He can

10   demonstrate how the finger retention device works.  And he can

11   show how the firearm fits into the holster.

12       And I don't think -- although I was concerned about it at

13   first, I don't now think that the distinctive features on the

14   holster, such as the finger retention device or the way in which

15   the holster attaches, constitute specialized knowledge within

16   the purview of Rule 702.  Again, it's clear to me now that the

17   special agent will be grounding his baseline and personal

18   experience and will be using that baseline to evaluate an event

19   that he personally observed rather than deriving his baseline

20   from specialized techniques or the research of others and then

21   assessing it -- assessing an event at issue in a case even if he

22   didn't witness it, as is the case in *Atlanta Channel, Inc*.  And

23   that's at 2021 Westlaw 4243383.  That's a Judge Contreras case.

24       I do think a layperson who has familiarity with firearms

25   and used the Blackhawk SERPA holster on a frequent basis would,

like the special agent, be able to recognize and identify its
distinctive features.  And I cite *U.S. v. Conn*, 297 F.3d 548 at
554, a Seventh Circuit case.

    And based on the government's proffer, I understand that
the special agent will not -- you don't intend to elicit any
expert testimony about the way in which the firearm was
manufactured or operates other than how it fits in the holster;
correct?

            MS. BERKOWER:  Yes; that's right.

            THE COURT:  All right.  And then you also represent
that the special agent will not testify based on the photograph
that he believes Mr. Reffitt possessed a firearm at the Capitol;
correct?

            MS. BERKOWER:  That's right, Your Honor.  I think the
photograph, there is some silver coloring on part of the
photograph that we will probably -- that I will point out with
him, but we won't ask him to draw any conclusions beyond that,
just that there's a silver object that appears to be at the top
of the holster.

            THE COURT:  Okay.  Well, I don't see that as giving an
expert opinion on the ultimate issue in the case, as Mr. Welch
has argued.  Again, this is based on his personal experience.
He personally viewed the holster in Mr. Reffitt's bedroom, and
he viewed photos of that holster subsequently, the holster in
the bedroom and what appears to be a holster on Mr. Reffitt

1    during the Capitol riot as reflected in the other photo.  And he

2    will be using his personal experience to evaluate both what he

3    saw in Mr. Reffitt's bedroom and in the photos that he's

4    reviewed in his investigation of this case.  So I will permit

5    that testimony to be introduced.

6        Next I want to talk about the parties' proposed

7    instructions for the obstruction count.  And I have a few

8    questions I want to discuss with each side, and I also want to

9    give you a chance to think about and provide written comment on

10   some proposed edits that I'm inclined to make.  Of course, we're

11   not going to finalize the jury instructions until the charging

12   conference once the evidence is in at trial, but I do think it's

13   important to resolve some of these more thorny legal issues

14   before trial, particularly with respect to this count about

15   which there's been so much pretrial litigation.

16       So I appreciate your efforts to do so, and yours as well,

17   Mr. Welch.  The record is very clear you haven't waived any

18   objections by giving the Court feedback on this.

19       But I do want to say, Mr. Welch, with respect to your

20   proposal, much of it conflicts with this Court's decision in

21   *Sandlin*, which you're aware of.  So I just want to review the

22   specific areas that I find problematic with your instruction in

23   light of the rulings I've already made in this case and in

24   *Sandlin*.

25       First, the Court will not adopt Mr. Reffitt's proposed

definition for "official proceeding."  You've emphasized,
Mr. Welch, that the proceeding at issue here is one before a
court, judge, or federal agency, as well as Congress, and also a
federal grand jury investigation.  That's language you want in
the jury instruction.  But as I and a half a dozen other judges
on this court have held, the defendant need not have intended to
instruct, impede, or influence the due administration of justice
to violate Section 1512(c)(2).  The statute just requires an
intent to obstruct an official proceeding, which includes
proceedings before Congress, and such proceedings need not
relate to the administration of justice.  So that's my *Sandlin*
opinion at 8 through 9.  So I'm rejecting that.

I'm also rejecting the argument you've raised that to
violate Section 1512(c)(2) a defendant needs to influence
another to violate a legal duty.  Judge Mehta specifically
addressed this in the *Caldwell* case and explained that
"corruptly" in Section 1512 is used -- (c)(2) is used in the
intransitive sense.  The defendant's own behavior must be
corrupt; he need not corrupt another.  And that's *Caldwell*, 2021
Westlaw 6062718 at 10.

The Court, although it considered it and I will hear any
additional argument, but I'm really also not inclined to define
"corruptly" by referencing an intent to gain an advantage for
oneself or another.  It's true that the motive typically
involves an expectation of financial gain or other benefit to

oneself or another, but not always.  And as I explained in *Sandlin*, I think what the government needs to prove is that the defendant acted either with unlawful means or to achieve an unlawful end.  In a moment, when we get into the government's instructions, I'm going to share some specific language I would like both sides to consider.

I think that the "unlawful" language will sufficiently guard against the vagueness and imprecision of a term like "improper purpose," and of course, the government's also going to have to prove that Mr. Reffitt acted with a specific intent to impede an official proceeding.

Finally, Mr. Welch, I'm not inclined to instruct the jury that the defendant must have acted dishonestly.  It's true, of course, that the Supreme Court held in *Arthur Andersen* that the 1512(b) jury instructions were flawed because they omitted the word "dishonestly."  But here, "dishonestly" doesn't fit the nature of this charge, and I think it's unnecessary, given that I do intend to instruct the jury that the defendant must have acted with consciousness of wrongdoing.  So I think that covers that.

But Mr. Welch, any additional remarks you want to make that are not in your papers on those issues?

MR. WELCH:  No, Your Honor.  We've covered our position in the papers.  We understand the Court's ruling, but we maintain our position.

1    THE COURT:  And I think I covered -- in the order on

2   the Reffitt denial without prejudice of the motion to dismiss, I

3   think I covered your point that -- addressing whether the

4   government had provided sufficient factual evidence.  And just

5   to be clear, as I made clear in that order, I never ordered the

6   government to provide all the factual evidence that it intends

7   to offer at trial to prove the obstruction charge.  Indeed, at

8   the time I entered that order, you had the government's exhibits

9   and grand jury testimony, *Jencks*, et cetera.  So I did not order

10  that.  I simply asked the government to clarify their theories

11  of obstruction.  So I don't view that their failure to produce

12  that is problematic in any way.

13    All right.  Turning to the government's instructions, is

14  this you, Ms. Berkower, or Mr. Nestler?

15    MR. NESTLER:  That's me, Your Honor.

16    THE COURT:  Okay.  I first wanted to ask you, on page

17  2 -- before I get there, am I right, Mr. Nestler, I think that

18  the Seventh Circuit is the only circuit to have a pattern

19  instruction on the 1512(c)(2)?  Is that why you chose that?

20    MR. NESTLER:  Yes, Your Honor.  That's the only

21  pattern instruction we found.

22    THE COURT:  Okay.  Well, same here.  So I am inclined

23  to use it as a baseline, but I do have a few suggested edits.

24    Looking first at page 2, I notice that you omitted the

25  term "influence," which appears in the statute, along

with "obstruct" and "impede," and I assume that was an
intentional omission and the government does not intend to press
an influence theory here?

MR. NESTLER:  Correct, Your Honor.  The government is
affirmatively deciding to not press an influence theory, and we
are restricting ourselves in that regard.

THE COURT:  Okay.  All right.  Then a question on your
official proceeding instruction at the top of page 3, can I
instruct the jury as a matter of law that the joint session
qualifies as an official proceeding, or does the jury need to
find for itself that the joint session qualifies, according to
the definition that I gave in my ruling in *Sandlin*?

MR. NESTLER:  Your Honor can instruct the jury that it
does qualify.  The way that we drafted the language, we feel,
was not as explicit.  I believe the defense's position actually
does have the Court instructing the jury that the proceeding
does qualify as an official proceeding.  That's not our
submitted proposal.

THE COURT:  Well, I thought -- maybe his is more
explicit.  But you say, "As used in Count 2, the term 'official
proceeding' means Congress's joint session."

So you're not intending that to be an instruction to the
jury that official proceeding -- a joint session equals an
official proceeding?  I read it that way, but now I see what
you're saying.  You're not intending that?

1          MR. NESTLER:  If the Court is inclined to do so and

2     the defense does not object, which is how we read defense's

3     instruction, that's acceptable to the government, but we did not

4     affirmatively propose that.

5          THE COURT:  Mr. Welch, what is your position on this?

6     Does the Court instruct the jury that Congress's joint session

7     is an official proceeding, or should the Court just give the

8     definition of an official proceeding consistent with its ruling,

9     again noting your objections, and let the jury make that

10    finding?

11         MR. WELCH:  I think it would be more appropriate for

12    the jury to make that finding as opposed to the Court to

13    instruct to make that finding.

14         THE COURT:  All right.  Well, I may -- on quick read,

15    Mr. Nestler, I was reading this to suggest that you were asking

16    me to instruct the jury in that way.  So I will think about how

17    to tweak that a little bit to be a little clearer so they don't

18    have the same impression.

19         All right.  On the same page, Mr. Nestler, you've proposed

20    that the Court instruct the jury that an official proceeding

21    need not be pending or about to be instituted at the time of the

22    offense.  If the official proceeding was not pending or about to

23    be instituted, the government must prove beyond a reasonable

24    doubt that the official proceeding was reasonably foreseeable to

25    the defendant.  Mr. Welch included similar language in his

1    instruction.

2        I don't have a problem with this.  It's consistent with my

3    ruling in *Sandlin*.  But I'm just wondering, in this case,

4    correct me if I'm wrong, but isn't it the case that the joint

5    session was actually taking place when Mr. Reffitt was outside

6    the Capitol interacting with Capitol Police?  And if so, I know

7    it was at some point delayed, but if that was simultaneous and

8    that's what the evidence will show, isn't this unnecessarily

9    confusing to the jury to include this, you know, reasonable

10   foreseeability and all of that language?

11       MR. NESTLER:  We think it's helpful to have in there,

12   Judge.  As a factual matter, yes, the joint proceeding was

13   ongoing.  It started at 1:00 p.m.  It didn't conclude until

14   January 7th at 3:45 a.m.

15       That being said, the two Houses had separated to debate an

16   objection to one of the states' votes.  And so at the time that

17   Mr. Reffitt happened to have been comitting his acts at the

18   Capitol, the Senate and the House are meeting in their own

19   separate chambers.

20       So while it is correct that the joint proceeding was still

21   technically happening, the two Houses were meeting separately.

22   For that reason, we don't know what the defense is intending to

23   argue.  We think it's safer to include this language to make it

24   clear that even if a juror believed the proceeding itself wasn't

25   actually happening at 1:45 p.m. or 2:00 p.m., that's what the

1   defendant was intending to do, was to prevent the joint

2   proceeding from rejoining themselves in --

3           THE COURT:  All right.  I understand.

4       Mr. Welch, I take it you agree with the government on this?

5           MR. WELCH:  Yeah, I wouldn't dispute that, Your Honor.

6           THE COURT:  You would dispute what?

7           MR. WELCH:  No, I said I would not dispute that.  I

8   mean, proceedings have recesses.  You think of it like -- as

9   we've taken the position, it's like a court proceeding.  You can

10  have a recess during a trial.  You're not actually in the

11  proceeding --

12          THE COURT:  No, understood.  But are you saying -- I

13  think your proposal had the same language in it.  Are you

14  suggesting I take it out or leave it in?

15          MR. WELCH:  No, leave it in, please.

16          THE COURT:  Okay.  All right.  Mr. Nestler, your

17  proposal incorporates one element of the nexus requirement, that

18  the proceeding was reasonably foreseeable to Mr. Reffitt, but it

19  does not include the nexus requirement that the natural and

20  probable effect of the defendant's conduct would be the

21  interference of the proceeding.  And I think in *Sandlin* I cited

22  *U.S. v. Friske*, 640 F.3d, 1288 at 1291, Eleventh Circuit case

23  that I was quoting, as well as *U.S. v. Phillips*, 583 F.3d at

24  1264, a Tenth Circuit case in which that circuit said a

25  conviction is proper under the statute if interference of the

1    official proceeding is a natural and probable effect of the

2    defendant's conduct.

3        Do you object to the Court including this language in the

4    instruction?

5          MR. NESTLER:  Yes, we don't believe that language is

6    necessary here.  I'm just pulling up the Seventh Circuit's

7    pattern instruction so I can -- on this point, if the Court

8    would give me a brief indulgence.

9        (Pause.)

10          MR. NESTLER:  The defendant is also charged with

11    attempt for the proceeding, and we don't believe that second

12    part of the nexus requirement would be required here.  It

13    focuses on the defendant's intent, and his intent is that the

14    proceeding was going to be reasonably foreseeable to him.

15          THE COURT:  All right.  Mr. Welch, what's your

16    position on this?

17          MR. WELCH:  Well, we think that it ought to be

18    required as a proposed fourth element that we had which speaks

19    to this, that there was a relationship in time, causation, and

20    logic, that his specific conduct would interfere with the

21    proceeding.  Even an attempt requires some sort of action, and

22    that action would have to have some sort of relation to

23    interfering with the proceeding.

24          THE COURT:  And even with an intent, Mr. Nestler, why

25    wouldn't -- maybe this nexus wouldn't apply to him specifically

1   but to the others who were trying to impede who he is trying to

2   help.  I mean, I'm going to think about this, and I am going to

3   give you all a chance to respond to this and to some other

4   issues I'm going to raise.  So I'm going to give you a chance to

5   put your best arguments in writing.  But I want to think about

6   this one.  I'm not -- I know the Seventh Circuit pattern

7   instruction doesn't have it, but it's the only circuit that has

8   a pattern instruction, and I'm not sure that the Tenth or the

9   Eleventh might not include that language.  So I want to think

10  about this more.  Again, I will give you a chance to set forth

11  your arguments on this issue in greater detail.

12          MR. NESTLER:  Yes, Judge.

13          THE COURT:  Another substantive change that I'm

14  considering is to the definition of "corruptly."  So it's very

15  similar, but it's structured slightly differently.  What I'm

16  inclined to substitute for this paragraph that the government

17  has, this paragraph that begins at the bottom of 3 and extends

18  to the top of page 4, I'm inclined to define "corruptly" in this

19  way:  "Corruptly means to act knowingly with consciousness of

20  wrongdoing and with the specific intent to obstruct or impede.

21  The person may act corruptly by acting with an improper"

22  person -- "purpose," sorry, "to accomplish either, one, an

23  unlawful end or result by lawful or unlawful methods or means

24  or, two, a lawful end or result by some unlawful method or

25  means."

1      So it's similar to the government's formulation, but it's a

2  little more specific.  And I'm proposing adding "by lawful or

3  unlawful methods or means" to the first prong because I think we

4  should make clear that a person acts corruptly when he or she

5  acts with a purpose to achieve an unlawful end and he uses

6  unlawful means to do so.  That means he satisfies both prongs,

7  the means and the purpose.  So that's something for you all to

8  think about.

9      I'm also inclined to strike -- I'm inclined to strike the

10  definition of "consciousness of wrongdoing."  If the parties

11  want a definition for that phrase, I would propose simply

12  stating that it means an understanding or awareness that what

13  the person is doing is wrong.  But I'm not inclined to use the

14  terms that have been criticized in cases, immoral, depraved, and

15  evil.  I don't think that's necessary with consciousness of

16  wrongdoing.  So I'm proposing striking that.

17      And in terms of the authority that would support this

18  proposal that I'm giving you for the definition of "corruptly,"

19  this is similar.  The "unlawful ends and/or unlawful means"

20  definition is often used in bribery cases, but it was referenced

21  approvingly by Justice Scalia in *Aguilar*, 515 U.S. 593 at 616

22  through 17.  Two cases from the Eastern District of Pennsylvania

23  use a similar formulation for Section 1512(b) and 1512(c)(1).

24  One is *U.S. v. Norris* at 553 F.Supp.2d, 492 at 521.  That was

25  affirmed in 419 F. App'x 190 by the Third Circuit.  And then

1    *U.S. v. Fumo*, 2009 Westlaw 1688482 at 54.  These are two --

2    again, two Pennsylvania -- Eastern District of Pennsylvania

3    cases.

4         And finally, I'm not inclined to give these examples that

5    the government's proposed.  I don't think they're necessary,

6    given the definition the Court will provide.  They strike me as

7    more appropriate argument than instruction.

8         So those are my thoughts.  If either side wants to provide

9    any feedback right now, I'm happy to hear it.  I'm also going to

10   give you a little bit of time to respond in writing.

11        Mr. Nestler, anything you would like to say about any of

12   those points?

13             MR. NESTLER:  No, Your Honor.  I think it's important

14   from the government's perspective to hear what the defense's

15   willingness to accept these proposed instructions are or not,

16   and that may affect what we would propose.  So if Your Honor is

17   suggesting something, it might make sense for the defense to

18   weigh in --

19             THE COURT:  For sure.  What I was inclined to do is

20   give you all each maybe until like February 8 to weigh in, and

21   then to the extent you wanted to respond to what the other

22   filed, to do that by the 11th of February.

23             MR. NESTLER:  That would be fine.

24             THE COURT:  Does that make sense to both sides?

25             MR. WELCH:  Yes.

1          THE COURT:  Okay.  Mr. Welch, anything you want to

2     raise right now?

3          MR. WELCH:  No, Your Honor.  I want to consider what

4     you've said.  I want to take a look at the cases that you've

5     cited.

6          THE COURT:  Okay.  All right.  And again, I want to

7     make really clear for the record, Mr. Welch, your objections to

8     this track that the Court's on are well noted, and you're not

9     waiving them by proposing changes to this language.  Given where

10    I am, given what my rulings have been, it's not helpful to

11    propose language that's inconsistent with those at this point.

12    What I'm looking for is, you know, tweaks to -- that you think

13    will make the instruction better that I'm settling on.

14         And again, I don't think that that's going to waive

15    Mr. Reffitt's right to appeal my decision, you know, in his case

16    if you were to do that.

17          MR. WELCH:  I understand.

18          THE COURT:  Okay.  So I did want to raise a scheduling

19    matter.  I would like to revisit this instruction at the

20    hearing -- at the next hearing we have scheduled on February 18.

21    We have it scheduled now for 9:00 a.m.  I have a conflict now,

22    and I'm wondering whether we could push this back to as late as

23    noon.

24         And I haven't checked with Mr. Hopkins on this.

25    Mr. Hopkins, can you tell us what's available, assuming

1    Mr. Nestler and Mr. Welch are available Friday afternoon -- are

2    you, Counsel?

3              MR. NESTLER:  Yes, Your Honor.

4              MR. WELCH:  I'm looking.  That would not be a problem.

5    That's fine.  We can move that.

6              THE COURT:  Okay.  So Mr. Hopkins, do we have any time

7    for Mr. Reffitt to appear on video conference in the afternoon

8    of the 18th?

9              COURTROOM DEPUTY:  Absolutely, Your Honor.  We can

10   start as early as 12:30, if you would like.

11             THE COURT:  Okay.  Why don't we do -- would 1:00 work

12   for you all?

13             MR. WELCH:  Yes.

14             MR. NESTLER:  That's fine.

15             THE COURT:  Would we have a good hour, hour and a

16   half, Mr. Hopkins?

17             COURTROOM DEPUTY:  No.

18             THE COURT:  Okay.  Then let's --

19             COURTROOM DEPUTY:  We would probably have -- let me

20   look just to make sure.  But it looks like we would probably

21   have about 45 minutes.

22             THE COURT:  Then let's move it up.  I would like to

23   move it up even to 12:00 if we can get the time.  I just want to

24   make sure we have the time we need to settle on these

25   instructions.  And maybe if the parties are close to agreement,

1      this won't take long, but if it is going to take long, I'd like

2      to work through all of that on the 18th.

3              COURTROOM DEPUTY:  Generally speaking, they can't do

4      12:00 because that's when they have lunch.  So we can start at

5      12:30.  We could get an hour in; we could definitely get an hour

6      in.

7              THE COURT:  Can you push for an hour and a half just

8      in case?

9              COURTROOM DEPUTY:  I will do what I can.

10             THE COURT:  Okay.  Thank you.

11         So we will take that up.  And also at that time, I will try

12     to, assuming that we have time, discuss trial courtroom

13     logistics.  I'm sorry for the confusion earlier this week, but I

14     hope you all had a chance to meet with Mr. Cramer, and if you

15     haven't had your questions answered, I know he's very receptive,

16     and the same with the rest of the court staff.

17         So there's going to be a lot of moving around, as I think

18     you know now.  We're going to do the general voir dire in the

19     Ceremonial Courtroom and then move to another courtroom, I think

20     it's Courtroom 16, for individualized voir dire, and then

21     ultimately move to Courtroom 14 for the trial, and there will be

22     overflow/media rooms.  So I just want to make sure that you all

23     have your questions and concerns answered and that we're all on

24     the same page about the trial logistics before the 28th.

25         Is there any specific issues that you all want me to check

1    on and be prepared to get back to you on on the 18th?

2         MR. NESTLER:  Two points, Judge.  One is we did talk

3    to Mr. Cramer.  We deferred meeting with him until the week

4    before the trial.  We thought that may make more sense so we

5    will have our laptop ready and everything.  But he's been

6    incredibly responsive and helpful.  So thank you.

7         And then to answer your question about other issues, we

8    just wanted to make sure the public will have the availability

9    to view and listen to the voir dire.  I don't know if Your Honor

10   knows now or later.

11        THE COURT:  Yeah, I think that there will be at least

12   one room available for that.  I will confirm that, but that's my

13   understanding.  They will not be in the courtroom because of the

14   COVID restrictions, but that throughout the trial, there will be

15   multiple cameras in the courtroom showing different

16   perspectives, views, evidence that's being shown, witness,

17   several different camera shots at any given time, and those will

18   be open, my understanding is, throughout the trial.  So I will

19   confirm that.

20        You said there were two issues, Mr. Nestler.

21        MR. NESTLER:  Sorry.  The question was more about not

22   the trial itself but the voir dire, so both the general voir

23   dire in the Ceremonial Courtroom and also the individual voir

24   dire in Courtroom 16, that the same public availability exists

25   for those.

1          THE COURT:  That's my understanding, yes.

2          MR. NESTLER:  And the other issue we will ask the

3     Court to make just a brief record on at some point is that the

4     courthouse is accessible to the public during the trial such

5     that the public can come in.  We just wanted to make sure that

6     was going to be on the record.

7          THE COURT:  Yes; yes.  I think I've made that clear,

8     but I will reiterate that with specificity.  Like every -- I

9     guess this is expected to be a high-profile case.  There are

10    times when seats fill up, but there will be access for the

11    public, and there will be people ensuring that that all goes

12    smoothly.

13         MR. NESTLER:  That's great, Judge.  To be more

14    specific, at some point if we could make a record that Chief

15    Judge Howell's standing orders don't restrict any public access

16    to the courthouse during the time of the trial such that the

17    public can -- any member of the public can show up at the

18    courthouse and listen in an overflow room if there's space and

19    not be on the public line.

20         THE COURT:  Right.  And as I've made clear, my public

21    courtroom line will not be open.  The public will have to be in

22    the courthouse to listen and see what's going on in the

23    courtroom.  So yes, I will make that very clear.

24         MR. NESTLER:  Thank you.

25         THE COURT:  And I had one thought, but I've lost it.

1        Anything else, Mr. Welch?

2            MR. WELCH:  Just going back for a moment, on the

3    citations that you gave us, would you be able to include those

4    in the minute order?  I assume there will be some minute order

5    about this proceeding.  I didn't get the third one.  I have

6    *Aguilar*, *Norris*, and I missed the third one.

7            THE COURT:  Okay.  Let me just give it to you now

8    because I don't know that I will put that in the minute order.

9    And these, I think, were, I think, cited in my opinion.  But

10   *U.S. v. Fumo*, F-u-m-o.

11           MR. WELCH:  Fumo, okay.

12           THE COURT:  And it's 2009 Westlaw 1688482, and that's

13   at 54.  So I think you should be able to get it with that.  And

14   I don't recall whether there was an opinion or not, but you've

15   got the cite.

16           MR. WELCH:  Thank you.

17           THE COURT:  *Aguilar* was.

18       All right.  So I know we do -- correct me if I'm wrong, but

19   you all have been unable to resolve the sealed issue that we

20   need to take up now; is that right?

21           MR. NESTLER:  That's correct, Your Honor.  But before

22   we get there, I just have a clarifying question about the

23   pretrial statement that we have due on Monday, the 7th.

24           THE COURT:  Yes.

25           MR. NESTLER:  What is Your Honor's expectation with

1    regard to the jury instructions there?  I saw in the order you

2    wanted all of the jury instructions.  Does that include both

3    preliminary and post-trial?

4            THE COURT:  Yeah, it would be helpful, if it's not too

5    much trouble, just because we're going to be working off an

6    electronic copy.  So if you all can do that with ease.

7        You all have agreed to most of them; right?

8            MR. NESTLER:  Right.  And I didn't know if now was a

9    good time, then, to discuss some of the instructions the defense

10   had asked for that we object to for the post-trial instructions.

11           THE COURT:  Well, flag -- I have not focused on those

12   right now, Mr. Nestler.  So I want -- thanks for reminding me.

13   We will take that up next time.  But flag for me the ones that

14   you object to, just so I -- you don't need to argue it right

15   now, but you can briefly summarize what your concern is.

16           MR. NESTLER:  Sure.  The defense has asked for

17   instructions for immunized witness.  We don't believe that's

18   necessary here.

19           THE COURT:  I had a question about that.  Does the

20   government have such a witness?

21           MR. NESTLER:  Yes.  We believe that the comments in

22   the instruction makes clear that the general credibility

23   instruction is more than adequate for instructing the jury and

24   that a special instruction about immunized witness is not

25   necessary.

1          THE COURT:  Okay.  What else?

2          MR. NESTLER:  And then the remainder of the defense's

3    instructions that we did not already agree to we don't think

4    have any applicability.  They asked for an instruction about

5    informants.  We do not have any informants.  They ask for an

6    instruction about expert witnesses, which we don't have, and

7    then also for things that we don't believe are going to come up

8    at the trial, which is witnesses who will refuse to answer

9    questions or invoke the Fifth or inconsistent statements or the

10   defendant's statements to the police and how the jury should

11   evaluate those.

12         THE COURT:  Well, those are things that we would take

13   up in the charging conference.  I get your point that some of

14   those may not be necessary.

15       But Mr. Welch, given my ruling, you agree that the expert

16   witness instruction is not needed?

17         MR. WELCH:  It would not be.  If there's no expert

18   testimony, then there would be no need for that instruction.

19         THE COURT:  Okay.  And do you think that there's a

20   need for the informant instruction?

21         MR. WELCH:  I think perhaps there is, Your Honor.  I

22   think that kind of what gets the case going and certainly what

23   gets the second part of the case going in terms of the charges

24   related to January the 11th, there is someone who is informing

25   the authorities and someone who is making recordings of the

defendant and then supplying those to the police.

And I'm not sure why that person was necessarily doing that.  I had understood the Court's instruction about proposing instructions that basically you wanted to be alerted to potential issues.

THE COURT:  No, and I'm glad you did.  This is helpful.  This is very helpful to deal with this up front.  I'm glad you did.

MR. WELCH:  Sometimes we don't know what witnesses are actually going to do until they get on the stand and they do it.  And I know you want to avoid that then suddenly being a surprise.  So I just wanted to alert you.  If it doesn't come to pass, then we will say it's not needed.

THE COURT:  Mr. Nestler, can you -- without revealing too much of the case, can you explain why you think that the instruction's not appropriate?

MR. NESTLER:  We don't believe that the witness that Mr. Welch is referring to would be classified as an informant.  An informant has a particular definition in the law, and there was no one acting as an informant at the time that these recordings were made.

THE COURT:  Okay.  All right.  Well, I think the -- so I will take a look at the immunized witness instruction and the general credibility of witnesses instruction and see whether I think that's appropriate.

1      You're confirming there is an immunized witness?

2           MR. NESTLER:  Yes.

3           THE COURT:  So I will take a look at that and give you

4      feedback on the 18th.

5      I think with regard to the informant instruction -- and I'm

6      striking the expert witness instruction in light of what -- you

7      agree, Mr. Welch; correct?  So I'm striking that.  But the

8      informant, the witness's refusal to answer or implication of the

9      Fifth Amendment and the informant instruction -- and what was

10     the other one?  Defendant's statements?  I think all of those

11     will have to wait.

12     So the only real issue I need to resolve or could resolve

13     now is this immunized witness instruction.  So I will take a

14     look at that.  That's helpful.

15     Anything else?  Have we missed something, Mr. Welch, that

16     you've proposed that we haven't addressed and that the

17     government hasn't raised also?

18          MR. WELCH:  The only thing that we need to do, and I

19     know now is not the appropriate time because of what you alluded

20     to earlier, I think we do need a hearing to just nail down

21     exactly what the understanding is on that issue that we alluded

22     to earlier.

23     Do you understand what I'm saying?

24          THE COURT:  The sealed matter that I referenced?

25          MR. WELCH:  I'm sorry?

1          THE COURT:  So I had said I was going to take up the

2     sealed matter after this hearing.

3          MR. WELCH:  Yes, that's it.

4          THE COURT:  Okay.  So I'm going to address that in

5     just a moment.  I'm going to take a brief break.  If you could

6     stay on, I will come back on and address that with you.

7          MR. WELCH:  Okay.

8          THE COURT:  Now I'm remembering what I thought of

9     earlier, and that is, Mr. Welch, what, if anything, do you need

10    from me to ensure that Mr. Reffitt has the shave, has the

11    haircut, whatever he wants and needs for trial and clothing and

12    all that?  Do you need the Court's assistance to make sure he's

13    ready to go on the 28th?

14         MR. WELCH:  The one thing I know that has come up is

15    that there are various COVID protocols.  And I have tried to get

16    the proof that Mr. Reffitt has had a COVID test, and the

17    response from the D.C. DOC was that I need a HIPAA release from

18    him, which I've mailed to him, and his mail has been very slow.

19         THE COURT:  Why do you need this?  Who is requiring

20    it?

21         MR. WELCH:  Well, as I understand, it's basically how

22    he is handled, how he is treated in going back and forth to the

23    jail.  So if I can provide that, he gets treated a little bit

24    better than if I don't.

25         And the holdup is that I've sent this -- because it

1    requires his signature.  The person that handles this at the DOC

2    wants it from him.  But my concern is that there will be a lag.

3    He's only getting mail from the beginning of December now.

4         THE COURT:  Okay.  Continue to work on it.  I will do

5    whatever you need as we get closer to facilitate that.

6         MR. WELCH:  The other two issues, in the past I've had

7    pretty good luck with the fax that I submit letting the jail

8    know when somebody has court, and they typically honor those.

9    They just want there to be a court date is really what it boils

10   down to.  We have a couple.  So I will take care of that, and I

11   will let you know if there's a problem.

12        And then finally, his clothes, I have a potential order if

13   I need it, but in the past, the marshals have been fine with me

14   just bringing the clothes to the lockup and giving him the

15   clothes beforehand.

16        THE COURT:  Check with them ahead of time.  I just

17   don't want there to be delays because of COVID protocols.  Okay?

18        MR. WELCH:  Uh-huh.

19        THE COURT:  All right, then.  If that's all --

20        MR. NESTLER:  Judge, can I raise one more jury

21   selection issue?  I don't need to know the answer now, but maybe

22   we can talk about it on the 18th.  In the Ceremonial Courtroom,

23   how many prospective jurors will fit at once?

24        THE COURT:  So I'm going to estimate, because I'm not

25   remembering exactly, but I think it's 50, and then I think there

would be another group.  So a very large group will report, and
50 will be brought in for the general questioning, and then
we'll go to the other courtroom and do the individualized voir
dire, so that that group of 30-plus is likely to be sent away
because it'll take some time to get through the 50.

 But I would expect in all likelihood we will have to go
through the general voir dire twice.  It's more cumbersome, and
that's why I'm really trying to anticipate things so everything
goes smoothly that day.

 MR. NESTLER:  That's helpful for us to know.  I'm just
asking about scheduling.  Does Your Honor also have the
Ceremonial Courtroom on the 1st, or do we have to go back on the
2nd?

 THE COURT:  Let's see.  I have it on the 28th and, I
hope, the 1st.  Why do you ask?

 MR. NESTLER:  My understanding from trying to read the
master trial calendar that we get periodically, that jury
selection will take place on Mondays and Wednesdays.

 THE COURT:  Oh, I'm glad you raised that.  I need to
check on that.  I'm hoping not, and if so, then perhaps we can
whittle the second group down to a small enough group where I
can do it in smaller batches in my own courtroom.  That would be
nice.  I really don't want to have a day gap between for this
jury.  I'm very glad you raised that.

 My understanding was I had it for Monday and Tuesday, but

you may well be right, in which case I will talk to the court

staff about what we can do on Tuesday.

MR. NESTLER:  If that were the case, would Your Honor

intend to then do the two different tranches both on Monday in

the Ceremonial Courtroom, and then we could do the whittling in

the individual courtroom for the rest of the day on Monday and

Tuesday?

THE COURT:  Perhaps.  I don't know whether I could fit

30 safely in my courtroom.

MR. NESTLER:  No, my suggestion was that they --

THE COURT:  You're saying the opposite.  To me, it

seems like it would be helpful to -- I don't know.  You all tell

me.  Would you prefer to have the general done for both groups

the first day and then send a pack away, maybe not to come back

for 24 hours or whatever, depending upon how quickly things

move, or would you -- your preference be to have the individual

voir dire immediately after?

I assumed the latter, but if you all are fine with doing

the general en masse, I think we could perhaps -- I want to

check with court staff, but that might be feasible.

MR. NESTLER:  The answer depends on whether we have

Monday or Tuesday.  So we do prefer the latter, but if we had to

have that Tuesday gap, then we may prefer the former.

THE COURT:  And what I'm not sure, what I was saying,

Mr. Nestler, it may be that if we didn't have the Ceremonial

1  Courtroom on Tuesday and we just had my trial courtroom, that

2  they could fit the 30 in my courtroom for general and then send

3  them to another courtroom while we do the individual.  That was

4  what I was trying to say.  So I don't know if 30 can fit in an

5  individual courtroom, but I think so.  It may be close.

6          MR. NESTLER:  That's up to the Court.  I didn't expect

7  that would be the answer.

8          THE COURT:  Okay.  Mr. Welch, do you have a

9  preference, not on the location but on whether or not we do all

10 the general at once and then send a group home or that we get

11 through the first tranche general and individual and then bring

12 back the second group for general and specific?

13         MR. WELCH:  I think it might make sense to do the

14 general in one fell swoop, and here's why, because we might not

15 have as many as we hoped for the individualized.  It depends on

16 how people answer some of these general questions.  I mean, if

17 people are answering the general questions in such a way to say

18 no, I can't be fair, then we may not have as many for individual

19 voir dire after doing the first batch of 50.

20         THE COURT:  So you mean before we even talk to jurors

21 individually, you think that the answers -- well, but they're

22 simply going to say they have information.  They're just going

23 to write down a number.  We don't have a questionnaire in this

24 case.

25         MR. WELCH:  No, but here's why I'm thinking this.  I

1    was involved in a state court trial in Baltimore several years

2    ago that involved really, really horrible facts involving an

3    infant.  And when you put that question up front, it was

4    knocking out -- we ended up having like six separate panels that

5    we went through before we could even do a jury selection.  So

6    sometimes --

7         THE COURT:  What question are you asking?  You're

8    asking, "Have you heard of Mr. Reffitt?"  And someone is certain

9    to say, perhaps, yes and write that number down.  But then how

10   does that tell us that they should be disqualified for cause?

11        MR. WELCH:  Well, the question in the joint proposed

12   section (b)(4) that I proposed, "Does anyone have such strong

13   feelings about events at the Capitol on January 6 that it would

14   make it difficult to be a fair juror in this case?"  That's a

15   general question, and you could get a response to that, and

16   people might say -- if half the room stands up and says yeah --

17        THE COURT:  Well, that's one I'm going to have to

18   throw.  We can't just take a yes answer to that and assume they

19   can't be fair and impartial without really drilling down on

20   that.  Do they just not want to serve, is that why they're

21   saying that, or do they really, really think they cannot be fair

22   and impartial?  So that would be flushed out in the

23   individualized voir dire.

24        So I don't think that what you're saying is likely going to

25   happen.  In other words, I can't imagine any yes answer leads us

1    to disqualify a whole group en masse.

2        So given that, Mr. Welch, given that I would proceed to

3    individualized voir dire even in that circumstance, what is your

4    position on the timing?  Would you rather do all the general up

5    front, or would you prefer to stagger it?

6        MR. WELCH:  I prefer to do it all as one, but it's not

7    a huge deal one way or the other.

8        THE COURT:  Okay.  Let me check on this, and we can

9    discuss this on the 18th.  All right?  I can't answer the

10    logistical questions right now, but I'm very happy you've raised

11    it.

12        All right.  I think I've excluded time through trial;

13    correct?

14        MR. WELCH:  I believe so.

15        MR. NESTLER:  Yes.

16        THE COURT:  Anything else from the government?

17        MR. NESTLER:  No, Your Honor.

18        THE COURT:  From the defense other than the sealed

19    hearing which we will come back to in a moment?

20        MR. WELCH:  No, just the sealed matter.

21        THE COURT:  Okay.  All right, then.  So I'm going to

22    step off and, Mr. Hopkins, have you disconnect the public line,

23    and I will be back on in just five minutes.

24        (Recess.)

25        (The following occurred under seal.)

















1

2

3

4          (End of sealed proceedings.)

5          (Proceedings adjourned at 1:57 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7          Please Note:  This hearing occurred during the

 8    COVID-19 pandemic and is, therefore, subject to the

 9    technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                  February 7, 2022

13    SIGNATURE OF COURT REPORTER       DATE

14

15

16

17

18

19

20

21

22

23

24

25
```