1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2

3      UNITED STATES OF AMERICA,          .
                                          .  Case Number 21-cr-32
4                Plaintiff,               .
                                          .
5           vs.                           .
                                          .
6      GUY WESLEY REFFITT,                .  February 18, 2022
                                          .  12:42 p.m.
7                Defendant.               .
       - - - - - - - - - - - - - - - - -

8

9            TRANSCRIPT OF CONTINUED PRETRIAL CONFERENCE AND
                            STATUS CONFERENCE
10          BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                       UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:      JEFFREY NESTLER, AUSA
                                   RISA BERKOWER, AUSA
14                                 United States Attorney's Office
                                   555 Fourth Street Northwest
15                                 Washington, D.C. 20530

16     For the Defendant:          WILLIAM WELCH, III, ESQ.
                                   5305 Village Center Drive
17                                 Suite 142
                                   Columbia, Maryland 21044

18

19

20

21     Official Court Reporter:    SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 U.S. Courthouse, Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24

25     Proceedings recorded by stenotype shorthand.
       Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present via telephone or video conference.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-32, the United States of America versus Guy Reffitt.

Representing Mr. Reffitt, we have Mr. William Welch, and representing the United States, we have Mr. Jeffrey Nestler and Ms. Risa Berkower.  And Mr. Reffitt is appearing by way of video.

THE COURT:  All right.  Good afternoon, everyone.  I'm appearing by telephone because I can't get on the network at the moment.  My apologies.

We do have a lot of issues to cover today.  I think I want to start with the Court's proposed modifications to the 1512 jury instructions, and after that, we can move on to the witnesses and exhibits.  I think we also have voir dire and then some practical issues about trial.

So starting with the substantive instruction for the 1512(c)(2) offense, I will give both of you a chance to provide feedback.

And by the way, if anyone is having difficulty hearing me, please speak up.  Mr. Hopkins, are you hearing me clearly?

COURTROOM DEPUTY:  Very clearly, Your Honor.

THE COURT:  Okay.  Am I too loud?

COURTROOM DEPUTY:  Not at all.  You're just right.

```
 1            THE COURT:  All right.  Good.  Let me know.

 2       So the instruction that I just posted expands the elements

 3  section of the instruction by pulling elements out of the

 4  definition of "corruptly" that the government had proposed.  So

 5  both the knowledge and the intent requirement have been added to

 6  the elements section.

 7       And on those issues, I do agree with the government that

 8  the word "specific" before "intent" is unnecessary.  So I've

 9  removed it.

10       With respect to knowingly, I pulled this out of the

11  "official proceeding" definition language, that the government

12  must prove that the defendant was aware that the natural and

13  probable effect of his conduct was to obstruct the official

14  proceeding, and I included that in the knowingly element.

15       Are there any issues from either side with respect to those

16  changes?  Mr. Nestler?

17            MR. NESTLER:  Yes, Your Honor, a couple of small

18  clarifications.  I had sent an e-mail to chambers last night

19  just to highlight this so the Court could see it in writing.  I

20  don't know if Your Honor had a chance to look at that yet.

21            THE COURT:  I have not.

22            MR. NESTLER:  Okay.  A couple of small edits, but in

23  general, the government does not have any objection to this.

24  The first edit would be to swap -- place the fourth element

25  first.  The way the Court proposed it, it had three mens rea
```

1    elements and then the actus reus element.

2              THE COURT:  Let's start just with these two, on the

3    knowingly.  Let's just do this in piecemeal rather than all of

4    your comments together.

5              MR. NESTLER:  Sure.

6              THE COURT:  The language that I'm proposing, I know

7    you agree with eliminating the word "specific" before "intent."

8         The definition of "knowingly," which is pulled out of the

9    "official proceeding" definition and added to the elements, any

10   objection from the government on that change?

11             MR. NESTLER:  Just to one word, and the word

12   being "was" should be "would be" because we're putting ourselves

13   in the defendant's shoes at the time he committed the actions.

14   So it should read that "the defendant acted knowingly with

15   awareness that the natural and probable effect of his conduct

16   would be to obstruct or impede the official proceeding" rather

17   than "was to obstruct."

18        Otherwise, the government has no objection.

19             THE COURT:  All right.  Mr. Welch?

20             MR. WELCH:  Your Honor, I don't object to that change.

21             THE COURT:  Okay.  All right.  So moving on to what

22   Mr. Nestler started to talk about, which is the "corruptly"

23   definition, so the instruction reads, "A person acts corruptly

24   by using unlawful means or by acting with an unlawful purpose or

25   both."

1          I fixed the problem in the Court's initial proposal that

2     required an improper purpose in all cases.  That was not my

3     intention.  As I explained in the *Sandlin* opinion, a defendant

4     can act corruptly by using corrupt means or by having a corrupt

5     purpose.  So the latest proposal corrects that discrepancy.

6          I've also replaced the "unlawful or lawful end"

7     with "unlawful purpose" in response to the government's concern

8     about the jury being confused.

9          I'm still not comfortable with the government's proposal

10    of "wrongful purpose."  I'm going to stick with unlawful and be

11    consistent, unlawful means or unlawful purpose.  I think this

12    formulation follows naturally from the definition of "wrongful,"

13    which is defined as "contrary to law, statute, or established

14    rule."  And that was quoted in *Sandlin*, I think.  Improper and

15    wrongful are too vague.

16         Mr. Nestler, government's concerns with those changes?

17              MR. NESTLER:  Briefly, Your Honor.

18         The Court had changed "have an unlawful purpose" to "act

19    with an unlawful purpose."  And we believe what is more

20    appropriate here, because we're talking about the defendant's

21    mental state, is to talk about the defendant having the unlawful

22    purpose rather than acting with the unlawful purpose.

23         Of course, as I noted, we would prefer the

24    language "wrongful or improper," because what's inside of

25    someone's head is not in itself unlawful.  That which is inside

of someone's head can be improper or wrongful.  That's why we had formulated it that way.  We don't think that unlawful necessarily fits onto what someone's intent was, the reason that they're taking a certain action.

But we understand the Court's point about wanting to use unlawful, but that's why we suggested using wrongful or improper or both even.

THE COURT:  Okay.  Mr. Nestler, I've -- as we've discussed in the past, it seems to me like the heart of the government's case is the alleged unlawful means that Mr. Reffitt used or engaged in to obstruct the proceeding.  I think in briefing, I think the government suggested that it will prove at trial that Mr. Reffitt, if he didn't assault Capitol police officers, he attempted to assault or that he aided and abetted others who assaulted Capitol police officers.

Is that correct?  That's the government's means theory?

MR. NESTLER:  Generally, yes.

THE COURT:  Okay.  And help me understand your purpose.  Whether it's wrongful or improper purpose as you want or unlawful purpose as I'm inclined to instruct the jury, help me understand, what is the purpose?

Previously, you've said that Mr. Reffitt -- I think you gave three ways that he violated 1512(c)(2), and you said one was stopping the certification proceeding from occurring in a timely fashion, you said by impeding lawmakers from

1   participating in the certification proceeding, and then you said

2   by preventing lawmakers from considering ballots and other

3   documents.

4       Is that the government's purpose theory?

5           MR. NESTLER:  That is the -- that is the means theory.

6   The purpose is why the defendant was taking the actions he was

7   taking.  And so the reason that he was taking the actions he was

8   taking, we believe, was corrupt and that it was wrongful and

9   improper or morally debased.

10          THE COURT:  But how -- divorced from any means, what

11  does that mean?  That you just have a corrupt thought with no

12  action?  That's -- that can't -- it seems like you can violate

13  1512(c)(2) by either corrupt means or corrupt purpose or both.

14  So purpose could stand alone.  And how can you say someone's

15  obstructing with just this intent in the head that has no

16  action?

17          MR. NESTLER:  Well, they have to have the -- they have

18  to take an action.  There's certainly an actus reus in the

19  element.  The corruptly is the mens rea element.  We're talking

20  about the definition of one of the elements, and that's the mens

21  rea element.  We're not saying that somebody's thought is itself

22  illegal.  We're saying that that thought, that mens rea

23  requirement coupled with the action is what violates the

24  statute.

25          THE COURT:  And so the act here would be the attempted

1    or aiding and abetting the assault?

2         MR. NESTLER:  Yes, and the interference with police

3    officers.  That is the act that's been taken.  So if the

4    defendant is taking that act for a corrupt purpose or morally

5    debased purpose or wrongful or improper purpose, that would

6    violate the statute.

7         If the defendant is taking that action for a purpose that

8    is not corrupt or wrongful or morally debased, then arguably he

9    would not have been violating the statutes.  He would not be

10   acting corruptly.  He could be interfering with law enforcement

11   officers, but doing so for a reason within his own head that was

12   not morally debased or corrupt.

13        THE COURT:  But how is this distinct -- this

14   definition of "corrupt," how is it distinct from a defendant's

15   specific intent to impede or obstruct a proceeding?  What's --

16   how is that anything more than the specific intent you have to

17   prove, that element, to have -- to be guilty of an obstruction

18   offense?  What's more -- what extra is added to that?

19        MR. NESTLER:  Not much, Judge.  That is why we had the

20   defendant acting with the intent to obstruct or impede within

21   the definition of "corruptly."

22        THE COURT:  But the cases, *Silverman* and *Norris*, said

23   corruptly is doing extra work; it's not specific intent to

24   impede or obstruct.  And *Andersen* suggested, too.  So corruptly

25   has to be something more than just specific intent to impede or

1    obstruct.  So what is it?

2        The way you describe it, I don't -- I don't understand what

3    that corrupt intent is that's separate from the intent to

4    obstruct the proceeding.

5        MR. NESTLER:  In this situation, under 1512(c)(2), we

6    believe it's the same thing.

7        THE COURT:  But doesn't the case law quite clearly say

8    you can't read corrupt out of the statute?

9        MR. NESTLER:  We're not reading corrupt out of the

10   statute when the defendant is intending to obstruct or impede

11   the official proceeding.  He has to be acting corruptly.  And

12   that means he has to be acting wrongfully and/or morally debased

13   or unlawfully.  He has to be doing something else.  That's where

14   the corrupt has the extra language.  That's why we're saying

15   that the attempt to obstruct or impede the proceeding is part of

16   the definition of "corrupt."  We're not saying it's the

17   entire --

18       THE COURT:  I read the cases to mean those are two

19   separate things.  And in this case it's very hard for me to see

20   how the government can proceed on a theory of unlawful purpose.

21   I guess the unlawful means, but it's -- if that can stand alone

22   and a jury can find either unlawful means or unlawful purpose, I

23   don't understand what your -- what extra work corruptly is doing

24   the way you're describing it here.

25       MR. NESTLER:  The unlawful purpose is one of the ways

1    to prove that the defendant acted corruptly.

2            THE COURT:  Understood.  But I don't see how it's

3    distinct from acting with a specific intent to impede the way

4    you've described it.

5            MR. NESTLER:  Because the intent to impede needs to --

6    there are reasons why and there are positions people can take to

7    impede or obstruct a proceeding that are not corrupt.  That goes

8    to the government's example paragraph.

9            THE COURT:  But your means here, you know, if proven,

10   are clearly unlawful.

11           MR. NESTLER:  Correct.

12           THE COURT:  Why do you need -- from the get-go, I

13   don't understand why the government's pressing, and I think it's

14   potentially very confusing to the jury.  It seems to me if you

15   can't prove the unlawful means in this case, you will lose this

16   case, and why you're pressing on this unlawful purpose as a

17   stand-alone basis to prove the defendant acted corruptly, I

18   don't understand.  It seems like you rise and fall on whether

19   you prove -- well, I don't want to say that.  At a minimum, you

20   need to prove the attempt or the aiding and abetting the

21   assaults, or you're not going to prove the obstruction.

22       So I just -- I wonder, one, I'm not sure I buy your

23   interpretation of unlawful or wrongful or immoral, whatever,

24   improper purpose, however you want to define it, but I'm

25   sticking with unlawful purpose here.  And in this case, in this

context, I think they all merge into means, and it's potentially
confusing to the jury.

    And to the extent there's something independent that you've
expressed here separate from unlawful means that would support a
finding of, you know, the defendant acting corruptly, I'm just
not sure it's a viable theory.  I'm just warning you now.

    And I will give this more thought, but it seems like all of
this is, you know, getting conflated into the means.

            MR. NESTLER:  Understood.

            THE COURT:  But the government, your position is that
the Court should instruct on both unlawful means and unlawful
purpose?  That's what -- the government wants to proceed on two
theories?

            MR. NESTLER:  Yes.  A person can act corruptly by
unlawful means or an unlawful purpose or both.

            THE COURT:  All right.  I'm not sure I'm following.  I
want to think about it more.  Openings, of course, is not a time
for arguing theories of the case, but you should avoid any
reference to the unlawful purpose theory in the opening.  I may
need to see how the evidence comes in.  As my opinion in *Sandlin*
makes clear, the unlawful means theory, at least where the
conduct is inherently criminal, survives.  Beyond that, I
haven't ruled.  So just keep that in mind as you're trying the
case.

            MR. NESTLER:  Understood, Your Honor.

1          THE COURT:  Okay.  All right.  So Mr. Welch, on these

2    issues that I've discussed with Mr. Nestler, anything you would

3    like me to consider?

4          MR. NESTLER:  Yes, please, Your Honor, and I will be

5    brief about this, because I think you already know what they are

6    and you've already addressed them.

7          But in terms of the third element that the defendant -- it

8    says the defendant acted corruptly.  There is no reference in

9    that to knowingly and dishonestly or with a wrongful purpose

10   obstructing, influencing, or impeding the due administration of

11   justice.  It's our position that that needs to be a part of the

12   third element.

13         In addition, we maintain that to act corruptly means to act

14   with an improper purpose and to engage in conduct knowingly and

15   dishonestly with the intent to obstruct, impede, or influence

16   the due administration of justice.  Corruptly requires the

17   government to prove beyond a reasonable doubt that the defendant

18   committed an obstructive act with the intent to obtain an

19   unlawful advantage for himself or an associate and that he

20   influenced another person to violate their legal duty.

21         So that's our position.

22         THE COURT:  Yeah, understood, Mr. Welch.  And as I've

23   explained before, your proposals continue to contradict my prior

24   rulings.  I appreciate you want to preserve your issues for

25   appeal.  But as I said at the last hearing and as I ruled in

*Sandlin*, I don't believe to violate 1512(c)(2) a defendant need

have intended to obstruct, impede, or influence the due

administration of justice.  A defendant also does not need to

have influenced another to violate his or her legal duty to fall

under Section 1512(c)(2).

I know you're -- well, you're probably going to get to the

motive and the acting to advantage oneself or another.  But as

I've said before, too, I think that's often the motive for

someone to act corruptly but not always.  And so I think that

requiring the government to prove the defendant acted either

with unlawful means or purpose, as I've explained -- well,

certainly, unlawful means will be adequate, and unlawful purpose

in this context, we will have to see.  But as you know, I've

rejected those arguments.

But nothing more particular with respect to the specifics

of the latest iteration of this instruction that you would like

to add beyond the comments that you've already made?

MR. WELCH:  Actually, there is one more.  In the final

sentence which is in the example that the Court provides, the

second example, "In contrast, an individual who obstructs or

impedes a court proceeding by bribing a witness to refuse to

testify in that proceeding," that I don't have a problem with,

but the following phrase, "or by engaging in other independently

unlawful conduct," that would probably be vague to the jury.  So

I would ask the Court to delete that phrase from the second

1    example.

2           THE COURT:  All right.  I'll think about it.

3       What was your position, Mr. Welch -- I know initially, I

4    think, you were opposed to examples.  Am I correct?  Am I

5    remembering correctly?

6           MR. WELCH:  Yes.

7           THE COURT:  Are you still opposed to examples, or do

8    you like these examples?

9           MR. WELCH:  We're okay with these examples.

10          THE COURT:  Okay.  Well, these -- I did change the

11   examples from those that the government had proposed because I

12   thought they were far too close to the alleged facts of this

13   case, particularly the reference to acting with violence.  And I

14   was concerned that a jury might interpret them as an instruction

15   about how to decide this case rather than just an example.

16      So that's why I took this out of Congress and referred to

17   conduct in the context of a court proceeding.  It could

18   constitute obstruction.  These are also examples that are well

19   established in the case law in *Arthur Andersen* and *Khatami* case.

20   The Ninth Circuit refers to bribing someone.

21      So Mr. Welch, you like them.  Mr. Nestler, what's your view

22   on these examples?

23          MR. NESTLER:  The government believes that the

24   examples will make more sense to the jury if they were in the

25   congressional context rather than the court proceeding context.

1   And we drew our examples from the case law as well.

2           THE COURT:  This broad reference to acting with

3   violence, what does that mean?  That's not tied to specific

4   offenses.  It's --

5           MR. NESTLER:  It's another means of independently

6   unlawful conduct, another example of independently unlawful

7   conduct.

8           THE COURT:  Well, again, I just think it's awfully

9   close to the facts of this case, and I'm concerned that the jury

10  would take it as a hint from the Court on how to decide the

11  case.  So for that reason, I'm not inclined to adopt the

12  congressional examples.

13      But if not, Mr. Nestler, is it the government's preference

14  that I not have any examples at all, or do you still think that

15  the examples would be helpful to the jury in figuring out these

16  concepts?

17          MR. NESTLER:  It's important to the government to have

18  the phrase "engaging in other independently unlawful conduct,"

19  which was cited by the Court in *Sandlin*.  And so with that

20  phrase, the government sees some utility in having this example

21  paragraph.  So that's where we would come down on this.

22          THE COURT:  So absent that, you would prefer the

23  examples out?

24      And it is consistent with my opinion in *Sandlin*.  So I'm

25  inclined to keep it in.  But I will give this some thought,

1   Mr. Welch.

2       But if this were to come out, Mr. Nestler, would the

3   government's view be to not include the examples?

4           MR. NESTLER:  Correct.

5           THE COURT:  Okay.  And Mr. Welch, is your view that if

6   it stays in I should not include the examples?

7           MR. WELCH:  No.  We would just like it taken out.

8           THE COURT:  Okay.  But if it stays in, you still

9   prefer the instruction with the example than without any at all?

10          MR. WELCH:  Correct.

11          THE COURT:  Okay.  All right.  So turning next to the

12  "official proceeding" definition, as I understand it, both

13  parties agree that the Court can instruct the jury as a matter

14  of law based on the Court's holding in *Sandlin* that Congress's

15  joint session constitutes an official proceeding.

16      Am I correct, Mr. Nestler?

17          MR. NESTLER:  That's the government's position.

18          THE COURT:  And Mr. Welch?

19          MR. WELCH:  Although we disagree with the definition,

20  we believe that the Court must instruct the jury on the law.

21          THE COURT:  Okay.  All right.  Well, I agree with both

22  sides it's appropriate for the Court to do so, and I will

23  instruct consistent with my ruling in *Sandlin*.

24      As requested by the parties, even though I don't know that

25  it's necessary here but since both sides want it, I'm going to

give it.  I've modified the language to make clear that an
official proceeding need not be pending or about to be
instituted at the time of the offense, but that if the official
proceeding was not pending or about to be instituted, the
government must prove beyond a reasonable doubt that the
proceeding was reasonably foreseeable to the defendant.

And as I mentioned earlier, I moved the knowledge piece up
into the elements that we've already discussed.

So are both sides okay with the official proceeding
language as it's now written?

MR. NESTLER:  Yes, Your Honor.

THE COURT:  Mr. Welch?

MR. WELCH:  Other than maintaining our disagreement
and our objection that certification of the Electoral College
vote does not qualify as an official proceeding, I'm not
objecting to this specific language beyond that.

THE COURT:  Okay.  All right.

So moving on to the parties' other substantive -- before I
do, have we covered 1512(c), all of your concerns and issues
with respect to the Court's proposed instruction?  Mr. Nestler?

MR. NESTLER:  A couple of small edits, Judge.

THE COURT:  Okay.

MR. NESTLER:  And that would just be -- they're mostly
stylistic, but first is, the Court has four elements.

THE COURT:  Yes.

1    MR. NESTLER:  The government believes that the first

2    element should be the actus reus, and then we should list the

3    mens rea.  So we should start with "first, the defendant

4    attempted to or did obstruct an official proceeding" and then go

5    to 3.

6         THE COURT:  Any objection to that, Mr. Welch?

7         MR. WELCH:  No.

8         THE COURT:  So I will make that change.

9         MR. NESTLER:  The second is that in what's currently

10   the fourth element, it says "any official proceeding."  That

11   should be "an official proceeding."

12        THE COURT:  Yes.  Okay.

13        MR. NESTLER:  And then the last change would be, in

14   the current first element, "the defendant acted with the intent

15   to obstruct," we believe that should be more naturally read

16   as "the defendant intended to obstruct" to make clear this is a

17   mens rea element, not an actus reus element.

18        THE COURT:  Any objection, Mr. Welch?

19        MR. WELCH:  I think it needs to stay "acted with the

20   intent," because as we've been talking about before, there's

21   this whole idea about some vague, unlawful purpose or unlawful

22   means.  And it's not enough to have one without the other.  So I

23   would think that you'd have to show the actus reus, and then you

24   have to show the mens rea in conjunction with it.

25        THE COURT:  All right.  I'm going to think about that

one.

Anything else, Mr. Nestler?

MR. NESTLER:  No, Your Honor.

THE COURT:  Mr. Welch, any additional points with respect to either the elements or the definitions of the 1512(c)(2) offense?

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  All right.  So moving on to the parties' jointly proposed substantive instructions relating to the other counts.

So yes, the Court's aware that *Arrington*'s requirement that the object must be capable of causing serious bodily injury or death to another person refers only to those weapons that are not inherently deadly.  And certainly, a gun count is inherently a deadly weapon.

The problem with the parties' initial proposed instruction is that it did not reference a firearm, nor did it instruct that a firearm qualifies as an inherently deadly weapon and, thus, that *Arrington*'s extra requirement was unnecessary.

The initial instruction also didn't say that only an inherently deadly object need not actually be capable of inflicting harm or injury.  So at least as initially written, the proposed instruction would have allowed the jury to find that an object that's not inherently deadly qualifies as a deadly or dangerous weapon, even if it is not capable of

1   inflicting harm or injury, and that would be inconsistent with

2   *Arrington*.

3        So I understand now that you all want to include "or

4   firearm" in this definition, because the government intends to

5   prove at trial that Mr. Reffitt carried a semiautomatic handgun.

6   But this leads to the question of -- and that all makes sense to

7   me, but it leads to the question of, if that's what the

8   government intends to prove, what is the point of including an

9   instruction on deadly or dangerous weapon at all?  Doesn't this

10  have the potential to confuse the jury, Mr. Nestler, if the --

11  if it's a firearm, why not just stick with the firearm language?

12  Why overly complicate this?

13        MR. NESTLER:  The title of the statute, Your Honor,

14  is "deadly or dangerous weapon" for 18 U.S.C. 1752(b)(1)(A), and

15  the government believes it's more appropriate to stick with the

16  statutory language.  So that's why we proposed it in that

17  fashion.

18        THE COURT:  Okay.  Well, if both parties want to

19  include both the firearm and the deadly or dangerous weapon,

20  then the Court's going to need to instruct the jury that a

21  firearm qualifies as an inherently deadly weapon and, thus,

22  there's no need for proof that the object is capable of

23  inflicting harm or injury, and your latest iteration does not do

24  that.

25        MR. NESTLER:  Understood, Your Honor.

1          THE COURT:  So Mr. Welch, do you object to adding that

2     language?  I don't think there's any dispute that a firearm

3     qualifies as an inherently deadly weapon, but that's still the

4     gap I see in this proposed language.

5          MR. WELCH:  No objection, Your Honor.

6          THE COURT:  Okay.  All right.  I will ask you all to

7     agree on some language.  It's just easier for me.  And then if I

8     need to change it, I will let you know.  But go ahead and work

9     collaboratively on this to make that change.

10         All right.  The instruction number 20, the elements

11    entering or remaining in a restricted building or grounds with a

12    deadly or dangerous weapon and the use of the term "vice

13    president elect," the Court is going to grant the government's

14    unopposed motion to strike references in Count 3 of the second

15    superseding indictment to the vice president elect.  The

16    indictment currently reads that "Mr. Reffitt did knowingly enter

17    and remain in a restricted building or grounds where the vice

18    president and vice president elect were temporarily visiting.

19    Section 1752 prohibits unlawful entry into a restricted building

20    or grounds, which are defined as any posted, cordoned off, or

21    otherwise restricted area of a building or ground where the

22    president or other person protected by the Secret Service is or

23    will be temporarily visiting."

24         Both the vice president and the vice president elect

25    qualify as another person protected by the Secret Service.  So a

defendant could violate the statute either by the vice president
or the vice president elect being present in the building or on
the grounds.  So the indictment here is charging the commission
of any one offense in several ways.  That's *U.S. v. Miller*,
471 U.S. at 136.  The vice president's presence alone is
sufficient to violate the statute, and it's immaterial that the
vice president elect, as the government now admits, was not at
the Capitol.  Therefore, the withdrawal from the jury's
consideration of the other alleged method of committing a
violation of the statute does not constitute a forbidden
amendment of the indictment.  And again, that's *Miller* at 145.

Other courts have permitted the striking of certain
language in an indictment when the prosecution is simply
narrowing the scope of the charges and adding nothing new to the
grand jury's indictment, thus constituting no impermissible
broadening.  See *United States v. Quinn*, 401 F.Supp. 2d at 90, a
D.D.C. case, quoting *U.S. v. Holland*, 117 F.3d at 595, D.C.
Circuit case.  See also *Poindexter*, 719 F.Supp. at 9.

So with the consent of the defendant, the Court will amend
the charging language in Count 3 from "where the vice president
and vice president elect were temporarily visiting" to "where
the vice president was temporarily visiting."  And to avoid
confusing the jury, the Court will not instruct the jury that
the list of Secret Service protectees includes the vice
president elect.

1    All right.  Any need to address anything more with respect

2    to that instruction?  Mr. Nestler?

3              MR. NESTLER:  No, Your Honor.

4              THE COURT:  Mr. Welch?

5              MR. WELCH:  No, Your Honor.

6              THE COURT:  Okay.  And the "will be temporarily

7    visiting" point, given, Mr. Nestler, you've represented that the

8    vice president was on the Capitol grounds at the same time as

9    Mr. Reffitt.  I just don't see why the government would object

10   to removing "or will be temporarily visiting" from the jury

11   instruction.  The indictment says only that the vice president

12   was temporarily visiting the restricted building or grounds when

13   Mr. Reffitt entered, and the government hasn't moved to amend

14   the indictment to say where the vice president was or would be

15   temporarily visiting.  I'm not sure that you could.

16       So why isn't the answer here just to have the government

17   prove that the vice president was on the Capitol grounds at the

18   same time as Mr. Reffitt?

19             MR. NESTLER:  We intend to do that, Your Honor.  The

20   definition for the term "restricted building or grounds" is

21   where that phrase comes from, so not the indictment itself.  But

22   the statute defines "restricted building or grounds" as a place

23   where, quote, a person protected by the Secret Service is or

24   will be visiting, temporarily visiting.

25             THE COURT:  I know.  But your indictment and what the

1    grand jury found doesn't say that.

2           MR. NESTLER:  That's correct, Your Honor.

3           THE COURT:  So I'm not inclined to do it.  If both

4    were in there, I would agree with you, but they're not.

5           MR. NESTLER:  Understood, Your Honor.

6           THE COURT:  Mr. Welch, anything to add there?

7           MR. WELCH:  No, Your Honor.

8           THE COURT:  So on the proposed instruction number 19,

9    transporting a firearm in furtherance of a civil disorder, the

10   use of the term "commerce," the parties are agreeing to omit the

11   phrase "or travel" for the definition of "commerce" for purposes

12   of Section 231 of Title 18.

13       Mr. Nestler, by my question I don't want you to think --

14   I'm inclined to include the term because I question whether the

15   jury will be able to understand whether a firearm that just

16   crosses state lines qualifies as being transported in commerce

17   under the statute.  But I want authority for this.  And an

18   out-of-circuit district court's jury instruction in a case where

19   the Court adopted the government's proposal without any

20   authority for the proposition doesn't give me a lot of

21   confidence in it.

22       Do you not have any authority that would support including

23   the travel in the definition, which again I would be inclined to

24   do?  I would ask that you all provide it to the Court.  Do you

25   just not have anything to support that?  Do you think that's not

the law?

MR. NESTLER:  We do think that the word "travel" would be appropriately included here, Judge.  The point here is that the commerce was affecting the civil -- sorry, that the civil disorder was affecting commerce.  And that's what the definition of "commerce" means.  So we're not having to prove the -- we're not having to prove travel.

And there are plenty of definitions of the word "commerce" within the U.S. Code, some with reference to travel.  Usually the phrase is "travel in interstate commerce."  So they go hand in hand.  So 18 U.S.C. 231 does not have that phrase of "travel in interstate commerce."

The only --

THE COURT:  You all confer.  I would be inclined to include it.  I just want you all to give some authority beyond the Southern District of Alabama case.  All right?  So I will leave that to you.

MR. NESTLER:  Sure.

THE COURT:  All right.  But on this instruction, I thought that this was -- I thought the purpose of this instruction was about the gun being transported in commerce, not that the civil disorder was disrupting commerce.

MR. NESTLER:  Court's brief indulgence.  Let me just pull up my -- you're correct, Judge.  This is for the definition for the transporting the firearms charge at 231(a)(2), not for

1    231(a)(3), which also has a definition of "commerce" drawn

2    from --

3              THE COURT:  Then I think this is potentially confusing

4    for the jury.  If the law does support including "travel," I

5    need authority, and I would be inclined to do it, particularly

6    given that the parties have suggested that the Court do that.

7    All right?  So Mr. Nestler and Mr. Welch, if you can provide

8    authority that would support that, I will consider keeping it

9    in.

10        So moving on to the defense's proposed Red Book

11   instructions, the defense is suggesting that the Court instruct

12   the jury on the Red Book instructions relating to 1.201,

13   photographs of the defendant, 2.204, testimony of immunized

14   witness, 2.205, an informer's testimony, 2.211, refusal of a

15   witness to answer questions, 2.212, indication of Fifth

16   Amendment privilege, 2.216, a prior inconsistent statement of a

17   witness, 2.3, missing witness or other evidence, and 2.305, a

18   statement of the defendant as substantive evidence.

19        Obviously, some of these need to wait for trial, but let's

20   talk about the ones that we can talk about now.

21        Mr. Nestler, you oppose all of these or just some of these?

22             MR. NESTLER:  We oppose all of them.  I mean, the ones

23   that may be applicable, if a witness invokes their Fifth

24   Amendment right or provides an consistent statement while

25   testifying, of course, we won't oppose them, but we will have to

1    wait to see what happens.

2         The remainder, we oppose.

3         THE COURT:  Sorry.  Let me -- sorry to interrupt.  The

4    statement of a defendant is substantive evidence, you oppose

5    that?

6         MR. NESTLER:  Yes.

7         THE COURT:  And the missing witness or other evidence,

8    you oppose that?

9         MR. NESTLER:  Yes.

10        THE COURT:  Okay.  I know your position on the

11   immunized witness because that's covered by the general

12   credibility instruction.  I'm going to reserve judgment on this,

13   but Mr. Welch, I am inclined to agree with the government here,

14   but tell me, Mr. Welch, what your objection to the general

15   credibility instruction is, given the notes attached to these

16   instructions.

17        MR. WELCH:  Well, the problem here is that the

18   immunized witness is different from the other witnesses who will

19   be testifying.  And while the general credibility might apply to

20   all of them, he now has a motive, because he was under

21   investigation himself for all of the same offenses and perhaps

22   an additional offense, and his words cannot hurt him.  When he

23   gets on that witness stand, the jury needs to be aware that what

24   he says, even though he's going to admit to crimes himself, that

25   he will never be charged with crimes as a result of his words,

1   even though he's going to confess to them.  And so he now has a

2   motive to protect himself, to shade his version of the story,

3   shade the truth to help himself.

4          THE COURT:  I understand all of that, but I assume

5   that you're going to explore this fully on cross-examination and

6   make the argument in your closing.  In instances where that

7   occurs, I think courts have said there's not necessarily a need

8   for an additional instruction on top of the general credibility

9   instruction.

10         So what makes this case different?

11         MR. WELCH:  I think courts have said that in

12  situations where the people were also actually charged as

13  accomplices; where in this situation, the immunized witness has

14  not been charged.

15         So while the government and I have been going back and

16  forth about, well, you know, is he an unindicted co-conspirator

17  in this or not, and they claim he's not, but I'm looking at it

18  and saying, you know, he's as involved allegedly as my client

19  is, and yet, he faces no consequences.  And his testimony is

20  basically geared to please the government so that he avoids ever

21  facing consequences.

22         That's different than every other witness in this case, and

23  simply saying well, it's a general credibility just like all the

24  other witnesses, like Agent Hightower or, you know, Jackson

25  Reffitt or anyone else, is just, you know, not accurate, and a

jury needs to be aware that they need to be especially, you know, cautious when considering the immunized witness's testimony.

THE COURT:  So Mr. Nestler, why is this witness not a co-conspirator?

MR. NESTLER:  The witness is not charged as a co-conspirator, and we don't intend to admit any evidence that this witness conspired with the defendant.  This witness heard the defendant's own statements and committed his own -- this witness's own actions by bringing firearms into the District of Columbia but did not actually act in concert with the defendant when the defendant was committing the defendant's crimes.

THE COURT:  All right.  I think I'm going to reserve and learn more about the nature of this.  This would be an instruction at the end; right, Mr. Welch?

MR. WELCH:  Yes, it would be a final instruction.

THE COURT:  All right.  So I'll reserve on that.

What about the issue of the informer testimony?  Is this the same witness that you're making the same point, or is this another witness?

MR. WELCH:  No, it's another witness, Your Honor.

THE COURT:  Okay.  And if I understand the government's position on this, this other witness is not actually an informer, informer as a legal term, and this witness does not fit the definition of that.

1          Do you disagree, Mr. Welch?

2          MR. WELCH:  Your Honor, I think it is something that

3    might become apparent at trial.  You never know what a witness

4    is going to end up saying.  I would tend to agree that this is

5    not -- the witness I'm thinking of is not someone who, you know,

6    has been charged in another case and is cooperating in the hope

7    of earning leniency.  At least that hasn't been disclosed to me

8    thus far.  But my concern is that you never know what's going to

9    come out during trial.

10         THE COURT:  All right.  Of course, while I try to

11   cover some of these more difficult legal issues pretrial just

12   because, you know, we want to keep this trial moving,

13   particularly during the pandemic, I certainly expect to have a

14   charging conference and these issues to be revisited.  So we

15   don't have to resolve all this now without the benefit of the

16   evidence.  It is helpful, though, Mr. Welch, to know which

17   instructions you will be asking for at that time.  So it sounds

18   like we can and probably should wait on decisions on all of

19   these until the evidence is presented.

20         Before I move on to -- I guess I wanted to talk briefly

21   about the need for -- whether there's a need for a special

22   verdict form, but is there anything else on instructions that we

23   should discuss before we move on to these other areas?

24         MR. NESTLER:  Judge, on the -- this is Mr. Nestler.

25   On the point for the substantive evidence and the statements of

1    the defendant, just so the record is clear, we don't believe --

2    we're not intending presently to introduce any statements the

3    defendant made to the police, though we are intending to

4    introduce statements he made to others, and this instruction

5    only applies to statements he made to the police.

6              THE COURT:  I see.  You're not introducing any

7    statements he would have made -- was he present at the time of

8    the search?

9              MR. NESTLER:  He was present at the time of the

10   search, yes.

11             THE COURT:  All right.  So none of those are coming

12   in?

13             MR. NESTLER:  We're not presently intending to

14   introduce those statements, no.

15             THE COURT:  Okay.  At least in your case-in-chief?

16             MR. NESTLER:  Correct.

17             THE COURT:  Okay.  All right.  In light of that,

18   Mr. Welch, does that change your mind?

19             MR. WELCH:  Well, if the government is committed to

20   doing that and then doesn't ultimately do it at trial, well,

21   then, I guess that would be moot.

22             THE COURT:  All right.  Is there anything else,

23   Mr. Nestler or Mr. Welch?

24             MR. NESTLER:  Yes, one other point on the jury

25   instructions, Judge.  After further review as a matter of

1    litigation risk avoidance, we would suggest amending the

2    instruction for the entering or remaining charge so that the

3    mens rea element of knowingly applies both to the entering

4    component and the unlawful authority component.

5         As it stands right now, the parties propose four elements

6    for that charge, and we would suggest actually heightening the

7    government's burden so that we would have to prove the

8    defendant's mental state, which is knowingly, both for the

9    defendant entering or remaining in a restricted building or

10   grounds and for doing so without lawful authority.

11        I'm sorry for the late notice on this.  I can propose that

12   language in writing, if that would be helpful.

13             THE COURT:  Yes.  I take it you don't object,

14   Mr. Welch?

15             MR. WELCH:  Correct.

16             THE COURT:  So Mr. Nestler, what I'm going to ask is

17   that you two together address these issues that have come up on

18   these other instructions with a revised copy.

19             MR. NESTLER:  Yes, Judge.

20             THE COURT:  And what would be most helpful is for you

21   to submit it with the red line so that I can see the changes

22   that you made rather than have to, you know, look for the one-

23   word change here and there.

24             MR. NESTLER:  Yes, Your Honor.  The parties will get

25   together and submit something.

1              THE COURT:  If you could do so by Wednesday of next
2     week.  Does that give you enough time?
3              MR. NESTLER:  That should be fine, Judge.
4              THE COURT:  Okay.  All right.  So moving on to this
5     issue of the special verdict form, as I understand it, the
6     government's proposed a special verdict form for a civil
7     disorder charge in Count 4.  The defense is asking that no
8     special verdict be used.
9          Mr. Nestler, can you help me understand your position?
10    Aren't these means versus elements, and if so, why are you
11    seeking a special verdict form?
12             MR. NESTLER:  To be clear, Judge, we are not seeking a
13    special verdict form.  We are deferring to the defense, and if
14    the defense does not want a special verdict form, then the
15    government is amenable to not having a special verdict form.
16             THE COURT:  Okay.  Am I correct, Mr. Welch, you do not
17    want a special verdict form with respect to this offense?
18             MR. WELCH:  Correct.
19             THE COURT:  Or with respect to any other, such as the
20    1512(c) offense?
21             MR. WELCH:  Correct.
22             THE COURT:  All right.  And Mr. Nestler, your position
23    on special verdict form with respect to that offense?
24         Given the Court's concerns on unlawful means and unlawful
25    purpose prongs of the "corruptly" definition, I'm reserving

1   judgment on that.  I may do one anyway.  But both sides would

2   prefer I not?  Is that what I'm hearing?

3        MR. NESTLER:  We would both prefer that you not and

4   also would prefer that the Court defer to the defense on behalf

5   of the defense's request or not for a special verdict form,

6   given the case law on that topic.

7        THE COURT:  Okay.  And Mr. Welch, you're certain you

8   don't want a special verdict form?

9        MR. WELCH:  Certain, do not want a special verdict

10  form.

11       THE COURT:  With respect to any of these offenses?

12       MR. WELCH:  Correct.

13       THE COURT:  Okay.  All right.  Well, I'm taking that

14  into account.  I have not decided, but I will look at the case

15  law on that.

16     All right.  Moving on to exhibits and witnesses, Mr. Welch,

17  aside from the government's marked exhibits at least, I don't

18  know that they intend to introduce them, but the Twelfth

19  Amendment and Electoral Count Act exhibits, am I correct that

20  you have no objections to any of the government's exhibits?

21       MR. WELCH:  Not in the sense that those -- that is

22  what the law currently says, Your Honor.  I'm not objecting to

23  the exhibits for that purpose.  There was in the papers, the

24  motion to dismiss that the Court has already ruled on, we

25  questioned the constitutionality of the Electoral Count Act in

that, and we would maintain to question that.  The Court has
already ruled on it.

What it currently says is not something that I would object
to, but I would certainly maintain and I will almost certainly
renew the motion to dismiss later on and most likely be making
the same arguments with respect to --

THE COURT:  Yes.  And I denied your motion without
prejudice.  So you certainly -- I would expect you to renew
that.

All right.  So you don't object to the -- sorry to phrase
it that way.  I know you have an issue with the Senate witness.
But just with respect to the government's exhibits, you don't
have any objections as to authenticity or anything else?

MR. WELCH:  No.

THE COURT:  Okay.  And so Mr. Nestler, on this issue,
I'm -- I guess I'm confused about the role that Mr. Schwager is
going to play here.  As I understand it, he's former counsel --
is it counsel to the Secretary of the Senate?  Is that right?

MR. NESTLER:  Yes, Your Honor.

THE COURT:  And he was there that day, and so while I
certainly think it's appropriate for him to give eyewitness
testimony as to what was happening that day and, perhaps, where
Congress was in the process that was happening, I don't
understand the relevance of him getting into the constitutional
and the legal bases for Congress's certification of the

1    Electoral College vote, especially given the parties' -- both

2    the stipulation, as well as the agreement that this is an

3    official proceeding, the joint session of Congress is an

4    official proceeding.

5        So you're going to need to help me understand how you

6    envision using this witness, and I don't think it's appropriate

7    for him to go off on the Constitution and the Electoral Act and

8    all of that.  It could be confusing to the jury and not

9    relevant.

10            MR. NESTLER:  The purpose for his testimony, Your

11   Honor, is, one, for eyewitness account of what happened.  But

12   two is to explain why Congress was meeting on January 6, the

13   significance of that in our constitutional system.

14       And so his role at the time on January 6 of last year was

15   to advise the Secretary of the Senate, who works for the Senate,

16   advises the Senate on how to do its procedures.  It's basically

17   like a standard operating procedure.  It's the manual for why we

18   meet at what time and where and who sits where and who has what

19   job.

20       And all of that is particularly relevant because it goes to

21   why the defendant was there that day, which was to stop this.

22   And so that's why it's probative.  And so we are not --

23            THE COURT:  Are you intending to introduce this law,

24   like the Twelfth Amendment and the Electoral Count Act?

25            MR. NESTLER:  Yes.

1          THE COURT:  But that's -- I don't understand why he

2     can't just explain under the Constitution and the Act this is

3     what happens, just matter of factly.  Like, what -- this is --

4     what's the relevance to what the jury must find to convict

5     Mr. Reffitt?

6          MR. NESTLER:  Well, the jury has to find that the

7     defendant had the intent to obstruct the proceeding, and so the

8     bases for the proceeding are both the Constitution and the

9     statute.

10         And so the reason why Congress was meeting and the way

11    Congress was meeting in terms of proceeding in a joint session

12    with the vice president present and all of the senators and

13    representatives present and voting and reviewing the ballots,

14    all of that is relevant to what Congress was doing that day.

15         So he is simply going to be explaining that is the basis

16    for why Congress was meeting and how Congress was meeting.

17    So --

18         THE COURT:  Sorry to interrupt.  I don't have it in

19    front of me right now, but don't you have a stipulation

20    explaining what happens in this -- in the joint session?

21    Haven't you all agreed to a bunch of stuff, and to the extent

22    something is missing in there, Mr. Welch, would you agree to

23    include it?

24         MR. WELCH:  I'd have to see what it was, Your Honor.

25    But yeah, I mean -- I don't have an objection to Mr. Schwager

1    saying what he saw, you know, what he was doing that day.

2          The issue ends up being my concern here that it sounded

3    like in the government's precis about his testimony that he was

4    going to be giving some sort of legal opinion or legal authority

5    about this.

6          THE COURT:  Yeah, Mr. Nestler, I'm concerned as well.

7    To the extent you all can't reach a stipulation, it seems like

8    the Court could instruct the jury that under the Act, you know,

9    the members gather at this time on this date, that kind of

10   thing, without the need to introduce laws as exhibits and have a

11   complicated colloquy with Mr. Schwager about this process.

12         I think that there may be a few nuggets that are relevant

13   here in terms of timing and date and who is supposed to be

14   present and what's going to happen that day.  But I think it can

15   be abbreviated and no need to introduce all of this stuff that

16   will be confusing to the jury.

17         MR. NESTLER:  Respectfully, Your Honor, we don't think

18   it's going to be confusing to the jury, and we think we have it

19   streamlined.  We've already met with Mr. Schwager, obviously.

20         The importance of the Act, the Electoral Count Act and the

21   Twelfth Amendment to the Constitution to what was happening on

22   January 6 of 2021 is central to the government's case.  That's

23   why the defendant and the rest of the mob were at the Capitol

24   that day.

25         And so having Mr. Schwager explain that -- and to the

extent we suggested in our prior pleading that he would be some

sort of expert or constitutional expert, that was, obviously, an

error.  We are not intending for him to make any legal

conclusions or opine on anything.  It doesn't matter that he is

a lawyer even.  What matters is he was in Congress that day to

see what happened and he knows why Congress was meeting that day

and the importance of Congress meeting that day to our

constitutional system.  And that is the reason why --

THE COURT:  That's the part that I worry about the

prejudice to the jury.  So again, the Court can instruct the

Constitution provides, the Act provides.  I don't know that

there's a need for the witness to spend a lot of time discussing

this.

MR. NESTLER:  And I understand, Judge.  We are not

planning to have him spend a lot of time discussing this.  First

of all, the Constitution itself and the four statutory

provisions, 3 U.S.C. 15 through 18, we believe, are

self-authenticating and so can be admitted to the jury.

And we were planning to admit them through Mr. Schwager

because he's familiar with them, but we can certainly admit them

through the Court just instructing the jury, if that's the

preference of the Court and defense counsel.

THE COURT:  All right.  Mr. Welch?

MR. WELCH:  That would be fine, you know --

THE COURT:  Which would be fine?

1    MR. WELCH:  -- if you want to do it that way.

2    THE COURT:  Which way?

3    MR. WELCH:  To simply have the Court instruct on it.

4    THE COURT:  Yeah, that's my inclination, Mr. Nestler,

5    and streamlining his testimony.  There are a few critical facts,

6    but there's a lot in here that's potentially confusing.  And,

7    you know, again, I do worry about potential prejudice to the

8    defendant.  I think the relevant facts, you can propose

9    something with Mr. Welch that the Court could consider

10   instructing the jury on and run through it in a succinct way

11   with the witness.  But that's how I'm looking at it.

12   MR. NESTLER:  I understand what the Court is saying.

13   The point from the witness is to discuss why everything was

14   there.  The Twelfth Amendment is important to his job and to

15   Congress's job and so is the Electoral Count Act.  So that's why

16   the Senate passed a resolution, a concurrent resolution on

17   January 3 in order to have these procedures consistent with the

18   Twelfth Amendment and the Act.  And so he's going to say that.

19   We're not going to belabor the point.

20   THE COURT:  That's the sentence.  These procedures are

21   consistent with the Constitution and the Act; right?  What more

22   beyond that needs to be said?

23   MR. NESTLER:  Well, we need to talk about why it's

24   important, because that's when Congress decides who the next

25   president's going to be, and that's why the defendant was there

1    at Congress that day.  So --

2         THE COURT:  But this witness cannot testify that

3    that's why Mr. Reffitt was there that day.

4         MR. NESTLER:  Correct.

5         THE COURT:  This witness can testify this is the

6    procedure and it's set forth in the Constitution and the Act and

7    this is the way, you know, the peaceful transfer of power occurs

8    and the new president is formally selected.  He can say all

9    that.  I'm just saying very succinctly.

10         MR. NESTLER:  That was our plan, Judge.  We are

11   planning to do it succinctly.  We are planning to display the

12   statute and the Constitution and have him read a sentence or two

13   from each, the important sentences, the date, the time, the

14   location, what they're doing.  That was the -- our intent with

15   him was to put it up on the screen and say this is the Twelfth

16   Amendment and what do the first two sentences of the Twelfth

17   Amendment say, and this is 3 U.S.C. 15, what does the first

18   sentence say.

19       And that is what's going to be the importance for the jury.

20   We're not getting into all the minutia -- I know some of the

21   statutes can be long and confusing.  We're not planning on doing

22   that.  We're planning on having him hit the high points about

23   why those are important and then talk about what he actually

24   observed that day.

25         THE COURT:  All right.  Well, Mr. Welch, your position

1    on this?

2           MR. WELCH:  I don't know the value in having this

3    witness read to the jury, but, you know, I'm not going to tell

4    the government how to present their case either.

5       My main concern with this is that he would get into giving

6    a legal opinion.  That is what was proffered in or suggested in

7    the government's summary of his testimony.  I mean, certainly,

8    he can -- it's appropriate to testify about what he saw that

9    day, what he did that day, like anyone.

10          THE COURT:  So Mr. Nestler, it sounds like you can

11   walk through this stuff pretty succinctly.  What I'm trying to

12   avoid is testimony, you know, suggesting this is -- potentially

13   inflammatory stuff, like this is the death of democracy, this

14   is -- it's just factual, this is what the law requires and this

15   is what we were there to do.

16          MR. NESTLER:  I understand, Judge.  We're not

17   intending for a witness to talk about the death of democracy.

18          THE COURT:  All right.  Have we covered all of your

19   concerns, Mr. Welch?

20      You all consider whether it makes sense to have the Court

21   instruct on the critical parts of the Act and the Constitution,

22   Mr. Welch, versus have this stuff introduced into evidence.

23          MR. WELCH:  I think it would be appropriate to have

24   the Court just instruct on it, but certainly, the government is

25   free to decide how it wants to present its case.

1    THE COURT:  All right.  Well, Mr. Nestler, do you want

2    to confer with Mr. Welch on this?

3    MR. NESTLER:  Sure, we will confer, and I appreciate

4    what he's saying, that the government has the ability to present

5    a coherent narrative to the defense -- sorry, to the jury to

6    make its case.  I appreciate Mr. Welch saying that.  We will

7    discuss it with him, and if we have a proposed stipulation, we

8    will let the Court know.

9    THE COURT:  All right.  Mr. Welch, any objections to

10   any of the other government witnesses?

11   MR. WELCH:  No.

12   THE COURT:  Okay.  In terms of -- Mr. Nestler, I

13   issued this pretrial order, as you know.  I didn't know whether

14   the government had already turned over *Giglio* and *Lewis*

15   materials.  Is that forthcoming, or have you done that already?

16   MR. NESTLER:  We've turned over any *Giglio* or *Brady*

17   materials that are in our possession.  We're not aware of any

18   *Lewis* materials.

19   THE COURT:  And I'm just -- I'll ask again, both of

20   you, Mr. Nestler, based on what's been turned over, there's no

21   motion to limit the cross-examination of any of your law

22   enforcement witnesses based on what's been turned over?

23   MR. NESTLER:  No motion from our perspective, no, Your

24   Honor.

25   THE COURT:  Okay.  And Mr. Welch, with respect to the

1    law enforcement or the family members and the immunized

2    witnesses, I know -- I think the government turned over *Jencks* a

3    while ago.  There's no motion to limit their testimony in

4    any way?

5              MR. WELCH:  No, Your Honor.

6              THE COURT:  And Mr. Nestler, no motion to limit their

7    cross-examination in any way?

8              MR. NESTLER:  No.

9              THE COURT:  Okay.  I'm just, again, trying to make

10   sure there aren't issues we can decide pretrial that will keep

11   things moving during trial.

12       All right.  Moving on to voir dire, I gave you an updated

13   version of the voir dire questions I intend to ask.  As you can

14   see, I incorporated some but not all of the government's

15   proposed additions.  I did want to add the question on the

16   juror's ability to not read the press during trial.  I think

17   that's important.  And I'm not sure that that was included.  I

18   did incorporate the defense's modification, an expansion, I

19   think, of the defense's proposed addition relating to the

20   presumption of innocence and the defense's suggestion to edit

21   the question about living or working at the Capitol.

22       I didn't incorporate many of the government's proposed

23   questions that I thought would be more appropriate for

24   questionnaire, and I will be asking yes-or-no questions up front

25   in the general voir dire.  So obviously, some of the

1    government's proposed questions will be natural follow-up

2    questions, should a prospective juror answer yes to any of the

3    questions I ask, for example what kind of a case did you serve

4    on as a juror and that kind of thing.

5         Any comments, concerns about what's omitted or additional

6    thoughts on what hasn't been raised but should be considered?

7    Mr. Nestler?

8              MR. NESTLER:  Ms. Berkower is going to handle our voir

9    dire arguments, Your Honor.

10             THE COURT:  Okay.  Ms. Berkower?

11             MS. BERKOWER:  Good afternoon, Your Honor.

12             THE COURT:  Good afternoon.

13             MS. BERKOWER:  Yes, Your Honor.  I guess one of the

14   questions that we did have before we get into exactly what we

15   believe may be missing is it was a little unclear from Your

16   Honor's proposal whether -- what kind of follow-up there would

17   be, whether that would be something Your Honor would do or

18   whether it's something we would do and whether we would be able

19   to get into some more details.

20        And the reason I raise that is there was one main area of

21   concern that we did think there needed to be additional

22   questioning on, and that relates to pretrial publicity and the

23   effect on potential or prospective jurors, and that's based on

24   some of the case law in the D.C. Circuit and the Supreme Court

25   concerning the inquiry that's appropriate into the extent of a

1    prospective juror's knowledge of the case, whether they formed

2    an opinion on it, and whether they can set it aside.

3         And so part of what I want to make clear before we sort of

4    dive into that a bit more is whether this is just the initial

5    set of questions Your Honor was going to be posing and then we

6    could do follow-up that got into those areas or whether this was

7    the complete set of questions?  We do not believe that --

8              THE COURT:  No, and I should have made this clear up

9    front.  Like many judges on this court, I do the note card

10   approach.  So I ask a series of questions and ask the jurors to

11   answer yes or no.  On note cards, if they answer yes to question

12   4, then they write the number 4.  And then they will be brought

13   into a separate courtroom for individualized voir dire.  And I

14   will begin following up with them on what their yes answers are

15   and probing a little bit more the basis for the yes answer.

16        And I also will permit both sides brief follow-up, but I do

17   mean true follow-up.  This is not an opportunity for you all to

18   preview your arguments or make speeches or preview the facts of

19   the case or ingratiate yourselves to the jurors.  This is pure

20   follow-up.  So you will both get a chance to do that.  And if

21   you all go on and on, I will probably start asking some of your

22   questions and/or cut you off.

23        But I do -- I certainly appreciate that the first four

24   questions are critical here in terms of voir dire and ensuring

25   that we have a jury that doesn't have a formed opinion for one

side or the other and that they are not biased.  So this is not

the end game, by any means, and many of the government's

questions were, you know, natural follow-up.

In this case, Ms. Berkower, your questions about how many

videos, one or two, three or four, five or six, seven, twelve, I

question.  It's not that I don't think it's appropriate to probe

the extent to which prospective jurors have seen and heard about

the events of January 6, but I think we all have to assume that

the vast majority, if not all, will have seen or heard, perhaps

seen videos.  And whether they've seen 15 clips, short 10-second

clips, or one long about, let's hope not, but Mr. Reffitt, it's

not necessarily the number that's going to be so telling.

So I can't say that I intend to track exactly what the

government has here in terms of appropriate follow-up.  But you

will get your chance, and I think we all share the same goal

here.

And I'm leading with these questions in part because it

would be really helpful in the event both sides believe that

there's a basis for a strike for cause with any individual

juror, that we come up with some, you know, signal that you all

can give me such that we don't go through all of the yes

answers, which might be numerous in a case like this.  This is

something we can talk about next week.  But if you all are in

agreement that somebody should be stricken for cause, it would

be great for me to get that hint from you before I go through 20

minutes of additional colloquy with a juror that both sides

think should be stricken.

So I don't know if that answers your question in full, but

I will give you a chance to follow up, assuming it's not abused.

MS. BERKOWER:   Thank you, Your Honor.   That clarifies

a number of things.

I think -- understanding, then, the procedure that Your

Honor is going to use, and I'm sure we can speak with Mr. Welch

about the manner in which, you know, we should come up with a

system to alert the Court if we both believe that a particular

juror would be -- should be stricken for cause so that we don't

waste time.

But setting that aside, I think that in the initial set of

questions, based on some of the case law that's out there

concerning pretrial publicity, we would request a couple of

additional questions in the case-specific event section of Your

Honor's proposal to have a better sense of any potential people

that could be struck right away for cause.

And I understand if Your Honor is not comfortable with

people estimating the number -- the amount of news they've

consumed.   We can phrase it differently.   But generally, the

case law has made clear that there does need to be a somewhat

thorough inquiry into the general volume of pretrial publicity

that the prospective juror has encountered and then the effect

of that on the potential juror.

1    And the cases I'm referring to are *United States vs.*

2    *Haldeman*, 559 F.2d 31, D.C. en banc opinion from 1976, which

3    addressed this in the context of a trial for people involved

4    with Watergate, and then *Mu'Min vs. Virginia*, 500 U.S. 415 from

5    1991, and then also *Skilling vs. The United States*, 561 U.S.

6    368 from 2010, which dealt with the Enron-related trial.

7    And in all of those cases, Your Honor, the courts found

8    that there did need to be a little bit more in-depth inquiry

9    into what the person had seen.

10    And the way we would propose doing that here, Your Honor,

11    is in this case we know that there is a little bit of difficulty

12    in assessing the potential -- whether someone even knows who

13    Mr. Reffitt is by name, because so much of the media and

14    publicity is just videos, and they may not particularly know,

15    you know, him by name but they may know him from a particular

16    video or they may know him from the surrounding facts of the

17    case, including, you know, the different allegations in the

18    indictment, including the last one that he made a threat against

19    family members.

20    And so the way we would propose, perhaps, adding and

21    building on to the first four questions that Your Honor has

22    proposed would be to ask a couple of additional questions.  And

23    I can sort of say them out loud now, if Your Honor would like,

24    and we can talk about them --

25    THE COURT:  Sure.

1              MS. BERKOWER:  -- and we can potentially submit them.

2          So I think the first question, keeping in mind that case

3      law that directs us to develop some information about how much

4      information the prospective juror has been exposed to, we would

5      propose asking, "How much attention did you pay to the news

6      about events at the Capitol on January 6?"  And then as a

7      follow-up to that, "Have you followed news accounts of specific

8      individuals who are involved in events at the Capitol on

9      January 6?"

10         And in our mind, if the person has not been following news

11     about specific individuals, that's a signal at least to the

12     government that it may be less likely that they have familiarity

13     with this particular defendant and the allegations in this

14     particular indictment.

15         And then a follow-up to that would be, "Have you heard or

16     seen anything in the news or elsewhere about the allegations in

17     this particular case?"  And then going back to Your Honor's

18     question number 1, "Have you seen anything in the news or

19     elsewhere about Guy Reffitt, this particular defendant?"

20         I think those, in our view, would more clearly establish --

21     you know, yes answers to those would allow for follow up that

22     could allow Your Honor to develop a record or the government or

23     Mr. Welch in attorney-conducted follow-up about what exactly

24     this person has been exposed to.  And it would allow the Court,

25     then, to follow up or us, if Your Honor would prefer, to talk

1 about whether the person had formed an opinion about the guilt

2 of this defendant, which I know is a question Your Honor asked,

3 question number 12.

4  We would also propose asking another question, "Have you

5 formed an opinion about the guilt of people involved in events

6 at the Capitol on January 6 more generally?"  Because we do

7 think that because this was an event that involved so many

8 people, that that is something that also should be explored and

9 put on the record.

10  And then the follow-up to that is whether -- a direct

11 question to the person of whether they could set aside any prior

12 opinions that they have formed if they were to be selected as a

13 juror.  We, of course, would like some follow-up to that as

14 well.

15  So I know that was a big -- that was a lot of information,

16 but that's generally what we had in mind with regard to

17 modifying the Court's proposal to develop that record more

18 clearly.

19   THE COURT:  Okay.  Well, I appreciate that,

20 Ms. Berkower, and I fully intended to drill down on the extent

21 and the nature of the news.  But it sounds like what you're

22 suggesting is that the first question be, which is certain to be

23 probably a yes from everyone, "Have you seen or heard anything

24 in the news or elsewhere about the events of January 6?"  Is

25 that the lead-in?

1          MS. BERKOWER:  I think the lead-in could be -- well, I

2     guess that's true, if you're trying to ask yes-or-no questions.

3          THE COURT:  Have you had conversations with Mr. Welch?

4     Are you all in agreement here?  Or Mr. Welch, do you have a

5     different perspective?

6          I certainly agree with the government, and I know you do,

7     too, that there has to be a lot of information pulled out from

8     prospective jurors who have heard certainly about this case and

9     certainly anyone who has strong feelings or opinions about the

10    events of January 6, that those need to be flushed out, as well

11    as, you know, anyone who lives or works near the Capitol or

12    anyone who has any connection.

13         So I'm sorry if I've left you all with the impression that

14    this was, you know, these questions and nothing more.  I think

15    the kinds of things you talked about, Ms. Berkower, are

16    appropriate.

17         But Mr. Welch, I want to hear your perspective as well.

18         MR. WELCH:  Well, Your Honor, I agree with the

19    additional questions that the government is proposing.

20         And just to give further support to that, there has been a

21    survey of D.C. residents by Select Litigation.  They surveyed

22    400 D.C. residents.  And in their survey, they found that 70

23    percent, perhaps even a little bit more, I think it was actually

24    71 percent have already formed an opinion about the people who

25    were involved in January 6.

1      So with that being said, I think we're going to need to

2  address that.  Because if people have already formed an opinion,

3  then it might be very difficult for them to set that aside.

4          THE COURT:  Yeah, I don't know how valid that study

5  is.  I'm not questioning that many people are aware of the

6  events and that some have strong opinions.  I'm not sure that

7  I'm -- I've just heard about this survey.  I know nothing about

8  its methodology or anything like that.  And to the extent you're

9  relying on that for any motion or whatever, you should be

10  putting that before me now so I can get into the weeds on that

11  and learn more about it, Mr. Welch.

12          MR. WELCH:  I understand.

13          MS. BERKOWER:  Your Honor, may I add something to what

14  Mr. Welch just said?

15      I would note that the ultimate question -- the Supreme

16  Court has made very clear that the ultimate question of whether

17  a prospective juror is fit for service is not whether they have

18  an opinion coming in to the case, but whether they can

19  effectively set that aside and only deciding the case based on

20  the evidence presented and the law as the Court instructs.

21      And the case law on that, the leading case is *Irvin v.*

22  *Dowd*, 366 U.S. 717 from 1961, quoting from that at 722 to 723.

23  "It is sufficient if the juror can lay aside his impression or

24  opinion and render a verdict based on the evidence presented in

25  court."

1    And so I think what we're getting at with our request for

2    the additional questions here is understanding if the person was

3    exposed to media, have they formed an opinion, and then is the

4    Court and are the parties satisfied that the person can set that

5    opinion aside and render a fair verdict based only on the

6    evidence.

7    And so I think we, of course -- I'm sure if Mr. Welch

8    submits something in writing we will want to respond about this

9    survey that he read.  But in our view, that simply does not --

10   that's not the end of the inquiry.  And part of the basis for

11   asking these additional questions is to be able to really allow

12   a determination to be made at the end of the voir dire of

13   whether or not the person -- we believe that the person can, in

14   fact, set aside any opinion he or she may have formed and be

15   fair.  And that is also something that the *Mu'Min* case that I

16   mentioned earlier addressed, that really at the end of the day

17   the question is whether the juror is to be believed when he says

18   that he hasn't formed an opinion about the case.

19   So I just add that to Mr. Welch 's, you know, comments from

20   a few minutes ago to make clear that it's our position that even

21   if there are people in the pool who have been exposed to media

22   and who have formed opinions, if upon a thorough inquiry from

23   the Court we are satisfied they can set that aside, there

24   certainly can be an appropriate jury picked from this pool.

25            THE COURT:  Okay.  Well, Ms. Berkower, perhaps it

1    makes sense -- I don't know.  If you all are on the same page,

2    it would be great to submit something jointly.  If not, why

3    doesn't the government submit something by Tuesday and the

4    defense by Thursday for additional follow-up.

5         But keep in mind, I'm intending to ask no more than half a

6    dozen questions that trigger a yes-or-no answer that then result

7    in additional drilling down on whether the person can -- has a

8    formed view and whether they can be a fair and impartial juror.

9    So the list of questions isn't going to capture everything, nor

10   should it.  There's got to be follow-up.

11        But I'm certainly receptive to your suggestions on what

12   that follow-up should be.  And to the extent you think I should

13   add an additional question or two to the -- or broaden any of

14   these to ensure that we get the yes answer so that there's

15   appropriate follow-up, I'm very open to it.

16        I think this is a critically important part of the trial.

17   So I don't want either side to think that I'm whetted to this.

18   I'm just trying to get a manageable voir dire for the whole

19   panel and then bring them one by one and have a more detailed

20   colloquy with each juror.

21        So does that work, Ms. Berkower?  Can you do that by

22   Tuesday and Mr. Welch by Thursday?  And if you all can do it

23   together by Tuesday, even better.

24             MS. BERKOWER:  Yes, Your Honor, I think we can

25   certainly work on trying to submit a proposal with Mr. Welch

1    jointly, and we will work on that.

2          THE COURT:  Why don't you all try to do it by Tuesday,

3    and then to the extent you can't reach agreement, have your

4    respective positions at the end of what you agree should be

5    follow-up questions.

6          MS. BERKOWER:  We'll do that.  Thank you.

7       Before we move off --

8          THE COURT:  By Tuesday?

9          MS. BERKOWER:  We can do it by Tuesday, yes.

10      One more point on the voir dire, Your Honor, that I wanted

11   to raise before we moved off of this topic.  In question 14 that

12   you had proposed, you said this case involves allegations about

13   the possession of a handgun which was not fired and refer to a

14   handgun throughout that.

15      There actually will be evidence about more than one

16   firearm, none of which were fired, so that's still true.  But

17   upon rereading that in anticipation of coming here to court

18   today, we realized it might be more appropriate to just say,

19   "This case involves allegations about the possession of guns or

20   firearms."

21         THE COURT:  Mr. Welch, any objection to changing that

22   to firearms?

23         MR. WELCH:  I think it should be "gun or firearms,"

24   Your Honor, because the specific -- there's firearms that are

25   seized that are not charged and that are not alleged to have

1   been charged.  There are also specific counts that involve a

2   handgun.

3        So I think that -- if there's someone out there who has

4   such strong feelings about any kind of guns, that we need to

5   identify that person.

6            THE COURT:  Isn't a handgun a type of firearm?

7            MR. WELCH:  It is.  And I think that -- I suppose if

8   you just say firearm, people could get it.  But since the

9   allegation is handgun, semiautomatic handgun in one of the

10  counts, we're dealing with regular people.  They might not be

11  lawyers.  Indeed, some of them probably won't be lawyers.  And

12  we want to make sure that we use words that regular people are

13  going to understand.

14           THE COURT:  And you think a regular person won't know

15  that a handgun is a firearm?

16           MR. WELCH:  A handgun is a subset is my concern.  And

17  if you only say firearms --

18           THE COURT:  You don't think that by saying "firearms"

19  we're covering every potential kind of gun and it's the broadest

20  way to ask the question that includes handguns all the way up to

21  a machine gun?  Your concern is that someone's going to think a

22  handgun doesn't fall within the umbrella of a firearm?

23           MR. WELCH:  My concern is that since the actual

24  indictment, since I believe the verdict sheet also makes

25  reference to a handgun, let's use the actual language.

1     Certainly, firearms is accurate.  I'm just suggesting handgun or

2     firearms in order to make sure that we get people's --

3         MS. BERKOWER:  Your Honor, may I interject the reasons

4     why we're making this request?  That may clear things up.

5         Count 1 of the second superseding indictment charges

6     Mr. Reffitt with transporting two firearms in commerce, and it

7     specifies, "That is, a rifle and a semiautomatic handgun."

8         And so it struck us that since the Court is inquiring into

9     whether people have certain concerns or biases concerning guns,

10    that referring to just a handgun when the indictment charges

11    Mr. Reffitt with transporting both a rifle and a handgun, it

12    would be more appropriate to refer to firearms, plural, or guns,

13    plural, but just referring to a handgun may not do it.

14        THE COURT:  I think this is -- I don't see this as an

15    issue.  I'd like to use a word that encompasses everything so

16    that any juror who has a problem with a handgun, a rifle, a

17    machine gun, you name it, is going to say yes.  And then if they

18    say yes, then we can follow up.

19        But I guess I'm just not -- I'm not following you,

20    Mr. Welch, that someone's going to say yes, they have a problem

21    with a handgun, but not say yes, they have a problem with a

22    firearm.

23        MR. WELCH:  And I'm not suggesting -- I'm sorry.

24        THE COURT:  No, go ahead.

25        MR. WELCH:  I'm not suggesting that someone would

necessarily say that.  I'm just thinking that when someone hears
that, they're listening, they might say oh, okay, the question
was about firearms, but then when they actually get down to it,
when they're selected, they're on a jury, and then they say oh,
now it's about rifles, now it's about handguns.

I was just thinking be broad, cast a broad net at the
outset, and avoid the situation where somebody is not
necessarily sitting there interpreting.  We have all kinds of
people that will come through the venire process, and if the
word changes, it might get by somebody.  It might not get by you
or me, but it might get by somebody.

THE COURT:  What is the evidence that's going to come
in here?  It's going to be a rifle and handgun?  Is that it?

MS. BERKOWER:  Yes, Your Honor.  There will be
evidence that the defendant transported both a rifle and a
handgun to the District of Columbia and that he brought them
with the intent to use them both on January 6.  There will be
evidence that he assembled his rifle and left it in his car for
purposes of returning to it and potentially using it later in
the day and that he brought his handgun with him and was armed
with it while he engaged with the Capitol Police on the steps of
the Capitol during the riot.

THE COURT:  Okay.  Will this satisfy everyone if I
say, "This case involves allegations about the possession of
rifles and a handgun, none of which were fired.  Does anyone

have such strong feelings about firearms that you cannot put

them aside and serve as a fair and impartial juror in this

case?"

Does that capture everything for everybody?

MS. BERKOWER:  That's fine for the government.

MR. WELCH:  Yes, Your Honor.

THE COURT:  All right.  What else, Ms. Berkower?

Anything else?

MS. BERKOWER:  Just a few other questions, small ones,

about jury selection.

Has Your Honor made a determination about how many

prospective jurors will be brought into the Ceremonial Courtroom

for the initial round of questioning?

THE COURT:  Yes.  That will be, I think, roughly 50.

So we will, in all likelihood, have to do this twice.  Maybe

not, but potentially.  So 50.

And to the extent you all have not been in touch with John

Cramer for technology issues, to the extent you've not

coordinated with Mr. Hopkins to take a look at the layout of the

courtroom where the case will be tried, you should do that.

I jumped ahead.  But Ms. Berkower, more about jury

selection?

MS. BERKOWER:  Yes, Your Honor.  I think at the last

hearing you mentioned you were going to look into whether you

had the ceremonial courtroom available both on the 28th and the

1    1st of March.

2          THE COURT:  I've been told we do.

3          The way this will work is I will do the general voir dire

4    with the first 50, and we will send the rest of those who have

5    been summoned probably -- I don't know.  I need to get advice

6    from the jury office about whether they should go home or just

7    come back late in the afternoon.  But we'll go through the first

8    50, and then we will move from the Ceremonial Courtroom to

9    Courtroom 16 where individualized voir dire will take place.

10   And one by one, jurors will be brought in and follow-up

11   questions will be asked.

12         And then if we don't have enough qualified jurors at the

13   end of that 50, we will go back and do another round of general

14   followed by another round of individual.

15         So I don't think I have the Ceremonial Courtroom on

16   Wednesday.  So we really need to aim to pick this jury Monday

17   and Tuesday.

18         And I am interested -- I am on the fence about number of

19   alternates.  I'm inclined to say at least three, in part because

20   with the COVID protocols, you know, jurors are told to stay home

21   if they're not feeling good, and this is the start of allergy

22   season.  I myself may have some sniffles; it doesn't necessarily

23   mean that I've got COVID.  But if that's the standard, if that's

24   what they're being told, you know, I don't want to get in a

25   situation where we lose our jury.

1        Thoughts from either side on number of alternates?

2            MS. BERKOWER:  Yes, Your Honor.  We would suggest, in

3    light of all the considerations you just listed, selecting four

4    alternates to ensure that we continue through the end of the

5    case with an adequate number of jurors.

6            THE COURT:  Mr. Welch, do you have a view?

7            MR. WELCH:  I'm sorry?

8            THE COURT:  Do you have a view?

9            MR. WELCH:  Yes.  I was going to suggest four as well.

10           THE COURT:  Okay.  All right.  We will aim for that.

11       So once we get the number of qualified -- the total number

12   of qualified jurors, which is somewhere around 38 -- and by the

13   way, after the individualized voir dire, any strikes for cause,

14   motions to strike for cause will need to be made when that juror

15   is done at the time.  All right?  We're not going to wait until

16   the end.  This could take a while, and while everything is

17   fresh, we should be making -- you should be making those

18   arguments, and I should be making those calls right away.

19       So once we have enough qualified jurors, then -- as I've

20   mentioned before, I don't know whether the Ceremonial Courtroom

21   will be available to go back to the Ceremonial Courtroom and do

22   peremptories, which do occur simultaneously with the whole group

23   of qualified jurors, whether we can do it in one room, in the

24   Ceremonial Courtroom, or whether we're doing it in the courtroom

25   where the trial will be, which is Courtroom 14, and a second

1    courtroom.

2        Previously, I think that both sides said there wouldn't be

3    an objection to doing peremptory strikes in two courtrooms if we

4    didn't have access to the Ceremonial Courtroom.  Is that still

5    the case?

6        MS. BERKOWER:  That's fine with the government, Your

7    Honor.

8        THE COURT:  Mr. Welch?

9        MR. WELCH:  I think that would be fine.

10        THE COURT:  All right.  I hope we don't have to do it

11    that way.  I hope we could go back to the Ceremonial Courtroom.

12    I don't know, and we could lose it.  So I just wanted to make

13    sure that that's acceptable to both sides.

14        MS. BERKOWER:  I'm sorry with the additional questions

15    on this, but Your Honor mentioned 38 to qualify.  Has Your Honor

16    determined the number of peremptories for each side, then, if

17    that accounts for the alternates as well?

18        THE COURT:  No, I need to do the math.  I was just

19    guesstimating.  Maybe it's 40.  I need to sit down and add it

20    all up.  Generally, with two alternates, it's one peremptory for

21    each side.  So I guess my initial thinking is two for each side

22    with four.

23        Do you have a view?

24        MS. BERKOWER:  That would be our request.

25        THE COURT:  Mr. Welch?

1          MR. WELCH:  I think that's correct.  I just need to

2     check.

3          THE COURT:  Yeah, okay.  So if we're talking two plus

4     two plus 10 plus 6, that's 20, plus 12 plus 4, I think that's

5     36.

6          MS. BERKOWER:  That's my math as well.

7          THE COURT:  So 36, but maybe we get -- I don't know.

8     We'll see how it's going, but if we're breaking before lunch or

9     something, I might want to qualify, you know, 37 or so in case

10    someone didn't return.  But if we're just -- if we're finishing

11    at a time that we're not letting jurors leave, then maybe 36

12    would be adequate.  We don't need an extra to get through the

13    peremptories.

14       So once we have 36, 37, we'll release the jurors and move

15    to peremptories.

16         MS. BERKOWER:  I think this actually will be my last

17    question on this.  I hope so, Your Honor.  I'm sorry for the

18    continuing list.

19         THE COURT:  No, I'm glad you're asking.

20         MS. BERKOWER:  For peremptories, you mentioned they

21    will be done simultaneously.  I just want to make sure I

22    understand Your Honor's practice correctly for exercising those.

23         THE COURT:  So you will do your six and Mr. Welch will

24    do his ten at the same time.  So it's possible you're striking

25    the same person.

1      MS. BERKOWER:  And we will do the alternate strikes

2   after the jury has been selected, or does that include

3   alternates?

4      THE COURT:  I think we will do the jury and then we

5   will do the alternates.  But I don't know whether I would be

6   moving people around to let them know, you know.  I think it

7   would be -- we would do one and then the other but in a way that

8   isn't obvious that's what we're doing to the jurors.

9   Does that make sense?

10      MS. BERKOWER:  Yes.

11      THE COURT:  And before trial begins, I will ask you

12   all to each provide two numbers that will be the alternates, but

13   the alternates, of course, won't know they're alternates.  So

14   the government might say 4 and 10, and then, Mr. Welch, you have

15   two other numbers.

16   So they will be scattered throughout the gallery in the

17   courtroom.  The courtroom, we'll just have room for the

18   participants in the case and the jury.  There will be an

19   overflow courtroom and a media room.  So members of the public

20   and the media will be able to watch live-stream video in those

21   rooms.  As I've said a couple times before, the public line will

22   not be accessible.

23      MS. BERKOWER:  And so Your Honor --

24      THE COURT:  Go ahead.

25      MS. BERKOWER:  -- if we're doing this simultaneously

1    and it means that we may end up striking the same person, does

2    Your Honor then pick the jury from the first seat through the

3    remaining numbers?  It means we will end up with potentially

4    more than the jury at the end.  There will be additional people

5    if we strike people at the same time.

6          THE COURT:  Right.  So that's why the order does

7    matter, the way in which they come in.  So the first 12 that

8    remain will be the jury.

9          MS. BERKOWER:  Part of the reason I ask, Your Honor,

10   is I've had this issue come up with regard to identifying the

11   alternates.

12         THE COURT:  Maybe we need to do the alternates at the

13   same time.  Let me think about this, Ms. Berkower.  It might

14   make more sense to do it all -- I don't know.  You all think

15   about it.  I will think about it.  And let's talk next week.  I

16   see how it could be difficult.

17         MS. BERKOWER:  I would just make a note for the Court,

18   I don't have it at my fingertips, but I remember this issue

19   actually came up in a prior trial I had.  And I remember, I

20   think, that one of the Rules of Criminal Procedure, I don't have

21   it at my fingertips right now, actually addresses peremptory

22   strikes of alternates and speaks to this issue at least a little

23   bit.  So I can provide that to the Court.

24         THE COURT:  I'll refresh my memory on this.  So let's

25   discuss the process for alternates next time to make sure we're

1    all on the same page.

2              MS. BERKOWER:  Thank you, Your Honor.

3              THE COURT:  Okay.  And for voir dire, you know, I do

4    know there's been a fair bit of press about this case and

5    Mr. Reffitt in particular.  I have not followed it, and if there

6    are specific issues that have been in the press that you all

7    think I need to be made aware of before the voir dire, you know,

8    please let me know, because I'm not -- I'm blissfully unaware of

9    all of that.  If you think there's something that will be

10   helpful to know for purposes of a thorough follow-up, please let

11   me know.

12             MS. BERKOWER:  We will.  Thank you, Your Honor.

13             THE COURT:  I think I asked this before, but are the

14   parties' anticipated witnesses vaccinated?

15             MR. NESTLER:  I don't believe you've asked that

16   previously, Your Honor.  I think it's fair to state for all of

17   the government witnesses, yes, but we can inquire if the Court

18   would like us to inquire.

19             THE COURT:  It would be helpful.  The numbers seem to

20   be going down, but for obvious reasons, not having witnesses

21   wearing a mask, that's where I'm leaning, but I'm interested in

22   what you all have to say and your perspective on that issue.

23             MR. NESTLER:  Yes, Judge.  That actually fed into a

24   question I was going to ask, which is what Your Honor's

25   preference was for mask wearing while people are speaking,

1    notably counsel who is examining a witness and the witness

2    himself or herself.

3            THE COURT:  Did we not have this conversation once

4    about vaccinations?

5            MR. WELCH:  We have not had this conversation, Your

6    Honor.

7            THE COURT:  No?  All right.  You've told me

8    Mr. Reffitt's vaccinated.

9            MR. WELCH:  No, Your Honor.  He's had COVID.  That's

10   why I was trying to get his medical records previously.

11           THE COURT:  Okay.  I guess it would be helpful for the

12   Court to know, and this is obviously, you know, private, but if

13   there's a way that you all can inform me, that would be helpful

14   in making decisions about how to ensure that the safety

15   protocols of the court are followed.

16           MR. NESTLER:  Yes, Judge.  We will inquire, and we can

17   talk about it when we get together next week.

18           THE COURT:  I'm trying to think if there are any other

19   points that we should discuss.

20       Mr. Welch, are there family members who are not witnesses

21   who will be attending the trial in person?

22           MR. WELCH:  My understanding is yes, they would like

23   to be there.

24           THE COURT:  Can you let me know how many?  I want to

25   make sure there's seating available for them in the overflow

1    room.

2         MR. WELCH:  I will find that out.

3         THE COURT:  With the number of jurors, particularly

4    with four alternates, it really makes the courtroom very tight

5    in terms of social distancing.  But I would want to make sure

6    that there's room for them in the overflow, which by the way

7    will have four separate cameras.  It will have one on the

8    witness, one on the attorney, one on any evidence, and I think

9    one on me, not on the jury.

10        MR. NESTLER:  Understood, Your Honor.  On that, two

11   small points.  One is, we may suggest that the Court arrange for

12   two overflow courtrooms, if possible.  I know you said one media

13   courtroom and one public courtroom.  We do believe there will be

14   potential for many attending, so the more space the better

15   probably.

16        THE COURT:  I hear you, Mr. Nestler.  I just don't

17   know that that's possible given the other trials that are going

18   on in the courthouse at the same time.

19        MR. NESTLER:  I totally understand.  I just wanted to

20   make that point.

21        And then the other question is, would the Court be amenable

22   to having one seat in the courtroom itself, Courtroom 14, for

23   witness counsel?

24        THE COURT:  How many witnesses have counsel?

25        MR. NESTLER:  All of the law enforcement witnesses and

1    the witness who works for the Senate.

2            THE COURT:  Okay.  Let me check on that.

3            MR. NESTLER:  To be fair, it's the Secret Service's

4    general counsel's office, the Capitol Police's general counsel's

5    office, and the Senate legal counsel for their respective

6    witnesses.

7            THE COURT:  And their concern is about potential

8    privileges?

9            MR. NESTLER:  Potential privileges and sensitivities.

10           THE COURT:  All right.  I will check on that.  Will

11   you remind me about that next time we meet?

12           MR. NESTLER:  We will.

13           THE COURT:  Okay.

14           MR. WELCH:  Your Honor, this is Bill Welch.

15           THE COURT:  Yes.

16           MR. WELCH:  While we're on this point, just because

17   we're late, Mr. Reffitt asked that the Court reconsider having

18   the public line available because of the difficulty in the

19   public accessing the courthouse, accessing the actual courtroom

20   where this is going on.  There is a right to a public trial, and

21   we believe it would facilitate that, given the current operating

22   procedures under the pandemic, to at least have people able to

23   listen to the proceedings on the telephone who can't actually

24   physically come in, given the capacity limitations.

25           THE COURT:  Well, this is an issue we address all the

1    time in normal times without a telephone line open.  And one of

2    my main concerns about that is the potential for witnesses who

3    could be listening in.  And so I've decided that won't be open.

4        I will bring the request for a second overflow courtroom to

5    the court's attention.  But just like in every other

6    high-profile case, there's often seating limitations.  So this

7    is no different than in normal, nonpandemic times.

8            MR. WELCH:  On another note, if I might, you had asked

9    Ms. Berkower about the questions that she had about the Court's

10   proposed voir dire, and I had one comment on the Court's

11   question number 18.  And that is, "Have any of you had

12   experience as a juror in a previous criminal trial that would

13   affect your ability to be a fair juror in this trial?"

14       I would ask that the Court just ask whether they had

15   experience as a juror in a previous trial.  Somebody could have

16   had a bad experience in a civil trial.

17           THE COURT:  That's a good point.  I will make that

18   change.

19       Anything else, Mr. Welch, on that?

20           MR. WELCH:  Not on the voir dire, Your Honor.  There's

21   a couple of housekeeping things that I think Mr. Nestler wanted

22   to raise and I wanted to raise as well not related to voir dire.

23           THE COURT:  Okay.  Go ahead.

24           MR. NESTLER:  Just one thing, just for the record,

25   Your Honor, along the lines of the courthouse being open.  We

1   wanted to note for the record that we noticed that Chief Judge

2   Howell issued Standing Order 22-07 on February 15 of this year

3   making clear the courthouse was open to all persons for all

4   purposes.

5           THE COURT:  That's right.  And this order went out, I

6   think, hours before that.  That's why it wasn't referenced.  But

7   yes, there are no longer limitations on individuals entering the

8   courthouse now.  Thank you for making that point.

9           MR. NESTLER:  Thank you, Your Honor.  Just to make the

10  record clear in this case.

11      And the other question that we had was, at counsel table we

12  would like to have Ms. Berkower and myself along with our

13  paralegal and an FBI case agent.  I just wanted to make sure the

14  Court was aware of that and address any concerns the Court would

15  have.

16          THE COURT:  Yes.  This is, what, Agent Hightower?  Is

17  he the case agent?

18          MR. NESTLER:  Agent Hightower from Texas and Agent

19  Ryan from D.C. are the two co-case agents, and we will have one

20  of them.

21          THE COURT:  All right.  Any objection, Mr. Welch?

22          MR. WELCH:  Mr. Nestler did ask me about that, and I

23  responded shortly before the hearing.  So I'm not sure that he

24  saw my response to that.

25      My understanding is that per the rule there can be any case

agent.  So certainly that I don't have a problem with.  I think the government needs to make an election who that is going to be.  I don't think they can move that person in and out.

But along with that, I also had a similar request. Nicholas Smith has been helping me with this case in kind of an informal capacity.  I'm not asking for him to be appointed pursuant to the CJA or anything like that, but if I need some help -- and I've already asked my client, and he is okay with it -- would it be okay if likewise Mr. Smith were to sit with us at counsel table?

THE COURT:  So Nicholas Smith is a paralegal?

MR. WELCH:  He is actually an attorney, Your Honor. But he's been just working with me and helping me out on this case because there's a lot of work involved in it.

THE COURT:  Has he entered an appearance in this case?

MR. WELCH:  No, he has not, and I'm not asking him to.

THE COURT:  Well, I think he should if he's involved in this case.

MR. WELCH:  Well, I will consult some more with him about that and whether he wants to do that or not.  But our request is just to have him sit at counsel table.

THE COURT:  I think the rules require, Mr. Welch, that counsel who is helping in the case be -- enter an appearance.

MR. WELCH:  He's been consulting, but he hasn't -- he's been consulting with me, but he hasn't actually been, you

```
 1    know, involved directly with my client.

 2              THE COURT:  All right.  Anything else?

 3              MR. WELCH:  I believe that covers it.

 4              THE COURT:  Mr. Nestler?

 5              MR. NESTLER:  Just to be clear, from the government's

 6    perspective, we will have either Agent Hightower or Agent Ryan

 7    sitting with us, and one or both of them will likely testify at

 8    the trial.  We just wanted to make sure that the Court was aware

 9    of that.

10              THE COURT:  Okay.  Just you can't flip them back and

11    forth.

12              MR. NESTLER:  Understood.  We just haven't decided

13    which one it will be yet.

14              THE COURT:  Okay.  All right.

15              MR. NESTLER:  The other question we had was if the

16    Court had time limitations for openings anticipated or if the

17    parties are just left to use their best judgment?

18              THE COURT:  Well, it depends.  Can you give me a rough

19    estimate of what your best judgment is?

20              MR. NESTLER:  I would suggest I have very good

21    judgment, Your Honor.  We would probably be in the range of 25

22    minutes, but we haven't done a stop watch yet.  So anything

23    under 30 minutes, I think, would be fine.  I didn't know if Your

24    Honor had some sort of strict limitations that we weren't aware

25    of, and I didn't want to get too far down the line.
```

1          THE COURT:  30 minutes seems reasonable to me.  So if

2     that's what you're saying you intend to stick to, if you go a

3     minute over, I'm not going to cut it off, but I would ask that

4     you be sensitive of the time.

5          MR. NESTLER:  Understood, Judge.

6          THE COURT:  Mr. Welch, does that work for you?

7          MR. WELCH:  Yes.

8          THE COURT:  Okay.  All right, then.  Any other

9     housekeeping issues?  We should talk about the next hearing

10     date, but are there any other issues that we need to --

11          MR. NESTLER:  The only other housekeeping issue for us

12     is related to exhibits, Your Honor.  The pretrial order asked

13     the government to provide binders next week, which we will of

14     course do.  How would the Court like to receive our media

15     exhibits?  Is a flash drive preferable?

16          THE COURT:  Probably.  There have been issues recently

17     with being able to access some of the government's flash drives.

18     So I don't -- let me check on that with Mr. Cramer.  I just want

19     to make sure I get it in a form that we can actually see.

20          MR. NESTLER:  Understood.  Whatever the Court would

21     prefer.  I just wanted to make sure as we were preparing

22     everything how the Court wanted to see it.

23          THE COURT:  I don't know that I'm going to watch all

24     this.  It's just helpful to see what you all have coming.

25          MR. NESTLER:  Of course.

1      THE COURT:  I don't want to create a bunch of extra

2  work.  What is the -- from the government's perspective, what's

3  the easiest way to provide that?

4      MR. NESTLER:  Putting it on a flash drive is

5  probably -- actually, either way.  The file exchange is probably

6  the easiest way to provide it.

7      THE COURT:  Is that what some call the Dropbox?

8      MR. NESTLER:  Yes.  It's called USAfx.  It's owned by

9  Dropbox.

10      THE COURT:  That's fine.  And Mr. Nestler, these

11  exhibits with videos, are they truncated to just the relevant

12  part, or are these going to be larger files that the government

13  is zeroing in on certain portions?  Please tell me you're not

14  playing hours of video.

15      MR. NESTLER:  Ultimately, at the end of the day, we

16  will have a substantial amount of video, but the video is

17  focused on Mr. Reffitt.

18    So to orient the Court, there are three different

19  surveillance cameras that capture Mr. Reffitt for a total of

20  about 40 minutes.  So we will be introducing those cameras.

21  We'll also be introducing a montage from various cameras around

22  the Capitol, both inside and outside, to demonstrate the civil

23  disorder or the riot as it progressed.  That's about a half hour

24  video file.  And then we have a couple of video files recovered

25  from the defendant's phone and devices that we will be playing

1   and another video montage of the official proceeding, which is

2   about 10 minutes long showing Congress doing its work.

3          THE COURT:  All right.

4          MR. NESTLER:  But yeah, we are not planning to

5   introduce large amounts of surveillance video that doesn't show

6   anything relevant.

7          THE COURT:  Okay.  And the 40 minutes from three

8   different cameras, does that mean 40 times 3, or does that mean

9   the three together are roughly 40 minutes of video?

10         MR. NESTLER:  Roughly 40 minutes of video.  We

11   actually took the cameras and put them all together into one

12   exhibit so that it's easy to move through.  We're trying to make

13   it as simple as we can for the Court and the jury.

14         THE COURT:  Okay.  And Mr. Welch, you've reviewed

15   these exhibits and don't have any objections to their

16   authenticity or the way in which they've combined things?

17         MR. WELCH:  With the exception of Exhibit 204 that the

18   government is supposed to be getting the final version on.

19   There was still one problem with the previous revised version.

20   I understand they're working on getting me a revised revised

21   version.

22         THE COURT:  This is the one that had the headings or

23   the subheadings?  Is that what you're talking about?

24         MR. WELCH:  Correct.  And then what happens is, at the

25   very end of it, it displays the file name, which also makes what

1    I feel is an inappropriate reference across the screen.  So that

2    needs to be edited out.

3              THE COURT:  I agree.  All right.

4         Mr. Nestler, you're working on that?

5              MR. NESTLER:  Yes.

6              THE COURT:  Are there transcripts of -- I don't know

7    whether there's telephone calls or anything that requires a

8    transcript, and if so, have those been provided, and Mr. Welch,

9    do you have any objections to them?

10             MR. NESTLER:  The answer is yes, there are

11   transcripts, and yes, they have been provided to Mr. Welch.

12             THE COURT:  And Mr. Welch, do you have any objection

13   to any of that?

14             MR. WELCH:  No, I don't, Your Honor.

15             THE COURT:  Okay.  All right.  It sounds like you all

16   are -- yes.

17             MR. NESTLER:  On the topic of exhibits, Your Honor, to

18   help move things along at the trial, would Your Honor allow us

19   to authenticate the exhibit at the same time we're already

20   displaying it to the jury so that everything can be pre-admitted

21   and not have to go through step-by-step authentication?

22             THE COURT:  What do you mean exactly?

23             MR. NESTLER:  I mean, instead of displaying a

24   photograph to a witness and asking the witness -- just the

25   witness, not the jury, asking the witness if they know what it

is, if it's fair and accurate, and then moving for its

admission, and then publishing it to the jury, our preference

would be to just display it to the witness and the jury at the

same time and then ask all of the authentication questions,

considering that Mr. Welch has no objection to our exhibits.

THE COURT:  And are they correct, Mr. Welch, you don't

object to that because you envision all of this coming in

without any authentication arguments?

MR. WELCH:  I do, depending on -- I would expect that

what they're talking about is the photographer who took pictures

during the search at Mr. Reffitt's house.  That would probably

be the bulk of it, and I don't anticipate a problem with that.

But as with other witnesses, perhaps, authenticating other

things, there's the potential that a different witness is used

or a witness doesn't do what's anticipated.  Then it's a problem

because then the jury has already seen it.  I don't have a

problem with the photographer stuff coming in that way.  With

other witnesses, I see a potential problem.

THE COURT:  Mr. Nestler, it sounds like this shouldn't

be a problem, but it's hard to pull back if it is.  So maybe you

all having a discussion would address this issue.  In the

abstract, I don't have a problem with it, but I don't want

Mr. Welch -- to draw an objection because it's the wrong witness

and then the jury's seen it and we have a problem.

MR. NESTLER:  I understand.  That was the reason why

1    the government filed our witness list the way we did, to lay out

2    each of our witnesses and the exhibit they were going to

3    authenticate and introduce, so if the defense believes that

4    those witnesses aren't able to authenticate those exhibits or

5    that those exhibits are somehow otherwise inauthenticate, that

6    we could discuss it in advance.  Otherwise, that's how we're

7    planning to do it, and we should plan to proceed most

8    expeditiously.

9            THE COURT:  Mr. Welch, it will save time.  Obviously,

10   I don't want you to waive any legitimate objection and have the

11   jury see something they shouldn't.  So can you take a look at

12   that and let me know if you have concerns about any particular

13   set of exhibits?

14           MR. WELCH:  Sure.

15           THE COURT:  That would be great.  That could help

16   things move more quickly.

17           MR. NESTLER:  And then the only other topic to discuss

18   is discovery.  To let the Court know, we did file a status

19   update last week -- I guess earlier this week based on the

20   status of global discovery as of February 9th of 2022.  In that,

21   we represented that we had or would be conducting additional

22   database searches to make sure that we've completed the lay of

23   the land for global discovery, and we have done so and now until

24   we're -- we've pushed some additional materials through our

25   Relativity database to the defense, and we will be informing him

1    of that.  But It's just one document that hadn't been produced

2    previously from global discovery.

3            THE COURT:  Has Mr. Welch seen that?

4            MR. NESTLER:  No, we just found this one document.

5    The point was, we were running checks through global discovery,

6    and there was just one document that was not in Mr. Reffitt's

7    case files or the witness's case files that we found that was

8    relevant to this case.  So we're pushing that to the defense

9    today.  But beside from that, we have -- and it's a two-page FBI

10   report of a witness statement.

11        But aside from that, we've run our different database

12   searches for geofence and facial recognition and the FBI

13   database and our own discovery databases.  So we believe we've

14   completed our discovery at this point.

15           THE COURT:  All right.

16           MR. NESTLER:  But we will continue to look and

17   monitor, and if anything additional comes up, we will of course

18   let Mr. Welch know.

19           THE COURT:  All right.  Anything else?

20           MS. BERKOWER:  Your Honor, just one more very brief

21   thing from me.  I know earlier I mentioned there was a Federal

22   Rule of Criminal Procedure that addressed selection of alternate

23   jurors, and I just wanted to make note, it is Rule 24, and it

24   does specify that alternate jurors need to be -- that alternate

25   peremptories need to be used for alternates only.

1    So to the extent the Court may be considering doing all

2    peremptories all at once, I just wanted to flag that for the

3    Court, that that rule seems to indicate that we have to do it in

4    at least two tranches.

5         THE COURT:  Okay.  Makes sense.

6    All right.  Anything else?

7         MR. NESTLER:  Not from the government, Your Honor.

8         MR. WELCH:  No, Your Honor.

9         THE COURT:  Okay.  So we have a tentative hearing date

10   of February 23 at 10:00 a.m.  We also have one on the 24th at

11   11:30.  We may not need both, but I'm inclined to keep the

12   first, and then we can see if there's a need for the second.

13   Do you all agree?

14        MR. WELCH:  Yes, Your Honor.

15        MR. NESTLER:  That's fine.  We don't believe we will

16   end up needing Thursday's hearing considering how thorough we

17   were today, but that's fine.

18        THE COURT:  All right.  And if -- keep it on your

19   calendars now, just because I do have some other matters that

20   are percolating.  If that were to cause me to get pulled in

21   another direction, I might prefer to meet one more time on the

22   Thursday.

23   Is that going to create a problem in terms of you all

24   preparing for trial, to keep them both on?  I don't expect to

25   need both.  I just hesitate right now to say only Wednesday.

1          MR. NESTLER:  That is fine for the government, Your

2     Honor.

3          MR. WELCH:  It's not a problem, Your Honor.

4          THE COURT:  Okay.  All right.  If you don't hear from

5     us first thing on Tuesday, then just assume we will move forward

6     on Wednesday and in all likelihood not have the Thursday

7     hearing.

8          MR. NESTLER:  Yes, Your Honor.

9          THE COURT:  Okay.  Thank you all.

10       (Proceedings adjourned at 2:52 p.m.)

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7            Please Note:  This hearing occurred during the

8   COVID-19 pandemic and is, therefore, subject to the

9   technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                    February 24, 2022

13   SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25