```
 1              BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-32
 4           Plaintiff,               .
                                      .
 5      vs.                           .
                                      .
 6   GUY WESLEY REFFITT,              .  February 24, 2022
                                      .  11:15 a.m.
 7           Defendant.               .
     - - - - - - - - - - - - - - - - -
 8

 9         TRANSCRIPT OF CONTINUED PRETRIAL CONFERENCE AND
                          STATUS CONFERENCE
10         BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                    UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the United States:      JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16   For the Defendant:          WILLIAM WELCH, III, ESQ.
                                 5305 Village Center Drive
17                               Suite 142
                                 Columbia, Maryland 21044
18

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

```
1                    P R O C E E D I N G S

2        (All participants present via video conference.)

3            COURTROOM DEPUTY:  Your Honor, we are in Criminal

4    Action 21-32, United States of America versus Guy Reffitt.

5            Representing Mr. Reffitt, we have Mr. William Welch, and

6    representing the United States, we have Mr. Jeffrey Nestler and

7    Ms. Risa Berkower.  And Mr. Reffitt is appearing by way of

8    video.

9            THE COURT:  All right.  Good morning again, everyone.

10       Just for the record, Mr. Welch, I take it Mr. Reffitt

11   continues to consent to appear for these pretrial hearings by

12   video conference pursuant to the Chief Judge's standing order

13   relating to the pandemic?

14           MR. WELCH:  Yes; that's right, Your Honor.

15           THE COURT:  All right.  So we have a lot of various

16   issues to cover today.  We need to talk about the remaining --

17   any remaining issues with voir dire and the jury instructions,

18   at least those issues we can resolve pretrial.

19       And then I think it probably makes sense to start with some

20   of the logistical stuff up front just to make sure we all cover

21   that, and if something comes to mind later that we missed,

22   please let me know.

23       First, in terms of public access, I know there have been a

24   number of inquiries about access to the trial.  And as

25   Mr. Nestler stated last hearing, the Chief Judge's latest order
```

1    relating to the pandemic does open the courthouse to the public,

2    and therefore, the public and the media will be able to watch

3    and hear the trial, as well as voir dire, from live feeds to all

4    three courtrooms.

5           We will start in the Ceremonial Courtroom with the general

6    voir dire.  We will move to Courtroom, I think it is, 16, for

7    the individual voir dire, and then the trial will be in

8    Courtroom Number 14.  And there will be live feeds for all those

9    courtrooms.  And in addition, there will likely be seats in

10   Courtroom 16 for the individual voir dire.

11          The Court plans to provide as much public access as is

12   possible.  As I've said before, there will be several other

13   trials going on in the courthouse at the same time, but I am

14   hopeful that the court will be able to have more than one

15   overflow courtroom.  They're working on the logistics for that,

16   as well as a media room.  So those details are being finalized

17   now.  So I expect there will be a media advisory issued tomorrow

18   with details relating to media.

19          Any questions there?

20          MR. WELCH:  No, Your Honor.

21          MR. NESTLER:  No, Your Honor.

22          THE COURT:  Mr. Welch, you were going to check on the

23   number of family members who would be attending the trial, in

24   the courthouse and viewing the trial from the overflow

25   courtroom.  Of course, that can't be family members who will be

1    witnesses at the trial, but can you tell me how many members of

2    Mr. Reffitt's family will be present in the overflow courtroom?

3    And I will make sure that we have seats reserved for them.

4         MR. WELCH:  Mr. Reffitt, correct me if I'm wrong, I

5    think it was about a half a dozen, six people.

6         THE DEFENDANT:  It's going to be more than that.

7    Closer to ten.

8         THE COURT:  I will need to check on that.  I take it,

9    Mr. Reffitt, these are people who can all sit next to each other

10   and not socially distance?

11        THE DEFENDANT:  I believe that would be correct.  I'm

12   not sure how it's going to work actually.

13        THE COURT:  We try -- with the Chief Judge's safety

14   and health protocols that the Court has put into effect in

15   consultation with experts, we try to have six feet of distance.

16   But I would think -- between individuals in the courtroom.  But

17   I would think if these are family members who are already not

18   socially distancing themselves, then perhaps they could be on

19   one row.

20      Does that make sense, Mr. Reffitt?

21        THE DEFENDANT:  They're relatives that live in the

22   same house.

23        THE COURT:  I would propose, and I have to confirm

24   this, Mr. Welch, I don't want to overpromise anything, but I

25   would propose that there be one row available for Mr. Reffitt's

family that should be able to accommodate those individuals.

Also, Mr. Nestler, you had asked about attorneys for government witnesses who might be there to protect privileges like Secret Service protocols or whatever, and I have confirmed that there will be a seat inside the well.  It will either be at the bench right in front of the gallery, or it will be a place in the jury box somewhere behind the witness, where the witness will be seated.

And I'm also trying to get a telephone for that person in the event there are sensitive legal issues that arise that need to be handled.  That would make it easier for everyone.  So I'm working on it.

MR. NESTLER:  Thank you.

THE COURT:  Let me run through -- let's see.  Before I run through the voir dire process, Mr. Welch, has Mr. Reffitt gotten what he needs from D.C. Jail in terms of haircut and everything else, or do you need my help?

MR. WELCH:  No, we need your help, Your Honor.  I've sent in a request, and he's also been making requests, and the response I got -- well, the normal procedure is you send in a fax to a particular number.  That's the way it's been for years, and it always worked.  Now it goes to a voicemail box, and you can't send a fax -- even though I'm dialing the same number. I've checked the program statement; I am dialing the correct number.  I e-mailed Deputy Warden Michelle Jones, and the

1    response was that according to their medical stay in place dated

2    February 14th, barbering and cosmetology services resume for

3    fully vaccinated people, both active residents and those with

4    upcoming jury trials.  But that doesn't actually make anything

5    happen.

6            THE COURT:  He has an upcoming jury trial.  So what's

7    the problem?

8            MR. WELCH:  I don't know.

9            THE COURT:  I'm going to have Mr. Hopkins work on this

10   during the hearing.  I don't know if he will be able to make any

11   headway.  But I certainly will do whatever needs to be done to

12   make sure that happens.

13       I know that's frustrating, Mr. Reffitt.

14           MR. WELCH:  Just so you know, my client tells me that

15   since they normally don't do those activities on weekends, it

16   would need to be done tomorrow in order for it to be done by

17   Monday.

18           THE COURT:  Like I said, I've got Mr. Hopkins working

19   on that now while we're in this hearing.

20       Anything else with regard to D.C. Jail while we're at it,

21   Mr. Welch?

22           MR. WELCH:  Not that I'm aware of.  That is the one

23   issue.

24           THE COURT:  Okay.  So let me just run through -- I

25   know we discussed this generally last week, but let me just run

1    through jury selection in a little more detail than I might have

2    done last week.

3         We talked about both sides want four alternates.  I think

4    that's prudent, given the circumstances.  So that means we will

5    have 12 jurors.  We will have four alternates.  We will also

6    have the ten potential defense peremptories and the six for the

7    government, plus two alternate strikes for the defense and for

8    the government.  So if I've done my math right, that means we

9    need a total of 36 jurors, and maybe we qualify one or two

10   extra, depending on the hour of the day.

11        And in terms of how this will work, when you come into the

12   Ceremonial Courtroom on Monday morning, I will want to meet with

13   you all very briefly to get your random numbers, whatever

14   numbers you want to pick for the alternates between 1 and 16.

15   So we don't want the alternates to be 13, 14, 15, 16.  So you

16   all will give me two numbers, you know, confidentially, and

17   also, you can tell me then whatever your signal is that you've

18   agreed on for strikes for cause that you think are -- both think

19   are appropriate in the individual voir dire.

20        After that, you will get your list of potential jurors from

21   the jury office, and the jury will be brought in.  They will be

22   brought in in numerical order and the way in which they appear

23   on the sheet.

24        So have you all had a chance to talk to Mr. Hopkins and

25   Mr. Cramer both about technology and about the layout of the

1    courtrooms?  Is that something you've done, both of you?

2              MR. WELCH:  I've done that, Your Honor.

3              THE COURT:  So you understand how the jurors will be

4    seated and in what order in the Ceremonial Courtroom?

5              MR. WELCH:  We didn't go into that part.  I met with

6    Mr. Cramer yesterday afternoon, and he kind of laid out the

7    technology in 14 for me.

8              THE COURT:  All right.  If that would be helpful for

9    you all to see in advance how the jury will be seated, we can

10   get you a plan that shows you that.

11      In terms of technology, have you both told Mr. Cramer with

12   your opening statements whether you want to stand at the podium

13   or use a lapel mic?

14             MR. WELCH:  Yes.

15             THE COURT:  And what have you chosen to do?

16             MR. WELCH:  I will stand at the podium.  Mr. Cramer

17   was explaining that apparently with the lapel mic it can fade in

18   and out sometimes, and you're really better off, he encourages

19   you using the actual wired mic.  You're tethered, but at least

20   it's reliable and people can hear you.

21             THE COURT:  What about you, Mr. Nestler or

22   Ms. Berkower?

23             MR. NESTLER:  We are meeting with Mr. Cramer this

24   afternoon.

25             THE COURT:  All right.  So anyway, there will be a set

seat for each juror.  Once they're all seated in the proper
order, then I will read my introductory remarks.  After that,
I'll read the general voir dire questions, which we're going to
talk about in a moment.  After that process is complete, you
know, each juror at their seat will have a note card and a
pencil, and I will ask the general questions.  And if they have
a yes answer to any of my questions, they will write that number
on the note card.

So then once that process is complete, we will leave the
Ceremonial Courtroom, and we will go to Courtroom 16, and then
the jurors will be brought in one by one again in the order that
they were seated, the order that they appear on the list.  And I
will be given the note card, and I will let you know what
questions they've answered yes to, and I will follow up with
them.

Again, we will talk about this when we get to the specific
voir dire questions, but I do intend to follow-up with some of
the questions you all suggested for general voir dire
individually, because I feel like there's some questions that
are much broader, and I'm concerned about having too many
overlapping questions.  I want to be able to follow up based on
their yes answers.  So we can talk about that more in a minute.

So I will ask them follow-up questions, and then you will
each have an opportunity to ask questions as well.  And as I
said last week, after you've asked your questions and the juror,

1    potential juror leaves the courtroom, that is the time when you

2    will need to make any strikes for cause, and if you don't, your

3    strikes for cause are waived.  So we will have that argument

4    about each juror as soon as the juror leaves the courtroom.

5        Do you all understand?

6            MR. WELCH:  Yes.

7            MR. NESTLER:  Yes, Your Honor.  Can I ask a clarifying

8    question?  Last week, you indicated there will be approximately

9    50 jurors in the Ceremonial Courtroom.

10           THE COURT:  I don't -- I've been having discussions

11   with the court staff about whether it makes sense to have a

12   couple of public seats in that Ceremonial Courtroom.  I don't

13   know if that makes sense.  They're hashing it out.  But if not,

14   we'll have 50.  If so, we might be one or two short of that.

15       All right?  So --

16           MR. NESTLER:  Understood.  And if I might ask, in

17   Courtroom 16 during individual voir dire, do you expect the

18   prospective juror to sit in the witness stand?

19           THE COURT:  I think the way it works is they'll be in

20   the jury box, I think.  John Cramer would be the best person to

21   confirm that, but I could be wrong.

22       Did you cover that, Mr. Welch, with him?

23           MR. WELCH:  He pointed out that the witness would be

24   in the jury box.  I would think that the various venire people

25   would be like witnesses.  We did not specifically discuss

jurors.

THE COURT:  I think they will be in the jury box, but I will check on that, and we can have Mr. Hopkins let you know. Again, I think the desire is to socially distance.  But I do expect there to be room for some members of the public in that individual voir dire room, Courtroom 16.

But each juror will be brought in individually.  The others will be waiting in the Ceremonial Courtroom or will be just outside in the hallway, probably in the Ceremonial Courtroom waiting their turn.

So we will handle the strikes for cause immediately after the potential juror leaves, and once we've qualified 36 or maybe one more, again depending on the time, we will likely -- I hope this is on, you know, if not Monday, on Tuesday -- I think we go back to the Ceremonial Courtroom, and if it goes into a later date and we don't have the Ceremonial Courtroom, as I've discussed already and you all agreed, we will have to use two regular-sized courtrooms for the peremptory strikes.

But I am hopeful that we will be in the Ceremonial Courtroom, and the jurors will, I think at this point, again be seated in their original positions.  The ones that have been stricken for cause, of course, are gone.  And you will exercise your peremptory challenges at the same time.  You will share your lists with each other and then with the courtroom deputy. And after that, you'll go through the same with the alternates.

1      And once we have a jury selected with the alternates, I

2 will address any other challenges to the jury.  And after those

3 are resolved, we will excuse the remainder of the jurors.

4      So again, we're going to be working in the order that

5 they're called in.  So to the extent there are extra jurors that

6 weren't stricken either for cause or with a peremptory, they're

7 going to be at the end of the list, and they'll just be excused.

8      Does that make sense to you all?

9           MR. WELCH:  Yes.

10           THE COURT:  Okay.  All right.  Any questions about

11 that process?

12           MS. BERKOWER:  Just a few questions, Your Honor.  Good

13 morning.

14      Has the Court decided on whether counsel and the

15 prospective jurors will be wearing masks during the

16 individualized voir dire?

17           THE COURT:  So I wanted to get to that, and I'm going

18 to in just one second.  I just got a text from Mr. Hopkins.  So

19 let me share some of this.

20      So I will do an order regarding Mr. Reffitt's haircut.  So

21 I hope that will do the trick.

22           MR. WELCH:  Thank you.

23           THE COURT:  And I'm informed that the juror will

24 actually be in the jury box, not on the witness stand.  All

25 right?

1     In terms of masks, that's another issue I did want to talk

2  to you all about.  My view is this:  I will be wearing a mask at

3  all times except when I'm speaking for a long period of time,

4  like in the voir dire process.  I will otherwise wear a mask.

5     In terms of witnesses, I'm inclined to not have the

6  witnesses wear masks.

7     Does either side disagree with that?

8          MR. WELCH:  No.

9          MS. BERKOWER:  That's fine with the government, Your

10  Honor.

11          THE COURT:  Mr. Nestler, yeah?  It looked like you

12  were saying something.

13          MR. NESTLER:  No.  Ms. Berkower beat me to it.

14          THE COURT:  Okay.  I thought you were talking, too.

15  In terms of the jurors, on that one, I'm interested in your

16  view, but I'm inclined to say that jurors who want to be

17  unmasked can be unmasked, and those who want to wear a mask

18  would be provided a clear transparent mask.

19     Any objection to that?

20          MS. BERKOWER:  No objection from the government.

21          MR. WELCH:  No objection.

22          THE COURT:  And in terms of attorneys, I think I will

23  leave that up to you all to make those decisions.  Look, if

24  you're not talking, though, I expect you to be masked at the

25  table.

1          Does everyone agree?

2               MR. WELCH:  Yes.

3               THE COURT:  Anyone sitting at the table, I think,

4    should be masked for safety reasons.

5               MS. BERKOWER:  To clarify that, then, Your Honor, what

6    I heard you say, and I want to make sure it is correct, that

7    when we are speaking, either addressing the Court or a witness

8    or during voir dire for prospective jurors, it is at our

9    discretion whether we wear a mask or not, but otherwise, when

10   we're not doing that, we will be wearing our mask?

11              THE COURT:  That's correct.  And I think you all have

12   informed me you're all vaccinated; right?

13              MS. BERKOWER:  Yes, Your Honor.

14              THE COURT:  For the other two, Mr. Welch, Mr. Nestler?

15              MR. WELCH:  True.

16              MR. NESTLER:  Yes, Your Honor.

17              THE COURT:  So yes, you have that correct.

18              MS. BERKOWER:  Thank you.  And I had just one or two

19   other questions about voir dire, Your Honor.

20              THE COURT:  Of course.

21              MS. BERKOWER:  After you -- when you first give your

22   introductory remarks before you ask the voir dire questions you

23   provided to counsel, will those introductory remarks include the

24   statement of the case that the parties have submitted?

25              THE COURT:  It will; it will.  I intend to, you know,

1    say a little bit more.  I intend to welcome them and tell them

2    what an important service they're performing.  I'll use what

3    you've submitted to describe the case.  I will start out by

4    saying this case relates to the events of January 6.  I'll use

5    your language in the way you've described the case and explain

6    the charges against Mr. Reffitt.  I will also make the point

7    that this is an important case to both sides, and I'll tell

8    them -- I'll summarize the process they're about to go through.

9         And I will really emphasize a good bit in detail that they

10   can't talk about the case, they can't do any research, they

11   can't use their phones during the voir dire process, they can't

12   get into conversations with people in the courtroom or outside

13   the courtroom about anything specific relating to this case.

14   They can tell them that they're potentially going to serve as a

15   juror in a criminal case, but not get into anything more than

16   that.

17        Do you all have any issues with that overview?

18            MS. BERKOWER:  That's fine with the government, Your

19   Honor.

20            MR. WELCH:  No issue.

21            THE COURT:  No issue, okay.

22            MS. BERKOWER:  The next question that I have, I wanted

23   to make sure I understood, you said that we will pick numbers of

24   who we want to make alternates.  Do you mean like just pick a

25   random number?

```
 1              THE COURT:  1 to 16.  You can pick 1 and 2, 15 and 16.

 2    You can pick 8 and 3, whatever.  Ideally, these alternates are

 3    interspersed in the -- it's not a box, but a big gallery box.

 4    We don't want anyone to know they're an alternate until the end.

 5              MS. BERKOWER:  Understood.  I assume we will be

 6    submitting those random numbers prior to even receiving the list

 7    of jurors?

 8              THE COURT:  Yes.

 9              MS. BERKOWER:  Great.  The next question was, it

10    sounds like Your Honor, I think based on our last hearing, you

11    were calling in 100 prospective jurors.

12              THE COURT:  80 jurors, 80 jurors, and I do think,

13    because there are other trials going on, I think that if we

14    needed more, I would hope that there would be some additional

15    available.

16              MS. BERKOWER:  Is there a time -- it sounds like we

17    will be addressing the first 50 in the Ceremonial Courtroom at

18    the outset.  Is there a time that you're going to direct the

19    other remaining 30 to return?

20              THE COURT:  Yeah, I'm interested in your thoughts on

21    that.  I think -- I guess my inclination might be to have them

22    come back the next morning or have just a few touch base in the

23    afternoon.

24        But what are counsel's thoughts on this?

25              MR. WELCH:  Your Honor, I think you're going to have
```

1    to make a judgment call on that one.  It is possible that what

2    you just said makes sense if things are going slowly.  On the

3    other hand, if things happen to be going quicker, we could find

4    ourselves --

5            THE COURT:  I definitely don't want to be in that

6    position.  So here's what I will do.  I will confer with the

7    jury office, and we will make our best determination.  I'm just

8    always reluctant to have jurors sitting around the court all day

9    when there's a low likelihood we're going to get to them.  But I

10   hear you, and I share your desire to move this.  So we may well

11   tell the other 30 to come back after lunch.  We're certainly not

12   getting to them before lunch.

13           MS. BERKOWER:  I agree with that, Your Honor.

14           THE COURT:  Okay.  These are great questions,

15   Ms. Berkower.

16           MS. BERKOWER:  Okay.  And then the next clarification

17   point I wanted to ask about relates to, you mentioned there

18   would be a plan for the seating of jurors.  Is that something

19   the clerk's office will provide to us, effectively a seating

20   chart or --

21           THE COURT:  Yes.  I will see if we can't provide that

22   to you today or tomorrow.

23           MS. BERKOWER:  Thank you.  Just one other point, I

24   think for the 30 that won't be involved in the initial general

25   voir dire, will Your Honor be addressing your opening remarks to

1    them?

2         THE COURT:  Oh, good point.  No, no, I think I have to

3    go through them again because I don't think they can fit in the

4    courtroom.  So we're going to do, you know, two full rounds

5    unless there are not enough strikes for cause to get up to that

6    second batch.

7         MS. BERKOWER:  Okay.  And then the last question that

8    I think I had was about the alternate strike.  I know Your Honor

9    mentioned that there would be a separate round for alternate

10   strikes after the initial -- excuse me, peremptory strikes for

11   alternate jurors.  Do you anticipate doing that in two tranches,

12   because I think we were going to pick four alternates, and each

13   side would have two strikes, or did Your Honor want us to --

14        THE COURT:  Why wouldn't we do them all at once?  Is

15   there a reason not to?  It seems to me you've got the eight

16   sitting there, and you exercise your -- each exercise your two

17   alternate strikes.

18        MS. BERKOWER:  Understood, Your Honor.  I just wanted

19   to understand.

20        THE COURT:  Just in a normal case, you have four

21   sitting there.  But you need to have one strike.

22        Any objection to doing it all at once, Mr. Welch?

23        MR. WELCH:  No objection, Your Honor.

24        THE COURT:  Ms. Berkower?

25        MS. BERKOWER:  No, Your Honor.  That's fine.

1        THE COURT:  Okay.  Anything else?

2        MS. BERKOWER:  Yes.  Just with regards to timing, I

3   did want to flag for the Court that, as the Court is aware in

4   our filing about the identity of our witnesses, we are having

5   several members of the Capitol Police Department testify at the

6   trial and Secret Service agents as well.  I wanted to flag for

7   the Court that the State of the Union address is actually

8   Tuesday evening.  And I know that that event is a very

9   significant event, involving both of those agencies.

10       So at present, given where we are with jury selection, it

11  would be our preference to start with witnesses Wednesday

12  morning if we finish jury selection on Tuesday afternoon.  Of

13  course, we don't want to keep the jury waiting or anything like

14  that, but --

15       THE COURT:  Can you not even have your lead Capitol

16  Police witness available for -- to testify in the event things

17  move quickly?

18       MS. BERKOWER:  Yes, we can, if necessary.  We just

19  wanted to flag that that event was happening, and we will plan

20  to have that person available if it looks like we will -- we're

21  making steady progress and will be in a position to start

22  witnesses in the afternoon Tuesday.

23       THE COURT:  Is your first witness -- do you know who

24  that will be?

25       MS. BERKOWER:  Yes, Your Honor.  It's a Capitol Police

1    Department officer.  It will be Shauni Kerkhoff.  Former.

2    Excuse me.

3             THE COURT:  It's a she; correct?  Is his or her

4    testimony expected to be lengthy?

5             MS. BERKOWER:  I think she will be a lengthy witness,

6    Your Honor.

7             THE COURT:  So yes, I think -- we'll have a better

8    sense, Ms. Berkower, seeing how Monday goes.  But if things go

9    chop chop, it would be good to have more than her available.

10   But it's just so hard to predict right now.

11            MS. BERKOWER:  Understood, Your Honor.  We may, then,

12   in that case, change some of the order just to account for those

13   agencies' needs on that evening.

14            THE COURT:  Okay.  I understand.  And I'm not saying I

15   won't be sensitive to that.  Let's just discuss it.  It's just

16   in the abstract very difficult to be definitive right now.

17            MS. BERKOWER:  Thank you.

18            THE COURT:  All right.  Anything else about jury

19   selection?

20        All right.  In terms of opening statements, assuming the

21   jury is selected and it's not at the end of the day, I will

22   immediately do introductory instructions after the jury is sworn

23   and move right into openings.

24        Is either side planning on using any demonstrative

25   exhibits?  And if so, can you all clear those with one another

1    ahead of time, and let me know if there's an issue?

2           MR. NESTLER:  The government is planning to use a

3    couple of small demonstrative exhibits, and we will make sure we

4    clear them with Mr. Welch.

5           THE COURT:  Okay.  Mr. Welch, if you have any

6    objections to them, will you let me know as soon as possible?

7           MR. WELCH:  I will, and I would expect to have an

8    objection to anything that's not in evidence being presented to

9    the jury before it's properly entered in evidence.

10          THE COURT:  Do you expect that, Mr. Nestler, or is

11   this -- what is it?  Diagrams and the like or things that are

12   not controversial?

13          MR. NESTLER:  They're not controversial, but we're

14   planning for a couple of still frames from videos.  So they're

15   not evidence yet, but we plan for them to be in evidence through

16   our first witness.

17          MR. WELCH:  I don't agree to that, Your Honor.  I'm

18   not going to agree to that.  It has to be in evidence.

19          THE COURT:  On that front, Mr. Welch, have you looked

20   at the government's exhibit list, and have you -- do you have

21   objections to them, you know, publishing at the same time they

22   authenticate it?

23          MR. WELCH:  Some of them, I would.  As long as

24   something is actually authenticated.  My concern is, there are a

25   lot of exhibits that are not going to be controversial, such as

1   the photographs taken during the search.  I understand that

2   would expedite things.  There's a lot of exhibits.  My concern

3   is that there are going to be exhibits, perhaps -- videos, these

4   still frames that Mr. Nestler is talking about, and it's going

5   to be a matter of whether they have the right witness on the

6   stand to authenticate these things or --

7           THE COURT:  But you know which witness is introducing

8   each exhibit.  Do you think there's going to be a problem based

9   on what you have?

10          MR. WELCH:  Not necessarily, but I don't want to agree

11  to this and then if, for whatever reason, things go out of

12  order, the witness doesn't, you know, appear when they're

13  supposed to appear, I don't want to have agreed to put something

14  in.

15          THE COURT:  All right.  And I'm not trying to force

16  you to do that.  I just -- my impression from what you've said

17  to date is there are no authentication issues, and it seemed

18  like with the information the government's given you might be

19  able to determine whether you would object to those exhibits if

20  the proper witness reflected on the exhibit list is testifying.

21     Mr. Nestler, I think you're just going to have to

22  communicate with Mr. Welch witness by witness, and we'll have to

23  make those calls if he has an objection.  I'm with him.  I don't

24  want the jury seeing exhibits that can't be properly

25  authenticated, but I very much appreciate the government's

1    efforts to move this along.  And to the extent you're able to

2    agree, Mr. Welch, it would make the trial move more smoothly.

3         But I hear you.  You all just keep discussing and let me

4    know witness by witness if you see a problem.

5              MR. WELCH:  Will do.

6              MR. NESTLER:  Understood, Your Honor.

7              THE COURT:  All right.  Anything else?

8              MR. NESTLER:  We will share the short demonstratives

9    with Mr. Welch as soon as they're prepared.  We're having our

10   team create them, but we do believe they're going to take screen

11   shots of surveillance video that we plan to display to the jury

12   in opening.  Of course, it's not going to be evidence at opening

13   because it hasn't been admitted yet.

14             THE COURT:  All right.  Mr. Welch, you can take a

15   look, and let me know your objections.  Okay?  Maybe you will

16   object to some but not all.  I don't know.  Take a look.

17        Can you do that today or tomorrow, Mr. Nestler, so that

18   we're not delaying the start on Monday?

19             MR. NESTLER:  Yes, Judge.

20             THE COURT:  Okay.  Thank you.  All right.  Any other

21   logistical matters that I've missed?

22        Oh, Mr. Nestler, I need a second binder of exhibits no

23   later than Monday.

24             MR. NESTLER:  Yes, Judge.  Was the Court able to get

25   the electronic versions we submitted?

1          THE COURT:  I have not seen them.  I can't answer

2    that.  We will let you know promptly if not.

3          MR. NESTLER:  Thank you.  We will prepare them, an

4    additional binder.

5          THE COURT:  Okay.  And thank you, Mr. Welch, for

6    yours.

7       Any objections -- I haven't had a chance to look either,

8    but any surprises in those exhibits that either side thinks

9    warrant a pretrial motion?

10          MR. NESTLER:  The exhibits we obtained from the

11    defense, we believe those are impeachment exhibits.

12          MR. WELCH:  That's correct.

13          MR. NESTLER:  We will make any objections as necessary

14    if they're offered for their own impeachment value.  I don't

15    believe Mr. Welch is intending to introduce any of them

16    affirmatively.

17          THE COURT:  Mr. Welch, you've had the exhibits for a

18    while.  Any concerns you missed earlier?

19          MR. WELCH:  No, Your Honor.  We will see if they have

20    the right witness to actually get things in when the time comes.

21          THE COURT:  Okay.  All right.  So let's -- if we've

22    covered the logistics --

23          MR. NESTLER:  One other logistical piece, Judge, and

24    that has to do with the exhibits and public access.

25          THE COURT:  Oh, yes.  Thank you.  I want you making

1    those available the day they're shown to the jury.  Are you

2    planning on doing that?

3           MR. NESTLER:  Yes.  We were planning to ask the

4    Court's permission, consistent with Chief Judge Howell's

5    Standing Order 21-28, to do so and informing the Court of the

6    government's position in advance of offering them, which is what

7    Chief Judge Howell asked us to do.  Our position is that if

8    they're admitted, they should be released to the public.

9           THE COURT:  Okay.  And I agree.

10      You agree, Mr. Welch?

11          MR. WELCH:  That's not a problem, if something's

12   properly admitted into evidence.

13          THE COURT:  I'm sorry?

14          MR. WELCH:  I said that won't be a problem if

15   something is properly admitted into evidence.

16          THE COURT:  Okay.  You keep saying, Mr. Welch, if

17   things are properly admitted.  Do you think there's a set of

18   exhibits that they can't lay the proper foundation?

19          MR. WELCH:  No, I'm not thinking that, Your Honor.

20   Basically, you know, that's a game plan.  It's almost like a

21   travel itinerary.  It's aspirational.  Sometimes you get places

22   when you've scheduled, but a lot of times, things don't go as

23   planned.  I don't want to have agreed to something ahead of

24   time, and they can't produce the proper witness or the witness

25   is not saying what they thought the witness was going to say,

1    and I've already agreed to let them show it to the jury.   I

2    don't want to do that.

3                THE COURT:   Okay.   I get it; I get it.   If there's

4    some custodian somewhere who you think they need, I guess we'll

5    just have to address that in the middle of trial.

6          Mr. Nestler, anything you want to add on that?

7                MR. NESTLER:   No.   So the Court is aware, we're

8    planning to use the same DropBox method that our colleagues used

9    for pretrial hearing exhibits, which is at the end of the day,

10   we will have some of our support staff download the admitted

11   exhibits.

12               THE COURT:   Would you be able to help Mr. Welch in the

13   event he admits exhibits?   He probably doesn't have the access

14   to that.   Is that something that you all could coordinate to

15   make sure it happens with defense exhibits as well?

16               MR. NESTLER:   Yes, Your Honor.

17               THE COURT:   Mr. Welch?

18               MR. WELCH:   That would be fine.

19               THE COURT:   Thank you for raising that.   I intended to

20   say that right at the outset, Mr. Nestler.   I'm glad to hear

21   that's what the government was planning anyway.

22         Okay.   Have we covered everything?   Let me know if

23   something comes to mind, but let's jump into the voir dire.

24         As you all saw from the updated draft of voir dire

25   questions that the courtroom deputy or law clerk sent to you,

I've incorporated some but not all of the parties' proposed

questions into the general voir dire.  That's not because I

don't think those are good questions.  As I've said before, I

think some are potentially overlapping and not as broad as the

ones that are in the questionnaire, and I really want to make

sure we draw out the yes and then follow up.

So I did adopt the defense's question regarding whether

anyone has such strong feelings, and wherever we say "feelings,"

I put "feelings or opinions," about events at the Capitol on

January 6 that would make it difficult to be a fair, and where

we say "fair," I say "fair and impartial juror" in this case.

I will follow up with the government's version.  I

understand the government's point that that's an appropriate

inquiry, to ask whether they can decide this case solely based

on the evidence and the instructions as I give them.  Again, I

just think it's more appropriate as follow-up.

So to be clear, the proposed questions I will ask during

individual follow-up include whether the juror has followed the

news about specific individuals involved in the events, and I do

think that that's more than covered by question 3 that talks

about, Have you followed the news about events at the Capitol.

Clearly, that encompasses covering specific individuals as

well.  I also intend to ask in individual follow-up whether the

juror has seen anything in the news about the allegations in

this case involving Mr. Reffitt.  Again, you know, I ask them,

1    Have you seen or heard anything in the news or elsewhere about

2    Guy Wesley Reffitt.  That's broader.  This is a more particular

3    question I will ask.

4         And then the other question that's not in the general is

5    whether the juror has formed an opinion about the guilt of other

6    individuals, not Mr. Reffitt.  I'm asking that one in the

7    general, but other individuals.

8         And again, I will follow up with that when we're talking

9    about to the extent they've followed individual defendants other

10   than Mr. Reffitt.  That would, in my view, be an appropriate

11   follow-up question.

12        So I do intend to ask all of those.  As I said, I also

13   intend to allow you all to ask follow-up.  So to the extent I

14   forget, and I don't think I will, but if I do or if I don't ask

15   the question in just the right way, you are certainly welcome to

16   do so.

17        You okay with that, or do you want to fight for one of

18   those to be in the general?

19             MS. BERKOWER:  I think the plan Your Honor has

20   proposed sounds fine.  One additional request we would make in

21   the individual follow-up by the Court would be if they have

22   formed an opinion, whether they are able to set aside that

23   opinion.

24             THE COURT:  Definitely; definitely.  That will always

25   be asked.

1          MS. BERKOWER:  All right.  I think if those questions

2    are included, then the government's comfortable with what Your

3    Honor has proposed.

4          THE COURT:  You too, Mr. Welch?

5          MR. WELCH:  I think that would be fine.  That's an

6    appropriate follow-up question.

7          You had asked a moment ago about whether any of these

8    individual voir dire questions might be appropriately a general

9    one.  And I think that one that might would be the one about

10   whether they've formed an opinion about the guilt of anyone who

11   was involved in January 6.  If you miss that in the general, if

12   it's only a follow-up, there might be people in the venire who

13   do feel that way, who would answer that question, who haven't

14   necessarily followed Mr. Reffitt but who have already formed an

15   opinion on Mr. Reffitt.

16         THE COURT:  Aren't those people -- don't they have to

17   answer yes to, Have you followed the news about the events that

18   took place at the U.S. Capitol?  And that's when I would get

19   into -- that's a yes question that would open the door to all of

20   these.

21         MR. WELCH:  Yeah, but it --

22         THE COURT:  Here's my concern, Mr. Welch.  I'm not

23   arguing that this isn't an appropriate question to ask at all.

24   I just get concerned about the pool getting confused.  I mean,

25   Mr. Reffitt's on trial here, not somebody else.  He's not

1    charged with a conspiracy.  And I really don't want to start

2    getting the jurors focused on all of these other cases.

3            MR. WELCH:  No, no, we certainly wouldn't want to do

4    that.

5        What I am concerned about, though, is someone might say,

6    Well, I've never heard of Mr. Reffitt but I do feel strongly,

7    I've already formed an opinion about the guilt of people who

8    were involved in the events on January 6, even though they

9    haven't heard about Mr. Reffitt.

10           THE COURT:  What about this.  What about if I change

11   question 4 to:  "Have you heard or seen anything in the news or

12   elsewhere about Guy Wesley Reffitt or anyone else associated

13   with the January 6 events?"

14           MR. WELCH:  That would be helpful.

15           THE COURT:  That will provoke a yes answer for anyone

16   who thinks they need to convict someone other than Mr. Reffitt.

17   That will draw out a yes, and I will follow up with whether they

18   have formed opinions about these.

19       I think it's potentially confusing to start getting into

20   questions at the outset about forming opinions as to guilt or

21   innocence of other individuals who aren't on trial or charged in

22   any way as co-conspirators of Mr. Reffitt.

23       I hear you.  I am going to spend a good bit of time with

24   this.  I'm not going to just ask these three follow-up

25   questions.  I'm going to be reactive to what they say.  If you

1    all think I haven't done a thorough enough job, you may do so.

2        All right?

3            MS. BERKOWER:  May I ask one clarification on Your

4    Honor's proposed change to question 4?

5            THE COURT:  Yes.

6            MS. BERKOWER:  So would the question then ask if they

7    have heard or seen anything in the news or elsewhere about

8    Mr. Reffitt, the defendant in the case, or other individuals?

9    I'm questioning the phrasing, because question 3 does address

10   did you follow the news and events.

11           THE COURT:  I think Mr. Welch wants to focus on

12   people.  So I would propose adding "or any other" -- let me ask

13   this, Mr. Welch:  Your defense is not like mistaken identity, is

14   it?  You're going to say Mr. Reffitt was present there, right,

15   during follow-up?  If I ask the jurors "if you hear evidence

16   that he was present at the Capitol that day, is that enough for

17   you to convict him?" you don't have a problem with me asking

18   questions referring to his presence there, do you?

19           MR. WELCH:  No.

20           THE COURT:  All right.  Then I might say something

21   like -- but I'm open to suggestions -- "or any other individual

22   who was present at the Capitol on January 6 of 2021."

23       Does that work, something like that?

24           MR. WELCH:  Yes.

25           MS. BERKOWER:  Understood, Your Honor.  I just wanted

1    to have clarity on how the question would be phrased.  Thank

2    you.

3                THE COURT:  All right.  So also in response to

4    Mr. Welch's concern, I did modify the question about firearms to

5    include a specific reference to both handguns and rifles.

6        I'm also going to ask each juror about previous jury

7    experience generally, not just experience in a criminal case.  I

8    think he's right, whether it's civil, criminal, grand jury, I

9    want to get a yes answer to that question.

10       Let's see.  Does that cover everything for voir dire?  I do

11   want to talk about jury instructions.  But any other concerns?

12   As I said, I tweaked the language throughout.

13               MS. BERKOWER:  Not from the government, Your Honor.

14   Thank you.

15               THE COURT:  Do you have any objections to the minor

16   changes I made, Mr. Welch, like, for example, adding "strong

17   feelings or opinions" or "fair and impartial" and things like

18   that throughout?

19               MR. WELCH:  No objection to that.

20               THE COURT:  Okay.  So if we're all set on the general

21   proposed voir dire and the anticipated individualized voir dire,

22   I will move on to jury instructions.

23       All right.  Before we get into specific edits to the jury

24   instructions, I wanted to ask you all just stylistically, when I

25   look at these instructions, particularly those relating to

1    Counts 2 and 4 that have both the substantive count, the

2    definition, and then the "attempt" language, I myself found it a

3    little confusing, because certain counts have three and four

4    separate pages.

5        And I was wondering how you all might feel about the Court

6    taking the definitions section, the relevant definitions, and

7    reading them into the elements, or do you prefer keeping the

8    elements of each substantive offense pure, just elements

9    without, for example, a definition of "official proceeding"

10   under the element that refers to official proceeding?

11       I'm interested in your views on that.  Mr. Welch?

12           MR. WELCH:  I would like them to be separate.  I think

13   the elements and the definitions need to be distinct.

14           THE COURT:  All right.  Then that settles that.

15       In that case, I do think -- and I will give you a copy

16   early in the trial, maybe even the first day, I will give you a

17   copy of the current set of jury instructions as we've discussed,

18   you know, today, so that you can look at them as you have time

19   during trial.  Again, we will have time at the charging

20   conference to address other issues.  I just want you to have the

21   time you need to look at them.

22       But I do think it's important in that case, if we're going

23   to keep them as-is, that I give the jurors some lead-in about

24   the fact that the defendant is charged with a substantive

25   offense and, in addition, an attempt at aiding and abetting.

1    And there's a section of definitions I'm going to read just

2    to ground them in why they're getting multiple pages for, say,

3    Count 4.  It seems like they need a little bit of guidance

4    getting through this set of instructions.

5         MR. WELCH:  Perhaps, Your Honor, it might make sense

6    to move the definitions after the attempt and the aiding and

7    abetting portion.  So you could say, okay, here's the elements

8    of the crime.  It can also be committed by attempt.  It can also

9    be committed by aiding and abetting.  And then here are the

10   definitions that you need.

11        THE COURT:  Yeah, I like that.

12   What do you think, Mr. Nestler or Ms. Berkower?

13        MR. NESTLER:  That's both a good suggestion and Your

14   Honor's suggestion of having an introductory sentence with --

15   for Count 2, "You may find the defendant guilty of the elements

16   below or under a theory of aiding and abetting which I will

17   describe to you shortly or under a theory of attempt" --

18        THE COURT:  I just think it's confusing.  It's hard to

19   keep it all straight.  So I will propose something, and you all

20   can give feedback.  But I also like your suggestion, Mr. Welch,

21   to move the definitions to the end.  I think that's cleaner and

22   gives better structure.  So I will take a look at that.

23        So moving on to Count 1, the civil disorder count, I do

24   agree with the government, and I appreciate the additional

25   authority.  I do agree that it's appropriate to include the

words "or travel" in the definition of "commerce."  As the
government knows, commerce has been defined in other statutes to
mean travel, trade, traffic, commerce, transportation, or
communication among the several states and between the District
of Columbia and any state.

So I do think -- 922(g) also, the "in or affecting commerce
element" is satisfied if the firearm traveled in interstate or
foreign commerce.  And they cited, I think, the *Scarborough* case
as well.

I'm just concerned, as I said before, that without the
inclusion of the word, the jury won't understand what it means
for a defendant to transport in commerce any firearm.

Mr. Welch, initially, you had no objection to including
travel.  Do you disagree with the legal authority that the
government has given?

MR. WELCH:  I don't disagree with the legal authority.
The issue being, it was initially proposed that we would delete
it by agreement.  And my concern is --

THE COURT:  No, you originally proposed that I include
it with agreement, and I raised the issue that I didn't think
you all had provided any authority.  And then Mr. Nestler said
we can strike it.  And I said I think it's an important thing,
but you need to give me more authority.

Now they've done so.  And I'm just wondering whether you
disagree with the legal authority.

1          MR. WELCH:  I think one of the issues as far as this

2    legal authority goes is that it needs to be clear that commerce

3    or travel in commerce would be at any point.

4       My understanding from the 922(g) context is that it's

5    manufactured in one state, it moves in commerce to the ultimate

6    purchaser.  It's not something that the purchaser does with

7    it --

8          THE COURT:  922(g) isn't -- I don't think all those

9    are that way, are they, with the purchaser?

10          MR. WELCH:  My understanding is it refers to basically

11   the manufacturing and sales process.  It is not referring to

12   somebody taking something that they own, that they do not sell

13   or give to anyone else, and just happened to travel with it.

14   They're not buying or selling anything.

15          THE COURT:  You think in this context, this civil

16   disorder offense, it contemplates a defendant selling the

17   firearm rather than having it in possession for the civil

18   disorder?  I don't see how that can be the case.  And 922(g)

19   contains a possession of a gun, too.

20          MR. WELCH:  It's possession, but the gun is not moving

21   in commerce at that point.  It's moving in commerce when it's

22   made by one person and transferred to another across a state

23   line.

24       That is what I understand commerce --

25          THE COURT:  Here's what I'm going to do.  I am very

1 strongly leaning towards including "travel."  If you all want to

2 provide some additional briefing, Mr. Welch, to set out your

3 arguments, you can do that.  But I'm not convinced based on what

4 you've said so far.  But if you want to give me some contrary

5 authority or a different way to read these cases, I will

6 consider it before -- and take it up at the charging conference.

7 As it stands now, I think the government's provided adequate

8 authority for the "travel" to be in it, but I'm certainly

9 interested in your argument.  So I will consider that at the

10 charging conference.

11      So one issue that neither side has raised but I'm concerned

12 with is in the definition of "firearm" that comes directly from

13 the statute, Title 18 United States Code Section 232.  I'm

14 concerned that a juror might not understand what a frame or

15 receiver of a firearm is.  Should we add a little bit more to

16 the definition from the case law on what those terms mean?

17      I assume a holster would not count as a receiver or frame,

18 but what do the parties think about further elaborating on what

19 that means?

20      And is this like the dangerous weapon issue, that the

21 government doesn't really need the frame or receiver and we

22 should just cut it out to avoid any confusion if the jury

23 convicts based on an empty holster?  Mr. Nestler?

24           MR. NESTLER:  We favor including the statutory

25 definition.

1    THE COURT:  What's your view on what those terms mean?

2  I don't know what a frame or receiver of a firearm is.

3    MR. NESTLER:  They're a part of the firearm.  So the

4  frame and the receiver are a part of what the firearm is.

5    So I believe the point of this is that even if the firearm

6  itself was somehow not functional, the frame or receiver of the

7  firearm still makes it a firearm.

8    THE COURT:  Could we add a statement to that effect?

9  I don't know.  It wasn't intuitive to me, the receiver at least.

10    MR. NESTLER:  I understand Your Honor's point, and if

11  we want to add a clarification sentence, that actually is

12  perfectly fine with the government to explain frame or receiver

13  or to explain that a holster is not --

14    THE COURT:  One or the other or both.

15    Mr. Welch, I assume you don't object.

16    MR. WELCH:  I don't object, as long as it makes clear

17  that a holster -- if we do this at all, it needs to explicitly

18  say that a holster is not a part of the firearm.

19    THE COURT:  Are you not asking for this?  Am I raising

20  something you would rather not be added?

21    MR. WELCH:  No, I would think it's a good point, and I

22  think that we need to make clear to the jury that a holster is

23  not a firearm.

24    THE COURT:  Okay.  All right.  I'm inclined, based on

25  what you said, Mr. Nestler, to just add a sentence.  Again, I

1    will give you all the copy, basically saying what you just said,

2    that a frame or receiver is a part of a firearm, not a holster.

3         Any objection to that?  You all can wordsmith it once you

4    get it.  That's, in essence, what it would say.

5              MR. NESTLER:  That general sentiment is fine with the

6    government.

7              THE COURT:  Okay.  Moving on to the second offense,

8    the obstruction offense, I will adopt the government's proposal

9    to flip the order of the elements, as I said before, so the

10   actus reus comes first, followed by the three mens rea elements.

11        I also fixed the typo that said "any official proceeding"

12   and changed it to "an," and I will change the "an official

13   proceeding" to "the official proceeding" for the intent element.

14        And finally, I will change the natural and probable effect

15   of the conduct "was to obstruct" to "would be to obstruct."

16        But I won't adopt the other proposals by the government and

17   the defense.  I am going to retain that the defendant "acted

18   with intent to obstruct" instead of the government's

19   proposed the defendant "intended to obstruct."  I think the

20   formulation is consistent with the case law.

21        See *U.S. v. Mintmire*, 507 F.3d at 1289, and *U.S. v. Bedoy*,

22   827 F.3d at 510.  Basically, those cases say a defendant must

23   act knowingly with the intent to obstruct.

24        I will also retain "acted with unlawful purpose" instead of

25   the government's proposed "have an improper purpose."  Again, I

think that's consistent with the case law, not only *Mintmire,*
*Mintmire* at 1289, but *U.S. v. Gordon*, 710 F.3d at 1161, acting
corruptly within the meaning of Section 1612(c)(2) means acting
with an improper purpose.

And I recognize that these cases do use "improper purpose"
instead of "unlawful purpose," but as I've explained, I'm
concerned about "improper" being too vague in this context.  In
particular, the D.C. Circuit has cautioned against relying on
vague, nebulous terms like "improper," "immoral," as I said in
the *Sandlin* opinion at 22, quoting *Poindexter* at 951 F.2d at 379
through -80.  So the Court will retain "unlawful purpose."

Finally, I do reject the defense's request and will retain
the language "engaging in other independently unlawful conduct"
in the example.  This language is consistent with my ruling in
*Sandlin* where I held a defendant uses corrupt means when those
means are independently criminal.  That's the *Sandlin* opinion at
24.

It's also consistent with this Circuit's case law.  *U.S. v.*
*North*, 910 F.2d at 943.  And that's *Silberman*'s concurring and
consenting opinion.

It also helps the jury understand that bribery isn't the
only means by which someone can act corruptly.

Mr. Nestler, as I said last hearing, I still remain
concerned about the government's unlawful or improper purpose
theory.  Last week, when I said what's the difference between

what you're saying and, you know -- what's the distinction

between "corruptly" and "specific intent" that the government

has to prove to convict Mr. Reffitt of obstructing an official

proceeding, you said "not much," and I just don't think -- I

think this Circuit's case law suggests otherwise, and you're

conflating corruptly with intentionally.

And I'm concerned that if the government's theory is

evidences to mean, and I understand that to mean that the

government intends to prove that Mr. Reffitt assaulted or

attempted to assault or aided and abetted in an assault, if the

jury doesn't buy that theory, I don't think the jury could

convict the defendant on the sole basis that he intended to

obstruct or impede the official proceeding.  I think that would

read corruptly out of the statute.

So if the government's theory ends up being the unlawful

purpose was more than to stop or delay the vote, you know, for

example, it was to pull members out of the room or something

like that, then that might be different.  But even in that

context, I wonder whether the means doesn't collapse into the

purpose there.  If ultimately the purpose is to stop or delay

the vote, I just don't think that can be -- that theory would be

appropriate in terms of improper purpose, and he could be

convicted of that alone without any unlawful means being used.

So I think I've made my position clear.

Anything more you want to say with regard to that?  We can

address it at the appropriate time, but you've assured me you're

not going to get into that.  It would be inappropriate anyway to

argue any sort of theory in the opening.  But I just want to be

real clear that I have concerns about that theory.  As I see

this, this is an unlawful means case.  But I could envision in

certain cases an unlawful purpose.  I just don't think the stop

or the delay of the vote is in and of itself an unlawful or

improper purpose necessarily, a criminal one, that is.

MR. NESTLER:  And the government's position is that

the defendant's intent at the time he went to the Capitol

grounds and did his actions, even if his actions were not

independently unlawful, why he was there is the purpose.  And so

he was there to drag legislators out by their heels.

THE COURT:  If that's how you're defining the purpose,

then if that's how you're defining the purpose, then I think you

have a different -- that would be different, if that's the end

purpose.  But if the purpose is just to, quote, stop or delay

the vote, that's a purpose that I don't think would need to

be -- the standard you need to meet.

MR. NESTLER:  Right.  And I think we're saying the

same thing actually, Judge.  Our position is that the

defendant's purpose for why he was at the Capitol building was

itself corrupt, which we say improper, and we understand the

Court's ruling about unlawful, but what was in his head of why

he was there, so not the means.  Even if he didn't assault or

1    aid and abet anyone else to assault an officer, the reason that

2    he was unlawfully on the Capitol grounds was for that improper

3    purpose, which is to drag the legislators out by their heels.

4              THE COURT:  All right.  Assault, you know, batteries,

5    all of that works.  What doesn't work are these vague, you know,

6    terms like stopping and delaying the vote or interfering with

7    police officers, you know, without that -- interfere by

8    shouting.  I.

9       Think the government needs to be crisp with its theory.

10   And so long as it is, it will go to the jury, but if it's not,

11   it won't.

12             MR. NESTLER:  Understood.

13             THE COURT:  All right.  Anything else on that?  I want

14   to move on to the entering or remaining in a restricted building

15   or grounds with a firearm.

16             MR. NESTLER:  No, Your Honor.

17             THE COURT:  All right.  Of course, I will accept the

18   parties' proposal to remove references to a deadly or dangerous

19   weapon.  I think that will be clear for the jury.

20      Okay.  With -- I have questions on the knowingly mens rea,

21   Mr. Nestler.  I don't know if this is you or Ms. Berkower.  But

22   as you pointed out, the government has to show that the

23   defendant knowingly entered or remained in the restricted

24   building or grounds without lawful authority; right?  That's

25   number 1.  And number 2, the defendant has to know that he

 1     lacked the lawful authority to be there; correct?

 2              MR. NESTLER:  Yes.

 3              THE COURT:  And I think there's a 3.  I think he has

 4     to know that he possessed the firearm, that he used or carried

 5     the firearm.  If someone dumped the firearm in his backpack,

 6     that wouldn't be a crime, this crime at least.

 7          Do you agree?

 8              MR. NESTLER:  Yes, Your Honor.

 9              THE COURT:  Okay.  So Mr. Welch, you haven't raised

10     it, but I take it you don't object that they've got to show

11     knowingly as to all three of those.

12              MR. WELCH:  Correct.

13              THE COURT:  It concerns me, folks, when I'm reviewing

14     these last minute and I'm catching things like that.  Mr. Welch,

15     that's a big issue, and I want to make sure that you're

16     carefully looking at these jury instructions, because that would

17     be a big omission to not have the knowing use or carrying of the

18     firearm.

19              MR. WELCH:  It would.

20              THE COURT:  Okay.  I think that covers it.  Have I

21     missed anything?

22              MR. NESTLER:  On the following page on that Count 3

23     instruction, we had a couple of additional edits --

24              THE COURT:  Remind me.  I don't have your filing in

25     front of me.  What were they?

1          MR. NESTLER:  Removing "the vice president elect" from

2     the definition as protected by the Secret Service and removing

3     the paragraph defining "dangerous or deadly weapon" --

4          THE COURT:  Yes.

5          MR. NESTLER:  And then adding a sentence that says the

6     term "firearm" has the same meaning I gave you previously.

7          THE COURT:  Yes.  Do you agree with all of those,

8     Mr. Welch?  No objection to those proposed changes?

9          MR. WELCH:  Correct.

10          THE COURT:  Okay.  All right.  I think that's it for

11     me.

12       If you all have any issues with the demonstrative exhibits,

13     those kinds of things, either file something or -- I would

14     prefer you file something.  But at a minimum, send an e-mail to

15     the chambers e-mail so I'm aware.  It would be good again to

16     resolve this before the end of the week so that we start ready

17     to go Monday morning and we can get through these jurors as

18     quickly as possible.

19          MR. NESTLER:  Thank you, Your Honor.  Just to be

20     clear, we are planning on meeting Monday morning at 9:00 a.m.?

21          THE COURT:  9:00 a.m.  I'll get your numbers.  You

22     just write them on a piece of paper and hand them to me.  Then

23     you will get the juror sheet, and you will -- any other

24     issues -- if there's an argument I need to hear Monday morning,

25     I hope not, but that would be the time to do that as well.

1          MR. NESTLER:  Understood.  Do you know what time the

2     Ceremonial Courtroom will be open for us to get there?

3          THE COURT:  Let me ask Mr. Hopkins that question.

4        Mr. Hopkins?

5          COURTROOM DEPUTY:  I will be there early.  I will be

6     there probably around 8:00.  So if you want to get there at the

7     same time, that's fine.  I will be there early.

8          MR. NESTLER:  Thank you, Mr. Hopkins.  And just to be

9     clear, Judge, we will bring the 50 jurors in, do the general

10    voir dire, do the individual voir dire for those 50, and then we

11    will return to the Ceremonial Courtroom either late Monday or

12    some time on Tuesday and do general voir dire for the remaining

13    30 jurors?

14         THE COURT:  Correct.

15         MR. NESTLER:  That makes sense.

16         THE COURT:  Okay.  I think Ms. Berkower makes a great

17    point.  We might not necessarily want to leave them until

18    Tuesday if things are going really smoothly.  We may want to --

19    my initial inclination to bring them back the next morning may

20    not be the right one.

21        But we will have to come back and go through the whole

22    spiel again.

23         MR. NESTLER:  In other words, I think Your Honor

24    indicated we would maybe try to talk to one or two of them, but

25    we can't, really.  We have to have all 30 back at once.

1          THE COURT:  We do.  I wish we could jam more people in

2     all of these courtrooms.  But we're trying to be safe.  We're

3     trying not to have a COVID outbreak as a result of us not

4     following the safety protocols that the experts have told us we

5     should follow.

6          Numbers are dropping, but still, the most recent advice we

7     received, which is in the last few days, is don't let down your

8     guard, it's still precarious to not have social distancing and

9     masks.  Maybe later in the year, this won't be a problem and

10    these trials can go forward with the public closer together, but

11    right now, we're told that you really need to keep social

12    distancing and you need to keep masks on.  So that's what we're

13    doing.

14          MR. NESTLER:  Thank you, Your Honor.  It all makes

15    sense.

16          THE COURT:  All right, then.

17     Mr. Reffitt, do you have any questions, concerns other than

18    the haircut, which I'm going to put out an order immediately

19    about?

20          THE DEFENDANT:  No, Your Honor.  That's pretty much

21    all I want taken care of at this point.  The rest will be on my

22    counsel.

23          THE COURT:  I'm sorry.  I couldn't hear the last part.

24          THE DEFENDANT:  The rest will be on counsel.

25          THE COURT:  Mr. Welch, anything we can do to help you

1    with access to Mr. Reffitt and all that?  Are you having any

2    issues?

3              MR. WELCH:  No, that hasn't been an issue, but I would

4    ask whether Mr. Hopkins could accommodate a breakout after we're

5    done.

6              THE COURT:  Yes, of course.

7         So Mr. Welch, in terms of the family members, we're going

8    to have one pew that I think can accommodate Mr. Reffitt's

9    family.  All right?

10             MR. WELCH:  All right.  Will that actually be during

11   the trial itself, or is that just during the voir dire?

12             THE COURT:  I'm going to have to talk to court staff

13   about that.  I think that the expectation was that there would

14   be a small number.  With this number, I don't know that I'm

15   saying all of them will be in the voir dire room itself.  I will

16   have Mr. Hopkins get back to you on this.  We're talking

17   overflow courtroom on all of this, though.

18        You understand that; right?

19             MR. WELCH:  Yes.

20             THE COURT:  Except for individual voir dire maybe.

21             MR. WELCH:  Okay.  I understand what you're saying.

22   And I guess what I would be asking, then, is when we get to the

23   actual trial and we're in 14, then could they at least in one of

24   the overflow courtrooms have a row for them so that they can not

25   be out in the hall?

1          THE COURT:  That's what I'm saying, that they wouldn't

2    have to line up.  Generally, it's first come/first served, but

3    there will be a row reserved for them so they don't have to get

4    here super early.  But it's not in the actual courtroom, because

5    we've got so many people, with the jurors in the gallery, with

6    the four alternates, and with the trial teams and with the

7    witnesses and with the attorneys for the witnesses.  There are a

8    lot of people, and it's hard to space them out in the courtroom.

9      So except for the individual voir dire -- which maybe we'll

10   accommodate, probably not all ten of them, but maybe one or two.

11   I will get back to you on that.  They will certainly have a row

12   in an overflow courtroom.

13          MR. WELCH:  Okay.

14          THE COURT:  All right.  Thank you all.  See you on

15   Monday.  And if there's a need to jump on line, like a telephone

16   call or something like that tomorrow, we can do that.  I don't

17   know that we would have Mr. Reffitt necessarily available, but

18   you all let me know.  If there's some issue that can be handled

19   without his presence that can be taken care of before Monday,

20   let me know.

21          MS. BERKOWER:  We will.  Thank you.

22      (Proceedings adjourned at 12:26 p.m.)

23

24

25

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7        Please Note:  This hearing occurred during the

8   COVID-19 pandemic and is, therefore, subject to the

9   technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                    February 26, 2022

13   SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25