1        BEFORE THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-32
4            Plaintiff,                  .
                                        .
5         vs.                           .
                                        .
6    GUY WESLEY REFFITT,                .  February 28, 2022
                                        .  9:07 a.m.
7            Defendant.                  .
     - - - - - - - - - - - - - - - - -

8

9                TRANSCRIPT OF JURY TRIAL
                     (MORNING SESSION)
10        BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the United States:    JEFFREY NESTLER, AUSA
                               RISA BERKOWER, AUSA
14                             United States Attorney's Office
                               555 Fourth Street Northwest
15                             Washington, D.C. 20530

16   For the Defendant:        WILLIAM WELCH, III, ESQ.
                               5305 Village Center Drive
17                             Suite 142
                               Columbia, Maryland 21044
18

19

20

21   Official Court Reporter:  SARA A. WICK, RPR, CRR
                               333 Constitution Avenue Northwest
22                             U.S. Courthouse, Room 4704-B
                               Washington, D.C. 20001
23                             202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S
 2          (Jury venire not present.)
 3              COURTROOM DEPUTY:  Your Honor, calling Criminal Action
 4     21-32, the United States of America versus Guy Reffitt.
 5          Actually, if I could have the parties identify themselves
 6     for the record, beginning with the United States.
 7              MR. NESTLER:  Good morning, Your Honor.  Jeff Nestler,
 8     on behalf of the United States.
 9              THE COURT:  Good morning.
10              MR. WELCH:  Good morning, Your Honor.  William Welch
11     on behalf of Mr. Reffitt.
12              THE COURT:  Good morning.
13          Good morning, Ms. Berkower.
14              MS. BERKOWER:  Good morning, Your Honor.
15              THE COURT:  And Mr. Reffitt, are you ready to go?
16          So we have a couple of unexpected matters.  But first, let
17     me go through some logistics.  Mr. Hopkins has handed me the
18     alternates.  Thank you for that, and I understand that you all
19     will ask me to ask a question if you all have an agreement that
20     someone should be stricken for cause.
21          I want you to know I have added a question to the voir dire
22     general questions.  I've added a new question number 24, which
23     would ask the jurors if they would be uncomfortable with the
24     attorneys and with me taking our masks off when we're speaking
25     for a long period of time.  I just want to get a sense whether
```

1    that makes them uncomfortable.

2        Also, I won't give the law clerks' names in voir dire.  Is

3    there any objection to that?  They will be present so the jurors

4    can see them.  Do you have a strong feeling that I say their

5    names on the record?

6            MS. BERKOWER:  No objection, Your Honor.

7            THE COURT:  All right.

8            MR. WELCH:  No objection to not saying their names,

9    but I would ask Your Honor to call the venire's attention to

10   them so they focus on them.

11           THE COURT:  Of course.  I will -- in terms of the

12   government's opening statement and the demonstrative exhibits, I

13   did see the photographs, Mr. Nestler.  I know we have copies of

14   the videos.

15       I take it you're showing excerpts?

16           MR. NESTLER:  Yes, Your Honor.

17           THE COURT:  One is an eight-second video.  I have no

18   idea which eight seconds you're talking about showing.

19           MR. NESTLER:  Did Your Honor get a copy of the

20   PowerPoint?

21           THE COURT:  We did, but it won't play video.  Maybe

22   later today, at the close of today, you can show it to me.

23           MR. NESTLER:  Sure.  I have it.

24           THE COURT:  I don't want to do that now, but

25   Mr. Welch, do you have any authority you want me to consider in

1    deciding whether to permit that?  I think it's pretty clear

2    under 401 and 403 if there's a good-faith basis for believing

3    this evidence is going to come in, courts have let it in in the

4    opening as a demonstrative exhibit.

5             MR. WELCH:  I understand that, Your Honor.  I don't

6    have any specific authority.  It just is inappropriate to be

7    showing the jury evidence before it is formally admitted in

8    evidence.

9             THE COURT:  But there are a lot of cases that permit

10   that, assuming there's a good-faith basis for believing that

11   it's going to come in and that it's not unduly prejudicial.

12            MR. WELCH:  Well, if -- the undue prejudice would be

13   that if for some reason -- even though they have a good-faith

14   basis for believing it's going to come in, if it doesn't, then I

15   have no remedy.

16            THE COURT:  Later today when I see the PowerPoint, I

17   want Mr. Nestler to explain exactly who is going to introduce

18   it, and we will both feel comfortable whether that's likely to

19   come in.  All right?

20       The defense witness list, do you have one for me to have

21   you read for voir dire, or do you want me just to ask the jurors

22   to listen to the government witnesses?

23            MR. WELCH:  Just the government witnesses.

24            THE COURT:  Okay.  So you have no witness list at this

25   point?

1          MR. WELCH:  I don't intend to call any witnesses at

2     this point.

3          THE COURT:  Okay.  Mr. Reffitt, during the general

4     voir dire, would you like to have your wife present?  There have

5     been a number of requests for more access to the courtroom.

6     I've reduced the number of jurors who are going to come in in

7     this first round to 47 so that there can be three members of the

8     public in the Ceremonial Courtroom for the general voir dire.

9     And if you wanted a family member to be present in one of those

10    seats, I would accommodate that.

11       Is that something you would like?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And that, I assume, would be your wife?

14          THE DEFENDANT:  That would be correct.

15          THE COURT:  Yes?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  So we will make sure she has one of those

18    three seats for the general voir dire.

19          THE DEFENDANT:  Thank you.

20          THE COURT:  I've been advised by the jury office not

21    to release the jurors.  I think I talked to you all about maybe

22    sending half of them away until later in the afternoon.  I think

23    there is some concern that if they go away, we might not get

24    them all back, and we might need them all.

25       So folks are just going to stay either in this room, or we

1    will take a one-hour break for lunch and they will be in the

2    cafeteria.  So I'm not going to be releasing any of the first

3    47.  The rest will be told to call back at the end of the day

4    about coming back tomorrow if that's necessary.

5         Any questions there?

6              MR. NESTLER:  Can we just ask that they be told that

7    they will likely have to come back tomorrow?

8              THE COURT:  Yes.  I think they will be.  I said that

9    differently.  I think in all likelihood they will need to come

10   back.

11        Mr. Welch, anything else from you?

12             MR. WELCH:  No, Your Honor.

13             THE COURT:  I don't know if this motion from the Press

14   Coalition actually hit the docket.  Did you all see this motion?

15             MR. NESTLER:  Yes, Your Honor.

16             THE COURT:  You did?  All right.  I received a

17   courtesy copy yesterday afternoon, and I am going to rule on

18   that now.

19        So before the Court is the Press Coalition's motion for

20   access during trial.  The Court has also received informal

21   requests from the defendant, from other defense attorneys in the

22   January 6 investigation, and other media organizations for

23   public access to the trial courtroom or the live broadcast of

24   this trial over the public telephone line.

25             Before I address all of these requests together, I want to

1   note that I have repeatedly stated during the hearings over the

2   course of the last several months that the public line would not

3   be open for this trial, and on February 15, nearly two weeks

4   ago, I issued a pretrial order making clear that Courtroom 14,

5   the trial courtroom, would be closed to members of the public,

6   and that includes the press.  Yet, the Press Coalition waited

7   until yesterday afternoon to file a motion.

8       Because the press has had ample time to voice its

9   objections to this District's public access plan and this

10  Court's pretrial order, the Court will not keep jurors waiting

11  in order to hear argument on this motion.  But I will rule

12  promptly now on the motion as the Press Coalition has requested.

13      As set forth on the website for the U.S. District Court for

14  the District of Columbia, this court has made changes to

15  standard operating procedures for criminal jury trials due to

16  the ongoing COVID-19 pandemic.

17      These changes strike a balance between three goals.  First,

18  they seek to ensure the safety of the defendant, the jurors, the

19  witnesses, the attorneys, the marshals, and court staff.

20  Second, they seek to minimize the risks of this trial resulting

21  in a spread of COVID-19.  And finally, they seek to preserve the

22  constitutional guarantee of an open court proceeding.

23      The Court has endeavored to strike an appropriate balance

24  in consultation with a wide range of experts and court

25  personnel.  Here are the considerations that have gone into that

balance.

First, the District Court has responded to COVID-19 safety concerns.  Most recently, the Court suspended jury trials altogether from December 30 of 2021 to February 7, 2022, in response to the omicron variant.  On January 20 of this year, the Court found that jury trials could resume on February 7, with continued precautions to protect the health of the trial participants and courthouse staff.

In consultation with experts, the Court has limited the number of people in a given courtroom at one time to ensure that they are socially distanced.  This has required reconfiguring all courtrooms to retrofit them with plexiglass separators and to space out jurors and other trial participants.  And it has required juries to deliberate in a courtroom as opposed to the traditional smaller jury room to allow for social distancing.

Court staff designed the above protocols after consulting with experts on disease transmission in air flow, and court staff consulted with experts as recently as last week about these protocols.

Although the CDC and the District of Columbia have recently loosened COVID guidelines and mandates, experts have urged this Court to keep the current restrictions in place for the time being.  The changes this court has made during the pandemic have helped minimize the risk of mistrial due to insufficient jurors or unavailable witnesses.

1          A trial in the Southern District of New York was able to

2    proceed despite a juror testing positive for COVID because the

3    jurors were socially distanced, masked, and had minimal contact

4    with each other, and therefore, the rest of the jury did not

5    test positive.  See *United States versus Weigand*.  That's

6    20-cr-188.

7          But a COVID outbreak in an Eastern District of Texas trial

8    led to a mistrial when there was insufficient jurors to proceed.

9    See *ResMan, LLC*.  That's Number 4-19-cv-402.

10         Against this backdrop, the Court finds that the costs of

11   these precautionary measures are justified to minimize the more

12   costly possibility of a mistrial.

13         One cost of those precautionary measures is limiting the

14   number of people who can be present in the trial courtroom.  To

15   comply with this court's social distancing guidelines, jurors

16   and alternates must sit in the courtroom gallery six feet apart.

17   This typically is a place where the public and the media would

18   sit.  In addition, witnesses now testify from the jury box

19   instead of the witness stand.

20         In addition to social distancing limitations, the Marshals

21   Service has expressed safety concerns about nonparticipants

22   sitting in the courtroom well during the trial.

23         With these changes to the courtroom configuration, and a

24   total of 12 jurors and four alternates as the parties have

25   requested, the Court is unable to accommodate any member of the

public, including a member of the defendant's family or the press, inside Courtroom 14 where the trial will occur.

But the Court has taken steps to ensure that members of the public and the media have access to the trial.  First, for general voir dire, it has reserved three spaces in the Ceremonial Courtroom for the public, including the media and Mr. Reffitt's wife.  Second, during individual voir dire, there will be public seating in the gallery of the courtroom for approximately 15 people.  Finally, throughout all stages of the trial, there will be at least one overflow courtroom and at least two media rooms, which will each have multiple realtime video feeds of the trial courtroom.

My understanding is that the overflow courtroom can accommodate approximately 16 members of the public, while the overflow and media rooms together can accommodate approximately 50 people.

Furthermore, I will follow the practice of Judge Moss in *United States versus El-Saadi*, 19-cr-374, which the Press Coalition cited approvingly.  And I will allow a member of the press to sit in the jury box for opening statements.  If that practice goes smoothly, I will consider doing the same for closing arguments.

The Court will not permit members of the public or the press to sit in the jury box during the evidentiary portion of the trial, because the jury box is where the witness -- all the

1    witnesses will sit.  Having an extra person in the jury box to

2    the right of the witness, even at a safe distance, would be

3    potentially distracting to the jury and the witnesses and could

4    be prejudicial to the parties.

5        The Court considered but rejected using this courtroom, the

6    Ceremonial Courtroom, for trial, because it is equipped with

7    only one camera which faces the bench.  This setup is ill-suited

8    for a trial, because unlike with Courtroom 14, it would be

9    impossible to provide live feeds of the witnesses, evidence, and

10   attorneys who will be questioning the witnesses.

11       Moreover, the Ceremonial Courtroom would only be able to

12   hold about 16 members of the public or the media.  That is far

13   fewer than the approximately 50 who will be able to view this

14   trial in realtime from the overflow courtroom and two media

15   rooms.  Thus, using 14 -- Courtroom 14 for trial will provide

16   greater public access than would this courtroom.

17       The Press Coalition has raised concerns about technical

18   glitches that interrupted the live feed in *El-Saadi*.  The Court

19   takes these concerns seriously, and court IT staff will be

20   monitoring the video and audio feeds.  The Court is prepared to

21   pause the proceeding if at any point problems surface with the

22   technology during trial.

23       As I've explained in multiple hearings, the public line

24   will be closed during trial under Federal Rule of Evidence 615.

25   Witnesses are excluded from the courtroom so that they cannot

hear other witnesses' testimony.  This rule serves to prevent one witness from shaping his testimony to match that given by another witness at the trial.  *Tasty Baking Company v. NLRB*, 254 F.3d at 122 to 23.

If the public line were to be open, there would be no way to monitor whether trial witnesses were listening by phone.  The public line will also be closed during voir dire to respect the privacy of the venire members whose presence is compelled and who must answer questions about their personal lives and views.

The Court concludes that the access outlined above is more than sufficient to qualify this trial as an open and public proceeding, particularly given the conditions of the pandemic.

The Court further concludes that it has met its obligations under *Presley v. Georgia* to take every reasonable measure to accommodate public attendance at criminal trials.  558 U.S. at 215.

The right to a public trial, one, ensures that the judge and prosecutor carry out their duties responsibly; two, it encourages witnesses to come forward; and three, discourages perjury.  *U.S. v. Perry*, 479 F.3d at 889.

As the D.C. Circuit explained in *Perry*, the public trial right is not implicated if a courtroom closing is trivial such that it does not impact these concerns.  Here, the courtroom will remain open throughout trial via live video feeds to multiple other rooms in the courthouse.  The viewing available

1    from the overflow rooms fulfill the goals of a public trial.

2    At least one other District Court who has faced this

3    problem has concluded similarly.  See *United States v.*

4    *Babichenko*, 508 F.Supp.3d 774, a District of Indiana case.  And

5    even during normal operating procedures, courtroom space limits

6    do not mandate the use of a public telephone line.

7    The Court does not find the Press Coalition's citation to

8    *United States v. Alimehmeti*, 284 F.Supp.3d 477, particularly

9    relevant, because that case did not face a problem of arranging

10   a courtroom to comply with appropriate health and safety

11   precautions during a pandemic.  *Presley* requires taking every

12   reasonable measure, not every possible measure, and

13   reasonableness is measured against all the competing concerns.

14   COVID-19 is one of those concerns today, and it was not a

15   concern in *Alimehmeti*.

16   For all these reasons, the Press Coalition's motion is

17   granted in part to allow a pool reporter in the trial room

18   during opening and potentially closing arguments.  It has been

19   denied as to the rest of the Coalition's request.

20   All right.  Before we bring the jury in, is there anything

21   else from either side?  Mr. Nestler?

22   MR. NESTLER:  Just briefly, Your Honor.  When Your

23   Honor introduces the prosecution team, we ask the Court to also

24   introduce our paralegal, Amanda Rohde, and our FBI agent, Thomas

25   Ryan, or would Your Honor like us to do that ourselves?

1          THE COURT:  That's fine.  I'll try to remember, but if

2     not, you're welcome to do that.

3       Mr. Welch, anything else for you and Mr. Reffitt?

4          MR. WELCH:  No, thank you.

5          THE COURT:  I will take a brief break while we bring

6     the jury in.  I think until I ask them the question about the

7     mask, I will keep my mask on for this part of the voir dire.

8       (Recess taken from 9:27 a.m. to 9:45 a.m.)

9       (Jury venire present.)

10    THE COURT:  Good morning, ladies and gentlemen.  Welcome to

11    the U.S. District Court for the District of Columbia.  My name

12    is Dabney Friedrich, and I will be presiding over the case for

13    which you have been called as a potential juror.  I want to

14    thank you for taking time out of your busy lives to come here to

15    participate in this process.

16       As you know, jurors play a critical role in our justice

17    system.  The Constitution guarantees every citizen a right to a

18    jury trial by a jury composed of one's peers, and this is a very

19    important civic duty you have been called upon to perform today.

20       The goal today and probably tomorrow, too, will be to

21    select a neutral panel of jurors who will hear the evidence in

22    this case and be fair and impartial in their decisionmaking.

23       This is a criminal case that relates to the events that

24    occurred at the Capitol on January 6 of 2021.  The defendant in

25    this case, Guy Wesley Reffitt, is charged with four crimes

relating to Congress's meeting at the United States Capitol on
January 6, 2021, to certify the Electoral College vote for
president.

First, he is charged with obstructing an official
proceeding for allegedly interfering with Congress's meeting.
Second, he is charged with being unlawfully present on Capitol
grounds while using or carrying a firearm.  Third, he is charged
with transporting firearms, knowing or intending that they will
be used unlawfully in furtherance of a civil disorder.  Fourth,
he is charged with interfering with law enforcement officers
during a civil disorder.  The government has also charged
Mr. Reffitt with obstructing justice based on statements he made
to his children while at home in Wylie, Texas.

Excuse me just a moment.  We need to connect the public
line.  I hate to do this to all of you, but I think we're going
to have to start over.  All of our proceedings are open to the
public, and even though there are not very many members of the
public here in the courtroom right now, only in the jury box
because of the social distancing concerns, you should know that
there are individuals in other parts of the courthouse that will
be listening and viewing this trial in overflow courtrooms.

So apologies again, but I will have to start again.

Okay.  Here we go.  Round 2.

Good morning, ladies and gentlemen, and welcome to the U.S.
District Court for the District of Columbia.  My name is Dabney

1    Friedrich, and I will be presiding over the case in which you've
2    been called to serve as a potential juror.  I want to thank you
3    for taking time out of your busy schedules to assist the Court
4    by coming here today to participate in this process.

5         As you know, jurors play a critical role in our justice
6    system.  The Constitution guarantees every citizen a right to a
7    jury trial by a jury of one's peers, and this is a very
8    important civic duty that you've been called to perform here
9    today.

10        The goal today and tomorrow will be to select a neutral
11   panel of jurors who will hear the evidence in this case and be
12   fair and impartial in their decisionmaking.

13        This is a criminal case that relates to the events that
14   occurred at the Capitol on January 6, 2021.  The defendant in
15   this case, Guy Wesley Reffitt, is charged with four crimes
16   relating to Congress's meeting at the United States Capitol on
17   January 6, 2021, to certify the Electoral College vote for
18   president.

19        First, he is charged with obstructing an official
20   proceeding for allegedly interfering with Congress's meeting.
21   Second, he is charged with being unlawfully present on the
22   Capitol grounds while using or carrying a firearm.  Third, he is
23   charged with transporting firearms, knowing or intending that
24   they will be used unlawfully in furtherance of a civil disorder.
25   Fourth, he is charged with interfering with law enforcement

officers during a civil disorder.  The government has also

charged Mr. Reffitt with obstructing justice based on statements

he allegedly made to his children while at home in Wylie, Texas,

around January 7th, 2021.

Mr. Reffitt has pleaded not guilty to all charges.

In a moment, you will be sworn in.  What that means is you

will be bound to answer the questions that you're asked

truthfully, and that is essential to this process.

Before we start, let me explain how this process will work.

This will take several stages.  First, I will ask all of you in

the group a series of questions, of general questions.  Once we

finish those questions, each one of you will be brought to

another courtroom one at a time where you will be asked some

follow-up questions based on the responses you give to questions

you're asked here.

You will be called in the order that you're seated, and

given the large number of people in this room, this process is

likely to take some time.  We will try very hard to move things

along, but please understand that some amount of waiting is

unavoidable.

While you're waiting in this courtroom for your turn to be

called, please feel free, if you wish, to talk quietly with one

another or to read, but I ask that you not talk to each other or

communicate outside the courtroom about anything at all relating

to this case or the January 6 events or the parties in this

1   case.

2       I also ask that you don't use the Internet to read or

3   research anything about this case or the parties, nor should you

4   make any telephone calls or send any e-mails, texts, tweets,

5   blog, instant message, Snapchat, or use any other form of

6   communication to tell a friend or family member or your

7   followers about this case or the fact that you're a potential

8   juror in this case.  Any juror who violates these restrictions

9   jeopardizes the process and possibly the trial, which could

10  require the entire trial process to start over.

11      Finally, I ask that you not use your mobile devices at any

12  point during the jury selection process or during the trial if

13  you're selected as a juror.  You can tell close friends and

14  family members or your employer that you've been called to court

15  to serve on a jury in a criminal case, but that is all.

16      From this point on, you must not read anything about this

17  case, and you should also try to avoid receiving any information

18  about the case from news media.  If it comes to your attention

19  inadvertently, please ignore it, even the headlines.

20      If you receive automatic alerts from any source, you may

21  need to change your push notifications, your news subscriptions

22  or RSS or Twitter feeds.  And if you happen to hear the case

23  being discussed, you should walk away from the conversation or

24  change the channel on the TV.

25      Please know that when you're called into the separate

1    courtroom for follow-up questioning, it's not my intention, nor

2    is it the lawyers', to invade your privacy or to embarrass you

3    in any way.  Our sole goal is to select a fair and impartial

4    jury that is composed of jurors who are not biased and who will

5    return a verdict based solely on the evidence and the legal

6    instructions that I provide.

7         As I mentioned at the outset, courtrooms and trials are

8    open to the public.  So throughout jury selection and during the

9    trial, members of the public and the media will be watching and

10   listening to these proceedings in other courtrooms here in the

11   courthouse.  Usually, members of the public and the media are

12   present in the courtroom itself, but due to social distancing

13   and other health and safety protocols that this courthouse has

14   implemented to minimize the spread of infection from the

15   coronavirus, only a few members of the public and the media are

16   in this courtroom and will be in the courtroom where we do the

17   follow-up questioning.  No members of the public or the media

18   will be in the trial courtroom except for opening statements and

19   possibly closing arguments.

20        During the follow-up questions, please know if there are

21   any questions that raise sensitive or personal issues to you,

22   you can ask permission to give your answers to me and to the

23   lawyers through a headset with the husher on, which makes a

24   noise, and that will ensure that only the parties and the court

25   staff can hear your answer.

1        Please understand that in the end we might not need to talk

2    to all of you, but we likely will, but we will likely end up

3    excusing some of you.  If that happens to you, please understand

4    that it's not because we don't like you or because we think you

5    said something improper or inappropriate.  It's just because we

6    will probably have more jurors than we will need, and there may

7    be a reason why you are not one of the people who is selected to

8    serve as a juror in this case.

9        Before we proceed, I need you to make sure that you have a

10   note card and a pencil at your seat, and if you don't, please

11   raise your hand.  Also, can you take a look at your juror badge

12   and make sure that the digits on your badge match those in the

13   upper right-hand corner of the note card.

14       Are there numbers on your note cards that match your badge?

15   There are no numbers?  Okay.  Then first step, I want you to

16   write on the note card -- in the right-hand corner, could you

17   please write your juror badge number.

18       All right.  During this first stage of the process, I am

19   going to read to you 27 questions.  You should be able to answer

20   each of these questions with a simple yes or no.  This is very

21   important.  If your answer to any question is a yes, all I want

22   you to do is to write down the number of the question that I

23   asked you.  So don't write down yes; don't write down no.

24   Simply write down the number of the question that I asked you,

25   but only write that down if your answer is a yes.  If your

answer is a no to my question, don't write anything down.

Anyone have any questions?

Okay.  So for example, if your answer to question number 1 is yes, you need to write down number 1 on your note card.  If your answer to the question number 1 I'm going to ask you is no, don't write anything down.

Once I've gone through all the questions, I will go to the other courtroom, and I will speak to each one of you, even if you don't answer yes to any of the questions I'm going to ask you here in a moment.  After I've asked you some follow-up questions, please understand that the attorneys might ask you some questions as well about your responses.

Once we've qualified the number of people who are needed to select a jury, we will bring all of the qualified jurors back into this courtroom to finish the selection process.  In all likelihood, that part of the process will happen some time tomorrow, but at this point, it's really hard to say how long the entire process will last.

Before I begin with the questions, I want to introduce my court staff.  I think you've already met Mr. Hopkins here sitting right in front of me.  He is the courtroom deputy.  He makes sure that the trains run on time and that I don't do anything that I'm not supposed to do.

Seated next to him is Ms. Wick.  She is our courtroom reporter, and she is taking down everything that is said in this

1    courtroom.

2        To my left and my right, you see my law clerks who work for

3    me.

4        I will now ask that all of you please stand up and raise

5    your right hand so that you may be sworn in.

6        (Jury venire sworn.)

7        THE COURT:  Thank you.  You may be seated.

8        Now for the questions.  With your pencil and note card in

9    hand, please listen to the 27 questions I'm going to ask you,

10   and please remember if the answer to the question is yes, you

11   simply write down that number.

12       All right.  The first question, do any of you live or work

13   at or near the U.S. Capitol?  That's question number 1.  If your

14   answer is yes to that question, write the number 1 on your note

15   card.  If it's no, write nothing.

16       PROSPECTIVE JUROR:  Do you mean near the Capitol here?

17       THE COURT:  Near the U.S. Capitol building, yes.

18       All right.  Question 2, do you or someone you know have a

19   direct or indirect connection to the events that occurred at the

20   U.S. Capitol on January 6, 2021?  If the answer to that question

21   is yes, please write down the number 2.

22       Question number 3, have you followed the news about the

23   events that took place at the U.S. Capitol on January 6, 2021?

24   If the answer is yes, please write the number 3 on your card.

25   If the answer is no, you don't need to write anything.

1   Question number 4, have you heard or seen anything in the

2   news or elsewhere about Guy Wesley Reffitt, the defendant in

3   this case, or about anyone else who was present at the Capitol

4   on January 6, 2021?  If the answer is yes, write down number 4.

5   Question number 5, does anyone have such strong feelings or

6   opinions about the events that took place at the U.S. Capitol on

7   January 6, 2021, that it would make it difficult for you to

8   serve as a fair and impartial juror in this case?  If the answer

9   is yes to that question, please write down the number 5.

10   Question number 6, as you sit here, do you have an opinion

11   about Mr. Reffitt's guilt or innocence in this case?  If the

12   answer is yes, write down the number 6.  If the answer is no,

13   don't write anything.

14   Question number 7, do you no longer live in the District of

15   Columbia?  That's question number 7.

16   Question number 8, the government in this case is

17   represented by Assistant United States Attorneys Jeffrey Nestler

18   and Risa Berkower.  I would like them to stand up and introduce

19   members of their trial team, please, Mr. Nestler or

20   Ms. Berkower.

21   MS. BERKOWER:  Good morning, everyone.  My name is

22   Risa Berkower.  I'm an Assistant United States Attorney here in

23   the District of Columbia.  With me is Jeffrey Nestler, also an

24   Assistant United States Attorney.  And we have Amanda Rohde, our

25   paralegal, at the table with us and also Special Agent Thomas

1    Ryan of the FBI.

2         THE COURT:  All right.  Do any of you know any of

3    these people?  If you do, write the number 8 on your card.

4    The defendant, Guy Wesley Reffitt, is represented by

5    William Welch.  With him is Mr. Reffitt.  Mr. Reffitt resides in

6    Wylie, Texas.  Do you know either Mr. Welch or Mr. Reffitt?  If

7    so, again, I would ask you to write down the number 8 on your

8    card.  This is the same question.

9         Question number 9, I will have the government now introduce

10   its witnesses by name, with a general area of residence and

11   employment.

12        MS. BERKOWER:  Good morning.  During this trial, in

13   the government's case, you may hear from or about a number of

14   people, including from the United States Capitol Police,

15   Inspector Monique Moore, Sergeant Adam DesCamp, Sergeant Matthew

16   Flood, Officer Shauni Kerkhoff; from the United States Secret

17   Service, Special Agent Paul Wade; from the Federal Bureau of

18   Investigation, the FBI, Special Agent Thomas Ryan from

19   Washington, D.C., Special Agent Stacy Shahrani from Washington,

20   D.C., Special Agent Laird Hightower from Dallas, Texas, and

21   Karla Kennedy, a nurse and photographer from Dallas, Texas; from

22   the United States Senate, you will hear from Daniel Schwager,

23   counsel to the Secretary of the Senate; from Wylie, Texas, which

24   is near Dallas, Texas, Jackson Reffitt and Peyton Reffitt; and

25   from Austin, Texas, Rocky Hardy.

1           Thank you, Your Honor.

2                THE COURT:  Thank you.

3           If you know any of the witnesses who have been introduced

4      to you, please write down the number 9 on your card.

5           All right.  Question number 10, I ask that you take a look

6      around you and look at the other potential jurors, and let us

7      know if you recognize or think that you know any of the other

8      potential jurors in the panel.  If you do, please write down the

9      number 10.

10          So question number 11, as I mentioned, the courtroom deputy

11     is sitting in front of me.  This is Jonathan Hopkins, and the

12     court reporter to his left is Sara Wick.  Again, my law clerks

13     are sitting on either side of me.

14          Do you know me or any member of my staff?  If so, please

15     write the number 11 on your card.

16          Question number 12, the government bears the burden of

17     proving Mr. Reffitt guilty beyond a reasonable doubt.  And

18     Mr. Reffitt is presumed innocent unless and until the government

19     meets that burden.  This burden of proof never shifts to

20     Mr. Reffitt, and he has no obligation to offer his own evidence.

21          Would you have any difficulty or hesitation with respecting

22     this allocation of the burden of proof?  If the answer is yes,

23     please write the number 12.

24          Question number 13, a defendant has a constitutional right

25     not to testify, and if Mr. Reffitt decides not to testify, I

will instruct you that you cannot hold his silence against him in any way.

Would you have any difficulty following that instruction? If the answer is yes, please write number 13 on your card.

Question number 14, jurors are the sole judges of the facts, but they must follow the principles of law as I instruct. The jury may not follow some rules of law and ignore others, and even if the jury disagrees or dislikes a rule of law or does not understand the reasons for some of the rules, it is the jury's duty to follow those rules.

Do you have any personal beliefs that would make it difficult to follow my legal instructions, whatever they may be? If the answer is yes, please write the number 14 on your card.

Question number 15, if you are selected as a juror in this case, I will continue to instruct you to avoid all media coverage relating to this case, including radio, television, podcasts, social media, and other Internet sources. That is, you will be forbidden from reading any newspaper articles about this case, listening to any radio or podcast stories about this case, or watching any TV news about this case. You will also be forbidden from Googling this case or blogging, tweeting, reading, or posting comments about this case on social media sites or anywhere else on the Internet.

Do you have any reservations or concerns about your ability or your willingness to follow this instruction?  If the answer

1    is yes, please write down the number 15.

2         Question 16, I will be instructing the jury at the end of

3    the trial that the testimony of a police officer should be

4    treated the same as the testimony of any other witness and that

5    the jury should not give either greater or lesser weight to the

6    testimony of a witness simply because that witness is a police

7    officer.

8         Does anyone have such strong feelings or opinions about the

9    police, either positive or negative, that would make it

10   difficult for you to be a fair and impartial juror in this case?

11   If the answer is yes, please write the number 16.

12        Question 17, this case involves allegations about the

13   possession of a handgun and rifles, none of which were fired.

14        Does anyone have such strong feelings or opinions about

15   firearms that you cannot put them aside and serve as a fair and

16   impartial juror in this case?  If the answer is yes, please

17   write down the number 17.

18        So the next three questions I'm going to ask you relate to

19   you, members of your immediate family, and close personal

20   friends.

21        So the first question is, does anyone in this group now

22   work for or previously worked for any law enforcement agency?

23        This includes any police department in or outside the

24   District, and it includes special police officers, as well as

25   prosecutor's offices, such as the U.S. Attorney's Office or a

1    State Attorney's Office.  It also includes federal law

2    enforcement agencies like the Department of Justice, the FBI,

3    the Secret Service, the Department of Homeland Security, and the

4    U.S. Park Police, and it includes any local police or sheriff's

5    department.

6         If you or any member of your immediate family or any close

7    personal friend falls into that category, please write down the

8    number 18 on your card.

9         Question 19, again, it applies to the same group of people.

10   Has any member of that group ever attended law school, worked as

11   a lawyer, or worked in a law office?  If the answer is yes,

12   please write down the number 19.

13        Question 20, again, it applies to the same group.  Has any

14   member of that group ever been arrested for, charged with, or

15   convicted of a crime or been a victim of or a witness to a

16   crime?  If the answer is yes to that question, please write down

17   the number 20.

18        Question 21, have any of you had an experience as a juror

19   that would affect your ability to be a fair and impartial juror

20   in this trial?  If the answer is yes, please write down the

21   number 21 on your card.

22        Question 22, we expect the presentation of evidence in this

23   case to conclude early next week.  After the close of the

24   evidence, the jury will deliberate until it reaches a decision.

25        Would serving as a juror in this case be an extreme

hardship to you?  And by this, I mean extreme.  Serving on a

jury is often inconvenient.  What I'm asking is whether serving

on this jury would be very difficult for you.  If the answer is

yes, please write down the number 22.

Question 23, do you have any health or physical problems

that would make it difficult to serve on this jury?  If the

answer is yes, please write down the number 23.

Number 24, the witnesses in this case will be testifying

behind plexiglass like you see here in front of me.  They will

be testifying, the witnesses, without their masks on, so that

the attorneys can address their demeanor and credibility.

Would any of you be uncomfortable with the attorneys and

myself not wearing masks when we are speaking for long periods

of time?  All of us are vaccinated.  If the answer to that

question is yes, please write down the number 24.

Question 25, do you have any difficulty reading, speaking,

or understanding the English language?  If the answer is yes,

please write 25 on your card.

Question number 26, I've been told that someone outside was

handing out a pamphlet to jurors.  Did you read a pamphlet?  If

the answer is yes, please write down the number 26.

Question number 27, my final question is what I call my

catchall question.  This asks whether there's any other reason

that I've not asked about that might make it difficult for you

to sit fairly, impartially, and attentively as a juror in this

1    case.  Perhaps you have a religious, a moral, or a philosophical

2    reason or strong personal or political beliefs that you believe

3    would make it hard for you to be a fair and impartial juror.

4        In sum, is there some reason that I have not already

5    mentioned that would make it difficult for you to sit as a fair

6    and impartial juror in this case?  If so, please write down the

7    number 27.

8        All right.  So now that we've completed this part of the

9    jury selection process, we're going to take a short break in

10   just a minute, a ten-minute break.  But first, before you take

11   that break, I will ask Mr. Hopkins to collect all of your note

12   cards.

13       As I said before, I'm going to leave this courtroom with

14   the parties to this case, and we're going to go to another

15   courtroom, Courtroom 16.  Each one of you will be brought to

16   that courtroom one by one in the order that you're seated.

17       Again, with this size group, it's likely to take a while.

18   I'm certain that we won't get to all of you this morning, and

19   it's possible we don't get to some of you until tomorrow.  It

20   really depends upon your answers to the questions that I've

21   asked you this morning.

22       So I am going to excuse you all for about 10 minutes, but

23   let's wait until Mr. Hopkins gets the note cards, and then I

24   will ask you to -- once you've given him your note card, you can

25   take a brief break, and then you're going to come back.

1          Mr. Hopkins, do you want them back in this courtroom?

2          COURTROOM DEPUTY:  Yes.

3          THE COURT:  So you will come back to this courtroom,

4    and you will sit in the same seat as you are.  So take a look at

5    who is on either side of you to make sure you end up in the same

6    spot.  And I will see each of you individually in Courtroom 16,

7    I hope, in a short while.  Thank you for your attention.

8          (Recess taken from 10:18 a.m. to 10:34 a.m.)

9          THE COURT:  Before we bring in the jurors one by one,

10   I want to just give you all a heads-up about two things.  One

11   is, you've been given a copy of this pamphlet that was

12   apparently distributed outside the courthouse to some

13   individuals, I don't know everybody, but there was someone

14   handing them out.  So that's why I asked the additional

15   question, and we will follow up, if necessary, with them about

16   that.

17         Two, I wanted to preview how I'm looking at strikes for

18   cause.  Virtually every potential juror who we will question

19   today will have seen or read something about the January 6

20   events, perhaps even about Mr. Reffitt himself, and virtually

21   every juror will have some view about the January 6 events, and

22   that likely holds true of most Americans, not just those who

23   have been summoned here as jurors in this case.

24         The critical question that I will be asking myself in

25   deciding whether to strike someone for cause is whether the

potential juror has such fixed opinions about January 6 or about those who participated in the events of that day that he or she cannot impartially judge the innocence or guilt of Mr. Reffitt. And I'm citing *Patton v. Yount*, 467 U.S. at 1035.

This Circuit's case law makes clear that jurors are not required to guarantee their impartiality. They have to express, though, in a manner that's credible to the Court a clear intent to try to be open-minded. See *U.S. versus Gabriel*, 365 F.3d at 31, vacated on other grounds.

I appreciate that a heightened standard may also apply in higher profile cases like this one. So in addition to each juror's intent, I will closely consider how closely they followed the events of January 6. I will be considering their sources of information. And I will pay close attention to their candor and their demeanor. See *U.S. v. Haldeman*, 559 F.2d at 67, Note 51.

This list I'm about to give you isn't an exhaustive list by any means, but you should know that I will be inclined to strike jurors who have formed an opinion about Mr. Reffitt's guilt or innocence. I will also be inclined to strike those who are familiar with specific facts related to Mr. Reffitt's case and those who followed individual January 6 prosecutions very closely.

Those who are closely associated with or have been similarly situated to law enforcement officers who engaged with

1    Mr. Reffitt also are likely to be stricken, and I will strike

2    those who express reluctance in following my legal instructions,

3    as well as those who demonstrate undue hardship.

4          As I've already mentioned, I'm not inclined to strike

5    everyone who has an opinion about the January 6 events so long

6    as they credibly show a clear intent to be open-minded.  They

7    will not have to guarantee their impartiality.  They will just

8    have to show that their opinion isn't fixed.

9          I also will not automatically strike anyone who is related

10   to a law enforcement officer, nor will I automatically strike

11   anyone who lives or works near the Capitol.  See *Gabriel*,

12   365 F.3d at 30.  But I will be sure to follow up with those who

13   do to make sure that they can judge the evidence based upon

14   what's in the courtroom presented.

15         Any questions about that before we get started?

16              MS. BERKOWER:  No, Your Honor.

17              THE COURT:  Okay.  So unless you all have an

18   objection, I would be inclined to start the questioning for

19   those jurors who have indicated some sort of hardship up front

20   in the event there's some obvious hardship that would cause me

21   to strike them for cause.

22         Any disagreement with doing that?

23              MS. BERKOWER:  That's fine, Your Honor.

24              MR. WELCH:  No problem, Your Honor.

25              THE COURT:  In terms of those who have, you know, say,

1    for example, a trip or something like that, I may not -- if it's

2    a personal trip, I may not strike them for cause, but without

3    your objection, I would be inclined to move them to the bottom,

4    and if we don't need them, we won't use them.  I'd rather not

5    have someone distracted about the fun trip they're missing, but

6    I don't want to end up short on jurors because we've struck

7    someone.

8         Any objection to sort of moving them to the bottom of the

9    list?  None from Mr. Welch.  How about from the government?

10              MS. BERKOWER:  That's fine, Your Honor.

11              THE COURT:  All right, then.  So what I will do, when

12   I call the juror in, I will state the numbers that they've

13   answered yes to so that you all know.  Again, I will begin with

14   the ones that are hardship-related first.

15        So according to my stack, the first juror I have is 0587.

16   So we're going to be referring to them by number, not by name.

17   And at some point -- I'm having issues with my feed to the

18   transcript.  So at some point, I may need to take a break when

19   the IT person comes so that I can get this up and running.  I

20   may need to consult the answers that jurors have given, and

21   right now, my feed's not running.

22        (Pause.)

23              THE COURT:  All right.  I'm still having problems with

24   the feed to my computer.  If there's a motion to strike a juror

25   for cause and I think it's a close call and I want to review the

1    transcript, I'm just going to have to hold off on making a

2    decision as to that juror until I can do so.  All right?

3        So I will put on my mask.  And I will let you know ahead of

4    time, there are some jurors who said they would have an issue

5    with us taking our mask off when we're talking for a long time.

6    I think it makes sense -- you all can follow my lead.  If I have

7    my mask off, we can assume that that juror's comfortable, and

8    you can do your follow-up questions with your mask off.  But if

9    I have mine on, that means that that juror is uncomfortable, and

10   I'm going to keep it on.  All right?

11       So the first juror to come in will be 0587.  And this juror

12   has answered yes to question number 3 and question number 4.

13       (Prospective juror steps up.)

14            THE COURT:  Good morning, sir.

15            PROSPECTIVE JUROR:  Good morning.

16            THE COURT:  Sorry to move you from courtroom to

17   courtroom.  It looks challenging.

18            PROSPECTIVE JUROR:  It's fine.

19            THE COURT:  If you're comfortable taking your mask

20   off, you may do so.

21       So I just want to confirm that you're number 0587.

22            PROSPECTIVE JUROR:  Yes.

23            THE COURT:  And you have answered yes to question

24   number 3, which means that you have followed the news about the

25   January 6 events at the Capitol; is that right?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  I'm wondering, have you followed news of

3    specific individuals, Mr. Reffitt or anyone else, or have you

4    just generally read articles?

5          PROSPECTIVE JUROR:  Just generally read articles.

6          THE COURT:  Can you tell us something about what

7    you've read and what you remember?

8          PROSPECTIVE JUROR:  There's a lot of people.  I know

9    there's a lot of different sides to the story.  I've tried to

10   get all sides, different news sources to tell me what happened

11   that day.  But I don't have any recollection about, like, any

12   individuals.  I tried to read CNN and Fox News and that kind of

13   thing to see what they were saying about that day to try to get

14   a better picture about it, but that's it.

15         THE COURT:  Tell me the kinds of things you've

16   reviewed.

17         PROSPECTIVE JUROR:  Just some news sources were saying

18   there was more violence than other news sources potentially.  I

19   feel like there's a lot of people trying to spin it different

20   ways.

21         THE COURT:  I'm sorry.  You're speaking really

22   quickly.  I'm having a hard time hearing you.  You said some

23   newspapers; is that right?

24         PROSPECTIVE JUROR:  News sources, stuff online.  I've

25   been -- I've tried, just like I do for anything that's going on,

1   just to try to get a broader picture of what happened that day,

2   like I do for anything that I'm interested in that's going on in

3   the world.

4           THE COURT:  And how closely have you followed this

5   since January 6?  Is it a daily sort of thing?

6           PROSPECTIVE JUROR:  No, not recently.  Right after, I

7   did, like most people, for the first couple of days, and then if

8   something came up in my news feed, I would read it, but that's

9   it.

10          THE COURT:  Have you read anything about Mr. Reffitt?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  I think he's been in the newspaper on

13   occasion.  You haven't read anything at all about him?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Are you certain about that?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Do you remember anyone that you've read

18   anything about?

19          PROSPECTIVE JUROR:  The QAnon Shaman, he's the guy I

20   remember, but in terms of any names, I can't think of anybody.

21          THE COURT:  It sounds like you've sort of sought out

22   information relating to the January 6 events.  Is that correct?

23   Or do you just read about it when you see a headline?

24          PROSPECTIVE JUROR:  Initially, I did.  I mean, I live

25   in the city.  I wanted to know what happened, but recently, no.

1      THE COURT:  Based upon what you've read, have you

2  formed any opinion about the guilt of people involved in the

3  events of January 6?

4      PROSPECTIVE JUROR:  No.  That's your job, and this

5  is -- I don't know their entire story.  So I would say I don't

6  know.

7      THE COURT:  All right.  And you haven't heard

8  anything, not only about Mr. Reffitt but about the allegations

9  in this case?

10      PROSPECTIVE JUROR:  No.

11      THE COURT:  All right.  So you've answered yes to

12  question 4, which is the question I asked about have you seen

13  news about Mr. Reffitt or other individuals.  And you're talking

14  about the Shaman.  Who else?

15      PROSPECTIVE JUROR:  Ashley Babbitt, I think, that

16  lady.

17      THE COURT:  All right.  Do you come into this

18  courtroom -- I'm wondering whether you come in here knowing a

19  lot of details about the events of that day.

20      PROSPECTIVE JUROR:  I really don't.  I know what was

21  big on the news right at the time, and that was -- if it's

22  happened recently, I don't really know the details, no.  I

23  haven't been following it.

24      THE COURT:  We really want to -- obviously, no one can

25  come into this courtroom, very few, I think, with a completely

1   clean slate about the events of January 6, because it was

2   reported so widely.  And yet, we don't want jurors who have

3   formed an opinion about what happened that day.

4        So I'm wondering whether, based on the volume or the nature

5   of the material that you've read, whether you've formed any

6   opinions about any individuals or any actions that individuals

7   have taken such that it would make it difficult for you to judge

8   this case based solely on what you hear in this courtroom.

9        PROSPECTIVE JUROR:  No, I don't think so.

10       THE COURT:  You think you could put aside everything

11  you've read --

12       PROSPECTIVE JUROR:  Yeah.

13       THE COURT:  And even if you heard something in this

14  courtroom that was inconsistent with what you read, would you be

15  willing to base any decision based on what you've heard in this

16  courtroom, assuming you found it credible?

17       PROSPECTIVE JUROR:  Yes.

18       THE COURT:  All right.  These are the only questions

19  that you've answered yes to.  There's no hardship for you to

20  serve on this jury if you were selected?

21       PROSPECTIVE JUROR:  No.

22       THE COURT:  You work in consulting.  What kind of

23  consulting?

24       PROSPECTIVE JUROR:  I'm a program analyst.

25       THE COURT:  Oh, wait.  I'm sorry.  I have the wrong --

```
 1              PROSPECTIVE JUROR:  Yeah, that's not me.

 2              THE COURT:  This is in the wrong order.  And where do

 3     you work?

 4              PROSPECTIVE JUROR:  Department of Defense Education

 5     Authority.

 6              THE COURT:  Sorry?

 7              PROSPECTIVE JUROR:  Department of Defense Education

 8     Authority.

 9              THE COURT:  So you work for DoD?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Based on the fact that you work for DoD,

12     would you be predisposed to the government's side of the case in

13     this case?

14              PROSPECTIVE JUROR:  No.  I just joined that job two

15     weeks ago.  It is a brand-new job.

16              THE COURT:  What did you do before that?

17              PROSPECTIVE JUROR:  I had a similar job with Army

18     National Guard for child and youth programs.  I was a program

19     analyst for all of their child and youth programs.

20              THE COURT:  All right.  Mr. Welch or Ms. Berkower, do

21     you have any follow-up?

22              MS. BERKOWER:  Only briefly, Your Honor.

23              THE COURT:  Okay.

24              MS. BERKOWER:  Good morning.  I'm Assistant United

25     States Attorney Risa Berkower.  Nice to meet you, sir.
```

1    Just a brief follow-up about when you said you were looking

2    for all the different sides and you looked at many different

3    sources of news concerning January 6.  Can you just explain what

4    some of those sources were that you were referring to?

5                    PROSPECTIVE JUROR:  CNN, NBC, Fox News, the big ones

6    that are on TV.

7                    MS. BERKOWER:  So you were referring to TV broadcasts

8    rather than online sources?

9                    PROSPECTIVE JUROR:  Mostly, yeah.

10                   MS. BERKOWER:  Were you also looking at online news

11   sources as well?

12                   PROSPECTIVE JUROR:  I was.  Yahoo! is what I use, so

13   anything that pops up there.

14                   MS. BERKOWER:  Any news publications other than Yahoo!

15   online?

16                   PROSPECTIVE JUROR:  No.

17                   THE COURT:  Any questions, Mr. Welch?

18                   MR. WELCH:  No questions.  Thank you.

19                   THE COURT:  Thank you, sir.  You may be excused, not

20   completely, but from this room.

21                   PROSPECTIVE JUROR:  Okay.  Thank you.

22        (Prospective juror steps down.)

23                   THE COURT:  Any motion with respect to that -- I mean

24   that juror?

25                   MS. BERKOWER:  Not from the government, Your Honor.

1          THE COURT:  Mr. Welch?

2          MR. WELCH:  No, thank you.

3          THE COURT:  The next juror is juror 1386.  This juror

4    also has answered yes to question 3, question 4, question 19,

5    and question 20.

6          MR. WELCH:  Excuse me, Your Honor.  I have a different

7    name with that number.  I think 1386 is the next one.

8          THE COURT:  Yes.

9          MR. WELCH:  That should be a woman.

10          THE COURT:  Why do you think it's not a female?

11          MR. WELCH:  I thought you said Mister --

12          THE COURT:  Oh, I did?  The next juror is 1386, who

13    does appear to be a woman.

14       (Prospective juror steps up.)

15          THE COURT:  Good morning, ma'am.  If you're

16    comfortable taking your mask off, please do.

17          PROSPECTIVE JUROR:  Thank you.

18          THE COURT:  So you have answered yes to four

19    questions.  The first one you've said yes to is following the

20    news about the January 6 events at the Capitol.

21       Can you describe what sort of news that you followed?

22          PROSPECTIVE JUROR:  TV, newspaper, some Apple news on

23    my phone.

24          THE COURT:  Is this consistently since January 6?

25          PROSPECTIVE JUROR:  Yeah, I do that every day.

1          THE COURT:  Are you reviewing kind of the headline

2     news, or are you actually looking for articles relating to the

3     January 6 events or information on the Internet?

4          PROSPECTIVE JUROR:  I wouldn't say I'm specifically

5     looking for it, but if it comes up as I'm reading my -- the

6     sites that I read, I will read the headlines and start to read

7     some of the introductory paragraphs, and if it's interesting to

8     me, I will read the rest.  But I don't specifically seek it out.

9          THE COURT:  All right.  And do you know whether you've

10    read anything specifically about Mr. Reffitt, the defendant in

11    this case?

12         PROSPECTIVE JUROR:  The name's not familiar to me.  So

13    I don't think I've read anything specifically about him.  I

14    don't remember his name.  I could have read something, but I

15    don't recall his name.

16         THE COURT:  Are there other individuals who you can

17    recall having read about?

18         PROSPECTIVE JUROR:  In general, the Proud Boys, QAnon,

19    and people more related to organizing the event before that,

20    Giuliani, but that's about it, just in general.

21         THE COURT:  Do you think, based upon what you've read,

22    would you be able to set that information aside if you were

23    selected as a juror in this case and decide this case based only

24    on what you hear in this courtroom?

25         PROSPECTIVE JUROR:  Yes, I think I could.

1          THE COURT:  Even if that evidence, that testimony,

2    exhibits, even if it conflicted with something you might have

3    read or seen previously?

4          PROSPECTIVE JUROR:  I think I could.  I understand the

5    obligation to put that aside.

6          THE COURT:  And you think you could do that?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  Based upon what you've heard, have you

9    formed any opinions about the individuals who were involved in

10   the events of January 6?

11         PROSPECTIVE JUROR:  I feel strongly about the event

12   itself.  I don't know if I've formed specific opinions about any

13   specific individuals.

14         THE COURT:  Can you share with us what your general

15   opinion about the January 6 events is.

16         PROSPECTIVE JUROR:  That it was pretty atrocious, the

17   violent part of it, and frightening.  I'm a native D.C. person,

18   and it was hard to see that.

19         THE COURT:  Do you live near the Capitol?

20         PROSPECTIVE JUROR:  No.  I live near the Cathedral.

21         THE COURT:  Were you affected in any way,

22   inconvenienced based upon the events of January 6?

23         PROSPECTIVE JUROR:  No, not in any big way.  I

24   actually had COVID then, and I was isolating.

25         THE COURT:  Oh, I'm sorry.  So you were stuck watching

1   TV at the time?

2           PROSPECTIVE JUROR:  Unfortunately, yes.

3           THE COURT:  Given that you have strong sort of

4   negative feelings about the event itself, do you think that you

5   would be able to put those strong feelings aside and come into

6   this courtroom and decide this case in a fair and impartial way?

7           PROSPECTIVE JUROR:  I would really hope I can.  I'm an

8   attorney, and I understand the obligation, and I have been on a

9   jury before, and I've had to do that.

10          THE COURT:  All right.  Tell me, what type of attorney

11  are you?

12          PROSPECTIVE JUROR:  So I'm a former attorney, but I

13  practiced mostly transactional law, real estate law.  So I was

14  here in D.C. at Arent, Fox, Kintner, Plotkin and Kahn -- now

15  it's Arent, Fox -- representing mostly developers in the real

16  estate world, and then moved up to New York and I was with

17  Milbank Tweed on the lender side, so mostly big banks who were

18  lending on real estate deals, securitized real estate.

19      And my husband is an attorney as well.

20          THE COURT:  What kind of attorney is he?

21          PROSPECTIVE JUROR:  He's retired from Arent, Fox, and

22  he represented mostly the developers on the real estate side,

23  and he's now working as -- for one of those developer clients

24  outside of the firm.

25          THE COURT:  All right.  So based on your knowledge of

1    the law, whether it goes all the way back to law school or

2    discussions with criminal defense lawyers or prosecutors, I'm

3    wondering whether you would be able to put aside what you think

4    you may know about the criminal law and follow any instructions

5    that you're given in this courtroom, even if those instructions

6    conflict with what you thought you knew as a lawyer?

7            PROSPECTIVE JUROR:  I believe I could do that, and I

8    was on a criminal case before as a juror, and I remember going

9    through that process in my head of -- frankly, I didn't remember

10   very much about criminal law.  So it was sort of as if I was

11   hearing it for the first time.

12           THE COURT:  All right.  And there's nothing about your

13   experience as a lawyer that makes you question whether you could

14   be fair and impartial in this case?

15           PROSPECTIVE JUROR:  No, not -- no.  I understand the

16   obligation, and I think I really could be fair and impartial.

17           THE COURT:  You've also mentioned that you have

18   perhaps family members or close friends or yourself in law

19   enforcement at one time, is that right, question number 19?  Am

20   I remembering that correctly?

21           PROSPECTIVE JUROR:  I think that was close family

22   member --

23           THE COURT:  Oh, sorry.  So 19 is the lawyer one.

24   Okay.  I'm going to get to question 20.  I'm sorry.  I had --

25   that was question 18.  Let me back up before I get to

question 20.

I just want to drill down a little bit more on your views about January 6.  Our goal here is to try to select jurors who come to the courtroom without any preconceived notions about the guilt or innocence of a defendant, as you know.  And understanding that you have a negative view about those events, I just want to follow up with you a little bit more about whether you think that you could follow the instructions, including the instruction that I've already explained in the Ceremonial Courtroom, that Mr. Reffitt sits here presumed innocent unless and until the government proves his guilt beyond a reasonable doubt.

Is there anything about the views you hold that would make you lean, perhaps, towards the government's side at the start of this case, which is really not what we want?

PROSPECTIVE JUROR:  I know; I know.  It's a hard task for you.

I think I haven't seen anything on TV -- there's been so much video with different faces, and the defendant's not familiar to me.  So I don't -- honestly, I think if I had seen something and I recognized the defendant, I think it would be really hard for me, just the presence there on the Capitol.  I think that would be hard to overcome.  But that's not the case.

So honestly, I think I can look at this fresh, but I do feel like if it was somebody that I had seen and seen do

1    something, then it would be really hard.

2              THE COURT:  And so far as you know -- Mr. Reffitt just

3    took his mask down.  You don't recognize him from the TV?

4              PROSPECTIVE JUROR:  No; huh-uh.

5              THE COURT:  So you've answered yes to question

6    number 20, and that means you know someone -- you or someone you

7    know has been arrested, charged, convicted of a crime or been a

8    victim or a witness to a crime.

9         Before you answer my questions, I want to know whether you

10   would feel more comfortable talking about the answer to that

11   question privately with the husher on.

12             PROSPECTIVE JUROR:  No.  It involves -- our house was

13   robbed a couple of times, and our car was robbed.  That's the

14   extent of it.

15             THE COURT:  Okay.  Anything about the way the judicial

16   system operated in those cases that make you question it?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Ms. Berkower, any follow-up

19   questions?

20             MS. BERKOWER:  None from the government, Your Honor.

21             THE COURT:  Mr. Welch?

22             MR. WELCH:  No, thank you.

23             THE COURT:  All right.  Thank you, ma'am.  You're

24   excused.

25             PROSPECTIVE JUROR:  I feel I should be obligated to

1    tell you that when I was at Milbank, we represented lenders, and

2    some of that involved Trump bankruptcies, and I also lived for a

3    period of time in a Trump building.

4            THE COURT:  You did what?

5            PROSPECTIVE JUROR:  I lived for a period -- rented an

6    apartment in a Trump building.

7            THE COURT:  Do you have especially strong feelings one

8    way or the other about Former President Trump?

9            PROSPECTIVE JUROR:  Not because of living in the

10   building or being a part of Milbank.

11           THE COURT:  But generally?

12           PROSPECTIVE JUROR:  Yeah.  I mean, I have strong

13   feelings about him.

14           THE COURT:  All right.  Is there anything about those

15   feelings that would make you not give both sides a fair trial

16   here?

17           PROSPECTIVE JUROR:  No.  I think this has to be looked

18   at individually.

19           THE COURT:  All right.  Thank you, ma'am.

20       Any follow-up before I release this juror?

21           MS. BERKOWER:  Not from the government, Your Honor.

22           MR. WELCH:  No, thank you, Your Honor.

23       (Prospective juror steps down.)

24           THE COURT:  All right.  This next juror is juror 0328.

25   The juror has marked a lot, including the hardship question,

1    which I'm inclined to start with.  The juror has also marked 3,

2    4, 5, 6, 12, and 13.  So I will start with the hardship

3    question, and if you all at any point agree that it's

4    appropriate to strike this juror for cause, you're going to ask

5    to ask a question?  Is that what you've decided?  All right,

6    then.

7          (Prospective juror steps up.)

8                THE COURT:  Good morning.

9                PROSPECTIVE JUROR:  Hello.

10               THE COURT:  Would you be comfortable taking off your

11   mask?

12               PROSPECTIVE JUROR:  I can do that.

13               THE COURT:  If I can ask you to sort of lean forward,

14   because the microphone is in front of you, and it's hard for the

15   court reporter to pick up your voice and for us to hear as well

16   as the other courtrooms.

17               PROSPECTIVE JUROR:  All right.  Just let me know if

18   you need me to speak louder.

19               THE COURT:  You've answered yes to a number of the

20   questions, and I want to start with question 22, which you

21   stated that serving as a juror would be an extreme hardship.

22        Can you explain why that would be the case?

23               PROSPECTIVE JUROR:  I wasn't sure of the definition of

24   an extreme hardship.  I have a trip planned to see family.

25               THE COURT:  And when is that trip?

1          PROSPECTIVE JUROR:  Starting the 12th, March 12th

2    through the 17th.

3          THE COURT:  So I don't think that this trial is

4    expected to last that long.  You never know, of course.  But is

5    this a trip that you could delay if the jury were still

6    deliberating?  I hope the evidence is not still going at that

7    point.  I will be very frustrated if it is.

8          PROSPECTIVE JUROR:  If necessary, yes.

9          THE COURT:  You could?  All right.  I appreciate your

10   willingness to serve.  I know it's inconvenient.

11      So moving on to some of the other questions you've said yes

12   to, you said you have followed the news about the January 6

13   events at the Capitol.  Can you tell us more about that?

14         PROSPECTIVE JUROR:  I feel pretty invested in the

15   events that happened.  I follow the news fairly closely,

16   especially podcasts.  So I subscribe to several podcasts to

17   listen to them daily.

18         THE COURT:  What podcasts are you listening to daily?

19         PROSPECTIVE JUROR:  Rachel Maddow, several of the Pod

20   Save America kind of family of podcasts.

21         THE COURT:  And you say you're "pretty invested."

22   What do you mean by that?  You're invested in following the news

23   of the Capitol events in particular?

24         PROSPECTIVE JUROR:  I think so, and have strong

25   feelings about it.

```
 1                THE COURT:  All right.  Tell us about those feelings.

 2                PROSPECTIVE JUROR:  I think it didn't feel safe, and I

 3     think maybe some personal reservations around the reasons why

 4     people came and the events that occurred.

 5                THE COURT:  Do you think that you would be able to put

 6     those strong -- I take it these are negative feelings?

 7                PROSPECTIVE JUROR:  (Nodded head.)

 8                THE COURT:  All right.  Do you think you would be able

 9     to put those strong negative feelings aside and judge the guilt

10     or innocence of Mr. Reffitt based solely on the evidence here,

11     or do you feel that you have such strong opinions about it that

12     he would not receive a fair trial?

13                PROSPECTIVE JUROR:  I think it would be difficult.  I

14     think everyone deserves a fair trial.  But I think given my

15     experience and the information I already have, I have some

16     strong thoughts that would be hard to change.

17                THE COURT:  Do you have information about him in

18     particular?

19                PROSPECTIVE JUROR:  I don't.

20                THE COURT:  All right.  Do you have -- you've learned

21     information about other individuals, though -- you answered that

22     question as well -- specific individuals who have been charged

23     in connection with the January 6 events?

24                PROSPECTIVE JUROR:  General news coverage, so people

25     who have already been charged.
```

1          THE COURT:  Do you remember in particular?

2          PROSPECTIVE JUROR:  Not names.

3          THE COURT:  All right.  You answered yes to the

4    question that you do have such strong feelings or opinions that

5    you can't put them aside and serve as a fair and impartial juror

6    in this case.

7      And here, I sense a little hesitancy, like you might be

8    able to, but we really appreciate your candor and do want to try

9    to have a set of jurors deciding this case who are neutral when

10   they come in.  So if you're walking into this courtroom kind of

11   leaning towards the government, that's something we want to

12   know.  It sounds like based on your answers here, you might feel

13   you are.

14         PROSPECTIVE JUROR:  I don't think I can be 100 percent

15   impartial.

16         THE COURT:  You don't think you can?

17         PROSPECTIVE JUROR:  I don't.

18         THE COURT:  Okay.  And you also said that you do have

19   an opinion about Mr. Reffitt's guilt or innocence.

20      I assume that you think he's guilty?

21         PROSPECTIVE JUROR:  I think that's a hard statement to

22   make, but I think to assume innocence until proven guilty, that

23   is a hard stance to take.

24         THE COURT:  Because you understand an instruction that

25   I've given already and would continue to give throughout this

```
 1    trial is that Mr. Reffitt's innocent unless and until the

 2    government proves his guilt beyond a reasonable doubt.

 3         But it sounds like you might struggle applying that

 4    instruction?

 5              PROSPECTIVE JUROR:  I think so.

 6              THE COURT:  Okay.  Any follow-up?

 7              MS. BERKOWER:  Not from the government, Your Honor.

 8              THE COURT:  Mr. Welch?

 9              MR. WELCH:  No, Your Honor, and I have a question for

10    the Court.

11              THE COURT:  Okay.  All right, ma'am.  Thank you so

12    much.  You can step out.

13         (Prospective juror steps down.)

14              THE COURT:  Is there a motion?

15              MR. WELCH:  Your Honor, I have a motion for cause.

16              THE COURT:  Any objection?

17              MS. BERKOWER:  Not from the government, Your Honor.

18              THE COURT:  All right.  So juror number 0328 will be

19    stricken for cause.

20         All right.  The next juror is 1419.  This juror has also

21    answered yes to 3, 4, 6, 19, and 22.  Again, I will start with

22    the hardship question.

23         (Prospective juror steps up.)

24              THE COURT:  Good morning, ma'am.

25              PROSPECTIVE JUROR:  Good morning.
```

1          THE COURT:  If you're comfortable taking your mask

2    off, you may do so.

3          All right.  So I have your card here before me, and I see

4    that you have answered yes to the question that serving as a

5    juror would be an extreme hardship to you.

6          PROSPECTIVE JUROR:  Going to the end first.

7          THE COURT:  Yes, because I want to hear what this is

8    before we go through all the other questions.

9          PROSPECTIVE JUROR:  Well, for me, these are hardships.

10   It's Ash Wednesday this week, Wednesday.  I'm newly converted to

11   the Episcopal faith.  I have, however, been a member of a church

12   that my husband and I have attended for a couple years.  This

13   would be my first Ash Wednesday service since I've been a member

14   of the choir.  It's a small but very serious choir, and they are

15   counting on me because I'm the only alto, too.  That may sound

16   ridiculous to many people, but that's a hardship to me, and it

17   would be a hardship to them to give them last-minute notice that

18   I have to miss Wednesday.

19         That's one thing.  The other thing is the last two days of

20   the period on my summons, next Thursday and Friday, my husband

21   and I have a long-time plan to be with our daughter and

22   son-in-law in New Orleans.  We haven't seen them in ages, and we

23   don't know when the next time we see them will be.

24         THE COURT:  Is this still Mardi Gras then?

25         PROSPECTIVE JUROR:  No, Mardi Gras is tomorrow.  Mardi

1    Gras is Tuesday and then comes Ash Wednesday.

2              THE COURT:  Is this just a weekend trip?

3              PROSPECTIVE JUROR:  It's a couple-day trip because I

4    want to come back to be with the choir on Sunday.  So it's a

5    couple days, Thursday and Friday trip, and we're coming back on

6    Saturday.

7              THE COURT:  Tell me about the time of the service in

8    the church where --

9              PROSPECTIVE JUROR:  It's at 12:10, and we have to be

10   there for rehearsal by 11:00.

11             THE COURT:  Let me ask you about some of your other

12   answers to questions.  It sounds like you've heard news about

13   the Capitol events, and you've also heard or seen news about

14   Mr. Reffitt or others, individuals.

15        Can you tell us about that?

16             PROSPECTIVE JUROR:  Yes.  The defendant's name did

17   seem somewhat familiar, but I couldn't remember anything

18   specific I had read.  I follow news voraciously, and I've read

19   everything, although not -- not on social media but on

20   Washington Post, but I read that voraciously on this and many

21   subjects that people send me, and I watch the news almost

22   constantly.  So --

23             THE COURT:  Do you just -- with respect to the Capitol

24   events, do you just watch and read what comes to you, or do you

25   actually seek out articles and stories and whatever else about

1    those events?

2           PROSPECTIVE JUROR:  I don't know that I seek it out,

3    because I feel like I'm getting it constantly.  When I say

4    "constantly," I'm one of those people who whatever I'm doing, I

5    have the news on.  So I don't seek it out beyond that.  But if

6    people send me things, I read them.

7           THE COURT:  All right.  But as you sit here now, you

8    don't think you've heard -- you think you've read or seen

9    something about Mr. Reffitt, but you can't remember the

10   specifics; is that right?

11          PROSPECTIVE JUROR:  That's correct.

12          THE COURT:  And I assume that means you don't know

13   about the specific allegations in this case until today?

14          PROSPECTIVE JUROR:  No, not the specifics.  Certainly,

15   I know these kinds of allegations are at issue in many cases,

16   but not this particular case.

17          THE COURT:  All right.  You've -- it's interesting to

18   me that you said yes to you have an opinion about Mr. Reffitt's

19   guilt or innocence, but you didn't say you have such strong

20   feelings or opinions about the Capitol events that it would be

21   difficult for you to be a fair and impartial juror.

22          PROSPECTIVE JUROR:  Right.

23          THE COURT:  So of course, to be a fair and impartial

24   juror, you can't have a view on Mr. Reffitt's guilt or

25   innocence.  So should you have answered yes to 5 as well?

1          PROSPECTIVE JUROR:  (Nodded head.)

2          THE COURT:  All right.  Tell us about that.

3          PROSPECTIVE JUROR:  There is a tension.  In answering

4    each question, I hesitated what to answer.  I have very strong

5    political beliefs.  I have very strong views in general about

6    the events of that day.  So I thought that I should indicate

7    that in the response to the question about the defendant,

8    although I don't -- as I say, the name sounds vaguely familiar,

9    but I can't attribute particular actions to a particular

10   defendant or another.  So I felt I should indicate that I have

11   strong views.

12       However, I am an attorney.  I believe in the system, and I

13   believe very strongly that I can be impartial.

14         THE COURT:  You do?  You feel strongly that you can be

15   impartial?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  So I'm confused.  Maybe you meant to

18   answer yes to a different question, because you said that you do

19   have an opinion about Mr. Reffitt's guilt --

20         PROSPECTIVE JUROR:  I thought I'd better be honest

21   by -- no, I tried to be careful about it.  Everything I have

22   read and heard about this and what I went through that day

23   thinking about it, watching it on the news happen, I know that I

24   have opinions.  I think most people in this world do, whether

25   they want to admit it or not.  I believe I have opinions.

1          However, I believe that our system only works if people of

2     good faith try to consume the evidence and follow the legal

3     instructions that are given and go with the evidence, and I

4     think I could do that.

5          But I felt I'd better indicate my view on the earlier

6     question so that people can -- y'all may think something

7     different when you hear me.

8               THE COURT:  I appreciate your honesty.  That's exactly

9     what we want you to do, and we appreciate you being forthcoming

10    about that.

11         Tell me, what kind of attorney are you?

12              PROSPECTIVE JUROR:  Oh, I have been retired for ages.

13    I went to law school when I was fairly young, and I practiced

14    for eight years.  Some of that was part-time after I had my

15    children.  I was in private practice at Wilmer Cutler Pickering,

16    and now it's WilmerHale.

17         My husband is an attorney.  He's just gone on senior

18    status.  He was for a long time a member of the D.C. ACLU board,

19    and then he was on the national board, and now he's going to be

20    chair, I believe, of the board of the International Senior

21    Lawyers Project, ISLP.

22         My son's a lawyer in Boston.

23              THE COURT:  So have either of you practiced criminal

24    law when you were practicing?

25              PROSPECTIVE JUROR:  No.  My husband did some work on

1   pro bono cases, and years ago, he was on a death penalty case in

2   that capacity, but that was not his --

3           THE COURT:  Based on anything you may know about the

4   criminal law from your conversations with other lawyers or your

5   studies in law school, is there anything about that that makes

6   you think it might be difficult for you to follow the

7   instructions I give you, even if they're inconsistent with what

8   you remember or were told?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  All right.  So I just want to circle back

11  to this strong opinion and just make sure that I understand

12  where you're coming from.  It sounds like you're saying that

13  although you have strong, I take it, negative views about the

14  events of the Capitol on January 6 of 2021, you think you can

15  put those strong views aside and come into this courtroom and

16  judge this case fairly and impartially based on the evidence

17  that's presented in this court?

18          PROSPECTIVE JUROR:  I think I could.  I would do my

19  best to.  I believe I could.

20          THE COURT:  And you would also follow this Court's

21  instructions?

22          PROSPECTIVE JUROR:  Oh, absolutely.

23          THE COURT:  All right.  Okay.  Any questions,

24  Ms. Berkower?

25          MS. BERKOWER:  Not from the government, Your Honor.

1          THE COURT:  Mr. Welch?

2          MR. WELCH:  Yes, please, Your Honor.

3      Ma'am, you mentioned something about what you went through

4  that day.  What did you mean by that?

5          PROSPECTIVE JUROR:  I didn't go through anything

6  different than most people who were just watching it unfold.  I

7  was at home.  I was watching TV coverage.  That's all I mean,

8  that I was actively focused on it from that moment on.

9          MR. WELCH:  Thank you.

10          THE COURT:  Anything else?

11      All right.  Thank you so much.

12          PROSPECTIVE JUROR:  Okay.

13      (Prospective juror steps down.)

14          THE COURT:  Any motion?

15          MR. WELCH:  No, Your Honor.

16          THE COURT:  All right.  Before we bring in the next

17  juror, let me review the questions.  This is juror 1541.  This

18  juror has marked questions 1, 2, 3, 4, 5, 6, as well as 18 and

19  19.

20      (Prospective juror steps up.)

21          THE COURT:  Good morning, sir.

22          PROSPECTIVE JUROR:  Good morning.

23          THE COURT:  If you're comfortable taking your mask

24  off, could you, please?

25          PROSPECTIVE JUROR:  Sure.

```
1              THE COURT:  All right.  So you've answered yes to all
2       of the questions relating to the Capitol events, the first
3       being, "Do you live or work at or near the U.S. Capitol?"
4              PROSPECTIVE JUROR:  Yes.
5              THE COURT:  Which is it?
6              PROSPECTIVE JUROR:  I live on Capitol hill.
7              THE COURT:  How close to the Capitol do you live?
8              PROSPECTIVE JUROR:  About a mile.
9              THE COURT:  Were you at your home on January 6 of
10      2021?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  You were?
13             PROSPECTIVE JUROR:  Yes.
14             THE COURT:  Were you inconvenienced that day by the
15      events of the Capitol?
16             PROSPECTIVE JUROR:  Not physically, you know.
17             THE COURT:  Were you at home that day watching the TV?
18             PROSPECTIVE JUROR:  Yes.
19             THE COURT:  You also mentioned that you or someone you
20      know has a direct or indirect connection to the January 6 events
21      at the Capitol.  What is that?
22             PROSPECTIVE JUROR:  A close friend of mine at the time
23      was Chief of Staff to the Deputy Secretary of Homeland Security
24      and so dealt with a lot of the, you know, actions on that day
25      and the aftermath.
```

1        THE COURT:  Was he or she at the Capitol that day?

2        PROSPECTIVE JUROR:  No, not at the Capitol.

3        THE COURT:  Have you had a lot of conversations with

4   that person about the events?

5        PROSPECTIVE JUROR:  I would say so, yes.

6        THE COURT:  And what kinds of conversations?

7   Specifics about what happened?

8        PROSPECTIVE JUROR:  Less specifics and more about just

9   sort of the general, you know, everything that happened that

10  day, how it happened, why it happened, that sort of thing.

11       THE COURT:  Did you hear a lot of information about

12  individuals who were injured that day from that friend?

13       PROSPECTIVE JUROR:  Not from that person.

14       THE COURT:  All right.  Tell us about the news that

15  you've read related to the -- read or seen related to the

16  Capitol events.

17       PROSPECTIVE JUROR:  I would say just a lot of the

18  general coverage that's been in The Washington Post, New York

19  Times, CNN, MSNBC, for, you know, the last year.

20       THE COURT:  And you've tracked it consistently since

21  January 6?

22       PROSPECTIVE JUROR:  I wouldn't say I've made a point

23  to track it, but it's just -- I consume a lot of news, and

24  that's been a part of it.

25       THE COURT:  What sources have you seen information

about it in?

PROSPECTIVE JUROR:  Washington Post, New York Times, MSNBC, CNN, various sources on Twitter, BuzzFeed, and other things like that, yeah.

THE COURT:  All right.  You've also answered yes to the question that you've heard or seen news about Mr. Reffitt or others who were at the Capitol on January 6.

Can you tell us about that?

PROSPECTIVE JUROR:  Yes.  I do recall seeing one story about the defendant, you know.  I can't say exactly when, but I know that name's been familiar.  And then actually just this morning before I came into court, I saw a story about how jury selection was --

THE COURT:  Little did you know.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  Do you remember any specifics about the articles you've read about -- not the one today, but the one earlier?

PROSPECTIVE JUROR:  Just that it involved a firearm at the Capitol, yeah.

THE COURT:  You've stated that you have such strong feelings or opinions about the Capitol events that you feel it would be difficult for you to be a fair and impartial juror.

Can you elaborate on that, please?

PROSPECTIVE JUROR:  Sure.  This is not me trying to

1    get out of jury service.  I do view it as a civic

2    responsibility.  But just being so close to it that day and in

3    general, I view it as so beyond the pale of anything that was

4    acceptable behavior, that I would like to think I could be

5    impartial, but I think that would be difficult.

6              THE COURT:  You think that would be difficult for you?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Even though, as I've already instructed

9    you, you would have to assume -- if you were selected as a

10   juror, you have to come into this courtroom, you know, in the

11   position that the defendant is innocent until proven guilty

12   beyond a reasonable doubt.  You think that would be difficult

13   for you to do?

14             PROSPECTIVE JUROR:  I understand that, and if

15   selected, I would absolutely strive to do my best, but I do

16   believe that would be difficult.

17             THE COURT:  All right.  So when you say you have an

18   opinion about Mr. Reffitt's guilt or innocence, as you sit here

19   now, you would be leaning towards the prosecution?

20             PROSPECTIVE JUROR:  Again, I hate to prejudge

21   anything, but if you're asking me that question and based upon

22   everything I know so far, I think that's a fair assumption, yes.

23             THE COURT:  All right.  You also mentioned that you

24   have some family members, close friends who work in law

25   enforcement?

1          PROSPECTIVE JUROR:  My sister-in-law formerly worked

2    at the Department of Justice, although that was years ago, and

3    then as I mentioned, my close friend works at DHS.

4          THE COURT:  And you have -- did you answer the next

5    question, having family members or close friends as lawyers or

6    students?  Is that from your sister?

7          PROSPECTIVE JUROR:  My sister-in-law, she's an

8    attorney, and also, I have another -- two close friends that are

9    attorneys.

10         THE COURT:  All right, sir.  We do appreciate your

11   candor.

12       Are there any follow-up questions?  Ms. Berkower?

13         MS. BERKOWER:  Good morning.

14         PROSPECTIVE JUROR:  Good morning.

15         MS. BERKOWER:  I just wanted to follow up on the

16   response you gave to Judge Friedrich a moment ago.  She noted to

17   you that she's going to instruct you -- you will be required, if

18   you are seated as a juror, to set aside the opinions that you

19   have, and you said that you would do your best, it would be

20   difficult.

21       Do you believe that you could do it?

22         PROSPECTIVE JUROR:  I believe I could, yes, and again,

23   I will do my best, but I do have strong opinions about the

24   events of that day.

25         MS. BERKOWER:  So you're confident you could set aside

1      those opinions if seated as a juror?

2                  PROSPECTIVE JUROR:  I would strive to, yes.

3                  THE COURT:  And I think you said you think that you

4      could and you would strive to, but how confident are you that

5      you would, in fact, be able to follow the Judge's instructions

6      to set aside those opinions and judge the case just on the

7      evidence in the courtroom and the law as she gives it to you?

8                  PROSPECTIVE JUROR:  I believe I could, yes.

9                  MS. BERKOWER:  All right.  Thank you.

10                 THE COURT:  Mr. Welch?

11                 MR. WELCH:  Please.

12          You also indicated, when Judge Friedrich asked, that you

13     would hate to prejudge anything but that you would be leaning

14     toward the prosecution; is that fair to say?

15                 PROSPECTIVE JUROR:  I believe that's what I said, yes.

16                 MR. WELCH:  Nothing else, Your Honor.  Question for

17     the Court.

18                 THE COURT:  All right.  Okay.  Thank you, sir.  We

19     appreciate you coming in.

20                 PROSPECTIVE JUROR:  Thank you.

21          (Prospective juror steps down.)

22                 THE COURT:  All right.  Is there a motion?

23                 MR. WELCH:  There's a motion for cause, Your Honor.

24                 THE COURT:  Government's position?

25                 MS. BERKOWER:  Your Honor, I apologize.  I don't think

1    I have a microphone at our table.  The government would --

2              THE COURT:  Can you speak into the microphone?

3              MS. BERKOWER:  The government would oppose striking

4    for cause.  The juror initially did give statements that he

5    thought it might be hard for him to set aside his opinions, but

6    upon further questioning just a moment ago, he said he believed

7    he could, and he said he was confident that he would follow Your

8    Honor's instructions and that he would -- that he understood the

9    significance, the importance of doing so, and that he would be

10   able to set aside those opinions.

11       And so I know Mr. Welch did just ask him if he would be

12   leaning toward the government upon coming into the case, but I

13   think the more pertinent inquiry here is, can he set that aside,

14   and he said he was confident that he could.  And so we believe

15   this juror should not be stricken for cause.

16             THE COURT:  All right.  Again, I don't have the feed

17   in front of me right now, but I do think the last thing he said

18   to Mr. Welch was that he would come in predisposed towards the

19   government, and I think that's a problem.  We want people coming

20   in here neutral.  I think he would strive really hard to set

21   aside his strong opinions about the case and he thought he could

22   do it, but I think -- my recollection of all the questions that

23   I asked him suggested that this was going to be really, really

24   difficult for him to do.

25             So I am -- I will grant the motion to strike for cause.

1      All right.  The next juror, number 31, has only listed one

2  question, and that's question number 18.

3      (Prospective juror steps up.)

4           THE COURT:  Good morning, ma'am.

5           PROSPECTIVE JUROR:  Good morning.

6           THE COURT:  It's nice to have you here today.

7      You have answered yes to just one question, and that

8  is, "Do you, family members, or close friends work in law

9  enforcement?"  You answered yes to that?

10          PROSPECTIVE JUROR:  I did.

11          THE COURT:  Why is that?

12          PROSPECTIVE JUROR:  You mentioned law enforcement.  My

13 daughter works for Homeland Security.

14          THE COURT:  What does she do for Homeland Security?

15          PROSPECTIVE JUROR:  She's deputy staff assistant in

16 the headquarters.

17          THE COURT:  Was she involved at all in January 6?

18          PROSPECTIVE JUROR:  She wasn't in that office at the

19 time.  She's always worked in Homeland.  So she was at, I think,

20 S&T at the time, but no involvement that I know of, no.

21          THE COURT:  All right.  So have you talked to her

22 about the Capitol events and found out information she knows

23 based on her job?

24          PROSPECTIVE JUROR:  No.  She doesn't share a lot with

25 me about her job.

1          THE COURT:  All right.  And how long has she worked

2     for Homeland Security?

3          PROSPECTIVE JUROR:  It's been, I think, four or five

4     years, I think, now.

5          THE COURT:  All right.  Is there anyone else in your

6     family who currently works or previously worked in the

7     government?

8          PROSPECTIVE JUROR:  My son works for Arlington Fire

9     Department.  He's a marshal.

10          THE COURT:  Given that you have close family members

11     who work for the federal government, does that make you think

12     you would be more inclined to the government's side of the case

13     here simply by virtue of those relationships?

14          PROSPECTIVE JUROR:  I probably would, yes.

15          THE COURT:  I'm sorry?

16          PROSPECTIVE JUROR:  I probably would, yes.

17          THE COURT:  You would?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  And given that you have these close

20     relationships with people in law enforcement, you're saying that

21     you would come in here leaning towards the government's side

22     before the case started?

23          PROSPECTIVE JUROR:  When you spoke about the case, I

24     was leaning towards the government's side.

25          THE COURT:  Tell us about that.  Why is that?

1      PROSPECTIVE JUROR:  I just think the acts were just

2 wrong against the government.  It was dangerous for everyone who

3 lives in the city, you know.  It was horrifying when I watched

4 it.

5      THE COURT:  You didn't answer yes to the question

6 about seeing news about the Capitol events, but it does sound

7 like you have seen news about them.

8      PROSPECTIVE JUROR:  Well, I saw the news when it was

9 occurring.  So that bothered me.  I mean, since it happened, I

10 feel a little better about, you know, what happened, and now

11 that things are being handled, per se.  But yeah, when I saw it,

12 when it was taking place, yes, it was a little horrifying for

13 me.

14      THE COURT:  Do you live near the Capitol?

15      PROSPECTIVE JUROR:  Not near.  Maybe 20 minutes from

16 the Capitol.

17      THE COURT:  All right.  Well, you understand that our

18 goal here is to try to identify people who are going to come in

19 and be neutral.  Of course, many Americans have views about the

20 Capitol events, but what we're looking for are jurors who can

21 put those views, even strong views, about the Capitol aside and

22 decide the guilt or innocence of this defendant based solely on

23 the evidence that's presented in court and the instructions that

24 I give.

25      And I'm wondering whether you think you would be able to do

1   that, given your views.

2          PROSPECTIVE JUROR:  Maybe not.  I would say no,

3   probably no.

4          THE COURT:  Even though I would instruct you, as I

5   have already, that you're to presume that the defendant is

6   innocent unless and until he's proven guilty beyond a reasonable

7   doubt?  You would have a hard time following that instruction?

8          PROSPECTIVE JUROR:  No, I wouldn't have a hard time

9   following it, no.  I've sat on juries before, criminal trials

10  before, and I don't have a problem with it at all.  It's just

11  that I am a little -- I was at the time -- I'm not as uneasy

12  about it as I was when I was actually witnessing it happen, and

13  it was just a little struggle.

14      But no, following your orders, I wouldn't have a problem

15  doing that, no.

16          THE COURT:  But earlier, it seemed like you suggested

17  that you would be leaning towards the government's side of the

18  case based on two things, your relationships with your family

19  members and then what you observed at the Capitol.

20      Did I hear you correctly?

21          PROSPECTIVE JUROR:  Yes, you did; you did.

22          THE COURT:  So again, you understand what we're

23  looking for are people who can come in and kind of wipe the

24  slate clean and not be predisposed towards one side or the other

25  when the case starts.

```
 1           And I appreciate your honesty here.  These are hard
 2      questions to answer.
 3               PROSPECTIVE JUROR:  I understand.  I mean, like you
 4      said, following your orders, I could do, but there is a but.
 5               THE COURT:  There's a what?
 6               PROSPECTIVE JUROR:  There is a but.  The but is, I was
 7      uncomfortable with that situation.  So maybe this isn't the
 8      trial for me because I was uncomfortable with the situation at
 9      that time.  I'm not as uncomfortable, but I was uncomfortable at
10      the time.
11               THE COURT:  All right.  Ms. Berkower?
12               PROSPECTIVE JUROR:  I wouldn't want to just blatantly
13      not follow your orders.  So I guess that is a no, maybe I should
14      not sit on this trial.
15               THE COURT:  I'm wondering how much of a struggle it
16      would be for you to do that.  I appreciate that you would try
17      your very best because you understand your duty.
18               PROSPECTIVE JUROR:  I honestly don't know.
19               THE COURT:  It's hard to know?
20               PROSPECTIVE JUROR:  I honestly can't tell you because
21      I don't know if sitting in the court listening to whatever I
22      would hear -- I don't know how I would react to it.  I really
23      don't.
24               THE COURT:  All right.  Ms. Berkower?
25               MS. BERKOWER:  Good morning, ma'am.
```

1          PROSPECTIVE JUROR:  Good morning.

2          MS. BERKOWER:  Just a few follow-up questions on some

3     of the things Judge Friedrich was just asking you.  It sounds

4     like you just said that you don't know how you would feel

5     listening to the evidence in court.  Is that right?

6          PROSPECTIVE JUROR:  That's right.

7          MS. BERKOWER:  And you believed you could follow the

8     Judge's instructions; right?  You've said that.

9          PROSPECTIVE JUROR:  Yes.

10          MS. BERKOWER:  And you've been on juries before where

11     you've also been given the instructions?

12          PROSPECTIVE JUROR:  Yes.

13          MS. BERKOWER:  If the Judge instructed you you could

14     only decide the case based upon the evidence you're hearing, is

15     that an instruction you could follow?

16          PROSPECTIVE JUROR:  Yes.  I have followed that before.

17     Yes, I can do that.

18          MS. BERKOWER:  I think what the Judge was trying to

19     get at and what we would like to know a little bit more about

20     is, can you set aside what you feel coming into the room to

21     judge the case just on the evidence that you're hearing?

22          PROSPECTIVE JUROR:  Yes, I could do that, yes.

23          MS. BERKOWER:  How confident are you you can do that?

24          PROSPECTIVE JUROR:  I'm very confident I can do that,

25     yeah.

1          MS. BERKOWER:  Okay.  Thank you.

2          THE COURT:  Mr. Welch?

3          MR. WELCH:  So would it be fair to say, ma'am, that

4     you're already leaning toward the prosecution's case?

5          PROSPECTIVE JUROR:  No, I'm not leaning towards the

6     prosecution's case.  I can only go by what I saw that day.  I

7     don't know the defendant from anyone else that I saw that day.

8     So I'm just saying it was uncomfortable then, that day and a few

9     days after that.

10         But if I had to sit in here and go by what I'm hearing and

11    what the Judge is telling -- the rules the Judge is telling me

12    to follow, then yeah, I can do that.

13         MR. WELCH:  Would you be affected by what you

14    personally remember from that day?

15         PROSPECTIVE JUROR:  No, no, no, I wouldn't.

16         MR. WELCH:  Previously, you said that the acts that

17    day were just wrong.  Is that how you still feel?

18         PROSPECTIVE JUROR:  Some of what I saw, yes.

19         MR. WELCH:  And would you be able to set that aside?

20         PROSPECTIVE JUROR:  In this case, yes.

21         MR. WELCH:  You said, "Maybe this isn't the case for

22    me."  Why did you say that?

23         PROSPECTIVE JUROR:  Well, based on what I was hearing

24    the Judge say to me, it's because I was so uncomfortable

25    watching it that day, I thought maybe because of that, that's

1  maybe why this was not -- is not a good case for me.

2         MR. WELCH:  Thank you.

3         THE COURT:  A couple more questions.

4         PROSPECTIVE JUROR:  Uh-huh.

5         THE COURT:  So one is, I just realized that you, given

6  your age, have the choice whether or not to serve, and we think

7  you can be a terrific juror here.  But I want to make sure I am

8  pointing out for those who are 70 and over that you do have the

9  option, and I take it by you being here you do want to serve.

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  So just circling back to the conversation

12  we had earlier, I guess the one question I have is whether you

13  have kind of a formed opinion right now, a formed view.

14         PROSPECTIVE JUROR:  No, I don't.  I don't have a

15  formed opinion, no, I don't.  I don't know why they did what

16  they did.  So I don't have an opinion about it at all.

17         THE COURT:  And at the beginning when I was

18  questioning you about your relationships with your children who

19  are in law enforcement and you said that you might be leaning

20  towards the government's side, do you understand now what I'm

21  getting at?  When you come to the courtroom --

22         PROSPECTIVE JUROR:  I think I --

23         THE COURT:  -- you have to put any tendency to lean

24  one way or the other aside.

25         PROSPECTIVE JUROR:  I think I understand what you're

saying.  I think my uncomfortableness is the fact that my

daughter works for Homeland Security, and it worries me

sometimes.  So that's really my concern.  That's basically all

it is.

THE COURT:  So the concern you expressed earlier

wasn't a concern about being impartial, but a concern about

what?

PROSPECTIVE JUROR:  Basically because of where my

daughter works, what she comes in contact with, you know, things

that are going on in the world.  I know she has a lot to -- her

job comes in contact with a lot of that.  So my fears are that,

basically.

That, of course, has nothing to do with judging someone in

a courtroom.  It has nothing to do with that, because again, I

can't physically judge anyone until I hear some evidence.

THE COURT:  But your fears about her serving for the

government, how does that relate to you serving as a juror here

in this case?  Are you concerned about her security?

PROSPECTIVE JUROR:  I don't think I'm concerned about

her security.  I think it's just a concern, period.  I don't

think I'm concerned about her security.

THE COURT:  I'm trying to understand why initially you

had said that you would be leaning a little towards the

government.  I can't remember exactly how you put it.  But --

PROSPECTIVE JUROR:  It's because I think the events

1    were towards the government.  So I assume that -- my mind would

2    lean towards the government.

3         But I've sat in criminal cases before, and sitting on a

4    trial, all kinds of things run through your head, even though

5    you see the evidence, you hear the evidence.  But when it comes

6    down to making a decision off of what the judge is telling us to

7    make our decisions of, I never had a problem with that.  I never

8    had a problem with it.  Whether a person was guilty, not,

9    whether they had evidence, I went by the rules that the judge

10   told us to go by.

11        THE COURT:  So as you sit here now, you have no formed

12   opinion as to Mr. Reffitt's guilt or innocence?

13        PROSPECTIVE JUROR:  No; no.

14        THE COURT:  And you would be able to -- if chosen to

15   serve on this jury, you would be able to decide this case only

16   on the evidence that's presented in this courtroom and the

17   instructions that I would provide?

18        PROSPECTIVE JUROR:  Yes; that's all I can go by, yes.

19        THE COURT:  And what about the events that you saw on

20   TV or read about in the newspaper?  Would those -- would you be

21   able to put that information out of your mind in judging the

22   evidence in this case?

23        PROSPECTIVE JUROR:  Basically, yes, yeah.

24        THE COURT:  Okay.  All right.  Any further follow-up?

25        MS. BERKOWER:  Not from the government, Your Honor.

```
 1              THE COURT:  Mr. Welch?
 2              MR. WELCH:  No, thank you.
 3              THE COURT:  All right.  Thank you, ma'am.  I
 4    appreciate it.
 5         (Prospective juror steps down.)
 6              THE COURT:  Any motion?
 7              MR. WELCH:  No, thank you.
 8              THE COURT:  All right.  So the next juror is 1120, and
 9    this juror has answered yes to number 18, number 19, and
10    number 2.
11         (Prospective juror steps up.)
12              THE COURT:  Good morning, sir.
13              PROSPECTIVE JUROR:  Good morning, ma'am.
14              THE COURT:  Are you comfortable taking off your mask?
15              PROSPECTIVE JUROR:  Yes, ma'am.
16              THE COURT:  You are juror 1120?
17              PROSPECTIVE JUROR:  Yes, ma'am.
18              THE COURT:  All right.  So you have answered yes to
19    question number 2, which is that you know -- you or someone you
20    know has a direct or indirect connection to the January 6
21    Capitol events.
22              PROSPECTIVE JUROR:  I must have put the wrong -- I was
23    thinking the question was the one had I heard anything.
24              THE COURT:  Yes, in the news.  Question number 3.
25              PROSPECTIVE JUROR:  Then it should be 3.
```

1          THE COURT:  And I see that's the last number you wrote

2    down.  So did you think about later you should have answered

3    that one correctly?  Is that what happened?

4          PROSPECTIVE JUROR:  After it was over, I wanted to ask

5    you to repeat that question, but I didn't know if I could or

6    not.

7          THE COURT:  Sorry about that.  Of course you could

8    have.

9       So you wanted to answer yes to the question, "Have you

10   heard news about the January 6 Capitol events?"

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Can you tell us what you've heard in the

13   news about them?

14         PROSPECTIVE JUROR:  Probably very minimal.  I'm not

15   really a news guy, and we probably haven't been in country -- we

16   are out of country a lot.  So no, I haven't really picked up --

17   at night, you know, you see the news, and clips come in.  I just

18   basically have been ignoring a lot of that, in all honesty.

19         THE COURT:  Were you here on January 6, 2021?  Were

20   you in the country then?

21         PROSPECTIVE JUROR:  Yes, ma'am.

22         THE COURT:  Do you live near the Capitol?

23         PROSPECTIVE JUROR:  Yes, ma'am.  We live up on Fourth

24   Street Northwest.

25         THE COURT:  All right.  Were you at home that day?

1              PROSPECTIVE JUROR:  Yes, ma'am.

2              THE COURT:  Were you inconvenienced at all by the

3       events of that day?

4              PROSPECTIVE JUROR:  No, ma'am.

5              THE COURT:  All right.  Do you recall whether you've

6       seen any news about Mr. Reffitt, the defendant in this case?

7              PROSPECTIVE JUROR:  No, I can't say I have.  I don't

8       recognize the gentleman if he's here.  No, I'm sorry.  I don't

9       recognize him.  So, no.

10             THE COURT:  Any specific news you recall about any

11      individual involved in the January 6 events?

12             PROSPECTIVE JUROR:  The only one I can really recall

13      is the guy with the horns on.  I guess you see -- that popped up

14      in the news originally, but other than that, no.

15             THE COURT:  Tell me -- so you're in and out of the

16      country?  Are you retired?

17             PROSPECTIVE JUROR:  Yes, ma'am.

18             THE COURT:  How often are you here in the country?

19             PROSPECTIVE JUROR:  We have a home out of country.  So

20      what we try -- since then, we probably have been out of country

21      maybe four or five months and in and out of D.C., just visiting

22      and traveling.

23             THE COURT:  You also said that you, family members, or

24      close friends work in law enforcement.

25             PROSPECTIVE JUROR:  My wife is retired.  She, I think,

1    back in the mid-'90s -- I think put '96 down, but I wasn't real

2    positive -- she wrote presentencing reports for CSOSA, I think,

3    which is a part of the D.C. court system.  That was when we

4    first met.

5              THE COURT:  This is your wife?

6              PROSPECTIVE JUROR:  Yes, ma'am.

7              THE COURT:  Did you have conversations about her job,

8    I assume, with her back then?

9              PROSPECTIVE JUROR:  Oh, gosh, probably, you know, like

10   why didn't you get here for happy hour or something.  Not

11   really.  I was working full-time doing engineering and science

12   work, and she was doing what she did.

13             THE COURT:  All right.  Do you have any -- based on

14   your relationship with her, any other lawyers, any views of the

15   criminal law, any knowledge?

16             PROSPECTIVE JUROR:  No.  My brother-in-law, he's a

17   retired attorney.  I think he dealt with social issues,

18   non-profit up in Massachusetts, but he's been retired about ten

19   years, I think, now.

20             THE COURT:  Anybody else in the family or close

21   friends who is a lawyer?

22             PROSPECTIVE JUROR:  Not really.

23             THE COURT:  Anything about your relationships with

24   those who are lawyers or in government jobs that would impact

25   your ability to judge this case fairly to both sides?

```
 1              PROSPECTIVE JUROR:  No, ma'am.  I was in the nuclear
 2     industry.  I don't think anyone would be --
 3              THE COURT:  All right.  Ms. Berkower?
 4              MS. BERKOWER:  Just very briefly.
 5         Good morning, sir.
 6              PROSPECTIVE JUROR:  Hi.  How are you?
 7              MS. BERKOWER:  May I ask, what country is your other
 8     home in?
 9              PROSPECTIVE JUROR:  Aruba.
10              MS. BERKOWER:  Thank you.
11              THE COURT:  Mr. Welch, any questions?
12              MR. WELCH:  No, thank you.
13              THE COURT:  All right.  Thank you, sir.  I appreciate
14     your time.
15         (Prospective juror steps down.)
16              THE COURT:  So the next juror is 0168, and this juror
17     has said yes to questions 3 and 4.
18         (Pause.)
19              THE COURT:  All right.  That card was out of order.
20     Sorry.  The next juror is juror number 1332, and that juror said
21     yes to 1, 2, 3, 4, and 5.
22         (Prospective juror steps up.)
23              THE COURT:  Good morning, sir.  Almost afternoon.  If
24     you're comfortable taking your mask off, please do.
25         You are juror number 1332?
```

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  So you answered yes to question number 1.

3    That is, you say that -- I think that's a question that you live

4    or work near the U.S. Capitol.

5              PROSPECTIVE JUROR:  I have and I continue to work as a

6    lobbyist.  I visit the Hill quite a bit.  I used to live on the

7    Hill.  I don't anymore.

8              THE COURT:  All right.  Where do you work on the Hill

9    roughly?  Not address, but are you close to the Capitol?

10             PROSPECTIVE JUROR:  My office is 1800 M Street, but I

11   frequently go to meetings on the Hill, including the Capitol.

12             THE COURT:  All right.  Were you on the Capitol, near

13   the Capitol on January 6?

14             PROSPECTIVE JUROR:  No, I was not.

15             THE COURT:  All right.  You also mentioned that you or

16   someone you know has a direct or indirect connection to the

17   events at the Capitol.

18             PROSPECTIVE JUROR:  I had a number of friends that

19   still work on the Hill who were Hill staffers or reporters who

20   were in the building at the time.

21             THE COURT:  And have you discussed the January 6

22   events with them?

23             PROSPECTIVE JUROR:  I have.

24             THE COURT:  And based on those discussions, have you

25   formed any opinions about this defendant or any other individual
```

1    at the Capitol that day?

2              PROSPECTIVE JUROR:  I'm not familiar with the

3    defendant.  I'm familiar with the events that occurred and some

4    of the violence that happened.

5              THE COURT:  Some of the what that happened?

6              PROSPECTIVE JUROR:  Some of the violence.

7              THE COURT:  Have you formed any opinions about the

8    people who committed the violence that day?

9              PROSPECTIVE JUROR:  I think there were a number of

10   different people there for a number of different reasons.  So I

11   don't have an opinion about everyone that was there that day.

12             THE COURT:  Do you have opinions about some of them?

13             PROSPECTIVE JUROR:  Not specific individuals.

14             THE COURT:  All right.  So what kind of information

15   did you receive from the folks you knew on the Hill?  Is this

16   the kind of information that was reported in the newspaper, or

17   was it more specific information?

18             PROSPECTIVE JUROR:  My former boss, congressman Brad

19   Schneider, was there.  He has moved around several times.  I

20   talked to him about his experience being huddled with Capitol

21   security and being moved around the building.  So he was the

22   main person that I talked to about that day rather than taking

23   just blanket information from the media.

24             THE COURT:  So this was -- your former boss was a

25   member of Congress?

```
1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  All right.  Given the relationship you

3     have with him, do you think that you could put the discussions

4     you had with him aside and judge this case fairly based on the

5     evidence presented in this courtroom?

6            PROSPECTIVE JUROR:  Yes, I believe I could.

7            THE COURT:  So simply because you have this

8     relationship with the congressman and others on the Hill, would

9     that -- based on that, would you tend to view this case

10    favorably for one side or the other?

11           PROSPECTIVE JUROR:  No.  I would be open to the

12    evidence that was given and make a judgment as to what actions

13    were taken on that day.

14           THE COURT:  Aside from what you've heard from the

15    individuals you've just mentioned, can you tell us what you've

16    heard in the news and how closely you've tracked the events of

17    January 6?

18           PROSPECTIVE JUROR:  I can't say I've tracked it very

19    closely as of late.  The days around then, I was pretty

20    horrified at some of the violence that happened.

21      I've worked in and out of the Capitol.  I used to give

22    tours of the Capitol building back when I was a congressional

23    page.  So I know the building very well.  I have a lot of

24    reverence for it.  I didn't like what I saw, and I was pretty

25    upset that people would take the building by force.
```

1          THE COURT:  I appreciate that you were horrified by

2     the events.  Given that, can you still judge this case fairly

3     and impartially?  Would you be able to put aside those strong

4     views about what happened that day?

5          PROSPECTIVE JUROR:  I would have to see evidence of

6     why someone would go there and the actions they took while they

7     were there, and I would judge it on that.

8          THE COURT:  So you wouldn't come in with any sort of

9     preconceived notions about what the evidence in this case will

10    show?

11         PROSPECTIVE JUROR:  I want to see the evidence and

12    judge it on that.

13         THE COURT:  And you understand, as I've instructed you

14    already, that the defendant who sits here, Mr. Reffitt, he's

15    presumed innocent unless and until the government proves him

16    guilty beyond a reasonable doubt?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Would you have any trouble applying that

19    instruction?

20         PROSPECTIVE JUROR:  No, I would not.

21         THE COURT:  So you did say yes to having such strong

22    feelings or opinions about the Capitol events that it would make

23    it difficult for you to be a fair and impartial juror.

24         Are you saying it would be difficult, but you're

25    comfortable you could do it, that you could follow the Court's

1   instructions?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Do you have any hesitation about being

4   able to do that?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  Ms. Berkower?

7          MS. BERKOWER:  Nothing from the government, Your

8   Honor.  Thank you.

9          THE COURT:  Mr. Welch?

10          MR. WELCH:  No questions.  Thank you.

11          THE COURT:  All right.  Thank you, sir.  I appreciate

12   your time.

13      (Prospective juror steps down.)

14          THE COURT:  All right.  Now to juror 0168, the one I

15   called out before, who answered yes to question 3 and

16   question 4.

17      (Prospective juror steps up.)

18          THE COURT:  Good morning, ma'am.

19          PROSPECTIVE JUROR:  Good morning.

20          THE COURT:  If you're comfortable taking your mask

21   off, please do.

22      All right.  So you've answered yes to two questions.  The

23   first, you say that you followed the news about the January 6

24   events at the Capitol.  Can you tell us what you know, what

25   you've read, what you've heard?

1          PROSPECTIVE JUROR:  I followed the news of the

2     January 6 events probably closest to the time that it occurred,

3     those few weeks after, just kind of the headlines in terms of

4     sort of replaying what happened that day and the impact of

5     safety and security concerns of Capitol Police stories and the

6     like.

7          THE COURT:  Have you continued to track it to current

8     day?

9          PROSPECTIVE JUROR:  Not closely.

10          THE COURT:  All right.  I take it you've read some

11     articles or seen some things in the news since January 6?

12          PROSPECTIVE JUROR:  Probably more personal stories of

13     Capitol Police officers or persons who were directly affected by

14     the events.

15          THE COURT:  Is there anything about those stories that

16     you've heard that would make it difficult for you to be a fair

17     and impartial juror in this case?

18          PROSPECTIVE JUROR:  I certainly have feelings about

19     what happened.  I don't think it would affect my impartiality.

20          THE COURT:  All right.  So you're saying despite those

21     feelings, you could put them aside and kind of wipe the slate

22     clean and come in here and decide this case based solely on the

23     evidence that's presented in this courtroom --

24          PROSPECTIVE JUROR:  I believe so.

25          THE COURT:  -- and the instructions that I give you?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Have you -- do you recall whether you've

3    seen anything in the news about Mr. Reffitt, the defendant in

4    this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Anything specific about anybody else that

7    you recall, any other individuals who were involved in January 6

8    events?

9          PROSPECTIVE JUROR:  I don't remember names.  I do

10   remember a few individuals.

11         THE COURT:  Can you tell us about those?

12         PROSPECTIVE JUROR:  I remember the case of a woman who

13   was a part of the January 6 protesting group who lost her life

14   that day.  I don't have specific memories at this time, but I

15   just remember certain individuals who were seen engaging in

16   certain behaviors that day, just in terms of interrupting or

17   running about or looting or that kind of thing.

18         THE COURT:  As you sit here now, have you formed any

19   opinions about the guilt or innocence of any of those people,

20   including Mr. Reffitt?

21         PROSPECTIVE JUROR:  Today?

22         THE COURT:  As you sit here now.

23         PROSPECTIVE JUROR:  I probably have previously felt

24   one way or the other based on the coverage that I watched or

25   read.

1          THE COURT:  And aside from the woman you described --

2     is this the woman who was shot?

3          PROSPECTIVE JUROR:  (Nodded head.)

4          THE COURT:  Aside from her, can you recall any

5     coverage specific about any individual?

6          PROSPECTIVE JUROR:  I couldn't recount specific

7     details.  I just kind of in general remember that there were

8     certain individuals who were identified having done something

9     that was possibly illegal and disruptive that day.

10          THE COURT:  Do you recognize Mr. Reffitt here in the

11     courtroom?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  All right.  You understand, ma'am, that

14     what we want are jurors who will come in here and be neutral to

15     start, not leaning to one side or the other.

16     And recognizing what you've said so far, I'm just curious,

17     do you think that you could put aside all of what you've seen on

18     TV or read in the newspaper and be a neutral juror, an impartial

19     juror, when this case begins?

20          PROSPECTIVE JUROR:  I believe so.

21          THE COURT:  All right.  Ms. Berkower?

22          MS. BERKOWER:  No questions from the government, Your

23     Honor.

24          THE COURT:  Mr. Welch?

25          MR. WELCH:  No questions.  Thank you.

1          THE COURT:  All right.  Thank you, ma'am.

2      (Prospective juror steps down.)

3          THE COURT:  All right.  This next juror is juror

4  number 0457.  This juror has answered yes to 3, 4, 5, 17, 18,

5  and 19.

6      (Prospective juror steps up.)

7          THE COURT:  Good morning, ma'am.

8          PROSPECTIVE JUROR:  Good morning, Judge.

9          THE COURT:  If you feel comfortable taking your mask

10  off, could you please?

11          PROSPECTIVE JUROR:  I'm happy to.

12          THE COURT:  Just to confirm, you're juror number 0457.

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  So you've answered yes to the question

15  that you've heard news about the January 6 Capitol events; is

16  that correct?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Can you tell us generally what news you've

19  heard?

20          PROSPECTIVE JUROR:  I've followed it since it started

21  on the 6th of January, and I follow Julie Kelly and podcasts

22  with Lee Smith and one other journalist.  I can't think of the

23  name.

24          THE COURT:  If I can ask you to keep your voice up a

25  little bit.  The microphone is in front of you, and we want to

make sure that the court reporter and the overflow rooms can
hear you clearly.

So you say you've followed this consistently since
January 6?

PROSPECTIVE JUROR:  Pretty consistently.  Last summer,
I wasn't anywhere near any kind of news or TV, et cetera.

THE COURT:  And do you seek out this news, or do you
just listen and read what comes across the normal news sources
that you always read?

PROSPECTIVE JUROR:  No, I seek it out, mostly on
podcasts.

THE COURT:  And tell us what you've heard on these
podcasts that you've listened to.

PROSPECTIVE JUROR:  Well, the most recent one was by
Julie Kelly.  I don't remember who interviewed her.  And she was
talking about the fact that the National Guard had been called
in early -- or was available, I guess is the term, early that
morning, but they were never called in.  That stuck in my brain.

THE COURT:  All right.  Aside from that, do you recall
specifics about any individuals who were involved in January 6,
including Mr. Reffitt, the defendant in this case?

PROSPECTIVE JUROR:  I do not recall his name.  The
other name I heard recently was a man who was back on his farm
or ranch in Texas.  I don't remember his last -- his name.

THE COURT:  You mean somebody who served a sentence

1    and is now --

2            PROSPECTIVE JUROR:  No.  And again, I didn't follow it

3    closely.  There was one gentleman who was at the forefront of

4    the investigation, and nobody seemed to be able to find him.

5    And then I read a clip where he was actually back at his

6    residence someplace in Texas.

7            THE COURT:  Do you recognize Mr. Reffitt here in the

8    courtroom?

9            PROSPECTIVE JUROR:  I do not.

10           THE COURT:  All right.  Have you formed an opinion

11   about the guilt or innocence of any of the individuals involved

12   in the Capitol events?

13           PROSPECTIVE JUROR:  No, because I don't have all the

14   information.

15           THE COURT:  You did state that you have strong

16   feelings about the events of January 6 such that you're

17   concerned that you can't put them aside and serve as a fair and

18   impartial juror in this case.

19       Is that because you are leaning one side or the other?

20           PROSPECTIVE JUROR:  Judge, I came here thinking it was

21   probably going to be another fender-bender.  So when you told

22   me -- when you said what the case was, I immediately became very

23   upset, because I have read both sides but I lean towards one as

24   more than the other.  So I'm not sure if I could be fair and

25   impartial.  I've never been put in that position.

1          THE COURT:  So you heard me already say that one of

2     the instructions that would be given again in this case is the

3     instruction that the defendant is presumed innocent as he sits

4     here now, and he cannot be convicted at trial unless and until

5     the government proves its case beyond a reasonable doubt.

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Would you have difficulty applying those

8     instructions?

9          PROSPECTIVE JUROR:  I'm sure I can move forward with

10    that -- yes, I could move forward with that decision.

11         THE COURT:  Yes, you would have difficulty, or yes --

12         PROSPECTIVE JUROR:  Yes, I would not have any

13    difficulty considering him innocent until he's proven guilty

14    otherwise.

15         THE COURT:  So you could put your strong feelings

16    aside and come in here and be neutral and not be influenced by

17    what you've seen before coming to this courtroom?

18         PROSPECTIVE JUROR:  Certainly.

19         THE COURT:  You also said yes to the question about

20    firearms, that you have strong feelings about firearms, that

21    you're concerned you might not be able to be fair for that

22    reason.

23         PROSPECTIVE JUROR:  Well, I've been trained to use a

24    firearm.  I don't own a firearm.  I live in the District.  But I

25    have family members who have several firearms, and we have been

1    at firing ranges.  So I'm very familiar.

2              THE COURT:  And does your experience with firearms or

3    your knowledge of firearms make you concerned that you couldn't

4    be fair in evaluating the evidence in this case during a trial?

5              PROSPECTIVE JUROR:  I don't believe it can.  Again,

6    it's the first time ever I've thought about it, because of this

7    situation.

8              THE COURT:  When you say "I don't believe it can,"

9    what do you mean?

10             PROSPECTIVE JUROR:  I mean, I answered the question in

11   the sense that I am familiar with firearms.

12             THE COURT:  I see; I see.  But not that you feel so

13   strongly one way or the other about firearms that you couldn't

14   be fair to Mr. Reffitt in this case; is that right?

15             PROSPECTIVE JUROR:  Yes, Judge.

16             THE COURT:  You also said that you have family members

17   in law enforcement; is that right?

18             PROSPECTIVE JUROR:  My brother was a FBI agent.  He's

19   retired.

20             THE COURT:  All right.  So there may be FBI agents

21   testifying in this case.  Would you be more likely to believe

22   them simply because your brother is a former FBI agent?

23             PROSPECTIVE JUROR:  No, I would not.

24             THE COURT:  Would you assess their credibility and

25   bias just like every other witness in this case?

1           PROSPECTIVE JUROR:  I would indeed.

2           THE COURT:  And then the other question you answered

3    yes to was family member as a lawyer.

4           PROSPECTIVE JUROR:  My brother.

5           THE COURT:  Same brother?

6           PROSPECTIVE JUROR:  Sorry, not a lawyer.  I thought

7    your question was working in a law office.

8           THE COURT:  That, too.

9           PROSPECTIVE JUROR:  He also worked in the court system

10   here in D.C.

11          THE COURT:  Where does he work exactly?

12          PROSPECTIVE JUROR:  Where did he work?

13          THE COURT:  Or did he work, yeah.

14          PROSPECTIVE JUROR:  He worked -- you know what?  I'm

15   not certain where it was.

16          THE COURT:  But he was in one of the courthouses?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  This courthouse or the one across the

19   street, Superior Court?

20          PROSPECTIVE JUROR:  Superior Court, I believe.

21          THE COURT:  And what did he do in that court?

22          PROSPECTIVE JUROR:  He clerked for a judge, and then

23   went on to become an FBI agent.

24          THE COURT:  So same brother?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  Anything about your conversations

2    with your brother make you concerned about following my

3    instructions in this case?

4          PROSPECTIVE JUROR:  Not at all.  As I've said, he

5    knows the rules, and I do, too.

6          THE COURT:  So ███████████, you are over 70, and I

7    think you can serve as a qualified juror here, but I want to ask

8    everyone who is that age that you do have a choice if you want

9    to serve.

10          PROSPECTIVE JUROR:  I had that choice when I filled

11    out the form.  I am happy to do it.

12          THE COURT:  Great.  I just wanted to make sure you

13    didn't miss that.

14       All right.  Thank you very much for your time and your

15    service.

16       Ms. Berkower?

17          MS. BERKOWER:  Good morning, ma'am.

18          PROSPECTIVE JUROR:  Good morning.

19          MS. BERKOWER:  Just a few follow-up questions for you.

20       You mentioned that you seek out information about

21    January 6.  I understand you write about that through news and

22    podcasts?

23          PROSPECTIVE JUROR:  Primarily through podcasts, yes.

24          MS. BERKOWER:  And the podcast you listen to, is it

25    one podcast or more than one?

1          PROSPECTIVE JUROR:  Many.

2          MS. BERKOWER:  Is it less than five?  Between five and

3    ten?  More than ten?

4          PROSPECTIVE JUROR:  More than -- maybe ten.

5          MS. BERKOWER:  And how often do you listen to these?

6    Are they like daily podcasts?  Weekly podcasts?

7          PROSPECTIVE JUROR:  The people that I listen to

8    primarily don't have daily podcasts.  So perhaps one of them is

9    twice a week, three times a week.  And I'm not consistent,

10   because it's -- sometimes the topic is not of interest.  So it's

11   somewhat sporadic on any particular podcast.

12         MS. BERKOWER:  I see.  But when those podcasts have

13   information about January 6, are those episodes that you do seek

14   out and listen to?

15         PROSPECTIVE JUROR:  I have, except there hasn't been a

16   lot of information.  As I mentioned, Julie Kelly, who I don't

17   know if she's an independent journalist, has been on recently.

18   So that's why I was, quote, updated on recent -- new

19   information.

20         MS. BERKOWER:  What is the most recent time that you

21   listened to a podcast about January 6?

22         PROSPECTIVE JUROR:  I would say within the last two

23   weeks.

24         MS. BERKOWER:  And how many podcasts have you listened

25   to in the last two weeks that touched on January 6?

1          PROSPECTIVE JUROR:  Well, it was primarily hers,

2     because she has focused on it.  And then after the question was

3     brought up initially, I was trying to remember what other

4     podcasts I had listened to which was a response to some of the

5     things she had said, a positive response.  I don't recall the

6     name, the date.

7          MS. BERKOWER:  And other than these podcasts that you

8     mentioned, do you seek out news from other sources about

9     January 6 as well?

10          PROSPECTIVE JUROR:  No; not really, no.

11          MS. BERKOWER:  And I think -- I know you said, when

12     Judge Friedrich questioned you, that you have strong feelings

13     about the events of January 6.

14       Did I understand that correctly?

15          PROSPECTIVE JUROR:  I do indeed have strong feelings.

16          MS. BERKOWER:  And have you formed opinions about what

17     happened there?

18          PROSPECTIVE JUROR:  To a degree, based upon again what

19     I've read.  I was traveling back from out of state.  I was in

20     Georgia for the runoff election when all this was taking place.

21     So I was in the city when all this chaos was going on.

22          MS. BERKOWER:  Were you affected by the chaos as you

23     traveled home?

24          PROSPECTIVE JUROR:  No.  I managed to circumvent it.

25          MS. BERKOWER:  And based on your experiences and these

1    opinions that you have about the events, have you also formed an

2    opinion about whether or not the people involved in January 6

3    are guilty of crimes?

4         PROSPECTIVE JUROR:  I am somewhat one-sided in terms

5    of the news that I get.  So far, I haven't had anything pointed

6    out that -- because whatever this commission that Speaker Pelosi

7    is putting together, I haven't followed that.  So I don't know

8    what the status is of anything right now.

9         MS. BERKOWER:  And I think my question maybe wasn't a

10   very good one.  What I was trying to get at, based on the

11   information that you have about January 6, you said you formed

12   some strong feelings; right?

13        PROSPECTIVE JUROR:  I have.

14        MS. BERKOWER:  And do you also have opinions about

15   whether the people involved in the events are guilty of crimes

16   or innocent of crimes?

17        PROSPECTIVE JUROR:  At this point, I would say

18   innocent, because this is the idea of why we're having a trial.

19   The person on trial is innocent until proven guilty.

20        MS. BERKOWER:  Of course, ma'am, and I wasn't trying

21   to imply otherwise.

22        PROSPECTIVE JUROR:  I understand.

23        MS. BERKOWER:  I mean just generally, based on the

24   information that you have learned from all of the news sources

25   and podcasts that you've listened to, have you formed an opinion

1    about the guilt of people involved with January 6?

2              PROSPECTIVE JUROR:  Yes; I think I have, yes.

3              MS. BERKOWER:  And how strongly do you hold those

4    opinions?

5              PROSPECTIVE JUROR:  Well, because I only know so much,

6    I can't really measure that at this point in time.

7              MS. BERKOWER:  And do you think that you will be able

8    to set aside those opinions when you come to court, or will that

9    be hard for you to do?

10             PROSPECTIVE JUROR:  It won't be hard, because that's

11   the question that was posed, and I didn't respond a yes on that.

12       As I said in the beginning, this was completely a huge

13   surprise.  The last time I was on, it was for a traffic

14   accident, and to come and find out what this is all about has

15   been shocking -- surprising and semi-shocking for me.

16             MS. BERKOWER:  I don't want to belabor the point, but

17   you did say you were upset when you learned the subject matter

18   of this case?

19             PROSPECTIVE JUROR:  Maybe the word "upset" is not the

20   right word.  Just completely taken off guard, again thinking

21   about hopefully what I was going to be doing on Wednesday, which

22   was not going to be in court.

23             MS. BERKOWER:  So it would be your preference you were

24   not selected?

25             PROSPECTIVE JUROR:  No.  Again, I'm basing it upon the

1    history of when I have been in the court.  It's just been in and

2    out on the same day.

3              MS. BERKOWER:  Oh, I understand.  All right.

4         And going on to a different topic, you mentioned your

5    brother is a former -- a retired FBI agent?

6              PROSPECTIVE JUROR:  Correct.

7              MS. BERKOWER:  May I ask how close you are with this

8    brother?

9              PROSPECTIVE JUROR:  Very.

10             MS. BERKOWER:  Have you spoken with him about his work

11   at the FBI?

12             PROSPECTIVE JUROR:  Oh, yes.  He had an interesting

13   job.  He worked in the Mafia division.

14             MS. BERKOWER:  Do you have opinions generally about

15   the FBI?

16             PROSPECTIVE JUROR:  I have wonderful stories that he

17   told me.  I mean, he's not telling me anything that you wouldn't

18   read in a book.  But yes, I think they're a wonderful

19   organization.

20             MS. BERKOWER:  Just one moment.

21             THE COURT:  Mr. Welch?

22             MR. WELCH:  I don't think Ms. Berkower is done.

23             THE COURT:  Oh, I'm sorry.  Are you done?

24             MS. BERKOWER:  I was just consulting co-counsel.  I am

25   finished.

1          MR. WELCH:  And now I don't have any questions.

2          THE COURT:  I want to follow up.  I don't know if I

3     heard you correctly.

4          You stated, I thought, that you had formed an opinion about

5     the guilt of individuals, and I was confused by that answer

6     because I thought we had discussed earlier that question.

7          As you sit here now, do you have an opinion as to whether

8     Mr. Reffitt or anyone else involved in the January 6 events is

9     guilty or not guilty?

10          PROSPECTIVE JUROR:  As I stated, Judge, when that

11     question was posed, I did not answer yes because, in spite of my

12     shock finding out what the case was about, finding out that it

13     was about something that I knew something about, and actually

14     just your instructions that from here forward we're going to

15     have to remove ourselves from any visual, reading, et cetera,

16     which that's a huge part of my life, all that is cycling

17     through.  But I feel I'm capable of sitting in a court and

18     listening and making a decision upon the evidence that's

19     presented.

20          THE COURT:  Do you think that it's going to be a

21     struggle for you to follow the instruction that you're not

22     allowed to read about this case or talk about this case if

23     you're selected as a juror?

24          PROSPECTIVE JUROR:  No, Judge.  I don't get the

25     newspaper daily.  I can, obviously, turn off a TV or radio at

1    any time.

2            THE COURT:  And what about any notices you might get

3    on your phone?  Can you stop those?

4            PROSPECTIVE JUROR:  Of course, I can.

5            THE COURT:  Anything else, Counsel?

6            MS. BERKOWER:  Your Honor, may we approach for a bench

7    conference briefly?

8        (Bench conference.)

9            MS. BERKOWER:  So the concern that the government has

10   here, Your Honor, is we're familiar with the podcast that Julie

11   Kelly produces, and the prospective juror said she had listened

12   to recent episodes in the last two weeks.  And that podcaster

13   talked about this case specifically in some of her recent

14   episodes and also has tweeted about this case in recent days.

15       Our concern is, I know we're not supposed to get into

16   the -- we're not trying to get into the content of the news

17   she's consumed.  We have concerns she may be familiar --

18           THE COURT:  I think it's fair to follow up if you have

19   that concern.

20       Any objection, Mr. Welch?

21           MR. WELCH:  No objection to a follow-up.

22           THE COURT:  I think you can drill down more on whether

23   in that podcast she's heard anything about Mr. Reffitt.

24           MS. BERKOWER:  Thank you, Your Honor.

25       (End of bench conference.)

```
 1              THE COURT:  Just a few more questions, ma'am.
 2              MS. BERKOWER:  Hello again.  Ma'am, we wanted to
 3    follow up just briefly.  In the podcasts you've listened to
 4    recently, including Ms. Kelly's podcast, have you heard
 5    information about this case?
 6              PROSPECTIVE JUROR:  No.
 7              MS. BERKOWER:  Do you follow Ms. Kelly on Twitter?
 8              PROSPECTIVE JUROR:  No.
 9              MS. BERKOWER:  Are you familiar with anything that
10    she's posted online about Mr. Reffitt in particular?
11              PROSPECTIVE JUROR:  I don't see any of her postings.
12    She was a guest on a podcast, which I don't remember the name
13    of, and this was again in the last three weeks or so.
14              MS. BERKOWER:  Thank you, ma'am.
15              THE COURT:  Anything else?
16              MR. WELCH:  No, thank you.
17              THE COURT:  All right.  You're excused.  Thank you.
18    Not to go home, but --
19              PROSPECTIVE JUROR:  Thank you, Judge.
20         (Prospective juror steps down.)
21              THE COURT:  So the next juror is 0155.  He has
22    answered -- or she, I'm not sure, yes to 3, 4, 8, 18, and 19.
23         (Prospective juror steps up.)
24              THE COURT:  Good morning.  I want to confirm you are
25    juror 0155?
```

1        PROSPECTIVE JUROR:  Yes; that's right.

2        THE COURT:  All right.  You have answered yes to

3   question number 3, which is, you say that you followed the news

4   about the January 6 events at the Capitol.

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  Can you tell us a little bit about that?

7        PROSPECTIVE JUROR:  I haven't followed it in great

8   detail, because since the pandemic began I've tried to avoid

9   news to some degree just to reduce anxiety in general.  But I do

10  usually check the news every, you know, day, twice a day, three

11  times a day, and living in D.C., you read the headlines of what

12  happened at the Capitol.  I haven't followed it closely, but

13  have generally read the news daily to see kind of major

14  headlines.

15       THE COURT:  Is your main source of that news about the

16  Capitol the newspaper articles that you've seen headlines about?

17       PROSPECTIVE JUROR:  Yes, CNN, New York Times,

18  Washington Post online, things like that, usually online

19  newspapers, not TV so much.

20       THE COURT:  Are you seeking out information about the

21  Capitol events?

22       PROSPECTIVE JUROR:  No; not actively seeking it out,

23  no.

24       THE COURT:  Have you followed news accounts about

25  specific individuals, the defendant in this case, Mr. Reffitt,

1    or anyone else?

2           PROSPECTIVE JUROR:  I can't say that I've followed

3    anyone specifically.  When it first happened, some of the

4    specific news stories, not about defendants but about a few of

5    the Capitol officers whose names are escaping me at the moment,

6    I've read a couple close stories about that.  And I had not

7    heard the defendant's name actually until this morning.

8           THE COURT:  All right.  Have you formed any opinion

9    about the guilt of those who were involved in the events at the

10   Capitol on January 6?

11          PROSPECTIVE JUROR:  Not the guilt, per se.  I think

12   I've certainly formed an opinion when I've seen video of people

13   storming the Capitol, that I think that was inappropriate, but I

14   haven't really thought about guilt or innocence or the legal

15   dynamics of it so much.

16          THE COURT:  So you're an attorney yourself; right?

17          PROSPECTIVE JUROR:  I am.

18          THE COURT:  Where do you work?

19          PROSPECTIVE JUROR:  I'm currently employed at Amazon

20   as corporate counsel.

21          THE COURT:  Have you done any criminal law in your

22   background?

23          PROSPECTIVE JUROR:  No.  I did a little -- at a law

24   firm, I did a little FCPA work that touched -- with some

25   criminal issues to it, and I did clerk for a judge prior to

1    joining a law firm.  We had a few criminal cases that I was

2    somewhat involved with, but not really that involved.

3              THE COURT:  Did you clerk here in D.C.?

4              PROSPECTIVE JUROR:  No.  I interned as a 1L for Judge

5    Walton here in D.C., but I clerked for the District of New

6    Hampshire Court Judge Barbadoro.

7              THE COURT:  So did you know this was his courtroom?

8              PROSPECTIVE JUROR:  I didn't recognize the courtroom.

9    I saw his name on the wall there.  I understand he's maybe taken

10   senior status.

11             THE COURT:  Despite what you know as a lawyer or

12   remember from law school about criminal law, would you be able

13   to set aside your knowledge and your experience as a lawyer and

14   follow my instructions, even if they conflicted with what you

15   thought you knew?

16             PROSPECTIVE JUROR:  Yes, I believe so.

17             THE COURT:  And to the extent you've formed any sort

18   of opinions about any of the Capitol defendants based on what

19   you've seen on television or in the paper, would you be able to

20   set those aside and come in here and decide this case solely

21   based on the evidence that's presented in this courtroom and the

22   instructions that I provide?

23             PROSPECTIVE JUROR:  I believe so.

24             THE COURT:  Do you have any hesitancy in doing that?

25             PROSPECTIVE JUROR:  No.

1        THE COURT:  You understand that Mr. Reffitt is

2  presumed innocent as he sits here?

3        PROSPECTIVE JUROR:  Yes.  I take that very seriously.

4        THE COURT:  And he can't be convicted unless and until

5  the government proves its case beyond a reasonable doubt.  Would

6  you have any problem whatsoever following those instructions?

7        PROSPECTIVE JUROR:  No.

8        THE COURT:  You said that you have family members in

9  law enforcement?

10        PROSPECTIVE JUROR:  I think -- well, I have an uncle

11  who is a retired police officer.  And I think that question

12  encompassed also people who worked at the DOJ who were close

13  friends.

14        THE COURT:  Yes.

15        PROSPECTIVE JUROR:  I do have a number of former

16  colleagues that I worked at a law firm at who I am friendly with

17  who work at DOJ.

18    And I also wanted to mark off that question to disclose

19  because I actually have a tentative offer for a Civil Division

20  post at the Department of Justice that I'm going through a

21  security clearance check on right now.  So I wanted to disclose

22  that to the Court.

23        THE COURT:  Congratulations.

24        PROSPECTIVE JUROR:  Thank you.

25        THE COURT:  To your knowledge, are any of your friends

1    working on the Capitol cases?

2         PROSPECTIVE JUROR:  Not to my knowledge, no.  I

3    haven't heard anything about them.  I don't think they work in

4    the Criminal Division; most of them work in the Civil Division.

5         THE COURT:  Given that you have an offer with the

6    Department of Justice and you hope to pass the clearance, would

7    that make you more inclined to favor the government in this

8    case, given that the U.S. Attorney's Office in D.C. is a part of

9    the Department of Justice?

10        PROSPECTIVE JUROR:  I don't believe so.

11        THE COURT:  Is there any hesitation about that?

12        PROSPECTIVE JUROR:  No.

13        THE COURT:  We've covered, I think, the lawyer

14   question you also answered yes to.  Aside from what you've

15   mentioned already, is there anyone else who is also a lawyer or

16   worked in an office?

17        PROSPECTIVE JUROR:  Myself, I'm a lawyer, and I have

18   lots of friends from law school and working at law firms in D.C.

19   who have gone on to different government attorney jobs, but no

20   one that I'm aware of that works on criminal matters in D.C.

21        THE COURT:  Thank you.

22      Ms. Berkower, any follow-up?

23        MS. BERKOWER:  Not from the government, Your Honor.

24        THE COURT:  Mr. Welch?

25        MR. WELCH:  No, thank you.

1           THE COURT:  All right.  Thank you, ma'am.

2       (Prospective juror steps down.)

3           THE COURT:  Before we bring in the next juror, let me

4   ask counsel, I'm kind of inclined to push through to 1:00.  Can

5   you all wait, or is anyone really hungry or needs a break or a

6   bathroom break?  You all right, Mr. Reffitt?

7           MR. WELCH:  If we could use the restroom, Your Honor,

8   we could continue.

9           THE COURT:  If we're going to do that, I might go

10  ahead and just take our break now.

11          MR. WELCH:  We can wait.

12          THE COURT:  Are you sure?

13          MR. WELCH:  Yes.

14          THE COURT:  We will take a couple more, and then we

15  will take a break.  We'll take about an hour for lunch.  Does

16  that work for everyone?

17      The next juror is juror number 1046.  This juror has

18  answered yes to questions 3, 4, and 5.

19      (Prospective juror steps up.)

20          THE COURT:  Good afternoon, sir.  You may take off

21  your mask if you're comfortable doing so.

22      All right.  So you are juror 1046?

23          PROSPECTIVE JUROR:  That's correct.

24          THE COURT:  And you've answered yes to seeing news

25  about the January 6 events at the Capitol; is that right?

1          PROSPECTIVE JUROR:  I have.

2          THE COURT:  Can you describe generally what you've

3    seen or heard?

4          PROSPECTIVE JUROR:  Well, I watched the events live on

5    CNN and the news and things the day, on January 6, and there

6    have been articles I've read in the weeks and months after that.

7    Very hard to avoid, I guess.

8          THE COURT:  Can you keep your voice up a little bit?

9          PROSPECTIVE JUROR:  In addition to watching the live

10   coverage, I also read articles and heard things on the radio in

11   the months following January 6 as well.

12         THE COURT:  Have you continued to follow those events

13   up to the current day?

14         PROSPECTIVE JUROR:  I wouldn't say I followed it

15   religiously, but it's hard to avoid those articles in the

16   newspapers and on the radio.

17         THE COURT:  So you're not looking for the information,

18   but when you see a headline, you're reviewing it?

19         PROSPECTIVE JUROR:  Yes, definitely.

20         THE COURT:  Have you read any information about

21   Mr. Reffitt or any other individuals involved in the events of

22   January 6 who you remember as you sit here now?

23         PROSPECTIVE JUROR:  I can't remember any of their

24   names.  To the best of my knowledge, I don't remember the

25   defendant.

1          THE COURT:  Do you recognize him based on --

2          PROSPECTIVE JUROR:  I don't, no.  No, I don't.

3          THE COURT:  Have you formed an opinion about the guilt

4    or innocence of the individuals who were involved in the

5    January 6 events?

6          PROSPECTIVE JUROR:  I mean, I was shocked by what I

7    saw.  I don't know what the defendant did or did not do that

8    day, but I was very uncomfortable with what I did see.

9          THE COURT:  You were what?

10         PROSPECTIVE JUROR:  Uncomfortable with what I did see.

11         THE COURT:  Understood.  I'm just wondering, can you

12   set aside that discomfort that you felt viewing the events of

13   January 6 on TV and based on what you've read, and can you come

14   into this courtroom kind of with the slate wiped clean and be a

15   neutral juror in this case?

16         PROSPECTIVE JUROR:  I believe so.

17         THE COURT:  I sense a little bit of hesitation.

18         PROSPECTIVE JUROR:  I do have some strong feelings.

19   It would be hard for me to be totally neutral in this.

20         THE COURT:  So that's the question I want to drill

21   down on.  So as I've told you already, you know, Mr. Reffitt is

22   presumed innocent as he sits here now, and he cannot be

23   convicted at trial unless the government proves its case beyond

24   a reasonable doubt.

25       Given your strong opinions about January 6, would you have

1    a hard time following either of those instructions?

2              PROSPECTIVE JUROR:  I would like to say no, but I

3    can't guarantee 100 percent.

4              THE COURT:  Do you have concerns about putting aside

5    what you've, you know, seen on TV or read about and judging the

6    case based solely on what you see in this courtroom?

7              PROSPECTIVE JUROR:  It would be difficult for me to

8    put aside what I have seen.  I watched the events unfurl in

9    realtime from around 12 noon well into the evening.  So it would

10   be hard for me to not take some of that into consideration, if

11   that makes sense.

12             THE COURT:  No, it makes total sense.  It's just we

13   want a panel of jurors who are neutral and don't come into this

14   courtroom with any preconceived notions.  I appreciate your

15   candor.  There's no wrong answer here.  I just want to know

16   whether you think you can be impartial, despite what you've seen

17   and heard about the events, or would you favor one side coming

18   in to this case?

19             PROSPECTIVE JUROR:  It would be difficult for me to be

20   neutral in dealing with a case like this.  It affects me -- I

21   live two miles from the Capitol, not close enough that I felt I

22   needed to answer the question I live close to the Capitol.  But

23   it did sort of feel like it was an attack on my home in a sense,

24   and it's hard to remove it from that.

25             THE COURT:  Were you there at your home on January 6?

1          PROSPECTIVE JUROR:  I was.

2          THE COURT:  Were you inconvenienced by the events of

3     January 6?

4          PROSPECTIVE JUROR:  I didn't leave my house the day

5     before, the day of, and the day after.

6          THE COURT:  You were worried about things based on

7     what you saw?

8          PROSPECTIVE JUROR:  Yes.  I have family members who

9     live on Capitol Hill, and they had troop transports and things

10    parked at the end of their street --

11         THE COURT:  I'm sorry?

12         PROSPECTIVE JUROR:  I have family that live in Capitol

13    Hill, and they had troop transports parked at the ends of their

14    streets, with armed people going past.  It was a very scary

15    time.

16         THE COURT:  And you've talked to those family members

17    about their experience on that day?

18         PROSPECTIVE JUROR:  I have, Your Honor.

19         THE COURT:  It sounds like it's pretty emotional

20    memory for you.

21         PROSPECTIVE JUROR:  It is.

22         THE COURT:  Is there anything else you would like to

23    add about what you've seen or heard?

24         PROSPECTIVE JUROR:  I don't think so, Your Honor.

25         THE COURT:  But just to be clear, your concern is not

1    so much about facts that you might know about this case in

2    particular but, rather, just your strong emotional reaction

3    about the Capitol events that make you hesitate in sitting as a

4    juror in this case?

5               PROSPECTIVE JUROR:  I think that's a good way to put

6    it, Your Honor.

7               THE COURT:  Ms. Berkower?

8               MS. BERKOWER:  Very briefly, Your Honor.

9         Good afternoon.

10              PROSPECTIVE JUROR:  Good afternoon.

11              MS. BERKOWER:  I just wanted to follow up on some of

12   the questions that the Judge asked you concerning the feelings

13   that you have about the events of January 6.

14        Do your strong feelings concern generally the people

15   involved and the events that happened, or do your concerns

16   relate to specific individuals?

17              PROSPECTIVE JUROR:  Generally about the events that

18   happened.  I can't tell you every person who went into the

19   Capitol, committed a crime, or committed violence, but what I

20   did see was shocking, and it's hard to separate that from the

21   individual as well.

22              THE COURT:  And if you were instructed to separate out

23   your feelings about the crowd generally from the particular

24   individual in this case, that's something that you think you

25   could do or you couldn't do?

1              PROSPECTIVE JUROR:  I think I would be able to do

2      that.

3              MS. BERKOWER:  You would?

4              PROSPECTIVE JUROR:  Yes.

5              MS. BERKOWER:  And how confident are you that you

6      would be able to make that separation?

7              PROSPECTIVE JUROR:  Very confident.

8              MS. BERKOWER:  Thank you.

9              THE COURT:  Mr. Welch?

10             MR. WELCH:  No questions, but I do have a question for

11     the Court.

12             THE COURT:  All right.  I just want to follow up on

13     what Ms. Berkower asked you.  So initially, you said you thought

14     it would be hard to separate what you know, what you saw about

15     the crowd and your strong feelings about the crowd, it'd be hard

16     to separate those feelings from Mr. Reffitt, the defendant in

17     this case.  Is that fair?

18             PROSPECTIVE JUROR:  That is fair, yes.

19             THE COURT:  Initially.  But then as you thought about

20     it, you think you would be able to separate?

21             PROSPECTIVE JUROR:  Yes.  Because ultimately, he's

22     just one person, and you can't judge one person based upon the

23     actions of a group, I don't think.

24             THE COURT:  Right.  So I'm just going to circle back

25     to the original, you know, colloquy we had about how strong

these feelings are and whether you have kind of a fixed mind-set about this case coming into this courtroom such that you would not approach the case as a neutral judge of the facts.

I'm just trying to drill down on that, because it is understandable that you and many others have strong views one way or the other about the Capitol events. I just want to make sure that the jurors who serve on a jury don't have such strong opinions that it really colors the way they view the evidence in this courtroom.

PROSPECTIVE JUROR: I would like to think I would be capable of separating the individual from the case, but it would also be hard for me to fully separate myself from what I experienced that day, what people close to me experienced that day. And there is still -- how do I put it? There's definitely some latent fear and alarm that I feel from that day, if that makes sense.

THE COURT: So you think as you -- if you were selected as a juror, you think as you would sit here and listen to the evidence, you might be thinking of those events on January 6 and what you learned that day, and you might have strong emotions? I'm not trying to put words in your mouth at all. I'm just trying to figure out whether you're going to be sitting here thinking about all of the things that upset you about that day as opposed to just the evidence that's presented here in court.

1    PROSPECTIVE JUROR:  I can't guarantee that I would be

2    able to separate out everything.  I would do my best, and I

3    would try, but it was a very difficult day.

4    THE COURT:  If the government presented its case and

5    you felt like they didn't prove their case beyond a reasonable

6    doubt, would you be able to find Mr. Reffitt not guilty, even if

7    you were convinced that he was present at the Capitol on that

8    day?

9    PROSPECTIVE JUROR:  If the evidence presented did not

10   give me -- if the evidence provided did not meet the threshold

11   for reasonable doubt, I don't think I would be able to convict.

12   THE COURT:  I'm sorry?  The last part, you don't think

13   you would be able to --

14   PROSPECTIVE JUROR:  If the evidence did not reach --

15   if I did not have a reasonable doubt -- I'm sorry.  I'm getting

16   confused by legal language.  If there was more than a -- if I

17   had a reasonable doubt, I would not convict.

18   Is that what you're asking?

19   THE COURT:  Yes.

20   PROSPECTIVE JUROR:  Then yes.  If the evidence

21   provided did not give me enough to firmly believe in his

22   conviction based on the evidence, I would not vote to convict.

23   THE COURT:  And you're certain about that?

24   PROSPECTIVE JUROR:  Yes.

25   THE COURT:  And as you sit here now, you don't have a

1    fixed view of Mr. Reffitt's guilt or innocence one way or the

2    other?

3              PROSPECTIVE JUROR:  No, not at this moment.

4              THE COURT:  All right.  Any follow-up, Mr. Welch?

5              MR. WELCH:  Yes, please.

6         Knowing the legal standard that you would be instructed to

7    apply, how difficult will it be for you to still set aside what

8    you've already seen?

9              PROSPECTIVE JUROR:  I can't say it would be easy,

10   given the -- but ultimately, I would do my best to examine the

11   evidence as presented and make the best decision I could with

12   the information that's provided.

13             MR. WELCH:  Knowing that you still have this latent

14   fear and alarm, would you still be able to set that aside?

15             PROSPECTIVE JUROR:  I honestly can't say that I could.

16             MR. WELCH:  Nothing further.

17             THE COURT:  Thank you, sir.  We really appreciate your

18   candor.

19        (Prospective juror steps down.)

20             MR. WELCH:  Your Honor, I have a question for the

21   Court.

22             THE COURT:  Ms. Berkower?

23             MS. BERKOWER:  Do you want Mr. Welch to go forward

24   since its his motion?

25             THE COURT:  Go ahead and give me your grounds.

1          MR. WELCH:  I'm moving for cause, Your Honor, because

2     the last thing that this venire person said was that he can't

3     say that he would be able to set aside his latent fear and alarm

4     over what he experienced.  He felt like it was an attack on his

5     home.  He didn't leave the house for three days.  He was worried

6     about family who also live on the Hill, troop transports coming

7     down the street.

8          So although he knows the legal standard and he articulated

9     it, he ultimately said that he can't say for sure he would set

10     his latent fear and alarm aside.  So I move for cause.

11          THE COURT:  Ms. Berkower?

12          MS. BERKOWER:  Yes, Your Honor.  We would oppose

13     striking this juror for cause.  This juror was asked a lot of

14     questions, and we went into a lot of detail about whether he had

15     an opinion in this case, and he repeatedly said no, he did not,

16     he did not have an opinion about the guilt of Mr. Reffitt and

17     that he was able to acquit Mr. Reffitt if he were not convinced

18     the government had met its burden of proof in this case.  He

19     said he would do his best; he would make his decisions based on

20     the evidence before the Court.

21          And I don't think it's necessarily determinative,

22     Mr. Welch's last question about his latent fear and alarm,

23     because he did say that he hasn't formed an opinion of the case

24     and he would address the case as presented on the evidence in

25     court.

1          And so we submit that simply knowing about the case,

2     knowing some information doesn't implicitly disqualify a juror,

3     and we believe that the -- the questions that Mr. Welch is

4     referencing get to that and not to whether he's formed an

5     opinion that would influence how he approached the evidence.  We

6     would submit he should not be struck.

7          THE COURT:  I think this is a close call.  I

8     appreciate what the government's saying about many of the

9     questions that he said he could put his feelings aside and try

10    to decide this case fairly based on the evidence presented in

11    court.

12         However, there were several times during the colloquies

13    back and forth, both with me and even with the government and

14    with the defense, where he was really, really struggling, and he

15    did seem emotionally impacted by the events of that day.  And I

16    am just concerned, as he said at the end there when Mr. Welch

17    questioned him, that he's -- he can't say whether he can set his

18    feelings aside.

19         And again, I don't have the exact line in front of me

20    because the transcript's not coming up on my computer, but it

21    seems to me he's clearly impacted by those events, and for that

22    reason, I think he would try very hard, and he's being sincere

23    when he thinks he can follow the instructions and he would

24    endeavor to do so.  But it just concerns me, starting from a

25    place where he feels so clearly, you know, visibly impacted by

1   the events and repeatedly hesitated at different points in the

2   questioning.

3        So in an abundance of caution, I will strike this juror.

4        Okay.  We will do one more, and then we will stop for the

5   day.  Not for the day.  For lunch.

6        The next one is 1384.  This juror said yes to questions 2,

7   3, 4, 19, and 23.

8        (Prospective juror steps up.)

9            THE COURT:  Good afternoon, ma'am.

10           PROSPECTIVE JUROR:  Hi.

11           THE COURT:  So I'm going to start with question 23,

12   which asked whether it would be an extreme hardship for you to

13   serve on the jury in this case.

14       Am I correct you answered yes to that question?

15           PROSPECTIVE JUROR:  I think I answered no, but there

16   was a question about a medical --

17           THE COURT:  Oh, medical issue.

18           PROSPECTIVE JUROR:  Yeah.

19           THE COURT:  Before I get into the answers on that --

20   sorry -- yes, this is whether you have a health or physical

21   problem that would make it difficult.  Before you answer that,

22   let me offer you the opportunity, if you would like, to tell me

23   the answer to that privately.  Is that something you would

24   prefer?

25           PROSPECTIVE JUROR:  Yeah, that would be great.

1    (Sealed bench conference.)

12    (End of sealed bench conference.)

13    THE COURT:  You also said you or someone you know have

14    a direct or incorrect connection to the January 6 Capitol

15    events.

16    Can you explain why you answered yes to that?

17    PROSPECTIVE JUROR:  Yeah.  I do know someone who is

18    representing some of the defendants.  She's a public defender.

19    THE COURT:  Who is that?

20    PROSPECTIVE JUROR:  Her name is Heather Shaner.

21    THE COURT:  Which defendants is she representing?

22    PROSPECTIVE JUROR:  I don't know.

23    THE COURT:  Have you talked to her about her

24    representation of her clients?

25    PROSPECTIVE JUROR:  I did, but on a very high level,

1   maybe in October when I saw her at a bar mitzvah.  We used to

2   see each other a lot because her granddaughter and my daughter

3   are friends, but it's been a while.

4       But anyway, she did talk to me a little bit about it.

5           THE COURT:  All right.  Is there anything about those

6   high-level discussions you said happened that might influence

7   you one way or the other in this case?

8           PROSPECTIVE JUROR:  I don't think so, no.

9           THE COURT:  All right.  You also -- well, before I

10  move on from that, she didn't mention anything about

11  Mr. Reffitt?

12          PROSPECTIVE JUROR:  No.  I don't remember any specific

13  names.  There was an article that she was -- about her that

14  someone else forwarded me like two months prior to that.  There

15  might have been names in there, but I don't remember what they

16  were.

17          THE COURT:  As you sit here now, you're not sure

18  whether Mr. Reffitt's name was in that article?

19          PROSPECTIVE JUROR:  I don't know, yeah.

20          THE COURT:  As you sit here now, do you have any

21  specific information beyond what I told you about this morning

22  about Mr. Reffitt and the charges in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  So you said you have reviewed news.  I

25  take it you've read articles.  You've watched TV.

1          PROSPECTIVE JUROR:  Yeah, I've read general articles,

2   and then someone did send me an article about her, just because

3   I know her.  It was like a friend of a friend.

4          THE COURT:  About Ms. Shaner?

5          PROSPECTIVE JUROR:  Yes.  It was in the Post.

6          THE COURT:  Beyond kind of TV and newspaper headlines,

7   have you followed any other news, Twitter, anything else

8   relating to the January 6 events?

9          PROSPECTIVE JUROR:  I'm not on Twitter.

10         THE COURT:  All right.  So as you sit here now, do you

11  know any specifics about any individual connected to the

12  January 6 events?

13         PROSPECTIVE JUROR:  I mean, other than what I've read

14  in the news.

15         THE COURT:  Can you recall any specific information

16  about any individual?

17         PROSPECTIVE JUROR:  The Shaman guy.  There was some

18  prominent people, although I don't actually recall any

19  information, but I did read articles about individuals that were

20  involved.

21         THE COURT:  But again, you don't think that those

22  related to Mr. Reffitt?

23         PROSPECTIVE JUROR:  I don't recognize that name at

24  all.

25         THE COURT:  All right.  You also said yes to you, your

1  family member, or close friend being a lawyer, student, or

2  working in a law office.

3          PROSPECTIVE JUROR:  I'm a lawyer.

4          THE COURT:  Where do you work?

5          PROSPECTIVE JUROR:  At the Consumer Financial

6  Protection Bureau.

7          THE COURT:  How long have you been there?

8          PROSPECTIVE JUROR:  Since 2013.

9          THE COURT:  Have you done any criminal work --

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  -- in your time as a lawyer?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Do you know lawyers who do criminal work,

14  aside from Ms. Shaner?

15          PROSPECTIVE JUROR:  Actually, no.

16          THE COURT:  Really?  In D.C.?

17          PROSPECTIVE JUROR:  Not anyone that I know well.

18          THE COURT:  Do you talk about the law with Ms. Shaner

19  or anyone else?

20          PROSPECTIVE JUROR:  Certainly at work.

21          THE COURT:  I mean about criminal law.

22          PROSPECTIVE JUROR:  No.  I don't know anything about

23  criminal law.

24          THE COURT:  Anything about your experience as a lawyer

25  that might make you struggle following my instructions, even if

```
1    they seem inconsistent with what you remember?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  I think that's it.

4         Ms. Berkower?

5              MS. BERKOWER:  Nothing from the government.

6              THE COURT:  Wait.  Sorry.  We've got potential

7    follow-up.

8              MS. BERKOWER:  Nothing from the government.

9              PROSPECTIVE JUROR:  Oh, I wasn't leaving.

10             THE COURT:  We didn't want to lose you.

11        Mr. Welch?

12             MR. WELCH:  No, thank you.

13             THE COURT:  So you are excused from the room, not from

14   the courthouse.

15             PROSPECTIVE JUROR:  Thank you very much.

16        (Prospective juror steps down.)

17             THE COURT:  All right.  This seems like a good time to

18   take a break.  Before we do, just so that we're all on the same

19   page, can we review so far the strikes and just confirm them

20   with Mr. Hopkins?  Mr. Hopkins, can you read them out?

21             COURTROOM DEPUTY:  Absolutely, Your Honor.  The

22   strikes that I have are jurors 328 --

23             THE COURT:  Read out their juror number if you could,

24   please.

25             COURTROOM DEPUTY:  Juror number 328.  We struck 1541.
```

1        And we struck 1046.

2            Is that what everyone else has?

3                MS. BERKOWER:  Yes.

4                THE COURT:  Okay.  And also, there was the juror --

5        how do you all feeling about moving the juror who really doesn't

6        want to miss Ash Wednesday, the trip, to the bottom?  Do you all

7        object?

8                    MR. WELCH:  Without objection, Your Honor.

9                THE COURT:  No objection to moving her to the bottom?

10               MR. WELCH:  No objection to moving her to the bottom.

11               THE COURT:  Was that juror number 1419?  Is that

12       correct?  Yeah.

13               MS. BERKOWER:  We'd rather not at this time, Your

14       Honor.

15               THE COURT:  All right.  So she will stay in the line.

16           So let's come back at 2:00, 5 after if you need -- I'll be

17       ready at 2:00 if you're ready.

18           (Recess taken at 1:05 p.m.)

19           (Afternoon session of this proceeding was reported by

20       Lorraine Herman and is bound under separate cover.)

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8     /s/ Sara A. Wick_____            February 28, 2022____

9     SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25