1              BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3  UNITED STATES OF AMERICA,        .
                                    .  Case Number 21-cr-32
4          Plaintiff,               .
                                    .
5      vs.                          .
                                    .
6  GUY WESLEY REFFITT,              .  March 1, 2022
                                    .  9:09 a.m.
7          Defendant.               .
   - - - - - - - - - - - - - - - - -

8

9                  TRANSCRIPT OF JURY TRIAL
                        (MORNING SESSION)
10        BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                 UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13  For the United States:      JEFFREY NESTLER, AUSA
                                RISA BERKOWER, AUSA
14                              United States Attorney's Office
                                555 Fourth Street Northwest
15                              Washington, D.C. 20530

16  For the Defendant:          WILLIAM WELCH, III, ESQ.
                                5305 Village Center Drive
17                              Suite 142
                                Columbia, Maryland 21044
18

19

20

21  Official Court Reporter:    SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
22                              U.S. Courthouse, Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24

25  Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal
 4      Action 21-32, United States versus Guy Reffitt.
 5          Representing the United States, we have Mr. Jeffrey Nestler
 6      and Ms. Risa Berkower.  Representing Mr. Reffitt, we have
 7      Mr. William Welch.
 8              THE COURT:  First off, the government's correct in
 9      terms of the number of jurors we need to qualify.  We were
10      double counting the alternates.  So we're trying to get to a
11      total of 36.  Even for those who had conflicts, would prefer not
12      to serve, my understanding is we didn't move any of those to the
13      bottom.
14          Am I correct?
15              MR. WELCH:  Correct.
16              THE COURT:  So we now have 24.  Is that right, 24?
17              COURTROOM DEPUTY:  24.
18              THE COURT:  24?  All right.  So I would suggest
19      getting to 37 or so.
20          Does that make sense to everyone?
21              MS. BERKOWER:  It does, Your Honor, and I think it's
22      24 without the juror who had a potential residency issue and 25
23      with her.
24              THE COURT:  Ms. Berkower, I'm told it's hard to hear
25      you.  So you need to keep your voice up, particularly in the
```

1    other room.  So I didn't hear that.  You can take the mask off

2    if you want.

3           MS. BERKOWER:  With regard to the number who have

4    qualified, it's the government's understanding it's 24 without

5    the juror who had the potential residency issue.

6           THE COURT:  Right.  And you all didn't get me any

7    authority on that.  Do you have any?

8           MS. BERKOWER:  I think in light of the defendant's

9    challenge to her, we will not object.

10          THE COURT:  Yeah.  Well, I was inclined to agree with

11   them, just looking at the Black's definition of "residence."  I

12   think it's defined as the act or fact of living in a given place

13   for some time, and it's distinguished from domicile.  And she's

14   been living, by her own admission, in Falls Church since

15   January.  So I would strike that juror.

16      So we're in agreement we have 24 with that juror stricken?

17          MS. BERKOWER:  Yes.  That's right, Your Honor.

18          THE COURT:  And do you all agree, both sides, that we

19   should aim for 37, or do you think we should go to 38?

20          MS. BERKOWER:  I think 37 is --

21          THE COURT:  I think 37.  We don't have a break.  We're

22   going to do the peremptories today.  So at some point later, I

23   want to talk to you all about the -- how we're going to do the

24   strikes in the Ceremonial Courtroom.  It's a little more

25   challenging with everyone spaced apart.  So I just want to make

1    sure we're all on the same page about how that's going to work,

2    but let's not keep the jury waiting any longer.

3         Also, just so you know, I am asking the court to take

4    another look at whether, given the relaxing of COVID protocols

5    generally, whether we can do anything to relax the Court's

6    order.  I don't know if I will have any luck on that.  But I

7    think Mr. Reffitt's family member, his wife, would have

8    priority, as well as the press.  So we're just really jammed

9    operating under a six-foot social distancing order.  So I just

10   want you all to know that I've made that request.

11        Let's see.  Anything else, Ms. Berkower, you want to say?

12             MS. BERKOWER:  Very briefly, Your Honor.  I know Your

13   Honor wanted to address the government's PowerPoint for opening.

14             THE COURT:  Right.

15             MS. BERKOWER:  But we did have, before we brought in

16   the prospective -- the next prospective juror, a request

17   concerning one of the jurors who did qualify yesterday.  We

18   wanted to just raise a question about whether further

19   questioning might be appropriate for one of these jurors, and I

20   can address that now or after --

21             THE COURT:  What juror number is this?

22             MS. BERKOWER:  Sorry.

23             THE COURT:  This is one who qualified?

24             MS. BERKOWER:  Yes, Your Honor.  It's juror 0457.

25             THE COURT:  And just briefly, what's the issue?  I'm

1    not sure I want to get into it now, given the jury's waiting for

2    us.

3            MS. BERKOWER:  Well, Your Honor, this was the juror

4    who had said that she had listened to podcasts, a lot of

5    podcasts in recent weeks about January 6 and followed it very

6    closely, one podcaster or journalist in particular.

7            And upon leaving court yesterday, we learned a little bit

8    more, that that podcaster has expressed the view that January 6

9    was a false flag attack committed by the government.

10           And while we addressed this juror's opinion concerning the

11   guilt or innocence of defendants or people involved with

12   January 6 and she said she could set those views aside, we did

13   not get into whether she has opinions about the government and

14   biases towards the government or against the government that she

15   could set aside to be a juror.

16           And in light of Your Honor's preference --

17           THE COURT:  I let you re-examine her.  You could have

18   brought that out.  I'm not going to continue to call folks back.

19   You drilled down quite a bit on that, and she certainly is

20   worthy probably of a peremptory strike by the government.  But I

21   don't -- we need to move it.  We've got jurors waiting.  We

22   spent a lot of time with her.

23           MS. BERKOWER:  Understood, Your Honor.  Thank you.

24           THE COURT:  All right.  Okay.  I will address the

25   issues with the demonstrative exhibits later.  I really don't

want to keep -- we've got jurors waiting in the jury room now,

Mr. Hopkins?

COURTROOM DEPUTY:  Yes, Your Honor, we do.

THE COURT:  All right.  I don't want to wait anymore

at this point.

Mr. Welch, any issues for you and Mr. Reffitt before we

bring the rest of the jurors in?

MR. WELCH:  No, Your Honor.  Thank you.

THE COURT:  Okay.  If I'm correct, the next juror up

is 1650.  This juror has said yes to questions 18, question 20,

and question 22.  I will start with 22, and I note that this

juror is over 70.

(Prospective juror steps up.)

THE COURT:  Good morning, ma'am.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  I'm very sorry we didn't get to you

yesterday.

PROSPECTIVE JUROR:  That's okay.

THE COURT:  If you're comfortable taking your mask

off, could you, please?

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Of course.  Ma'am, I just want to remind

you that you are still under oath.  Yesterday, you were placed

under oath.  I just want to remind you of that.

So I understand that you have said yes to the question that

serving as a juror would be an extreme hardship.  And before you

answer that question, I want to remind you that I'm happy to

take your answer on the telephone if you would like to say why

it would be a hardship privately to me and to the court staff.

But also, I want to make sure that you realize that you are

here voluntarily, given your age.  Am I correct you're over 70?

PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  You're not required to serve.

PROSPECTIVE JUROR:  I know.

THE COURT:  So if you would prefer not to serve,

that's your prerogative.  We would be delighted to have you

serve, but I want you to know that you have that right.

PROSPECTIVE JUROR:  Yes.  I have only one -- I may not

have answered the question correctly.  But I have an excuse for

March the 7th.

THE COURT:  Okay.  And that would be hard for you to

be here on March the 7th?

PROSPECTIVE JUROR:  Correct, because I already have

arbitration on March the 7th.

THE COURT:  All right.  And this trial, today's the

1st, and I think it's probably likely to still be going on by

March the 7th.

And you can't miss that?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Given that you don't have to serve, does

1   either side have any objection to excusing this juror?

2           MS. BERKOWER:  No, Your Honor.

3           MR. WELCH:  (Shook head.)

4           THE COURT:  All right, ma'am.  Thank you for your

5   service.

6       (Prospective juror steps down.)

7           THE COURT:  All right.  So that juror, I don't know

8   whether it's appropriate to strike for cause or she's just

9   exercised her right not to appear, but she won't be a qualified

10  juror.

11      The next juror is 0365.  This juror has answered yes to

12  questions 1, 3, 4, 5, and 20.

13      (Prospective juror steps up.)

14          THE COURT:  Good morning, ma'am.

15          PROSPECTIVE JUROR:  Good morning.

16          THE COURT:  Sorry to keep you waiting all day

17  yesterday and not get to you.  If you feel comfortable taking

18  your mask off, please do.  Again, I want to remind you that you

19  are still under oath.

20      I see that you have answered yes to question number 1,

21  which is that you live or work at or near the Capitol.  Which is

22  it, or both?

23          PROSPECTIVE JUROR:  It's both.  I work in Northeast,

24  and I live in Northwest.

25          THE COURT:  How far from the Capitol would you say,

1    roughly?  Are you on Capitol Hill?

2           PROSPECTIVE JUROR:  No, I'm not in the area.  I wasn't

3    actually sure about that answer.

4           THE COURT:  Were you inconvenienced at all on

5    January 6 as a result of the events at the Capitol?

6           PROSPECTIVE JUROR:  On that day?

7           THE COURT:  Yes.

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Were you here in D.C. on that day?

10          PROSPECTIVE JUROR:  No.  I was in San Francisco.

11          THE COURT:  You've also said that you have heard news

12   about the January 6 events and that you heard news about

13   Mr. Reffitt or others who were at the Capitol on January 6.

14      Can you tell us what you've heard?

15          PROSPECTIVE JUROR:  I haven't heard specifically, but

16   just events reported on the news, but I haven't heard specific

17   names or anything.

18          THE COURT:  Ma'am, can you please keep your voice up?

19   It's hard to hear.  That's the microphone.

20          PROSPECTIVE JUROR:  Sure.  Sorry.

21          THE COURT:  That's all right.

22      So I'm wondering, the news that you've seen or heard, was

23   that concentrated on or around January 6, or has it been

24   constant since that date?

25          PROSPECTIVE JUROR:  No, it's just like general news.

1          THE COURT:  So, what, you've read articles and seen

2     things on TV just as you follow the news?

3          PROSPECTIVE JUROR:  Sure, yeah.

4          THE COURT:  Are you tracking the January 6 events

5     specifically?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  You have to keep your voice up.

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you seen -- you haven't seen anything

10    about Mr. Reffitt in particular that you can recall?

11        So Mr. Reffitt's seated at that table.  Do you recognize

12    him?

13         PROSPECTIVE JUROR:  Nope.

14         THE COURT:  Have you formed any opinion about the

15    guilt or innocence of the people involved in the events at the

16    Capitol on January 6?

17         PROSPECTIVE JUROR:  Can you repeat that?  Sorry.

18         THE COURT:  The question is, have you formed an

19    opinion about the guilt or innocence of the individuals who were

20    involved in the January 6 events at the Capitol?

21         PROSPECTIVE JUROR:  Not about the people.  I think it

22    was -- as a D.C. resident, I think it was a lot of failures,

23    yeah.  I don't know.

24         THE COURT:  When you say "a lot of failures," what do

25    you mean?  Do you mean on the part of the individuals who

1    participated in the riot or on the part of the security folks,

2    or both?

3              PROSPECTIVE JUROR:  I think it was probably a

4    combination of things, and I don't -- I think people were

5    probably somewhat drawn into the situation and it perhaps got

6    out of hand, and I think that's where some of the

7    miscommunication and system failures and -- with respect to

8    Mayor Bowser's call to Capitol Police.  I think it escalated

9    quickly from what I saw on TV.

10       But during that year, I had -- I reside in D.C., but my

11   parents are in California.  So during 2020, working from home, I

12   was working remotely from San Francisco.

13             THE COURT:  So you were in San Francisco still on

14   January 6th of 2021?

15             PROSPECTIVE JUROR:  Correct, yeah.  We were still in

16   work-from-home -- my parents are elderly, too.  At that point,

17   everyone was quarantining.

18             THE COURT:  So given your feelings and the opinions

19   you have about what happened on January 6, is there anything

20   about those feelings, those opinions, that would be difficult

21   for you to set aside and judge this case solely based on the

22   evidence that's presented in this court?

23             PROSPECTIVE JUROR:  No.  I think it's fair to hear all

24   sides.  I don't -- I think -- I don't succumb to everything the

25   news says either.  So I mean, I think people are entitled to

1    present their side of what happened.

2              THE COURT:  And you realize what you've seen and heard

3    in the news is not and could not be evidence in this case, in

4    this trial?

5              PROSPECTIVE JUROR:  Sure, yeah.  I mean, it's TV.

6              THE COURT:  All right.  You realize that media may not

7    be fully accurate or complete?

8              PROSPECTIVE JUROR:  I totally -- yes, I agree.

9              THE COURT:  So you could kind of wipe the slate clean

10   with what you've seen and heard and decide this case based on

11   the evidence in this courtroom?

12             PROSPECTIVE JUROR:  I think I could be fair and

13   objective, yes.

14             THE COURT:  All right.  You have also said yes to you

15   or someone you know having been arrested, charged, or convicted

16   of a crime or been a victim or witness to a crime.

17        And before you answer that, let me remind you that if you

18   feel more comfortable answering that by the telephone headset

19   privately, you may do so.

20             PROSPECTIVE JUROR:  No.  I recently was a victim of

21   crime myself.

22             THE COURT:  What kind of crime?

23             PROSPECTIVE JUROR:  My identity was stolen.  My credit

24   card information was lifted and used at a golf course in New

25   Jersey for a paintball session.

1          But long story short, between when I found out that day,

2     once I saw the money out of my account, I kind of sprung into

3     action.  I called the golf course down in New Jersey.  They

4     ended up arresting the person.

5               THE COURT:  Really?

6               PROSPECTIVE JUROR:  Yeah.

7               THE COURT:  You're one of the lucky few.

8          Was there a prosecution?

9               PROSPECTIVE JUROR:  Yes.  Well, as of -- so I spoke

10    to, I think it was, the district attorney around New Year's, and

11    they were going to offer the person a plea bargain.  I just

12    really wanted to know how this person obtained my credit card

13    info.  They could have bought it.  It could have been lifted

14    from a gas station.  I don't know.  I had the card on me.

15         So that was the last I heard from the detective, and that

16    was around, I think -- yeah, they were going to offer a plea

17    bargain, and then they said if the person didn't take the plea

18    bargain, then it would probably go to trial, in which case I

19    might -- I don't know.  I just haven't followed up.

20              THE COURT:  All right.  And these are New Jersey law

21    enforcement authorities you were dealing with?

22              PROSPECTIVE JUROR:  Uh-huh.

23              THE COURT:  Is there anything about the way that case,

24    that investigation or prosecution was handled that would make

25    you lean towards one side or the other in this case?

1           PROSPECTIVE JUROR:  No.  I mean, they sprung into

2     action.  I mean, between -- you know, they showed up at the golf

3     course the next day, like, undercover, and the person showed up

4     with 15 of his friends expecting to play paintball, and I think

5     I ruined his birthday party.

6           The amount that was withdrawn from my checking was about

7     1,800.  It was enough to, like, put my -- go into overdraft as

8     well, too.  So unfortunately, in the last, I don't know, say 20

9     years, I've had my identity stolen a few times.  So this was

10    like --

11          THE COURT:  Very bad luck.

12          PROSPECTIVE JUROR:  Yeah.  And oftentimes, I think

13    these things happen where they don't have enough, you know, but

14    the person was going to show up.

15          But they were very professional.

16          THE COURT:  Thank you.

17    Ms. Berkower?

18          MS. BERKOWER:  Good morning.

19          PROSPECTIVE JUROR:  Good morning.

20          MS. BERKOWER:  So just a couple of questions for you

21    to start with, when you said you were teleworking from

22    California.  When did you start teleworking from California?

23          PROSPECTIVE JUROR:  Probably around March 16th or 17th

24    of 2020.

25          MS. BERKOWER:  So like right after the shutdown?

1          PROSPECTIVE JUROR:  It was kind of around that time,

2     yeah.

3          MS. BERKOWER:  And how long were you out in California

4     for?

5          PROSPECTIVE JUROR:  During 2020, probably most of the

6     year.  I think I came back to D.C. maybe in October, but then I

7     went back out.  During this time, my mom also fell out there.

8     So she suffered like three fractures.  So it was between

9     maintaining my employment, because my employer's in D.C., and

10    then, you know, keeping safe, social distancing, like not going

11    anywhere.

12        So that's -- my parents are out there.

13         MS. BERKOWER:  To make sure I understand, it sounds

14    like you left for California in March of 2020 --

15         PROSPECTIVE JUROR:  Yeah, I was gone probably most of

16    2020, even though I paid rent every month.

17         MS. BERKOWER:  You said you came back in

18    October of 2020?

19         PROSPECTIVE JUROR:  I did, yeah, because I had been

20    away from my apartment for so long, my car was parked on the

21    street.  We were all instructed to still be working from home,

22    and I had gotten approval from my manager and vice president to

23    work from California.  Like, I was a work-from-home in D.C., but

24    I was actually like remote.  So I had their permission, and I

25    was able to continue my job effectively and stuff.

1          MS. BERKOWER:  Okay.  So you came back in

2     October of 2020.  When did you go back to California?

3          PROSPECTIVE JUROR:  It was around Thanksgiving, and

4     then I stayed out in San Francisco through Christmas, through

5     January.  And then it was probably around maybe Martin Luther

6     King Day where they started wanting people to return to the

7     office and showing up to work.  With everyone's different

8     personal situations at home, people have kids and stuff, so --

9          MS. BERKOWER:  So when did you come back to D.C.?

10    Martin Luther King --

11         PROSPECTIVE JUROR:  It was probably around that time.

12         MS. BERKOWER:  -- of 2021?

13         PROSPECTIVE JUROR:  Uh-huh.

14         MS. BERKOWER:  And have you been back to California

15    since then?

16         PROSPECTIVE JUROR:  So I went out for --

17         MS. BERKOWER:  And I don't mean like little vacation

18    trips.  I mean like, did you remote work from California?

19         PROSPECTIVE JUROR:  I think it was in April of 2021,

20    we were all back.  I've been going back to the office every day.

21    So --

22         MS. BERKOWER:  And you think you came back for that in

23    January of 2021?

24         PROSPECTIVE JUROR:  That sounds about right.  It was

25    probably Martin Luther King, or end of January.  Then I was

probably maybe working from home a couple days a week in D.C.
and then going to campus.

          MS. BERKOWER:  But not teleworking from the other
coast anyway?

          PROSPECTIVE JUROR:  Yes.  Eastern Standard Time.

          MS. BERKOWER:  Thank you for clearing that up.

     So a couple of questions for you.  You said that you
thought that people -- well, first of all, you said that you
have heard some news about it.  Do you know what news sources
generally you got that news from?

          PROSPECTIVE JUROR:  A variety of news sources.  I
mean, I'm --

          MS. BERKOWER:  Is it on TV?  On the Internet?  Social
media?

          PROSPECTIVE JUROR:  I think it's -- I don't read like
blogs or anything.  I don't go down rabbit holes with stuff.

          MS. BERKOWER:  Any particular channel?

          PROSPECTIVE JUROR:  I think with respect again to
January 6, as someone who has been a D.C. resident now for ten
years, I am active in the statehood cause and all that.  So I
think it's a part of a larger issue than just a person or a
group of people.  I think there was like lots of --

          MS. BERKOWER:  You said you thought people were drawn
in.  So which people were you talking about getting drawn in?

          PROSPECTIVE JUROR:  I think people who came to the

Capitol that day, I imagine that they didn't know that was going to happen.

MS. BERKOWER:  Is that an opinion you have that's pretty firmly held?

PROSPECTIVE JUROR:  I think that some people probably were misled, yeah.

MS. BERKOWER:  Do you have an opinion as to whether everyone who was there was misled and didn't know that was going to happen?

PROSPECTIVE JUROR:  It's hard to say.  I don't know. I really -- I personally don't think I know anyone directly that went to the Capitol that day.  I mean --

MS. BERKOWER:  So the Judge is going to ask you to set aside your, you know, preconceived opinions --

PROSPECTIVE JUROR:  Right.

MS. BERKOWER:  -- and views about the case.  She is going to order you to do that in order to consider the evidence. Are you going to be able to put that out of your mind?

PROSPECTIVE JUROR:  I think so; yeah, I think so.

MS. BERKOWER:  If you hear evidence in the case, are you going to be comparing that to that preconceived belief that you have?

PROSPECTIVE JUROR:  No.  I think people are entitled to a fair trial and to present their side of the story as well, too.

1        MS. BERKOWER:  Okay.  That's not quite what I mean,

2   though.

3        PROSPECTIVE JUROR:  Oh.

4        MS. BERKOWER:  What I mean is, the Judge is going to

5   ask you to set aside the information you know from before coming

6   to court and only listen to what's there.

7        So as you're hearing the evidence, are you going to be

8   comparing it in the back of your mind to what you heard

9   before --

10       PROSPECTIVE JUROR:  No, no.  I think I -- I know

11  enough to not take everything that's presented in front of me on

12  TV, on the Internet at face value.

13       MS. BERKOWER:  And you said that you have opinions

14  about certain failures.  Can you just explain?  I want to make

15  sure I understand what you meant about certain failures that

16  contributed to the events of that day.

17       PROSPECTIVE JUROR:  Well, based on what I heard from

18  Mayor Bowser, she -- or from her office, I understand that she

19  called in, I think it was, the National Guard, and they really

20  ignored her calls.  So I think that our mayor tried to contain

21  the situation.

22       And honestly, like that day for me, I do remember it as

23  like different -- we were three hours behind, and it was a big

24  day because they were going to certify the election.  And it's a

25  huge deal.  So I was working that day.  I started work probably

1    around 4:30 a.m.  So --

2              MS. BERKOWER:  Oh, wow.  To stay on the East Coast

3    time?

4              PROSPECTIVE JUROR:  Yeah.  And it just unfolded, and I

5    was like, this is spiraling out of control.  Within a couple of

6    hours, it was like (indicating).

7         And to me, I think, like -- I lived in New York City during

8    9/11.  I saw it with my own eyes.  And I was -- yeah.

9              MS. BERKOWER:  So when you talk about failures, you

10   have in mind that Mayor Bowser called the National Guard and

11   they ignored her?  That's sort of what you have in your mind's

12   eye?

13             PROSPECTIVE JUROR:  Yeah.  I think it spiraled out of

14   control.  I think it -- I don't know if -- it's hard to say

15   whether that was the intended outcome, but I do think that -- I

16   don't know how many people were down there.  I don't know like

17   the size of the crowds, per se.  But I don't think that -- let's

18   see.

19             MS. BERKOWER:  I think we understand what you're

20   getting at.  So thank you very much.

21             THE COURT:  All right.  Mr. Welch?

22             MR. WELCH:  No questions.  Thank you.

23             THE COURT:  All right.  Thank you.  Thank you, ma'am.

24   You're excused from the courtroom.

25        (Prospective juror steps down.)

 1          THE COURT:  Ms. Berkower, two things.  One, watch the

 2    leading questions.  Sometimes when witnesses answer a question a

 3    certain way, you're really pressing to change their answer, and

 4    I don't know that you should be doing that.

 5       And two, quit saying I'm going to order them to follow the

 6    law.  They will be instructed.  "Order" sounds very strong.

 7       All right?

 8          MS. BERKOWER:  Understood, Your Honor.

 9          THE COURT:  Okay.  Next juror is 0038.  They've

10    answered yes to 3, 4, 6, and 20.

11       (Prospective juror steps up.)

12          THE COURT:  Good afternoon, sir.

13          PROSPECTIVE JUROR:  Hello.

14          THE COURT:  If you're comfortable taking off your

15    mask, please do.

16          PROSPECTIVE JUROR:  Okay.

17          THE COURT:  And let me remind you that you are still

18    under oath from yesterday.

19          PROSPECTIVE JUROR:  Correct.

20          THE COURT:  Sorry to keep you waiting all day

21    yesterday and bring you back here today, but I appreciate your

22    patience.

23       You have answered yes to having followed the news about the

24    January 6 events and having seen news about either Mr. Reffitt

25    or other individuals at the Capitol.

1          Can you give us some detail about that?

2          PROSPECTIVE JUROR:  Yes.  So I followed what was

3    happening, the insurrection that was happening on the 6th, and

4    since then, in terms of specific individuals, I only saw

5    headlines of certain people, like the Shaman person, the person

6    who took Nancy Pelosi's desk, not the individual for this case,

7    I didn't see any news about, but a few others.

8          THE COURT:  Do you recognize Mr. Reffitt here in the

9    courtroom?

10         PROSPECTIVE JUROR:  No, no.

11         THE COURT:  So he's at this table.  You don't

12   recognize him?

13         PROSPECTIVE JUROR:  No, I do not.

14         THE COURT:  The news that you've seen, have you

15   tracked it closely, or are you just reviewing general news and

16   reading the articles about January 6 as they arise?

17         PROSPECTIVE JUROR:  I tracked it closely at the time.

18   It was very -- it was something that was very scary for me to

19   see, living a few miles away and seeing what was happening.  It

20   was kind of horrific to watch on the day of, and so I continued

21   consuming news about it.

22         THE COURT:  All right.  And you were here in D.C. on

23   the day of?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Where were you when the actual events were

1    occurring?

2              PROSPECTIVE JUROR:  At my home, which is about two

3    miles away from the Capitol.

4              THE COURT:  All right.  And were you afraid that day?

5              PROSPECTIVE JUROR:  Yes, yes, I was.  I was afraid for

6    my city.

7              THE COURT:  For the city?

8              PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  Were you afraid for yourself?

10             PROSPECTIVE JUROR:  Not for myself, because I was safe

11   at home.

12             THE COURT:  Do you know any individuals who were at

13   the Capitol that day, either as rioters or folks inside the

14   Capitol?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Do you think -- based on what you've seen

17   and heard in the news, do you think that you would be able to

18   set aside what you've seen and heard and decide this case solely

19   based on the evidence that's presented here in court and the

20   instructions I would give you?

21             PROSPECTIVE JUROR:  I feel that I can review

22   information in an unbiased way, but I do have strong opinions

23   about the individuals who participated in that -- in the

24   insurrection.  So I just want to make that clear, that I do have

25   a general feeling about that.

1          THE COURT:  A general feeling about the event as a

2    whole?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You also answered yes to having an opinion

5    about Mr. Reffitt's guilt or innocence.  As he sits here now, do

6    you have a feeling that he's guilty based on the strong feelings

7    you have about the events of January 6?

8          PROSPECTIVE JUROR:  Just participating in the events

9    makes me concerned, but I do -- I feel that I can review

10   information in an unbiased way.  But I do understand that just

11   his being there is concerning.

12         THE COURT:  If the government were to present evidence

13   that Mr. Reffitt was present, near the Capitol on January 6,

14   based on that evidence alone, would you be inclined to convict

15   him of the crimes charged?

16         PROSPECTIVE JUROR:  There was several crimes charged,

17   and not all are related necessarily to him being there.  So I

18   would say no.

19         THE COURT:  All right.  So you would carefully listen

20   to the evidence and apply that evidence to the elements, the

21   multiple elements that the government would have to prove?

22         PROSPECTIVE JUROR:  Correct, yes.

23         THE COURT:  All right.  And you realize that anything

24   you've seen or heard in the news is not evidence in this case?

25         PROSPECTIVE JUROR:  Correct; yes, I do.

1          THE COURT:  And you realize as Mr. Reffitt sits here

2    he is presumed under the law to be innocent?

3          PROSPECTIVE JUROR:  Yes, I do.

4          THE COURT:  And you understand that it would be the

5    government's burden to prove his guilt beyond a reasonable

6    doubt, and unless and until it did, Mr. Reffitt could not be

7    convicted of any of the offenses with which he's charged?

8          PROSPECTIVE JUROR:  I understand, yeah.

9          THE COURT:  And you would have no problem following my

10   instruction?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Yes, you would not have a problem?

13         PROSPECTIVE JUROR:  I would not have a problem.

14         THE COURT:  You also indicated that you or someone you

15   know has been arrested, convicted, or been a victim of a crime.

16   And I want to remind you that if you feel more comfortable

17   answering that question on the telephone, the private telephone

18   line, you may do that.

19         PROSPECTIVE JUROR:  I think I heard the question

20   poorly.  I don't know anyone who has been convicted of a crime.

21   I have seen crimes committed.

22         THE COURT:  What kinds of crimes have you seen

23   committed?

24         PROSPECTIVE JUROR:  I participated in many of the

25   Black Lives Matter protests two years ago in D.C. and saw police

1    officers committing crimes against peaceful protestors such as

2    myself.

3              THE COURT:  So you feel that police officers committed

4    crimes against you and others in connection with the protests in

5    the summer of January 2020?

6              PROSPECTIVE JUROR:  Yes, but I believe that those are

7    completely different from the -- what took place on January 6,

8    because I was participating in peaceful protests on public

9    property.

10             THE COURT:  Where were you when you were participating

11   in a peaceful protest on public property?

12             PROSPECTIVE JUROR:  I was marching but also Lafayette

13   Square.

14             THE COURT:  In Lafayette Square?

15             PROSPECTIVE JUROR:  Yes, including on June 1st.

16             THE COURT:  I'm sorry?

17             PROSPECTIVE JUROR:  On June 1st, when there were

18   significant events at Lafayette Square, I was there.

19             THE COURT:  Can you remind me what happened on

20   June 1st?

21             PROSPECTIVE JUROR:  That was the day when Secret

22   Service police on cavalry charged into the protestors who were,

23   of course, standing outside of Lafayette Square and pushed us

24   all out with --

25             THE COURT:  And cleared the area when the President

1   spoke in front of St. John's Church?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  You were there that day?

4               PROSPECTIVE JUROR:  Yes.

5               THE COURT:  And based on what you experienced yourself

6   that day and what you saw, do you have a general view about law

7   enforcement officers, a negative view of them generally?

8               PROSPECTIVE JUROR:  I do not have a negative view of

9   police officers.  I think -- I believe that there's systemic

10  issues with how police officers may operate, but I do not

11  believe that in general police officers are -- that there's

12  anything wrong about them, or I'm not afraid of them, if that's

13  what you mean, yeah.

14              THE COURT:  Well, based on your view that there's

15  systemic issues with how police officers may operate, would you

16  be more or less inclined to -- let me rephrase that.

17          Would you weigh the testimony of a police officer or a

18  federal agent any differently than any other witness, based on

19  your views of the police in general or the way the police acted

20  on June 1st of 2020?

21              PROSPECTIVE JUROR:  No, I do not.

22              THE COURT:  And I don't expect -- the government can

23  correct me if I'm wrong, but I don't expect that any of the

24  officers who were present on June 1st of 2020 will be witnesses

25  in this case.

1      But again, you can set aside what happened on that day and

2   weigh the credibility of any law enforcement officer just like

3   you would any other witness?

4          PROSPECTIVE JUROR:  Yes.  I feel that what I

5   experienced and what took place on January 6 were completely

6   different and completely different law enforcement actions.

7          THE COURT:  And let me see if I understand what you're

8   saying.  Is it fair to say that you're saying that the actions

9   took -- that the police took on June 1st of 2020, in your view,

10   were inappropriate, but the actions the police took on

11   January 6, 2021, were appropriate?  Is that simplifying what

12   you're saying too much, or is that a fair characterization?

13          PROSPECTIVE JUROR:  That's a fair assessment, yes.

14          THE COURT:  And based on your view that the police

15   acted appropriately on January 6 of 2021, again, would you come

16   into this courtroom giving any greater weight to the testimony

17   of police officers or the government's case in general?

18          PROSPECTIVE JUROR:  No.  I believe that -- well, I

19   feel that I would be able to consider each individual's

20   experiences because I did not personally experience what took

21   place on January 6; whereas, I did in 2020.

22          THE COURT:  As I said yesterday, our goal here is to

23   select a neutral poll of jurors who can come in here and

24   impartially judge this case based solely on the evidence that's

25   presented and the instructions I give.

1      Do you feel that you could come into this courtroom or a

2   courtroom two floors down and be fair and open-minded to both

3   sides as the trial begins?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Is there any hesitation?

6           PROSPECTIVE JUROR:  I -- in a general sense, I am very

7   horrified and ashamed about what happened on January 6, but I do

8   feel that I can be an unbiased participant to hear about and

9   make opinions about what actually happened to this individual.

10          THE COURT:  And follow my instructions, even if you

11  disagree with them?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Ms. Berkower?

14          MS. BERKOWER:  Nothing for the government, Your Honor.

15          THE COURT:  Mr. Welch?

16          MR. WELCH:  I have a couple, please, Your Honor.

17          THE COURT:  All right.

18          MR. WELCH:  Do you have strong feelings --

19          COURTROOM DEPUTY:  Forgive me for interrupting.

20  Please make sure the microphone is --

21          MR. WELCH:  Even closer.  Not a problem.

22      Do you have strong feelings about people who have, say, the

23  opposite opinions and political views from yourself?

24          PROSPECTIVE JUROR:  Yes.

25          MR. WELCH:  For instance, if someone were opposed to

1   Black Lives Matter protests, how would you feel about that

2   person?

3          PROSPECTIVE JUROR:  I might think that that individual

4   doesn't know all the facts or maybe is prejudiced.

5          MR. WELCH:  I didn't hear.

6          THE COURT:  Sir, can you keep your voice up?  That's

7   the microphone.

8          PROSPECTIVE JUROR:  I would feel like that person

9   might not know all the facts or is prejudiced.

10          MR. WELCH:  And if that person felt it was you who

11   didn't have all the facts and it was you who was prejudiced, how

12   would you feel about that person?

13          PROSPECTIVE JUROR:  I would want to learn all the

14   information that I could to make a sound conclusion and learn

15   their point of view.

16          MR. WELCH:  Would you be able to set aside your

17   political feelings, your political beliefs, and judge the

18   conduct of another person who held the opposite opinions and the

19   opposite political feelings from you?

20          PROSPECTIVE JUROR:  I feel that I would be able to

21   review the actions that that person took without considering

22   what their political viewpoint was and specifically focus on

23   what they did.

24          MR. WELCH:  And you're promising us that you can set

25   aside your own political feelings and opinions, even if you find

1    that other person's political feelings and beliefs offensive?

2            PROSPECTIVE JUROR:  I do find -- I would find that

3    person's beliefs offensive, and I would have an opinion about

4    that.  But I realize from a legal perspective that that's

5    irrelevant in a situation such as this courtroom, because it's

6    focused on the actual actions and not beliefs.

7            MR. WELCH:  So you're promising us, just so that I

8    understand, that you would set aside your own feelings about

9    someone whose beliefs and opinions are offensive to you, you

10   will set that all aside and just judge the conduct of the

11   person, and that's it, even if that person offends you and

12   upsets you?

13           PROSPECTIVE JUROR:  I will do my best, yes.

14           MR. WELCH:  Thank you, Your Honor.

15           THE COURT:  Thank you, sir.

16           PROSPECTIVE JUROR:  Thank you.

17       (Potential juror steps down.)

18           THE COURT:  All right.  The next juror is 1184.  This

19   juror answered yes to questions 3 and 4.

20       (Prospective juror steps up.)

21           THE COURT:  Good morning, ma'am.  How are you?

22           PROSPECTIVE JUROR:  Good.  How are you?

23           THE COURT:  Doing well.  Thanks.  Sorry to keep you

24   waiting all day yesterday and to bring you back this morning.

25           PROSPECTIVE JUROR:  That's fine.  I got a lot of

1    reading done.

2            THE COURT:  If you feel comfortable taking your mask

3    off, please do.  And let me remind you that you are still under

4    oath from yesterday.

5        All right.  So you have answered yes to having followed the

6    news about the January 6 events at the Capitol and having heard

7    news about either Guy Reffitt or other individuals at the

8    Capitol on January 6.

9        Can you please tell us what you have heard in general?

10           PROSPECTIVE JUROR:  Yeah.  So in terms of following

11   the news, I mean, just it was national news.  I was getting

12   texts from friends.  I think I was in the middle of the workday,

13   so just kind of co-workers --

14           THE COURT:  Can you lean a little bit towards the

15   microphone there?

16           PROSPECTIVE JUROR:  So co-workers were chatting about

17   it.  I'm trying to think.  I think people were sending like

18   Twitter links showing what was going on.  I was kind of trying

19   to figure out like where everything was taking place, just to

20   make sure that, like, it wasn't anywhere near where I was or the

21   rest of my family.

22           THE COURT:  And where were you on that day?

23           PROSPECTIVE JUROR:  I was at home in like the Adams

24   Morgan area.

25           THE COURT:  All right.

1    PROSPECTIVE JUROR:  And so not anywhere close to it,

2    yeah.

3    And so then after that, I think just kind of what the

4    national news was about it, just kind of seeing -- there were

5    videos and photos that were being shown.

6    And then in terms of the people specifically, I hadn't

7    heard of the specific gentleman's name, and I don't think I

8    could name anybody, but I've seen those names.  None of them

9    have stuck with me, but just kind of as people were being

10   identified, I remember seeing things like that.  But I think

11   nothing that I could name specifically.

12   THE COURT:  All right.  Do you recognize Mr. Reffitt

13   seated at the table over there?

14   PROSPECTIVE JUROR:  No, I don't.

15   THE COURT:  And have you tracked the news yourself,

16   the January 6 events in particular, or have you just read what

17   comes across your normal news that you consume?

18   PROSPECTIVE JUROR:  Just what comes across normal

19   news.

20   THE COURT:  And what do you do?  You read the paper?

21   You mentioned Twitter.

22   PROSPECTIVE JUROR:  Yeah.  I get a Washington Post

23   news digest every morning that I read maybe like 20 percent of

24   the time or mostly just skim the headlines.  And then I do have

25   Twitter, but I mostly follow pet accounts.  So sometimes things

1    get retweeted and I see them there.

2         THE COURT:  All right.  And have you read the recent

3    articles about this case in The Washington Post?

4         PROSPECTIVE JUROR:  No.

5         THE COURT:  You've not?

6         PROSPECTIVE JUROR:  No.  I didn't know this was

7    happening.

8         THE COURT:  As a result of the news you've seen and

9    heard, do you have any opinion about the guilt or innocence of

10   the people who were involved in the events at the Capitol on

11   January 6?

12        PROSPECTIVE JUROR:  No, not without, you know, seeing

13   specific evidence attached to specific people.

14        THE COURT:  And you understand that anything you've

15   seen to this point or heard cannot be evidence in this case?

16        PROSPECTIVE JUROR:  Yes, I understand.

17        THE COURT:  And do you feel that you could put aside

18   what you've seen and heard to date and judge this case solely

19   based on the evidence that's presented in this courtroom?

20        PROSPECTIVE JUROR:  Yes, I believe so.

21        THE COURT:  As a result of what you've seen and heard,

22   have you formed any strong opinions that you think would be

23   difficult to set aside in weighing the facts that are presented

24   in this case?

25        PROSPECTIVE JUROR:  No, I don't believe so.  I think I

1    could set any previous ideas aside.

2            THE COURT:  And do you have any opinion at all about

3    Mr. Reffitt's guilt or innocence as he sits here today?

4            PROSPECTIVE JUROR:  No, I do not.

5            THE COURT:  You understand that under the law he's

6    presumed innocent?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  And you understand that he cannot be

9    convicted of any of the charged offenses unless and until the

10   government proves its case beyond a reasonable doubt?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  And you would have no problem following

13   that instruction?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Thank you.

16       Ms. Berkower?

17           MS. BERKOWER:  Good morning.

18           PROSPECTIVE JUROR:  Good morning.

19           MS. BERKOWER:  Very briefly, where do you work?

20           PROSPECTIVE JUROR:  I work at the George Washington

21   University.  I work in graduate admissions.

22           MS. BERKOWER:  Okay.  So are you in the admissions

23   office?

24           PROSPECTIVE JUROR:  So graduate admissions is

25   separated by schools.  So I'm at the Elliott School of

```
1    International Affairs.  So that's where I work.
2              MS. BERKOWER:  Thank you.
3              PROSPECTIVE JUROR:  Uh-huh.
4              THE COURT:  Any questions, Mr. Welch?
5              MR. WELCH:  No, thank you, Your Honor.
6              THE COURT:  All right.  Thank you, ma'am.  I
7    appreciate it.
8         (Prospective juror steps down.)
9              THE COURT:  All right.  The next juror is -- is it
10   1201?  Is that right?
11             MR. WELCH:  That's what I have, Your Honor.
12             THE COURT:  1201.  She has answered yes to 1, 2, 3, 4,
13   and 19.
14        (Prospective juror steps up.)
15             THE COURT:  Good morning, ma'am.  How are you today?
16             PROSPECTIVE JUROR:  I'm well.  Thank you.
17             THE COURT:  My apologies for keeping you here all day
18   yesterday and coming back today.  Thank you for coming.  If you
19   feel comfortable, please take off your mask, and let me remind
20   you that you are still under oath that you received yesterday.
21        All right.  So you've answered yes to question number 1,
22   which is that either or both you live and/or work at or near the
23   U.S. Capitol.
24             PROSPECTIVE JUROR:  Yes; that's correct.
25             THE COURT:  And which one is it?
```

1          PROSPECTIVE JUROR:  I work near the Capitol.

2          THE COURT:  And where do you work?

3          PROSPECTIVE JUROR:  I work at 400 North Capitol

4    Street.

5          THE COURT:  And what do you do for a living?

6          PROSPECTIVE JUROR:  I work for a trade association.

7          THE COURT:  What does the trade association do?

8          PROSPECTIVE JUROR:  We -- do you want me to say the

9    name of the trade association?

10          THE COURT:  If you're comfortable doing so.

11          PROSPECTIVE JUROR:  I work for the American Gas

12    Association.  We represent natural gas utilities.

13          THE COURT:  All right.  Were you at work on January 6?

14          PROSPECTIVE JUROR:  I was working from my home.  I was

15    not in my office.

16          THE COURT:  And is your home near the Capitol?

17          PROSPECTIVE JUROR:  No, it is not.

18          THE COURT:  Did you watch the events on TV live that

19    day?

20          PROSPECTIVE JUROR:  Yes, after I was alerted to what

21    was happening, yes, I did turn the TV on.

22          THE COURT:  All right.  Did you happen to see

23    Mr. Reffitt, the defendant in this case, on television that day?

24          PROSPECTIVE JUROR:  No, I did not.

25          THE COURT:  Have you followed the news closely since

1    January 6?

2         PROSPECTIVE JUROR:  I followed the news initially

3    following January 6, but over time, not as much.

4         THE COURT:  You stated that you have seen news about

5    either Mr. Reffitt or other individuals who were at the Capitol

6    on January 6.  Have you seen news about Mr. Reffitt in

7    particular?

8         PROSPECTIVE JUROR:  No, I have not.

9         THE COURT:  Have you read any recent articles about

10   him or seen anything online?

11        PROSPECTIVE JUROR:  No.  I, obviously, saw -- I saw

12   headlines but have gone past those.

13        THE COURT:  Headlines about Mr. Reffitt?

14        PROSPECTIVE JUROR:  Not about him in particular, just

15   about the events of January 6.

16        THE COURT:  I see.  So you haven't followed it that

17   closely as time has gone on; is that fair?

18        PROSPECTIVE JUROR:  That is correct.

19        THE COURT:  You also said you or someone you know has

20   a direct or indirect connection to the events at the U.S.

21   Capitol on January 6.  Was someone that you knew or know there

22   on that day?

23        PROSPECTIVE JUROR:  No.  I know someone that is

24   involved in -- is an attorney who is involved in January 6

25   cases.

```
 1              THE COURT:  And who is that?

 2              PROSPECTIVE JUROR:  Elita Amato.

 3              THE COURT:  And she's a defense attorney for some of

 4   the -- one or more of the January 6 defendants?

 5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  Do you know which one?

 7              PROSPECTIVE JUROR:  No, I do not.

 8              THE COURT:  Have you talked to her about those cases?

 9              PROSPECTIVE JUROR:  No.  That is all that I know.

10              THE COURT:  Is she a close friend?

11              PROSPECTIVE JUROR:  Yes, she is.

12              THE COURT:  In general, do you talk about the criminal

13   law with her?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  So you also mentioned that you know

16   lawyers, or you yourself is a lawyer.  Obviously, Ms. Amato is

17   someone you know.  Are there others?

18              PROSPECTIVE JUROR:  My sister went to law school.

19              THE COURT:  And I suppose in your job you have to work

20   with a number of lawyers?

21              PROSPECTIVE JUROR:  Yes.  There are several on staff.

22              THE COURT:  Do you talk about legal issues with them?

23              PROSPECTIVE JUROR:  Not beyond contracts.

24              THE COURT:  All right.  There are no contracts at

25   issue in this case.
```

1      I'm just wondering, in your role as a member of this trade

2 association, do you work closely with members of Congress and

3 their staffs?

4           PROSPECTIVE JUROR:  No, I do not.  I am the senior

5 director of membership.  So I specifically work with our member

6 companies on recruiting and retaining the membership.  I'm not

7 involved in advocacy.

8           THE COURT:  Is there anything about your job or your

9 experience that would make you favor one side over the other in

10 this case?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Do you have strong feelings about what

13 happened on January 6?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  All right.

16           PROSPECTIVE JUROR:  I mean, I --

17           THE COURT:  I assume you have some feelings.

18           PROSPECTIVE JUROR:  I have feelings about it, and I

19 followed it because it certainly impacted us, but not -- I mean,

20 not any more than -- I don't know how to describe it.  I would

21 just say I have feelings about it, but not strong feelings.

22           THE COURT:  All right.  Because most people have

23 feelings about what happened that day.  It was a big day.

24      I guess the question is, whatever those feelings are, would

25 you be able to put them aside and judge this case solely based

1   on the evidence that you hear in this courtroom and the

2   instructions I give you?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Do you have any hesitation in being able

5   to do that?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  All right.  Ms. Berkower?

8            MS. BERKOWER:  Good morning.

9            PROSPECTIVE JUROR:  Good morning.

10           MS. BERKOWER:  So just to follow up about

11  conversations you had with your friend, Ms. Amato, what has she

12  told you about January 6?

13           PROSPECTIVE JUROR:  She has not told me anything about

14  January 6.  I only know that she has clients, a client or

15  clients.  That's all that I know.

16           MS. BERKOWER:  How did that come up?

17           PROSPECTIVE JUROR:  Honestly, I don't even recall.  We

18  very rarely speak about our work.  I don't recall how it came

19  up, but I do know that she is representing one or more.

20           MS. BERKOWER:  Any information that she mentioned to

21  you other than just the fact that she has those cases?

22           PROSPECTIVE JUROR:  No.

23           MS. BERKOWER:  And you said a moment ago that you did

24  have feelings about what happened on January 6.  Did those

25  feelings lead to opinions that you have about the events of that

1   day?

2          PROSPECTIVE JUROR:  Well, yes, I do have opinions and

3   feelings about that day.

4          MS. BERKOWER:  Okay.  And will you be able to set

5   aside those opinions if you were picked as a juror?

6          PROSPECTIVE JUROR:  Yes.

7          MS. BERKOWER:  How confident are you that you can set

8   aside your opinions?

9          PROSPECTIVE JUROR:  I'm confident I could do that.

10          MS. BERKOWER:  Thank you.

11          THE COURT:  Mr. Welch?

12          MR. WELCH:  No questions.  Thank you.

13          THE COURT:  Thank you, ma'am.  I appreciate your time.

14       (Prospective juror steps down.)

15          THE COURT:  All right.  The next juror is 0442.  This

16   individual answered yes to number 22 and 27.

17       (Prospective juror steps up.)

18          THE COURT:  Good morning.  My apologies for keeping

19   you here all day yesterday and having to bring you back again

20   this morning.  If you're comfortable taking off your mask,

21   please do, and let me remind you that you're under oath still

22   from yesterday.

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  So you have answered yes to the question

25   that serving as a juror would be an extreme hardship to you.

1    Before you explain why, let me remind you if you would like to

2    explain why through the telephone headset in a private way, you

3    may do so.

4        Are you comfortable answering that question publicly?

5            PROSPECTIVE JUROR:  I can answer it, but I don't

6    recall.  That was number 22?

7            THE COURT:  Yes, I think I'm right about that.

8            PROSPECTIVE JUROR:  I don't think that's --

9            THE COURT:  I think that's right, 22.  Let me take a

10   look and make sure I've got that right.

11       Yes.  So I said that we expected the evidence in this case

12   to conclude early next week, and then, of course, there would be

13   a period of time for deliberations.  And I asked whether it

14   would be difficult for the jurors, prospective jurors to serve.

15       And you answered yes, but was that an accident, you think?

16           PROSPECTIVE JUROR:  Yeah, because I didn't recall 22

17   reading like that.

18           THE COURT:  Just to confirm, you are juror 442?

19           PROSPECTIVE JUROR:  I am.

20           THE COURT:  Let me review the questions on either

21   side.

22           PROSPECTIVE JUROR:  Please.

23           THE COURT:  Question 21 was, have you had an

24   experience as a juror that would affect your ability to be a

25   fair and impartial juror in this case.

```
 1                    PROSPECTIVE JUROR:  Maybe that's it.

 2               THE COURT:  Have you served as a juror before?

 3               PROSPECTIVE JUROR:  Plenty of times, yeah.

 4               THE COURT:  In civil or criminal cases?

 5               PROSPECTIVE JUROR:  Both.

 6               THE COURT:  And have you served in this court or

 7     across the street in Superior Court?

 8               PROSPECTIVE JUROR:  In June this year here.

 9               THE COURT:  Here in federal court?

10               PROSPECTIVE JUROR:  Yes.

11               THE COURT:  During COVID?

12               PROSPECTIVE JUROR:  Criminal.

13               THE COURT:  Do you remember who the judge was?

14               PROSPECTIVE JUROR:  I can't remember his name.

15               THE COURT:  Do you remember what type of case it was?

16               PROSPECTIVE JUROR:  Tax.

17               THE COURT:  Tax case?  All right.

18          Have you served in other criminal cases?

19               PROSPECTIVE JUROR:  In district courts many, many

20     years ago.

21               THE COURT:  In Superior Court?

22               PROSPECTIVE JUROR:  Superior Court, yes.

23               THE COURT:  And I don't want you to get into -- I

24     don't want you to tell me what the verdicts were in any of those

25     criminal cases on which you served, but I'm wondering whether
```

1    the jurors did reach a verdict in those cases.  Do you remember?

2              PROSPECTIVE JUROR:  We did.

3              THE COURT:  In every case?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Including the one here in June?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Is there anything about your experience

8    having served as a juror in all of those cases that would make

9    you reluctant to serve here?

10             PROSPECTIVE JUROR:  No.  I think the reason that I

11   answered the question the way I did is because of how it was

12   described about the three courtrooms or the three rooms where

13   people would hear you, and that kind of --

14             THE COURT:  That kind of bothered you?

15             PROSPECTIVE JUROR:  That kind of bothered me a little

16   bit, yeah, and being able now for facial recognition in this

17   case.

18             THE COURT:  Right.  You understand that in every case

19   in which you served the courtrooms were open to the public?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  And in a typical period of time, the

22   public and the press in a high-profile case would be in the

23   actual courtroom itself.

24        Do you understand that?

25             PROSPECTIVE JUROR:  I do understand, but I think the

1    clarity for me was because this case we did in June, pandemic

2    was on or it was going on, and the judge had it a little bit

3    stricter.

4              THE COURT:  Had it stricter than here?

5              PROSPECTIVE JUROR:  It was more stricter with people

6    coming inside.

7              THE COURT:  So you mean there weren't people coming

8    inside?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  I think in any trial that's happened, even

11   in COVID, there is an overflow courtroom.  There may not be as

12   many as we have in this case, but every defendant has a right, a

13   constitutional right, to a public trial.  That may not have been

14   as obvious to you then because perhaps that wasn't as high of a

15   profile case as this one.

16             PROSPECTIVE JUROR:  Maybe.

17             THE COURT:  But am I hearing you correctly to say that

18   that concerns you about serving on a jury in this case because

19   there is media and public attention on this case?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  And can you explain generally what you're

22   concerned about?  Are you concerned for your safety?

23             PROSPECTIVE JUROR:  I guess more so and --

24             THE COURT:  More so than the cases that you've served

25   on previously?

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  And is that based on the nature of this

3    case?

4              PROSPECTIVE JUROR:  I don't think so much as the

5    nature.  I think when this case that we're approaching, the

6    pandemic was out.  I was stressed out about the pandemic.  I

7    didn't watch this case.  I just had enough stress on me at that

8    time.

9              THE COURT:  So I'm just noticing, am I correct you're

10   over 70?

11             PROSPECTIVE JUROR:  I am.

12             THE COURT:  Do you realize that it's your choice

13   whether to show up here and serve again?

14             PROSPECTIVE JUROR:  I do, but --

15             THE COURT:  And given what you're saying, I'm

16   wondering whether your preference would be not to serve on this

17   case, because you are not compelled to serve on this case.  If

18   you would prefer not to serve on this case, you don't have to

19   serve on this case.

20             PROSPECTIVE JUROR:  Okay.  I'd prefer not.

21             THE COURT:  Okay.  We appreciate you showing up and

22   doing your civic duty time and time again.

23             PROSPECTIVE JUROR:  Thank you.

24             THE COURT:  But I will excuse you.

25             PROSPECTIVE JUROR:  Thank you.

```
 1              (Prospective juror steps down.)
 2                   THE COURT:  All right.  The next juror is 1655.  This
 3      juror has answered yes to number 3, number 5, and number 17.
 4              (Prospective juror steps up.)
 5                   THE COURT:  Good morning, ma'am.  How are you today?
 6                   PROSPECTIVE JUROR:  I'm good, thanks.
 7                   THE COURT:  If you're comfortable taking off your
 8      mask, please do.
 9                   PROSPECTIVE JUROR:  Oh, yeah, sure.
10                   THE COURT:  Sorry for keeping you waiting all day
11      yesterday and bringing you back today, but thank you for being
12      here.  Let me remind you that you're still under oath from
13      yesterday.
14              Do you understand?
15                   PROSPECTIVE JUROR:  Yes.
16                   THE COURT:  So you have answered yes to following the
17      news about the January 6 events.
18                   PROSPECTIVE JUROR:  Yeah.  I can't say it was
19      intensely, just sort of the same as everyone else, just sort
20      of --
21                   THE COURT:  Can you keep your voice up?  There's a
22      microphone right there to your left.
23                   PROSPECTIVE JUROR:  Is this it?
24                   THE COURT:  Yes.
25                   PROSPECTIVE JUROR:  I can't say I followed it
```

1    intensely, probably the same amount as everybody else did just

2    to keep updated as to what was going on.

3              THE COURT:  And have you followed it fairly

4    consistently since January 6?

5              PROSPECTIVE JUROR:  No, sorry, not really.

6              THE COURT:  Okay.  Have you seen any articles or heard

7    any news about Mr. Reffitt, the defendant in this case?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Do you recognize him here in the

10   courtroom?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  You have also indicated that you're

13   concerned that you have strong feelings or opinions about the

14   events that occurred on January 6, that you might not be able to

15   put them aside and serve as a fair and impartial juror on this

16   case.

17        You understand that you can't judge this case based on

18   anything that you've seen or heard outside the courtroom?

19             PROSPECTIVE JUROR:  (Nodded head.)

20             THE COURT:  You have to say yes or no.

21             PROSPECTIVE JUROR:  Yes.  Sorry.

22             THE COURT:  And your concern is that you have feelings

23   about what happened on January 6 that just make you an

24   unbiased -- I mean a biased juror?

25             PROSPECTIVE JUROR:  Oh, I see.  I answered yes to that

1    question because I suppose when you asked the question about

2    like, oh, do you have a bias or any specific thoughts about the

3    events that occurred on that date, I sort of -- when I thought

4    about that, I did sort of walk away from January -- and when I

5    stopped reading the articles about it that week or the following

6    week, I did kind of walk away from it being just like -- having

7    an opinion about the events, which were just that it was sort of

8    unnecessary and strange.

9        But so that's why I answered yes to that question.

10       THE COURT:  I appreciate you being forthcoming.

11   That's helpful and better to answer yes than not at all.

12       But based on what you're saying, it sounds like you

13   understand that you would have to put aside any feelings you

14   have about the events of January 6 and judge this case solely

15   based on the evidence --

16       PROSPECTIVE JUROR:  Yes.

17       THE COURT:  -- that's presented in the courtroom?

18       PROSPECTIVE JUROR:  Yes.

19       THE COURT:  And are you confident that you would be

20   able to listen to the evidence and do so with an open mind and

21   follow my instructions?

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  All right.  You understand that as the

24   defendant sits here he is presumed innocent under the law?

25       PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And you understand that he cannot be
2    convicted unless and until the government proves its case --
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  -- beyond a reasonable doubt?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  Do you come into this courtroom favoring
7    one side or the other as you sit here now?
8          PROSPECTIVE JUROR:  One political side or --
9          THE COURT:  No, no.  One side, either the prosecution
10   or the defense.
11         PROSPECTIVE JUROR:  Oh, no.
12         THE COURT:  Have you formed any opinion --
13         PROSPECTIVE JUROR:  No.
14         THE COURT:  -- on one side or the other?
15         PROSPECTIVE JUROR:  No.
16         THE COURT:  All right.  You also answered yes to
17   having strong views about firearms and guns such that you're
18   concerned that you might not be able to be a fair and impartial
19   juror.
20       Did you answer this question the way you did -- in the same
21   way you answered the first question about feelings about the
22   January 6 events?
23         PROSPECTIVE JUROR:  Yeah.  My gut instinct, just me
24   personally, I don't like guns or firearms.  I understand that in
25   a lot of situations in our circumstances across the country they

1    are necessary for individuals.  However, no, my gut instinct is

2    yeah, I don't like firearms.

3              THE COURT:  All right.  Given that you don't like

4    firearms, is that going to make you predisposed to the

5    government's case in -- the government's side in this case?

6        The defendant, as you know, is charged with two counts that

7    involve firearms.  And would you be able to put aside your

8    personal views about firearms and, again, judge this case solely

9    based on the evidence presented in this court and the

10   instructions that I give?

11             PROSPECTIVE JUROR:  I believe -- well, like I said, I

12   mean, I guess on one hand, I want to say yes because I do

13   understand that there's circumstances in which people need

14   firearms and such.  But on the other hand, I did just say my gut

15   instinct is that I don't like them.  So I don't know entirely.

16   So I guess I'm going to say no, then.

17             THE COURT:  So you don't think you could put aside

18   your views about firearms and judge this case based on the

19   evidence?

20             PROSPECTIVE JUROR:  I think I -- sorry.  I think that

21   I could.  However, I don't want to, like, sit here and lie and

22   say that I don't have, like, a personal view on firearms, if

23   that makes sense.

24             THE COURT:  No, I understand you have a personal view.

25   And again, most people have personal views on firearms.

1    Would the fact that you have a strong personal view on

2    firearms make it difficult for you to be fair to the defendant

3    in this case?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  And you don't think you could be impartial

6    in weighing the evidence against him?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.  I just want to follow up with you,

9    because your answers initially were that you thought you could

10   be, and now you're thinking that you can't be.  And I'm not

11   trying to press you.  We really want you to be completely

12   forthcoming and honest.

13       When it comes to the firearm charges, the government would

14   have to prove certain elements beyond a reasonable doubt to

15   convict Mr. Reffitt of the charges.

16           PROSPECTIVE JUROR:  Okay.

17           THE COURT:  Simply having a firearm in his possession

18   is not enough to convict him of the charge, that alone.

19       Again, given your views about firearms, are you going to be

20   more inclined to convict him of those charges simply because you

21   don't like firearms, even if you find based on the evidence the

22   government hasn't proven either that he possessed the firearm or

23   the other elements relating to those offenses?

24           PROSPECTIVE JUROR:  Oh, okay.  I see what you're

25   saying.  Phrased that way, if the government is not able to

1  prove beyond a reasonable doubt or whatever, what you mentioned,

2  then no, I don't feel like I would be able to convict him, in

3  which case my answer to your initial question would be yes, I

4  believe I would be able to be impartial if the evidence

5  presented by the government was not sufficient.

6  THE COURT:  All right.  You have no hesitation about

7  that?

8  PROSPECTIVE JUROR:  No.

9  THE COURT:  All right.  Again, you understand that as

10  he sits here under the law he is presumed innocent?

11  PROSPECTIVE JUROR:  Yes.

12  THE COURT:  All right.  Are there -- do you have any

13  other strong personal or political views that would make it

14  difficult for you to give the defendant or the government a fair

15  trial in this case?

16  PROSPECTIVE JUROR:  No.

17  THE COURT:  All right.  Ms. Berkower?

18  MS. BERKOWER:  Nothing from the government, Your

19  Honor.  Thank you.

20  THE COURT:  Mr. Welch?

21  MR. WELCH:  No questions.  Thank you.

22  THE COURT:  All right.  Thank you, ma'am.  I

23  appreciate it.

24  PROSPECTIVE JUROR:  Thank you.

25  (Prospective juror steps down.)

1          THE COURT:  All right.  The next juror I have is 1774.

2     He answered yes to number 3 only.

3        (Prospective juror steps up.)

4          THE COURT:  Good morning, sir.

5          PROSPECTIVE JUROR:  Good morning.

6          THE COURT:  Very sorry to keep you waiting all day

7     yesterday and not get to you and have to bring you back this

8     morning.

9          PROSPECTIVE JUROR:  That's okay.

10          THE COURT:  If you're comfortable taking off your

11     mask, please do, and let me remind you that you are still under

12     oath from yesterday.

13        Do you understand?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  I see that you answered yes to just one of

16     my questions, and that was the question about have you seen news

17     about the January 6 events at the Capitol.

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Can you tell us in general what you saw in

20     the news?

21          PROSPECTIVE JUROR:  Obviously, that day, it was all

22     over the news.  So my family and I probably watched it for the

23     majority of the day.  And I've seen various snippets throughout

24     the time from then to now.  Not a lot.  I don't watch the news a

25     lot, actually.  I find it too depressing.

```
 1            THE COURT:  You're not the first juror who said that
 2    they avoid the news because it makes them less happy.
 3            PROSPECTIVE JUROR:  Yes.
 4            THE COURT:  All right.  Well, have you -- it sounds
 5    like you haven't tracked the events specifically, but you just
 6    watch the news as it comes up on TV.  Is that --
 7            PROSPECTIVE JUROR:  If I happen to be watching the
 8    news and it comes up, I may stay tuned to it.  But no, I don't
 9    track it.
10            THE COURT:  All right.  Have you seen anything on the
11    news about the defendant in this case, Mr. Reffitt?
12        And he is seated at that table.  Do you recognize him?
13            PROSPECTIVE JUROR:  No.
14            THE COURT:  Have you seen his name in the news, as far
15    as you recall?
16            PROSPECTIVE JUROR:  No.
17            THE COURT:  Aside from TV, are there other sources of
18    news that you read or watch?
19            PROSPECTIVE JUROR:  I read -- every day, I read the
20    news feed from my iPhone.
21            THE COURT:  And what is your news feed that comes on
22    your iPhone?
23            PROSPECTIVE JUROR:  Mostly just the headlines from the
24    country's news.  So, I mean, I read stories about politics,
25    sports, human interest.
```

1          THE COURT:  Are these from newspapers, or are these

2     from blogs or social media, anything like that?

3          PROSPECTIVE JUROR:  Mostly newspapers, Wall Street

4     Journal, Washington Post, Apple News.

5          THE COURT:  As a result of everything that you've seen

6     and heard and read about the events of January 6, have you

7     formed any opinion about the guilt or innocence of any of those

8     individuals who were involved in those events on that day?

9          PROSPECTIVE JUROR:  Not about individuals, but the

10    overall, I think I kind of have an opinion that it was -- that

11    it was an interesting activity.  I feel like in this country

12    sometimes you have to do things out of the ordinary to get some

13    attention.  So --

14         THE COURT:  And is there anything about your feelings

15    and your opinions about the events of January 6 that make you

16    feel like you might not be fair to one side or the other in this

17    case?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Would you come into the courtroom with an

20    open mind and put what you've seen and heard and read out of

21    your mind and judge this case solely based on the evidence

22    presented in the courtroom?

23         PROSPECTIVE JUROR:  Yes, I could do that.

24         THE COURT:  All right.  You understand as Mr. Reffitt

25    sits here he's innocent until presumed guilty?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  He's presumed innocent?

 3              PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  And the government would have to prove him

 5    guilty beyond a reasonable doubt to convict him for any of the

 6    crimes for which he is charged?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Would you have any hesitation following my

 9    instructions in that regard?

10              PROSPECTIVE JUROR:  No.

11              THE COURT:  All right.  Ms. Berkower?

12              MS. BERKOWER:  Good morning.

13              PROSPECTIVE JUROR:  Good morning.

14              MS. BERKOWER:  So a moment ago, you were asked if you

15    formed opinions about the January 6 events generally.  You said

16    you thought it was interesting activity.

17              PROSPECTIVE JUROR:  Yes.

18              MS. BERKOWER:  Can you explain a little bit more what

19    you mean by that?

20              PROSPECTIVE JUROR:  Well, interesting from the

21    standpoint that you actually had citizens who felt they were

22    wronged enough to go and interrupt an activity.  So in that

23    regard, I thought that was very interesting.

24              MS. BERKOWER:  What about that fact was interesting?

25              PROSPECTIVE JUROR:  Because you had people who felt
```

1      that was wrong and they had to do something about it.

2              MS. BERKOWER:  And you said sometimes you have to do

3      things out of the ordinary to get attention.  Can you explain

4      that a little bit more, too?

5              PROSPECTIVE JUROR:  I think from the United States's

6      perspective, I think since this country has been around, I mean,

7      there's always been incidents throughout history where people

8      have decided to go against the norm to get their voices heard.

9          I think back to the '60s and the human rights marches and

10     the bus boycotts and whatever.  Sometimes you just have to speak

11     up; you have to do things out of the ordinary.

12             MS. BERKOWER:  Do you view what you know about

13     January 6 to be similar to the marches from the '60s?

14             PROSPECTIVE JUROR:  I don't know if I would go that

15     far.  I don't know if I would put them on the same page.  But --

16             MS. BERKOWER:  What are the differences, in your mind,

17     and what are the similarities?

18             PROSPECTIVE JUROR:  I think the similarity is where

19     you had a group of people who came together to voice an opinion,

20     maybe in not the most -- in the best way, but they did come

21     together to voice their opinion.

22         What was the second part of that?  How are they different?

23             MS. BERKOWER:  Yes.  Sorry.

24             PROSPECTIVE JUROR:  Well, I think with the marches of

25     the '60s, I think that was a systemic issue that affected the

1    whole country and a particular race of people.

2              MS. BERKOWER:  And what about the January 6 events?

3    What was different about that?

4              PROSPECTIVE JUROR:  Well, I think what was different

5    is that you had probably just a small fraction of folk who were

6    calling for that support, that help.

7              MS. BERKOWER:  And you said you thought that citizens

8    felt wronged enough to get together for the activity of

9    January 6.  That's what you found interesting about it?

10             PROSPECTIVE JUROR:  Yes.

11             MS. BERKOWER:  Do you think that they were wronged?

12             PROSPECTIVE JUROR:  Overall, I think it was probably

13   the wrong tack to take.  I don't know individually, if I can say

14   individually people were wrong, but I think overall, as a group,

15   I think it was the wrong activity, yes.

16             MS. BERKOWER:  And why was it the wrong tack to take?

17             PROSPECTIVE JUROR:  Well, I mean, it would be similar

18   to us sitting here trying to conduct business and you have a

19   group of people just barge in and try to stop us.  I don't think

20   that's right.

21             MS. BERKOWER:  So I guess one follow-up question to

22   that is, if people break the law while they're trying to get

23   their voices heard, should they be held accountable, in your

24   view?

25             PROSPECTIVE JUROR:  Any time you break the law, you

```
 1    should be held accountable.

 2              MS. BERKOWER:  And one last question.  May I ask, I

 3    saw that you work for a company, and I wasn't sure what it was.

 4    Could you explain what kind of work you do?

 5              PROSPECTIVE JUROR:  Yes.  I'm a senior project manager

 6    for the Cerner Corporation.

 7              MS. BERKOWER:  What kind of company is that?

 8              PROSPECTIVE JUROR:  It's a IT healthcare corporation.

 9    We actually do software development for, I personally, the part

10    of the company I work on, we support the VA, Veterans Affairs.

11              MS. BERKOWER:  You said you're a senior project

12    manager.  Does that mean you have a team of people working for

13    you?

14              PROSPECTIVE JUROR:  Yes.  There are about 70, 80

15    people across the country that work under me, yes.

16              THE COURT:  And have you been at that company for a

17    period of time, then?

18              PROSPECTIVE JUROR:  No, not at Cerner.  I've been at

19    Cerner since December 6.

20              MS. BERKOWER:  Where did you work before then?

21              PROSPECTIVE JUROR:  A company called LTS.  Same kind

22    of work, probably a smaller team, about 40 people, again at the

23    VA.

24              MS. BERKOWER:  Thank you, sir.

25              THE COURT:  Mr. Welch?
```

```
 1              MR. WELCH:  No questions.  Thank you.

 2              THE COURT:  All right.  Thank you, sir, very much.

 3         (Prospective juror steps down.)

 4              THE COURT:  The next juror is 0548.  This juror has

 5     answered yes to number 1, 3, 4, 5, 6, 17, 22, and 23.  I will

 6     start with 22 and 23.

 7         (Prospective juror steps up.)

 8              THE COURT:  Good morning, ma'am.  How are you today?

 9              PROSPECTIVE JUROR:  I'm good.  How are you?

10              THE COURT:  Fine, thanks.  If you feel comfortable

11     taking off your mask, please do.  And sorry about keeping you

12     here all day yesterday and having to bring you back today, but I

13     appreciate your patience.

14              PROSPECTIVE JUROR:  No problem.

15              THE COURT:  Let me remind you that you're still under

16     oath from yesterday.  Do you understand?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  All right.  You've answered yes to a

19     number of the questions I asked yesterday.  I want to start with

20     the answer to the question I asked about whether serving on a

21     jury would be an extreme hardship to you, and you indicated that

22     it would.

23         Is that a question you feel comfortable answering in

24     public, or would you feel more comfortable --

25              PROSPECTIVE JUROR:  It's more of a physical.
```

1          THE COURT:  Again, are you comfortable talking about

2     this in public?

3          PROSPECTIVE JUROR:  Yes.  I'm in my early pregnancy.

4     I'm very nauseous and ill --

5          THE COURT:  Oh, I'm sorry to hear that.

6          PROSPECTIVE JUROR:  And I have my first two

7     appointments Wednesday and Thursday of this week.

8        So I'm not quite sure if that counts as extreme but --

9          THE COURT:  Well, it's certainly important.  When --

10    what time are your appointments?

11         PROSPECTIVE JUROR:  3:00 and 3:30, I believe, on

12    Wednesday and Thursday.

13         THE COURT:  On Wednesday and Thursday of this week?

14         PROSPECTIVE JUROR:  Yeah.

15         THE COURT:  These are your first appointments?

16         PROSPECTIVE JUROR:  First two in person, yeah.

17         THE COURT:  Do you happen to know whether you might be

18    able to get them scheduled earlier or later in the day?

19         PROSPECTIVE JUROR:  I can try.

20         THE COURT:  Would you try to check on that?

21         PROSPECTIVE JUROR:  I've waited quite a while for

22    them.  So I'm not quite sure.

23         THE COURT:  Yeah, I understand, but if you could

24    check, that would be helpful.

25        In terms of how you're feeling, are there times in the day

1   when you're nauseated and --

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Does that happen frequently?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Does it make you concerned about having to

6   sit from 9:30 to 4:30 for a period of probably five days or so?

7          PROSPECTIVE JUROR:  A little bit, yeah.

8          THE COURT:  A little bit?

9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  So the plan would be to sit from roughly

11   9:30 to 4:30, 4:45, take an hour break for lunch, and probably a

12   mid-morning and a mid-afternoon break.

13          PROSPECTIVE JUROR:  Okay.

14          THE COURT:  Would that be challenging for you?

15          PROSPECTIVE JUROR:  It's just a little tough to not

16   eat and go to the bathroom.

17          THE COURT:  How often do you have to eat and go to the

18   bathroom?

19          PROSPECTIVE JUROR:  Eating every couple hours and

20   going to the bathroom probably like once an hour or so.

21          THE COURT:  Okay.  All right.  Let me go ahead and

22   follow up with some of your other questions while we have you

23   here.

24      First of all, you say that you live or work near the

25   Capitol?

```
 1              PROSPECTIVE JUROR:  Yes, I do.

 2              THE COURT:  Where about?

 3              PROSPECTIVE JUROR:  I live in Navy Yard, which is

 4    right next to the highway on the other side of the Capitol.

 5              THE COURT:  If I can ask you to please keep your voice

 6    a little bit up.  That's a microphone in front of you.

 7              PROSPECTIVE JUROR:  Sure.

 8              THE COURT:  Were you home on January 6 of 2021?

 9              PROSPECTIVE JUROR:  I was not.  I was at work.

10              THE COURT:  Were you working in D.C.?

11              PROSPECTIVE JUROR:  I was working in Maryland, so

12    driving home during the curfew.

13              THE COURT:  What do you do for a living?

14              PROSPECTIVE JUROR:  I'm a chiropractor.

15              THE COURT:  Were you inconvenienced by the events of

16    that day?

17              PROSPECTIVE JUROR:  I think I left work a little bit

18    early because of the curfew.  I think there was a curfew that

19    day.  And just being nervous.  My boyfriend was home.  So I was

20    a little worried about him.

21              THE COURT:  I'm sorry?

22              PROSPECTIVE JUROR:  My boyfriend was home.  So I was

23    worried about him.

24              THE COURT:  Was he near the Capitol?

25              PROSPECTIVE JUROR:  He was at home in the apartment.
```

1          THE COURT:  I see.  You mentioned that you've -- like

2     most people, you've heard news about the January 6 events.  Have

3     you tracked that news carefully?

4          PROSPECTIVE JUROR:  Pretty closely.  I'm not searching

5     it out, but it's been in the headlines quite often.

6          THE COURT:  Have you reviewed any news stories or seen

7     anything on the television about Mr. Reffitt, the defendant in

8     this case?

9          PROSPECTIVE JUROR:  I have not.

10         THE COURT:  Do you recognize him?  He's seated at that

11    table.

12         PROSPECTIVE JUROR:  I do not.

13         THE COURT:  You did mention that you've heard or seen

14    news about others, other individuals --

15         PROSPECTIVE JUROR:  Yeah.

16         THE COURT:  -- in connection with the January 6

17    events.  Can you tell us if you remember names of who they are?

18         PROSPECTIVE JUROR:  I can't remember names, no.  I

19    just remember seeing different people doing different acts

20    throughout the day.

21         THE COURT:  All right.  And is this again just normal

22    headline news or TV clips?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  As a result of what you've seen and heard

25    in the news, have you formed any opinions about the January 6

events that would be difficult to set aside coming to court and
serving as a juror in this case?

PROSPECTIVE JUROR:  Yeah.  I mean, it's pretty -- to
be honest, as soon as I heard you say January 6, I was kind of
already like oh, okay, well -- I kind of have my opinions about
it.

THE COURT:  And these opinions are based solely on
what you've seen in the news?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And you're saying that it would be
difficult for you to set those opinions aside and be a fair and
impartial juror, fair to both sides in this case, if you were
selected as a juror?

PROSPECTIVE JUROR:  A little bit, just because it
seems like most involved are pretty guilty, from what I've seen.

THE COURT:  You did mention that you have an opinion
about Mr. Reffitt's guilt or innocence.  Can you elaborate?

PROSPECTIVE JUROR:  Just generally speaking.  I had
not heard his name before.

THE COURT:  Again, please keep your voice up.

So you're saying you had not heard his name before?

PROSPECTIVE JUROR:  I have not heard his name before.

THE COURT:  So did you answer yes to the question
because you have a general view about anyone who participated in
the events that they're guilty of a crime?

1    PROSPECTIVE JUROR:  Just generally speaking.

2    THE COURT:  All right.  Do you understand that under

3    the law Mr. Reffitt is innocent, there's a presumption of

4    innocence that applies?  Do you walk into this courtroom

5    thinking he's guilty of crimes?

6    PROSPECTIVE JUROR:  It's hard to put my opinion that I

7    had before aside, but I do understand that that's how that

8    works.

9    THE COURT:  I guess I'm asking whether you think that

10   would be a challenge for you to do, because of course, you would

11   be instructed that any personal views, any political views have

12   to be kept out of the courtroom and you have to judge

13   Mr. Reffitt's guilt or innocence solely based on the evidence in

14   the case and the instructions that I provide.

15     Do you have any hesitation in being able to do that?

16   PROSPECTIVE JUROR:  I would do my absolute best.  It's

17   just a little bit tough knowing so much about what happened that

18   day.

19   THE COURT:  And when you say "knowing so much about

20   what happened that day," what --

21   PROSPECTIVE JUROR:  Just generally speaking, what was

22   going on, the people who were there and why they were there.

23   THE COURT:  Again, this is just coming from the news

24   stories that you've seen?

25   PROSPECTIVE JUROR:  It is, yes.

```
1           THE COURT:  And you understand that what's on the news

2      cannot be considered evidence in this case?

3           PROSPECTIVE JUROR:  I do.

4           THE COURT:  And you understand that an indictment, a

5      charging document itself is not evidence in this case?

6           PROSPECTIVE JUROR:  I do.

7           THE COURT:  And you understand that if you were

8      selected as a juror you really have to come into the courtroom

9      with a clean slate and be open-minded?  Is that something that

10     you think you can do?

11          PROSPECTIVE JUROR:  It is something I would try very

12     hard to do, yes.

13          THE COURT:  You also answered yes to the question

14     about having strong views on firearms such that you're concerned

15     that you can't be a fair and impartial juror.

16      You understand that the charges in this case include

17     firearm-related charges?

18          PROSPECTIVE JUROR:  I do.

19          THE COURT:  Based on the views you have about

20     firearms, are you concerned that you would favor one side or the

21     other based on your views alone?

22          PROSPECTIVE JUROR:  A little bit, yes.

23          THE COURT:  And again, as I explained before, the

24     instructions would tell you you have to set your personal views

25     aside and decide this case based solely on the evidence.
```

1          PROSPECTIVE JUROR:  Right.

2          THE COURT:  And you have reservations about being able

3   to do that?

4          PROSPECTIVE JUROR:  I guess I thought you were

5   asking -- I have an opinion, but yes, I would try to put all my

6   opinions aside to be as objective as possible.  But I do have

7   opinions.

8          THE COURT:  As I explained yesterday, our goal here is

9   to select a neutral panel of jurors, folks who don't have

10  preconceived notions, who aren't predisposed towards one side or

11  the other.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Would you put yourself in that category of

14  open-minded, neutral jurors, or do you feel that you are

15  predisposed -- it sounds like if you're disposed one way or the

16  other, it's towards the government's side.  Is that correct?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And do you feel that you could be fair to

19  the defense and be neutral, open, judge the evidence fairly,

20  impartially, despite the views you have about firearms and the

21  events of January 6?

22         PROSPECTIVE JUROR:  I would do my best to be objective

23  about it.

24         THE COURT:  All right.  You know yourself best.  We

25  can't ask for a guarantee.  But if you were sitting in

1    Mr. Reffitt's position, would you feel that you could be a fair

2    juror in deciding this case?

3            PROSPECTIVE JUROR:  All I can say is I will do my best

4    to be open-minded and hear all of the evidence that's presented.

5            THE COURT:  Ms. Berkower?

6            MS. BERKOWER:  Nothing from the government, Your

7    Honor.  Thank you.

8            THE COURT:  Mr. Welch?

9            MR. WELCH:  No questions for the venire person; a

10   question for the Court.

11           THE COURT:  All right.  So I'm going to ask you to

12   step out.  And if you could, please, make a call about --

13           PROSPECTIVE JUROR:  I will.

14           THE COURT:  Before you leave, let me just follow up on

15   the appointment issue.  You say these are your first

16   appointments relating to your pregnancy?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  And do they have to occur in this next

19   week?  Is that what's required?

20           PROSPECTIVE JUROR:  They said before week 12, and this

21   is week 12.  So I was waiting to get in, and I finally got in.

22   So that's where it kind of became a difficult thing to navigate.

23   But I can give them a call today.

24           THE COURT:  That would be helpful information to have.

25           PROSPECTIVE JUROR:  All right.

1          THE COURT:  All right.  Thank you.

2      (Prospective juror steps down.)

3          MR. WELCH:  Your Honor, I have a motion for cause.

4  This juror is being candid.  She has told the Court repeatedly

5  that it would be hard to put her opinion aside knowing

6  everything that -- or knowing so much and everything that has

7  happened, she would try her best.  She has strong feelings about

8  guns, but she would try her best.  She is concerned that she

9  would favor one side, that she would be predisposed to the

10  government.  The best that she can say is that she would try her

11  best to put that aside.

12      So when the Court asked would she, if she sat where

13  Mr. Reffitt sits, want her to serve as a juror, she didn't say

14  yes.  She said, "I will try my best."

15      So I think she's trying to candidly tell the Court that she

16  is biased is basically what it boils down to.

17      On top of that, she would want, and anyone would want her

18  to go to her first appointments --

19          THE COURT:  Well, I agree.  If that comes back, given

20  that this is her 12th week, and she can't reschedule those

21  appointments until early in the day or late in the afternoon, I

22  think that's a for-cause strike, and I assume the government

23  would not object.

24      So I hear on you that issue.  I think the other one is a

25  closer call.

 1          Ms. Berkower, I will hear from you.

 2          MS. BERKOWER:  Yes, Your Honor, and since I wasn't

 3    standing near the microphone, if the appointments can't be

 4    rescheduled, her medical appointments, we would not object to

 5    striking her for cause, of course.

 6          But with regard to her opinions about the case, I think the

 7    Court was very clear with her what would be required of her as a

 8    juror.  And the question really is not is it hard for the person

 9    to set aside their opinions, but whether they can do it.  And

10    she repeatedly said she would do her absolute best.  I wrote

11    down "absolute best" to put her opinions aside, and she said

12    that she thinks she could do it.

13          And we would submit that that is really what's required

14    here.  She formed an opinion, but she can set it aside in order

15    to judge the case fairly.  So we would submit she should not be

16    struck for cause.

17          THE COURT:  I'm going to reserve on this for now and

18    hear what the answer is on the medical issue before I resolve

19    this motion for strike.  So that's a question mark for now.

20          All right.  The next juror I have is 0541.  This juror

21    answered yes to questions 3 and 4.

22          (Prospective juror steps up.)

23          THE COURT:  Good morning, ma'am.

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  If you feel comfortable taking off your

1    mask, would you, please?

2              PROSPECTIVE JUROR:  Thank you.

3              THE COURT:  Sorry for keeping you here all day

4    yesterday and having to bring you back this morning, but there

5    are a lot of you.  This takes time.

6         I want to remind you that you're under oath.  Do you

7    understand that the oath you took yesterday applies today?

8              PROSPECTIVE JUROR:  Yes, ma'am.

9              THE COURT:  So you have answered yes to having heard

10   news about the January 6 events and seeing news either about

11   Mr. Reffitt or other individuals who were involved in the

12   January 6 events.

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Can you give us a general idea of what

15   you've seen and heard in the news?

16             PROSPECTIVE JUROR:  Just mostly during the time that

17   January the 6th happened, it was almost impossible to avoid in

18   the news, and then just casually hearing about certain people,

19   not even their names, certainly not Mr. Reffitt.

20             THE COURT:  So far as you are aware now, so far as you

21   can recall, have you seen or heard anything about Mr. Reffitt,

22   the defendant in this case?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Do you recognize him sitting at the table

25   over there?

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  All right.  Did you watch the events of

 3    January 6 live on that day?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  Were you here in the District?

 6              PROSPECTIVE JUROR:  Yes.

 7              THE COURT:  Where were -- were you close to the

 8    Capitol at all?

 9              PROSPECTIVE JUROR:  No.  Define "close."  I live off

10    of U Street.

11              THE COURT:  All right.

12              PROSPECTIVE JUROR:  But no, I wasn't anywhere near the

13    Capitol.

14              THE COURT:  And I take it from your comments already

15    that you haven't been tracking these particular cases but,

16    rather, reading the headlines that you see as you read news?

17              PROSPECTIVE JUROR:  Exactly; exactly.

18              THE COURT:  As a result of what you've seen and heard

19    in the news, have you formed any opinions about the guilt or

20    innocence of those who were involved in the January 6 events?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  All right.  And you understand that as

23    Mr. Reffitt sits here he's presumed innocent under the law?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  And you understand he can't be convicted
```

1    unless and until the government proves its case beyond a

2    reasonable doubt?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Would you have any difficulty applying

5    those instructions and deciding this case based solely on the

6    evidence you hear in this courtroom?

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  All right.  Ms. Berkower?

9            MS. BERKOWER:  Good morning.

10           PROSPECTIVE JUROR:  Good morning.

11           COURTROOM DEPUTY:  Can I ask for the potential juror

12   to speak in the microphone in front of you.  Yes, ma'am.  Thank

13   you.

14           MS. BERKOWER:  Ma'am, you said that you did watch news

15   at the time of the January 6 events generally, just not live on

16   TV that day?

17           PROSPECTIVE JUROR:  Yes.

18           MS. BERKOWER:  Can I ask, what sources of news do you

19   remember getting that information from?

20           PROSPECTIVE JUROR:  I usually type into like Google

21   News.  That's my primary source.

22           MS. BERKOWER:  Any other sites that Google takes you

23   to?

24           PROSPECTIVE JUROR:  No.  I read The Wall Street

25   Journal every day, but I'm not seeking out information.

1          MS. BERKOWER:  Understood; understood.

2      And given what you did see back at the time, did you form

3  an opinion at all about the events that occurred?

4          PROSPECTIVE JUROR:  I think my opinion changed over

5  time.

6          MS. BERKOWER:  So could you explain what your opinion

7  originally was and how it changed?

8          PROSPECTIVE JUROR:  It's really hard to describe.  I

9  thought at first it was people exercising their right to

10  disagree, and then when you saw the events and the descriptions

11  later of what happened inside the Capitol -- I know people get

12  caught up in the times, but I still don't really have any

13  opinion about --

14          MS. BERKOWER:  So at first -- you said at first --

15          PROSPECTIVE JUROR:  You know how TV exaggerates;

16  right?  So they show one thing over and over again, and you

17  think it's a lot more.

18          MS. BERKOWER:  Okay.  So at first you thought people

19  were exercising their right to disagree.  And did you have an

20  opinion on their position, their point of view?

21          PROSPECTIVE JUROR:  Just that they had the right to do

22  so.

23          MS. BERKOWER:  And you said later your view on that

24  changed.  So what view did you come to?

25          PROSPECTIVE JUROR:  The people on the Mall versus the

1    people actually climbing the walls of the Capitol.

2              MS. BERKOWER:  What difference are you drawing in your

3    mind?

4              PROSPECTIVE JUROR:  It kind of went beyond free

5    speech; climbing the walls of the Capitol went beyond free

6    speech.

7              MS. BERKOWER:  Where do you view that line being

8    drawn?

9              PROSPECTIVE JUROR:  Physical probably.  It would start

10   when you --

11             MS. BERKOWER:  Okay.  So you said you did hear some

12   news or descriptions of what happened that changed your view.

13   Can you be a little more specific about what kinds of

14   descriptions you heard that changed your view?

15             PROSPECTIVE JUROR:  The mob attacking a Capitol

16   policeman.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  And actually stealing the

19   speaker's lectern, as you saw on TV.

20             MS. BERKOWER:  Okay.  Judge Friedrich will instruct

21   you that if you are selected as a juror you have to set aside

22   what you know.

23             PROSPECTIVE JUROR:  Yes.

24             MS. BERKOWER:  Do you understand that?

25             PROSPECTIVE JUROR:  Yes, ma'am.

```
1          MS. BERKOWER:  How confident are you that you will be

2    able to follow her instruction on that point?

3          PROSPECTIVE JUROR:  Very confident.

4          MS. BERKOWER:  Do you currently work?

5          PROSPECTIVE JUROR:  Yes, ma'am.

6          MS. BERKOWER:  What kind of work do you do?

7          PROSPECTIVE JUROR:  I'm a scientist.

8          MS. BERKOWER:  What kind of science?

9          PROSPECTIVE JUROR:  Materials science, but I have a

10   background in engineering as well.

11         MS. BERKOWER:  Do you work for the government?

12         PROSPECTIVE JUROR:  No.  I work for Lawrence Livermore

13   National Laboratory.  Anyone who is not familiar with that, it's

14   a nuclear weapons design lab.  And I'm on assignment here in

15   Washington employed by Lawrence Livermore, and currently, I'm

16   working at the Pentagon.

17         MS. BERKOWER:  I see.  And were you in that position

18   at the time of January 6 as well?

19         PROSPECTIVE JUROR:  Yes.

20         MS. BERKOWER:  Any conversations you had with people

21   at the Pentagon about the events of that day?

22         PROSPECTIVE JUROR:  No.

23         MS. BERKOWER:  I hear that you speak with an accent.

24         PROSPECTIVE JUROR:  Yes, I do.

25         MS. BERKOWER:  May I ask where you're originally from?
```

1          PROSPECTIVE JUROR:  I was born in England, and I've

2    been here since 1973, and I'm a nationalized citizen since 1979.

3          MS. BERKOWER:  Understood.  Thank you.

4          THE COURT:  Mr. Welch, any questions?

5          MR. WELCH:  No, thank you, Your Honor.

6          THE COURT:  Thank you, ma'am, very much.

7       (Prospective juror steps down.)

8          THE COURT:  All right.  I would like to do two more,

9    the last two, and then we can take a break.  Can everyone wait

10   that long to take a break?

11      All right.  I'm informed there's three more.  We're not

12   sure if we have two or three, but let's try to get through two

13   or three.

14      The next juror is 1484, answered yes to 3, 4, 5, and 6, 12,

15   15, and 19.

16       (Prospective juror steps up.)

17          THE COURT:  Good morning, sir.

18          PROSPECTIVE JUROR:  Good morning.

19          THE COURT:  If you feel comfortable taking off your

20   mask, please do.  I'm very sorry to keep you here all day

21   yesterday and have to bring you back, but thank you for your

22   patience.

23      Let me remind you that you are still under oath.  Do you

24   understand?

25          PROSPECTIVE JUROR:  Yes, I do.

1          THE COURT:  All right.  You have answered yes to a

2    number of questions relating to the January 6 events.  You've

3    said that you've heard news about the events and you've heard

4    news about specific individuals.

5        Have any of those news stories been about Mr. Reffitt, the

6    defendant in this case?

7          PROSPECTIVE JUROR:  Not as far as I can remember, no.

8          THE COURT:  Do you recognize him?  He's seated at that

9    table.

10          PROSPECTIVE JUROR:  I don't recall.  I don't know.  I

11    don't think so.

12          THE COURT:  Can you keep your voice up?  It's hard to

13    hear.

14          PROSPECTIVE JUROR:  No, I don't remember him, him

15    specifically.

16          THE COURT:  You've also stated that you have an

17    opinion about his guilt or innocence as he sits here.  Can you

18    explain what that's based on?

19          PROSPECTIVE JUROR:  That is based on the people that I

20    already know about, you know, and this whole QAnon thing.  I

21    don't know if I should have said opinion on guilt or innocence,

22    but as soon as I heard, you know, January 6 rioter, I just heard

23    guilty in my head, just like no.

24          THE COURT:  As you sit here now, you feel the folks

25    involved in the January 6 events are guilty?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And you understand under the law that

3    Mr. Reffitt, the defendant here, is presumed innocent?

4          PROSPECTIVE JUROR:  Yeah.  Under the law, he's

5    presumed innocent, but --

6          THE COURT:  Do you think you'd have a hard time

7    following my instruction that you cannot --

8          PROSPECTIVE JUROR:  I do.

9          THE COURT:  -- find Mr. Reffitt guilty unless and

10   until the government proves its case beyond a reasonable doubt?

11         PROSPECTIVE JUROR:  I do, and I will tell you why,

12   because my mother was Jewish, and the QAnon people are not very

13   fond of her or her family.  I'm going to be honest.

14       And -- I'm going to be honest.  I had a hard time following

15   some of your questions, because when I found out who I was

16   sitting in the same room with, I was just really upset, quite

17   frankly, and I don't think I could remain emotionally neutral in

18   a trial like this.

19         THE COURT:  All right.  So even as you sit here now,

20   you feel that you're leaning towards the government's side in

21   this case?

22         PROSPECTIVE JUROR:  Yeah, I am.

23         THE COURT:  Ms. Berkower, any questions?

24         MS. BERKOWER:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  Thank you, sir.

1          (Prospective juror steps down.)

2               THE COURT:  I assume there's no objection to striking

3     this potential juror for cause?

4               MS. BERKOWER:  No objection, Your Honor.

5               THE COURT:  All right.  That juror is stricken.

6          Just one moment.  Mr. Hopkins?

7          (Pause.)

8               THE COURT:  Okay.  I have one more card here.

9     Apparently, there should be a card for juror 0715.  I don't have

10    that card.  We're trying to track that card down.  As I see it,

11    we have two options.  One would be to have me go through the

12    questions with her, I think, again in this courtroom one by one.

13    Or she is the last witness -- I mean the last potential juror.

14    We could make her sit through the general again.

15         Do the parties have a preference?  Mr. Welch?

16              MR. WELCH:  Your Honor, I think it just makes sense --

17    we're on the cusp of having you do the general again.

18              THE COURT:  That's what we'll do.  I'm hoping we can

19    find the card, because she's been waiting around, and that's

20    going to be annoying to have to sit through that again, but

21    that's what we will do if we can't find the card.

22         So the next juror is 1718.  The only yes answer was to

23    number 1.

24         (Prospective juror steps up.)

25              THE COURT:  Good morning, sir.

```
1                 PROSPECTIVE JUROR:  Good morning.

2                 THE COURT:  If you feel comfortable taking off your

3     mask, please do.  Thank you for your patience.  I'm very sorry

4     to keep you all day here yesterday and have to bring you back.

5     We appreciate it.

6          Let me remind you, you understand you're still under oath

7     from yesterday?

8                 PROSPECTIVE JUROR:  Yes.

9                 THE COURT:  You've answered yes to living or working

10    near the Capitol.

11                PROSPECTIVE JUROR:  Uh-huh.

12                THE COURT:  Which is it?

13                PROSPECTIVE JUROR:  Work.  I'm a Senate woodcrafter.

14                THE COURT:  You're a what?

15                PROSPECTIVE JUROR:  A Senate woodcrafter.  I'm a

16    cabinetmaker and carpenter on the Senate-side buildings.

17                THE COURT:  And are you employed by the Senate?

18                PROSPECTIVE JUROR:  Architect of the Capitol.

19                THE COURT:  Okay.  And were you employed in that

20    capacity on January 6?

21                PROSPECTIVE JUROR:  No.  I've only been there for five

22    months.

23                THE COURT:  So just recently?

24                PROSPECTIVE JUROR:  Yes.

25                THE COURT:  All right.  You did not indicate that you
```

1    had seen anything in the news about the January 6 events.

2        Were you in D.C. at the time?

3            PROSPECTIVE JUROR:  I was.

4            THE COURT:  Were you aware of the events?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Have you seen news stories about them?

7            PROSPECTIVE JUROR:  I did, yeah.

8            THE COURT:  Have you followed those news stories

9    closely?

10           PROSPECTIVE JUROR:  Not really.

11           THE COURT:  Have you seen news stories or heard news

12   stories about specific individuals who participated in the

13   January 6 events?

14           PROSPECTIVE JUROR:  There's a few that I recall about,

15   you know, a man with the headpiece and a few of the flashy

16   things on the front page, but otherwise, I haven't followed

17   anything closely.

18           THE COURT:  Do you recall anything about Mr. Reffitt?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  Do you recognize him?  He's seated at the

21   table over there.

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  Do you think there's anything about your

24   current job that would make you come into this courtroom

25   favoring one side over the other?

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  Do you have close relationships with

3  members of Congress or their staff or anyone else who was

4  present in the Capitol on January 6?

5        PROSPECTIVE JUROR:  No.  Everyone that I know was out

6  for COVID reasons, that I can recall.

7        THE COURT:  You mean the individuals who you know now

8  from your job were not folks who were in the Capitol on

9  January 6?

10        PROSPECTIVE JUROR:  No, they -- most of them -- they

11  were staggering staff pretty heavily, and I haven't spoken with

12  anyone that was actually in the building.

13        THE COURT:  Have you talked to the folks you do know

14  about the events, even though they weren't there?  Have you

15  learned information from them about what happened that day?

16        PROSPECTIVE JUROR:  No, I haven't actually had those

17  conversations.  When I started the job, I didn't -- it hasn't

18  come up, and I haven't spoken to any of my co-workers about it.

19        THE COURT:  Are you involved in making repairs to

20  property that was damaged as a result of the January 6 events?

21        PROSPECTIVE JUROR:  No.

22        THE COURT:  Have you heard about what needed to be

23  repaired before as a result of the January 6 events?

24        PROSPECTIVE JUROR:  I did read one article about the

25  lumber that was being sourced to repair some of the historic

1    items, but otherwise, that's as far as my knowledge goes.

2              THE COURT:  Have you formed any personal views or do

3    you have any political views about the January 6 participants?

4              PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  And do you think that you could put those

6    views, those opinions aside and decide this case solely based on

7    the evidence that's presented here in the courtroom?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Do you understand that as Mr. Reffitt sits

10   here he's presumed innocent under the law?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  And do you understand that he cannot be

13   convicted of any crimes unless and until the government proves

14   its case beyond a reasonable doubt?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  And you would have no hesitancy in

17   following my instructions, legal instructions, even if you

18   disagreed with them?

19             PROSPECTIVE JUROR:  Yes, I would not have a hesitancy.

20             THE COURT:  All right.  I understood.  Thank you for

21   clarifying.

22        All right.  Do you have any concerns about working at the

23   Capitol in light of what occurred on January 6 of 2021?

24             PROSPECTIVE JUROR:  It was definitely something that

25   is always -- the week before I took the job, there was an

1    incident that shut down the neighborhood when I was trying to do

2    a delivery, and I was like, well, this is a part of the job.

3         And I'm actually leaving next week because it's not really

4    for me.

5              THE COURT:  It's not what?

6              PROSPECTIVE JUROR:  The job wasn't -- working in that

7    sort of place wasn't really my cup of tea.  So I won't be there

8    any longer.

9              THE COURT:  So you're about to stop working there?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Would it be a problem to serve on this

12   jury for this period, given your current job?

13             PROSPECTIVE JUROR:  No.  My supervisors were

14   understanding, and my responsibilities have been diminished for

15   my final weeks.

16             THE COURT:  Are the reasons that you're leaving the

17   job, do they have anything to do with, directly or indirectly,

18   the January 6 events or security issues at the Capitol?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  And based on your current job -- I think I

21   may have asked you this already, but let me ask it again.

22   Anything about your current job make you favor one side or the

23   other in this case?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  All right.  Ms. Berkower?

```
 1                    MS. BERKOWER:  Good morning.

 2                    PROSPECTIVE JUROR:  Good morning.

 3                    MS. BERKOWER:  So you said that the job you're

 4       currently in you did not hold on January 6; is that correct?

 5                    PROSPECTIVE JUROR:  That's correct.

 6                    MS. BERKOWER:  Were you working at a different job

 7       then?

 8                    PROSPECTIVE JUROR:  Yes.

 9                    MS. BERKOWER:  What job was that?

10                    PROSPECTIVE JUROR:  A small general contractor based

11       in Hyattsville called Fajen & Brown.

12                    MS. BERKOWER:  Is that also a business that did

13       woodcrafting?

14                    PROSPECTIVE JUROR:  Yes.

15                    MS. BERKOWER:  Is that something you've been trained

16       in?

17                    PROSPECTIVE JUROR:  Yes.

18                    MS. BERKOWER:  What job are you leaving for?

19                    PROSPECTIVE JUROR:  I'm going back to my former

20       position.

21                    MS. BERKOWER:  You said you have formed views about

22       the events of January 6?  Did I understand you right about that?

23                    PROSPECTIVE JUROR:  Yes.

24                    MS. BERKOWER:  Can you explain a little bit what views

25       you've formed?
```

1          PROSPECTIVE JUROR:  I came to conclusions of why the

2    events took place.

3          MS. BERKOWER:  What kinds of conclusions did you come

4    to?

5          PROSPECTIVE JUROR:  That they were primarily driven by

6    the former president and people that were following him, and

7    that's about it.

8          MS. BERKOWER:  And how did you come to those

9    conclusions?  Did you do research?  Did you read news?  What

10   drew you to those conclusions?

11         PROSPECTIVE JUROR:  Yeah, radio, news that you

12   overhear in the morning.

13         MS. BERKOWER:  What kinds of sources are you talking

14   about?  What news sources?

15         PROSPECTIVE JUROR:  Radio, news, and newspapers.

16         MS. BERKOWER:  Which ones?

17         PROSPECTIVE JUROR:  NPR is generally what I was, and

18   then -- yeah, just the NPR at that time is all I was receiving.

19         MS. BERKOWER:  Do you read NPR's web site in addition

20   to listening to the radio or --

21         PROSPECTIVE JUROR:  I didn't at the time.  I recently

22   have.

23         MS. BERKOWER:  You understand if you are selected as a

24   juror, the Judge will instruct you you have to set that -- what

25   you know and what you've learned in those conclusions out of

1    your mind as you consider the case?  Do you understand that?

2              PROSPECTIVE JUROR:  Yes.  I'm only looking at the

3    evidence and not any preconceived notions.

4              MS. BERKOWER:  Do you feel confident you will be able

5    to follow her instruction on that point?

6              PROSPECTIVE JUROR:  Yes.

7              MS. BERKOWER:  How confident are you?

8              PROSPECTIVE JUROR:  I'm fully confident.

9              MS. BERKOWER:  Thank you, sir.

10             THE COURT:  Mr. Welch, any questions?

11             MR. WELCH:  No questions.  Thank you.

12             THE COURT:  Sir, I have one question.  I want to make

13   sure.  You were not directly appointed by anyone in public

14   office?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Who is your boss?

17             PROSPECTIVE JUROR:  The actual architect of the

18   Capitol?  I'm blanking on his name right now.

19             THE COURT:  Okay.  But you were not appointed by

20   anyone elected to public office?

21             PROSPECTIVE JUROR:  No.  I was hired by James Atkins,

22   who is the woodcrafting supervisor.

23             THE COURT:  All right.  Thank you, sir.  You're

24   excused.

25             PROSPECTIVE JUROR:  Thank you.

```
 1            (Prospective juror steps down.)

 2            THE COURT:  All right.  Good news.  We found the card.

 3    This last one is juror 715.  This juror has answered yes to 4,

 4    17, 22, and 24.  So that's the mask question.  I will put on my

 5    mask.  And I will start with 22.

 6            (Prospective juror steps up.)

 7            THE COURT:  Good morning, ma'am.  How are you?

 8            PROSPECTIVE JUROR:  Good morning.  I'm fine.  And

 9    yourself?

10            THE COURT:  Doing well, thanks.

11       Sorry for the inconvenience, and thank you for your

12    patience.  I know you've been waiting a long time to come in

13    here and talk to us.

14       Let me remind you that you are still under oath from

15    yesterday.  Do you understand?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  All right.  You have answered yes to the

18    question I asked about whether serving as a juror would be an

19    extreme hardship.  Is that a question you feel comfortable

20    answering publicly?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  Can you explain why you answered yes to

23    that question?

24            PROSPECTIVE JUROR:  Typically, governments and courts

25    and laws and everything never really have truly been my thing.
```

1    But I am a person that don't feel comfortable with being on

2    anyone's jury because I really value the safety of myself and my

3    family.  People who are qualified to do so should, and those who

4    aren't shouldn't.

5            THE COURT:  I just want to make sure that I understand

6    what you're saying.  Is it your position that serving on any

7    jury, civil or criminal, poses a risk to your safety?

8            PROSPECTIVE JUROR:  Yes; for me, yes.

9            THE COURT:  A civil case?

10           PROSPECTIVE JUROR:  I just don't feel comfortable,

11   honestly.

12           THE COURT:  You understand it is your civic duty to

13   serve on a jury when called to do so?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Can you explain to me why you feel that

16   there's a security issue in you serving on a jury, particularly

17   in a civil trial where there's not a criminal defendant?

18           PROSPECTIVE JUROR:  Well, from how I grew up, I just

19   believe in -- you know, if you don't have the necessary, you

20   know, -- the necessary steps or educated enough about to do

21   something, you shouldn't be doing it.

22       I just really -- it don't make me feel no type of

23   comfortable to be doing this.  It makes me feel very

24   uncomfortable actually.  And I have social anxiety.  So this is

25   a little bit much for me.

1          THE COURT:  You understand that your sole job as a

2     juror in this case would be to decide the facts, not the law,

3     that the Court would instruct you on what the law is?  So you

4     don't need any special legal training to fulfill this role as a

5     juror.

6          PROSPECTIVE JUROR:  The only thing I really know about

7     everything is what you all tell me, and, you know, I'm a person

8     that likes to do research of our own.

9          THE COURT:  You like to do what?

10          PROSPECTIVE JUROR:  Do research of our own, because I

11     only know what you tell me about my civic duty to do this.

12     Actually, I understand this is my civic duty.  I learned it when

13     I was younger for the fact that at some point you may have to

14     serve, go to jury duty and everything.

15          THE COURT:  But your view as you sit here is you

16     should not ever have to sit on a jury?

17          PROSPECTIVE JUROR:  No.  I said that I grew up -- I

18     was told when I was younger that at some point your civic duty

19     would be to do jury duty at some point.

20          THE COURT:  But you're unwilling to fulfill that duty?

21          PROSPECTIVE JUROR:  Yes, I'm a little uncomfortable.

22     This is kind of uncomfortable.

23          THE COURT:  And again, it's because you're concerned

24     for your safety or your ability?

25          PROSPECTIVE JUROR:  More so my safety, honestly.

1   Well, yeah, and ability, too, but more so my safety.  I just

2   don't really feel comfortable.

3           THE COURT:  But your unwillingness to serve as a juror

4   has nothing to do with your inability to judge another person?

5   That's not what you're saying?  It's solely safety or some

6   concern about your ability to fulfill the role?

7           PROSPECTIVE JUROR:  Yes, ma'am.

8           THE COURT:  So again, not based on your inability to

9   sit in judgment of someone else?

10          PROSPECTIVE JUROR:  Yes, ma'am.

11          THE COURT:  Yes, ma'am, what?

12          PROSPECTIVE JUROR:  What you --

13          THE COURT:  When you say yes, I don't know if you're

14   agreeing with me or you're saying --

15          PROSPECTIVE JUROR:  Yes, I'm agreeing with you, ma'am.

16          THE COURT:  You're agreeing with me?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  You also indicate that you have such

19   strong feelings or opinions about firearms that you can't be

20   fair and impartial.

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  You understand if you're selected as a

23   juror in this case that I would instruct you that you have to

24   put your personal views aside and you have to weigh the evidence

25   in the case based solely on what you see in the courtroom?

```
 1              PROSPECTIVE JUROR:  Yes, ma'am.

 2              THE COURT:  And do you think you would be able to do

 3    that?

 4              PROSPECTIVE JUROR:  To do what's right, yes, I

 5    probably could.  This is all new for me.  It's a little

 6    nerve-wracking, if you ask me.

 7              THE COURT:  I can certainly understand feeling

 8    uncomfortable --

 9              PROSPECTIVE JUROR:  Yes.

10              THE COURT:  -- being in a courtroom if you haven't

11    been here before.

12              PROSPECTIVE JUROR:  I've never been in a courtroom.

13              THE COURT:  You've never been in a courtroom?

14              PROSPECTIVE JUROR:  I've never been in a courtroom.  I

15    was so lost coming here, but I swear, this is my first time.

16    So --

17              THE COURT:  It's not so bad, is it?

18              PROSPECTIVE JUROR:  Well, this is a little

19    uncomfortable, to be honest.  Yeah, to do what's right.  I don't

20    like to have someone's freedom in my hands.  That's too much of

21    responsibility for me.  That's another thing.  I don't like to

22    have anyone's freedom in my hands, and that's pretty much how I

23    view things.

24              THE COURT:  And that's because it feels stressful and

25    anxiety --
```

1          PROSPECTIVE JUROR:  Exactly.  And I have anxiety, and

2     I get overwhelmed very quickly.

3          THE COURT:  And do you think that if you're chosen to

4     serve as a juror in this case you will be worried sitting in the

5     jury box, or in this case in the gallery during COVID, you would

6     be nervous sitting there and listening to the evidence that's

7     presented?

8          PROSPECTIVE JUROR:  Yes, ma'am.

9          THE COURT:  Would that make it hard to focus on the

10    evidence?

11         PROSPECTIVE JUROR:  Yes, ma'am.

12         THE COURT:  You also indicated that you've heard or

13    seen news about Mr. Reffitt or others who were at the Capitol on

14    January 6?

15         PROSPECTIVE JUROR:  Yes, ma'am.  Well, I actually --

16    days prior to me being served, I had a friend who discussed

17    something along the lines of the case.

18         THE COURT:  This case?

19         PROSPECTIVE JUROR:  Yes, like days prior to

20    everything.

21         THE COURT:  What did the friend say about this case?

22         PROSPECTIVE JUROR:  The only thing he said was -- he

23    said his ass needs to go to jail, he did that.

24         THE COURT:  Is this a close friend of yours?

25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And based on what your friend said, would

2     you be more inclined to favor the government if you were picked

3     as a juror in this case?

4          PROSPECTIVE JUROR:  I don't think I understand your

5     question.

6          THE COURT:  Let me rephrase it.

7       Would you be able to set aside what your friend told you

8     and judge this case based only on what you hear and see in the

9     courtroom?

10          PROSPECTIVE JUROR:  Yes.  I didn't actually do no type

11     of research or really took, you know, interest in it when it

12     happened, but I thought it was kind of amazing how someone was

13     able to get inside the Capitol, because I been inside of there

14     before, and it's a lot of security.

15       But what he said, we were regularly talking, casually

16     talking, because it popped up on The Shade Room.

17          THE COURT:  It popped up on what?

18          PROSPECTIVE JUROR:  The Shade Room.  It's a social

19     media outlet that gives you, like, daily news.

20          THE COURT:  But that comment that you've heard would

21     not influence you if you were to serve as a juror on this case?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Do you live or work close to the Capitol?

24          PROSPECTIVE JUROR:  No, ma'am.

25          THE COURT:  Were you in D.C. on January 6?

```
 1            PROSPECTIVE JUROR:  Yes, ma'am.

 2            THE COURT:  Did you watch the events live on TV that

 3    day?

 4            PROSPECTIVE JUROR:  No, ma'am.

 5            THE COURT:  You've just seen news since that date?

 6            PROSPECTIVE JUROR:  Clips on Shade Room, yes.

 7            THE COURT:  You said that you feel anxious.  Did the

 8    events of January 6 make you feel anxious about living in D.C.,

 9    being in D.C. after the fact?

10            PROSPECTIVE JUROR:  Yes.  Actually, it did, because I

11    went to school in South Carolina.  So a lot of my friends from

12    there were contacting me like, you know, Ta, What's going on?

13    And I'm like, bro, I can't even tell you.

14        I've been to the Capitol.  I've been to the White House.

15    I've been inside all of those buildings.  And the way the

16    security was set up, I was just so surprised that this was able

17    to happen.

18            THE COURT:  And you're a teacher; is that right?

19            PROSPECTIVE JUROR:  Yes; I work in the teacher's

20    field, yes.  I'm a substitute teacher.

21            THE COURT:  And is the school where you work at all

22    near the Capitol?

23            PROSPECTIVE JUROR:  Well, I actually was supposed to

24    start this week, but when I got my summons, I had to take off.

25            THE COURT:  You were supposed to start what?
```

```
 1            PROSPECTIVE JUROR:  This week, my new job this week.
 2    Prior to that, I was at the bus lot, yes.
 3            THE COURT:  Where were you before?
 4            PROSPECTIVE JUROR:  At the school bus lot prior to
 5    being a substitute teacher aide.
 6            THE COURT:  All right.  I want to circle back to your
 7    concerns about being anxious about serving on the jury.
 8            PROSPECTIVE JUROR:  Uh-huh.
 9            THE COURT:  You know yourself best.
10            PROSPECTIVE JUROR:  Yes.
11            THE COURT:  It's important to pay attention and listen
12    to the witnesses and view the exhibits and be focused in doing
13    that.  Are you telling me that you feel so worried about serving
14    on this jury that you think you won't be able to do that?
15            PROSPECTIVE JUROR:  Yes.
16            THE COURT:  Ms. Berkower?
17            MS. BERKOWER:  Good morning.
18            PROSPECTIVE JUROR:  Good morning.
19            MS. BERKOWER:  So you said you have strong views about
20    firearms; did I hear that right?
21            PROSPECTIVE JUROR:  Yes.
22            MS. BERKOWER:  Could you explain what those views are?
23            PROSPECTIVE JUROR:  Typically, in this situation, I
24    felt as though if you are bringing a firearm to this riot, you
25    have every intention on using it.  It's like the street code.
```

```
1    If you show it, you better use it.  So, you know, that's
2    typically my personal opinion, even though the evidence stated
3    that he wasn't -- he didn't use the firearm, but he had every
4    intention to do so, whether it was shooting it or hitting
5    someone with one.
6         MS. BERKOWER:  The Judge is going to instruct you you
7    have to set your views aside when you're considering the case.
8    Are you going to be able to set that view aside?
9         PROSPECTIVE JUROR:  I have strong views as far as that
10   goes.  So it would definitely be a task for me to do so.  Like
11   the Judge said, I know myself better than anyone.  I would
12   probably have an issue.
13        MS. BERKOWER:  And by saying you would probably have
14   an issue, you mean you think --
15        PROSPECTIVE JUROR:  Putting my personal views aside.
16        MS. BERKOWER:  You would have an issue putting your
17   personal views aside?
18        PROSPECTIVE JUROR:  Yes, when it comes to firearms.
19        MS. BERKOWER:  And you also said that you are -- you
20   don't want to have someone's freedom in your hands; did I hear
21   that right?
22        PROSPECTIVE JUROR:  Yes, ma'am.
23        MS. BERKOWER:  So you know this defendant is charged
24   with crimes; right?
25        PROSPECTIVE JUROR:  Yes, ma'am.
```

1          MS. BERKOWER:  And if the government proves its case

2     beyond a reasonable doubt, would it be hard to convict him since

3     you don't want to have someone's freedom in your hands?

4          PROSPECTIVE JUROR:  Probably so, only because like I

5     said, stated earlier, having someone's freedom in my hands is a

6     big responsibility for me.  So it would definitely carry on to

7     me going home.  So that's the only thing that's going to be on

8     my mind.  I never really typically wanted to be in a courtroom

9     for any reason, to have that weight on my shoulders.

10          MS. BERKOWER:  So even if the government proves the

11     charges beyond a reasonable doubt, you still --

12          PROSPECTIVE JUROR:  Whatever the government decided to

13     do, conviction, I'm glad to go along with it, but you know,

14     that's just me.

15          THE COURT:  Anything further, Ms. Berkower?

16          MS. BERKOWER:  No, Your Honor.

17          THE COURT:  Anything from the defense?

18          MR. WELCH:  Just a question.

19     Ma'am --

20          PROSPECTIVE JUROR:  Yes.

21          MR. WELCH:  -- would you have any concerns if you were

22     picked to serve and the government failed to prove its case --

23     the Judge would instruct you that in that situation, the law

24     requires you to find a person not guilty -- would you be

25     concerned that your friend who said something to the effect that

1    "his ass needs to go to jail, he did that," would you be afraid

2    that that friend would be upset with you?

3            PROSPECTIVE JUROR:  To cause me bodily harm, no, not

4    at all, but I know he's going to be pissed.  I'm sorry.  I know

5    he's going to be upset.  I'm sorry.

6            MR. WELCH:  Do you fear it would affect your

7    relationship with that friend?

8            PROSPECTIVE JUROR:  No.

9            MR. WELCH:  All right.  Thank you.

10            THE COURT:  Thank you, ma'am.  I appreciate it.

11            PROSPECTIVE JUROR:  One more thing.  I had answered on

12    the question that I probably was going to be uncomfortable with

13    the no-mask thing.  I just want to address that.  I've had COVID

14    before, and I have family members at home with underlying health

15    issues.  So I would not be comfortable at all.

16            THE COURT:  Understood.  I appreciate your candor.

17    Thank you.  That's all.

18      (Prospective juror steps down.)

19            THE COURT:  All right.  Is there a motion?

20            MS. BERKOWER:  Yes, Your Honor.  The government will

21    move to strike this juror for cause.

22            MR. WELCH:  I will join.

23            THE COURT:  I was going to be inclined to anyway.

24    Initially, I thought she was just trying to avoid jury service,

25    but as she spoke, I think she genuinely has both anxiety about

1   serving, pretty severe anxiety, and also an inability to sit in

2   judgment, and also issues putting her personal views aside.

3        So for all those reasons, I will strike her for cause.

4        So that ends the initial batch.  We're going to need to go

5   back to the Ceremonial Courtroom.  I think it's a good time to

6   take a little bit of a break.  I appreciate you all forging

7   through without a break this morning.  If ever anyone is

8   uncomfortable, raise your hand or speak up during a break.  I

9   just really want to try to get through these today.

10       So why don't we say, to give the court staff adequate time,

11   would 20 minutes be adequate for you all?  Mr. Nestler?

12            MR. NESTLER:  Where should we go after 20 minutes?

13            THE COURT:  To the Ceremonial Courtroom.  So we will

14   be in there, and then I think it might make sense after I do the

15   general to take a lunch break.  That's a natural time.  And then

16   we will go through.

17       I have strikes for cause for 1650, 442, 1484, and 715.  Did

18   I miss any?

19            MS. BERKOWER:  That's what we have.

20            THE COURT:  And we're waiting on the other.  And we'll

21   get information and share that with you when we come back in the

22   Ceremonial Courtroom.  And if we have information, I'll decide

23   on that juror.

24       So far, you all agree these four have been stricken for

25   cause?

1          MS. BERKOWER:  Correct.

2          MR. WELCH:  Yes.

3          THE COURT:  Not taking into the account the juror

4    we're waiting for additional information on, what's our total

5    number now?

6          COURTROOM DEPUTY:  32.

7          THE COURT:  So we're close.

8          COURTROOM DEPUTY:  For the next group, do you want me

9    to bring the entire group?

10         THE COURT:  How many do we have?

11         COURTROOM DEPUTY:  38.

12         THE COURT:  At this point, I'm just reluctant to let

13   everyone go because it would be a crying shame if we had bunch

14   of strikes and couldn't get a jury.  They got to go home

15   yesterday.  So they can wait.

16      All right.  So we will be adjourned until 10 till.

17      (Recess taken from 11:33 a.m. to 12:02 p.m.)

18      (Call to order of the court.)

19         THE COURT:  All right.  Good afternoon, ladies and

20   gentlemen.  We have to wait and get the public line open.

21      (Pause.)

22         THE COURT:  All right.  Good afternoon, everyone.

23   Welcome to the U.S. District Court for the District of Columbia.

24   I am Dabney Friedrich, and I will be presiding over the case

25   that you've been called to serve as a potential juror.

1    I want to thank all of you for taking time out of your busy

2    schedules.  I'm sorry that we weren't able to accommodate all of

3    you yesterday, but I hope you were sent home and not waiting in

4    the courthouse all day to appear here.  But thank you again for

5    taking time out of your busy lives to assist the court by coming

6    here to participate in the process.

7    As you know, jurors play a critical role in our justice

8    system.  The Constitution guarantees every citizen a right to a

9    jury trial by a jury of one's peers.  And this is a very

10   important civic duty that you've been called to perform today.

11   The goal today will be to select a neutral panel of jurors

12   who will hear the evidence in this case and be fair and

13   impartial in their decisionmaking.

14   This is a criminal case that relates to the events that

15   occurred at the Capitol on January 6, 2021.  The defendant in

16   this case, Guy Wesley Reffitt, is charged with four crimes

17   relating to Congress's meeting at the United States Capitol on

18   January 6 to certify the Electoral College vote for president.

19   First, he is charged with obstructing an official

20   proceeding for allegedly interfering with Congress's meeting.

21   Second, he is charged with being unlawfully present on the

22   Capitol grounds while using or carrying a firearm.  Third, he is

23   charged with transporting firearms knowing or intending that

24   they will be used unlawfully in furtherance of a civil disorder.

25   Fourth, he is charged with interfering with law enforcement

1  officers during a civil disorder.  The government has also

2  charged Mr. Reffitt with obstructing justice based on statements

3  he made to his children while at home in Wylie, Texas, around

4  January 11th of 2021.

5        Mr. Reffitt has pleaded not guilty to all charges.

6        In a moment you will be sworn in, and what that means is

7  that you'll be bound to answer the questions you will be asked

8  truthfully, and that is essential to this process.

9        Before we start, let me explain how this process will work.

10  It will take several stages.  First, I will ask this entire

11  group a set of questions.  Once we finish those questions, each

12  one of you will be brought into another courtroom one at a time

13  where you will be asked to follow up on some of the answers that

14  you gave here in this courtroom.

15        You will be called in the order that you're seated.  And

16  given the large number of people in this courtroom, this process

17  is likely to take a little bit of time.  We will try very hard

18  to move things along, but please understand that some amount of

19  waiting will be unavoidable.

20        While you're waiting in this courtroom for your turn to be

21  called, please feel free, if you wish, to talk quietly with one

22  another or to read, but I ask that you not talk to each other or

23  communicate outside of the courtroom about anything at all

24  relating to this case or the January 6 events or the parties in

25  this case.

1    I also ask that you don't use the Internet to read or

2   research anything about the case or the parties, nor should you

3   make a telephone call or send an e-mail or a text or a tweet or

4   a blog or instant message or Snapchat or use any other form of

5   communication to tell others about this case or the fact that

6   you're a potential juror in this case.  Any juror who violates

7   these restrictions jeopardizes the process and possibly the

8   trial, which could require the entire process to start over.

9    Finally, I ask that you not use your mobile devices at any

10   point during the jury selection process or during the trial if

11   you are selected as a juror.  You can tell close friends and

12   family members or your employer that you've been called to serve

13   as a juror on a criminal case, but that is all.

14    From this point on, you must not read anything about this

15   case, and you should try to avoid receiving any information

16   about the case from the news media.  If it comes to your

17   attention inadvertently, please ignore it, even headlines, and

18   if you receive automatic alerts from any source, you may need to

19   change your push notifications, your news subscriptions, RSS, or

20   Twitter feeds.  And if you happen to hear the case being

21   discussed, you should walk away from the conversation or change

22   the channel on the TV.

23    Please know when you're called into the separate courtroom

24   to follow up with questioning, it's not my intention, nor is it

25   the lawyers' intention, to embarrass or make you feel

uncomfortable in any way.  Our sole goal is to select a fair and impartial jury that is composed of jurors who are not biased and who will return a verdict based solely on the evidence and the legal instructions that I provide.

You should understand that courtrooms and trials are open to the public.  So throughout jury selection and during the trial, members of the public and the media will be watching and listening to these proceedings, perhaps in the courtroom itself, like now, or in other rooms in the courthouse, in overflow courtrooms.  And that's why that line was turned on, so that folks who are in overflow rooms right now and who could not come in here because of social distancing requirements can also hear what is going on.

So during follow-up questioning, if there are any questions that you feel raise sensitive or personal issues, you can ask permission to give your answers to me and to the lawyers through a headset with a husher on that will ensure that only the parties to the case and court staff can hear your answer.

And please understand that in the end we might not need to talk to all of you and will likely end up excusing some of you. If that happens to you, please understand it's not because we don't like you.  It's not because we think you said something inappropriate or improper.  It's just because we have more potential jurors than we might need, and there may be a reason why you're not one of the people who are selected to serve as a

1    juror in this case.

2         Before we proceed, please make sure that you have at your

3    seat both a note card and a pencil, and if you don't have both

4    of those, please raise your hand.

5         All right.  I will ask that you first write in the

6    right-hand corner of that card your badge number.

7         And in this first stage of the process, I'm going to read

8    27 questions to you.  You should be able to answer each of these

9    questions with a simple yes or no.  If there's a question that

10   you answer a yes to, all you need to do is write down the number

11   of the question.  You don't need to write down anything else.

12   You don't need to write down even yes.  Just the number of the

13   question.

14        So for example, if I ask you the first question and your

15   answer to that question is a yes, simply write down the number 1

16   on your card.  If the answer is a no, don't write down anything

17   at all.

18        Once I've gone through all 27 questions, I will go to the

19   other courtroom, and I will speak to each one of you again in

20   the order that you're seated, and I will speak to you even if

21   you don't answer yes to any question that I ask you.

22        And also, please understand that after I've asked you

23   questions the attorneys themselves might have some brief

24   follow-up questions for you based on your responses.

25        Once we've qualified the number of people who are needed to

1    select a jury, we will bring all of the qualified jurors back

2    into this courtroom to finish the selection process.  In all

3    likelihood, that process of the selection process will happen

4    later today, but at this point, it's hard to say for certain.

5         Before I begin with the questions, let me introduce the

6    court staff.  I think you've already met Mr. Hopkins, the

7    courtroom deputy, who is seated in here in front of me to my

8    right.  He's the one who makes sure that the trains run on time

9    and that I don't make any mistakes.

10        Next to him is Ms. Wick.  She's the court reporter who is

11   taking down everything that's said in this courtroom.

12        Sitting on either side of me are my law clerks.

13        I will now ask all of you to stand and please raise your

14   right hand so that you may be sworn in.

15        (Jury venire sworn.)

16           THE COURT:  All right.  So with your note card and

17   pencil ready, I'm going to start with the 27 questions.

18        The first question is, do you live or work at or near the

19   U.S. Capitol?  If the answer to that question is a yes, please

20   write down number 1 on your note card.  If the answer is a no,

21   don't write anything down.

22        Question number 2, do you or someone you know have a direct

23   or indirect connection to the events that occurred at the U.S.

24   Capitol on January 6, 2021?  If the answer is yes, please write

25   the number 2.  If the answer is no, no need to write anything

down.

Question number 3, have you followed the news about the events that took place at the U.S. Capitol on January 6, 2021? Again, if the answer is a yes, please write the number 3 on your card.

Question 4, have you heard or seen anything in the news or elsewhere about Guy Wesley Reffitt, the defendant in this case, or about anyone else who was present at the Capitol on January 6, 2021?

Question number 5, does anyone have such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for you to serve as a fair and impartial juror in this case?

Question 6, as you sit here, do you have an opinion about Mr. Reffitt's guilt or innocence in this case?

Question 7, do you no longer live in the District of Columbia?  If the answer is yes, please write down the number 7.

Question number 8, the government in this case is represented by Assistant U.S. Attorney Jeffrey Nestler, who is standing, and Risa Berkower.  I will ask them to introduce other members of their trial team as well.

MS. BERKOWER:  Good afternoon, everyone.  Here at our table, we have paralegal Amanda Rohde and Special Agent Thomas Ryan with the FBI.

THE COURT:  In addition, the defendant -- you all may

1    have a seat.

2         The defendant, Guy Wesley Reffitt, is represented by

3    William Welch.  Mr. Reffitt resides in Wylie, Texas.  I'm going

4    to ask you -- and this is again question number 8 -- whether you

5    know or recognize any of these people.  If so, write down the

6    number 8 on your note card.  If not, you don't need to write

7    anything down.

8         I will now ask the government to introduce its witnesses by

9    name and ask you whether you know any of these witnesses.

10             MS. BERKOWER:  Thank you, Your Honor.

11        During this trial, you may hear from or about the following

12    individuals:  From the United States Capitol Police, Inspector

13    Monique Moore, Sergeant Adam DesCamp, Sergeant Matthew Flood,

14    Officer Shauni Kerkhoff; from the United States Secret Service,

15    Special Agent Paul Wade; from the Federal Bureau of

16    Investigation, Special Agent Thomas Ryan from Washington, D.C.,

17    Special Agent Stacy Shahrani from Washington, D.C., Special

18    Agent Laird Hightower from Dallas, Texas, Karla Kennedy, a nurse

19    and photographer from Dallas, Texas; from the United States

20    Senate, Daniel Schwager, counsel to the Secretary of the Senate;

21    from Wylie, Texas, which is near Dallas, Jackson Reffitt and

22    Peyton Reffitt; and from Cedar Park, Texas, which is near

23    Austin, Rocky Hardie.

24        Thank you, Your Honor.

25             THE COURT:  Thank you, Ms. Berkower.

1          So if you know any of those witnesses who have been

2     introduced to you, please write down the number 8 -- sorry, the

3     number 9 on your card.

4          Question 10, if you could please take a look around the

5     room and see if you recognize any other potential jurors in this

6     case.  If you do, please write down the number 10 on your card.

7          Question number 11, as I've mentioned, the courtroom deputy

8     is Jonathan Hopkins, and the court reporter is Sara Wick.

9     Again, seated on either side of me are my law clerks.

10         Do you know me or any member of my staff?  If so, write

11    down the number 11.

12         Question number 12, the government bears the burden of

13    proving Mr. Reffitt guilty beyond a reasonable doubt, and he is

14    presumed innocent unless and until the government meets that

15    burden.  This burden of proof never shifts to Mr. Reffitt, and

16    he has no obligation to offer his own evidence.

17         Would you have any difficulty or hesitation with respecting

18    this allocution of the burden of proof?  If the answer to that

19    question is yes, then write down the number 12, please.

20         Question 13, a defendant has a constitutional right not to

21    testify, and if Mr. Reffitt decides not to testify, I will

22    instruct you that you cannot hold his silence against him in

23    any way.

24         Would you have any difficulty following that instruction?

25    If the answer is yes, please write the number 13 on your card.

Question number 14, jurors are the sole judges of the facts, but they must follow the principles of law as I instruct. The jury may not follow some rules of law and ignore others. And even if the jury disagrees or dislikes any rule of law or does not understand the reasons for some of the rules, it is the jury's duty to follow them.

Do you have any personal beliefs that would make it difficult to follow my instructions, whatever they may be?  If the answer is yes, please write the number 14 on your card.

As I've mentioned already, if you're selected as a juror in this case, I will continue to instruct you to avoid all media coverage relating to the case, including radio, television, podcasts, social media, and other Internet sources.  That is, you will be forbidden from reading any newspaper articles about this case, listening to any radio or podcast stories about this case, or watching any TV news about this case.

You will also be forbidden from Googling this case or blogging, tweeting, reading, or posting comments about this case on social media or anywhere else on the Internet.

Do you have any reservations or concerns about your ability or your willingness to follow that instruction?  If the answer is yes, please write 15 on your card.

Question 16, I will be instructing the jury at the end of trial that the testimony of a police officer should be treated the same as the testimony of any other witness and that the jury

should not give either greater or lesser weight to the testimony of a witness simply because that witness is a police officer.

Does anyone have such strong feelings or opinions about the police, either positive or negative, that would make it difficult for you to be a fair and impartial juror in this case? If the answer is yes, please write the number 16 on your card.

Question 17, this case involves allegations about the possession of a handgun and rifles, none of which were fired.

Does anyone have such strong feelings or opinions about firearms that you are unable to put them aside and serve as a fair and impartial juror in this case?  If the answer is yes to that question, please write the number 17 on your card.

The next three questions I'm going to ask you relate to you and to members of your family, your immediate family, and to close personal friends.

So the first question is, does anyone in that group now work for or previously worked for any law enforcement agency? This includes any police department in or outside the District of Columbia, and it includes special police officers as well as prosecutors' offices, such as the U.S. Attorney's Office or a State Attorney's Office.  It also includes federal law enforcement agencies like the Department of Justice, the FBI, the Secret Service, the Department of Homeland Security, and the U.S. Park Police, and it includes any local police or sheriffs' departments.

1      If the answer to that question is yes for you, your

2  immediate family, or any close friend, please write the number

3  18 on your card.

4      Has any member of that group, again, you, your immediate

5  family, or close personal friend, ever attended law school,

6  worked as a lawyer, or worked in a law office?  If the answer is

7  yes, please write the number 19.

8      Question 20, has any member of that group ever been

9  arrested for, charged with, or convicted of a crime or been a

10  victim or a witness to a crime?  If the answer to that question

11  is yes for you, any member of your immediate family, or any

12  close friend, please write down the number 20 on your card.

13      Question number 21, have any of you had an experience as a

14  juror that would affect your ability to be a fair and impartial

15  juror in this trial?  If the answer is yes, write the number 21.

16      We expect that the presentation of evidence in this case to

17  conclude early next week after the close of evidence.  The jury

18  will deliberate until it reaches a decision.

19      Would serving as a juror in this case be an extreme

20  hardship to you?  And by this, I mean extreme.  Serving as a

21  juror is certainly an inconvenience to all.  What I'm asking is

22  whether serving on the jury would be very difficult for you for

23  some reason.  If the answer to that question is yes, please

24  write the number 22.

25      Question 23 is, do you have any health or physical problems

1   that would make it difficult to serve on the jury?  If the

2   answer to that question is yes, please write the number 23.

3        Question number 24, the witnesses in this case will be

4   testifying behind plexiglass, like is in front of me now,

5   without their masks on so that the jury can assess their

6   demeanor and their credibility.

7        Would any of you in this room be uncomfortable with the

8   attorneys or with me not wearing masks when we are speaking for

9   long periods of time?  We are all vaccinated.  If you would be

10  uncomfortable with me or the attorneys not wearing masks when

11  we're speaking for long periods of time, please write the number

12  24 on your card.

13       Do you have any difficulty reading, speaking, or

14  understanding the English language?  If the answer is yes,

15  please write the number 25 on your card.

16       Question 26 relates to something that happened yesterday.

17  I don't know if it happened again today.  But I understand at

18  least yesterday someone outside was handing out a pamphlet to

19  jurors.

20       Did any of you read a pamphlet that was being handed out

21  somewhere outside the courthouse yesterday?  If the answer is

22  yes, please write the number 26 on your card.

23       My final question is what I call a catchall question, and

24  this asks whether there's any other reason that I've not asked

25  about that might make it difficult for you to sit fairly and

1    impartially and attentively as a juror in this case?

2        Perhaps you have a strong religious, moral, or

3    philosophical reason or a strong personal or political belief

4    that you believe would make it hard for you to be fair and

5    impartial.

6        In sum, is there any reason that I have not already

7    mentioned that would make it difficult for you to sit as a fair

8    and impartial juror in this case?  If so, please right the

9    number 27 on your card.

10       So folks, that completes the general questioning.  As I

11   mentioned, what will happen next is one by one you will be

12   brought down to a smaller courtroom down the hallway where one

13   by one I will ask you follow-up questions based on your

14   responses.

15       Given that is it is now 12:30, I think it makes sense to

16   take a break for lunch.  Mr. Hopkins, I would be inclined to

17   take an hour break.  Should the jurors remain in the courthouse

18   during that period?

19           COURTROOM DEPUTY:  Yes, Your Honor.

20           THE COURT:  We ask, given the short time frame, that

21   you stay in the courthouse for that period.  There's a cafeteria

22   downstairs.  And we will be back at 1:30 sharp, and we will

23   start again in the order that you're called.  We ask that those

24   of you who aren't called in initially, that you wait in this

25   room, and if you need to leave the room in order to get a drink

1    from the water fountain or use the restroom or make a call, that

2    you just let the staff know that you're stepping out for a

3    moment.

4         Again, we do hope to complete this process today.

5         Mr. Hopkins, is there any reason why I can't just release

6    them now and stay in here to talk to the attorneys?

7              COURTROOM DEPUTY:  That's fine, Your Honor.

8              THE COURT:  So I'm going to release you all now, and I

9    will see you back in an hour or so in the other courtroom.  But

10   come back here.  Report here first.

11        Thank you.  Yes, we need to collect those note cards before

12   you leave.  Mr. Hopkins is going to walk around and take your

13   note cards in the order that you're seated.  And he has some

14   helpers.  Thank you all again for your patience.

15        (Jury venire left courtroom.)

16             THE COURT:  So I've just been informed that juror

17   number 548 was unable to change her medical appointments.  So

18   she will be stricken for cause based on her medical

19   appointments.

20        Secondly, I have some good news.  I have been given

21   authorization to reduce the social distancing protocols for

22   trial such that I can allow a press person and Mr. Reffitt's

23   wife or other family member in the courtroom, the actual trial

24   courtroom for trial, possibly one other person.

25        We're looking at the seating now.  But I'm pleased that I

1    can relax those somewhat now.  I think we can still do so

2    safely, but the court has consulted further with experts about

3    whether we think we can do this in a safe way, and we can.  So I

4    will be able to give you more information later today about

5    where those individuals will sit in the courtroom.

6         And finally, before I go, Mr. Welch, I understand that

7    you've asked for authorization for the transcripts, and I am

8    ordering release of the transcripts to him.

9         Is there anything else I need to do from the court

10   reporter's standpoint?  Do I need to put an order on the record,

11   or is that fine?

12             COURT REPORTER:  No, that's fine, Your Honor.

13             THE COURT:  Okay.  I will see you back in Courtroom 16

14   at 1:30.

15        Mr. Hopkins, if you can keep the jurors in the jury room so

16   I can come in and address if I have any additional information

17   before we bring the jurors in.

18        All right.  See you all back.

19        (Recess taken at 12:36 p.m.)

20        (Afternoon session of this proceeding was reported by

21   Lorraine Herman and is bound under separate cover.)

22

23

24

25

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Sara A. Wick_____          March 1, 2022_____

9   SIGNATURE OF COURT REPORTER          DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25