```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,
                                    CR Action
            Plaintiff,              No. 1:21-032

       vs.                          Washington, DC
                                    March 1, 2022
GUY WESLEY REFFITT,
                                    1:33 p.m.
            Defendant.


     TRANSCRIPT OF VOIR DIRE - DAY 2 - AFTERNOON SESSION
        BEFORE THE HONORABLE DABNEY L. FRIEDRICH
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:       JEFFREY S. NESTLER
                         RISA BERKOWER
                          U.S. ATTORNEY'S OFFICE
                          555 Fourth Street NW
                          Washington, DC 20530
                          202-252-7277


For the Defendant:       WILLIAM WELCH, III
                          5305 Village Center Drive
                          Suite 142
                          Columbia, MD 21044
                          410-615-7186



Reported By:             LORRAINE T. HERMAN, RPR, CRC
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6720
                          Washington, DC 20001
                          202-354-3196




Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

1    **P R O C E E D I N G S**

2          (Whereupon, the morning session of this proceeding

3    was reported by Sara Wick, and is bound under separate

4    cover.)

5          **THE COURT:**  Good afternoon.

6          All right.  A couple things before we bring the

7    jurors in.  First of all, I understand you were given a copy

8    of my introductory instructions.  Does either side have any

9    objection to the introductory instructions?

10          **MS. BERKOWER:**  No, Your Honor.

11          **MR. WELCH:**  No, Your Honor.

12          **THE COURT:**  All right.

13          And I am hearing feedback from the media room that

14    it's hard to hear.  So really continue to try to speak into

15    your microphones.

16          Second, I want to qualify 38 jurors, that means we

17    need six more.  Is that consistent with what you believe?

18    Mr. Welch?

19          **MR. WELCH:**  Yes, Your Honor.  I'm sorry.

20          **THE COURT:**  All right.

21          **MS. BERKOWER:**  Your Honor, I think we may need one

22    more.  I had before 32 qualified, but 31 if the person was

23    struck who had the medical appointment.

24          **THE COURT:**  Okay.  We will check that.

25    Mr. Hopkins is keeping count.  So we will, you know, before

1     we stop this process, we will make sure we are all on the

2     same page.  And we will go over the seating chart in the

3     ceremonial courtroom, once we have the 38.

4             On the demonstrative exhibit request.  You can

5     have a seat, Ms. Berkower.  I've looked at the law on this.

6     There is no clear circuit authority on the video issue.

7     District Courts across the country go both ways.  The

8     government's given me no briefing on the issue.

9             As I said yesterday, I do have concerns about the

10    government showing the video given its content.  I think

11    showing it three separate times to the jury could be unduly

12    prejudicial.  But with respect to the photos and the

13    statements that the government wants to refer to, Mr. Welch,

14    unless you can convince me that these exhibits are not --

15    that either the defendant's statements or the photographs

16    are not coming into evidence, I am inclined to permit them

17    to do that.

18            Now, you've had these exhibits since November.

19    You've had the list of witnesses who are set to introduce

20    them for weeks, I know.  I do want to know.  I'm trying to

21    move the trial along.  With respect to these exhibits or any

22    other exhibits, authentication issues, you've had some time

23    to flag them.  I want you to do that so we are not having to

24    stop in the middle of trial to address issues we could have

25    addressed earlier.

1          **MR. WELCH:**  I have had the exhibits for the time

2     you've said.

3          **THE COURT:**  Can you take off your mask?

4          **MR. WELCH:**  I would prefer not to.  If I can't be

5     heard, let me know --

6          **THE COURT:**  Well, just speak up.

7          **MR. WELCH:**  Will do.

8          **THE COURT:**  While sitting there, while you're

9     speaking, you don't have to take your mask off.

10          **MR. WELCH:**  Right.

11          **THE COURT:**  Up to you.  I just want to be clear.

12     You don't have to take your mask off because of me at any

13     point.  I thought you wanted to take it off.

14          **MR. WELCH:**  No, I don't.

15          **THE COURT:**  Oh, really.  Okay.

16          **MR. WELCH:**  I have grandchildren who cannot get

17     vaccinated.

18          **THE COURT:**  Okay.  All right.  Are you

19     uncomfortable with me not having mine off?

20          **MR. WELCH:**  I'm not, Your Honor.  I'm not trying

21     to tell other people what to do.

22          **THE COURT:**  Okay.  All right.

23          **MR. WELCH:**  It's just me.

24          **THE COURT:**  Okay.

25          **MR. WELCH:**  I have had the exhibits, I have had

1    the witness list.  I do not have a specific reason or

2    authority for the Court.  It would just have been my

3    experience as a trial attorney for many years that sometimes

4    the prosecution, for whatever reason, makes a mistake, fails

5    to call the proper witness to get something into evidence,

6    and I would be objecting as it is my duty to do.

7           **THE COURT:**  Understood.  But you know who the

8    witnesses are.  They were there that day.  Assuming that

9    they can say these photographs fairly and accurately depict

10   what they saw, which I assume the government wouldn't be

11   seeking to do this if there was any risk they would say, no,

12   to that, you are not going to object.  Right?

13          I just want to know.  If you think the evidence

14   isn't coming in.

15          **MR. WELCH:**  I don't have a specific objection.

16   You implored us both to file motions in limine.  I can look

17   at this.  I can evaluate it and say how I would do it were I

18   the prosecution.  But I don't want to tell them how to do it

19   --

20          **THE COURT:**  Okay.

21          **MR. WELCH:**  -- because if they mess this up, I

22   want to be able to object.

23          **THE COURT:**  I know.  I know.

24          On this issue with respect to the photographs, my

25   recollection is that they all relate to the scene on January

1    6.  Do you agree with that from the PowerPoint?

2            **MR. WELCH:**  Yes.

3            **THE COURT:**  And they are going to have multiple

4    witnesses from the Capitol.  And Ms. Berkower, Mr. Nestler,

5    you have a witness who can say, with respect to every one of

6    those photographs, that they fairly and accurately depict

7    what that witness saw that day?

8            **MR. NESTLER:**  Yes, Your Honor.

9            **THE COURT:**  Okay.  All right.

10           The defendant's statements obviously come in as

11   admissions.

12           **MR. WELCH:**  Provided they have -- I mean, it's not

13   just like they are going to call an agent to say, He told

14   me.  It's not that straightforward.

15           **THE COURT:**  So they are going to call another

16   witness to say, He said this.

17           **MR. WELCH:**  I don't know what they are going to

18   do.  I know if I was the prosecution, I would probably have

19   a couple of witnesses to get this done.

20           **THE COURT:**  All right.  Let me hear from

21   Mr. Nestler on who is going to get in the statements that

22   you or Ms. Berkower referred to in opening.

23           **MR. NESTLER:**  Yes, Your Honor.  Excuse me.

24           The statements we have in our PowerPoint slide or

25   some of the statements the defendant made we plan to

1    introduce in opening.

2            The defendant made oral statements to his family

3    and to Mr. Hardie, we plan to talk about.  He made written

4    statements via text message and Telegram message, we plan to

5    talk about.  And he made statements captured on his camera

6    helmet that we plan to talk about.  The Telegram messages,

7    text messages and helmet camera are going to come in through

8    Special Agent Stacy Shahrani with the FBI.

9            THE COURT:  Who did the analysis on all of the

10   electric -- the computers and whatever?

11           MR. NESTLER:  She pulled the items of evidence off

12   the defendant's devices; that's correct.

13           THE COURT:  Is she also the one who will testify

14   about the Cellebrite, the Apple-generated -- the

15   computer-generated sheets?

16           MR. NESTLER:  Yes.

17           THE COURT:  Are those coming in through her?

18           MR. NESTLER:  Yes.

19           THE COURT:  Mr. Welch, she is the one who did the

20   analysis.  Are you going to object on authentication grounds

21   on that?

22           MR. WELCH:  Not to her doing that, Your Honor.

23           THE COURT:  Okay.

24           MR. WELCH:  But she didn't seize those things.

25           THE COURT:  Okay.  Presumably you have the agent

1    who seized the things also testifying?

2            MR. NESTLER:  Correct.  So the defendant's cell

3    phone was taken off of his person at his arrest by Special

4    Agent Laird Hightower, who will be testifying.  Karla

5    Kennedy, who is an evidence recovery technician.  Her day

6    job is as a nurse with the FBI in Dallas, was present at the

7    search of the defendant's home, and will identify the items

8    that we are talking about.  Notably, the defendant's camera

9    that he had on top of his helmet, and the external hard

10   drive and his Microsoft Surface Pro.

11           THE COURT:  All right.  With respect to the other

12   statements of Mr. Reffitt that were not on the computer

13   devices but made to individuals, each of those individuals

14   will testify at trial that he said those statements to him?

15           MR. NESTLER:  Yes.

16           THE COURT:  All right.

17           MR. NESTLER:  In addition, Jackson Reffitt, the

18   defendant's son recorded some of the statements the

19   defendant made.  And Jackson Reffitt will be testifying and

20   authenticating those audio recordings.

21           THE COURT:  And he was present when he recorded

22   those statements?

23           MR. NESTLER:  Yes.

24           THE COURT:  Okay.  Well, Mr. Welch, do you want to

25   make any additional arguments as to the photographs or the

1    statements?

2              **MR. WELCH:**  No, Your Honor.

3              **THE COURT:**  Okay.  All right.

4              But, Mr. Nestler, again, the video, I think

5    showing that three times, given the content, I'm not going

6    to allow.

7              **MR. NESTLER:**  I understand, Your Honor.

8              **THE COURT:**  Do you need to make judgments?  Or

9    have you made two PowerPoints to move forward this

10   afternoon?  My hope is to proceed after the afternoon break

11   with openings.

12             **MR. NESTLER:**  We need to make a few adjustments.

13   I think we ought to be able to handle that timing-wise.  I

14   also hope we open today, but I'm also -- given the fact that

15   we need to do the rest of the jury selection --

16             **THE COURT:**  I know.  It may slow down but I think

17   it's doable, if we move ahead.  But no objections to the

18   introductory remarks that I plan to make to the jury?

19             **MR. NESTLER:**  No.

20             **THE COURT:**  Okay.

21             **MR. NESTLER:**  One comment on them is that you

22   indicated Ms. Wick as the court reporter.  But we actually

23   have two court reporters during the trial.

24             **THE COURT:**  Oh, right.

25             **MR. NESTLER:**  To the extent you want --

1      **THE COURT:**  Right.  So I need to --

2      **MR. NESTLER:**  Make sure all are included.

3      **THE COURT:**  Okay.  And I probably should have said

4  that to the jurors when I questioned them.  All right.

5  Thank you for pointing that out.

6      One other thing, I did -- I meant to flag this

7  before I read the opening remarks to the jurors yesterday

8  and today.  You all did describe one of the firearm offenses

9  in a way that did not track the language of the indictment.

10  So I corrected it.  I think you said "possession" or

11  something when it was "use and carry."  I just want to flag

12  that for you.  The changes I made were more tied to the

13  actual charges.

14      **MR. NESTLER:**  We noticed that.  I think the

15  defense and the government when we suggested those was to

16  give the jury a very general overview, and not actually

17  focus --

18      **THE COURT:**  All right.  I just in an abundance of

19  caution wanted to do that.

20      All right.  Any other issues we need to address

21  right now?

22      **MR. NESTLER:**  Just about the opening two other

23  small questions, Your Honor.

24      **THE COURT:**  Okay.

25      **MR. NESTLER:**  One is Your Honor's pretrial order

1     indicated that the parties should refer to witnesses with a

2     Mr. or Ms. if they are over 18.  The government would

3     request permission to refer to Jackson Reffitt, the

4     defendant's son, as Jackson.

5              THE COURT:  Any objection, Mr. Welch?

6              MR. WELCH:  No, Your Honor.

7              MR. NESTLER:  And Your Honor said something about

8     four-letter words.  I want to make sure I understand Your

9     Honor's position on using four-letter words, either on the

10    screen or from my mouth.

11             THE COURT:  It's more on the screen.  He said it.

12    It's coming in.  I just think not to overly inflame them,

13    putting it up.  If you can do it with asterisks, instead of

14    the F-word.

15             MR. NESTLER:  And we can make that adjustment.  I

16    wanted to make sure I understood Your Honor's ground rules.

17    If I put asterisks on the screen --

18             THE COURT:  You can say the word.  It's fine.  All

19    right?

20             MR. NESTLER:  That's what I was asking.

21             THE COURT:  Just try not to inflame the jury.  If

22    it's what he said, and that's what is coming in, you can say

23    it.

24             MR. NESTLER:  Thank you.

25             THE COURT:  All right.  I'm just trying not to, in

1   opening statement, you know, inflame the jury before they

2   hear any evidence at all.

3            **MR. NESTLER:**  We will put it on the screen and I

4   will say the word.

5            **THE COURT:**  Okay.

6            **MR. NESTLER:**  And the other thing is to just to

7   highlight for Your Honor, when we do have -- starting with

8   Officer Kerkhoff, who is our first witness -- there is a

9   radio run transcript.  And we are -- versions of the

10   transcripts, I provided them to chambers, have -- sorry.

11   Our versions of the media files have transcripts embedded in

12   them for the jury's comprehension.

13            So I will probably want to flag for the Court,

14   before we introduce that, to have the Court admonish the

15   jury.

16            **THE COURT:**  That it's not evidence?

17            **MR. NESTLER:**  Correct.  And I can just ask Your

18   Honor at some point during our examination.  I just wanted

19   to put that out there to have the Red Book at the handy.

20            **THE COURT:**  Okay.

21            Any objection, Mr. Welch?  You've reviewed the

22   transcript and it's not going to be a problem to show the

23   jury the transcript?

24            **MR. WELCH:**  As long as it doesn't go into

25   evidence, there's not a problem with them using it as an

413

1    aid.

2                    **THE COURT:**  Okay.

3                    **MR. NESTLER:**  I just wanted Your Honor to instruct

4    them it is an aid, the first time it happens.

5                    **THE COURT:**  Right.  And I appreciate -- to the

6    extent you all have -- you know, you know there is a need

7    for instructions coming, if you can let me know before the

8    witness.

9                    And as for the radio runs, Mr. Nestler, is the

10   purpose the government is introducing them, because they are

11   hearsay, is it to show why the officers took the actions

12   they did?

13                   **MR. NESTLER:**  Yes.

14                   **THE COURT:**  So it's not coming in for the truth of

15   the matter.

16                   **MR. NESTLER:**  Well, there are two short clips.

17   Both of the clips have Officer Kerkhoff speaking on the

18   clip.  They are to show why she did what she did.  The other

19   reason that the clips are coming in are for the truth of the

20   matter asserted, which is an excited utterance and a

21   present-sense impression from Officer Kerkhoff.

22                   **THE COURT:**  What?  Certain select portions of

23   that?

24                   **MR. NESTLER:**  Correct.

25                   She on each clip speaks for 10 seconds or so, but

1    the -- or 15 seconds maybe.  But her voice, on the first

2    clip says that she and her partner are responding to the

3    west side.

4              **THE COURT:**  Mr. Welch, do you agree it is an

5    excited utterance?

6              **MR. WELCH:**  It's an excited utterance, Your Honor.

7              **THE COURT:**  I'm not asking for an answer now, but

8    consider whether there's a need to instruct the jury on part

9    of it coming in for the truth and part of it not, but coming

10   in to show why they took the actions.

11             **MR. NESTLER:**  Understood, Your Honor.

12             **THE COURT:**  You all can think about that.

13             **MR. NESTLER:**  Thank you.

14             **THE COURT:**  Anything else?

15             **MR. NESTLER:**  No, thank you, Your Honor.

16             **THE COURT:**  Okay.  All right.

17             I need the juror cards -- oh, are they back in the

18   chambers?  They are?

19             **COURTROOM DEPUTY:**  I'm asking.

20             **THE COURT:**  Did I get them?  Can you all go look?

21             (Discussion off the record.)

22             **THE COURT:**  I don't see that there is any way

23   given the State of the Union and the road closings that we

24   will get to your first witness.  So to the extent you all

25   want to let him know or her know, please do.

1        **MS. BERKOWER:**  Thank you, Your Honor.

2        **THE COURT:**  Ms. Berkower, our count -- I haven't

3    confirmed this with Mr. Hopkins, but our count is we do have

4    32 qualified jurors.

5        Do you have a count, Mr. Welch?

6        **MR. WELCH:**  I don't have an exact count, Your

7    Honor.  I don't have any reason to disbelief your

8    calculation.

9        **THE COURT:**  All right.  Well -- let me ask --

10   confirm with Mr. Hopkins.

11       Mr. Hopkins, do you have a count on the qualified

12   jurors?

13       **COURTROOM DEPUTY:**  I do.

14       **THE COURT:**  What is it?

15       **COURTROOM DEPUTY:**  Thirty-two.

16       **MS. BERKOWER:**  Mr. Nestler tells me that that is

17   correct.

18       **THE COURT:**  Okay.  So we need six more.

19       **COURTROOM DEPUTY:**  Five more.

20       **THE COURT:**  We are going to do 38, just to be

21   sure.

22       **COURTROOM DEPUTY:**  Okay.

23       If Mr. Nestler says that it is correct then --

24       **MR. NESTLER:**  Just following your lead.

25       **THE COURT:**  While we have the time, let's go ahead

1      and talk very briefly about the floor plan of the ceremonial

2      courtroom.

3              Obviously when we bring all of the jurors back in,

4      there will be a large number of gaps, because of the strikes

5      for cause.  I don't think it would be prudent to move the

6      jurors forward so that there are no gaps, because you all

7      know who these jurors are, based on where they are seated in

8      the courtroom.  Am I correct about that?

9              **COURTROOM DEPUTY:**  I don't think we can do it that

10     way, Your Honor.  Since we had two different groups, we can

11     put each group -- start it from -- the first group start 1

12     through 50 and second starts 1 to 38.

13             **THE COURT:**  We are only bringing in 36 jurors.

14             **COURTROOM DEPUTY:**  Right.  If you are saying --

15             **THE COURT:**  Oh --

16             **COURTROOM DEPUTY:**  To have them sit in the seat

17     before.

18             **THE COURT:**  You all probably can't hear

19     Mr. Hopkins.  So the issue is some jurors will be in the

20     same seats for both panels.  So you all are going to need

21     some time -- you are going to need some time to see where

22     each juror is seated.  And I would propose -- you tell me if

23     you disagree -- but I would propose leaving the first

24     batch --

25             **MR. WELCH:**  May I make a suggestion?

1          **THE COURT:**  Yeah.

2          **MR. WELCH:**  I think it might only take a few

3   minutes if Mr. Hopkins could call the roll of the 36 who

4   have been qualified.  And one at a time, they could just

5   stand up.  We could see the person and correlate that with

6   our papers.  I don't think it would take long to call the

7   roll of 36 people.

8          **THE COURT:**  All right.  And so would you propose

9   that the jurors just sit in that room in the order that they

10  are called?

11         **MR. WELCH:**  Sure.  They can sit in any order.

12  Because once they are called, by number, only number, they

13  stand up, we correlate that.  We already have them in

14  order --

15         **THE COURT:**  All right.

16         **MR. WELCH:**  -- on our papers.

17         **THE COURT:**  So in terms of the alternate seats,

18  that I don't want you to state on the record, is that going

19  to mess anything up by just calling them in order?

20         **MR. WELCH:**  I wouldn't think so.  I think it would

21  just allow us to put the person with the number on our

22  paper.

23         **THE COURT:**  Because I don't know to this point any

24  of the alternate seats have been stricken.  In other words,

25  there are four people sitting in those seats.

1          **MR. WELCH:**  I understand.

2          **THE COURT:**  You all think about that, whether

3     there is a need to -- I don't know.

4          **MR. WELCH:**  I think once they are called, they

5     have --

6          **THE COURT:**  I don't want to single anyone out to

7     go sit in a certain seat.

8          **MR. WELCH:**  No, and you wouldn't.  They wouldn't

9     take the seats until after the roll had been called.  So we

10    just have a list.  These are all of the people and so --

11         **THE COURT:**  Are the alternates filling the new

12    seats in the order in which they are sitting or would you

13    know which of the four are now in the alternate seats?

14         **COURTROOM DEPUTY:**  We wouldn't know that.

15         **MR. WELCH:**  We wouldn't know that.  We just have a

16    long list of people.

17         **COURTROOM DEPUTY:**  Your Honor, he is saying,

18    essentially we will have a list of 37 people.

19         **THE COURT:**  Right.

20         **COURTROOM DEPUTY:**  The numbers that they gave us

21    for alternates wouldn't come into play until after they've

22    stricken their jurors.  Once they've stricken them, then I

23    would call them in the order --

24         **THE COURT:**  But it's done in two separate stages.

25    So right now we have four jurors sitting in the alternate

1    seats.  And those are the alternates, absent strikes.  So I

2    think we need to preserve those folks.

3              Now, we could say -- we could all agree ahead of

4    time, by calling them in order.  You all now know that those

5    alternates are sitting in seats, A, B, C and D.  And those

6    are the new alternate seats.  But you know that those are

7    the alternates who were in the seats that you initially

8    picked.  Does that make sense?

9              I don't know.  You all think about this.  We don't

10   need to resolve this right now.  I don't want to keep the

11   jurors waiting.  I do think right now there are four

12   alternates that have not been stricken, and we need to treat

13   them separately from the rest.  And I prefer not to single

14   them out and say, You sit here.  You sit here.  You sit

15   here.  You sit here.  Because the whole purpose of this

16   exercise is for them not to know they are an alternate.

17             So I think we need to put our heads together and

18   all agree the alternates are now in seats A through D.  And

19   we can do that privately in a way that won't reveal what

20   those seats are to anyone.

21             **MR. WELCH:**  The other thing we can do -- and it

22   will just make more work for Mr. Hopkins -- we could call

23   the roll, only of a sufficient number of jurors, for us to

24   exercise our peremptories on the actual jury and stop.  Then

25   have Mr. Hopkins call the roll --

1          **THE COURT:**  But that still doesn't work because

2     you have people in the same seats, I think.

3          **MR. WELCH:**  Then the people will land in whatever

4     seat.  He would have to know which seats to put people in.

5          **THE COURT:**  I don't know.  Let me think about

6     this.  This is complicated.

7          Ms. Berkower, you seem like you want to say

8     something.

9          **MS. BERKOWER:**  I was just going to make a brief

10    suggestion, Your Honor, that the way I think we thought this

11    was going to happen was the first qualified juror would be

12    seated in seat 1 in the courtroom.  The second qualified

13    juror would be seated in seat 2.  They may or may not have

14    been originally sitting there, because people may have been

15    eliminated.

16         **THE COURT:**  Uh-huh.

17         **MS. BERKOWER:**  Then so on and so forth, so that we

18    have the qualified people sitting in the seats 1 through 16.

19    Then based on that --

20         **THE COURT:**  All right.  Whoever lands in those

21    alternate seats, you are all in agreement that those are the

22    four alternates right now?

23         **MS. BERKOWER:**  I think so.

24         **THE COURT:**  All right.  That's the easier way.

25         I thought it would make it much more difficult for

1    you all to do your strikes and know who's where, having to

2    change the list, you know --

3            **MS. BERKOWER:**  I think --

4            **THE COURT:**  Anyway, if this works for you all,

5    this is the simplest way.  I am in agreement with that.

6            If both sides agree that the people who happen to

7    sit in the four seats you've chosen are the first round of

8    alternates, that you all would be not striking when we are

9    doing peremptories, you would just be ignoring them, and you

10   do your peremptory strikes, exchange lists, give them to

11   Mr. Hopkins, the strikes would happen.

12           And then everyone would just continue to sit where

13   they are in the courtroom.  No one would be told to leave.

14   And then after that, you would exercise your two-each

15   peremptory strikes on the people you had ignored, but you

16   know are alternates.

17           And if some of those are stricken, then you know

18   it's going to be the next two jurors that are filling those

19   seats.  Right?  And you are also going to know that we have

20   a couple of extra jurors sitting in the courtroom that are

21   not the ones who are going to be filling the alternate

22   seats, right, at the end.

23           **MS. BERKOWER:**  Yes.

24           **THE COURT:**  Okay.  All right.  So we are all on

25   the same page.  That's great.

1        **MS. BERKOWER:**  The one thing is, we will need to

2   find out from Mr. Hopkins is what those seats are.

3        **THE COURT:**  Yeah.  We can remind you.

4        **MS. BERKOWER:**  Okay.  Thank you, Your Honor.

5        **THE COURT:**  All right.  So let's bring in -- the

6   first juror will be --

7        **MR. WELCH:**  Your Honor, just as a precaution --

8        **THE COURT:**  Yeah?

9        **MR. WELCH:**  -- can you confirm for us that we

10  didn't duplicate any numbers?

11       **THE COURT:**  You did not duplicate.

12       **MR. WELCH:**  Thank you.

13       **THE COURT:**  Oh, I'm sorry.  I thought you all

14  shared with each other.

15       **MR. WELCH:**  No.

16       **THE COURT:**  Okay.  All right.

17       We will give those right after -- I don't know

18  that -- yeah, we have them with us.  So we can -- the law

19  clerk will share them with you after we take our next break.

20       All right.  The next juror is 344.  This juror --

21  he answered yes to 3, 4, 5, 19 and 20.  With question marks

22  next to 5 and 20.

23       **COURTROOM DEPUTY:**  Juror number 0344.

24       (Prospective juror steps up.)

25       **THE COURT:**  Good afternoon.  If we could have you

1    have a seat on the first row, second row from the end,

2    please, sir.  All the way.  All the way.  Do you see the

3    microphone to your left?

4              **PROSPECTIVE JUROR:**  Yes, ma'am.

5              **THE COURT:**  All right.  And if you are comfortable

6    speaking with your mask off, could you please take it off?

7              **PROSPECTIVE JUROR:**  [Complied]

8              **THE COURT:**  All right, sir.  So you have answered

9    yes to having heard news about the January 6th Capitol

10   events and having heard news about Mr. Reffitt or other

11   individuals who were involved in the January 6th events.

12             Can you tell us what you've heard in the news?

13             **PROSPECTIVE JUROR:**  Yes.  I do not know of

14   Mr. Reffitt specifically.  And so I was answering yes to the

15   latter half of that question as it related to hearing about

16   particular individuals that were involved in those events.

17             I am reasonably well-informed about the events of

18   January 6th.  I followed the news reports as they happened,

19   though I was not in Washington, D.C. at the time.  And I

20   have since followed the general news coverage of the event.

21   I watched the -- I think it was the -- HBO had a documentary

22   on it that I watched, and generally have been aware as a

23   casual reader of the news of what's gone on since January

24   6th.

25             **THE COURT:**  Have you done your own research or

1    sought out news about the events of January 6th or are you

2    just reading what pops up what you read your daily news?

3              **PROSPECTIVE JUROR:**  I am reading what pops up when

4    I read the daily news.

5              **THE COURT:**  I'm not familiar with the HBO program.

6    What was shown in that?

7              **PROSPECTIVE JUROR:**  It may not have been HBO.  I

8    don't remember which of the various streaming services it

9    was on, but it was a composition of the footage of the

10   event, kind of in realtime, that was kind of attempting to

11   explain the different parts of the altercation on the

12   Capitol as it happened.

13             **THE COURT:**  Did that footage focus on any

14   individuals?

15             **PROSPECTIVE JUROR:**  I'm certain that it did.  It

16   was a long enough time ago now that I don't remember

17   specific -- I can remember a few caricatures.  You know, the

18   QAnon Shaman and a couple other figures that it spoke about.

19   But I would be hard pressed to be able to generate any

20   specific names of individuals outside of, obviously, members

21   of the U.S. government and such that were involved in the

22   events.

23             **THE COURT:**  Do you recall whether there were any

24   interviews of family members of those who were involved in

25   the January 6th events?

1          **PROSPECTIVE JUROR:**  I do not recall.

2          **THE COURT:**  But you've said you didn't recognize

3    Mr. Reffitt earlier today when he stood up in the courtroom.

4    You don't recognize him now?

5          **PROSPECTIVE JUROR:**  I do not, no.

6          **THE COURT:**  In terms of other news sources, where

7    else do you learn about the events of January 6th other than

8    the newspapers and TV?

9          **PROSPECTIVE JUROR:**  Those are my primary sources.

10         **THE COURT:**  Do you follow any podcasts or blogs or

11   social media focused on these events?

12         **PROSPECTIVE JUROR:**  None that would be relevant to

13   these events.

14         **THE COURT:**  And have you read anything in

15   particular about this case or this trial?

16         **PROSPECTIVE JUROR:**  I have not read anything in

17   particular about this case.

18         **THE COURT:**  Based on what you have seen and heard

19   in the news -- well, first, let me back up.

20         Do you know anyone who was at the Capitol on

21   January 6, either anyone who participated in the events, any

22   of the rioters or any of the folks who were inside of the

23   Capitol?

24         **PROSPECTIVE JUROR:**  I -- not directly, no.

25         **THE COURT:**  How about indirectly?

1       **PROSPECTIVE JUROR:**  Indirectly, yes.  I am engaged

2   -- I live in Washington, D.C. and I work for a software

3   company that provides services to the general government

4   community.  So through kind of -- you know, through work and

5   through other connections I know staffers on Capitol Hill

6   and such, but none that I would call, kind of, close

7   personal friends or anything of that variety.

8       **THE COURT:**  Have you spoken to any of those

9   staffers on Capitol Hill about what happened on January 6th?

10      **PROSPECTIVE JUROR:**  I have not personally, no.

11      **THE COURT:**  Have you heard indirectly anything

12  about what happened that day from inside the Capitol?

13      **PROSPECTIVE JUROR:**  Indirectly, yes.

14      **THE COURT:**  And through what, another colleague of

15  yours?

16      **PROSPECTIVE JUROR:**  Yes.  So, for example, during

17  and after the events of January 6th there was -- my company

18  uses Slack as a communication mechanism.  And lots of people

19  were talking about what happened.  And my friends know this.

20  My other friend said that.  That kind of level of, you know,

21  complete hearsay from a prospective juror.

22      **THE COURT:**  I'm wondering what you heard from

23  others or based on what you've seen or heard in the news,

24  have you formed any opinions about any of the individuals

25  who were involved in the events of January 6?

1       **PROSPECTIVE JUROR:**  This is why I put a question

2   mark next to number 5.  I do have fairly strong opinions

3   about the events of January 6th as a whole.  I view that

4   what happened as an overall event was exceedingly negative

5   for our democracy and is something that I would very much

6   not want to happen again in this country and is a -- I could

7   use -- I would use very strong terms to describe how

8   negatively I feel about the overall events as they occurred.

9       However, simultaneously I know nothing about the

10  particular defendant.  I know nothing about his actions.  I

11  know nothing about the, you know, anything at all.  And I

12  also do also strongly believe that we, as a country, survive

13  on the fact that people are innocent until proven guilty;

14  and that it is important for jurors to look at the facts

15  about an individual in a particular scenario, not about the

16  bigger picture of what occurred.

17      And so the reason I put a question mark about that

18  is if you asked me to say, Do I think January 6th was a bad

19  thing?  I would say, Absolutely.  Yes.  If you asked me if I

20  have any opinions about this particular person or anything

21  to that regard I would say, no.  And therefore I'm not

22  certain -- depending on the meaning of the question, I would

23  answer it differently.

24      **THE COURT:**  All right.  We appreciate your being

25  so forthcoming.  I'm glad you answered the question, yes, so

1    we could talk more about that.

2            Given the strong, negative feelings you have about

3    the events of January 6th, I'm wondering whether you could

4    come into this courtroom, if you were selected as a juror,

5    and be able to put those strong opinions aside and decide

6    this case solely based on what you hear in this courtroom

7    and the instructions I provide.  Is that something that

8    would be difficult for you to do?

9            **PROSPECTIVE JUROR:**  That would be my complete

10   intention to do so.  I think the role of a juror in our

11   society is to do that and to -- I think that there is a lot

12   of biases that we all bring into all kinds of decisions on a

13   day-to-day perspective.

14           And I do believe that my opinions about January

15   6th, as a whole, would likely be one form of bias, like many

16   forms.  But I also simultaneously believe that it would be

17   important for me not to use that as a decision making

18   factor, to the best of my ability.

19           I do not -- I don't believe myself to be unduly

20   influenced by those -- I don't think I would be unduly

21   influenced by those opinions, but I did want to be

22   forthcoming about the fact that this is a historical event

23   that I feel strongly about.  And that I do feel strongly

24   about our country and our values and our democracy and all

25   of those things.

1            And so I also understand that that cuts both ways

2    and that -- that reasonable individuals involved in the

3    event on both sides could have had similar opinions about

4    those things.  And I do believe that, therefore, it would be

5    important to look at the evidence presented in the case.

6            And, you know, there's particular charges that

7    have been filed in particular evidentiary standards, in

8    order to determine whether those charges are valid.  That is

9    an independent -- should be an independent determination

10   from whether or not January 6th is a bad thing.

11           **THE COURT:**  You sound like you have some knowledge

12   or experience in the law.  Is this from friends or TV or are

13   you trained as a lawyer?

14           **PROSPECTIVE JUROR:**  I'm certainly not trained as a

15   lawyer, beyond mock trial in high school, which scarcely

16   counts.  And the fact I live in Washington, D.C. and so

17   therefore I forget -- it was question 19 or something -- do

18   you have close friends that are lawyers?  I live in

19   Washington, D.C., so yes.

20           **THE COURT:**  It's pretty obvious, yes.

21           **PROSPECTIVE JUROR:**  I also had the

22   fortune/misfortune, depending on how you look at it, to be

23   involved plenty of legal things as part of my profession.  I

24   am an entrepreneur.  So I spend -- I have spent more time

25   dealing with the law than I would have wanted to in many

430

1    ways.

2              **THE COURT:**  All right.  Well, based on anything

3    you have learned through your work or just being friends

4    with lawyers, do you have any question that you could follow

5    the instructions I give you in this case, even if they

6    conflict with what you think the law is?

7              **PROSPECTIVE JUROR:**  I am very convinced of my lack

8    of knowledge this these areas.  So, no, I would not have any

9    difficulty.

10             **THE COURT:**  Based on what you said earlier, it

11   sounds like you don't have an opinion, as you sit here,

12   about Mr. Reffitt's guilt or innocence; is that correct?

13             **PROSPECTIVE JUROR:**  That's correct.

14             **THE COURT:**  And you think that if you were chosen

15   as a juror, you could put aside everything that you've seen

16   and come to this Court and just decide this case based on

17   the evidence presented in this courtroom?

18             **PROSPECTIVE JUROR:**  Yes.

19             **THE COURT:**  You would not be leaning in favor of

20   the government, based solely on your strong views that you

21   hold about January 6th as a whole?

22             **PROSPECTIVE JUROR:**  That's correct.

23             **THE COURT:**  All right.

24             Ms. Berkower?

25             **MS. BERKOWER:**  No questions from the government,

1    Your Honor.

2              **THE COURT:**  Mr. Welch?

3              **MR. WELCH:**  No questions.  Thank you.

4              **THE COURT:**  Thank you, sir.

5              **PROSPECTIVE JUROR:**  Thank you very much.

6              **THE COURT:**  Oh, wait.  Wait.  Wait.  I'm sorry.  I

7    forgot to ask you about one of your answers.  Just one

8    second.

9              You also said that you or someone you know has

10   been arrested or convicted of a crime or been a victim or

11   witness of a crime; is that a question you feel comfortable

12   answering publicly?

13             **PROSPECTIVE JUROR:**  If I could use the --

14             **THE COURT:**  Okay.  Of course.

15             (Sealed sidebar discussion.)

16             **PROSPECTIVE JUROR:**  ████████████████████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ████████████████████████████████████████

20             **THE COURT:**  ███████████████████████

21   ██

22             **PROSPECTIVE JUROR:**  ██████████████████████

23             **THE COURT:**  ████████████████████████████

24   ██████████████████

25             **PROSPECTIVE JUROR:**  ████████████



432

1    THE COURT:
2
3    PROSPECTIVE JUROR:
4    THE COURT:
5
6    PROSPECTIVE JUROR:
7
8    THE COURT:
9    PROSPECTIVE JUROR:
10
11
12
13
14    THE COURT:
15
16    PROSPECTIVE JUROR:
17
18    THE COURT:
19
20
21
22    PROSPECTIVE JUROR:
23
24    THE COURT:
25

```
1      MS. BERKOWER:

2

3      MS. BERKOWER:

4

5

6

7

8

9      PROSPECTIVE JUROR:

10

11

12

13

14

15

16

17

18      MS. BERKOWER:

19      THE COURT:

20      MR. WELCH:

21

22      THE COURT:

23

24

25      MR. WELCH:
```

1          **THE COURT:** ███████████████████████

2  ████████████████████████████████

3          **PROSPECTIVE JUROR:** ███████

4          (Sealed sidebar discussion concluded.)

5          **THE COURT:** Mr. Welch, do you have follow-up

6  questions?

7          **MR. WELCH:** Briefly.

8          Sir, do you have any problems with the judge's

9  instructions about burden of proof in a criminal case?

10          **PROSPECTIVE JUROR:** The burden of proof is on the

11  prosecutors.

12          **MR. WELCH:** Do you have any problems with the

13  judge's instructions about a defendant's constitutional

14  right to remain silent?

15          **PROSPECTIVE JUROR:** I believe the Fifth Amendment

16  is incredibly important.

17          **MR. WELCH:** Thank you, Your Honor.  I have no

18  further questions.

19          **THE COURT:** Thank you.  You may be excused.

20          **PROSPECTIVE JUROR:** Thank you very much.

21          **THE COURT:** Thank you, sir.

22          (Prospective juror steps down.)

23          **THE COURT:** All right.  The next juror is 1221.

24  This juror has said yes to number 3.  To number 5 she said

25  "not sure".  I'll ask her about that.  Number 7 she put a

1    question mark.  I'll ask her about that.  Number 19 she, I

2    think, might have put a question mark and the word niece

3    next to it.  And 22, question mark, with timing.

4                    **COURTROOM DEPUTY:**  Juror 1221.

5                    (Prospective juror steps up.)

6              **THE COURT:**  Good afternoon, ma'am.

7              **PROSPECTIVE JUROR:**  Good afternoon.

8              **THE COURT:**  If you are comfortable testifying with

9    your mask off, you may take it off.

10             **PROSPECTIVE JUROR:**  Okay.  Sure.

11             **THE COURT:**  All right.  I see that you have

12   answered yes to question 3 about news -- having seen news

13   related to the Capitol events; is that right?

14             **PROSPECTIVE JUROR:**  Correct.

15             **THE COURT:**  Can you describe generally what you

16   followed in the news?

17             **PROSPECTIVE JUROR:**  We were overseas and we saw it

18   on TV, basically.  And then, you know, at the time read

19   newspaper articles from -- French newspapers.  And I read

20   the Financial Times so what was in there.  But it was really

21   mostly at the time.  I haven't followed it much since then.

22             **THE COURT:**  Do you occasionally see news stories

23   or TV stories about those events?

24             **PROSPECTIVE JUROR:**  Yeah.  Yeah.  Not as much as

25   when it initially happened.

1          **THE COURT:**  Do you recall anything about any

2     specific individual?

3          **PROSPECTIVE JUROR:**  Just the one man with the

4     horns.

5          **THE COURT:**  Okay.  All right.  Nobody else that

6     you can recall?

7          **PROSPECTIVE JUROR:**  Not really.

8          **THE COURT:**  All right.

9          You mentioned that you might have some strong

10    feelings or opinions about the events of January 6th that

11    might make it difficult for you to be fair and impartial in

12    this case; is that true?

13         **PROSPECTIVE JUROR:**  Not difficult, no.  More that

14    it was, you know, a sad event for me to watch overseas.

15         **THE COURT:**  Can you put your feelings about it

16    being a sad event aside and come to this courtroom and be a

17    neutral juror, if you are selected in this case?

18         **PROSPECTIVE JUROR:**  Yeah, I think I could, yes.

19         **THE COURT:**  All right.  I neglected to mention

20    earlier today that the court reporter here -- is this

21    Ms. Herman?  I can't --

22         **COURTROOM DEPUTY:**  Yeah.

23         **THE COURT:**  The new court reporter -- I mentioned

24    Sara Wick, earlier today.  This is Lorraine Herman.  Do you

25    recognize her?

1          **PROSPECTIVE JUROR:**  I don't.

2          **THE COURT:**  Okay.  I just wanted to make sure you

3     didn't know her.

4          You also put a question mark next to -- oh, number

5     7, whether you still live in D.C.

6          **PROSPECTIVE JUROR:**  I am.  I am a permanent

7     resident, but -- I mean, I used to be 12 months permanent

8     but I travel more now.  So our daughter is in California.

9          **THE COURT:**  So you're gone a lot.

10          **PROSPECTIVE JUROR:**  Well, a few months a year but

11     mostly here still.

12          **THE COURT:**  But your residence, for purposes of,

13     you know, voting and driving and all of that is here in

14     D.C.?

15          **PROSPECTIVE JUROR:**  Yes.

16          **THE COURT:**  You don't have another residence you

17     spend most of the year?

18          **PROSPECTIVE JUROR:**  No, mostly here.

19          **THE COURT:**  All right.  And you mention that you

20     either are a lawyer or know a lawyer?

21          **PROSPECTIVE JUROR:**  No, I'm not a lawyer.  My

22     niece is a lawyer.

23          **THE COURT:**  What kind of lawyer is your niece?

24          **PROSPECTIVE JUROR:**  She's -- I think you'd call it

25     a corporate lawyer.  She works for -- she used to work for

1    Hogan.  I think -- I don't know what she does, but I think

2    it's mostly she works with pharmaceutical companies.

3                **THE COURT:**  Do you talk about the law with her

4    any?

5                **PROSPECTIVE JUROR:**  No.  No.

6                **THE COURT:**  All right.  So you put a question mark

7    on the timing and said this might be an extreme hardship for

8    you to serve.

9                **PROSPECTIVE JUROR:**  Well, we are about to be

10   grandparents.  So the baby is due at the end of May.  So I

11   will be wanting to go to California.

12               **THE COURT:**  Oh, great.  I hope we are not here.

13               **PROSPECTIVE JUROR:**  I didn't catch the timing.

14               **THE COURT:**  We hope to be here about a week for

15   the evidence, and then the jury will deliberate.  It should

16   not be a problem.

17               **PROSPECTIVE JUROR:**  Yeah.

18               **THE COURT:**  All right.  Anything further,

19   Ms. Berkower?

20               **PROSPECTIVE JUROR:**  I should also mention that my

21   husband's English, and his family all lives in France;

22   that's why we spend quite a bit of time there.  We are

23   supposed to be there in April.

24               **THE COURT:**  All right.  Thank you.  I suspect that

25   this will be over in a couple of weeks.  It should not be a

1   problem.

2           Ms. Berkower.

3           **MS. BERKOWER:**  Good afternoon.

4           **PROSPECTIVE JUROR:**  Good afternoon.

5           **MS. BERKOWER:**  Just to clarify.  You said you were

6   out of the country on the day of January 6th.

7           **PROSPECTIVE JUROR:**  Correct.

8           **MS. BERKOWER:**  Where were you?

9           **PROSPECTIVE JUROR:**  In France.

10          **MS. BERKOWER:**  In France.  Okay.

11          And did you return to the district shortly after

12   or was it sometime after?

13          **PROSPECTIVE JUROR:**  No.  It was COVID at the time.

14   So we were afraid to travel.  So, actually -- I mean, it was

15   extraordinarily, actually.  We stayed longer in France than

16   we ever stayed.  It's near a village and we felt safe so we

17   just stayed there.

18          **MS. BERKOWER:**  So no inconvenience to you getting

19   back?  It didn't disrupt your plans or anything like that?

20          **PROSPECTIVE JUROR:**  We didn't get back quite a bit

21   later until we were vaccinated because I didn't want to

22   travel.

23          **MS. BERKOWER:**  Understood.

24          Do you currently work?

25          **PROSPECTIVE JUROR:**  No, I'm retired.

1          **MS. BERKOWER:**  What are you retired from?

2          **PROSPECTIVE JUROR:**  I was an economist at the

3    World Bank for many years.

4          **MS. BERKOWER:**  An economist at the World Bank.  Is

5    there an area -- like a country that you specialized in?

6          **PROSPECTIVE JUROR:**  Macro economics and trade

7    economics, basically.

8          **MS. BERKOWER:**  And how long have you been retired

9    for?

10         **PROSPECTIVE JUROR:**  Well, then I consulted for

11   quite a while until 2011.  So since 2011.  About 11 years.

12         **MS. BERKOWER:**  Understood.  All right.  Thank you,

13   ma'am.

14         **THE COURT:**  Mr. Welch?

15         **MR. WELCH:**  No questions.  Thank you.

16         **THE COURT:**  All right.  Thank you.  Thank you,

17   ma'am.  Appreciate your time.

18              (Prospective juror steps down.)

19         **THE COURT:**  All right.  The next juror is 1240.

20   He answered yes to 18, 22 and 25.  So I will start with 22

21   and 25.

22         **COURTROOM DEPUTY:**  Juror 1240.

23         **THE COURT:**  Good afternoon, sir.

24         **PROSPECTIVE JUROR:**  Good afternoon.

25         **THE COURT:**  If you are comfortable taking your

1    mask off, would you please?

2              **PROSPECTIVE JUROR:**  Sure.

3              **THE COURT:**  All right.  Before I forget, I want to

4    ask you to take a look at the court reporter.  Her name is

5    Lorraine Herman.  Do you recognize her?

6              **PROSPECTIVE JUROR:**  No.

7              **THE COURT:**  Okay.  You have answered yes to the

8    question about whether serving on this jury would present an

9    extreme hardship to you.  Is that an answer you feel

10   comfortable giving in public?

11             **PROSPECTIVE JUROR:**  No.

12             **THE COURT:**  All right.  So I'll ask you to pick up

13   the headset and push the button down.

14             (Sealed sidebar discussion.)

15             **THE COURT:**  ███████████████████████████████

16   ████████████████████████

17             **PROSPECTIVE JUROR:**  ██████████████████████

18   ██████████████████████████

19             **THE COURT:**  ██████████████████████████████████

20   ████████████████████████████████████

21   ███████████████████████████████████

22   ██████████████████

23             **PROSPECTIVE JUROR:**  ████████████████████████

24   ████████████████

25             **THE COURT:**  ███████████████████████████████████



1 ████████████████████████

2      **PROSPECTIVE JUROR:** ████████████████

3          **THE COURT:** ████████████████████

4 ████████████████████

5      **PROSPECTIVE JUROR:** ████████████████████

6 ████

7          **THE COURT:** ████████████████

8      **PROSPECTIVE JUROR:** ████

9      **MS. BERKOWER:** ████████████████████

10 ████████████████████

11         **THE COURT:** ████████████

12     **PROSPECTIVE JUROR:** ████████████████████

13 ████████████████

14         **THE COURT:** ████████████████████

15 ████████████████████████

16     **PROSPECTIVE JUROR:** ██████

17         (Sealed sidebar discussion concluded.)

18         **THE COURT:**  You may be excused.  Thank you, sir.

19         (Prospective juror steps down.)

20         **MS. BERKOWER:**  Your Honor, for the record, the

21 government will strike him for cause for some of the reasons

22 that were being explained.

23         **THE COURT:**  Right.  And I think that is a joint

24 motion; is that right, Mr. Welch?

25         **MR. WELCH:**  It is.

1          **THE COURT:**  All right.  So I will strike juror

2     1240 for cause.

3          The next juror is 1081.  This juror has answered

4     yes to 1, 3, 4 and 19.

5          **COURTROOM DEPUTY:**  Juror 1081.

6          (Prospective juror steps up.)

7          **THE COURT:**  Good afternoon, sir.

8          **PROSPECTIVE JUROR:**  Good afternoon.

9          **THE COURT:**  If you feel comfortable taking off

10    your mask, please do.

11         **PROSPECTIVE JUROR:**  Sure.

12         **THE COURT:**  Before I forget, let me ask you -- I

13    forgot to mention that the court reporter in the afternoon

14    would be Ms. Lorraine Herman.  She is sitting here.  Do you

15    recognize her?

16         **PROSPECTIVE JUROR:**  I do not.

17         **THE COURT:**  All right.

18         You stated, yes, you live or you work near the

19    U.S. Capitol.

20         **PROSPECTIVE JUROR:**  I live on H Street northeast.

21    So not super close but --

22         **THE COURT:**  Were you there on January 6th?

23         **PROSPECTIVE JUROR:**  No, I work in Maryland.  I

24    drove back roughly around 4 or 5:00, once news started to --

25    I work in a secure environment.  So I didn't get news until

1    later in the day.

2              **THE COURT:**  All right.  Were you inconvenienced

3    coming back to Capitol Hill because of those events?

4              **PROSPECTIVE JUROR:**  No, it was pretty empty coming

5    in.

6              **THE COURT:**  I'm sorry?

7              **PROSPECTIVE JUROR:**  It was pretty empty coming in.

8              **THE COURT:**  All right.  No streets closed around

9    you?

10             **PROSPECTIVE JUROR:**  Nope.

11             **THE COURT:**  All right.

12             You also mentioned that you have seen news related

13   to the events of January 6 and to some individuals.  Does

14   that include any news about the defendant in this case,

15   Mr. Reffitt?

16             **PROSPECTIVE JUROR:**  Yes, I saw a news story

17   yesterday that the first trial was proceeding.

18             **THE COURT:**  Okay.  Did you read that article?

19             **PROSPECTIVE JUROR:**  No.

20             **THE COURT:**  Have you heard any other news about

21   him in particular?

22             **PROSPECTIVE JUROR:**  No.

23             **THE COURT:**  Have you tracked, followed other

24   individuals who are accused of crimes related to the January

25   6th events?

1              **PROSPECTIVE JUROR:**  Yes.  I'd say I followed

2    relatively closely, watched a documentary or two.

3              **THE COURT:**  You followed what?

4              **PROSPECTIVE JUROR:**  Followed the news surrounding

5    it and people that have been arrested relatively closely,

6    yes.

7              **THE COURT:**  And do you seek that news out or do

8    you read it in your normal review of news on a daily or

9    weekly basis?

10             **PROSPECTIVE JUROR:**  Probably depends on the time

11   of year and general news cycle.  I watched the HBO

12   documentary about it.  I think it was called "Four Hours at

13   the Capitol".

14             **THE COURT:**  Can you tell us about that

15   documentary?

16             **PROSPECTIVE JUROR:**  It detailed, kind of like --

17   you know, in real -- kind of, like, time-line fashion, the

18   events of the day, with eyewitness accounts.

19             **THE COURT:**  Eyewitness accounts of officers?

20             **PROSPECTIVE JUROR:**  From what I remember, yeah.  I

21   think a few other people but that was -- I think a few

22   Congressional staffers as well.  Now that I am remembering.

23             **THE COURT:**  All right.  Did you not see -- was

24   Mr. Reffitt in that documentary, as far as you recall?

25             **PROSPECTIVE JUROR:**  Not that I recall, no.

1          **THE COURT:**  All right.  Any family members of

2     individual rioters in that documentary?

3          **PROSPECTIVE JUROR:**  Nope.

4          **THE COURT:**  Do you follow any podcasts or social

5     media that focuses in particular on the events of January

6     6th?

7          **PROSPECTIVE JUROR:**  No.

8          **THE COURT:**  Is there anything about what you've

9     seen in the news, whether it's the HBO documentary or

10    anything else, is there anything at all that has resulted in

11    a strong feeling one way or the other about the events of

12    January 6th?

13         **PROSPECTIVE JUROR:**  I think the events of January

14    6th is probably a generalization that I wouldn't be

15    comfortable with in terms of saying "strong feelings."  I

16    have strong feelings about the politics surrounding the

17    events.

18         **THE COURT:**  What do you mean about that?

19         **PROSPECTIVE JUROR:**  I mean -- I think it was

20    probably the greatest affront to democracy that our country

21    has seen and certainly within, you know, our current era.

22    But I think it was, you know, a largely,

23    politically-directed event.  And I separate that from the

24    subsequent kind of collective action that resulted from

25    that.

1          **THE COURT:**  Have you formed an opinion on the

2     guilt of any of the individuals involved in the January 6th

3     events?

4          **PROSPECTIVE JUROR:**  Just the former president and

5     Rudy Giuliani, and I would say that's it.

6          **THE COURT:**  But none of the individuals who were

7     actually at the Capitol that day rioting?

8          **PROSPECTIVE JUROR:**  No.

9          **THE COURT:**  And what about if those individuals

10    shared some of the political views of the former president

11    or Mr. Giuliani, how --

12         **PROSPECTIVE JUROR:**  I think -- oh, sorry.

13         **THE COURT:**  I'm wondering whether that would

14    influence your view in any way of the evidence that you

15    would hear in this case, if you were to serve as a juror?

16         **PROSPECTIVE JUROR:**  I don't think it's a matter of

17    political views, but instead actual action taken or not

18    taken.

19         **THE COURT:**  All right.

20         As you sit here now, are you leaning in favor of

21    one side or the other, based on what you've seen and heard

22    about the events of January 6th?

23         **PROSPECTIVE JUROR:**  No.  I think everyone is

24    entitled to a judicious review of the facts at hand.  Like I

25    said, I think I am capable to judge the actions of several

1      people on that day, with a greater degree of granularity and

2      understanding than, you know, kind of the more condensed

3      collective action that was taken afterwards.  So I'd

4      certainly like to think that I would approach it with a fair

5      and judicious mind.

6                  **THE COURT:**  You heard me read some instructions

7      earlier this afternoon like the one about the presumption of

8      innocence under the law.  Mr. Reffitt, the defendant here is

9      presumed innocent.  Would you have any difficulty in

10     applying that instruction?

11                 **PROSPECTIVE JUROR:**  I don't believe I would, no.

12                 **THE COURT:**  Or the instruction that it's the

13     government's burden to prove its case beyond a reasonable

14     doubt?

15                 **PROSPECTIVE JUROR:**  I would not, no.

16                 **THE COURT:**  You also state that you either are a

17     lawyer or know lawyers or both?

18                 **PROSPECTIVE JUROR:**  Yeah, my dad was a lawyer.

19                 **THE COURT:**  What kind of a lawyer was he?

20                 **PROSPECTIVE JUROR:**  He was a public defendant

21     (sic).

22                 **THE COURT:**  Represented defendants, criminal

23     defendants?

24                 **PROSPECTIVE JUROR:**  Correct.  Yeah.  Mostly in

25     juvenile defense.

1          **THE COURT:**  All right.  Did you talk to him about

2    his cases?

3          **PROSPECTIVE JUROR:**  No, he passed away in 2015.

4          **THE COURT:**  All right.  But before then, did you

5    have conversations with him about the law?

6          **PROSPECTIVE JUROR:**  Yeah, naturally.

7          **THE COURT:**  Would you be able to put aside

8    anything you think you know about the law from those

9    conversations and decide this case based solely on the

10   instructions I give you?

11         **PROSPECTIVE JUROR:**  I'm acutely aware that I am

12   not a trained lawyer.

13         **THE COURT:**  I'm sorry?

14         **PROSPECTIVE JUROR:**  I'm sorry.  I am acutely aware

15   that I am not a trained lawyer or student of the law so --

16         **THE COURT:**  All right.  So you could follow my

17   instructions?

18         **PROSPECTIVE JUROR:**  Yeah.

19         **THE COURT:**  All right.

20         I think that you -- am I correct that you're

21   employed at DOD?

22         **PROSPECTIVE JUROR:**  That is correct.

23         **THE COURT:**  Anything about your employment for the

24   federal government might make you favor the federal

25   government, the U.S. Attorney's Office in this case?

1              **PROSPECTIVE JUROR:**  I would say, no.

2              **THE COURT:**  All right.  I'm sorry go ahead.  Go

3      ahead.

4              **PROSPECTIVE JUROR:**  My job doesn't have a law

5      enforcement component.  I am an Arabic linguist, which is

6      extremely specialized so --

7              **THE COURT:**  You are a what linguist?

8              **PROSPECTIVE JUROR:**  Arabic.

9              **THE COURT:**  All right.  Okay.

10             Ms. Berkower?

11             **MS. BERKOWER:**  Good afternoon.

12             **PROSPECTIVE JUROR:**  Good afternoon.

13             **MS. BERKOWER:**  I just wanted to follow up on one

14     of the things you said a few moments ago.  You said that you

15     make a distinction between -- you feel that there is a

16     difference between Trump and Giuliani and other people

17     involved in the events of January 6th.  So can you explain

18     what that distinction is in your mind?

19             **PROSPECTIVE JUROR:**   Yeah.  Ultimately, I think we

20     were able to watch their actions in realtime with -- I

21     wasn't in realtime, but it happened in realtime.  I think

22     their actions are quite clear to everyone in terms of what

23     their intent was and the extent to which they were, you

24     know, making a conscious decision to do that.

25             I don't think it's necessarily fair to then say,

1    like, any -- by watching footage that you can judge the

2    actions of any individual amongst a group of thousands, you

3    know, just based off the news.  Right?  I think based off

4    the news you can certainly glean more specificity from the

5    actions of Trump and Giuliani and other people that were on

6    stage.

7          **MS. BERKOWER:**  So what you are saying is that you

8    feel like you have more information about them because you

9    saw what they were doing in realtime versus what other

10   people were doing in realtime?

11         **PROSPECTIVE JUROR:**  That's a much more succinct

12   way of saying it, yes.

13         **MS. BERKOWER:**  I see.  Okay.  That makes sense.

14         Would it be your opinion that you would look to

15   the evidence in the case about the particular individuals'

16   intentions and what brought them there?

17         **PROSPECTIVE JUROR:**  Correct.  Yeah.

18         **MS. BERKOWER:**  Okay.  All right.

19         And last thing, with regard to your father's

20   former profession, did you ever consider being a lawyer or a

21   public defender yourself?

22         **PROSPECTIVE JUROR:**  I mean, you know, I was a Poli

23   Sci major.  It certainly kind of crossed my mind.  He

24   generally tried to stear me away from that direction.

25         **MS. BERKOWER:**  Oh, really?  Why so?

1          **PROSPECTIVE JUROR:**  He didn't find a lot of career

2    satisfaction.  He was a family lawyer before being a public

3    defendant (sic) so --

4          **MS. BERKOWER:**  Any negative feelings one way or

5    the other about the criminal justice system based on, sort

6    of, him steering you away from it?

7          **PROSPECTIVE JUROR:**  No.  No, not particularly.

8          **MS. BERKOWER:**  Okay.  Thank you.

9          **THE COURT:**  Mr. Welch?

10         **MR. WELCH:**  No questions.  Thank you.

11         **THE COURT:**  All right.  Thank you, sir.  You are

12   excused.

13         **PROSPECTIVE JUROR:**  Thank you.

14         (Prospective juror steps down.)

15         **THE COURT:**  The next juror is 0464.  He answered

16   yes to 1, 2, 3, 4, 5.

17         **COURTROOM DEPUTY:**  Juror number 0464.

18         (Prospective juror steps up.)

19         **THE COURT:**  Good afternoon, sir.

20         **PROSPECTIVE JUROR:**  Good afternoon.

21         **THE COURT:**  If you feel comfortable taking off

22   your mask, please do.

23         **PROSPECTIVE JUROR:**  Sure.

24         **THE COURT:**  You answered yes to the question I

25   asked about living or working by the Capitol.

1          **PROSPECTIVE JUROR:**  Yes.  I work for the Architect

2     of the Capitol.

3          **THE COURT:**  Really?  You are the second -- the

4     second person who works for the Capitol.  How long have you

5     worked there?

6          **PROSPECTIVE JUROR:**  About six years.

7          **THE COURT:**  All right.  Were you working at the

8     Capitol on January 6th?

9          **PROSPECTIVE JUROR:**  I was not at the Capitol on

10    January 6th, but I was on site not long thereafter.

11         **THE COURT:**  And I take it that I heard from the

12    folks you worked with at the Capitol about the events of

13    January 6th?

14         **PROSPECTIVE JUROR:**  Yes.

15         **THE COURT:**  Did you learn information, specific

16    information, from them that's beyond what's reported in the

17    papers, generally?

18         **PROSPECTIVE JUROR:**  Yes.

19         **THE COURT:**  Can you tell us the type of

20    information you learned?

21         **PROSPECTIVE JUROR:**  Well, I work very closely with

22    the Capitol Police.  I know an officer who was there at the

23    Capitol on that day and he was actually assaulted.

24         **THE COURT:**  And you work closely with these

25    Capitol officers or you know them well from your time at the

1    Capitol?

2              **PROSPECTIVE JUROR:**  I work with them regularly,

3    yeah.  I know them pretty -- fairly well, yeah.

4              **THE COURT:**  All right.  You did also state that

5    you have such strong feelings or opinions about the events

6    that occurred at the Capitol on that date, that you think

7    you can't put them aside and serve as a fair and impartial

8    juror in this case?  Is that true?

9              **PROSPECTIVE JUROR:**  Well, my job is to maintain

10   those buildings.  And to see them damaged in that way, it

11   was pretty hard.

12             **THE COURT:**  Have you worked on some of the

13   property damage related to the January 6th events?

14             **PROSPECTIVE JUROR:**  Um, no.  I was -- I work at

15   the library.  So I'm right next door to the Capitol.

16             **THE COURT:**  The Library of Congress.

17             **PROSPECTIVE JUROR:**  The Library of Congress;

18   that's correct.

19             **THE COURT:**  So you were not actually in the

20   building that day.  You were working remotely or just off

21   that day?

22             **PROSPECTIVE JUROR:**  I was working remotely on that

23   day.  But, as you know, the fencing around it affected one

24   of my projects for several months afterwards.

25             **THE COURT:**  All right.  Given all of that, would

1    it be hard for you, if you were selected as a juror, to come

2    in here and start from a neutral position in this case?

3            PROSPECTIVE JUROR:  I think it would be possible

4    though.  I mean -- you do get emotionally invested in your

5    work and the work of your organization.  But I think I could

6    potentially do it, yeah.

7            THE COURT:  Is your reservation related to the

8    property damage or something broader than that?

9            PROSPECTIVE JUROR:  It's related to the damage to

10   the building in terms of -- I work with historic

11   preservation and know that once that material is damaged --

12   I mean, it's gone.  It can't really be recreated.  Does that

13   make sense?

14           THE COURT:  No, I understand completely.

15           PROSPECTIVE JUROR:  Okay.

16           THE COURT:  And I'm just wondering based on what

17   you know about what happened that day, either from the news

18   or secondhand or firsthand, based on what you saw in terms

19   of the damage, whether you formed any opinion as to the

20   guilt or innocence of any of those individuals?

21           PROSPECTIVE JUROR:  Um -- well, I don't know

22   anything of the defendant.  I mean, I do have opinions about

23   -- about -- I mean, I kept up on the story, obviously,

24   because of my work and followed it pretty closely for, you

25   know, the several months afterwards.

1          **THE COURT:**  You mean the story being the events at

2     the Capitol in general as opposed to this case,

3     Mr. Reffitt's case?

4          **PROSPECTIVE JUROR:**  Exactly.  Yeah, in general.

5          **THE COURT:**  All right.  So you followed it pretty

6     closely.  By that you mean you sought out information about

7     it or did you just read the headlines that popped up in the

8     news you typically read on a daily basis?

9          **PROSPECTIVE JUROR:**  I sought out information about

10     it.

11          **THE COURT:**  I'm sorry?

12          **PROSPECTIVE JUROR:**  I sought out information about

13     it.  I was curious.  Any news articles that I would read, I

14     wanted to learn --

15          **THE COURT:**  What kind of sources do you read?

16          **PROSPECTIVE JUROR:**  Primarily MSN, is what I

17     usually read in terms of the news.

18          **THE COURT:**  Do you follow any -- did you follow

19     any podcasts or blogs or any social media about this?

20          **PROSPECTIVE JUROR:**  No.  No, I did not.

21          **THE COURT:**  All right.

22          You understand that as Mr. Reffitt sits here, as I

23     said already today, he's presumed innocent.

24          **PROSPECTIVE JUROR:**  Understood.

25          **THE COURT:**  Would you have any problem applying

1      that instruction or the instruction that it's the

2      government's burden to prove the case beyond a reasonable

3      doubt.  And unless and until it does, he cannot be convicted

4      of any offenses?

5              **PROSPECTIVE JUROR:**  No, I would presume him

6      innocent until I heard the case.

7              **THE COURT:**  I'm sorry?  Can I ask you to keep your

8      voice up.

9              **PROSPECTIVE JUROR:**  I'm sorry.  I would presume

10     him innocent until I heard the case.

11             **THE COURT:**  And you think that you can set aside

12     your -- both your knowledge about what happened at the

13     Capitol, your firsthand knowledge, as well as your feelings

14     about that and give him a fair trial?

15             **PROSPECTIVE JUROR:**  I think I can.  I think I can

16     do my best, yes.

17             **THE COURT:**  You paused.

18             **PROSPECTIVE JUROR:**  Yes.  I will say, yes.

19             **THE COURT:**  I'm not trying to push you one way or

20     the other.

21             **PROSPECTIVE JUROR:**  I understand.

22             **THE COURT:**  You did pause and seemed to struggle

23     to answer that question.  What were you thinking while you

24     were considering the answer?

25             **PROSPECTIVE JUROR:**  I think -- I mean, I have

1    feelings about what happened that day, but none of them are

2    in relation to the defendant, if that --

3              **THE COURT:**  So none of them are in relation to

4    Mr. Reffitt?

5              **PROSPECTIVE JUROR:**  Exactly.

6              **THE COURT:**  All right.  And tell me in particular

7    what you know about the damage that was done that day?

8              **PROSPECTIVE JUROR:**  Um I -- I have not been inside

9    of the Capitol since January 6th, 2021.  I do know multiple

10   Capitol police officers.  And I know that they, you know,

11   had both physical and -- there is some physical and

12   emotional trauma as a result of what they went through on

13   that day.

14             So I think what I can -- beyond the news and

15   beyond what is common knowledge, I can only, kind of, speak

16   more speak to, like, the human toll.  If that makes sense.

17             **THE COURT:**  Certainly.

18             But given these relationships that you have with

19   Capitol police officers who were assaulted on that day, will

20   that make you -- make it difficult for you here, not to

21   bring those feelings into this case as well, if you hear

22   about any sort of harm to any Capitol police officer?

23             **PROSPECTIVE JUROR:**  Um -- I think -- it would make

24   it difficult, to be honest.  Just from knowing these people

25   and working with them.  I think --

1          **THE COURT:**  I appreciate your honesty.

2    Ms. Berkower?

3          **MS. BERKOWER:**  Good afternoon.

4          **PROSPECTIVE JUROR:**  Good afternoon.  How are you?

5          **MS. BERKOWER:**  So I just want to follow up on what

6    Judge Friedrich just asked you.  She asked you if it would

7    -- I think you said it would make it difficult -- knowing

8    the police officers, the Capitol police officers that you

9    know, would make it difficult to put what they've told you

10   out of your mind in the jury room.  Did I understand that to

11   be what you were saying?  Is that right?

12         **PROSPECTIVE JUROR:**  That's correct.  Yes.

13         **MS. BERKOWER:**  Okay.  So would you be unable to do

14   it, if you were instructed to do so by the judge?

15         **PROSPECTIVE JUROR:**  I wouldn't say unable.  But, I

16   mean, it would not be -- it's not an easy yes or no, but I

17   would not say unable.

18         **MS. BERKOWER:**  Does that mean you would be able?

19         **PROSPECTIVE JUROR:**  I would be able.  I will say I

20   would be able.

21         **MS. BERKOWER:**  And the Architect of the Capitol;

22   is that -- about how many people work for the Architect of

23   the Capitol?

24         **PROSPECTIVE JUROR:**  I'm not sure of the exact

25   number but it's a lot.  We maintain at least a dozen

1    buildings on Capitol Hill, including the Capitol, and some

2    satellite locations as well.  I would say 10,000 perhaps.

3         **MS. BERKOWER:**  Several thousands you said?

4         **PROSPECTIVE JUROR:**  Ten was my estimate.  Several

5    thousand.

6         **MS. BERKOWER:**  Okay.  And what is your specific

7    job with the Architect of the Capitol?

8         **PROSPECTIVE JUROR:**  My title is general engineer.

9    I am an architect by training.  I basically manage

10   construction projects on -- for the library, as well as

11   other accessibility, life safety issues.

12        **MS. BERKOWER:**  And so you said you work at the

13   Library of Congress.  Does that mean you are assigned to

14   that building or do you work at other buildings as well?

15        **PROSPECTIVE JUROR:**  I work at the Library of

16   Congress.  I am in the library, buildings and grounds

17   jurisdiction.

18        **MS. BERKOWER:**  Have you ever worked on the Capitol

19   building itself or been assigned there?

20        **PROSPECTIVE JUROR:**  I have done a few small

21   projects there.  I worked on the Cannon House Office

22   Building for about three years.  I did a couple of small

23   projects in the Capitol building.  But I've been pretty much

24   solely at the library buildings and grounds for the past

25   three and a half years.

1        **MS. BERKOWER:**  Did you say you don't think you've

2   done a project in the Capitol building for how long?

3        **PROSPECTIVE JUROR:**  It's probably been four or

4   five years.

5        **MS. BERKOWER:**  All right.  So most of your time --

6   you said you worked there for six years.  Most of your time

7   has been with the Library of Congress.

8        **PROSPECTIVE JUROR:**  Between the Cannon Building

9   and the Library of Congress.

10       **MS. BERKOWER:**  And that is not the Capitol itself;

11  that's a separate building?  The Cannon Building?

12       **PROSPECTIVE JUROR:**  It is, yes.

13       **MS. BERKOWER:**  Okay.  And in terms of putting

14  aside the things that you know from police officers you've

15  spoken with and colleagues or other folks who work at the

16  Capitol, I think you said it would be difficult, but you

17  would be able to do it.  How confident are you that you

18  would be able to do it?

19       **PROSPECTIVE JUROR:**  Um, it's a hard question to

20  answer without knowing all of the facts of the case.  But I

21  would say that I would -- I do believe in everyone getting a

22  fair trial.  So I would -- I think I would be able to do it,

23  yes.

24       **MS. BERKOWER:**  Thank you.

25       **THE COURT:**  Mr. Welch, any questions?

1          MR. WELCH:  Yes, please.

2          Sir, a friend of yours was injured on January 6th

3   at the Capitol; is that right?

4          PROSPECTIVE JUROR:  One of my colleagues -- one of

5   the people I work closely with, yes.

6          MR. WELCH:  And were there more than just the one

7   friend who were injured or just one?

8          PROSPECTIVE JUROR:  He is the only person I know

9   who -- know fairly well, who was injured.

10          MR. WELCH:  And that person is a Capitol police

11   officer.  Correct?

12          PROSPECTIVE JUROR:  That is correct.

13          MR. WELCH:  And if the evidence in this case were

14   to involve you listening to other Capitol police officers

15   talk about their experiences that day, wouldn't that remind

16   you about what happened to your friend?

17          PROSPECTIVE JUROR:  I think it would, yes.

18          MR. WELCH:  And wouldn't being reminded about what

19   happened to your friend make it very difficult to just

20   ignore that and set it aside?

21          PROSPECTIVE JUROR:  Um, I -- yeah, I think that is

22   -- I think that is not unreasonable, yes.

23          MR. WELCH:  Your work was also directly affected

24   by the events on January 6th; is that right?

25          PROSPECTIVE JUROR:  The -- my work was directly

1       affected by the aftermath of those events.

2              MR. WELCH:  A project that you were handling was

3       delayed.  Correct?

4              PROSPECTIVE JUROR:  That's correct.

5              MR. WELCH:  How long was it delayed?

6              PROSPECTIVE JUROR:  Over two months.

7              MR. WELCH:  Was that frustrating to you?

8              PROSPECTIVE JUROR:  It was, yes.

9              MR. WELCH:  Would hearing about the events of

10      January 6th remind you about that frustration?

11             PROSPECTIVE JUROR:  I think I could put that

12      aside, as the project has been completed.  It's kind of in

13      the past and it's -- so I think I would be fine in that

14      regard.

15             MR. WELCH:  But it would be much harder to put

16      aside the injuries that your friend suffered as a result of

17      the events on January 6th, wouldn't it?

18             PROSPECTIVE JUROR:  He did not receive any lasting

19      injuries.  I mean, he is a very tough person.  So -- but I

20      do work very closely with the Capitol Police and I do have a

21      lot of respect for them.  It wouldn't be the easiest thing

22      to remain completely emotionally distant from that.

23             THE COURT:  Okay.  Mr. Welch, do you have any

24      other questions?

25             MR. WELCH:  One moment of the Court's indulgence.

1    I want to talk to my client.

2            (Discussion off the record between Mr. Welch and

3    Mr. Reffitt.)

4            **MR. WELCH:**  Thank you, Your Honor.  No further

5    questions.

6            **THE COURT:**  All right.  Thank you, sir.

7            **PROSPECTIVE JUROR:**  Thank you.

8            (Prospective juror steps down.)

9            **THE COURT:**  Any motion?

10           **MR. WELCH:**  No, Your Honor.

11           **THE COURT:**  No motion?  Okay.

12           Any motion by the government?

13           **MS. BERKOWER:**  No, Your Honor.

14           **THE COURT:**  All right.  Number -- the next juror

15   is 1054.  The questions are -- the yes answers are 1, 3, 4,

16   6, 15, 18, 22.

17           **COURTROOM DEPUTY:**  Juror 1054.

18           (Prospective juror steps up.)

19           **THE COURT:**  Good afternoon, sir.

20           **PROSPECTIVE JUROR:**  Good afternoon.

21           **THE COURT:**  If you are comfortable taking off your

22   mask, could you please?

23           **PROSPECTIVE JUROR:**  Certainly.

24           **THE COURT:**  All right.  I want to review some of

25   your yes answers.  The first I want to start with is the one

1      where you said it would be an extreme hardship to serve.  Do

2      you feel comfortable answering publicly why that might be?

3                     **PROSPECTIVE JUROR:**  Um, yes, I can.

4             The reason it's a little bit difficult at this

5      particular point in time is because I have an aging parent

6      -- actually both of my parents -- in Colorado that I am

7      caring for long distance.  I am conservator for my father

8      who has a mental illness, and my mother was recently

9      diagnosed with dementia.  I am administering both of their

10     affairs from afar.

11                    **THE COURT:**  How do you do that from afar?

12                    **PROSPECTIVE JUROR:**  I make frequent trips out

13     there.  As a matter of fact, I have one scheduled for next

14     week.

15                    **THE COURT:**  Oh, I see.  So you are not actually

16     managing from here but you are traveling frequently.

17                    **PROSPECTIVE JUROR:**  Well, I do manage it from here

18     and then I pay their bills.  And we have caregivers at the

19     house that I check in with daily in terms of how things are

20     progressing.

21                    **THE COURT:**  So when you are not there, they are

22     not alone?

23                    **PROSPECTIVE JUROR:**  They are not alone.  Right.

24     We have a live-in caregiver at the house.

25                    **THE COURT:**  Is there any specific reason why next

1    week it's important for you to go or is it just your

2    periodic check-in?

3            PROSPECTIVE JUROR:  Very good question.  The 11th

4    happens to be my mother's 89th birthday.  And I have been

5    going out there every year for the past 30 years to

6    participate in that.

7            THE COURT:  All right.  Any other reasons?

8            PROSPECTIVE JUROR:  Nope.

9            THE COURT:  All right.  Let me review some of your

10   other answers with you.  You say that you live or work near

11   the Capitol; is that right?

12           PROSPECTIVE JUROR:  That's correct.

13           THE COURT:  Which one?

14           PROSPECTIVE JUROR:  I live here near the Capitol.

15           THE COURT:  And where -- how close to the Capitol?

16           PROSPECTIVE JUROR:  I'm, actually, walking

17   distance.  I'm at Fifth and K, which is about -- let's see.

18   It takes me about 10 minutes to walk down here so the

19   Capitol is, what, another five minutes from here?

20           THE COURT:  Were you at home that day?

21           PROSPECTIVE JUROR:  I was out running errands that

22   day, but I did go home on that day, yes.

23           THE COURT:  Were you inconvenienced as a result of

24   the Capitol events?

25           PROSPECTIVE JUROR:  Um -- no, I wouldn't really

1    say inconvenienced.  I was surprised.

2            THE COURT:  All right.  You say that you've heard

3    news about the Capitol events and about individuals who were

4    involved in the events at the Capitol.  Are any of those the

5    defendant, Mr. Reffitt, the defendant in this case?

6            PROSPECTIVE JUROR:  I'm sorry.  Can you repeat the

7    question?

8            THE COURT:  You said that you've seen news stories

9    about the Capitol events.  Correct?

10           PROSPECTIVE JUROR:  Correct.

11           THE COURT:  And you've also said that you've seen

12   news events about specific individuals who were involved in

13   the Capitol events; that is right also?

14           PROSPECTIVE JUROR:  That's correct.

15           THE COURT:  Are of those individuals the defendant

16   in this case, Mr. Reffitt?

17           PROSPECTIVE JUROR:  It just so happens that I

18   heard about it last week or earlier this week about him.

19           THE COURT:  You did.  Do you remember what it was

20   in particular that you heard about Mr. Reffitt?

21           PROSPECTIVE JUROR:  There were a couple things,

22   actually, that I remember hearing that he did have

23   possession of a weapon; and that he was from Texas; and that

24   he actually had -- I don't know if the word threatened is

25   the appropriate word, but that he had discussed with family

1    members about turning him in.

2             **THE COURT:**  You realize that anything you've heard

3    in the news is not evidence in this case?

4             **PROSPECTIVE JUROR:**  That's correct.

5             **THE COURT:**  Beyond what you just mentioned, have

6    you heard other things specific to Mr. Reffitt?

7             **PROSPECTIVE JUROR:**  No.

8             **THE COURT:**  Have you seen anything on TV that

9    shows him or any family members?

10            **PROSPECTIVE JUROR:**  I have seen pictures of him,

11   yes.

12            **THE COURT:**  On TV?

13            **PROSPECTIVE JUROR:**  On TV.

14            **THE COURT:**  And what were those pictures showing?

15            **PROSPECTIVE JUROR:**  Um -- let's see.  I remember

16   actually one, I believe outside of the Capitol -- or there

17   were a couple he was outside of the Capitol.  And I think at

18   that time they said that he also had a weapon on him at that

19   time.

20            **THE COURT:**  I'm sorry.  I got distracted.  Can you

21   repeat your answer?

22            **PROSPECTIVE JUROR:**  No worries.

23            I remember a picture of him being seen outside of

24   the Capitol, and they said at that time he had a weapon in

25   his possession.

1          **THE COURT:**  And this is a photograph that you've

2     seen?

3          **PROSPECTIVE JUROR:**  Yes.

4          **THE COURT:**  All right.

5          You say also that you have an opinion, as you sit

6     here, about his guilt or innocence.

7          **PROSPECTIVE JUROR:**  I would say, yes, I probably

8     do.

9          **THE COURT:**  And that's based on what you've seen

10    and heard in the news?

11         **PROSPECTIVE JUROR:**  Um, that's correct.

12         **THE COURT:**  Even though you understand that's not

13    --

14         **PROSPECTIVE JUROR:**  I understand.

15         **THE COURT:**  -- it's not admissible evidence in

16    this case?

17         **PROSPECTIVE JUROR:**  Yes.

18         **THE COURT:**  But based on what you've seen and

19    heard, is it fair to say you think it would be difficult to

20    put that aside and decide this case based solely on what you

21    hear in this courtroom?

22         **PROSPECTIVE JUROR:**  I might be able to.

23         **THE COURT:**  You might?

24         **PROSPECTIVE JUROR:**  Yes.

25         **THE COURT:**  All right.  Well, our goal here, as I

1      said, is to select a neutral panel of jurors.

2              **PROSPECTIVE JUROR:**  Right.

3              **THE COURT:**  And if you are uncertain about your

4      ability to do that, it makes me wonder whether you should be

5      part of that panel.

6              **PROSPECTIVE JUROR:**  I understand.

7              **THE COURT:**  Do you have some hesitancy about

8      whether you could follow the instructions I give you in this

9      case, including the instruction that Mr. Reffitt's presumed

10     innocent unless and until proven guilty beyond a reasonable

11     doubt?

12             **PROSPECTIVE JUROR:**  No, I think I could probably

13     make a decision based upon the evidence as presented.

14             **THE COURT:**  Do you think that you could wipe the

15     slate clean and put aside what you've seen in the news?

16             **PROSPECTIVE JUROR:**  I believe I could.

17             **THE COURT:**  And that's what you've seen about the

18     photograph -- you said a photograph showing him -- you said

19     with a firearm; is that what you saw?

20             **PROSPECTIVE JUROR:**  Well, I don't remember

21     actually seeing the firearm.  But I do remember them

22     indicating that he was on the Capitol grounds with one.  The

23     photograph -- I don't think it clearly showed the actual

24     firearm.

25             **THE COURT:**  All right.  Well, what are the

1    particulars that you've heard about his communications with

2    the family members?  You said something about family members

3    turning him in.

4         **PROSPECTIVE JUROR:**  Correct.  From what I

5    remember, when he was -- I guess they were trying to round

6    up all of the people that were actively involved in the

7    incident on January the 6th, that he instructed family

8    members, I believe, to his children -- I think it might have

9    been daughters, not to notify the authorities of his

10   involvement.

11        **THE COURT:**  And having heard all of that, you

12   think you'd be able to put that aside and decide this case

13   based solely on the evidence presented in court?

14        **PROSPECTIVE JUROR:**  It might be a little bit

15   difficult, you know, when you have information in the back

16   of your mind.

17        **THE COURT:**  All right.  You also said you'd

18   struggle to follow my instruction to avoid all media and

19   research.  Can you tell me why that is?

20        **PROSPECTIVE JUROR:**  The reason is because I do

21   follow the news quite a bit from the majority of the

22   networks, the major networks.  I try to get my information

23   from, I guess, the major ones are both Fox, CNN and MSNBC.

24   So I pretty much follow all of the major networks in terms

25   of events.  Pretty much nightly it's a point for me to watch

1     pretty much all of the major networks.  So I'm -- I try to

2     be aware of what is going on.

3             **THE COURT:**  I wouldn't say you can't watch any TV

4     at all, but if something popped up on the TV about this

5     case, would you be able to leave the room?

6             **PROSPECTIVE JUROR:**  If I were on the jury, I would

7     have no choice but to, so yes.

8             **THE COURT:**  All right.

9             I'm sorry.  You don't think that you would have a

10    problem doing that?

11            **PROSPECTIVE JUROR:**  No.  If I were watching, say a

12    news article or television, and this particular case came

13    up, I would -- I know that I'd have to excuse myself from

14    watching any more of it or watching it.

15            **THE COURT:**  All right.  And you say you have --

16    either you, family members or close friends work in law

17    enforcement?

18            **PROSPECTIVE JUROR:**  Correct.

19            **THE COURT:**  Can you tell us who that is?

20            **PROSPECTIVE JUROR:**  Yes.  I have a brother and a

21    sister-in-law that were police officers.  They are now

22    retired.  And I'm a former Department of Justice employee.

23            **THE COURT:**  Anything about those relationships

24    that might make you favor one side or the other?

25            **PROSPECTIVE JUROR:**  No, I don't think so.

1          **THE COURT:**  All right.  Do you talk criminal law

2     with them?

3          **PROSPECTIVE JUROR:**  Not criminal law.  We

4     sometimes discuss some of the events that are going on.

5          **THE COURT:**  Have you talked to them about the

6     events of January 6th?

7          **PROSPECTIVE JUROR:**  We've talked about that, and I

8     did indicate before today's hearing that when I left the

9     court yesterday that I had a feeling that this might be

10    going on here right now because of -- when I walked out I

11    saw the tripods around the building.  And so I just kind of

12    said, you know, that might be what the case is that is going

13    on now.

14         **THE COURT:**  So you thought you might be coming

15    back for a case related to January 6th?

16         **PROSPECTIVE JUROR:**  That's correct.

17         **THE COURT:**  What was their reaction to that?

18         **PROSPECTIVE JUROR:**  I don't recall -- we didn't

19    discuss it in great detail, only because I happened to be

20    right here at the building as it was being discussed.  I

21    walked from my house.  And by the time I got to the building

22    I said, Yep, here are the tripods, the cameras.

23         **THE COURT:**  When you came back to the courthouse?

24         **PROSPECTIVE JUROR:**  This morning when I came in.

25    When I was walking, I was talking to my brother who happens

1    to be a retired police officer.  And I had said that this

2    might be one of the cases dealing with January 6th.  And

3    then I said, Oh, here are the tripods again.  And I said,

4    pretty much, I need to get off of the phone because I am

5    ready to enter the court.

6         **THE COURT:**  All right.  When you thought you might

7    be on a case related to January 6th, did you go home and

8    read, try to figure out what case it might be?

9         **PROSPECTIVE JUROR:**  No.  I think I pretty well

10   knew which one it might have been.

11        **THE COURT:**  And why is that?

12        **PROSPECTIVE JUROR:**  Just connecting the dots.

13        **THE COURT:**  Because you had read an article about

14   Mr. Reffitt?

15        **PROSPECTIVE JUROR:**  Just because the news stories

16   that had come up recently.  And they said, I think, that

17   there was going to be a trial.  And I just didn't know it

18   was this quickly, though.

19        **THE COURT:**  If you were to be selected as a juror

20   in this trial, and you were to determine that the government

21   did prove its case beyond a reasonable doubt, would you have

22   trouble telling these folks you have relationship with, who

23   are in law enforcement, that you voted to acquit

24   Mr. Reffitt?

25        **PROSPECTIVE JUROR:**  Would I have a problem telling

1        them that?

2                THE COURT:  Yeah.  Would it make it difficult for

3        you to vote in the way that you think the evidence

4        justifies?

5                PROSPECTIVE JUROR:  No, I don't think I have a

6        problem with that if the evidence supported it.

7                THE COURT:  So if you felt like the government

8        hadn't proven its case beyond a reasonable doubt, you could

9        vote to acquit Mr. Reffitt --

10               PROSPECTIVE JUROR:  Correct.

11               THE COURT:  -- even you --

12               PROSPECTIVE JUROR:  I might --

13               THE COURT:  -- you might have conversations with

14       police officers and others who might -- I don't know -- be

15       frustrated with that.

16               PROSPECTIVE JUROR:  Right.  I understand the

17       question.  No, I don't think I have a problem with that.

18       Like you said, it's the presentation of the evidence.

19               THE COURT:  All right.  Well, the -- a concern

20       that I am going to circle back to --

21               PROSPECTIVE JUROR:  Okay.

22               THE COURT:  -- with having you on the jury is the

23       extent to which you know or think you might know details --

24               PROSPECTIVE JUROR:  Sure.

25               THE COURT:  -- about the evidence that could come

1    forth in this case.  And whether it is realistic to think

2    that you could put aside what you've seen in the media, the

3    particular information you've heard with regard to

4    Mr. Reffitt, true or not, when you come to court to sit as a

5    juror.

6              And you did say that you think it could be

7    difficult to put that aside, and that would be essential --

8              **PROSPECTIVE JUROR:**  Sure.

9              **THE COURT:**  -- for you to be able to do that.  And

10   if you can't do that, then you really shouldn't serve as a

11   juror in this case because, you know, he's entitled to a

12   trial based solely on the evidence in the courtroom.

13             So can you -- and there's no right or wrong answer

14   here.  Just can you try to help me understand how you would

15   be looking at this if you were asked to serve as a juror?

16             **PROSPECTIVE JUROR:**  Well, I think my

17   responsibility, as indicated, would be to anything that I

18   might know -- or what I think I know, as you said -- would

19   probably be incompetent.  So by being in the actual court it

20   will give me a better picture of what really occurred versus

21   what I hear in the media.

22             **THE COURT:**  Are you going to separate what you

23   know from the media, which could be flat wrong?  Are you

24   going to be able to separate that from what you hear in the

25   courtroom?

1          PROSPECTIVE JUROR:  I think I could.

2          THE COURT:  All right.  Ms. Berkower?

3          MS. BERKOWER:  Good afternoon.

4          PROSPECTIVE JUROR:  Good afternoon.

5          MS. BERKOWER:  So to follow up on some of Judge

6   Friedrich's questions concerning the media you've seen.  I

7   want to make sure I understand.  The articles or TV stories

8   you've heard, did it speak about -- it sounds like it talked

9   about the charges; is that right?  What the charges were?

10          PROSPECTIVE JUROR:  I'm sorry.  Say it again?

11   What the charges were?

12          MS. BERKOWER:  It said he was charged with certain

13   crimes; is that right?  You said the threats, possessing the

14   gun.  Those two things?

15          PROSPECTIVE JUROR:  Um -- I'm trying to remember.

16   I think it did say that he was being charged for unlawful

17   carrying a weapon in the District of Columbia and on the

18   Capitol grounds.

19          MS. BERKOWER:  Did it go into anything other than

20   the allegations against the defendant?  Did it talk about

21   witness accounts or provide any opinion one way or the

22   another or was it just explaining that he's charged with

23   those things?

24          PROSPECTIVE JUROR:  I think it was more

25   explanations.  It wasn't like one of those talks.  It was

1    just presenting of the news.  It wasn't, like, a discussion

2    about right or wrong.

3              **MS. BERKOWER:**  So just saying, this is what he is

4    charged with.  He was from Texas.  These things are

5    happening.  Things of that nature?

6              **PROSPECTIVE JUROR:**  Correct.

7              **MS. BERKOWER:**  Did it get into any of the

8    substance of what might come in at court like photographs or

9    witness accounts or anything like that?

10             **PROSPECTIVE JUROR:**  Not that I recall.

11             **MS. BERKOWER:**  Okay.  And you said that --

12             **THE COURT:**  Wait.  Sorry to interrupt,

13   Ms. Berkower.  I just wanted to get clarification.  I

14   thought you had said earlier that you saw a photograph.

15             **PROSPECTIVE JUROR:**  I did see a photograph but it

16   didn't -- it was basically just a photograph.  They were

17   identifying who the person was and -- I guess that there was

18   going to be a hearing, that there was going to be a trial.

19             **THE COURT:**  Okay.  All right.

20             **MS. BERKOWER:**  May I proceed, Your Honor?

21             **THE COURT:**  Yeah.  Sorry.

22             **MS. BERKOWER:**  Thank you.

23             And I think you said that you had an opinion based

24   on what you saw in the news.  Can you explain what your

25   opinion was?  Is?

1     **PROSPECTIVE JUROR:**  Good question.  Apparently he

2     was carrying a weapon on the Capitol grounds, but as far as

3     any more detail, what else there might be, I couldn't

4     clarify that.

5     **MS. BERKOWER:**  So it was an opinion that he may

6     have done that based on the news account you heard?

7     **PROSPECTIVE JUROR:**  That's correct.

8     **MS. BERKOWER:**  And would you be able -- you said

9     it might be hard for you to set that aside and just listen

10    to the evidence in court, but would you be able to do it at

11    the end of the day?

12    **PROSPECTIVE JUROR:**  I think I would be able to do

13    at the end of the day.  Because, I mean, by being here in

14    the court you are getting the firsthand information, what is

15    going on as opposed to a media interpretation.

16    **MS. BERKOWER:**  And how confident are you that you

17    would be able to just do that and just listen to the

18    evidence in court?

19    **PROSPECTIVE JUROR:**  I think I am actually capable

20    of doing that.  I think I do it with a lot of family

21    situations so --

22    **MS. BERKOWER:**  All right.  Thank you.

23    **THE COURT:**  Mr. Welch?

24    **MR. WELCH:**  Good afternoon.

25    **PROSPECTIVE JUROR:**  Good afternoon.

1          MR. WELCH:  Did the photograph that you saw show

2    you the Capitol building as well or something that appeared

3    to be on the Capitol grounds?

4          PROSPECTIVE JUROR:  Yes, the Capitol building was

5    in the background.

6          MR. WELCH:  And was there only one picture or have

7    you seen multiple pictures?

8          PROSPECTIVE JUROR:  Only one that I can really

9    remember.

10          MR. WELCH:  How many news stories have you heard

11    about Mr. Reffitt?

12          PROSPECTIVE JUROR:  Within the last week I'm going

13    to say -- I think just one.

14          MR. WELCH:  And how many stories about this case

15    have you heard?

16          PROSPECTIVE JUROR:  About the case?

17          MR. WELCH:  Meaning the case pertaining to

18    Mr. Reffitt.  Whether it mentioned him by name.  You

19    mentioned hearing about a trial, and you thought it might

20    have something to do with January 6th.  So did you hear

21    another story?

22          PROSPECTIVE JUROR:  A crime?  Well, no.  I am

23    familiar with what occurred on that day.  But I don't know

24    any more about this particular individual other than they

25    said he had a gun in his possession.  As far as the actual

1   crime, I guess the crime would be if he were carrying it on

2   the Capitol grounds or even in the district.

3       **MR. WELCH:**  And as you sit here right now, are you

4   starting from the point right now, where you have an opinion

5   that Mr. Reffitt did have a gun on the Capitol grounds?

6       **PROSPECTIVE JUROR:**  No, I wouldn't necessarily say

7   that.  Because I -- again, it's just news accounts.  In the

8   picture I don't recall seeing a gun in his possession.

9       **MR. WELCH:**  Court's indulgence, please.

10      No further questions.

11      **THE COURT:**  All right.  Thank you, sir.

12      **PROSPECTIVE JUROR:**  You're welcome.

13      (Prospective juror steps down.)

14      **MR. WELCH:**  Your Honor, I have a motion for cause.

15      **THE COURT:**  All right.  Go ahead.

16      **MR. WELCH:**  Um, first thing that came up was the

17  venireman's aging parents in Colorado.  He has plans to go

18  there next week while we are going to be in trial.  He

19  attends his mother's birthday.  This will be her 89th.

20      He has given the most specific information of

21  anyone that we have heard about.  He says that he has

22  already seen pictures of Mr. Reffitt at the Capitol, which

23  is likely pictures that the media has picked up from the

24  government's evidence in the detention papers that they

25  filed.

1          He indicated at one point that he had an opinion

2     about Mr. Reffitt's guilt or innocence, as far as having a

3     gun at the Capitol.  Then he indicated he didn't have that.

4     Kind of backtracked indicating, well, he would listen to the

5     evidence and be fair, but these were things that he heard in

6     the media.

7          This sounds like someone who has already formed an

8     opinion, has already seen evidence that is supposed to be

9     presented in the case.  And there's the latent concern that

10    his mind will be elsewhere, if we keep him here, instead of

11    with his parents in Colorado for his mother's 89th birthday.

12    So for all of those reasons I move for cause.

13              **THE COURT:**  All right.  Ms. Berkower?

14          **MS. BERKOWER:**  Your Honor, we would oppose the

15    defense motion to strike this juror.

16          With regard to the conflict, we would be very,

17    very surprised if this case went through to the 11th.  That

18    is a week from Friday.  And I think, as Your Honor said,

19    it's next Friday.  I think -- we think the evidence will

20    wrap up either at the end of this week or early next week.

21    And for deliberations to go all of the way to the end of

22    that week could be unusual.

23              **THE COURT:**  You don't think the jury could

24    deliberate for three days?

25          **MS. BERKOWER:**  It's possible but I don't think

1    it's guaranteed that he would have to miss his family's

2    event.

3              But with regard to the other basis that Mr. Welch

4    cited, this juror, prospective juror, basically said that he

5    had learned in the media the same things that the Court told

6    him today about the case.  That Mr. Reffitt was from Texas;

7    that he was charged with having a gun on Capitol grounds;

8    and that he was charged with threatening his children.

9              It's pretty well-established in the case law that

10   exposure to those kinds of facts and not actually evidence

11   in the case -- I know he saw one photograph he said of

12   Mr. Reffitt at the Capitol.  But that photograph --

13   photographs of that type will certainly be coming into

14   evidence.  I think the Court has already ruled that one of

15   them will be shown in opening statement.  That in and of

16   itself is not adequate to create a bias that is preclusive

17   of the prospective juror serving.

18             This particular juror was thoughtful --

19   prospective juror -- and really gave careful answers.  I

20   think the Court was able to observe his demeanor.  And he

21   said he was confident he could set aside all of that

22   information anyway to comply with the Court's instructions.

23   And then when Mr. Welch very pointedly asked him if he was

24   starting from the position where he has an opinion that the

25   defendant has done something wrong, he said no.

1          So I would submit that this prospective juror's

2     answers certainly showed he is able to set aside any

3     opinions or other information that he has from the one news

4     story he saw about this case and serve as a fair juror here.

5          **THE COURT:**  All right.  Well, here's my concern,

6     as I said at the outset where I would be drawing lines for

7     strikes for cause, I said that those who are familiar with

8     specific facts of Reffitt's case would be struck.

9          I've reviewed the transcript.  He did indicate

10    more than just the charges.  He said that he instructed his

11    family members, I believe, to his children.  I think it may

12    have been daughters, not to notify the authorities of his

13    involvement.  That sounds more to me that he heard more than

14    a simple charge.

15         He also at one point in early -- in the exchange

16    with me said something about seeing a photo.  He didn't

17    think the gun was in there.  I can't recall whether he was

18    -- I think he was somewhat equivocal about that.  You know,

19    I am concerned given that he's heard about alleged threats

20    to children.  He's seen a photo of Reffitt at the Capitol.

21    We don't know which photo.  He's heard about the gun.

22         You know, to be consistent here, based on the

23    lines I talked about at the outset, I do think an abundance

24    of caution, despite his comments that he thinks he could be

25    capable of setting them aside, but he did -- my recollection

1    is that he did acknowledge early on that he appreciated it

2    could be difficult.  And I'm just concerned about having

3    anyone come in here with knowledge of the evidence before

4    evidence has been introduced, particularly the threats or

5    concerning the Court.  So I will strike him for cause.

6              And this is juror -- which number is this?

7         **COURTROOM DEPUTY:**  This juror is 1054.

8         **THE COURT:**  Okay.  All right.

9              Can we also -- can I have counsel pick up the

10   phone briefly to talk about another matter?

11             (Discussion at sidebar.)

12        **THE COURT:**  Can you all hear me?

13        **MR. WELCH:**  Yes, Your Honor.

14        **THE COURT:**  All right.  Mr. Welch, I don't want to

15   put you on the spot but based on what the witness -- I'm

16   sorry the juror, before this juror, and that is 0464 said

17   about the close relationships to the Capitol police officers

18   in the Capitol, and the fact that he would be thinking of

19   his friend, as well as the knowledge of the facts that he

20   had about, you know, the damage at the Capitol, the fence

21   outside and the like, I was inclined to strike that juror

22   for cause.  And, you know, I'm concerned -- if you've made a

23   conscious choice not to strike him, I just want to

24   understand where you are coming from on that.

25             I thought he really struggled when pressed about

1    whether he could be fair.  He said he thought he could do

2    so, but it looked to me like he was struggling with answers

3    to those questions.  And his body language suggested to me

4    that it would be difficult for him to not have that in his

5    mind.

6         **MR. WELCH:**  May I have a moment of the Court's

7    indulgence, please?

8              **THE COURT:**  Sure.

9              (Discussion between Mr. Welch and Mr. Reffitt off

10   the record.)

11        **MR. WELCH:**  Thank you for the Court's indulgence,

12   Your Honor.  I am going to make a motion for cause on number

13   0464.

14             **THE COURT:**  Okay.  All right.

15             For all of the reasons I've stated, Ms. Berkower

16   if you want to be heard, I will give it to you.

17             I am really concerned.  He did seem to agonize

18   when asked questions about this relationship to the officer

19   who was injured, who is a friend, that he would be thinking

20   of him.  And that's really the driver here.  In addition,

21   like I said, the -- kind of firsthand knowledge of damage at

22   the Capitol, was a secondary but not as critical of a reason

23   in my mind.  But I am concerned that he struggled to answer

24   those questions.

25             **MS. BERKOWER:**  Yes, Your Honor.  We would oppose

1    that.  That juror, prospective juror was very thoughtful.

2    He gave very thoughtful considered answers.  I understand

3    that he didn't always answer immediately and sometimes took

4    time to think about his answers.  But we would submit to the

5    Court that showed how deeply he was reflecting on it and

6    giving the Court a heartfelt, thoughtful response.

7           He was pressed numerous times on whether he felt

8    he could set his feelings aside and his beliefs aside, and

9    he said he was confident he could do it.  He said he did

10   believe in everyone getting a fair trial.  And yes, he could

11   do it when asked if he could set aside his views.

12           **THE COURT:**  All right.  You can read his reactions

13   in two ways.  One is the way you are reading it.  Another is

14   that he also takes his duty very seriously and would try

15   very hard to be fair and impartial and wouldn't want to say

16   he's going to, you know, come in here with -- leaning

17   towards the government and not holding the government to its

18   burden.

19           But it did seem to me, based on the colloquy you

20   had with him, I had with him, the defense had with him, that

21   he was really struggling in a way that makes me

22   uncomfortable about whether he could really do what he wants

23   to do.  I do think he was agonizing.  And I know there are

24   two ways to read that.  But I'm not convinced that reading

25   it the way you are reading it is correct.

1          So I will strike juror number 1081 for cause.

2          **MS. BERKOWER:**  Your Honor, I had him as 0464.

3          **MR. WELCH:**  I agree.  0464.

4          **THE COURT:**  Okay.  Sorry about that.  Yeah, to

5    correct the record, it's 0464 I will strike for cause.  I

6    will say that on the record now.

7          All right.  Thank you.

8          (Sidebar discussion concluded.)

9          **THE COURT:**  All right.  I will strike also juror

10   0464 for cause as well.

11         So we need three more jurors.  Next one up is

12   1509, who has answered yes to number 3 and number 19.

13         **MS. BERKOWER:**  Your Honor, very briefly, before we

14   bring them in, I have 0464 and 1054 were both struck for

15   cause; is that correct?

16         **THE COURT:**  That's correct.

17         **MS. BERKOWER:**  Thank you.

18         **THE COURT:**  I forgot.  Can we hold off?  I'm

19   sorry.  I get distracted and court staff is going to have to

20   remind me.  We need a break here.  Probably the rest of you

21   do too.  Please don't be shy about raising your hands.  I

22   tend to get focused and forget that people need breaks.  We

23   are going to take a 10-minute break and we will come back.

24         I think given where we are -- this is going more

25   slowly than I hoped -- I think it is unrealistic that we are

1    going to do more than finish the jury selection today.  I do

2    think we need to press on though, because I definitely want

3    to complete that today.

4              All right.  So we will be back in 10 minutes, just

5    shortly after -- 36 or 37 after.

6              **COURTROOM DEPUTY:**  All rise.

7              (Break.)

8              **COURTROOM DEPUTY:**  We still need Mr. Reffitt.

9              **THE COURT:**  Okay.  You all have the alternate

10   seats.

11             **MR. WELCH:**  Yes, thank you.

12             **MS. BERKOWER:**  The only question in our mind was

13   whether in numerical order that would be first alternate,

14   second alternate, third alternate, fourth alternate.

15             **THE COURT:**  Yes.  Do you agree, Mr. Welch?

16             **MR. WELCH:**  Yes.

17             **MS. BERKOWER:**  All right.

18             **THE COURT:**  Are you talking about the backup for

19   the alternates or the alternates as they sit in those

20   numbers you picked?

21             **MS. BERKOWER:**  For both.

22             **THE COURT:**  For both.  Right.  Are you saying if a

23   juror gets sick, would the first alternate be the lowest

24   number?

25             **MS. BERKOWER:**  Yes.

1            **THE COURT:**  Yes.  Yes.

2            **MS. BERKOWER:**  That would also be for striking

3    purposes we would be -- cause we are doing it in two

4    tranches -- oh, no?  We are doing it all at once?

5            **MR. NESTLER:**  We are doing it all at once.

6            **MS. BERKOWER:**  Never mind.

7            **THE COURT:**  Wait.  Wait.  Wait.  All the

8    alternates at once, but you are doing --

9            **MS. BERKOWER:**  Forget I said the last thing.

10           **THE COURT:**  -- but you are doing peremptories for

11   the regular jurors and then for the alternates; and that

12   will be done in one tranche.  So you can strike anyone in

13   those four seats or any of the other four, who are sitting

14   out in the audience, further out.  Right?

15           **MS. BERKOWER:**  Yes.  And if someone gets sick, it

16   will be the lowest number --

17           **THE COURT:**  Correct.

18           **MS. BERKOWER:**  Thank you.

19           **THE COURT:**  All right.  Mr. Reffitt, are you ready

20   to go?

21           **THE DEFENDANT:**  Yes, Your Honor.

22           **THE COURT:**  The next potential juror is 1590.

23   This juror answered yes to number 3 and to number 19.

24           **COURTROOM DEPUTY:**  Your Honor, 1509.

25           (Prospective juror steps up.)

1          THE COURT:  Hi, again, sir.  Sorry to keep you

2     waiting.

3          PROSPECTIVE JUROR:  No worries.

4          THE COURT:  If you are comfortable taking off your

5     mask, please do.

6          PROSPECTIVE JUROR:  Of course.

7          THE COURT:  Before I forget, I want to ask you

8     whether you recognize the court reporter.  This is someone

9     different who was in the room earlier.  Her name is Lorraine

10    Herman.  Do you know Ms. Herman?

11         PROSPECTIVE JUROR:  No, I do not.

12         THE COURT:  You answered yes to hearing news about

13    the January 6th Capitol events.  Can you share in general

14    terms what you've heard?

15         PROSPECTIVE JUROR:  Sure.  So the day of the

16    electoral vote counts, I was watching the news as the vote

17    was happening.  So I saw the events that were happening on

18    the Mall earlier that day get closer to the Capitol.  I

19    would say for probably the first week or two after January

20    6th followed the news reporting fairly closely around the

21    events.

22         THE COURT:  Do you seek out news related to the

23    Capitol events or do you just read what you see in the news

24    that you typically read?

25         PROSPECTIVE JUROR:  I probably started out the

1       first two weeks, and not as a D.C. resident, didn't have a

2       capacity to engage with the reporting.  I haven't actively

3       sought out any since then.

4              THE COURT:  What do you mean you didn't have the

5       capacity?  You mean you were just overwhelmed with the

6       amount of news or the nature of the news?

7              PROSPECTIVE JUROR:  Both.  Overwhelmed with the

8       amount of news.  It sort of consumed all of the news I

9       consume on television, in newspapers, on social media.  And

10      also it was a grave, violent situation.  So I did not want

11      to engage with that emotionally.

12             THE COURT:  All right.  So I take it you have

13      strong feelings about what you saw on the news relating to

14      the January 6th events.

15             PROSPECTIVE JUROR:  Yes.  I would say so.  I think

16      the images I saw that day were startling in that they were

17      not images like I had seen before in my life.

18             THE COURT:  Do you recall seeing any images or any

19      news about specific individuals who were involved in the

20      January 6th events?

21             PROSPECTIVE JUROR:  No.  Not to the extent that I

22      would know any names.  I have -- I primarily have followed

23      stories around elected officials, but not really anything

24      about private citizens that were present that day.

25             THE COURT:  Do you recall seeing any stories about

1    Mr. Reffitt, the defendant in this case?

2              **PROSPECTIVE JUROR:**  I do not.

3         **THE COURT:**  Do you recognize Mr. Reffitt?

4              **PROSPECTIVE JUROR:**  I do not.

5         **THE COURT:**  All right.  I'm wondering, given the

6    feelings you have about the events of January 6th, do you

7    think that you would be able to put those feelings aside, if

8    you were selected as a juror in this case, and decide this

9    case based solely on the evidence that's presented in the

10   courtroom and the instructions I give you?

11             **PROSPECTIVE JUROR:**  Yes.

12        **THE COURT:**  Do you have any hesitation about that?

13             **PROSPECTIVE JUROR:**  No.

14        **THE COURT:**  Do you understand that Mr. Reffitt, as

15   he sits here, he is innocent unless and until he is proven

16   guilty beyond a reasonable doubt?

17             **PROSPECTIVE JUROR:**  Yes.

18        **THE COURT:**  You live here in D.C.?

19             **PROSPECTIVE JUROR:**  Yes, I do.

20        **THE COURT:**  Do you live close to the Capitol?

21             **PROSPECTIVE JUROR:**  No, about two miles away.

22        **THE COURT:**  All right.

23        You also say you have a family member, a close

24   friend or you yourself is a lawyer.

25             **PROSPECTIVE JUROR:**  I am not myself.  I have

1    several close friends who are lawyers.

2              **THE COURT:**  Do you talk about the law with your

3    friends?

4              **PROSPECTIVE JUROR:**  No, not often.  I know that's

5    what they do, but we don't talk about their work.

6              **THE COURT:**  All right.  I think that's it.

7    Ms. Berkower?

8              **MS. BERKOWER:**  Nothing from the government, Your

9    Honor.  Thank you.

10             **THE COURT:**  Mr. Welch?

11             **MR. WELCH:**  No questions.  Thank you.

12             **THE COURT:**  All right.  Thank you, sir.

13             (Prospective juror steps down.)

14             **THE COURT:**  The next potential juror is 797.  This

15   juror marked yes to 1, 2, 3, 18 and 19.

16             **COURTROOM DEPUTY:**  0797.

17             **THE COURT:**  Good afternoon, ma'am.

18             **PROSPECTIVE JUROR:**  Good afternoon.

19             **THE COURT:**  I forgot to ask you earlier today,

20   when we were in the other courtroom, whether you recognize

21   this particular court reporter or know her by name?  Her

22   name is Lorraine Herman.

23             **PROSPECTIVE JUROR:**  No.

24             **THE COURT:**  All right.  If you feel comfortable

25   taking your mask off, you are welcome to do so.

1              So I understand you either live or work or both by

2    the U.S. Capitol.

3              **PROSPECTIVE JUROR:**  Yeah, I live in Bloomingdale.

4              **THE COURT:**  And how far away from the Capitol is

5    that?

6              **PROSPECTIVE JUROR:**  I don't know.  A mile and a

7    half, two miles up North Capitol.

8              **THE COURT:**  Were you at home on January 6th, 2021?

9              **PROSPECTIVE JUROR:**  Yes.

10             **THE COURT:**  Were you inconvenienced at all by the

11   events of that day?

12             **PROSPECTIVE JUROR:**  No.

13             **THE COURT:**  Were you scared about the events of

14   that day?

15             **PROSPECTIVE JUROR:**  Not physical safety.  Just

16   what's happening next.

17             **THE COURT:**  Did you watch the events live on that

18   day?

19             **PROSPECTIVE JUROR:**  Not until later that day.  I

20   was home sick that day.

21             **THE COURT:**  All right.

22             You've stated that you or someone you know has a

23   direct or indirect connection to the January 6th Capitol

24   events.  Can you describe what that is, please?

25             **PROSPECTIVE JUROR:**  Yes.  My friend's husband is

1    an MPD officer who was there that day.

2              THE COURT:  Actually on the Capitol grounds that

3    day?

4              PROSPECTIVE JUROR:  Well, not initially but later

5    called to it.

6              THE COURT:  Called to respond?

7              PROSPECTIVE JUROR:  Correct.

8              THE COURT:  Was that officer hurt?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  What happened to that officer?

11             PROSPECTIVE JUROR:  I think it was mace or pepper

12   spray and some bruising, lower limb.  Not anything

13   significant but I think he had to stay home for a couple

14   days or something.

15             THE COURT:  Do you know the name of that police

16   officer?

17             PROSPECTIVE JUROR:  I do.  Jason Mastiny

18   (phonetic).

19             THE COURT:  Do you know where that officer was on

20   the Capitol grounds?

21             PROSPECTIVE JUROR:  I don't believe it was inside.

22   I believe it was out front, but I don't know the specifics.

23             THE COURT:  You know whether it was on the east or

24   the west side?

25             PROSPECTIVE JUROR:  I do not.

1          **THE COURT:**  Have you talked to either that officer

2     or your friend about what happened to that officer that day?

3          **PROSPECTIVE JUROR:**  Just with the small details

4     that you gave me -- I mean, that I gave you.  Not anything

5     really further than that.

6          **THE COURT:**  All right.

7          You've also said that you've heard news about the

8     January 6th events.  Did you follow them after January 6th

9     and the days immediately following January 6th?  Have you

10    followed them to present day?

11         **PROSPECTIVE JUROR:**  Not this great detail.  I'm a

12    headline reader.  I would say probably things more on social

13    media.  Not super deep but I live here so --

14         **THE COURT:**  What sort of social media do you view

15    that has information about those events?

16         **PROSPECTIVE JUROR:**  Just things, like, from news

17    sources and some, like, local D.C. social media accounts.

18         **THE COURT:**  Have the accounts that you've seen

19    either on social media or anywhere else in the media, have

20    those focused on individuals who you remember?

21         **PROSPECTIVE JUROR:**  No.

22         **THE COURT:**  So you've heard nothing before today

23    about Mr. Reffitt?

24         **PROSPECTIVE JUROR:**  Correct.

25         **THE COURT:**  Do you think you've seen anything on

1    TV or elsewhere?  Any footage showing Mr. Reffitt?

2           **PROSPECTIVE JUROR:**  No, not that I remember.

3           **THE COURT:**  Okay.  Do you recognize Mr. Reffitt

4    seated at the table over there?

5           **PROSPECTIVE JUROR:**  No.

6           **THE COURT:**  You indicated that you or family

7    members or close friends work in law enforcement.

8           **PROSPECTIVE JUROR:**  That would just be the same

9    friend.

10          **THE COURT:**  Same friend whose --

11          **PROSPECTIVE JUROR:**  Well, I have in the same group

12   of friends, one other friend who is also a police officer,

13   an MPD officer.

14          **THE COURT:**  All right.  And you know this police

15   officer who was injured firsthand or you just know the

16   friend who is close to this police officer?

17          **PROSPECTIVE JUROR:**  No, it's my good friend's

18   husband.

19          **THE COURT:**  Have you met him before?

20          **PROSPECTIVE JUROR:**  Oh, yes.

21          **THE COURT:**  Is there anything about that

22   relationship with that police officer that would make you

23   give either greater or lesser weight to a police officer or

24   federal agent's testimony here in trial?

25          **PROSPECTIVE JUROR:**  No.

1        **THE COURT:**  Is there anything based on that

2  relationship that would make you favor the prosecution's

3  side in this case?

4        **PROSPECTIVE JUROR:**  No.

5        **THE COURT:**  Do you understand, as Mr. Reffitt sits

6  here, he's presumed innocent under the law?

7        **PROSPECTIVE JUROR:**  Yes.

8        **THE COURT:**  And that he cannot be convicted unless

9  and until the government proves his guilt beyond a

10  reasonable doubt?

11        **PROSPECTIVE JUROR:**  Yes.

12        **THE COURT:**  You also stated that either you, a

13  family member or close friend is a lawyer or law student or

14  works in a legal office.  Who's that?

15        **PROSPECTIVE JUROR:**  I have a cousin who is an

16  attorney.

17        **THE COURT:**  What kind of an attorney?

18        **PROSPECTIVE JUROR:**  Tax.

19        **THE COURT:**  Anybody else?  It's D.C.

20        **PROSPECTIVE JUROR:**  I know.  It's been a while but

21  there was a period where -- ten years ago or so I knew a few

22  but not regularly now.

23        **THE COURT:**  All right.  And do you work?

24        **PROSPECTIVE JUROR:**  Yes.

25        **THE COURT:**  What do you do?

1           **PROSPECTIVE JUROR:**  I am an occupational

2     therapist.

3           **THE COURT:**  All right.  Thank you.  Ms. Berkower?

4           **MS. BERKOWER:**  Nothing from the government.  Thank

5     you.

6           **THE COURT:**  Mr. Welch?

7           **MR. WELCH:**  No questions.  Thank you.

8           **THE COURT:**  All right.  Thank you, ma'am.

9           (Prospective juror steps down.)

10          **THE COURT:**  So we need one more and that will be

11    38?

12          **COURTROOM DEPUTY:**  Yeah.

13          **THE COURT:**  Okay.  All right.

14          This next potential juror is 0348.  I am a little

15    confused by the card.  It says 0348 in the corner and 0348.

16    I don't think it is questions 3, 4 and 8 because there is a

17    zero there.  I think probably no yes answers but we will

18    see.

19          (Prospective juror steps up.)

20          **THE COURT:**  Second one.  Right there.  Yes.  Good

21    afternoon.

22          **PROSPECTIVE JUROR:**  Good afternoon.

23          **THE COURT:**  If you feel comfortable taking off

24    your mask, feel free to.

25          So I have before me the card.  Can you see me over

1    here to your left?

2              **PROSPECTIVE JUROR:**   [NODDED HEAD]

3              **THE COURT:**   All right.  So I have your card that

4    has your juror number on it, but it looks like you might

5    have written your juror number twice; is that right?

6              **PROSPECTIVE JUROR:**   I wrote it big and was told to

7    write it in the upper, right-hand corner.

8              **THE COURT:**   All right.  So all of these questions

9    I read, you don't have any yes answers to any of them?

10             **PROSPECTIVE JUROR:**   There is one I would like to

11   clarify.

12             **THE COURT:**   All right.

13             **PROSPECTIVE JUROR:**   One question said about

14   arrests and convictions.  And I have not been convicted of

15   anything, but I have done some protests, arrests, the

16   symbolic arrest for issues of the day like climate change

17   with Fire Drill Friday; and that was at the Capitol.  I

18   think it was 2019.

19             **THE COURT:**   All right.  So you, yourself have been

20   arrested or you've been around folks who have been arrested?

21             **PROSPECTIVE JUROR:**   I did the symbolic arrest.

22   Post and forfeit.

23             **THE COURT:**   I'm sorry?  What was the last bit?

24             **PROSPECTIVE JUROR:**   It was arrest.  Post and

25   forfeit.  I didn't end up spend any time in jail or

1    anything.

2              **THE COURT:**  I see.  I see.  And that was related

3    to climate change?

4              **PROSPECTIVE JUROR:**  That particular one was

5    climate change.  It was every Friday.  I participated in the

6    one that had a focus on the effect of climate on women.

7    Climate change on women.

8              **THE COURT:**  The effect of climate change on women?

9              **PROSPECTIVE JUROR:**  Yes.  Uh-huh.

10             **THE COURT:**  And have there been other occasions

11    where you've been arrested for protests?

12             **PROSPECTIVE JUROR:**  Yes.

13             **THE COURT:**  When were those?

14             **PROSPECTIVE JUROR:**  I did two with the Poor

15    People's Campaign.  One was at the Senate Office Building

16    and one we were just -- it was a march in the streets.

17             **THE COURT:**  And when did those happen?

18             **PROSPECTIVE JUROR:**  I think it was probably 2020

19    and 2021, the most recent was -- the last time Reverend

20    Barber came.  It started at Union Station, and there was a

21    march.  And then we were just in the streets and did the

22    arrest.  We were processed there and let go.

23             **THE COURT:**  All right.  Is there anything about

24    the way you were treated by the police when you were

25    arrested on those occasions that might make you favor one

504

1   side over the other in this case?

2           **PROSPECTIVE JUROR:**  No.  It was very non-violent

3   and very gentle, very processed.  D.C. has a lot of

4   experience with these protests.  And it was -- they were

5   always handled very well.

6           **THE COURT:**  Is there anything about those protests

7   that you participated in that might make you view the events

8   of January 6, in an unbiased way?

9           **PROSPECTIVE JUROR:**  No.

10           **THE COURT:**  Um --

11           **PROSPECTIVE JUROR:**  Oh, in an unbiased way?

12           **THE COURT:**  Yeah.  Let me rephrase the question.

13           **PROSPECTIVE JUROR:**  In a biased way, I guess I was

14   thinking in my head, no.

15           **THE COURT:**  You don't have any strong feelings

16   about the January 6th events?

17           **PROSPECTIVE JUROR:**  No.  I haven't followed it

18   closely.  I saw general things but my focus has not been at

19   all on that.  So I don't know any of the individuals or the

20   specifics of it.

21           **THE COURT:**  All right.  So you did not answer yes

22   to the question that you've heard news about the January 6th

23   Capitol events, but you have heard some news.  You just

24   haven't tracked it carefully; is that why you didn't answer,

25   yes?

1          **PROSPECTIVE JUROR:**  That's right.  I was out of

2     town.  I mean, you can't know -- completely not hear

3     anything.  And so I did but not specifics.  I couldn't even

4     tell you one of the people that was involved.

5          **THE COURT:**  All right.

6          **PROSPECTIVE JUROR:**  I know that they did recently,

7     you know, some arrests of people.  But I have not followed

8     that.

9          **THE COURT:**  Do you read the articles about January

10    6th or do you just look at the headlines?

11         **PROSPECTIVE JUROR:**  Yeah.  Um, I don't really even

12    read a lot of the articles.  I've focused on other issues,

13    free press, peace, anti-war; that concerns me more right

14    now.  I know it's going -- you know, I knew these were going

15    on.  I knew that they were coming to trial, but I have not

16    even paid attention that much to the headlines other than,

17    you know, that it was going on.

18         **THE COURT:**  As you sit here now, do you have any

19    view of Mr. Reffitt, the defendant, whether he's guilty or

20    innocent of the charges?

21         **PROSPECTIVE JUROR:**  I don't know anything about

22    it.  I don't have an opinion.  At this point I know that --

23    you know, if -- that I would stop paying attention to

24    anything if you know if I -- now that I know that the -- you

25    know, this is potentially a jury trial for me, I would stop

1    because I know you have to pay attention to just what is in

2    the courtroom.  And I know people, myself included, can be

3    affected by social media, you know, corporate media.

4              **THE COURT:**  But it sounds like, based on what

5    you've said already, that you haven't really been following

6    these events closely, anyway; is that right?

7              **PROSPECTIVE JUROR:**  That's right.

8              **THE COURT:**  Do you think if you are selected to be

9    a juror in this case, you would come into this courtroom

10   with an open mind?

11             **PROSPECTIVE JUROR:**  Yes.

12             **THE COURT:**  Do you think you could be fair to both

13   sides?

14             **PROSPECTIVE JUROR:**  Yes.

15             **THE COURT:**  There's nothing about your

16   experiences, in terms of your earlier protests or arrests,

17   that would make you lean one way or the other in this case?

18             **PROSPECTIVE JUROR:**  No, I don't think so.

19             **THE COURT:**  Do you have any strong feelings about

20   firearms?

21             **PROSPECTIVE JUROR:**  Um, I mean -- I'm against war

22   but I don't have any particular -- I don't own a gun.  To

23   that extent.  But I don't have strong feelings.  I know that

24   people have a right to have guns.  I would not myself.

25             **THE COURT:**  All right.

1           Any of your feelings about firearms or war, for

2     that matter, affect your ability to be a fair and impartial

3     juror here?

4           **PROSPECTIVE JUROR:**  I don't think so, no.

5           **THE COURT:**  All right.

6           Ms. Berkower?

7           **MS. BERKOWER:**  Good afternoon.

8           **PROSPECTIVE JUROR:**  Good afternoon.

9           **MS. BERKOWER:**  So you mentioned you had some

10     arrests related to protests; is that right?

11           **PROSPECTIVE JUROR:**  Um mum.

12           **MS. BERKOWER:**  You said there was one in 2019,

13     2020 and 2021.  Have you had any beyond those three?

14           **PROSPECTIVE JUROR:**  Probably a decade and a half

15     ago there was a demonstration around peace in the Middle

16     East.  It was at the State Department.  Rabbi Michael

17     Lerner, Cornel West were leading it.  We sat down in front

18     of the street in front of the State Department.

19           I mean, I see the protests in a way as to raise

20     issues, almost like freedom of the press.  To be able to say

21     these are important issues.  We were arrested, taken to the

22     station, held for a few hours and released and paid $50.

23           **MS. BERKOWER:**  Was it a trespassing offense?  Or,

24     like, a trespassing offense that you were charged with?

25           **PROSPECTIVE JUROR:**  Yeah -- well, not exactly

508

1      trespassing.  I forget -- incommoding or something is

2      usually --

3              **MS. BERKOWER:**  Getting in the way of traffic or

4      something?  Blocking traffic?

5              **PROSPECTIVE JUROR:**  We didn't block traffic.  I

6      forget the exact charge.

7              **MS. BERKOWER:**  Something.

8              **PROSPECTIVE JUROR:**  In some way or another you get

9      dropped.

10             **MS. BERKOWER:**  You were in a space you weren't

11     supposed to be in?

12             **PROSPECTIVE JUROR:**  We were in the street, right

13     in front of -- there is really no traffic there, actually.

14             **MS. BERKOWER:**  Was it a restricted space you

15     didn't have permission to go into?

16             **PROSPECTIVE JUROR:**  They did ask us to -- at a

17     certain point they, you know, said we'll give you three

18     chances.  We'll tell you you'll be arrested if you don't

19     leave.

20             **MS. BERKOWER:**  Okay.  You were told to leave and

21     you didn't --

22             **PROSPECTIVE JUROR:**  Yes.  Yes.

23             **MS. BERKOWER:**  -- and were arrested.

24             **PROSPECTIVE JUROR:**  Yes.

25             **MS. BERKOWER:**  I understand.  It sounds like you

1    engaged in that activity to raise awareness for certain

2    causes.  Did I understand that to be right?

3              PROSPECTIVE JUROR:  Yes.

4              MS. BERKOWER:  In your view is it all right to

5    violate laws to raise awareness to certain causes?

6              PROSPECTIVE JUROR:  Yes.  And take the

7    consequences.  Yeah.  I knew I'd be arrested and -- yeah, so

8    I'd have to say I believe in civil disobedience for, you

9    know -- to me it wasn't harming anybody.  I wouldn't harm

10   anybody.  But I do believe there are times where if an issue

11   isn't being covered and people are losing lives, which on

12   these issues or climate change, I think it's important

13   enough to say, People care.  We have to do something about

14   this.  Its crucial.

15             MS. BERKOWER:  So in your view, you take it upon

16   yourself to decide when it's appropriate to just violate the

17   law?

18             PROSPECTIVE JUROR:  Yes, that's right.  It's a

19   moral choice that I make and I know that -- yes, that I am

20   responsible for paying a price for that.

21             MS. BERKOWER:  So the judge in this case, Judge

22   Friedrich, at the end of the case, if you are selected to be

23   a juror, is going to give you instructions about the law.

24             PROSPECTIVE JUROR:  Uh-huh.

25             MS. BERKOWER:  She is also going to tell you that

1    the government has to prove the elements of each charge,

2    beyond a reasonable doubt.  Now, if the government did that,

3    but you didn't agree with the law that she described -- as

4    she described it to you, instructed you, would you still

5    convict the defendant, given that you have the beliefs you

6    just expressed?

7              **PROSPECTIVE JUROR:**  For me, I would not be the

8    person -- I mean, each person has to decide for themselves.

9    I wouldn't be deciding for somebody else.  I -- you know, I

10   go all the time.  I go by the laws and I believe in the

11   laws.

12             **MS. BERKOWER:**  Yes.

13             **PROSPECTIVE JUROR:**  You know, I think that's how

14   we improve ourself as a society.

15             **MS. BERKOWER:**  But it sounds like sometimes there

16   are laws you feel need to be broken to make an important

17   point.

18             **PROSPECTIVE JUROR:**  Yeah.  I don't -- it's not so

19   much that I think laws should be broken.  But if -- yeah, I

20   do believe in non-violence, civil disobedience when I feel

21   that there's an issue that needs to be exposed.

22             **MS. BERKOWER:**  So if the judge instructed you that

23   these are the elements of a particular crime, but you didn't

24   disagree that that law should be followed because there was

25   a cause that perhaps justified breaking it, would you vote

1    to convict the defendant, even if the government met its

2    burden of proof for that crime?  Or would you say, uh --

3            **PROSPECTIVE JUROR:**  I believe if people break the

4    law they should face the consequences.  Myself included.

5            I do believe that there are times, certainly in

6    war or where -- where an injustice is going on -- that there

7    is a higher moral level that is important.

8            **MS. BERKOWER:**  So would you follow the judge's

9    instructions about what the law is --

10           **PROSPECTIVE JUROR:**  Yes.  Yes, I would.

11           **MS. BERKOWER:**  -- or would you decide for

12   yourself?

13           **PROSPECTIVE JUROR:**  No, I would follow the judge's

14   instruction of what the law is.

15           **MS. BERKOWER:**  But if you thought, perhaps, that

16   was the kind of law that shouldn't be followed, would you

17   still convict the defendant, if the government met its

18   burden?

19           **THE COURT:**  Ms. Berkower, I think she's answered

20   this already.

21           Ma'am, I forgot to point out that given your age,

22   you have the right not to serve, if you would prefer not to.

23   You don't have to be here.  I'm delighted that you are here.

24   But I want to make sure that you realize you are not

25   required to serve by law.  Is it your desire to be here?

1    Were you aware that you didn't have to come?

2              **PROSPECTIVE JUROR:**  My understanding was if I am

3    healthy and nothing stops me, I should make myself

4    available.  And whether or not I am seated, it's up to the

5    Court.

6              **THE COURT:**  All right.  You are 70 or above.

7    Correct?

8              **PROSPECTIVE JUROR:**  I'm 74.

9              **THE COURT:**  All right.  Again, you are welcome to

10   stay.  I just want you to know that you have the option not

11   to, if you would prefer not to serve.  Am I hearing that you

12   would like to serve on this jury?  You are not required to.

13             **PROSPECTIVE JUROR:**  I'm available if I am chosen.

14   I don't need to excuse myself on the basis of --

15             **THE COURT:**  I just wanted to make sure I was

16   understanding you.

17             Mr. Welch?

18             **MR. WELCH:**  No questions.  Thank you.

19             **THE COURT:**  All right.  Thank you, ma'am.

20             **PROSPECTIVE JUROR:**  Uh-huh.

21             (Prospective juror steps down.)

22             **THE COURT:**  All right.  Ms. Berkower?

23             **MS. BERKOWER:**  Your Honor, the government moves to

24   strike this prospective juror for cause based on the fact

25   that she says she thinks it's okay to break the law, to

1       engage in acts of civil disobedience to raise awareness for

2       causes she feels strongly about.

3              And she said that she can decide that for herself.

4       But given that she has a pattern of breaking laws, similar

5       to the crimes charged in this case.  Mr. Reffitt is charged

6       with trespassing on Capitol grounds, being there at a time

7       when he wasn't supposed to be, engaging in -- I expect the

8       defense will argue -- standing up for a cause that he

9       believes in.  The government's concern is that this juror

10      will not be able to separate that out and follow the law as

11      the Court instructs her to do.

12             I think she wasn't able, upon questioning -- I

13      know Your Honor saw I questioned her several times on this

14      to put her finger on when she would or wouldn't be okay with

15      breaking a law.  She kind of said it's up to her to decide.

16             **THE COURT:**  I thought she consistently said that,

17      for herself included, if someone stands up for something

18      they believe in and they violate the law, that she should

19      suffer the consequences.  Is that not what she said?  I

20      thought she said that a lot of different ways and applied it

21      to herself as well.

22             **MS. BERKOWER:**  She did say that but she also said

23      that it's okay to break the law for causes that you believe

24      in.  And the government's -- our concern here is that she is

25      going to view the defendant's conduct in a certain --

1    through a certain lens that is going to put it in conflict

2    with the Court's instructions to her.

3         **THE COURT:**  But she -- correct me if I'm wrong, I

4    thought she consistently said that she would follow my

5    instructions.

6         **MS. BERKOWER:**  Well, I thought she seemed a little

7    bit confused about whether or not she would be the one

8    making determinations of what the law is.  She never said

9    that she would convict the defendant, if the government

10   proved its case, and the judge -- and it met the elements,

11   as Your Honor instructed.

12        **THE COURT:**  Did you ask that question and she said

13   she wasn't sure she could do that?  I missed that.

14        **MS. BERKOWER:**  I did ask her if she would convict

15   if the government met its burden, and it satisfied the

16   elements.

17        **THE COURT:**  And she said she would not.

18        **MS. BERKOWER:**  It's not that she said she would

19   not.  She didn't give a clear answer, which is why I kept

20   pressing on that point.

21        **THE COURT:**  Well, I cut you off because I felt

22   like you continued to equate violating the law in terms of

23   civil obedience with violating my instructions.  I think she

24   was saying two different things.  I thought she was saying

25   she would follow my instructions.  Yes, she thinks for cause

515

1     as you believe in, it's okay to violate the law.  But you

2     also suffer the consequences.  So I didn't take away from

3     what she said that she was unwilling or unable to follow my

4     instructions.

5               **MS. BERKOWER:**  I don't think she gave a clear

6     answer, Your Honor, which is frankly why we are moving to

7     strike.

8               **THE COURT:**  Okay.  Mr. Welch?

9               **MR. WELCH:**  Your Honor, the venirelady said it was

10    her moral decision for herself when to make a decision about

11    whether she would violate the law, as a matter of civil

12    disobedience.

13              She also said that she would do so with the

14    understanding that she would face the consequences for that.

15    And she understands that other people who do so have to face

16    the consequences for that.  She says she believes that if

17    people break the law, they should face the consequences for

18    that, and she said she would follow your instructions on

19    that.

20              I think all she was doing was explaining her

21    feelings about what she was willing to do as a matter of

22    civil disobedience, separate and apart from whether if she

23    were selected as a juror, she would apply the law fairly to

24    someone else.  And she indicated that she believes if

25    someone breaks the law, they must face the consequences, and

1   she would follow your instructions.  We oppose the motion to

2   strike.

3           **THE COURT:**  All right.  I'm taking a moment to

4   review the transcript.

5           **MS. BERKOWER:**  May I add one more thing, Your

6   Honor?

7           **THE COURT:**  Sure.

8           **MS. BERKOWER:**  Another concern that we have here

9   is that she gave several examples of being arrested for an

10  offense, and being told to leave an area, and didn't leave

11  an area.  And was arrested, processed quickly, delightfully

12  handled in a certain way.

13          And in this case there will be testimony that the

14  officers ordered Mr. Reffitt to stand down from what he was

15  doing --

16          **THE COURT:**  She's never used violence.  Right?

17  Isn't that what she said?

18          **MS. BERKOWER:**  That's what she said.  But in this

19  case, the testimony will be that Mr. Reffitt also was

20  ordered to stand down; that Mr. Reffitt refused to do so;

21  and that he was -- had this encounter with the Capitol

22  Police that -- there's no allegation in this case, to be

23  clear, Your Honor, that Mr. Reffitt ever laid a hand on

24  those officers; that's not part of this crime; that's not

25  what he's charged with.  He's not charged with engaging in a

1       physical fight.

2                    **THE COURT:**  He's charged with attempted assault.

3       Right?  Basically?  Isn't that your theory of the case that

4       you've pushed the entire time, this case has been pending,

5       as recently as several days ago.

6                    **MS. BERKOWER:**  He's charged with interfering --

7                    **THE COURT:**  No, no, Ms. Berkower.  I've asked

8       Mr. Nestler numerous times about the means and he says, Yes,

9       attempted assault.  Yes, aiding and abetting assault; is

10      that not correct?

11                   **MS. BERKOWER:**  That is correct, Your Honor.

12                   **THE COURT:**  Okay.  All right.  Let me review the

13      transcript, please.

14                   (Break.)

15                   **THE COURT:**  All right.

16                   In talking about the occasion she said it was very

17      non-violent, very gentle.  When I asked her, as she sat here

18      now, did she have a view on Mr. Reffitt, whether he was

19      guilty of the charges, she says, I don't have an opinion.

20      At this point I know -- you know, if -- that I would stop

21      paying attention to anything, you know.  If I -- now that I

22      know that the -- you know, this is potentially a jury trial

23      for me.  I would stop because I know you have to pay

24      attention to just what is in the courtroom.  And I know

25      people, myself included, can be affected by social media,

1    you know, corporate media.

2            So that tells me she would try hard to follow the

3    instruction I have given her to not read news accounts or

4    social media.

5            Do you think if you are selected to be a juror in

6    this case you would come to the courtroom with an open mind?

7    Yes.  Do you think you could be fair to both sides?  Yes.

8    There's nothing about your experiences in terms of your

9    earlier protests or arrests that would make you lean one way

10   or another in this case?  No, I don't think so.

11           Do you have strong feelings about firearms.  Um, I

12   mean, I am against war.  I don't have any particular -- I

13   don't own a gun to that extent.  I don't have strong

14   feelings.  I know people have a right to own guns.  I would

15   not myself.

16           I continued:  Any of your feelings about your

17   firearms, or war for that matter, affect your ability to be

18   a fair and impartial juror here?

19           I don't think so, no.

20           You said, So you take it upon yourself when it is

21   appropriate to violate the law.  Yes, that's right.  It's

22   the moral choice I make.  I know, yes, I am responsible for

23   paying a price for that.

24           Ms. Berkhower:  So the judge in this case, Judge

25   Friedrich, at the end of the case, if you are selected to be

1       a juror, is going to give you instructions about the law.

2                  Uh-huh.

3                  It says lost but I don't think that is what you

4       said.  She is going to tell you that the government has to

5       prove the elements of each charge beyond a reasonable doubt.

6                  Now, if the government did that, but you didn't

7       agree with the law that she described, as she described it

8       to you, instructed you, would you still convict the

9       defendant given that you have the beliefs you just

10      expressed?

11                 She said, For me, I would not be the person.  I

12      mean, each person -- this says has toasted -- I think she

13      meant tested for themselves.  I wouldn't be deciding for

14      someone else.  I, you know, I go all of the time.  I think

15      she is talking about protests.  I go by the laws and I

16      believe in the laws.

17                 Ms. Berkower:  Yes.

18                 Juror:  You know, I think that is how we improve

19      ourself as a society.

20                 Ms. Berkower:  But it sounds like sometimes there

21      are laws that you feel can be broken to make a point?

22                 Juror:  Yes, I don't.  It's not so much that I

23      think laws should be broken, but yeah, I do believe in

24      non-violence, civil disobedience, when I feel there is an

25      issue that needs to be exposed.

1          Ms. Berkower:  So if the judge instructed you that

2   these are the elements of a particular crime, that you

3   didn't disagree that the law should be followed because

4   there was a cause that perhaps justified breaking it --

5   which is a very confusing question to me.

6          Would you vote to convict the defendant, even if

7   the government met its burden of proof for that crime?

8          Prospective Juror:  I believe if people break the

9   law, they should face the consequences, myself included.  I

10  do believe that there are times, certainly in war or where

11  injustice is going on, that there is a higher moral level

12  that is important.

13         Ms. Berkower:  So would you follow the judge's

14  instructions about what the law is?

15         Yes, yes, I would.

16         Ms. Berkower:  Or would you decide for yourself?

17         Juror:  I would follow the judge's instruction of

18  what the law is.

19         Ms. Berkower:  But if you thought, perhaps, that

20  was the kind of law that shouldn't be followed -- I guess

21  you are talking about my instructions, not laws that she's

22  breaking through civil disobedience -- would you still

23  convict the defendant if the government met its burden?

24         And I said, Ms. Berkower, I think she's answered

25  this already.

1          You know, having reviewed the transcript

2    carefully, I think this juror has drawn a distinction

3    between breaking the law for civil disobedience and taking

4    the consequences and not being able to follow my

5    instructions.

6          I can certainly see why the government might want

7    to strike her, but that's a peremptory not a strike for

8    cause.  So we are now at 38.

9          I'd like to go back to the ceremonial courtroom.

10   Bring in all of the jurors, put them in order, and have you

11   all exercise your peremptories.  And we will do this in two

12   rounds, then the alternates.  All right?

13         **COURTROOM DEPUTY:**  All rise.

14         (Recess.)

15         (Proceedings in the ceremonial courtroom.)

16         **THE COURT:**  I lost the courtroom deputy.

17         **COURTROOM DEPUTY:**  Your Honor, I'm going to read

18   off the numbers --

19         **THE COURT:**  Wait.  Let me just explain to the

20   jury.

21         **COURTROOM DEPUTY:**  All right.

22         **THE COURT:**  All right.

23         So, ladies and gentlemen, we have completed the

24   first phase of the jury selection process.  We now have

25   qualified a sufficient number of jurors to move to the

522

1    second stage of the process.

2         The second stage will take about -- hard to say

3    but roughly 20 minutes or so.  And if at all possible, I ask

4    that you not leave the courtroom during this part of the

5    process.  You can read quietly.  Again, you know, no

6    research, reading about this case.

7         But Mr. Hopkins is going to call your juror

8    numbers to ensure that everyone is seated in the right seat.

9    And then we will proceed.  So if you could answer yes when

10   he calls your -- raise your hand and say yes, that would be

11   helpful.

12        All right, Mr. Hopkins.

13        **COURTROOM DEPUTY:**  Juror 0587, seat number 1.

14        **PROSPECTIVE JUROR:**  Here.

15        **COURTROOM DEPUTY:**  Juror 1386, seat number 2.

16        **PROSPECTIVE JUROR:**  Here.

17        **COURTROOM DEPUTY:**  Juror 1419, seat number 3.

18        **PROSPECTIVE JUROR:**  Yes.

19        **COURTROOM DEPUTY:**  Juror 0031, seat number 4.

20        **PROSPECTIVE JUROR:**  Yes.

21        **COURTROOM DEPUTY:**  Juror 1120, seat number 5.

22        **PROSPECTIVE JUROR:**  Here.

23        **COURTROOM DEPUTY:**  Juror 1332, seat number 6.

24        **PROSPECTIVE JUROR:**  Yes.

25        **COURTROOM DEPUTY:**  Juror 0168, seat number 7.

1          **PROSPECTIVE JUROR:**  Yes.

2          **COURTROOM DEPUTY:**  Juror 0457, seat number 8.

3          **PROSPECTIVE JUROR:**  Here.

4          **COURTROOM DEPUTY:**  Juror 0155, seat number 9.

5          **PROSPECTIVE JUROR:**  Yes.

6          **COURTROOM DEPUTY:**  Juror 1384, seat number 10.

7          **THE COURT:**  Oh, wait.  Wait.  Mr. Hopkins, we have

8     a problem with the audio.

9          **MR. CRAMER:**  Did you hang up the phone line?

10          **COURTROOM DEPUTY:**  I hung up and called back.

11          **MR. CRAMER:**  No, remember, I said we had a

12     secondary line.

13          **THE COURT:**  Counsel, could you pick up the phone

14     briefly?  I have a question for you.

15          (Sidebar discussion.)

16          **THE COURT:**  Can you all hear me?  Okay.

17          Mr. Welch, I just wanted to make sure that the

18     defendant has --

19          **MR. WELCH:**  We're okay for now.  They are not

20     outside now.

21          **THE COURT:**  Are you okay proceeding without them

22     present?  Mr. Reffitt, can you answer?

23          **THE DEFENDANT:**  [NODDED HEAD]

24          **THE COURT:**  He is nodding his head affirmatively.

25     Okay.

524

1            (Discussion at sidebar concluded.)

2            **THE COURT:**  So I have a feeling I should have

3    asked Mr. Cramer.

4            Should start from scratch?  Do you know the cut

5    off?  Were you doing the roll or was I speaking?

6            **COURTROOM DEPUTY:**  I was doing the roll.

7            **THE COURT:**  All right.  So if you could resume

8    where you were.

9            **COURTROOM DEPUTY:**  Sure, Your Honor.

10           **THE COURT:**  Sorry to repeat this, but there is

11   public right to access to the room.

12           **COURTROOM DEPUTY:**  Should I start from the

13   beginning?

14           **THE COURT:**  Wherever you think you were.

15           **COURTROOM DEPUTY:**  1384, seat number 10.

16           **PROSPECTIVE JUROR:**  Here.

17           **COURTROOM DEPUTY:**  0946, seat number 11.

18           **PROSPECTIVE JUROR:**  Here.

19           **PROSPECTIVE JUROR:**  0322, seat number 12.

20           **PROSPECTIVE JUROR:**  Here.

21           **COURTROOM DEPUTY:**  1009, seat number 13.

22           **PROSPECTIVE JUROR:**  Yes.

23           **COURTROOM DEPUTY:**  1312, seat number 14.

24           **PROSPECTIVE JUROR:**  Yes.

25           **COURTROOM DEPUTY:**  1486, seat number 15.

1          PROSPECTIVE JUROR:  Here.

2          COURTROOM DEPUTY:  0671, seat number 16.

3          PROSPECTIVE JUROR:  Here.

4          COURTROOM DEPUTY:  1566, seat number 17.

5          PROSPECTIVE JUROR:  Here.

6          COURTROOM DEPUTY:  1670, seat number 18.

7          PROSPECTIVE JUROR:  Here.

8          COURTROOM DEPUTY:  0355, seat number 19.

9          PROSPECTIVE JUROR:  Here.

10         COURTROOM DEPUTY:  0663, seat number 20.

11         PROSPECTIVE JUROR:  Here.

12         COURTROOM DEPUTY:  0828, seat number 21.

13         PROSPECTIVE JUROR:  It's 0826.

14         COURTROOM DEPUTY:  0826, seat number 21.

15         PROSPECTIVE JUROR:  Here.

16         COURTROOM DEPUTY:  0193, seat number 22.

17         PROSPECTIVE JUROR:  Here.

18         COURTROOM DEPUTY:  1459, seat 23.

19         PROSPECTIVE JUROR:  Here.

20         COURTROOM DEPUTY:  0543, seat 24.

21         PROSPECTIVE JUROR:  Here.

22         COURTROOM DEPUTY:  0365, seat 25.

23         PROSPECTIVE JUROR:  Here.

24         COURTROOM DEPUTY:  0038, seat 26.

25         PROSPECTIVE JUROR:  Here.

1          COURTROOM DEPUTY:  1184, seat 27.

2          PROSPECTIVE JUROR:  Here.

3          COURTROOM DEPUTY:  1201, seat 28.

4          PROSPECTIVE JUROR:  Here.

5          COURTROOM DEPUTY:  1655, seat 29.

6          PROSPECTIVE JUROR:  Yes.

7          COURTROOM DEPUTY:  1774, seat 30.

8          PROSPECTIVE JUROR:  Here.

9          COURTROOM DEPUTY:  0541, seat 31.

10         PROSPECTIVE JUROR:  Here.

11         COURTROOM DEPUTY:  1718, seat 32.

12         PROSPECTIVE JUROR:  Here.

13         COURTROOM DEPUTY:  0344, seat 33.

14         PROSPECTIVE JUROR:  [Indicated]

15         COURTROOM DEPUTY:  0344, seat 33.

16         PROSPECTIVE JUROR:  Here.

17         COURTROOM DEPUTY:  I'm sorry, sir.  I didn't see

18    you.  I was listening.

19         PROSPECTIVE JUROR:  That's okay.

20         COURTROOM DEPUTY:  1221, seat 34.

21         PROSPECTIVE JUROR:  Here.

22         COURTROOM DEPUTY:  1081, seat 35.

23         PROSPECTIVE JUROR:  Yes.

24         COURTROOM DEPUTY:  1590, seat 36.

25         PROSPECTIVE JUROR:  Yes.

1           **COURTROOM DEPUTY:**  0797, seat 37.

2           **PROSPECTIVE JUROR:**  Yes.

3           **COURTROOM DEPUTY:**  0348, seat 38.

4           **PROSPECTIVE JUROR:**  Yes.

5           **COURTROOM DEPUTY:**  Thank you.

6           **THE COURT:**  348.  Right?  The last one, 348?

7           **COURTROOM DEPUTY:**  Yes.

8           **THE COURT:**  All right.

9           Okay, ladies and gentlemen, this part of the

10   process -- we'll just sit for a few moments.  Again, feel

11   free to read, just not about this case.

12           (Counsel struck jurors.)

13           (Sidebar discussion.)

14           **MS. BERKOWER:**  Um, Your Honor -- Your Honor, we

15   were, as you suggested, exchanged our sheets.  And we

16   noticed that Mr. Welch, in his initial fleet of peremptory

17   strikes, included several alternates, several people who

18   were sitting in the seats that the Court had listed as

19   designated alternates.  So we are not really sure what --

20           **THE COURT:**  Well, I think that -- he can't strike

21   those, as we've discussed, Mr. Welch.  So you need to take

22   your sheet back and do the strikes that don't include the

23   alternates.

24           **MR. WELCH:**  Understood, Your Honor.

25           **THE COURT:**  All right. hold on.

1          **MS. BERKOWER:**  The issue, Your Honor, is he's now

2      seen all of our strikes.

3          **THE COURT:**  All right.  Well, I mean --

4          **MS. BERKOWER:**  He wrote them down.  He took notes

5      on them.

6          **THE COURT:**  I don't know that that's waiving it.

7      If you want to brief this, then we will send the jury home.

8      I'm not prepared to say he's waived it right now, with no

9      authority to that effect.

10         Is that something you all would like to do, take

11     the time out and bring the jury back tomorrow?  I don't know

12     the answer to this question.  I am not trying to be

13     difficult but I have no idea.

14         **MS. BERKOWER:**  Your Honor, we are not trying to be

15     difficult either, but I've never been in a situation where

16     the defense has known what all of the government's

17     peremptory strikes are and they can adjust based on four

18     additional strikes.  So I'm afraid we do need to assert the

19     opportunity to do this.

20         **MR. WELCH:**  Your Honor, it was a mistake on my

21     part.

22         **THE COURT:**  Understood, Mr. Welch.

23         **MR. WELCH:**  -- my mistake, that's all.

24         **THE COURT:**  We reviewed this up front.  And you

25     knew how we were doing this.  And we were all on the same

1    page when we discussed this.

2              I don't have any choice right now except to give

3    the government a chance to brief this.

4              **MR. WELCH:**  I understand.

5              **THE COURT:**  You know, I hope that we don't have to

6    start jury selection from scratch.

7              **MR. WELCH:**  I don't think that will be necessary,

8    Your Honor.  It was simply -- I jumped the gun in writing

9    down my strikes for alternates.  I did not look at the

10   government's before I handed it to them.

11             **THE COURT:**  All right.

12             **MR. NESTLER:**  Your Honor, if he wants to -- let me

13   consult with Mr. Nestler.  We may have a quick solution if

14   you give me 10 seconds.

15             **THE COURT:**  Sure.

16             (Discussion amongst counsel off the record.)

17             **MS. BERKOWER:**  Your Honor, perhaps we can confer

18   with Mr. Welch and come to a resolution --

19             **THE COURT:**  All right.  If both sides can.

20             **MS. BERKOWER:**  We will try.

21             **THE COURT:**  If not, we have to take a break.  It's

22   unfortunate but I am prepared to do that.

23             **MS. BERKOWER:**  Thank you, Your Honor.  We will try

24   and confer.

25             (Discussion between counsel off the record.)

1          (Sidebar discussion continued.)

2          **THE COURT:**  Yes?

3          **MR. WELCH:**  Okay.  I think the confusion is that I

4     wrote down in strikes 1 through 10 my first 10 peremptory

5     strikes.  I didn't match them to seats.  I said, Here are my

6     strikes, 1 through 10.  That's not matched to seats, but the

7     government thinks that's matched to seats.

8          Unfortunately with the alternates, I should have

9     waited.  I wrote down alternate strike number 1 and

10    alternate strike number 2 and that's it.

11         **THE COURT:**  But that prejudices him.  Do you

12    disagree --

13         **MS. BERKOWER:**  Your Honor, the issue is seating in

14    the courtroom, as the chart that the Court sent us the other

15    day, some of the individuals that he struck in his initial

16    10 are jurors 2, 10, 13 and 15, who were designated by the

17    Court as the alternates; and that's why we raised this to

18    the Court.

19         **THE COURT:**  All right.  So I don't think we have

20    another choice right now except to take a recess and have

21    everyone come back tomorrow.

22         Does counsel for either side think we have any

23    other option at this point?

24         **MR. WELCH:**  I do, Your Honor.

25         There's not 37 seats, 38 seats, listed on this

1    form.  I am not corresponding -- where it says strikes, it

2    doesn't say seat.  I listed the first 10 strikes as

3    peremptories.  I jumped the gun on the alternates, but these

4    do not correspond to seats.

5             **THE COURT:**  But do you list the juror numbers?  Is

6    that what you are listing?

7             **MR. WELCH:**  I listed a number next to strike

8    number 1, not a seat.

9             **THE COURT:**  Okay.  Are any of those numbers people

10   who fall in seats 2, 10, 13 or 15?  If any of them are, we

11   have a problem.

12            **MR. WELCH:**  I don't believe they do but --

13            **THE COURT:**  Counsel is nodding their head

14   affirmatively that they do.

15            **MS. BERKOWER:**  He struck -- he tried to strike the

16   juror sitting in seat 2, juror number 1386.  He tried to

17   strike the juror seated in seat 10, 1384.  And he tried to

18   strike the juror sitting in 13, juror 1009.  Those were all

19   listed.

20            **THE COURT:**  So, Mr. Welch, I think we got a

21   problem.  You struck people who are in the alternate seats.

22   And you clearly thought we were doing all of them at once,

23   despite our multiple conversations about doing this in

24   stages.

25            So we do have a problem.  I don't think -- it's

532

1    unfortunate.  I don't think we have another option except to

2    bring all of these jurors back in tomorrow.  Do you

3    disagree?

4              MR. WELCH:  I don't disagree but -- I want it done

5    right.

6              THE COURT:  Yeah.  I don't think you intended to

7    do this, but it is what it is now, and we are going to have

8    to deal with this legal issue that I don't know the answer

9    to right now.

10             Unfortunately, do you have any other ideas?

11   Counsel for either side?  I'm inclined to tell the jurors

12   that we've had a legal issue arise, and we are going to have

13   to go -- we are going to have to focus on this tonight and

14   come back tomorrow and complete this part of the process,

15   and our apologies.

16             MR. WELCH:  We will have to sort it out.

17             MS. BERKOWER:  Your Honor, perhaps if we, the

18   parties and the Court could stay behind to talk about

19   solutions.

20             THE COURT:  Sure.  I'll stay as long as it takes,

21   but I don't think we can hold these jurors here.

22             MS. BERKOWER:  That makes sense, Your Honor.

23             MR. NESTLER:  Can we have 30 more seconds with

24   Mr. Welch?  I may have a solution, if we could just talk

25   with him.

1          **THE COURT:**  Sure.

2          (Discussion between counsel off the record.)

3          (Sidebar discussion continued.)

4          **MR. WELCH:**  I think if we could hold --

5          **THE COURT:**  Wait for the government.

6          **MR. WELCH:**  Oh, I'm sorry.

7          I think if we could hold on for maybe 5 or 10

8  minutes -- just hold these folks for 5 or 10 minutes, we

9  might be able to resolve it this afternoon.  I will only do

10  my strikes.

11          **THE COURT:**  Okay.  Let's just be mindful of the

12  fact that the streets are going to be shut at 5:30.

13          **MR. WELCH:**  It won't take a long time to do this.

14          **THE COURT:**  All right.

15          **COURTROOM DEPUTY:**  We also need to get Mr. Reffitt

16  back at some point.

17          **THE COURT:**  We also have to get Mr. Reffitt back

18  at some point.  Mr. Hopkins, can you check with the

19  marshall?  I mean, there's this holding them up versus

20  bringing all of them back.  I think they should wait.

21          **MR. NESTLER:**  I agree.

22          **THE COURT:**  Can you check while they are doing

23  this?  And you all try to -- see if you can work it out.  If

24  you can't, you can't.  And we just have to do what we have

25  to do.  All right?

1          **MR. WELCH:**  All right.

2          **MS. BERKOWER:**  Thank you.

3              (Sidebar discussion concluded.)

4              (Counsel continued striking jurors.)

5          **MR. WELCH:**  Your Honor, I think we -- I think

6    we've reached an agreement and are handing you our strike

7    sheets.

8              (Handed to the judge.)

9              (Sidebar discussion.)

10         **THE COURT:**  I've only gone through the defenses

11   strikes.  There are strikes in the alternate section.  I

12   should disregard those.  Correct?

13         **MS. BERKOWER:**  Your Honor, I think the reason we

14   did that is because the sheet that Mr. Welch handed to us

15   originally had that on it.  But we understand that it is

16   being struck from a separate pool.  So if Your Honor wants

17   to disregard that for now --

18         **THE COURT:**  For now I'm going to disregard that.

19   But I haven't gone through the government's.  I am doing

20   that now.

21             Before we resume, I want to make sure that we are

22   all in agreement on what the alternates are and what are the

23   potential alternate strikes.  All right?

24         **MS. BERKOWER:**  Yes.

25         **THE COURT:**  So you all be thinking about that and

1     be ready to tell me, and I will do the government's now.

2              **MR. NESTLER:**  Sorry, Judge.  To clarify, we both

3     did our alternate strikes, because we knew what the

4     defense's strikes were, we then took his strikes and made

5     our two alternate strikes.  We already took care of it.

6              I think we are settled on the 16 people.  I can

7     read them, if it helps Your Honor and Mr. Hopkins.

8              **THE COURT:**  Okay.  So you all did this in two

9     stages?

10             **MR. NESTLER:**  Yes.  We did it in two stages

11    without involving the Court --

12             **THE COURT:**  Okay.  I wish you would have involved

13    me so that I would have been part of that.

14             **MR. NESTLER:**  It was because Mr. Welch had done

15    the alternates initially.  So in order to rectify -- the

16    solution we had was that he had tried to strike some

17    alternates in the main.  And then some main in the

18    alternates.  So he flip-flopped them around.  We were

19    already aware of who his alternate strikes were going to be,

20    so that's how it worked.

21             **THE COURT:**  Mr. Welch, do you have any objection

22    to this?

23             **MR. WELCH:**  No, Your Honor.  This is the fair way

24    to resolve the mistake that I made.  I got confused on the

25    sheet in thinking strikes instead of seats and we've gone

536

1    over it.  We've discussed it, the government and I.   And

2    this is the fair way, we believe, to resolve it.

3              We've now made all of our peremptory and alternate

4    strikes and they are now before you.

5              **THE COURT:**  And you have not been prejudiced by

6    doing this --

7              **MR. WELCH:**  No.

8              **THE COURT:**  -- this way.

9              **MR. WELCH:**  No, we haven't.

10             **THE COURT:**  You did it in separate steps, you just

11   didn't tell me this in between.  And there are no challenges

12   to this jury?

13             **MR. WELCH:**  No challenges, as far as the

14   government strikes are concerned, Your Honor.  In fact, some

15   of our strikes overlapped.

16             **THE COURT:**  And no challenges from the government

17   side?

18             **MS. BERKOWER:**  That's right.

19             **THE COURT:**  All right.  So let me get through the

20   government's quickly and then we'll proceed.

21             But you all are confident that you exercised the

22   alternate strikes from the appropriate individuals who were

23   in the audience?

24             **MS. BERKOWER:**  We are, Your Honor.

25             **MR. WELCH:**  Yes, Your Honor.  I'm sorry.  We both

1    spoke at the same time but, yes.

2              **THE COURT:**  All right.

3              Mr. Reffitt, you yourself have no concerns with

4    how this has been done?

5              **THE DEFENDANT:**  [SHAKES HEAD]

6              **THE COURT:**  You are shaking your head negatively;

7    is that correct?

8         **MR. WELCH:**  You need to hold the thing on the

9    phone itself.

10             **COURTROOM DEPUTY:**  His phone is set so that he

11   cannot speak.

12             **MR. WELCH:**  Oh, okay.  Yes, he is in agreement.

13             **THE COURT:**  All right.  And you've conferred with

14   him?

15             **MR. WELCH:**  Yes.

16             **THE COURT:**  All right.  Okay.  Why don't -- um --

17   all right.  Just give me just another minute.

18             **MR. WELCH:**  Sure.

19             (Sidebar discussion break.)

20             (Sidebar discussion continued.)

21             **THE COURT:**  So can you all tell me who you believe

22   the alternates will be?

23             **MR. NESTLER:**  Yes, Judge.  If I can just go

24   through them all 1 through 12, to make sure that we are all

25   on the same page.

1          **THE COURT:**  All right.

2          **MR. NESTLER:**  Seat 1, 0587.

3          **THE COURT:**  Yep.

4          **MR. NESTLER:**  Seat 2, 0031.

5          **MS. BERKOWER:**  No.

6          **THE COURT:**  Yes.

7          **MS. BERKOWER:**  Sorry.  Sorry.  Yes.

8          **MR. NESTLER:**  Seat 3, 1120.

9          Seat 4, 0168.

10         Seat 5 --

11         **COURTROOM DEPUTY:**  Hold on for one moment.  I'm

12    sorry.  Go ahead.

13         **MR. NESTLER:**  Seat 5, 0322.

14         Seat 6, 1312.

15         Seat 7, 0355 --

16         **THE COURT:**  Wait.  Wait a second.

17         **MR. NESTLER:**  Oh, I'm reading the alternate.

18         **COURTROOM DEPUTY:**  That was number 19, Your Honor.

19         **THE COURT:**  Yep.  Okay.  Got it.

20         **MR. NESTLER:**  Number 8, 0826.

21         Number 9, 1459.

22         **THE COURT:**  Okay.

23         **MR. NESTLER:**  Number 10, 1201.

24         Number 11, 1655.

25         And number 12, 1774.

1      **THE COURT:**  Okay.

2      **MR. NESTLER:**  And then alternate 1, 0541.

3      Alternate 2, 1718.

4      Alternate 3, 0344.

5      And alternate 4, 1486.

6      **THE COURT:**  Wait.  Wait.  Wait.

7      Why not 1221?

8      **MR. NESTLER:**  Oh -- 1486 was never struck; that

9   person was always sitting in seat 15.

10     **THE COURT:**  Why wouldn't that be alternate 1?

11     **MR. NESTLER:**  Because we asked earlier.  Your

12   Honor said we were going to replace the alternates in that

13   order.

14     **THE COURT:**  That's right.  That's right.

15     So what's the fourth one?  I'm sorry.

16     **MR. NESTLER:**  The fourth one is 1486.

17     **THE COURT:**  And where is that on the sheet?

18     **COURTROOM DEPUTY:**  That's number 15, Your Honor.

19     **THE COURT:**  Okay.

20     **MR. NESTLER:**  And just to be clear.  I'm sorry.  I

21   read the first 12 and then the four alternates, because

22   that's how we kept track of them.  But when they are seated,

23   the alternates are going to be intermixed, where they are

24   actually seated.  So they are not seated against seats 13,

25   14, 15, and 16.

1      **THE COURT:**  Correct.  These alternates will be
2    seated in the number of seats that you all identified up
3    front --
4      **MR. NESTLER:**  Correct.
5      **THE COURT:**  -- correct?
6      **MR. NESTLER:**  Correct.  I just read them here so
7    we know what order they are coming in.
8      **THE COURT:**  Okay.  All right.
9          Mr. Hopkins, do you understand how you need to
10   read these out?
11     **COURTROOM DEPUTY:**  I believe so.  Let me do it
12   just to make sure with you guys.  I want to make sure I am
13   doing it correctly.
14         0587 is supposed to be juror number 1.
15         0031 should be juror number 2.
16         1120 should be juror number 3.
17         0168 is number 4.
18         0322 is juror number 5.
19         1312 is juror number 6.
20         1486 is juror number 7.
21         0355 is juror number 8.
22     **MS. BERKOWER:**  And, Mr. Hopkins, I'm sorry to
23   interrupt you, but I actually think that if we are going by
24   the plan from before, we should have read them in a
25   different order because the way we gave them to you, and the

1    way you are reading them, means you will have the four

2    alternates in the back.

3            **THE COURT:**  Okay.

4            **MS. BERKOWER:**  So we can reread you the order that

5    is correct with alternates interspersed.  And we will

6    designate who that is as we go.

7            **THE COURT:**  Okay.  And, Mr. Welch, if at any point

8    you disagree with this order, you will speak up.

9            **MR. WELCH:**  I will.

10           **MS. BERKOWER:**  Mr. Nestler is going to start over

11   with that.

12           **COURTROOM DEPUTY:**  Okay.  And we are going to do

13   it in the order that I'm to read it.

14           **MR. NESTLER:**  Sure.  No problem.

15           So seat 1, 0587.

16           Seat 2, 0541 -- and that's also alternate number

17   1.

18           **COURTROOM DEPUTY:**  Hold on.  Okay.

19           **THE COURT:**  0541.

20           **COURTROOM DEPUTY:**  That's number 31.

21           **MR. NESTLER:**  Right.

22           **COURTROOM DEPUTY:**  Okay.

23           **MR. NESTLER:**  Seat --

24           **MR. WELCH:**  No, I think you might be confused

25   there, Mr. Clerk.

1          **COURTROOM DEPUTY:**  0541 is seat number 31, but

2     that's going to be juror number 2.

3          **MR. NESTLER:**  Correct.  So he's saying seat 31

4     after the --

5          **MR. WELCH:**  Oh, okay.  I got you.  I got you.

6          **MR. NESTLER:**  So the person sitting in seat number

7     3 is going to be 0031.

8          **COURTROOM DEPUTY:**  0031.  Okay.

9          **THE COURT:**  And where is that?

10          **COURTROOM DEPUTY:**  That's number 4.  Seat number

11     4.

12          **THE COURT:**  Wait.  Wait.  I thought that was 3.

13          **COURTROOM DEPUTY:**  Seat number 4 is juror number

14     3.

15          **THE COURT:**  Wait.  We are on seat 3.  Who is seat

16     3?

17          **COURTROOM DEPUTY:**  0031.  That's going to be juror

18     number 3.

19          **THE COURT:**  All right.  Okay.  Go ahead.  And 4 is

20     which one?

21          **MR. NESTLER:**  1120 should be sitting in seat 4.

22          **COURTROOM DEPUTY:**  Got you -- no.  No -- okay.

23     Got you.

24          **MR. NESTLER:**  0168 should be sitting in seat 5.

25          **COURTROOM DEPUTY:**  0168.  I'm sorry.  Got you.

1        **MR. NESTLER:**  1718 should be sitting in seat 6;

2   and that is also alternate 2.

3        **COURTROOM DEPUTY:**  1718 should be number 6.  Okay.

4   Got you.

5        **MR. NESTLER:**  And then 0322 should be in seat 7.

6        **COURTROOM DEPUTY:**  Got you.

7        **MR. NESTLER:**  And then -- we are here.  Right?

8   No.  Give us a minute.

9            (Discussion between counsel off the record.)

10       **THE COURT:**  Ladies and gentlemen, thank you for

11  your patience.  We are almost done.  I just want to tell

12  you, I know this is taking longer than we thought, but we

13  are almost done.  Just a few more minutes.

14            (Discussion at sidebar.)

15       **THE COURT:**  Mr. Nestler, it looks like -- are the

16  alternates off?

17       **MS. BERKOWER:**  We are just rewriting the order.

18  We had to backfill from a second page and it is causing

19  confusion as we read out the list to Mr. Hopkins.  So now we

20  are just double checking it and rewriting it so that we can

21  read it off in the order they are supposed to be seated, and

22  also designate to you who is on the jury and who is an

23  alternate.

24       **THE COURT:**  Okay.  Because my concern is, have we

25  picked the first next juror for each of the alternate seats?

1    Are you confident that we have done that?

2              **MS. BERKOWER:**  Yes.  And that's actually why we

3    are having trouble flipping back and forth.

4              **THE COURT:**  Okay.  All right.  Go ahead.

5              **MS. BERKOWER:**  One more moment.

6              (Discussion between counsel off the record.)

7              (Sidebar discussion.)

8              **MS. BERKOWER:**  Does Your Honor need me to clarify

9    what those columns mean?

10             **THE COURT:**  No.  I understand what you are saying.

11   But the first alternate, who would be in seat number 2, this

12   is juror number 0541.  Both sides agree that this is the

13   first juror, after the 12 regular jurors, to appear on this

14   list.

15             Mr. Welch, do you agree?

16             **MR. WELCH:**  Agreed, Your Honor.

17             **THE COURT:**  And you agree, Mr. Nestler?

18             **MS. BERKOWER:**  Yes, Your Honor.  That juror was

19   originally in seat 44.  So we backfilled.  When alternate 1

20   was struck, we backfilled that position from the back of the

21   line.

22             **THE COURT:**  All right.  And then alternate number

23   2 is 1718; that makes sense.  It comes after.

24             Alternate number 3 is 0344, that comes next.

25             And alternate number 4 is --

1          **MS. BERKOWER:**  1486, from the first page, because

2    he was never struck.  So he was never backfilled.  He just

3    stayed in his original position as alternate 4 in seat 15.

4          **THE COURT:**  I see.  But that was the last of the

5    alternates.  So he's behind the others because he was the

6    last.

7          **MS. BERKOWER:**  [NODDED HEAD]

8          **THE COURT:**  That makes sense.

9          **MS. BERKOWER:**  Yep.

10          **THE COURT:**  So you all are confident that

11    Mr. Hopkins is about to read off the jurors in order.  Take

12    a look at what he is going to read, show it to Mr. Welch and

13    to Mr. Nestler before he reads them.

14          **COURTROOM DEPUTY:**  Sure.  Sure.

15          (Sidebar discussion concluded.)

16          (Discussion between counsel and courtroom Deputy

17    off the record.)

18          **THE COURT:**  All right.  Again, ladies and

19    gentlemen, I'm very sorry.  That took much longer than we

20    thought.  I'm kind of yelling here because the speakers

21    aren't working up here, so I want to make sure folks can

22    hear me in the overflow room.

23          We've now completed the jury selection process.

24    Mr. Hopkins will now call out the numbers of 16 of you.

25    Twelve of you will be jurors in this case, and four of you

1    will be alternates.

2            You will not know who the alternates are until the

3    end of trial.  For those of you whose names are not called,

4    I want to thank you very much for your service.  As I said

5    in the beginning, the constitution guarantees every citizen

6    a right to a jury trial by a jury of one's peers.  And it's

7    due to the time and effort of folks like you who fulfill

8    their constitutional duty that our criminal justice system

9    works, our judicial system as a whole, in fact.

10           We understand it was definitely an inconvenience

11   to be here for two days.  We are sorry it took as long as it

12   did, but if your number is not called, you are released from

13   service.

14           Should they check back anywhere, Mr. Hopkins?

15           **COURTROOM DEPUTY:**  They should.  They should call

16   the number that's on your form, to see if you need to come

17   back in tomorrow for another selection.

18           **THE COURT:**  Okay.  And to be clear.  The numbers

19   of the jurors who are called, the 16 numbers, you are on the

20   jury in this case.  Four of you will be alternates.  It will

21   not necessarily be the last four.  You will be interspersed

22   so, again, you won't know who the alternates are until the

23   very end of trial.

24           And you should show back up here tomorrow at 9:30

25   a.m. for me to instruct you, to give you initial

1    instructions, have you sworn in, and then we'll hear the

2    opening statements.  All right?

3            I neglected to tell you that you should report to

4    Courtroom 14 tomorrow.  Oh, sorry.  Okay.

5            The trial courtroom will be Courtroom 14, but you

6    should report to Courtroom 12, which will be the jury room,

7    tomorrow at 9:30, if your name is called.

8            Any questions, anyone?

9            [No response]

10           All right.  So, Mr. Hopkins, if you could please

11   call the names of the jurors.  And I'd ask that no one leave

12   until all 16 names are called.

13           **COURTROOM DEPUTY:**  Juror number 1 will be, 0587.

14   0587 is juror number 1.

15           Juror number 2, 0541.  Juror number 2, 0541.

16           Juror number 3, 0031.  Juror number 3, 0031.

17           Juror number 4, 1120; 1120.

18           Juror number 5, 0168; 0168.

19           Juror number 6, 0322.  0322 is juror number 6.

20           Juror number 7, 1312.  Juror number 7 is 1312.

21           Juror number 8, 0355.  Juror number 8 is 0355.

22           Juror number 9, 0826.  Juror number 9, 0826.

23           Juror number 10, 1718.  Juror number 10 is 1718.

24           Juror number 11, 1459.  Juror number 11 is 1459.

25           Juror number 12 is 1201.  Juror number 12 is 1201.

548

1          Juror number 13, 0344; 0344 is juror number 13.

2          Juror number 14, 1655.  1655 is juror number 14.

3          Juror number 15, 1486.  Juror number 15 is 1486.

4          And juror number 16 is 1774.  Juror number 16 is

5     1774.

6          **THE COURT:**  Okay.  Ladies and gentlemen, if your

7     name was not called, you can leave the courtroom.  I want to

8     ask the 16 whose names -- not names, numbers were called to

9     stay very briefly so I can give you a very brief instruction

10    before you leave.

11          (Jury panel exited the courtroom.)

12          **THE COURT:**  All right.

13          Ladies and gentlemen, the courtroom Deputy thinks

14    there may be 17 folks in here.  Does anyone have a number

15    that was not called, who is still in the courtroom?

16          **COURTROOM DEPUTY:**  I see 18 now.  I see 17.

17          (Sidebar discussion.)

18          **MR. NESTLER:**  I think the woman in the back left,

19    Your Honor, as Your Honor is facing, is a member of the

20    public.

21          **THE COURT:**  Okay.  All right.  Thank you.

22          (Sidebar discussion concluded.)

23          **THE COURT:**  All right.

24          As I told you numerous times, you can't read about

25    this case.  You can't do research about this case.  You

1    can't talk to anyone about this case.

2              If anyone approaches you and tries to talk to you

3    about the case, I need you to report it to me through my

4    courtroom deputy.  The only information that you are to

5    consider in deciding this case is the information that you

6    hear in the courtroom.

7              So, again, I just want to admonish you one last

8    time and ask you to let me know if someone tries to talk to

9    you about the case.

10             All right.  Any questions?

11             [No response]

12             If not, we will see you back here --

13             **COURTROOM DEPUTY:**  One of the --

14             **JUROR:**  Can you repeat the instruction.

15             **THE COURT:**  Yes.  Courtroom 12 is where you will

16   report for service tomorrow.  That will be your jury room.

17   It's a regular courtroom, and that's where you will

18   deliberate.  And then you will come -- someone will take you

19   to Courtroom 14, where the trial will begin.

20             Any other questions?

21             [No response]

22             Mr. Hopkins is the man to know.  He's going to

23   help you figure out where you need to be when.  But just get

24   to Courtroom 12 at 9:30 tomorrow.

25             **COURTROOM DEPUTY:**  I'll meet you in Courtroom 12

1   and give you the things you will need for trial.  Okay?

2                   **THE COURT:**  All right.  Thank you, everyone.  You

3   are excused.

4                   (Jurors exited the Ceremonial Courtroom at

5   5:53 p.m.)

6                   **THE COURT:**  Okay.  Um, just briefly, I wanted to

7   make sure that there was nothing that you needed addressed

8   before we leave.

9                   I suggest we come back at 9 a.m.  Any issues you

10  anticipate at this point?

11                  **MR. NESTLER:**  No, Your Honor.

12                  **MR. WELCH:**  No, Your Honor.

13                  **MR. NESTLER:**  9:00 tomorrow morning is great.  I

14  will see you in Courtroom 14.

15                  **THE COURT:**  Okay.  At 9 a.m. we will meet, and I

16  will show you how the courtroom configuration will be.  All

17  right?  If that was your question.

18                  And to the marshals, I want to apologize.  I never

19  would have done this at this late hour, had I known that

20  this would take this amount of time it did.  I appreciate

21  your patience.

22                  Mr. Reffitt, we will see you back bright and early

23  in the morning.  All right.  Thank you, all.

24                  **COURTROOM DEPUTY:**  All rise.

25                  (Proceedings concluded at 5:56 p.m.)

1

2                    **C E R T I F I C A T E**

3

4              I, **Lorraine T. Herman, Official Court**

5    **Reporter,** certify that the foregoing is a true and correct

6    transcript of the record of proceedings in the

7    above-entitled matter.

8

9

10

11

12    ____**March 2, 2022**____        ___/s/_____
              **DATE**                        **Lorraine T. Herman**
13

14

15

16

17

18

19

20

21

22

23

24

25