```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,          .
                                          .  Case Number 21-cr-32
 4              Plaintiff,                 .
                                          .
 5          vs.                            .
                                          .
 6     GUY WESLEY REFFITT,                 .  March 2, 2022
                                          .  9:12 a.m.
 7              Defendant.                 .
       - - - - - - - - - - - - - - - - -
 8

 9                       TRANSCRIPT OF JURY TRIAL
                             (MORNING SESSION)
10             BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                       UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13     For the United States:    JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16     For the Defendant:        WILLIAM WELCH, III, ESQ.
                                 5305 Village Center Drive
17                               Suite 142
                                 Columbia, Maryland 21044
18

19

20

21     Official Court Reporter:  SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

C O N T E N T S

OPENINGS

Preliminary Jury Instructions........................... 566

Opening Statement by Government......................... 576

Opening Statement by Defense........................... 595

TESTIMONY

SHAUNI KERKHOFF          Direct Examination............... 602

EXHIBITS RECEIVED

Government 603......................................... 609

Government 210.1....................................... 611

```
 1                      P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4      Action 21-32, United States of America versus Guy Reffitt.

 5          Your Honor, representing Mr. Reffitt, we have Mr. William

 6      Welch, and representing the United States, we have Mr. Jeffrey

 7      Nestler, and his colleague is not here yet.

 8              MR. NESTLER:  She went to the restroom real quick,

 9      Your Honor.

10              THE COURT:  I want to run through a couple of matters.

11      I think we have a jury coming in at 9:30.

12          So just for the record, last night, I reviewed the parties'

13      peremptory challenge sheets, which will be made a part of the

14      record.  The juror numbers represented on the sheet correspond

15      to the representations that have been made in terms of the

16      stages of the peremptory strikes.  I double-checked the order in

17      which the jurors were seated, both for the 12 jurors and the

18      four alternates, and all are accurate and reflect the proper

19      seats and order of alternates.

20          And neither side has any objection to the 12 jurors and

21      four alternates that have been selected; correct?

22              MR. WELCH:  No objection, Your Honor.

23              MR. NESTLER:  No objection, Your Honor.

24              THE COURT:  Or, of course, to the jurors who were

25      released; right?
```

1          MR. WELCH:  No objection.

2          THE COURT:  And I want to thank both of you for

3     working cooperatively to get through that problem.

4      I also would like to talk to you about whether it makes

5     sense -- I'm inclined to make the joint e-mail a part of the

6     record, obviously not the public record but a part of the record

7     for appeal.

8      If you all would prefer to submit that in a formal, you

9     know, notice to the Court, you can do that.  I know you're busy.

10    If you'd prefer that I just make that e-mail a part of the

11    record, I can do that, but I think it's important because you

12    both all thoroughly laid out the process.

13     Mr. Welch, what's your preference?

14         MR. WELCH:  Your Honor, we're fine with the Court just

15    making that e-mail a part of the record.

16         THE COURT:  Mr. Nestler, do you agree?

17         MR. NESTLER:  We agree.  I think the bottom part of

18    the e-mail talks about which jurors are alternates.

19         THE COURT:  Sorry.  I didn't hear that.

20         MR. NESTLER:  The bottom part of the e-mail discusses

21    which of the four jurors are alternates.  So we shouldn't make

22    that a part of the public record yet.

23         THE COURT:  No, no.  And none of this will be public,

24    as I think at least at this stage it would be inappropriate to

25    do so.  But it will be on the court docket.

1          And so Mr. Hopkins, I will have one of the law clerks give

2     you an e-mail that was provided to the Court last night by the

3     parties, and we need to put it on the docket in a way that's not

4     accessible to the public because it reflects juror numbers and

5     alternate numbers, but it explains what transpired --

6               COURTROOM DEPUTY:  I think I may have that, Your

7     Honor.  I think he cc'd me on the same e-mail.

8               THE COURT:  Just check with them.

9               COURTROOM DEPUTY:  Absolutely.

10              THE COURT:  So all right.  We covered that.

11         Now, have you all been provided a copy of the seating chart

12     for the trial?  All right.  As you can see, it's been changed to

13     accommodate three individuals from the public, which will

14     include a member of Mr. Reffitt's family.

15         And Mr. Welch, at any point when the trial starts if the

16     family member's not here, I'm not going to wait.  They need to

17     be ready to come in to the courtroom and sit in the seat.  I'm

18     not going to hold proceedings up for them to do that.

19              MR. WELCH:  All understood, Your Honor.  I've already

20     spoken with Mr. Reffitt's family who are here and explained to

21     them that if they wanted to make a change because of where they

22     are sitting, they would need to wait until a recess so they're

23     not walking effectively through the jury box.

24              THE COURT:  Okay.  All right.  And in addition to a

25     member of Mr. Reffitt's family, there will be two seats for

1    press and public, obviously first come, first served on the

2    public seat.  And I was able to make this change because court

3    staff consulted again with experts about relaxing the COVID

4    protocols in Appendix 8 to the Continuity of Operations Plan

5    referenced in the Chief Judge's February 15th standing order

6    Number 2207.

7        This seating plan is consistent with the changes the court

8    will be making imminently to Appendix 8, and because that plan

9    will be modified, I was both able and willing to make those

10   changes.  So I'm glad we were able to resolve that.

11       All right.  So when the jurors are brought in, I would like

12   for you all just to confirm with your notes that we have them

13   seated in the proper order.  I will have them sworn in, and I

14   will give them the preliminary instructions.  And you all, I

15   take it, received modified versions of those instructions.

16       Any objections to cutting the portions that we suggested

17   cutting?  I feel like I've told them a lot about what they can't

18   do, and it seemed unduly repetitive to say it two different ways

19   in that set of instructions.

20       So if there's anything in there that you want changed, I'm

21   happy to consider that.  Just let me know.  And I know you

22   haven't had a chance to fully review it, but you'll have a few

23   minutes to do that before they come in.

24       After I instruct the jurors, the government will make its

25   opening statement.  Will that be you, Mr. Nestler, or

1    Ms. Berkower?

2              MR. NESTLER:  I will be handling it, Your Honor.

3              THE COURT:  Are you going to be speaking from the

4    podium?

5              MR. NESTLER:  Partially, Your Honor, but I also have a

6    lapel mic that Mr. Cramer helped me with this morning.

7              THE COURT:  I would just encourage you all, given the

8    problems with the overflow room and the audio feed, I think

9    every chance you can, you should be at the podium.  And try to

10   speak into the microphone.  If I turn my head, you know, six

11   inches this way, it's not picking up.

12       So I know there was some comments last night, in

13   particular, about not being able to hear things, and most of

14   that, of course, was with the husher on.  But I think there are

15   problems in the normal course as well.

16       So I'm going to hold you to your 30-minute estimate.  I'm

17   not going to cut you off right at 30 minutes, but I will give

18   you a warning and one or two minutes to wind up.

19       Mr. Nestler, no video in the opening; right?

20             MR. NESTLER:  Yes, Your Honor.

21             THE COURT:  All right.  Mr. Welch, do you plan on

22   giving an opening?

23             MR. WELCH:  Yes, I do, Your Honor.

24             THE COURT:  All right.  So I'm going to omit the part

25   in the introductory instructions to the jurors about sometimes

1   the defense gives an opening, sometimes it doesn't, because I

2   know you're going to.  Any objection?

3               MR. WELCH:  No, ma'am.

4               THE COURT:  All right.  So as you all know -- you can

5   have a seat.  Thank you.

6               MR. WELCH:  Thank you.

7               THE COURT:  As you all know, the jurors, perhaps more

8   than one, who have been selected for this panel expressed

9   concerns about sitting longer than an hour, and we didn't move

10  them to the end.  So I'm going to be very accommodating with

11  breaks as needed, and I'm going to tell them if at any point

12  someone needs a break, raise their hand and we will take a

13  break.  That's the cost of having a juror like that, you know,

14  in the panel.  I don't want anyone uncomfortable and not able to

15  pay attention because they need a break.

16      So I've told Mr. Hopkins to speak to the jurors and let

17  them know if they need a break, raise their hand.  As you all

18  can tell, I get in the zone, and I forget about breaks.  So you,

19  too, Mr. Reffitt, if you need a break, all right?  I want

20  everybody comfortable.  But I don't think that we're going to

21  need more than a break every hour, I hope.  Maybe every hour and

22  a half.

23      So the plan, in an ideal world, would be to go to a natural

24  breaking point for lunch, take an hour for lunch, take a

25  mid-morning break in between when we start and when we think

1    lunch will be, and take an afternoon break.  But given the

2    composition of the jury, we might need to have a five-minute

3    break somewhere in there.

4        So government will have Ms. Kerkhoff and your next witness

5    ready and available today after Mr. Welch's opening?

6            MR. NESTLER:  Yes, Your Honor.

7            THE COURT:  All right.  Can you just tell me roughly

8    how long you expect your direct of her to be?

9            MR. NESTLER:  For Ms. Kerkhoff, probably about an hour

10   and a half.

11           THE COURT:  Is that your witness or Ms. Berkower's?

12           MR. NESTLER:  Mine, Your Honor.

13           THE COURT:  One thing I noticed last night in going

14   through the government's exhibits is it appears that your

15   exhibit list is correct, but the exhibits that are marked in the

16   binder are not.  So for example, 51-A, I think, is supposed to

17   be a picture of the Capitol, and it's a picture of a firearm.

18       So I either need a new notebook with the exhibits properly

19   marked, or I need you all to take a look over lunch and

20   substitute it.

21       I take it Kerkhoff's not testifying about the firearms that

22   were seized from the home?

23           MR. NESTLER:  I'm sorry, Your Honor.  Exhibit 51-A is

24   a photo of a Tippmann PepperBall launcher.

25           THE COURT:  I thought, looking at the exhibit sheet --

1   so maybe that's off.  I thought 51-A is a Kerkhoff admission of

2   a photo, left side.

3            MR. NESTLER:  Yes, of the Tippmann PepperBall

4   launcher, which is the less-than-lethal weapon she was using --

5            THE COURT:  Oh, she was using?  I thought these were

6   the firearms seized from the defendant.

7            MR. NESTLER:  The initial series, Your Honor, are

8   either physical items or photos of physical items that the

9   government took.  Starting with the 100 series are photographs

10  from the search warrant and arrest of the defendant.

11           THE COURT:  Sorry.  I thought these were firearms of

12  the defendant's.

13           MR. NESTLER:  51 through 54 are the weapons that the

14  Capitol Police used on the defendant.

15           THE COURT:  Understood.  All right.  I take that back.

16      We do have the rule about witnesses invoked, 615.

17  Mr. Welch, you've instructed family members who are going to be

18  witnesses that they cannot be in this courtroom or the overflow

19  courtrooms?

20           MR. WELCH:  That's correct, Your Honor.  And if it

21  hasn't been formally invoked, I would ask to invoke it now.

22           THE COURT:  All right.  It has.

23      And Mr. Nestler, same for you with the government

24  witnesses?

25           MR. NESTLER:  The same for the government witnesses,

1    Your Honor, with the exception of Special Agent Ryan, who is

2    sitting here.

3              THE COURT:  Understood.  All right.

4         And is Kerkhoff the witness that we had the under seal

5    motion on, the issue that you're going to confront consistent

6    with my ruling?

7              MR. NESTLER:  I plan to start with leading questions

8    on direct.

9              THE COURT:  Okay.  All right.

10        Are there any other logistical issues?

11             MR. NESTLER:  Just one thing to put on the record,

12   Your Honor.

13        This morning when I came into the courthouse, juror number

14   4 stopped me in the foyer and said, "You're a part of the trial;

15   right?"  And before I could respond or walk away, he said, "We

16   have to go to the fourth floor; right?" to which I answered,

17   "Yes."

18        But it might make sense --

19             THE COURT:  I will remind them that you all can't

20   interact with them.

21             MR. NESTLER:  Thank you, Your Honor.  It might also

22   make sense to remind members of the press and the public to not

23   try to speak with the jurors as they're in and out of the

24   courthouse.

25             THE COURT:  I will do that.

1        Anything else, Mr. Welch?

2              MR. WELCH:  No, Your Honor.

3              THE COURT:  Mr. Hopkins, do we have the jury coming in

4    at 9:30?

5              COURTROOM DEPUTY:  Yes, Your Honor.

6              THE COURT:  I imagine it will take a few minutes.  I

7    hope they're all on time, but if not, we will be a little

8    delayed.

9         Let me talk to counsel just briefly about a confidential

10   medical issue with a juror.

11        (Sealed bench conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5          (End of sealed bench conference.)

6          THE COURT:  All right.  So I will take a brief recess,

7     and we will be back to swear in the jury and do preliminary

8     instructions and opening statements.

9          (Recess taken from 9:28 a.m. to 9:52 a.m.)

10          (Call to order of the court.)

11          THE COURT:  Good morning again.  Before we bring the

12     jurors in, I'm going to remind the members of the press and the

13     public they are not to try to talk to any of the jurors in this

14     matter.

15          Anything else we need to address, Counsel?

16          MR. WELCH:  No, Your Honor.

17          THE COURT:  All right.  I will have Mr. Hopkins bring

18     in the jury.

19          (Jury entered courtroom.)

20          THE COURT:  Good morning, everyone.  I hope you all

21     had a good evening, and I'm very sorry again for keeping you so

22     late yesterday.  If I had known it was going to take so long to

23     select a jury, we would have waited until this morning, but I

24     did want to try to get the larger crowd home and not have to

25     come back again today.  So thank you for showing up on time, and

1    in a few minutes, you will hear the opening statements of

2    counsel for both sides.

3         But first, I will have the courtroom deputy swear you in,

4    and then I will give you some initial preliminary instructions.

5         (Jury sworn.)

6              THE COURT:  All right, ladies and gentlemen.  Before

7    we begin the trial, I want to explain how the trial will work,

8    and I also want to explain some of the legal rules that will be

9    important in this trial.

10        As an initial matter, the instructions that I give you now

11   are no substitute for the longer, more substantive instructions

12   that I will give to you both orally and in writing at the end of

13   the case.  So you will get substantive instructions on the law

14   at the very end.  This is just to give you an orientation as to

15   how the trial is going to proceed and what your responsibilities

16   as jurors are.

17        We have notebooks and pencils for each of you.  Some jurors

18   find it helpful to take notes; others find it distracting.  It's

19   entirely up to you whether you take notes or not.  If you do

20   decide to take notes, you should feel free to write down

21   anything you would like.  The notes will be locked in the

22   courtroom during recesses and overnight and will be destroyed at

23   the end of the trial.

24        So feel free to write anything you like in the notebooks.

25   I won't see them; none of the lawyers or the parties or your

1    fellow jurors will see what you write.

2        As you've seen, there are 16 of you.  Four of you are

3    alternates.  As I said before, we selected the alternates before

4    any of you all showed up, and so we know who the alternate

5    chairs are, but you do not.  And as I explained yesterday, it's

6    not necessarily the last four, 13, 14, 15, and 16.

7        Because any of your seats could be an alternate seat, you

8    should all think of yourselves as regular jurors and give this

9    case your fullest and most serious attention.

10       I will apologize in advance, because at the end of the

11   trial, I will need to dismiss four of you.  You will remain on

12   call, so to speak, in case something should happen to one of the

13   other 12 jurors who will be deliberating, but it's never a good

14   feeling for me to have to tell folks who have sat through a

15   trial that they will not be deliberating unless something

16   unexpected happens.  So again, I apologize in advance.

17       As I told you at the outset, this is a criminal case.  The

18   indictment in this case charges the defendant, Guy Wesley

19   Reffitt, with four counts relating to Congress's meeting at the

20   United States Capitol on January 6, 2021.

21       First, he is charged with obstructing an official

22   proceeding for allegedly interfering with Congress's meeting.

23   Second, he is charged with being unlawfully present on the

24   Capitol grounds while using or carrying a firearm.  Third, he is

25   charged with transporting firearms, knowing or intending that

they be used unlawfully in furtherance of a civil disorder.
Fourth, he is charged with interfering with law enforcement
officers during a civil disorder.  The government has also
charged Mr. Reffitt with obstructing justice based on statements
he made to his children while at home in Wylie, Texas, around
January 11, 2021.

Mr. Reffitt has pled not guilty to all of these charges.

At the end of the trial, you will have to decide whether or
not the evidence presented has convinced you beyond a reasonable
doubt that the defendant committed these offenses.

To prove the offense, the government must prove beyond a
reasonable doubt each of the elements of the charged offenses.
You should understand that the indictment that I just summarized
is not evidence in this case.  The indictment is just a formal
way of charging a person with a crime in order to bring him to
trial.  You must not think of the indictment as evidence of the
guilt of the defendant just because he's been indicted.

At the end of trial, you will have to decide whether the
government has proven each element of the charged offense beyond
a reasonable doubt, and I will explain what those elements are
in more detail at the end of the trial.

As I said before, Mr. Reffitt is presumed innocent.  That
presumption remains throughout the trial unless and until he is
proven guilty beyond a reasonable doubt.  The burden is always
on the government.  If the government proves each element of the

offense beyond a reasonable doubt, it is your duty to find the defendant guilty of that offense.  But if you find that the government has not proved one or more elements of the charged offense, you must find the defendant not guilty of that offense.

Throughout the trial, you will hear me refer to the government and the defense or the defendant.  When I refer to this side of the courtroom (indicating) as the government, that simply means the prosecution team or one of the lawyers or legal assistants from the U.S. Attorney's Office.  When I refer to the defense (indicating), that just means the defendant or defense counsel.

This case will proceed in four stages.  First, we will begin with opening statements.  The government will begin, and then we will move to the defense opening statement.  The opening statements are not evidence in this case.  They are only intended to give you a road map of what each side believes the evidence will show in the case.

The next stage of the trial will be the presentation of evidence.  Again, we will start with the government's case-in-chief.  There will be a direct examination of witnesses, then a cross-examination by the defense, and, if necessary, a brief rebuttal examination or a brief redirect examination.

After the government's case, the defendant may, but is not required to, put on his own case-in-chief.  If the defendant decides to put on a case, it will follow the same order as the

government's case, and the government may choose at the end to bring a rebuttal case.

During the presentation of evidence, the lawyers will be asking questions.  Like their opening statements, the questions are not evidence.  The only evidence in the case is the sworn testimony of witnesses and the exhibits that will be admitted into evidence.

After the presentation of evidence, I will instruct you on the rules of law that you are to apply in your deliberations when you retire to consider your verdict in this case.

After legal instructions, we will move to closing arguments, and they will proceed in the same order as the presentation of evidence:  First the government, then the defense, and then the government rebuttal argument.  The lawyers' closing arguments, just like their opening statements, are not evidence in this case.  They are only intended to help you understand the evidence.

Finally, at the end, I will give you a few final instructions, and then you will deliberate.

My responsibility during the trial is to run a fair and efficient trial, to rule on questions of law and evidentiary questions that arise during this trial, and to instruct you on the law.  Your responsibility as jurors is to accept the laws I instruct, and you and only you are the deciders of the facts in this case.  You will weigh the evidence.  You will judge the

1    credibility and believability of the witnesses.

2          Occasionally, a lawyer might object to a question that

3    opposing counsel has posed.  If I sustain the objection, that

4    simply means that the question must be withdrawn, and you must

5    not speculate on what the answer is.  If the answer has already

6    been given and I strike the answer from the record, then you are

7    to disagree -- disregard the answer.  The same is true for any

8    exhibits that I order stricken.

9          If I overrule an objection, that means that the question

10   stands, and the witness may answer it, and you may consider the

11   witness's answer.  And please don't fault either side if I

12   sustain more or fewer of their objections.  They're simply doing

13   their job.

14         During this trial, you should not take any of my statements

15   or actions as any indication of my opinion about how you should

16   decide the facts.  If you think that somehow I have expressed or

17   even hinted at an opinion as to the facts in this case, you

18   should disregard it.  The verdict in this case is your sole and

19   exclusive responsibility.

20         You are not permitted to discuss this case with anyone

21   until this case is submitted to you for your decision at the end

22   of my final instructions.  This means that until the case is

23   submitted to you, you may not talk about it, even with your

24   fellow jurors.  This is because we don't want you making

25   decisions until you've heard all of the evidence and the

1    instructions of law.

2         In addition, as I've said, you may not talk about the case

3    with anyone else.  You also may not write about the case

4    electronically, through any blog, posting, or other

5    communication, including social networking sites, until you have

6    delivered your verdict and the case is over.  This is because

7    you must decide the case based on what happens here in the

8    courtroom, not on what someone may or may not tell you outside

9    of the courtroom.

10        You must not give anyone any information about the case

11   itself or the people involved in the case.  You must also warn

12   people not to try to say anything to you or write to you about

13   your jury service in the case.  This includes face-to-face,

14   phone, or computer communications.  You must also not disclose

15   your thoughts about your jury service or ask for advice on how

16   to decide the case.

17        Now, when the case is over, you may discuss any part of it

18   with anyone you wish, but until then, you may not do so.

19        Although it is a natural human tendency to talk with people

20   who you may come into contact, as I explained, you must not talk

21   to any of the parties, their attorneys, or any witnesses in this

22   case during the time that you serve on the jury.  If you should

23   encounter anyone connected with the case outside the courtroom,

24   you should avoid having any conversation with them, overhearing

25   their conversation, or having any contact with them at all.

1        For example, if you find yourself in a courthouse corridor,

2    elevator, or any other location where the case is being

3    discussed by attorneys, parties, witnesses, or anyone else, you

4    should immediately leave the area to avoid hearing such

5    discussions.  If you do overhear a discussion about the case,

6    you should report that to Mr. Hopkins as soon as you can.

7        Finally, as I said before, if you see any of the attorneys

8    or any of the witnesses or court staff involved in the case and

9    they turn and walk away from you, they are not being rude.  They

10   are merely following the same instruction that I gave to them.

11       It is very unlikely, but again, if someone tries to talk to

12   you about the case, you should refuse to do so and immediately

13   let me know by telling Mr. Hopkins.  Don't tell the other

14   jurors.  Just let Mr. Hopkins know, and I will bring you in the

15   courtroom to discuss it.

16       You must decide the facts based on the evidence presented

17   in court and according to the legal principles about which I

18   will instruct you.  Again, you are not permitted during the

19   course of the trial to conduct any independent investigation or

20   research about the case.  That means, for example, you can't use

21   the Internet to do research about the facts or the law or the

22   people involved in the case.  Research includes something even

23   as simple or seemingly harmless as using the Internet to look up

24   a legal term or view a satellite photo of the scene of the

25   alleged crime.

1    I want to explain to you why you should not conduct your

2  own investigation.  All of the parties have a right to have the

3  case decided only on evidence and legal rules that they know

4  about and that they have a chance to respond to.  Relying on

5  information you get outside this courtroom is unfair because the

6  parties would not have a chance to refute, correct, or explain

7  it.

8    Unfortunately, information that we get over the Internet or

9  from other sources may be incomplete or misleading or just plain

10  wrong.  It is up to you to decide whether to credit any evidence

11  presented in court, and only the evidence presented in court may

12  be considered.  If evidence or legal information has not been

13  presented in court, you cannot rely on it.

14    Mr. Reffitt is entitled to a verdict based simply on the

15  evidence of this case, and when jurors go out and start

16  researching matters that are beyond the evidence, he is deprived

17  of that right, and that would not be fair.

18    Moreover, if any of you do your own research about the

19  facts or the law, this may result in different jurors basing

20  their decisions on different information.  Each juror must make

21  his or her decision based on the same evidence and under the

22  same rules.

23    There may be reports on the newspaper, on the radio,

24  Internet, or television concerning the case while the trial is

25  ongoing.  Again, you may be tempted to read, listen to, or watch

1   it.  But you must not do so, because you must decide this case

2   solely on the evidence presented in this courtroom.  As I

3   mentioned before, if you receive automatic alerts from any

4   source, you may need to change your push notifications, news

5   subscriptions, or RSS and Twitter feeds.  If any information

6   about this trial inadvertently comes to your attention during

7   this trial, do not discuss it with jurors or anyone else.

8   Again, just let Mr. Hopkins know as soon after it happens as you

9   can, and I will discuss it briefly with you.

10          Also, should you observe another juror who is not following

11   the Court's instructions, please let Mr. Hopkins know.  He will

12   bring it to my attention, and we will figure out how to deal

13   with it.

14          After I submit the case to you, you can discuss it only

15   after I instruct you to do so, and only in the jury room, and

16   only in the presence of all of your fellow jurors.  It is

17   important that you keep an open mind and you not decide any

18   issue in the case until after I submit the entire case to you

19   with my final instructions.

20          Ms. Wick and, this afternoon, Ms. Herman will be taking

21   down all of the proceedings, but you will not have a copy of the

22   transcript when you go back to deliberate.  So when you go back

23   to deliberate, you will have to rely on your memory and on any

24   notes that you choose to take.

25          So with those instructions, we will begin the opening

 1   statements by the government.

 2        Mr. Nestler?

 3             MR. NESTLER:  Thank you, Your Honor.

 4        Mr. Hopkins, do you mind turning the monitors on?

 5             COURTROOM DEPUTY:  Absolutely.  Do you want to make

 6   sure the jury can see it, Counsel?

 7             MR. NESTLER:  Yes.  Thank you.

 8        Good morning.  On January 6 of 2021, the United States

 9   Capitol, the heart of democracy in our country, the massive

10   white building across the street from where you're sitting right

11   now, was attacked by a mob in what was the worst assault on the

12   Capitol since the War of 1812.  This mob was determined to

13   physically prevent Congress from meeting inside the Capitol

14   building that afternoon.

15        A mob needs leaders, and this man, Guy Wesley Reffitt, of

16   Wylie, Texas, drove all the way from his home in Texas to D.C.

17   to step up and fulfill that role.  Mr. Reffitt helped lead the

18   mob up the staircases of the Capitol building to overwhelm the

19   police, actually invade the building, and drive our elected

20   representatives physically out of their chambers.  In the

21   defendant's own words, he lit the match that started the fire.

22        On the screen, you will see a screen shot from surveillance

23   video facing the United States Capitol.  Just before 2:00 p.m.

24   on January 6 of 2021, a mob of hundreds or thousands of people

25   gathered on the west side of the Capitol there in the middle

1    ground of that photograph.  They were already within the

2    restricted perimeter of the Capitol building.  The mob tried to

3    push forward, but they were blocked by police and the building

4    and the scaffolding.

5         The defendant, seen here with the arrow, seized the

6    opportunity to be a leader.  He climbed up on the banister to

7    lead the mob towards the doors of the building.  He literally

8    stood out from the crowd.  There he is with the blue jacket on

9    in front of the crowd with a megaphone, helmet, bulletproof

10   vest, police-style flex cuffs, and a holstered handgun.

11        The defendant led the mob up these stairs to overwhelm the

12   Capitol police officers and storm the building.  The defendant

13   was the tip of this mob's spear.

14        Now, as residents from all over of the District, as we

15   discussed yesterday during jury selection, you may have seen the

16   Capitol building right off in the distance with the Statue of

17   Freedom perched atop the dome almost 300 feet in the air, or

18   perhaps you live or work close by or even just saw it this

19   morning as you came into the courthouse to do your service as

20   jurors.

21        But many people don't know or don't think about the work

22   that actually happens inside of the building itself.  During

23   this trial, you're going to have a short civics lesson on the

24   first branch of government, the Legislature or Congress.

25        Congress has two parts:  The House of Representatives and

the Senate.  Back on January 6 of last year, the person in charge of the House of Representatives was Speaker of the House Nancy Pelosi.  The person in charge of the Senate was Senate Majority Leader Mitch McConnell.

The United States Constitution, the document that controls our entire government, requires the House of Representatives and the Senate to meet together as a single body once every four years for the sole purpose of reviewing and counting the ballots that formally declare the winner of the presidential election, the person who will be sworn in on Inauguration Day.

A federal law specifies exactly when and how that session must work.  It must occur on January 6.  It must start at 1:00 p.m. in the afternoon.  It must take place in the House of Representatives's chamber within the United States Capitol building.  The Vice President of the United States must be the person who presides over that proceeding.  And by law, that session cannot end until Congress counts all of the ballots and declares the name of the next president.

The evidence in this case will show that the defendant attacked the Capitol on the afternoon of January 6 precisely because Congress was meeting in joint session at that time.  He planned to light the match that would start the fire.  He wanted to stop Congress from doing its job.  And he had two specific targets in mind:  The people in charge of the two houses of Congress, Speaker Nancy Pelosi and Senate Majority Leader Mitch

1    McConnell.

2        Let's rewind a couple of weeks before January 6 to late

3    December of 2020.  The defendant was living in Wylie, Texas,

4    just outside of Dallas.  You're going to learn during this trial

5    that the defendant was a member of a group who called themselves

6    the Texas Three Percenters.  The name of Three Percenters comes

7    from the myth that only 3 percent of American colonists rose up

8    to fight against the British during the Revolutionary War.

9        Like many people in our country, these Three Percenters

10   were angry about the results of the 2020 presidential election,

11   but what makes this defendant stand out are the actions that he

12   took.  In December of 2020, arguing that the legislative branch

13   has committed treason -- those are his words -- the defendant

14   messaged his fellow Three Percenters about his plans to drive

15   across the country and into our nation's capital.  The defendant

16   told members of this group, "The fuel is set" and "we will

17   strike the match in D.C. on the 6th."

18       The defendant also told his own family about his plans and

19   what he planned to do and, in his words, that it will be

20   "something big."  You will hear from the defendant's own

21   teenaged son Jackson during this trial.  Jackson had watched the

22   defendant join the Texas Three Percenters, stock up on

23   ammunition after the election, and angrily talk about how

24   Senator Mitch McConnell and Speaker Nancy Pelosi had "ruined

25   everything."

1    In late December, the defendant messaged his family.  You
2    will see these messages here during the trial.  He
3    said, "Congress has made fatal mistakes this time.  What comes
4    next is about tyranny.  The entire house of legislation has
5    committed unthinkable acts on our people.  What's about to
6    happen will shock the world.  That's why I'm going to D.C. "

7    Like many fathers and sons, Jackson and his father often
8    argued about politics.  But this was not an argument, and this
9    was not about politics.  The defendant told his son about the
10   defendant's plans to commit acts of violence here in D.C.
11   Jackson will tell you that he hoped to the bottom of his heart
12   that his father wouldn't actually do anything to Congress, but
13   that if his father actually did commit violence, Jackson wanted
14   to have tried to have done something about it.

15   So Jackson will tell you he did what was a wrenching
16   decision for him.  On Christmas Eve of 2020, he sent a tip to
17   the FBI about his own father and about what his father planned
18   to do at the Capitol.

19   As the defendant made his plans to come to the Capitol on
20   January 6, he tried to recruit other members of the Texas Three
21   Percenters group to join him.  One man named Rocky Hardie
22   agreed.  You will hear from Mr. Hardie during this trial.

23   He will explain that starting on January 4 of 2020, he and
24   the defendant drove across the country, more than a thousand
25   miles over two days.  They drove this entire distance rather

than fly so they could bring their guns with them.  The
defendant brought an AR-style rifle, specifically a
Smith & Wesson MMP Model 15, and a handgun, a Smith & Wesson
.40-caliber semiautomatic pistol.  You're going to see both of
these guns here in this courtroom during this trial.

Like the defendant, Rocky Hardie also brought his own
AR-style rifle, and Rocky Hardie also brought his own handgun.
But Mr. Hardie is not on trial here.  He is here to tell you the
inside story of what he and the defendant did.  He will be
testifying before you pursuant to an immunity agreement, which
means that his statements that he delivers in court cannot be
used against him, but nothing prevents him from being prosecuted
based on other evidence.

Mr. Hardie will tell you that he and the defendant
discussed how they knew bringing these guns into D.C. was
illegal, but the defendant thought the risk was well worth it.
The defendant wanted his guns at his disposal while he was doing
what he did at the Capitol.

Mr. Hardie and the defendant spent the night of January 5
here in the District at the Melrose Hotel in Georgetown.  The
next morning, January 6 of 2021, the defendant dressed for
battle.  He called it "full battle rattle," in his words.  He
wore a bulletproof vest filled with heavy ceramic plates.  He
carried a radio so he could communicate with Mr. Hardie in case
they got lost, which they did, or separated.

1    He wore a helmet with a camera mounted on the top to record

2  his own actions.  He carried thick, plastic, police-style flex

3  cuffs used to restrain people so he could restrain members of

4  Congress when he encountered them.  You're going to see each of

5  these items here in this courtroom during this trial.

6    The defendant also carried a megaphone with him during his

7  assault at the Capitol so the mob could better hear his

8  commands, but he appears to have dropped the megaphone while

9  there at the Capitol.

10    Critically, in a holster on his hip the defendant put his

11  Smith & Wesson .40-caliber pistol.

12    With their rifles assembled and the defendant's car in

13  their hotel garage and their handguns in holsters on their

14  bodies, the defendant and Mr. Hardie walked from their hotel,

15  the Melrose Hotel, down towards the National Mall.

16    The two men first went to The Ellipse and the Washington

17  Monument, near where President Trump was speaking that morning.

18  There, the defendant continued to tell people openly what he

19  planned to do later that day, that he planned to storm the

20  Capitol, and he encouraged other people to join him.  You're

21  going to hear these words coming straight out of the defendant's

22  mouth, because they were captured on that camera he was wearing

23  on his head, on his helmet the entire time.

24    You're going to have to excuse some of the language you're

25  going to hear me say right now and that you're going to hear

during this trial.  These are the defendant's words, not my
words.  You're soon going to hear them for yourself on the
actual audio recordings.

The defendant said, "We're taking the Capitol before the
day is over, ripping them out by their hair, every fucking one
of them."  The defendant said, "Dragging them out kicking and
fucking screaming.  I just want to see Pelosi's head hitting
every fucking stair on the way out and Mitch McConnell too."

The defendant told the people around him, "I'm packing
heat, and I'm going to get more heat, and I am going to that
fucking building, and I am dragging them the fuck out."

Finally, when another man asked the defendant what will
happen if the Capitol Police start shooting back, he
responded, "A hell rain of fire comes back, because every one of
my guys are here, and I can assure you, they came in hot.  So
did I."

Around 1:00 p.m., the defendant walked with the mob from
The Ellipse to the Capitol.  This is the precise time that the
Vice President of the United States Mike Pence formally gavelled
in the joint session of Congress as required by the Constitution
and federal law.

The defendant arrived on the west side of the Capitol by
around 1:35 p.m.  By this time, the senators had temporarily
moved to their own chambers in a different wing of the Capitol
to handle a debate.  Vice President Pence was presiding over the

Senate.  Speaker Nancy Pelosi was presiding over the House.

On this day, the west side of the Capitol looked a little different than it normally looks.  That's because there was scaffolding covered with white tarp, as workers were still in the process of building the inaugural stage that would host the inauguration two weeks in the future.

By the time the defendant arrived, the mob had formed below the scaffolding.  They were shouting at police officers who stood midway up the flight of stairs on a landing between the crowd and the building itself.  Behind the officers was a narrow stairway that led to the doors outside the Senate chamber.

Faced with this roadblock to the building, the defendant took charge.  In his own words, he lit the fire of the surrounding mob.  He climbed up on the banister adjacent to the scaffolding, he took out his megaphone, and he directed his voice forwards and backwards.  Forward between him and the building, he made demands of the Capitol police officers who had gathered on the landing above him.  He ordered them to stand down and step aside and let him and the mob into the building.  Backwards to the mob below and behind him, he urged the crowd to push up towards the building and overtake the officers, and he showed the mob the way.

Capitol police officers have a sworn duty to protect our senators and elected representatives and to protect the building itself.  That is their mission, as you will hear.  These

officers were blocking the defendant's access to the building, and they were carrying what you will hear they call less-than-lethal weapons, weapons designed to stop or incapacitate people during a civil disorder.

Confronted with this defendant standing on the banister out in front of the angry crowd that continued to grow behind him, the officers did their duty.  Officer Shauni Kerkhoff launched pepper balls at the defendant.  Designed for use as crowd control, pepper balls both hurt on impact and also release pepper gas, which is an irritant.

The defendant was not deterred.  He stepped forward on the banister towards the officers.  He appeared to be showing off. Every time he stepped forward, the crowd behind him also stepped forward.

Seeing that the pepper balls were not stopping the defendant, Officer Kerkhoff called to her partner, Sergeant Adam DesCamp.  He came to assist her and brought a bigger, more powerful weapon with projectiles designed to have a greater physical impact, meaning they hurt more.  This weapon is called an FN-303 projectile launcher.

But the defendant was not deterred.  He continued to walk up the banister.  He kept showing off for the crowd.  Every time he stepped forward, the crowd stepped forward behind him.

Sergeant DesCamp then also called for backup, this time from Sergeant Matthew Flood.  Sergeant Flood was using a small,

handheld canister of OC spray, commonly called pepper spray.  He
sprayed the defendant, which finally had some small effect, but
not enough.  The defendant continued to step forward, continued
to move towards the officers, and every time he stepped forward,
the crowd filled in the space behind him.

The defendant finally sat down on the banister, but he did
not retreat.  In fact, he continued to try to lead the crowd
below and behind him, gesturing repeatedly with his arms up
towards the Capitol for the mob to go up and overwhelm the
officers and take the building.  The defendant had shown them
the way.

Finally, Sergeant DesCamp, with a large, powerful canister
of OC spray -- it looks like an oxygen tank; you're going to see
it here during the trial -- sprayed the defendant and other
members of the mob that were near him.  That finally had the
effect of stopping the defendant's advances, and it gave the
officers some critical time to regroup, but it was not enough.

You will hear that, during this entire time, Vice President
Pence was still presiding over the Senate just up the stairs
from where the officers were trying to do their jobs holding the
defendant and the mob back.

Over the next 15 minutes, the crowd below the defendant
moved up the stairs, filling in the space the defendant had
gained.  Members of the crowd dismantled the tarp protecting the
inaugural scaffolding, and they used it as a shield to protect

1   themselves from the officers' pepper balls and OC spray.

2        The mob pushed further up the stairs between the girders of

3   the scaffolding and through the scaffolding itself, and then

4   when their numbers were great enough, the mob physically

5   overpowered the small number of officers who were trying to hold

6   that landing.

7        At this time, 2:09 p.m. on January 6, the Senate was still

8   in session, and Vice President Pence was still in that chamber

9   performing the role that the Constitution and the federal law

10  required him to do.  It was this mob that ran up these stairs

11  and broke into the Capitol building, smashing through windows

12  and doors in the foyer just outside the Senate chamber.

13       The defendant, still on the stairs, tried to push forward

14  with the rest of the mob, but he was, obviously, still reeling

15  from the confrontation he had had.  But his work was done.  In

16  his words, he had lit the match.  He showed the mob behind him

17  the way to get up, opened the window of opportunity for them to

18  cut down the tarp, infiltrate the scaffolding, and overwhelm the

19  police officers trying to hold their line.

20       And the entire time the defendant was doing this, he was on

21  the stairs of the United States Capitol with a handgun on his

22  waist.

23       Within the building, the United States Secret Service

24  evacuated Vice President Pence, and the United States Capitol

25  Police evacuated the senators and representatives and their

1    staff members.

2         You will hear from the people who were there inside the

3    building who will tell you what it felt like when they heard the

4    heavy metallic locks of the Senate chambers doors lock shut,

5    when they saw the police officers with rifles have to escort

6    them to safety.  Rioters powered into the Senate chamber and

7    freely roamed the halls of the Capitol building.

8         The defendant, for his part, almost immediately started

9    bragging about what he had accomplished.  Using Telegram, which

10   is a messaging app. you have on your phone, he wrote to another

11   Three Percenters, his words, "I was the first percent to light

12   the fire on the Capitol steps."  And then in all caps, he

13   wrote, "We took the Capitol."

14        And the defendant on Telegram provided a detailed account

15   of his confrontation with the Capitol police officers, writing

16   to another person, "She shot me several times in the vest and

17   realized it wasn't doing any good.  I laughed and moved forward.

18   Then she started shooting my legs.  I laughed again and moved

19   forward.  She ran out after 20 plus, and then they pepper

20   sprayed me with bear spray.  That stopped me but fired up the

21   crowd.  They couldn't be stopped after that.  I finally made it

22   to the top of the steps when they broke through the doors.  My

23   job was done then.  I had to fall back and get my sight back."

24        The defendant's own words.

25        Once the defendant was home in Texas, he convened a meeting

of the Texas Three Percenters to explain his own intent in going in the Capitol and what he had done, which was, in his own words, to take out Congress.  Because the defendant conducted the meeting over Zoom, you're going to see a recording of this Three Percenters meeting here during the trial.  I'm going to give you a preview now.  Again, these are the defendant's words, not my words.

Describing what the defendant told others while at The Ellipse just before heading to the Capitol, the defendant said, "When this is over, we're going to the Capitol.  I'm not done until we drag them out screaming and kicking.  I don't care if Pelosi's head is hitting every step as I drag her by her ankles.  She's coming out."

Then the defendant recounted his own actions for his fellow Three Percenters members.  He said, "I climbed up that banister and got wrecked.  I just kept screaming, "Take the House," and everybody just started ripping the scaffolding apart.  I had my .40 on my side.  They're lucky we didn't shoot them.  They really need to be grateful."

The evidence will show that the defendant was speaking the truth during this meeting.  This was not mere puffery or bluster.  The defendant did tell others at The Ellipse he was headed to the Capitol to drag Nancy Pelosi out by her ankles. He did then go to the Capitol.  He did climb up that banister. He did keep screaming.  The mob did rip the scaffolding apart.

1    And the defendant did have his .40, his Smith & Wesson handgun,

2    on his side.

3         You are also going to hear evidence about what happened

4    inside the defendant's house shortly after he got back to Texas

5    from D.C., about how he was proud of his accomplishments.  The

6    defendant bragged to his family about his role in taking the

7    Capitol, and he played his helmet camera videos while narrating

8    the action for his family.

9         The defendant's teenaged son Jackson had seen the images of

10   the Capitol attack all over the news, and he will tell you he

11   felt sick knowing his father had been part of it.

12        Following on the heels of Jackson's decision to send a tip

13   to the FBI two weeks earlier, Jackson made another wrenching

14   decision.  He recorded his own father talking about his crimes

15   in his own house.  During this trial, you are going to hear some

16   of those recordings with the defendant speaking in the

17   defendant's own voice about what he had done.

18        According to the defendant, he explains he started the

19   fire, admits he brought a gun with him to the Capitol, and says

20   that "we had a right to carry a weapon and take over Congress,

21   as we tried to do.  We went in, and they scurried like rats and

22   hid."

23        While the defendant was initially proud and boastful,

24   around January 10, his mood abruptly changed as the fallout from

25   the attack on the Capitol started to become clear.

1    First, the leader of the Texas Three Percenters told the

2    defendant he had been taken into questioning by law enforcement.

3    The defendant frantically messaged the rest of the group to warn

4    them, in all caps, "This is not a drill."  In the defendant's

5    own words, he wrote, "The shit is now hitting the fan."  He told

6    the rest of the group to purge, his word, all of their

7    conversations.

8    The second change on this day was that the FBI had started

9    arresting rioters around the country, and the FBI's arrests were

10   making big news, both nationally and locally in the Dallas area.

11   The defendant started telling his children the FBI was after

12   him, they needed to be careful what they said, who they talked

13   to.  The defendant worried aloud that he was being watched and

14   that he'd be arrested next.

15   The next day, January 11 of 2021, the situation came to a

16   boil.  The defendant was distressed.  He was agitated.  You will

17   hear he was especially worried about what his children would do,

18   because he knew they did not share his politics and that they

19   were upset about his actions in D.C.  The defendant told his

20   children, "Don't turn your back on me.  Don't betray me.  Don't

21   put the family in jeopardy."  He told his son Jackson and his

22   16-year-old daughter Peyton that if they turned him in "they

23   would be traitors.  And you know what happens to traitors.

24   Traitors get shot."

25   Jackson was more involved in the argument than Peyton was.

She was playing on her cell phone, like many other teenagers
were probably doing around this time.  But when Peyton held up
her phone, the defendant told her if that she were recording him
or posting anything about him he would put a bullet through her
phone.

Jackson heard these statements from his dad, and Jackson
was scared.  Jackson knew that his father had followed through
on his threats about Congress, and Jackson was worried about
what would come next.  Jackson knew his father was angry and
determined, and of course, everyone in the family knew that the
defendant had his guns in the house.  Jackson will tell you that
his father slept every night with his loaded .40-caliber
Smith & Wesson handgun in his nightstand and wore it on his hip
every day.

Let's talk briefly about your job as jurors.  Judge
Friedrich will provide you with lengthy formal instructions at
the end of the trial, as she just said, and that is the law you
need to apply.  But you should know the five charges against the
defendant so you can know what to look for and listen for as you
hear and see the evidence over the next several days.

The first four charges, as the Judge told you, relate to
Congress's meeting at the United States Capitol on January 6 of
2021, to count the ballots and formally declare Joe Biden the
winner of the presidential election.  And we expect to prove to
you that the defendant committed all four of these crimes while

on the grounds of the Capitol without even going inside the Capitol building itself.

Count 1, the defendant is charged with transporting firearms for use in furtherance of a civil disorder.  That charge is for bringing his rifle and handgun from Texas into D.C. to have ready to use during the attack at the Capitol.

Count 2, the defendant is charged with obstructing an official proceeding.  That charge is for corruptly interfering with Congress's meeting, and it also includes attempting to interfere with the meeting and helping others to interfere with the meeting.

Number 3, the defendant is charged with being in a restricted area while armed with a firearm.  That charge is for having a gun on the grounds of the Capitol while the vice president was inside the Capitol.

And Count 4, the defendant is charged with interfering with police officers during a civil disorder.  That charge is for interfering with those officers who were trying to hold the mob at bay while protecting that crucial landing on the stairs of the Capitol.

The fifth charge you will consider is for obstructing justice, and the defendant is facing that charge because once he was home in Texas, when he thought the FBI was going to come for him next, he threatened his children to stop them from cooperating with the FBI.

1    As Judge Friedrich will explain, we, the government,

2    Ms. Berkower and I, have the burden to prove the defendant's

3    intent to you beyond a reasonable doubt.  Ordinarily, a person's

4    intent cannot be proved directly, because there is no way of

5    knowing what a person is actually thinking.  But in this case

6    the evidence will show you that the defendant has actually made

7    it easy.

8    Before coming to D.C., the defendant told his family and

9    fellow Texas Three Percenters what he planned to do.  On the

10   drive to D.C. with Rocky Hardie, the defendant said what he

11   planned to do.  While at The Ellipse, he told those people in

12   the crowd near him what he planned to do.  He said he intended

13   to storm the Capitol, stop Congress's proceeding that was taking

14   place inside, and drag the senators and representatives inside

15   out by their heels.

16   And on January 6 of 2021, with his bulletproof vest,

17   helmet, megaphone, flex cuffs, and holstered gun, the defendant

18   went to the Capitol and did exactly what he said he was going to

19   do.  With the defendant's help and leadership, lighting that

20   match that would start that fire, the mob actually succeeded in

21   storming the building and preventing Congress from having its

22   meeting on that solemn and important day.

23   Once you have heard all of this evidence, Ms. Berkower is

24   going to stand before you and ask you to reach the only verdict

25   consistent with the evidence, and that, ladies and gentlemen, is

1    that the defendant, Guy Reffitt, is guilty.

2         Thank you.

3              THE COURT:  All right.  Mr. Welch?

4              MR. WELCH:  Good morning.  I would like to speak to

5    you for a few minutes about what the evidence will show.

6         The evidence will show that Guy Reffitt never assaulted

7    anyone.  He never tried to assault anyone.  He did not help

8    anyone else commit an assault.  He never disarmed an officer.

9    He never tried to.  And he did not help anyone else disarm an

10   officer.

11        Guy Reffitt never interfered with an arrest.  He never

12   tried to.  And he did not help anyone else interfere with an

13   arrest.  He was not armed.  He did not threaten harm.  He was

14   not aggressive.

15        He was told to get back.  He was hit with pepper balls,

16   weighted plastic impact projectiles, and pepper spray.  As soon

17   as he was pepper sprayed, that was the end of it.  He sat down

18   on the banister.  It lasted approximately five minutes.

19        A group of people pulled him off the railing so that he

20   would not fall over the edge.  They used a piece of tarp to

21   shield themselves and Mr. Reffitt from more pepper spray.  They

22   tried to help Mr. Reffitt decontaminate himself.

23        Guy Reffitt did not go in the Capitol.  He did not break

24   anything.  He did not take anything.  Guy does brag.  He

25   exaggerates, and he rants.  He uses a lot of hyperbole, and that

1    upsets people.

2        The evidence will show that this case has been a rush to

3    judgment.  The trial -- the rush to judgment -- and it's based

4    on bragging, and it's based on a lot of hype.  This trial will

5    be about fact versus hype, and it will be about truth versus

6    fiction.

7            THE COURT:  All right.  Thank you, Mr. Welch.

8        So I think that the tech person wants us to take a brief

9    break now to adjust the cameras in this courtroom.

10       So ladies and gentlemen, we're going to take a ten-minute

11   break, and then we will come back and have the government's

12   first witness.  I want to remind you, no conversations about the

13   case, no research about the case.  We will see you back in ten

14   minutes.

15       Thank you.

16       (Recess taken from 10:52 a.m. to 11:25 a.m.)

17       (Jury not present.)

18           THE COURT:  All right, Counsel.  I assume you've heard

19   about the issues with the feed into the other rooms?

20           MR. WELCH:  No.

21           THE COURT:  Apparently, there's an issue with the

22   exhibits.  And so the tech people are working on it, and we hope

23   it's fixed, but it's possible that we could start with this

24   witness and get a message saying it's not working, in which case

25   we're going to take an early lunch and come back in an hour and

1    start from the beginning.  So just keep that in mind.

2        So I will tell the jurors when they come in that we hope we

3    don't have to take an early lunch, but it's a possibility, and

4    we are working on fixing the problem.

5             MR. NESTLER:  Yes, Judge, that's fine.  I have a

6    couple preliminary matters for this witness.

7             THE COURT:  Okay.

8             MR. NESTLER:  This witness is going to be Shauni

9    Kerkhoff.  Three issues to flag for the Court.  One is, she is

10   going to be displaying the four less-than-lethal weapons that we

11   talked about earlier today to the jury as demonstrative

12   exhibits.  Since she is no longer with the Capitol Police, those

13   exhibits are remaining with the Capitol police officer.  His

14   name is Jerry Buhaj.

15       So we were going to ask the Court's permission to have

16   Officer Buhaj sit in the front pew, and when Ms. Kerkhoff wants

17   to describe a weapon and once it's admitted as a demonstrative,

18   he will be the one to show it to the jury.

19            THE COURT:  What is his name again?

20            MR. NESTLER:  Jerry Buhaj.

21            THE COURT:  Do you all want me to introduce him to the

22   jurors and see if anyone knows him?  Mr. Welch is saying yes.

23            MR. NESTLER:  That's fine for the government.  We

24   would suggest that he be in the courtroom when the jurors get

25   here, but I defer to the Court.

1          THE COURT:  That's fine, he can be there.

2          MR. NESTLER:  So he will have those weapons with him,

3   and we have already had them cleared with the deputy marshals.

4   They have no ammunition in them.  They're just the weapon

5   itself.

6          THE COURT:  And will he take them out after this

7   witness?

8          MR. NESTLER:  Yes.

9          THE COURT:  Okay.

10         MR. NESTLER:  The next issue is the touch screen

11  monitor.  We understand that the witnesses will not have access

12  to a touch screen at their seat.  We've gone over this with the

13  court staff.  But there is the ability to use the touch screen

14  monitor here at the podium.  We're going to use that very

15  sparingly during our case because we know how inconvenient it

16  is, but for this witness, we do think it's important, for two

17  different exhibits, for her to actually display on the touch

18  screen where something happened.

19     So I will ask the Court's permission while she's testifying

20  to step down and come to this touch screen where I'm standing

21  and make a notation.

22         THE COURT:  She's going to come to the podium?  That's

23  the only way we can do that?

24         MR. NESTLER:  Yes, unfortunately.

25         THE COURT:  Any objection, Mr. Welch?

1          MR. WELCH:  No, Your Honor.

2          THE COURT:  All right.

3          MR. NESTLER:  And then she will resume her seat.

4   That's the only touch screen we have available to us.

5          THE COURT:  All right.

6          MR. NESTLER:  The final thing is, as I indicated

7   yesterday, Exhibit 210.1 and 210.2 are radio run transcripts.

8   When I get to 210.1, I will just make a note to the Court and

9   ask if the Court wants to provide the cautionary instruction

10  2.310 about transcripts.

11         THE COURT:  Do you all have a copy of that?

12         MR. NESTLER:  Not to pass up to the Court.  I have a

13  copy in my outline.  It's in the Red Book.

14         THE COURT:  All right.  We should have that.  This is

15  the instruction that says part of this exhibit is being admitted

16  for the truth and part to show why the officer took the actions

17  she did?

18         MR. NESTLER:  No.  This is the instruction that says

19  that the exhibit is the audio file and that it comes along with

20  a transcript to help the jury understand the language better but

21  the transcript is not evidence.

22         THE COURT:  But weren't you all going to work on a

23  joint cautionary instruction relating to the radio feed?  Didn't

24  we talk about that yesterday, about part of it coming in for the

25  truth and part of it not?

600

```
 1              MR. NESTLER:  Briefly.  Could we have the Court's
 2    indulgence, please?
 3              THE COURT:  All right.
 4         (Government and defense counsel conferred.)
 5              MR. NESTLER:  Yes, Your Honor.  If Your Honor at the
 6    same time could please instruct the jury that Officer Kerkhoff's
 7    statements are being introduced for the truth and the other
 8    statements on the radio file are being introduced to explain
 9    Officer Kerkhoff's actions.
10              THE COURT:  Mr. Nestler, can you repeat again the
11    2.310 instruction?
12              MR. NESTLER:  Sure.  2.310 generally says that the
13    transcripts -- the exhibit is the audio file, and the jury is
14    being provided with a transcript to aid its comprehension in
15    listening to the audio file.
16              THE COURT:  To aid its comprehension?
17              MR. NESTLER:  I believe that's the phrase that the Red
18    Book uses.
19              THE COURT:  All right.  We will try to check that.
20    All right.  You're going to flag this up front when we get to
21    that exhibit?
22              MR. NESTLER:  Yes.
23              THE COURT:  So again, I don't know, it's quite
24    possible you get about five questions out and we have to stop.
25              MR. NESTLER:  We will try.
```

1          MR. WELCH:  And while we're on the subject, I just

2     wanted to remind the Court and counsel about the Court's order

3     that while opposing counsel may begin with some leading

4     questions to address that one issue --

5          THE COURT:  Yes.

6          MR. WELCH:  -- that there will not be leading

7     questions throughout this witness's testimony.

8          THE COURT:  Mr. Nestler, you're on board; right?

9          MR. NESTLER:  Yes, Your Honor.

10          THE COURT:  All right.  Should we bring in the jury?

11          COURTROOM DEPUTY:  Yes, Your Honor.

12          MS. BERKOWER:  Your Honor, I can e-mail the Court the

13     Red Book jury instruction Mr. Nestler just referenced.

14          THE COURT:  We have it now.  Thank you.

15        (Jury entered courtroom.)

16          THE COURT:  Ladies and gentlemen, in just a minute,

17     we're going to hear the testimony of Officer Shauni Kerkhoff.

18     Assisting Ms. Kerkhoff will be another witness -- not another

19     witness, another individual by the name of Officer Jerry Buhaj,

20     and he's in the courtroom.

21        And if I can ask you, sir, to turn around and take your

22     mask down.

23        Can any of you please raise your hand if you recognize

24     Officer Buhaj?

25        All right.  Thank you, sir.

1      Also, ladies and gentlemen, we're continuing to have some

2  technological problems with the feed on the exhibits going into

3  the overflow room.  We hope the problem's been fixed.  If it

4  hasn't, we will get notice that it hasn't been fixed, and

5  unfortunately, we will have to take an early lunch if that's the

6  case.  So the government will begin with its witness, and if we

7  have to stop, we will break, and then we will start over when we

8  come back.

9      We're hoping that's not the case, but we just don't know.

10      All right.  Mr. Nestler, are you ready?

11          MR. NESTLER:  Yes, Your Honor.  The government calls

12  Officer Shauni Kerkhoff.

13        SHAUNI KERKHOFF, WITNESS FOR THE GOVERNMENT, SWORN

14                      DIRECT EXAMINATION

15          BY MR. NESTLER:

16  Q.   Good morning, ma'am.

17  A.   Good morning.

18  Q.   With the Court's permission, could you please remove your

19  mask if you're comfortable.

20  A.   I can.

21  Q.   Could you please state and spell your name.

22  A.   Yes.  My first name is Shauni, S-h-a-u-n-i, last name

23  Kerkhoff, K-e-r-k-h-o-f-f.

24  Q.   And that black bar in front of you is the microphone, so if

25  you want to get a little bit closer to it at points, that would

1    be helpful.

2    A.    Understood.

3    Q.    And Ms. Kerkhoff, did you work as an officer with the

4    United States Capitol Police on January 6 of 2021?

5    A.    I did.

6    Q.    How long were you an officer with the Capitol Police?

7    A.    Approximately four and a half years.

8    Q.    Are you still an officer with the Capitol Police?

9    A.    I am not.

10   Q.    Do you work elsewhere in the federal government now?

11   A.    I do.

12   Q.    Did your leaving the Capitol Police have anything to do

13   with what occurred on January 6 or this case?

14   A.    It did not.  I applied to my current position prior to the

15   6th.

16   Q.    Did you leave the Capitol Police in good standing?

17   A.    I did.

18   Q.    Thank you.  What are Capitol police officers sworn to do?

19   A.    We're sworn to protect Congress and its buildings.

20   Q.    How many divisions are within the uniformed part of the

21   Capitol Police?

22   A.    There are four divisions.

23   Q.    Could you please explain what they are.

24   A.    Absolutely.  Capital Division protects the Capitol; Senate

25   Division protects the Senate office buildings; House Division

1  protects the House office buildings; and the Library Division

2  protects the library and the library congressional office

3  buildings.

4  Q.   What was your day-to-day assignment in January of 2021?

5  A.   Day to day, I was assigned to the Senate Division.

6  Q.   Are you aware of the phrase "collateral assignment"?

7  A.   I am.

8  Q.   What is a collateral assignment?

9  A.   It is an assignment you do in addition to your regular

10  duties.

11  Q.   Did you have any collateral assignments?

12  A.   I did.

13  Q.   What was your collateral assignment?

14  A.   My collateral assignment was the Civil Disturbance Unit,

15  less-lethal team.

16  Q.   Does the Civil Disturbance Unit go by an acronym?

17  A.   We do.

18  Q.   What is that?

19  A.   CDU.

20  Q.   What does the Civil Disturbance Unit do?

21  A.   So we respond to anything from a peaceful protest to a

22  riot.

23  Q.   And what kind of training do you have to go through to be a

24  part of the Civil Disturbance Unit?

25  A.   The initial training is a 40-hour basic course that

1    officers do out of academy, and then there's continued training

2    each year.

3    Q.    And you mentioned you were a part of the less-than-lethal

4    team within the Civil Disturbance Unit; is that right?

5    A.    That is correct.

6    Q.    What is the less-than-lethal team?

7    A.    We operate less-than-lethal launchers to deter any type of

8    activity related to crowd control.

9    Q.    Is there a fancy name for people who are a part of the

10   less-than-lethal team?

11   A.    Yes, there is.

12   Q.    What is that fancy name?

13   A.    That fancy name is called a grenadier.

14   Q.    So you were a grenadier?

15   A.    I was.

16   Q.    Approximately how many grenadiers were there as of

17   January 6 of 2021?

18   A.    Approximately, we had ten officers and sergeants.  So

19   combined it was ten, officers and sergeants.

20   Q.    And you were one of them?

21   A.    I was.

22   Q.    Let's talk about January 6 of 2021.  Do you know

23   approximately what time you arrived for work that day?

24   A.    Yeah.  It would be my normal time, approximately 6:00 a.m.

25   Q.    Who was your partner?

1    A.    My partner was Sergeant Adam DesCamp.

2    Q.    And on January 6 of 2021, were you doing your regular

3    assignment in the Senate Division or your collateral assignment

4    with the CDU?

5    A.    I was assigned to my collateral assignment.

6    Q.    And how far in advance approximately, do you know, were you

7    told you were going to be with the CDU that day?

8    A.    Unsure of the exact time, but probably a week prior.

9    Q.    What were you wearing when you left your offices on

10   January 6 of 2021 to go out that day?

11   A.    I was wearing what I would define as regular duty attire.

12   So I had my vest, my duty belt on, my hat, sunglasses, and our

13   grenadier backpack.

14   Q.    What's a grenadier backpack?

15   A.    It's a backpack essentially with a place to put a launcher

16   in the back of it and store the extra ammunition that we might

17   have.

18   Q.    And you use the word "launcher"; is that right?

19   A.    I do.

20   Q.    What is a launcher?

21   A.    A launcher is what we refer to as less-lethal weapons.  We

22   call those launchers.

23   Q.    Why don't you call them guns?

24   A.    Because I want to make a firm distinction between lethal

25   force and less-lethal force.

1    Q.    Were you carrying your firearm with you when you went out

2    for duty on January 6?

3    A.    I was.

4    Q.    And so that is lethal force; is that what you said?

5    A.    Yes, that is lethal force.

6    Q.    When you left your meeting place, you and your partner

7    Sergeant DesCamp, where did you first go on your assignment?

8    A.    We were assigned to the east front of the Capitol.

9    Q.    And at this time I'm going to ask Ms. Rohde to pull up just

10   on the screen in front of you, Ms. Kerkhoff, Exhibit 603.

11         Do you see that on the screen in front of you?

12   A.    On this screen right here?

13   Q.    Yes.

14   A.    I do not.

15   Q.    How about now?

16   A.    No.  I just see a seal of some sort.  It's looking like

17   it's almost there.

18   Q.    Can you see Ms. Rohde's screen where you're sitting?

19   A.    I can.

20   Q.    Do you recognize what is on her screen?

21             THE COURT:  Mr. Nestler, the rest of us can't see

22   either.

23             MR. NESTLER:  I'm just authenticating it now.

24             THE COURT:  I'm wondering if we're going to be able to

25   see it.  Mr. Hopkins, can you tell?

1            COURTROOM DEPUTY:  I see a screen from whatever the

2    laptop is.

3            THE COURT:  I'm not trying to get ahead of ourselves.

4    I want you to introduce it.  I just want to make sure that we

5    stop if the rest of us can't see it.

6        Mr. Welch, do you have a problem?

7            MR. WELCH:  No.  I would like to walk around and see

8    what's being shown.

9            COURTROOM DEPUTY:  I think you see what everyone else

10   is seeing.

11           MR. WELCH:  I would like to see what the witness is

12   seeing.

13           THE COURT:  Yes, you should.

14       Ladies and gentlemen, my apologies again.  Apparently,

15   we're continuing to have technology problems.

16           THE WITNESS:  I see it.

17           COURTROOM DEPUTY:  I have not published it to the jury

18   yet.

19           THE COURT:  I can't see it.  All right.

20           MR. NESTLER:  May I proceed, Your Honor?

21           THE COURT:  You may.

22           BY MR. NESTLER:

23   Q.   Ms. Kerkhoff, do you see the screen in front of you?

24   A.   I do.

25   Q.   This is Exhibit 603.  Do you recognize what this is?

1    A.   I do.

2    Q.   What is it?

3    A.   It's a three-dimensional picture of the Capitol building

4    and its surrounding area.

5    Q.   Is this approximately what the Capitol building looked like

6    on January 6?

7    A.   Yes.

8              MR. NESTLER:  The government moves to admit

9    Exhibit 603 into evidence.

10             THE COURT:  Any objection?

11             MR. WELCH:  No, Your Honor.

12             THE COURT:  The exhibit is admitted.

13       (Government Exhibit 603 received into evidence.)

14             MR. NESTLER:  And the government requests that it be

15   published to the jury.

16             THE COURT:  It may.

17             BY MR. NESTLER:

18   Q.   Okay.  Ms. Kerkhoff, the east front, you indicated

19   earlier --

20   A.   Yes.

21   Q.   -- which side of the building is that as we're looking at

22   this screen?

23   A.   It's going to be the area opposite of the stage.  So it

24   would be the furthest side in this picture.

25   Q.   So on the back side of the building in this picture, you

1    said?

2    A.   Correct, on the back side.

3    Q.   While you were on the east front, what did you observe?

4    A.   We were standing by on the east front.

5         Approximately what time do you -- are you referring to?

6    Q.   Shortly before you left the east front, what were your

7    observations?

8    A.   There was a large group starting to form along the bike

9    rack line we had set up on the front.

10   Q.   What did the bike rack line demarcate?

11   A.   One of our security perimeters.

12   Q.   So the people on the east front that you were observing,

13   were they inside the secured perimeter on the east side or

14   outside the security perimeter?

15   A.   At that point they were outside the security perimeter.

16   Q.   Did you have a radio with you when you were on assignment

17   on January 6?

18   A.   Yes, I did.

19   Q.   Is that standard procedure?

20   A.   It is standard procedure.

21   Q.   Prior to coming in to court today, have you reviewed a

22   snippet of the radio communications that you heard and that you

23   spoke on on January 6?

24   A.   I have.

25   Q.   Were those radio communications you heard with your own

1    voice and others authentic, as far as you were aware?

2    A.    Yes.

3           MR. NESTLER:  The government moves to admit into

4    evidence Exhibit 210.1.

5           THE COURT:  Any objection?

6           MR. WELCH:  Without objection.

7           THE COURT:  All right.  The exhibit is admitted.

8         (Government Exhibit 210.1 received into evidence.)

9           MR. NESTLER:  At this time the government would ask

10   the Court to provide the instruction we discussed earlier.

11          THE COURT:  All right.  So ladies and gentlemen,

12   recordings of conversations identified by witnesses have been

13   received into evidence.  Transcripts of these recorded

14   conversations will be furnished for your convenience and

15   guidance as you listen to tapes to clarify portions of the tape

16   which are difficult to hear and to help you identify speakers.

17       The recordings, however, are the evidence in the case; the

18   transcripts are not.  If you notice any difference between the

19   transcripts and the recordings, you must rely only on the

20   recordings and not the transcript.

21       In addition, if you cannot determine from the recording

22   that the particular words were spoken, you must disregard the

23   transcripts as far as those words are concerned.

24       In addition, Officer Kerkhoff's statements about the radio

25   file are being admitted into evidence for the truth of the

1    matter.  However, the other statements on the radio file, the

2    statements of other individuals, are not being admitted for the

3    truth of the matter.  They are being admitted solely to explain

4    Officer Kerkhoff's actions that she took that day.

5              MR. NESTLER:  Thank you, Your Honor.

6         I'm sorry.  We actually just heard from a colleague in the

7    overflow courtroom they may not be able to see the screen.  I

8    just didn't know if it was possible for court staff to confirm

9    that they could or could not.

10             THE COURT:  Let's confirm that before we stop, but

11   that was my fear.

12             MR. NESTLER:  Thank you, Your Honor.

13             COURTROOM DEPUTY:  He is unable to get that portion

14   working.  So they will not be able to see the exhibits

15   downstairs.

16             THE COURT:  All right, ladies and gentlemen.

17   Unfortunately, members of the public who are in the other

18   overflow rooms in the courthouse trying to watch this trial

19   cannot see the exhibits.  Therefore, we are going to take a

20   one-hour lunch break.  It is now 11:52.  If you could return to

21   the jury room, Courtroom 12, at 12:55, we should have the

22   problem solved by then, and we will resume with this witness.

23             (Recess taken at 11:52 a.m.)

24             (Afternoon session of this proceeding was reported by

25   Lorraine Herman and is bound under separate cover.)

```
1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Sara A. Wick, certify that the foregoing is a

4      correct transcript from the record of proceedings in the

5      above-entitled matter.

6

7

8      /s/ Sara A. Wick                    March 2, 2022

9      SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```