IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                Plaintiff,

     vs.

GUY WESLEY REFFITT,

                Defendant.

CR Action
No. 1:21-032

Washington, DC
March 2, 2022

1:06 p.m.


TRANSCRIPT OF JURY TRIAL
(AFTERNOON SESSION)
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**      JEFFREY S. NESTLER
                        RISA BERKOWER
                         U.S. ATTORNEY'S OFFICE
                         555 Fourth Street NW
                         Washington, DC 20530
                         202-252-7277

**For the Defendant:**     WILLIAM WELCH, III
                        5305 Village Center Drive
                        Suite 142
                        Columbia, MD 21044
                        410-615-7186

**Reported By:**          **LORRAINE T. HERMAN, RPR, CRC**
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6720
                        Washington, DC 20001
                        202-354-319

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

E X H I B I T S

EXHIBIT                                                          PAGE

Government No. 3      Admitted into Evidence                      627

Government No. 603A   Admitted into Evidence                      631

Government No. 225  Admitted into Evidence                        633

Government No. 205   Admitted into Evidence                       637
Government No. 50A and 51B Admitted into Evidence

Government No. 51C    Admitted into Evidence                      656

Government No. 52A and 52B  Admitted into Evidence                659

Government No. 52C    Admitted into Evidence                      660

Government No. 54A    Admitted into Evidence                      664

Government No. 53A and 53B  Admitted into Evidence                664

Government No. 201    Admitted into Evidence                      667

Government No. 203    Admitted into Evidence                      670

Government No. 210.2  Admitted into Evidence                      675

Government No. 200    Admitted into Evidence                      687

Government No. 202    Admitted into Evidence                      696

Government No. 211    Admitted into Evidence                      702

Government No. 601    Admitted into Evidence                     740 -P

Government No. 602    Admitted into Evidence                     742 -P

Government No. 601B and 601C and 601D Admitted into              746
           Evidence

Government No. 204    Admitted into Evidence                      756

I N D E X

WITNESS                                                          PAGE

    Cross-Examination by The Court                               712

    Cross-Examination by Mr. Welch                               714

    Redirect Examination by Mr. Nestler                          731

MONIQUE MOORE

Direct Examination by Mr. Nestler                    737

1      **P R O C E E D I N G S**

2              (Whereupon, the morning session of this proceeding

3      was reported by Sara Wick, and is bound under separate

4      cover.)

5              **THE COURT:**  Good afternoon.

6              All right.  So I'm told there's been a workaround

7      --

8              **COURTROOM DEPUTY:**  Excuse me, Your Honor.

9              **THE COURT:**  Can you hear me now?

10             **COURTROOM DEPUTY:**  Yes.

11             **THE COURT:**  All right.

12             So I'm told there's been a workaround and

13     hopefully we will not have continued problems.  I can't

14     guarantee, of course.

15             In addition, you have been given an email that was

16     received.  I don't see the need to take any action.  I just

17     wanted to provide it to you all in the event you thought

18     otherwise.

19             Are we ready to bring in the jury?

20             Mr. Nestler, I don't know if you need to back up,

21     except when you started showing exhibits.  Right?  Not all

22     the way to the beginning.

23             **MR. NESTLER:**  Understood, Your Honor.

24             **THE COURT:**  All right.

25             **COURTROOM DEPUTY:**  All rise for the jury panel.

1          (Jurors entered the courtroom.)

2          **THE COURT:**  All right, ladies and gentlemen.

3          I hope you've had a nice lunch.  Apologies again

4    for the delay.  We think that we have the problem solved.

5    Of course I don't want to guarantee that and jinx us, but we

6    think we figured it out.  And I'll have Mr. Nestler proceed

7    with Officer Kerkhoff.  And I'll ask you, Mr. Nestler, to go

8    back to the time at which you began to show Officer --

9    Ms. Kerkhoff exhibits, please.

10         **MR. NESTLER:**  Yes, Your Honor.

11         **THE COURT:**  Officer Kerkhoff, I remind you you are

12   still under oath.

13         **THE WITNESS:**  Understood.

14         **DIRECT EXAMINATION OF SHAUNI KERKHOFF (CONT'D.)**

15   **BY MR. NESTLER:**

16   **Q.**   Good afternoon.

17   **A.**   Good afternoon.

18   **Q.**   Can you please state your name again for us?

19   **A.**   I can.  Shauni Kerkhoff.

20   **Q.**   Ms. Kerkhoff, before we took a little break for

21   tech issues, we discussed Exhibit 210.1 and it had been

22   admitted into evidence.

23         **MR. NESTLER:**  At this time I will ask if it can be

24   displayed to the jury.  It's an audio file.

25         (Played audio.)

1          **MR. NESTLER:**  We will start that file from the

2     beginning.

3               (Played audio.)

4          **THE COURT:**  Is the Government's exhibit turned up

5     as high as it can be?

6          **MR. NESTLER:**  The audio, we understand, actually

7     comes through the court system from the ceiling speakers,

8     not from our computer.

9          **THE COURT:**  All right.

10         **MR. NESTLER:**  I can move on.

11         **THE COURT:**  Of course.  Thank you.

12         **MR. NESTLER:**  Let's turn back to Exhibit 603.  If

13    we can publish that to the jury, which it is.

14    **BY MR. NESTLER:**

15    **Q.**   So you earlier indicated this was a 3D model of

16    the Capitol building around January 6th of 2021; is that

17    correct?

18    **A.**   That's correct.

19    **Q.**   When you were on the east side of the Capitol, did

20    there come a time when you left the east side of the

21    Capitol?

22    **A.**   Yes.

23    **Q.**   And why was that?

24    **A.**   I -- there was calls for support on the west front

25    that I responded to.

1      Q.   And those calls came on the radio?

2      A.   They did.

3      Q.   All right.  We will get back to that radio file in

4  a minute, if we can get the radio issue resolved.

5           When you went to the east front to the west front,

6  how did you go?  Which path did you take?

7      A.   I originally tried to go inside of the building.

8  The building was then locked down.  So we had to go back out

9  to the east front and run around the north exterior of the

10 building.

11     Q.   And on this map or this diagram, is the north side

12 the one on the left side of the photograph or on the right

13 side of the photograph?

14     A.   It is on the left side of the photograph.

15     Q.   So if you were on the east front --

16          MR. WELCH:  Objection.

17          THE COURT:  Basis?

18          (Sidebar discussion.)

19          MR. WELCH:  Mr. Nestler should not be marking the

20 exhibit.  The witness should be marking the exhibit, as far

21 as what she did.  Otherwise he is leading her.

22          THE COURT:  All right.  Mr. Nestler, at some point

23 did you plan to have her come step down and do this part of

24 your direct?

25          MR. NESTLER:  I modified my plans thinking of how

1    awkward it would be to come down and testify from here.  So

2    I was planning on have her describe what she did, which she

3    just did, from the east side to the west side going north.

4    And she indicated on the left side of the diagram.  So I was

5    going to make the record by repeating what she said.

6              **THE COURT:**  All right.  Well, Mr. Welch, you

7    object to this line of questioning?

8              **MR. WELCH:**  I don't object to the line of

9    questioning, but it needs to be the witness who is

10   testifying --

11             **THE COURT:**  All right.  Very well.

12             **MR. WELCH:**  -- and not Mr. Nestler.

13             **THE COURT:**  This will be more laborious.  I think,

14   Mr. Nestler, since we don't know exactly where she was

15   relative to the building, if Mr. Welch is going to object, I

16   will, unfortunately, have to ask Ms. Kerkhoff to step down

17   and do it herself.

18             **MR. NESTLER:**  Very well, Your Honor.

19             (Sidebar discussion concluded.)

20   **BY MR. NESTLER:**

21       **Q.**   Ms. Kerkhoff, with the Court's permission, would

22   you please step down from the witness stand and come join me

23   over here near the podium, so you can display on the touch

24   screen the direction which you traveled.

25       **A.**   Absolutely.  Do it with my finger?

1      **Q.**   You use your finger, yes.

2      **A.**   Okay.  So we were approximately here in a vehicle.

3   We tried to go inside the building.  It didn't work.  Went

4   back outside the building.  Ran around the exterior.  This

5   was our path of travel, approximately over to here.  Down

6   and onto the stage.

7      **Q.**   Thank you, Ms. Kerkhoff.  So for the record,

8   Ms. Kerkhoff drew a circle on the left side of the diagram

9   tracing the north path, past the northern chamber over to

10   the west side at the front of the stage.

11           **MR. WELCH:**  Objection, Your Honor.

12           (Sidebar discussion.)

13           **MR. WELCH:**  Mr. Nestler is now testifying instead

14   of the witness testifying.

15           **THE COURT:**  All right.  We are just trying to

16   confirm for the record, this is not a permanent exhibit,

17   what it reflects.  The witness needs to do this?  Do you

18   have any objection to what he is saying?  Is it inconsistent

19   in any way with what she said?

20           **MR. WELCH:**  It just needs to be the witness who is

21   saying it.  It's not -- if Mr. Nestler was a witness in the

22   case, he can certainly testify.

23           **THE COURT:**  All right.  All right.  This is going

24   to take more time than it needs to but go ahead.

25           **MR. NESTLER:**  I'm sorry, Your Honor.  I just

1    disagree.  We need to make a record of what the witness

2    indicated.  The witness drew with a piece of -- I guess an

3    electronic Crayon.  It is the same as pointing it out on the

4    map.  I am, for the purposes of the record, indicating what

5    she did so we can have a record of it because this is a

6    non-stable exhibit.

7              THE COURT:  Yeah.  The --

8              MR. WELCH:  The record needs to reflect -- the

9    record is the witness' testimony.  The record is the

10   exhibit, not Mr. Nestler's testimony.

11             THE COURT:  If there's anything Mr. Nestler says

12   that's inconsistent with what she just testified to and

13   drew, then you can object.  Has he said anything that is

14   inconsistent with her testimony?

15             MR. WELCH:  He was talking about specific

16   locations.  He referred to the north.  He referred to the --

17             THE COURT:  She said all of that.  She said all of

18   that.

19             MR. WELCH:  Well, it's in the record and he

20   doesn't need to testify to it himself.

21             THE COURT:  All right.  I am going to overrule the

22   objection.

23             Mr. Nestler, try to keep your description of

24   what's been drawn as brief as possible.  And this is just to

25   establish the record.  It's not testimony.  And I will

1    instruct the jury as such.  Because this is a line that will

2    disappear.  Right, Mr. Nestler?

3         **MR. NESTLER:**  That is correct.  I confirmed with

4    the courtroom there is no way to print it out or make it

5    stable.  So after Ms. Kerkhoff sits down, this line will

6    disappear.  The only way to preserve this for the record is

7    for me --

8         **THE COURT:**  All right.  I will explain to the jury

9    what you are doing.

10        (Sidebar discussion concluded.)

11        **THE COURT:**  All right.  Ladies and gentlemen,

12   you've heard Officer Kerkhoff testify about what she did on

13   January 6th.  Her testimony is testimony.  Anything that

14   Mr. Nestler says, is not testimony.  But he is making a

15   record now of the line that she drew around the Capitol.  So

16   you are not to consider what Mr. Nestler says as evidence.

17   He is merely trying to describe the line that Ms. Kerkhoff

18   drew.

19        **MR. NESTLER:**  Thank you, Your Honor.

20   **BY MR. NESTLER:**

21   **Q.**   Okay.  Ms. Kerkhoff, you indicated that you

22   initially went to the center stage here at the end of your

23   line you drew; is that correct?

24   **A.**   That is correct.

25   **Q.**   What did you observe when you got to that center

1    stage?

2         **A.**   I, along with several teammates of mine were up on

3    the center stage, in that half-circle area of the stage,

4    where there is a railing.  And just beyond that we saw a

5    crowd of people infringing upon the security perimeter --

6              **THE COURT:**  Sorry, Mr. Nestler.  Just for the

7    record, again, can you point where your -- can you make a

8    mark on the half circle?  Are you talking about the circle

9    that's drawn on the east side or are you now on the west

10   side?

11             **THE WITNESS:**  I'm on the west side.  So I can

12   indicate that.  Absolutely.

13             **THE COURT:**  All right.

14             **THE WITNESS:**  Right where I drew that circle, you

15   are going to see a half circle on the front of the stage;

16   that's the furthest point out from the stage.

17             **THE COURT:**  Right.

18             **THE WITNESS:**  That is where I was standing with my

19   teammates.

20             **THE COURT:**  Understood.  Thank you for clarifying.

21             **THE WITNESS:**  Very welcome.

22   BY MR. NESTLER:

23        **Q.**   We will get to what you observed on the west side

24   in a minute.  But while you are standing here, could you

25   indicate to us, at some point you leave the west side of the

626

1   Capitol and go to a different part of the west side of the

2   Capitol?

3        **A.**   I did.

4        **Q.**   How would you classify that area that you went to?

5        **A.**   Yes.  I went to this area right here.  (Marked.)

6        **Q.**   And is that north or south of the area in the

7   center?

8        **A.**   That is north of the stage.

9             **MR. NESTLER:**   So for the record, Ms. Kerkhoff drew

10  a circle towards the center bottom of the photograph, as she

11  indicated the north of the stage.

12  **BY MR. NESTLER:**

13       **Q.**   Thank you, Ms. Kerkhoff.  You can please be

14  seated.

15            Now, when you were in the center area at the half

16  circle, you said you saw a crowd; is that correct?

17       **A.**   I did.

18       **Q.**   How would you describe the crowd?

19       **A.**   At this point it was violent.

20       **Q.**   Are you aware of a security perimeter on the west

21  side of the Capitol that day?

22       **A.**   Yes.

23       **Q.**   And could you see the security perimeter from

24  where you were on the west side in the center of that little

25  semicircle?

1      **A.**   Yes, we did have two security parameters just to

2   be more specific, which one are you referring to?

3      **Q.**   Well, let's pull up Exhibit 0601A for you.  Maybe

4   that will help you clarify.  Thank you, Ms. Kerkhoff.

5          **MR. NESTLER:**  So I will display just to

6   Ms. Kerkhoff Exhibit 601A.

7   **BY MR. NESTLER:**

8      **Q.**   Do you see this?

9      **A.**   I do.

10      **Q.**   Do you know what this is?

11      **A.**   Yes, I do.

12      **Q.**   What is it?

13      **A.**   This is the security perimeter.

14          **MR. NESTLER:**   Government moves to admit into

15   evidence Exhibit 601A.

16          **THE COURT:**  Any objection?

17          **MR. WELCH:**  No, thank you.

18          **THE COURT:**  It's admitted.

19      (Government Exhibit 601A admitted into evidence)

20          **MR. NESTLER:**  Please publish the exhibit to the

21   jury.

22          **COURTROOM DEPUTY:**  The exhibit is published.

23   **BY MR. NESTLER:**

24      **Q.**   So can you describe for us, Ms. Kerkhoff what we

25   are looking at?

1    **A.**   Yes.  So this is a security perimeter that we --

2    it's a temporary security perimeter that we formed with bike

3    racks that are attached together.  This was one of those

4    security parameters.

5    **Q.**   And by "this" you referring to the red outline?

6    **A.**   Yes, I am referring to the red outline in this

7    image.

8    **Q.**   And you indicated earlier there were two security

9    parameters; is that right?

10   **A.**   Yes.  So this is what I would call the outer

11   security perimeter.

12   **Q.**   And then was there also an inner security

13   perimeter?

14   **A.**   There was.

15   **Q.**   How would you describe where that inner security

16   perimeter was, if you were on the west side on that little

17   semicircle you indicated earlier?

18   **A.**   It might be better if I illustrated it by drawing

19   it, if I could.

20   **Q.**   Please step down and come back to the podium,

21   please.

22   **A.**   [COMPLIED]  I do want to preface that this is

23   approximate.  I do not know where the exact security

24   perimeter was.  This is to the best of my knowledge on that

25   day.

1          So if you see this line right here, there would be

2     a line of bike racks that is separating the stage from the

3     pathways here in this large area right here.  So those bike

4     racks are separating this large area from the stage.  I

5     believe that was put there to protect the stage for the

6     inauguration.

7          Q.   Thank you, Ms. Kerkhoff.  You can be seated.

8               MR. NESTLER:  For the record, Ms. Kerkhoff drew a

9     line and circle on the west side of the Capitol on a curved

10    area where on the map it says "Representative Cliff Sterns."

11    BY MR. NESTLER:

12         Q.   So the crowd that you indicated you saw when you

13    were on the west side of the Capitol, what were they doing?

14         A.   They had pushed these bike racks back.  When we

15    first got there, the bike racks were starting to become

16    disconnected and there was starting to become holes.  There

17    was a line of police trying to hold those bike racks back.

18         Q.   And earlier you indicated that you had made your

19    way to the north side on the west side of the Capitol; is

20    that right?

21         A.   That is correct.

22         Q.   What brought you over to that area?

23         A.   There -- we started to see individuals encroach

24    upon those stairs.  I could indicate where those stairs are.

25    It's just to the north of the stage, where I initially

630

1    circled on that previous diagram.  If it's helpful I can

2    come back down and indicate it.

3        Q.    That's fine.  Thank you.  Remind us, what were you

4    carrying at the time?

5        A.    I was carrying what was on my duty belt.  My legal

6    weapon, as well as my grenadier backpack.

7        Q.    Did you have any less-than-legal weapons out at

8    the time?

9        A.    Yes, I did.

10       Q.    What less-than-lethal weapon did you have out?

11       A.    I had a pepper ball launcher slung.  It was not

12   slung.  My apologies.  I did not have a strap.

13       Q.    So you had a PepperBall launcher?

14       A.    Yes, in my hands.

15           MR. NESTLER:  If we could show the witness Exhibit

16   603A.

17   BY MR. NESTLER:

18       Q.    Ms. Kerkhoff, you indicated you had gone over to

19   the north side, on the west side of the Capitol.  I'm

20   showing you Exhibit 603A.  Do you recognize this?

21       A.    I do.

22       Q.    What is it?

23       A.    So this is a pathway, a narrow pathway on the

24   stairs, coming up from the bottom up to the base here that

25   connects to the stage.

1      **Q.**    Is this approximately what the area on the north

2    side, where you were standing, looked like on January 6th?

3      **A.**    Yes.

4         **MR. NESTLER:**  The government moves to admit 603A

5    into evidence.

6             **THE COURT:**  Any objection?

7             **MR. WELCH:**  No, thank you.

8             **THE COURT:**  It's admitted.

9         (Government Exhibit 603A admitted into evidence)

10    **BY MR. NESTLER:**

11      **Q.**    So what direction is a person facing if they are

12    standing on the landing right here?

13      **A.**    If you are facing forward?

14      **Q.**    Correct.

15      **A.**    If you are facing forward, you are facing the

16    west.

17      **Q.**    And so what's behind you if you are facing the

18    west?

19      **A.**    It's the Capitol building.

20      **Q.**    And any particular part or chamber of the Capitol

21    building?

22      **A.**    Yes, the Senate chamber.

23      **Q.**    How would one access the Senate chamber from where

24    they were standing in this landing right here?

25      **A.**    There was a stairway behind.  If I was standing

1    here, the stairs would be behind me.  They would go up the

2    stairs and there would be windows and doors that are

3    accessible.

4         **Q.**    What is the large box-like thing on the left side

5    of this diagram?

6         **A.**    That is the scaffolding.  There was scaffolding

7    with a large tarp covering it.

8         **Q.**    When you got to this area on January 6th of 2021,

9    what did you see when you looked west down these stairs?

10        **A.**    I seen a sea of people.

11        **Q.**    What did you think at that time?

12        **A.**    That we were outnumbered.

13        **Q.**    Did that concern you?

14        **A.**    Very much so.

15        **Q.**    Why?

16        **A.**    Because our job is to protect Congress.  They were

17   in a joint session that day, confirming the electoral vote.

18   And we were the only thing standing between thousands of

19   these people and the Congress.

20        **Q.**    How did the crowd seem, from your perspective?

21        **A.**    Angry and violent.

22        **Q.**    I'm going to show just you, Officer Kerkhoff

23   Exhibit 225.  Do you recognize what this is?

24        **A.**    I do.

25        **Q.**    Can you briefly describe it before we show it to

633

1    the jury?

2         **A.**   Yes.  It is a large amount of people in front of

3    the inaugural stage and the Capitol building.

4         **Q.**   Do you recognize yourself in this photograph?

5         **A.**   I do.

6         **Q.**   Is this photograph a fair and accurate depiction

7    of the crowd you were just describing looked like on January

8    6th of 2021?

9         **A.**   I would say it is an accurate representation of

10   what I was looking at.

11             **MR. NESTLER:**  The government moves into evidence

12   Exhibit 225?

13             **THE COURT:**  Any objection?

14             **MR. WELCH:**  No objection.

15             **THE COURT:**  It's admitted.

16             **COURTROOM DEPUTY:**  It's published.

17        (Government Exhibit 225 admitted into evidence)

18   **BY MR. NESTLER:**

19        **Q.**   Ms. Kerkhoff, why don't you help orient us to what

20   we are looking at here.  Do you see the semicircle you had

21   indicated earlier with you were standing on?

22        **A.**   Yes, I do.

23        **Q.**   I hate to ask you to do this, but do you mind

24   stepping down and annotating for us?

25        **A.**   I don't mind at all.

634

1    **Q.**   Thank you.

2    **A.**   So that semicircle I was referring to is

3    approximately right here.  You can see the banister that we

4    were standing along.

5    **Q.**   And for the record, Ms. Kerkhoff drew a circle on

6    the center of the frame.

7            And if you could go on and show us where the north

8    side was, that landing that you had indicated you had gone

9    to.

10    **A.**   Yes, it was approximately right here.  You can see

11    myself in that image.

12    **Q.**   For the record, Officer Kerkhoff drew a circle on

13    the left side of the frame near a cauldron-looking object.

14    Do you know what that is, by the way?

15    **A.**   Yes, it's a planter.

16    **Q.**   And if you could hit the clear button for us.

17    **A.**   Okay.  Sorry.

18    **Q.**   Near where you were standing, did you see a person

19    wearing a blue jacket?

20    **A.**   I did.

21    **Q.**   Could you please circle that person on this

22    photograph?

23    **A.**   I can.

24    **Q.**   For the record, Ms. Kerkhoff has circled the

25    person in blue, just below where she indicated she had been

1    standing.  You can resume your seat.  Thank you.

2              Now, up the staircase behind where you were

3    standing, what building is that?

4         A.   That is the Capitol building.

5         Q.   Now, the person in blue that you have circled here

6    on the screen --

7         A.   Yes.

8         Q.   -- did you have an interaction with him on January

9    6th of 2021?

10        A.   Yes, I did.

11        Q.   Could you please describe the person's race?

12        A.   Yes, white.

13        Q.   And the person's gender?

14        A.   Male.

15        Q.   We talked about the person's jacket.  What color

16   was the jacket?

17        A.   The jacket was blue.

18        Q.   Did the person have anything on his head?

19        A.   Yes.

20        Q.   What was that?

21        A.   A tactical helmet.

22        Q.   Did the person have anything in his hands?

23        A.   Yes.

24        Q.   What was that?

25        A.   He had some sort of megaphone.

636

1     **Q.**   If you saw the person again, would you recognize

2    him?

3     **A.**   Yes.

4     **Q.**   Do you see the person in the courtroom here today?

5     **A.**   Yes.

6     **Q.**   Could you please point to that person and describe

7    an article of clothing the person is wearing?

8     **A.**   Yes.  Right there.  Directly across from me,

9    wearing a light blue shirt, and gray suit jacket,

10   approximately, glasses.

11         **MR. NESTLER:**  Let the record reflect that the

12   witness has identified the defendant.

13         **THE COURT:**  It may reflect.

14   **BY MR. NESTLER:**

15    **Q.**   Are you aware of the Capitol Police having

16   surveillance video?

17    **A.**   Yes, I am.

18    **Q.**   Have you seen surveillance video of your

19   interactions on January 6th of 2021?

20    **A.**   Yes, I have.

21         **MR. NESTLER:**  If we can display just the opening

22   scene, Ms. Rhode, 205 just for the witness.

23   **BY MR. NESTLER:**

24    **Q.**   Do you recognize this video montage that's Exhibit

25   205?

1          **A.**    Yes, I do.

2          **Q.**    And you've seen this before.  Correct?

3          **A.**    I have.

4               **MR. NESTLER:**  The government moves to admit into

5     evidence Exhibit 205.

6               **THE COURT:**  Any objection?

7               **MR. WELCH:**  No, Your Honor.

8               **THE COURT:**  It's admitted.

9          (Government Exhibit 205 admitted into evidence)

10              **MR. NESTLER:**  If you could please publish to the

11    jury.

12              **COURTROOM DEPUTY:**  It is published.

13              **THE COURT:**  And what is the building in the frame

14    before we start, Ms. Kerkhoff?

15              **THE WITNESS:**  That is the Capitol building.

16              **MR. NESTLER:**  If you could play forward,

17    Ms. Rohde.  And if we could stop at about 15 seconds.

18    **BY MR. NESTLER:**

19         **Q.**    Do you see the blue checkered area there?

20         **A.**    I do.

21         **Q.**    Do you know what that indicates?

22         **A.**    Yes.

23         **Q.**    What's that?

24         **A.**    The scaffolding.

25         **Q.**    Do you see the yellow circle area?

1      **A.**   I do.

2      **Q.**   Do you know what that indicates?

3      **A.**   Yes.

4      **Q.**   What's that?

5      **A.**   That's the area we were referring to where I was

6  standing.

7      **Q.**   Thank you.

8           **MR. NESTLER:**  If we could please play forward.

9  And if we could pause right there at 29 seconds.

10  **BY MR. NESTLER:**

11     **Q.**   You indicated earlier you are familiar with some

12  of the Capitol Police surveillance video.

13     **A.**   I am.

14     **Q.**   And are these three of the views of the Capitol

15  Police surveillance video that capture some of this

16  interaction?

17     **A.**   Yes.

18           **MR. NESTLER:**  Let's play it forward, Ms. Rohde.

19  And we'll play it forward here and stop it at 59 seconds,

20  please.

21           (Playing video.)

22           **MR. NESTLER:**  If you could play it just one slide

23  forward.  Right there.  Thank you.

24           And so for the record we stopped at about 1:01 on

25  the counter, which is 1:47:56 p.m.

BY MR. NESTLER:

Q.   Did you see an individual who came into more focus on the left side of the frame here?

A.   I do.

Q.   And can you indicate who that person is?

A.   Yes.

Q.   Who is it?

A.   The defendant.

Q.   And at the time that the defendant came into focus here on the frame, do you know where you were?

A.   Yes.

Q.   And where is that?

A.   It's blocked by the wooden beam in this picture.

Q.   So what direction on this photograph?  Right or left?

A.   It would be left.

Q.   And were you at the same level of the defendant or higher or low than them?

A.   I was higher.

MR. NESTLER:  If we could play it forward, please.

(Played video.)

BY MR. NESTLER:

Q.   While it's playing, I should ask you, Ms. Kerkhoff, are you aware of these security videos having audio capabilities?

1      **A.**   I am not aware of that, no.

2      **Q.**   So when we're watching the video, there is no

3   audio to listen to; is that correct?

4      **A.**   That is correct.

5         **MR. NESTLER:**  We will stop it at about 1:49.

6   Right there -- or 1:51.  I'm sorry.  It's 1:47:56 on true

7   time, on the top left.

8   **BY MR. NESTLER:**

9      **Q.**   Who is behind this cauldron, planter thing in the

10   center of the screen?

11      **A.**   That is me.

12      **Q.**   Did you see the person in blue just stand up on

13   the middle, right side of the screen?

14      **A.**   Yes.

15      **Q.**   And who is that?

16      **A.**   That is the defendant.

17      **Q.**   What are you holding in your hand?

18      **A.**   The PepperBall launcher?

19         **MR. NESTLER:**  If we could play this forward,

20   Ms. Rohde.

21         (Played video.)

22         **MR. NESTLER:**  Could you stop it there?  We are

23   stopping it at 1:48:03.

24   **BY MR. NESTLER:**

25      **Q.**   Do you see the defendant holding something in his

1    right hand?

2         **A.**   I do.

3         **Q.**   What was that?

4         **A.**   A megaphone.

5         **Q.**   Could you tell what he was doing with the

6    megaphone?

7         **A.**   Yes.

8         **Q.**   Which was what?

9         **A.**   Speaking into it.

10        **Q.**   Could you tell where he was directing his speech?

11        **A.**   Towards me.

12        **Q.**   How did you feel about that?

13        **A.**   I didn't like it.

14        **Q.**   Do you remember the kinds of things the defendant

15   was saying to you?

16        **A.**   I do not remember what exactly was said.

17        **Q.**   Do you remember the general sentiment?

18        **A.**   Yes.

19        **Q.**   What was the general sentiment?

20        **A.**   Anger.

21        **Q.**   At the frame here, the officer on the far left,

22   who just came in frame.  Do you see who that is?

23        **A.**   Yes, I do.

24        **Q.**   Who was that?

25        **A.**   Sergeant Adam DesCamp.

642

1    Q.   Can you see what he has on his back?

2    A.   I can.

3    Q.   Which is what?

4    A.   One of the grenadier backpacks.

5    Q.   And can you tell what he is carrying in his hand?

6    A.   Yes, I can.

7    Q.   What's that?

8    A.   An FN-303 launcher.

9    Q.   What are you doing at this time, Ms. Kerkhoff,

10   when you see the defendant with his megaphone out, directing

11   comments at you?

12   A.   I am giving verbal commands.

13   Q.   And in layman's speak, what does it mean to give

14   someone verbal commands?

15   A.   I am giving them directions to stop a behavior.

16   Q.   And why are you telling the defendant to stop this

17   behavior?

18   A.   Because he was progressing forward.

19   Q.   Did the defendant comply when you told him to

20   stop?

21   A.   He did not.

22   Q.   Did you advise him of anything?

23   A.   Yes, I did.

24   Q.   What did you advise him of?

25   A.   That I was going to utilize the PepperBall

1     launcher.

2         **Q.**    Why did you advise him of that before utilizing

3     it?

4         **A.**    Because it's policy.

5         **Q.**    What is the point of advising somebody?

6         **A.**    You need to give them warning before you engage

7     them, to give them an opportunity to stop what they are

8     doing.

9         **Q.**    Did the defendant stop what he was doing when you

10    told him you were going to use your PepperBall launcher?

11        **A.**    He did not.

12        **Q.**    So what did you do?

13        **A.**    I engaged him with the PepperBall launcher.

14        **Q.**    And in laymen's terms, what does it mean to engage

15    somebody?

16        **A.**    I launched projectiles at him.

17        **Q.**    And we talked earlier about how you use the phrase

18    "launch projectiles."  You didn't shoot bullets; is that

19    correct?

20        **A.**    That is correct.

21        **Q.**    And when you launched the projectiles at him, did

22    you hit him?

23        **A.**    I did.

24        **Q.**    Did you notice anything at the time that the

25    projectiles from your PepperBall launcher hit the defendant?

1    **A.**    I did.

2    **Q.**    What did you notice?

3    **A.**    I noticed that they didn't seem to take effect.

4    **Q.**    What does that mean to not take effect?

5    **A.**    It didn't seem like he was -- it didn't affect his

6    behavior.

7    **Q.**    What did that mean to you?

8    **A.**    That I needed to transition to something else.

9         **MR. NESTLER:**   If we could play this forward from

10   1:48:03, Ms. Rohde?  And we will play this for about a

11   minute, stopping at 1:49:18.

12        (Played video.)

13   **BY MR. NESTLER:**

14   **Q.**    What did you see the defendant doing over that

15   prior minute?

16   **A.**    He was posturing.

17   **Q.**    And was he saying anything to you?

18   **A.**    Yes.

19   **Q.**    Do you remember approximately what he was saying

20   around this time?

21   **A.**    I don't remember exact words.

22   **Q.**    And do you see him addressing the people behind

23   him at all?

24   **A.**    Uh -- I mean, like, maybe in passing.  I didn't

25   see any specific thing said.

1      **Q.**   Do did you see him doing anything with his hands

2   in terms of pointing or gesturing?

3      **A.**   Yes.

4      **Q.**   What were those points or gestures?

5      **A.**   He was pointing upward, like, towards me, in my

6   direction.

7      **Q.**   What did that mean for you?

8      **A.**   That he was intent on continuing forward.

9      **Q.**   During this time, what are you doing with your

10   PepperBall launcher?

11      **A.**   I am continuing to launch projectiles and give

12   verbal warnings.

13      **Q.**   You said that your partner, Sergeant DesCamp, had

14   arrived next to you.

15      **A.**   That is true.

16      **Q.**   Did you see what he was doing at this time?

17      **A.**   Yes.

18      **Q.**   What was he doing?

19      **A.**   He was utilizing the FN-303 launcher.

20      **Q.**   Who was he launching those projectiles at?

21      **A.**   The defendant.

22      **Q.**   Did they seem to have an effect?

23      **A.**   They did not seem to have an effect.

24      **Q.**   What was your concern at this point?

25      **A.**   My concern was that we would have to transition

1    into something else.

2              **MR. NESTLER:**  If we could play the file forward,

3    Ms. Rohde, to 1:49:49.

4              (Played video.)

5    **BY MR. NESTLER:**

6    **Q.**   And did you see an individual who entered the

7    frame from the left?

8    **A.**   Yes, I did.

9    **Q.**   Who was that?

10   **A.**   Sergeant Matthew Flood.

11   **Q.**   What's he wearing on his face?

12   **A.**   He is wearing a gas mask.

13   **Q.**   At this time, were you wearing a gas mask?

14   **A.**   I was not.

15   **Q.**   Why not?

16   **A.**   I didn't put it on yet.  I didn't have time to put

17   it on yet, to be clear.

18   **Q.**   As the defendant moved closer to you on the

19   banister, did you see what the crowd behind him had done in

20   terms of their placement and movement?

21   **A.**   Yes.

22   **Q.**   And what's that?

23   **A.**   Every time he took a step, they took a step.

24   **Q.**   How did that make you feel?

25   **A.**   That it was becoming a dire situation.

1      **Q.**   Did you see what Sergeant Flood was holding in his

2   hand when he arrived here around 1:49:49?

3      **A.**   Yes, I did.

4      **Q.**   And what was that?

5      **A.**   It was an OC canister.

6          **MR. NESTLER:**   And if we could play it forward

7   until 1:49:57, for the next eight seconds.

8          (Played video.)

9   **BY MR. NESTLER:**

10     **Q.**   What do you see Sergeant Flood doing?

11     **A.**   He is administering OC spray at the defendant.

12     **Q.**   To administer OC spray, what does that mean?

13     **A.**   He's spraying OC spray at the defendant.

14     **Q.**   And what are you doing at the time he is spraying

15   OC spray at the defendant?

16     **A.**   I was telling some of the officials behind me that

17   he was about to utilize OC spray.

18     **Q.**   Why were you doing that?

19     **A.**   Cause there's usually back spray, and the wind was

20   blowing towards us, so we were going to get hit with the

21   same spray we were using.

22     **Q.**   And you indicated you were not using a mask; is

23   that right?

24     **A.**   I was not.

25     **Q.**   So what would that mean in terms of any spray

1    hitting you?

2         **A.**    I would probably be affected by the OC spray as

3    well.

4         **Q.**    Have you been sprayed with OC spray before?

5         **A.**    I have.

6         **Q.**    Could you please describe for us the reaction that

7    it makes?

8         **A.**    It's an intense burning, stinging of the eyes and

9    the nasal passages.

10        **Q.**    Do you recall the words the crowd was saying at

11   this time?

12        **A.**    I recall some of the words, yes.

13        **Q.**    What were some of the words the crowd was saying

14   at this time?

15        **A.**    They were calling us traitors, saying that we were

16   in their way, to get out of their way.  That they supported

17   us and now we were betraying them.

18        **Q.**    How did that make you feel?

19        **A.**    It made me feel angry.

20        **Q.**    Why?

21        **A.**    Because it's my job to stand in their way.

22        **Q.**    What was your concern about what the crowd wanted

23   to do if you went out of the way?

24        **A.**    My concern was that they would get to members of

25   Congress.

1          **MR. NESTLER:**  If we could play it forward.  Stop

2     at 1:50:47.  So about a minute away from here.

3              (Played video.)

4     BY MR. NESTLER:

5          **Q.**   Do you see what that person just pulled out of

6     Sergeant DesCamp's backpack?

7          **A.**   I do.

8          **Q.**   And who was the person who pulled it out of the

9     backpack?

10         **A.**   Sergeant Matthew Flood.

11         **Q.**   And what was it that he pulled out of Sergeant

12    DesCamp's backpack?

13         **A.**   A large canister of OC spray.

14         **Q.**   What do you observe Sergeant DesCamp do with this

15    canister of OC spray after he accesses it?

16         **A.**   He utilizes it.

17         **MR. NESTLER:**  Why don't we play it forward,

18    Ms. Rohde, stopping at 1:50:50.  Just play it for a couple

19    more seconds.

20              (Played video.)

21         **MR. NESTLER:**  And if you stop it there at 1:50:53.

22    BY MR. NESTLER:

23         **Q.**   Did you see what the defendant was doing with his

24    right arm?

25         **A.**   Um --

 1          **MR. NESTLER:**  If you could rewind it, Ms. Rohde,

 2     about five seconds.

 3          **THE WITNESS:**  Yes, please.

 4          (Played video.)

 5          **MR. NESTLER:**  I'll ask you to look at what the

 6     defendant is doing at about 1:50:50, Ms. Kerkhoff.  If you

 7     could pause it there.

 8     **BY MR. NESTLER:**

 9      **Q.**   Could you see what the defendant was doing?

10      **A.**   I did.

11      **Q.**   What was that?

12      **A.**   Waving the crowd to go past him.

13          **MR. NESTLER:**  If you could play it forward,

14     Ms. Rohde.

15          (Played video.)

16     **BY MR. NESTLER:**

17      **Q.**   And what do you see the defendant doing now with

18     his right arm?

19      **A.**   Could you play it again?  I'm sorry.

20      **Q.**   Sure.

21      **A.**   A lot of stuff to focus on.  My apologies.

22      **Q.**   That's all right.  We will go back just a couple

23     seconds.  So at 1:57:09, what do you see the defendant doing

24     here?

25      **A.**   Waving for the crowd to go past him.

1          **MR. NESTLER:**  We will play this forward until

2     1:51:37.

3               (Played video.)

4          **MR. NESTLER:**  If we could pause it there.

5     **BY MR. NESTLER:**

6          **Q.**   Do you see -- if we could pause it there.  Do you

7     see what the crowd is doing with respect to the white tarp

8     over the scaffolding?

9          **A.**   I do.

10         **Q.**   What are they doing?

11         **A.**   They are using it to protect themselves.

12         **Q.**   What's about to happen?  Do you know?

13         **A.**   Um, the OC -- the large canister of OC spray is

14    about to be utilized.

15         **Q.**   What color is the OC when it is sprayed?

16         **A.**   It is orange.

17         **Q.**   Can you see it against the white background when

18    it is sprayed?

19         **A.**   Yes, you can, when it is sprayed.

20         **MR. NESTLER:**  If we can play it forward until

21    1:51:44.

22              (Played video.)

23    **BY MR. NESTLER:**

24         **Q.**   Did you see OC being deployed?

25         **A.**   I did.

1    Q.   And who was doing the deploying of the OC spray?

2    A.   That would have been Sergeant Adam DesCamp.

3    Q.   Where is he standing at this time?

4    A.   He is standing behind the cauldron we referred to.

5    Q.   Where are you at this time?  Do you know?

6    A.   I am somewhere in the crowd behind him.  I believe

7    I am directly to his left side.

8    Q.   Let's take a break from the video and talk about

9    the less-than-lethal weapons you were discussing.  Okay?

10   A.   Okay.

11   Q.   You indicated that you had access to several

12   different kinds of less-than-lethal weapons; is that right?

13   A.   That is correct.

14   Q.   What is the principle or theory by which the Civil

15   Disturbance Unit uses the different kinds of

16   less-than-lethal weapons?

17   A.   Could you repeat that question?

18   Q.   Sure.  That was a bad question.  Is there a theory

19   of which weapons you use for which times?

20   A.   Yes.

21   Q.   And what is that?

22   A.   So PepperBall is more of a chemical effect, you

23   know.  FN-303 is a pain compliance.  So we would probably

24   start with PepperBall and ramp it up from there, if that

25   makes sense.  Does that answer your question?

1    **Q.**   Yes.  So at this time we have Officer Buha here

2    with some weapons from the less-than-legal unit.  I am going

3    to talk about Exhibit 51, which is the Tippmann PepperBall

4    launcher.

5         **MR. NESTLER:**  Could you show it just to

6    Ms. Kerkhoff?

7    **BY MR. NESTLER:**

8         **Q.**   Do you see what Officer Buhaj is holding?

9         **A.**   I do.

10        **Q.**   And what is that?

11        **A.**   That is a Tippmann 98 PepperBall launcher.

12        **MR. NESTLER:**  The government moves to display this

13   to the jury as a demonstrative.

14        **THE COURT:**  Hold up.  I don't see it.  Oh, sorry.

15   I thought it was on the screen.

16        **MR. NESTLER:**  You can sit down.  The government

17   moves to display this to the jury as a demonstrative

18   exhibit.

19        **THE COURT:**  Any objection?

20        **MR. WELCH:**  No, thank you.

21        **THE COURT:**  All right.  Go ahead.

22   **BY MR. NESTLER:**

23        **Q.**   Officer Buhaj, if you please stand and show the

24   jury, who is sitting behind you, what the Tippmann

25   PepperBall launcher looks like.  And Ms. Kerkhoff, how does

1    this weapon work?

2         A.    It is powered by compressed air, so it launches

3    the projectile with compressed air.  And it's a round that

4    is filled with PAVA powder that causes an inflammatory

5    response, similar to OC spray.

6         Q.   And we are going to put up on the screen, just in

7    front of, you Exhibit 51A.  Do you recognize what this is?

8         A.   I do.

9         Q.   What is it?

10        A.   Again, it's the Tippmann 98 PepperBall launcher.

11        Q.   And 51B?

12        A.   That is the back side of the launcher.

13             MR. NESTLER:  The government moves to display 51A

14   and B to the jury.

15             THE COURT:  Any objection?

16             MR. WELCH:  No, Your Honor.

17             THE COURT:  All right.  Are you offering it --

18             MR. NESTLER:  Yes, Your Honor.

19             THE COURT:  -- the photograph?

20             MR. NESTLER:  Yes, Your Honor.

21             THE COURT:  All right.  It's admitted.

22        (Government Exhibit 51A AND 51B admitted into evidence)

23   BY MR. NESTLER:

24        Q.   So you indicated earlier the compressed air -- is

25   the version that Officer Buhaj was holding up, does it have

1    the compressed air tank on it?

2         **A.**    It does not.

3         **Q.**    How about the photograph?

4         **A.**    It does.

5         **Q.**    Where is the compressed air tank?

6         **A.**    It's to the right in the photo.

7         **Q.**    This is 51A.  Correct?  This is Exhibit 51A?

8         **A.**    Oh, that's correct.

9         **Q.**    Where does one put the pellets or ammunition?

10        **A.**    So just above the word Tippmann you can see a

11   small circle on top of the launcher and that is where the

12   hopper would go.

13        **Q.**    What do you put inside of the hopper?

14        **A.**    The hopper -- the projectiles go inside of the

15   hopper.

16        **Q.**    So we will show you Exhibit 51C.  Do you recognize

17   what this is?

18        **A.**    Yes, I do.

19        **Q.**    What is it?

20        **A.**    That is a PepperBall projectile.

21        **Q.**    The government moves to admit.

22             **THE COURT:**  Any objection?

23             **MR. WELCH:**  No, Your Honor.

24             **THE COURT:**  It's admitted.

25             (Government Exhibit 51C were admitted into evidence)

1    BY MR. NESTLER:

2        Q.    And so what is the point of using a PepperBall

3    launcher?  What is it supposed to do to the person you are

4    launching at?

5        A.    So it has a small amount of pain compliance.  So

6    it should hurt a little bit.  So that should deter actions.

7    As well as when the ball hits something, it will -- it is

8    filled with PAVA powder, so it will launch that PAVA powder

9    into the air and will affect the nasal passages as well as

10   the eyes, causing stinging, burning.

11       Q.    And is PAVA, P-A-V-A?

12       A.    That's correct.

13       Q.    What do you aim for when you first start

14   launching?

15       A.    Typically I aim for the ground.

16       Q.    Why?

17       A.    I try to just get the chemical in the air so I

18   don't have to actually -- if I can deter somebody without

19   actually striking them, I am going to try that first.

20       Q.    And if the ground method does not work, then what

21   do you do?

22       A.    I typically move to large meaty areas.

23       Q.    Why do you start with large meaty areas on the

24   person's body?

25       A.    They can handle more pain there.

1    **Q.**   And if the large meaty areas don't work, then what

2    do you do?

3    **A.**   I target bony areas.

4    **Q.**   When you were interacting with the defendant,

5    which areas did you target?

6    **A.**   I targeted his chest, his shins, his thighs.

7    **Q.**   When you targeted his chest, did you see if it had

8    any impact?

9    **A.**   It did not.

10   **Q.**   Did you have any impression about why it wasn't

11   having any impact?  Did you are hear or see anything that

12   gave you any impression?

13   **A.**   He appeared to be padded up.

14   **Q.**   What does that mean to be padded up?

15   **A.**   It appeared that he was either wearing lots of

16   clothing or he had some sort of vest under his clothes.  I

17   am not sure exactly, but it appeared he had a lot of

18   clothing on.

19   **Q.**   Can you approximate how many PepperBalls you

20   launched at the defendant?

21   **A.**   I would estimate it to be maybe 40, 50

22   projectiles.  But that -- it is just an approximate

23   estimation.

24   **Q.**   If the PepperBall launcher is not having the

25   desired effect, it's not stopping the person's actions, do

1    you try a different weapon?

2        **A.**    Yes.

3        **Q.**    And what was the weapon that Sergeant DesCamp was

4    initially holding?

5        **A.**    He was holding an FN-303 launcher.

6        **Q.**    Okay.  And, Officer Buhaj, if you could display to

7    Ms. Kerkhoff the FN-303 launcher.  Is Officer Buhaj holding

8    an FN-303 luncher?

9        **A.**    Yes, he is.

10        **MR. NESTLER:**  The government moves to display this

11    exhibit, Exhibit 52, to the jury as a demonstrative.

12            **THE COURT:**  Any objection?

13        **MR. WELCH:**  No, Your Honor.

14            **THE COURT:**  You may do so.

15        **MR. NESTLER:**  If you could please stand, Officer

16    Buhaj, and display that to the jury.

17            (Displayed exhibits.)

18    **BY MR. NESTLER:**

19        **Q.**    I will pull it up on the screen, just for you,

20    Ms. Kerkhoff, Exhibits 52A and then B.  Do you recognize

21    what they are?

22        **A.**    Yes, I do.

23        **Q.**    What are they?

24        **A.**    They are the front and back of the FN-303

25    launcher.

1          **MR. NESTLER:**  The government moves into evidence

2     Exhibit 52A and B.

3               **THE COURT:**  Any objection?

4               **MR. WELCH:**  No, Your Honor.

5               **THE COURT:**  They are admitted.

6          (Government Exhibit 52A and 52B admitted into evidence)

7               **MR. NESTLER:**  If we could display just one of

8     those to the jury.

9     **BY MR. NESTLER:**

10         **Q.**  And how does the FN-303 projectile launcher work,

11    Ms. Kerkhoff?

12         **A.**  It is also padded by compressed air.  And the

13    round itself is --

14              **THE COURT:**  Sorry to interrupt, Mr. Nestler.  I

15    just noticed that the court reporter did not get my

16    statement that those were admitted.

17              (Previous exhibits were admitted).

18              **MR. NESTLER:**  Thank you, Your Honor.

19    **BY MR. NESTLER:**

20         **Q.**  You indicated earlier compressed air.  Is that

21    this canister we see here?

22         **A.**  Yes, that front-facing canister is compressed air.

23         **Q.**  And the version that Officer Buhaj, does it have a

24    canister on it?

25         **A.**  It does not.

1     **Q.**   And how does it work with the compressed air?

2     **A.**   The compressed air powers a finned or beveled

3     projectile that spins when it comes out of the barrel.

4     **Q.**   I will now show you Exhibit 52C.  What are we

5     looking at here?

6     **A.**   That is an FN-303 projectile.

7     **MR. NESTLER:**  The government moves to admit into

8     evidence Exhibit 52C.

9     **THE COURT:**  Any objection?

10    **MR. WELCH:**  No, Your Honor.

11    **THE COURT:**  It's admitted.

12    (Government Exhibit 52C admitted into evidence)

13    **BY MR. NESTLER:**

14    **Q.**   And what is the projectile resting on top of, for

15    perspective?

16    **A.**   A binder clip.

17    **Q.**   And so can you describe how the projectile works?

18    **A.**   Yes.  So the projectile is weighted; that's what

19    that gray stuff is in the front of it, it's bismuth.  It

20    gives it weight.  It comes out of the barrel, the fins in

21    the back of it, once it hits air, will spin.  And that

22    causes more pain compliance.

23    **Q.**   And you're using the phrase "pain compliance,"

24    which is a law enforcement term.  What would a layperson

25    call pain compliance?

1      **A.**    It will hurt when it hits them.

2      **Q.**    If it hurts when it hits you, what is the person

3   supposed to do when it hurts?

4      **A.**    It should stop the behavior.

5      **Q.**    How is the pain compliance of an FN-303 projectile

6   launcher compared to the pain compliance of a PepperBall?

7      **A.**    The FN-303 launcher has significantly more pain

8   compliance than the PepperBall launcher.

9      **Q.**    Meaning it hurts more?

10      **A.**    Yes.

11      **Q.**    Okay.  When you and Sergeant DesCamp were

12   interacting with the defendant, did the FN-303 projectile

13   luncher or the PepperBall launcher stop the defendant's

14   advances?

15      **A.**    They did not.

16      **Q.**    What item did Sergeant Flood have?

17      **A.**    He had the canister of OC spray.

18          **MR. NESTLER:**  And, Officer Buhaj, if you could

19   please take out Exhibit 54.

20   **BY MR. NESTLER:**

21      **Q.**    Do you see what Officer Buhaj is holding?

22      **A.**    I do.

23      **Q.**    Is that the canister of OC spray that looks

24   approximately like the canister Sergeant Flood had on

25   January 6th?

1        **A.**   Yes.

2               **MR. NESTLER:**   The government moves to display

3    Exhibit 54 to the jury.

4               **THE COURT:**   Any objection?

5               **MR. WELCH:**   No, thank you.

6               **THE COURT:**   Okay.   You may do so.

7    BY MR. NESTLER:

8        **Q.**   Can you describe how the canister of OC spray

9    works?   How does one access the OC spray?

10       **A.**   Yes.   There is a pin on the left side that you had

11   to detach before you depress the yellow trigger on the top

12   of it, and then it expels the OC.

13       **Q.**   Thank you.

14              And then finally, did Sergeant Flood's use of the

15   smaller canister of the OC spray fully stop the defendant's

16   advances?

17       **A.**   They did not.

18       **Q.**   Did you see what Sergeant DesCamp did after that?

19       **A.**   I did.

20       **Q.**   What did he use?

21       **A.**   He utilized a larger can of OC spray called a Mark

22   46, MK46.

23       **Q.**   Do you know why it is called MK46?

24       **A.**   Yes.

25       **Q.**   Why?

1       **A.**    It has approximately 46 ounces of OC spray.

2            **MR. NESTLER:**  Could Officer Buhaj show

3   Ms. Kerkhoff Exhibit 53?

4   **BY MR. NESTLER:**

5       **Q.**    What is Officer Buhaj holding?

6       **A.**    That is a Mark 46 SABRE Red OC spray canister.

7            **MR. NESTLER:**  The government moves to show Exhibit

8   53 to the jury as a demonstrative.

9            **THE COURT:**  Any objection?

10           **MR. WELCH:**  No, Your Honor.

11           **THE COURT:**  You may do so.

12           (Exhibit displayed.)

13  **BY MR. NESTLER:**

14      **Q.**    And how does Exhibit 53, the Mark 46 work?

15      **A.**    It has a similar pin, and it also has a trigger

16  that you can see in the middle of that rectangular section

17  at the top of the canister.  You depress that and it expels

18  the OC spray.

19      **Q.**    Thank you.

20           **MR. NESTLER:**  Ms. Rohde, if you could pull up,

21  just for Ms. Kerkhoff, Exhibit 54A.

22  **BY MR. NESTLER:**

23      **Q.**    Do you know what that is?

24      **A.**    Yes.  That is a Mark 9 SABRE Red OC spray

25  canister.

1      **Q.**   Okay.  Is that a photograph of approximately what

2   Exhibit 54 looked like?

3      **A.**   Approximately.

4          **MR. NESTLER:**  The government moves to admit into

5   evidence Exhibit 54A.

6          **THE COURT:**  Any objection?

7          **MR. WELCH:**  No, Your Honor.

8          **THE COURT:**  It's admitted.

9      (Government Exhibit 54A admitted into evidence)

10          **MR. NESTLER:**  And then if you could pull up

11   Exhibits 53A and B, please, Ms. Rohde.

12   **BY MR. NESTLER:**

13      **Q.**   Do you recognize what these are?

14      **A.**   I do.

15      **Q.**   What are they?

16      **A.**   It is a Mark 46 SABRE Red OC spray canister.

17          **MR. NESTLER:**  The government moves to admit

18   Exhibits 53A and B.

19          **THE COURT:**  Any objection?

20          **MR. WELCH:**  No, Your Honor.

21          **THE COURT:**  They are admitted.

22      (Government Exhibit 53A and 53B admitted into evidence)

23          **MR. NESTLER:**  If you could pull up on the screen

24   Exhibit 53A, Ms. Rohde.

25

1    BY MR. NESTLER:

2         Q.    So, Ms. Kerkhoff, you indicated you experienced OC

3    spray yourself in the past; is that correct?

4         A.    That's correct.

5         Q.    Could you explain to the jury the velocity of the

6    larger 46-ounce container versus the smaller container that

7    Sergeant Flood had?

8         A.    Yes, it sprays both further and faster than the

9    smaller canister.

10        Q.    And what does it mean for people who are on the

11   receiving end of being sprayed to get sprayed with something

12   that is spraying farther and faster?

13        A.    It's going to -- you're going to be struck with a

14   higher quantity of OC spray.

15        Q.    Thank you.

16             MR. NESTLER:   You can take this down, Ms. Rohde.

17   Thank you.

18   BY MR. NESTLER:

19        Q.    Have you observed your interaction with the

20   defendant from different video angles, different from the

21   surveillance video I showed you earlier?

22        A.    I have.

23        Q.    And could you tell where those additional angles

24   were from?  Were they from elevated positions or positions

25   below you?

1      **A.**    They were from elevated positions.  The ones I've

2      seen.  There were both though.  I've seen both.

3      **Q.**    You've seen both?  Okay.

4      **A.**    Yes.

5      **Q.**    Let's start with Exhibit 201.

6      **A.**    Did that answer your question, Mr. Nestler?

7      **Q.**    Yes.  Thank you.

8             (Played video.)

9             Have you seen this video before?

10     **A.**    I have.

11     **Q.**    Does this video capture an interaction that you

12     had on January 6th?

13     **A.**    It does.

14            **MR. NESTLER:**  The government moves to admit into

15     evidence Exhibit 201.

16            **THE COURT:**  Any objection?

17            **MR. WELCH:**  The Court's indulgence, please.

18            (Discussion at sidebar.)

19            **MR. WELCH:**  I don't believe this is a Capitol --

20     excuse me.  I don't believe this is a Capitol Police video.

21     What is this?

22            **MR. NESTLER:**  This is a video taken by Reuters.

23            **THE COURT:**  So, Mr. Nestler, is the witness going

24     to say that the video fairly and accurately depicts what she

25     observed that day?

1          **MR. NESTLER:**  Yes.

2          **THE COURT:**  So what's the objection?

3          **MR. WELCH:**  Well, if she does, fine.  But if she

4   doesn't, then I think we are going to have a problem.

5          **THE COURT:**  For sure.  But let's wait and see what

6   she says.

7               (Sidebar discussion concluded.)

8          **MR. NESTLER:**  Court's brief indulgence.

9               (Discussion between Mr. Nestler and courtroom

10   deputy.)

11       (Government Exhibit 201 admitted into evidence)

12          **MR. NESTLER:**  Okay.  We can put it on the screen

13   just for Ms. Kerkhoff.

14   **BY MR. NESTLER:**

15     **Q.**   Does this video fairly and accurately capture what

16   you recall occurring on January 6th of 2021?

17     **A.**   Yes.

18          **MR. NESTLER:**  The government moves to admit

19   Exhibit 201 into evidence.

20          **THE COURT:**  Any objection?

21          **MR. WELCH:**  No, Your Honor.

22          **THE COURT:**  It's admitted.

23          **MR. NESTLER:**  If we could pull up for the jury --

24   this video does have audio.  We will see if the audio is

25   adequately working.

1           (Played video.)

2           **MR. NESTLER:**  It is not.  But why don't we stop it

3      there at seven seconds.  We will go forward without audio

4      and we will see if we can get the audio working a little bit

5      later.  We will just go with the video for now.

6  **BY MR. NESTLER:**

7      **Q.**   It stopped here at eight seconds.  Who is the

8      person in the sunglasses in the front?

9      **A.**   That is me.

10     **Q.**   What are you wearing on your head?

11     **A.**   I am wearing Capitol Police baseball cap.

12     **Q.**   And what are you holding in your hand?

13     **A.**   That is the PepperBall launcher.

14     **Q.**   What's that big round thing in the middle of the

15     frame that you are holding?

16          **MR. NESTLER:**  Oh, it's not on the screen.  Thank

17     you, jurors.  Sorry.  Now it's on the screen for the jurors

18     based on some thumbs up.

19  **BY MR. NESTLER:**

20     **Q.**   Ms. Kerkhoff, you indicated it's you in the center

21     of the frame with the sunglasses and the hat?

22     **A.**   That is correct.

23     **Q.**   What is the circular thing that you are holding

24     that is part of the PepperBall launcher?

25     **A.**   On the top of the launcher?

1    **Q.**   Yes.

2    **A.**   That is the hopper.

3    **Q.**   And what goes in the hopper?

4    **A.**   The projectiles.

5    **Q.**   Can you tell who you are addressing at this point?

6    **A.**   Yes.

7    **Q.**   And who are you addressing?

8    **A.**   The defendant.

9    **Q.**   Do you know what you are saying?

10   **A.**   I can't tell exactly what I am saying.

11   **Q.**   Do you know generally what you were saying?

12   **A.**   Yes.

13   **Q.**   Which is?

14   **A.**   Stop.

15   **Q.**   Was the defendant complying?

16   **A.**   No.

17          **MR. NESTLER:**  Let's now go to Exhibit 203.

18          (Played video.)

19   **BY MR. NESTLER:**

20   **Q.**   Do you recognize this video, Ms. Kerkhoff?

21   **A.**   I do.

22   **Q.**   Have you seen this video before you came into

23   Court?

24   **A.**   I have.

25   **Q.**   Does this video fairly and accurately capture what

1      you were doing on January 6th?

2              **A.**    It does.

3                      **MR. NESTLER:**  The government moves to admit

4      Exhibit 203 into evidence.

5                      **THE COURT:**  Any objection?

6                      **MR. WELCH:**  No, Your Honor.

7                      **THE COURT:**  It's admitted.

8              (Government Exhibit 203 admitted into evidence)

9                      **MR. NESTLER:**  One second, Ms. Rohde.  Let's put it

10     up for the jury.

11                     (Played video.)

12                     **MR. NESTLER:**  Now this video also has audio.  We

13     will try to get back to the audio in a minute.  But let's

14     play this forward and stop it at about 15 seconds.

15                     (Played video.)

16     **BY MR. NESTLER:**

17             **Q.**    Who is holding the weapons?

18             **A.**    Myself and Sergeant Adam DesCamp.

19             **Q.**    What weapon are you holding?

20             **A.**    I am holding the PepperBall launcher.

21             **Q.**    What is he holding?

22             **A.**    He is holding an FN-303 launcher.

23             **Q.**    Who are you aiming at?

24             **A.**    The defendant.

25             **Q.**    Can you point out the defendant by what he is

1      wearing and carrying?

2          **A.**    He is wearing blue jeans, a blue jacket, a

3      megaphone, tactical helmet.

4              **MR. NESTLER:**  If we can play this forward,

5      stopping at about 22 seconds.

6              (Played video.)

7      **BY MR. NESTLER:**

8          **Q.**    And is that still you and Sergeant DesCamp?

9          **A.**    Yes, it is.

10             **MR. NESTLER:**  If we could play this forward for a

11     minute, stopping at 1 minute and 12 seconds.

12             (Played video.)

13     **BY MR. NESTLER:**

14         **Q.**    What's that building behind you?

15         **A.**    That is the Capitol building.

16         **Q.**    Do you see a person entering the frame here at 1

17     minute and 12 seconds?

18         **A.**    I do.

19         **Q.**    And who is that?

20         **A.**    I believe it's Sergeant Matthew Flood.

21         **Q.**    Do you see what he is holding in his hand?

22         **A.**    Yes, I do.

23         **Q.**    What is that?

24         **A.**    That is the Mark 9 SABRE Red OC spray.

25             **MR. NESTLER:**  If we could play this forward to

1    1:24.

2              (Played video.)

3    BY MR. NESTLER:

4        Q.   Did you see that orange spray?

5        A.   I did.

6        Q.   What is that?

7        A.   That is OC spray.

8        Q.   Did you hear the crowd making any noise when he

9    deployed the OC spray?

10       A.   Yes.

11       Q.   What was that noise?

12       A.   A general sentiment of anger.

13       Q.   And could you tell who that was directed at?

14       A.   Yes.

15       Q.   Who?

16       A.   Myself, Sergeant Flood and Sergeant Adam DesCamp.

17             MR. NESTLER:  If we could play it forward stopping

18   at 1:30.

19             (Played video.)

20   BY MR. NESTLER:

21       Q.   Who is in the center of the frame?

22       A.   That is Sergeant Adam DesCamp.

23       Q.   What is he holding.

24       A.   The FN-303 launcher.

25       Q.   What is he doing with it?

1    **A.**    He is utilizing it to impact the defendant.

2    **Q.**    So he is launching projectiles at the defendant?

3    **A.**    Yes.

4         **MR. NESTLER:**  If we could play it forward to 1:33.

5         (Played video.)

6    **BY MR. NESTLER:**

7    **Q.**    Did you hear anything on the video about Sergeant

8    DesCamp's FN-303 luncher?  Did you hear impact?

9    **A.**    I could hear it coming out of his launcher.

10   **Q.**    What does it sound like when it comes out?

11   **A.**    You can hear the compressed air go through the

12   chamber.  You can hear a -- (blew air).  It is a lot louder

13   than the PepperBall launcher.

14        **MR. NESTLER:**  For the record it was a -- (blew

15   air).

16   **BY MR. NESTLER:**

17   **Q.**    Did the FN-303 stop the defendant's advances?

18   **A.**    It did not.

19        **MR. NESTLER:**  Let's move to Exhibit 201, which was

20   already admitted into evidence, and pull it up on the

21   screen.  And we had stopped it at seven seconds earlier.  So

22   let's play it forward from about seven seconds.

23        (Played video.)

24        **MR. NESTLER:**  If we could stop it there at 18

25   seconds.

1    BY MR. NESTLER:

2         **Q.**   Who's the officer on the left?

3         **A.**   That is Sergeant Adam DesCamp.

4         **Q.**   Who is the officer in the middle?

5         **A.**   That is me.

6         **Q.**   Who is the officer on the right?

7         **A.**   Sergeant Matthew Flood.

8         **Q.**   Remind us what he is wearing on his face?

9         **A.**   He is wearing a gas mask.

10        **Q.**   What is he holding in his left hand?

11        **A.**   The Mark 9 SABRE Red OC spray canister.

12        **Q.**   Can you tell us what you are doing right now?

13        **A.**   Yes.

14        **Q.**   What are you doing?

15        **A.**   I am using my radio.

16        **Q.**   Why are you using your radio?

17        **A.**   Because the crowd is getting closer and closer to

18   the building.

19        **Q.**   Why would it be important for you to use your

20   radio?

21        **A.**   To warn other officers about the situation and get

22   help.

23        **Q.**   Could you describe what your voice sounded like on

24   the radio at this time?

25        **A.**   Panicked.

1    **Q.**   Have you heard that radio communication before?

2    **A.**   I have.

3    **Q.**   And is the radio communication you heard a fair

4    and accurate depiction of the voice you used on the radio on

5    January 6th?

6    **A.**   Yes.

7         **MR. NESTLER:**  The government would move to admit

8    Exhibit 210.2 into evidence.

9         **THE COURT:**  Any objection?

10        **MR. WELCH:**  No, Your Honor.

11        **THE COURT:**  It's admitted.

12    (Government Exhibit 210.2 admitted into evidence)

13        **MR. NESTLER:**  And we will see if we can get the

14    audio working.

15        **THE COURT:**  Mr. Nestler, before you start it, I am

16    just told by the tech people we are as high as we can get in

17    this courtroom.

18        **MR. NESTLER:**  All right.  We will make do.

19    **BY MR. NESTLER:**

20    **Q.**   Do you see on the screen where it says Officer

21    Kerkhoff?

22    **A.**   I do.

23    **Q.**   Is that referring to you?

24    **A.**   Yes.

25    **Q.**   All right.

1          **MR. NESTLER:**  Why don't we play from the

2    beginning, Ms. Rohde.

3               (Playing audio.)

4               And if you could pause it there at about 10

5    seconds.

6    **BY MR. NESTLER:**

7         **Q.**   Whose voice was that?

8         **A.**   That was my voice.

9         **Q.**   What are you saying?

10        **A.**   I am saying that there is somebody breaching the

11   west terrace.

12        **Q.**   And what are you asking for?

13        **A.**   Help.

14        **Q.**   Who are you referring to?

15        **A.**   Other officers.

16        **Q.**   Who was breaching the west terrace?

17        **A.**   Oh, the defendant.

18             **MR. NESTLER:**  Can we play it forward from then?

19             (Played audio.)

20             **MR. NESTLER:**  Can we pause it there at 28 seconds?

21   **BY MR. NESTLER:**

22        **Q.**   Who was just talking?

23        **A.**   I believe that was myself.

24        **Q.**   Can you characterize your voice at this time?

25        **A.**   Panicked.

1    **Q.**   What are you saying?

2    **A.**   That there are individuals coming up the west side

3    of the stairs.

4    **Q.**   And why were you panicked and why were you saying

5    that?

6    **A.**   Because there was thousands of people in front of

7    me and several of them were attempting to come up the stairs

8    towards the Capitol building.

9            **MR. NESTLER:**  Let's play this forward.

10           (Played audio.)

11           **MR. NESTLER:**  If we could pause it there at 1:47.

12   **BY MR. NESTLER:**

13   **Q.**   Did you hear somebody say it was a priority?

14   **A.**   Yes.

15   **Q.**   What does a priority mean?

16   **A.**   A priority means to pretty much stop what you are

17   doing and listen to the radio because there is something bad

18   happening.

19   **Q.**   And when there was somebody indicating that the

20   breach was occurring, what does it mean that a breach is

21   occurring?

22   **A.**   A breach means that some security perimeter or a

23   door -- some level of our security perimeter has been

24   broken.

25   **Q.**   And what's the north side?

1       **A.**   The north side is the Senate side.

2       **Q.**   And when people were referring to the north side

3   of the upper west terrace, how does that impact where you

4   were?

5       **A.**   The north side of the upper west terrace is where

6   I was.

7           **MR. NESTLER:**   If we could play it forward from

8   1:47.

9           (Played audio.)

10  **BY MR. NESTLER:**

11      **Q.**   And did you hear the dispatch say 1351 hours?

12      **A.**   I did.

13      **Q.**   Do you know what that means?

14      **A.**   1:51 p.m.

15          **MR. NESTLER:**   We'll now go back to Exhibit 201.

16  Your Honor, this might be a good time, if you were looking

17  for a break, but we can continue going.

18          **THE COURT:**   How much longer do you have?

19          **MR. NESTLER:**   Probably 25 minutes.

20          **THE COURT:**   Okay.  All right.  Let's take a break.

21          Ladies and gentlemen, we will take a 10-minute

22  break.  And we will be back for the rest of Ms. Kerkhoff's

23  testimony.

24          **COURTROOM DEPUTY:**   All rise.

25          (Recess.)

1          **THE COURT:**  When the jury comes in, you all can

2     sit down as they sit.  You don't have to wait to be told to

3     sit.  Okay?

4          **MR. WELCH:**  Your Honor, earlier we voir dired the

5     jury on the officer who was assisting Officer Kerkhoff.  And

6     there's another person who's been sitting with the officer,

7     but I don't know who that is.  She is seated now on your

8     right in the very first row within the well.  Can we make

9     sure that the jury does not know this person.

10          **THE COURT:**  Mr. Nestler?

11          **MR. NESTLER:**  The person who is here is Lisa

12    Walters, who is the assistant general counsel of the Capitol

13    Police.  And she is here as witness counsel.  It doesn't

14    offend us to voir dire the jury, but we are going to have

15    many different witness counsel here.  And I don't think that

16    there is any need, if she is not going to perform any role.

17    Officer Buhaj actually stood and performed some role.  She

18    is here purely as an observer.

19          **THE COURT:**  She is just an attorney for a witness.

20          **MR. WELCH:**  It is fine.  But it would be nice if

21    somebody would let me know that.

22          **THE COURT:**  Of course.  So let him know in the

23    future when you have an attorney.

24          **MR. NESTLER:**  No problem, Your Honor.

25          **THE COURT:**  Do you expect to have any other

1     witnesses like the officer who played a role?

2              **MR. NESTLER:**  No.  When we have the physical

3     evidence with Karla Kennedy, Special Agent Ryan will perform

4     that role of displaying the items to the jury.

5              **THE COURT:**  But you already introduced him the

6     first day.  Right?

7              **MR. NESTLER:**  Correct.  No one else is new.  We

8     only had to do that because Capitol Police didn't want us to

9     have those items leave their custody.

10             **THE COURT:**  No, that makes sense.

11             You say roughly 25 more minutes.

12             **MR. NESTLER:**  That's about right, Your Honor.

13             **THE COURT:**  All right.

14             **MR. NESTLER:**  Then we can go right into our next

15    witness, who will be Inspector Monique Moore from the

16    Capitol Police.

17             **THE COURT:**  Okay.  Are you concerned about the

18    audio with other exhibits moving forward?  I don't know if

19    there are any other courtrooms that are any better than

20    this.

21             **MR. NESTLER:**  No.  It actually worked fine during

22    the break.

23             **THE COURT:**  So it went higher during the break?

24             **MR. NESTLER:**  Much higher.

25             **THE COURT:**  Really?

1    **MR. NESTLER:**  Yes.

2    **THE COURT:**  What did we do?

3    **MR. WELCH:**  You weren't here.

4    **THE COURT:**  Am I doing something?

5    **MR. WELCH:**  He said it's nothing we are doing or

6    not doing.  He wasn't able to pinpoint anything.

7    **THE COURT:**  We had a bad contractor apparently.

8    **MR. NESTLER:**  We will try it again, and we will

9    make do.  We are fine to move forward.

10   **THE COURT:**  All right.  So are we ready for the

11   jury?

12   **MR. WELCH:**  Yeah.

13   **COURTROOM DEPUTY:**  I will go get them, Your Honor.

14   **THE COURT:**  The next witness is Officer Moore?

15   **MR. NESTLER:**  Inspector Moore; that's correct.

16   **THE COURT:**  Okay.

17   (Jurors entered the courtroom.)

18   **THE COURT:**  Ms. Kerkhoff, I remind you, you are

19   still under oath.  Mr. Nestler, you may proceed.

20   **BY MR. NESTLER:**

21   **Q.**   Hello, Ms. Kerkhoff.

22   **A.**   Hello.

23   **Q.**   Why don't we go to Exhibit 201, already in

24   evidence.

25   **MR. NESTLER:**  If we could display to the jury,

1    please?

2              **COURTROOM DEPUTY:**  Absolutely.

3              **MR. NESTLER:**  Okay.  We had stopped this about 16

4    seconds earlier.  So why don't we go to 16 seconds,

5    Ms. Rohde, and play it from there.

6              And stop it there at 19 seconds -- or actually

7    stopped at 20 but that's fine.

8              (Played video.)

9    **BY MR. NESTLER:**

10        **Q.**   Who entered the frame?

11        **A.**   Sergeant Matthew Flood.

12        **Q.**   Can you tell me what you are doing at this point?

13        **A.**   I can -- well, what I am doing behind him at this

14   point?

15        **Q.**   Well, are you having any conversation with

16   Sergeant Flood?

17        **A.**   Yes.

18        **Q.**   What are you talking to him about?

19        **A.**   He just came over to this side of the stage or

20   this side of the Capitol.  We are letting him know what we

21   are seeing and interacting with.

22        **Q.**   Why is it important to let Sergeant Flood know

23   what you are seeing and you are interacting with?

24        **A.**   Because he was about to also interact with the

25   defendant and wanted to know what we have done thus far.

1      **Q.**   Why does that matter?

2      **A.**   It matters because it affects his use of force.

3      **Q.**   Do you see what he is holding in his left hand?

4      **A.**   I do.

5      **Q.**   What's that?

6      **A.**   The Mark 9 SABRE Red OC canister.

7          **MR. NESTLER:**  All right.  Why don't we play this

8      forward until about 38 seconds.  There should be audio on

9      this file as well.

10         (Played video.)

11     **BY MR. NESTLER:**

12     **Q.**   What did you see Sergeant Flood do?

13     **A.**   He sprayed the defendant with OC spray.

14         **MR. NESTLER:**  Let's try a different exhibit.  We

15     will pull up on the screen, just for just Ms. Kerkhoff,

16     Exhibit 200.

17     **BY MR. NESTLER:**

18     **Q.**   And, Ms. Kerkhoff, have you seen this video

19     before?

20     **A.**   I have.

21     **Q.**   Are you depicted somewhere in this video?

22     **A.**   Yes, I am.

23     **Q.**   Does this video fairly and accurately represent

24     what occurred on January 6th from your perspective?

25     **A.**   It does.

1          **MR. WELCH:**  Objection, Your Honor.  Can we speak?

2                (Discussion at sidebar.)

3          **THE COURT:**  Go ahead.

4          **MR. WELCH:**  Okay.  Some of what is in this video

5    might be something that this witness can authenticate from

6    her perspective.  But this exhibit was not going to be

7    brought in through this witness.  This exhibit was going to

8    be brought in through Agent Hightower, at a later point in

9    the trial, as I understand it.  Because this is not

10   something that Officer Kerkhoff would be able to

11   authenticate the entire thing.  She can authenticate herself

12   but there are other parts of this that she could not

13   possibly authenticate.

14         **THE COURT:**  Mr. Nestler?

15         **MR. NESTLER:**  That's not correct.  This is a video

16   that was published by News2Share, which is owned by a

17   videographer named Ford Fischer, who provided a certificate

18   of authenticity, authenticating the video.  We provided that

19   to Mr. Welch to confirm its authenticity.  In addition,

20   Ms. Kerkhoff is visible at a portion of this video.

21         **MR. WELCH:**  Yes, she is visible.  So she can

22   authenticate what she can see, but she cannot possibly

23   authenticate what she could not see.  In other words,

24   looking from another perspective, is my point.

25         **THE COURT:**  So, Mr. Nestler, the certification you

1    think alone gets this in?

2              MR. NESTLER:  Yes.  It is a business record.  A

3    business captured this in its regular course of business and

4    certified that it was authentic.  And so we plan to admit it

5    through both, Ms. Kerkhoff, who is visible in it and also

6    through the certification.

7              MR. WELCH:  And my point would be that she can

8    authenticate herself in the video.  But when it switches to

9    something else, she can't do that --

10             THE COURT:  But why if it's a business record that

11   comes in with a certification?  Do you question the

12   certification?

13             MR. WELCH:  I do not question the certification,

14   but the timing of this certification is somewhat

15   problematic, and when it came into the government's

16   possession --

17             THE COURT:  Okay.  Well --

18             MR. WELCH:  -- much later, not contemporaneously.

19             THE COURT:  Mr. Welch, I've asked you to raise

20   issues about individual exhibits again and again and this is

21   brand new.  You knew this is coming up.  I don't know what

22   you mean by the government received this later.  What

23   significance that has.

24             MR. WELCH:  My point, Your Honor, is that the

25   government represented on its exhibit list that this would

1    be coming in later through Hightower.

2         **THE COURT:**  But you had notice of the exhibit and

3    you had notice that witnesses would get it in.  I'm not

4    going to prevent them from entering it into evidence earlier

5    than they otherwise would have.

6         **MR. WELCH:**  But there's parts of this that this

7    witness would not be able to authenticate.

8         **THE COURT:**  It sounds like, based on what

9    Mr. Nestler's represented, that they could just stand up and

10   offer this exhibit; that it's self-authenticated as a

11   business record with a certification; is this what you are

12   representing, Mr. Nestler?

13        **MR. NESTLER:**  Yes, Your Honor.

14        **THE COURT:**  So I don't think that they need this

15   witness to testify about all of it.  Moreover, it sounds

16   like there will be another witness later.  So I am going to

17   go ahead and allow it, in an effort to be efficient, so that

18   we are not chopping this up.  And I think that -- what they

19   provided is sufficient to admit it.

20        **MR. WELCH:**  And I just want to note that, you

21   know, they represented they were going to put it in through

22   a different witness.  They are now putting it in through

23   this witness.  And that is not what was represented

24   previously.

25        **THE COURT:**  All right.  Understood.  Your

1    objection is noted.  I will overrule it and I'll permit them

2    to introduce the exhibit.

3                    (Sidebar discussion concluded.)

4                    **MR. NESTLER:**  The government would move to admit

5    Exhibit 200 into evidence and publish it to the jury.

6                    **MR. WELCH:**  Same objection.

7                    **THE COURT:**  All right.  The exhibit is admitted

8    for the reason stated.

9              (Government Exhibit 200 admitted into evidence)

10   **BY MR. NESTLER:**

11        **Q.**   Ms. Kerkhoff, can you see the screen okay?

12        **A.**   I can.

13        **Q.**   Do you see the person in blue in the center of the

14   screen with an arm outreached?

15        **A.**   Yes.

16        **Q.**   Who is that?

17        **A.**   That is the defendant.

18                    **MR. NESTLER:**  And if we could play it forward for

19   about 9 seconds.

20                    (Played video.)

21   **BY MR. NESTLER:**

22        **Q.**   Do you see a person holding a canister?

23        **A.**   Yes.

24        **Q.**   Who is that?

25        **A.**   Sergeant Matthew Flood.

688

1          **MR. NESTLER:**  And if we could continue playing it

2     forward for about 9 seconds.

3               (Played video.)

4     BY MR. NESTLER:

5          **Q.**   Who is in the center of the frame from the police

6     officer perspective?

7          **A.**   Sergeant Adam DesCamp.

8          **Q.**   What is he holding?

9          **A.**   He is holding the FN-303 launcher.

10         **Q.**   Who is he aiming it at?

11         **A.**   The defendant.

12         **MR. NESTLER:**  If you could please play it forward,

13    Ms. Rohde.

14              (Played video.)

15         **MR. NESTLER:**  And if we could go back to about 43

16    seconds, Ms. Rohde.  Go back to 42, actually, just behind

17    that flag on the left.

18    BY MR. NESTLER:

19         **Q.**   Do you see a person on the left side of the

20    screen, Ms. Kerkhoff?

21         **A.**   Yes, I do.

22         **Q.**   Who is that person?

23         **A.**   The one furthest on the left is myself.

24         **Q.**   Can you tell what you are doing at this time?

25         **A.**   Yes.  Talking to Matthew Flood and Sergeant Adam

1    DesCamp.

2         **Q.**    What are you communicating about?

3         **A.**    Communicating about the situation now.  So -- what

4    to do next.

5              **MR. NESTLER:**  Let's play it forward, Ms. Rohde,

6    until about 1:04.

7              (Played video.)

8    **BY MR. NESTLER:**

9         **Q.**    Did you see the person as well on the left side of

10   the screen?

11        **A.**    Yes.

12        **Q.**    Who is that?

13        **A.**    Sergeant Adam DesCamp.

14        **Q.**    What is he holding?

15        **A.**    He's holding the 46 SABRE Red CO spray canister.

16        **Q.**    Do you know what he is about to do with it here?

17        **A.**    Yes.

18        **Q.**    What's that?

19        **A.**    He is about to spray the defendant with OC spray.

20             **MR. NESTLER:**   Can we play this until the end,

21   Ms. Rohde?

22             (Played video.)

23   **BY MR. NESTLER:**

24        **Q.**    Do you see the defendant's right hand during this

25   time?

1      **A.**   Yes.

2      **Q.**   What is he doing with it?

3      **A.**   He is waving the crowd on.

4      **Q.**   And who is standing next to Sergeant DesCamp at

5    this time?

6      **A.**   Myself.

7      **Q.**   I know you can't hear the audio very well here,

8    but how loud was it at the time?

9      **A.**   Very, very loud.

10     **Q.**   What did that mean for you?

11     **A.**   That it was difficult to communicate with my

12   fellow officers and use the radio.

13     **Q.**   Now that we have viewed the interaction that

14   you've had with the defendant from a couple different

15   angles, I want to return to the Capitol Police surveillance

16   video, which is Exhibit 205.

17          **MR. NESTLER:**   If we could go to time at 1:51:37,

18   which is about 5:35 on the counter.

19          (Played video.)

20   **BY MR. NESTLER:**

21     **Q.**   Do you see yourself visible in the video there,

22   Ms. Kerkhoff?

23     **A.**   I do.

24     **Q.**   Where are you?

25     **A.**   I am just to the left of the cauldron in front of

1   Matthew Flood.

2       Q.   Would you characterize Matthew Flood as tall or

3   short?

4       A.   He's taller than me.

5           MR. NESTLER:  Why don't we play it forward from

6   1:51:38 for about 5 seconds.

7               (Played video.)

8   BY MR. NESTLER:

9       Q.   If we stop it there, do you see an orange color

10  change at the tarp?

11      A.   Yes, I do.

12      Q.   What was that?

13      A.   That was the OC spray.

14          MR. NESTLER:   Why don't we play it forward until

15  1:51:48.

16              (Played video.)

17          MR. NESTLER:  We will stop it there.

18  BY MR. NESTLER:

19      Q.   What do you do immediately after Sergeant DesCamp

20  sprays?

21      A.   I got hit by back spray so I retreated back to put

22  my gas mask on.

23      Q.   Did you have a gas mask with you?

24      A.   I did.

25      Q.   Where was it?

1      A.   It was on a drop holster on my leg.

2      Q.   Were you able to get your gas mask on?

3      A.   I was with the help of Sergeant Matthew Flood.

4           MR. NESTLER:  Let's fast forward a few minutes to

5  1:54:15.

6           (Played video.)

7           MR. NESTLER:  We can pause it there.

8  BY MR. NESTLER:

9      Q.   Do you see yourself?

10     A.   I do.

11     Q.   Where are you?

12     A.   I am to the left of the cauldron, and I have my

13  gas mask on now.

14     Q.   So you look differently now?

15     A.   I do.  I don't have a hat on.

16     Q.   Do you see an officer standing just below the

17  cauldron/planter?

18     A.   Yes, I do.

19     Q.   Do you see what that officer is holding in his

20  hand?

21     A.   Yes, I do.

22     Q.   What is that?

23     A.   That is a six-foot -- we call them riot shields.

24     Q.   What is a riot shield?

25     A.   It is a shield that officers use on the CDU team

1    to protect themselves.

2        Q.   What's your concern at this point?

3        A.   My concern at this point is that they are getting

4    closer and closer to the building; and if they get past us,

5    they could get into the building.

6        Q.   How would you characterize the number of officers

7    who were with you on this landing area?

8        A.   A small number of officers.

9        Q.   How would you characterize the size of the crowd?

10       A.   The crowd was as far as I could see, to be honest

11   with you.

12       Q.   What's on the other side of this tarp?

13       A.   Scaffolding and the stage, the inaugural stage.

14           MR. NESTLER:  Why don't we play this forward until

15   1:55:06, for about a minute.

16           (Played video.)

17   BY MR. NESTLER:

18       Q.   And what just occurred over that prior minute,

19   Ms. Kerkhoff?

20       A.   One of the officers confronted -- the individuals

21   were proceeding up the stairway with what looked like a

22   wooden pallet.  The officer confronted them with a six-foot

23   shield.  That's when several other officers stepped in.  It

24   looked like there was a struggle between the officers and

25   the crowd.

1    **Q.**   Could you see where the defendant was during this

2    time?

3    **A.**   Yes.

4    **Q.**   And where is he?

5    **A.**   He is on the railing.

6    **Q.**   Did he retreat from the railing?

7    **A.**   He did not.

8        **MR. NESTLER:**   Let's move to Exhibit 202 just for

9    Ms. Kerkhoff.  Have you seen this interaction we just

10   witnessed with the man with the wooden pallet from a

11   different angle?

12       Mr. Hopkins, if you could pull down the exhibit

13   for the jury's view.  Thank you.

14   **BY MR. NESTLER:**

15   **Q.**   Have you seen this same interaction we've just

16   described from different angles?

17   **A.**   Yes, I believe so.

18   **Q.**   I have on the screen in front of you,

19   Ms. Kerkhoff, Exhibit 202.  Have you seen this video before?

20   **A.**   Yes, I have.

21   **Q.**   Is this a fair and accurate depiction of what you

22   recall occurring around this time with the man with the

23   wooden pallet?

24   **A.**   Yes, it is.

25       **MR. NESTLER:**   The government moves admit into

1    evidence Exhibit 202.

2              **THE COURT:**  Any objection?

3              **MR. WELCH:**  The same objection as with the

4    previous exhibit.

5              **THE COURT:**  Okay.  Can counsel pick up the phone?

6              **MR. WELCH:**  Yeah.

7              (Discussion at sidebar.)

8              **THE COURT:**  It will -- can you all hear me?

9              **MR. WELCH:**  Yes.

10             **THE COURT:**  So I looked at the exhibit list, and

11   it seems to me that you are focused on the screenshots of

12   these videos.  My exhibit list reflects that this video and

13   the other video were coming in with a certification.

14             **MR. WELCH:**  Correct.

15             **THE COURT:**  So it's not misrepresented that they

16   were coming in through Hightower.

17             **MR. WELCH:**  My understanding was that they were

18   because they were adjacent to Hightower.

19             **THE COURT:**  Well, that is the wrong assumption.

20   It says certification.  So to the extent you didn't have

21   notice, that's not a ground for your objection.  I get your

22   other objection.  What was the other one?

23             **MR. WELCH:**  The other one is that this witness

24   could testify from her perspective what she was able to see,

25   but she could not testify from the opposite perspective and

1    authenticate something the other way.

2            **THE COURT:**  What is the certification doing?

3            **MR. WELCH:**  The certification is fine.  I

4    understand what the certification is saying.  My

5    understanding is that these things will be coming in when

6    Hightower testified, not when Kerkhoff testified.  There is

7    no indication --

8            **THE COURT:**  That's not what the Exhibit list

9    shows.  So I don't see your objection.  All right.  Just

10   want to clarify that for the record.

11           (Sidebar discussion concluded.)

12           **MR. NESTLER:**  Okay.  The government moves to admit

13   Exhibit 202 into evidence.

14           **THE COURT:**  It's admitted.

15       (Government Exhibit 202 admitted into evidence)

16           **MR. NESTLER:**  If we could please display it to the

17   jury.

18           **COURTROOM DEPUTY:**  Absolutely.

19   **BY MR. NESTLER:**

20       **Q.**   And before we start playing, Ms. Kerkhoff, do you

21   see the defendant in this frame?

22       **A.**   Yes, I do.

23       **Q.**   Could you point out where he is?

24       **A.**   He is halfway up the railing, blue jacket,

25   tactical helmet.

1      Q.   Do you know approximately where you are at this

2  point?

3      A.   Yes.  I am just at the top of the stairs pointing,

4  and I have a gas mask on.

5           MR. NESTLER:  If we could play this forward until

6  about six seconds, Ms. Rohde.

7           (Played video.)

8           MR. NESTLER:  Why don't we start the video over

9  and see if we can get it to play normal speed and go until

10 about 26 seconds.

11          (Played video.)

12          MR. NESTLER:  We are going to try playing that

13 video again with a different player, to see if it can play

14 in true speed.

15          If you could take down the jury portion, thank

16 you, Mr. Hopkins.  Exhibit 202.

17          All right.  Why don't we put it back on the jury

18 screen, if you could, Mr. Hopkins.  Thank you.  If you could

19 try to turn the volume up, if you have any ability to, that

20 would be helpful.  Thank you.  Okay.  Let's play this

21 forward.

22          (Played video.)

23 BY MR. NESTLER:

24     Q.   Can you stop there about 26 seconds.  Did you hear

25 a noise?  Could you hear it on your version?

1        **A.**   I couldn't hear much.

2        **Q.**   Understood.  Where are -- those officers who are

3   going up the steps, what building is in front of them?

4        **A.**   That is the Capitol building.

5        **Q.**   What part of the Capitol building is there?

6        **A.**   That is the Senate chamber.

7            **MR. NESTLER:**  And if we could play this forward.

8            (Played video.)

9            **MR. NESTLER:**  Okay.  Thank you, Ms. Rohde.  Let's

10   go back to Exhibit 203, which is already in evidence.

11           Mr. Hopkins, if you wouldn't mind taking down the

12   jury screen for just a second.  Thank you.

13           If we could start about 2:05 on the counter.

14           (Played video.)

15           **MR. NESTLER:**  We are going to stop it at 2:20.

16   **BY MR. NESTLER:**

17       **Q.**   Do you see the defendant visible?

18       **A.**   I do.

19       **Q.**   Can you describe him?

20       **A.**   Yes, blue jacket, tactical helmet, blue jeans.

21       **Q.**   What was he doing with his right arm?

22       **A.**   Appears to be waving the people past him.

23       **Q.**   Do you know where you are?

24       **A.**   Yeah.  I do believe I am just in front of this guy

25   with the camo backpack.

 1     **Q.**   Is this a similar interaction from a different

 2     view?

 3          **A.**   Yes.

 4               **MR. NESTLER:**  If we could play this video until

 5     the end.

 6               (Played video.)

 7               **MR. NESTLER:**  Okay.  Let's return to the

 8     surveillance video now that we've gone over that interaction

 9     you've had.  It's at 2:05.  If we could go to 12:20 on the

10     counter.  It's 1:58:23 p.m.

11               (Played video.)

12               **MR. NESTLER:**  If you could just pause there for a

13     second, Ms. Rohde.

14     **BY MR. NESTLER:**

15          **Q.**   Do you see the defendant?

16          **A.**   I do.

17          **Q.**   Could you point out approximately where he is?

18          **A.**   Yep.  Halfway up the railing, blue jacket.

19          **Q.**   Do you know what the officers are doing at this

20     point?

21          **A.**   Um -- I do -- I mean, I know they are talking to

22     each other and discussing the situation because they are

23     getting closer and closer to the building.

24          **Q.**   Got it.

25               **MR. NESTLER:**  Why don't we play it forward for

1      about 20 seconds.

2                **THE WITNESS:**  Ah, yes!  I do know what the

3      officers are doing.

4      **BY MR. NESTLER:**

5           **Q.**   What are the officers doing?

6           **A.**   The individuals have now gotten through the

7      scaffolding and up to the left the officers you see on the

8      screen, and there is a skirmish happening between the

9      building and scaffolding.

10          **Q.**   What does it mean for the officers at this point

11     on the landing that there is a skirmish on the other side of

12     the tarp?

13          **A.**   That they have gotten through, like, past the

14     stairs.  Now they are at the building.

15          **Q.**   What does it mean for the officers who are in this

16     small area on the landing that the crowd has come up through

17     the tarp?

18          **A.**   That means that the individuals on this stairway

19     have another way up.  We are not their only -- they've now

20     breached the scaffolding, essentially.

21               **MR. NESTLER:**  Why don't we play it forward to

22     1:58:37.

23     **BY MR. NESTLER:**

24          **Q.**   If you could focus on the defendant for us.

25          **A.**   Yes.

1      **Q.**   Do you see what he is doing with his arms there

2    around 1:58:37?

3      **A.**   Yes, I do.

4      **Q.**   Do you see the defendant?

5      **A.**   Yes.

6      **Q.**   What is he doing?

7      **A.**   Waving the crowd past him.

8           **MR. NESTLER:**   If you could continue playing until

9    about 1:58:43.

10   **BY MR. NESTLER:**

11     **Q.**   Can you tell what the defendant is doing now?

12     **A.**   Yes, I can.

13     **Q.**   What's that?

14     **A.**   Washing his eyes out with water.

15     **Q.**   Have you seen video of the defendant washing his

16   eyes out with water from a different angle?

17     **A.**   I have.

18     **Q.**   I am going to show just you, Ms. Kerkhoff, Exhibit

19   211.

20          **MR. NESTLER:**   If we could take down the juror

21   screen for a second.  Thank you, Mr. Hopkins.

22   **BY MR. NESTLER:**

23     **Q.**   Do you see the -- well, do you recognize what this

24   is?

25     **A.**   Yes.

1      **Q.**   What's that?

2      **A.**   It's the defendant washing his eyes out with a

3   water bottle.

4           **MR. NESTLER:**  The government moves to admit

5   Exhibit 211 into evidence.

6           **MR. WELCH:**  Without objection.

7           **THE COURT:**  Sorry?

8           **MR. WELCH:**  Without objection.

9           **THE COURT:**  Sorry.  It's admitted.

10          (Government Exhibit 211 admitted into evidence)

11          **MR. NESTLER:**  If we could play it forward.

12          **COURTROOM DEPUTY:**  Publish to the jury?

13          **MR. NESTLER:**  Yes, please.

14          (Exhibit published to the jury.)

15   **BY MR. NESTLER:**

16      **Q.**   Do you know approximately -- well, what's behind

17   the defendant at the time that he is doing this?

18      **A.**   The Capitol building is behind him.

19      **Q.**   All right.  Now, let's finally return to the

20   surveillance video, our final trip down the surveillance

21   video, to Exhibit 205.

22          **MR. NESTLER:**  Let's go to 2:03:30 p.m., that's

23   17:25 on the counter.

24   **BY MR. NESTLER:**

25      **Q.**   Can you point out where the defendant is?

1    **A.**    Yes, he is on the railing, halfway up, blue

2    jacket.

3    **Q.**    What do you notice about the tarp?

4    **A.**    The tarp has been cut away and you can see the

5    scaffolding and people climbing on it.

6    **Q.**    Did there come a time where you yourself were on

7    the scaffolding?

8    **A.**    Yes.

9    **Q.**    What were you doing when you were climbing on the

10    scaffolding?

11    **A.**    I was trying to impact the individuals in the

12    scaffolding from above them.

13    **Q.**    What do you mean impact them?

14    **A.**    I was trying to use the PepperBall launcher from

15    an upward angle through the scaffolding downward.

16    **Q.**    Was it working?

17    **A.**    It was not, no.

18    **Q.**    Why did you get down off of the scaffolding?

19    **A.**    It began to shake, and we got a call that people

20    -- somebody went over the radio and said they were taking

21    apart the scaffolding.

22    **Q.**    What did that mean for you as a person in an

23    elevated position of the scaffolding?

24    **A.**    I needed to get down off of it because I was

25    afraid it was going to fall.

1      Q.   Let's go back to the video, it's at 2:03:30.

2   Right here.  Why don't we play it forward.  Stop at 2:03:34.

3   If you could focus on the defendant, please.  Did you see

4   what he did?

5      A.   I did.

6      Q.   What was that?

7      A.   He took off his tactical helmet.

8           MR. NESTLER:  Let's fast forward two minutes to

9   2:07:35.

10  BY MR. NESTLER:

11     Q.   Do you see where the defendant is?

12     A.   I do.

13     Q.   Where is that?

14     A.   Halfway up the railing, blue jacket.

15     Q.   Still on the banister?

16     A.   Yes, but it appears he's getting off of it.

17          MR. NESTLER:  We can keep going for about 5

18  seconds, to stop at 2:07:42.

19  BY MR. NESTLER:

20     Q.   What just happened?

21     A.   He just got off the railing.

22     Q.   And where is that area that he is on now?

23     A.   He is now on the stairs.

24          MR. NESTLER:  Let's fast forward about 2 minutes

25  to 2:09:30.

1    BY MR. NESTLER:

2        Q.    What are the police officers doing now?

3        A.    The police officers are dealing with people from

4    both sides of them.  They are now to their left and in front

5    of them.

6            MR. NESTLER:  And why don't we play that forward

7    for 20 seconds.  If you could focus on the officers.

8            (Played video.)

9            MR. NESTLER:  If we can stop it there at 2:09:50.

10   BY MR. NESTLER:

11       Q.    What just occurred?

12       A.    The crowd just pushed past the officers.

13       Q.    What do you that in police parlance?

14       A.    I would call it a breach.

15       Q.    And what is up the stairs where those officers

16   were guarding?

17       A.    The Senate chamber.

18           MR. NESTLER:  Let's go to 2:15:27, which is about

19   26:54 on the counter.

20   BY MR. NESTLER:

21       Q.    Do you recognize this camera view?

22       A.    Yes, I do.

23       Q.    And where is this camera view compared to the one

24   we were just looking at?

25       A.    This camera view is further north, is how I would

1    define it.  So further to the right, if you will, from the

2    previous camera view.

3         **Q.**   Where is the Capitol building from this view?

4         **A.**   The Capitol building would be up and to the left

5    from this view.

6         **Q.**   And from where you had been standing earlier,

7    where were you standing earlier compared to this view?

8         **A.**   So where the -- that's the cauldron that I was

9    standing next to.  So I was standing on that landing that

10   the people have now completely taken over.

11        **Q.**   So that's the landing you were standing on

12   earlier?

13        **A.**   That is the landing I was standing on earlier.

14        **Q.**   Do you see this defendant in this view at 2:15:28?

15        **A.**   Yes, I do.

16        **Q.**   Could you please point out where he is compared to

17   the landmark?

18        **A.**   Yes.  So the big couldran/planter, he's directly

19   to the right of it.  You can see white Oakleys, a blue

20   jacket, white male, no helmet.

21        **Q.**   And what direction is he going?

22        **A.**   It appears he's facing forward towards the

23   building.

24        **Q.**   Okay.

25        **A.**   So towards the Capitol building is what it

1    appears.

2         **MR. NESTLER:**  If we could play that forward.

3    **BY MR. NESTLER:**

4         **Q.**   Do you see still see him?

5         **A.**   Yes, I do.

6         **Q.**   And what direction is he going?

7         **A.**   He is going towards the Capitol building.

8         **Q.**   What direction is everybody else going?

9         **A.**   Towards the Capitol building.

10         **MR. NESTLER:**  We can stop it there about 2:16:14.

11   **BY MR. NESTLER:**

12        **Q.**   When we stopped it, was the defendant going out of

13   view?

14        **A.**   Yes.  It appeared he was going towards the

15   building out of view.

16        **Q.**   What was that large green thing that he was going

17   behind?

18        **A.**   That was a tree.

19        **Q.**   Thank you.

20         **MR. NESTLER:**  Let's play it forward from here,

21   Ms. Rohde.  And if you could pause it right here.  We are

22   now at 2:30:53.

23   **BY MR. NESTLER:**

24        **Q.**   So about 15 minutes from where we last saw the

25   defendant; is that right?

1       **A.**   Yes.

2       **Q.**   Do you see the defendant in this frame?

3       **A.**   I do.

4       **Q.**   Where is he?

5       **A.**   He is directly to the right of the tree, blue

6       jacket, white male, right next to the railing, to the left

7       of the black flag you see right there.

8       **Q.**   And what direction is he going now?

9       **A.**   Away from the building.

10          **MR. NESTLER:**  Let's fast forward to 2:31:44.

11      **BY MR. NESTLER:**

12      **Q.**   Do you see people on the outside of the stairs?

13      **A.**   Yes.

14      **Q.**   Are people allowed to climb on the outside of the

15      stairs?

16      **A.**   They're not.

17          **MR. NESTLER:**  We will stop it here at 2:31:44.

18      **BY MR. NESTLER:**

19      **Q.**   Do you see the defendant?

20      **A.**   I do.

21      **Q.**   Where?

22      **A.**   To the left of the planter.

23      **Q.**   The left cauldron or right cauldron?

24      **A.**   The furthest right cauldron, and he is left of

25      that.

1    **Q.**    What direction is he going?

2    **A.**    It appears he is going away from the building.

3    **Q.**    Thank you, Ms. Kerkhoff.

4         **MR. NESTLER:**  All right.  We can take the

5    surveillance video down.

6    **BY MR. NESTLER:**

7    **Q.**    So, Ms. Kerkhoff, how would you characterize the

8    crowd that you encountered on January 6th?

9    **A.**    I would characterize them as angry, motivated.

10   **Q.**    Were they following your directions?

11   **A.**    No.

12   **Q.**    What did that mean for you, that people were not

13   following your directions?

14   **A.**    That I would have to use alternative uses of force

15   to try to prevent them from doing so.

16   **Q.**    You had some interaction with the defendant

17   directly; is that right?

18   **A.**    That's correct.

19   **Q.**    How would you characterize the defendant as

20   compared to the rest of the crowd --

21   **A.**    Um --

22   **Q.**    -- from your perspective?

23   **A.**    It appeared he was leading the crowd up from the

24   stairs.

25   **Q.**    What did gave you that impression?

1      **A.**   Every time he took a step they followed him.  He

2    kept waving -- even when he was affected by the pepper

3    spray, he waved them on.  He encouraged them to pass him.

4      **Q.**   Every time you shot him, did you see what he did

5    with his legs?

6      **A.**   Yeah.  It appeared he was posturing up, like as if

7    it wasn't affecting him, presenting his leg to me as a

8    target.

9      **Q.**   What did that make you think about or what

10   impression he was trying to give you that he was posturing

11   or presenting his leg to you?

12     **A.**   That what I was doing was not going to stop him.

13     **Q.**   What did that mean in terms of the effect on the

14   crowd below?

15     **A.**   It encouraged them.

16     **Q.**   Let's discuss your service weapon, which you

17   indicated earlier you had with you on January 6th of 2021

18   during this interaction; is that right?

19     **A.**   That is correct.

20     **Q.**   What kind of force does your service -- or your

21   firearm offer?

22     **A.**   Lethal force.

23     **Q.**   Did you use your firearm that day?

24     **A.**   I did not.

25     **Q.**   What impact, Ms. Kerkhoff, if any, did the

1  presence of the crowd have on your decision to not use your

2  firearm?

3      **A.**   So there's several factors that go into using

4  lethal force.  One of them is making sure you have a safe

5  target, backstop and beyond.

6      **Q.**   Slow down.  I want to slow you down for a second.

7      **A.**   I'm sorry.

8      **Q.**   That's okay.  Safe target, backstop and beyond.

9      **A.**   That's correct.

10      **Q.**   So tell us what that means in laymen's terms.

11      **A.**   Yes.  So you have to consider who you're firing at

12  and consider those around them.  Because if you miss or the

13  bullet goes through them, you have to consider who you will

14  hit after that.  Cause we consider -- we don't -- we think

15  of the bullet to continue to travel regardless.  So you have

16  to consider everything behind and around your target.

17      **Q.**   And so if you were to shoot somebody in front of

18  the crowd, where could that bullet possibly go?

19      **A.**   It could strike somebody behind them.

20      **Q.**   What other impact, if any, did the presence of the

21  crowd have on your thought process about whether you would

22  use your firearm?

23      **A.**   Based on prior radio calls that day, we -- I

24  assumed that people in this crowd were armed; therefore, if

25  I used my firearm, I was afraid it would be a shootout.  I

1    was afraid other people would also use their firearms, if I

2    had fired mine.

3         Q.   And what would that mean for you if there was

4    shootout between the Capitol Police and the people trying to

5    breach the building?

6         A.   Several lives lost.

7         Q.   Thank you, Ms. Kerkhoff.

8                    EXAMINATION OF SHAUNI KERKHOFF

9    BY THE COURT:

10        Q.   Ms. Kerkhoff, I just have one question.

11             You testified about a number of videos that had

12   time stamps in the left-hand corner.

13        A.   Yes.

14        Q.   Do you know whether those are accurate?

15        A.   From my knowledge that day, it's all sort of a

16   blur because it was a very, very long day.  But to my

17   knowledge, yes, I do believe those were accurate based on

18   that day.

19             THE COURT:  All right.

20             MR. NESTLER:  And, Your Honor, the next witness

21   will also speak to that, and it's a stipulation to that

22   effect.

23             THE COURT:  All right.

24             Mr. Welch, before your cross-examination, I just

25   wanted to ask you about something first.

1          (Discussion at sidebar.)

2          **THE COURT:**  So, Mr. Welch, I'm assuming from your

3    exhibits that you intend to cross-examine Ms. Kerkhoff on an

4    email and perhaps a 302.

5          **MR. WELCH:**  Yes, Your Honor; that's correct.  The

6    302 was written by --

7          **THE COURT:**  Hightower.  So I don't think it is

8    appropriate to cross her on that.  You can ask him about it,

9    but it's not her statement.

10         **MR. WELCH:**  Right.  But basically I would ask her

11   about the conversation that she had with him and whether she

12   made the representations to him.  I'm not going to ask her

13   --

14         **THE COURT:**  Well, don't -- don't reference the

15   302.  You can ask if she had a conversation.

16         **MR. WELCH:**  If she had a conversation.  Right.

17   Right.

18         **THE COURT:**  Right.  And then you can follow up

19   with him.  Don't start waving the 302 --

20         **MR. WELCH:**  No.  No.  No.  No, I wasn't going to

21   do that.

22         **THE COURT:**  I just wanted to make sure.  Okay.

23   Thanks.

24         (Discussion at sidebar concluded.)

25            CROSS-EXAMINATION OF SHAUNI KERKHOFF

1   BY MR. WELCH:

2       **Q.**   Good afternoon, Officer Kerkhoff.

3       **A.**   Good afternoon, sir.

4       **Q.**   My name is Bill Welch.  I am also going to ask you

5   some questions.

6       **A.**   Okay.

7       **Q.**   Do you recall whether, around March the 22nd of

8   last year, 2021, you had a conversation with Special Agent

9   Laid (sic) Hightower -- Laird Hightower -- excuse me -- of

10  the FBI?

11      **A.**   Yes, I do recall that.

12      **Q.**   And is it true that in preparation for that

13  interview, you reviewed photographs and posts that Agent

14  Hightower provided to you?

15      **A.**   That is correct.

16      **Q.**   And in those posts that were provided to you, was

17  it represented to you that that was stuff that Mr. Reffitt

18  had said to describe his interaction with you on January

19  6th?

20          **THE COURT:**  All right.  Mr. Welch, I think you

21  need to rephrase the question.  I wasn't clear what you were

22  asking.

23          **MR. WELCH:**  Sure.

24  BY MR. WELCH:

25      **Q.**   Was it your understanding that the materials that

1    Agent Hightower provided you included Mr. Reffitt's

2    description of his interaction with you on January 6th?

3        **A.**   Yes, I do believe that to be the case.

4        **Q.**   Okay.  And you reviewed those materials.  Correct?

5        **A.**   That is correct.

6        **Q.**   And is it fair to say that after you reviewed

7    them, you said that you did not recall any of those

8    discussions with Mr. Reffitt?

9        **A.**   That is correct.

10        **Q.**   So, for instance, you did not recall Mr. Reffitt

11    saying, This is our house.

12        **A.**   I don't recall that.

13        **Q.**   You don't recall Mr. Reffitt saying, You need to

14    stand down.

15            **MR. NESTLER:**  Objection.

16            **THE COURT:**  Sustained.

17    **BY MR. WELCH:**

18        **Q.**   You do recall, from your interaction with

19    Mr. Reffitt, telling him to stop.  Correct?

20        **A.**   That is correct.

21        **Q.**   And you gave him a warning before you used the

22    PepperBall launcher; is that correct?

23        **A.**   That is correct.

24        **Q.**   Do you recall writing an email to Mr. Nestler in

25    October of last year, specifically October 13th, regarding

1     January 6th, 2021?

2           **A.**   I don't remember that specifically, no.

3                 **MR. WELCH:**  May I approach the witness given the

4     technological issues we have?  I understand the ELMO is not

5     available.

6                 **THE COURT:**  Sure.

7                 **MR. WELCH:**  I would like to do this old school.

8                 For the Court and counsel's reference, I am

9     showing Defendant's Exhibit 2 to the witness for

10    identification.

11                **THE WITNESS:**  Thank you.

12                **MR. WELCH:**  Would you please take a moment to look

13    at both sides of that and let me know when you are done.

14                **THE COURT:**  Ms. Kerkhoff, don't read the entire

15    email, but do you recognize that?

16                **THE WITNESS:**  Briefly -- I realize I probably

17    wrote this, yes.  But I don't remember the email

18    specifically, no.  But it appears I am giving -- yes, I

19    recognize this.

20                **MR. WELCH:**  Okay.  May I have that back?  Thank

21    you.

22                To the best of your recollection you did write an

23    email to Mr. Nestler on summarizing your activities on

24    January 6, 2021.

25                **THE COURT:**  Hold up.  Do you have a recollection

1      or are you testifying because you've seen the email?

2              **THE WITNESS:**  I am testifying I saw that email.  I

3      don't necessarily remember the email, no.  I don't remember

4      the email specifically, but you are showing it to me.  It

5      looks like my writing.  It looks like something I would have

6      said.  I don't remember the specific email you are referring

7      to.

8      **BY MR. WELCH:**

9          **Q.**  So are you saying what's in here is not true?

10         **A.**  I'm not saying that.  I am saying I do not

11     remember that email.  If I can read that whole thing

12     completely I can let you know if it's true or false.

13         **Q.**  So that would refresh your recollection?

14         **A.**  Yes.

15             **MR. WELCH:**  I would like to show it to the witness

16     again to refresh her recollection.

17             **THE COURT:**  Okay.  Can you --

18             (Discussion at sidebar.)

19             **THE COURT:**  All right.  So Mr. Welch, I take it

20     you are trying to impeach Ms. Kerkhoff with a prior

21     inconsistent statement?

22             **MR. WELCH:**  Correct.

23             **THE COURT:**  Right.  Well, you need to start by

24     confirming whatever her testimony was on direct examination

25     that you think is inconsistent with this email; that's

1    number one.  If you are trying to impeach her, that's step

2    one.

3        **MR. WELCH:**  That's true, Your Honor and that's

4    fine.  I can review that.  The point of this email is that

5    she summarizes her activity and never mentions Mr. Reffitt

6    at all.

7        **THE COURT:**  Okay.  Well, the other problem I have

8    with this is, if you are going to have her simply read the

9    entire email, and she has no independent recollection, you

10   are really not refreshing her recollection.  This is, like,

11   recollection recorded, isn't it?

12       **MR. WELCH:**  Well, she said that she didn't review

13   the whole thing.  I would like her to at least read the

14   whole thing and see if it refreshes her recollection.  It

15   might.

16       **THE COURT:**  Mr. Nestler, do you have a view on

17   this?  It seems to me that that's not refreshing

18   recollection to have her read the entire document and

19   testify based on what's in the document, when she has no

20   independent recollection of it.

21       **MR. WELCH:**  Well, if after reviewing it she says

22   she doesn't, then I would go through it and say, you don't

23   remember this?  You don't remember that?

24       The other thing I understand is based on this

25   Circuit's authority, that if she does not recall this at

1    all, or denies this, that this would come into evidence for,

2    you know -- come into evidence, not just be for ID.

3            **THE COURT:**  It seems like this is recollection

4    recorded.  But, Mr. Nestler, what is the government's

5    position on this?

6            **MR. NESTLER:**  Just one as a factual matter.  This

7    is not an email she wrote to me.  She wrote this to herself,

8    notes.

9            **THE COURT:**  You're breaking up.

10            **MR. NESTLER:**  Can you hear me now?

11            **THE COURT:**  No.

12            **MR. NESTLER:**  Can you hear me now?

13            **THE COURT:**  Yes.

14            **MR. NESTLER:**  As a factual matter, this is an

15    email that she wrote notes to herself in her phone.  And

16    then she forwarded those notes to me.  So those are Jencks

17    material.  So the email was not to me.  The email we gave it

18    to Mr. Welch as her Jencks.  So just to clarify that.

19            **THE COURT:**  You are saying this is a text rather

20    than email?

21            **MR. NESTLER:**  I'm saying the information below the

22    yellow bar is actually what she had written down herself

23    somewhere on her phone, I believe, for herself.  I asked if

24    she had written anything down about the incident.  When she

25    said yes, I asked her to provide it to us so it could be

1    disclosed as her Jenks.  So that's what happened.

2             **THE COURT:**  How did she provide it, by sending an

3    email?

4             **MR. NESTLER:**  Correct.

5             **THE COURT:**  Ultimately she did send an email.

6    Right?

7             **MR. NESTLER:**  I think Mr. Welch's questions were,

8    Did she write an email to me about what occurred on January

9    6th?  And that's not accurate.  She wrote notes to herself

10   well earlier and then provided that to me as Jenks.

11            **THE COURT:**  But she sent an email to you.

12            **MR. NESTLER:**  Correct.

13            **THE COURT:**  You can clarify that, but the bigger

14   question I have is whether this would be refreshing her

15   recollection or you need to lay more foundation.

16            **MR. NESTLER:**  We believe it would be appropriate

17   for her to read the entirety of the email to see if it

18   refreshes her recollection.

19            **THE COURT:**  All right, Mr. Welch, you may proceed.

20            **MR. WELCH:**  Thank you.

21            (Discussion at sidebar concluded.)

22   **BY MR. WELCH:**

23   **Q.**   Officer Kerkhoff, I am going to hand this to you

24   again and have you read the whole thing.

25   **A.**   Okay.

1      Q.    And let me know when you are done.

2      A.    Okay.  I'm done, sir.

3      Q.    Thanks.  After reading that, does it refresh your

4  recollection of what it is?

5      A.    Yes, it does.

6      Q.    Okay.  What is it?

7      A.    It appears to be my recollection of those events

8  that day.  So a rundown of everything I did that day.

9      Q.    So that is your written recollection of everything

10  you did that day.  Correct?

11      A.    A brief summary.  Yes, it was a very long day but

12  yes.

13      Q.    Sure.  Understandably.  Now, in that you did not

14  mention Mr. Reffitt at all, did you?

15      A.    I mentioned a group that he was a part of.

16      Q.    I understand that.  But you didn't mention his

17  name.

18      A.    I didn't know his name.

19      Q.    And you do not mention giving a warning to

20  Mr. Reffitt specifically, did you?

21      A.    I was not specific because I did not know his

22  name, and it was one person of many that I impacted that day

23  with the PepperBall gun.

24      Q.    Fair enough.  Did you mention a description of

25  Mr. Reffitt in that email?

1    **A.**    I did not.

2    **Q.**    Okay.  Now, you did mention that at some point

3    that day, you were involved in arresting somebody; is that

4    right?

5    **A.**    I placed handcuffs on somebody.

6    **Q.**    Okay.  Wouldn't it be fair to say that person was

7    under arrest, if you placed handcuffs on him?

8    **A.**    Yes.  Well, sir, he was detained, but there was

9    nowhere to process individuals that day.

10   **Q.**    I understand.  Now that person was not

11   Mr. Reffitt, was it?

12   **A.**    No.

13   **Q.**    You also mention that at some point after your

14   interaction with Mr. Reffitt, you went inside of the Capitol

15   building; is that right?

16   **A.**    That is correct.

17   **Q.**    And --

18   **A.**    Not immediately after but eventually I went into

19   the Capitol building, yes.

20   **Q.**    Understood.  And the first place that you went

21   when you went inside of the Capitol building was where?

22   **A.**    The first place I went was to secure the

23   ammunition and air that we had just brought into the

24   building.

25   **Q.**    Okay.  And when you went to whatever location that

1    is, inside of the building, you did not see Mr. Reffitt?

2        **A.**    No.

3        **Q.**    At some point after that, where did you go?  After

4    you secured the ammunition, where did you go?

5        **A.**    To my best recollection I went up to the rotunda.

6        **Q.**    You went up to the rotunda.  When you got to the

7    rotunda, you didn't see Mr. Reffitt.

8        **A.**    I seen hundreds of people, I wouldn't have known a

9    single person but, no, I did not see him individually, no.

10        **Q.**    After you went to the rotunda, where did you go in

11    the Capitol next?

12        **A.**    I think I went down to lower west terrace door.

13        **Q.**    Lower west terrace door?

14        **A.**    That is correct.

15        **Q.**    When you got down there, you didn't see

16    Mr. Reffitt?

17        **A.**    I did not.  Not individually, no.

18        **Q.**    Okay.  When you got to that lower west terrace, do

19    you did you remain in the building or go outside?

20        **A.**    I remained in the building.

21        **Q.**    Do you remember if you went anywhere else in the

22    building after you went to the lower west terrace door?

23        **A.**    Yes.

24        **Q.**    Where did you go?

25        **A.**    I responded to several calls from offices where

724

1    people needed help.

2         Q.   Okay.  In responding to any of those several

3    offices, did you see Mr. Reffitt in any of those offices?

4         A.   I do not recall.

5         Q.   You don't recall seeing him?

6         A.   I do not recall seeing him, no.

7         Q.   Okay.  After you went to those several offices,

8    was that for the purpose of clearing those offices or was

9    the clearing of the offices something you did later?

10        A.   That was something I did later or helped do.

11        Q.   Okay.  So after you went first to give assistance

12   in the various offices, the several offices that you went

13   to, what did you do after that?

14        A.   I believe that's when we started to push people

15   out of the building.  So I just went down to the main

16   atrium, the crypt I believe, and pushed people both ways,

17   north and south.

18        Q.   When you were pushing people out of the building,

19   you didn't see Mr. Reffitt again?

20        A.   I do not recall seeing him.

21        Q.   Okay.  After you pushed the people out of the

22   building what, if anything, did you do?

23        A.   We secured the building at that point.

24        Q.   And once you secured the building, is that when

25   you would have gone from room to room clearing the rooms?

1    **A.**   That was done by SWAT teams and other people.  We

2    just gathered around like serviced our weapons, helped other

3    officers and that kind of stuff.

4    **Q.**   So after you secured the people, what, if

5    anything, did you do?

6    **A.**   Eventually I went back outside.

7    **Q.**   And when you went back outside, did you see

8    Mr. Reffitt again?

9    **A.**   I did not.

10    **Q.**   I now want to ask you some questions about your

11    training as a police officer.

12    **A.**   Okay.

13    **Q.**   You indicated that you used the PepperBall

14    launcher.  Correct?

15    **A.**   That is correct.

16    **Q.**   And you were trained to use that.

17    **A.**   I was trained to use that, yes.

18    **Q.**   You were trained to use that.  You also talked

19    about the FN-303 less-lethal riot gun launcher.  Was that

20    something you were trying to use or are you just familiar

21    with?

22    **A.**   No, I am an instructor on both of those weapons.

23    **Q.**   Instructor on both of those weapons.  And what

24    about the Mark 46 pepper spray canister?

25    **A.**   We are all certified in academy to use Mark 46,

1    Mark 9, and the Mark 3 that we carry on our belts, we are

2    all certified to use those.

3         **Q.**   All right.  You mentioned earlier that you had

4    been pepper sprayed yourself.  Was that something related to

5    an incident or was that something as part of your training?

6         **A.**   As part of our training we get a direct spray to

7    the face, and I also got sprayed that day.

8         **Q.**   Okay.  What is it like when you got the direct

9    spray to the face as part of your training?

10        **A.**   It's debilitating.

11        **Q.**   Debilitating.  Specifically, can you see?

12        **A.**   I mean, I opened my eyes because I had to fight

13   for my weapon as part of my training so I could see my

14   adversary because I had to.  But it's very, very difficult

15   to see and your eyes close shut.

16        **Q.**   Do they get watery?

17        **A.**   Yes.

18        **Q.**   How long does that last?

19        **A.**   It can last anywhere -- most people 25 minutes.

20   Mine was, like, two hours.  Fair-skinned people usually have

21   a worse reaction.

22        **Q.**   And is there anything that a person can do to try

23   to get rid of that stuff?

24        **A.**   Exposure to fresh air and water.

25        **Q.**   Okay.  So you can try to wash it off?

1      **A.**   That's correct.

2      **Q.**   You mentioned that you also had your firearm with

3    you that day.  Correct?

4      **A.**   That is correct.

5      **Q.**   All right.  And you mentioned your concerns about

6    using it in order to control the crowd.  You didn't want to

7    just be shooting at random.  You didn't want to get into a

8    shootout.  Correct?

9      **A.**   That's correct.

10     **Q.**   Now, you've also -- as part of your training, have

11   you learned how to identify armed people?

12     **A.**   Yes.

13     **Q.**   And how do you identify an armed person?

14     **A.**   I have to see a weapon.

15     **Q.**   Okay.  And upon seeing --

16     **A.**   Or the outline of a weapon or bulk.  There are

17   other ways to identify it, but I have to physically see the

18   weapon.

19     **Q.**   Understood.  Have you been trained how to handle a

20   person who you have identified as armed because you have

21   seen a weapon?

22     **A.**   That is correct.

23     **Q.**   And what is your training in that respect?  How do

24   you handle someone like that?

25     **A.**   That's a very complicated question.  It's

1    situation dependent.  I don't feel I can give you one answer
2    to that question.
3        **Q.**   Okay.  Let's say you see a weapon on somebody.
4        **A.**   Okay.
5        **Q.**   What would you do in response to that?  You
6    wouldn't shoot PepperBalls at them.  Right?
7        **A.**   If I saw a weapon -- was it holstered?  Was it in
8    their hand?  Where was it?
9        **Q.**   Let's say you see a weapon in a holster?
10       **A.**   In a holster?  It's not actively being pointed at
11   me.  And in a crowd like that, I'm not going to have him
12   take it out of his holster and place it on the ground, which
13   is what I would do if he was in an area by himself; that's
14   probably what I would do.  I can't tell you specifically,
15   because that is extremely situation dependent.
16       **Q.**   I understand.  What I am asking you though is if
17   you saw the weapon, on someone's hip, in that crowd, what
18   would you have done?
19       **A.**   I would have impacted them with less lethal,
20   unless they were pointing that weapon at me or someone else.
21       **Q.**   And at that point, if they had pulled a weapon,
22   what would you have done?
23       **A.**   If they pulled a weapon?
24       **Q.**   Yes.
25       **A.**   I would have had to calculate several factors,

1   but -- that is an impossible question to answer, because I

2   would have to be in that situation to answer that.

3       **Q.**   In all likelihood, you would have drawn your

4   weapon, wouldn't you, at the very least?

5       **A.**   Yes.  Drawn it for sure.

6       **Q.**   Sure.  If somebody had pointed the weapon at you,

7   somebody had pointed a gun at you at that point, what would

8   you have done?

9       **A.**   I do believe I would pull my gun out and I believe

10  depending -- I believe I would engage them based on my use

11  of force policy and the circumstances you are describing.

12  It's hard to say if I'm not in that situation.  That is an

13  extremely difficult question to answer.

14      **Q.**   I understand.

15          **MR. WELCH:**  The Court's indulgence.

16  **BY MR. WELCH:**

17      **Q.**   Mr. Nestler asked you several questions about

18  Mr. Reffitt waving.  Isn't it true that the waving that you

19  were talking about was after he had been pepper sprayed?

20      **A.**   Him waving the crowd past him?

21      **Q.**   Yes.

22      **A.**   I believe he was he had already been pepper

23  sprayed.

24      **Q.**   He had already been pepper sprayed?

25      **A.**   Yes.

730

1      Q.   Based on your experience being pepper sprayed, you

2      indicated it affects your vision.  You have a hard time

3      seeing when you've been pepper sprayed.  Correct?

4      A.   That's correct.

5      Q.   And certainly if you were on stairs, you would

6      want to be able to see where you are.  Correct?

7      A.   I would think so.

8      Q.   If you were on a railing, you would want to be

9      able to see where you are.  Correct?

10     A.   I believe that to be the case.

11     Q.   And if you needed water to clear your eyes at that

12     point, you would want to get water.  Correct?

13     A.   Yes.  I'm sure I would.

14     Q.   Okay.

15         MR. WELCH:  The Court's indulgence, please.

16   BY MR. WELCH:

17     Q.   Turning back to your conversation with Agent

18     Hightower.  Is it fair to say that you told him in your

19     interview that your interaction with Mr. Reffitt lasted

20     between five and ten minutes?

21     A.   I would have to see what I said.  I'd have to

22     recall what I wrote down, but I couldn't tell you a specific

23     time frame that I interacted with him.  It seemed like a lot

24     longer than five to ten minutes.  But if I told him that at

25     that time, that's what I recalled at that time.

1      **Q.**   To the best of your recollection, did you write

2      anything down during your conversation with Agent Hightower

3      or it would that just have been a conversation?

4      **A.**   I didn't write anything down to my recollection. I

5      believe I was answering his questions based on my

6      recollection.

7      **Q.**   Thank you.

8              **MR. WELCH:**  I pass the witness, Your Honor.

9              **THE COURT:**  All right.  Mr. Nestler?

10             REDIRECT EXAMINATION OF SHAUNI KERKHOFF

11     **BY MR. NESTLER:**

12     **Q.**   Hello, again, Ms. Kerkhoff.

13     **A.**   Hello, Mr. Nestler.

14     **Q.**   Can you please explain to the jury why it is

15     difficult to answer Mr. Welch's question about whether you

16     would use lethal force on somebody?

17     **A.**   Yes, I can.  Lethal force is an extremely

18     difficult choice for an officer to make.  There are several

19     factors you need to consider.  I've already discussed a

20     couple of them.  Target, backstop and beyond.  You have to

21     consider --

22     **Q.**   Slow down a little bit.

23     **A.**   My apologies.  You can have to consider target,

24     backstop and beyond like we discussed.  You have to consider

25     the suspect's characteristics.  How tall they are.  What is

1   their strength?  What do they have in their hand?  Is it a

2   knife?  A gun?  What is it pointed at?  It's situational.

3   It's hard to say what you would do if you are not in that

4   situation.

5       Q.   You indicated earlier -- well, defense counsel,

6   Mr. Welch, showed you Defendant's Exhibit 2, which was an

7   email; is that right?

8       A.   Yes.

9       Q.   Hold on one second.  I'm going to show you what

10  defense counsel showed you.

11      A.   Okay.

12      Q.   And do you recall why, after reviewing that, do

13  you recall when and why you had written that?

14      A.   So, originally why I had written this or when I

15  wrote it to you?

16      Q.   Originally when you had written the text you have

17  written there.

18      A.   So this original text was written to go to one of

19  my officials at Capitol Police, when he asked me what I did

20  that day.

21      Q.   Okay.  So let's clarify it.  Originally, you wrote

22  down text to tell one of your bosses what you did that day.

23      A.   That is correct.  And specifically -- I believe it

24  was Sergeant DesCamp.  They wanted to put us in for a

25  possible award or something and they asked us for what we

1    did that day.

2         Q.    So you provided Sergeant DesCamp, who is a

3    sergeant.  You are an officer.  Right?

4         A.    That is correct.

5         Q.    A summary of what you did that day.

6         A.    That is correct.  A brief, brief summary.

7         Q.    When you were writing this, was it anything

8    involved with a criminal case?

9         A.    Oh, no.  Not at all.

10        Q.    Anything involved with any unique defendant or

11   suspects?

12        A.    No.

13        Q.    Who was it focused on?

14        A.    It was focused on me and my actions that day.

15        Q.    When you forwarded this statement to me in October

16   of 2013, why did you do that?

17        A.    I don't recall the email.  I think you might have

18   asked for a list of things I did that day, but I don't

19   recall specifically.  It's --

20        Q.    So you forwarded me what you had originally sent

21   to Sergeant DesCamp?

22        A.    That is the exact same message I sent to Sergeant

23   DesCamp that I just forwarded to you.

24        Q.    Thank you.  Mr. Welch asked you about assuming

25   when people are armed.  Do you remember that question?

1      **A.**   Yeah.  Like -- I think he had said how do -- how

2   am I trained to handle people I am assumed are armed or

3   something.  I don't remember the specific question.

4      **Q.**   How do you tell if someone is armed?

5      **A.**   I usually have to physically see something.  Maybe

6   you see a bulge, maybe you see an outline of something, but

7   you can't really make the assumption.  You would have to

8   physically see a weapon.

9      **Q.**   On January 6th, when you were interacting with the

10  defendant, did you see his right hip under his jacket?

11     **A.**   I did not.

12     **Q.**   Mr. Welch asked you about arresting someone else

13  or trying to arrest somebody else.

14     **A.**   Uh-huh.

15     **Q.**   Were you actually able to arrest somebody?

16     **A.**   No, I was not.

17     **Q.**   Why weren't you able to arrest that person?

18     **A.**   There were far too few of us.  Do you want me to

19  be specific about this interaction with this individual?

20     **Q.**   No.  When you put cuffs on somebody what happens?

21     **A.**   I had to hand them to another officer because I

22  was less lethal that day.  Another officer took custody of

23  the individual until we could figure out where to process

24  them.

25     **Q.**   Were you able to process anybody that day?

1      **A.**    To my knowledge, we may have processed a few

2      people, but we did not have the logistics to process

3      hundreds of people.

4      **Q.**    Why didn't you arrest the defendant on January

5      6th?

6      **A.**    My interaction with him -- I wasn't close enough

7      to him.  I had gone to refill.  And then I got separated

8      from him and the crowd when I tried to come back to that

9      location.

10      **Q.**    Thank you.

11            **THE COURT:**  You're done?

12            **MR. NESTLER:**  I have no further questions.

13            **THE COURT:**  All right.  Can this witness be

14      excused or subject to recall?

15            **MR. NESTLER:**  She can be excused from the

16      government's perspective.

17            **THE COURT:**  Mr. Welch?

18            **MR. WELCH:**  Excused.

19            **THE COURT:**  Excused?

20            **MR. WELCH:**  Yes.

21            **THE COURT:**  All right.  Thank you very much,

22      Ms. Kerkhoff.

23            **THE WITNESS:**  Thank you, ma'am.

24            **THE COURT:**  All right.  Mr. Nestler, can you

25      estimate about how long your direct for this next witness

1      will be?

2            **MR. NESTLER:**  Probably about 40 minutes.

3            **THE COURT:**  All right.  Let me ask the jury.  I'd

4      like to at least start the testimony.  And if it goes

5      smoothly, maybe even complete it by 4:30.  But I am

6      wondering if any of you needs a break before we do that?

7            [No response]

8            **THE COURT:**  All right then.  Okay.  You may

9      proceed.  Call your next witness, please.

10           **MR. NESTLER:**  Thank you, Your Honor.  The

11     government calls Capitol Police Inspector Monique Moore.

12           **THE COURT:**  Mr. Nestler, it would be great if we

13     could aim to finish around 4:30.  I don't know if that works

14     with what you have planned, and I know that there are

15     technical problems occasionally, but if there is a way to --

16           **MR. NESTLER:**  I will do my best.  Is that clock

17     accurate, Your Honor?

18           **THE COURT:**  Yes.

19           **COURTROOM DEPUTY:**  Do you solemnly swear or

20     affirm, the testimony you will give to this Court and the

21     jury in the case on trial, to be the truth, the whole truth

22     and nothing but the truth?

23           **THE WITNESS:**  Yeah.

24           **COURTROOM DEPUTY:**  Thank you very much.  You may

25     be seated.

1              DIRECT EXAMINATION OF MONIQUE MOORE

2     **BY MR. NESTLER:**

3          **Q.**   Good afternoon, ma'am.  If you feel comfortable,

4     you are allowed to remove your mask.

5          **A.**   Okay.

6          **Q.**   The black bar in front of you is a microphone.  I

7     know it looks a little odd, just try to speak into that

8     microphone, but the jury is sitting out there.  Okay?

9          **A.**   Okay.

10         **Q.**   Could you please tell us what your name is?

11         **A.**   Inspector Monique Moore.

12         **Q.**   How do you spell your name?

13         **A.**   M-O-N-I-Q-U-E, last name M-O-O-R-E.

14         **Q.**   Inspector Moore, where do you work?

15         **A.**   U.S. Capitol Police.

16         **Q.**   You said you are an Inspector; is that correct?

17         **A.**   That's correct.

18         **Q.**   How many levels below Chief of Police is

19     Inspector?

20         **A.**   That's three.

21         **Q.**   Before you were an Inspector, what was your

22     position?

23         **A.**   A captain.

24         **Q.**   And before you were a captain, what were you?

25         **A.**   A lieutenant.

1   **Q.**   And before you were a lieutenant, what were you?

2   **A.**   A sergeant.

3   **Q.**   And before a sergeant?

4   **A.**   An officer.

5   **Q.**   How long in total have you been with the Capital

6   police?

7   **A.**   Total 24 years.

8   **Q.**   Inspector Moore, what are Capital police officers

9   sworn to do?

10   **A.**   We are sworn to protect Congress, the members,

11   employees, to make sure they are able to fulfill their

12   constitutional and legislative duty to perform in a safe and

13   secure environment.

14   **Q.**   When Congress is in session, do you know

15   approximately how many people work in the Capitol building?

16   **A.**   I will say between 3,000 and 2,000 people.

17   **Q.**   Let's discuss the Capitol building itself.  First

18   I will read into the record a stipulation between the

19   parties which is Exhibit 700.

20   **MR. NESTLER:**  If we could put it up on the screen

21   as well and admit it into evidence?  Ms. Rohde, if you

22   wouldn't mind making it a little larger.

23   **BY MR. NESTLER:**

24   **Q.**   The stipulation reads as follows:  The United

25   States and defendant Guy Reffitt agree and stipulate to the

following:  By law, the U.S. Capitol, which is located at First Street Southeast in Washington D.C. is secured 24 hours a day by U.S. Capitol Police, which goes by U.S.C.P.

Restrictions around the Capitol include permanent and temporary security barriers and posts manned by U.S.C.P. Only authorized people with appropriate identification are allowed access inside the Capitol.  At the U.S. Capitol, the building itself has 540 rooms, covering 175,175 square feet of ground, roughly four acres.  The building is 751 feet long, roughly 228 meters from north to south and 350 feet wide (106 meters) at its widest point.

The U.S. Capitol visitor center is 580,000 square feet and is located underground on the east side of the Capitol.

On the west side of the Capitol building is the West Front, which includes a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases and multiple terraces at each floor.  On January 6, 2021 the inaugural stage scaffolding was on the west front of the Capitol building.

On the east front are three staircases.  Porticoes on both the House and Senate side, and two large skylights into the visitor's center surrounded by a concrete parkway.

**THE COURT:**  Ladies and gentlemen, the parties may agree or stipulate to certain facts.  And you should

1      consider any stipulation as undisputed as evidence in a

2      factual stipulation.

3              **MR. NESTLER:**  Now, if we could take down the

4      juror's screen and put up just Exhibit 601 for Inspector

5      Moore.

6      **BY MR. NESTLER:**

7          **Q.**   Inspector Moore, do you see the screen there in

8      front of you?

9          **A.**   Yes.

10         **Q.**   Do you know what that is?

11         **A.**   The US Capitol building.

12         **Q.**   Does this photograph fairly and accurately depict

13     what the Capitol building looked like around the time of

14     January 6th, 2021?

15         **A.**   Yes.

16             **MR. NESTLER:**  The government moves to admit

17     Exhibit 601 into evident.

18             **THE COURT:**  Any objection?

19             **MR. WELCH:**  No, Your Honor.

20             **THE COURT:**  It's admitted.

21         (Government Exhibit 601 admitted into evidence)

22     **BY MR. NESTLER:**

23         **Q.**   On the Capitol building, the photograph we are

24     looking at here, Inspector Moore, can you tell which

25     direction is north?

1      **A.**   Yes.  North is going to be your Senate side.

2      **Q.**   Is that the top of the picture or the bottom of

3  the picture?

4      **A.**   That's going to be the top of the picture.

5      **Q.**   Okay.  And on the left side, do you see that white

6  area with some semicircles in it?

7      **A.**   Yes.

8      **Q.**   What is that?

9      **A.**   That's the inaugural stage.  The west front of the

10  Capitol, that's in front of the west front of the Capitol.

11      **Q.**   And if the Senate is on the north side, what

12  chambers is on the house -- the south side?

13      **A.**   That's the House chambers.

14      **Q.**   What is that big circle thing in the middle?

15      **A.**   The rotunda.

16          **MR. NESTLER:**  Let's show just Inspector Moore,

17  Exhibit 602.

18  **BY MR. NESTLER:**

19      **Q.**   Do you see 602 in front of you, Inspector Moore?

20      **A.**   Yes.

21      **Q.**   Do you know what that is?

22      **A.**   The U.S. Capitol building.

23      **Q.**   Is that a diagram?

24      **A.**   Yes.

25      **Q.**   Is it a fair and accurate depiction of what a

742

1    diagram of the building would look like?

2         **A.**   Yes.

3              **MR. NESTLER:**   The government moves admit into

4    evidence Exhibit 602.

5              **THE COURT:**   Any objection?

6              **MR. WELCH:**   No, Your Honor.

7              **THE COURT:**   It's admitted.

8         (Government Exhibit 602 admitted into evidence)

9    **BY MR. NESTLER:**

10        **Q.**   The smaller chamber on the left side of the

11   building.  Do you know what chamber is the smaller chamber?

12        **A.**   That's the Senate chamber.

13        **Q.**   On the right side of the building the larger what

14   chamber is that?

15        **A.**   The House chambers.

16        **Q.**   What about the big circle in the middle?

17        **A.**   The rotunda.

18        **Q.**   Okay.  Now, Inspector Moore, on a normal day, what

19   kind of security must a person pass through in order to

20   enter the U.S. Capitol building?

21        **A.**   They are required to pass through an

22   administrative search, which is required to inspect any

23   packages or their persons for any prohibited items.

24        **Q.**   And what kind of machine do you have to put your

25   items on to get into the building?

1    **A.**    An x-ray machine.

2    **Q.**    And the person itself, do you have to walk through

3    any special machine in order to enter into the Capitol

4    building?

5    **A.**    Yes.  You have to walk through the walk-in

6    magnetometer.

7    **Q.**    What does a magnetometer do?

8    **A.**    It detects magnetic objects and possible

9    prohibited weapons.

10   **Q.**    Why does the Capitol police screen people and

11   their belongs for prohibited belongings and weapons?

12   **A.**    Because that's a secure area and it's prohibited

13   from coming inside the buildings, the Capitol complex.

14   **Q.**    Can visitors pass through any door they want to

15   get into the Capitol building?

16   **A.**    No.

17   **Q.**    Why not?

18   **A.**    Because it's in a secure area.

19   **Q.**    And so are there certain doors that people are

20   allowed to go through and others that they are not?

21   **A.**    No.

22   **Q.**    Um, how do visitors and other people get into the

23   Capitol building?

24   **A.**    They have to -- they have to come through the

25   visitor's entrance.  Once they get to the door, they have to

1    submit to that administrative search.

2         **Q.**   And who handles the searching of people who enter

3    the Capitol building at the entrances like that?

4         **A.**   US Capitol police officers.

5         **Q.**   Are visitors to the Capitol building allowed to

6    pass through windows to get into the building?

7         **A.**   No.

8         **Q.**   On January 6th of 2021 was the U.S. Capitol open

9    to the public?

10        **A.**   No.

11        **Q.**   How many reasons for its closure were there?

12        **A.**   Two.

13        **Q.**   What was the first reason?

14        **A.**   COVID protocols.

15        **Q.**   And what was the second reason?

16        **A.**   The certification of the President's election

17   results.

18             **MR. NESTLER:**   Let's pull up on the screen Exhibit

19   601, which is already in evidence.  And if we could publish

20   to the jury -- I'm sorry, 601A.

21   **BY MR. NESTLER:**

22        **Q.**   Do you recognize what this is, Inspector Moore?

23        **A.**   Yes.

24        **Q.**   And what is it?

25        **A.**   It's the perimeter around the U.S. Capitol

1   complex.

2       **Q.**   And how was the perimeter marked on this map?

3       **A.**   In red.

4       **Q.**   Let's start up the north and work our way

5   clockwise.  Okay?

6       **A.**   Okay.

7       **Q.**   On the north side of the Capitol complex, where

8   was the security perimeter on January 6th of 2021?

9       **A.**   Constitution Avenue.

10      **Q.**   On the east side of the Capitol where was the

11  security perimeter?

12      **A.**   East front of the Capitol.

13      **Q.**   On the south side, where was the security

14  perimeter?

15      **A.**   First Street.

16      **Q.**   Sorry, on the south side?

17      **A.**   That is going to be Independence.

18      **Q.**   And then about on the west side?

19      **A.**   First Street.

20      **Q.**   What did the Capitol police use as security

21  barriers on January 6th of 2021?

22      **A.**   Metal bike racks.

23      **Q.**   And did those bike racks interlock with one

24  another?

25      **A.**   Yes.

1      **Q.**   What are they supposed to do?

2      **A.**   They are supposed to prevent anyone into that

3   secure area.

4           **MR. NESTLER:**  Let's show just Inspector Moore

5   601B, C and D.

6   **BY MR. NESTLER:**

7      **Q.**   This is 601B, Inspector Moore, and then we will

8   show you 601C and we will show you 601D.  Have you seen

9   these photographs before?

10     **A.**   Yes.

11     **Q.**   Do they fairly and accurately depict the area of

12   the Capitol and signs at the Capitol on January 6th of 2021?

13     **A.**   Yes.

14          **MR. NESTLER:**  The government moves to admit 601B,

15   C and D into evidence.

16          **THE COURT:**  Any objection?

17          **MR. WELCH:**  Without objection.

18          **THE COURT:**  They are admitted.

19      (Government Exhibit 601B and 601C and 601D admitted

20   into evidence)

21          **MR. NESTLER:**  Let's start with 601B on the screen

22   for the jury, please.

23   **BY MR. NESTLER:**

24     **Q.**   What are we looking at here, Inspector Moore?

25     **A.**   You are looking at the west front of the Capitol,

1    also the inaugural stage.

2         **Q.**   Do you see --

3              **MR. NESTLER:**   If you zoom in, Ms. Rohde, on those

4    little white things on the green fencing in the middle --

5    right there.

6    **BY MR. NESTLER:**

7         **Q.**   Can you tell what those are?

8         **A.**   Yes, those are signs.

9         **Q.**   Okay.  And have you seen signs at the Capitol

10   complex over your 24 years there?

11        **A.**   Yes.

12        **Q.**   Does Capitol police use signs a lot?

13        **A.**   Yes.

14        **Q.**   Let's go to 601C.  What are we looking at here?

15        **A.**   You're looking at the west front of the Capitol,

16   Pennsylvania walkway.

17        **Q.**   What is the building we can see in this

18   photograph?

19        **A.**   The U.S. Capitol building.

20        **Q.**   And you said this is the Pennsylvania Avenue

21   walkway?

22        **A.**   Yes.

23        **Q.**   And you see those metal things in the middle of

24   the picture?

25        **A.**   Yes.

1    **Q.**   What are those?

2    **A.**   The metal bike racks.

3    **Q.**   Is that what the Capitol police had set up for the

4    security perimeter?

5    **A.**   Yes.

6    **Q.**   Do you see the sign on those?

7    **A.**   Yes.

8    **Q.**   Can you read the large red lettering?

9    **A.**   "Area closed".

10   **Q.**   And let's go to 601D, like David.  And is this a

11   photograph of -- what those signs actually look like?

12   **A.**   Yes.

13   **Q.**   Can you read the whole sign for us?

14   **A.**   "Area closed by order of the United States Capitol

15   Police Board."

16   **Q.**   Were these signs posted on fences on January 6th

17   of 2021?

18   **A.**   Yes.

19   **Q.**   Let's talk about the command center.  On January

20   6th of 2021, what was your assignment?

21   **A.**   My assignment was to oversee the operation of the

22   command center.

23   **Q.**   What is a command center?

24   **A.**   The command center is where we have eyes on all

25   areas of the Capitol complex, where we provide resources to

1   the units out in the field.

2       **Q.**   Where is the command center located?

3       **A.**   The seventh floor of headquarters.

4       **Q.**   And is the headquarters in the Capitol building

5   itself?

6       **A.**   No.

7       **Q.**   Close by?

8       **A.**   Yes.

9       **Q.**   On January 6th of 2021, approximately how many

10  people were in the command center early in the day?

11      **A.**   Between 20 to 30 people.

12      **Q.**   Did that number change as the day went on?

13      **A.**   Yes.

14      **Q.**   What direction did it go?

15      **A.**   It grew larger.

16      **Q.**   Can you briefly describe the different roles of

17  the people in the command center?

18      **A.**   Yes.  I have a watch commander.  My watch

19  commander is in charge of giving direction to my operational

20  specialists inside the command center.  Also, he is

21  responsible to provide guidance and resources out to units

22  in the field that request it over the radio.

23          I also have a PIT operation.  My PIT operation is

24  where we operate the cameras.  The air space security is

25  where we monitor the air space and make sure there is no

1    threats coming toward the Capitol complex.  I also have a

2    operational specialist that logs in all information, if we

3    have to activate a command bridge, they log in every

4    information that's being provided on that phone call, so we

5    can have orders of what happened.  I also have a sergeant

6    that's located in the PIT to actually monitor and oversee,

7    and if they need to activate the command bridge, they

8    actually activate it.

9         **Q.**   You oversee all of that?

10        **A.**   Yes.

11        **Q.**   Is it busy in the command center?

12        **A.**   Yes.

13        **Q.**   Approximately how many TV screens are in the room?

14        **A.**   Fifty.

15        **Q.**   And how many walls do they take up?

16        **A.**   Two walls.

17        **Q.**   While you're in the command center, do you have

18   access to radio communications?

19        **A.**   Yes.

20        **Q.**   And how is it that you are able to communicate

21   with officers who are out in the field, who you can see on

22   the surveillance video?

23        **A.**   Each operational specialist have a radio assigned

24   to them.  So if needed we are able to communicate

25   immediately.

1          **Q.**    Let's talk about your closed-circuit camera video

2    system.   Approximately how many cameras does Capitol police

3    operate?

4          **A.**    1600.

5          **Q.**    Who controls those cameras?

6          **A.**    Command center.

7          **Q.**    So ultimately you are responsible for figuring out

8    what to look at in the command center?

9          **A.**    Yes.

10         **Q.**    Why does the Capitol police have surveillance

11   cameras?

12         **A.**    To make sure that we are able to have eyes on all

13   units in the field or any incoming traffic in the field.

14         **Q.**    Is closed-circuit video system a regular part of

15   the Capitol police's practice?

16         **A.**    Yes.

17         **Q.**    And are the videos regularly kept and maintained?

18         **A.**    Yes.

19         **Q.**    Can camera operators in the command center change

20   the view of the camera?

21         **A.**    Yes.

22         **Q.**    How do they do that?

23         **A.**    They can either zoom or move the camera to

24   whatever location that they need to see.

25         **Q.**    Do your security cameras have audio?

1       **A.**   No.

2              **MR. NESTLER:**  At this point, I'd like to introduce

3       an additional stipulation between the parties, Exhibit 701.

4       And if we could just make it a little bit larger, Ms. Rohde.

5              The United States and defendant Guy Reffitt agree

6       and stipulate to the following:  The United States Capitol

7       police (U.S.C.P.) operate and maintain closed-circuit video

8       monitoring and recording equipment that captures locations

9       inside and outside of the U.S. Capitol building and on the

10      Capitol grounds.  The video equipment timestamps each

11      recording with the date and time at which the footage is

12      captured.

13             The U.S.C.P. video equipment was in good working

14      order on January 6th, 2021 and video footage recovered from

15      the cameras and equipment with the timestamp of January 6,

16      2021 is footage from January 6th, 2021.

17             The events depicted in the video footage are a

18      fair and accurate depiction of the events of the US Capitol

19      on January 6, 2021.  And the time stamps on the video

20      footage was not altered or edited in any way.  The video

21      footage is authentic in that it is what it purports to be.

22      **BY MR. NESTLER:**

23         **Q.**   Okay.  Let's talk about January 6th, Inspector

24      Moore.  What time did you arrive at work that day?

25         **A.**   0700.

1    **Q.**   What is that for laymen?

2    **A.**   7 a.m.

3    **Q.**   What were your expectations for the day?

4    **A.**   My expectations was just to make sure that we

5    execute our operations in the command center and provide the

6    resources that's needed.

7    **Q.**   And what was occurring at the Capitol that day, to

8    the best of your knowledge?

9    **A.**   The certification of the presidential election.

10   **Q.**   Did that mean anybody important who would have

11   their own security at the Capitol that day?

12   **A.**   Yes.  The Vice President was coming up to do the

13   certification.

14   **Q.**   What does that mean for your role, the fact that

15   the Vice President would be there?

16   **A.**   For my role, it was to make sure that we had our

17   cameras fixated on all of his movements to the Capitol and

18   through the Capitol.

19   **Q.**   Did there come a time when you observed unwanted

20   visitors in the Capitol building?

21   **A.**   Yes.

22   **Q.**   What did you do when you made that observation?

23   **A.**   When we made the observation, we put all the

24   cameras in all areas where this action was taking place.

25   **Q.**   Did you contact any other agencies for assistance?

1      **A.**   Yes.

2      **Q.**   And which agencies were those?

3      **A.**   I contacted MPD, US Secret Service, US Park Police

4      and FBI.

5      **Q.**   Were you the one who made those contacts?

6      **A.**   Yes.

7      **Q.**   Why did you contact these other agencies for help?

8      **A.**   Because my officers needed additional resources.

9      **Q.**   As far as you can tell from reviewing the

10     surveillance video in the command center, did the unwanted

11     visitors inside the building go through the security

12     screening we talked about a little while ago?

13     **A.**   No.

14     **Q.**   What does that mean for you in terms of the

15     security of the building and members of Congress?

16     **A.**   That means the building was breached.  There was a

17     threat on the members of Congress' life (sic) and the safety

18     on the staff members.

19     **Q.**   And can you briefly describe for us, Inspector

20     Moore, what was mood was like inside the command center as

21     the day went on?

22     **A.**   The mood was in disbelieve of what we were seeing

23     because this was --

24     **Q.**   It's okay.  Take a minute.  It's okay.  I got

25     tissues.  If we took a minute or two break, would that make

1    you feel a little more comfortable?

2         A.   I'm okay.  I'm okay.  This was our first time ever

3    seeing anything of such at Capitol police before.  At least

4    for my 24 years.

5              With the chiefs that were in the room with me and

6    my colleagues that was in the room, we never seen any action

7    of such -- of individuals coming up to the Capitol with

8    total disregard of police, the law, the democracy of Capitol

9    police.  So it was just, um -- just in disbelief and trying

10   to figure out a way to get our officers the help that they

11   needed.

12        Q.   How did you personally feel about what you could

13   do in terms of being in the command center and not on the

14   ground with your colleagues at the Capitol building?

15        A.   Um, my personal was, it was hard to hear my

16   officers scream on the radio.  Screaming for help.  And

17   knowing that it is my job to make sure that I try to get all

18   of the resources that they need to get that assistance,

19   because the crowd was just overwhelming what we had planned

20   for that particular day.

21        Q.   Thank you.  Let's go to Exhibit 204.

22             MR. NESTLER:  Just pull it up for Inspector Moore,

23   if you could.

24   BY MR. NESTLER:

25        Q.   Have you seen this video compilation before,

1     Inspector Moore?

2          **A.**   Yes.

3          **Q.**   And is this compilation of surveillance video from

4     Capitol Police from January 6th?

5          **A.**   Yes.

6          **Q.**   And have you personally, yourself, been in each of

7     the areas depicted on this surveillance video?

8          **A.**   Yes.

9              **MR. NESTLER:**  At this time the government moves to

10    admit Exhibit 204 into evidence.

11             **THE COURT:**  Any objection?

12             **MR. WELCH:**  No, Your Honor.

13             **THE COURT:**  It's admitted.

14         (Government Exhibit 204 admitted into evidence)

15    **BY MR. NESTLER:**

16         **Q.**   If we could publish it to the video.  The video is

17    about 22 minutes long.  I will ask questions of you,

18    Inspector Moore, as we go through it.

19             So what are we looking at here at 12:51 p.m.?

20         **A.**   You are looking at the west front of the Capitol,

21    Pennsylvania Avenue walkway.

22         **Q.**   Do you see bike racks assembled there?

23         **A.**   Yes.

24         **Q.**   And now at 12:54 p.m., are you still able to see

25    the second row of bike racks?

1        **A.**    No.

2        **Q.**    And do you see what direction people are going?

3        **A.**    They are going towards the west front of the

4    Capitol.

5        **Q.**    Are these some of the things you are seeing when

6    you are inside of the command center?

7        **A.**    Yes.

8        **Q.**    At 12:57, which video are we looking at now?

9        **A.**    The Peace Circle.

10        **Q.**    And what direction is it facing?

11        **A.**    It's facing towards Constitution Avenue.

12        **Q.**    What direction are the people walking?

13        **A.**    Oh, the people are walking east.

14        **Q.**    Towards which building?

15        **A.**    The U.S. Capitol building.

16        **Q.**    At 12:58, what area are we looking at now?

17        **A.**    You are looking at the inaugural stage and the

18    west front of the Capitol.

19        **Q.**    What is the west lawn on the west front?

20        **A.**    What is it?

21        **Q.**    Yes.

22        **A.**    It's the west side of the U.S. Capitol building.

23        **Q.**    And here, at about 12:58:44, do you see people on

24    the white stage you mentioned earlier?

25        **A.**    Yes.

758

1        Q.   Are people allowed on that area?

2        A.   No, that's a secured area.

3             **MR. NESTLER:**   If we could pause there, Ms. Rohde.

4   **BY MR. NESTLER:**

5        Q.   Now, from the time between approximately 1 p.m.

6   and 2 p.m. from your review of the surveillance video, did

7   the size of the crowd at the U.S. Capitol change?

8        A.   Yes.

9        Q.   How so?

10       A.   It changed to where it was overwhelming for the

11  officers that we had in the perimeter.

12       Q.   Did more people arrive at the Capitol over the

13  course of that hour?

14       A.   Yes.

15       Q.   How would you characterize their numbers?  Small

16  or large?

17       A.   Large.

18            **MR. NESTLER:**   Now if we will continue playing,

19  Ms. Rohde.  We are now looking at approximately 1:59 p.m.

20  **BY MR. NESTLER:**

21       Q.   Where is this view of?

22       A.   This is the east front of the Capitol.

23       Q.   And what's the chamber on the right-hand side of

24  this photograph?

25       A.   That's the Senate chambers.

1    Q.   And how about -- what's the thing in the middle of

2    the photograph?  What area of the Capitol is that?

3        A.   The rotunda.

4        Q.   Do you see people walking towards the building in

5    this?

6        A.   Yes.

7        Q.   Are those people inside or out of the security

8    perimeter at this point?

9        A.   At this point they are inside.

10       Q.   And at 2:06 p.m., what are we looking at now?

11       A.   The rotunda steps.

12       Q.   Who are the people standing at the top of the

13   rotunda steps?

14       A.   U.S. Capitol police officers.

15       Q.   And what's that door behind them lead to?

16       A.   The rotunda.

17       Q.   What direction are the people going?  Towards or

18   away from the building?

19       A.   Towards.

20       Q.   And at 2:09 p.m., what area are we looking at now?

21       A.   That's the upper west terrace of the Capitol, the

22   steps going up to the upper west terrace of the Capitol.

23       Q.   Which chamber is up these steps?

24       A.   That is the Senate chambers.

25       Q.   And at 2:11 p.m., where are we looking now?

1      **A.**   That's the inaugural stage -- well, that's right

2  there, the upper west terrace of the Capitol.

3      **Q.**   And what is through these doors that people are

4  walking to on the left and straight ahead?

5      **A.**   The Senate chambers is in that area.

6      **Q.**   Are -- are these doors open to the public?

7      **A.**   No.

8      **Q.**   And at approximately 2:12 p.m., what area is the

9  video focusing on now?

10     **A.**   The first floor Senate wings' doors.

11     **Q.**   Is this the door we looked at from the outside

12 view just a second ago?

13     **A.**   Yes.

14     **Q.**   Was this door open to the public?

15     **A.**   No.

16     **Q.**   Do you see any glass shattering on the right side

17 of the frame?

18     **A.**   Yes.

19     **Q.**   Were people allowed to enter the building through

20 windows?

21     **A.**   No.

22     **Q.**   How do people first enter the building?

23     **A.**   Through a window.

24     **Q.**   Did you just see the door open as well?

25     **A.**   Yes.

1    Q.   What did that mean in terms of how many people

2    were able to enter the building?

3    A.   That is a breach of the Capitol.

4    Q.   Now, at 2:14, what area are we looking at now?

5    A.   The west front of the Capitol.

6    Q.   Do you see those metal things the police officers

7    are holding?

8    A.   Yes.

9    Q.   What are those?

10   A.   The metal bike racks.

11   Q.   And which agency are these officers with?

12   A.   That's Metropolitan Police Department.

13   Q.   Does Metropolitan Police normally patrol the

14   Capitol grounds?

15   A.   No.

16   Q.   Do you see how the camera is zooming out at this

17   point?

18   A.   Yes.

19   Q.   Why is that happening?

20   A.   Because of my command center operators.

21   Q.   They are able to zoom in and out with some of the

22   views?

23   A.   Yes.

24   Q.   At 2:15 p.m., what are we looking at?

25   A.   The Senate chambers, Senate floor.

1      Q.    Do you know what this corridor is called?

2      A.    Yes.

3      Q.    What's that?

4      A.    The Senate chambers.

5      Q.    Where is the Senate chambers in this view?

6      A.    On the second floor of the Capitol.

7      Q.    Can somebody access the Senate chambers through

8  one of the doors visible here?

9      A.    No.

10     Q.    Do you remember watching this video from the

11  command center live?

12     A.    Not this particular video.

13     Q.    And at 2:18 p.m., do you know what area we are

14  looking at here?

15     A.    Um --

16     Q.    You can let the video play and I will show you.

17     A.    Okay.

18     Q.    Do you know what area this is?

19     A.    Yes, that's the Senate door.

20     Q.    And on the right-hand video, the interior, do you

21  see the machine on the left side of the view?

22     A.    Yes.

23     Q.    What machine is that?

24     A.    The walk-through magnetometer.

25     Q.    Does it appear to being used appropriately as

1    people are entering the building?

2        **A.**    No.

3        **Q.**    And at 2:25 p.m., what area of the Capitol are we

4    looking at now?

5        **A.**    The crypt.

6        **Q.**    And what is the crypt?

7        **A.**    It's a smaller area of the rotunda.

8        **Q.**    What's directly above the crypt?

9        **A.**    The rotunda.

10       **Q.**    What direction is the crowd headed in this video

11   we just saw?

12       **A.**    Um, it looks -- well, the video went by so fast.

13       **Q.**    It's okay.  At 2:25 p.m. what are we looking at

14   here?

15       **A.**    That's the rotunda doors, second floor of the

16   Capitol.

17       **Q.**    And what's to the left of this view?

18       **A.**    The rotunda.

19       **Q.**    And at 2:26 p.m., what area are we looking at

20   here?

21       **A.**    That's the small rotunda.

22       **Q.**    Can you tell what direction the crowd is going?

23       **A.**    Yes.  The crowd is moving towards the memorial

24   door coming from the area where staffers are located.  The

25   OAP Office.

1     Q.    And what is the OAP office?

2     A.    It is the Office of Attending Physician.

3     Q.    At 2:28 where is the crowd going?

4     A.    The crowd is moving towards the memorial door.

5     Q.    And at 2:28 p.m., what are we looking at here?

6     A.    That's the House wing.

7     Q.    What direction is the crowd going?

8     A.    Towards the House chambers.

9     Q.    Is the -- are the police officers walking forwards

10    or backwards?

11    A.    Backwards.

12    Q.    And at 2:29 p.m., what area is this?

13    A.    That's the Capitol visitor's center connecting to

14    the U.S. Capitol.

15    Q.    Are the visitor's center and the Capitol actually

16    part of the same building?

17    A.    Um, it's part of the same building, but it can be

18    cut off because of this gate.

19    Q.    And this gate that is lowering here at 2:29:30 if

20    that gate is lowered, will that separate the visitor's

21    center from the capital?

22    A.    Yes.

23    Q.    Are there safety protocols with respect to using

24    this door?

25    A.    Yes.  The safety protocols is when we want to shut

1    off access from either building because of some type of

2    threat.

3        **Q.**   Is the door able to close if there's an item

4    underneath it?

5        **A.**   No.

6        **MR. NESTLER:**  Ms. Rohde, do you mind pausing it

7    right there, please.

8            Judge, I probably have about 15 minutes left.  If

9    you wanted to stop here, it can make sense or I can try to

10   push through.

11       **THE COURT:**  I think it makes sense.  The jury has

12   been here a while today.

13           Ladies and gentlemen, we will return tomorrow at

14   9:30, and we will resume the testimony of Inspector Moore.

15   I'd like to remind you, again, no reading, no talking about

16   the case, no independent research.

17           I appreciate your attentiveness today and look

18   forward to seeing you tomorrow morning.

19       **COURTROOM DEPUTY:**  All rise.

20           (Jury exited the courtroom.)

21       **COURTROOM DEPUTY:**  This court stands ajourned.

22           (Proceedings concluded at 4:31 p.m.)

23       **THE COURT:**  I hate to have the marshals bring --

24       **MR. NESTLER:**  I don't know that we need the

25   defendant.  We were just going to tell the Court.  The Court

1    asked to know what the witnesses were going to be for the

2    next day.

3              **THE COURT:**  Yeah.  Yeah.  I think it's all right.

4              **MR. NESTLER:**  Yeah.

5              **MS. BERKOWER:**  The next witnesses after Inspector

6    Moore are Special Agent Stacy Shahrani and Jackson Reffitt

7    and Daniel Schwager and then Paul Wade.  And I think that

8    may well take us through the end of tomorrow or beyond

9    tomorrow.  But I know the Court had wanted to know ahead of

10   time.

11             **THE COURT:**  Yeah, I appreciate that.

12             Are there any issues that we need to address with

13   regard to Jackson Reffitt or any of those witnesses?

14             **MR. WELCH:**  Not to my knowledge.

15             **THE COURT:**  All right.  Just checking.  I just

16   don't want surprises.  Right?

17             **MR. WELCH:**  I understand.

18             **THE COURT:**  Okay.  Also, just curious,

19   Mr. Nestler, all of these Capitol -- do you intend to go

20   through every video with each of them?

21             **MS. BERKOWER:**  Your Honor, if it's all right I can

22   answer since I am standing here.

23             **THE COURT:**  Sure.

24             **MS. BERKOWER:**  No, this is a compilation video

25   that this witness will be testifying to.  I don't think we

1      expect to go through this video again.

2                    **THE COURT:**  So the three officers who were around

3      officer -- Ms. Kerkhoff, you are not going to take them

4      through the whole thing again like you did with her?

5                    **MS. BERKOWER:**  We will take them through pieces to

6      explain what their interactions were --

7                    **THE COURT:**  But it will be short.

8                    **MS. BERKOWER:**  I expect will be shorter.  I

9      thought Your Honor was referring to 204, which is the long

10     compilation video.

11                   **THE COURT:**  All right.

12                   **MS. BERKOWER:**  There are two witnesses we expect

13     agency counsel for, Daniel Schwager will have counsel and

14     Paul Wade will have agency counsel from the Secret Service.

15                   **THE COURT:**  Thank you.

16                   **MS. BERKOWER:**  Your Honor, it would be our request

17     that for Jackson Reffitt, who is one of the victims charged

18     in Count 5 -- one of the victims of the count -- one of the

19     victims in Count 5.

20                   **THE COURT:**  I got it.

21                   **MS. BERKOWER:**  We would request to have our victim

22     witness advocate from the office to sit in the seat counsel

23     has been sitting, if that's agreeable to the Court.

24                   **THE COURT:**  That's agreeable.  Just right inside

25     of the well; is that where you are talking about?

1        **MS. BERKOWER:**  Sit where the lawyer has been

2   sitting the past hour for witnesses.

3        **THE COURT:**  Is Jackson Reffitt, or either, under

4   18?

5        **MS. BERKOWER:**  His sister is.  He is 19.

6        **THE COURT:**  I think there are special precautions

7   we need to follow statutorily.

8        **MS. BERKOWER:**  For Jackson Reffitt, he is 19 years

9   old.

10       **THE COURT:**  For the sister.

11       **MS. BERKOWER:**  Perhaps, Your Honor, I think we can

12   cross that bridge when we come to it and we can speak to it.

13       **MR. WELCH:**  She is not on the list for tomorrow.

14       **THE COURT:**  Anything you want to flag now?

15       **MR. WELCH:**  I did want to mention that we had

16   previously talked a little bit in one of the status hearings

17   about Mr. Schwager's testimony.  We have a stipulation.  I

18   already signed number 702, which talks about Congress' -- I

19   don't know that Mr. Schwager's testimony was going to add

20   anything to that.  It was something we bought up in the

21   status hearing.

22       **THE COURT:**  I think he was an eyewitness.  It was

23   appropriate to have him testify.  I think Mr. Nestler

24   assured me this was not going to be a lengthy witness and

25   was not going to confuse the jury with long explanation of

1    the law, but hit the high points; is that right,

2    Mr. Nestler?

3            **MR. NESTLER:**  Yes, Your Honor.

4            **MR. WELCH:**  My recollection was I don't know if

5    the government still plans to do it.  She'll have charts and

6    have him reading statutes.

7            **THE COURT:**  I asked you all to get together and

8    agree on something.  You all never gave me something.  I

9    assumed you didn't --

10           **MR. WELCH:**  We have the stipulation.

11           **THE COURT:**  But that existed at the time.  That

12   existed at the time.  And there were, I think, additional

13   facts that the government wanted to get in, and I suggested

14   if you all want to get together and propose sections of the

15   law for the Court to instruct the jury, I'm open to it and

16   you all never came back to me.  So here we are.

17           **MR. WELCH:**  I believe the stipulation covered it.

18   It doesn't cite sections of the law but it talks about

19   Congress' business.

20           **THE COURT:**  I thought at the time, Mr. Welch, you

21   said you had no problem with him.  He was an eyewitness --

22   he gave eyewitness testimony.  Mr. Nestler assured me he is

23   not going to give expert testimony on the law.  He is just

24   going to say, This is the date, by statute this was supposed

25   to happen at this time.  And he's not going to get into

1   constitutionality of any act or anything like that.

2            **MR. WELCH:**  Okay.  And that's all true.  I'm just

3   pointing out since we are trying to move expeditiously, I

4   don't think he adds anything.  We have a stipulation.  If we

5   don't want to hear the stipulation that's fine too.

6            **THE COURT:**  I am 100 percent in favor of that, but

7   you all haven't given me anything to that effect.  So I was

8   proceeding as though you couldn't reach an agreement on that

9   and he would be testifying.

10           You told me, let the government try its case.  I

11  was prepared to, you know, shorten it but you seemed not to

12  object.  Here we are.

13           **MR. WELCH:**  I've signed the stipulation and sent

14  it to them.  Apparently they don't want to use it.  I just

15  want to put it on the record.

16           **THE COURT:**  I raised that over a week ago.  You

17  said, I don't want to tell them how to try their case; we

18  will try to get together and work something out.  And you

19  all didn't.

20           Mr. Nestler, I am going to be looking for that to

21  be a pretty brief witness.

22           **MR. NESTLER:**  [NODDED HEAD]

23           **THE COURT:**  All right.  Anything else?

24           **MS. BERKOWER:**  Just very briefly, Your Honor.

25  Given the problems we had with the sound today, we are going

1    to -- we asked Mr. Hopkins if we can stay behind and try to

2    fix -- we have some litigation support team members here who

3    might have a separate speaker.  But we are going to need to

4    have sound tomorrow.  We are going to work on that.

5            **THE COURT:**  All right.  If this really is a

6    problem, again, I don't know with the court staff whether

7    this is feasible, but I want the jury to be able to hear the

8    audio as well as the public in the other room.  I'm so

9    frustrated that we are having these issues, but it's above

10   my pay grade.

11           **MS. BERKOWER:**  Thank you, Your Honor.

12           **THE COURT:**  All right.  Thank you.

13           (Proceedings concluded at 4:46 p.m.)

1                     **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4      **Reporter,** certify that the foregoing is a true and correct

5      transcript of the record of proceedings in the

6      above-entitled matter.

7

8         ___**March 3, 2022**___              ___/s/_____
9                **DATE**                      **Lorraine T. Herman**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25