```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,          .
                                          .  Case Number 21-cr-32
 4               Plaintiff,               .
                                          .
 5         vs.                            .
                                          .
 6     GUY WESLEY REFFITT,                .  March 3, 2022
                                          .  9:00 a.m.
 7               Defendant.               .
       - - - - - - - - - - - - - - - - -

 8

 9                        TRANSCRIPT OF JURY TRIAL
                             (MORNING SESSION)
10             BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                        UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13     For the United States:       JEFFREY NESTLER, AUSA
                                    RISA BERKOWER, AUSA
14                                  United States Attorney's Office
                                    555 Fourth Street Northwest
15                                  Washington, D.C. 20530

16     For the Defendant:          WILLIAM WELCH, III, ESQ.
                                    5305 Village Center Drive
17                                  Suite 142
                                    Columbia, Maryland 21044
18

19

20

21     Official Court Reporter:    SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
22                                  U.S. Courthouse, Room 4704-B
                                    Washington, D.C. 20001
23                                  202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

MONIQUE MOORE          Direct Examination (continued)..... 785
                      Cross-Examination................... 795

STACY SHAHRANI        Direct Examination................. 800
                      Cross-Examination................... 873
                      Redirect Examination............... 878

EXHIBITS RECEIVED

Government 220.......................................... 792
Government 1B4.......................................... 806
Government 1B4.0........................................ 810
Government 1B4.1........................................ 817
Government 1B4.2........................................ 826
Government 1B4.3........................................ 830
Government 1B4.4........................................ 835
Government 1B4.5........................................ 836
Government 1B4.6........................................ 839
Government 1B4.7........................................ 842
Government 1B4.8........................................ 844
Government 1B4.9........................................ 849
Government 1B4.10....................................... 850
Government 1B20.1....................................... 854
Government 1B20.1.1..................................... 855
Government 1B20.1.2..................................... 856
Government 1B20.1.2MD................................... 858
Government 1B22......................................... 859
Government 1B20.2....................................... 861
Government 1B20.2.1..................................... 862
Government 1B20.2.2..................................... 868
Government 1B20.2.3..................................... 870
Government 1B20.2.3.1 through 1B20.2.3.5................ 871

<pre>
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3          (Jury not present.)

 4          COURTROOM DEPUTY:  Your Honor, we are in Criminal

 5   Action 21-32, the United States of America versus Guy Reffitt.

 6          Representing Mr. Reffitt, we have Mr. William Welch.

 7   Representing the United States, we have Jeffrey Nestler and Risa

 8   Berkower.

 9          THE COURT:  Good morning, everyone.  Good morning,

10   Mr. Reffitt.

11          THE DEFENDANT:  Good morning, Your Honor.

12          THE COURT:  Mr. Reffitt, I had a brief conversation

13   with counsel after they took you back.  No one realized I was

14   going to come back on the bench.  And I just want to review what

15   we talked about.  You probably talked to your counsel about

16   this.  No?

17          MR. WELCH:  (Shook head.)

18          THE COURT:  You all chime in if I forget anything.

19   The government explained the order of witnesses today.  We will

20   finish with Inspector Moore, and then it will be Officer or

21   Agent Shahrani.

22          MR. NESTLER:  Agent Shahrani.

23          THE COURT:  And then Jackson Reffitt, and then

24   Mr. Schwager, the Senate counsel, and then Secret Service Agent

25   Wade.
</pre>

1              MR. NESTLER:  Mr. Schwager will testify tomorrow.  So

2    if we have time after Jackson Reffitt today, it will be Special

3    Agent Wade.

4              THE COURT:  You don't think we will get through Moore,

5    Shahrani, Reffitt, and Wade?

6              MR. NESTLER:  We hope so.  We have no idea what the

7    defendant's cross is.

8              THE COURT:  All right.  So Schwager will be tomorrow;

9    that's what you're saying?

10             MR. NESTLER:  (Nodded head.)

11             THE COURT:  Okay.  Let's see.  What else?

12        We talked about the Senate counsel because the parties were

13   unable to reach an agreement about what he will testify to.  He

14   will testify briefly about what he witnessed that day and the

15   key elements of the statute and the Twelfth Amendment; right?

16   Things like -- Mr. Nestler, I just want to make sure I

17   understand the scope -- the date the vote needed to happen, the

18   time the vote needed to happen, when they could adjourn, who is

19   required to be there.

20        Anything else?

21             MR. NESTLER:  Your Honor, his testimony will be a

22   little bit broader than that, but not about the statutes.  We

23   intend him to literally read one sentence of the Twelfth

24   Amendment and each of the statutes that are in question, just

25   one critical sentence of the --

1          THE COURT:  And then he will testify about what he

2     witnessed that day?

3          MR. NESTLER:  Correct.

4          THE COURT:  All right.  Was there anything else,

5     Counsel, I missed, just to bring Mr. Reffitt up to speed?

6          MR. WELCH:  No, Your Honor.

7          THE COURT:  So consistent with the Chief Judge

8     Howell's modification to the standing order and the COVID

9     protocols which enabled me to open the courtroom more, that

10    order also requires me to ask you all to inform me if you're

11    having COVID symptoms any day.  So I trust that you will do

12    that.  I didn't mention that yesterday.

13        Is there anything else preliminarily we need to discuss

14    before the jury comes in?

15         MR. NESTLER:  We noticed this morning, Your Honor,

16    that there's some additional plexiglass near where the witness

17    is sitting.

18         THE COURT:  And that should have been there yesterday.

19         MR. NESTLER:  Okay.

20         THE COURT:  Is that a problem?

21         MR. NESTLER:  Potentially.

22         THE COURT:  Because -- oh, handing exhibits?  Is that

23    the issue?

24         MR. NESTLER:  Well, two things.  One, I think it

25    blocks some of the sight lines from some of the jurors, and then

1    also, it makes it hard for the witness to get in and out of the

2    space, because the witness can't enter from the area closer to

3    Your Honor because they're blocked by the microphone stand.  So

4    we had to move the plexiglass back a little bit.

5              THE COURT:  Oh, you moved it, because it looks like

6    there's a space now.

7              MR. NESTLER:  We were just testing it right before

8    Your Honor took the bench to see if anyone can get in or out.

9    The way it was set up, no one could get in or out.

10             THE COURT:  And are you concerned about the sight

11   lines for some jurors?

12             MR. NESTLER:  Yes.

13             THE COURT:  In what way?  Just the corner there?

14             MR. NESTLER:  Yeah, corner, and the glare.

15             THE COURT:  All right.  I told the jurors that the

16   witnesses would be testifying with plexiglass in front of them.

17   So I feel bad yesterday there wasn't plexiglass.

18       I think what I will do is I will tell the jurors that today

19   we have the plexiglass, and if anyone's vision is obstructed,

20   they should raise their hand, and we can adjust it so that they

21   can see.  All right?

22             MR. NESTLER:  That makes sense.  And if we could just

23   ask them about both the glare and the sight line, that would be

24   helpful.

25             THE COURT:  All right.  And what is it that -- you

1    mean just in terms of seeing their face, or is there anything in

2    particular that you're concerned about in terms of exhibits?  Is

3    it just the face?

4            MR. NESTLER:  Seeing their face, or that sometimes the

5    glare from the screen can come up on the plexiglass and,

6    therefore, obstruct --

7            THE COURT:  I will ask them, and if they have an

8    issue, we will briefly pull it away.

9            MR. NESTLER:  That makes sense.

10       And then just so Your Honor is aware, yesterday after

11   court, we worked with court staff on the audio issue, because

12   the court's speaker system from the ceiling doesn't seem to be

13   working.

14       So anyway, we have an old school solution, which is a --

15           THE COURT:  A boom box?

16           MR. NESTLER:  A boom box-style speaker and a lapel

17   microphone near it, battery operated, so the overflow courtroom

18   can hear the audio coming out of it.  We tested it last night,

19   and it seems to work.  So that's what we're going with today,

20   just so Your Honor is aware.

21           THE COURT:  While I'm thinking about it, Mr. Nestler,

22   with Jackson Reffitt, you're not going to get into the

23   Mississippi GPS issue, are you?

24           MR. NESTLER:  No, Your Honor.

25           THE COURT:  All right.  Mr. Welch, anything?

1          MR. WELCH:  No, thank you.

2          THE COURT:  So we have the jury coming in at 9:30?

3          COURTROOM DEPUTY:  Yes, Your Honor.

4          THE COURT:  If they happen to get here earlier, let's

5     go ahead and start.  I will just be in the jury room right here.

6          At the end of every day, folks, I'm no longer going to

7     leave the bench for the jury to leave.  I'm just going to excuse

8     them so we don't have the same issue happen.  But I just think

9     it's helpful every day before we start and when we end to make

10    sure there's nothing we need to discuss for the next day.

11         And then tomorrow, I have another matter at 4:30.  So we

12    will need to stop no later than 4:00.  Thank you.

13         (Recess taken from 9:06 a.m. to 9:38 a.m.)

14         (Jury not present.)

15         THE COURT:  Counsel, I wanted to address you quickly

16    before the jury came in because one of them raised an issue with

17    Mr. Hopkins that I wanted to talk to you about, and that is that

18    three of the jurors in the courtroom can't see Mr. Reffitt.

19         I don't see that as a problem, because nothing Mr. Reffitt

20    does sitting at the table is evidence in this case, but I wanted

21    to talk to you all about, you know, what I intend to tell them.

22         I'm going to tell them about the plexiglass, ask them to

23    speak up.  I'm inclined to say I understand some of you can't

24    see Mr. Reffitt, but I think it's important to tell the group as

25    a whole, even those who can see Mr. Reffitt, that there's

1    nothing he does at the table that is evidence in this case.

2         Both sides agree?

3              MR. WELCH:  Yes, Your Honor.

4              THE COURT:  If he takes the stand, that's different.

5    But as he sits here, that's not relevant to the jury's

6    deliberations.

7         Do you agree, Mr. Nestler?

8              MR. NESTLER:  Yes, Your Honor, that's fine.  Could

9    Your Honor disclose which jurors they are so we just know is it

10   a sight line issue?

11             THE COURT:  I think it's the first juror over there in

12   the corner, and it might be the three along the right, or it

13   might be someone in the middle.  But Mr. Welch is blocking their

14   view of Mr. Reffitt.

15        In my view, they don't need to be looking at Mr. Reffitt at

16   all.  I'm not going to tell them that, but that's -- it's not

17   evidence what he does at the table.

18             MR. NESTLER:  Correct, but they are entitled to look

19   at him if they want to.

20             THE COURT:  Right.  And I won't say that, but I don't

21   see this as an issue, but I think it's important, because

22   they're asking, that they're told that -- you all tell me.  I'm

23   inclined to say some of you have raised an issue about not being

24   able to see Mr. Reffitt, and nothing Mr. Reffitt does, no

25   expression of Mr. Reffitt is evidence in this case.

1          MR. NESTLER:  That's fine, Your Honor.

2          MR. WELCH:  Agreed.

3          THE COURT:  All right.  And then I will raise the

4     plexiglass issue.

5        Anything else?

6          MR. NESTLER:  Your Honor, could we just clarify?  We

7     do believe that the jurors' impressions of Mr. Reffitt's

8     demeanor are important for them to consider when they're

9     deliberating.  So if Your Honor is going to give them an

10    instruction, we just want to make sure it's clear that they are

11    allowed to consider what he looks like, how he reacts to

12    witnesses if they want to.

13         THE COURT:  All right.  But hypothetically, let's say

14    not this case, but let's say in a case a defendant had an

15    outburst, I would be instructing them that they're not to

16    consider -- Ms. Berkower is shaking her head no, but I think

17    that's the law.  If a defendant has an outburst, I think that

18    you're supposed to instruct the jury they're not to consider

19    that as evidence.

20        Do you disagree with that?

21         MR. NESTLER:  Yes.  We believe that what the

22    witness -- the jurors' impressions of the defendant during the

23    trial are things they are allowed to consider.  So if he makes

24    facial expressions or leans back in his chair or takes a nap

25    while witnesses are testifying, they can certainly consider that

1    while they're deliberating.

2            THE COURT:  Mr. Welch, what's your position on this?

3            MR. WELCH:  Your Honor, I agree with the Court, and I

4    would just add that it would be one thing in a situation where,

5    in response to a witness's testimony, a defendant then blurts

6    out and makes a statement, maybe doesn't formally testify.  I

7    think the jurors could consider that statement.

8        But for goodness' sakes, someone could have gas, and that

9    could cause a facial expression, and the jurors are supposed to

10   consider that and interpret that?  I mean, I think that's going

11   a little far.

12           THE COURT:  I would like to take a look at the case

13   law on this before I advise them.  Unless either side objects, I

14   think I will bring them in, proceed with the trial right now as

15   is, and after a break raise this issue later when we can all

16   agree on what I say in terms of an instruction.

17       Any objection to that?

18           MR. WELCH:  No objection.

19           THE COURT:  At this point, given the COVID protocols,

20   we really can't do anything about this.

21           MR. NESTLER:  The government agrees with that, Your

22   Honor.

23           THE COURT:  Mr. Hopkins is pointing out that he can

24   see -- in the juror box where the witness will sit, the

25   government's laptop can be seen, the screen.  So if you can turn

1    that so a witness won't see the laptop.  Now that's good.

2            COURTROOM DEPUTY:  Thank you.

3            THE COURT:  Again, we will bring them in.  I'll raise

4    the issue with the plexiglass, ask them to raise their hand.

5    And if they ask a question about not seeing the defendant, I

6    will say I will give them an instruction on that shortly.

7        Mr. Nestler, do you think the rate we're going you're going

8    to be able to rest your case tomorrow?

9            MR. NESTLER:  No.

10           THE COURT:  When?

11           MR. NESTLER:  Likely end of the day on Monday.  We

12   moved a little bit more slowly yesterday than we had

13   anticipated.

14           THE COURT:  Yeah, well, I hope tat you don't do the

15   repetitive testimony with every Capitol police officer.

16           MR. NESTLER:  We understand, Your Honor.  There was an

17   issue also with the audio yesterday.  We're going to have to

18   play some of those videos again with the audio with different

19   officers.

20       (Jury entered courtroom.)

21           THE COURT:  Good morning.  Welcome back.  Today, we

22   will continue with Inspector Moore's testimony.  Before she gets

23   on the witness stand, I just want to point out for you that we

24   have plexiglass now in front of the witness, which we should

25   have had yesterday.  To the extent any of your vision is

1    obstructed by either the edges of the plexiglass or the glare at

2    any point, if you could raise your hand, we want to make sure

3    that all of you can see and hear the witness clearly.  So if

4    that's an issue for any of you, please let us know.

5         All right.  Mr. Nestler?

6              MR. NESTLER:  Thank you, Your Honor.  The government

7    recalls Inspector Monique Moore.

8       MONIQUE MOORE, WITNESS FOR THE GOVERNMENT, RESUMED STAND

9                    DIRECT EXAMINATION (Continued)

10             BY MR. NESTLER:

11   Q.   Good morning, ma'am.

12   A.   Good morning.

13   Q.   Are you the same Inspector Moore who was testifying here

14   yesterday afternoon?

15   A.   Yes.

16   Q.   Okay.  When we finished your testimony yesterday afternoon,

17   we were on Exhibit 204 at around 12 minutes on the counter.  We

18   had just finished looking at the clip from the Capitol Visitor

19   Center.  So we're going to resume playing Exhibit 204, if

20   Mr. Hopkins could please publish it to the jury.

21        And we will resume playing at 12 minutes on the counter.

22        (Video playing.)

23   Q.   Here at 2:32, Inspector Moore, where is the view?

24   A.   First floor of the hallway on the House side.

25   Q.   And what are behind these doors in the hallway?

1    A.    Those are staff offices.

2    Q.    Do people actually work inside the Capitol building?

3    A.    Yes.

4    Q.    And were staff inside the Capitol building while these

5    unwanted visitors were in the building on January 6?

6    A.    Yes.

7    Q.    And at 2:33 p.m., where is the view we're looking at now?

8    A.    The west front of the Capitol.

9    Q.    And where are the police officers and all of the crowd

10   standing?

11   A.    On the Upper West Terrace.

12   Q.    Are people allowed to stand on that area?

13   A.    No.

14   Q.    Now at 2:34 p.m., what area are we looking at now?

15   A.    That's the Speaker's house, the hallway for the Speaker's

16   office.

17   Q.    Do people work in the offices behind these doors?

18   A.    Yes, the Speaker's staff.

19   Q.    And at 2:35 p.m., what area of the Capitol are we looking

20   at now?

21   A.    That's the main hallway to the House chamber.

22   Q.    Do you see people entering the frame here?

23   A.    Yes.

24   Q.    And what direction are the officers as the people are

25   entering?

1    A.    They're going towards the House chambers door.

2    Q.    And at 2:36 p.m., what are we looking at now?

3    A.    That's the east front door of the Capitol, east steps.

4    Q.    What's behind the area where these officers just came from?

5    A.    The Rotunda.

6    Q.    Now at 2:41 p.m., what view are we looking at now?

7    A.    That's the upper House door.

8    Q.    Do you see in the right-hand photograph a machine that's

9    blinking green?

10   A.    Yes.

11   Q.    What machine is that?

12   A.    That's the walk-through magnetometer.

13   Q.    Was it being used properly this day?

14   A.    No.

15   Q.    And at 2:42 p.m., what area are we looking at?

16   A.    That's the hallway by the Senate gallery.

17   Q.    And through those doors that the officer is holding shut,

18   where does one go?

19   A.    To the Senate chambers.

20   Q.    Do you see a large machine on the right-hand side of the

21   view?

22   A.    Yes.

23   Q.    What kind of machine is that?

24   A.    That's called the enhanced screening portal.

25   Q.    What's it for?

1    A.    It's a screening portal that detects -- that detects

2    metallic and nonmetallic items.  Also, it detects weapons or any

3    explosives.

4    Q.    Was it being used properly on this day?

5    A.    No.

6    Q.    At 2:42 p.m., what view is this?

7    A.    That's the House door, upper House door.

8    Q.    And at 2:48 p.m., what area is this?

9    A.    That's the Senate wing.

10   Q.    Is this the same view we saw yesterday afternoon when

11   people first broke the glass?

12   A.    Yes.

13   Q.    And at 3:00 p.m., what area are we looking at now?

14   A.    That's the Lower West Terrace door.

15   Q.    What's behind where this camera view is from the

16   perspective of the video camera?

17   A.    That would be the inaugural stage.

18   Q.    Out in front here that we're looking at?

19         Sorry.  If we can just rewind for a quick second,

20   Ms. Rohde.

21         What direction are these people coming?  Where are they

22   going to?

23   A.    The people are coming inside the building, inside the U.S.

24   Capitol.

25   Q.    And if they were coming inside the building, where would

1    they be once they entered?

2    A.    On the first floor of the Capitol.

3    Q.    Okay.  Play it forward, Ms. Rohde.  Thank you.

4          And now at 3:01 p.m., what area are we looking at here?

5    A.    Right outside the Senate chambers, the doors.

6    Q.    What's between -- or behind those glass doors on the

7    right-hand side of the video?

8    A.    The Senate chambers.

9    Q.    And at 3:13 p.m., what area are we looking at here?

10   A.    The Lower West Terrace door.

11   Q.    Is this the same view we saw a few minutes ago?

12   A.    Yes.

13   Q.    And what are those clear objects we see people holding

14   above their heads?

15   A.    Those are shields.

16   Q.    And now we've moved forward a few minutes to about

17   3:19 p.m.  And do you know what agency these officers are with?

18   A.    Yes, MPD.

19   Q.    Now, at 3:28 p.m., what area are we looking at?

20   A.    That's the foyer of the Rotunda door.

21   Q.    What's behind this view?

22   A.    The Rotunda.

23   Q.    Do you know what the officers are trying to do at this

24   point in the day?

25   A.    They're trying to push the crowd back outside to clear the

1  building.

2  Q.   And 11 minutes in the future here at 3:39 p.m., what area

3  are we looking at here?

4  A.   That's the Senate wing door.

5  Q.   The same view we saw earlier?

6  A.   Yes.

7  Q.   And what are the officers trying to do at this point here?

8  A.   Trying to push the individuals back outside the building.

9  Q.   And now we fast forward about an hour to 4:30 p.m., and

10  what area are we looking at here?

11  A.   That's going to be the Upper West Terrace on the Senate

12  side.

13  Q.   Do you know what the officers are doing here?

14  A.   They're trying to clear the Capitol complex.

15  Q.   How would you characterize the number of officers present

16  now compared to earlier in the day?

17  A.   Compared to where we started at, we are at a full strength

18  of officers.

19  Q.   Did you have any role in helping to clear individuals from

20  the building?

21  A.   Yes.  For the command center, I had two roles.  We had

22  cameras where we viewed the hallways in the building to identify

23  any other individuals, unwanted individuals in the building, to

24  make sure that we -- when they did call clear, that the building

25  was actually cleared.

1    Q.    And why was that important?

2    A.    Because -- it's important because it's a secure area, and

3    no one's supposed to be in the building.  They did not enter the

4    building properly.

5    Q.    So from the command center, you're using videos to help the

6    officers who were there inside the building?

7    A.    Yes, to clear the building.  Also --

8    Q.    What was the other role you had with respect to clearing

9    the building?

10   A.    Yes.  So the other role was, we had staffers that were

11   actually -- had locked theirselves in their offices.  At this

12   point, we were able to give them a certain code word, so if they

13   did hear a knock on the door, to identify that it was actually a

14   USCP officer or Metropolitan officer to escort them out of the

15   office.

16   Q.    And why does Capitol Police have that program in place

17   about using code words for staffers?

18   A.    It's in place just for security reasons, just to

19   basically -- for the staffer to feel comfortable that it is a

20   law enforcement officer that's trying to extract them from their

21   office.

22   Q.    Rather than who?

23   A.    Rather than a rioter or individual that's not -- that's

24   causing some type of threat to the Capitol complex.

25   Q.    If you could move the mic closer to you so we can be sure

1    you're being heard.

2          At this point, if we could take down the jurors' screen and

3    if we could show just Inspector Moore Exhibit 220.

4          Are you familiar with this view, Inspector Moore?

5    A.   Yes.

6    Q.   Is this one of the views from the Capitol Police's

7    surveillance videos?

8    A.   Yes.

9          MR. NESTLER:  The government moves to admit

10   Exhibit 220 into evidence.

11            THE COURT:  Any objection?

12            MR. WELCH:  No, Your Honor.

13            THE COURT:  It's admitted.

14   (Government Exhibit 220 received into evidence.)

15            MR. NESTLER:  If we could please publish to the jury.

16            BY MR. NESTLER:

17   Q.   And we saw a similar view when we were looking at the

18   montage earlier; is that correct, Inspector Moore?

19   A.   Yes.

20   Q.   So just to orient us, what is the door right in front of

21   this view in the middle of the building?

22   A.   That's the Rotunda door.

23   Q.   And how about on the right side of this view?

24   A.   That's going to be the Senate carriage door.

25   Q.   And you indicated earlier you were aware of the vice

1    president being present at the Capitol on January 6; is that

2    right?

3    A.   Yes.

4    Q.   And are you familiar with how the vice president travels?

5    A.   Yes.

6    Q.   And what kind of travel mode does he take?

7    A.   A motorcade.

8    Q.   And were you able to witness his motorcade from your perch

9    in the command center?

10   A.   Yes.

11   Q.   And if we could play this video forward, Ms. Rohde.

12        Do you recognize whose motorcade is visible here on the

13   east plaza, Inspector Moore?

14   A.   Yes.  That's the vice president's.

15   Q.   Were you watching this from the command center?

16   A.   Yes.

17   Q.   And what do you observe the motorcade doing when you're

18   watching it from the command center?

19   A.   They're relocating from the east front plaza.

20   Q.   And is this around 1:59 p.m.?

21   A.   Yes.

22   Q.   What did that mean to you when you were in the command

23   center watching the vice president's motorcade relocating from

24   where they had been staged?

25   A.   Basically, they viewed the crowd as a threat, a security

1    threat.  So they had to relocate the vice president motorcade.

2    Q.   What did that mean to you in terms of the overall security

3    of the Capitol, that the vice president's motorcade was

4    relocating?

5    A.   That the vice president was in possible -- in a possible

6    situation that his life was going to be in danger.

7    Q.   Does the Capitol Police operate the cameras inside the

8    Senate and House chambers that we see on C-SPAN on TV?

9    A.   No.

10   Q.   Why not?

11   A.   It's against the Capitol Police Board ruling.

12   Q.   And so from your spot in the command center, do you have

13   access to look at the live feeds from inside the House and

14   Senate chambers?

15   A.   We don't have access other than C-SPAN.

16   Q.   So just like anybody else?

17   A.   Yes.

18   Q.   Did there come a time when you were inside of the command

19   center when you observed that the senators and representatives

20   were leaving their chambers?

21   A.   Yes.

22   Q.   Did you have a role with respect to making sure that they

23   were safe?

24   A.   Yes.

25   Q.   What role did you play with that?

1    A.   My role for that is to make sure that we have the -- that

2    we call up the right resources to evacuate them out of that

3    particular area.

4    Q.   And were you able to get the resources you needed to make

5    sure they were evacuated?

6    A.   Yes.

7          MR. NESTLER:   Thank you, Inspector.   No further

8    questions.

9          THE COURT:   Mr. Welch?

10                   CROSS-EXAMINATION

11         BY MR. WELCH:

12   Q.   Good morning, Inspector.

13   A.   Good morning.

14   Q.   My name is Bill Welch.   I'm also going to ask you some

15   questions.

16   A.   Okay.

17   Q.   Yesterday, you mentioned that one of the things you

18   supervise are the cameras that the Capitol Police have all over

19   the grounds.   I believe you mentioned there are 1,600 cameras;

20   is that right?

21   A.   Yes.

22   Q.   And would that 1,600 include all of the cameras inside and

23   outside the building, or is that just one area or the other?

24   A.   It would include both.

25   Q.   Both inside and outside?

1    A.    Uh-huh.

2    Q.    You also mentioned that those cameras can be controlled by

3    operators in your command center; is that right?

4    A.    That's correct.

5    Q.    You mentioned they can be zoomed in to look more closely at

6    things; correct?

7    A.    Yes.  Not all cameras.  There's certain cameras that are

8    able to be zoomed, and some cameras are fixed.

9    Q.    I understand.  And in addition to zooming -- the ones that

10   can be moved as opposed to stationary, can they also change

11   direction in addition to zooming in and out?

12   A.    Yes.

13   Q.    And those are controlled by the operators in the command

14   center; correct?

15   A.    Yes.

16   Q.    Regardless of whether they can be -- whether the focus of

17   them can be changed or whether they're fixed, are they all

18   recorded?

19   A.    Yes.

20   Q.    And at a high level, can you please explain what the system

21   is for recording and preserving the images that the cameras

22   display?

23   A.    Well, all cameras are recorded and stored for 30 days.

24   After the 30 days, they're automatically overwritten.

25         We do have the option for an event of such, if needed, we

1    can record the video footage that we need and have that stored.

2    Q.   Understood.  Are the operators able to do anything else

3    with the images other than change direction on the ones that are

4    not stationary and zoom in and out?

5    A.   No.

6    Q.   And why is that?

7    A.   I'm not understanding your question.

8    Q.   Sure.

9    A.   When you said --

10   Q.   Let me ask it another way.

11   A.   Okay.

12   Q.   Is there any way for an operator to affect or control

13   whether images are recorded or not?

14   A.   An image can be -- we can bookmark an image, and that will

15   indicate that we want to go back to view that particular image.

16        Like I said, all images are recorded and stored for 30

17   days.  So within that 30-day period, we have the opportunity to

18   go back and review.

19   Q.   So they can pull it up and review it?

20   A.   Yes.

21   Q.   Are they able to edit it?

22   A.   No.

23   Q.   Are they able to delete it?

24   A.   No.

25   Q.   And why is that?

1    A.   Because we don't have the authorization to do that, not my

2    command staff.

3    Q.   I understand.  These things are supposed to be kept and

4    maintained and secured; correct?

5    A.   Yes.

6         MR. WELCH:  Court's indulgence, please.

7         BY MR. WELCH:

8    Q.   Yesterday, the government asked you about a stipulation.

9    That's Government's Exhibit 701.

10        Do you recall that?

11   A.   You would have to pull it back up.

12   Q.   Okay.

13        MR. WELCH:  May I approach the witness old school,

14   Your Honor?

15        THE COURT:  Yes, you may.

16        BY MR. WELCH:

17   Q.   I'm handing you a copy of Government Exhibit 701 that was

18   displayed yesterday while you were testifying.  Can you please

19   take a moment and look at that, and let me know when you're

20   done.

21   A.   Okay.  I'm done.

22   Q.   May I retrieve that from you?

23   A.   Uh-huh.

24   Q.   Would you agree that the video recordings that you have

25   been asked to look at yesterday and today are fair and accurate

1   depictions of the events at the Capitol?

2   A.   Yes.

3   Q.   And would you agree that the time stamps are accurate on

4   those?

5   A.   Yes.

6   Q.   And would you agree that those recordings were not altered

7   or edited in any way?

8   A.   Yes.

9   Q.   Are you the custodian of records for those recordings?  Is

10  that a part of your responsibility?

11  A.   No.

12  Q.   No?

13          MR. WELCH:  Court's indulgence, please.

14      I will pass this witness, Your Honor.

15          THE COURT:  All right.  Mr. Nestler, any redirect?

16          MR. NESTLER:  No redirect, Your Honor.  Thank you.

17          THE COURT:  All right.  May this witness be excused?

18          MR. WELCH:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you, Inspector Moore.

20          THE WITNESS:  Thank you.

21          THE COURT:  Your next witness, Mr. Nestler?

22          MR. NESTLER:  Thank you, Your Honor.

23      The government calls FBI Special Agent Stacy Shahrani.

24          THE COURT:  While we're waiting for this witness, let

25  me ask the jurors, did anyone have an issue seeing Inspector

1    Moore testify?  All right.  The jurors are indicating they did

2    not.  That's good to hear.

3            MR. NESTLER:  Mr. Hopkins, can you take down the video

4    screen?

5            STACY SHAHRANI, WITNESS FOR THE GOVERNMENT, SWORN

6            MR. NESTLER:  Could we pick up the phones for a brief

7    second, Your Honor.

8        (Bench conference.)

9            MR. NESTLER:  Agent Shahrani just wanted to make sure

10   that I was aware that she had a brief interaction with a

11   juror --

12           MR. WELCH:  I can't hear anybody now.

13           THE COURT:  I can't either.

14           MR. NESTLER:  She had a brief interaction with a juror

15   in an elevator, that the juror said to her, "I hope they lift

16   the mask mandate."  She didn't know the person was a juror until

17   they left the elevator and she saw the person's juror badge.

18           THE COURT:  Mr. Welch, do you have any response?

19           MR. WELCH:  Does she know which juror it is?

20           MR. NESTLER:  She did not know, because she saw the

21   person had a badge, but she doesn't know which seat they are in,

22   and I didn't ask her for a physical description.

23           COURTROOM DEPUTY:  Forgive me for interrupting, Your

24   Honor.  Are you sure it was a juror from this case?  There are

25   two other trials going on in the building.

1          MR. NESTLER:  She was not.  She just, in an abundance

2     of caution, let me know before she sat down.  That's why I'm

3     informing the Court.

4          THE COURT:  Mr. Nestler, why don't you ask her

5     privately now if she recognizes the juror in the courtroom and,

6     if so, which one it is, and you can tell us.  But at a minimum,

7     at the next break, I intend to, if it is a juror in this

8     courtroom, to remind them that they're not to speak to

9     individuals they may see in the courthouse because it could be a

10    potential witness.  They don't know.  It's not their fault here.

11    They don't know.  But in an abundance of caution, they should

12    try to refrain from speaking, in the event they're talking to a

13    future witness in the trial.

14       But go ahead and ask her quietly.

15          MR. NESTLER:  Yes, Your Honor.

16       (Government counsel conferred with witness.)

17          MR. NESTLER:  She does not see the juror in the

18    courtroom.

19          THE COURT:  Okay.  So, moot point.

20       Go ahead.  Proceed.

21       (End of bench conference.)

22                         DIRECT EXAMINATION

23          BY MR. NESTLER:

24    Q.   Good morning, ma'am.

25    A.   Good morning.

1    Q.    If you are comfortable, you are allowed to remove your

2    mask.

3    A.    Thank you.

4    Q.    Could you please state your name for us.

5    A.    Stacy Shahrani.

6    Q.    And Agent Shahrani, that black thing in front of you is a

7    microphone.  If you could do your best to try to speak into that

8    microphone, but recognize the jury is out that way in the

9    gallery, and also, people are listening to what you're saying in

10   the overflow courtroom, which is why the microphone is so

11   important.  Okay?

12   A.    Understood.

13   Q.    Could you please state your name for us.

14   A.    Stacy, S-t-a-c-y, last name is Shahrani, S-h-a-h-r-a-n-i.

15   Q.    And Agent Shahrani, where do you work?

16   A.    I work for the Federal Bureau of Investigation.

17   Q.    What is your title?

18   A.    I'm a special agent.

19   Q.    And do you have any other positions within the FBI?

20   A.    I am a forensic examiner trainee for the Computer Analysis

21   Response Team.

22   Q.    And does Computer Analysis Response Team go by any

23   government acronym?

24   A.    We call it CART.

25   Q.    What does CART do?

A.    CART's responsibility is the examination of digital

devices.

Q.    What kind of training do you have with respect to being a

special agent and with respect to examining digital devices?

A.    I've received Quantico Academy training to become a special

agent, and since then, I've received over 300 hours in forensic

training and over 250 hours in generic cyber training.

Q.    How long have you been with the FBI?

A.    I've been with the FBI since December of 2008.

Q.    And did there come a time after you were initially just a

regular special agent when you became qualified or certified to

do forensic extractions?

A.    There was.

Q.    And approximately when was that?

A.    In 2017.

Q.    Before you joined the FBI, did you have any prior relevant

work experience?

A.    I was a captain in the United States Air Force, and I

was -- I had my undergraduate degree, a bachelor of science in

chemical engineering.

Q.    Now, Agent Shahrani, in connection with the case we're here

about this trial on, did you work with case agents from

elsewhere in the FBI who were in charge of the investigation?

A.    I did.

Q.    Did you work with an agent from the FBI's Washington Field

1    Office?

2    A.    I did.

3    Q.    What's that person's name?

4    A.    Tom Ryan.

5    Q.    Do you see him here in the courtroom?

6    A.    I do.

7    Q.    Okay.  And did you work with an agent from the FBI's Dallas

8    Field Office?

9    A.    I did.

10   Q.    And what's his name?

11   A.    Laird Hightower.

12   Q.    And is he here elsewhere in the courthouse right now?

13   A.    He is.

14   Q.    Let's talk about general examination of devices.  What kind

15   of tools do you use generally to do a forensic examination of a

16   device?

17   A.    Generally, we use a computer.  We use hardware that's

18   designed to basically take the data out of whatever the device

19   is and to protect it while doing so.  And we also use software

20   to be able to take that data that's been extracted and to put it

21   into a human-readable format.

22   Q.    And in connection with this case, did you examine a cell

23   phone?

24   A.    I did.

25   Q.    A camera?

1    A.    I did.

2    Q.    A tablet computer?

3    A.    I did.

4    Q.    And an external hard drive?

5    A.    I did.

6    Q.    Okay.  We're going to go through each of those items one at

7    a time here today.  Understand?

8    A.    Yes.

9    Q.    All right.  We will start with Exhibit 1B4.

10         And Agent Ryan, if you could please grab 1B4 and just give

11   it to Agent Shahrani.

12         You can take it out of the packaging.  Do you recognize

13   what that is?

14   A.    I do.

15   Q.    What is it?

16   A.    It is an Apple iPhone.

17   Q.    And do you recognize it?

18   A.    I do.

19   Q.    Is it the Apple iPhone that you examined in connection with

20   this case?

21   A.    It is.

22              MR. NESTLER:  The government moves into evidence

23   Exhibit 1B4.

24              THE COURT:  Any objection?

25              MR. WELCH:  No, Your Honor.

1          (Government Exhibit 1B4 received into evidence.)

2               MR. NESTLER:  Can it please be displayed to the jury.

3               THE WITNESS:  How do I do that?

4               MR. NESTLER:  Agent Ryan, if you could just walk in

5     front show the jury Exhibit 1B4.

6               BY MR. NESTLER:

7     Q.   So generally, you said it's an iPhone; correct?

8     A.   Yes.

9     Q.   Any certain kind of iPhone?

10    A.   It's an iPhone 12.

11    Q.   And there are some stickers on this iPhone; is that right?

12    A.   There are.

13    Q.   Were there stickers on it when you first got it?

14    A.   No.

15    Q.   Who put the stickers on it?

16    A.   I did.

17    Q.   What does the white sticker indicate?

18    A.   The white sticker tells me what the case is called by the

19    FBI, what the internal CART number is that we use to track it.

20    1B4, that's what I called it as relation to the number that it

21    was called when seized; the date I did the physical examination

22    of this device; and then I put my initials there so that I know

23    that it's me that did the examination on this device.

24    Q.   And there's also some colored stickers on the iPhone 12, is

25    there?

1   A.   There are.

2   Q.   Why are those colored stickers there?

3   A.   Because it's to prevent me -- two reasons.  It's to prevent

4   me from accidentally taking a screen shot and taking a picture

5   of myself, which I'm sure we've all done before, and it's also

6   to prevent any facial recognition or anything like that from,

7   you know, timing out or locking up because it doesn't recognize

8   my face.

9   Q.   What process did you use in order to examine this

10   iPhone 12?

11   A.   When I received this iPhone 12, I performed a physical

12   examination.  You can see I took out the SIM card to keep it

13   from transmitting any data.  And then I had it hooked up to a

14   piece of hardware.  That hardware pulled the data out of it.

15   And then I took that data, and I put it into a piece of software

16   that would give a human-readable format.

17   Q.   Did that human-readable format you finally ended up with

18   the process on show the ownership of the phone?

19   A.   It did.

20   Q.   And what information did it provide you about the ownership

21   of the phone?

22   A.   It told me the name of the device was "Guy's iPhone 12" and

23   that the owner name was Guy Reffitt.

24   Q.   Was the phone in a certain time zone?

25   A.   The phone defaulted to Chicago time, or Central Time.

1  Q.   And are you aware of whether Dallas, Texas, is in Central

2  Time?

3  A.   It is.

4  Q.   When you looked at the phone and the extraction from the

5  phone, did you see whether it had any apps on it?

6  A.   I did.

7  Q.   Did it have an app. called Life360?

8  A.   It did.

9  Q.   Do you know what the app. Life360 is, or does?

10  A.   Based on my training throughout this examination and what

11  I've learned through this examination, Life360 is an application

12  you can use to track a device's whereabouts and a person's

13  whereabouts, similar to -- if you have an iPhone, you can do

14  "Find My iPhone," and you can share that information with people

15  that you want to share it with.

16  Q.   Did the iPhone have the ability to send and receive text

17  messages?

18  A.   It did.

19  Q.   And what do you call that in forensic speak?

20  A.   SMS, or MMS if it's a picture.

21  Q.   Did the iPhone have an app. called Telegram?

22  A.   It did.

23  Q.   Can you please explain what Telegram is?

24  A.   Telegram is an application that uses end-to-end encryption,

25  meaning the information is only between me and the person

1   sending it.  If I send to -- a Telegram message to someone, only

2   that person's phone and my phone could see it.  It doesn't get

3   saved anywhere in between.

4   Q.   And how is that different from SMS?

5   A.   SMS goes through and hits cell towers and can be reached by

6   the providers to be provided to anyone who asks with a lawful

7   authority.

8   Q.   Within Telegram, how do the messages look?  Is it similar

9   to a text message?

10  A.   They do.

11  Q.   And can people send direct messages?

12  A.   They can.

13  Q.   And what about groups?

14  A.   Yes, there are group messages.

15  Q.   Can groups be named?

16  A.   They can be.

17  Q.   When you did this device examination for item 1B4,

18  approximately how many Telegram message threads did you see?

19  A.   A lot.  Hundreds.

20  Q.   In each thread, could you approximate how many messages

21  were in each thread?

22  A.   A lot more.

23  Q.   All right.  Let's start walking through some of the

24  exhibits we're going to examine from this phone.

25       So if we could pull up just for Agent Shahrani Exhibit

1B4.0.

    Do you recognize what this is, Agent Shahrani?

A.   I don't see it yet.  There we go.

Q.   Do you recognize it now?

A.   I do.

    THE COURT:  Can we make that bigger?  Is that possible?  Go ahead.

    BY MR. NESTLER:

Q.   Is this an extraction report?

A.   It is.

Q.   And were you involved in extracting this data from Cellebrite?

A.   I was.

    MR. NESTLER:  The government moves to admit into evidence Exhibit 1B4.0.

    THE COURT:  Any objection?

    MR. WELCH:  No, Your Honor.

    (Government Exhibit 1B4.0 received into evidence.)

    BY MR. NESTLER:

Q.   If we could publish that to the jury.

    And Agent Shahrani, what is Cellebrite?

A.   Cellebrite is a comprehensive tool that allows for the extraction and interpretation of that data in a human-readable format.

Q.   Thank you.  Up on the screen, if we could just make the

1  participants list a little bit bigger, Ms. Rohde, that would be

2  great.

3      And can you tell from looking at this and looking at

4  Cellebrite whether this was an SMS message thread or a Telegram

5  message thread?

6  A.   I can tell that it's an SMS message thread.

7  Q.   And on this message thread, how many participants were

8  there?

9  A.   There were five.

10  Q.   Could you please read their names.

11  A.   The names were Pitter Pats, Nicole, Jackson Reffitt, Sarah

12  Bearah, and Guy Reffitt.

13  Q.   Does Cellebrite indicate who the owner was?

14  A.   It does.

15  Q.   And who is that?

16  A.   Guy Reffitt.

17  Q.   We're going to go over just a few of the messages within

18  item or Exhibit 1B4.0.  And so that the jury can more easily see

19  it, we will use a different format on the screen rather than

20  this very, very small .pdf.  So we will start with slide 2.

21      So here on slide 2, in the green, who is the message from?

22  A.   It says it's from Guy Reffitt, owner.

23  Q.   And what is the number -- without reading the number, what

24  does that number indicate next to his name?

25  A.   That it's the same number as the cellular device was

1    registered.

2    Q.   So is that a phone number?

3    A.   Yes, it's a phone number.

4    Q.   And when was this message sent?

5    A.   It was sent on December 21st of 2020.

6    Q.   And the time there, it says UTC minus 6.  Do you know what

7    that means?

8    A.   That is how the software is interpreting Central Time.

9    Q.   So this is the time of Central Time when the message was

10   sent?

11   A.   Yes.

12   Q.   And what did the owner of this phone, Guy Reffitt, write on

13   December 21st of 2020 at 9:31 p.m.?

14   A.   "Congress has made fatal mistakes this time.  This isn't

15   about Trump.  It's much bigger.  It's about our country."

16   Q.   And if we could then advance forward to slide 12, please,

17   Ms. Rohde.

18        On December 24 of 2020 at 1:03 p.m., what does Guy Reffitt

19   write to this thread?

20   A.   "He's another politician.  Why I'm going to D.C.  They all

21   must go."

22   Q.   And if we could then go to slide 15, what did Guy Reffitt

23   write at 1:05 p.m. on December 24 of 2020?

24   A.   "What's about to happen will shock the world."

25   Q.   If we could then go forward to slide 25, please, Ms. Rohde.

1         What did Guy Reffitt write on December 24th, that same day,

2    at 1:12 p.m.?

3    A.   "The entire house of legislation has committed unthinkable

4    acts on our people.  We have had enough.  Time a new party."

5    Q.   If we could just go forward one more slide.  Slide 26, what

6    did he also write at 1:12 p.m.?

7    A.   "Takes over."

8    Q.   If we could then go forward to slide 32, this is a

9    different color; is that right?

10   A.   Yes.

11   Q.   And when you look at the messages in Cellebrite, do they

12   have different colors to show the different people?

13   A.   They do.

14   Q.   Just like we're looking at on a regular iPhone?

15   A.   Yes.

16   Q.   And so who is this message from?

17   A.   This says it's from Jackson Reffitt.

18   Q.   And who is it to?

19   A.   Guy Reffitt.

20   Q.   And what did Jackson Reffitt write on December 24th of 2020

21   at 1:27 p.m.?

22   A.   "They just need to rotate them out."

23   Q.   And if we can go to the next slide, on slide 33 at

24   1:29 p.m., just a minute or two later, what did Guy Reffitt

25   respond?

1    A.    "Exactly.  Time to remove them.  That's why I'm going to

2    D.C.  Promise, I'm not alone."

3    Q.    And now let's go forward to slide 34.

4          And the last message we read was from December 24 of 2020;

5    is that right?

6    A.    Yes.

7    Q.    Now we're here on January 6 of 2021, so several days in the

8    future?

9    A.    Yes.

10   Q.    And who was the author of this message?

11   A.    Pitter Pats.

12   Q.    And what did Pitter Pats write at 9:00 a.m. on January 6 of

13   2021?

14   A.    "Dad, please be safe.  You know you are risking not only

15   your business but your life, too, and that isn't just something

16   to through away.  LOL."

17   Q.    And what did -- excuse me one second.

18         (Government counsel conferred.)

19   Q.    We're going to take a ten-second tech break.  If

20   Mr. Hopkins can please pull it down off the jury screen.

21         If you could please put it back on the jury screen,

22   Mr. Hopkins, and we appreciate your indulgence.

23         Okay.  So after Pitter Pats wrote this message on January 6

24   of 2021 at 9:09 a.m., if we could then advance forward to

25   slide 35, the next slide, what did Guy Reffitt write at

1   9:13 a.m. that same day?

2   A.   "I have no intentions on throwing it away.  I love all of

3   you with all of my heart and soul.  This is for our country and

4   for all of you and your kids.  God bless us one and all."

5   Q.   If we could then go forward two slides, Ms. Rohde, to

6   slide 37.

7        This is January 8, so two days later; is that right?

8   A.   Yes.

9   Q.   So on January 8 of 2021 at 12:12 a.m., what did Guy Reffitt

10  write to this message thread?

11  A.   "Shot multiple times with clay balls and pepper sprayed

12  heavily.  We took the United States Capitol.  We are the

13  republic of the people."

14  Q.   If we could go forward two slides, on slide 39 here on

15  January 8 of 2021 at 9:29 a.m., what did Guy Reffitt post to

16  this message thread?

17  A.   "The Ingraham Angle" on Wednesday, January 6, and what

18  appears to be a link.

19  Q.   A link to what?

20  A.   To a video that is on foxnews.com.

21  Q.   If we go forward to slide 40, what did Guy Reffitt write

22  right after he posted that message to the Fox News link?

23  A.   "30 minutes and 46 seconds in.  That's my starting in the

24  blue."

25  Q.   And if we could go forward to slide 42, what does Guy

1    Reffitt write shortly afterwards on January 8 of 2021 at

2    9:45 a.m.?

3    A.    "No.  Keep watching and you will see me walking up the

4    stairs handrail in my Kuwaiti blue coat and light blue jeans.

5    They started shooting me and then they pepper sprayed me."

6    Q.    And then if we could go forward to slide 47, what did Guy

7    Reffitt post to the same thread on that same day at 9:51 a.m.?

8    A.    "Fox News at Night, Thursday, January 7," and what appears

9    to be another video link to foxnews.com.

10   Q.    And if we go forward one slide, what did he then write a

11   minute later to this message thread?

12   A.    "One minute in, you can see me trying to clear my sight

13   from the pepper spray."

14   Q.    Thank you, Agent Shahrani.

15         If we could take down the jury screens, Mr. Hopkins, and we

16   will go to Exhibit 1B4.1, just for Agent Shahrani.

17         Can you see that on your screen, Agent Shahrani, the .pdf

18   of 1B4.1?

19   A.    Yes.

20   Q.    Do you recognize what this is?

21   A.    It's a Cellebrite extraction report.

22              MR. NESTLER:  The government moves to admit into

23   evidence Exhibit 1B4.1.

24              THE COURT:  Any objection?

25              MR. WELCH:  No, Your Honor.

1          THE COURT:  It's admitted.

2       (Government Exhibit 1B4.1 received into evidence.)

3          BY MR. NESTLER:

4   Q.   If we could publish to the jury, and if you could highlight

5   that top portion, Ms. Rohde.

6       Which messaging service was this on the iPhone?

7   A.   Telegram.

8   Q.   And approximately how many people were in this Telegram

9   message thread?

10  A.   Over 50.

11  Q.   What are the numbers above the users' names here?

12  A.   Those are the numbers assigned by Telegram for that user's

13  account.

14  Q.   So these are not phone numbers?

15  A.   No.

16  Q.   The fourth name down -- if we could highlight that,

17  Ms. Rohde -- what does that say?

18  A.   "Call to Arms (owner)."

19  Q.   What does that mean?

20  A.   Call to Arms account, and that number above it, the iPhone

21  is associating it with that device.

22  Q.   So the owner of the device goes by Call to Arms?

23  A.   Yes.

24  Q.   If we could go four rows down, what is the user name that's

25  highlighted right now?

1    A.    Rocky Hardie.

2    Q.    Now, if we could transition over to the PowerPoint so the

3    jurors can see the screen a little bit better.

4          So just give us a tech second, please.

5          Up on the screen, what did Call to Arms, the owner of the

6    phone, write on December 20th of 2020 to this message thread?

7    A.    "Our president will need all of us" -- let me start over.

8          "Our president will need us, all of us, on January 6.  We

9    the people owe him that debt.  He sacrificed for us and we must

10   pay that debt.  Cutting the head of the demon and demanding

11   constitutional expulsion of corrupt congressional officials.  A

12   March on D.C. with clear demands for expulsion, regardless of

13   party affiliation."

14   Q.    If we could go forward to the next slide, what did the Call

15   to Arms owner then write next?

16   A.    "We March on D.C. January 6 with every beating American

17   heart.  We drain the swamp.  The House and Senate must be held

18   accountable for the tyrannical acts against the republic of the

19   people.  I will be leaving on January 4th to make the trip and

20   stand in solidarity or fight if needed.  Those of you patriots

21   that are true blooded."

22   Q.    And it's continued.  Let's go to the next slide.

23   A.    "Warriors can join or you can join or be tread on.  It's a

24   commitment and that's no doubt.  Yet the travel, commitment, and

25   time will either be sacrificed now for the greater good of the

1   future, or we will lose the moment forever.  Not making the

2   sacrifice for this short time in your life could be detrimental

3   for the rest of your life.  Stand and be counted."

4   Q.   And that message was sent on December 21st at around

5   11:30 a.m.; is that right?

6   A.   Yes.

7   Q.   If we can go forward to the next slide, please.  What did

8   Call to Arms write next?

9   A.   "I will be traveling with Teresa Lynne, and we will leave

10  4th and stop in Nashville, TN.  Margaritaville Hotel in downtown

11  Nashville.  Sleep and head out 5th to D.C. and stay a 55-minute

12  walk away from the Capitol, the Melrose Georgetown.  Walking

13  directly past the WH.  Sleep and wake on the 6th for Armageddon

14  all day."

15  Q.   And this is continued to the next slide.  How did it

16  continue?

17  A.   "Sleep that night and head back to Nashville for another

18  rest before heading home.  Barring any extenuating

19  circumstances, that is the plan.  Hotels are already booked."

20  Q.   This message was sent on the afternoon of December 21st; is

21  that right?

22  A.   Yes.

23  Q.   If we could please go forward, what did Call to Arms next

24  write to this message thread at 1:09 p.m. that same day?

25  A.   "Can't fly with all the battle rattle, so driving is the

1    realistic option."

2    Q.   And the next slide, what did Call to Arms write later that

3    night, December 21st of 2020, at 11:00 p.m.?

4    A.   "Drain the swamp.  I'm leaving on the 4th for D.C.  If you

5    decided to G, be vigilant about gun laws in D.C. "

6    Q.   If we could go forward, and then what did Call to Arms

7    write?

8    A.   "Go."

9    Q.   We can go forward again.

10        And what did Call to Arms write here?

11   A.   "All I see here is the talk of a big game and so little

12   true action.  I've booked my hotels and arranged my affairs.  I

13   will be leaving for D.C. on the 4th.  Many in this country have

14   made the same.  January 6th is a constitutional day of

15   affliction on the American people.  This isn't about Trump."

16   Q.   And it's continued to the next slide.

17   A.   "This is about the corruption that has plagued our nation

18   for more than 50 years.  Lines drawn and crossed far too many

19   times."

20   Q.   And this was sent on December 22nd of 2020 around

21   9:34 a.m.; is that right?

22   A.   Yes.

23   Q.   If we could go forward, and now a different person named

24   Riley Feickert sends a message on December 22, 2020, at

25   9:47 a.m. that says, "The only way you will be able to do

1    anything in D.C. is if you get the crowd to drag the traitors

2    out."

3         Do you see that?

4    A.   I do.

5    Q.   And then what did the owner Call to Arms write next?

6    A.   "I don't think anyone going to D.C. has any other agenda."

7    Q.   And that was at 9:55 a.m. the same day?

8    A.   Yes.

9    Q.   If we can go forward to the next slide.

10        Now, what did Call to Arms then write?

11   A.   "Cities have burned.  We stood by and stayed civil.

12   Civility's dead."

13   Q.   And then there's a little emoji after that?

14   A.   Yes.

15   Q.   What does that look like?

16   A.   Skull and crossbones.

17   Q.   If we could go forward after that, what did Call to Arms

18   then write at 11:24 a.m.?

19   A.   "This is a movement."

20   Q.   If we can keep going forward, that same day at 11:24 a.m.,

21   Chris Cook wrote, "What are we demanding?"

22        Do you see that?

23   A.   I do.

24   Q.   And then if we can go forward, what did Call to Arms write

25   at the same time, 11:24 a.m.?

1 A. "They had theirs.  Let's show them ours."

2 Q. If we could then go forward, then what did Call to Arms

3 write one minute later?

4 A. "The legislature."

5 Q. If we could go forward, what did he write one minute after

6 that?

7 A. "The legislative branch has committed treason."

8 Q. And next slide, one minute after that?

9 A. "Have they not?"

10 Q. And continue forward, please, Ms. Rohde.

11  What did Call to Arms write on December 27 of 2020, a few

12 days after the prior message?

13 A. "Give me Liberty or give me death," end quotes.

14 Q. And then if we could go forward, what did Call to Arms

15 write that same day, December 27th?

16 A. "The fuel is set.  We will strike the match in D.C. on the

17 6th."

18 Q. And if we could go forward, please, what did Call to Arms

19 write here?

20 A. "I have arranged my affairs here at home.  Not because I'm

21 not coming home.  I do this because I'm not promised tomorrow

22 nor am I promised the rest of today.  If I don't make it home.

23 TTP Security Services LLC will belong to my wife, and it is open

24 for business this week.  She will collect my life insurance and

25 begin to move forward.  You are all welcome and encouraged to

1   become licensed level 4 security officers.  Join the company and

2   make money while protecting your 2A rights.  You will have ammo

3   and weapons availability at reasonable prices and readily

4   availability.  If they come for the average Joe, they will take

5   their weapons, but yours will be protected under essential

6   work-related protocol.  TTP Security is your umbrella policy to

7   circumvent the legality."

8   Q.   And that message was sent on January 3rd at 8:55 a.m.; is

9   that right?

10  A.   Yes.

11  Q.   If we can go forward to the next slide, please, what did

12  Call to Arms then write?

13  A.   "If they won't follow the laws of the land, we have no

14  reason to follow their laws.  Try and stop thousands of armed

15  pissed off patriots.  They burned down our country and nothing

16  happened to them.  They got bail and changed the laws to allow

17  them freedom from compliance.  There will be no double

18  standards.  All for we and no for thee.  We have watched them

19  break laws and walk free.  If carrying a weapon in a no weapon

20  zone among masses of patriots, so be it.  It's a single law I'm

21  willing to break."

22  Q.   And that message was sent on January 4 of 2021 at

23  12:47 a.m.; is that right?

24  A.   Yes.

25  Q.   If we could then go forward, Ms. Rohde, please.

1        On January 6 of 2021 at 6:58 a.m., what did Call to Arms

2    write?

3    A.    "Both parties are dead today.  Oracle says hi from D.C. "

4    Q.    And just to confirm, you indicated earlier, UTC-6 is

5    Central Time zone; is that right?

6    A.    Yes.

7    Q.    So if this phone happened to be in D.C. at the time this

8    was written, what time would it be?

9    A.    It would be 7:58.  Mental math on the stand is not my

10   forte.

11   Q.    Thank you, Agent.  Let's go forward.

12        What did Call to Arms write next the same morning of

13   January 6?

14   A.    "As we oil our weapons, hold our beer and watch this shit."

15   Q.    If we go forward, please, we're now in the afternoon of

16   January 6th at 4:15 p.m.  What did Call to Arms write to this

17   group?

18   A.    "We took the Capitol of the United States of America.  What

19   have you done today?"

20   Q.    And if we go forward, what did Call to Arms write at

21   4:17 p.m.?

22   A.    "I had to fall back due to pepper spray to the face.  I was

23   the lead up the Capitol stairs."

24   Q.    And if we could go forward, please, what did Call to Arms

25   write at 4:19 p.m.?

1    A.    "Multiple clay bullets and a battle cry like in Braveheart.

2    The insurrection began immediately after."

3    Q.    If you could please go forward, Ms. Rohde.

4          At the same time, 4:19 p.m., someone named Bones

5    wrote "wow."

6          Do you see that?

7    A.    Yes.

8    Q.    What did Call to Arms write on the next slide?

9    A.    "I'll check the video and upload."

10   Q.    Did you recover any videos related to January 6th in

11   connection with your investigation in this case?

12   A.    I did.

13   Q.    We will get to those in a little bit.  Okay?

14   A.    Okay.

15   Q.    Let's move forward.  What did Call to Arms write here?

16   This is now on January 10th of 2021 at 12:57 p.m.

17         Do you see that?

18   A.    I do.

19   Q.    So four days after the prior message; is that right?

20   A.    Yes.

21   Q.    What did Call to Arms write here?

22   A.    "Everyone be aware.  As of this very minute, our state

23   leader is being escorted by three state officers for questioning

24   of things said on an app.  This is not a drill.  This is not a

25   drill.  He has just called me to spread the word.  Be prepared.

1    The shit is now hitting the fan."

2    Q.    If you could go to the next slide, what did Call to Arms

3    write at 1:17 p.m. that same day?

4    A.    "Spread the word."

5    Q.    The next slide, someone named Chris Cook at 1:19 p.m.

6    wrote, "State lead for TTP to clarify."

7          What did the owner Call to Arms say?

8    A.    "Yes."

9    Q.    Okay.  If we could take this down from the jury's screen,

10   and if we could show just Agent Shahrani Exhibit 1B4.2.

11         Do you see that in front of you, Agent Shahrani?

12   A.    I do.

13   Q.    Is this one of the extractions you performed from

14   Exhibit 1B4?

15   A.    It is.

16              MR. NESTLER:  The government moves to admit into

17   evidence Exhibit 1B4.2.

18              THE COURT:  Any objection?

19              MR. WELCH:  No, Your Honor.

20              THE COURT:  It's admitted.

21         (Government Exhibit 1B4.2 received into evidence.)

22              BY MR. NESTLER:

23   Q.    If we could just highlight that top portion for the jury,

24   Ms. Rohde.

25         Could you tell which app. this message thread was in?

1    A.    This was also from Telegram.

2    Q.    And if we could go to the next spot where the group photo

3    is, Ms. Rohde.

4          Is there a group photo associated with this thread?

5    A.    There is.

6    Q.    What's a group photo?

7    A.    Telegram, when you do group chats, allows you to

8    potentially put up a group photo or a group name.

9    Q.    And if we could then scroll down to participants, please.

10         How many participants were in this thread?

11   A.    Two.

12   Q.    What were their names?

13   A.    Russ William Bowen and Call to Arms.

14   Q.    Who is the owner of the phone still?

15   A.    Call to Arms.

16   Q.    Ms. Rohde, if you could scroll down to that red X on the

17   top of that green.

18         What does this red X symbolize?

19   A.    It's the way that Cellebrite interprets the message as

20   having been deleted and recovered.

21   Q.    And so the FBI was still able to recover it even though it

22   was deleted?

23   A.    Yes.

24   Q.    If we could then move to the PowerPoint version for easier

25   readability, please, Ms. Rohde, and if we could show that to the

1    jury.

2         Okay.  On this screen, what did Call to Arms write on

3    December 28th of 2021?

4    A.   "We are going in hot until we get to the D.C. line.  Then

5    we go in heavy.  Everything will be legitimate as per D.C.

6    regulations.  Between here and the D.C. line, we will be

7    prepared for any conflicts.  Rocky is riding shotgun."

8    Q.   If we go to the next slide.

9    A.   "Sleep and wake up.  Surveil the atmosphere for like-minded

10   patriots and see if we have enough marching with heat.  Then

11   just join the group.  We will be legion.  This could be a

12   turning point in our country, and I'll be damned if this time

13   will pass unchecked.  Prayers and God speed."

14   Q.   This was December 28 at 1:04 p.m.?

15   A.   Yes.

16   Q.   If we can go to the next slide, please, do you see where

17   Russ William Bowen wrote just one minute later, "I hate seeing

18   patriots unarmed.  Sitting ducks of SHTF."

19   A.   Yes.

20   Q.   And then one slide later, "*if"; is that correct?

21   A.   Yes.

22   Q.   Then what did Call to Arms write at 1:09 p.m. that same

23   day?

24   A.   "I don't think unarmed will be the case this time.  I will

25   be in full battle rattle.  If that's a law I break, so be it,

1   but I won't do it alone.  They spent four years breaking laws.

2   The government has spent decades committing treason.  I'm not

3   afraid of unconstitutional laws.  I wish I was but just can't

4   be."

5   Q.   If we could then go forward, Ms. Rohde, what did Call to

6   Arms then write?

7   A.   "I have three contact numbers from Sleepy that will help

8   with the gathering point.  We are also joining flag wavers to

9   draw cover.  Anything violent will be thwarted with strong

10  resistance."

11  Q.   And then if we could go forward, please.

12       So that was on December 28th, that prior message; is that

13  right?

14  A.   Yes.

15  Q.   So here we are about a week later, on January 6th of 2021,

16  at 9:24 p.m.  What did Call to Arms write to William Bowen in

17  this thread?

18  A.   "I had to rest due to being shot with clay bullets and

19  pepper spray.  But that seems minor compared to what's about to

20  happen."

21  Q.   And next?  Okay.  If we could then go to just for Agent

22  Shahrani the .pdf of 1B4.3.

23       Okay.  This is 1B4.3, Agent Shahrani.  Do you see it on the

24  screen in front of you?

25  A.   I do.

1    Q.   Is this one of the extractions you pulled off the phone?

2    A.   It is.

3             MR. NESTLER:  Government moves to admit into evidence

4    1B4.3.

5             THE COURT:  Any objection?

6             MR. WELCH:  No, Your Honor.

7             THE COURT:  It's admitted.

8         (Government Exhibit 1B4.3 received into evidence.)

9             BY MR. NESTLER:

10   Q.   And if could show it to the jury, please, Mr. Hopkins, and

11   Ms. Rohde, if you could highlight the top portion there.

12        Which app. was this through?

13   A.   This was from Telegram again.

14   Q.   Okay.  If we can go down to the next portion where it

15   says "name," Ms. Rohde.

16        Do you see where it says "name" for this thread, Agent

17   Shahrani?

18   A.   I do.

19   Q.   What's the name?

20   A.   "D.C. bound."

21   Q.   How does somebody name a thread?

22   A.   When you open up the chat and create the group chat, the

23   application lets you name it.

24   Q.   And if we go down a little bit further, Ms. Rohde, can we

25   see the three names of the people who are in this chat?  What

1   were the names of the people in this chat?

2   A.   Call to Arms, owner, Maverick Robert, and Russ William

3   Bowen, admin.

4   Q.   What does admin mean?

5   A.   Admin is -- he -- this individual is the administrator, so

6   likely the person who created the chat.

7   Q.   And if we could then transition to the PowerPoint version

8   of 1B4.3, if we could take down the jury's screen, please, just

9   for a quick second.

10       If we could put it back on for the jury, please.

11       So here for 1B4.3, what does the admin say on January 2nd

12   of 2021?

13   A.   This is a system message that's created by the application

14   saying that Russ William Bowen created the group "D.C. bound."

15   Q.   Thank you.  If we can go forward to the next slide, what

16   did Russ William Bowen write later on January 2nd of 2021?

17   A.   "This is a D.C. chat.  It can help us stay in contact and

18   keep me up-to-date with what's going on."

19   Q.   If we can go to the next slide, what did Call to Arms write

20   at 7:04 p.m. that same day, January 2nd?

21   A.   "We are leaving Wylie at 9:00 a.m.  Stopping in Nashville,

22   TN.  Margaritaville Hotel.  Then leaving in time to arrive D.C.

23   around 1800, the Melrose Georgetown."

24   Q.   If we can go forward, so now four days in the future, on

25   January 6 of 2021, at 7:26 a.m. Central Time, what did Russ

1   William Bowen write?

2   A.   "Good morning.  How are things?  I hate relying on videos,

3   but it seems a few altercations happened."

4   Q.   If we could go forward, please, what did Call to Arms write

5   just a minute later?

6   A.   "We are showing and then heading to rendezvous point."

7   Q.   If we could then go forward, what did Call to Arms then

8   write at 7:27 a.m.?

9   A.   "Do the recon and then come back for weapons hot."

10   Q.   If we can go forward, please, what did Call to Arms write

11   one minute later?

12   A.   "This dance is about to start."

13   Q.   If we could then go forward.  And at 7:29 a.m., do you see

14   where Russ William Bowen wrote, "You have any video equip such

15   as a GoPro?"

16   A.   I do.

17   Q.   If we could go forward one slide, what did Call to Arms

18   post at 7:31 a.m. after that message?

19   A.   What appears to be a link to a Kodak PixPro camera.

20   Q.   And in connection with your investigation in this case, did

21   you examine a Kodak PixPro camera?

22   A.   I did.

23   Q.   We will get to that in a little bit.

24       If we could then go forward, what did Call to Arms write at

25   7:31 a.m.?

1    A.    "This will be mounted to my bump cap."

2    Q.    If we could then go forward.  Thank you, Ms. Rohde.

3          MR. NESTLER:  Now might be a good time for a break, if

4    Your Honor wants.

5          THE COURT:  Let me ask the jurors.

6    Does anyone need a break right now?  All right.  So we will

7    take a 10-minute break.  We will be back at 11:10.

8          (Recess taken from 10:58 a.m. to 11:09 a.m.)

9          (Jury not present.)

10          THE COURT:  The courtroom deputy is not here, but I

11    just want to address the issue of the jurors and whether they

12    can see Mr. Reffitt.

13    So my law clerk found a D.C. Circuit case,

14    *U.S. versus Wright*, 489 F.2d at 1181, in which the Circuit

15    stated that the prosecutor cannot comment on the character of

16    the accused as evidenced by his courtroom behavior.  The Court

17    continued that the jury witnesses the courtroom behavior in any

18    event does not make it proper for the prosecutor to tell them,

19    even with the Court's approval, that they may consider it as

20    evidence of guilt.  And that's at 1186.

21    Many other circuits hold it's reversible error for the

22    prosecutor to refer to a defendant's behavior off the witness

23    stand.

24    All of that suggests to me that this is not evidence in the

25    case.  And given that I instruct the jury at the end that the

evidence they should consider include the exhibits, the

stipulations, and the witness testimony, I think that adequately

covers the juror's question.

And you all should know that the juror who raised the issue

is not someone who saw anything, but someone who can't see

Mr. Reffitt very well.  So this isn't a situation where

someone's seen something and said these folks can't see it.

And I haven't seen Mr. Reffitt react in any way during

anyone's testimony, and he has a mask on.  So I don't even think

this is an issue.

Based on all of that, I'm inclined not to instruct them at

all.

Ms. Berkower?

MS. BERKOWER:  That was going to be our suggestion as

well, Your Honor, not to instruct them.

Thank you.

THE COURT:  Not to?

MS. BERKOWER:  Correct.  We would agree not to

instruct them at all.

THE COURT:  All right.

MR. WELCH:  Agreed.

THE COURT:  So are we ready?

MR. WELCH:  Yes.

(Jury entered courtroom.)

THE COURT:  Let me remind you you are still under

1    oath.

2              THE WITNESS:  Yes, Your Honor.

3              BY MR. NESTLER:

4    Q.   Agent Shahrani, I'm going to pull up on the screen just in

5    front of you Government Exhibit 1B4.4.

6         Can you see it okay?

7    A.   Yes.

8    Q.   Is this another message thread you pulled off of

9    Exhibit 1B4?

10   A.   It is.

11             MR. NESTLER:  The government moves to admit into

12   evidence Exhibit 1B4.4.

13             THE COURT:  Any objection?

14             MR. WELCH:  No --

15             THE COURT:  It's admitted.

16        (Government Exhibit 1B4.4 received into evidence.)

17             BY MR. NESTLER:

18   Q.   And which application was this message thread from?

19   A.   This was an SMS or a text message.

20   Q.   And how many people were in this thread?

21   A.   Two.

22   Q.   What were their names?

23   A.   Terri and Guy Reffitt.

24   Q.   And what did Guy Reffitt write on the afternoon of

25   January 6 of 2021?

1   A.   "I got hit with rubber bullets and pepper sprayed.  I was

2   the first person to light the fire on the Capitol steps.  We

3   took the Capitol."

4   Q.   Thank you.  If we could please pull that down from the

5   jury's screen.  And now we will show just Agent Shahrani the

6   .pdf of Exhibit 1B4.5.

7      Do you see that in front of you, Agent Shahrani?

8   A.   I do.

9   Q.   Is this another message thread you pulled off the iPhone?

10   A.   It is.

11      MR. NESTLER:  Government moves to admit into evidence

12   Exhibit 1B4.5.

13      THE COURT:  Any objection?

14      MR. WELCH:  No, Your Honor.

15      THE COURT:  It's admitted.

16   (Government Exhibit 1B4.5 received into evidence.)

17      BY MR. NESTLER:

18   Q.   And which application was this message thread in on the

19   phone?

20   A.   Again, this was SMS or text messages.

21   Q.   And how many people were in this thread?

22   A.   Two.

23   Q.   What were their names?

24   A.   The user was Bill and Christi Stypick and Guy Reffitt.

25   Q.   And if we could go to the .pdf version after we pull that

1    down for the jury just for a quick second, Mr. Hopkins, so that

2    we could have the PowerPoint version, and then if we could

3    display it to the jury.

4        So on January 8 of 2021 at 12:43 p.m., what did Guy Reffitt

5    write to Bill and Christi Stypick?

6    A.   "And this was me forcing the Capitol Police hand."

7    Q.   Was there an attachment to that message?

8    A.   Yes.

9    Q.   What kind of attachment is that?

10   A.   It's a JPEG or a photo.

11   Q.   And let's go to the next slide.

12        Is this the photo that was attached?

13   A.   It is.

14   Q.   If we could go to the next slide, what did Guy Reffitt

15   write here on the next message to Bill and Christi Stypick?

16   A.   "I've added you to a Texas Three Percenters Continental

17   Army Telegram chat.  I am Texas state intel officer and call

18   sign is Call to Arms.  I have researched both of your past and

19   present.  Bill, you have a bit of a lead foot, but as expected,

20   you are both very true-blooded patriots.  We have been working

21   to recover from the FB purge.  We now have a new secure web

22   page, www.texasthreepercenters.org.  Go and sign up.  We have a

23   ladies group that are training for the exact skills that you

24   both excel at.  The battle rattle equipment is also another

25   variant we are working on.  I have a new security business to

1    circumvent the Second Amendment issue.  TTP Security Services

2    LLC.  Web site is under construction but business is licensed

3    with the Secretary of State, Texas DPS and Texas Board of

4    Private Security.  We can get ammo and weapons available to law

5    enforcement.  We have an interior-certified training officer.

6    Join us and let's take back our country.  The fight has only

7    just begun."

8    Q.    That message was sent on January 9 of 2021 at 1:59 a.m.; is

9    that correct?

10   A.    It is.

11   Q.    Let's go forward to the next slide, please, Ms. Rohde.

12         And later, on January 10th of 2021 at 10:27 a.m., do you

13   see where Bill and Christi Stypick wrote to Guy Reffitt, "What

14   am I looking at/for in the video?"

15   A.    I see that.

16   Q.    If we could go to the next slide, what did Guy Reffitt

17   respond?

18   A.    "Mostly just me spitting after being pepper sprayed."

19   Q.    And if we could go to the next, what did Guy Reffitt then

20   write at 10:31 a.m. that day?

21   A.    "That's my coat I got when I was in Kuwait.  It was the

22   only one big enough to covet my gear."

23   Q.    And if we could go forward.  Thank you, Ms. Rohde.  If we

24   could take down the jury screen and pull up the .pdf version of

25   1B4.6 for Ms. Rohde -- I'm sorry, for Agent Shahrani.

```
 1          Can you see it okay, Agent Shahrani?
 2   A.   I can.
 3   Q.   And is this another message thread you pulled off of the
 4   iPhone?
 5   A.   It is.
 6          MR. NESTLER:  Government moves to admit Exhibit 1B4.6
 7   into evidence.
 8          THE COURT:  Any objection?
 9          MR. WELCH:  No, Your Honor.
10          THE COURT:  It's admitted.
11       (Government Exhibit 1B4.6 received into evidence.)
12          BY MR. NESTLER:
13   Q.   What application was this from?
14   A.   Telegram.
15   Q.   And was there a group photo?
16   A.   There was.
17   Q.   Okay.  And how many people were in this message thread?
18   A.   Two.
19   Q.   And what were their names?
20   A.   Roddy and Call to Arms.
21   Q.   If we could then switch over to the PowerPoint version, if
22   we can take down the jury's version for a quick second.
23       On January 9, do you see where Roddy wrote, "How's it been
24   going brother?"
25   A.   Yes.
```

1    Q.   If we can go to the next slide, how did Call to Arms

2    respond at 10:18 a.m. on January 9 of 2021?

3    A.   "Painful.  Just returned home last night from D.C.  Got

4    shot multiple times with clay balls and then pepper sprayed."

5    Q.   And if we could go to the next slide, please, what did Call

6    to Arms then write at 10:20 a.m.?

7    A.   "We took the Capitol of the United States of America, and

8    we will do it again."

9    Q.   If we can go to the next slide, please, what did Call to

10   Arms also write at 10:20 a.m.?

11   A.   "Unfortunately, my camera only recorded one second before

12   my advancement."

13   Q.   If we can go to the next slide, please, what did Call to

14   Arms then write at 10:21 a.m.?

15   A.   "Sounds excellent."

16   Q.   If we can go forward, do you see where Roddy at the same

17   time, 10:21 a.m., wrote, "Did you have a vest with you?"

18   A.   Yes.

19   Q.   What did Call to Arms respond?

20   A.   "Yes.  She shot me several times in the vest and realized

21   it wasn't doing any good.  I laughed and moved forward.  Then

22   she started shooting my legs.  I laughed again and moved

23   forward.  She ran out after 20 plus and then they pepper sprayed

24   me with the bear spray.  That stopped me but fired up the crowd.

25   They couldn't be stopped after that."

1    Q.   And that was at 10:25 a.m. on January 9; is that right?

2    A.   Yes.

3    Q.   If we could then go forward, Ms. Rohde.

4         Do you see at the same time, 10:25 a.m., Roddy wrote,

5    "Yeah, I watched that shit live"?

6    A.   Yes.

7    Q.   If we could go to the next slide, please, what did Call to

8    Arms write one minute later?

9    A.   "I finally made it to the top of the steps when they broke

10   through the doors.  My job was done then.  I had to fall back

11   and get my sight back."

12   Q.   If we could go forward, please, at 10:29 a.m., do you see

13   where Roddy wrote, "God damn man, watching it from the outside.

14   Next time, we need a formation.  We outnumbered everyone."

15   A.   I see that.

16   Q.   If we could then go forward, please, how did Call to Arms

17   respond also at 10:29 a.m.?

18   A.   "We all had weapons but never fired a single round."

19   Q.   If we could then go forward.  Okay.  If we could then take

20   down the jury's screen, please, Mr. Hopkins, and we will pull up

21   for Agent Shahrani 1B4.7, please.

22        And do you see this in front of you, Agent Shahrani?

23   A.   I do.

24   Q.   It's another message thread from the iPhone?

25   A.   It is.

1              MR. NESTLER:  Government moves to admit into evidence

2       Exhibit 1B4.7.

3              THE COURT:  Any objection?

4              MR. WELCH:  No, Your Honor.

5              THE COURT:  It's admitted.

6          (Government Exhibit 1B4.7 received into evidence.)

7          BY MR. NESTLER:

8       Q.   What application is this from?

9       A.   It's also from Telegram.

10      Q.   If we could then publish it to the jury, please, and show

11      the group photo and name, Ms. Rohde.

12           What is the group photo of?

13      A.   The group photo is the outline of Texas with three Roman

14      numerals in the center surrounded by stars.

15      Q.   And what is the name of this group thread?

16      A.   "TTP state."

17      Q.   How many people were in this group, please?

18      A.   Seven.

19      Q.   Okay.  And do you see the second from the bottom, the name

20      Russ William Bowen?

21      A.   I do.

22      Q.   And you see the top one named Call to Arms?

23      A.   I do.

24      Q.   Let's go to the PowerPoint version, please, if we could

25      please take down the jury's version.  And if we could go back to

1    putting the screen on for the jury, Mr. Hopkins, please.

2         What did Call to Arms write on this group on the evening of

3    January 9?

4    A.   "If we quickly declare our undivided intentions here and

5    now we will all know what to do if it goes dark.  No meetings or

6    training, just numbers and determination.  I'll say it now.  The

7    Capitol has been done, and they are on their heels.  They are

8    prepared."

9    Q.   If we could then go forward, please.

10   A.   "California, Big Tech, and MSM.  They aren't ready and

11   don't believe they can ready fast enough."

12   Q.   If we could then go forward, please, on January 9 of 2021

13   at 7:36 p.m., what did Call to Arms write to this group?

14   A.   "I'll arrange it shortly after I get back home."

15   Q.   And then what at 7:44 p.m.?

16   A.   "This will be a secure Zoom conference call.  I'll need

17   e-mail address of each person to send the link."

18   Q.   In connection with your investigation in this case, Agent

19   Shahrani, did you recover a recording of a Zoom meeting?

20   A.   I did.

21   Q.   We'll get to that in a minute.  Thank you.

22        If we could go forward, please, do you see what Call to

23   Arms wrote at 9:08 p.m.?  If you wouldn't mind reading that,

24   please.

25   A.   "Will this be all attending?  Rocky will also be joining.

1    Meeting at 9:30 p.m.  Check your e-mail."

2    Q.   If we could then go forward, do you see at 9:34 p.m. on

3    that same day Russ William Bowen wrote, "I am waiting to be let

4    in"?

5    A.   Yes.

6    Q.   If we could then go forward.  And the next day, January 10,

7    2021, at 1:20 a.m., what did Call to Arms write to this group?

8    A.   "After they cleared the building, they had no reason to

9    stop the people.  They already knew they didn't have the numbers

10   to stop us."

11   Q.   If we could then go forward, what did he write at

12   1:22 a.m.?

13   A.   "They only intended to delay the protestors until they

14   could secure the Congress."

15   Q.   Okay.  Thank you.  If we could go forward.  Okay.  If we

16   could take that down off the screen, please, Mr. Hopkins, and

17   then put up just on Agent Shahrani's screen, Ms. Rohde, 1B4.8.

18        Is this another message thread from the iPhone?

19   A.   It is.

20        MR. NESTLER:  The government moves to admit into

21   evidence Exhibit 1B4.8.

22        THE COURT:  Any objection?

23        MR. WELCH:  No, Your Honor.

24        THE COURT:  It's admitted.

25        (Government Exhibit 1B4.8 received into evidence.)

```
 1              BY MR. NESTLER:
 2    Q.   If we could please publish it to the jury.
 3         What application was used to make this thread?
 4    A.   This was again Telegram.
 5    Q.   And can you please go down, Ms. Rohde, and show the group
 6    name.
 7         What's the group name?
 8    A.   The group was named Oracle Thoughts.
 9    Q.   And if you could then go down and show the participants in
10    the group.
11         Do you see that Call to Arms is a participant?
12    A.   I do.  It's registered as the owner.
13    Q.   How about the person underneath that?  Who is that?
14    A.   Rocky Hardie, admin.
15    Q.   And what does that mean, to be the admin?
16    A.   That's the administrator, or the person that created the
17    group.
18    Q.   If we could take down the jury screen, please, and we will
19    go to the PowerPoint.  And there's just two more.  We're getting
20    through here.  We will go to 1B4.8 PowerPoint.  If we could put
21    it up on the jury screen, Mr. Hopkins.  Thank you.
22         What does the system say on January 11 of 2021 at
23    11:27 a.m.?
24    A.   The system message says Rocky Hardie created the group
25    Oracle Thoughts.
```

1             THE COURT:  Mr. Nestler, can we chat for a moment?

2         (Bench conference.)

3             THE COURT:  I'm just wondering, is this getting into

4     California tech issues and future plans with regard to

5     California tech?  No?  I can't hear you.

6         Ms. Berkower is shaking her head no.  It's not?  Okay.

7         So just while we're here, Mississippi -- can you all hear

8     me?

9             MR. WELCH:  Yes, I can hear you.

10            THE COURT:  Mississippi GPS stuff, California tech

11    stuff -- can you hear me, Mr. Nestler?  I can't hear you.  Can

12    you hear me, Ms. Berkower?

13            COURTROOM DEPUTY:  I will have someone look at these

14    over the lunch break.

15            THE COURT:  Ms. Berkower, can you hear me?

16    Mr. Nestler, can you hear me?

17            MR. NESTLER:  Yes.

18            THE COURT:  Sorry to interrupt, but I thought you were

19    going into the California tech stuff.  That and Mississippi GPS

20    stuff are not things you're going to get into in this trial;

21    right?

22            MR. NESTLER:  Right.

23            THE COURT:  I didn't know if Oracle had to do with

24    their plans with regard to that.

25            MR. NESTLER:  Oracle is the name of Rocky Hardie, and

1    they're talking about their actions after the fact.

2             THE COURT:  Okay.  Sorry.

3         (End of bench conference.)

4             THE COURT:  You may proceed, Mr. Nestler.

5             BY MR. NESTLER:

6    Q.   After Rocky Hardie started this group on January 11th of

7    2021 at 11:27 a.m. -- let's go to the next screen -- what did

8    Rocky Hardie write?

9    A.   "I deleted my other channels to focus on important events."

10   Q.   If we can go forward, what did Call to Arms write at

11   12:09 p.m. on January 11?

12   A.   "It was Rocky and I alone in D.C.  Yes, we did encroach the

13   U.S. Capitol.  What were the rest of you doing that day?"

14   Q.   And if we could go forward again, what did Call to Arms

15   write here at 12:10 p.m.?

16   A.   "This was us on January 6th, being shot with clay balls and

17   pepper sprayed.  Any questions?"

18   Q.   In between these two messages at 12:09 p.m. and 12:10 p.m.,

19   were other messages sent from Call to Arms of this group?

20   A.   There were.

21   Q.   Could you tell, did they contain any data or other

22   information?

23   A.   They appeared to be deleted images, photographs that were

24   not recovered.

25   Q.   So you were not able to recover the photographs?

1    A.    No.

2    Q.    If we could then go forward, Ms. Rohde.

3          Do you see here where Randy, unit XO, wrote the following,

4    "Well, Yahoo for you you fucking jackasses, because all you

5    accomplished was getting us all declared domestic terrorists to

6    make our communication even harder than it already is.  Not one

7    positive thing was accomplished by attending D.C. and raiding

8    the Capitol.  So if you're proud of that you're just a big of

9    fucking idiot as I thought you were" on January 11 at

10   12:16 p.m.?

11   A.    I see that.

12   Q.    And what did Call to Arms write after that at 12:17 p.m.

13   that day?

14   A.    "Hundreds of thousands of people and yet no heat.  It was a

15   pure show of numbers.  We had heat, more heat than I will post

16   on here.  We didn't fire a single round.  Besides, hundreds of

17   thousands would disagree with you."

18   Q.    And if we can go forward, Ms. Rohde, do you see on that

19   same day at 12:36 p.m. someone named Dane George Washington

20   wrote, "What I was saying is very clear.  If you were at the

21   Capitol representing TTP, I personally feel it was a wrong move.

22   If you were not and you were just there, that's fine.  I just

23   don't need detectives knocking on my door questioning something

24   that somebody else did or was planning on doing"?

25   A.    I see that.

1    Q.   And how did Call to Arms respond at 12:43 p.m.?

2    A.   "We went and removed all insignia of TTP.  To remove any

3    association to our group.  At least give us credit for being

4    ahead of the game.  The coat I was wearing was actually written

5    in Arabic because I brought it home from Kuwait.  The shirt is

6    Oath Keepers."

7    Q.   If you could move forward, please, Ms. Rohde.  Thank you.

8         If we can take down the jury screen, please, and just show

9    Agent Shahrani 1B4.9.

10        Do you recognize this, Agent Shahrani?

11   A.   I do.

12   Q.   Is it another message thread you pulled off of Exhibit 1B4?

13   A.   It is.

14             MR. NESTLER:  Government moves to admit into evidence

15   1B4.9.

16             THE COURT:  Any objection?

17             MR. WELCH:  No, Your Honor.

18             THE COURT:  It's admitted.

19        (Government Exhibit 1B4.9 received into evidence.)

20             BY MR. NESTLER:

21   Q.   And if we can pull it up on the screen here, which

22   application was this from?

23   A.   Telegram.

24   Q.   If we could go down, Ms. Rohde, to the group photo.

25        What is the group photo?

1  A.   It is a skull and crossbones, and the lower right-hand

2  corner has a ring of stars with Roman Numeral 3 in the center.

3  Q.   And just on the .pdf, Ms. Rohde, if you can just highlight

4  the one message.

5       And so what is the one message that we have extracted from

6  this .pdf here on January 13 of 2021 at 10:02 a.m.?

7  A.   From Call to Arms, "I'll not be taken down again like in

8  D.C.  I have a riot shield and 9 ounce cans of bear spray in

9  route to my home."

10  Q.   Thank you.  If we could please take down the jury screen, I

11  will do the final text message extraction, which is 1B4.10.

12       Do you see that in front of you, Agent Shahrani?

13  A.   I do.

14  Q.   Another message thread from the iPhone?

15  A.   Yes.

16          MR. NESTLER:  The government moves to admit into

17  evidence 1B4.10.

18          THE COURT:  Any objection?

19          MR. WELCH:  No, Your Honor.

20          THE COURT:  It's admitted.

21       (Government Exhibit 1B4.10 received into evidence.)

22          BY MR. NESTLER:

23  Q.   And which application on the phone was used to make this

24  thread?

25  A.   These are text messages.

1    Q.   Okay.  And if we could then go down to the participants,

2    please, Ms. Rohde.

3         And who are the two participants?

4    A.   Russ William Bowen and Guy Reffitt.

5    Q.   And the numbers associated with the individuals' names,

6    because this is a text message, what are those numbers?

7    A.   The numbers are the phone number.

8    Q.   And if we could then move to the .pdf version, if we could

9    just briefly take down the jury screen, Mr. Hopkins.  Thank you.

10   And if we can go to the PowerPoint version.  Sorry.  And we can

11   put the jury screen back up, please.

12        Let's start on July 28th of 2020.  What did Russ William

13   Bowen write to Guy Reffitt?

14   A.   "This is Russ, Texas state lead.  I'm looking to add a

15   position in state, intelligence officer.  I am not sure if

16   that's your forte or not.  You seem to have the ability to

17   investigate individuals.  I need someone that can gather intel

18   on BLM, Antifa, and NFAC."

19   Q.   And then to the next slide, what did Russ William Bowen

20   write to Guy Reffitt that same day?

21   A.   "Okay.  I'm Dead Shot.  I'm almost everything."

22   Q.   And then if we go to the next slide, what did Guy Reffitt

23   write to Russ William Bowen on that same day?

24   A.   "Wait, you're William."

25   Q.   If we go forward, what did Russ William Bowen respond to

1    Guy Reffitt that same day?

2    A.   "Yes, I go by Russ in real life.  Dead Shot in the group."

3    Q.   If we could then go forward.  So that was back in

4    July of 2020; is that right?

5    A.   Yes.

6    Q.   Let's fast forward now to January 6th, 2021, at 1:51 p.m.

7         And just to remind us, this is in Central Time; correct?

8    A.   Correct.

9    Q.   And Eastern Time is one hour ahead?

10   A.   Yes.

11   Q.   What did Russ William Bowen write to Guy Reffitt at

12   1:51 p.m. Central?

13   A.   "You guys okay?  Y'all in the building?"

14   Q.   And if we could go to the next slide, that's four days in

15   the future.  The last one was on January 6th.  This is on

16   January 10.  Correct?

17   A.   Yes.

18   Q.   What did Guy Reffitt write to Russ William Bowen at

19   4:10 p.m. in the afternoon on January 10?

20   A.   "You home yet?"

21   Q.   And then if we go forward, what did Russ William Bowen

22   write to Guy Reffitt at 6:31 p.m. that day?

23   A.   "I am.  Thank you for checking on me and letting everyone

24   know.  They saw your message not long after you posted it.

25   Asked me what I told you to say, that you sounded intense."

1   Q.   And if we go forward, what did Guy Reffitt then write to

2   Russ William Bowen at 6:40 p.m. that same day, January 10th?

3   A.   "Hell, yeah, I was intense.  Time was of the essence.  I

4   needed actions to happen fast to secure all comms until we could

5   fix the issue.  Your security was at the heart of what we do.

6   When you are ready, you are the only one who can give the all

7   clear order."

8   Q.   If we could then go forward, what did Guy Reffitt then

9   write at 6:41 p.m.?

10  A.   "All chats have been cleared and rebuilt."

11  Q.   I think that's the last slide, Ms. Rohde.  If we could pull

12  down the jury screen, please.

13       So thank you, Agent Shahrani.  We're done with the items

14  from the iPhone, which was 1B4.

15       And now let's talk about Exhibit 1B20.1.  And Agent Ryan,

16  if you could please pass Exhibit 1B20.1 to Agent Shahrani.

17       Do you recognize what this is?

18  A.   I do.

19  Q.   Is it an item that you examined as a part of your role in

20  this case?

21  A.   It is.

22            MR. NESTLER:  The government moves to admit into

23  evidence Exhibit 1B20.1.

24            THE COURT:  Any objection?

25            MR. WELCH:  No, Your Honor.

1          THE COURT:  It's admitted.

2      (Government Exhibit 1B20.1 received into evidence.)

3          BY MR. NESTLER:

4   Q.   If you could please give it back to Agent Ryan to display

5   it to the jury.

6          While he's doing that, could you please tell us what it is?

7   A.   Sure.  It's a Microsoft Surface Pro.

8   Q.   What is a Microsoft Surface Pro?

9   A.   It is a tablet that kind of doubles as a computer.

10  Q.   And on this Microsoft Surface Pro, there are also some

11  stickers; is that correct?

12  A.   There are.

13  Q.   Just like with the iPhone, what does the white sticker

14  indicate?

15  A.   The white sticker has the case identifier, the CART lab

16  number, the date I did the physical examination on this device,

17  and my initials indicating that I've reviewed this device and no

18  other person.

19  Q.   You also put some colored stickers on there for the camera;

20  is that correct?

21  A.   I did.

22  Q.   Okay.  Let's talk about your examination of this tablet.

23         When you boot up the tablet, does the computer say

24  anything?

25  A.   With this device, when I initially booted up the device to

1    see what I could do with it, because it is a tablet, it was

2    looking for a face.  It was trying to do facial recognition.

3    Q.   Did the home screen say anything?

4    A.   It said, "I can't find you," and then it had a user name.

5    Q.   What was the user name?

6    A.   The user name was Guy Reffitt.

7    Q.   What kinds of things did you find when you were able to

8    examine this tablet?

9    A.   I found things consistent with what you would see on a

10   computer.  There were documents and videos and images,

11   photographs.

12   Q.   Okay.  Let's show, Ms. Rohde, if you could, just to Agent

13   Shahrani Exhibit 1B20.1.1.

14        Is this a photograph you found on the Microsoft Surface

15   Pro?

16   A.   It is.

17             MR. NESTLER:  The government moves to admit into

18   evidence exhibit 1B20.1.1.

19             THE COURT:  Any objection?

20             MR. WELCH:  No, Your Honor.

21        (Government Exhibit 1B20.1.1 received into evidence.)

22             BY MR. NESTLER:

23   Q.   If we could please publish it to the jury.

24        Is this a photograph?

25   A.   It is a photograph.

1    Q.    Did it have an embedded time stamp on it?

2    A.    It had an embedded time stamp on the photo itself.

3    Q.    What was the date of that?

4    A.    The date of that was January 5, 2021.

5    Q.    Earlier, when we were going through the messages in the

6    iPhone, did you see anything about Call to Arms saying that he

7    had been wearing an Oath Keepers T-shirt?

8    A.    I did see that.

9    Q.    Can you please read what's on the T-shirt of the person on

10   the left here in this photograph?

11   A.    Oath Keepers Texas.

12   Q.    And now if we could take down that screen, please,

13   Mr. Hopkins, and we will show Agent Shahrani Exhibit 1B20.1.2.

14        Is this another photograph you found on the Microsoft

15   Surface Pro?

16   A.    It is.

17              MR. NESTLER:  Government moves to admit it into

18   evidence.

19              THE COURT:  Any objection?

20              MR. WELCH:  No, Your Honor.

21        (Government Exhibit 1B20.1.2 received into evidence.)

22              BY MR. NESTLER:

23   Q.    If we could please publish it to the jury.

24              THE COURT:  Mr. Nestler, I'm just curious, do we have

25   a lot of exhibits from the computer that you're going to be

1    admitting, seeking to admit?

2              MR. NESTLER:  No.

3              THE COURT:  Okay.

4              MR. NESTLER:  This is the last one.

5              THE COURT:  I was going to suggest we try to do it in

6    bulk.  But this is it?

7              MR. NESTLER:  Correct, Your Honor.

8              BY MR. NESTLER:

9    Q.   This is also a photograph you found on the computer?

10   A.   Yes, on the Microsoft Surface Pro.

11   Q.   What does it appear to be a photograph of?

12   A.   Somebody's stomach and bruising.

13   Q.   And was there metadata associated with this photograph?

14   A.   There was.

15   Q.   And did the metadata tell you the date and time the photo

16   was taken?

17   A.   Yes.  Well -- yeah, it said the date and time that it

18   appeared on the Microsoft Surface Pro.

19   Q.   Got it.  And if we could then show Agent Shahrani just

20   1B20.1.2MD.

21        Is this the metadata?

22   A.   It is.

23   Q.   And we don't need to publish it to the jury, but can you

24   just tell us what the date and time that this photograph was --

25   first appeared on the Microsoft Surface Pro?

1    A.   It first appeared on the Microsoft Surface Pro on

2    January 11, 2021.

3    Q.   Got it.

4              MR. NESTLER:  If we could just formally move this into

5    evidence.

6              THE COURT:  Any objection?

7              MR. WELCH:  No, Your Honor.

8              THE COURT:  It's admitted.

9         (Government Exhibit 1B20.1.2MD received into evidence.)

10             BY MR. NESTLER:

11   Q.   Okay.  Let's move on to Exhibit 1B22.

12        Agent Ryan, if you could please pass Agent Shahrani

13   Exhibit 1B22.

14   A.   One second.

15   Q.   It's okay.  You can open all the bags and find the thing

16   inside all the bags.

17        Is that a camera you're holding?

18   A.   It is.

19   Q.   Is that a camera you examined as a part of your role in

20   this case?

21   A.   It is.

22             MR. NESTLER:  The government moves to admit into

23   evidence Exhibit 1B22.

24             THE COURT:  Any objection?

25             MR. WELCH:  No, Your Honor.

1          (Government Exhibit 1B22 received into evidence.)

2              BY MR. NESTLER:

3     Q.   If you could pass it back to Agent Ryan, please, and he can

4     display it to the jury.

5          And while he's doing that, if you wouldn't mind, Agent

6     Shahrani, telling us, what is this?

7     A.   It is a Kodak Orbit 360 camera.  It is designed to take

8     photographs or video footage in 360.  And it is also a 4K.

9     Q.   What does it mean to be 4K?

10    A.   It's got pretty high resolution.

11    Q.   Does it have the same kind of sticker situation we talked

12    about on the other devices we talked about to show that you're

13    the one who examined it?

14    A.   Yes.  The difference is I put it on the SD card this time.

15    It has the same information and my initials, telling me that I

16    was the examiner.

17    Q.   This camera, does it record the data on some sort of

18    external media?  You mentioned an SD card.

19    A.   Yes.

20    Q.   Did you actually examine the camera and the SD card?

21    A.   I did a physical examination of the camera, noted that

22    there didn't appear to be any internal storage other than the SD

23    card, and I put it in physical inventory and just checked out

24    the SD card itself, and I examined that with software and

25    hardware in the lab.

1    Q.   And so when you examined the SD card with hardware and

2    software, did you locate any video files on the SD card?

3    A.   There were no video files.  I did find a file table listing

4    of things that used to be -- that the SD card recognized used to

5    be on that device, but there was nothing there.

6    Q.   And what are some of those file names that you recall

7    seeing, even though the files themselves were not there?

8    A.   Two relevant file names that I noted were -- the first one

9    was labeled D.C. 001, and the second was labeled D.C. 002.

10   Q.   Now, when you examined a different item of evidence in this

11   case, did you find files with the file names D.C. 001 and

12   D.C. 002?

13   A.   I did, and their logical size was consistent with what was

14   listed on the file table.

15   Q.   And that item that you found those two files on, what was

16   it?

17   A.   That was the Seagate external hard drive.

18   Q.   Perfect time to move to the Seagate external hard drive.

19        Agent Ryan, if you wouldn't mind showing Agent Shahrani

20   item 1B20.2.

21        Do you recognize Exhibit 1B20.2, Agent Shahrani?

22   A.   I do.

23   Q.   Is it a device that you examined as a part of this case?

24   A.   It is.

25             MR. NESTLER:  The government moves to admit into

1    evidence Exhibit 1B20.2.

2              THE COURT:  Any objection?

3              MR. WELCH:  No, Your Honor.

4              THE COURT:  It's admitted.

5         (Government Exhibit 1B20.2 received into evidence.)

6              BY MR. NESTLER:

7    Q.   If you can, please, pass that back to Agent Ryan, he can

8    show it to the jury.

9         And can you quickly tell us what this is, Agent Shahrani?

10   A.   A mass storage device.  It's an external drive that you

11   plug into a computer, and it operates the same as a thumb drive.

12   You can use it as a place to store photos and documents and

13   videos.

14   Q.   Does it have the same white sticker on it with all the

15   information we talked about for the other devices?

16   A.   It sure does.

17   Q.   Great.  Okay.  Let's talk about Exhibit 1B20.2.1 and just

18   display it to Agent Shahrani.

19        And you indicated earlier, Agent Shahrani, that file

20   D.C. 001 was on this external hard drive; is that right?

21   A.   It was.

22   Q.   What kind of file was it?

23   A.   It was a video.

24   Q.   I'm going to pull up Exhibit 1B20.2.1.  Are you aware of

25   whether this is the video file that you were just talking about?

 1    A.    Yes, it is.

 2    Q.    Okay.  And we're going to open it in a different player.

 3    If you could pause it and take it back to the beginning,

 4    Ms. Rohde.

 5          Does this file have audio with it?

 6    A.    It does.

 7    Q.    We're going to have Agent Ryan operate the speaker setup

 8    over here.  Hopefully, he doesn't hurt his ears or anyone else's

 9    ears.

10          MR. NESTLER:  At this time the government moves to

11    admit into evidence Exhibit 1B20.2.1.

12          THE COURT:  Any objection?

13          MR. WELCH:  No, Your Honor.

14          THE COURT:  It's admitted.

15       (Government Exhibit 1B20.2.1 received into evidence.)

16          BY MR. NESTLER:

17    Q.    If we could put up on the screen, Mr. Hopkins -- and before

18    we get started, Agent Shahrani, let me ask you, when you first

19    viewed this video file, did it have any special features that

20    you were able to access?

21    A.    So this type of camera that recorded this is able to -- it

22    has a proprietary player, which means that it's a player that's

23    owned by the company.  So it has the ability to play somewhat

24    differently in different players.

25          And then VLC, VLC interprets it in such a way that you can

1   actually move around in the video.  You can zoom in, and you can

2   move the cursor up and move the cursor down and see different

3   portions of the 360 view.

4   Q.   And did you do that?

5   A.   I did.

6   Q.   How did you feel while watching it?

7   A.   I was a little bit seasick when I picked a few views.

8   Q.   Why did it make you seasick to watch it by that?

9   A.   Because there was no stable horizon.

10  Q.   The version that we're looking at now, did we attempt to

11  stabilize the horizon?

12  A.   Yeah.

13  Q.   Did we do a good job of trying to --

14  A.   I get motion sick pretty badly, and I feel okay with it.

15  Q.   Okay.  So the version we're looking at now, is this more of

16  a stable view than in the original file that came right off of

17  the hard drive?

18  A.   The way that it's initially viewed in most media players is

19  not quite as stable as the way that we're going to view it

20  today.

21  Q.   And the version we're looking at here has space on the

22  bottom.  Is that because there's also a transcript attached to

23  this file that's been created just for this case?

24  A.   That is correct.

25  Q.   That transcript was not a part of the video file you saw?

1   A.   It was not.

2   Q.   Okay.  And at this time the government is going to play

3   Exhibit 1B20.2.1.  I just want to start here before we even play

4   it.  Is there someone's face visible here?

5          MR. WELCH:  Your Honor, can we have a conference here?

6      (Bench conference.)

7          MR. WELCH:  I would like to ask the Court to just

8   remind the jury of the instruction that the transcript is not

9   evidence in the case and that only the image is evidence,

10  please.

11         THE COURT:  All right.

12         MR. NESTLER:  The image and the audio.

13         MR. WELCH:  I think he's saying the image and the

14  audio.

15         THE COURT:  The video is evidence but the transcript

16  is not; right?

17         MR. NESTLER:  Correct.

18     (End of bench conference.)

19         THE COURT:  Ladies and gentlemen, before the

20  government plays this video, I want to remind you that the video

21  itself is evidence and the transcript is not.  It's just there

22  to assist you.  To the extent that there's any inconsistency,

23  the video is the evidence.

24         BY MR. NESTLER:

25  Q.   Okay.  Before we get started playing it, Ms. Rohde, we see

1    an individual's face; is that correct?

2    A.    Yes.

3    Q.    And what item do you see on the individual's chest?

4    A.    I see a handheld radio.

5    Q.    And if we could play it forward just for three seconds or

6    so, Ms. Rohde.

7          (Video played.)

8    Q.    Can we stop there?  Do you see what the color of the

9    person's jacket is?

10   A.    I did.

11   Q.    Which is?

12   A.    Blue.

13   Q.    What about the person's pants?

14   A.    Light blue denim.

15   Q.    What item do you see that's white with a red back hanging

16   off the person's side?

17   A.    It appears to be a red and white megaphone.

18   Q.    And if we could then please play it forward, Ms. Rohde.

19         (Video played.)

20   Q.    If you could stop there again.

21         Did you hear the audio, "All right, Rocky, we gotta push

22   forward, buddy"?

23   A.    Yes.

24   Q.    Let's fast forward to 5:25, please, Ms. Rohde, and if we

25   could start from there.

```
 1              (Video played.)
 2     Q.   Can we stop there at 6:02.  Could we then fast forward to
 3     8:25, please, Ms. Rohde.  And if we could go back just a couple
 4     of seconds.  We will start there at 8:24.
 5              (Video played.)
 6     Q.   If you can stop there at 8:32.  And let's scroll forward to
 7     9 minutes even, please, Ms. Rohde, and play forward from there.
 8              (Video played.)
 9     Q.   Pause it right there at 9:12.
10          Do you see an item in the individual's hand?
11     A.   I do.
12     Q.   What does that item appear to be?
13     A.   It appears to be consistent with the iPhone 12.
14     Q.   That same item 1B4 you examined earlier?
15     A.   Yes.
16     Q.   Is there a time on that phone that's listed?
17     A.   11:30.
18     Q.   Thank you.  Let's fast forward, Ms. Rohde, to 9:50, and if
19     we can start playing there for about ten seconds.
20              (Video played.)
21     Q.   Let's go back a second or two before, so maybe 9:47.  Okay.
22              (Video played.)
23     Q.   If you can pause it there at 10 minutes.  Now let's fast
24     forward to 12:05 and play it for about five seconds.
25              (Video played.)
```

1    Q.   Pause it there at 12:20.  We will then move forward to 14

2    minutes and play it for about 20 seconds.  You can start it

3    right there, Ms. Rohde.  That would be great.

4         (Video played.)

5    Q.   Pause there at 14:20.  We will now fast forward to 15:15

6    and play it for just over a minute.

7         (Video played.)

8    Q.   Pause there at 17:02.  Did you hear an individual say,

9    "This camera is 360 degrees, so it captures everything"?

10   A.   I did.

11   Q.   Remind us of the name of this camera.

12   A.   This is the Kodak Orbit 360.

13   Q.   Let's fast forward to 20:30, Ms. Rohde, and we will play it

14   for about 15 seconds.

15        (Video played.)

16   Q.   Stop it there at 20:43.  Now let's fast forward to 23:42

17   and play it for about 20 seconds.

18        (Video played.)

19   Q.   And stop there at 24:05.  Now let's fast forward to 25:45.

20   And play it for about a minute.

21        (Video played.)

22   Q.   If we could pause it there at 25:50.  If we could, please,

23   fast forward, Ms. Rohde, to 27:39 and play it for about 40

24   seconds.

25        (Video played.)

1    Q.   Pause it there at 28:23.  If we could then fast forward to

2    28:37 and play it for about three minutes to the end.

3         (Video played.)

4    Q.   Let's pause there at 31:07.

5         Now, Agent Shahrani, on this Seagate external hard drive,

6    did you also locate a file with the file name D.C. 002?

7    A.   I did.

8    Q.   I want to pull up on this screen just for Agent Shahrani

9    file 1B20.2.2.

10        Does this appear to be that file D.C. 002 you had located

11   on the external hard drive?

12   A.   It does.

13             MR. NESTLER:  The government moves into evidence

14   1B20.2.2.

15             THE COURT:  Any objection?

16             MR. WELCH:  No, thank you.

17        (Government Exhibit 1B20.2.2 into evidence.)

18             THE COURT:  Mr. Nestler, I'm just wondering, if you

19   have a number of these coming up, whether you might be able to

20   do that --

21             MR. NESTLER:  No, Your Honor.  This is the last one,

22   and then we have one more set of exhibits, and then that's it.

23             THE COURT:  All right.

24             BY MR. NESTLER:

25   Q.   Okay.  If we could put up on the screen, Mr. Hopkins, and

1    let's start at 1:16, Ms. Rohde.

2         (Video played.)

3    Q.   If you could pause there.  Let's now please forward to 3:30

4    and play for about a minute.

5         (Video played.)

6    Q.   If we could stop there at 4:30 and fast forward, Ms. Rohde,

7    to 12:05, and play for about ten seconds.

8         (Video played.)

9    Q.   If you could pause it there at 12:15.

10        Thank you, Mr. Hopkins.  If you could take down the jury

11   screen.

12        Finally, Agent Shahrani, on the Seagate external hard

13   drive, did you also recover a Zoom file?

14   A.   I did.

15   Q.   And I'm going to pull up on the screen in front of you

16   Exhibit 1B20.2.3MD.  Are you familiar with the

17   phrase "metadata"?

18   A.   I am.

19   Q.   What is metadata?

20   A.   It's things that are embedded in a file, like time stamps

21   and location, created date, modified date, access date, that are

22   kind of native to the file and baked in.

23   Q.   Up on the screen in front of you, do you recognize this

24   exhibit?

25   A.   I do.

1    Q.    Is it the metadata from file 1B20.2.3?

2    A.    It is the metadata of when the device first saw this Zoom.

3    So it's the date and time, created, modified, and accessed of

4    when it appeared on that device.

5              MR. NESTLER:  The government moves into evidence this

6    exhibit.

7              THE COURT:  Any objection?

8              MR. WELCH:  No, Your Honor.

9              THE COURT:  It's admitted.

10         (Government Exhibit 1B20.2.3 received into evidence.)

11             BY MR. NESTLER:

12   Q.    So this file, if we could display it to the jury, what kind

13   of file is it?

14   A.    Sure.  It's an MP4, which is an MPEG 4.0 video file.

15   Q.    So it's a video file?

16   A.    Yep.

17   Q.    Okay.  And you see the folder that it's in?  What folder

18   was it in on the computer?

19   A.    It was in the documents folder and a subfolder of "Zoom."

20   Q.    And within the subfolder of Zoom within documents, was

21   there another date, time, and writing for the next subfolder

22   name?

23   A.    There was.

24   Q.    And what was that?

25   A.    It says 2021-01-09 and 21.14.57.

1    Q.   And you were formerly in the Air Force; is that right?

2    A.   I was.

3    Q.   For us laypeople, what does 21.14.57 equate to in real

4    time?

5    A.   9:14:57 p.m.

6    Q.   And after that in the file name, what were the next three

7    words?

8    A.   Texas state meeting.

9    Q.   Thank you.  Now, as a part of this metadata, did you also

10   review the actual MP4 video file?

11   A.   I did.

12        MR. NESTLER:  The government at this time moves into

13   evidence the five clips from that video file, 1B20.2.3.1 through

14   .5.

15        THE COURT:  Any objection?

16        MR. WELCH:  No, Your Honor.

17        THE COURT:  They're admitted.

18   (Government Exhibits 1B20.2.3.1 through 1B20.2.3.5 received

19   into evidence.)

20        BY MR. NESTLER:

21   Q.   Ms. Rohde, if you could please pull up on the screen -- if

22   you could take down the jury screen for just a second,

23   Mr. Hopkins.  Perfect.  We will just get the files ready.

24        While that's happening, Agent Shahrani, can you explain

25   what Zoom is, in case anyone doesn't know?

1    A.    Living in the Age of COVID, I think everyone might.  But

2    Zoom is a video teleconferencing application.  It lets people

3    who are in different locations hop on the Internet, send out a

4    link, and talk to each face-to-face through audio or video.

5    Q.    Is there an ability to record one's own Zoom?

6    A.    There is.

7    Q.    And is there an ability to participate via audio only

8    without video?

9    A.    There is.

10   Q.    Okay.  Let's pull up the first clip, which is .1.  Please

11   publish it to the jury, Mr. Hopkins.  And if we could just play

12   the clip forward, Ms. Rohde.

13         (Video played.)

14   Q.    Now let's go to the next clip, 1B20.2.3.2.

15         (Video played.)

16   Q.    If we could take down the screen for just a second,

17   Mr. Hopkins, and we will go to 1B20.2.3.3.  If you could put it

18   back on the screen, please.  Now we can play.

19         (Video played.)

20   Q.    If we can take it down from the jury, please, Mr. Hopkins,

21   and we will go to 1B20.2.3.4.  And we can put it back on the

22   screen for the jury.  And we can play it, Ms. Rohde.  Thank you.

23         (Video played.)

24   Q.    Finally, if you could take it down from the screen,

25   Mr. Hopkins, we will play Exhibit 1B20.2.3.5.  If we could put

1    it back up for the jury, and Ms. Rohde, you can play it forward.

2         (Video played.)

3              MR. NESTLER:  Thank you, Agent Shahrani.  I have no

4    further questions.

5              THE COURT:  Mr. Welch?

6              MR. WELCH:  Yes, please.

7                        CROSS-EXAMINATION

8              BY MR. WELCH:

9    Q.   Good afternoon, Agent Shahrani.

10   A.   Good afternoon, sir.  How are you?

11   Q.   I'm fine.  And how are you?

12   A.   Good.

13   Q.   My name is Bill Welch.  I'm also going to ask you some

14   questions.

15   A.   Okay.

16   Q.   You mentioned that you are a part of the Computer Analysis

17   Response Team; is that correct?

18   A.   That is correct.

19   Q.   And is your responsibility restricted to just extracting

20   materials from digital devices, or do you do anything other than

21   that?

22   A.   I'm predominantly responsible for extracting the data from

23   devices, put it in a human-readable format, and then providing

24   it to case agents to review.

25   Q.   Do you know whether your team, the Computer Analysis

Response Team, has other capabilities beyond just what you described?

A.   They do.

Q.   For instance, could you tell us what those other responsibilities are or capabilities are?

A.   They can do vehicle forensics.

Q.   Vehicle forensics?

A.   They can do extractions of like closed circuit TVs or video footage.

Q.   Is it strictly extractions?  Because the name says "analysis."  And I was wondering what, if any, kinds of analyses the Computer Analysis Response Team does.

A.   So because I'm a forensic examiner trainee, I didn't do a lot of analysis in this investigation.  I predominantly extracted the data and then just put it in a human-readable format, which the software does for me.  And then any responsibility is just verifying that the data didn't change from the start to the beginning.

And my other responsibility is to make sure that the report that I'm providing for agents to review is consistent with what appears to be on the device.

Q.   Understood.  You mentioned something just a moment ago about making sure that the data doesn't change during the extraction; correct?

A.   Yes.

1    Q.   So do you or does the Computer Analysis Response Team have

2    the ability to look at a file -- if somebody gives you a digital

3    file, an audio recording or a video recording, do you have the

4    ability to look at that file and analyze whether it has ever

5    been edited or changed?

6    A.   It depends.  And I'm not being cute.  It just depends.

7    Q.   It depends.  So it is possible to do.  It is possible for

8    the Computer Analysis Response Team to do that, but it kind of

9    depends on something.

10        What does it depend on?

11   A.   It depends on what kind of data they're looking for, what

12   kind of things that happen to that.  For example, if I take a

13   picture with my iPhone and I send it to someone, just straight

14   to someone, it has one file name, and if I save it to my phone

15   and I send it to somebody else, the file name can change.

16        So those are things that are baked into that image.  The

17   image isn't different.  It's just calling it something

18   different.  So it depends on the devices, and it depends on what

19   they're looking for.

20   Q.   If someone were to take a file, say an image from an iPhone

21   like you're talking about, and they were to edit it, would that

22   change the file name?

23   A.   It depends.  I'm sorry.  I'm not being cute, I promise.

24   Q.   I'm not suggesting that you are.  I'm just trying to learn

25   what you know.

1   A.   Yeah.

2   Q.   So these files, digital files, can be altered; correct?

3   A.   Correct.

4   Q.   They can be changed?

5   A.   Yes, they can be.

6   Q.   And it might or might not change the file name, if I

7   understand you correctly?

8   A.   That is true.

9   Q.   Mr. Nestler asked you about your understanding of certain

10  terms.  I want to ask you one also.

11       Are you familiar through your work with the term "deep

12  fake"?

13  A.   I've heard of it, but I'm woefully underprepared to answer

14  any questions on it because I just don't know enough on it.

15  Q.   What have you heard?

16            MR. NESTLER:  Objection.

17            THE COURT:  Mr. Welch.

18       (Bench conference.)

19            THE COURT:  Mr. Nestler?  I can't hear you.

20            MR. NESTLER:  I think this is beyond the scope of

21  direct.

22            THE COURT:  Well, I'm going to allow it.  But

23  Mr. Welch, do you have some good-faith basis for asking all of

24  this?

25            MR. WELCH:  I do.

1           THE COURT:  All right.  He could recall her in the

2      case-in-chief.  So doesn't it make sense just to proceed now?

3           MR. NESTLER:  I don't know where he's going with this,

4      but it doesn't seem like he's trying to ask her questions about

5      any of the files I just introduced through her.

6           THE COURT:  He is suggesting that something might be

7      altered, some of the files that you introduced.

8        Is that where you're headed, Mr. Welch?

9           MR. WELCH:  Yes.

10           THE COURT:  And what is the good-faith basis you have

11      for this?

12           MR. WELCH:  Your Honor, she has defined several terms,

13      and I'm going to ultimately ask her, in looking at any of these

14      files, did she observe whether any of them were deep fakes.

15           THE COURT:  And that's it?

16           MR. WELCH:  That's it.

17           THE COURT:  But how are you going to support this

18      theory of alteration of files?

19           MR. WELCH:  Well, she might answer that none of them

20      are, in which case that's the end of my questioning, but I'm

21      just going to ask her.

22           THE COURT:  All right.  I will allow it.

23        (End of bench conference.)

24           BY MR. WELCH:

25      Q.   Would you like me to repeat the question?

1    A.    Yes, please, sir.  Thank you.

2    Q.    Sure.  What have you heard about the term "deep fake"

3    through your work?

4    A.    So through my work, not as a forensic examiner trainee but

5    as a agent in the crimes against children/child sexual

6    exploitation material world, I've heard that you could use deep

7    fakes to impose celebrity photographs on child pornography or

8    child sexual abuse material.  And that's the limited scope of

9    deep fakes that I've heard about.

10   Q.    Now, let me ask you another question related to the files

11   that Mr. Nestler just asked you about.  When you examined those

12   files, did you have any reason to believe that any of them were

13   deep fakes, any of those images that we just looked through?

14   A.    I don't have any reason to believe that.

15   Q.    Okay.  Were you checking for it?

16   A.    As an investigator, I check for things that are there, not

17   for things that are not there.  So no, I wasn't checking for it.

18          MR. WELCH:  Thank you very much.

19      I pass the witness.

20          THE COURT:  Mr. Nestler?

21                      REDIRECT EXAMINATION

22      BY MR. NESTLER:

23   Q.    Agent Shahrani, you indicated you're also an FBI special

24   agent; is that right?

25   A.    I am.

1    Q.   And sometimes you work on your own cases?

2    A.   I did.  I don't now, but I did.

3    Q.   All of those exhibits we introduced over the past several

4    hours, all of those video files, did you find any evidence that

5    they had been altered in some way?

6    A.   I didn't find any evidence, no.

7    Q.   Or any evidence that they had been faked in some way?

8    A.   I didn't.

9    Q.   Did they appear to be normal files like you would expect to

10   find on these kinds of devices?

11   A.   They did.

12            MR. NESTLER:  No further questions.

13            THE COURT:  All right.  May we excuse this witness?

14            MR. WELCH:  Yes.

15            THE COURT:  Thank you, ma'am.

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  Is this a good time to take a break for

18   lunch?

19            MR. NESTLER:  Yes, Your Honor.

20            THE COURT:  All right, ladies and gentlemen.  We are

21   going to take a one-hour break, and we will come back at 1:30.

22   Again, I will remind you, no conversations, no reading, no

23   investigation.  And enjoy your lunch.

24         (Recess taken at 12:35 p.m.)

25         (Afternoon session of this proceeding was reported by

1    Lorraine Herman and is bound under separate cover.)

2

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4

5                    CERTIFICATE OF OFFICIAL COURT REPORTER

6

7            I, Sara A. Wick, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12   /s/ Sara A. Wick_____        March 3, 2022_____

13   SIGNATURE OF COURT REPORTER            DATE

14

15

16

17

18

19

20

21

22

23

24

25