IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

             Plaintiff,

     vs.

GUY WESLEY REFFITT,

             Defendant.

CR Action
No. 1:21-032

Washington, DC
March 4, 2022

1:42 p.m.


TRANSCRIPT OF JURY TRIAL
(AFTERNOON SESSION)
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the Plaintiff:**     JEFFREY S. NESTLER
                      RISA BERKOWER
                       U.S. ATTORNEY'S OFFICE
                       555 Fourth Street NW
                       Washington, DC 20530
                       202-252-7277

**For the Defendant:**    WILLIAM WELCH, III
                      5305 Village Center Drive
                      Suite 142
                      Columbia, MD 21044
                      410-615-7186


**Reported By:**          **LORRAINE T. HERMAN, RPR, CRC**
                      Official Court Reporter
                      U.S. District & Bankruptcy Courts
                      333 Constitution Avenue, NW
                      Room 6720
                      Washington, DC 20001
                      202-354-319
Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

# E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Government's No. 101 | Admitted into Evidence | 1192 |
| Government's No. 103 | Admitted into Evidence | 1192 |
| Government's No. 105 | Admitted into Evidence | 1192 |
| Government's No. 107 | Admitted into Evidence | 1192 |
| Government's No. 109 | Admitted into Evidence | 1192 |
| Government's No. 110 | Admitted into Evidence | 1192 |
| Government's No. 111 | Admitted into Evidence | 1192 |
| Government's No. 112 | Admitted into Evidence | 1192 |
| Government's No. 113 | Admitted into Evidence | 1192 |
| Government's No. 114 | Admitted into Evidence | 1192 |
| Government's No. 115 | Admitted into Evidence | 1192 |
| Government's No. 128A | Admitted into Evidence | 1192 |
| Government's No. 128B | Admitted into Evidence | 1192 |
| Government's No. 130 | Admitted into Evidence | 1192 |
| Government's No. 131 | Admitted into Evidence | 1192 |
| Government's No. 132 | Admitted into Evidence | 1192 |
| Government's No. 133 | Admitted into Evidence | 1192 |
| Government's No. 134 | Admitted into Evidence | 1192 |
| Government's No. 137 | Admitted into Evidence | 1192 |
| Government's No. 138 | Admitted into Evidence | 1192 |
| Government's No. 139 | Admitted into Evidence | 1192 |
| Government's No. 144 | Admitted into Evidence | 1192 |
| Government's No. 145 | Admitted into Evidence | 1192 |
| Government's No. 146 | Admitted into Evidence | 1192 |
| Government's No. 150 | Admitted into Evidence | 1192 |
| Government's No. 1B1 | Admitted into Evidence | 1192 |
| Government's No. 1B3 | Admitted into Evidence | 1192 |
| Government's No. 1B6 | Admitted into Evidence | 1192 |
| Government's No. 1B7 | Admitted into Evidence | 1192 |
| Government's No. 1B10 | Admitted into Evidence | 1192 |
| Government's No. 1B13.1 | Admitted into Evidence | 1192 |
| Government's No. 1B13.2 | Admitted into Evidence | 1192 |
| Government's No. 1B13.3 | Admitted into Evidence | 1192 |
| Government's No. 1B14 | Admitted into Evidence | 1192 |
| Government's No. 1B19 | Admitted into Evidence | 1192 |
| Government's No. 1B20.1 | Admitted into Evidence | 1192 |
| Government's No. 1B20.2 | Admitted into Evidence | 1192 |
| Government's No. 1B22 | Admitted into Evidence | 1192 |
| Government's No. 1B23.1 | Admitted into Evidence | 1192 |
| Government's No. 1B23.2 | Admitted into Evidence | 1192 |
| Government's No. 1B27 | Admitted into Evidence | 1192 |
| Government's No. 1B28.1 | Admitted into Evidence | 1192 |
| Government's No. 1B28.2 | Admitted into Evidence | 1192 |
| Government's No. 1B28.3 | Admitted into Evidence | 1192 |
| Government's No. 1B29 | Admitted into Evidence | 1192 |
| Government's No. 160 | Admitted into Evidence | 1232 |

```
Government's No. 161      Admitted into Evidence      1232
Government's No. 162      Admitted into Evidence      1232
Government's No. 202.1    Admitted into Evidence      1243
Government's No. 203.1    Admitted into Evidence      1246
```

### **I N D E X** (CONTINUED)

| **WITNESS** | **PAGE** |
|---|---|
| KARLA KENNEDY | |
| Direct Examination by Ms. Berkower | 1196 |
| Cross-Examination by Mr. Welch | 1215 |
| Redirect Examination by Ms. Berkower | 1216 |
| LAIRD HIGHTOWER | |
| Direct Examination by Ms. Berkower | 1218 |
| Cross-Examination by Mr. Welch | 1253 |
| Redirect Examination by Ms. Berkower | 1260 |

1       **P R O C E E D I N G S**

2                   (Whereupon, the morning session of this proceeding

3       was reported by Sara Wick and is bound under separate

4       cover.)

5                   (Partially-sealed sidebar discussion.)

6                   **THE COURT:**  All right.  Can you call the case?

7                   **COURTROOM DEPUTY:**  Certainly, Your Honor.

8                   We are in the matter of Criminal Action 21-32.  We

9       have Mr. Welch for Mr. Reffitt and Jeffrey Nestler and Risa

10      Berkower for the government.

11                  **THE COURT:**  All right, folks.  I brought you in

12      here because Mr. Hopkins just brought to my attention a

13      message that he received last night that he wasn't able to

14      listen to until today at lunch.  And it was a message left

15      by Juror Number 5.

16                  Juror Number 5 says she has concerns about

17      something she overheard.  Other jurors talking about the

18      case.  I'm not sure how many but it made her feel

19      uncomfortable.  So my proposal is to bring Juror Number 5 in

20      here.  I'll ask her what she heard, who was involved.  If

21      you all would like to do brief follow-up questions, I will

22      give you the opportunity to do that as well.

23                  Then we will take her out, talk about it, in all

24      likelihood bring in the other jurors who were involved.

25      With the bottom line goal of ensuring that whatever was

1  heard by one or more jurors isn't influencing them in their

2  deliberations.  Right?

3            Any other thoughts that you all have at this

4  point?

5            [No response]

6            All right.  I'm surprised because I don't think I

7  have forgotten to warn them on every occasion.

8            **MR. NESTLER:**  You have not, Your Honor.

9            Can I confirm we are at the equivalent of a bench

10 conference?

11           **THE COURT:**  This is an under-seal proceeding.

12           Another thing you should know, there are press

13 inquiries about the under-seal proceeding that happened this

14 morning.  So when we go back into the public courtroom, I

15 will say something like, We've had, you know, three

16 different issues under seal today.  One related to a juror

17 issue.  It can't be disclosed.  I'll just go through the

18 substance of what they are so they feel comfortable that I'm

19 not having sealed proceedings that should be open to the

20 public.

21           With respect to some of these down the road,

22 post-trial, I suspect I will unseal those.  But it's during

23 the trial that I don't think it's appropriate for the press

24 to be writing about jurors talking about deliberations in

25 the event a juror sees the article.

1           So I'm going to proceed under seal for now.

2           **MR. NESTLER:**  Understood, Your Honor.  It was

3    awkward --

4           **THE COURT:**  We are in a separate courtroom, yes.

5    Please say it's not being piped anywhere, Mr. Hopkins.

6           **COURTROOM DEPUTY:**  Sorry?

7           **THE COURT:**  This is not being piped anywhere.

8    Right?

9           **COURTROOM DEPUTY:**  No, it's not.  That's the

10   reason I wanted to keep mics off, because I didn't want it

11   too loud.

12          **THE COURT:**  All right.  I will mention we had

13   another sealed proceeding in another courtroom.  I don't

14   want to be hiding stuff from them, but I am not going to get

15   into the content.  It will be jury related.

16          So bring in Juror Number 5.  She can sit in the

17   first seat here in the front row.

18          (Juror entered the courtroom.)

19          **THE COURT:**  Good afternoon, ma'am.  How are you?

20          **JUROR:**  I'm good.

21          **THE COURT:**  Are you comfortable taking off your

22   mask?

23          **JUROR:**  I am.

24          **THE COURT:**  All right.  So as you might suspect,

25   we brought you in here because of the message that you left

1       on Mr. Hopkins' voicemail last night.

2               He just listened to it at lunch today.  He had a

3       busy morning and wasn't able to check voicemail.  So I am

4       just learning about this now.

5               And I understand, you told him in the voicemail

6       message that you were uncomfortable because you had heard

7       jurors talking about the case; is that right?

8               **JUROR:**  Not at length but just a few comments, and

9       it made me a little uncomfortable.

10              **THE COURT:**  I'm glad you did what you did, because

11      we want to know about things like that.

12              So can you tell us, if you can -- you will not

13      know the juror numbers, but do you know where the jurors are

14      seated in the other courtroom, who you saw speaking about

15      the case?

16              **JUROR:**  I can identify them but I can't say where

17      they are seated.

18              **THE COURT:**  Can you describe them?

19              **JUROR:**  Tall, dark hair, Europe/British accent.

20              **THE COURT:**  She sits on the front row.  Front left

21      side.  Okay.  All right.  You heard her.  Who was she

22      speaking to?

23              **JUROR:**  I don't remember.  I just heard the

24      comments.

25              **THE COURT:**  Can you tell us what she said?

1        **JUROR:**  Um, something like, That lawyer is a jerk

2   or something like that.

3        **THE COURT:**  Do you know which lawyer she was

4   talking about?

5        **JUROR:**  I have no idea.

6        **THE COURT:**  Hmmm.  Okay.

7        Was there anything else about the case that she

8   said?

9        **JUROR:**  Then there was another brief moment when

10  that same juror -- and, again, I don't remember the other

11  jurors that they were speaking to, just kind of identified

12  the who's who in the back of the courtroom.

13       **THE COURT:**  I'm sorry?  I'm not following you.

14       **JUROR:**  Like, what relationship those persons in

15  the back may have had to people involved in the case.

16       **THE COURT:**  Oh, I see.  And do you remember which

17  juror that was?

18       **JUROR:**  The same juror.

19       **THE COURT:**  Oh, same juror.  Okay.

20       So she mentioned two things.  One, she said a

21  lawyer -- that lawyer was a jerk.  You are not sure which

22  lawyer she was talking about.

23       **JUROR:**  I don't want to say for sure exactly what

24  she said.  I just -- I was not -- I didn't want to hear

25  anything so --

1   **THE COURT:**  Okay.  Yeah.  Understood.

2   And you're not sure who around her heard beyond

3   you?

4   **JUROR:**  [No response]

5   **THE COURT:**  Where did she say this?

6   **JUROR:**  I believe in the --

7   **THE COURT:**  The courtroom?  The jury room?

8   **JUROR:**  Yeah.

9   **THE COURT:**  And then you also heard her mention

10  something about the individuals in the back of the courtroom

11  being related to Mr. Reffitt.

12  **JUROR:**  Possibly.

13  **THE COURT:**  Okay.  All right.  Would counsel for

14  either side like to ask any questions?

15  **MR. NESTLER:**  No, Your Honor.

16  **MR. WELCH:**  No, Your Honor.

17  **THE COURT:**  Okay.  All right.  Thank you very

18  much.  If we could ask you to step outside.  If you could

19  just wait in that small jury room.

20  (Juror exited the courtroom.)

21  **THE COURT:**  All right.  So two things:  One,

22  correct me if I'm wrong, I think that's an alternate, number

23  2?

24  **MS. BERKOWER:**  Yep.

25  **MR. NESTLER:**  Yes, Your Honor.

1          **THE COURT:**  Two, I mean, given the nature of the

2   comments, I'm not sure we have to bring in that juror but

3   I'm happy to do so, if counsel thinks otherwise.

4          Mr. Welch, do you want me to call her in and ask

5   her which attorney she's talking about?

6          **MR. WELCH:**  No, Your Honor.  I don't think that's

7   necessary.

8          **THE COURT:**  Are you sure?

9          **MR. WELCH:**  I'm sure.

10         **THE COURT:**  All right.  What about the statement

11  about Mr. Reffitt's -- you know, speculating about those

12  being his family members?  Does that concern either side?

13         **MR. WELCH:**  Not that comment, per se.  I am,

14  though, getting the feeling that -- this is what this lady

15  was good enough to come forward and tell us she overheard.

16  It sounds like this particular juror, who I think we all

17  know who it is at this point, is likely talking about the

18  case.  And I think it might be a good idea to excuse this

19  alternate before any other comments are made.  You've

20  already admonished them not to talk about the case.

21         **THE COURT:**  Uh-huh.

22         **MR. WELCH:**  And this other juror apparently is not

23  following those instructions.  I think probably the most

24  prudent thing to do is get rid of that juror, excuse that

25  alternate.

1        **THE COURT:**  Now, is she the fourth alternate or

2   the first?

3            **MS. BERKOWER:**  (Showed one finger.)

4        **THE COURT:**  I do share your concerns.

5        Mr. Nestler?

6        **MR. NESTLER:**  We disagree that it's warranted to

7   excuse her at this point, if we don't know what else she has

8   said.  I think Mr. Welch is speculating on what else she is

9   saying.  If we think there is a concern of that, we should

10  voir dire her about it, based on the comments we've heard

11  from the juror.

12       **THE COURT:**  All right.  But we definitely don't

13  want her talking.

14       **MR. NESTLER:**  That we 100 percent agree with.  I

15  am saying, at this point, I don't think there is a basis to

16  excuse her.  But I think it would be appropriate for the

17  Court to admonish her and/or the entire panel to not talk

18  about the case.

19       **THE COURT:**  I will.  I certainly intend to do that

20  at a minimum.

21            **MR. NESTLER:**  Can I make another suggestion?

22            **THE COURT:**  Sure.

23       **MR. NESTLER:**  If she was speculating about who the

24  people in the back of the courtroom were, I don't know if

25  Your Honor or Mr. Hopkins has told the jurors there are

1    three people sitting behind them.

2            **THE COURT:**  I think I mentioned there would be

3    places for three members of the public, and I may have said

4    the defendant's family.

5            **COURTROOM DEPUTY:**  I think you did, Your Honor.

6            **MR. NESTLER:**  Okay.  We're not worried about that

7    comment, just that she's talking generally.

8            **MR. WELCH:**  She's already expressed an opinion

9    about counsel, whoever it might be, and --

10            **THE COURT:**  We don't even know which side it is,

11    though.

12            **MR. WELCH:**  And I don't know it is appropriate to

13    inquire into that.  Certainly if opposing counsel wants to,

14    we can go down that road.  I don't know that it's

15    appropriate.

16            The bigger concern is you told the jury, you gave

17    instructions.  So if this juror is already not listening to

18    your instructions, not following them, even though you've

19    continued to give instructions and admonish, what guarantee

20    do we have that she will follow your instructions about

21    anything in the future?  They may taint the jury pool, if

22    they are talking about things.

23            I think the most prudent thing to do is excuse

24    this juror before this gets out of hand.

25            **THE COURT:**  Well, I guess I'm reluctant at this

1    stage to excuse her entirely.  I want to think about that.

2    I might move her to the end.  I am going to give a more

3    specific admonishment and say, When I say don't talk about

4    the case, I mean don't talk about the parties, don't talk

5    about the attorneys, don't talk about anything that happens

6    in this courtroom.

7         So I'm obviously not happy that this juror said

8    anything.  However, I'm reassured that it's not about the

9    evidence in the case.  It's not about Mr. Reffitt.  I don't

10   know which side it is.  And, Mr. Welch, if you want to bring

11   her in, we can figure that piece out; that might change your

12   mind on whether you want her off.

13        **MR. WELCH:**  It might change my mind.  Then we are

14   going to be getting personal, aren't we?  I don't know that

15   it's necessary to go down that road.

16        **THE COURT:**  All right.  I just want -- I want you

17   to know that I'm fully able and willing to bring her in

18   here.  And I would -- I would question her, and you all

19   would not have to say anything so that she wouldn't hold it

20   against anyone.

21        I'm happy to bring her in here, admonish her

22   individually, ask about that comment, if either side thinks

23   that's important to do.  I just want to give you the

24   opportunity to ask for that.

25        **MR. NESTLER:**  We don't believe it's necessary to,

1  unless Your Honor was inclined to take some sort of action,

2  like excusing her and moving her in the alternate order,

3  then we think it would be appropriate.  Right now we have

4  what Juror 5 said.  We haven't even heard from Juror 2.

5      **THE COURT:**  Well, I'm not going to decide that.

6  What I'm saying right now is, based on what I know now, I'm

7  not for certain excusing her.  I haven't ruled it out.  We

8  could always talk to her later.  And I'm not going to decide

9  whether I am moving her now.  But, again, Mr. Welch, if you

10 want me to bring her in here, I will do that.

11     **MR. WELCH:**  I understand.  No, I do not want her

12 to be brought in.  I am moving formally that she be excused

13 at this time.

14     **THE COURT:**  I understand.

15     **MR. WELCH:**  I understand you will take it under

16 advisement, but that is our position.  She should be excused

17 now before she taints anything further.

18     **THE COURT:**  Before we go back in there, so I just

19 don't have to put us under seal again in that courtroom, we

20 may as well just continue.

21 ████████████████████████████████████████

22 ████████████████████████████████████

23 ███████████████████████████████████

24 ██████████████████████████████████████████

25 █████████████████████████████████

1185



```
 1
 2
 3
 4
 5
 6         MR. NESTLER:
 7
 8
 9
10
11
12
13         THE COURT:
14
15         MR. NESTLER:
16         THE COURT:
17
18
19
20
21
22
23         MR. NESTLER:
24
25
```





1188



1

2

3

4

5          THE COURT:

6

7          MR. NESTLER:

8

9

10

11          THE COURT:

12

13

14          MR. WELCH:

15

16          THE COURT:

17          MR. WELCH:

18

19

20

21

22

23

24

25

1189



5   THE COURT:

19   MR. WELCH:

1   ████████

2   THE COURT:  ██████████████████████████

3   ██████████████████████████████████

4   ██████████████████████████████████

5   ██████████████████████████████████

6   ██████████████████████████████

7   ████████████████

8        ████████████████████████

9   MR. NESTLER:  ████████████████

10   MR. WELCH:  ████████

11   THE COURT:  ██████████████████████████

12   ████████████████████████████████

13   ████████████████████████████████

14   ██████████

15   MR. NESTLER:  ████████████████████

16        ██████████████████████████████████

17   ████████████████████████████████

18   ████████████████████

19   THE COURT:  ████████████████████

20   ██████████████████████████████

21   ████████████████████████████████

22   ██████████████████████████████████

23   ████████████████████████████████

24   ████████

25        ████████████████████████████

1      ██████████████████████████████████████

2      ████████████████████████████████████████

3      ████████████████████████████████████

4      ████████████████████████████████████████████

5      ████████████████████████████████████████████

6      ██████████████████████████████████████████

7      ████████████████████████████████████████

8      ██████████████████████████████████████████

9      ██████████████████████████████████████████

10      ██████████████████████████████

11      **MR. NESTLER:** ████████████

12      **THE COURT:** █████████████

13      ██████████████████████████████████████████

14      ██████████████████████████████████

15      ██████████████████████████████████████

16      ██████

17      **MR. NESTLER:** ████████████

18      **THE COURT:** ██████████████████████████

19      (Partially-sealed sidebar discussion concluded.)

20      **MS. BERKOWER:** Thank you, Your Honor.

21      Over the lunch break, in light of the Court's

22 discussion with the parties this morning, we agreed to move

23 into evidence ahead of this next witness, Karla Kennedy, the

24 following exhibits: 101, 102 -- sorry. 101 -- I'll start

25 over -- 101, 103, 105, 107, 109, 110, 111, 112, 113, 114,

1   115, 139, 128A, 128B, 130, 131, 132, 133, 134, 137, 138,

2   144, 145, 146, 149 and 150.

3        And in addition to that, Mr. Welch has also agreed

4   that we will admit 1B1, 1B3, 1B6, 1B7, 1B10, 1B13.1, 1B13.2,

5   1B13.3, 1B14, 1B19, 1B20.1, 1B20.2, 1B22, 1B23.1, 123 point

6   -- excuse me -- 1B23.2, 1B27, 1B28.1, 1B28.2, 1B28.3, 1B29.

7        **THE COURT:**  All right.  Thank you, Ms. Berkower.

8   So without objection, all of those exhibits are admitted

9   into evidence.

10      (Government's Exhibits 101, 103, 105, 107, 109, 110,

11  111, 112, 113, 114, 115, 139, 128A, 128B, 130, 131, 132,

12  133, 134, 137, 138, 144, 145, 146, 150, 1B1, 1B3, 1B6, 1B7,

13  1B10, 1B13.1, 1B13.2, 1B13.3, 1B14, 1B19, 1B20.1, 1B20.2,

14  1B22, 1B23.1, 1B23.2, 1B27, 1B28.1, 1B28.2, 1B28.3, 1B29

15  were admitted into evidence.)

16      **THE COURT:**  And just for the record, the exhibits

17  that the record doesn't reflect the Court admitting

18  yesterday include 1B4, 1B4.0, 1B20.1.1, 1B20.1.2, 1B22.  All

19  of those are exhibits that the parties agree the Court did

20  admit yesterday.  So just for a clear record.  Anything

21  more?

22      **MS. BERKOWER:**  No, Your Honor.

23      **THE COURT:**  Okay.

24      **MS. BERKOWER:**  The next witness will be testifying

25  about those exhibits, but we won't have to actually go

1    through and admit them.

2         **THE COURT:**  Wonderful.  Thank you.

3         Okay.  I'm sorry to the public for the delay just

4    now.  We did have another sealed matter that related to the

5    sealed matter that we had earlier today, and there was an

6    inquiry about the nature of that matter.  The public should

7    know that the sealed proceedings related to sensitive,

8    private information that both parties agree should be under

9    seal related to a witness who will be testifying in the

10   case, and therefore those are going to remain under seal.

11        In addition, earlier today, I did address a juror

12   issue that won't be disclosed now, but may well be in the

13   future.  Disclosing it now could reveal information such as

14   who the alternates are.  So for that reason, those matters

15   will remain under seal.

16        Is there anything else counsel for either side

17   would like to say with respect to either of those sealed

18   proceedings?

19        **MR. NESTLER:**  Not from the government, Your Honor.

20        **MR. WELCH:**  No, Your Honor.

21        **THE COURT:**  All right.  Are we ready to bring in

22   the jury?

23        **MR. WELCH:**  Yes, Your Honor.

24        (Jurors entered the courtroom.)

25        **THE COURT:**  All right, ladies and gentlemen.

1     Welcome back.

2              Very, very sorry to keep you waiting.  I

3     appreciate your patience.  I had to deal with some legal

4     issues with the parties, and occasionally that will happen

5     during trials, so bear with us.  We are going to try to keep

6     going until 4:00, when we will take a break for the weekend

7     the government is prepared to call the next witness.

8              (Sidebar discussion.)

9              **MR. WELCH:**  Your Honor, you were going to admonish

10    them?

11             **THE COURT:**  I know.  And let me tell you why I'm

12    not doing that now.  The juror we spoke to expressed a

13    concern walking back that people would be upset with her.  I

14    do -- I don't think we will need to take a break.  So before

15    they leave this courtroom, I'm going to give them a much

16    more lengthy, cautionary instructions.  And I'm going to

17    weave in those comments, because I don't think it's really

18    in anyone's interest for them to think that that's what we

19    dealt with -- you know, that she was complaining.

20             And she did have a work issue.  When she went back

21    to the room, there was conversation between Mr. Hopkins and

22    her about her work.  So I think that that's in everyone's

23    best interest, if at a certain point we have to bring the

24    other juror in -- you know, we'll deal with it then.  But I

25    think it's -- it's better now not to have the potential

1    conflict.  I don't see why, while they are sitting here for

2    the next hour and a half not talking, why they need to be

3    admonished right now.

4              **MR. WELCH:**  That's fine.  I agree.  And I agree.

5    Obviously they are not talking to each other during

6    evidence.

7              **THE COURT:**  Yeah.

8              **MR. WELCH:**  I was concerned you had forgotten.

9              **THE COURT:**  Oh, thank you.

10             **COURTROOM DEPUTY:**  Not with this judge.

11             **THE COURT:**  All right.

12             The other thing is, for the court reporter's sake,

13   this should remain under seal.

14             **MR. WELCH:**  Thank you.

15             (Sidebar discussion concluded.)

16             **THE COURT:**  Before you bring in the witness, can

17   you give me just one -- before we bring in the witness, if I

18   can just ask those sitting in the back to not talk, because

19   sometimes it's distracting when there is a witness on the

20   stand.  So keep your -- if you need to talk, go outside to

21   speak.  All right?

22             Okay.  Go ahead.  Bring in the next witness.

23             **MS. BERKOWER:**  The next witness the government

24   calls is Karla Kennedy.

25             **COURTROOM DEPUTY:**  Please raise your right hand.

1    Do you solemnly swear or affirm the testimony you will give

2    to this honorable court and this jury on trial to be the

3    truth, the whole truth and nothing but the truth?

4              **THE WITNESS:**  Yes.

5              **DIRECT EXAMINATION OF KARLA KENNEDY**

6    **BY MS. BERKOWER:**

7         **Q.**   Good afternoon.  Could you please state and spell

8    your name?

9         **A.**   It's Karla Kennedy.  K-a-r-l-a, K-e-n-n-e-d-y.

10        **Q.**   Ms. Kennedy, are you employed?

11        **A.**   Yes, I am.

12        **Q.**   Where do you work?

13        **A.**   FBI Dallas division.

14        **Q.**   What was your job at the FBI?

15        **A.**   I am the Dallas division occupational health

16   nurse.

17             **THE COURT:**  Ma'am, try to keep your voice up

18   because the microphone is not picking up things very well.

19             **THE WITNESS:**  Yes, ma'am.

20   **BY MS. BERKOWER:**

21        **Q.**   Do you also work as a photographer for the FBI?

22        **A.**   Yes, I do.

23        **Q.**   Do you work with the evidence response team?

24        **A.**   Yes.

25        **Q.**   And did you serve as the photographer for the

1    search at the defendant's house?

2         **A.**   Yes, I did.

3         **Q.**   So we are going to ask you about some of the items

4    that were found at that search.  Okay?  So generally

5    speaking, very briefly, could you explain what you do when

6    you serve as a photographer for a search of someone's house?

7         **A.**   Yes.  So I make entry photos documenting the house

8    as we found it.  After the house has been cleared,

9    photograph the evidence, and then I complete the search with

10   exit photos.

11        **Q.**   And did you review a number of photographs before

12   you came to court that you took from that search?

13        **A.**   Yes.

14        **Q.**   So we are going to go through some of those now.

15        **MS. BERKOWER:**  So first, if we could show

16   Government's Exhibit 101 and 103 that have already been

17   admitted into evidence.  And Mr. Hopkins, if we could please

18   have the monitor for the jury.

19   **BY MS. BERKOWER:**

20        **Q.**   Could you explain what this shows?

21        **A.**   A white truck outside the residence.

22        **Q.**   And going on to 103, could you explain what this

23   shows?

24        **A.**   The rear of the white truck.

25        **MS. BERKOWER:**  Now going on to Government's

1    Exhibit 105, which is in evidence, could you please display

2    that, Ms. Rohde?

3    **BY MS. BERKOWER:**

4        **Q.**   Did you take that photo?

5        **A.**   Yes, I did.

6        **Q.**   Can you explain what it shows?

7        **A.**   A blue jacket resting over the front passenger's

8    seat, and a bag in the rear passenger floor.

9        **Q.**   And if we could go on to Government's Exhibit 107,

10   please.  Do you see the blue jacket again in this photo?

11       **A.**   Yes.

12       **Q.**   Is there a plastic bag below the jacket?

13       **A.**   Yes.

14       **Q.**   What's inside that bag?

15       **A.**   A black ballistic helmet.

16       **Q.**   Now going on to Government's Exhibit 109, please.

17   Did you take that photo?

18       **A.**   Yes, I did.

19       **Q.**   Could you explain why?

20       **A.**   The subject's name is in the photo.

21       **Q.**   And where is it?

22       **A.**   On the inside of the jacket, the tag.

23           **MS. BERKOWER:**  Now, Special Agent Ryan, if you

24   could please hand up to Ms. Kennedy Government's Exhibit

25   1B10.

1   BY MS. BERKOWER:

2       **Q.**   Ms. Kennedy, could you please take a look at what

3   special Agent Ryan is holding.  Do you recognize that?

4       **A.**   Yes, I do.

5       **Q.**   What is it?

6       **A.**   The blue jacket from the white truck in front of

7   the residence.

8           **MS. BERKOWER:**  And, Special Agent Ryan, if you

9   could please display that to the jury.

10          Ms. Rohde, if we could please have Government's

11  Exhibit 110 in evidence.

12  BY MS. BERKOWER:

13      **Q.**   Ms. Kennedy, is that a photo you took?

14      **A.**   Yes, it is.

15      **Q.**   Could you explain what you see in that photo?

16      **A.**   Yes, the ballistic helmet, shoulder holster and

17  flex cuffs.

18          **MS. BERKOWER:**  Special Agent Ryan, if we could

19  have you hand up to Ms. Kennedy Government's Exhibit 1B13.1,

20  1B13.2 and 1B13.3.

21  BY MS. BERKOWER:

22      **Q.**   Ms. Kennedy, before you you have Government's

23  Exhibit 1B13.1.  Do you recognize what that is?

24      **A.**   Yes, I do.

25      **Q.**   Could you explain, please?

1    **A.**    The black ballistic helmet that was found in the

2    white truck.

3          **MS. BERKOWER:**  And Special Agent Ryan, if you

4    could hand Ms. Kennedy what's been marked as Government's

5    Exhibit 1B13.2.

6    **BY MS. BERKOWER:**

7    **Q.**    Do you recognize what they are, Ms. Kennedy?

8    **A.**    Yes, I do.

9    **Q.**    Please explain.

10   **A.**    These are the flex cuffs.

11   **Q.**    Are these the flex cuffs you are seeing in

12   Government's Exhibit 110?

13   **A.**    Yes, these were from the truck, the white truck.

14   **Q.**    Is the helmet that you were handling a moment ago

15   13.1 also in that photograph?

16   **A.**    Yes, it is.

17         **MS. BERKOWER:**  Special Agent Ryan, if you could

18   hand Ms. Kennedy Government's Exhibit 1B13.3.

19   **BY MS. BERKOWER:**

20   **Q.**    Do you recognize what that is?

21   **A.**    Yes, I do.

22   **Q.**    Could you explain what that is, please?

23   **A.**    This is a shoulder holster.  It is the shoulder

24   holster that is in the photo.

25         **MS. BERKOWER:**  And Special Agent Ryan, if you

1    could display these items to the jury, Government's Exhibit

2    1B13.1, 1B13.2 and 1B13.3.

3              While he's doing that, Ms. Rohde, if you could go

4    to photograph 111 in the evidence.

5    **BY MS. BERKOWER:**

6        **Q.**    Ms. Kennedy, is that a different angle of the same

7    helmet that you testified about a moment ago?

8        **A.**    That is correct.

9        **Q.**    Do you see writing on the side of the helmet?

10   Wording?

11       **A.**    Yes, I do.

12       **Q.**    Could you read the wording, please?

13       **A.**    "Three Percenter."

14           **MS. BERKOWER:**  Now, Ms. Rohde, if you could please

15   pull up Government's Exhibit 114 -- and 115.  Sorry.

16   **BY MS. BERKOWER:**

17       **Q.**    Ms. Kennedy, do you recognize those?

18       **A.**    Yes, I do.

19       **Q.**    What are they?

20       **A.**    White sunglasses.

21           **MS. BERKOWER:**  And Special Agent Ryan, if you

22   could please hand Ms. Kennedy Government's Exhibit 1B14.

23   **BY MS. BERKOWER:**

24       **Q.**    Could you explain what that evidence item is,

25   Ms. Kennedy?

1    **A.**   Yes, these are the white sunglasses that were

2    found in the white truck on the dashboard, the same ones in

3    the photo.

4    **Q.**   Thank you.

5         **MS. BERKOWER:**  Special Agent Ryan, if you could

6    display those to the jury, please.

7    **BY MS. BERKOWER:**

8    **Q.**   Now, Ms. Kennedy, were the photos that you just

9    testified about all taken outside?

10    **A.**   Yes.

11    **Q.**   Did you also find items of evidence inside of the

12    house?

13    **A.**   Yes.

14    **Q.**   So let's talk about some of those now.

15         **MS. BERKOWER:**  Ms. Rohde, if we could please have

16    Government's Exhibit 120 pulled up on the screen.

17    **BY MS. BERKOWER:**

18    **Q.**   I'm directing your attention to the coffee table.

19    Do you see several items on the coffee table?

20    **A.**   Yes, I do.

21    **Q.**   Did the FBI seize several of those items?

22    **A.**   Yes, we did.

23    **Q.**   Starting with the silver-colored square object on

24    the coffee table, did the FBI seize that?

25    **A.**   Yes.

1      **Q.**   Do you see black items, square objects, behind and

2   to the -- well, a little bit more in the foreground of the

3   coffee table?

4      **A.**   Yes.

5      **Q.**   Did the FBI seize those?

6      **A.**   That's correct.

7      **Q.**   And do you see a gray bag on the edge of the

8   coffee table?

9      **A.**   Yes.

10      **Q.**   Did the FBI seize those?

11      **A.**   We did.

12      **MS. BERKOWER:**   So, Special Agent Ryan, if you

13   could hand Ms. Kennedy 1B20.2, 1B22 and 1B20.1.

14   **BY MS. BERKOWER:**

15      **Q.**   Ms. Kennedy, do you have 1B20.1 in front of you?

16      **A.**   Yes, I do.

17      **Q.**   Could you explain what that is?

18      **A.**   This is a laptop, the laptop that is sitting on

19   the coffee table in the photo.

20      **Q.**   And could you also take a look at 1B20.2.

21      **A.**   Yes.

22      **Q.**   Could you explain what that is, please?

23      **A.**   This is a Seagate portable drive that is also on

24   the coffee table.

25      **Q.**   And 1B22?

1       **A.**   The gray bag?

2       **Q.**   Yes.

3       **A.**   Yes, the gray --

4       **Q.**   Is that the gray back that was on the coffee

5  table?

6       **A.**   Yes, it is.

7            **MS. BERKOWER:**   Actually, before we get to the gray

8  bag, Special Agent Ryan, can you display to the jury

9  Government's Exhibit 1B20.1 and 1B20.2?  Thank you, Special

10  Agent Ryan.

11  **BY MS. BERKOWER:**

12      **Q.**   Ms. Kennedy, turning to the gray bag, if you could

13  please open it and tell us what is inside.

14      **A.**   Oh, there's several cords and the GoPro PixPro

15  camera.

16      **Q.**   Was that the PixPro camera that was seized at the

17  defendant's house?

18      **A.**   Yes, it is.

19      **Q.**   Now, looking at that PixPro camera, is there black

20  plastic around it?

21      **A.**   Yes, there is.

22      **Q.**   Before coming to court today, did you review this

23  item with the case agents?

24      **A.**   I did.

25      **Q.**   Could you explain what that black plastic item is?

1    **A.**    The PixPro has a camera mount; and that is what

2    the black plastic piece surrounding it is, a camera mount.

3    **Q.**    When the camera was found, did it have that black

4    plastic piece around it?

5    **A.**    No, we reassembled.

6    **Q.**    Before you came to court?

7    **A.**    That is correct.

8    **Q.**    And was that black plastic piece actually visible

9    in one of the photographs you took, when it was separate and

10   apart from the camera?

11   **A.**    Yes, it is.

12       **MS. BERKOWER:**  Ms. Rohde, if we could please have

13   Government's Exhibit 139.

14   **BY MS. BERKOWER:**

15   **Q.**    Ms. Kennedy, do you see that black plastic piece

16   in this photograph?

17   **A.**    Yes, it is.

18   **Q.**    Could you explain where you see it?

19   **A.**    To the left -- to the left of the charger.  It's

20   the last thing on the coffee table in the sequence next to

21   the watch remote and the Motorola.

22   **Q.**    Do you see wording on the black plastic piece you

23   are talking about?

24   **A.**    Yes.

25   **Q.**    Could you read the wording?

1206

1    **A.**    PriPro.

2         **MS. BERKOWER:**  Ms. Rohde, do you mind just blowing

3    up that part of the photograph.

4    **BY MS. BERKOWER:**

5    **Q.**    So is that the black plastic piece that you and

6    the agents put on to the camera?

7    **A.**    Yes, it is.

8         **MS. BERKOWER:**  Special Agent Ryan, if you could

9    please display the camera and the black plastic piece to the

10   jury.

11   **BY MS. BERKOWER:**

12   **Q.**    Ms. Kennedy, do you see in this photograph before

13   you a radio?

14   **A.**    Yes.

15   **Q.**    Was that also seized at the guest's house or

16   residence?

17   **A.**    Yes, it was.

18        **MS. BERKOWER:**  Special Agent Ryan, if you could

19   please hand Ms. Kennedy Government's Exhibit 1B23.1.

20        **THE WITNESS:**  Yes.

21   **BY MS. BERKOWER:**

22   **Q.**    Do you see that radio that you took a

23   photograph -- in that bag?

24   **A.**    Yes, the Motorola.  Uh-huh.

25   **Q.**    Are the other objects in this photograph in that

1    bag other than the holder for the camera?

2         **A.**   Yes, they are.

3         **Q.**   So could you just take the radio out only, please?

4         **A.**   Certainly.

5         **Q.**   Okay.

6              **MS. BERKOWER:**  And, Special Agent Ryan, if you

7    could display the Motorola radio to the jury, please.  Thank

8    you.

9              Now, Ms. Rohde, could you show Government's

10   Exhibit 124, 125 and 126.  And you could scroll through them

11   and linger on them for a minute or two so that Ms. Kennedy

12   can see.

13   **BY MS. BERKOWER:**

14        **Q.**   Ms. Kennedy, are those photographs you took on the

15   day of the search?

16        **A.**   Yes, they are.

17        **Q.**   And what do those photographs show?

18        **A.**   A handgun on a nightstand in the bedroom inside

19   the residence.

20        **Q.**   And is that the way it looked when the FBI entered

21   the home on the morning of the search?

22        **A.**   That is correct.

23        **Q.**   Do you know what time the search started that day?

24        **A.**   Generally -- I don't remember the exact time, but

25   I will say that we usually conduct searches first thing in

1    the morning.

2        Q.   And when you arrived at this home, was it still

3    dark out?

4        A.   That is correct.

5        Q.   And when you left had it already become light?

6        A.   Yes.

7        Q.   So fair to say that it happened before daybreak on

8    the morning of the search?

9        A.   That is correct.

10       Q.   Okay.

11           MS. BERKOWER:   Now, if we could please show

12   Ms. Kennedy Government's Exhibit 127 and 128 in the same

13   fashion, Ms. Rohde, that you showed those other photographs?

14   BY MS. BERKOWER:

15       Q.   Ms. Kennedy, do you recognize those photographs?

16       A.   Yes, I do.

17       Q.   Could you explain what they are?

18       A.   The Smith & Wesson handgun from the nightstand.

19       Q.   And did you take those photographs?

20       A.   I did.

21       Q.   Could you explain what happened between this

22   object, this gun being on the nightstand, to when you

23   photographed it?

24       A.   Yes.  So I took the first shots of the gun on the

25   nightstand in place.  And then the weapon has to be cleared

1    before I can make the close-up shots.

2         **Q.**    And what does it mean for a weapon to be cleared,

3    just very generally?

4         **A.**    Rendered safe.

5         **Q.**    Does that mean that an FBI agent takes -- checks

6    it for ammunition?

7         **A.**    That is correct.  Removes any ammunition from the

8    butt of the gun and if there's ammo in the chamber.

9         **Q.**    And this gun, did it have ammunition in it when

10   the FBI agent did that process?

11        **A.**    Yes, it did.

12        **Q.**    How do you know that?

13        **A.**    That is the magazine that was removed from the

14   gun, and that is the round that was from the chamber.

15        **Q.**    And why did you photograph that altogether?

16        **A.**    Protocol.

17        **Q.**    Does that indicate to you that it was all found --

18   the gun was found loaded with that magazine and that round

19   in the chamber?

20        **A.**    That is correct.  We also document that on the

21   photo log.

22             **MS. BERKOWER:**  So I think if we could please have

23   Government's Exhibit 127.  Special Agent Ryan, if you could

24   hand that up to Ms. Kennedy.

25

1    BY MS. BERKOWER:

2        Q.   And do you recognize what that is?

3        A.   Yes, it is the gun from the nightstand.

4        Q.   And prior to coming to court, did you check to see

5    if this gun is still cleared?  Let me ask you a different

6    question.  Can you tell if this gun has been cleared?

7        A.   Yes.

8        Q.   How can you tell that?

9        A.   The green zip ties in place on the gun indicates

10   it's been cleared by a firearms instructor.

11       MS. BERKOWER:  All right.  And, Special Agent

12   Ryan, if you could please display the gun to the jury.

13   Thank you, Special Agent Ryan.

14       Could you please hand Ms. Kennedy 1B20.1 and

15   1B20.2.

16       THE WITNESS:  Yes.

17   BY MS. BERKOWER:

18       Q.   Ms. Kennedy, can you explain what these items are?

19       A.   This is the ammunition that was with the Smith &

20   Wesson.  One magazine was in the weapon.  The round from the

21   chamber and this was the extra magazine that was next to it.

22       MS. BERKOWER:  And, Special Agent Ryan, could you

23   display those items to the jury.

24       And, Ms. Rohde, if you could pull up in order,

25   just pausing a few moments between so the witness can see

1    and the jury can see, Government's Exhibit 130, 131, 132,

2    133, 134, 137, 138, 144, 145 and 146.

3    **BY MS. BERKOWER:**

4        **Q.**   Now, generally speaking, could you explain,

5    Ms. Kennedy, what these photographs showed?

6        **A.**   Items -- excuse me.  Items from the room G or the

7    bedroom in the subject's residence.

8        **Q.**   And is room G the same -- do you label the rooms

9    when you go in to document the search?

10       **A.**   That is correct.

11       **Q.**   Was room G the same room where you found the

12   handgun on the nightstand in the holster?

13       **A.**   Yes.

14       **Q.**   Was the closet -- was this closet -- sorry.  Can

15   you explain where this closet was in relation to room G?

16       **A.**   Yes, this is the closet in room G.

17       **MS. BERKOWER:**  So, Special Agent Ryan, if you

18   could please hand Ms. Kennedy Government's Exhibit 1B3.

19   **BY MS. BERKOWER:**

20       **Q.**   Ms. Kennedy, do you know what that is?

21       **A.**   Yes, this is bear spray.

22       **Q.**   And where did that come from?

23       **A.**   This is the -- these two canisters were on top of

24   the safe in the closet in room G.

25       **Q.**   And in this Exhibit 130 on the screen in front of

1  you, can you just explain briefly where they were found?

2      **A.**   Yes.  You can see the two canisters, that black

3  line at the bottom is the top of the safe, and that is the

4  interior of the closet.

5          **MS. BERKOWER:**  And, Special Agent Ryan, if you

6  could please just display those canisters.

7  **BY MS. BERKOWER:**

8      **Q.**   Ms. Kennedy, before you do that, actually, can you

9  tell if the canisters have liquid in them?

10     **A.**   They are -- they are heavy.

11         **MS. BERKOWER:**  Now, Ms. Rohde, if you could pull

12  up Government's Exhibit 135 and 136.

13  **BY MS. BERKOWER:**

14     **Q.**   Ms. Kennedy, could you explain what those exhibits

15  show?

16     **A.**   Yes.  This is the long gun that was in the safe in

17  room G in that bedroom.

18     **Q.**   And is one of those -- ask can you explain what

19  the two photos show, why they are different?

20     **A.**   I usually will take a weapon on all sides.  I flip

21  it over and also get a serial number.

22         **MS. BERKOWER:**  Now going on to Government's

23  Exhibit 149 and 150, Ms. Rohde.

24  **BY MS. BERKOWER:**

25     **Q.**   Do you recognize those exhibits?

1    **A.**   Yes, I do.

2    **Q.**   Could you explain what that was --

3         **MS. BERKOWER:**  Actually, if you could go back to

4    149.

5         **THE WITNESS:**  These are multiple cards, ID cards

6    from the wallet.  In the top of the photo montage is the

7    Melrose Hotel key card.

8    **BY MS. BERKOWER:**

9    **Q.**   And could you read the writing on that keycard?

10   **A.**   Melrose George Washington -- I'm sorry --

11   Georgetown Hotel, Washington, D.C., Remington.

12        **MS. BERKOWER:**  Special Agent Ryan, could you

13   please hand Ms. Kennedy Government's Exhibit 1B7.

14   **BY MS. BERKOWER:**

15   **Q.**   And could you explain what that is, please?

16   **A.**   This is the hotel keycard that is shown in the

17   photo.

18        **MS. BERKOWER:**  Special Agent Ryan, could you

19   please dislay that to the jury.

20        And, Ms. Rohde, if we could go on to Government's

21   Exhibit 150, please.

22   **BY MS. BERKOWER:**

23   **Q.**   Ms. Kennedy, do you know what this is?

24   **A.**   Yes, I do.

25   **Q.**   Could you explain what it is?

1  **A.**   Documents found at the residence.

2  **Q.**   And do you see wording and a symbol at the top of

3  the document?

4  **A.**   I do.

5  **Q.**   Could you read what those words say?

6  **A.**   Yes.  "Texas Three Percenters.  Come and take it."

7  There is the silhouette of Texas in the center with Roman

8  numeral III, superimposed over two crossed long guns.

9  **Q.**   And going back to the full document, do you see

10 highlighted text on this document?

11 **A.**   Yes.

12     **MS. BERKOWER:**  Thank you, Ms. Rohde.

13 **BY MS. BERKOWER:**

14 **Q.**   Do you see the number 2?

15 **A.**   Yes, I do.

16 **Q.**   Could you read the words after 2?

17 **A.**   "Providing a focus on the education of ourselves

18 and others regarding the constitution, political arena,

19 local laws, preparation and self preservation."

20     **MS. BERKOWER:**  And, Ms. Rohde, if you could zoom

21 out for a moment, and go to the first line of the writing on

22 the document.

23 **BY MS. BERKOWER:**

24 **Q.**   Do you see the word "mission" there?

25 **A.**   Yes.

1    **Q.**   And where did the wording you just read from item

2    2 come underneath -- come in the document?  Was it

3    underneath the word mission?

4    **A.**   Yes, that is correct.

5    **Q.**   And was that highlighting there when you found the

6    document?

7    **A.**   Yes.

8         **MS. BERKOWER:**  Special Agent Ryan, could you

9    please hand the witness Government's Exhibit 1B6.

10   **BY MS. BERKOWER:**

11   **Q.**   And could you explain what that is, please?

12   **A.**   This is the Three Percenters mission document that

13   is shown in the photo found at the residence.

14        **MS. BERKOWER:**  Special Agent Ryan, if you could

15   please display that to the jury.

16        No further questions, Your Honor.

17        **THE COURT:**  Mr. Welch?

18             **CROSS-EXAMINATION OF KARLA KENNEDY**

19   **BY MR. WELCH:**

20   **Q.**   Hi, Ms. Kennedy.

21   **A.**   Hello.

22   **Q.**   My name is Bill Welch.  I am going to ask you just

23   a couple questions.

24   **A.**   Yes.

25   **Q.**   Do you recall how many photographs you took the

1    day of the search?

2        **A.**   Photographs in total, the exact number, I don't

3    recall.

4        **Q.**   Could you give us an estimate?

5        **A.**   I could tell you the number, if I had my photo

6    logs.  But the estimate would be around five or six hundred.

7        **Q.**   Five or 600 photographs.  And do you know how many

8    items were seized?  How many items that we've seen here

9    today, how many items were seized at the house that day?

10       **A.**   The exact number, I don't know.

11       **Q.**   Could you estimate?

12       **A.**   If I had the evidence log, I could tell you.  My

13   estimate would be around 30.

14       **Q.**   Around 30.

15           **MR. WELCH:**   Thank you.  Pass the witness.

16           **THE COURT:**   All right.  May this -- any redirect?

17           **MS. BERKOWER:**   Very briefly, Your Honor.

18           **REDIRECT EXAMINATION OF KARLA KENNEDY**

19   **BY MS. BERKOWER:**

20       **Q.**   When you go to the house, what is the purpose of

21   taking photographs?

22       **A.**   To document the scene as we have found it, the

23   evidence that we find and take and then document the scene.

24   And exit photos is how we have left the residence.

25       **Q.**   When you say you took 5 or 600 photos, why did you

1    take that many?

2         **A.**    It is not really a lot.  It sounds like a lot but

3    it is not a lot.  There is a very standard procedure for

4    photographing every room and every item.  And so the 5 or

5    600 photos is actually not quite a lot.

6         **Q.**    And does the FBI take -- recover and seize every

7    single item of evidentiary interest that you photograph?

8         **A.**    No, not always.

9         **Q.**    Why is that?

10        **A.**    Sometimes they would just want to have a photo

11   documenting it.  Oftentimes they don't have to seize it, if

12   they have a photo.

13            **MS. BERKOWER:**  No further questions, Your Honor.

14            **THE COURT:**  May this witness be excused?

15            **MR. WELCH:**  Yes, Your Honor.

16            **THE COURT:**  Thank you, ma'am.

17            **THE WITNESS:**  Thank you.

18            **THE COURT:**  Who is the next witness?

19            **MS. BERKOWER:**  The government calls FBI Agent

20   Laird Hightower.

21            **COURTROOM DEPUTY:**  Please raise your right hand

22   sir.  Sir, do you solemnly swear or affirm the testimony you

23   will give to this honorable court and this jury on trial to

24   be the truth the whole truth and nothing but the truth?

25            **THE WITNESS:**  I do.

1    **COURTROOM DEPUTY:**  You can sit in the second seat.

2    That apparatus in front of you is a microphone.  So speak

3    directly into it.

4    **THE WITNESS:**  Yes, sir.

5    **DIRECT EXAMINATION OF LAIRD HIGHTOWER**

6    BY MS. BERKOWER:

7    **Q.**   Good afternoon.

8    **A.**   Good afternoon.

9    **Q.**   Could you please tell the jury your name and spell

10   it?

11   **A.**   Laird Hightower.  First name, L-a-i-r-d, last name

12   Hightower, H-i-g-h-t-o-w-e-r.

13   **Q.**   Are you employed?

14   **A.**   Yes.

15   **Q.**   Where do you work?

16   **A.**   Federal Bureau of Investigation.

17   **Q.**   How long have you been an agent there -- or sorry.

18   What is your job title?

19   **A.**   Special agent.

20   **Q.**   And how long have you been a special agent?

21   **A.**   March 14th will be 23 years.

22   **Q.**   Do you have prior law enforcement experience

23   before that?

24   **A.**   Yes.

25   **Q.**   What is that?

1   **A.**   I was employed by the Oklahoma Bureau of Narcotics

2   and Dangerous Drugs as a State Police narcotic agent.

3   **Q.**   And what is your current assignment with the FBI?

4   **A.**   I am assigned to work domestic terrorism.

5   **Q.**   Where?

6   **A.**   Dallas.

7   **Q.**   In the Dallas field office?

8   **A.**   Yes.

9   **Q.**   Are you familiar with the investigation into Guy

10  Reffitt?

11  **A.**   Yes.

12  **Q.**   Why?

13  **A.**   Because the lead was assigned to me.

14  **Q.**   So are you the case agent for that matter in

15  Dallas?

16  **A.**   Yes.

17  **Q.**   Now, as the case agent, did you gather and review

18  evidence about the defendant's activities on January 6th?

19  **A.**   Yes.

20  **Q.**   Did you participate in a search of his house?

21  **A.**   Yes.

22  **Q.**   Are you familiar with the evidence that was found

23  there?

24  **A.**   Yes.

25  **Q.**   And did you also review photos and videos from

1    events at the Capitol on January 6th that relate to this

2    defendant?

3        **A.**   Yes.

4        **Q.**   So we are going to talk about each of those

5    things, but I am going to ask you first about something

6    else.

7        **A.**   Okay.

8        **Q.**   So you said you are the case agent in Dallas; is

9    that right?

10       **A.**   Yes, ma'am.

11       **Q.**   Why the FBI in Dallas investigating Mr. Reffitt?

12       **A.**   Because there was a lead that was assigned to me

13   that involved an individual who lived in my area.

14       **Q.**   Were other FBI offices also involved in the

15   investigation into Mr. Reffitt?

16       **A.**   Yes.

17       **Q.**   Which ones?

18       **A.**   FBI Washington field office.

19       **Q.**   And where there other agents assigned to work on

20   that -- on this case from that office?

21       **A.**   Yes.

22       **Q.**   Who?

23       **A.**   FBI Special Agent Tom Ryan.

24       **Q.**   And did other agents from the Washington field

25   office do the forensic examination of the devices found?

1    **A.**    Yes.

2    **Q.**    Who did that?

3    **A.**    FBI Washington field office hard examiner Stacy

4    Shahrani.

5    **Q.**    Let's take a step back and talk about the

6    investigation of Mr. Reffitt.  Okay?  How did the FBI first

7    become aware of Guy Reffitt?

8    **A.**    Through a tip that had been submitted to the FBI

9    tip line.

10   **Q.**    Was that a phone tip or an online tip?

11   **A.**    An online tip.

12   **Q.**    Does the online tip system allow the tipster a

13   name and/or contact information for follow up?

14   **A.**    Yes.

15   **Q.**    Did this tipster provide a name and contact

16   information?

17   **A.**    Yes.

18   **Q.**    What -- who was -- what was the name of the

19   tipster provided?

20   **A.**    Jackson Reffitt.

21   **Q.**    When was the tip submitted?

22   **A.**    December 24th.

23   **Q.**    Of what year?

24   **A.**    2020.

25   **Q.**    And after the tip was submitted, what happened to

1       it?

2            **A.**    It was reviewed and assigned to the FBI Dallas

3       field office.

4            **Q.**    Now, is it fair to say that the FBI gets a large

5       volume of tips through the online tip line?

6            **A.**    Yes.

7            **Q.**    What happens when a tip comes in to the online tip

8       line?

9            **A.**    It is reviewed, analyzed and assigned to the

10      appropriate division for further investigative follow up.

11           **Q.**    And what is that initial assessment for?

12           **A.**    To determine whether or not it -- there is enough

13      -- there are enough facts as to if the case should be opened

14      as a full investigation.

15           **Q.**    When the tip is first assessed, is a determination

16      made about how quickly follow up is required?

17           **A.**    Yes.

18           **Q.**    Could you explain that?

19           **A.**    In the guardian program, we have two different

20      categories basically, a threat to life category and a

21      regular guardian, normal guardian.  In that procedure you

22      have up to 90 days to work it, to determine whether or not

23      there are enough facts there to merit a full investigation.

24           **Q.**    Now when you say "guardian," do you just mean a

25      tip?

1     **A.**    Yes.

2     **Q.**    And when you say "an immediate threat to life,"

3     what in particular qualifies as an immediate threat to life?

4     **A.**    If the reviewing officials, where the tip was

5     submitted in the guardian program, determine there were

6     enough specific facts to merit a threat to life, then it

7     will be addressed within 24 hours or immediately by case

8     agents in that respected area where the threat tip is

9     assigned.

10    **Q.**    And if that's not the case, what happens to the

11    tip?

12    **A.**    Then it is reviewed and worked as an ordinary

13    guardian by an agent or task force officer to work in 30-day

14    increments up to 90 days for determination whether or not it

15    should be closed or whether or not it should be opened as a

16    full investigation.

17    **Q.**    Now, when did you get -- when did you first see

18    the tip from Jackson Reffitt?

19    **A.**    January the 6th of 2021.

20    **Q.**    And when you got the tip from Jackson Reffitt,

21    which of those two buckets had it been put into upon intake?

22    **A.**    Normal guardian.  In fact, it was a preassessment

23    guardian.  So it wasn't even a full-fledged guardian.  It

24    was just a general guardian.

25    **Q.**    When you are referring to guardian, is that

1    effectively the same term as a tip?

2        **A.**    Yes.

3        **Q.**    So when you read the tip that you received from

4    Jackson Reffitt, what did it say?

5        **A.**    It said words to the effect that Jackson Reffitt's

6    father, Guy Reffitt, was higher up in the Three Percenters;

7    that his father was planning to travel from Texas to

8    Washington, D.C.; that he was planning some kind of serious

9    damage; and that there were potential threats to the

10   legislative branch.

11       **Q.**    And when you read the tip, did you draw any

12   significance from the reference of the Three Percenter

13   group?

14       **A.**    Yes.

15       **Q.**    Can you explain what significance you drew?

16       **A.**    It is pertinent to the investigations that I work,

17   which is anti-government, anti-authority, militia extremism.

18       **Q.**    And what do you understand the term three percent

19   to mean?

20       **A.**    Three percent is a term that references the idea

21   that in 1776 only three percent of the minutemen took arms

22   against the British army.

23       **Q.**    Do you know whether that is true?

24       **A.**    It's unfounded.  It's -- no one knows.

25       **Q.**    Now, you said that you read the tip as it was

1    assigned to you as a normal investigation.  Right?

2        **A.**    Yes.

3        **Q.**    Had the FBI received other tips related to January

4    6?

5        **A.**    Yes.

6        **Q.**    Generally speaking, what was the volume of tips

7    that came in related to January 6th?

8        **A.**    Thousands.

9        **Q.**    And when you read Jackson Reffitt's tip, had the

10   crowd in D.C. already reached the U.S. Capitol?

11       **A.**    Yes.

12       **Q.**    So what did you do when you read it?

13       **A.**    I made a notation in the guardian that I would

14   call Jackson Reffitt to get more details regarding his tip.

15       **Q.**    Did you call him?

16       **A.**    Yes.

17       **Q.**    And were you able to reach him?

18       **A.**    Yes.

19       **Q.**    When did you ask him?

20       **A.**    I told him at that point we would have to postpone

21   a meeting.  And he had told me words to the effect that his

22   father did, in fact, travel to Washington D.C.; that his

23   father was higher up in the Three Percenters; that he had

24   video of himself on the steps of the Capitol; and that he

25   had traveled with others.

1226

1      Q.    And what did you decide to do at that point?

2      A.    Discuss the matter with executive management and

3   make plans to interview Jackson Reffitt in person.

4      Q.    Now, you've been an agent you said over 20 years?

5      A.    Yes, ma'am.

6      Q.    When you make plans to meet with someone, do they

7   always show up?

8      A.    Sometimes they do not.

9      Q.    In this case, did Jackson show up?

10      A.    He did.

11      Q.    When did you meet him?

12      A.    I met him on January 11th, Monday.

13      Q.    So let's talk more about that meeting.  Where did

14   you meet him?

15      A.    In a parking lot near a restaurant.

16      Q.    And why did you meet him there?

17      A.    To get more details as to the nature of the tip

18   that he had submitted regarding his father.

19      Q.    And why did you meet him there?

20      A.    Because it was a closer area to him in the town

21   that he lived; and that particular location was a public

22   place and there were -- it was in an area where there was a

23   lot of people mingling about in the parking lot area.

24      Q.    What was your objective for conducting this

25   meeting?

1    **A.**    To get more additional details to follow up

2    related to that tip.

3    **Q.**    And what did you observe about him when you first

4    saw him?

5    **A.**    He was worried.  His demeanor appeared concerned,

6    nervous and quiet.

7    **Q.**    And what did you talk to him about when you met

8    up?

9    **A.**    All the information that he had regarding his

10   father's activities on January 6th.

11   **Q.**    Did he show you any news items from the internet?

12   **A.**    Yes.

13   **Q.**    What did he show you?

14   **A.**    He showed me a video clip of his -- who he advised

15   me was his father; and that he had received from his father.

16   **Q.**    And what did he tell you -- what did the clip

17   show?

18   **A.**    I reviewed the clip and it was of a man who he

19   said was his father; and that it was Guy Reffitt; and that

20   the individual appeared to be high up on a banister railing

21   of a staircase at the U.S. Capitol; and the individual was

22   wearing clothing that was -- I could see in the video -- he

23   told me that was his father.

24   **Q.**    Could you tell the color of any of the clothing?

25   **A.**    Yes.

1    Q.    What was the color of the clothing that you saw?

2    A.    There was a neon or bright blue jacket.  The man

3    that he said was Guy Reffitt, he was wearing a black

4    tactical bump-style helmet, with a GoPro-type video camera

5    mounted on top of the helmet, at the front of the helmet.

6    And he was holding a water bottle and had white-rimmed

7    sunglasses.

8    Q.    Did Jackson Reffitt also provide you with

9    screenshots from his phone?

10    A.    Yes.

11    MS. BERKOWER:  Ms. Rohde, if you could pull up

12    Exhibit 212.1 and 212.2.

13    BY MS. BERKOWER:

14    Q.    Were these the screenshots that he provided to

15    you?

16    A.    Yes.

17    Q.    Did you talk to him about the photographs in

18    Government's Exhibit 212.2?

19    A.    Yes.

20    Q.    What did he say about those photographs?

21    A.    He stated that these were screenshots that were

22    sent to him by his father.  And Jackson Reffitt identified

23    the circle on the photo as his father, and advised he had

24    received this, and his father was talking about his

25    activities on January the 6th.

1    **Q.**   Now, did he give you any audio recordings?

2    **A.**   Yes.

3    **Q.**   What audio recordings did he give you?

4    **A.**   Jackson Reffitt told me that late on the night of

5    the 8th, to the early morning hours of the 9th, he made six

6    covert recordings, of his own initiative, of family

7    discussions where his father discussed his activities on

8    January the 6th.

9    **Q.**   Did he also tell you about a conversation he had

10   had with his father and sister earlier that day?

11   **A.**   Yes.

12   **Q.**   And what did he tell you about that conversation?

13   **A.**   He told me, Jackson Reffitt told me words to the

14   effect that earlier in the day that his father had told him

15   words to the effect that if Jackson were to turn him in or

16   report him to law enforcement that if that line was crossed,

17   he would have no other choice but to do his duty, because

18   the family is put in jeopardy and do what is best for the

19   country and do what he had to do.

20   **Q.**   Throughout this conversation, what was Jackson's

21   demeanor?

22   **A.**   Worried, concerned.

23   **Q.**   Did you take him seriously?

24   **A.**   Yes.

25   **Q.**   Why?

1    **A.**   Because of the nature of the tip I had admonished

2    him about telling the truth.  It was a federal offense to

3    lie to agents.  And just due to the gravity of the

4    situation, I took him very seriously.

5    **Q.**   And did the material that he provided to you

6    impact how seriously you took him?

7    **A.**   Yes.

8    **Q.**   Could you explain why?

9    **A.**   Because the information that was provided was the

10   beginning of a full conversion to a full investigation

11   regarding this matter.

12   **Q.**   Did the materials he provided, like the

13   screenshots and the recordings, corroborate or contradict

14   what he was telling you?

15   **A.**   Corroborate.

16   **Q.**   Now five days later on January 16th, were you part

17   of a team of agents that executed a search warrant at

18   Mr. Reffitt's house?

19   **A.**   Yes.

20   **Q.**   As the case agent, did you have the opportunity to

21   walk through the different rooms of the house?

22   **A.**   Yes.

23   **Q.**   So we're going to talk in a moment about some of

24   the evidence that you found there.  But when you first got

25   to the house, did you place someone under arrest?

1      **A.**   Yes.

2      **Q.**   Who?

3      **A.**   Guy Wesley Reffitt.

4      **Q.**   Do you see him here in the courtroom?

5      **A.**   Yes.

6      **Q.**   Could you point him out by something he's wearing?

7      **A.**   Yes.  He has some sunglasses, and it looks like a

8   charcoal suit coat.

9            **MS. BERKOWER:**  Your Honor, I ask the record

10  reflect that the witness has identified the defendant.

11           **THE COURT:**  So reflects.

12  **BY MS. BERKOWER:**

13     **Q.**   And as part of that arrest, did you search his

14  person?

15     **A.**   Yes.

16     **Q.**   Did you find a cell phone?

17     **A.**   Yes.

18     **Q.**   And are you familiar with that as what's been

19  admitted into evidence as Government's Exhibit 1B4?

20     **A.**   Yes.

21     **Q.**   Was that phone later examined by the CART team at

22  WFO?

23     **A.**   Yes, ma'am.

24           **MS. BERKOWER:**  Now, if we could please show -- the

25  Court's brief indulgence.

1          Mr. Hopkins, if you could take down the screen for

2    a moment, please.

3          And, Ms. Rohde, for the Court, counsel and witness

4    only, if you could please show Government's Exhibits 160,

5    161 and 162.

6    **BY MS. BERKOWER:**

7       **Q.**   Special Agent Hightower, do you recognize those

8    photos?

9       **A.**   Yes.

10      **Q.**   Are they photos you took on the day of arrest?

11      **A.**   Yes.

12          **MS. BERKOWER:**  I'd ask to admit these exhibits.

13          **THE COURT:**  Any objection?

14          **MR. WELCH:**  No, Your Honor.

15          (Government's Exhibits 160, 161 and 162 were admitted

16    into evidence.)

17          **MS. BERKOWER:**  And, so, if we could go back to

18    160, please, and publish to the jury.

19    **BY MS. BERKOWER:**

20      **Q.**   Could you explain what this photo is?

21      **A.**   That is a booking photo, a front facial photo for

22    booking purposes.

23      **Q.**   Was that taken the day you arrested the defendant?

24      **A.**   Yes.

25      **Q.**   Going on to the next exhibit, could you explain

1    what this shows?

2         A.    They are -- it is a photograph of a leg --

3    Mr. Reffitt's lower leg, and it appears to show bruising or

4    welting.

5         Q.    And what day was the arrest?

6         A.    That would have been January the 16th.

7         Q.    So how many days after January 6th is that?

8         A.    Ten days.

9              MS. BERKOWER:   And going on to 162, please.

10   BY MS. BERKOWER:

11        Q.    Could you explain what this photo is?

12        A.    That is a picture of Mr. Reffitt's stomach area.

13        Q.    Why did you take that?

14        A.    There was a noticeable bruising or welting on his

15   lower abdomen.

16        Q.    All right.   Now, based on your experience, your

17   involvement in the search of the defendant's house, are you

18   familiar with some of the items that were found in his

19   truck?

20        A.    Yes.

21             MS. BERKOWER:   Special Agent Ryan, if you could

22   please hand Special Agent Hightower Government's Exhibit

23   1B13.1.  And, Ms. Rohde, if you could please pull up

24   Government's Exhibit 112.

25             THE COURT:   Ms. Berkower, are we going to go

1   through all of these exhibits with the agent?

2            **MR. NESTLER:**  No, Your Honor, just a few of them.

3   **BY MS. BERKOWER:**

4       **Q.**   Special Agent Hightower, as part of your

5   investigation, did you examine front of this helmet?

6       **A.**   Yes.

7       **Q.**   What did you see there?

8       **A.**   It is a mounting bracket that appears on the front

9   of the helmet.

10           **MS. BERKOWER:**  And, Special Agent Ryan, if you

11  could hand Special Agent Hightower Government's Exhibit

12  1B22.

13  **BY MS. BERKOWER:**

14      **Q.**   Special Agent Hightower, what do you have as 1B22

15  in your hand?

16      **A.**   It is a Kodak Orbit360, EcoPro-style [sic]

17  Camera.

18      **Q.**   And as part of your investigation, did you assess

19  whether or not this camera would fit onto the helmet?

20      **A.**   I did.

21      **Q.**   What did you learn?

22      **A.**   It does.

23      **Q.**   Could you demonstrate that please?

24      **A.**   Yes.

25           **MS. BERKOWER:**  Special Agent Ryan, would you mind

1   displaying that to the jury?

2   **BY MS. BERKOWER:**

3       **Q.**   Now, Special Agent Hightower, when you were

4   examining that helmet, did you find any eye protection on

5   it?

6       **A.**   Yes.

7       **Q.**   Where did you find eye protection on it?

8       **A.**   The eye protection is hidden underneath and it

9   rotates out from underneath just like that.

10      **Q.**   When you say "just like that," are you indicating

11  that Special Agent Ryan just lowered the eye protection on

12  the helmet?

13              **MR. WELCH:**  Objection.

14              **THE COURT:**  Let's move it along.

15              **MS. BERKOWER:**  Now, Special Agent Ryan, if you

16  could please hand Special Agent Hightower Government's

17  Exhibit 1B1.

18  **BY MS. BERKOWER:**

19      **Q.**   Special Agent Hightower, do you recognize that?

20      **A.**   Yes, I do.

21      **Q.**   What -- and is that a vest that was seized from

22  the defendant's house?

23      **A.**   Yes.

24      **Q.**   How much does it weigh?

25      **A.**   Approximately 22 pounds.

1    **Q.**    And why is it so heavy?

2    **A.**    The ballistic panels located inside of the vest.

3    **Q.**    Did you, as part of your investigation, take those

4    panels out?

5    **A.**    Yes.

6    **Q.**    And what did you find them to be?

7    **A.**    They are Level III+ rated.

8    **Q.**    What does that mean?

9    **A.**    That means they are designed to defeat pistol and

10    rifle bullets.

11    **MS. BERKOWER:**  And, Special Agent Ryan, if you

12    could please show the vest to the jury.

13    **BY MS. BERKOWER:**

14    **Q.**    Now, Special Agent Hightower, are you familiar

15    with a rifle that was found at the defendant's house?

16    **A.**    Yes.

17    **MS. BERKOWER:**  Special Agent Ryan, if you could

18    you please hand the witness Government's Exhibit 1B29.

19    **BY MS. BERKOWER:**

20    **Q.**    Prior to coming to court today, Special Agent

21    Hightower, did you check this firearm to see whether it was

22    cleared?

23    **A.**    Yes.

24    **Q.**    How can you tell?

25    **A.**    I can tell because there is no source of

1   ammunition, and there are zip ties in the injection port

2   area, which render it safe and inoperable.

3       **Q.**   And was this the firearm found in Mr. Reffitt's

4   house?

5       **A.**   Yes.

6         **MS. BERKOWER:**  Special Agent Ryan, could you

7   please display it to the jury?

8   **BY MS. BERKOWER:**

9       **Q.**   Now, Special Agent Hightower, were you aware of

10  whether a handgun was found in Mr. Reffitt's house?

11      **A.**   Yes.

12      **Q.**   Did you see that handgun in the home when you were

13  there for the search?

14      **A.**   Yes.

15      **Q.**   When you observed the handgun, was it inside of

16  anything?

17      **A.**   Yes.

18      **Q.**   What was it inside of?

19      **A.**   The holster.

20        **MS. BERKOWER:**  And, Ms. Rohde, if you could please

21  pull up Government's Exhibit 126.

22  **BY MS. BERKOWER:**

23      **Q.**   Is this what you observed in the defendant's

24  house?

25      **A.**   Yes.

1    **MS. BERKOWER:**  And, Ms. Rohde, could you zoom in

2    on the center.

3    **BY MS. BERKOWER:**

4        **Q.**   Now, Special Agent Hightower, when you observed

5    this in the defendant's house, were you ever able to make

6    observations about the holster in particular?

7        **A.**   Yes.

8        **Q.**   Did you recognize the holster?

9        **A.**   Yes.

10       **Q.**   What did you recognize it to be?

11       **A.**   A Blackhawk SERPA CQC concealment sportster-type

12   holster.

13       **Q.**   Let's talk now about how you knew it to be that

14   kind of holster.  Do you have personal experience with that

15   kind of holster?

16       **A.**   Yes.

17       **Q.**   Do you own it?

18       **A.**   Yes.

19       **Q.**   How many do you own?

20       **A.**   Two to three.

21       **Q.**   Where did you get them?

22       **A.**   I purchased them.

23       **Q.**   Was it a store available to the general public?

24       **A.**   Yes.

25       **Q.**   Have you used it in connection with your job as a

1    FBI agent, that type of holster?

2        **A.**    Yes.

3        **Q.**    Have you used that holster outside of work?

4        **A.**    Yes.

5        **Q.**    What do you use it for outside of work?

6        **A.**    To carry authorized pistols for off-duty or duty

7    use.

8        **Q.**    And based on your experience using this type of

9    holster, does it have any distinctive features on its

10   exterior?

11           **MR. WELCH:**  Objection.

12           (Discussion at sidebar.)

13           **MR. WELCH:**  The objection is, we are getting into

14   his experience, Your Honor.  I think this is getting into

15   something that we were to get at pretrial.  Experience is

16   going to be leading into expertise.  They said they not are

17   not --

18           **THE COURT:**  No.

19           (Multiple speakers.)

20           **MR. WELCH:**  -- [unintelligible] -- as an expert.

21           **THE COURT:**  He -- I think she's been leading him

22   and she's -- correct me if I'm wrong -- but I think she's

23   gotten out all she is going to get.  And she is not going

24   into his position as a firearms trainer or anything like

25   that.  And this is based on his personal, firsthand

1    experience of carrying this holster.  Am I correct,

2    Ms. Berkower?

3          **MS. BERKOWER:**  Yes, Your Honor.

4          I am trying to follow very closely to questions

5    and the subject matter that we said we would have him

6    testify about in our motion.

7          **THE COURT:**  Okay.  I would suspect now that you

8    are about to get into the distinctive features and then this

9    will end?

10         **MS. BERKOWER:**  That's right.

11         **THE COURT:**  All right.  Overruled.

12         (Discussion at sidebar concluded.)

13         **THE COURT:**  You may proceed.

14         **MS. BERKOWER:**  Thank you.

15   **BY MS. BERKOWER:**

16      **Q.**   Based on your experience using this type of

17   holster, does it have any distinctive features on its

18   exterior?

19      **A.**   Yes.

20      **Q.**   What distinctive features does it have on its

21   exterior?

22      **A.**   A matte black finish.  It has autolock retention

23   device, which is an L-shaped paddle.  And it has a hip

24   paddle mounting attachment.

25      **Q.**   Do you see the L-shaped finger retention device

1   you just mentioned in this photograph?

2        **A.**   Yes.

3        **Q.**   Could you explain where you see it?

4        **A.**   It is in the middle, the top end of the holster,

5   and it is what appears to be an L-shaped paddle for an index

6   finger to press.

7        **Q.**   And do you also see -- you said there is a hip

8   mounting paddle?

9        **A.**   Yes.

10       **Q.**   Do you see that in this photograph?

11       **A.**   Yes.

12       **Q.**   Could you explain where?

13       **A.**   It is at the bottom portion of the photograph, and

14   it is the attachment for the mounting platform to put on to

15   your pants belt or your pants.  It is at the lower portion

16   of the photograph.

17       **Q.**   Now, let's talk about some additional

18   investigative work you did after the day of this search.  As

19   part of your investigation, did you review photos and videos

20   of events at the Capitol on January 6th of 2021?

21       **A.**   Yes.

22       **Q.**   Did you review footage showing the defendant?

23       **A.**   Yes.

24       **Q.**   So let's talk now about a very specific video that

25   you reviewed.

1242

1      **MS. BERKOWER:**  And, Ms. Rohde, if you could please

2   pull up Government's Exhibit 202, which is already in

3   evidence, and play until 11 seconds on the video.  And,

4   Mr. Hopkins, if we could please have the --

5      **COURTROOM DEPUTY:**  It is --

6      **MS. BERKOWER:**  Thank you.

7      (Played audio.)

8      **MS. BERKOWER:**  If you can stop the video here in

9   the interest of time.

10  **BY MS. BERKOWER:**

11     **Q.**   Special Agent Hightower, are you familiar with

12  this video?

13     **A.**   Yes.

14     **Q.**   Does it show the defendant on the steps of the

15  Capitol on January 6th?

16     **A.**   Yes.

17     **MS. BERKOWER:**  Now, Mr. Hopkins, if we could take

18  down the pubic view for a minute.  And, Ms. Rohde, if you

19  could pull up Government's Exhibit 202.1 for the Court,

20  counsel and witness only.

21  **BY MS. BERKOWER:**

22     **Q.**   Special Agent Hightower, do you know what this is?

23     **A.**   Yes.

24     **Q.**   Well, let me ask you if you know where it came

25  from?

1    **A.**   Yes.

2    **Q.**   Did it come from Government's Exhibit 202?

3    **A.**   Yes.

4    **Q.**   And how did it come from Government's Exhibit 202?

5    **A.**   It is a still image taken from the video.

6    **Q.**   From reviewing Government's Exhibit 202, is it

7    accurate?

8    **A.**   Yes.

9           **MS. BERKOWER:**  Your Honor, I'd ask to admit

10   Government's Exhibit 202.1.

11          **THE COURT:**  Any objection?

12          **MR. WELCH:**  No objection, Your Honor.

13          **THE COURT:**  It's admitted.

14          **MS. BERKOWER:**  May we publish it?

15   **BY MS. BERKOWER:**

16   **Q.**   Now, Special Agent Hightower, do you see an item

17   in the defendant's rear pants pocket?

18   **A.**   Yes.

19   **Q.**   And do you see a dark item above what's in the

20   defendant's rear pants pocket?

21   **A.**   Yes.

22   **Q.**   What does that dark item appear to be?

23   **A.**   A Blackhawk SERPA CQC concealment sportster-type

24   holster.

25   **Q.**   How can you tell that?

1    **A.**   By the features that I observed.

2    **Q.**   So in particular, which of those features do you

3    see here?

4         **MS. BERKOWER:**  And, Ms. Rohde, if you could

5    please, actually, zoom in on that area of the photograph.

6    Actually, it might be better without that.

7         **THE WITNESS:**  I see a matte black finish.  I see

8    an auto lock retention device.  It's an L-shaped paddle.

9    And I see a paddle attachment that is mounted on the

10   holster.

11   **BY MS. BERKOWER:**

12   **Q.**   Does it look like something is inside of the

13   holster?

14   **A.**   Yes.

15   **Q.**   What color is the item that you see there?

16   **A.**   It is a silvery, metallic, linear object.

17        **MS. BERKOWER:**  Going back to the full photograph,

18   Ms. Rohde.  Thank you.

19   **BY MS. BERKOWER:**

20   **Q.**   Do you see another dark object to the right of the

21   holster that you just described?

22   **A.**   Yes.

23   **Q.**   What do you see there?

24   **A.**   I see what is black -- what are black plastic zip

25   cuffs.

1    Q.   And based on your knowledge of this investigation,

2    do you know whether any zip cuffs were found at the

3    defendant's residence?

4    A.   Yes.

5    Q.   Were they?

6    A.   Yes.

7         MS. BERKOWER:   Now, Ms. Rohde, if we could take

8    that down and pull up Government's Exhibit 203 in evidence.

9    Thank you.   Just play a few seconds of this.

10        (Played video.)

11        MS. BERKOWER:   Ms. Rohde, you can stop it there.

12   BY MS. BERKOWER:

13   Q.   Special Agent Hightower, are you familiar with

14   this video?

15   A.   Yes.

16   Q.   Did you review it before you came to court?

17   A.   Yes.

18        MS. BERKOWER:   And if we could take this down for

19   the public.   And, Ms. Rohde, if you can pull up Government's

20   Exhibit 301 -- excuse me 203.1.   Oh, I think we need the --

21   yeah.   Thank you.

22   BY MS. BERKOWER:

23   Q.   Special Agent Hightower, are you familiar with

24   what this is?

25   A.   Yes.

1    **Q.**   What is it?

2    **A.**   It is an image of -- taken from the video.

3    **Q.**   And does this exhibit have a series of still shots

4    from the video?

5    **A.**   Yes.

6    **Q.**   Are they accurate depictions of what's in the

7    video?

8    **A.**   Yes, ma'am.

9         **MS. BERKOWER:**  Your Honor, I'd ask to admit and

10   publish this Exhibit 203.1.

11        **THE COURT:**  Any objection?

12        **MR. WELCH:**  No, Your Honor.

13        **THE COURT:**  They're admitted.

14        (Government's Exhibit 203.1 admitted into evidence.)

15        **MS. BERKOWER:**  And, Ms. Rohde, if you could go to

16   slide 35 and scroll through to slide 41.

17   **BY MS. BERKOWER:**

18   **Q.**   Special Agent Hightower, if you could watch as the

19   slides progress.  Special Agent Hightower, in that series of

20   slides, did you observe a dark item on the defendant's rear

21   waist area?

22   **A.**   Yes.

23   **Q.**   What does that item appear to be?

24   **A.**   A holster.

25   **Q.**   Did it appear that the holster had something

1   inside it?

2        **A.**   Yes.

3        **Q.**   What color was the object that you saw?

4        **A.**   A silvery, metallic, linear object.

5            **MS. BERKOWER:**  Ms. Rohde, if you could please go

6   to slide 59 and play through the slides to slide 68.

7   **BY MS. BERKOWER:**

8        **Q.**   Special Agent Hightower, did you observe anything

9   in the defendant's waist area in that series of slides?

10       **A.**   Yes.

11       **Q.**   What did you observe?

12       **A.**   What appeared to be a holster.

13       **Q.**   And did it look like it had something inside of it

14   at that time?

15       **A.**   Yes.

16       **Q.**   What color was the item that you saw there?

17       **A.**   Silvery, metallic, linear object.

18           **MS. BERKOWER:**  Now, Special Agent Ryan, if you

19   could hand Special Agent Hightower what has been marked as

20   Government's Exhibit 55?

21   **BY MS. BERKOWER:**

22       **Q.**   Special Agent Hightower, are you familiar with

23   what this is?

24       **A.**   Yes.

25       **Q.**   What is it?

1248

1    **A.**    It is a Blackhawk SERPA CQS concealment

2    sportster-type holster, with paddle attachment.

3    **Q.**    And how did the FBI get this?

4    **A.**    Purchased it.

5    **Q.**    To be clear, it was not taken from the defendant's

6    house?

7    **A.**    That is correct.

8    **Q.**    Was any of the -- was any holster seized or

9    collected on the day of the search?

10    **A.**    Not to my knowledge.

11    **Q.**    So if you could pick up the Government's Exhibit

12    55 and could you -- do you see a finger retention device on

13    this holster?

14    **A.**    Yes.

15    **Q.**    Could you point it out, please?

16        **MS. BERKOWER:**   Let the record reflect you are

17    pointing to an L-shaped piece on the front of Government's

18    Exhibit 55.

19    **BY MS. BERKOWER:**

20    **Q.**    Now, could you explain by demonstrating how that

21    L-shaped paddle works?

22    **A.**    The index finger of the strong hand, the side that

23    the holster is on, presses the L-shaped paddle, which

24    releases the locking mechanism inside of the holster,

25    allowing the pistol to be drawn.

1    Q.    And what color is this holster?

2    A.    Matte black finish.

3    Q.    Do you also see a mechanism on this holster to

4    attach it to the wearer's clothing?

5    A.    Yes.

6    Q.    Could you explain what attachment it has?

7    A.    It is a hip paddle mounting attachment.  And it

8    allows the individual to attach this inside the pants or

9    between the pants and the belt on your pants.

10    Q.    And could you demonstrate how that works?

11    A.    Yes.  Would you like me to remove my jacket to do

12    this?

13    Q.    Yes, please.

14    **MS. BERKOWER:**  And for the record, Special Agent

15    Hightower slid the hip paddle on to his belt on his right

16    side.

17    **BY MS. BERKOWER:**

18    Q.    And, Special Agent Hightower, I see that you

19    actually have a holster on your left side; is that right?

20    A.    Yes, ma'am.

21    Q.    Why is that?

22    A.    I am left handed.

23    Q.    And are you required to carry a firearm in

24    connection with your job as a special agent for the FBI?

25    A.    Yes, ma'am.

1    **Q.**    Now, before coming to court today, did you become

2    familiar with item 1B27 in evidence?

3    **A.**    Yes.

4    **Q.**    And did you determine whether or not that item --

5          **MS. BERKOWER:**  And, Special Agent Ryan, if you

6    wouldn't mind getting that item for Special Agent Hightower

7    from the well of the court.  It's the Smith & Wesson.

8    **BY MS. BERKOWER:**

9    **Q.**    Special Agent Hightower, are you familiar with

10   1B27?

11   **A.**    Yes.

12   **Q.**    What do you know it to be?

13   **A.**    I know it to be a Smith & Wesson SD .40 caliber

14   pistol.

15   **Q.**    Where did it come from?

16   **A.**    This pistol came from the residence --

17         **THE COURT:**  Agent, could you keep your voice up,

18   please?

19         **THE WITNESS:**  This pistol came from the residence

20   at 1409 Laura Drive.

21   **BY MS. BERKOWER:**

22   **Q.**    And was it the firearm seen in the photograph that

23   you looked at earlier, 124, 125, 126 --

24   **A.**    Yes.

25   **Q.**    And also 127 and 128?

1      **A.**    Yes.

2      **Q.**    Before coming to court today, did you check to

3 ensure that this firearm was rendered safe?

4      **A.**    Yes.

5      **Q.**    Can you tell if it's rendered safe?

6      **A.**    Yes.

7      **Q.**    How?

8      **A.**    No source of ammunition, the chamber is empty.  NS

9 the zip ties holding the slide back render it inoperable.

10      **Q.**    And before coming to court, did you also

11 demonstrate whether Government's Exhibit 1B27 would fit into

12 the holster that is Government's Exhibit 1B55?

13      **A.**    Yes.

14      **Q.**    What did you determine?

15      **A.**    That it will fit.

16      **Q.**    Could you demonstrate how that works?

17      **A.**    Yes.

18      **Q.**    And, Special Agent Hightower, did you hear a noise

19 when you inserted the firearm into the holster?

20      **A.**    Yes.

21      **Q.**    Do you know what that noise was?

22      **A.**    Yes.

23      **Q.**    What was it?

24      **A.**    That is the autolock retention device engaging the

25 locking mechanism inside of the holster, to give an audible

1    click, that you know the weapon is locked into the holster.

2    It can only be drawn from the holster, if the L-shaped

3    paddle autolock retention device is engaged.

4         Q.   Can you demonstrate how the firearm would be

5    removed from this holster?

6         A.   Yes.

7         Q.   And for the record, can you explain what you did

8    to get it out --

9              THE COURT:  Ms. Berkower, I think everyone can see

10   this.  Let's move on.

11   BY MS. BERKOWER:

12        Q.   Special Agent Hightower, in order to render the

13   firearm safe, what did you have to do with the slide or the

14   silver part of the gun?

15        A.   Lock the slide to the rear using the slide stop

16   lever.

17        Q.   And if you had not done that, and the slide were

18   closed, would the gun be longer or shorter or the same

19   length as it is right now?

20        A.   It would be shorter, because the slide would come

21   down and be this length, instead of the overall length that

22   it is now.  It would be shorter.

23             MS. BERKOWER:  I'll pass the witness, Your Honor.

24             THE COURT:  Mr. Welch.

25                  CROSS-EXAMINATION OF LAIRD HIGHTOWER

1    BY MR. WELCH:

2         Q.   Good afternoon, Agent Hightower.

3         A.   Good afternoon.

4         Q.   My name is Bill Welch.  I am also going to ask you

5    some questions.

6              How did you acquire Government's Exhibit 202, the

7    Emily Molli video that we just looked at?

8         A.   The Emily Molli video was prepared by the

9    government.

10        Q.   Was prepared by the government.  Okay.  How did

11   you acquire Government's Exhibit 202.1, which was a

12   screenshot that you just looked at?

13        A.   It was prepared by the government.

14        Q.   Likewise, would you say the same about

15   Government's Exhibit 202, the other screenshot from the

16   Emily Molli video?

17             MS. BERKOWER:  Your Honor, objection.

18             (Discussion at sidebar.)

19             THE COURT:  What in the world is the objection to

20   him asking --

21             MS. BERKOWER:  It's not in evidence, Your Honor,

22   that particular item he just asked about was not introduced

23   into evidence.

24             MR. WELCH:  I thought they were all -- I thought

25   we agreed, and that's what we moved in.

1    **MS. BERKOWER:**  We moved 202.1.  I don't believe we

2    moved in 202.2.  If he wants to introduce it, that's fine.

3            **MR. WELCH:**  No, that's fine.

4            **THE COURT:**  Did you ask about 1 already?

5            **MR. WELCH:**  I did ask about 1 already.

6            **THE COURT:**  All right.  Let's go.

7            **MR. WELCH:**  I'll move on.

8            (Discussion at sidebar concluded.)

9    **BY MR. WELCH:**

10       **Q.**   Agent Hightower, I believe you did review the

11   other video, which was Government's Exhibit 200; is that

12   right?  That was another video we looked at a moment ago.

13       **A.**   May I see the video?

14           **MR. WELCH:**  Could you run it again for him,

15   please?

16           (Played video.)

17           **MR. WELCH:**  Thank you.

18   **BY MR. WELCH:**

19       **Q.**   Does that refresh your recollection?

20       **A.**   Yes.

21       **Q.**   How did you acquire that one to review?

22       **A.**   This was the video clip -- I can't remember.

23       **Q.**   Okay.  You can't remember.  I'm going to turn your

24   attention now to Government's Exhibit 55, that Blackhawk

25   holster you were wearing a moment ago.  You mentioned it was

1    purchased.

2         **A.**   Yes, sir.

3         **Q.**   Who purchased it?

4         **A.**   The government.

5         **Q.**   Do you know who specifically?

6         **A.**   I do not know who purchased it.

7         **Q.**   Do you know whose idea it was to purchase it?

8         **A.**   No.

9         **Q.**   It wasn't your idea?

10        **A.**   No.

11        **Q.**   Somebody in the government had the idea to

12   purchase it?

13        **A.**   Yes.

14        **Q.**   Now, I'm going to turn your attention to your

15   initial meeting with Jackson Reffitt back on -- I believe it

16   was January the 11th of 2021.

17             During that meeting, Jackson Reffitt told you

18   about what his father had said to him that morning.

19   Correct?

20        **A.**   Yes.

21        **Q.**   And did you -- other than opening a general

22   investigation, did you reclassify this to something that

23   would have been an immediate threat to life?

24        **A.**   No.

25        **Q.**   Why not?

1   **A.**   There was not enough specific details as to a

2   threat to life that needed an imminent intervention by FBI

3   agents.

4   **Q.**   Did you learn during that interview that my

5   client, Guy Reffitt, rants a lot?

6   **A.**   I don't recall that he had mentioned that

7   specifically.

8   **Q.**   Did you learn during that interview whether my

9   client had income at that time?

10   **A.**   Yes.

11   **Q.**   And what did you learn?

12   **A.**   As I recall, the mother and the sister were the

13   primary breadwinners.

14   **Q.**   Were you present -- I believe you said you were

15   but just to make sure I got my facts straight, were you

16   present several days later when there was a search of my

17   client's home and he was arrested?

18   **A.**   Yes.

19   **Q.**   Do you recall how many items were seized during

20   that search?

21   **A.**   No, sir.

22   **Q.**   Do you have an estimate?

23   **A.**   I would be guessing and I'm not -- I shouldn't

24   guess.

25   **Q.**   Would it be fair to say more than 25?

1   **A.**   Less than 25.  Maybe 20 is a better number.

2   **Q.**   Okay.

3   **A.**   But, again, that won't be an accurate.  I am just

4   estimating.

5   **Q.**   Did you learn -- did you speak with Jackson

6   Reffitt again or did somebody speak with Jackson Reffitt

7   again on the day of the search?

8   **A.**   Yes.

9   **Q.**   Did he not come to the house during the search; is

10  that right?

11  **A.**   Yes.

12          **THE COURT:**  Yes, he did not come to the house?

13          **THE WITNESS:**  Yes, he came to the house.

14          **THE COURT:**  He did come to the house.

15          **MR. WELCH:**  Court's indulgence, please.

16  **BY MR. WELCH:**

17  **Q.**   During your investigation, did you have occasion

18  to speak to a Capitol police officer by the name of Shauni

19  Kerkhoff on or about March 22nd, 2021?

20  **A.**   Yes.

21  **Q.**   Did you, during that interview, learn whether my

22  client had made any statements to her?

23          **MS. BERKOWER:**  Your Honor, objection.

24          (Discussion at sidebar.)

25          **THE COURT:**  You're not going to get into the

1    defendant's statements.

2             **MR. WELCH:**  No, I am just going to ask whether he

3    learned that she heard him make any statements.  I believe

4    he is going to say that she did not say that, but I just

5    want to confirm it.

6             **THE COURT:**  But if he did make statements, you're

7    not going to ask --

8             **MR. WELCH:**  Then I'm not going to ask what it was.

9             **THE COURT:**  All right.

10            **MS. BERKOWER:**  And part of the objection is it's

11   outside of the scope of the direct, Your Honor.  But if that

12   is what he is going to ask, we can live with that.

13            (Discussion at sidebar concluded.)

14            **MR. WELCH:**  The objection was overruled.  Correct?

15            **THE COURT:**  Overruled.

16   **BY MR. WELCH:**

17       **Q.**   If you remember the question, go ahead and answer

18   it.  If you need me to repeat it, I will.

19       **A.**   If you could please repeat the question.

20       **Q.**   I'll be happy to.

21            When you interviewed Officer Shauni Kerkhoff of

22   the Capitol police on or about March 22nd, 2021, did you

23   learn from her whether my client had made any statements to

24   her?

25       **A.**   I do not recall.

1    Q.   Did you not -- I'm going to turn your attention

2  back to those -- to Government's Exhibit 202, I believe, and

3  202.1.  And isn't it true that you previously reviewed them

4  and said that they appeared suspicious, but you couldn't say

5  for certain what they showed?

6    A.   I do not understand your question.

7    Q.   Today was not the first time that you had looked

8  at Government's Exhibit 202 and 202.1, the Emily Molli video

9  and the screenshot from it.  Today is not the first time you

10 seen those.  Correct?

11   A.   That is correct, sir.

12   Q.   When had you looked at them previously?

13   A.   I'm not aware of the specific date but several

14 times.

15   Q.   Several times.  Would you have looked at them back

16 in June of last year?

17   A.   Yes.

18   Q.   And when you looked at them back then, did you say

19 that they appeared suspicious, but you couldn't say anything

20 for certain about them?

21   A.   Based on the first image that I observed at that

22 time, that is correct.

23        **MR. WELCH:**  Court's indulgence.

24        I'll pass this witness, Your Honor.

25        **THE COURT:**  Ms. Berkower?

1    **MS. BERKOWER:**  Ms. Rohde, if you could please pull

2  up Government's Exhibit 202.1, which is in evidence.  And,

3  Mr. Hopkins, could you please present it to the jury?  Thank

4  you.

5              <u>**REDIRECT EXAMINATION OF LAIRD HIGHTOWER**</u>

6  **BY MS. BERKOWER:**

7    **Q.**   Special Agent Hightower, Mr. Welch was just asking

8  you questions about this exhibit.  Do you remember being

9  asked about that?

10   **A.**   Yes.  Yes.

11   **Q.**   Did you first see this image around June of 2021?

12   **A.**   Not -- there was an image I saw before this one.

13   **Q.**   And prior to -- prior to June 2021, had you been

14  looking for images of the defendant?

15   **A.**   Yes.

16   **Q.**   And prior to seeing this image, had you been able

17  -- or excuse me.  I will withdraw that question and

18  rephrase.

19              Was there a time when you were not able to

20  determine or to make an opinion about the dark object on the

21  back of Mr. Reffitt's pants?

22   **A.**   Yes.

23   **Q.**   Could you explain why that was the case?

24   **A.**   Because at the time the image that I was viewing

25  was obscured by the jacket.  So I was seeing minimal of an

1    object and could not make a definitive determination as to

2    what that object was that I was looking at.

3        **Q.**   Were you also looking at lower-quality images and

4    videos?

5        **A.**   Yes.  They were very granular, lacking clarity.

6        **Q.**   When you saw an image with this clarity, was your

7    ability to draw observations about the dark object on the

8    back of Mr. Reffitt's pants enhanced?

9        **A.**   Yes.

10       **Q.**   Why?

11       **A.**   Because it was clear to me what the features were

12   of what I was looking at, and I knew what I was looking at

13   because of my familiarity.

14              **MS. BERKOWER:**  Nothing further, Your Honor.

15              **THE COURT:**  All right.  May this witness be

16   excused?

17              **MR. WELCH:**  Yes, Your Honor.

18              **THE COURT:**  All right.  Thank you, sir.

19              So, ladies and gentlemen, it is now almost 4:00.

20   So we are going to adjourn for the day.  Mr. Nestler?

21              **MR. NESTLER:**  I was indicating to Mr. Hopkins to

22   turn off the monitors.

23              **THE COURT:**  Oh, sorry.  Okay.

24              So we are going to adjourn until 9:30 Monday

25   morning.  I know I've admonished you many, many times not to

1  talk about the case, read about the case, do any

2  investigation about the case.  But this is especially

3  important now that we have a longer break, and we are going

4  to be apart over the weekend.

5      It's critical that you don't say anything at all

6  about this case.  And by anything, I mean anything relating

7  to witnesses, exhibits, attorneys, the defendant or anything

8  else related to this case.  And this is very important that

9  you not say anything, even to one another.  Because it's

10  critical that you wait until the case is over.  To share

11  information, you have to wait until your deliberations to

12  say anything about the case to each other or it could

13  potentially result in a mistrial.  So please, please be very

14  careful.

15      Also, same goes true for things you might read in

16  the newspaper or hear on TV or see on the internet.  Very

17  important that you don't do it.  We've all been through five

18  long days, and we want to make sure that the case gets to

19  you without any issues.

20      So I think with any luck, we should be able to

21  conclude the government's case on Monday.  Is that right,

22  Mr. Nestler?

23      **MR. NESTLER:**  Yes, Your Honor.

24      **THE COURT:**  All right.  So I hope you have a great

25  weekend.  I hope you get some rest, and we will see you back

1    in the courtroom on Monday morning at 9:30.

2             **COURTROOM DEPUTY:**  All rise --

3             **THE COURT:**  Oh, and if you see or hear anything,

4    please report it to Mr. Hopkins.

5             (Jurors exited the courtroom.)

6             **COURTROOM DEPUTY:**  Parties may be seated.

7             **THE COURT:**  All right.  So, Mr. Nestler, the

8    government has Agent Ryan, the two Capitol police officers

9    and then Peyton --

10            **MR. NESTLER:**  Peyton Reffitt.  Yes, Your Honor.

11   We believe we will rest before lunch on Monday morning.

12            **THE COURT:**  All right.  Great.

13            So, Mr. Welch, if you have any witnesses to share

14   consistent with the pretrial order, please let Mr. Nestler

15   know.

16            **MR. WELCH:**  We do not.

17            **THE COURT:**  All right.  Okay.  Very well.

18            Anything else we need to address?

19            **MR. NESTLER:**  Just scheduling, Your Honor.  If we

20   rest before lunch on Monday, and the defense does not call

21   any witnesses, how Your Honor wanted to handle the charging

22   conference, and what we should expect after that.

23            **THE COURT:**  I think if there is no defense case,

24   then I think it would make sense to do that Monday

25   afternoon.

1264

1    MR. NESTLER:  Yes, Your Honor.

2    THE COURT:  And that shouldn't take a long time,

3    given all the hard work we've done already on it.  So I

4    don't want to be overly optimistic, but perhaps we can do

5    the -- begin the closings or I could, at a minimum, instruct

6    the jury the substantive instructions before the closing,

7    because I will do that before your closings.

8    MR. NESTLER:  Yes, Your Honor.  That sounds

9    perfect.

10   THE COURT:  Do you have an estimate how long

11   closings are expected be?

12   MR. NESTLER:  We expect about an hour for our

13   closings, Your Honor.

14   THE COURT:  Mr. Welch?

15   MR. WELCH:  Fifteen minutes.

16   THE COURT:  Okay.  We will see what time we end on

17   Monday.  Maybe we can do some work over the lunch hour.

18   Make sure you have enough time for lunch, but maybe we can

19   break it in two and make it go more quickly -- the charging

20   conference, that is.

21   MR. NESTLER:  Yes, Your Honor.  Thank you.

22   THE COURT:  Okay.  Have a good weekend, everyone.

23   MR. NESTLER:  You too.

24   (Proceedings concluded at 3:58 p.m.)

25

1    **C E R T I F I C A T E**

2

3           I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8

9

10   **March 5, 2022**              **/s/**
                **DATE**                      **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25