```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                           FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,          .
                                         .  Case Number 21-cr-32
 4              Plaintiff,               .
                                         .
 5         vs.                           .
                                         .
 6    GUY WESLEY REFFITT,                .  March 7, 2022
                                         .  9:06 a.m.
 7              Defendant.               .
      - - - - - - - - - - - - - - - - -

 8

 9                        TRANSCRIPT OF JURY TRIAL
                               (MORNING SESSION)
10              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                       UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For the United States:      JEFFREY NESTLER, AUSA
                                  RISA BERKOWER, AUSA
14                                United States Attorney's Office
                                  555 Fourth Street Northwest
15                                Washington, D.C. 20530

16    For the Defendant:          WILLIAM WELCH, III, ESQ.
                                  5305 Village Center Drive
17                                Suite 142
                                  Columbia, Maryland 21044
18

19

20

21    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
22                                U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
23                                202-354-3284

24

25    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

ADAM DESCAMP                Direct Examination............... 1273
                           Cross-Examination................ 1300
                           Redirect Examination............. 1304

THOMAS RYAN                Direct Examination............... 1306
                           Cross-Examination................ 1317

MATTHEW FLOOD              Direct Examination............... 1322
                           Cross-Examination................ 1345
                           Redirect Examination............. 1348

EXHIBITS RECEIVED

Government 226 and 604.1 through 604.4.................. 1270

```
 1                   P R O C E E D I N G S
 2          (Call to order of the court.)
 3          (Jury not present.)
 4          COURTROOM DEPUTY:  Your Honor, we are in Criminal
 5   Action 21-32, the United States of America versus Guy Reffitt.
 6          Representing Mr. Reffitt, we have Mr. William Welch.
 7   Representing the United States, we have Mr. Jeffrey Nestler and
 8   Ms. Risa Berkower.
 9          THE COURT:  All right, folks.  So we're ready for the
10   government's witnesses?  Will that be Agent Ryan or the Capitol
11   police officers?
12          MR. NESTLER:  Good morning, Your Honor.
13          THE COURT:  Good morning.
14          MR. NESTLER:  We intend to have Sergeant DesCamp be
15   our first witness, and then Agent Ryan, and then Sergeant Flood.
16   We've elected to not call Peyton Reffitt, and I've informed
17   defense counsel of that fact.
18          THE COURT:  Okay.  Before the government rests, I
19   would like you all to -- Mr. Hopkins should hear this, but I
20   would like you all to confer with him on what we think is in
21   evidence and we're all on the same page.
22          MR. NESTLER:  Yes, Your Honor.
23          THE COURT:  And are we all set in terms of the
24   computer that would go back or exhibits?  Have you all worked
25   through that with John Cramer?  It's beyond my pay grade, but --
```

 1          MR. NESTLER:  Yes, our staff is talking to Mr. Cramer

 2     about that.

 3          THE COURT:  There's a clean computer that's ready to

 4     go back there?

 5          MR. NESTLER:  My understanding is they're debating

 6     whether to put the exhibits directly on the computer or just to

 7     provide a clean computer and an external hard drive with the

 8     exhibits.  But we're working on that today and should have it

 9     all settled by the end of the day.

10          THE COURT:  Okay.  Mr. Hopkins, so I was saying to

11     both sides, before the government rests, during a break, they

12     should confer with you and make sure that what you think is in

13     evidence is in evidence.

14          COURTROOM DEPUTY:  Absolutely, Your Honor.

15          THE COURT:  So Mr. Welch, in light of the government's

16     decision not to call Peyton Reffitt, does the defense intend to

17     call any witnesses?

18          MR. WELCH:  No, Your Honor.

19          THE COURT:  Okay.  All right, then.  Are there other

20     issues that we should address before the jury comes in?

21          MR. NESTLER:  Just two things to make today a little

22     more efficient.  We have two sets of exhibits we would like to

23     move to admit now.  We've cleared them both with Mr. Welch.

24     They will be introduced through the witnesses testifying today.

25          The first is 226, which is a video from YouTube, of some of

1    the events being discussed by Sergeant DesCamp.  And the second

2    is Exhibits 604.1 through 604.4, which are the four Life360,

3    maps which will be introduced through Agent Ryan.

4            THE COURT:  Any objection, Mr. Welch?

5            MR. WELCH:  No, Your Honor.

6            THE COURT:  So all those exhibits are admitted.

7        (Government Exhibits 226 and 604.1 through 604.4 received

8    into evidence.)

9            MR. NESTLER:  Thank you, Your Honor.

10           THE COURT:  You all had predicted you would rest

11   before lunch.  That's definitely the case now?

12           MR. NESTLER:  Yes, Your Honor.

13           THE COURT:  How long do you think these three

14   witnesses will take?

15           MR. NESTLER:  If we get started around 9:30, we ought

16   to get end around noon, we believe.

17           THE COURT:  For those three witnesses, you think, will

18   take until noon?

19           MR. NESTLER:  Potentially, depending on the cross.

20   Agent Ryan will be very short, ten minutes, but the other two

21   witnesses will be between a half an hour and an hour each, but

22   not particularly long, much shorter than Officer Kerkhoff was.

23           THE COURT:  All right.  So I'm just trying to think

24   ahead in terms of when it makes sense to take our breaks.  It

25   probably makes sense to send the jury away for a little bit

1   longer lunch so we can address the issues with the jury

2   instructions.  I would also like to have a colloquy with

3   Mr. Reffitt if he's not going to testify, very briefly, but

4   obviously outside the presence of the jury.  And I guess that's

5   it.

6       So let's just say hypothetically the government ends at

7   noon.  Maybe between now and 9:30, you all can review the

8   exhibits so that everybody's comfortable with the government

9   resting that what's in the Court's exhibit list is in line with

10  what the parties think.  And then we could do the colloquy with

11  Mr. Reffitt either before or after lunch and the jury

12  instructions all at once.

13      Does that make sense?

14          MR. WELCH:  That's fine.

15          MR. NESTLER:  Just for scheduling purposes, is Your

16  Honor intending to have a separate hearing or argument on any

17  Rule 29 motion?

18          THE COURT:  Yeah, if there is such a motion, I'm

19  inclined to reserve that.  Among other reasons, given what

20  happened in New York recently, I just -- where comments the

21  judge made popped up on jurors' phones, I think it's prudent for

22  me to reserve any ruling on that.

23          MR. NESTLER:  Yes, Your Honor.

24          THE COURT:  Do you have any thoughts on that,

25  Mr. Welch?

1          MR. WELCH:  The Court can always, in its discretion,

2    reserve on a Rule 29 motion.

3          THE COURT:  Yeah, I know.

4          MR. WELCH:  And I'm going to make one to cover my

5    behind.

6          THE COURT:  Obviously, I would assess the motion at

7    the time -- with the evidence that was before the Court at that

8    time.  I just would hate for there to be some news alert that a

9    juror sees before they start deliberating about what the judge

10   has said about the evidence in this case.  So I'm inclined to

11   wait.

12       And Mr. Welch, are there any issues that you would like to

13   address before the jury comes in?  We're a little bit early.

14         MR. WELCH:  No.  I think we ought to take the time to

15   go through the exhibits with Mr. Hopkins.

16         THE COURT:  I will get off the bench.  You all can do

17   that.  And I will just be in the jury room here.  So if there's

18   some reason to bring me back in for something, just let me know.

19       (Recess taken from 9:12 a.m. to 9:39 a.m.)

20         THE COURT:  Are we ready to bring the jury in?

21         MR. WELCH:  Yes.

22       (Jury entered courtroom.)

23         THE COURT:  All right.  Good morning, ladies and

24   gentlemen.  Welcome back.  I hope you had a nice weekend.  We're

25   now going to resume with the government's case.

1    Mr. Nestler, can you call your next witness, please.

2    Ms. Berkower.

3         MS. BERKOWER:  The government calls Adam DesCamp.

4         ADAM DESCAMP, WITNESS FOR THE GOVERNMENT, SWORN

5              DIRECT EXAMINATION

6         BY MS. BERKOWER:

7    Q.   Good morning.

8    A.   Good morning.

9    Q.   Could you please state and spell your name.

10   A.   Adam DesCamp, A-d-a-m D-e-s-C-a-m-p.

11   Q.   Are you employed?

12   A.   I am.

13   Q.   Where do you work?

14   A.   United States Capitol Police.

15   Q.   And what is your title there?

16   A.   Sergeant.

17   Q.   How long have you been at the Capitol Police?

18   A.   16 years.

19   Q.   Do you have prior law enforcement experience?

20   A.   I do.  Eight years active duty Army MP, Military Police.

21   Q.   What's your current assignment with the Capitol Police?

22   A.   Senate Division supervisor.

23   Q.   Do you have collateral duties as well?

24   A.   I do.

25   Q.   What are those collateral duties?

1    A.    Civil Disturbance Unit instructor.

2    Q.    And were you on duty on January 6 of 2021?

3    A.    I was.

4    Q.    What assignment were you handling that day?

5    A.    I was a part of the less-lethal team for the Civil

6    Disturbance Unit.

7    Q.    Did you encounter the defendant Guy Reffitt at the Capitol?

8    A.    I did.

9    Q.    So I'm going to ask you more questions about each of those

10   topics, but first, I will ask you about just a few other things

11   concerning your collateral duties as a Civil Disturbance Unit

12   officer.

13         Is there an acronym that the Capitol Police knows that unit

14   by?

15   A.    Less-lethal team is basically what we go by.  CDU is the

16   acronym for the Civil Disturbance Unit.

17   Q.    When you are activated with CDU, do you carry any weapons?

18   A.    I do, yes.

19   Q.    On the 6th, were you carrying a weapon with the CDU?

20   A.    I was.

21   Q.    What kind of weapon was that?

22   A.    It's called the FN303.

23   Q.    And what category of weapon is that?

24   A.    It's similar to the PepperBall system.  It's a

25   launcher-type device.

1    Q.   Is it a lethal weapon or a less-than-lethal weapon?

2    A.   That is a less-lethal weapon.

3    Q.   Ms. Rohde, if we could, please, have Government's

4    Exhibit 52A.  And Mr. Hopkins, this is already in evidence, so

5    if we could please display it to the jury.  Thank you.

6         Sergeant DesCamp, do you see what's in this exhibit?

7    A.   Yes, ma'am.  That is the FN303.

8    Q.   And you mentioned a PepperBall gun; is that right?

9    A.   Yes, ma'am.

10   Q.   Did somebody else with you have that weapon that day?

11   A.   Officer Kerkhoff was carrying the PepperBall system.

12   Q.   Was she your partner that day?

13   A.   She was.

14   Q.   Now, let's start talking about January 6 specifically.

15   Around what time did your workday start?

16   A.   The workday started around 6:00.

17   Q.   Where were you stationed initially?

18   A.   Initially, I was on the east front of the Capitol.

19   Q.   And Ms. Rohde, if you could please pull up Government's

20   Exhibit 601.

21        Sergeant DesCamp, using this photograph, could you describe

22   where you were initially stationed?

23   A.   Yes.  It's directly in the center next to the Capitol

24   building, if I can touch it here.

25   Q.   Unfortunately, it's actually not a touch screen.  But if

1  you could just describe, if the Capitol building is in the

2  center of the photograph, which side of the picture were you

3  stationed on?

4  A.   If you go to the very center of the building, I was on the

5  top side where the shadow is, right in that shadow, right in the

6  center.

7  Q.   Is that where you were initially deployed?

8  A.   That's where my initial deployment was, yes.

9  Q.   Is that the west side or the east side of the Capitol?

10  A.   That's the east side.

11  Q.   And who was your partner that day?

12  A.   Officer Kerkhoff.

13  Q.   Who else were you with?

14  A.   I was with several other less-lethal operators:   Officer

15  Buhaj, Sergeant Greene, and Sergeant Cobert.

16  Q.   And as the day went on, did you change positions?

17  A.   Yes, we did.

18  Q.   Where did you go?

19  A.   I responded to the west front to assist when I heard the

20  call for less-lethal.

21  Q.   Who went with you?

22  A.   Officer Kerkhoff.

23  Q.   And what in particular did you hear that drew you to the

24  west side of the Capitol?

25  A.   I heard the inspector over the radio asking less-lethal to

1    launch, which was the first time that's ever happened before.

2    So that triggered in us that we need to go assist.

3    Q.   And let me make sure that we're clear on what you just

4    testified to.  When you say you heard "less-lethal to launch,"

5    what in layman's terms does that mean?

6    A.   They were requesting that the less-lethal operators fire

7    upon the demonstrators to create distance between the line.

8    Q.   And you said that was unusual to you?

9    A.   Yes.  It was the first time we've ever actually deployed

10   our less-lethal weapon systems.

11   Q.   And so upon hearing that over the radio, what did you do?

12   A.   Officer Kerkhoff and I decided that we were going to

13   respond over there to assist, leaving the three remaining

14   operators on the east front.  We went inside the building to

15   respond out the Lower West Terrace door, which is directly

16   opposite of where I was posted, but the building went into

17   lockdown.  So we actually had to respond back outside the same

18   way we went in, and we went around the Upper West Terrace to get

19   over there.

20   Q.   Ms. Rohde, if you could pull up Government's Exhibit 603.

21        Sergeant DesCamp, does this show the area that you

22   responded to on the west side of the Capitol?

23   A.   It does.

24   Q.   Could you explain -- describe where on this picture you

25   ended up?

1    A.    I ended up on the stage podium area right in the center.

2    It looks like a -- a small cutout there.

3    Q.    And Ms. Rohde, if you could please blow up that area.

4          Sergeant DesCamp, does this area that Ms. Rohde expanded

5    show the area to which you responded?

6    A.    Yes, ma'am.

7    Q.    And what did you find when you got there?

8    A.    When I first got there, Officer Kerkhoff and I were

9    observing -- we could see the inspector down on the lower level

10   still requesting less-lethal to launch.  So our first reaction

11   was this:  Has anybody engaged yet?  Because there was already a

12   team there.

13   Q.    When you said there was already a team there, about how

14   many officers were already there?

15   A.    There were three officers there.

16   Q.    And was there a crowd in front of you?

17   A.    There was.

18   Q.    Could you describe what it looked like?

19   A.    You had your line of CDU, or Civil Disturbance Unit,

20   officers basically fighting with thousands, a crowd of thousands

21   right on the line on the Lower West Terrace.

22   Q.    And how far away from you was that line and the crowd?

23   A.    It would be right down at the lower portion of the stand

24   area.  So if you drew a straight line across the Lower West

25   Terrace where the stage ends, that's where they were.

1   Q.   Do you see an area on this -- an area on this exhibit that

2   looks like a tower in front of the Capitol building?

3   A.   I do.

4   Q.   Where in relation to that tower was the crowd when you were

5   observing it?

6   A.   They were right in front of it.

7   Q.   Ms. Rohde, could you blow up that area as well.  Thank you.

8        Sergeant DesCamp, is the area we just expanded on the

9   exhibit the area you're speaking about?

10  A.   Yes, ma'am.

11  Q.   Now, at some point did you change your position again?

12  A.   I did.

13  Q.   Why?

14  A.   As we were reloading our weapon systems on the podium area,

15  I saw through a corridor one of our inspectors waving at us to

16  come over here to the Senate side of the steps in order to --

17  that she was signifying that people were attempting to get up

18  the railing on the Senate side of the scaffolding.

19  Q.   And when you say she called you over, was that -- what mode

20  of communication was she using?

21  A.   She was far enough away that I wouldn't have heard her.

22  She was waving us over like this (indicating) and pointing down

23  the rail.

24  Q.   What did you do when you saw that?

25  A.   I grabbed Officer Kerkhoff, and we responded over to assist

1    with her.

2    Q.   Now, one more question about what you were doing before you

3    responded over to the inspector.

4         Had you deployed your less-than-lethal weapons at this

5    point?

6    A.   Yes.

7    Q.   What had you done?

8    A.   I had engaged the crowd that was anything -- anyone that

9    was violently attacking officers were being engaged with the

10   less-lethal systems.

11   Q.   When you say being engaged with the less-lethal systems,

12   what does that mean in layman's terms?

13   A.   We would launch our projectiles at them.

14   Q.   What effect, if any, did that have on the crowd?

15   A.   It was minimal, but it was effective for a short period of

16   time.

17   Q.   Now, going back to when the inspector called you over to a

18   different area, could you describe on this exhibit where you

19   were called over to?

20   A.   Sure.  If I left the center portion of the podium and I

21   went directly to the left, there's a small hallway or corridor

22   there that leads to the Senate side of the scaffolding, and

23   that's where we ended up.

24   Q.   And Ms. Rohde, if you could just expand the area.

25        Do you see the corridor that you just testified about in

1    this portion of the exhibit?

2    A.    I do.

3    Q.    Could you explain where you see it?

4    A.    That large square portion is the scaffolding, and there's a

5    dark gap in the center.  That's a corridor or a hallway, which

6    is where we were at.

7    Q.    So to be clear, where did the corridor start?

8    A.    The corridor starts right here at the edge of the

9    scaffolding and just prior to the podium.

10   Q.    Now, when you got over to where the inspector was, what did

11   you see?

12   A.    There were multiple individuals attempting to climb up the

13   railing over there.

14   Q.    And in that corridor, could you explain what you saw prior

15   to getting all the way to the stairs?

16   A.    Yes.  So in the center of the scaffolding, there's a large

17   open area for easy access to walk up the steps normally.

18   There's an opening there that I looked in, and I could see

19   people were attempting to breach the tarp that was covering the

20   scaffolding.  They were cutting it with knives or ripping it

21   apart the best they could to get inside of that.

22   Q.    And let's be clear.  The white box along the stairs, is

23   that the area you're referring to as the scaffolding?

24   A.    Yes, ma'am.

25   Q.    And what was covering the scaffolding that day?

1   A.   There was a white tarp that was covering the entire

2   scaffolding.

3   Q.   So when you walked through that corridor, was there an

4   opening into the scaffolding?

5   A.   There is.

6   Q.   And how many people at the time that you walked through

7   that corridor were already inside the scaffolding?

8   A.   There was several people in there, inside.  They had just

9   begun breaching that area.  But once they got it, it just got

10  worse.  They just kept piling in.

11  Q.   But I'm just asking initially, when you walked over to the

12  top of the stairs, about how many were inside that scaffolding

13  area?

14  A.   I would say several.

15  Q.   Now, when you got to the top of the stairs, did you see any

16  individuals?

17  A.   Yes.

18  Q.   Who did you see?

19  A.   I saw the defendant, and there was a long line of people

20  behind him.

21  Q.   And what was the defendant doing?

22  A.   At that point he was already speaking to Officer Kerkhoff,

23  and he was trying to talk to her to basically talk her down.

24  Q.   What was he saying?

25  A.   "You can't stop us all."  "Let us in."  Things of that

1    nature.

2    Q.   How was he saying it?

3    A.   It was in a manner not so much threatening, but it was a

4    statement being made.  "Don't be a traitor.  Let us in." That

5    sort of thing.

6    Q.   "Don't be a traitor"?  Is that what you said?

7    A.   Yes.

8    Q.   What did you take that to mean?

9    A.   That means that he felt like I was doing something against

10   the country.

11   Q.   What was Officer Kerkhoff doing with regard to the

12   defendant?

13   A.   She had first initiated with verbals, trying to speak to

14   him, trying to get him to stop advancing forward.

15   Q.   Why get him to stop?

16   A.   That is a -- an access point there.  If they get up into

17   that corridor area, they have direct access to the Lower West

18   Terrace door, which is the only entrance point to the Capitol on

19   that level.  So we wanted to keep them down out of there.

20   Q.   And at that point in time, was the scaffolding having an

21   effect on how many people could access that area?

22   A.   Yes.

23   Q.   Could you explain that?

24   A.   Well, the scaffolding being fully tarped off, it just took

25   up a lot of space, so people couldn't be there.

1     So they were climbing up the railing on the outside, up --

2   on the outside of the scaffolding there.

3   Q.   Who in particular was climbing up the railing?

4   A.   The defendant.

5   Q.   Do you see the defendant that you're referring to here in

6   court?

7   A.   I do.

8   Q.   Could you point him out by something he's wearing?

9   A.   Right over there (indicating).

10  Q.   Could you describe something he's wearing?

11  A.   He's wearing his glasses.

12       MS. BERKOWER:   Let the record reflect the witness has

13  identified the defendant.

14       THE COURT:   So reflects.

15       BY MS. BERKOWER:

16  Q.   Now, as -- you said Officer Kerkhoff was using verbal

17  commands?

18  A.   Correct.

19  Q.   Did she take any other action against the defendant?

20  A.   She did.   She deployed the PepperBall system.

21  Q.   What effect, if any, did that have?

22  A.   Zero.

23  Q.   Did the defendant say anything after she deployed it?

24  A.   He did.   I wasn't there for what he said.   So I can't speak

25  as to what he said.

Q.   And after Officer Kerkhoff deployed that weapon, what

happened next?

A.   She yelled that the PepperBall was ineffective.  She was

yelling at me so that I could come over with my launcher system

to try to handle it my way.

Q.   In comparison to the PepperBall system, what does your

weapon do that the --

A.   The FN303 uses high-pressure air to shoot its projectile

out.  It's much more accurate.  It comes out with a little bit

more force or kinetic energy.  So it's a little more pain

compliance.  But it's a direct impact from -- obviously, from me

to one person.

Q.   And what did you do when she called for you?

A.   She called me over there.  She had already engaged the

defendant.  So I came over.  I told him to get back down.  He

didn't do it.  I gave him two rounds with the FN303 launcher,

which were also ineffective.

Q.   And you said that you gave him commands to get back down.

What was he doing at that point that required you to say that?

A.   He was taking small steps one at a time up the railing.  As

we would say "stop, don't come any closer," he was basically

antagonizing, doing -- he was proceeding.  He was just going

slowly while doing it.

Q.   And as he went slowly, what was happening behind him?

A.   All the people that were with him were also moving up every

1    time he moved up.

2    Q.   Was that significant to you?

3    A.   It was.

4    Q.   Why?

5    A.   Because again, the only access to the Capitol at this point

6    is on that level, and we want to keep everybody down.  And

7    they're being noncompliant, obviously, doing what we're asking

8    them not to do.

9    Q.   How many officers were on the landing at that point in

10   time?

11   A.   I believe there was only three or four of us up there.

12   Q.   And how big was the crowd?

13   A.   It was excessively large.

14   Q.   Did you feel outnumbered?

15   A.   Absolutely.

16   Q.   Now, after -- you said that you launched your weapon at the

17   defendant?

18   A.   Yes, ma'am.

19   Q.   What effect, if any, did that have on him?

20   A.   It had little to none.  It made a sound, actually, when it

21   hit him that I remember.  I don't know if he had padding on

22   under his clothes or something like that.

23   Q.   And what did he do after getting hit?

24   A.   He didn't do anything.  He just continued to proceed up the

25   railing.

1    Q.    Was he still talking?

2    A.    He was talking.

3    Q.    What was he saying?

4    A.    He was like, again, "You can't stop us all.  Don't be a

5    traitor.  Let us in."  That sort of thing.

6    Q.    And was the crowd behind him reacting to this interaction

7    you were having?

8    A.    Yes.  They were also taking cues from him, shouting at us

9    and those types of things, and attempting to move forward every

10   time he did.

11   Q.    What types of things was the crowd shouting?

12   A.    Same sorts of things, you know, "Don't be a traitor.  You

13   can't stop us all."

14   Q.    Now, as the defendant moved up, did the crowd also -- did

15   the crowd behind him also start -- actually, hold on just a

16   moment.

17         (Government counsel conferred.)

18   Q.    As you were engaging with the defendant, what, if anything,

19   was happening with the tarp and the scaffolding?

20   A.    I could see beyond him that they were using knives to cut

21   the scaffolding open to gain access into that area.

22   Q.    Did that concern you?

23   A.    Yes, very much.

24   Q.    Why?

25   A.    If they get inside the scaffolding, they're going to enter

1    that open hallway area where it's easy access.  You're just

2    walking up the steps at that point up to the landing where you

3    can enter the Capitol.

4    Q.   And as they cut down the tarp, what were they doing, if

5    anything, with the tarp?

6    A.   They would cut -- they cut the tarp open or cut it off, and

7    they were using the tarp as a shield from pepper spray and

8    things of that nature, but they were just piling in once there

9    was a large hole in the scaffolding.

10   Q.   And you said that when you engaged the defendant with your

11   FN303 and it didn't have any effect on him, what did you do

12   next?

13   A.   I said, "Somebody get the pepper spray out of my backpack."

14   Q.   Why?

15   A.   Because he wasn't wearing a mask, and our other less-lethal

16   options we had already utilized.  So the pepper spray would have

17   been effective.

18   Q.   And what happened when you did that?

19   A.   Sergeant Flood actually responded with a Mark 9 and

20   deployed his pepper spray before I was able to get mine out of

21   the backpack.

22   Q.   What, if any, effect did that have on the defendant?

23   A.   That had a good effect.  It was incapacitating.

24   Q.   And what did he do at that point?

25   A.   He sat down on the railing or laid down on the railing.

1   Q.   At that point in time, where did you turn your attention?

2   A.   The center of the scaffolding area, where that large open

3   area was.

4   Q.   Why?

5   A.   Because at this point there were hundreds of people inside

6   the center of the scaffolding, and there was only a small bike

7   rack and two officers there to defend that area.

8   Q.   Now, you mentioned that every time the defendant moved up

9   the railing the crowd came behind him.

10  A.   Correct.

11  Q.   Do you remember saying that?  Were there still other

12  members of the crowd on the stairs after the defendant --

13  A.   Yes, ma'am.

14  Q.   So could you explain what's happening on the stairs even

15  after the defendant sat down?

16  A.   So he was laying down or sitting down on the railing, and

17  the other demonstrators were continuing to press forward and

18  push up to try to come up to the landing area.

19  Q.   Did they have any defensive equipment with them?

20  A.   They had gear on.  They had either bulletproof vests or

21  helmets or whatever they were wearing.  But they also were

22  picking up pieces of the scaffolding, like a large wooden board,

23  to basically defend themselves.

24  Q.   And could you explain how the large wooden board would help

25  them defend themselves?

1   A.   For the PepperBall launcher and the FN303, that would

2   easily stop those rounds.  It would -- it's just basically

3   absorbing those.

4   Q.   So you said that Sergeant Flood deployed the Mark 9 on the

5   defendant?

6   A.   Yes, ma'am.

7   Q.   What happened after that with regard to any other weapons

8   deployed on the stairs?

9   A.   Once he deployed his pepper spray and it ran out, we were

10  able to get my pepper spray, which is a Mark 46, or MK46, out of

11  my backpack, and I was able to deploy on the people, the

12  additional people trying to get up the railing.

13  Q.   Could you just briefly explain what the difference is

14  between the Mark 9 and the Mark 46?

15  A.   The Mark 9 is a small handheld device, and the MK46 is a

16  large fire extinguisher-sized pepper spray canister.

17  Q.   What effect, if any, did the Mark 46 have?

18  A.   It was a good deterrent for a short period of time.

19  Q.   At that point in time, what was happening with the tarp?

20  A.   They were tearing off the tarp and using it to block the

21  pepper spray so that it rendered that ineffective at that point.

22  Q.   Court's brief indulgence.

23       (Government counsel conferred.)

24  Q.   Ms. Rohde, if we could please have Government Exhibit 205

25  in evidence, and starting at time stamp 6:05.

1          (Video played.)

2   Q.    And if we could just pause it there.  We can pause it.

3          So Sergeant DesCamp, could you describe what's happening

4   with the tarp at this point in time?

5   A.    They're tearing the tarp off or cutting it open and trying

6   to pull it up over top of the defendant in order to cover him.

7   Q.    And was this before or after Sergeant Flood had deployed

8   the Mark 9?

9   A.    This is after.

10  Q.    And Ms. Rohde, if we could just play this through to 6:50,

11  please.

12         (Video playing.)

13  Q.    If I could focus your attention to the area below the

14  defendant on the stairs.

15         Sergeant DesCamp, could you explain what was happening with

16  the tarp during that clip that we just watched?

17  A.    They were cutting large holes into the tarp in order to

18  gain access into the center portion.

19  Q.    Now, if we could fast forward to time stamp 12:25, please.

20         And I would ask you again to focus on the area below the

21  defendant on the stairs and the tarp as we play this.

22         (Video playing.)

23  Q.    Sergeant DesCamp, at this point were people from the crowd

24  able to access the scaffolding?

25  A.    Yes, ma'am.

1    Q.   Do you see that in this video as we're watching?

2    A.   Yes.

3    Q.   Could you explain where you're seeing that?

4    A.   They're all entering right through the large opening in the

5    tarp there.  It's even all the way down at the bottom.  They've

6    already removed half of the tarp there.

7    Q.   And I think you mentioned before, members of the crowd were

8    handing objects to each other?

9    A.   Correct.

10   Q.   Do you see that in this video as we're watching?

11   A.   Yeah.  There's a bike rack being moved up the stairs.

12   Q.   Did that concern you?

13   A.   Yes.

14   Q.   Why?

15   A.   I could only imagine that they were going to use that as a

16   weapon against us.

17   Q.   Now, where are you at this point in time?

18   A.   I believe I'm in the center scaffolding area in the

19   opening, trying to deal with the people that are inside the

20   scaffolding now.

21   Q.   And in relation to the footage we're watching, could you

22   explain how you get to --

23   A.   On the far left side of the screen, in the hallway or

24   corridor area.

25   Q.   If we could stop that there at 14:13.  And if we could,

```
 1    please, go on to time stamp 19:50, and we can play it from
 2    there.
 3         (Video playing.)
 4    Q.   Sergeant DesCamp, in the video we're watching, how does the
 5    state of the tarp compare to the video we watched earlier?
 6    A.   Half of the tarp now is missing, all on the bottom half of
 7    the scaffolding.
 8    Q.   And compared to before, how many people are inside the
 9    scaffolding?
10    A.   Now there are probably hundreds in there.
11    Q.   Did that concern you?
12    A.   Yes, very much.
13    Q.   We can stop that there at 20:16.
14         Now, before we go on, Sergeant DesCamp, directing your
15    attention to the landing, do you see a flag there?
16    A.   I do.
17    Q.   Where do you see a flag?
18    A.   There's an American flag.  You can see the stars.
19    Q.   Where is that in relation to --
20    A.   That is in the corridor or the hallway, in the center
21    portion of the scaffolding, but it appears they have already
22    gained access up to the level that we were on.
23    Q.   Was that significant to you?
24    A.   It was.
25    Q.   Why?
```

1    A.    That means that we had lost that landing, and now these

2    people have direct access to the Lower West Terrace door, the

3    only entry point that is on that level.

4    Q.    Did they also have access to the Senate?

5    A.    Correct.

6    Q.    Could you explain how they could access the Senate?

7    A.    If they could go up the stairs -- if they continued to

8    press up the stairs where all the officers are, that would get

9    them to the Upper West Terrace, and once they get to the Upper

10   West Terrace, there are many entry points and windows that are

11   accessible there.

12   Q.    Where do those entry points and windows go?

13   A.    Directly into the Capitol building.

14   Q.    What wing in particular?

15   A.    Senate.

16   Q.    Now, Ms. Rohde, if we could fast forward to 23:35, please,

17   and that's 2:09 p.m., and play that.

18         (Video played.)

19   Q.    We can stop that there at 22:53, 2:09:58 p.m.

20         Sergeant DesCamp, could you please explain what we just

21   watched in that segment of the video?

22   A.    The large mass of the crowd broke the lines on the

23   left-hand side to go up the steps toward the Upper West Terrace.

24   I was in the center of the scaffolding area and was pushed to

25   the opposite direction or the doorway between the stage and the

1    landing area.

2    Q.    How many officers were with you when the crowd moved

3    forward and pushed you toward that door?

4    A.    When they pushed me over to the door, I was alone.

5    Q.    Did that concern you?

6    A.    Yes.

7    Q.    Why?

8    A.    I was the only officer standing between this entire crowd

9    and the podium.

10   Q.    Ms. Rohde, if we could turn to Government's Exhibit 226 in

11   evidence.  If we could just play the first few seconds, please.

12       (Video played.)

13   Q.    We stopped at four seconds.

14       Sergeant DesCamp, can you explain who you're seeing in this

15   screen?

16   A.    This is me in the doorway to the podium.

17   Q.    Did you review this video before coming to court?

18   A.    Parts of it.

19   Q.    And what does it generally show?

20   A.    It is showing me standing in the doorway to prevent the

21   crowd from coming into the podium area where the other officers

22   are.

23   Q.    Does it also provide a view into the scaffolding itself?

24   A.    No.

25   Q.    Well, not this screen, but the rest of the video?

1    A.    Yes, it does show in the rest of the video, yes.

2    Q.    If we could play to 21 seconds, please.

3          (Video played.)

4    Q.    Now, could you explain what we just saw in that portion of

5    the video?

6    A.    That there is the center area of the scaffolding where

7    everybody pushed their way up through there, and that was just

8    me standing in the doorway blocking access.

9    Q.    What is the state of the tarp over the scaffolding at this

10   point in time?

11   A.    The tarp is in complete disarray.  They've removed it on

12   most levels that they can touch.

13   Q.    And when you first went over to deal with the defendant and

14   assist Officer Kerkhoff, what was the state of the tarp?

15   A.    The tarp was fully intact when we first dealt with him.

16   Q.    If we could, please, continue playing this video.

17         (Video played.)

18   Q.    Sergeant DesCamp, how many other officers were assisting

19   you at this point?

20   A.    There should be one other officer at this point that has

21   came up to assist.

22   Q.    Did you feel outnumbered?

23   A.    Yes.

24   Q.    And if we could jump to 1:41 on the video, please.

25         Sergeant DesCamp, could you, please, describe the state of

1    the tarp at this point in time.

2    A.   The tarp is clearly missing from the bottom six feet.

3    Whatever they could reach, they just cut the tarp off all around

4    the bottom of it.

5    Q.   To the right side of the screen, what is the state of the

6    tarp there?

7    A.   It's missing completely.

8    Q.   And what part of the building are we looking at?

9    A.   I'm sorry.  What was the question?

10   Q.   What are we looking at to the right side of the screen?

11   A.   This is the center portion of the scaffolding, and the

12   right side is where the railing is where the defendant was.

13   Q.   Ms. Rohde, if we could fast forward to 2:30, please, and if

14   we could, please, play this video from here to the end.

15        (Video played.)

16   Q.   We paused at three minutes.

17        Sergeant DesCamp, can you, please, explain where this crowd

18   is heading.

19   A.   This crowd is heading up the steps where we were originally

20   trying to hold.  They are heading up to the Upper West Terrace,

21   which I again will say there's many access points to the Capitol

22   building there.

23   Q.   And in particular, which part of the Capitol?

24   A.   The Senate side.

25   Q.   Ms. Rohde, if we could please continue playing.

1          (Video played.)

2    Q.   Sergeant DesCamp, in the background of the final frames of

3    that video, what part of the building was there?

4    A.   That was the Senate side of the Capitol on the Upper West

5    Terrace.

6    Q.   Now, Sergeant DesCamp -- and Ms. Rohde, we can take that

7    down.  Thank you.

8          Sergeant DesCamp, as the crowd rushed up the stairs, did

9    you have any confrontations with some of the people that came

10   up?

11   A.   I did.  Once the crowd ran up the steps to the other side,

12   I was continuing to hold the door with, I think, one officer was

13   standing behind me, and I was directly assaulted with a carbon

14   choke cleaner or WD-40, something of that nature, and bear

15   spray.

16   Q.   And could you describe in particular how you were assaulted

17   with those items?

18   A.   They pushed my mask aside, because my hands were trapped on

19   my PR-24 baton.  As I was holding these people back, they pushed

20   my mask aside.  They sprayed me with a carbon choke cleaner or

21   brake cleaner, whatever it was, and put my mask back on my face.

22   I could still see.  I only know, other than -- smell and taste

23   is how I assessed what the chemical was, but it wasn't

24   irritating my eyes, so I thought that was good.  But they pushed

25   my mask aside and used the bear spray, sprayed it directly into

1    my face and put my mask back on.

2    Q.   Let me stop you there.  What effect did that have, having

3    the bear spray sprayed on you and your mask put back on?

4    A.   A bad effect; that was a serious effect.

5    Q.   And were you able to continue defending your position at

6    that point?

7    A.   I was for a limited amount of time, I was able to stand my

8    ground.

9    Q.   What happened after that?

10        Actually, before we go there, did you still have your

11   less-than-lethal weapon with you?

12   A.   I did at that time, but the crowd was basically up on me

13   pinning my arms down.  They actually managed to -- the FN303 was

14   slung in front of me.  They took it apart.  So it was now the

15   front half of it was missing.

16   Q.   At that point in time, what weapons did you have left?

17   A.   Only my baton and my service weapon.

18   Q.   And after that point, what did you do next?

19   A.   At that point I had support coming up behind me to help me,

20   and I told them, "I can't see."  So they sent me in to

21   decontaminate.

22   Q.   After that, where did you go?

23   A.   After that, I responded to the Lower West Terrace door.

24   Q.   Why?

25   A.   Because that was the primary access point which everybody

1    seemed to be attempting to enter.

2    Q.   And that was after the crowd had come up the stairs you

3    were initially defending?

4    A.   Correct.

5            MS. BERKOWER:  Court's brief indulgence.

6         (Government counsel conferred.)

7            MS. BERKOWER:  No further questions, Your Honor.

8            THE COURT:  Mr. Welch?

9            MR. WELCH:  Thank you, Your Honor.  Court's

10   indulgence, please.

11                      CROSS-EXAMINATION

12            BY MR. WELCH:

13   Q.   Good morning, Sergeant.

14   A.   Good morning.

15   Q.   My name is Bill Welch, and I'm also going to ask you some

16   questions.

17   A.   Okay.

18   Q.   Mr. Reffitt never touched you, did he?

19   A.   Talked to me?

20   Q.   No, touched you.

21   A.   No, he never touched me.

22   Q.   Mr. Reffitt never threw anything at you?

23   A.   No.

24   Q.   Mr. Reffitt never touched Officer Kerkhoff, did he?

25   A.   Correct.

```
 1    Q.    He never threw anything at Officer Kerkhoff?

 2    A.    Correct.

 3    Q.    Mr. Reffitt never threw anything at Sergeant Flood, did he?

 4    A.    No.

 5    Q.    And he never touched Sergeant Flood, did he?

 6    A.    No.

 7    Q.    In fact, I believe you said a few moments ago that after

 8    Sergeant Flood pepper sprayed Mr. Reffitt it incapacitated

 9    Mr. Reffitt; correct?

10    A.    Correct.

11    Q.    When you were inside the scaffolding, you never saw

12    Mr. Reffitt inside that scaffolding; correct?

13    A.    No.

14    Q.    Mr. Reffitt never cut that tarp, did he?

15    A.    No.

16    Q.    When you were pushed by the crowd, Mr. Reffitt was not

17    pushing you?

18    A.    No.

19    Q.    When the crowd pushed your mask back, Mr. Reffitt was not

20    the person who pushed your mask, was it?

21    A.    No.

22    Q.    When you were sprayed with carbon brake spray or WD-40,

23    Mr. Reffitt did not spray you with those things?

24    A.    No.

25    Q.    When someone in the crowd put your mask back on, it was not
```

1   Mr. Reffitt, was it?

2   A.   No.

3   Q.   When your mask was pushed back off again, it was not by

4   Mr. Reffitt, was it?

5   A.   No.

6   Q.   When someone sprayed you with bear spray, that was not

7   Mr. Reffitt, was it?

8   A.   No.

9   Q.   When somebody put your mask back on, that was not

10  Mr. Reffitt, was it?

11  A.   No.

12  Q.   When your FN303 was disassembled, it was not Mr. Reffitt

13  who disassembled it, was it?

14  A.   No.

15  Q.   When you responded to the Lower West Terrace door, you did

16  not see Mr. Reffitt, did you?

17  A.   No, sir.

18  Q.   Mr. Reffitt did not try to disarm Officer Kerkhoff, did he?

19  A.   No.

20  Q.   He did not try to disarm you?

21  A.   No.

22  Q.   He did not try to disarm Sergeant Flood, did he?

23  A.   No, sir.

24  Q.   And I believe you also said that he did not make any

25  threatening statements, did he?

1    A.    They weren't direct threats.  I believe implied, You can't

2    stop us all.  But no direct threats, no.

3    Q.    He didn't threaten you with bodily harm?

4    A.    No.

5    Q.    He did not threaten Officer Kerkhoff with bodily harm?

6    A.    No.

7    Q.    He did not threaten Sergeant Flood with bodily harm?

8    A.    No.

9    Q.    But he didn't listen when he was told to get back, did he?

10   A.    Correct.

11   Q.    He was hit with pepper balls; correct?

12   A.    Correct.

13   Q.    He still didn't get back; correct?

14   A.    Yes, sir.

15   Q.    He was hit with the weighted plastic impact projectiles.

16   That's what an FN303 shoots; correct?

17   A.    Correct.

18   Q.    He still didn't listen; right?

19   A.    Yes, sir.

20   Q.    But then he was hit with the pepper spray; correct?

21   A.    Yes.

22   Q.    And he was incapacitated?

23   A.    Correct.

24   Q.    After you saw Mr. Reffitt for the first time until he was

25   incapacitated, is it fair to say that was approximately five to

1  ten minutes?

2  A.   Yes.

3  Q.   After you saw Mr. Reffitt for the last time, did you go

4  back inside the Capitol building at all?

5  A.   Oh, when I went back inside after the crowd had pushed up

6  the stairs, yes.

7  Q.   Okay.  So you went back inside the Capitol.  And when you

8  were inside the Capitol, you did not see Mr. Reffitt, did you?

9  A.   No.

10 Q.   You did not see Mr. Reffitt break anything?

11 A.   No.

12 Q.   You did not see Mr. Reffitt take anything?

13 A.   No.

14         MR. WELCH:  I pass the witness, Your Honor.

15         THE COURT:  Any redirect?

16                   REDIRECT EXAMINATION

17         BY MS. BERKOWER:

18 Q.   Sergeant DesCamp, you said that you understood the

19 defendant to make implied threats to you.  Is that what you just

20 said to Mr. Welch?

21 A.   Yes.

22 Q.   Could you explain what you mean by that?

23 A.   You can't stop us all; we're going to come up there,

24 basically that -- implying that he's going to attack me to try

25 to get up there.  So it was an implied threat.

```
 1   Q.   Did you draw that from the context in which it was being
 2   said?
 3   A.   Yes.
 4   Q.   What was that context?
 5   A.   It was don't be a traitor, you can't stop us all, and
 6   essentially, we're coming regardless of whether you're there or
 7   not.
 8   Q.   How many people were behind him at that point?
 9   A.   There was quite a few.  So I would say hundreds.
10   Q.   And Mr. Welch asked you if the defendant himself had
11   assaulted you, and you said no; right?
12   A.   Correct.
13   Q.   Were the people that assaulted you a part of the crowd?
14   A.   Yes.
15   Q.   Were those people -- did those people come from behind
16   where the defendant had been engaging with you?
17   A.   Yes.
18             MS. BERKOWER:  Nothing further, Your Honor.
19             THE COURT:  All right.  Can this witness be excused?
20             MR. WELCH:  Yes, Your Honor.
21             THE COURT:  Thank you, sir.
22             THE WITNESS:  Thank you.
23             THE COURT:  Mr. Nestler?
24             MR. NESTLER:  Thank you, Your Honor.  The government
25   calls Special Agent Thomas Ryan.
```

```
 1              THOMAS RYAN, WITNESS FOR THE GOVERNMENT, SWORN

 2                         DIRECT EXAMINATION

 3              BY MR. NESTLER:

 4    Q.   Good morning, sir.

 5    A.   Good morning.

 6    Q.   Could you please state and spell your name for us.

 7    A.   Tom Ryan, T-o-m R-y-a-n.

 8    Q.   Where do you work?

 9    A.   At the FBI here in Washington, D.C.

10    Q.   What is your title with the FBI?

11    A.   I'm a special agent.

12    Q.   How long have you been a special agent with the FBI?

13    A.   21 years.

14    Q.   What are some of the duties that a special agent with the

15    FBI does?

16    A.   Special agents with the FBI investigate violations of

17    federal law, generally speaking.

18    Q.   What was your role with respect to the investigation of

19    what happened at the U.S. Capitol on January 6 and specifically

20    with respect to Guy Reffitt?

21    A.   I was assigned a lead to investigate Guy Reffitt for his

22    actions taken on January 6.  Dallas Division had also opened a

23    case on him.  The Washington Field Office had opened sister

24    cases, if you will, on the same matters.

25    Q.   Approximately when did you start working on the
```

1    investigation related to the attack at the Capitol?

2    A.    It was on the 6th.

3    Q.    Are you aware of the FBI making any arrests related to the

4    attack on the Capitol?

5    A.    Yes.

6    Q.    How long approximately after January 6 did those arrests

7    start being made?

8    A.    It was pretty quick.  I don't know the exact date.  I know

9    there was just a frenzy of activity starting almost immediately

10   on the 6th.  I remember seeing a press release two days later on

11   the 8th that there had already been 13 people charged in federal

12   court here in the District.

13        So it happened pretty quickly, and arrests were probably

14   made shortly thereafter.

15   Q.    Are you aware of any tips coming in to the FBI relating to

16   what happened on January 6?

17   A.    Generally, yes.

18   Q.    Approximately when did those start coming in?

19   A.    Immediately.

20   Q.    And you indicated that the arrests started within a couple

21   of days.  You saw the press release.  Are you aware of any

22   publicity regarding those arrests?

23   A.    As I recall, generally, there was a lot of publicity in the

24   days and weeks immediately following January 6, and it was in

25   D.C. and across several parts of the country as well.

1  Q.   Let's move on to a different topic, Agent Ryan, which is

2  Life360.  Do you know what that is?

3  A.   Yes, I do.

4  Q.   What is it?

5  A.   It's a location-sharing application that's commonly used by

6  parents and friend groups to keep track of one another.

7  Q.   Did you receive any data from Life360 related to Guy

8  Reffitt in connection with this case?

9  A.   I did.

10  Q.   What format did you get that data in?

11  A.   A spreadsheet format.

12  Q.   Was the spreadsheet format easy to look at and understand?

13  A.   No, it was not.

14  Q.   What did -- what kind of data was on the spreadsheet?

15  A.   There were dates, times, and GPS coordinates expressed in

16  latitude, longitude, and so forth.

17  Q.   What did you do with that data to make it easier to

18  understand?

19  A.   I had that data plotted on a map for a graphical

20  representation.

21  Q.   Is that map easier to understand?

22  A.   Much.

23  Q.   Can we pull up on the screen Government Exhibit 604.1 and

24  publish it to the jury.  It's already been admitted into

25  evidence.

1    And on the screen here, Agent Ryan, can you tell us

2    generally what we're looking at?

3    A.   Sure.  It's a map of the central and eastern part of the

4    United States showing the data points or the location of

5    Mr. Reffitt's phone between January 4 and January 6 of 2021.

6    Q.   And according to this map, approximately when did

7    Mr. Reffitt's phone enter Washington, D.C., over there on the

8    far right of the map?

9    A.   Approximately 11:00 p.m. on November 5th.

10   Q.   November 5th?

11   A.   Thank you.  January 5 of 2021.

12   Q.   If we could go to Government Exhibit 604.2, already in

13   evidence.

14   What are we looking at here on this map, Agent Ryan?

15   A.   Same sort of data.  This time, it's the movement of

16   Mr. Reffitt's phone within Washington, D.C., on January 6.

17   Q.   And according to the data received from Life360,

18   approximately where was plaintiff's phone early in the morning

19   and in the evening?

20   A.   At the Melrose Georgetown Hotel.

21   Q.   Is that over there near 25th and K area approximately?

22   A.   Yes.

23   Q.   According to the Life360 data, approximately what time did

24   Mr. Reffitt's phone head out from the Melrose Hotel area on the

25   morning of January 6?

1   A.   It was right around 9:00 a.m.

2   Q.   And according to that data, approximately what time was the

3   phone near the area of the Ellipse?

4   A.   Approximately 11:00 a.m.

5   Q.   What time approximately did the phone depart the area of

6   the Ellipse?

7   A.   Some time between 12:08 and 1:00 p.m.

8   Q.   And did the phone eventually make its way over to the area

9   of the United States Capitol?

10   A.   It did.

11   Q.   Approximately what time was the phone entering the area of

12   the United States Capitol?

13   A.   It looks like just before 2:00 p.m.

14   Q.   And did the phone eventually leave the area of the United

15   States Capitol?

16   A.   It did.

17   Q.   Approximately what was the first data point that Life360

18   reported for the phone leaving the area of the Capitol?

19   A.   Right around 3:00 p.m.

20   Q.   And did the phone eventually make its way back to the area

21   of the Melrose Hotel?

22   A.   It did.

23   Q.   What time approximately did it arrive there?

24   A.   About 4:20.

25   Q.   Ms. Rohde, if we could, please, move to Exhibit 604.3,

1    already in evidence.

2         On this map, Agent Ryan, generally, what are we looking at

3    with respect to the Life360 data?

4    A.   This shows the return of Mr. Reffitt's phone between

5    January 7th and 8th, leaving Washington, ultimately arriving

6    back in Wylie, Texas.

7    Q.   And approximately what time did the phone arrive back in

8    Wylie, Texas, on January 8 there on the far left side of the

9    map?

10   A.   It was 10:38 p.m. Eastern Time, so about 9:38 p.m. Central

11   Time.

12   Q.   Thank you.  And finally, Ms. Rohde, can we go to

13   Exhibit 604.4, already in evidence.

14        Are you aware of the defendant's address, Agent Ryan?

15   A.   I am.

16   Q.   And what is that?

17   A.   1409 Laura Drive in Wylie, Texas.

18   Q.   And generally, what does this diagram show with respect to

19   the location of Mr. Reffitt's phone between January 8th and

20   January 13th of 2021?

21   A.   It shows that the phone was present at the home almost

22   entirely throughout that time.

23   Q.   Thank you.  Let's move to a different topic, and that is

24   the Melrose Hotel.  You indicated earlier that you're familiar

25   with a hotel in Washington, D.C. called the Melrose Hotel; is

1    that right?

2    A.   Yes.

3    Q.   I'm going to pull up on the screen Government Exhibit 411,

4    already admitted into evidence.  If we can blow it up a little

5    bit, please, Ms. Rohde, just the top third.  Thank you.

6         And are you familiar with what this document is, Agent

7    Ryan?

8    A.   I am.

9    Q.   What is it?

10   A.   It's a -- they call it a folio.  It's a receipt for

11   Mr. Reffitt's hotel stay at the Melrose Georgetown Hotel.

12   Q.   And according to the records from the Melrose Hotel, what

13   date did Mr. Reffitt check into the hotel?

14   A.   January 6, 2021.

15   Q.   What date did he depart?

16   A.   January 7, 2021.

17   Q.   And how many guests were in the room?

18   A.   Two.

19   Q.   Thank you, Ms. Rohde.

20        If we could then go on to a new topic, Agent Ryan, which is

21   pulling up initially Government Exhibit 415, already in

22   evidence.  Are you aware, Agent Ryan, whether Mayor Bowser

23   issued a curfew on January 6?

24   A.   I am.

25   Q.   Did she?

1    A.    She did.

2    Q.    Are we looking at here a copy of Mayor Bowser's curfew

3    order?

4    A.    Yes.

5    Q.    All right.  So this is Mayor's Order 2021-002.  Can you see

6    the date on there in the top right?

7    A.    January 6 of 2021.

8    Q.    If we could, please, go to the next page, Ms. Rohde.

9          And did Mayor Bowser make certain findings in connection

10   with issuing this curfew order on January 6?

11   A.    Yes.

12   Q.    If I could, please, ask you to read four of these

13   paragraphs with respect to Mayor Bowser's factual findings in

14   support of her curfew order, starting with paragraph 4.

15   A.    Sure.  "On January 5 through 6, 2021, First Amendment

16   demonstrations were issued permits by the federal government for

17   Freedom Plaza, the Ellipse, the National Mall, and the U.S.

18   Capitol grounds, as Congress meets to accept the Electoral

19   College votes cast to elect Joe Biden and Kamala Harris as the

20   nation's next President and Vice President, respectively.

21         "On the night of January 5, 2020, a number of weapons

22   arrests were made.  On January 6, 2021, protests transformed

23   from peaceful to violent.  Barricades at the Capitol were

24   stormed, and persons have entered the Capitol with the intent of

25   disrupting proceedings.  Protestors brought their own stink

1  bombs and deployed them, sprayed pepper spray, and threw bricks,

2  bottles, and bicycle racks at persons, including law enforcement

3  officers.  Both Capitol Police and Metropolitan Police

4  Department officers have been injured.  Bomb threats have been

5  called in and shots have been fired at the Capitol.

6      "Policing experience shows that violence escalates at

7  night, and thus, we are in reasonable apprehension that the

8  already violent crowd will become even more dangerous.

9      "The health, safety, and well-being of persons within the

10 District of Columbia are threatened and in danger because of the

11 existence of these violent actions and large crowds gathering at

12 night, particularly when they are likely to be in close

13 proximity without wearing face masks and potentially engaged in

14 physical altercations."

15 Q.   Thank you.  If we could, please, go to the final page,

16 Ms. Rohde.

17      After making those factual findings, did Mayor Bowser issue

18 or impose a measure?

19 A.   She did.

20 Q.   And at the bottom of the page there, Ms. Rohde, if we could

21 highlight that.

22      What was the first paragraph of the measure Mayor Bowser

23 imposed in D.C.?

24 A.   The measure stated, "A curfew is hereby ordered commencing

25 at 6:00 p.m. on Wednesday, January 6, 2021, and ending at

1    6:00 a.m. on Thursday, January 7, 2021."

2    Q.   And if we could then go to the next page, after "the curfew

3    shall."

4         "The curfew shall apply" where?

5    A.   "The curfew shall apply citywide."

6    Q.   Thank you.  Did Mayor Bowser sign this order down at the

7    bottom?

8    A.   She did.

9    Q.   Now, on the screen, if you could, Ms. Rohde, please pull up

10   Government Exhibit 703, already in evidence and a stipulation

11   between the parties.

12        And I will now read that to the jury.  It reads as follows:

13        "The United States and defendant Guy Reffitt agree and

14   stipulate to the following:

15        "On January 6, 2021, at around 3:45 p.m., in response to

16   Mayor Bowser's Order imposing a curfew in the District of

17   Columbia because of the events at the U.S. Capitol, Safeway

18   closed all 12 of its stores in the District of Columbia as of

19   4:00 p.m.  Safeway's stores were supposed to close at 11:00 p.m.

20   Safeway later determined that its District of Columbia stores

21   made between 18 percent and 47 percent less in sales to the

22   public on January 6, 2021, than they had been projected to make

23   on that day.

24        "Safeway's District of Columbia stores receive their

25   shipments from a warehouse in Pennsylvania.  After 4:00 p.m.,

1    January 6, 2021, the scheduled shipments for the remainder of

2    the day could not be delivered because the stores were closed

3    and no employees were working."

4            THE COURT:  Ladies and gentlemen, let me remind you

5    that you should consider any stipulation of fact as undisputed

6    evidence in the case.

7            BY MR. NESTLER:

8    Q.   Thank you, Agent Ryan.  Final topic to discuss with you

9    briefly.  I've just handed you a bag, Government Exhibit 55.

10        Do you know what it is?

11   A.   I do.

12   Q.   What is it?

13   A.   It's a Blackhawk CQC SERPA holster.

14   Q.   Who bought that?

15   A.   I did.

16   Q.   Where did you buy it?

17   A.   I believe it was Amazon.

18   Q.   Why did you buy it?

19   A.   I bought it because we did not -- the FBI did not seize

20   Mr. Reffitt's holster for whatever reason during the search of

21   his home.  And rather than try to explain the holster to the

22   jury, we decided to use this version as a demonstration.

23   Q.   Whose idea was it to buy the holster?

24   A.   It was mine.

25           MR. NESTLER:  Thank you, Agent Ryan.  No further

1    questions.

2              THE COURT:  Mr. Welch?

3              MR. WELCH:  Thank you, Your Honor.

4                      CROSS-EXAMINATION

5              BY MR. WELCH:

6    Q.   Good morning, Agent Ryan.

7    A.   Good morning, sir.

8    Q.   Mr. Nestler asked you about how many people had been

9    charged regarding the events at the Capitol at a point shortly

10   thereafter last year.

11        Do you remember when he asked you that a few minutes ago?

12   A.   I think he asked how many arrests were made, and I

13   responded by saying that I had recalled seeing a press release

14   about people being charged.

15   Q.   And you indicated 13 people charged in federal court;

16   correct?

17   A.   That was in, I believe, a January 8 press release, yes,

18   sir.

19   Q.   January 8 last year?

20   A.   2021.

21   Q.   2021.  Have you continued to follow the investigation

22   through your work?

23   A.   Yes.

24   Q.   And currently, approximately how many people have been

25   charged?

1   A.   Oh, I apologize.  I thought you meant Mr. Reffitt's case.

2   I don't really know.

3   Q.   Would it be fair to say more than a hundred?

4   A.   Yes.  I believe it's in several hundred.

5   Q.   More than 500; correct?

6   A.   I believe so.

7   Q.   Now, you also testified about the Life360 exhibits that you

8   prepared; correct?

9   A.   Yes, sir.

10  Q.   And you also testified about Mayor Bowser's curfew order;

11  correct?

12  A.   Yes, I did.

13  Q.   And isn't it true that your Life360 exhibits show that

14  Mr. Reffitt did not violate the Mayor's curfew order?

15  A.   That's correct.

16  Q.   Did you, as a part of your investigation of Mr. Reffitt,

17  confirm that Jackson Reffitt gave an interview on CNN?

18  A.   Yes.

19  Q.   And did you also confirm as a part of your investigation of

20  Mr. Reffitt that Jackson Reffitt put up a GoFundMe page for

21  himself?

22  A.   That came to my attention, yes, sir.

23          MR. WELCH:  Pass the witness.

24          THE COURT:  Any redirect?

25          MR. NESTLER:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Thank you, sir.

2      So Mr. Nestler, how long do you think this last witness

3  will be?

4          MR. NESTLER:  Approximately 45 minutes or so.

5          THE COURT:  All right.  So ladies and gentlemen, I

6  think this is probably a good time to take our mid-morning

7  break.  We will come back and finish the government's

8  case-in-chief.

9      You should know that after the government completes its

10  case-in-chief I will likely send you for an extended lunch for a

11  couple of hours so that I can work through some legal issues

12  with the parties.  So we will talk about that when we end, but I

13  just want to give you a heads-up.  You're probably going to have

14  a longer-than-normal lunch today.

15      All right.  So we will adjourn for ten minutes.  We will

16  come back at 11:00 a.m.

17      (Jury exited courtroom.)

18          THE COURT:  So counsel, my preference would be, after

19  the government rests, to go ahead and dive into jury

20  instructions.  Are you all prepared to do that?

21          MR. WELCH:  Yes.

22          THE COURT:  That will give us a chance to make any

23  revisions and come back and give you the revised instructions to

24  look at one more time before I instruct the jury.

25          MR. NESTLER:  That's fine, Your Honor.

1        And we made very effective use of the time this morning to

2    go over the exhibits --

3            THE COURT:  Great.

4            MR. NESTLER:  -- with both counsel and Mr. Hopkins.  I

5    think we're all in agreement with what comes in.

6        When Sergeant Flood is done, we can go ahead and rest

7    before the jury, if you would like.

8            THE COURT:  That's great.  Go ahead and rest.  I will

9    send them away.  We will talk jury instructions.  That will give

10   me a chance to talk to Mr. Reffitt.  And when we come back after

11   lunch, Mr. Welch, you can indicate that the defense isn't

12   presenting a case and rest, and then I will be prepared to

13   instruct the jury.

14           MR. NESTLER:  Yes, Your Honor.  Thank you.

15           THE COURT:  Any other issues, Mr. Welch?

16           MR. WELCH:  The only thing I can think of, Your Honor,

17   is somewhere in there I just need to note my Rule 29 motion on

18   the record, even though we've already discussed how we're going

19   to handle it.

20           THE COURT:  Right.  So after the government rests, in

21   that break, you can also note that then.  All right?

22           MR. WELCH:  All right.  Thank you.

23           THE COURT:  Does that make sense?

24           MR. WELCH:  Yes, it does.  I just wanted to make sure

25   I did it --

1          THE COURT:  So Rule 29, jury instructions, colloquy

2     with Mr. Reffitt.  We can do all of that in that break, and then

3     we will give you an hour for lunch, and we will come back and

4     let you take a look at the instructions before I read them.

5          All right.  Thank you all.

6          (Recess taken from 10:51 a.m. to 11:02 a.m.)

7          THE COURT:  Does either side have any objection to

8     letting more members of the public and media sit in the jury box

9     during closings?  They've been limited here.  I'm inclined to

10    allow that, but I wanted to ask both sides.

11         You're okay with it, Mr. Welch?

12              MR. WELCH:  I am, Your Honor.

13              THE COURT:  Mr. Nestler?

14              MR. NESTLER:  That's fine for the government, Your

15    Honor.

16         We also wanted to flag for closings that some of the people

17    who testified as government witnesses may sit in the overflow

18    courtroom for closing, with the Court's permission.

19              THE COURT:  And they've all been excused; right?

20              MR. NESTLER:  Yes.

21              THE COURT:  Any objection, Mr. Welch?

22              MR. WELCH:  No.

23              MR. NESTLER:  Thank you.

24         (Jury entered courtroom.)

25              THE COURT:  All right.  Mr. Nestler?

```
 1              MR. NESTLER:  Thank you, Your Honor.  The government
 2   calls Sergeant Matthew Flood.
 3          MATTHEW FLOOD, WITNESS FOR THE GOVERNMENT, SWORN
 4                        DIRECT EXAMINATION
 5              BY MR. NESTLER:
 6   Q.   Good morning, sir.
 7   A.   Good morning.
 8   Q.   Could you please state and spell your name.
 9   A.   It's Matthew Flood, M-a-t-t-h-e-w F-l-o-o-d.
10   Q.   And Sergeant Flood, where do you work?
11   A.   I work for the United States Capitol Police.
12   Q.   What is your position there?
13   A.   I'm currently a sergeant.
14   Q.   And that black bar in front of you is a microphone.  If you
15   could do your best to keep your voice up, we would appreciate
16   it.
17   A.   Okay.
18   Q.   How long have you been with the U.S. Capitol Police?
19   A.   Currently in my 15th year.
20   Q.   And what is your assignment right now with the U.S. Capitol
21   Police?
22   A.   I'm a supervisor for the First Responders Unit.
23   Q.   What is the First Responders Unit?
24   A.   The First Responders Unit is responsible for the security
25   of the exterior of the Capitol building, and they're the first
```

 1   response to any critical incident at the Capitol.

 2   Q.   Prior to being with the First Responders Unit, what was

 3   your assignment with the Capitol Police?

 4   A.   For two years, I served as a criminal investigator in our

 5   Threat Assessment Section.

 6   Q.   What is the Threat Assessment Section?

 7   A.   They investigate threats against members of Congress.

 8   Q.   Prior to your time in the Threat Assessment Section, what

 9   job did you have with the Capitol Police?

10   A.   I spent nine years as a special agent with the Dignitary

11   Protection Division.

12   Q.   What does the Capitol Police's Dignitary Protection

13   Division do?

14   A.   The Dignitary Protection Division provides security details

15   for congressional leadership throughout the country and the

16   world.

17   Q.   Sergeant Flood, do you have any collateral assignments with

18   the Capitol Police?

19   A.   Yes.

20   Q.   What are your collateral assignments?

21   A.   I'm a CDU instructor and a part of the Bicycle Response

22   Team.

23   Q.   What does the Bicycle Response Team do?

24   A.   The Bicycle Response Team is essentially a mobile CDU

25   component.

1   Q.   And CDU means what?

2   A.   Civil Disturbance Unit.

3   Q.   And you said you're an instructor with the CDU?

4   A.   Yes.

5   Q.   Are you familiar with the term "grenadier"?

6   A.   Yes.

7   Q.   What is a grenadier?

8   A.   A grenadier is someone that's trained in the use of

9   less-lethal munitions, and they support our typical CDU.

10  Q.   Are you also a grenadier?

11  A.   Yes.

12  Q.   Let's talk about January 6 of 2021, Sergeant Flood.  Do you

13  recall approximately what time you arrived at work that day?

14  A.   10:00 a.m.

15  Q.   And what was your attire that day before you headed out on

16  your assignment?

17  A.   It was my usual duty uniform.

18  Q.   And can you describe what your duty uniform looks like?

19  A.   It was a patrol jacket, cargo pants, and a jacket with the

20  Capitol Police insignia, name tag, badge.

21  Q.   So are your name tag and badge visible on the outside of

22  the uniform?

23  A.   Yes.

24  Q.   And were you carrying any weapons with you when you went

25  out for the day?

1  A.   I had my duty belt, which had my firearm, baton, and OC

2  spray.

3  Q.   Did you have a gas mask with you?

4  A.   Yes.

5  Q.   And did you have a radio with you?

6  A.   Yes.

7  Q.   Who were your partners when you went out for the day on

8  January 6 of 2021?

9  A.   I was partnered with Sergeant DesCamp and Officer Kerkhoff

10  and another sergeant.

11  Q.   And did you first travel in a vehicle?

12  A.   Yes.

13  Q.   Who was driving?

14  A.   I was driving the vehicle.

15  Q.   Where did you park the vehicle?

16  A.   I drove to the East Front Plaza of the U.S. Capitol.

17  Q.   Why were you there on the east front?

18  A.   At the time there were several hundred demonstrators that

19  had already arrived at the Capitol.

20  Q.   Did there come a time when you left the east front to go

21  somewhere else?

22  A.   Yes.

23  Q.   Why did you do that?

24  A.   I heard an urgent radio call that the perimeter along First

25  Street had been breached.

1  Q.   And is First Street on the east side or the west side of

2  the Capitol?

3  A.   It's on the west side of the Capitol.

4  Q.   So if you were on the east side, how did you get to the

5  west side?

6  A.   Myself and the other officers ran to the other side of the

7  building.

8  Q.   Now, you indicated earlier that you were a grenadier.  Do

9  grenadiers carry certain things on their backs?

10 A.   Yes.  They carry backpacks.

11 Q.   Did all of the grenadiers on January 6 have grenadier

12 backpacks?

13 A.   No.

14 Q.   Why not?

15 A.   At the time the department didn't have enough.

16 Q.   Were you one of the grenadiers who had a backpack or one

17 without a backpack?

18 A.   I was without a backpack.

19 Q.   So as a grenadier without a backpack, what was your role

20 with respect to the officers who did have backpacks?

21 A.   I was more in a support role at that time.  I would assist

22 them by taking things out of their backpack if they needed it,

23 additional munitions.  I would also try to watch over them as

24 sort of their eyes.

25 Q.   Why is it important to have an officer watching over other

1    officers as being their eyes?

2    A.    Just in my mind, I thought that they would be focused more

3    on the rioters.  And so I wanted to make sure I watch over them,

4    because there were debris and lasers and different things that

5    were being aimed and thrown at us.

6    Q.    When you got to the west side of the Capitol, where did you

7    go?

8    A.    Originally, we went to a higher position to kind of

9    evaluate what we were dealing with.

10   Q.    And when you went to the higher position on the west side,

11   can you describe for the jury what you saw down below?

12   A.    I saw lots of people streaming in through what looked like

13   the perimeter on First Street.  Street officers had attempted to

14   make a police line at the base of the inaugural stage.  They

15   were fighting with rioters at that time.

16   Q.    And you indicated the perimeter along First Street is on

17   the west side of the Capitol; is that right?

18   A.    Yes.

19   Q.    So all the people you saw fighting with police officers at

20   the line at the base of the inaugural stage, were they within or

21   outside of the security perimeter?

22   A.    They were already within the perimeter.

23   Q.    What did that mean to you?

24   A.    It was a really bad situation, where we had hundreds of

25   people that were already inside the security perimeter, and

1  essentially, we had to try to find a way to keep them out or

2  push them back out of the perimeter.

3  Q.  What did you do when you were on the elevated position

4  surveying the crowd?

5  A.  I moved down to the center of the inaugural stage.

6  Q.  And what were you doing there?

7  A.  At that time they started to deploy some of the less-lethal

8  munitions.  So I was assisting some of the grenadiers.

9  Q.  So what are you doing assisting the other grenadiers in

10  deploying their less-than-lethal munitions?

11  A.  I'm checking on them.  I'm giving them additional

12  munitions.  I'm pulling things out of their backpack.  I'm

13  watching -- I'm trying to watch the crowd or the rioters as much

14  as I can.  Like I said, there was lasers and things.  So we were

15  trying to communicate with one another to give each other, you

16  know, a better idea of the dangers that we were facing.

17  Q.  Can you describe the volume level at this time?

18  A.  Extremely loud.  It was very difficult to hear, to

19  communicate with either my teammates that were -- that were

20  right next to me.

21  Q.  You indicated that you're in sort of an assisting role.

22  The Tippmann PepperBall launcher and the FN303 projectile

23  launcher, what mechanism makes those weapons work?

24  A.  It's compressed air.

25  Q.  And is that compressed air unlimited?

```
1   A.   No, it is not.

2   Q.   So what do you do with respect to the compressed air?

3   A.   We would have to refill the tanks periodically.

4   Q.   Is that one of your roles?

5   A.   I assisted -- I didn't fill any of the tanks that day.

6   Q.   Did there come a time when you made your way from the

7   center stage on the west side to the north side?

8   A.   Yes.

9   Q.   And if we could, Ms. Rohde, please pull up Government

10  Exhibit 203, already in evidence, and display it to the jury.

11       And we're going to start here at about 33 seconds.  This

12  does have audio.  Thank you, Agent Ryan.  If we could play that

13  forward for about 30 seconds.

14       (Video played.)

15  Q.   We can stop it there at 1:13.

16       Did you see who just entered the frame from between the

17  scaffolding and that structure behind it?

18  A.   Yes.  That's me.

19  Q.   What are you wearing on your face?

20  A.   I have a gas mask on.

21  Q.   And who were the officers who were standing on that landing

22  right before you got there?

23  A.   It's Sergeant DesCamp and Officer Kerkhoff.

24  Q.   Why did you go to this area?

25  A.   I moved between several different areas to check on the
```

1  grenadiers.  So I went to this area because I heard that they

2  were on the north side, and I wanted to go and check on them.

3  Q.   When you got to that area, where, if anywhere, did you put

4  your hands?

5  A.   I put my hand on Officer Kerkhoff.

6  Q.   Why did you put your hand on Officer Kerkhoff?

7  A.   It's typically -- it's a way that we communicate to let

8  someone know physical contact there, especially in stressful

9  situations, very loud, just allows them to know that I'm right

10  there.

11  Q.   When you put your hand on Officer Kerkhoff, did you have a

12  conversation with her?

13  A.   Yes.

14  Q.   What did she inform you?

15  A.   It was brief.  She said that there was -- essentially, the

16  person in the blue jacket is a problem.

17  Q.   And what did that mean for you?

18  A.   It meant that I would try to do whatever I could to assist.

19  Q.   Had you seen the person in the blue jacket yet before you

20  turned the corner here?

21  A.   No.

22  Q.   What did you do after she told you the person in the blue

23  jacket was a problem?

24  A.   I went down the stairs and deployed a 16-ounce can of

25  OC spray.

1    Q.   If we could play it forward to about eight seconds and

2    stopping at 1:30, Ms. Rohde, please.

3         (Video played.)

4    Q.   And so what do you do for these eight seconds here,

5    Sergeant Flood?

6    A.   I moved in front of the very small police line we had.  I

7    moved down the stairs and deployed the OC spray on the person

8    with the blue jacket.

9    Q.   Do you see that person with the blue jacket sitting in the

10   courtroom today?

11   A.   Yes.

12   Q.   Can you, please, point to him and tell us what he's

13   wearing.

14   A.   Sitting right here, and he's wearing a blue shirt.

15        MR. NESTLER:  Let the record reflect there's been an

16   identification of the defendant.

17        THE COURT:  So reflects.

18        BY MR. NESTLER:

19   Q.   Why are you targeting this person in the blue jacket?

20   A.   I'm targeting him because he was -- I was told that he was

21   a problem.  He's breached the perimeter.  He's approaching other

22   officers.  And he's in front of all the other rioters.

23   Q.   And could you approximate how many people are behind him?

24   A.   It's difficult.  Hundreds.

25   Q.   Was the crowd saying anything around this time?

1   A.   They were just loud, yelling obscenities, "Fuck you,

2   traitor.  Let us in."

3   Q.   Could you tell who those obscenities were being hurled at?

4   A.   I took it they were being directed at myself and the other

5   officers who were on the landing.

6   Q.   What did it mean to you that people were calling you a

7   traitor?

8   A.   I don't know.  I just took it as a -- I don't know.  It was

9   hurtful somewhat, I guess.

10  Q.   When the crowd was yelling "let us in," what did that mean

11  to you?

12  A.   In my view, I thought they wanted to get into the building

13  where the members of Congress were.

14  Q.   As a Capitol police officer, did that concern you?

15  A.   Yes.

16  Q.   Why?

17  A.   My job is to protect members of Congress, congressional

18  staff, anyone that is visiting these buildings.  So their

19  security is my concern.

20  Q.   At the time you sprayed the defendant with your OC spray,

21  did you see what he did right afterwards?

22  A.   I did not.

23  Q.   If we could play this forward for about ten seconds.

24       (Video played.)

25  Q.   We can stop there at 1:30.

1      Did you hear the crowd make any noises after you sprayed

2   the defendant?

3   A.   Yes.

4   Q.   What noise was that?

5   A.   Loud booing.

6   Q.   What did that mean for you?

7   A.   Essentially, it meant that they were all together.  They

8   didn't like that I had sprayed the person in the blue jacket

9   with OC spray.

10  Q.   And at 1:31 here on the screen, who is the individual

11  holding the less-than-lethal weapon?

12  A.   That's Sergeant DesCamp.

13  Q.   If we could play that forward for just a few seconds.

14       (Video played.)

15  Q.   And you can stop it there.  Thank you, Ms. Rohde.

16       Are you aware of other videos capturing this interaction

17  from a slightly different angle?

18  A.   Yes.

19  Q.   If we could pull up on the screen Government Exhibit 201,

20  already in evidence.  And if we could go to 13 seconds, please,

21  Ms. Rohde.  Thank you.

22       Can you identify the two officers we see in the front

23  there?

24  A.   It's Sergeant DesCamp and Officer Kerkhoff.

25  Q.   And if we could play that forward for about five seconds.

1     (Video played.)

2  Q.   At 18 seconds, who just enters the frame?

3  A.   That's me.

4  Q.   What are you holding in your left hand?

5  A.   A 16-ounce can of OC spray.

6  Q.   And why are you holding it?

7  A.   I'm holding it because I'm getting ready to deploy it.

8  Q.   What are you doing with your right hand there on the

9  canister?

10  A.   So I'm removing a safety pin that needs to be removed

11  before you can deploy the can of OC.

12  Q.   Is this the first time you're deploying this can?

13  A.   This is the first time that day, yes.

14  Q.   Do you deploy this can of OC spray when you are far from an

15  individual or close to an individual?

16  A.   I typically need to be closer to have the desired effect.

17  Q.   Why?

18  A.   From a distance, it won't be effective.  Essentially, it's

19  not effective from a long distance.

20  Q.   And how does that compare to the PepperBall launcher and

21  the FN303?

22  A.   You have a little bit more distance where it's effective.

23  Q.   So what does it mean in terms of how close the crowd is

24  getting that you're about to use your 16-ounce can of pepper

25  spray?

1    A.    The crowd is advancing, and I'm essentially trying to hold

2    this crowd back.

3    Q.    If we could play it forward until about 30 seconds,

4    Ms. Rohde.

5          (Video played.)

6    Q.    Did you see whether the defendant took any steps forward

7    after you sprayed him?

8    A.    It looks like he stepped forward.

9    Q.    Do you know how many steps you went down in order to access

10   the defendant?

11   A.    I'm not sure.  Four or five maybe.

12   Q.    How did you feel walking down those stairs?

13   A.    I was exposed.  So it was certainly dangerous.  The white

14   tarp behind me was filled with rioters that were in there as

15   well.  So walking in front of the police line, there's always

16   the worry you're going to be pulled into the crowd.

17   Q.    What would that mean for you if you were pulled into the

18   crowd?

19   A.    It would certainly be extremely dangerous.

20   Q.    Are you a righty or a lefty?

21   A.    I'm right-handed.

22   Q.    Why were you spraying the defendant with your left hand?

23   A.    I wanted my right hand available to access my firearm if I

24   needed to.

25   Q.    If we could now move to Exhibit 205, please, Ms. Rohde.

1        Before we start playing some of the surveillance video, I

2   want to ask you a question, Sergeant Flood.  Did there come a

3   time when you had to remove a different weapon from your utility

4   belt?

5   A.   Yes.

6   Q.   And what weapon was that?

7   A.   I removed the baton from my belt.

8   Q.   And if we could go on Exhibit 205 to 1:51:15, about 5:10 on

9   the counter.  If we could play there for a few seconds,

10  Ms. Rohde.

11       (Video played.)

12  Q.   And if we could stop there for a second.

13       Do you see yourself?

14  A.   Yes.

15  Q.   Where are you on this screen?

16  A.   I'm sort of behind the planter, wearing a gas mask.

17  Q.   Are you fairly tall or fairly short?

18  A.   Tall.

19  Q.   And is the defendant still visible?

20  A.   Yes.

21  Q.   And where is he at this point?

22  A.   He's still on the banister.

23  Q.   And if we could play this forward to 1:51:26.

24       (Video played.)

25  Q.   And we can stop it there.  What did you take off your belt

1    with your right hand?

2    A.    I pulled out my baton.

3    Q.    Why did you take your baton off your belt?

4    A.    At this time I thought the crowd was going to surge forward

5    and it was going to turn into a hand-to-hand battle.

6    Q.    What would it mean to you if this was about to turn into a

7    hand-to-hand battle?

8    A.    It's just very dangerous.  There's only a few of us there.

9    We're definitely outnumbered.  And so that -- that was the

10   weapon that I chose to pull out to try -- to try to fight them

11   back.

12   Q.    And if we could rewind it for about five seconds,

13   Ms. Rohde.

14        And I'm going to ask you, Sergeant Flood, to focus on the

15   defendant this time, rather than focusing on yourself, from

16   1:51:20, and let us know what you observe the defendant doing

17   with his right arm.

18        (Video played.)

19   Q.    And you can stop it there, Ms. Rohde, at 1:51:31.

20        Did you see what the defendant was doing?

21   A.    Yes.

22   Q.    What is that?

23   A.    It appears he was gesturing to the crowd to continue moving

24   forward.

25   Q.    What did that mean for you?

1  A.   It meant that he's trying to get everyone to continue

2  moving forward towards our position.

3  Q.   How would you characterize the crowd at this point?  Are

4  they peaceful?

5  A.   No.  Angry, loud, violent.

6  Q.   When you had seen the defendant move forward, did you

7  notice anything that the crowd did behind him?

8  A.   They would fill the gap behind him as he moved forward.

9  Q.   And what did that mean for you?

10 A.   It just makes it more dangerous.  You typically want some

11 type of stand-off distance, and the closer that a large, violent

12 crowd gets to you, the more dangerous it becomes.

13 Q.   If we could fast forward, please, Ms. Rohde, to 1:53:54,

14 and play for about five seconds.

15      (Video played.)

16 Q.   You can stop it there, Ms. Rohde.

17      Did you see that tall officer just put something on his

18 back?

19 A.   Yes.

20 Q.   Who is that person?

21 A.   That's me.

22 Q.   What are you putting on your back at 1:53:38?

23 A.   I picked up a grenadier backpack.

24 Q.   Why?

25 A.   It was laying on the ground, and I thought that we weren't

1   going to be able to hold this position anymore.  It had chemical

2   munitions in it, and I didn't want to leave them for the rioters

3   that were coming towards us.

4   Q.   If we could fast forward, please, Ms. Rohde, to 1:54:44.

5        (Video played.)

6   Q.   Did there come a time while you were on this landing when

7   you actually did have to engage in close-quarters combat with

8   the people coming up the stairs?

9   A.   Yes.

10  Q.   We're going to play this video forward for about 15

11  seconds, please, Ms. Rohde.

12       (Video played.)

13  Q.   If you could pause it there.

14       Did you see what the people coming up the stairs did?

15  A.   Yeah.  They're throwing debris, whatever was there, and it

16  appears they're spraying something at the officers.

17  Q.   Were you able to see what the defendant was doing during

18  this time?

19  A.   No.

20  Q.   If we could rewind about ten seconds and ask you to focus

21  on the defendant during this ten-second period, please, Sergeant

22  Flood.

23       (Video played.)

24  Q.   If we could pause it there at 1:54:58, did you see what the

25  defendant was doing with his right hand during this assault?

```
 1    A.    Yeah, he was waving --

 2              MR. WELCH:  Objection.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  He was waving towards the rioters,

 5    gesturing them to move forward.

 6              BY MR. NESTLER:

 7    Q.    And with rioters moving forward, where would they be if

 8    they got forward?

 9    A.    They're going to be on our position.

10    Q.    Are you aware of a different video capturing a different

11    angle of this incident that you can see sort of behind the

12    cauldron?

13    A.    Yes.

14    Q.    All right.  At this time I'm going to move to Government

15    Exhibit 202, already in evidence.

16              Do you see the defendant here?

17    A.    Yes.

18    Q.    And where is he?

19    A.    He's on the banister.

20    Q.    Okay.  We will play it forward for about 12 seconds.

21              (Video played.)

22    Q.    Stop it there.  Do you see the defendant making any

23    gestures?

24    A.    He's gesturing with his arm for them to move forward.

25    Q.    And if we could play it forward for about ten seconds.
```

1    (Video played.)

2    Q.   Stop there at 22 seconds.

3         Did you see the defendant make any additional gestures?

4    A.   I didn't.  I wasn't watching him.

5    Q.   I'm sorry.  Before we rewind it, can you tell us who just

6    entered the frame?

7    A.   That's me.

8    Q.   And what are you wearing on your face?

9    A.   I have a gas mask.

10   Q.   Do all of your officer colleagues have a gas mask?

11   A.   No.

12   Q.   What does that mean for you?

13   A.   Well, it means they're going to be exposed to any sort of

14   chemical irritant that's going to be deployed by one of us or

15   the rioters.

16   Q.   Are people in the crowd deploying chemical irritants?

17   A.   Yes.

18   Q.   If we could rewind about six or seven seconds, Ms. Rohde.

19        And I will ask you to focus on the defendant at the time

20   you are entering this frame.

21        If we could go back to about 18 seconds and play it forward

22   from there.  Thank you, Ms. Rohde.

23        (Video played.)

24   Q.   What did you observe the defendant doing at the time you

25   were entering this frame?

```
 1    A.    He's waving towards the crowd for them to move forward.
 2    Q.    What do you think about the position that you're trying to
 3    hold around this time?
 4    A.    It's a very difficult -- it's a difficult position to hold,
 5    just where it is.  It's very narrow.
 6    Q.    If we could play forward to about 29 seconds, please.
 7          (Video played.)
 8    Q.    If you could go to about 20 seconds.
 9          If you could listen for any audible noises, that would be
10    helpful, Sergeant Flood.
11          (Video played.)
12    Q.    You can stop there at 30 seconds.
13          Did you hear that loud noise?
14    A.    Yeah.  It sounded like an explosion of some type.
15    Q.    Do you have an idea about what it might have been?
16    A.    I thought maybe it was a flash bang.
17    Q.    What's a flash bang?
18    A.    Just sort of a concussion grenade.
19    Q.    Did you know where the flash bang was coming from?
20    A.    No.
21    Q.    Did you believe it was coming from officers deploying it?
22    A.    No.  We did not have -- Capitol Police did not have flash
23    bangs that day.
24    Q.    So who did you think was deploying the flash bang?
25    A.    I thought it was coming from the rioters.
```

1  Q.   What did that mean for you?

2  A.   It's definitely upped the ante, that they've brought some

3  type of other explosive device to use against us.

4  Q.   And do you see officers on stairs here on the left side of

5  the frame at 30 seconds?

6  A.   Yes.

7  Q.   What's on the top of that landing, at the top of those

8  stairs?

9  A.   That's one of the levels of the United States Capitol.  So

10  that's where there's several doors, access points.

11  Q.   And if a person were to go into the Capitol through one of

12  those doors, where would they be in the Capitol?

13  A.   They would be on the north side of the Capitol.

14  Q.   And which chamber is on the north side?

15  A.   It's the Senate chamber.

16  Q.   Shortly after this interaction, did you leave this area?

17  A.   Yes.

18  Q.   Why?

19  A.   I heard that the building itself had been breached.  So I

20  wanted to move into the building and go to the Senate chamber to

21  try to assist the senators that were there.

22  Q.   And before you left this area, was the defendant still here

23  on the banister, as far as you knew?

24  A.   Yes.

25  Q.   And so you said you went to the Senate chamber after going

1    inside.  Why did you decide to go to the Senate chamber?

2    A.   I heard that there was a breach on the north side.  That's

3    where the Senate chamber is.  And I thought if they were

4    breaching the building, we're going to go to where the members

5    were, which is the Senate chamber.

6    Q.   From your time in the Dignitary Protection Division detail

7    protecting members of Congress, did you have any experience with

8    who might need assistance if the building were breached?

9    A.   Yes.

10   Q.   And what's that?

11   A.   It's the typical -- the policy of how we sort of reinforce

12   different areas and evacuate members of Congress, if needed.

13   Q.   And did there come a time when you did help evacuate

14   members of Congress?

15   A.   Yes.

16   Q.   Why?

17   A.   Rioters had breached the building.  They had reached the

18   second floor.  They were just outside the Senate chamber.  There

19   was only one access point that was left to evacuate from, and

20   that's where we ended up evacuating the senators from.

21   Q.   And did you assist with that?

22   A.   Yes.

23   Q.   What are you sworn to do as a United States Capitol police

24   officer?

25   A.   Protect members of Congress, congressional staff, and

1    visitors to the Capitol.

2              MR. NESTLER:  Thank you, Sergeant Flood.

3              THE COURT:  Mr. Welch?

4              MR. WELCH:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6              BY MR. WELCH:

7    Q.   Good morning, Sergeant.

8    A.   Good morning.

9    Q.   My name is Bill Welch.  I'm also going to ask you some

10   questions.

11   A.   Okay.

12   Q.   Your attention on January 6 was initially called to

13   Mr. Reffitt when Officer Kerkhoff told you he was a problem; is

14   that right?

15   A.   Yes.

16   Q.   And shortly thereafter, you pepper sprayed him; correct?

17   A.   Yes.

18   Q.   And he sat down on the railing after you pepper sprayed

19   him; correct?

20   A.   From the video, yes.

21   Q.   And do you remember that?

22   A.   I remember deploying the pepper spray, yes.

23   Q.   Mr. Reffitt never touched you, did he?

24   A.   No, he didn't.

25   Q.   And he never touched Officer Kerkhoff; correct?

1   A.   No.

2   Q.   Or Sergeant DesCamp; correct?

3   A.   No.

4   Q.   Or anyone else, to your knowledge?

5   A.   No.

6   Q.   And he never threw anything at you; correct?

7   A.   I don't know.

8   Q.   Well, you didn't see him -- you can't look at him right now

9   and look him in the face and say, "I know you threw this at me"?

10  A.   No, I can't say that.

11  Q.   And you never saw him throw anything at Officer Kerkhoff?

12  A.   No.

13  Q.   Never saw him throw anything at Sergeant DesCamp; correct?

14  A.   No.

15  Q.   He did not try to take your pepper spray away from you?

16  A.   No.

17  Q.   He did not try to take your baton away from you?

18  A.   No.

19  Q.   Did not try to take your service weapon away from you?

20  A.   No.

21  Q.   When you did later remove your baton, it was not in

22  response to Mr. Reffitt; it was in response to another

23  situation?  Is that right?

24  A.   It was in response to the situation on the stairs.

25  Q.   But not specifically because you were confronting

1    Mr. Reffitt; he had already been pepper sprayed.  Isn't that

2    right?

3    A.   He had been pepper sprayed.  He was still there.

4    Q.   Would it be fair to say that he was incapacitated after you

5    pepper sprayed him?

6    A.   I don't know.

7    Q.   You did not grab your service weapon in response to your

8    interaction with Mr. Reffitt, did you?

9    A.   No.  I had it available.

10   Q.   But you didn't need to use it?

11   A.   No, I didn't draw it.

12   Q.   At some point you went back in the Capitol building to

13   evacuate senators; is that correct?

14   A.   Yes.

15   Q.   While you were in the building evacuating senators, you did

16   not see Mr. Reffitt?

17   A.   No.

18   Q.   You did not see him break anything?

19   A.   No.

20   Q.   You did not see him take anything?

21   A.   No.

22   Q.   Have you been trained to use the pepper spray?

23   A.   Yes.

24   Q.   Did part of that training involve you being sprayed with

25   pepper spray yourself?

1  A.    Yes.

2  Q.    Could you, please, tell us what that was like.

3  A.    It's a burning sensation that you have.  It typically

4  affects your -- it can affect your respiratory system, make it

5  difficult to breathe, makes your eyes water or close shut, and

6  then burning sensation on the skin.

7  Q.    How long did that last for you?

8  A.    It depends.  It could be 30 minutes, could be an hour.

9         MR. WELCH:  I pass the witness.

10        THE COURT:  Any redirect?

11                    REDIRECT EXAMINATION

12        BY MR. NESTLER:

13  Q.    Sergeant Flood, Mr. Welch asked you if the defendant

14  personally assaulted you.  Do you remember that question?

15  A.    Yes.

16  Q.    From your perspective, did the defendant appear to be a

17  part of the crowd that was coming up the stairs?

18  A.    Yeah, he was a part of the rioters, the crowd that was

19  coming up the stairs at us.

20  Q.    And when you first encountered the defendant, where was he

21  with respect to that crowd?

22  A.    He was in front.

23  Q.    What does that mean for you from your perspective?  How do

24  you interpret that?

25  A.    He was leading them up the stairs.

1   Q.   Mr. Welch also asked you about your service weapon and how
2   you had it on your belt; is that correct?
3   A.   Yes.
4   Q.   Did the thought cross your mind to draw your service
5   weapon?
6   A.   At some point, yes.
7   Q.   Why did you consider drawing your service weapon?
8   A.   We were being overwhelmed.  A lot of people in the crowd
9   were wearing tactical gear.  It gave me the impression that some
10  of them were -- possessed weapons, firearms, different things
11  that could be dangerous to us.
12  Q.   What would that mean for you?
13  A.   It'd be extremely dangerous.
14  Q.   What impact did the size of the crowd have on you, if any,
15  about your decision about not actually drawing your service
16  weapon?
17  A.   For me, you're accountable for every round you fire.  So
18  the likelihood of discharging your firearm and not injuring
19  anybody else are very slim.
20  Q.   What were you concerned about -- what would happen if you
21  did draw your firearm in terms of what the crowd would do?
22  A.   They might become more violent or take weapons out that
23  they had.
24            MR. NESTLER:  Thank you.  No further questions.
25            THE COURT:  Is this witness excused?

1    MR. WELCH:  Yes, Your Honor.

2    THE COURT:  All right.  Mr. Nestler, does the
3    government have any further witnesses?

4    MR. NESTLER:  No, Your Honor.  At this time the
5    government rests its case.

6    THE COURT:  All right.  Thank you, Mr. Nestler.

7    So ladies and gentlemen, the government has now completed
8    its case-in-chief.  As I said before, we're going to take a
9    lengthier break now so that I can resolve some legal issues with
10   counsel.  And so I'm going to ask that you come back just a few
11   minutes before 2:00 p.m.  So you get an extra long lunch.

12   Again, I want to remind you, we're getting close to the end
13   of the trial, but do not talk to anyone, including each other,
14   about the case.  Don't do any research.  If you hear anything,
15   bring it to our attention through Mr. Hopkins.  And don't read
16   anything, please.

17   All right.  We will see you back here at 10 of 2:00,
18   please.

19   (Jury exited courtroom.)

20   THE COURT:  All right.  Mr. Welch, do you have a
21   motion?

22   MR. WELCH:  I do.  Thank you.  Pursuant to Federal
23   Rule of Criminal Procedure 29, I move for judgment of acquittal.
24   Given our earlier discussions and the Court's decision to
25   ultimately take that under consideration, I would like to file a

```
 1    proper motion and submit that for the Court's consideration.

 2              THE COURT:  You mean after trial?

 3              MR. WELCH:  Yes, Your Honor.

 4              THE COURT:  Do you want to make any argument now?

 5              MR. WELCH:  Your Honor, may we speak on the phone for

 6    a moment?

 7              THE COURT:  Sure.

 8         (Pause.)

 9              THE COURT:  Sorry, folks.  We're going to have to wait

10    until we figure out what's going on with that.  Let's hold off

11    on that for now.

12              MR. WELCH:  Okay.

13              THE COURT:  Why don't we move to jury instructions.

14         Did you all have a chance to look at the revisions that we

15    made to the jury instructions?

16              MR. WELCH:  Yes.

17              THE COURT:  Mr. Welch, why don't I start with you.

18              MR. WELCH:  Thank you for the Court's indulgence.

19         Your Honor, I didn't have any --

20              THE COURT:  Sorry to interrupt.  Let me ask

21    Mr. Hopkins.

22         Mr. Hopkins, we tried to have a bench conference, and my

23    headset's not working.  Do you know how to make that work?  And

24    if not, can you call IT?

25              COURTROOM DEPUTY:  It's not working at all?
```

1    THE COURT:  No.

2    COURTROOM DEPUTY:  It should be working now.  Try it

3  now.

4    THE COURT:  We'll call IT again.  Sorry to interrupt,

5  Mr. Welch.

6    MR. WELCH:  That's all right.

7    Your Honor, I didn't have any --

8    THE COURT:  Can you keep your voice up a little bit?

9  It's hard to hear.

10    MR. WELCH:  I didn't have any objections to the

11  Court's proposed revisions.  My objections relate to what we

12  have discussed previously about the definition of "corruptly"

13  and the general definition -- the general instruction on

14  Count 2.

15    I do want to mention, just to flag it for the Court, that I

16  do believe after I was reading Federal Rule of Criminal

17  Procedure 31(c)(1) that the Court would need to instruct on the

18  lesser included offense in Count 3 of unarmed being in a

19  restricted building or grounds.  I did prepare for the Court and

20  Counsel's consideration -- I have hard copies that I can pass

21  up -- my suggestion on how we might deal with that, a proposed

22  Count 3A.

23    And also, the jury instruction itself would basically be

24  the same instruction that you would give, same definitions that

25  you would give for Count 3.  It would just be without the

1  element of a firearm and without the definition of a firearm.

2      With the Court's permission, I would like to hand that to

3  counsel.  I pass one up to Mr. Hopkins.  I also have the

4  proposed instruction that I would suggest --

5          THE COURT:  Wait.  I just have a verdict form here.

6          MR. WELCH:  Right.  I had to separate them out.

7          THE COURT:  Does the verdict form change?

8          MR. WELCH:  Only to add Count 3A and the instruction

9  on whether to even consider it.  If the jury were to find

10  Mr. Reffitt guilty of Count 3, then there's no need to consider

11  Count 3A.  But if they were to find him not guilty of Count 3,

12  then the jury would need to consider Count 3A.

13      And here's a copy, Mr. Hopkins, for the Judge.

14          THE COURT:  So it says the government would have to

15  prove the following three elements beyond a reasonable doubt,

16  and then it lists two elements.

17          MR. WELCH:  I neglected to change that.  That was my

18  mistake.  I apologize.

19          THE COURT:  All right.  Okay.  I will hear in just a

20  minute from Mr. Nestler on that.  But let me run through a

21  couple of other questions while you're up there, Mr. Welch.

22          MR. WELCH:  Yes, Your Honor.

23          THE COURT:  With regard to instruction number 14,

24  inadmissible and stricken evidence, the last sentence of that

25  instruction -- do you have the sheet up there?

```
 1          MR. WELCH:  I have it.  I read everything over, and I

 2    do have it on my computer.

 3          THE COURT:  Okay.  So that last sentence

 4    states, "Likewise, exhibits as to which I've sustained an

 5    objection or that I've ordered stricken are not evidence, and

 6    you must not consider them in your deliberations."

 7      I don't think I've stricken any exhibits and maybe any

 8    answers.

 9      Do you all recall?

10          MR. WELCH:  I agree that you didn't.

11          THE COURT:  So do we even need to give --

12          MR. WELCH:  No.

13          THE COURT:  It's confusing, I think.

14      So we would strike the entire instruction 14?

15          MR. WELCH:  I agree.

16          THE COURT:  In the next instruction, 15, of course, we

17    need the general instruction with regard to credibility of

18    witnesses.  There is bracketed language about inconsistencies or

19    discrepancies between what the witness says now and what the

20    witness may have previously said.

21      Do you think, Mr. Welch, that should stay in there?

22          MR. WELCH:  I do.  I believe that applies to Jackson

23    Reffitt.

24          THE COURT:  All right.  With regard to instruction 19,

25    the proof of the state of mind, so this references Mr. Reffitt
```

1    specifically, and this is -- there's two parts to this question.

2    One is a generic question.

3        Should we throughout refer to Mr. Reffitt as the defendant

4    or Mr. Reffitt?  I think we should be consistent.  This

5    particular instruction creates a problem later when we're

6    talking about aiding and abetting, because of course with aiding

7    and abetting someone else can commit the offense and he can be

8    found of aided and abetted.

9        So interested in any thoughts you have about how to make

10   that apply to more than just Mr. Reffitt.

11               MR. WELCH:  I think -- well, if I understand the first

12   part of the question correctly, I think for the sake of

13   consistency I would just say "the defendant."

14               THE COURT:  The defendant across the board?

15               MR. WELCH:  Across the board.

16               THE COURT:  It still doesn't deal with the issue --

17   the government's theory presumably is that even if Mr. Reffitt

18   didn't obstruct Congress, he aided and abetted others who did,

19   and so long as they -- there's evidence that shows that they --

20   the government's proven those elements with respect to another

21   January 6er that Mr. Reffitt aided and abetted, that he could be

22   found guilty of aiding and abetting?

23               MR. WELCH:  He could if they showed that.

24               THE COURT:  And maybe "the defendant" is the best we

25   can do here, but I would be interested in any suggestions you

1    have to address that issue now or as you think about it.

2         Do you understand what I'm saying, Mr. Welch?

3              MR. WELCH:  I do.  I'm going to take a look at it, but

4    I do understand your question.

5              THE COURT:  And instruction number 21, you're okay

6    with how I did the holster's neither a frame nor a receiver?

7    That was all good with you?

8              MR. WELCH:  What was highlighted you proposed to keep

9    in?

10             THE COURT:  Yes.  I just highlighted it so you knew

11   what I changed.

12             MR. WELCH:  Agreed.

13             THE COURT:  Question 22 had an introductory sentence

14   explaining there's a substantive offense and then there's aiding

15   and abetting and attempt.

16        Did you have any problem with that preparatory language?

17             MR. WELCH:  I do not.  And that is what triggered me

18   to take another look at Federal Rule of Criminal Procedure

19   31(c)(1) and realized that we needed a lesser included.

20             THE COURT:  All right.  What about in the aiding and

21   abetting section?  I had broke down a fourth element that had

22   both knowingly and intentionally and separated them into two

23   elements.  It seemed to conflate two into one.

24        Any objection to that, Mr. Welch?

25             MR. WELCH:  No.  I agree it should be broken out.

1           THE COURT:  Same question with regard to instruction

2    number 24.  This is the obstructing officers during a civil

3    disorder.  I again had some introductory language.

4       No objection to that?

5           MR. WELCH:  No, Your Honor.

6           THE COURT:  All right.  And no objection to the

7    breaking down knowingly and with intent?

8           MR. WELCH:  No objection.

9           THE COURT:  All right.  Same with instruction 25 with

10   the introductory language?  No problem?

11          MR. WELCH:  No problem.

12          THE COURT:  Do you agree that in the concluding

13   instructions we can strike instruction number 28 with redacted

14   documents and tapes?  Is there anything that's redacted that you

15   all have introduced?

16          MR. WELCH:  Yes.  I believe the Mayor's curfew order

17   at least, and there might have been other things, too.  But that

18   one I remember from this morning.

19          THE COURT:  All right.  Are there redacted tapes?

20          MR. NESTLER:  Some of the phone numbers for people

21   have been redacted.

22          THE COURT:  All right.  So I will leave that in.

23      Finally, I know you wanted the additional Red Book

24   instructions for the photographs of the defendant.  You wanted

25   the testimony of immunized witness.  And you wanted informer's

1    testimony.

2         With regard to informer's testimony, you don't think that

3    that's appropriate, do you?

4              MR. WELCH:  Informers did not materialize.

5              THE COURT:  The refusal to answer the question didn't.

6    Fifth Amendment privilege being invoked didn't.  Prior

7    inconsistent statement of a witness, I think that's in there

8    already.

9         The missing witness or evidence?

10             MR. WELCH:  Well, the holster.

11             THE COURT:  The holster?  Well, is this really

12   missing?  I will take a look at that instruction.  There is an

13   explanation.  It just wasn't seized; right?

14             MR. WELCH:  For whatever reason.

15             THE COURT:  What?

16             MR. WELCH:  For whatever reason.

17             THE COURT:  But you think, based on those facts, that

18   this instruction is correct?  This isn't a situation where no

19   one knows where the exhibit is.  Everyone here knows that it

20   wasn't seized.

21             MR. WELCH:  Correct.

22             THE COURT:  So you think this still applies?

23             MR. WELCH:  So it's missing.

24             THE COURT:  I will have to take a look at it.

25        What about the photographs of the defendant Red Book

1    instruction and the testimony of immunized witness instruction?

2    Do you continue to want those?

3        MR. WELCH:  I don't continue to request the

4    instruction on the photographs, because there wasn't anything I

5    was concerned being so prejudicial about them being arrest

6    photographs.

7        I do continue to press the immunized witness instruction,

8    Your Honor.

9        THE COURT:  All right.

10       MR. WELCH:  I don't believe general credibility is

11   going to be sufficient to cover that.

12       THE COURT:  All right.  I will give that instruction,

13   the Red Book instruction.

14       MR. WELCH:  Yes, please.

15       THE COURT:  In terms of statements that I admitted not

16   for the truth of the matter, I think for the most part I gave

17   instructions at the time I admitted it -- admitted those

18   statements and made clear to the jury that these were being

19   admitted not for the truth but for, you know, to show why the

20   officers did what they did or whatever the case may have been.

21       I'm not sure that I said that when Schwager testified.  I

22   don't know that that's critically important.  Do you, Mr. Welch?

23       But to the extent you all think I need to itemize for the

24   jury the occasions that this happened, I would consider doing

25   that.  I don't know that that is necessary, but I just flag it

 1    as something for you to think about.

 2         Do you have a view right now as you stand here?

 3         MR. WELCH:  I don't think you need to itemize it.  I

 4    do just think it needs to be in the Court's final instructions,

 5    just as a reminder to the jury.

 6         THE COURT:  All right.  So nothing else other than

 7    this lesser included instruction and the immunized witness

 8    instruction?

 9         MR. WELCH:  Correct.

10         THE COURT:  And the missing evidence instruction,

11    which I'm going to take a look at.  I haven't reviewed that in a

12    while.

13         MR. WELCH:  Yes, please.

14         THE COURT:  Okay.  Mr. Nestler?

15         MR. NESTLER:  Thank you, Your Honor.

16         THE COURT:  So just running through, do you want to

17    walk me through any comments that you have?

18         MR. NESTLER:  Sure.  Can we start with the defendant's

19    request for a lesser included instruction?

20         THE COURT:  Sure.

21         MR. NESTLER:  I guess we're a little taken off guard

22    here.  We had jointly agreed several weeks ago and had gone

23    through this colloquy with the Court that neither party wanted a

24    lesser included instruction, and the federal rule does not

25    require any party to ask for one.  So I'm not exactly sure what

1    changed and why the defense is now requesting one.

2            THE COURT:  Maybe he just hadn't focused on it.  But

3    do you think it's improper, aside from the waiver issue?

4            MR. NESTLER:  No, just we had already prepared the

5    verdict form and the instructions.  But if the defense wants

6    one -- but I guess just to make clear, Mr. Welch seemed to

7    indicate somehow it's required.  I don't think it's required at

8    all.  It's up to the defendant to elect.

9            THE COURT:  I am going to take a look at it.

10       In terms of the content of the instruction or the verdict

11   form, any issues with that?

12           MR. NESTLER:  The Count 3 language on the verdict form

13   Mr. Welch passed out, we should take "deadly or dangerous

14   weapon" out and replace that with "firearm."

15           THE COURT:  Yeah.  Thank you for catching that.

16           MR. NESTLER:  There's one other spot in Your Honor's

17   instructions that I could flag for you.

18           THE COURT:  Flag for me.

19           MR. NESTLER:  If I could walk through, starting on

20   page 1, and any questions or issues we have?

21           THE COURT:  That's fine.

22       Before you start, do we need an instruction that just says

23   you should consider each count separately?  We don't, I don't

24   think, have that, do we?

25           MR. NESTLER:  I believe you do already have that.

1   It's instruction number 20, multiple counts, one defendant.

2           THE COURT:  Okay.  All right.  And you all agreed on

3   the reasonable doubt instruction; correct, Mr. Nestler?

4           MR. NESTLER:  Yes, Your Honor.

5           THE COURT:  And Mr. Welch?

6           MR. WELCH:  Yes.

7           THE COURT:  Okay.

8           MR. NESTLER:  So on page 6, instruction number 14, I

9   think Your Honor may have said -- indicated to remove the whole

10  thing.  I think just the two final sentences should be removed.

11          THE COURT:  Yeah, he convinced me.

12          MR. NESTLER:  So it would end with "the answer would

13  have been."

14          THE COURT:  You're talking about instruction 14?

15          MR. NESTLER:  Right.  The second paragraph, just the

16  first sentence.

17          THE COURT:  Okay.

18          MR. NESTLER:  And then end after the word "would have

19  been."

20          THE COURT:  You agree, Mr. Welch?

21          MR. WELCH:  Yes, Your Honor.

22          MR. NESTLER:  On page 7, I believe Your Honor asked

23  Mr. Welch about the middle paragraph starting with "you may

24  consider whether there are any inconsistencies."  I'm not sure

25  that Jackson Reffitt was impeached with anything.  So I'm not

 1    sure that would be appropriate.

 2              THE COURT:  I think he tried to impeach him about

 3    being attentive to the family and caring about them.  It was

 4    weak, but I think there's enough there to keep it in.

 5              MR. NESTLER:  Yes, Your Honor.  On page 8, we're happy

 6    to provide the number of law enforcement officers for

 7    instruction 16, or just leave it at "a number of law enforcement

 8    officers."

 9              THE COURT:  Say that again.  I'm sorry.

10              MR. NESTLER:  We can provide an actual number, or Your

11    Honor can just say "a number."

12              THE COURT:  Let's just keep it at as a number.  It's

13    not critically important how many of them.  There's a lot of

14    them.

15              MR. NESTLER:  I was just flagging where Your Honor

16    left brackets in.

17              THE COURT:  Okay.

18              MR. NESTLER:  17, you're removing -- you're keeping;

19    right?

20              THE COURT:  He's not testifying; right?

21              MR. NESTLER:  On 18, the second sentence says,

22    "Transcripts of these recorded conversations are being

23    furnished."  We should just put past tense there.  I think the

24    instruction is written to give mid-trial, which Your Honor did,

25    and now we should reference that these had been given.

1    THE COURT:  So they're not going back to the room; is

2    that what you're saying?

3    MR. NESTLER:  Correct.  And the way it reads now

4    suggests they are going back to the room, but they're not.

5    THE COURT:  Mr. Welch?

6    MR. WELCH:  Your Honor, I think that's a potential

7    problem, because the transcripts were displayed right on the

8    video, unless the only thing going back is an audio file.

9    If what we all saw goes back, there is a transcript going

10   back.

11   THE COURT:  You all aren't sending those slides all

12   back?  Ms. Berkower is saying no.  So this is a bigger issue,

13   that whatever format this is going back to the jurors, I want

14   you all to spend some time once the case is submitted to the

15   jury actually looking at the computer or disk drive, whatever it

16   is, to make sure you all are comfortable, Mr. Welch, with what

17   is on that -- what is accessible to the jurors.

18   All right?

19   MR. WELCH:  Yes, Your Honor.

20   MR. NESTLER:  Just to be clear, we prepared two

21   versions of each exhibit, one with a transcript embedded and one

22   without a transcript embedded.  And we displayed to the jury the

23   one with the transcript embedded, and we plan to provide the

24   jury during deliberations the one without the transcript

25   embedded.

1        MR. WELCH:  As long as that's the case, that's fine.

2        THE COURT:  I am putting this on you all.  And I will

3    remind you, but I really need you all to review that jointly and

4    get me back out here if there's any issue.  All right?

5        If I don't hear from you, Mr. Welch, I'm going to assume

6    that you've blessed the set of exhibits that the jury has access

7    to.

8        MR. WELCH:  I understand.

9        THE COURT:  Okay.

10       MR. NESTLER:  And then if Your Honor wanted to be

11   consistent, the sentence in that -- number 18, "if you notice

12   any difference," you could just do past tense, "noticed any

13   difference."

14       THE COURT:  Okay.

15       MR. NESTLER:  On instruction 19, we agree just

16   saying "the defendant" instead of "Mr. Reffitt" makes sense, and

17   both the words "done" and "omitted" are in brackets.  We think

18   both can be there, done or omitted.

19       To address Your Honor's questions about people whom the

20   defendant may have aided and embedded, it might make sense to

21   say after saying, "You may consider any statement made or acts

22   done or admitted by defendant, or anyone whom the defendant may

23   have aided and abetted."

24       MR. WELCH:  Your Honor?

25       THE COURT:  Yes.

1        MR. WELCH:  There aren't any statements by anyone that

2   the defendant is alleged to have aided or abetted.  They haven't

3   identified anybody.  So I don't see how that could be

4   appropriate.

5        THE COURT:  Well, but clearly, there's evidence in the

6   record that they could make that argument in closing.  When he's

7   going like this (indicating), that he's, you know --

8        MR. WELCH:  That's an argument in closing, I agree.

9   However, not having identified anybody, there's nobody in any of

10  these witness --

11       THE COURT:  Wait a minute.  One witness just testified

12  that he was in the front and that he -- I forget the exact

13  testimony, but he kind of cleared the way for those behind him

14  to get past him.

15    Who was that just recently today?

16       MR. NESTLER:  Sergeant Flood just testified to that.

17       THE COURT:  And I think DesCamp did as well, I

18  thought.

19       MR. NESTLER:  I think we're referring to any

20  statements or actions done by people whom the defendant may have

21  aided and abetted, and we've introduced lots of evidence about

22  what the rest of the crowd did, how they yelled "traitors"

23  and "let us inside" --

24       THE COURT:  Is your point as to the statements, or as

25  to the statements and acts?  Just the statements?

1          MR. WELCH:  The statements of others.  That's the

2     problem.

3          THE COURT:  Now, that's true.  I thought you were

4     making the bigger argument.  You're saying that there's no

5     evidence that someone else made some statement.  I need to think

6     about that.

7        Is there, Mr. Nestler?  Is there evidence that some other

8     January 6er made statements like, you know, Mr. Reffitt was

9     making that you're trying to pin him with here?

10          MR. NESTLER:  The crowd's statements.  So the crowd

11     calling the officers "traitors," saying "step aside, let us in"

12     and cursing profanities, those are statements made by people

13     whom the defendant aided and abetted, which the jury could use

14     to infer those individuals' intent.

15          THE COURT:  What about that, Mr. Welch?

16          MR. WELCH:  That's highly speculative, Your Honor.

17     Nobody testified that they said that.  Nobody testified

18     identifying a person who said that.

19          THE COURT:  You don't think there was testimony about

20     the crowd and on the videos there were voices that were heard?

21     I need to think about it, but I think that there were.

22          MR. WELCH:  Nobody's been identified.  That's the

23     problem.  We're basically saying, you know, somebody heard

24     something, we don't know who said it, we don't know exactly what

25     they said necessarily either, and yet, whatever you think you

1   heard, you can use against Mr. Reffitt.

2       I think that goes too far, and I think that ought to come

3   out of this instruction.

4           THE COURT:  And yet, you think it's okay for them to

5   say the actions of the larger crowd can be used against him but

6   not the statements?

7           MR. WELCH:  No, I would dispute that as well.  I mean,

8   they -- he's not charged with anybody else in this.

9           THE COURT:  He's not charged with what?

10          MR. WELCH:  Mr. Reffitt is not charged with anyone

11  else.  In other words, he doesn't have a co-defendant.

12          THE COURT:  But that's not a prerequisite to getting

13  him with aiding and abetting.

14          MR. WELCH:  No, but you would need to identify who he

15  aided and abetted.

16          THE COURT:  Is your view that if he didn't aid and

17  abet Rocky Hardie, he couldn't have aided and abetted anyone

18  else who was there right behind him trying to get in the

19  Capitol?

20          MR. WELCH:  They would need to be identified.  It's

21  not like he can be -- it's unreasonable to imply that he has

22  aided and abetted over 700 people.

23          THE COURT:  No, it would just need to be one, and

24  you're saying they need to identify a given individual?

25          MR. WELCH:  Yes.  And in this case, I suppose it could

1       be Rocky Hardie.

2                  THE COURT:  He was nowhere around.

3                  MR. WELCH:  That's the point.

4                  THE COURT:  But I'm just not sure I'm buying your

5       argument that he can't have aided and abetted one of the people

6       behind him, even if he doesn't know him by name or her by name,

7       that that's -- the jury may not buy it, but that that's not a

8       fair argument for the government to make.

9                  MR. WELCH:  It might be an argument for the government

10      to make, although the video doesn't show that.  They could argue

11      it.  However, I don't think the Court ought to be instructing

12      the jury that.  I don't think that applies.

13                 THE COURT:  I'm just giving a basic principle of law,

14      that you can consider any statement made or acts done or omitted

15      by these other people, along with all the other facts and

16      circumstances, to assess Mr. Reffitt's intent and knowledge.

17      I'm not saying that they must.  I'm just saying that they can

18      consider that.

19                 MR. WELCH:  And the problem is that those people,

20      whoever they might be, have not been identified, is my point.

21                 THE COURT:  I just don't think the case law supports

22      that there has to be an identified individual for him to have

23      aided and abetted someone else.  The theory would be that he was

24      well aware that people were right behind him trying to get up,

25      and he's doing his best to clear the way for them to get up and

1    enter the Capitol.

2           MR. WELCH:  I think it would be more appropriate in

3    the situation if you had a video of, say, an armed robbery, and

4    maybe you weren't able to identify the other person because they

5    got away, but it would clearly show one other person, you know,

6    sitting in the getaway car, so to speak, and you can say a-ha.

7           THE COURT:  But that's a conspiracy there.  There's

8    something short of being a conspirator and still aiding and

9    abetting.  You don't need to have the agreement between

10   Mr. Reffitt and another individual to aid and abet.

11          MR. WELCH:  So the question would become, who in that

12   video is he aiding and abetting?

13          THE COURT:  Again, the theory is the people right

14   behind him who he's trying to clear the way for and then telling

15   them to go.  So it's those people, whether he knew them by name

16   or not.  That's the theory.

17       If you give me some case that suggests otherwise, I will

18   review it, but I'm not -- I think that that's a viable legal

19   theory.  The jury may not buy it, but I don't think that that's

20   an improper argument for the government to make.

21          MR. WELCH:  I agree, it's not an improper argument,

22   but I don't think that the evidence has generated this

23   instruction.

24          THE COURT:  You don't think that the evidence

25   supports --

1        MR. WELCH:  Giving the instruction.

2        THE COURT:  You mean the additional -- the added --

3    all right.  Well, my concern with not doing something, and it

4    doesn't necessarily have to be here, is the jury getting hung up

5    on how to apply the aiding and abetting law to this offense.

6        And when you get -- on page 11, you get into the elements

7    of aiding and abetting.  Where is the sentence I saw earlier

8    that said that someone else could commit the elements of the

9    offense?  I thought it was in aiding and abetting on page 11.

10        Mr. Nestler?

11        MR. NESTLER:  I think it would be on page 14.

12        THE COURT:  Yes, okay.

13        So here's my concern.  On page 14, it says, "In order to

14    find the defendant guilty of obstruction of an official

15    proceeding" -- and this, of course, would also hold true for the

16    later offense, I think it's Count 4, that has an aiding and

17    abetting piece of it.  "In order to find him guilty of

18    obstruction of an official proceeding because he aided and

19    abetting others in committing this offense, you must find that

20    the government proved beyond a reasonable doubt the following

21    five requirements:  First, that others committed obstruction of

22    an official proceeding by committing each of the elements of the

23    offense charged as I've explained above."

24        And what I'm telling the jury there is to go back to the

25    obstruction offense, which just defines it for Reffitt.

1    Actually, no, this is the state of mind.

2         So I don't know, Mr. Nestler.  Inferring intent of those

3    people, the January 6ers, do we need to have this -- do we need

4    to modify this instruction, or can we just put some language in

5    the aiding and abetting portion?

6         MR. NESTLER:  That's fine to just include it in the

7    aiding and abetting portion.  Your Honor had indicated it makes

8    sense to include it here, and we think it makes sense.  We're

9    trying to prove someone's state of mind.

10        THE COURT:  Do you think it's necessary to add

11   something?  I'm curious why it's not already taken into

12   account --

13        MR. NESTLER:  We don't need to add anything.

14        THE COURT:  You don't think you need anything at all?

15        MR. NESTLER:  No, I think the aiding and abetting

16   instruction adequately captures --

17        THE COURT:  All right.  Mr. Welch, to your point, I

18   will add nothing.

19        MR. WELCH:  Thank you.

20        MR. NESTLER:  Okay.

21        THE COURT:  Sorry.  Detour.

22        MR. NESTLER:  I will get back to aiding and abetting

23   in a second.  I guess we will just continue going in order, Your

24   Honor.

25        So page 9, instruction 20, there's a bracket "unless I

1    instruct you to do otherwise."  In light of the defense's

2    request this morning for a lesser included, we would suggest

3    Your Honor instruct them here.  "You should return separate

4    verdicts as to each count except with respect to Count 3, for

5    which there's a lesser included charge."

6            THE COURT:  Okay.  But strike the "unless I instruct

7    you to do otherwise"?

8            MR. NESTLER:  Correct.  I think that's the instruction

9    otherwise.

10           THE COURT:  Any objection, Mr. Welch?

11           MR. WELCH:  I don't think that's what that instruction

12   is about, Your Honor.  I think that is basically telling the

13   jury they are to consider each charge on the verdict sheet

14   separately.  And then it's possible that you could have a jury

15   that reaches a verdict on some counts --

16           THE COURT:  And then wants a partial verdict?

17           MR. WELCH:  Yes.  I think that's what that's driving

18   at.  I don't think it's driving at what Mr. Nestler is

19   suggesting at all.

20           THE COURT:  I tend to agree.

21           MR. NESTLER:  I think the instruction says both.  The

22   instruction says you should consider each charge by itself, but

23   there's an exception.  That exception is Count 3, at the

24   defendant's request to not consider 3 separately from 3A.

25           THE COURT:  Why is this not -- it says, "You should

1    return separate verdicts as to each count."  And why isn't 3 and

2    3A just one count, they do one or the other?

3              MR. NESTLER:  We agree, so long as we make clear that

4    3 and 3A are separate -- or sorry, Your Honor.

5              THE COURT:  You agree, Mr. Welch, somewhere they need

6    to be told that you can't -- I guess you could find him guilty

7    of 3 and 3A, but you couldn't find him guilty --

8              MR. NESTLER:  But they're not supposed to, because if

9    they find him guilty of 3, they're not supposed to consider 3A.

10   So this instruction is telling them basically how to consider

11   the charges, they should consider them all separately.

12             THE COURT:  Don't you agree we do need a sentence

13   somewhere to say, with respect to Count 3, you should return a

14   verdict either as to Count 3 or Count 3A?

15             MR. WELCH:  That would be fine, and I think there's

16   also an instruction right on the verdict sheet that tells them

17   how to handle 3 and 3A.

18             MR. NESTLER:  We agree it should be on the verdict

19   sheet, but we also tell them nothing on the verdict sheet should

20   dictate how they deliberate.  So I think we need to actually

21   instruct them on it as well.

22             THE COURT:  Do you disagree?

23             MR. WELCH:  I don't disagree.  I just think they're

24   going to get confused.

25             THE COURT:  Well, I think -- I will take a look at

1    this language, but I would be inclined to leave this instruction

2    as is.  I think Mr. Welch is right, that this is a situation

3    when, you know, the jury says we've reached a verdict as to some

4    but not all counts and at some point they return a partial

5    verdict.

6        But maybe we can simply repeat language like the language

7    that's on the verdict form or something like it here.

8            MR. NESTLER:  That makes sense.  When we instruct them

9    on Count 3, I think Your Honor is going to need to instruct them

10   on how to complete the verdict form and then consider 3 and 3A.

11           THE COURT:  Maybe that's where that sentence goes

12   rather than in this.

13           MR. NESTLER:  That makes sense to us.  As long as it's

14   somewhere, that's fine.

15           THE COURT:  Okay.

16           MR. NESTLER:  Let's continue.  Page 10, the government

17   is fine with the highlighted language "or travel" and also the

18   final sentence about the frame, the receiver, and the holster.

19           THE COURT:  Okay.

20           MR. NESTLER:  On page 11, we're fine, and actually, we

21   really appreciate the Court's drafting of that introductory

22   language.  We think it's very helpful and makes everything very

23   clear.

24           THE COURT:  Okay.

25           MR. NESTLER:  On page 12, the sentence starting "to

1   act corruptly," we think it would be helpful for the third

2   sentence on consciousness of wrongdoing to add the words "or

3   unlawful."  In other words, "Consciousness of wrongdoing means

4   with an understanding or awareness that what the person is doing

5   is wrong or unlawful."

6           THE COURT:  Any objection?

7           MR. WELCH:  No, Your Honor.

8           THE COURT:  Or should it just say that what the person

9   is doing is unlawful, given how the instructions are written?

10          MR. WELCH:  That would be cleaner.

11          MR. NESTLER:  We think "wrong or unlawful" is

12  warranted here.

13          THE COURT:  But what, short of -- given the

14  instructions as a whole, what short of "unlawful" is going to

15  meet the definition of "wrong"?

16          MR. NESTLER:  Well, the person doesn't need to know

17  what they're doing is unlawful.

18          THE COURT:  But that's not what that -- oh, I see.

19   "With an understanding or awareness."  They don't need to know

20  the law itself.

21          MR. NESTLER:  Right.  They don't need to know the law.

22  They need to know that it's wrong.  But they don't need to know

23  the law.  So ignorance of the law is not going to be a defense,

24  which is why the word "wrong" is important there.  We believe

25  both words are important.

1          MR. WELCH:  The problem that we are opening the door

2    back up to again is the whole idea of something being wrong,

3    being incorrect, which is not necessarily illegal.

4      So if you focus more on something being unlawful, that

5    gives clearer guidance to the jury than inviting them to convict

6    someone who is just wrong about something.

7          THE COURT:  All right.  I'm going to think about that.

8    I get your point.

9          MR. NESTLER:  And this language, we believe, is from

10   other pattern instructions as well and other courts have used,

11   including --

12         THE COURT:  I know, but I've rejected a lot of the

13   pattern stuff.

14         MR. NESTLER:  No, I understand.  I believe there was a

15   Ninth Circuit decision earlier this year which endorsed, I

16   believe, this same language, but I can go back and look.

17     We believe that there's no requirement for us to prove the

18   defendant's awareness of the law.  So requiring us to prove that

19   the defendant knew what the defendant was doing is unlawful --

20         THE COURT:  Yeah, I'm just hesitant to get in a

21   situation where the jury could like sweep in regulatory

22   offenses.  As you know, that's not how these instructions are

23   written.  So that's the caution that the Court has.

24         MR. NESTLER:  We understand.  We think the way Your

25   Honor has crafted the instruction works very well.  We think we

```
 1    should add the two words "or unlawful," but it's very important
 2    to keep the word "wrong."
 3              MR. WELCH:  And I disagree.  I think it ought to just
 4    be "unlawful."
 5              THE COURT:  I'm going to look at that.  I'm just
 6    not -- anyway.
 7              MR. NESTLER:  Yes, Your Honor.
 8              THE COURT:  I will come out early, and we will talk
 9    about this before closings.
10              MR. NESTLER:  Yes, Your Honor.
11         Going forward, on page 15 --
12              THE COURT:  What about at the bottom of 12, the "even
13    if" language?
14              MR. NESTLER:  We agree.  Sorry.  I skipped over that.
15    We agree with that, and we agree with the highlighted version on
16    page 14.
17         On page 15, instruction 23, we need to change the title
18    to "firearm" rather than "deadly or dangerous weapon."
19              THE COURT:  You're again okay with 14?  You said that
20    already?
21              MR. NESTLER:  Yes.  I know we had been the ones to
22    flag this a week or two ago -- time has gone by quickly, Your
23    Honor, or maybe slowly -- on the mens rea element for knowingly
24    without lawful authority.  We think that the current formulation
25    may actually be a little -- could be cleaned up a little bit.
```

1    THE COURT:  What page are you on?

2    MR. NESTLER:  Page 15 for the elements.  Our

3    suggestion is just to make element 1 the actus reus and

4    element 2 the mens rea.  And so the way we would suggest doing

5    that is "first, the defendant entered or remained in a

6    restricted building or grounds without lawful authority to do

7    so"; in other words, remove the word "knowingly."

8    And then element 2 is "second, that the defendant knew that

9    the building or grounds was restricted and knew that he lacked

10   the lawful authority to enter or" --

11   THE COURT:  Shouldn't I -- that's two separate

12   knowinglys.  So shouldn't it be four elements, then?

13   MR. NESTLER:  They can both be in the same -- for the

14   second element, the defendant knew the building or grounds was

15   restricted and he knew that the -- he lacked the lawful

16   authority to enter or remain there.

17   Our initial suggestion was just to make element 2 "second,

18   the defendant did so knowingly."  It looks like Your Honor

19   wanted to make it --

20   THE COURT:  I want to make clear that they have to do

21   both.

22   MR. NESTLER:  Right.  And we thought that that

23   "knowingly" would import to everything in the first element.

24   But we understand Your Honor's position, which is why we

25   think we should use the word "knew" twice.  The defendant knew

1   the building or grounds was restricted and he knew that he

2   lacked the lawful authority to enter or remain there.

3       We're then capturing the mens rea both for the entering and

4   the lawful authority in element 2, and we're focusing on the

5   mental state there.

6           THE COURT:  Mr. Welch?

7           MR. WELCH:  I think it's fine the way it is.

8           THE COURT:  I do -- I like carving out the act.  Right

9   now, we just don't have an act alone.  I think that's clearer.

10  The only question I have is whether there should be two

11  "knowingly" elements here.

12          MR. NESTLER:  We think that entering and remaining

13  without lawful authority is one concept, but we understand the

14  defendant has to know both of them, but it is one concept as the

15  elements describe it.  This is why we put it together in the

16  second element.

17          THE COURT:  Okay.  Mr. Welch, if I am going to take

18  the "knowingly" out of the first, what's your position on the

19  second?  It does seem like the defendant has to do two things

20  knowingly.  Do you feel strongly whether it needs to be

21  separated out or a single element?

22          MR. WELCH:  I think it should be separated out to show

23  that each part of it is done knowingly.

24          THE COURT:  I mean, the "and" would make clear that

25  they have to show A and B.  It's a little different than the

1    "knowingly and intentionally."

2              MR. WELCH:  It's a little different, but I think this

3    is fine the way it is.

4              THE COURT:  Again, I'm going to take the government's

5    suggestion on the act, and I will think about the second

6    element.

7         But I hear what you're saying, Mr. Nestler.  "Knowingly"

8    has two elements.  It's knowingly on restricted grounds and

9    knowing you don't have the lawful authority.  And it does seem

10   like it could be lumped in one.

11             MR. NESTLER:  Correct.  That was why we had done it

12   that way.

13             THE COURT:  All right.

14             MR. NESTLER:  If I could just go back to the -- so

15   going back to the aiding and abetting, which I skipped over on

16   page 13 and 14, there is two sentences, consistent with what

17   Mr. Welch just mentioned, that we ought to include from the Red

18   Book instruction, which is that it's not necessary that the name

19   of the people be proved and it's not necessary that the people

20   who committed the crime be caught or identified.

21        And I could read the Red Book instruction there.  And I

22   realize that that is not in the instructions here, and it should

23   be.  And I can read what the Red Book has.

24             THE COURT:  So this is not the full Red Book

25   instruction for aiding and abetting?

1          MR. WELCH:  No.  It doesn't have this extra -- it's a

2    bracketed piece at the bottom of the Red Book instruction.

3          THE COURT:  But Mr. Nestler, you all agreed to these

4    instructions.

5          MR. NESTLER:  I am aware, Your Honor.

6          THE COURT:  All right.  Tell me what you want.

7          MR. NESTLER:  "It is not necessary that all the people

8    who commit the crime be caught or identified.  It is sufficient

9    if you find beyond a reasonable doubt that the crime was

10    committed by someone and that the defendant knowingly and

11    intentionally aided and abetted in committing the crime."

12        It's instruction 3.200 in the Red Book, and it's the very

13    bottom before the comments, the bracketed language.

14          THE COURT:  All right.  So I will check that.

15        Mr. Welch, your position on this?

16        I think the waiver argument doesn't apply here, because

17    I've just let you modify what you wanted.  Do you have any other

18    argument on why that's not appropriate?

19          MR. WELCH:  No, Your Honor.  If it's in the Red Book,

20    that's fine.  I'm not going to take issue with the Red Book.

21          MR. NESTLER:  And if I could just suggest, it might

22    make sense at the bottom of page 13 --

23          THE COURT:  Where would those two sentences go,

24    Mr. Nestler?

25          MR. NESTLER:  Sorry.  I think they might make sense at

1    the bottom of page 13.  "The person whom the accomplice aids and

2    abets is known as the principal."

3         So it might make sense there.

4              THE COURT:  All right.

5              MR. NESTLER:  Okay.  Moving forward to page 16, which

6    is instruction 24, I believe Your Honor slightly modified the

7    parties' joint proposed language for the elements here.

8              THE COURT:  This is where I separated the "knowingly"

9    and "intentionally"?

10             MR. NESTLER:  Right.  And that's fine with the

11   government.  We just have a suggestion on how to phrase the

12   second element that might make that a little bit clearer.

13             THE COURT:  Okay.

14             MR. NESTLER:  Which is -- our proposal is, "Second, in

15   committing or attempting to commit that act, the defendant

16   intended to" and then "obstruct, impede, or interfere with one

17   or more law enforcement officers."

18             THE COURT:  The defendant intended to what?

19             MR. NESTLER:  "Obstruct, impede, or interfere."

20             MR. WELCH:  This is bottom of page 15?

21             THE COURT:  16.

22             MR. WELCH:  Could you please repeat it, Mr. Nestler?

23             MR. NESTLER:  We wanted to highlight the intention

24   here which Your Honor was trying to get at.  So our suggestion

25   is, "Second, in committing or attempting to commit that act, the

1    defendant intended to obstruct, impede, or interfere with one or

2    more law enforcement officers."

3            MR. WELCH:  Okay.

4            THE COURT:  Mr. Welch, do you have a position on that?

5            MR. WELCH:  I'm okay with that, Your Honor.

6            THE COURT:  Okay.  I am, too.

7        Moving along, page 18?

8            MR. NESTLER:  Page 18, we're comfortable with Your

9    Honor's proposed introductory language.

10       Page 19, same thing.

11       Page 20, for instruction 29 --

12           THE COURT:  You're good striking -- no, we are leaving

13   in the redacted documents and tapes, we decided; right?

14           MR. NESTLER:  Yes.  And we should just

15   highlight "except for the firearms and ammunition and bear

16   spray."  So if Your Honor wants to say something like "weapons"

17   or identify those three items that we're not going to be

18   providing the jury unless they ask.

19           THE COURT:  I'm sorry.  Where are you?

20           MR. NESTLER:  I'm sorry.  Instruction 29, you have

21   bracketed "firearms."  But they're not going to get the

22   firearms, which there are two, or the ammunition or the bear

23   spray.

24           THE COURT:  No objection, Mr. Welch?

25           MR. WELCH:  No objection.

1          MR. NESTLER:  And then on page 21, the first full

2     sentence, the first full paragraph, it could be the same thing.

3     "If you wish to examine the firearms."

4          And then continuing on, Your Honor, the final bracketed

5     paragraph there starts with "if you wish to see or hear

6     portions."  We think it would be appropriate here to talk about

7     the exhibits with the transcripts.  So "if you wish to hear or

8     see portions of those recordings which I have admitted into

9     evidence with accompanying transcripts, please notify the clerk

10    by a written note, and we will assemble them in the courtroom

11    with the appropriate equipment."

12         MR. WELCH:  But the transcripts weren't admitted.

13         THE COURT:  The tapes were.

14         MR. NESTLER:  I'm sorry.  Not admitted into evidence,

15    "which were admitted to aid your comprehension."

16         I thought the idea here was if the jury wants to listen

17    again with the aid of a transcript -- some of them are very hard

18    to hear because of all the background noise.  They have them in

19    the back to listen as many times as they want.  If they want to

20    see them or listen with the aid of a transcript, they would need

21    to do that in court as a demonstrative.  It wouldn't be in the

22    jury room.

23         This would tell them if they wanted to do that, they have

24    to ask.

25         THE COURT:  Mr. Welch?

1          MR. WELCH:  That's correct.  I don't know if you want

2     to be inviting them to do that.

3          THE COURT:  Yeah, I don't know that I want to either.

4          MR. NESTLER:  Understood, Your Honor.

5          THE COURT:  Yeah, I'm inclined to strike that, the

6     bracketed language.

7          MR. NESTLER:  That's fine.

8          THE COURT:  We may get the question anyway, and we

9     will address it then.

10          MR. NESTLER:  If they do ask, our position is they

11     should be allowed to come in here and watch in court.

12          THE COURT:  Okay.

13          MR. NESTLER:  But it's fine to strike that entire

14     bracketed paragraph, then.

15          THE COURT:  Okay.  And if I give the, I've said,

16     immunized witness instruction, where should that be inserted?

17     After the assessing credibility?  Where is the appropriate spot?

18          MR. NESTLER:  We still don't believe it's appropriate,

19     Your Honor, that the general credibility instruction would be

20     adequate.  Mr. Hardie was direct and cross-examined on his

21     immunity agreement.  So we disagree that it's necessary.

22          But if Your Honor believes it is, then we would say it

23     should be on page 8 after "credibility," before police officer's

24     testimony.

25          MR. WELCH:  Agreed.

1       MR. NESTLER:  If that were the case, Your Honor should

2   identify Mr. Hardie in the instruction.

3       THE COURT:  Okay.

4       MR. WELCH:  Agreed.

5       THE COURT:  And Mr. Welch, the Red Book instruction

6   you asked for with regard to prior inconsistent statement of

7   witness, I don't know that that's the one that's in here, and

8   I'm just wondering whether we need that as well, and what's --

9   so this is a general inconsistent statement of a witness

10  instruction, but don't you think that the paragraph in the

11  credibility of witness paragraph covers what you need in terms

12  of inconsistent statements of Jackson Reffitt, or do you think

13  you need more here?

14      MR. WELCH:  Court's indulgence, please.

15      I think as long as the bracketed language on page 7 is in,

16  then this is sufficient for an inconsistent statement.

17      THE COURT:  Okay.  All right.  So we won't add the Red

18  Book 2.216 instruction the defense had requested.  And I promise

19  to take a look at the missing evidence instruction.

20      What's your position on that, Mr. Nestler?  It doesn't

21  apply in this context?

22      MR. NESTLER:  No, Your Honor.  We think the Red Book

23  is quite clear, as is the case law, that it requires evidence to

24  be uniquely within one party's possession.

25      THE COURT:  Clearly, if that's what it says,

1    Mr. Welch, then this is clearly -- and Mister -- unless you show

2    me otherwise, his possession or his -- not his possession, but

3    he has access to, through others, to items in his home.

4          MR. WELCH:  Correct, and it's alleged to have been in

5    his house.

6          THE COURT:  Right.  And there's been no evidence that

7    it disappeared or anything from his home.

8          MR. WELCH:  Or that it was ever there.

9          THE COURT:  No, there was a photograph of it.  Okay.

10    I'm rejecting that one.

11       So let me ask Counsel.  Counts 2 and 4 of the indictment

12    charge Mr. Reffitt with attempts and aiding and abetting, as

13    well as a substantive offense.  And I'm just wondering whether

14    we need some more introductory language at the outset making

15    clear that these counts charge him with committing the charged

16    offenses, whatever it might be in each context, as well as

17    aiding and abetting in an attempt, and explaining to the jury

18    that you could find the defendant guilty of the substantive

19    offense or attempting the offense or aiding and abetting others

20    who committed or attempted to commit the substantive offense.

21       Again, this is just guiding the jury to what all this means

22    and those counts that go on for a long time.  I just flag it to

23    see whether the parties think it's helpful.

24          MR. NESTLER:  Your Honor's point is well-taken, and it

25    makes sense to have sort of a conclusion sentence at the end

1    of -- I think Your Honor's introductory paragraph does a lot of

2    that work, but I think Your Honor's point is well-taken.  It

3    just ends and moves to the next element or the next charge.  So

4    it might make sense to put sort of a conclusion sentence with a

5    heading.

6                 THE COURT:  Saying what?

7                 MR. NESTLER:  Saying that you may find the defendant

8    guilty -- or you can phrase it more neutrally, if the

9    government --

10                THE COURT:  That's the hard part.  How does one phrase

11   it neutrally?

12                MR. NESTLER:  If you find the government has proved

13   each of these elements beyond a reasonable doubt, you may find

14   the defendant guilty of this offense.  If you find that, then

15   you can list the three different options.

16                THE COURT:  All right.  Mr. Welch doesn't want it.

17       I'm just concerned about ending with that kind of language

18   that the jury might read to suggest that I think that they need

19   to find him guilty in one of three ways.  That's my concern with

20   the way you're suggesting it.

21       But if you think, Mr. Nestler, the introductory remarks

22   that I added do adequate work to not confuse the jury, I would

23   be inclined to leave it as is.

24       Mr. Welch, anything you want to add?

25                MR. WELCH:  That's what I would say, Your Honor.  I

1  think the introductory comments are fine.  Aiding and abetting

2  is explained in there.  Attempt is explained in there.  And

3  we're dealing with grown-ups.  I think they will be all right.

4          THE COURT:  All right.  So I will leave that as is.

5      Let me just check my notes.

6      So Mr. Welch, when we come back in and it's the defense's

7  case, you're going to stand up and indicate that there's no --

8          MR. WELCH:  I will just say that the defense rests.

9          THE COURT:  I would be inclined then to remind them

10  that there's no obligation to put on a case, after you do that,

11  and no obligation for Mr. Reffitt to testify.

12          MR. WELCH:  Yes, please.

13          THE COURT:  So I will say that.  In terms of the --

14          MR. NESTLER:  I'm sorry, Your Honor.  Could we go back

15  to the jury instructions for just one second?

16          THE COURT:  Yes.

17          MR. NESTLER:  The defense proposed 3A and handed up

18  the paper.  Just so we know, the title there should be changed

19  to "firearm" instead of "deadly or dangerous weapon."  And Your

20  Honor already indicated there would be two elements rather than

21  three.

22          THE COURT:  Right.

23          MR. NESTLER:  I believe there is a Red Book

24  instruction on how to instruct a jury with respect to a lesser

25  included instruction.  We would ask that Your Honor give that.

1    THE COURT:  I also had questions whether it would be

2 appropriate to give a couple of additional instructions that

3 neither side offered.  Just hear me out on that.

4    Instruction 2.505, possible punishment not relevant, is

5 that an instruction that either side would think would be

6 relevant to give here?

7    Another one, instruction 2.510, attitude and conduct of

8 jurors in deliberation, I guess that would be a closing

9 instruction.

10    Did you have any issues with the jurors' duty to

11 deliberate?  I think I included it.  Maybe I didn't include

12 that.  There are other instructions that I've given in other

13 cases in terms of a juror's duty to deliberate in delivering the

14 verdict, just to guide them.  I can give you that language to

15 look at.

16    MR. WELCH:  My concern is that -- this is not an *Allen*

17 charge that you're suggesting, is it?

18    THE COURT:  No, no.  But backing up, what about the

19 punishment's not relevant?  Is that anything either side wants?

20    MR. WELCH:  No.

21    THE COURT:  Okay.  All right.  Any other thoughts?

22    MR. NESTLER:  No, Your Honor.

23    THE COURT:  When we -- so have you got anything else

24 to raise, Mr. Nestler?

25    MR. NESTLER:  No, Your Honor.

1          THE COURT:  I know we need to do -- I know, Mr. Welch,

2     you need time to talk on the speaker here privately.  I will

3     give you that in just a moment.

4          Just to review what we will do when we come back in, we

5     will bring in the jury.  Mr. Welch will rest.  I will remind the

6     jury that the defendant has no obligation to present a case.

7     Then I will move on to the substantive instructions, and those

8     are the ones that go from page 1 to the top of page 20.

9          And then I will turn to the government -- actually, I will

10    take a brief break, because I think that's a long time for them

11    to sit through those instructions.  So we will take a ten-minute

12    break, then come back, and hear from the government.

13         And Mr. Nestler, you've said a total of an hour for both;

14    right?

15              MR. NESTLER:  Sorry.  I don't believe I had said that.

16    If I did --

17              THE COURT:  I thought you said one hour for closings,

18    plural.  No?

19              MR. NESTLER:  Ms. Berkower's closing will be about 45

20    minutes to an hour, and I will plan to make my rebuttal fairly

21    brief, but maybe 15 minutes.

22              THE COURT:  Is it going to be more death by video?

23              MR. NESTLER:  Not more death by video.

24              THE COURT:  But not more than 1:15?

25         Mr. Welch, you said you need how long?

```
1              MR. WELCH:  15 minutes, Your Honor.

2              THE COURT:  I can't imagine, Mr. Nestler, you need

3     longer than he's taking for rebuttal.

4              MR. NESTLER:  No, Your Honor.  During that break, in

5     between the -- Your Honor doing the initial instructions and the

6     closings, we would just ask to work with the court staff on the

7     podium, to put the podium in place with the microphone and

8     everything.

9              THE COURT:  Maybe we can do that in this break.

10             COURTROOM DEPUTY:  I've already taken care of it.

11             THE COURT:  Oh, you have?  Great.

12        So then after the closings, if we're talking about more

13    like an hour and a half total for everything, I think we sit

14    through all of them and then take another break, and then I will

15    come back and give those closing instructions.

16        And we will see what time it is.  I would be inclined --

17    and then, of course, after the final instructions, I'm going to

18    discharge the four alternates, but I am going to tell them to

19    continue not to talk about the case in the event they're called

20    back because if something happens to a juror.

21        And then my plan would be to release the jury around 4:30

22    today with instructions to return at 9:30.

23        Do you all want to be here when I release them?  No,

24    Mr. Welch says.

25             MR. NESTLER:  We defer to the defense.
```

```
1            THE COURT:  Okay.

2            MR. WELCH:  That's not necessary.  Let them keep the

3    schedule that they would like to keep on that.  I'm sure you can

4    handle it, Your Honor.

5            THE COURT:  Okay.  I will try not to screw it up.  So

6    4:30, release them.  They will come back at 9:30.

7        You all need to make sure Mr. Hopkins has a way to reach

8    you and you can get here in 15 minutes if there's a note.

9        Is there anything else we should talk about right now other

10   than the Rule 29 -- and I do want to have a colloquy with

11   Mr. Reffitt.

12       Anything else in terms of logistics?

13           MR. NESTLER:  No, Your Honor.  We would need to tweak

14   the verdict form, and I can get together with Mr. Welch and make

15   sure it's --

16           THE COURT:  Yeah, because we don't have the pen on

17   that.  You've got --

18           MR. NESTLER:  We will work together on that and get

19   something --

20           THE COURT:  Do you have the ability to e-mail all of

21   this to chambers e-mail so we can work on it?

22           MR. WELCH:  Yes.

23           THE COURT:  And you all, I will come out -- or we will

24   have the packet brought out as fast as we can do it and leave it

25   on your table.  And if we need a little bit more time, we will
```

1  just tell the jury it's taken longer than we thought.  All

2  right?

3       So as soon as we have the jury instructions done, we will

4  leave them sitting at your table, and you can let --

5  Mr. Hopkins, if you could come back a little bit earlier.  I

6  hope you have time to eat, but just to alert me if there's a

7  need to come back in and deal with any remaining issues.  All

8  right?

9       So before we go on the confidential headset for the bench

10  conference, I just want to talk to Mr. Reffitt.

11       So Mr. Reffitt, I understand that you do not intend to

12  testify, but before your attorney rests in front of the jury, I

13  want to make sure you know that you have the constitutional

14  right to testify in this trial.  And I want to know whether

15  you've had an adequate time to speak to Mr. Welch about that

16  decision.

17            THE DEFENDANT:  I have, Your Honor.

18            THE COURT:  And you understand that the decision about

19  whether to testify is ultimately your decision and your decision

20  alone?

21            THE DEFENDANT:  Yes, Your Honor, I understand.

22            THE COURT:  And you understand that no one can prevent

23  you from testifying if you want to testify?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  You understand if you choose not to

1    testify, I will instruct the jury that you have a constitutional

2    right not to testify, and they cannot draw any inference of

3    guilt against you for that decision?

4         THE DEFENDANT:  Yes, Your Honor, I understand.

5         THE COURT:  And is it still your decision not to

6    testify in this trial?

7         THE DEFENDANT:  Yes, that's correct.

8         THE COURT:  And you're making this decision

9    voluntarily?

10        THE DEFENDANT:  Yes, Your Honor, that's correct.

11        THE COURT:  All right.  So let's see if this headset

12   now works, and we will deal with your issue, Mr. Welch.

13        (Bench conference.)

14        MR. WELCH:  Your Honor, given the concerns that you

15   expressed about the case in New York the other day and my

16   intention to cite to some of the prior transcripts that we've

17   had about Count 2 in terms of the Rule 29 motion that I'm making

18   on that, I did not want to just jump into doing that knowing

19   that there's an overflow courtroom where people could hear

20   things and then worry that your comments would show up in front

21   of the jury.

22        THE COURT:  I'm fine with that, but I think what

23   you're saying to me now doesn't need to be under seal.  You can

24   just simply say that you are making this motion, and you're

25   not -- you intend to file a written motion post-trial, and

1    you're not going to get into argument now for the reasons that I

2    stated, and I think this can be unsealed.

3        I'm really trying to be forward-leaning in terms of

4    releasing stuff.  So I don't see any reason why this needed to

5    be under seal.  I appreciate you doing it in the event I felt

6    differently.

7        Do you agree with me, this can be released this evening?

8            MR. WELCH:  Yes.

9            THE COURT:  Why don't you just say the content of what

10   you said, and you can say you're going to file a written motion

11   later, you're not going to make argument now.

12           MR. WELCH:  Very good.

13       (End of bench conference.)

14           THE COURT:  Mr. Welch, if you can just summarize the

15   content of what we just discussed, and what we just discussed

16   will be released later today.  It's not a sealed proceeding.

17       But go ahead.  In substance, state for the record what

18   you -- the points you just made.

19           MR. WELCH:  Your Honor, this is on my motion of

20   judgment for acquittal pursuant to Rule 29.

21       My argument relies particularly on Count 2, on some

22   transcripts of prior court proceedings where this has been

23   discussed at length, and I intend to write and file a Rule 29

24   motion with the Court in which I cite those in more detail and

25   in more substance in support of the motion that I'm making

1    orally right now.

2              THE COURT:  Okay.  Understood.

3         And for the record, I stated earlier, I will reserve any

4    decision on that motion until after a verdict, if there is a

5    verdict in this case.  All right?

6              MR. WELCH:  Thank you.

7              THE COURT:  Okay.  All right.

8         Counsel, if there's nothing more, we will adjourn, and I

9    will get you the jury instructions as soon as we make those

10   revisions.

11             (Recess taken at 12:52 p.m.)

12             (The afternoon session if this proceeding was reported by

13   Lorraine Herman and is bound under separate cover.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    March 7, 2022

SIGNATURE OF COURT REPORTER         DATE