IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                Plaintiff,

     vs.

GUY WESLEY REFFITT,

                Defendant.

CR Action
No. 1:21-032

Washington, DC
March 7, 2022

2:32 p.m.

TRANSCRIPT OF JURY TRIAL
(AFTERNOON SESSION)
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**      JEFFREY S. NESTLER
                        RISA BERKOWER
                        U.S. ATTORNEY'S OFFICE
                        555 Fourth Street NW
                        Washington, DC 20530
                        202-252-7277

**For the Defendant:**     WILLIAM WELCH, III
                        5305 Village Center Drive
                        Suite 142
                        Columbia, MD 21044
                        410-615-7186

**Reported By:**          **LORRAINE T. HERMAN, RPR, CRC**
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6720
                        Washington, DC 20001
                        202-354-319

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

1    **P R O C E E D I N G S**

2             (Whereupon, the morning session of this proceeding

3    was reported by Sara Wick, and is bound under separate

4    cover.)

5             **THE COURT:**  All right, folks.  Have you had a

6    chance to review the revisions to the jury instructions?

7             **MR. WELCH:**  Yes, Your Honor.

8             **THE COURT:**  Any concerns?

9             **MR. WELCH:**  [SHAKES HEAD]

10            **THE COURT:**  Let me point out just a couple things.

11   Mr. Welch, your new 3A instruction, we had to conform the

12   elements to the other offense.  I take it you don't have any

13   problem with that.

14            **MR. WELCH:**  No, I don't, Your Honor.

15            **THE COURT:**  Added some, you know,

16   non-controversial language.  I think this is the instruction

17   where I added the phrase "that person" before the phrase

18   "and committing the crime".  I think that was the

19   instruction.  It was a minor tweak to the Red Book

20   instruction, just to make it clear.  I am not adding the

21   "unlawful" to the definition of "consciousness of

22   wrongdoing."

23            Because, as I said, I am concerned about covering,

24   you know, minor regulatory offenses and, you know, we hashed

25   this out for weeks beforehand.  I settled on that

1    instruction.  I'm just not going to make that substantive

2    change right now.

3           Mr. Welch, I think -- the point I'm making, I

4    think an argument can be made that Mr. Reffitt has more

5    exposure, perhaps, using the word "unlawful," if it

6    encompasses regulatory-type offenses.  It might technically

7    -- they are unlawful, but he might not have known that it

8    was wrong to commit those; that's why I'm sticking with

9    that.

10          I am trying to think of if there is anything else

11   worth discussing.  Mr. Welch, did you see anything that

12   gives you concerns?

13         **MR. WELCH:**  No, Your Honor, I didn't, other than

14   what we've been talking about over and over again as far as

15   the "unlawful" versus "wrongful."  You know, we maintain our

16   position as far as that is concerned.  It shouldn't be

17   simply being wrong; that there should be some sort of

18   violation of the law involved.

19         **THE COURT:**  But it is defined -- I mean, they've

20   got to show unlawful means or unlawful purpose.

21         **MR. WELCH:**  I understand.  But my --

22         **THE COURT:**  So I think that's covered.  And I'm

23   just concerned that it's broader using "unlawful."  His

24   exposure is broader here.

25         **MR. WELCH:**  Potentially, yes, it is.  My concern

1    is just that the jury is going to hear this and think that

2    if he was wrong, that's it.

3         **THE COURT:**  But the jury has to find either an

4    unlawful purpose or unlawful means.  It cannot convict him

5    without finding one of those two things.

6         **MR. WELCH:**  I understand what the Court is saying.

7         **THE COURT:**  Do you disagree?

8         **MR. WELCH:**  Well, I was just thinking about the

9    court's Sandlin opinion.  I was thinking about our

10   discussions and some of the things that I am going to be

11   putting in the Rule 29 Motion.  Because my concern is that,

12   as the Court had expressed at one point, the idea that

13   somehow this could just all fold into having some sort of

14   unlawful purpose without an act.  And that would be my

15   concern; is that if you just don't like somebody's purpose,

16   that would be enough --

17        **THE COURT:**  No, it has to be an unlawful purpose.

18        **MR. WELCH:**  I understand.

19        **THE COURT:**  I don't think it counts just stopping

20   necessarily or delaying the vote.  I don't think that that's

21   automatically meeting that definition.  Pulling members of

22   Congress out by their heels would.

23        **MR. WELCH:**  Yes, that would.  As I think we talked

24   about before, clearly an assault would.  But when you get

25   out to the margins and you talk about someone just coming,

1    seeking to delay or stall or something like that, that some

2    people might view that as wrong.

3         **THE COURT:**  Right.  But I don't think that the

4    evidence in this case supports that theory, really, for the

5    government to argue that.

6         **MR. WELCH:**  I don't either.

7         **THE COURT:**  I think the only theory that is

8    supported is this unlawful purpose of dragging members of

9    Congress out by their heels.  There's certainly evidence of

10   that.  I don't remember anyone saying his purpose was to

11   delay the vote.

12        **MR. WELCH:**  And I don't recall that either.  I

13   just hope that the jury doesn't get the idea that somehow

14   that would be wrong, and therefore he should be convicted on

15   that basis.

16        **THE COURT:**  All right.  So the three additional,

17   non-substantive offenses that were added at the very end of

18   the closing instructions, it was not the Allen charge at

19   all.  It was, basically, logistics.  Any issues with

20   including those?

21        **MR. WELCH:**  No, Your Honor.

22        **THE COURT:**  Okay.

23        All right, then.  In terms of dismissing the

24   alternates, you saw both the seat numbers as well as the

25   juror numbers in there.  Can you all check those and make

1    sure that those are accurate?  And then I will give you a

2    chance after I do the substantive jury instructions, we will

3    give the jury a break, and you all can object to my charge,

4    if I say anything incorrectly.

5              Mr. Nestler, any errors or problems?

6              **MR. NESTLER:**  Just one small suggestion, Your

7    Honor, for Count 3A, for the lesser included.  I think, Your

8    Honor -- it's on Page 16 with the red line or gray line.

9    Your Honor had written, If you find the defendant not guilty

10   of Count 3, then proceed to Count 3A.  I think we just need

11   to clarify that's on the verdict form.  In other words, they

12   are not required to deliberate in any particular order.  I

13   just think we are trying to flag for them on the verdict

14   form.

15             **THE COURT:**  Then proceed on the verdict form to

16   Count 3A?

17             **MR. NESTLER:**  Right.  Or maybe even start the

18   sentence with, "On the verdict form."  I think maybe on the

19   verdict form should start that sentence.  We only flag that

20   because none of the other counts have anything at all to do

21   with the verdict form or how to record a verdict, but we are

22   flagging that here.

23             **THE COURT:**  Is this -- I thought this was where

24   both parties thought this language should go in the

25   instructions.  Do you agree it should be on top of the

1    definitions?

2         **MR. WELCH:**  I think that's fine.  Oh, sorry.

3         **MR. NESTLER:**  Go ahead, Mr. Welch.  This is your

4    request.  So we will defer to you on where it belongs.

5         **MR. WELCH:**  I didn't want to make life any more

6    difficult for the court reporter.  Your Honor, it's fine

7    where it is.

8         **THE COURT:**  Okay.  And you agree with the

9    government's addition on the verdict form, If you find the

10   defendant not guilty of Count 3, then proceed to Count 3A?

11        **MR. WELCH:**  Yes, that's fine.

12        **THE COURT:**  Okay.  All right.

13        **MR. NESTLER:**  I think it should just say, for the

14   second sentence, If you find the defendant guilty of Count

15   3, then skip -- then do not consider Count 3A.

16        In other words, we are not talking about how they

17   are recording anything here, just how they consider it.

18        **THE COURT:**  Agree, Mr. Welch?

19        **MR. WELCH:**  That's fine, Your Honor.

20        Except Mr. Nestler had just said that they are not

21   bound to consider these in any particular order.  So they

22   can go in any order they want.

23        **THE COURT:**  Well, do you all think I need to state

24   that explicitly?  I don't ever tell them they must go in a

25   certain order.

1    **MR. WELCH:**  No.

2    **THE COURT:**  All right.

3         I'm just looking to see if there's anything else

4    we need to cover.

5         Either side?  Any issues?

6    **MR. NESTLER:**  No, Your Honor.

7    **MR. WELCH:**  No.

8    **THE COURT:**  So as we discussed, I will bring the

9    jury in.  Mr. Welch, I will call on you, since the

10   government's rested.  And you're going to indicate that the

11   defense rests.  Correct?

12   **MR. WELCH:**  Yes.

13   **THE COURT:**  All right.  And at that point I will

14   remind the jury that there's no obligation for the defense

15   to present any case at all, and they should not hold that

16   against the defendant.

17        Okay.  Just one moment.  Let me check one thing.

18        All right.  Did either side have any issues with

19   the verdict form?  I don't think we made any changes.

20   **MR. WELCH:**  [SHAKES HEAD]

21   **THE COURT:**  All right.  Mr. Welch, do you need a

22   little more time?  Do you need me to take a break?

23   **MR. WELCH:**  No, I'm fine.  Thank you, Your Honor.

24   **THE COURT:**  Are you sure?  Because I will take a

25   break after instructions.

1      **MR. NESTLER:**  I'm sorry.  I didn't see an updated

2  copy of the verdict form.

3              **THE COURT:**  I don't think we changed anything.

4  Correct?

5              **LAW CLERK:**  I forgot.

6              **THE COURT:**  You forgot to give it?

7              **LAW CLERK:**  It's the same.

8              **THE COURT:**  It's the same.  We forgot to give it.

9              **MR. NESTLER:**  I'm sorry.  The same as what?

10             **THE COURT:**  As what you sent to us.

11             **MR. NESTLER:**  As what I emailed?

12             **THE COURT:**  Yes.

13             **MR. NESTLER:**  Okay.

14             **THE COURT:**  But we'll make sure you see it before

15  it goes to the jury.

16             **MR. NESTLER:**  I'm sorry.  I didn't know which

17  version we were working off of.  Thank you.

18             **THE COURT:**  Given where we are in the day, I don't

19  anticipate sending the jury back to deliberate today.  I

20  think it's going to be pretty late.  They are probably going

21  to be tired, and we will bring them back tomorrow morning at

22  9:30.

23             **MR. NESTLER:**  That's fine, Your Honor.

24             **THE COURT:**  Does that make sense?  All right.

25  Okay.  Are we ready to bring them in?

1    **MR. WELCH:**  Yes.

2    **THE COURT:**  All right then.

3    **COURTROOM DEPUTY:**  All rise.

4    (The jury entered the courtroom.)

5    **COURTROOM DEPUTY:**  You may be seated.

6    **THE COURT:**  All right.  Good afternoon, ladies and

7    gentlemen.

8    Sorry about that.  It took us a little bit longer

9    than we expected.  The good news is I expect that we won't

10   have to take very lengthy breaks this afternoon, and we

11   should be able to get this case to you this afternoon.

12   So now I'm going to turn to Mr. Welch.

13   **MR. WELCH:**  Your Honor, the defense also rests.

14   **THE COURT:**  All right.  Thank you, Mr. Welch.

15   Ladies and gentlemen, as I instructed you

16   previously, the defendant has no duty to present any

17   evidence at all.  The government bears the burden entirely

18   in this case to prove its case beyond a reasonable doubt.

19   So now that we've heard all of the evidence in

20   this case, before you begin your deliberations, I am going

21   to instruct you on the law.  I will start with some general

22   rules of law and then talk about the specific charges

23   alleged here and some of the specific issues in this case.

24   Some of these rules will repeat what I told you in my

25   preliminary instructions.

1        During your deliberations I will provide you with

2   a copy of any instructions.  You may, if you want, refer to

3   these instructions during your deliberations.  While you may

4   refer to any particular portion of the instructions, you are

5   to consider the instructions as a whole, and you may not

6   follow some instructions and ignore others.

7        If you have any questions about the instructions,

8   you should feel free to send me a note.  Please return your

9   instructions to me when your verdict is rendered.

10       As I explained at the beginning of the trial, my

11  function is to conduct this trial in an orderly, fair and

12  efficient manner, to rule on questions of law and to

13  instruct you on the law that applies in this case.

14       It is your duty to accept the law as I instruct

15  you.  Again, you should consider all of the instructions as

16  a whole.  You may not ignore or refuse to follow any of

17  them.

18       Your function as a jury is to determine what the

19  facts are in this case.  You are the sole judges of the

20  facts.  While it was my responsibility to decide what was

21  admitted as evidence during the trial, you alone decide what

22  weight, if any, to give the evidence.  You alone decide the

23  credibility or believability of the witnesses.

24       You should determine the facts without prejudice,

25  fear, sympathy or favoritism.  You should not be improperly

1    influenced by anyone's race, ethnic origin or gender.

2    Decide the case solely based on a fair consideration of the

3    evidence.

4           You may not take anything I may have said or done

5    as indicating how I think you should decide this case.  If

6    you believe that I have expressed or indicated any such

7    opinion, you should ignore it.  The verdict in this case is

8    your sole and exclusive responsibility.  If any reference by

9    me or the attorneys to the evidence is different from your

10   own memory of the evidence, it is your memory that should

11   control your deliberations.

12          During the trial, I have permitted those jurors

13   who wanted to do so to take notes.  You may take your

14   notebooks with you into the jury room and use them during

15   your deliberations if you wish.

16          As I told you at the beginning of the trial, your

17   notes are only to be an aid to your memory.  They are not

18   evidence in this case, and they should not replace your own

19   memory of the evidence.  Those jurors who have not taken

20   notes, should rely on their own memory of the evidence.  The

21   notes are intended to be for the notetaker's own personal

22   use only.

23          During your deliberations, you may consider only

24   the evidence properly admitted in this trial.  The evidence

25   in this case consists of the sworn testimony of the

1    witnesses, the exhibits that were admitted into evidence and

2    the facts stipulated by the parties.

3        During the trial, you were told that the parties

4    had stipulated; that is, agreed to certain facts.  You

5    should consider any stipulation of fact to be undisputed

6    evidence.  When you consider the evidence, you are permitted

7    to draw from the facts that you find have been proven such

8    reasonable inferences as you feel are justified in the light

9    of your experience.

10       You should give any evidence such weight as in

11   your judgment it is fairly entitled to receive.  The

12   statements and arguments of the lawyers are not evidence.

13   They are only intended to assist you in understanding the

14   evidence.  Similarly, the questions of the lawyers are not

15   evidence.

16       The indictment is merely a formal way of accusing

17   a person of a crime.  You must not consider the indictment

18   as evidence of any kind.  You may not consider it as any

19   evidence of the defendant's guilt or draw any inference of

20   guilt from it.

21       Every defendant in a criminal case is presumed to

22   be innocent.  This presumption of innocence remains with the

23   defendant throughout the trial, unless and until the

24   government has proven he is guilty beyond a reasonable

25   doubt.

1    This burden never shifts throughout the trial.
2    The law does not require the defendant to prove his
3    innocence or to produce any evidence at all.  If you find
4    that the government has proven beyond a reasonable doubt
5    every element of the offenses with which the defendant is
6    charged, it is your duty to find him guilty of those
7    offenses.

8    On the other hand, if you find that the government
9    has failed to prove any element of a particular offense
10   beyond a reasonable doubt, it is your duty to find the
11   defendant not guilty of that offense.

12   As I've explained, the government has the burden
13   of proving the defendant guilty beyond a reasonable doubt.
14   In civil cases, it is only necessary to prove that a fact is
15   more likely true than not or in some cases that it's truth
16   is highly probable.

17   But in criminal cases, such as this one, the
18   government's proof must be more powerful than that.  It must
19   be beyond a reasonable doubt.  Reasonable doubt, as the name
20   implies, is a doubt based on reason.  A doubt for which you
21   have a reason based upon the evidence or lack of evidence in
22   the case.

23   If after careful, honest and impartial
24   consideration of all the evidence, you cannot say that you
25   are firmly convinced of the defendant's guilt, then you have

1    a reasonable doubt.

2            Reasonable doubt is the kind of doubt that would

3    cause a reasonable person, after careful and thoughtful

4    reflection, to hesitate to act in the graver or more

5    important matters in life.

6            However, it is not an imaginary doubt nor a doubt

7    based on speculation or guesswork.  It is a doubt based on

8    reason.  The government is not required to prove guilt

9    beyond all doubt or to a mathematical or scientific

10   certainty.  Its burden is to prove guilt beyond a reasonable

11   doubt.

12           There are two types of evidence from which you may

13   determine what the facts are in this case:  Direct evidence

14   and circumstantial evidence.

15           When a witness, such as an eyewitness, asserts

16   actual knowledge of a fact, that witness' testimony is

17   direct evidence.  On the other hand, evidence of facts and

18   circumstances from which reasonable inferences may be drawn

19   is circumstantial evidence.

20           Let me give you an example.  Assume a person

21   looked out a window and saw that snow was falling.  If he

22   later testified in court about what he had seen, his

23   testimony would be direct evidence that snow was falling at

24   the time he saw it happen.

25           Assume, however, that he looked out a window and

1   saw no snow on the ground, and then went to sleep and saw

2   snow on the ground after he woke up, his testimony about

3   what he had seen would be circumstantial evidence that it

4   had snowed while he was asleep.

5          The law says that both direct and circumstantial

6   evidence are acceptable as a means of proving a fact.  The

7   law does not favor one form of evidence over another.  It is

8   for you to decide how much weight to give any particular

9   evidence, whether it is direct or circumstantial.  You're

10  permitted to give equal weight to both.

11         Circumstantial evidence does not require a greater

12  degree of certainty than direct evidence.  In reaching a

13  verdict in this case, you should consider all of the

14  evidence presented, both direct and circumstantial.

15         You must not allow the nature of a charge to

16  affect your verdict.  You must consider only the evidence

17  that has been presented in this case in reaching a fair and

18  impartial verdict.

19         The weight of the evidence is not necessarily

20  determined by the number of witnesses testifying for each

21  side.  Rather, you should consider all the facts and

22  circumstances in evidence, to determine which of the

23  witnesses you believe.

24         You might find that the testimony of a smaller

25  number of witnesses on one side, is more believable than the

1   number of a greater number of witnesses on the other side,

2   or you might find the opposite.

3            The lawyers in this case sometimes objected when

4   the other side asked a question, made an argument or offered

5   evidence that the objecting lawyer believed was not proper.

6   You must not hold such objections against the lawyer who

7   made them or the party he or she represents.  It is the

8   lawyer's responsibility to object to evidence that he or she

9   believes is not admissible.

10           If during the course of the trial, I sustained an

11  objection to a lawyer's question, you should ignore the

12  question, and you must not speculate as to what the answer

13  would have been.

14           In determining whether the government has proved

15  the charges against the defendant beyond a reasonable doubt,

16  you must consider the testimony of all the witnesses who

17  have testified.

18           As I've said already, you are the sole judges of

19  the credibility of the witnesses.  You alone determine

20  whether to believe any witness and the extent to which a

21  witness should be believed.  Judging a witness's credibility

22  means evaluating whether the witness has testified

23  truthfully and also whether the witness accurately observed,

24  recalled and described the matters about which the witness

25  testified.

1          You may consider anything that in your judgment

2    affects the credibility of any witness.  For example, you

3    may consider the demeanor and the behavior of the witness on

4    the witness stand.  The witness's manner of testifying.

5    Whether the witness impresses you as a truthful person.

6    Whether the witness impresses you as having an accurate

7    memory and recollection.  Whether the witness has any motive

8    for not telling the truth.  Whether the witness had a full

9    opportunity to observe the matters about which he or she has

10   testified.  Whether the witness has any interest in the

11   outcome of the case or friendship or hostility toward other

12   people concerned with this case.

13          In evaluating the accuracy of a witness's memory,

14   you may consider the circumstances surrounding the event,

15   including any circumstances that would impair or improve the

16   witness's ability to remember the event, the time that

17   elapsed between the event and any later recollections of the

18   event, and the circumstances under which the witness was

19   asked to recall the details of the event.

20          You may consider whether there are any

21   inconsistencies or discrepancies between what the witness

22   says now and what the witness may have previously said.  You

23   may also consider any inconsistencies between the witness's

24   testimony and any other evidence that you credit, such as

25   the testimony of another witness.

1          You should consider whether any inconsistencies

2    are the result of different individuals seeing, hearing or

3    recollecting things differently, are the result of actual

4    forgetfulness, are the result of innocent mistakes, are the

5    result of intentional falsehood.

6          You may consider the reasonableness or

7    unreasonableness, the probability or improbability of the

8    testimony of a witness in determining whether to accept it

9    as true and accurate.

10          You may consider whether the witness has been

11   contradicted or supported by other evidence that you credit.

12   If you believe that any witness has shown him or herself to

13   be biased or prejudiced, for or against either side in this

14   trial, you may consider and determine whether such bias or

15   prejudice has colored the testimony of the witness, so as to

16   affect the desire and capability of that witness to tell the

17   truth.  You should give the testimony of each witness such

18   weight as in your judgment it is fairly entitled to receive.

19          You have heard the evident that Rocky Hardie has

20   received immunity.  This means that his testimony cannot be

21   used in any criminal case.  You should consider whether a

22   witness who realizes that he may avoid prosecution by

23   incriminating another, may have a motive to lie.

24          However, you may also consider that the witness is

25   under the same obligation to tell the truth as is any other

1    witness, because the grant of immunity does not protect him

2    against a prosecution for perjury or false statement, should

3    he lie under oath.

4              The testimony of a witness to whom immunity has

5    been granted should be considered with caution.  You should

6    give the testimony as much weight as in your judgment it

7    deserves.

8              In this case you have heard testimony from a

9    number of law enforcement officers.  A police officer's

10   testimony should be evaluated by you, just as any other

11   evidence in the case.  In evaluating the officer's

12   credibility, you should use the same guidelines that you

13   apply to the testimony of any witness.

14             In no event should you give either greater or

15   lesser weight to the testimony of any witness, merely

16   because he or she is a police officer.

17             Every defendant in a criminal case has an absolute

18   right not to testify.  The defendant has chosen to exercise

19   this right in this case.  You must not hold this decision

20   against him, and it would be improper for you to speculate

21   as to the reason or reasons for his decision.  You must not

22   assume the defendant is guilty because he chose not to

23   testify.

24             Recordings of conversations identified by

25   witnesses have been received into evidence.  Transcripts of

1    these recorded conversations have been furnished for your

2    convenience and guidance, as you have listened to the tapes,

3    to clarify portions of the tape, which are difficult to hear

4    and to help you identify speakers.

5                The recordings, however, are the evidence in the

6    case.  The transcripts are not.  If you noticed any

7    difference between the transcripts and the recordings, you

8    must rely only on the recordings and not the transcripts.

9                In addition, if you cannot determine from the

10   recording that particular words were spoken, you must

11   disregard the transcripts, as far as those words are

12   concerned.

13               Someone's intent or knowledge ordinarily cannot be

14   proved directly, because there is no way of knowing what a

15   person is actually thinking.  But you may infer someone's

16   intent or knowledge from the surrounding circumstances.  You

17   may consider any statement made or acts done or omitted by

18   the defendant and all other facts and circumstances received

19   in evidence which indicate his intent or knowledge.

20               You may infer, but are not required to infer, that

21   a person intends the natural and probable consequences of

22   acts he intentionally did or intentionally did not do.  It

23   is entirely up to you, however, to decide what facts to find

24   from the evidence received during this trial.

25               You should consider all the evidence -- all of the

1    circumstances in evidence that you think are relevant in

2    determining whether the government has proved beyond a

3    reasonable doubt that the defendant acted with a necessary

4    state of mind.

5         Each count of the indictment charges a separate

6    offense.  You should consider each offense and the evidence

7    which applies to it separately.  And you should return

8    separate verdicts as to each count, unless I instruct you to

9    do otherwise.

10        The fact that you may find the defendant guilty or

11   not guilty on any one count of the indictment should not

12   influence your verdict with respect to any other count of

13   the indictment.

14        At any time during your deliberations, you may

15   return your verdict of guilty or not guilty with respect to

16   any count.

17        All right.  Count 1, transporting a firearm in

18   furtherance of a civil disorder.  Count 1 of the indictment

19   charges the defendant with transporting a firearm in

20   commerce while knowing, having reason to know or intending

21   that it would be used unlawfully to further a civil

22   disorder, which is a violation of federal law.

23        In order to find the defendant guilty of this

24   offense, you must find that the government proved each of

25   the following two elements beyond a reasonable doubt:

1    First, that the defendant transported a firearm in commerce;

2    second, that the defendant did so knowing, having reason to

3    know or intending that the firearm would be used unlawfully

4    in furtherance of civil disorder.

5          The term "civil disorder" means any public

6    disturbance involving acts of violence by groups of three or

7    more persons which, A, causes an immediate danger of injury

8    to another individual; B, causes an immediate danger of

9    damage to another individual's property; C, results in

10   injury to another individual or, D, results in damage to

11   another individual's property.

12         The term "commerce" means commerce or travel

13   between one state, including the District of Columbia, and

14   any other state, including the District of Columbia.  It

15   also means commerce wholly within the District of Columbia.

16         A firearm includes any weapon, which is designed

17   to or may be readily converted to expel any projectile by

18   the action of an explosive or the frame or receiver of any

19   such weapon.  A frame or receiver is a part of the firearm.

20   A holster is neither a frame nor is it a receiver.

21         Count 2, obstruction of an official proceeding and

22   aiding and abetting.  Count 2 of the indictment charges the

23   defendant with corruptly obstructing an official proceeding,

24   which is a violation of the law.  Count 2 also charges the

25   defendant with attempt to obstruct or impede an official

1    proceeding, and aiding abetting others to commit that

2    offense.

3         The Court will first explain the elements of the

4    substantive offense, along with its associated definitions,

5    then the Court will explain how to determine whether the

6    defendant attempted the offense and whether the defendant

7    aided and abetted the offense.

8         In order to find the defendant guilty of corruptly

9    obstructing an official proceeding, you must find that the

10   government proved each of the following four elements beyond

11   a reasonable doubt:

12        First, the defendant attempted to or did obstruct

13   or impede an official proceeding.  Second, the defendant

14   acted with the intent to obstruct or impede the official

15   proceeding.  Third, the defendant acted knowingly, with

16   awareness that the natural and probable effect of his

17   conduct would be to obstruct or impede the official

18   proceeding.  And, fourth, the defendant acted corruptly.

19        The term "official proceeding" includes a

20   proceeding before the Congress.  The official proceeding

21   need not be pending or about to be instituted at the time of

22   the offense.  If the official proceeding was not pending or

23   about to be instituted, the government must prove beyond a

24   reasonable doubt that the official proceeding was reasonably

25   foreseeable to the defendant.

1        As used in Count 2, the term "official proceeding"

2   means Congress's joint session to certify the electoral

3   college vote.

4        A person acts knowingly if he realizes what he is

5   doing and is aware of the nature of his conduct, and does

6   not act through ignorance, mistake or accident.  In deciding

7   whether the defendant acted knowingly, you may consider all

8   of the evidence, including what the defendant did or said.

9        To act corruptly, the defendant must use unlawful

10  means or act with an unlawful purpose or both.  The

11  defendant must also act with consciousness of wrongdoing.

12  Consciousness of wrongdoing means with an understanding or

13  awareness that what the person is doing is wrong.

14       Not all attempts to obstruct or impede an official

15  proceeding involve acting corruptly.  For example, a witness

16  in a court proceeding may refuse to testify by invoking his

17  constitutional privilege against self-incrimination thereby

18  obstructing or impeding the proceeding.  But he does not act

19  corruptly.

20       In contrast, an individual who obstructs or

21  impedes a court proceeding by bribing a witness to refuse to

22  testify in that proceeding or by engaging in other

23  independently unlawful conduct, does act corruptly.

24       In Count 2, as I mentioned, the defendant is also

25  charged with attempt to commit the crime of obstruction of

an official proceeding.  An attempt to commit obstruction of

an official proceeding is a crime, even if the defendant did

not actually complete the crime of obstruction of an

official proceeding.

In order to find the defendant guilty of attempt

to commit obstruction of an official proceeding, you must

find that the government proved beyond a reasonable doubt

each of the follow two elements:

First, that the defendant intended to commit the

crime of obstruction of an official proceeding, as I have

defined that offense above.  Second, that the defendant took

a substantial step toward committing obstruction of an

official proceeding, which strongly corroborates or confirms

that the defendant intended to commit the crime.

With respect to the first element of attempt, you

may not find the defendant guilty of attempt to commit

obstruction of an official proceeding merely because he

thought about it.  You must find that the evidence proved

beyond a reasonable doubt that the defendant's mental state

passed beyond the stage of thinking about the crime to

actually intending to commit it.

With respect to the second element, the

substantial step element, you may not find the defendant

guilty of attempt to commit obstruction of an official

proceeding merely because he made some plans to or some

1    preparation for committing that crime.  Instead, you must

2    find that the defendant took some firm, clear, undeniable

3    action to accomplish his intent to commit obstruction of an

4    official proceeding.

5         However, the substantial step element does not

6    require the government to prove that the defendant did

7    everything, except the last act necessary to complete the

8    crime.

9         In this case, the government further alleges that

10   the defendant aided and abetted others in committing

11   obstruction of an official proceeding, as charged in Count

12   2.

13        A person may be guilty of an offense if he aided

14   and abetted another person committing the offense.  A person

15   who has aided and abetted another person in committing an

16   offense is often called an accomplice.  The person whom the

17   accomplice aids and abets is known as the principle.

18        It is not necessary that all the people who

19   committed the crime be caught or identified.  It is

20   sufficient, if you find beyond a reasonable doubt, that the

21   crime was committed by someone; and that the defendant

22   knowingly and intentionally aided and abetted that person in

23   committing the crime.

24        In order to find the defendant guilty of

25   obstruction of an official proceeding because he aided and

1  abetted others in committing this offense, you must find

2  that the government proved beyond a reasonable doubt the

3  following five requirements:

4         First, that others committed obstruction of an

5  official proceeding by committing each of the elements of

6  the offense charged, as I have explained above.  Second,

7  that the defendant knew that obstruction of an official

8  proceeding was going to be committed or was being committed

9  by others.  Third, that the defendant performed an act or

10  acts in furtherance of the offense.  Fourth, that the

11  defendant knowingly performed that act or acts for the

12  purpose of aiding, assisting, soliciting, facilitating or

13  encouraging others in committing the offense of obstruction

14  of an official proceeding.  Fifth, that the defendant did

15  that act or acts with the intent that others commit the

16  offense of obstruction of an official proceeding.

17         To show that the defendant performed an act or

18  acts in furtherance of the offense charged, the government

19  needs to show some affirmative participation by the

20  defendant, which at least encouraged others to commit the

21  offense.  That is, you must find that the defendant's act or

22  acts did in some way aid, assist, facilitate or encourage

23  others to commit the offense.

24         The defendant's act or acts need not further aid,

25  assist, facilitate or encourage every part or phase of the

1    offense charged.  It is enough if the defendant's act or

2    acts further, aid, assist, facilitate or encourage only one

3    or some parts or phases of the offense.  Also, the

4    defendant's acts need not themselves be against the law.

5           In deciding whether the defendant had the required

6    knowledge and intent to satisfy the fourth requirement for

7    aiding and abetting, you may consider both direct and

8    circumstantial evidence, including the defendant's words and

9    actions and other facts and circumstances.

10          However, evidence that the defendant merely

11   associated with persons involved in a criminal venture or

12   was merely present or was merely a knowing spectator during

13   the commission of the offense, is not enough for you to find

14   the defendant guilty as an aider and abettor.

15          If the evidence shows that the defendant knew that

16   the offense was being committed or was about to be committed

17   but does not also prove beyond a reasonable doubt that it

18   was the defendant's intent and purpose to aid, assist,

19   encourage, facilitate or otherwise associate himself with

20   the offense, you may not find the defendant guilty of the

21   obstruction of an official proceeding as an aider and

22   abettor.

23          The government must prove beyond a reasonable

24   doubt that the defendant in some way participated in the

25   offense, committed by others, as something the defendant

1    wished to bring about and to make succeed.

2              Count 3, entering or remaining in a restricted

3    area or grounds with a firearm.  Count 3 of the indictment

4    charges the defendant with entering or remaining in a

5    restricted building or grounds while using or carrying a

6    firearm, which is a violation of federal law.

7              In order to find the defendant guilty of this

8    offense, you must find that the government proved each of

9    the following three elements beyond a reasonable doubt.

10   First, that the defendant entered or remained in a

11   restricted building or grounds without lawful authority to

12   do so.  Second, that the defendant knew that the building or

13   grounds was restricted, and he knew that he lacked lawful

14   authority to enter or remain there.  Third, that the

15   defendant knowingly used or carried a firearm during and in

16   relation to the offense.

17             On the verdict form, if you find the defendant not

18   guilty of Count 3, then you shall proceed to Count 3A.  If

19   you find the defendant guilty of Count 3, then do not

20   consider Count 3A and proceed to Count 4.

21             The term "restricted building or grounds" means

22   any posted, condoned off or otherwise restricted area of a

23   building or grounds where a person protected by the Secret

24   Service is temporarily visiting.

25             The term "person protected by the Secret Service"

1    includes the Vice President and immediate family of the Vice

2    President.  The terms "knowingly" and "firearm" have the

3    same meaning I have given you already.

4           Count 3A is a lesser-included offense of Count 3

5    of the indictment, which charges the defendant with entering

6    or remaining in a restricted building or grounds.

7           In order to find the defendant guilty of this

8    offense, you must find that the government proved each of

9    the following two elements beyond a reasonable doubt:

10          First, that the defendant entered or remained in a

11   restricted building or grounds without lawful authority to

12   do so.  Second, that the defendant knew that the building or

13   grounds was restricted, and he knew he lacked the lawful

14   authority to enter or remain there.

15          The terms, "restricted buildings or grounds,"

16   "person protected by the Secret Service" and "knowingly"

17   have the same meanings I gave you previously.

18          Count 4 charges the defendant with committing or

19   attempting to commit an act to obstruct, impede or interfere

20   with law enforcement officers lawfully carrying out their

21   official duties, incident to a civil disorder, which is a

22   violation of federal law.

23          The Court will first explain the elements of the

24   substantive offense along with its associated definitions.

25   Then the Court will explain how to determine whether the

1    defendant attempted the offense.  In order to find the

2    defendant guilty of obstructing officers in a civil

3    disorder, you must find the following four elements beyond a

4    reasonable doubt:

5            First, the defendant knowingly committed an act or

6    attempted to commit an act.  Second, in committing or

7    attempting to commit that act, the defendant intended to

8    obstruct, impede or interfere with one or more law

9    enforcement officers.

10           Third, at the time of the defendant's actual or

11   attempted act, the law enforcement officer or officers were

12   engaged in the lawful performance of their official duties

13   incident to and during a civil disorder.  Fourth, the civil

14   disorder in any way or degree obstructed, delayed or

15   adversely affected either commerce or the movement of any

16   article or commodity in commerce or the conduct or

17   performance of any federally-protected function.

18           The terms "knowingly," "civil disorder" and

19   "commerce" have the same meaning as I gave you previously.

20   The term, "federally-protected function" means any function,

21   operation or action carried out under the laws of the United

22   States by any department, agency or instrumentality of the

23   United States or by an officer or employee thereof.

24           The term "department" includes executive

25   departments.  The Department of Homeland Security, which

1    includes the United States Secret Service is an executive

2    department.

3         The term "agency" includes any department,

4    independent establishment, commission, administration,

5    authority, board or bureau of the United States.

6         In Count 4, the defendant is also charged with

7    attempt to commit the crime of obstructing officers during a

8    civil disorder.  An attempt to obstruct officers during a

9    civil disorder is a federal crime, even if the defendant did

10   not actually complete the crime of obstructing officers

11   during a civil disorder.

12        In order to find the defendant guilty of attempt

13   to commit the crime of obstructing officers during a civil

14   disorder, you must find that the government proved beyond a

15   reasonable doubt each of the following two elements:

16        First, that the defendant intended to commit the

17   crime of obstructing officers during a civil disorder, as I

18   have defined that offense above.  Second, that the defendant

19   took a substantial step toward committing the crime of

20   obstructing officers during a civil disorder, which strongly

21   corroborates or confirms that the defendant intended to

22   commit that crime.  The principles governing attempt that I

23   explained above apply here as well.

24        Count 5, obstruction of justice.  Hindering

25   communication through force or threat of force.  Count 5 of

1    the indictment charges the defendant with using physical

2    force or threatening to use physical force against Jackson

3    Reffitt and Peyton Reffitt to hinder, delay or prevent the

4    communication to a law enforcement officer or a federal

5    judge, which is a violation of law.

6            Count 5 also charges the defendant with attempt to

7    commit the crime of obstruction of justice through physical

8    force or threat of physical force.  Again, the Court will

9    first explain the elements of the substantive offense, along

10   with its associated definitions.  Then the Court will

11   explain how to determine whether the defendant attempted the

12   offense.

13           In order to find the defendant guilty of this

14   offense, you must find that the government proved each of

15   the following four elements beyond a reasonable doubt:

16           First, that the defendant knowingly used or

17   attempted to use physical force or the threat of physical

18   force against Jackson Reffitt or Peyton Reffitt.  Second,

19   that the defendant acted with intent to hinder, delay or

20   prevent Jackson Reffitt or Peyton Reffitt from communicating

21   to law enforcement information relating to the commission or

22   possible commission of an offense.

23           Third, that there was a reasonable likelihood that

24   at least one of the communications targeted by the defendant

25   would have been made to a federal officer.  Fourth, the

1  information that would have been communicated to a federal

2  officer related to the possible commission of a federal

3  offense.

4         The government need not prove that the defendant

5  knew that the office related to a federal offense or knew

6  that the communications were reasonably likely to reach a

7  federal officer.

8         The term "knowingly" has the same meaning I gave

9  you previously.

10        In Count 5, the defendant is also charged with

11  attempt to commit the crime of obstruction of justice

12  through physical force or threat of physical force.

13        An attempt to commit obstruction of justice

14  through physical force or threat of physical force is a

15  federal crime, even if the defendant did not actually

16  complete the crime of obstruction of justice through

17  physical force or threat of physical force.

18        In order to find the defendant guilty of attempt

19  to commit obstruction of justice through physical force or

20  threat of physical force, you must find that the government

21  proved beyond a reasonable doubt each of the following two

22  elements:

23        First, that the defendant intended to commit the

24  crime of obstruction of justice through physical force or

25  threat of physical force, as I have defined that offense

1    above.  Second, that the defendant took a substantial step

2    toward committing obstruction of justice through physical

3    force or threat of physical force, which strongly

4    corroborates or confirms that the defendant intended to

5    commit that crime.

6              The principles governing attempt that I explained

7    above apply here as well.

8              So, ladies and gentlemen, those are the

9    substantive instructions that I will give you.  I will give

10   you a few more instructions before I send you back to

11   deliberate.

12             Before we hear closing arguments though, I want to

13   give you a brief-minute break so that you have time --

14   you're comfortable to sit through all of the closing

15   arguments.  So I will ask you to come back at 3:40, please.

16             (Jurors exited the courtroom.)

17             **THE COURT:**  All right.  Does either side have any

18   objections to the charge I gave the jury?

19             **MR. NESTLER:**  No, Your Honor.

20             **MR. WELCH:**  Yes, Your Honor.

21             Just to instruction 23, more specifically to the

22   definitions of official proceeding, which we believe, as

23   I've said before, involves the administration of justice.

24   And also to the definition of corruptly.  We've discussed

25   this before.  We briefed it before.

1    **THE COURT:**  All right.  These are your old

2   objections.  There is nothing about the way I delivered them

3   that you object to?

4    **MR. WELCH:**  No.

5    **THE COURT:**  Those are certainly preserved for

6   appeal.

7    **MR. WELCH:**  Very good.

8    **THE COURT:**  All right.  So we will take a

9   10-minute break, and then we will come back with

10  Ms. Berkower as initial closing, and then Mr. Welch, and

11  Mr. Nestler for rebuttal?

12   All right.  Thank you.

13   (Break.)

14    **THE COURT:**  Are we ready for the jury?

15    **MR. WELCH:**  Yes, Your Honor.

16    **THE COURT:**  Assuming we have time, I am inclined

17  to give them all of the instructions tonight and then

18  dismiss them to come back tomorrow and start deliberating

19  right away.  Because that way I can release the alternates.

20  Does that make sense?  And you all don't have to show up at

21  9:30 for them to start their deliberations.

22   (Nods all around.)

23    **COURTROOM DEPUTY:**  All rise.

24   (Jurors entered the courtroom.)

25    **COURTROOM DEPUTY:**  You may be seated.

1    **THE COURT:**  All right, ladies and gentlemen, we

2  are now going to begin with the closing arguments.  We will

3  start with Ms. Berkower.

4    **MS. BERKOWER:**  Thank you, Your Honor.  May I

5  proceed?

6    **THE COURT:**  Of course.

7    **MS. BERKOWER:**  On January 6th, 2021, Guy Reffitt

8  lit the fire of the very first group of rioters that

9  breached the U.S. Capitol building, armed with a bulletproof

10  vest and semiautomatic handgun, he stepped to the front of a

11  violent, angry mob and confronted an outnumbered line of

12  U.S. Capitol police officers, who were making a last stand.

13    A short distance behind these officers was the

14  door to the United States Senate where Vice President Mike

15  Pence was presiding over a fundamental act required by the

16  constitution itself, certifying the presidential election on

17  January 6th.

18    Before the defendant arrived, the crowd below the

19  Senate was growing.  Every mob needs leaders.  And this

20  defendant was a leader that day.  He drove here all the way

21  from Texas with an AR-15 rifle and a semiautomatic handgun

22  for this very moment, to storm the Capitol with a vigilante

23  mob, overthrow Congress, and forcibly remove the legislators

24  inside.  He pushed to the front, climbed up on a railing and

25  made his move upward.

1        Officer Shauni Kerkhoff, one of the brave U.S.

2   Capitol police officers responsible for protecting the

3   Capitol building and the legislators inside, ran to the top

4   of the stairs.  The crowd below was terrifying, it was

5   massive and angry.

6        Officer Kerkhoff ordered the defendant to stop and

7   shot him with pepper balls.  The defendant continued to

8   advance, taunting her, telling her she would need a bigger

9   gun than that.  She knew her options were limited.  She

10  certainly couldn't shoot her service pistol into that crowd,

11  that would risk lives and potentially escalate the situation

12  into a full-blown shootout.

13       So she called Sergeant DesCamp.  He ran over to

14  help and shot the defendant with a bigger, but still

15  less-than-lethal gun.  Those rounds also had no effect and

16  bounced off the defendant as they hit him, because he was

17  wearing body armor that could stop bullets from a

18  high-powered rifle.  The defendant prepared for this.  He

19  continued to advance.  This was his plan.

20       The Capitol building, with legislators inside, in

21  full session, was just behind those officers.  They were in

22  an impossible situation.  Out-manned, and they feared,

23  out-gunned.

24       The top of those stairs was a crucial choke point

25  to access the building.  If they could hold on to that

1    strategic position, they just might be able to fend off the

2    mob.  But that small group of officers could only do so

3    much.  And the defendant wouldn't stop.  Every step he took

4    up the railing, the crowd came with him.  Up the stairs,

5    ever closer to the Senate.

6         The crowd was energized and cheered him on.  And

7    from watching the defendant confront those officers, the

8    crowd learned how to overcome them.  While the officers were

9    distracted dealing with the defendant, the crowd behind him

10   opened up a whole new avenue upward cutting the construction

11   tarp that allowed them into the inaugural scaffolding, that

12   was covering the rest of the stairway.  They saw, too, these

13   officers were only using non-lethal projectiles against this

14   defendant.  They started making shields.  They used the tarp

15   to cover themselves.  They used a large piece of plywood out

16   front to push up the stairs.

17        The defendant's decision to step forward and take

18   on the officers allowed the crowd behind him not just to

19   advance but also to adapt.  Mere minutes after he stepped up

20   to lead, the mob swarmed upward, pushed the officers aside

21   and broke into the building.  Those were the very first

22   rioters who entered the U.S. Capitol that day.  This

23   defendant lit the fire that got them there.

24        Around the world, the U.S. Capitol building's

25   iconic dome is a powerful symbol of democracy, of

1   self-government, illustrated by a peaceful transfer of power

2   every four years.  But on January 6th of 2021, the vigilante

3   mob, ignited by the defendant, breached the Senate doors and

4   upended that process.  Legislators and their staff, the Vice

5   President himself, were stopped in their tracks, forced to

6   abandon their work to certify the election.

7         Take a moment to think about that.  You heard in

8   court that an officer, armed with a rifle, was on the floor

9   of the United States Senate, a place designed for the free

10   exchange and debate of ideas, staffers were grabbing boxes

11   containing the original ballots from all 50 states and our

12   own District of Columbia.  Boxes containing the fruit of our

13   democratic process and evacuating.

14         For hours chaos reigned and the certification

15   could not take place.  For many people, these events marked

16   a dark day in American history.  But not for this defendant.

17   He was ecstatic.  About what he did.  About what the mob

18   did.  As he put it himself, he had a great time doing it.

19   Back home in Texas, he thought he had gotten away with it.

20   And he was ready for more.

21         He bragged to his Three Percenter buddies and to

22   his family that this was just the beginning, only the

23   preface of the book; that is, until he realized, that he

24   maybe hadn't gotten away with it.

25         Law enforcement had regrouped.  People were being

1   arrested.  Some had been turned in by their own families,

2   and this defendant knew he had freely admitted to his family

3   what he did; and that neither of his teenage children

4   approved.

5            So he took his next stand.  He told them, in no

6   uncertain terms, they were either with him or they were

7   against him.  He had squared off with the Capitol police,

8   and now he squared off with his own children.  If his

9   children cooperated with the FBI, he would take matters into

10  his own hands.

11           At the beginning of this trial, my colleague,

12  Mr. Nestler, told you that the government would prove beyond

13  a reasonable doubt that the defendant committed all five

14  crimes charged in the indictment; and that is exactly what

15  the evidence in this case proved.

16           The defendant is guilty of transporting two guns.

17  A semiautomatic handgun and an AR-15 style rifle from Texas

18  to D.C. to use in a civil disorder on January 6th.

19           He is guilty of obstructing -- corruptly

20  obstructing Congress's certification of the election on

21  January 6th.  He is guilty of carrying a semi-automatic

22  handgun in the restricted area of the U.S. Capitol grounds.

23  He is guilty of interfering with Capitol police, as they

24  tried to carry out their duties on January 6th.  And he is

25  guilty of threatening his children, back home in Texas, to

1    prevent them from cooperating with the FBI's investigation

2    into January 6th.

3            I'm going to talk to today about what the

4    defendant did and why he did it.  And let's start with the

5    evidence that proves what he did on January 6th.  In his

6    opening, Mr. Welch told you that this case was a rush to

7    judgment based on the defendant's bragging and hype.  You

8    now know that the evidence proves the opposite.

9            Armed with a handgun, the defendant pushed his way

10   to the front of the crowd on the Capitol steps and

11   confronted the police.  Officer Kerkhoff and Sergeants

12   DesCamp and Flood, all eyewitnesses, told you, from their

13   unique perspective looking out over the crowd, why the

14   defendant's conduct was so significant and so dangerous.

15           Before the defendant got there, an angry crowd was

16   growing, but no one had stepped up to the front.  But once

17   the defendant started up the stairs, every time he advanced,

18   the crowd advanced.  That is exactly what you saw in the

19   videos from that day.  You saw him lead the crowd.

20           In Capitol surveillance footage, you saw what it

21   looked like from the landing above.  When you deliberate,

22   watch that video and you can see this unfold.  When the

23   defendant stepped up on the railing, no one was there with

24   him.  No one was right behind him.

25           But as he confronted the officers and laughed at

1    their less-lethal rounds, he advanced up the stairs and

2    others were emboldened.  A few stepped up and stood behind

3    him.  And then they started filling in more and more.  And

4    as they did, they adapted, bringing those plywood pieces and

5    pieces of the tarp up with them, to allow them all to

6    advance.  Watch that footage, and remember what Officer

7    Kerkhoff and Sergeants Des Camp and Flood told you.  With

8    the Senate doors just a short distance behind them, the

9    defendant forced them to make a stand here.

10          You should also consider what this looked like

11   from the thick of the crowd.  Look at Government's Exhibit

12   203.  When the defendant stepped up, it was him taking

13   charge.  No one else was there.  But then other rioters

14   joined him.  The crowd started chanting "USA" to support

15   him.  The crowd screamed at the officers confronting the

16   defendant, Stand down!  And when Sergeant Flood sprayed him

17   with pepper spray, they booed.  You saw this yourself.

18          (Played video.)

19          **MS. BERKOWER:**  This defendant lit the fire in that

20   mob, so that even after he was stopped, they could continue

21   their advance, assaulting officers and screaming profanity

22   as the defendant waved them on.  You saw this in

23   Government's Exhibit 202.

24          (Played video.)

25          **MS. BERKOWER:**  Within minutes of the defendant

1  stepping up to lead, the mob forced its way past the

2  officers, up to the Capitol building behind them, and into

3  the Senate wing doors.  You saw that mob rush forward.

4  Nothing could stop them.

5        This was not bragging.  This was not hype.  This

6  was real.  It was real for officers like Shauni Kerkhoff,

7  Adam Des Camp and Matthew Flood, who were fighting to

8  protect the Capitol that day.  And it was real for the

9  people in the building who ran for their lives.  It was real

10  for Inspector Moore, watching in horror at the command

11  center, as her colleagues were overrun.  You remember

12  Inspector Moore sitting in this chair before you, having a

13  hard time composing herself, and recalling the events and

14  her helplessness.

15        And it was real for the defendant.  He went there

16  for a purpose, to overthrow Congress.  And he was determined

17  to achieve it.  What the defendant did was not just bragging

18  or hype.  This was the fire that the defendant lit on those

19  stairs.

20        (Played video without audio.)

21    **MS. BERKOWER:**  And this is what the mob did next

22  when they got to the Senate doors, the very first breach of

23  the building.

24        (Played video without audio.)

25    **MS. BERKOWER:**  This evidence proves that the

1    defendant stepped up to lead a mob against the Capitol

2    police that day.  But the defendant's own admissions about

3    what he did confirm there is no other room for

4    interpretation about his purpose.

5           Rocky Hardie told you, the defendant radioed him

6    while he was still at the Capitol.  He said he was trying to

7    go into the building, but he had to turn back because of the

8    lingering effects of the officers' pepper spray.

9           Back at the Melrose Hotel, the defendant showed

10   off his bruises from the officers' projectiles.  Mr. Hardie

11   was so impressed, he took a photo of those injuries.  And

12   the defendant proudly explained how he got them.  By

13   confronting the police, he had lit the fire that allowed the

14   mob to push up the stairs and into the building.

15          That same day, the defendant proudly informed his

16   fellow Three Percenters and other friends of what he had

17   done.  To his militia he reported, We took the Capitol of

18   the United States of America.  What have you done today?

19   Multiple clay bullets and a battle cry like in Braveheart.

20   The insurrection began immediately after.

21          Was he bragging?  Of course he was.  But he was

22   bragging about what he actually did that day.  Bragging

23   about what you saw him do on the video.  To friends he

24   wrote, I was the first person to light the fire on the

25   Capitol steps.  We took the Capitol.  And to another friend,

1    This was me forcing the Capitol police hand.  He sent that

2    message with a photo of himself up on the railing, facing

3    off with the officers.

4           And to another friend, I finally made it to the

5    top of the steps when they broke through the doors.  My job

6    was done then.  I had to fall back and get my sight back.

7           Before the defendant even got home to Texas, he

8    started bragging to his family.  He sent his family videos

9    of himself on the family text thread from Fox News and

10   explained, We took the United States Capitol.  Like I said

11   before, hold my beer.  Watch this.

12          And, of course, when we got home, he talked about

13   his crimes.  You heard him explain it in his own words,

14   because Jackson Reffitt, scared at what he was hearing, and

15   fearful that no one would ever believe him otherwise,

16   recorded what his father was saying.

17          You heard those open admissions by the defendant

18   on those recordings.  You could hear the pride in his voice

19   as he gave the details to his family.  How nothing Officer

20   Kerkhoff could do would stop him.  And how he told her to

21   stand down or be tried for treason.

22          During the recorded Zoom call with his militia, a

23   few days later, he recounted yet again.  He was proud.  He

24   was laughing.  He mocked Officer Kerkhoff's efforts to stop

25   him.  Listen to the Zoom call clips as you deliberate.  The

1    defendant explained himself to his militia leader it was his

2    actions that got the crowd up the stairs and into the

3    building.

4            The videos of the defendant -- from January 6th

5    itself, either have no sound or were too far away to hear

6    exactly what he was saying, but those messages and those

7    recordings leave no question.  The defendant confronted the

8    police to storm the building and take over Congress.

9            You also know that the defendant did all of this

10   while armed with a handgun.  This is proved by a mountain of

11   evidence.  Not bragging.  Not hype.  Facts.

12           You saw Government's Exhibit 202.1, a still shot

13   of the defendant's exposed waistband.  That photo is so

14   clear that Special Agent Hightower could tell you what kind

15   of holster he was using.  A Blackhawk SERPA CQC concealment

16   holster, with a silver object inside.  You know what that

17   object was.  You saw it in the same type of holster on the

18   defendant's nightstand in his bedroom in Texas, a handgun.

19   A Smith & Wesson .40 caliber handgun, with a silver metal

20   slide.  The same gun that Jackson Reffitt told you the

21   defendant wore on his right hip nearly every day and kept on

22   that exact nightstand every night.

23           The same gun Jackson Reffitt recognized by its

24   silver slide on top.  The same gun that the defendant

25   gestured to when he returned to Texas and told his family

1    that when he was confronting the police, "This gun right

2    here was loaded."  The same gun Rocky Hardie told you the

3    defendant brought from Texas and stashed on the nightstand

4    of their shared hotel room on the night of the 6th.

5         The evidence proves that the defendant brought

6    that gun and wore it all day on the 6th.  And while that

7    evidence on its own is enough, other evidence provides still

8    more proof that he was armed on the 6th.  By the defendant's

9    own words to the leader of his militia group, he planned to

10   be in full battle rattle, including weapons, on January 6th.

11   "If that's the law I break, so be it," he wrote to his

12   leader.  And on January 6th at 8:30 a.m., "This dance is

13   about to start."

14        He wore that large blue coat to cover it all up,

15   because he always planned to be armed at the Capitol.  Rocky

16   Hardie explained the how and why of it.  Both the defendant

17   and Mr. Hardie wanted their guns on hand on the 6th.  They

18   talked about how it wasn't legal to bring these guns to D.C,

19   even though they had concealed carry permits in Texas.  They

20   talked about how in D.C. the guns were supposed to be

21   disassembled in a locked case.  But for the 6th, they

22   agreed, they knew what the law said, and they didn't care.

23   They'd rather be, "Judged by 12 than carried by 6."

24        The defendant knew what the law required, and he

25   decided he didn't care.  He was itching to be judged by you,

1   the jury of 12, and now we are here.

2        Before I go any further, I want to step back and

3   say a word about Rocky Hardie.  First of all, you know that

4   Mr. Hardie has immunity for his testimony.  That means the

5   government can't use his testimony to prosecute him.  But

6   remember, he does not have immunity for lying.  Under this

7   agreement, he is required to tell the truth.  And in

8   addition to that, while you may not agree with his beliefs,

9   and you may not approve of what he did, and you may not even

10  like him, the government is not asking you to like him.  But

11  he gave you a whole new vantage point on the defendant.  He

12  gave you the close-up, inside story of what the defendant

13  was doing and saying while he was in D.C.

14        Who would you expect to have information like

15  that?  Only someone who was there with the defendant, who

16  shares the defendant's world view, enough to make that

17  24-hour drive from Texas to D.C. with him.  And the most

18  important thing to keep in mind, as you consider

19  Mr. Hardie's testimony, is what he told you is corroborated

20  by a lot of other evidence.

21        So let's go back to that evidence now.  At the

22  Ellipse, on the morning of the 6th, the defendant made clear

23  that he wasn't going to let any law stop him from by

24  bringing a gun to the Capitol.  You heard him say so

25  yourself on the video from his helmet camera.

1       (Played video.)

2       **MS. BERKOWER:**  And you heard him admit it to his

3   family, in one of the recordings that Jackson Reffitt made,

4   Government's Exhibit 217, at timestamp 1:10, the defendant

5   matter of factually told his son, "I did.  I did bring a

6   weapon on property we own.  Federal grounds or not.  The law

7   is written, but it doesn't mean it's right law.  The people

8   that were around me were all carrying too."

9       The defendant knew he was breaking the law by

10  bringing his handgun to the Capitol.  He just decided he was

11  above the law.  And you also know that he didn't just bring

12  that handgun for use on the 6th.  He drove two days, from

13  Texas to D.C., instead of flying, because he brought two

14  guns.  On top of his handgun, he also brought his AR-15

15  assault rifle.

16      You know he had the AR-15 with him for two

17  reasons.  First, you know this from Mr. Hardie.  He

18  described how they loaded their AR-15s into the defendant's

19  car in Texas when they started the trip.

20      The defendant had to help Mr. Hardie disassemble

21  his to put it in the case.  And how, on the morning of

22  January 6th, while in the hotel garage preparing for the

23  day, he and the defendant reassembled both of those guns,

24  and left them in the defendant's car, in case they needed

25  them later.

1    And you know Mr. Hardie is telling you the truth

2    that the defendant brought his AR-15 to D.C. because Jackson

3    Reffitt corroborated that fact.  Jackson told you when he

4    realized his father had gone to D.C. for the 6th, and

5    checked the safe in his parents' bedroom and saw the rifle

6    wasn't there.  When his father returned home, Jackson saw

7    his father bring that rifle back in from the car.

8    Don't forget, when the FBI searched the

9    defendant's house, the agents found that rifle back in the

10   defendant's closet again.  The evidence proves that the

11   defendant brought both guns to D.C. for the 6th, and that he

12   was armed with his handgun, when he stormed the Capitol.

13   Now, let's talk about why the defendant did all of

14   this.  The evidence proved that the defendant traveled to

15   D.C. for one very specific purpose, to storm the Capitol,

16   break inside and remove Congress.  Just to be part of a day,

17   just like what happened on January 6th.

18   When he got to D.C., everything he did was in

19   service of that goal.  Arming himself with a handgun, a

20   bulletproof vest, a helmet and zip tie handcuffs, leading

21   the mob in the push that breached the building, that first

22   breach of the day.

23   From the start, weekends before January 6th, the

24   defendant made his purpose clear to those around him.  You

25   saw this in his encrypted Telegram messages to his militia,

where he confessed his intentions.  Look at them as you deliberate in Government's Exhibit 1B4.1.  He wrote that he planned to drive to D.C. and, "Sleep and wake on the 6th for Armageddon all day."  When another member commented that, "The only way you will be able to do anything in D.C. is if you get the crowd to drag the traitors out."  The defendant responded, "I don't think anyone going to D.C. has any other agenda.  The legislative branch has committed treason and, the fuel is set.  We will strike the match on the 6th."

He didn't just tell his fellow Three Percenters. He also told his family.  He was going to D.C. to overthrow Congress.  You saw those texts.  On December 21st he wrote, Congress has made fatal mistakes this time.  It's the government that is going to be described in this fight. Hold my beer and I'll show you.

A few days later on Christmas Eve, "The entire House of legislation has committed unthinkable acts on our people.  We have had enough.  Time a new party.  Why I'm going to D.C.  They all must go.  Time to remove them. That's why I'm going to D.C.  Promise, I'm not alone."  And chillingly, "What's about to happen will shock the world."

It may be that this defendant sometimes talks big. Rocky Hardie told you that the temperature on the militia thread runs pretty hot.  But you heard from Jackson Reffitt, the defendant's 19-year-old son, who knows the defendant as

1  only a close family member can.  You met him and he told you

2  he could tell his father wasn't just talking big in the

3  weeks before January 6th.  He told you the defendant had

4  been saying things since August that worried him.

5          But Jackson also told you that by Christmas Eve of

6  2020, it was different.  The messages his father was sending

7  really scared him.  They were specific.  He had seen his

8  father get more and more involved with the Three Percenters.

9  And now his father was talking about going to D.C. to take

10  out legislators.

11          You saw Jackson pleading with his father in these

12  late-December messages, as his father wrote about rising up

13  and removing legislators who, "Committed unthinkable acts."

14  Jackson responded that voting, not violence, was the better

15  path.  His father brushed him off.

16          Jackson told you his father's messages made him so

17  uncomfortable, he became paranoid.  He knew this was

18  different.  It was dangerous.  And he couldn't bear to have

19  all of that knowledge resting just on his shoulders alone.

20  So in his bedroom, in his father's house, he followed his

21  gut instincts.  Even as it filled him with guilt, he pulled

22  up the FBI online tip system and filled out the form.

23          He told you he submitted it, and then shut off the

24  rest of his day, trying to put what he had just done out of

25  his mind.  He turned on the TV, tried to take a nap.  But he

1    could hear his father talking loudly with his mother in

2    another room.  Through the walls he heard the names of

3    legislators in Washington, D.C.  Nancy Pelosi, Mitch

4    McConnell.  And remember, that was two whole weeks before

5    January 6th.  You now know that Jackson's instinct was

6    right.  His father was serious.  This wasn't bluster.  This

7    went hype.  Before the defendant ever left Texas, he

8    intended to overthrow Congress on January 6th.  The messages

9    were his action plan and he never wavered.

10          Rocky Hardie told you throughout their 24-hour

11   drive to D.C., the defendant talked about taking back their

12   country and removing Congress.  They laughed together at the

13   idea of Nancy Pelosi's head bouncing on the stairs as she is

14   forcibly dragged out.  You heard the defendant repeat that

15   vulgar, violent image, again and again, in the video from

16   the Ellipse, in the Zoom call with his militia.  Mr. Hardie

17   told you he didn't think the defendant was seriously

18   considering storming the Capitol, because he just didn't

19   believe it was realistic.  Security would be too tight

20   there.

21          But the defendant showed everyone how serious he

22   was.  His true intentions were borne out by what he did

23   next.  After dressing in full combat gear on the 6th, body

24   armor, helmet, zip ties and handgun, and assembling his

25   AR-15 in his car for quicker access, the defendant started

1    the day at the Ellipse.

2              There he told anyone within earshot that he

3    planned to storm the Capitol that very afternoon.  You

4    watched the videos from his helmet camera.  He said it over

5    and over.  Here are just a few examples.

6              (Played video.)

7         **MS. BERKOWER:**  And when people actually stopped to

8    listen, he tried to recruit them to his cause.  You saw him

9    do it here, standing in a semicircle with a group of other

10   men.  That's the demon, he told them.  Cut the head off.

11   The tentacles fall away.  And he made it crystal clear that

12   what he was recruiting them for was not peaceful protest.

13   It was violent action.

14             (Played video.)

15        **MS. BERKOWER:**  This purpose is what brought the

16   defendant to D.C.  He brought the zip ties and the gun on

17   his belt for a reason.  This is why he stepped to the front

18   of that mob, took charge, and lit the fire.  They are all

19   coming out, that was his purpose.

20             And afterward he was no less candid about his

21   intentions.  He told his militia leader over Zoom, watch

22   those clips.  He explained it to them plainly.  We went

23   there to take out Congress.  We were very clear that the

24   Capitol was the only objective.  It's the head of the demon.

25             And to his family, on the recordings that Jackson

1    Reffitt made, "I don't care about Trump as much as I care

2    about this country and what Congress is doing to all of us.

3    "The defendant's intentions were clear before January 6th,

4    on January 6th and afterward.  You know the why of all of

5    this.  The evidence has proved it.  He went to overthrow

6    Congress.

7           Now, the defendant said that he wanted his actions

8    to be judged by the 12; and that is you, the jury.  So let's

9    talk about the law that the judge instructed you to apply

10   here.  As we do, keep in mind this picture, the defendant,

11   on the railing, defying the officers with the whole mob

12   behind him.

13           (Played video.)

14           **MS. BERKOWER:**  Judge Friedrich explained the

15   elements of the crimes charged in the indictment and the

16   burden of proof, and her instructions absolutely control

17   your deliberations about the evidence.  As she explained,

18   the government must prove the elements of each crime beyond

19   a reasonable doubt to convict the defendant.

20           Here, the government submits that this burden has

21   been fully met for every element of every charge.  And let's

22   talk about some of the high points of those elements now.

23           Count 1 charges the defendant with transporting a

24   firearm in furtherance of a civil disorder.  To prove this,

25   the government must prove two things:  That the defendant

1    transported a firearm in commerce; and that he did so

2    knowing or intending that the firearm would be used

3    unlawfully in furtherance of a civil disorder.

4         Judge Friedrich also instructed you that commerce

5    means travel between states, including D.C.  Under the

6    definition the Judge gave you, there is no question that the

7    riot on January 6th was a civil disorder.  The evidence here

8    proves both elements of this crime.

9         When a man drives across the country with two

10   firearms, and carries one of them on his hip to the U.S.

11   Capitol to lead a mob, while leaving the other ready for use

12   in his car to confront the police, to try to take over

13   Congress and forcibly remove the legislators, he is guilty

14   of transporting a firearm to further a civil disorder.

15        Before January 6th, while the defendant was still

16   in Texas, he said he would go to the Capitol armed to

17   overthrow Congress.  He said it again on January 6th, while

18   he was at the Ellipse and then he did it.  You saw the photo

19   yourself.  Count 1 is proved.

20        Count 2 charges the defendant with obstructing

21   Congress or with attempting to obstruct Congress or with

22   aiding and abetting others in the crowd to obstruct

23   Congress.

24        Judge Friedrich instructed you that this crime has

25   four elements:  That the defendant attempted to or did

1   obstruct or impede an official proceeding; that the

2   defendant acted with the intent to obstruct or impede an

3   official proceeding; that the defendant acted knowingly; and

4   that he acted corruptly.

5           She told you that for this charge, Congress's

6   joint session to certify the electoral vote is an official

7   proceeding.  She explained that to act knowingly means to

8   act with awareness of what you are doing, not ignorantly or

9   by mistake or accident.  And to act corruptly, means with

10  consciousness of wrongdoing.  Using an unlawful means or an

11  unlawful purpose.  The evidence here proved each of these

12  elements.

13          When a man dresses in full battle rattle,

14  including a gun and zip tie handcuffs to assault legislators

15  and forcibly drag them out of the Capitol, and he leads a

16  mob that then storms inside while he knows Congress is in

17  session, he is guilty of obstructing an official proceeding.

18          There is no question the defendant knew that the

19  certification was happening on January 6th because he talked

20  about it in text messages to his militia, back in January.

21  "January 6th is a constitutional day of affliction for the

22  American people," he wrote.

23          And look what he did on January 6th.  At 1:48

24  p.m., while Vice President Pence presided over the Senate,

25  and Speaker Pelosi presided over the House of

1     Representatives, the defendant was confronting Capitol

2     police officers on the steps outside.  The defendant knew

3     what he was doing was wrong, and he just decided to do what

4     he wanted, removing the legislators by force and installing

5     a new party; and that that justified the means.

6           Armed and clad in tactical gear that could

7     withstand rifle fire, he did everything he could to storm

8     that building and remove the members of Congress as they

9     worked.  Drag them out.  Take them over.  That is corrupt

10    intent to knowingly obstruct or impede.  And the chaos that

11    the defendant helped unleash, undoubtedly stopped the joint

12    session of Congress itself.  Count 2 is proved.

13          But Judge Friedrich also explained that Count 2 is

14    unique, because you can also find the defendant guilty if

15    you determine that he attempted to obstruct Congress or that

16    he aided or abetted others to commit that crime.  The judge

17    explained what those terms mean and both of them apply here.

18          The defendant didn't make it inside the Capitol

19    building, so he didn't get to make use of his weapons or

20    drag the legislators out by their hair, as he said he would

21    do just before at the Ellipse.  But by leading the crowd and

22    lighting the fire, he certainly took a substantial step

23    toward carrying out his intentions.  That together with his

24    underlying intentions, is enough to prove the attempt.

25          And there is also no question that the defendant

1  aided and abetted others; the mob that he stepped out to

2  lead in obstructing Congress.  You saw what happened.  After

3  the defendant showed the mob the way, they surged up the

4  stairs and through the scaffolding.  They were the first

5  group to break in, interrupt the legislators, and force

6  everyone to evacuate.  The defendant was the tip of the

7  mob's spear.  You heard them cheering for him in those

8  videos.  The action he took to advance all of their shared

9  goals also proves this count.  For all these reasons, and in

10  all these ways, based on all of this evidence, Count 2 is

11  proved.

12       Count 3 charges the defendant with entering the

13  restricted area of the Capitol grounds with a gun.  This

14  crime requires the government to prove three things:  That

15  the defendant entered the restricted area without authority;

16  that the defendant knew it was a restricted area and knew

17  that he wasn't allowed there; and that he carried a gun

18  during and in relation to the offense.  All three of these

19  elements have been proven beyond a reasonable doubt.

20       When a man armed with a gun knowingly jumps over

21  police barricades into a restricted area and refuses to obey

22  officers' orders to stop and retreat, he is guilty of this

23  crime; and that's exactly what happened here.  You saw the

24  map with the red outline that showed the blocked-off area

25  for January 6th.  The police perimeter.  The steps of the

1  Capitol were well inside.

2          You also knew that the defendant knew he wasn't

3  allowed there.  You heard him admit on Jackson's recordings

4  that he jumped over the barricades.  And, of course, the

5  U.S. Capitol police officers who shouted commands at him and

6  shot him with less-than-lethal weapons made clear he was not

7  allowed to be there.

8          And you know, from Government's Exhibit 202.1, and

9  his statements to others, that he was packing heat to help

10  him carry out his mission, removing Congress.  Count 3 is

11  proved.

12          Count 4 charges the defendant with obstructing

13  officers during a civil disorder.  The elements of this

14  crime require proof that the defendant knowingly acted or

15  attempted to act with the intended purpose of obstructing,

16  interfering or impeding with law enforcement officers; that

17  at the time the defendant acted, the officers were engaged

18  in their law enforcement duties during a civil disorder; and

19  that the civil disorder adversely affected commerce or any

20  officers performing a federally-protected function.

21          The evidence proves each of these elements.  As

22  with Count 1, the riot on January 6th was a civil disorder

23  for these purposes.  And you know that the civil disorder

24  negatively impacted commerce, because that's the evidence

25  that you heard today about how the riot caused the curfew,

1    and the curfew in turn caused Safeway stores in D.C. to

2    close early and lose out on business and deliveries.

3         You also heard that the riot also caused the

4    Secret Service to change their planned operations to ensure

5    the safety of Vice President Mike Pence.  They had to

6    relocate him, his family, his motorcade, and brought in

7    additional agents to ensure his safety; that's an impact on

8    a federally-protected function.

9         And then, of course, there's the impact on the

10   Capitol police, who were defending the building.  You know

11   that when the defendant stepped to the front of the crowd,

12   he forced the Capitol police into an impossible last stand,

13   to protect the building and the people inside.  When the

14   defendant advanced, so did the crowd.

15        While the officers were occupied trying to stop

16   him, the crowd adapted and out flanked them.  The defendant

17   intentionally interfered with the Capitol police, as they

18   tried to carry out the duties in the midst of this growing

19   chaos.  Count 4 is proved.

20        Count 5 charges the defendant with obstructing

21   justice or attempting to obstruct justice by a threat of

22   physical force against his children, Jackson and Peyton, at

23   their home in Texas on January 11th.

24        The elements of this charge require proof that the

25   defendant threatened physical force against Jackson or

Peyton; that the defendant made the threat with the intent
to prevent them from giving law enforcement information
relating to a federal crime; that there was a reasonable
likelihood that the information would have been given to a
federal agent; and that the information at issue related to
the commission of a federal offense.

Judge Friedrich also instructed you that for these
purposes, like with Count 2, you can find the defendant
guilty, if you find that the defendant attempted to obstruct
justice.  This means that if you find the defendant intended
to use a threat of physical force to obstruct justice, and
he took a substantial step towards doing so, he is guilty of
that charge.

Here, the evidence proves each of these elements.
Jackson Reffitt told you that while his father initially was
proud of his conduct on January 6th, a few days later, he
became scared at the news that other rioters were being
arrested.  He told Jackson that he was convinced that he was
being watched by the FBI.  And then on January 11th, while
arguing with his children about his involvement in the riot
and what he had done, the defendant's paranoia boiled over.

The defendant knew his children had all kinds of
incriminating information about what he had done at the
Capitol from their family text chain, from their own
conversations in which he told them what he did.  Angry,

1   shaking and wide-eyed, he told his children they had to

2   choose a side.  They were either with him or they were

3   against him.  If they were against him, they would be

4   traitors and traitors get shot.  He went on to threaten

5   Peyton again, if she was recording him on her phone, he

6   would put a bullet through it.

7         Jackson told you that when he heard this, he tried

8   outwardly to downplay his fear, but inside he was terrified,

9   both for himself and for his younger sister.  He couldn't

10  believe his father would say that to his own children and he

11  seemed serious.

12        In the past Jackson hadn't always taken his father

13  seriously, but that was before January 6th, when his father

14  acted on some of the most extreme things he ever said he

15  would do.

16        After January 6th, Jackson saw his father's words

17  in a different light.  He already had a meeting set with the

18  FBI for later that day.  He went to that meeting, reported

19  the threat immediately, and gave Special Agent Hightower all

20  of the recordings he had made, as well as all of the other

21  evidence he had about his father's involvement in events at

22  the Capitol.

23        You heard Special Agent Hightower testify, during

24  that conversation Jackson Reffitt looked scared.  And you

25  know why.  He told you that from the day he first sent in

1   the tip, he felt guilty.  His words were that he felt

2   "gross" about what he was doing to his family.

3          The defendant's threat of physical force

4   undoubtedly was designed to prevent Jackson from doing

5   exactly what he did.  Even though the threat didn't work,

6   and Jackson Reffitt still went to that meeting with Special

7   Agent Hightower, that threat was the substantial step that

8   proves an attempt.  Count 5 is proved.

9          As you consider the evidence in this case, you

10  should be clear about something very important.  There is a

11  difference between not knowing what the law says and not

12  caring what the law says.  The evidence proves that this

13  defendant knew he could not bring guns to D.C.  He was

14  willing to break that law.  Just like he decided that

15  Congress had committed unthinkable acts that justified

16  vigilante justice at his own hands, dragging the legislators

17  out by their hair.  He may believe in his cause, and that

18  the ends justify the means.  But make no mistake, in this

19  country, no one is above the law.

20         The election didn't yield the results that he

21  wanted, so the defendant took matters into his own hands,

22  regardless of what the law said.  He chose to defy the law

23  to get what he wanted, removing Congress.  But that's not

24  the way our system works.  We are here today because no one

25  is above the law.  And it's time to hold this defendant

1    accountable.

2           The evidence proves beyond a reasonable doubt that

3    on January 6th, 2021, Guy Reffitt challenged the police at

4    the head of a vigilante mob, determined to break into the

5    United States Capitol.  He did this because he wanted to

6    take out Congress.  And an angry, energized crowd gave him

7    his best shot.  He came ready.  Body armor, helmet, flex

8    cuffs, his handgun.  His confrontation with officers on the

9    Capitol stairs lit the fire that turned that crowd into an

10   unstoppable force.

11          Within minutes the mob pushed the Capitol police

12   backward, advanced up the stairs, and broke into the

13   building through the windows.  Congress was derailed for

14   hours.  Staff members and legislators fled for their lives.

15   And the defendant proudly celebrated.  For days he bragged

16   openly.  Until he realized he could face consequences for

17   these crimes.

18          Feeling cornered, he threatened his children in an

19   attempt to silence them.  Now is the time to hold the

20   defendant accountable for all of this.  A mountain of

21   evidence proves what the defendant did and why he did it.

22          Find this defendant guilty as charged, because

23   that is the only conclusion consistent with the evidence.

24          Thank you.

25          **THE COURT:**  Mr. Welch?

1       **MR. WELCH:**  Good afternoon.

2           I would like to speak with you about why my client

3   is guilty of Count 3A and not guilty of the others.

4           The evidence proved that Guy Reffitt never put his

5   hand on anyone.  Never threw anything at anyone.  Never hit

6   anyone with anything.  He never assaulted anyone.  Never

7   tried to.  And he did not help anyone else commit an

8   assault.

9           Guy Reffitt never disarmed an officer, never tried

10  to and did not help anyone else disarm an officer.  Guy

11  Reffitt never interfered with an arrest.  Never tried to.

12  And did not help anyone else interfere with an arrest.

13          Guy Reffitt did not go in the Capitol.  He did not

14  break anything, and he did not take anything.  He was not

15  armed.  He did not threaten harm.  He was not aggressive.

16          Guy does brag a lot.  He embellishes and he

17  exaggerates.  He's not going to say, I spent four days

18  driving.  Spent three nights in a hotel to be incapacitated

19  in five minutes without doing anything.

20          He uses a lot of hyperbole that upsets people.

21  However, it's common knowledge that people express

22  outrageous things.  For example, at the Ellipse, President

23  Trump said, You got to go to the Capitol and fight like

24  hell.  Rudy Giuliani advocated, trial by combat.

25          **MR. NESTLER:**  Objection.

1        **THE COURT:**  Sustained.

2        **MR. WELCH:**  People say outrageous things.  People

3    have advocated fumigating the president out of the White

4    House.  People have said they thought about blowing up the

5    White House.  The point is, they haven't been charged.

6        Capitol police officers, Shauni Kerkhoff, DesCamp

7    and Sergeant Flood each testified that Mr. Reffitt was told

8    to get back.  They each testified, Mr. Reffitt was hit with

9    PepperBalls, weighted plastic impact projectiles, and he was

10   pepper sprayed.

11       As soon as he was pepper sprayed, that was the end

12   of it.  And he sat down on the banister railing.  Sergeant

13   Des Camp said Mr. Reffitt was incapacitated.  Sergeant Des

14   Camp told you Mr. Reffitt said, You can't stop us all.  Let

15   us in.  Don't be a traitor.  Let us in.  Sergeant Des Camp

16   said, he was not so much threatening.

17       The Capitol police did not hype their testimony by

18   claiming to hear things that they did not hear.  You can

19   also bet that if there were a gun, they would have told you

20   so.  Agent Hightower wasn't even at the Capitol and neither

21   was Agent Ryan.

22       Exhibit 205, the Capitol police video, shows what

23   the Capitol police testified to.  Please watch it.  All of

24   it.  And just let it play.

25       Inspector Moore testified about the Capitol police

1    recording video system and the safeguards that prevent

2    altering or editing.

3            The timestamps on the recording are accurate.  And

4    the Capitol police video was not altered or edited in any

5    way; that is also stipulated in Exhibit 701.

6            You should find my client guilty of Count 3A

7    because the evidence shows that he remained in a restricted

8    area; that is what proof beyond a reasonable doubt looks

9    like, but it ends there.

10           Exhibit 702, for instance, is a stipulation that

11   the joint session began at approximately 1:00 and adjourned

12   approximately 15 minutes later.  Compare that with the

13   timestamps in Exhibit 205.  The joint session had adjourned

14   approximately a half hour before Mr. Reffitt's interaction

15   with the Capitol police.  Judge Friedrich has told you that

16   you should consider any stipulation of fact to be undisputed

17   evidence.  Do not let the government tell you otherwise.

18           Compare the timestamps in Exhibit 205 with the

19   timestamps in Exhibits 507 and 221.  Mr. Reffitt's

20   interaction with the Capitol police lasted approximately

21   five minutes.  It was over while Vice President Pence was

22   still presiding in the Senate and Speaker Pelosi was still

23   presiding in the House.

24           Mr. Reffitt's interaction with the Capitol police

25   was over long before Vice President Pence was seen in the

1    stairwell with Agent Wade.

2              You should doubt Rocky Hardie because he seemed to

3    have trouble remembering.  And when he didn't know what to

4    say, he asked Ms. Berkower for examples.  Rocky Hardie is

5    just saying whatever he has to say for his deal with

6    Ms. Berkower and Mr. Nestler.  They decide whether he was

7    truthful under their agreement.  Not Judge Friedrich and not

8    you.  After all, whether he gets the benefit of his bargain

9    is up to them.  And he has not been charged for over a year

10   now.

11             You should also doubt Jackson Reffitt's claims

12   that his life was threatened and Peyton's was too.  Jackson

13   claims that Peyton and Cade Mitchell were there, but they

14   haven't told you that.

15             Consider that all three Capitol police officers

16   who interacted with Mr. Reffitt testified about their

17   interaction with him.  But you haven't heard from them.  You

18   haven't heard from Peyton.  You haven't heard from Cade.

19             Consider that Jackson Reffitt recorded five

20   conversations, but he didn't record any threat.  You would

21   have expected that the priority of the investigation would

22   have increased if Jackson had told Agent Hightower lives

23   were threatened, because Agent Hightower told you about how

24   life-threatening emergencies receive priority.  Instead,

25   Jackson went back to his dad's house, and the FBI came five

1     days later.

2             Jackson has said he did not believe his dad would

3     ever hurt him.  Later he changed that to, he took the

4     threats seriously.  Now he's changed it to, he's pretty sure

5     about what his dad said.  Jackson has been hyping this on

6     CNN, Good Morning America and on his GoFundMe page, which

7     has made him over $158,000.

8             In addition to having doubt about Jackson's story,

9     you should have doubt about the missing holster.  You can

10     bet, if Mr. Reffitt had been wearing a holster at the

11     Capitol, they would have seized it, because they seized

12     dozens of other items, including a different holster.

13             You should have doubt about the holster that was

14     purchased by the government.  Agent Ryan said it wasn't

15     seized for "whatever reason."  You don't know when Agent

16     Ryan purchased that holster.  And the reason could be that

17     it matches the images Agent Hightower said were "prepared by

18     someone in the government and enhanced."

19             The government concedes that the holster Agent

20     Hightower and Agent Ryan showed you, is not Mr. Reffitt's

21     holster.  And it has never been Mr. Reffitt's holster.  You

22     can bet, if Mr. Reffitt had a holster on him like they

23     claim, then Ryan would not have bought the one they showed

24     you.  You should have doubt about images that don't have

25     safeguards like the Capitol police do, to prevent altering

1       or editing.

2                Agent Hightower said, "Images were prepared by

3       someone in the government and enhanced."  I'm talking about

4       Exhibit to 202.1.  You don't know who prepared them.  How

5       they were enhanced or when.

6                Judge Friedrich told you, If evidence has not been

7       presented in Court, you cannot rely on it.  The Capitol

8       police video did not have to be prepared or enhanced,

9       because it already existed with safeguards to prevent

10      altering or editing.

11               This case has been a rush to judgment and most of

12      it based on bragging and a lot of hype.  Be the grownups in

13      the courtroom.  Separate the fact from the hype.  Find

14      Mr. Reffitt guilty of Count 3A and not guilty of the other

15      charges.  Thank you for listening.

16               **THE COURT:**  Mr. Nestler?

17               **MR. NESTLER:**  Yes, Guy Reffitt brags.  You know

18      what he brags about?  The truth.  The things that he

19      actually did.

20               All you have to do is watch two minutes of his

21      Zoom video with his militia leader, William Teer and Rocky

22      Hardie.

23               Mr. Hopkins, if you could please put the screen up

24      for the jury.

25               On the Zoom video he is in his own living room.

1    Talk about fake videos.  I don't know what Mr. Welch is

2    talking about fake videos and manipulation of videos.  Look

3    at the video for yourself.  Mr. Reffitt, the defendant

4    sitting in his own living room.  You can see from the

5    photographs the FBI took, this is his living room.  The

6    decorative grates are above his head.  That's his hat.  It

7    is on his headboard, that Trump hat.  Everything he told

8    William Teer he did, he actually did.

9               (Played video.)

10             **MR. NESTLER:**  Climbed up on the pedestal.  Sure

11   enough, surveillance video, there's the defendant climbing

12   up on the pedestal.  He tells Mr. Teer, there was a chick,

13   his words, with a clay ball gun telling us to get back.

14             (Played video.)

15             **MS. BERKOWER:**  There's Officer Kerkhoff, the chick

16   he referred to, with her PepperBall gun, telling him to "get

17   back."  He didn't comply.

18             The defendant says he got out his megaphone and

19   told the officers to, Step down.  Step aside.  This is our

20   house.  You are going to be tried for treason.  What do you

21   hear from Officer Kerkhoff, Sergeant Des Camp, Sergeant

22   Flood?  That's what the defendant was saying.  That's what

23   the crowd was saying.  The defendant was bragging because he

24   was speaking the truth.

25             Here he is holding his megaphone, doing what he

1        said he was going to do.

2                   The defendant told Mr. Teer, "I stepped forward.

3        She started pelting me with pepper balls."  There is Officer

4        Kerkhoff pelting him with pepper balls.  He was speaking the

5        truth.

6                   On the Zoom call he tells Mr. Teer that he was

7        almost close enough --

8                   (Played video.)

9             **MR. NESTLER:**  Sure enough.  There is the

10       defendant, on the rail of the Capitol building, almost close

11       enough to dive for her and take her gun away.  The defendant

12       was speaking the truth.

13                  He tells Mr. Teer that a man came around the

14       corner -- surrounded him with pepper spray.

15                  (Played video.)

16            **MR. NESTLER:**  And there's Sergeant Flood coming

17       around the corner, the defendant's words, with the pepper

18       spray and spraying the defendant in the face.

19                  The defendant says that he finally got to the top.

20                  (Played video.)

21            **MR. NESTLER:**  On the railing he kept waving his

22       arm.  Go forward.  Go forward.  His exact movements.

23                  (Played video.)

24            **MR. NESTLER:**  Look at what he does on the

25       surveillance video.  That same exact image.  Go forward.  Go

1   forward.  You can believe it when he said it.  When he told

2   his boss, William Teer, what he said, he was speaking the

3   truth.

4            (Played video.)

5            **MR. NESTLER:**  He said people started ripping the

6   scaffolding apart.  Here we go.  The scaffolding was ripped

7   apart, while he was still there on the banister.  He told

8   Mr. Hardie that he had his Spartan armor plates.

9            (Played video.)

10           **MR. NESTLER:**  Twenty-two pounds, you will have

11  these in the jury room, of his bulletproof plates.  Spartan

12  Arms is the brand.  Right here.  You can pull out the

13  ceramic plates and see for yourself.  You've heard Agent

14  Hightower tell you, the plates on the side, those are called

15  the kidney plates.  Look at what the defendant is saying.

16  He said, "I had my Spartan Armor plates and my kidney

17  plates."  And then he says, He had his ".40 on my side."

18           Mr. Welch told you he is guilty of Count 3A.  No.

19  He is guilty of 3 and all the other counts.  He admitted to

20  right here, he had his .40 on his side.

21           (Played video.)

22           **MR. NESTLER:**  He is speaking the truth, ladies and

23  gentlemen.  Look at the truth.  The .40 on his side.  That

24  same .40 that was found on his bedside table.  That same .40

25  that Rocky told you about.  The same .40 that Jackson

1   Reffitt talked to you about.  The same .40 the FBI found.

2   That was the .40 that was on his side.  He was speaking the

3   truth.

4           He also said he went up the stairs and saw people

5   banging on the doors, and here he is after his confrontation

6   with the police.  Mr. Welch told you, after he got

7   incapacitated -- Mr. Welch's words -- the defendant sat on

8   the banister and did nothing else.  You know that's not

9   true.  Look at him here, 2:15 walking up the stairs with the

10  rest of the mob.

11          He tells Mr. Teer on that Zoom call, he got to the

12  top of the landing, the level, and saw everyone banging on

13  the doors; and that's when he finally turned around.  This

14  is the exact path that he went up, those stairs.  That

15  circle there is the Senate alcove door; and that shows where

16  people first broke into the Capitol, part of the defendant's

17  mob that he helped get up there.

18          (Played video.)

19          **MR. NESTLER:**  He told Mr. Teer what he told

20  everyone else at the Ellipse, When we are done here, we're

21  going to the Capitol and dragging them out.  Talking about

22  Nancy Pelosi.

23          And Ms. Berkower just played it for you.  I'm not

24  going to play it again, him at the Ellipse, telling

25  everybody, when this is over, we are going to the Capitol

1    and we are dragging Nancy Pelosi by her heels.  I want to

2    see her head hitting every step on the way down.

3            Mr. Welch told you that the defendant never

4    assaulted anyone.  The government has not charged the

5    defendant with assaulting anybody.  Let that be clear.

6            The defendant is charged with obstruction of

7    Congress and interfering with law enforcement officers.  And

8    part of those charges are that the defendant intended to

9    assault people.  He brought his handgun.  He brought his

10   bump helmet.  His bulletproof armor and he brought his flex

11   cuffs to break into the United States Capitol, restrain

12   members of Congress, and physically remove them from the

13   building; that's the assault he intended to do.  That's how

14   you know his intent was unlawful.  When you talk about

15   whether he had the corrupt intent; that's how you know.  He

16   intended to physically, with handcuffs, remove your Senators

17   and Representatives from the United States Capitol.

18           As I told you in opening statement, ordinarily --

19   and as Judge Friedrich just instructed you -- ordinarily

20   it's impossible to know what a person is thinking because

21   you're not inside of someone's head.

22           But in this case, the defendant has actually made

23   it easy for you.  He was open about his intent and his

24   knowledge.  He knew he couldn't bring guns to D.C.  He did

25   it anyway.  He knew he couldn't bring guns to the Capitol.

1  He did it anyway.  He knew he couldn't go past the security

2  perimeter.  He did it anyway.  He thinks he is above the

3  law.  He thinks what he did was justified.  It is your job

4  to tell him that he is wrong.  That he is guilty of all of

5  these crimes.

6        Thank you.

7        **THE COURT:**  All right.

8        Ladies and gentlemen, that concludes the closing

9  statements.  Before I proceed, I do want to ask you all -- I

10 understand that one or more of you had made an inquiry of

11 Mr. Hopkins about what time we would leave.  And since it is

12 5 p.m. and some of you may have -- you know, places you need

13 to be, I want to ask you whether your preference is to have

14 me instruct you and read basically three to four more pages

15 of instructions and then you would come back and start

16 deliberating tomorrow.

17        Alternatively, I can excuse you now and come back

18 and instruct you first thing in the morning, and then you

19 can begin your deliberations.

20        Is there anyone who does need to leave?  I want to

21 be sensitive to your time.

22        **JUROR:**  (Show of hand.)

23        **THE COURT:**  Yes?  You do?  Okay.

24        Before I excuse you for the day, I do want to

25 excuse the alternate jurors, because I am reluctant to have

1       them come back tomorrow solely to be released.

2                So as I explained at the start of the trial, the

3       selection of alternates was an entirely random process and

4       we did it before you all arrived.  We picked seats that

5       would be alternate seats.  And since all of you have

6       remained very healthy and attentive, I feel comfortable

7       excusing the four alternates.

8                But before you leave, I will ask you to tear out a

9       sheet in your notebook, write down your name, your daytime

10      number, and hand it to Mr. Hopkins, so that in the event we

11      need to summon you back to rejoin the jury, in case

12      something unexpected were to happen to a regular juror, we

13      would want to be able to reach you.

14               So since that possibility exists, I am going to

15      also instruct you to continue not to read about this case,

16      not to talk about this case, communicate about it at all, on

17      the internet or elsewhere.  In all likelihood, we will be

18      calling you back to tell you there has been a verdict, and

19      you are now free to discuss the case.  But there is,

20      however, a small chance that we would need to bring you back

21      on the jury.

22               So I ask you to refrain from that.  We are

23      extremely grateful for your service and your time and

24      attention in this case.  So again, before you leave, give

25      Mr. Hopkins your name and number.  And also turn in your

1    badge to him as well.  And at this moment, I will now excuse

2    those jurors who are seated in seats number 2, 10, 13, and

3    15.  Those are jurors numbers 0541, 1718, 0344 and 1486.

4         All right.  Now the rest of you may be excused and

5    we will resume tomorrow at 9:30.  I will give you some brief

6    instructions, and you can report to the jury room to begin

7    your deliberations.

8         Thank you all for your attentiveness.  Again, I

9    want to remind you, no conversations.  If you can remove any

10   push notifications, I would expect that there's likely to be

11   press today.  And I don't want you to see something on this

12   last day.  So please be sure to take care of that and not do

13   any investigation or reading about the case.

14        All right.  Thank you all.

15        **COURTROOM DEPUTY:**  All rise.

16        (Jurors exited the courtroom.)

17        **COURTROOM DEPUTY:**  You may be seated.

18        All right, Counsel.  We got close but there was a

19   juror who needed to go.  So we will need to report back at

20   9:30.  I suspect it will take me no more than 10 to 15

21   minutes to give the last instructions.  And they will be

22   excused to deliberate.  We will give them the jury

23   instructions, the verdict form.

24        You all have checked about the computer or the

25   disk drive that is going back?

1          **MR. WELCH:**  [SHAKES HEAD]

2          **THE COURT:**  Do that between now and then so if

3    there is any problem, we can address it.

4          All right?  Any questions?  Concerns?

5          **MR. NESTLER:**  No, Your Honor.

6          **THE COURT:**  Mr. Welch?

7          **MR. WELCH:**  No, Your Honor.

8          **THE COURT:**  All right.  Okay.  See you all back

9    tomorrow.

10          (Proceedings concluded at 5:04 p.m.)

1          **C E R T I F I C A T E**

2

3                I, **Lorraine T. Herman, Official Court**

4   **Reporter,** certify that the foregoing is a true and correct

5   transcript of the record of proceedings in the

6   above-entitled matter.

7

8

9

10   __March 8, 2022__              __/s/_____

                **DATE**                        **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25