# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-00032-DLF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GUY WESLEY REFFITT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## SENTENCING MEMORANDUM and MOTION FOR DOWNWARD VARIANCE[1]

F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)
clint@texascrimlaw.com

Attorney for Defendant
Guy Wesley Reffitt

---

[1]Defendant addresses his objections to the presentence report in a separate pleading attached hereto as Attachment A.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS...................................................................................................2

INDEX OF SUPPORT LETTERS.................................................................................3

I.  GUY REFFITT'S BACKGROUND........................................................................5

II.  WHAT GUY REFFITT DID AND DID NOT DO ON JANUARY 6...................10

      A.  What He Did Do....................................................................................10

      B.  What He Did *Not* Do..............................................................................11

III. PRETRIAL DETENTION AND CONDITIONS OF THAT DETENTION.........12

IV. 18 U.S.C. § 3353................................................................................................15

      A.  Nature and Circumstances of the Offense [§ 3353(1)]................................15

      B.  Mr. Reffitt's History and Characteristics [§ 3353(1)]................................16

      C.  Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public [§§ 3353(2)(A)-(C) and ]............................17

      D.  Need for Treatment [§ 3353(2)(D)]...............................................................18

      E.  Avoiding Unnecessary Sentencing Disparities [§ 3353(7)]........................18

V.  CONCLUSION.....................................................................................................25

CERTIFICATE OF SERVICE.......................................................................................27

## INDEX OF SUPPORT LETTERS

| **Name** | **Attachment** |
|---|---|
| PEYTON REFFITT (Daughter) | C |
| SARAH REFFITT (Daughter) | D |
| NICOLE REFFITT (Wife) | E |
| COLE MITCHELL (Sarah Reffitt's Long Term Boyfriend) | F |
| TIMOTHY SEWELL  (Family Friend) | G |
| KEELAN BUBB  (Family Friend) | H |
| CHRISTI CROSS  (Family Friend) | I |
| LINDA REFFITT (Mother) | J |
| DEANNA SEWELL  (Family Friend) | K |

## SENTENCING MEMORANDUM

Defendant Guy Wesley Reffitt submits this Sentencing Memorandum in order to assist the Court in imposing a sentence in this case that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

Many judges have been heard to remark that sentencing a defendant is one of the most difficult, if not *the* most difficult, tasks they have.[2]  The defense understands that, in connection with the January 6 cases, courts encounter difficulties that exacerbate what is already one of the most difficult tasks.

It is anticipated that the government's Sentencing Memorandum will spill much ink simply about January 6th in general and, given that the events of that day stand as an unprecedented blight on this country's history, the government's inclination to do so is somewhat understandable.  Nevertheless, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings...."  *Gall v. United States*, 552 U.S. 38, 52 (2007).

Still and on the other hand, because of the sheer number of January 6th

---

[2]*See, e.g.*, Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007) ("Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge."); *Carter v. Illinois*, 329 U.S. 173, 178(1946) ("It is a commonplace that no more difficult task confronts judges than the determination of punishment not fixed by statute.").

defendants that will be sentenced in this district and the fact that one of the factors set forth in 18 U.S.C. § 3553 is the need to avoid sentencing disparities, it is also recognized that courts in this district must look beyond the individual in an attempt to achieve some degree of uniformity.

## I.  GUY REFFITT'S BACKGROUND

Some common themes come through in both Mr. Reffitt's letter to the Court (attached hereto as Attachment B) and the various support letters that are attached hereto as Attachments C-K.  In particular, Undersigned Counsel commends to the Court's attention the letter from Mr. Reffitt's daughter Peyton (one of the alleged victims in Count 5).  While that letter is lengthy, it does a very insightful job of explaining her father and what led to his offenses on January 6.

Guy Reffitt grew up a victim of physical abuse from his father.  While Mr. Reffitt's mother describes her late husband (Guy's father) as 'pro physical punishment," in her letter to the Court," Mr. Reffitt unpacks the meaning of that to be "[b]elts, switches and occasionally smacks or fists."[3]   As Mr. Reffitt further explains, "I took it, until I didn't."  Mr. Reffitt left home at 15 years of age and began working at KFC as a dishwasher and moved in with his older sister.  *See* PSR at ¶ 83.

---

[3]As recounted in the PSR, Mr. Reffitt's mother admitted her late husband was "physically abusive to her and to [Guy]."  *See* PSR at ¶ 85.

Mr. Reffitt's wife, Nicole, explains, "Much of Guy's personality comes from the fact that he has been on his own since he was fifteen, and he has had only himself to back himself up." Indeed, she has noted that her husband's "issue in his childhood have caused him to be 'very driven concerning his family....'" *See* PSR at ¶ 88.

Indeed, because of his childhood, Mr. Reffitt's adult life has centered around providing for his family and one can clearly see that this became his identity. Financially that produced a lot of highs and lows and Mr. Reffitt was often required to spend large periods of time away from his family as a result of his work in the oil industry. At one point, Mr. Reffitt's employment allowed the family to move to Malaysia where, as his daughter, Sarah explains: "My dad not only wanted to show us the wonders of the world, but also to meet different people and experience others' culture. It was one of his proudest achievements, having my siblings and I go to an international school and travel and to be able to allow us to have that experience."

Unfortunately, the oil and gas industry collapsed and first he, and then his family, returned to the United States. Because Guy Reffitt always viewed himself as the family's provider and protector, he tried to shield his children from the tremendous financial stress the oil industry collapse caused the family. As Sarah describes it: "For months we were living on very little money, however dad made sure to make everything as happy as possible. Looking back on it now makes me beyond

6

sad knowing the amount of stress he had on him while smiling and giving us as much as he could....My father has always worked very hard and was feeling that he couldn't provide us with what we needed and that it seemed to him that he could hardly provide the basics."  And, as Peyton describes from a slightly different perspective:

> When we got back, during August of 2016, I recognized that my father was trying to show us that he was doing fine but I could tell he was deeply disappointed in himself and depressed.  (I had noticed at this point he had started to take interest in the election and the Trump Administration, he had rarely ever taken interest in politics before then).

Mr. Reffitt's depression over his believing that he was unable to adequately provide for his family manifested itself in thoughts of suicide.  According to Sarah, by the time COVID hit, "[h]e had thought of killing himself due to being ashamed and in his words, 'a failure.'"

Throughout this period, Guy Reffitt's family noticed that "[h]is mental health was declining."[4] At one point, he tried to start a security company which resulted to his introduction to the Three Percenters in Texas.  Several of the letter writers, some directly and some indirectly, describe a depressed man who believed he was unable to adequately provide for his family (his life's mission), and a man who felt cast aside and marginalized.  Peyton explains:

> He always feels like he needs to be doing something purposeful.  When

---

[4]Letter of Sarah Reffitt

he was out of work, he would either be looking into what he could do to build a security business to sustain our family and be a business owner or he was falling down the rabbit hole of political news and online banter. He can't stand seeing injustice in the world or in the lives of his loved ones. These qualities he has about him I believe put him in a position where he has been subjected to wholeheartedly putting his faith into a leader with the attributes of President Trump. I could really see how my fathers [sic.] ego and personality fell to his knees when President Trump spoke, you could tell he listened to Trump's words as if he was really truly speaking to him....Constantly feeding polarizing racial thought. Trump didn't speak to his supporters as individuals but more as a group of one, as though the group were [sic.] somehow more important than the individual. As if all individual citizens outside of this group were another group of one. This contradicts the aspects of our genetic makeup that every human being is unique, this basis that our whole idea of freedom is based upon. I wish my father had his guard up against these verbal booby traps into which he has been led, he should have analyzed this verbiage and made more rational decisions that day.

Sarah's long-term boyfriend, Cole Mitchell, appears to truly hit the nail on the head when he describes a marginalized, underemployed individual who went to Washington, D.C. on January 6 in a quixotic hope of wanting to be part of "something bigger." Nevertheless, as Mr. Reffitt explains in his letter, "My regrets for what has happened is [sic.] insurmountable."

There are also character traits of Guy Reffitt that are consistently described in the support letters. First, that he is bombastic and hyperbolic but not dangerous. As Sarah explains, "[a]lthough some of his language sounds alarming, if you knew him you would know that he talks with a lot of hyperbole and exaggeration, but really

what he means is much more of an understatement."  Second, that Guy Reffitt "never hesitates to assist people whom he may not [even] know personally" and that "[h]e finds joys in making others' lives easier;" with Sarah describing her father as "selfless."[5]  In a passage which Undersigned Counsel personally believes speaks volumes because Sarah did not likely realize its true significance when she was composing it, she writes:

> He is considered a second dad by many of my friends.  He always opened his home to me and my brother and sisters' friends who may have stressed or troubled lives at their own home.  I had a fair share of friends who were not comfortable in their own house, whether it was neglect, abuse or they didn't' have a safe space.  My dad wanted them to know that they always have a safe space in his home and made sure they always felt welcome.

As noted in the Presentence Report, Mr. Refitt is in Criminal History Category I, and his criminal history is limited to a deferred adjudication on a misdemeanor for unlawfully carrying a weapon almost two decades ago (at age 21) and a 2009 conviction for Driving While Intoxicated where he successfully completed probation. *See* PSR at ¶¶ 70-72.

Perhaps, Peyton Reffitt summarized it all best when she writes "[i]f I did not know my father so personally I would have perceived this all so differently, from the

---

[5]Letter of Sarah Reffitt

outside looking in."[6] Again, her letter speaks volumes regarding her personal observations about her father that transcend her father's actions on January 6, 2021.

## II.  WHAT GUY REFFITT DID AND DID NOT DO ON JANUARY 6

In imposing a sentence that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553, it is imperative that a distinction be made between what the government alleges that Guy Reffitt did and what he did *not* do in relation to the events of January 6.

### A.  What He Did Do

Guy Reffitt and Rocky Hardie did drive from Texas to Washington, D.C.  Guy Reffitt brought with him an AR-15 and a .40 caliber handgun.  *See* PSR at ¶ 20.  He and Mr. Hardie attended President Trump's speech at the Ellipse.  *See* Trial Tr. at 1138-39.  As Mr. Hardie described it in his testimony, "[t]he President said hey, you know, I'd like a million people to show up and I said, well, I think maybe I need to be counted."  *Id*. at 1105.

During the speech, President Trump urged those in attendance to march on the

---

[6]To the PSR writer:

[Peyton] stated the following, "He's a great father and a good man.  He's always been very protective over the family.  He's really smart and like [sic,] to be in control in the house."  She noted that she was upset over [his] actions and felt that he "crossed a line" but noted that she was "not scared or frightened of him.

PSR at ¶ 90.

Capitol, where he knew the electoral votes were being counted, and Mr. Reffitt did so.[7]  He possessed a handgun in a holster, wore a tactical helmet and bulletproof armor, and had zip ties.  *See* Trial Tr. at 1130, 1135; PSR at 22.  At some point, after arriving at the Capitol, he climbed the staircase on the west side and refused to retreat when ordered to do so by the police and continued to do so after being hit by "less than-lethal projectiles."  *See* PSR at ¶¶ 22-23.  He also appears to have waved forward other individuals in the crowd.  *See* Gov't Trial Ex. 205.  Eventually, while others pushed past the police and entered the Capitol building, Mr. Reffitt retreated down the staircase which he initially climbed.  *Id*.  Mr. Reffitt's entire time on the staircase and the *first* landing on top of the staircase was approximately 44 minutes.  *Id*.

Prior to arriving at the Capitol, Mr. Reffitt made physical threats against House Speaker Pelosi that, while certainly concerning, appear to be hyperbolic.  *See* PSR at ¶21.  Then, upon returning to Texas, he urged two of his children not to turn him in to the FBI and told them "traitors get shot," and he threatened to "put a bullet through" his daughter's phone.  *Id*. at ¶ 25.

## B.  What He Did *Not* Do

First, unlike hundreds of the rioters, Mr. Reffitt never entered the Capitol.

---

[7]ABC News, *This is what Trump told supporters before many stormed Capitol Hill* (Jan. 7, 2021) accessed at
https://abcnews.go.com/Politics/trump-told-supporters-stormed-capitol-hill/story?id=75110558

Second, unlike many rioters, Mr. Reffitt never assaulted police officers nor anybody else.

Third, Mr. Reffitt never removed his handgun from his holster.

Fourth, Mr. Reffitt left the AK-47 he brought from Texas in his vehicle in Georgetown and did not bring it to the Capitol.

Fifth, while Mr. Reffitt's paranoid statements to two of his children are not to be condoned, he never gave any indication he would actually harm his children. Indeed, his wife has stated that, while she was understandably "disturbed" by her husband's "extreme" statements to his children, she did not believe that he would ever act on those statements. *See* Criminal Complaint [Doc. 1-1] at ¶ 26. Similarly, one of his daughters told law enforcement that she did not believe her father to be a true threat to anybody in the family. *Id*. at ¶ 30. Moreover, in her letter to this Court, Peyton writes, "I never felt threatened, my father doesn't threaten me. I rather get annoyed about his dramatic way of speech that often uses outdated references and recitations." Peyton's letter also describes the government's decision not to call her as a witness at trial when they learned "I wasn't going to benefit their narrative."

## III. PRETRIAL DETENTION AND CONDITIONS OF THAT DETENTION

Mr. Reffitt will, of course, get day-for-day credit for the approximately 19 months he will have spent in custody prior to his sentencing (14 of those months

occurring prior to his convictions).  Nevertheless, in fashioning a sentence in this case, Undersigned Counsel urges the Court to consider whether day-for-day credit is sufficient in light of the conditions of Mr. Reffitt's confinement.

At the onset, Mr. Reffitt understands that pretrial detainees "cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988).  Still, there is pretrial confinement and there is pretrial confinement.

To begin with, CTF inmates were not allowed any visitors from the time Mr. Reffitt arrived there (March 18, 2021) until February 14, 2022.  Moreover, CTF inmates were not given access to any video visitation during that time.  In short, Mr. Reffitt was isolated for over a year as a result of the jail conditions.

Even more concerning, CTF inmates were confined to their cells for 23 hours a day from the time Mr. Reffitt arrived until approximately June 13, 2021; 22 hours from approximately June 13, 2021, to approximately October 2021; and again for 22 hours from December 22, 2021, to February 28, 2022.  In other words, for approximately half of the time Mr. Reffitt has been at the CTF, he has been confined to his cell for between 22-23 hours per day.  The psychological strain that puts on an individual cannot be seriously debated and is closely akin to the dangers of solitary confinement.

As noted by former Justice Kennedy:

The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes." The State of the Prisons in England and Wales 152 (1777). In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings. A Tale of Two Cities (1859). And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.

One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170, 10 S.Ct. 384, 33 L.Ed. 835 (1890); *see also id.*, at 168, 10 S.Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition ... and others became violently insane; others, still, committed suicide"). The past centuries' experience and consideration of this issue is discussed at length in texts such as The Oxford History of the Prison: The Practice of Punishment in Western Society (1995), a joint disciplinary work edited by law professor Norval Morris and professor of medicine and psychiatry David Rothman that discusses the deprivations attendant to solitary confinement. *Id.*, at 184, 10 S.Ct. 384.

*Davis v. Ayala*, 567 U.S. 257, 287-88 (2015) (Kennedy, J., concurring)  Moreover,

Justice Kennedy noted:

[D]espite scholarly discussion and some commentary from other sources, the condition in which prisoners are kept simply has not been

14

a matter of sufficient public inquiry or interest. To be sure, cases on prison procedures and conditions do reach the courts. Sentencing judges, moreover, devote considerable time and thought to their task . *There is no accepted mechanism, however, for them to take into account, when sentencing a defendant*, whether the time in prison will or should be served in solitary.

*Id*. at 288 (citations omitted) (emphasis added)

Here, unlike post-sentence solitary confinement, there is an "accepted mechanism" for this Court to "take into account, when sentencing a defendant," conditions of confinement while fashioning a sentence that is "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553. Again, the Bureau of Prisons will give Mr. Reffitt day-for-day credit for the time spent in pretrial detention. Undersigned Counsel respectfully suggests, however, that the Court apply a different ratio and reduce any sentence it would otherwise impose in this case by the additional number of months produced by that ratio.

## IV. 18 U.S.C. § 3353

### A. Nature and Circumstances of the Offense [§ 3353(1)]

Undersigned Counsel will not attempt to defend the indefensible. Again, however, it is important to focus on Mr. Reffitt's individual actions with regard to what occurred on January 6, 2021.

**B.  Mr. Reffitt's History and Characteristics [§ 3353(1)]**

Without fully repeating what has been said in Section I of this Sentencing Memorandum, it again bears noting that, until the divide that was brought upon in this nation, Mr. Reffitt was a productive and law-abiding citizen who spent most of his days trying to provide for his family.  These characteristics are reflected in the supporting letters attached hereto.  Moreover, as noted in the Presentence Report, Mr. Reffitt has only a very minor criminal history: a deferred adjudication on a misdemeanor for unlawfully carrying a weapon almost two decades ago at age 21 and a conviction for Driving While Intoxicated more than a decade ago where he successfully completed probation.  *See* PSR at ¶¶ 70-72.

Unfortunately, as explained in several of the support letters, Mr. Reffitt felt marginalized and inadequate after the loss of his job in 2019 and believed he was failing the family he always worked so hard to provide for.  With more time on his hands, he spent significant amounts of time on the computer and, to state the obvious, the internet can be both a blessing and a curse.  As one of the letter writers observed, Mr. Reffitt wound up in Washington, D.C. on January 6 "want[ing] to be part of something bigger" and with a very "romanticized" view of what might take place.  *See* Attachment F.

As recounted in the PSR:

Mrs. Reffitt noted that the defendant was very "disenfranchised before Trump took office," but soon became "enamored with Trump" and felt that the former president's policies were "speaking to him."  She noted that the defendant was obsessed with watching the news during the pandemic and he and his family member often argued over politics in the home.

PSR at ¶ 8.  Significantly, however, Mrs. Reffitt observes that her husband "seems to have a 'lot more clarity now.'" *Id.*

In his own letter to the Court, Mr. Reffitt explains, that his regrets for his actions on January 6 are "insurmountable" wishes he could "turn back the clock and stay home."  At another point in the letter, Mr. Reffitt reflects that, although he did not actually engage in physical violence on January 6, he was "truly ashamed" of his actions at the Capitol.

Suffice it to say, Mr. Reffitt has indicated to counsel that he is done with politics.  His only goal now is to put his family back together while recognizing that as much as he spent the past two decades providing for them, he is the one who has driven them apart.

## C.  Seriousness of the Offense, Respect for the Law,  Just Punishment, Deterrence  and Protection of the Public [§§ 3353(2)(A)-(C) and ]

Again, it is impossible not to recognize that Mr. Reffitt committed serious offenses.  Nevertheless, it should also be recognized that, up until that point, Mr.

Reffitt was a productive member of our society and respected the law.  Mr. Reffitt seeks to show the Court that his actions on January 6 were an aberration and to show the Court that, when he is released, he will faithfully comply with the law as well as any conditions of Supervised Release.

As a result of his actions, Mr. Reffitt has already served approximately 19 months confinement in very difficult conditions and will forever be a felon. Likewise, after release from any incarceration, he will be under this Court's supervision.   These consequences serve to act as both a specific and general deterrence

### D.  Need for Treatment [§ 3353(2)(D)]

The Presentence Report notes that Mr. Reffitt has a documented mental health diagnosis.  *See* PSR at ¶ 103.  Likewise, several of the support letters reference untreated depression that resulted in suicidal ideations.   Undersigned Counsel sincerely believes that an extended prison sentence will exacerbate that condition and is better addressed as a condition of Supervised Release.

### E.  Avoiding Unnecessary Sentencing Disparities[§ 3353(7)]

As noted above, Undersigned Counsel recognized that, in light of the sheer number of January 6 defendants, it is likely important to the Court to attempt to achieve some degree of uniformity in the various sentences imposed.  As such,

Undersigned Counsel has identified the **ten cases** in which defendants have been sentenced to **24 months or more imprisonment** and has reviewed the facts set forth in the government sentencing memorandums filed in each of the ten cases.[8]

(1) *United States v. Fairlamb*, No. 1:21-CR-00325-CKK **41 months incarceration**

•Shoved and Punched an MPD officer.

•Climbed the scaffolding.

•Entered the Capitol carrying a stolen police baton.

(2) *United States v. Chansley*, No. 1:21-CR-0003-RCL **41 months incarceration**

•Q-Anon Shaman and the very face of the events of January 6.

•Climbed the scaffolding.

•Entered the Capitol and roamed the second and third floors of the building.

•Entered the Senate gallery and screamed obscenities.

•Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of himself on the dias.

•Called other rioters up to the dias and lead them in an incantation including to be thankful for the "opportunity 'to allow us to send a message to all the tyrants, the communists, and the globalists, that this

_____

[8]This analysis is based upon the Sentencing Chart filed in *United States v. Suarez* , No. 1:21-CR-00205-DLF [Doc. 53-1] on July 2, 2022.

is our nation, not theirs, that we will not allow American, the American way of the United States of America to go down.'"

•Gave a *60 Minutes* interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate.

(3) *United States v. Cleveland*, No. 1:21:CR-00159-ABJ **28 months incarceration**

•Did not arrive in Washington, D.C. until January 7, 2021 as a result of car trouble.

•While in Washington, he texted that he was "thinking about heading over to Pelosi Cunt's speech and putting a bullet in her noggin on live TV."

•While in Washington, he texted that he "may wander over to the Mayor's office and put a 5.56 in her skull, FNG cunt."

•In his trailer, which he drove to Washington D.C., the FBI agents found a Glock 19, nine-millimeter handgun, and a model IWI Tavor X95 rifle, approximately 2,500 rounds of ammunition, and 10 large capacity ammunition feeding devices.  Those rounds included:

   \*Approximately 856 loose and boxed 9 mm cartridges;

   \*Approximately 320 loose, green tipped, LC17 rifle cartridges;

   \*Approximately 1001 loose, copper-color tipped, 5.56 mm rifle cartridges;

   \*Approximately 94 loose 30-30 rifle cartridges;

   \*Two 15-capacity 9 mm magazines containing approximately 29 total cartridges;

*Two 31-capacity 9 mm magazines containing approximately 62 total cartridges;

*One 50-capacity 9 mm drum magazine containing approximately 53 total cartridges;

*Five 5.56 mm rifle magazines containing a total of 118 cartridges (110 copper-color tipped cartridges and 8 green tipped cartridges); and

*One 9 mm expended cartridge case.

(4) *United States v. Palmer*, 1:21-CR-0328-TSC **63 months incarceration**

•Was on the steps leading to the LWT tunnel and, having acquired a wooden plank, he threw the plank like a spear at police officers.

•He picked up a fire extinguisher and sprayed police with its contents. Then, once it was empty, he threw it at police officers.

•He then "cast around for additional items with which he could assault the police."  He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.

•He then picked up the fire extinguisher he previously used to assault police and again threw it at police.

•Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

(5) *United States v. Thompson*, No. 1:21-CR-00461-RCL **46 months incarceration**

•Joined rioters as they actively assaulted police.

•Armed himself with a police baton and incited violence outside of the Capitol.  Also stayed in the heart of the violent zone, watching *hours* of

attacks against law enforcement.  Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."

•Provided rioters with riot shields to use against the police which had previously been stolen from the police.

•Assisted in throwing a large audio speaker at police.

•Assaulted a police officer with a baton when the officer was trying to assist a rioter needing medical attention.

(6) *United States v. Languerand*, No. 1:21-CR-00353-JDB **44 months**

•Threw a piece of wood at police.

•Just a few minutes later, he and another rioter threw a heavy black audio speaker at the police.

•A minute later, threw two sticks in rapid succession at officers.

•Three minutes later, threw another stick at officers.

•A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.

•A minute later, threw a pepper spray container followed by a bottle of liquid.

•Approximately 30 seconds later, threw a piece of wood,

•Then threw another stick at the police.

(7)   *United States v. Wilson*, No. 1:21-CR-00345-RCL **51 months imprisonment**

• Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.

• Picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at officers with it.

• "[E]ngaged multiple officers with whatever means he had available."

(8)   *United States v. Coffman*, No. 1:21-CR-00004-CKK **46 months imprisonment**

• Drove to Washington on January 6 from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun.  Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items.  The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (*i.e.* Molotov cocktails).

• The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.

• A month before January 6, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

(9) *United States v. Creek,* No. 1:21-CR-00645-DLF **27 months incarceration**

• "Violently pushed and hit" a police officer in the face.

23

• Then made a "beeline for a U.S. Capitol Police (USCP) officer who was attempting to protect himself behind a bike rack barrier and a police shield. He went around the barrier, gave [the Officer] a hard shove in the shoulders, and then kicked him, causing [the Officer] to fall backwards to the ground."

• Then picked up a thick strap with a heavy metal buckle and threw it at officers.

(10) *United States v. Miller*, 1:21-CR-00075-RDM **33 months imprisonment**

• While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.

• Used a bike rack to scale the Capitol wall.

• Threw batteries at officers.

• Sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields. The contents of the fire extinguisher sprayed at least a dozen police officers.

* * * * * * * *

Admittedly an apples-to-apples comparison is often difficult to achieve. Moreover, Mr. Reffitt acknowledges that the above defendants did not go to trial (although not all were given an acceptance of responsibility reduction). Nevertheless, the very fundamental question that must be answered is, should Mr. Reffitt who

did *not* engage in any violence,

did *not* throw any objects at police,

24

did *not* attack police with any weapons,

did *not* spray police with hazardous chemicals contained in fire extinguishers,

spent only a limited time in the restricted areas (*i.e.* the Capitol steps and landing), and

did *not* enter the Capitol (let alone the Senate chambers)

be treated similarly to those that did?  Frankly put, most if not all defendants who received a sentence of greater than 24 months imprisonment are at a whole different level than Mr. Reffitt and Undersigned Counsel submits that is it important for Mr. Reffitt's sentence to reflect these distinctions.   Indeed, it would appear that, in attempting to weigh culpability among the hundreds of January 6 defendants, those defendants fall in four general but distinct categories with some defendants falling in more than one category: (1) Those simply present in a restricted area; (2) Those present in restricted areas with weapons; (3) Those who entered the Capitol building; (4) Those who assaulted police officers.

## V.  CONCLUSION

Based upon the foregoing, Undersigned Counsel respectfully suggests that a sentence of **no more than 24 months imprisonment** is, in fact, sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

Respectfully submitted,


/s/ F. Clinton Broden
F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)
clint@texascrimlaw.com

Attorney for Defendant
Guy Wesley Reffitt

## **CERTIFICATE OF SERVICE**

I, F. Clinton Broden, certify that on July 15, 2022, I caused a copy of the above

document to be served via electronic filing on all counsel of record:

/s/ F. Clinton Broden
F. Clinton Broden
