## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-32-DLF** |
| **GUY WESLEY REFFITT,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM[1]

For Defendant Guy Reffitt's central role in leading a mob that attacked the United States Capitol while our elected representatives met in a solemn Joint Session of Congress—including his intention to use his gun and police-style flexicuffs to forcibly drag legislators out of the building and take over Congress, and his later threats to harm his children if they turned him into the FBI— the government respectfully requests that this Court sentence him to 15 years of incarceration.

The Court should depart upwards from the PSR's Sentencing Guidelines range of 9 to 11.25 years (108 to 135 months)[2] of incarceration both because Reffitt's crime "was calculated to influence or affect the conduct of government by intimidation or coercion," U.S.S.G. § 3A1.4, cmt. n.4, and because the Guidelines' grouping analysis provides "inadequate scope" for Reffitt's possession of multiple weapons in the commission of his offenses, *see* U.S.S.G. § 3D1.4, bkgd. cmt. (upward departure based on grouping); § 5K2.6 (upward departure based on use of weapons).

---

[1] This memorandum also reiterates the government's objections to the Presentence Investigation Report (PSR), ECF No. 155, and serves as a motion for an upward departure from the U.S. Sentencing Guidelines.

[2] As explained below, the PSR incorrectly calculated the total offense level as 31.  The total offense level, before departures, should be 33, leading to a range of 11.25 to 14 years (135 to 168 months) of incarceration.

# **Table of Contents**

I.     FACTUAL BACKGROUND ........................................................................................ 3

    A.     The January 6, 2021 Attack on the Capitol ...................................................... 3

    B.     Summary of the Evidence ................................................................................ 5

    C.     Militia Membership.......................................................................................... 7

    D.     Reffitt's Statements Evidencing His Intent ................................................... 10

        1.     Intent to Commit Violence at Capitol.................................................... 10

        2.     Intent to Commit Additional Violence After the Attack on the Capitol ................. 12

        3.     Lack of Remorse for Conduct ............................................................... 16

    E.     Reffitt's Additional Illegal Conduct .............................................................. 18

        1.     Firearm Silencer .................................................................................... 18

        2.     Assault on His Wife ............................................................................... 19

II.    THE CHARGES AND VERDICT ........................................................................... 20

III.   STATUTORY PENALTIES ..................................................................................... 20

IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS......................... 21

    A.     Total Offense Level ....................................................................................... 21

        1.     Sequencing of Guidelines Analysis for Each Count ................................. 22

        2.     Adjustment for Obstruction of Justice Under U.S.S.G. § 3C1.1 .............. 24

        3.     Guidelines Total Offense Level.............................................................. 28

    B.     Probation's Correct Application of Certain Adjustments .............................. 29

        1.     U.S.S.G. § 2J1.1(b)(1)(B) (causing or threatening injury) and § 2J1.1(b)(2)
(substantial interference with administration of justice)......................................... 29

        2.     U.S.S.G. § 2J1.2(b)(3) (otherwise extensive in scope, planning or preparation)....... 35

    C.     Guidelines Sentencing Range......................................................................... 37

    D.     Upward Departure .......................................................................................... 37

        1.     Upward Departure for Terrorism............................................................ 37

        2.     Upward Departure for Inadequate Grouping and Weapons ..................... 42

V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) ...................................... 45

    A.     Nature and Circumstances of the Offense...................................................... 45

    B.     Reffitt's History and Characteristics ............................................................. 46

    C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense ........... 46

    D.     The Need for the Sentence to Afford Adequate Deterrence ........................... 47

　　　1.　　General Deterrence ................................................. 48

　　　2.　　Specific Deterrence ................................................. 49

　　F.　Unwarranted Sentencing Disparities ................................. 49

VI.　　RESTITUTION ...................................................................... 51

VII.　　FINE ........................................................................................ 56

VIII.　CONCLUSION .................................................................... 56

## I.　　FACTUAL BACKGROUND

### A.　　The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully entered the U.S. Capitol grounds in an effort to disrupt a Joint Session of Congress that was meeting to ensure the peaceful transfer of power after the November 3, 2020 presidential election.　Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.　Members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate their chambers, and the Joint Session was suspended.

As described in more detail below, Reffitt's actions enabled rioters to reach the West Front of the Capitol Grounds, where some of the most vicious assaults on police officers occurred.　And those assaults, in turn, made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.　Initiated by the most fervent smaller groups and individuals within the crowd— individuals like Reffitt—and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's defenses until the building itself was accessible and its occupants were at risk.　The physical breaches of the building can therefore

be traced directly back to the assaultive conduct on the grounds of the West Front—and Reffitt's own action in leading the mob there.

"[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021). Rioters injured more than a hundred members of law enforcement, *see* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021)[3] at 29 (describing officer injuries), and inflicted significant emotional injuries on law enforcement officers and Capitol employees alike, *see id*.; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021)[4] (describing the stress suffered by Architect of the Capitol employees due to the attack). The attack caused substantial damage to the U.S. Capitol building, resulting in losses of more than $2.7 million.

---

[3]

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf.

[4]    https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf.

### B.    Summary of the Evidence

A member of the Texas Three Percenters militia group (further explained below), Reffitt was aware of Congress's Joint Session on January 6, 2021, to review and certify the Electoral College ballots, and he wanted to stop it.   He specifically targeted Speaker of the House Nancy Pelosi and Senate Majority Leader Mitch McConnell.   At the Ellipse on the morning of January 6, he told other members of his militia group and those gathered around him that he planned to physically drag Speaker Pelosi out of the Capitol building by her ankles, with her head hitting every step on the way down.

Reffitt traveled from his home in Texas to the District of Columbia with an AR-15-style semi-automatic rifle and a Smith & Wesson .40 caliber handgun.   On the afternoon of January 6, Reffitt went to the Capitol to participate in the riot and to obstruct Congress from meeting to certify the vote.   While at the Capitol, Reffitt, armed with his handgun in a holster on his waist, wearing a tactical helmet and bulletproof armor, and carrying police-style flexicuffs, confronted three U.S. Capitol Police officers on the west side stairs, just north of the temporary scaffolding, outside of the Senate Wing.   Reffitt rushed at the officers, who unsuccessfully tried to repel him with two different types of less-than-lethal projectiles before successfully halting his advances with pepper spray.   To assist Reffitt, other rioters cut down the tarp covering the scaffolding, both to further penetrate into the scaffolding and to use the tarp as a shield to protect Reffitt from additional pepper spray and projectiles.   Before and after being hit with pepper spray, Reffitt encouraged other rioters to charge forward at the officers, which they did both by moving up the stairs and by climbing up through the scaffolding, overwhelming the police officers trying to defend their position on a landing at the top.   That landing was the access point to the final set of stairs leading

to the Upper West Terrace and the Capitol building itself.   The officers were forced to fall back, the Capitol was breached at the Senate Wing Doors, and for several hours the Capitol was overrun with thousands of rioters, preventing Congress from carrying out its constitutionally and statutorily mandated duty to certify the Electoral College vote.   The legislators, their staffers, and other workers at the Capitol building were forced to run for cover and hide from the mob.

Reffitt recruited Rocky Hardie, another militia group member, in December 2020 to join him on the trip to the District.   Reffitt made the travel arrangements for the two men and instructed Hardie on what to bring (including firearms, despite discussing with Hardie the fact that they were illegal in the District).   Hardie brought his own handgun and AR-15 rifle on the trip; Reffitt helped him assemble his rifle to leave in Reffitt's car (along with Reffitt's own assembled rifle) at their hotel in Georgetown on the morning of January 6.   Before heading out for the day on January 6, Reffitt donned a plate carrier vest laden with armored plates that could stop a rifle round.   Because Hardie had brought plates but not a carrier, Reffitt used Gorilla tape to secure Hardie's armored plates to Hardie's shoulders and chest.   Also in the hotel room, Reffitt gave Hardie two zip ties to use to detain people.

Reffitt returned home to Texas on January 8, triumphant about the integral role he played in the attack on our democracy.   But his mood quickly changed.   On January 10, after learning that the Texas Three Percenters' leader had been questioned by Texas law enforcement agents, Reffitt sent messages to several other group members informing them about the leader's questioning, telling them to "[b]e prepared, the Shit is now hitting the fan," and "Start purge of all previous conversations.   NOW."   Heeding his own advice, Reffitt deleted from his iPhone a Telegram message thread between himself and the militia leader in which they discussed in late

December and early January Reffitt's plans and intentions while in the District of Columbia on January 6, including being armed while at the Capitol.   (The FBI was able to recover this deleted thread.)

The following day—January 11—after hearing about the militia leader's questioning and seeing nonstop news coverage of people around the country being arrested for their participation in the attack on the Capitol, Reffitt threatened to hurt his two teenage children if they reported him to the FBI.   He specifically told his 18-year-old son Jackson and his 16-year-old daughter Peyton that if they turned him in to the FBI they would be traitors, and traitors get shot.   He also told Peyton that if she were using her cellphone to record him or post anything about him online, he would put a bullet through her phone.   Both teenagers were well aware that their father kept several firearms in the house.

On January 16, FBI agents arrested Reffitt and searched his home in Wylie, Texas.   The agents located the AR-15-style rifle and Smith & Wesson .40-caliber pistol that Reffitt had brought into the District—and onto the Capitol grounds, in the case of the pistol.   (Though not presented at trial, the FBI also located three additional firearms, as explained below.)

During the search of Reffitt's home, the agents also located cans of bear spray and thick plastic zip ties, both unmodified (near his gun safe) and modified to work as handcuffs (in his car, along with other materials he had on his person while at the Capitol).

### C.    Militia Membership

Reffitt's dangerousness is enhanced by his leadership role in the Texas Three Percenters (TTP) militia group, which is part of the larger "Three Percenter" movement.   Militia extremists sometimes call themselves three percenters ("III%ers" or "threepers") based on the myth that only

three percent of American colonists took up arms against the British during the American Revolution.   Some Three Percenters regard the present-day United States Government as analogous to British authorities during the Revolution in terms of infringements on civil liberties. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow a tyrannical government if well-armed and prepared.   As explained by the motto on a shirt recovered from Reffitt's house, Govt. Ex. 148, the group believed in "rebellion" against the federal government:



Reffitt was savvy about his militia membership, recognizing both its utility and liability. While at the Ellipse, he used his membership in the Texas Three Percenters and other militia groups to encourage others to follow his lead to violently attack the Capitol, hoping that a show of force in numbers would help him accomplish his goal of removing and replacing Congress.   As he explained to a group of people gathered around him:

> I'm the state intel for the Texas Three Percenters.   I'm also with the Oath
> Keepers, this is Texas Freedom Force, the Old Country Watchmen.   We're
> everywhere.   There's thousands, tens of thousands of us.   We're all here
> somewhere, there's a whole bunch of us. . . . If we take that building, and
> we clean that one out, I told every one of my guys, and I have more than
> 1500 that I was speaking with before I left.   I said, you motherfuckers better
> goddamn well take the state capitol at Austin, when we get through with
> this one I better be able to crawl across cross every fucking state.

Govt. Ex. 1B20.2.1 at 28:37.   But just hours later when he was visibly and prominently attacking

at the Capitol, he deliberately obscured his involvement with the Texas Three Percenters, lest he

bring the group to the attention of law enforcement.   Thus, in a Telegram message on January 11,

2021, after another member complained that it was a "wrong move" if Reffitt "were at the Capitol

'representing TTP,'" because he did not want "detectives knocking on my door," Reffitt explained

that prior to attacking the Capitol he "removed all insignia of TTP.   To remove any association of

our group.   At the least give is credit for being ahead of the game."   Govt. Ex. 1B4.8.

Similarly, on January 9—three days after he attacked the Capitol—he both strategized with

fellow militia members and recruited others to join the group by discussing how to obscure their

true intentions why operating with a veneer of legitimacy.   Thus, when he convened a meeting of

Texas Three Percenters, held over Zoom with Rocky Hardie and TTP leader William Teer, he

explained that openly describing themselves as Three Percenters would not allow them to make

the necessary inroads with politicians to further their aims of overtaking the government: "Don't

tell them you're a Three Percenter.   Tell them you work with TTP Security Services, you're a

security service officer and you'd like to speak with them."   Sent. Ex. 1B at 75.   And in a

Telegram message, Reffitt recruited fellow Capitol rioters to join his militia, promising them

"ammo and weapons available to law enforcement" and a way to "circumvent" firearms laws:

> The battle rattle equipment is also another variant we are working on. I have a new security business to circumvent the 2nd Amendment issue. TTP Security Services LLC. Website is under construction but business is licensed with Secretary of State, Texas DPS, and Texas Board of Private Security. We can get ammo and weapons available to law enforcement.

Govt. Ex. 1B4.5.

### D.   Reffitt's Statements Evidencing His Intent

Reffitt made numerous statements about his intent to come into the District of Columbia while armed, and his plans to attack the Capitol and the legislators' inside. He also made numerous statements demonstrating his lack of remorse and his disrespect for the judicial process.

### 1.   Intent to Commit Violence at Capitol

Reffitt did not intend to simply obstruct Congress's certification of the Electoral College vote. Rather, Reffitt intended to physically remove the legislators from the building (using his firearm and flexicuffs, and the power of the crowd) and actually "take over" Congress. *See* Govt. Ex. 217 (telling his family after returning home that he had a "right" to "carry a weapon and take over the Congress").

On January 6, 2021, while at the Ellipse before heading to the Capitol, Reffitt repeatedly told others around him, as recorded on his helmet camera, that he was going to take over the Capitol by, in part, physically removing the legislators who were working inside:

- "We're taking the Capitol before the day is over." Govt. Ex. 1B20.2.1 at 8:25.

- "We're taking the capitol before the day is out." *Id.* at 9:50.

- "We're taking the Capitol after this." *Id.* at 12:05.

- "We're going for the Capitol before the day's over with, everybody's coming out kicking and fucking screaming. Fuck 'em." *Id.* at 14:06.

- "I'm taking the Capitol with everybody fucking else. We're all going to drag them mother

fuckers out kicking and screaming, I don't give a shit.   I just want to see Pelosi's head hit every fucking stair on the way out. (Inaudible) Fuck yeah.   And Mitch McConnell too. Fuck 'em all.   They fucked us too many goddamn years for too fucking long.   It's time to take our country back.   I think everybody's on the same damn wavelength.   And I think we have the numbers to make it happen."   *Id.* at 16:03.

- "We're taking the Capitol after this shit.   Before the day's out."   *Id.* at 23:42.

- "If we take Congress today and rip every one of them, Republican, Democrat, the fuck out of there, because the republic of the people owns that fucking building.   We take 'em out, we go back to the original republic of the people party, consult with the judicial branch, we've got a fucking president, we don't need much more.   We just get rid of them motherfuckers and start over."   *Id.* at 25:45.

- "I'm packing heat and I'm going to get more heat, and I am going to that fucking building and I am dragging them the fuck out."   *Id.* at 27:45.

- "Even if Pence doesn't or does do his part, you can't leave them motherfuckers in there. We can't."   *Id.* at 27:57.

- "Get them out of there, I'll sit in one of those chairs in the Congress, and just wait, until everything's ready to go. . . .   It's 1776 again, let's start over."   *Id.* at 30:00.

- "Grab 'em by the ankle and drag 'em, let their heads hit the steps all the way down.   Fuck 'em, every one of 'em's coming out.   I don't give a shit.   I like Ted Cruz.   He's still a goddamn politician.   They are all coming out.   We'll start over.   We own this motherfucker.   We'll start over."   Govt. Ex. 1B20.2.2 at 1:19.

- "Whatever it takes to get 'em out of that building, and empty it out, and put us in that motherfucker."   *Id.* at 3:44.

And he was adamant that he was carrying a weapon with him and planned to use it if necessary to complete his mission: When asked by a member of the crowd what would happen if he or other rioters came under fire from police, Reffitt responded, "a hell rain of fire comes back cause every one of my guys are here and I assure you they came in hot.   So did I."   *Id.* at 3:53.

Shortly after Reffitt returned home to Texas, Jackson Reffitt recorded his father explaining that he had driven from Texas to the District of Columbia armed with a firearm to physically remove the legislators from the building:

11

> I came here for a reason.    I didn't drive twenty fucking hours to come here
> and not do what needs to be done.    The bad people are in that building.
> They're the bad people.    They're disgusting people.

Govt. Ex. 218.

On the January 9, 2021, Zoom meeting with Rocky Hardie and TTP leader William Teer, Reffitt described his actions and intentions during the attack on the Capitol.   He bragged about how much "restraint" he showed in not shooting Officer Kerkhoff when he confronted her on the steps of the Capitol: "I didn't go after the bitch that shot me, although I would have loved to have pulled my weapon and shot her right then."   Sent. Ex. 1B at 20.

### 2.     Intent to Commit Additional Violence After the Attack on the Capitol

Significantly, in multiple messages, Reffitt championed the riot, recruited fellow rioters into his militia, predicted more political violence in the future, and described his own preparations for that future violence.   On January 9, 2021, Reffitt wrote to other TTP members on Telegram, "We took the Capital of the United States of America and we will do it again."   Govt. Ex. 1B4.6. In a Telegram message sent on January 13, Reffitt described law enforcement's efforts to stop him during the riot, and predicted additional violence to come:

> I was in DC on the 6th and I can't go into details but I was repeatedly shot
> with clay bullets and Pepper Sprayed very heavily.   We took the Capital
> and put the POS Capital Hill on it's heels.   This has only just begun and
> will not end until we The People of The Republic have won our country
> back.   We had thousands of weapons and fired no rounds yet showed
> numbers.   The next time we will not be so cordial.

Sent. Ex. 2.

In several messages that started on January 7, Reffitt also communicated with two other rioters from Texas he appears to have met while at the Capitol.   In one message, Reffitt sent a photograph of himself from the Capitol, bragging, "And this was me forcing the Capital police

hand."   Govt. Ex. 1B4.5.   In another message on January 9, Reffitt recruited these rioters to join

his militia, promising them that "[t]he fight has only just begun" if they joined him:

> I've added you to a Texas Three Percenters Continental Army Telegram
> chat.   I am Texas State Intel Officer and call sign is Call to Arms.   I have
> researched both of your past and present[5]. . . . as I expected you are both
> very true blooded Patriots. . . . Join us and lets take back our country.   The
> fight has only just begun.

Govt. Ex. 1B4.5.

Finally, Reffitt sent messages identifying future targets and his efforts to prepare for similar

violence in the future.   On January 9, 2021, Reffitt sent a Telegram message to other TTP

members, telling them that "DC is a futile effort now.   Changing direction and attack protocol

would benefit.   MSM[6] and Big Tech need to feel the rathe of the Republic now."   Sent. Ex. 3.

In the same thread a few hours later, he declared: "THE CAPITAL HAS BEEN DONE AND

THEY ARE ON THEIR HEELS. THEY ARE PREPARED.   California, Big Tech and MSM.

They aren't ready and don't believe they can ready fast enough."   *Id.*

Indeed, that prior evening, in a conversation that Jackson Reffitt recorded in his home,

Reffitt stated, "We are still not done.   And everyone I've spoke to is -- actually they're getting

ready to go back on the 20th."[7]   Govt. Ex. 215.   But Reffitt disagreed with that plan, because

now the Capitol Police would be prepared for them.   Instead, he said, "We need to go to California

. . . we need to destroy the news media and start all over."   *Id.*

---

[5]  In other messages, the defendant claimed to have access to the National Crime Information
Center (NCIC) database, which is used by law enforcement.

[6]  MSM is believed to refer to the "mainstream media."

[7]  The "20th" was a likely reference to then-President-Elect Biden's planned inauguration in the
District of Columbia just eleven days later, on January 20.

13

Reffitt's words were not idle talk.   He was so upset that the Capitol Police offers were able to temporarily stop his advances that he planned to do whatever was necessary to be successful in his next attack.   On January 13, 2021, Reffitt wrote to his fellow TTP members, "I'll not be taken down again like in DC.   I have a riot shield and 9oz cans of Bear Spray in route my home."   Govt. Ex. 1B4.9.   Three days later, during the search of his house, the FBI in fact recovered two apparently full cans of bear spray from Reffitt's bedroom closet.   Govt. Ex. 1B3.   While the FBI did not recover a riot shield, Reffitt was apparently in the process of buying one when he was arrested: on Telegram, he disseminated a link to an eBay posting for an "Anti-Riot-Protective-Shield" to his fellow TTP members.

While with his family shortly after returning home to Texas, when asked if he believed he had accomplished his mission, Reffitt replied:

> I think, no.   Actually what happened was only the preface of the book. You know what a preface is?   The beginning of the book.   It's kind of an explanation of how the book is going to turn out.     But it's just a notification of what you're going to read in the future.   All that was just an example of what we could do without firing a shot.   Even though this gun was right here loaded, all I had to do was <mechanical noise> that and shoot, but I didn't have to do that.

Govt. Ex. 218.

Finally, Reffitt stated that he was not finished with political violence.   Indeed, just as he described January 6 as the "preface" of a book, Reffitt also asserted that the Capitol insurrection was just the "beginning" of "a lot more":

> I had every constitutional right to carry a weapon and take over the Congress, as we tried to do.   We went in, they scurried like rats and hid.... I'm not done yet.   I got a lot more to do.   That's the beginning.

Govt. Ex. 217.

14

On the TTP Zoom call on January 9, Reffitt discussed the need to recruit others to "join our Army."  Sent. Ex. 1B at 31.  In fact, he extensively discussed the need to increase TTP's membership so that the group could better take on the government, declaring:

> I have no care for a fallback position. I have no need for any more ammunition than I have right now because after my 1,000 rounds are gone, then I'm going to start with just -- just going to be hand-to-hand combat, and it's going to be, but it's going to be what it's – I'm going to have to do it.  But it doesn't matter at that point, if we don't move forward we're always going to be falling back. There's nowhere to go. This country's not big enough, there's not enough area left in the world for us. We drove to Washington, and I can assure you, there was such beautiful land, and it was a lot of open property, but that still, you can't hide from the United States government military if we don't push forward and show them that they are not under the rule of Nancy Pelosi, that they are under the rule of the Republic of the People of America, Marbury vs. Madison, 1803, that we have the power. We showed them what we could do, even though in [indiscernible] way that was nothing by comparison to what we have the capability of doing, and we should do. We didn't fire a shot, but we had the ability to do so. But the next time won't be so nice.

*Id.* at 68-69.

After attacking the Capitol, Reffitt wanted his militia to turn its attention to attacking "mainstream media" or" big tech."  *Id.* at 17.  In fact, he suggested firing a sniper rifle round through the backup generators at a Facebook facility in Texas:

> [T[he only thing we could do to anyone who wouldn't expect it would be mainstream media or Silicon Valley to the big tech.  Now, I know that they have underground cables to their power sources and they have backup systems, but a good round through the crankcase of a Caterpillar 3512 would drain the oil and it'll die off in 15 minutes.  They'll have – the Facebook assembly here in Forth Worth has three backup generators, but sniper round though the radiators or the crankcase would completely disseminate those.  And if we can disable their cables then we can shut down their media.  That's going to shut them down, as well it's going to shut us down.  They were going to make them feel it back in the Capitol, and in the Capitol then they won't know we're coming next time.

*Id.* at 17.

And this was not the first time that Reffitt targeted violence at Facebook.   In August 2020, after Facebook disabled the accounts belonging to Reffitt and other Texas Three Percenter members, Reffitt sent an email to the office of Senator Ted Cruz, with the subject line "Facebook has taken down all of our Texas Three Percenters pages," threatening to use an "immeasurable" amount of "2nd Amendment" "force" against Facebook.   Sent. Ex. 3.

### 3.      Lack of Remorse for Conduct

Far from demonstrating remorse or disavowing his actions, since his arrest and detention, Reffitt has continued to attempt to recruit others to his crusade to attack the government.

On May 11, 2021, ProPublica published an article titled *In Exclusive Jailhouse Letter, Capitol Riot Defendant Explains Motives, Remains Boastful*.   *See* ECF No. 24.   The government previously filed a copy of Reffitt's manifesto,[8] written on behalf of what he called the "1/6ers," in which he explained that "January 6th was nothing short of a satirical way to overthrow a government."   ECF No. 24-2.   Reffitt declared that Congress had been in power for too long— "more than half a century"—and that it was up to him and his compatriots to "notify our government, they have transgressed much too far."   The manifesto suggests that more is to come.

On February 25, 2022—the Friday before the trial began in this case—Reffitt, through his wife, issued a statement through Telegram.   Sent. Ex. 5.   Reffitt accused the Court of keeping the public line inaccessible because the government "want[s] a secret tribunal."   He proclaimed that his trial would be the "beginning of what could make or break this nation" and that it would "be

---

[8] After Reffitt's counsel declined to concede Reffitt's authorship of the letter, the government corroborated it through his jail messages.   *See* Opp. to Motion for Change of Venue (ECF No. 39) at 14 n.3.

for the heart and soul of The Republic."   He wrote that, at the trial, he was "prepared to stare down the barrel of tyranny to receive the bullet of freedom."

Similarly, on May 25, 2022, just before the originally scheduled sentencing date, a letter was posted on Twitter purporting to be from Reffitt.   Sent. Ex. 6.   With strikingly similar language, he wrote that he was "prepared to once again, stare down the barrel of tyranny and receive the bullet of freedom."   *Id.*   He encouraged others to keep "fight[ing]": "You weren't wrong that day.   You aren't wrong now.   Don't let them win."   He professed that he was a martyr for his cause, writing, "I do this time in chains for my family, and for yours."   *Id.*

On his family's GiveSendGo donation site, Reffitt similarly attempted to get his message out to the world, while simultaneously criticizing the judicial process.   On May 25, 2022, he faulted the Court for reading the jury instructions too quickly and the jurors for being "biased."   Sent. Ex. 7.   He wrote that "the jury didn't take the time to see if the government was lying," and that he would "never bend the knee to tyranny."   *Id.*

On June 17, 2022, Reffitt wrote again to his fellow "Patriots" on GiveSendGo, urging them to "Hold the Line."   *Id.*   He accused his trial counsel of being "corrupt" but lamented that juries have convicted other defendants for their roles in the attack on the Capitol.   *Id.*   He further proclaimed that "[t]here is something very wrong with this place," *id.*—presumably meaning the District of Columbia or its federal courthouse.

Finally, even after the jury returned its guilty verdict, Reffitt was adamant in an interview with a reporter that the riot was staged and that he had been entrapped.   *See* Sent. Ex. 8.

E.      **Reffitt's Additional Illegal Conduct**

1.      **Firearm Silencer**

While searching Reffitt's home on January 16, 2021, FBI agents located three firearms in addition to the two firearms that Reffitt brought with him into the District of Columbia: a Walther P22 semi-automatic pistol, a Savage Arms Model III 7mm rifle, and a Smith & Wesson ".38 Special" revolver.   All three firearms were in the gun safe in Reffitt's bedroom closet.   Next to the Walther P22 was an unregistered silencer that could be threaded onto the firearm, as depicted below:



Initially, in a custodial interview with the FBI, Reffitt falsely claimed that the silencer was a "fuel filter" for his car, but he eventually admitted that it was, in fact, a silencer that he had purchased, attached to his firearm, and fired.[9]

---

[9] Attached as Sent. Ex. 9 is Agent Hightower's interview of Reffitt about the silencer; Sent. Ex. 9A is the video file and Sent. Ex. 9B is the transcript.

Reffitt's possession of the unregistered silencer is illegal.[10]   A "firearm silencer," which is a "device for silencing, muffling, or diminishing the report of a portable firearm," 18 U.S.C. § 921(a)(24), qualifies as a firearm under 18 U.S.C. § 921(a)(3)(C) and 26 U.S.C. § 5845(a)(7). A firearm must either bear a serial number or be registered with the ATF.   26 U.S.C. § 5842. Because Reffitt's firearm silencer did not bear a serial number and was not registered with the ATF, his possession of the silencer was illegal.   Reffitt's illegal possession of the firearm silencer, if it resulted in a conviction, would subject him to a term of imprisonment of up to 10 years.   *See* 26 U.S.C. § 5871; *see also* U.S.S.G. §2K2.1(a)(5) (providing for a base offense level of 18 for a person convicted of illegal possession of a firearm silencer, which is one of the prohibited weapons, along with machineguns and short-barreled rifles, defined in 26 U.S.C. § 5845(a)).

### 2.      Assault on His Wife

In the summer of 2020, Reffitt pointed a loaded gun at the head of his wife, Jodi Nicole Reffitt.   Reffitt's son Jackson and wife Jodi Nicole both recounted the incident to a reporter as part of a podcast series, *Will Be Wild*.[11]   Jackson explained that in the summer of 2020, he was sitting outside on the patio of his family's house when his mother came outside and reported that Reffitt had just put a gun to her head.   Sent. Ex. 11A.1.   Jodi Nicole corroborated the incident, explaining to the reporter that Reffitt actually held a gun to her head on two different occasions, including one time when he ultimately fired the gun next to (but not at) her head.   Sent. Ex. 11A.2.

---

[10]  Attached as Sent. Ex. 10 are the two ATF reports about the silencer.

[11]  The statements were published in episode 4, "Rules for Radicals," released on May 9, 2022, in *Will Be Wild*, produced by Pineapple Street Studios and Wondery.   Sent. Exs. 11A.1 and 11A.2 are the audio file excerpts and Sent. Exs. 11B.1 and 11B.2 are the transcripts.

She elaborated that Reffitt's actions were a result of him getting angry at her, and she believed that pointing a gun at her was how he expressed his anger.

## II.    THE CHARGES AND VERDICT

On September 15, 2021, the grand jury returned a superseding indictment charging Reffitt with the following five counts:

- Count One, Transporting a Firearm in Furtherance of a Civil Disorder, 18 U.S.C. § 231(a)(2)

- Count Two, Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)

- Count Three, Entering or Remaining in a Restricted Building or Grounds with a Firearm, 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

- Count Four, Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3)

- Count Five, Obstruction of Justice—Hindering Communication Through Force or Threat of Physical Force, 18 U.S.C. § 1512(a)(2)(C).

The Court presided over the trial from February 28 through March 8, 2022, when the jury returned a verdict of guilty on all counts.   On May 4, 2022, the Court denied Reffitt's post-trial motions for a new trial, for judgment of acquittal, and to arrest judgment.   ECF No. 148.

## III.    STATUTORY PENALTIES

Reffitt now faces sentencing on all five counts.   As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years each on Count Two (Obstruction of an Official Proceeding) and Count Five (Obstruction of Justice), 10 years on Count Three (Restricted Grounds with a Firearm), and 5 years each on Count One (Civil Disorder, Transporting Firearms) and Count Four (Civil Disorder, Obstructing Officers).   PSR ¶¶ 131-35.

The statutory maximum fine for each count is $250,000.   PSR ¶ 155.   The maximum term

of supervised release for each count is three years.   PSR ¶¶ 139.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49

(2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark" for determining a defendant's sentence.

*Id.* at 49.   The Sentencing Guidelines are "the product of careful study based on extensive

empirical evidence derived from the review of thousands of individual sentencing decisions" and

are the "starting point and the initial benchmark" for sentencing.   *Id.*

In this Section, the government (A) explains why the total offense level should be 33, (B)

agrees with Probation's inclusion of certain adjustments, over Reffitt's objections, (C) lays out the

Sentencing Guidelines incarceration range, and (D) moves for an upward departure.

### A.     Total Offense Level

As explained in the addendum to the PSR, the government generally agrees with the PSR's

Guidelines analysis but respectfully submits that the offense level computations should be

performed prior to the grouping analysis.   Sequencing the analysis as the government suggests

(and as the Guidelines require) shows that, *first*, the total offense level should be 33 rather than 31,

because of an additional two-level enhancement for an obstruction-of-justice conviction pursuant

to U.S.S.G. §§ 3C1.1, cmt. n.8; and 3D1.2(c), and, *second*, the grouping analysis provides

"inadequate scope for ensuring appropriate additional punishment for the additional crimes,"

U.S.S.G. § 3D1.4, bkgd. cmt., because Reffitt's firearms crimes do not result in any enhancement of the Guidelines level.

### 1.    Sequencing of Guidelines Analysis for Each Count

The Guidelines set out the specific "order" of the analysis:   first, for each count of conviction, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. § 1B1.1(a)(1)-(3).   Then, repeat each step for each additional count of conviction.   U.S.S.G. § 1B1.1(a)(4).   Finally, perform the grouping analysis in Part D of Chapter 3.   *Id.*

Probation did not follow this procedure in preparing the PSR.[12]   Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 41-45, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Counts Two, PSR ¶¶ 46-54, and Four, PSR ¶¶ 56-61. Probation then performed the grouping analysis, PSR ¶¶ 62-68.   But the grouping analysis should be "[a]ppl[ied]" only *after* the Guidelines analysis is performed for each separate count.   U.S.S.G. § 1B1.1(a)(4).

The PSR did not include a Guidelines analysis for Counts One, Three, or Five.   Although the government agrees with Probation that Counts One, Three, and Five group with Count Two pursuant to U.S.S.G. § 3D1.2(c), PSR ¶¶ 41-42, and that the offense level applicable to the grouped offenses will be the adjusted offense level for Count Two, the PSR should have included the offense level computation for all counts.

---

[12] On page 28 of the PSR, Probation explained that the *Guide to Judiciary Policy* allows the grouping analysis to take the place of certain individual count analyses.   But the Guidelines themselves are clear on the necessary sequencing.

The government submits that the appropriate offense level computations for Counts One,

Two, Three, and Five, *prior to any grouping analysis under Part D of Chapter 3*, are as follows:

### Count One: 18 U.S.C. § 231(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(7) | Base Offense Level | 12 |
| U.S.S.G. § 2K2.1(b)(1)(A) | Number of Weapons | +2 |
| U.S.S.G. § 2K2.1(b)(6)(B) | Connection with Other Felony | +4 |
| | | 18 |
| U.S.S.G. § 2K2.1(c)(1)(A) | Cross-reference to Count Two | |
| U.S.S.G. § 2X1.1(a) | Base offense level | 27 |
| U.S.S.G. § 3B1.1(c) | Aggravating role | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4(D) | Obstruction of Justice | +2 |
| | **Total** | **31** |

### Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening Injury | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3B1.1(c) | Aggravating Role | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4(D) | Obstruction of Justice | +2 |
| | **Total** | **31** |

### Count Three: 18 U.S.C. § 1752(a)(1), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon | +2 |
| | | 8 |
| U.S.S.G. § 2B2.3(c)(1) | Cross-reference to Count Two | |
| U.S.S.G. § 2X1.1(a) | Base offense level | 27 |
| U.S.S.G. § 3B1.1(c) | Aggravating role | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4(D) | Obstruction of Justice | +2 |
| | **Total** | **31** |

23

**Count Five: 18 U.S.C. § 1512(a)(2)(C)**

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening Injury | +8 |
| | **Total** | **22** |

### 2.    Adjustment for Obstruction of Justice Under U.S.S.G. § 3C1.1

Performing the Guidelines analysis for each individual count (as described above) shows that an *additional* two-level adjustment for an obstruction of justice conviction applies under U.S.S.G. § 3C1.1—leading to a total offense level of 33 rather than 31.

The PSR initially noted that a two-level adjustment for obstruction applies because Reffitt "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when the defendant directed other members of the TTP to delete their message threads after he became aware that the FBI was investigating the events at the US Capitol."   PSR ¶ 29.   Probation later applied a two-level obstruction enhancement when calculating the offense level for Group One based on that conduct *and also* because "[u]pon his return to Texas, the defendant told his children that if they turned him into the FBI, they would be traitors, and traitors get shot.   He also told his daughter that if she were recording him, he would put a bullet through her phone."   PSR ¶ 53.   The PSR thus apparently provided a single two-level adjustment for obstruction of justice based on Reffitt's instruction to others to delete evidence *and* Reffitt's completely separate action (which resulted in a separate conviction) of threatening to harm his children if they reported him to federal law enforcement.

That determination disregards U.S.S.G. § 3C1.1, cmt. n.8, which explains how grouping under § 3D1.2(c) operates when a defendant is "convicted both of an obstruction offense … and

24

an underlying offense (the offense with respect to which the obstructive conduct occurred)."   That occurred in this case.

Reffitt threatened his two children with physical violence if they informed the FBI about his criminal conduct on January 6, including his obstruction of the Congressional certification vote on that date.   For those threats, Reffitt was convicted in Count Five of "an obstruction offense," *i.e.*, a violation of 18 U.S.C. § 1512(a)(2)(C)—threatening physical force against two persons to prevent communication to a law enforcement officer.   He was convicted in Count Two, "the underlying offense," of a violation of 18 U.S.C. § 1512(c)(2)—corruptly obstructing an official proceeding before Congress.   Applying Note 8, Reffitt's Count Two offense conduct was "the offense with respect to which the obstructive conduct" in Count Five "occurred."

In such a case, Note 8 instructs that "the count for the obstruction offense (here, Count Five) will be grouped with the count for the underlying offense (here, Count Two) under subsection (c) of § 3D1.2 (Groups of Closely Related Counts)."   U.S.S.G. § 3C1.1, cmt. n.8.   To ensure that the obstructive conduct increases the combined offense level under U.S.S.G. §§ 3D1.1-.4, Note 8 further instructs that the "offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater."   *Id.*

This approach effectuates Note 8.   As the PSR determined, at ¶ 54, the adjusted offense level for Count Two is 31.   That includes a two-level enhancement under § 3C1.1 because of Reffitt's instructions to his fellow TTP members to delete incriminating digital communications between them regarding Reffitt's plans to obstruct the certification vote.   This conduct amounted to "directing or procuring another person to destroy or conceal evidence that is material to an

25

official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so." U.S.S.G. § 3C1.1, cmt. n. 4(D).

As Probation also determined, Counts One, Two, and Three group together as Group One. PSR ¶¶ 41, 46. The government agrees.[13] And as explained above, the government agrees with the PSR's inclusion of Count Five as part of Group One. PSR ¶ 42. Indeed, Note 8 requires Count Five to be included. *See United States v. Provenzano*, 1 F. App'x 43, 45 (2d Cir. 2001) (unpublished) (applying Note 8 where defendant pled guilty "both to obstruction offenses … and to the underlying offenses … 'with respect to which the obstructive conduct occurred'").

Further applying Note 8, the total offense level for Group One is increased by two levels, resulting in a total offense level of 33 from the adjusted offense level of 31 that applies to Count Two. This two-level adjustment should be applied to Count Two because that is the count with the highest offense level in Group One. *See United States v. Perrin*, 551 F. App'x 694, 696 (4th Cir. 2014) (unpublished) (noting that the "obstruction enhancement was properly applied to that calculation" of the count with the higher offense level).

The PSR did not apply Note 8. But Note 8 can and should be applied even if the adjustment in U.S.S.G. § 3C1.1 was already applied when performing the initial Guidelines analysis under U.S.S.G. § 1B1.1(a)(3). Note 8 is part of the commentary of § 3C1.1 "that

---

[13] The PSR reached this conclusion because "the offense involved the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." PSR ¶ 41. The government submits that Counts Two and Three group because they involve the same victim, U.S.S.G. § 3D1.2(a), and Count One "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count Three, specifically "a dangerous weapon (including a firearm) was possessed." U.S.S.G § 3D1.2(c). The result is the same.

interprets or explains a guideline," and as such, is "authoritative unless [the commentary] violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).   The PSR noted, at page 30, that a representative from the Sentencing Commission, when consulted, indicated that § 3C1.1 allows for only a single application of a two-level adjustment.   But this interpretation finds no support in the Guidelines, commentary, or case law and fails to account for the plain language of Note 8.   By contrast, Note 8 gives meaning to §3C1.1 and §3D1.2.   Consequently, Note 8 offers an "authoritative" interpretation of § 3C1.1 and should be applied.   *See United States v. Robinson*, 86 F.3d 1197, 1199 (D.C. Cir. 1996) (holding that Guideline commentary was not inconsistent with the text of the Guideline and therefore must be applied).

Nor would application of Note 8 result in impermissible "double-counting" of Reffitt's obstructive conduct.   The two-level enhancement required by Note 8 increases the total offense level for Group One because of Reffitt's threats against his children as embodied in the conviction for Count Five.   The enhancement to Count Two under Note 4(D) of Section 3C1.1 is based on Reffitt's entirely separate directive to other Texas Three Percenters to delete incriminating communications.   Thus, applying Section 3C1.1's Note 8 enhancement and Note 4(D) enhancement punishes two entirely distinct obstructive acts.   *See United States v. Baker*, 200 F.3d 558, 562 (8th Cir. 2000) (rejecting double-counting objection to application of Note 8 where the obstruction occurred after the underlying fraud had been completed); *see also United States v. Koumbairia*, 17 F. Supp. 3d 81, 85 (D.D.C. 2014) (explaining why there was no impermissible double-counting).

The Sentencing Commission "plainly understands the concept of double counting, and expressly forbids it where it is not intended."   *United States v. Valdez-Torres*, 108 F.3d 385, 389 (D.C. Cir. 1997) (quoting *United States v. Williams*, 954 F.2d 204, 208 (4th Cir. 1992)).   With Note 8, the Sentencing Commission expressly commanded the application of the two-level enhancement as part of a grouping analysis in order to guard against double-counting by treating the counts separately.   *See United States v. Yielding*, 657 F.3d 688, 717 (8th Cir. 2011) (noting that Note 8 "is designed to prevent double-counting by ensuring that the obstructive conduct is taken into account only once: as a two-level adjustment to the base offense level for the underlying offense, or as the offense level provided for the obstruction offense itself").   That is the case here, where the application of Note 8 means that Reffitt's obstructive conduct at issue in Count Five increases the total offense level only once, by increasing the combined offense level for Group One.   If Note 8 is not applied, however, Reffitt's Count Five obstructive conduct would have no effect on the total offense level.   That would be an unwarranted result: Reffitt's threatening conduct for which he was convicted in Count Five, which was temporally and geographically distinct from his criminal conduct on January 6 and represented an additional serious crime after his January 6 crimes were complete, should result in additional punishment.

### 3.    Guidelines Total Offense Level

For Count Two, there is a two-level adjustment based on Reffitt's instruction to others to delete evidence, leading to an initial adjusted offense level of 31.   *Then*, after Count Five is grouped with Count Two (and Counts One and Three), Section 3C1.1's Note 8 and Section 3D1.2(c) compel an additional two-level adjustment based on the obstruction of justice conviction

embodied in Count Five.   Therefore, the adjusted offense level for Group One should be 33, meaning that the total offense level would also be 33.[14]

### B.   Probation's Correct Application of Certain Adjustments

As noted in the addendum to the PSR, at pages 33-35, Reffitt objected to the application of enhancements pursuant to U.S.S.G. §§ 2J1.1(b)(1)(B) (causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice), 2J1.1(b)(2) (substantial interference with the administration of justice), and 2J1.2(b)(3) (otherwise extensive in scope, planning or preparation).   But Probation was correct to apply all three of these adjustments.

### 1.   U.S.S.G. § 2J1.1(b)(1)(B) (causing or threatening injury) and § 2J1.1(b)(2) (substantial interference with administration of justice)

Reffitt argues that neither of these specific offense characteristics is applicable to his conduct because his actions on January 6, 2021, did not relate to the "administration of justice." But Reffitt's argument fails to account for § 2J1.2's text and commentary, *see* U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence."), which provides a broad definition of "administration of justice."   It defines the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).   This definition goes well beyond a judicial or grand

---

[14] The government agrees with Probation that Group Two does not increase the total offense level because it is 9 or more levels less serious than Group One.   PSR ¶¶ 62-64.

jury proceeding to include the unnecessary expenditure of substantial "governmental" resources. *Id.* And because Note 1 is part of the commentary of § 2J1.2 "that interprets or explains a guideline," it is "authoritative unless [the commentary] violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38.

Other courts have applied § 2J1.2(b)(2) to proceedings that would not fit Reffitt's narrow definition of the "administration of justice," including at least one of the January 6 cases in which, as here, the defendant contested application of the enhancement.   As Chief Judge Howell noted in rejecting an identical argument, § 2J1.2 "applies to a broad swath of obstruction statutes that reach obstruction of nonjudicial proceedings." *United States v. Rubenacker*, 21-cr-193-BAH (D.D.C., Sentencing Hearing May 26, 2022) (attached as Sentencing Exhibit 12) at Tr. 65.   In *Rubenacker*, Chief Judge Howell squarely held that the special offense characteristics under §§ 2J1.2(b)(1)(B) and (b)(2) applied to enhance a defendant's sentence under 18 U.S.C. § 1512(c)(2) for his crime of corruptly obstructing Congress's proceeding on January 6.[15]

Chief Judge Howell rejected the argument that § 2J1.2's use of the "phrase 'the administration of justice' is limited to the activities of courts or grand juries, or even federal agency adjudicatory proceedings." *Rubenacker* Tr. at 62.   The phrase "administration of justice" "is sufficiently broad to encompass nonjudicial official proceedings, such as Congress's certification

---

[15]   In addition to Chief Judge Howell, two additional judges on this Court have applied at least one, and sometimes both, of the "administration of justice" enhancements in the context of the Capitol breach on January 6, in cases where the parties agreed to their application.   *See, e.g.*, *United States v. Duke Wilson*, No. 21-CR-345 (Lamberth, J.); *United States v. Paul Hodgkins*, No. 21-CR-188 (Moss, J.); *United States v. Scott Fairlamb*, No. 21-CR-120 (Lamberth, J.); *United States v. Jacob Chansley*, No. 21-CR-3 (Lamberth, J.).

of the Electoral College votes." *Id.* at 69-70.   The Chief Judge explained:

> We may not always think about the administration of justice and the democratic process being so closely intertwined, but what Congress was doing on January 6, 2021, was recognizing, protecting, and upholding the democratic choices of millions of voters across each of the states, as it heard and resolved objections to the certification of any state's exercise of their electoral votes.

> Congress was convened to ensure that the official results of the presidential election accurately reflected the choices that had been made weeks earlier at the ballot box.   The successful completion of that process is a stable basis upon which the authority of the incoming President is built.   Congress's tasks on January 6, 2021, fit easily into the definition courts have given to the phrase "administration of justice."   When Congress convened to count the Electoral votes, by "performing acts or duties required by law," Congress was maintaining "the right within a political community," as Black's Law Dictionary states, to have votes counted in a particular manner, using "the physical force of the state" in the form of law enforcement officers located in and around the Capitol to secure the proceedings; though that security was severely tested and breached by the actions of the defendant and others who illegally entered the Capitol that day.

> The constitutionally mandated procedure falls within the meaning of the phrase "administration of justice."

*Id.* at 74-75.

Like Reffitt, while Rubenacker did not directly verbally threaten Capitol Police officers, his "physical movements . . . communicated threats to law enforcement."   *Rubenacker* Tr. at 56. "[The defendant's] pursuit of [an officer], in blatant disregard for this officer's instructions to stand back and leave, as the crowd of angry, yelling rioters swelled around him, constituted a clear and direct threat to the safety of [the officer] and could have led to [the officer's] physical injury."   *Id.* at 57.   "The defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers."   *Id.* at 58.   These statements apply

with equal force to Reffitt's threatening actions toward the Capitol Police officers guarding the landing, including using his megaphone, pointing at the officers, and waving rioters towards the officers, all while the crowd around him swelled and yelled at those officers.

Moreover, while there was no evidence in *Rubenacker* that the defendant uttered verbal threats against officers, here Reffitt clearly did.   While on the Ellipse before heading to the Capitol, Reffitt told others of his intention to use his firearm against legislators and Capitol Police officers.   *See* Section I.D.i, *supra* (recounting Reffitt's statements).   This is a threat, even though it was not communicated directly to the legislators or officers.   *See United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) (in prosecution for interstate communications of threats, the "threat doesn't need to be communicated directly to its victim or specify when it will be carried out"); *United States v. Baker*, 514 F. Supp. 3d 1369, 1378 (N.D. Fla. 2021) (holding that the "language of 18 U.S.C. § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce.") (quoting *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001)).

*Rubenacker*'s interpretation of the term "administration of justice" as used in § 2J1.2 is consistent with the approaches taken by other courts.   *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional

subcommittee); *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (upholding the application of § 2J1.2(b)(2) where defendant's "scheme and lies caused a substantial waste of resources, including hundreds of hours of work from the investigators") (citing *United States v. Johnson*, 485 F.3d 1264, 1271-72) (11th Cir. 2007)); *United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (same); *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002) (same); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (same); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same).

Although the commentary defines only the term "substantial interference with the administration of justice" in § 2J1.2(b)(2), and not the term "in order to obstruct the administration of justice" in § 2J1.2(b)(1)(B), the same term should be interpreted consistently.   The relevant term in both provisions ("administration of justice") is identical.   And the operative verbs, "interfere[]" and "obstruct," carry the same meaning in this context.   The adjective "substantial" does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of substantial governmental . . . resources."   U.S.S.G. § 2J1.2, cmt. n.1.   Thus, the term "in order to obstruct the administration of justice" in § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities.   A different conclusion would lead to the unlikely result of two different meanings for the term "administration of justice" within the same guideline.

The definition of "administration of justice" in § 2J1.2, cmt. n.1, is consistent with the term's ordinary meaning, which can encompass the application or execution of any law, including the laws relating to the electoral certification.   One meaning of "justice," for example, is "[t]he fair and proper administration of laws."   Black's Law Dictionary (11th ed. 2019) (definition 4).

And some cases have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).   The electoral certification easily falls within this broad understanding of "administration of justice," because it involved Congress's performance of duties required by law.   *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.

Further, § 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense that Reffitt advocates (i.e., relating only to judicial proceedings).   *See* U.S.S.G. § 2J1.2, cmt.; U.S.S.G. Appendix A; 18 U.S.C. § 551 (concealing or destroying invoices or papers relating to imported merchandise); § 665(c) (obstructing an investigation under the Workforce Innovation and Opportunity Act); § 1505 (obstruction of proceedings before departments, agencies, and committees), § 1511 (obstruction of enforcement of state gambling laws), § 1512 (obstruction of official proceedings), § 1516 (obstruction of a federal audit), § 1519 (destruction of documents in agency investigations); 26 U.S.C. § 7212 (interfering with the administration of the Internal Revenue Code).   Yet, under Reffitt's proposed interpretation, enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to any of those statutes.

"A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct."   *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018).   The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct."   *United States v. Booker*, 543 U.S. 220,

246 (2005).   Consistent with this purpose, § 2J1.2 sets forth several specific offense characteristics that provide sentencing courts with tools to adequately address the "[n]umerous offenses of varying seriousness" that "may constitute obstruction of justice."   U.S.S.G. § 2J1.2 bkgd. cmt.   The Sentencing Commission quite reasonably determined that obstructing justice by causing or threatening injury or property damage is more serious and deserves greater punishment than obstruction that does not involve those features.   And causing or threatening injury to obstruct a congressional proceeding is just as serious as doing so to obstruct judicial proceedings. To avoid making §§ 2J1.2(b)(1)(B) and (b)(2) inapplicable to many of the statutes for which the guideline was designed, the commentary's broad definition of "administration of justice" should apply, as its text makes clear, beyond just judicial proceedings.

Probation therefore correctly applied the two enhancements under § 2J1.1(b).

### 2.    U.S.S.G. § 2J1.2(b)(3) (otherwise extensive in scope, planning or preparation)

Section § 2J1.2(b)(3)(C) provides a two-level enhancement if the offense was "otherwise extensive in scope, planning, or preparation."   *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016) (upholding enhancement where conduct was extensive in planning and preparation even though not extensive in scope).   Probation correctly determined that Reffitt's actions were extensive in all three respects.   PSR ¶ 50 & p.35.

While "otherwise extensive" is not defined in the Guidelines, "there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved."   *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994).   Thus, in *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (per curiam) (unpublished), the Eleventh Circuit affirmed the application of the two-level enhancement under

§ 2J1.1(b)(3)(C), finding that the defendant's conviction for conspiracy to obstruct justice, which was done in secret from prison, directing several people through numerous coded phone calls and emails, was part of a "scheme [that] involved an elaborate gathering together of lies and misrepresentations."   Similarly, in *Petruk*, 836 F.3d at 977, the Eighth Circuit affirmed the application of the § 2J1.2(b)(3)(C) enhancement, concluding that the obstructive conduct of the defendant—who, while incarcerated, solicited his girlfriend to find someone else to falsely claim on a recorded line to be the perpetrator of the underlying crime—was extensive in planning and preparation (though not in scope).

Here, Reffitt's offenses were extensive in planning, preparation, and scope.   Start with planning and preparation: Reffitt's actions here were at least as extensive as Petruk's phone calls from the jail.   Reffitt spent several weeks planning the trip from Texas to the District of Columbia, finding another TTP member to accompany him, making the hotel and driving arrangements, and transporting the firearms, body armor, helmet, flexicuffs, and megaphone into the District and onto the Capitol grounds, for purposes of carrying out his plan to storm the building and remove lawmakers.   Indeed, on the morning of January 6, he told the TTP leader over Telegram that he was planning to "do the recon and then come back for weapons hot," Govt. Ex. 1B4.3, meaning that he was going to perform reconnaissance before deploying his loaded firearm.   Moreover, Reffitt had the foresight to bring a radio with him to communicate with Hardie while they were on the Capitol grounds.

Reffitt's actions to obstruct Congress's certification of the Electoral College vote were also "extensive in scope."   Unlike other rioters who may have decided to head to the Capitol only after attending the rally at the Ellipse, Reffitt intended, from the outset of his planning in Texas, to

launch—and indeed lead—an attack on the Capitol.   He played an integral role in overwhelming the officers protecting the building, directly leading to the very first breach of the Capitol building, the evacuation of lawmakers engaged in their duties, and the suspension of the Certification proceeding.

Probation therefore correctly applied the enhancement under § 2J1.2(b)(3)(C).

### C.     Guidelines Sentencing Range

Probation calculated Reffitt's criminal history as category I, which is not disputed.   PSR ¶ 72.   Accordingly, if the total offense level is 31, the Guidelines range is 9 to 11.25 years (108 to 135 months) of incarceration.   If the total offense level is, as the government submits, 33, the Guidelines range is 11.25 to 14 years (135 to 168 months) of incarceration.

### D.     Upward Departure

The Court should impose a sentence of incarceration that departs upwards from the Guidelines range on two bases.   First, the Court should depart upward under U.S.S.G. § 3A1.4, cmt. n.4 ("Terrorism"), because Reffitt's conviction under 18 U.S.C. § 1512(c)(2) for obstructing Congress's certification of the Electoral College vote "was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Second, the Court should depart upward under U.S.S.G. § 3D1.4, bkgd. cmt. (grouping), and U.S.S.G. § 5K2.6 (weapons), because the Guidelines' grouping analysis does not adequately account for Reffitt's possession of multiple weapons in the commission of his offenses.

#### 1.     Upward Departure for Terrorism

Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as

defined by 18 U.S.C. § 2332b(g)(5).   U.S.S.G. § 3A1.4, cmt. n.1.   Where, as here, a defendant's

conviction was not for, or was not "intended to promote," an enumerated "federal crime of

terrorism," an upward departure is warranted under U.S.S.G. § 3A1.4, cmt. n.4(A) ("Note 4(A)")

if "the offense was calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct."[16]

Here, the evidence submitted at trial clearly shows that Reffitt's conduct was calculated for

these ends.[17]   First, the evidence showed that Reffit both planned and carried out coercive and

intimidating acts targeting the U.S. government.   He brought a firearm and police-style flexicuffs

onto Capitol grounds.   Carrying his holstered handgun and clad in body armor that could

withstand rifle fire, Reffitt was one of the first rioters to confront United States Capitol Police

officers on the stairs on the west side of the Capitol building.   There, he intimidated law

enforcement officers by advancing toward them at the head of a mob of rioters.   He impeded and

---

[16] The government bears the burden to prove that the U.S.S.G. § 3A1.4 enhancement is applicable with reference to Reffitt's conviction and "relevant conduct" by a preponderance of the evidence. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018).   A defendant's "relevant conduct" is the conduct that "occurred during, in preparation for, or to evade responsibility for" the offense of conviction and includes "all harm that resulted from" or "was the object of" the defendant's "acts and omissions," even if uncharged.   *Id*. at 187-88 (citing U.S.S.G. § 1B1.3).

[17] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole purpose or motivation. For example, the D.C. Circuit has held (applying a prior version of Section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose."   *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular *motivation* . . . is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

interfered with those officers not only by refusing to obey their verbal commands to stop advancing, but also by continuing forward even after they discharged less-than-lethal munitions at him.   And, using both his voice (amplified through his megaphone) and hand gestures, he urged others behind him to continue moving toward the Capitol building, which they did, overrunning the officers and breaching the building, causing the legislators to evacuate from their chambers and cease performing their constitutional duties.

Second, Reffitt's choice of target—the United States Capitol building—further evidences his intent to intimidate, affect, or retaliate against the government.   As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target."   Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government."   *Id.* at 199.   That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities."   *Id.* (citing cases).   Clearly, attacking the United States Capitol—the legislative seat of our government—while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or retaliate against the government.

Third, the evidence at trial showed that Reffitt extensively planned for weeks ahead of January 6 to come to the District of Columbia with the specific intent of attacking the Capitol and taking over Congress.   He recruited Rocky Hardie to join him in December 2020, discussed with Hardie the need to bring multiple firearms, made travel arrangements for the two of them, and

outfitted himself with weapons, body armor, and zip ties.[18]   This level of planning is consistent

with application of the terrorism enhancement.   *See United States v. Siddiqui*, 699 F.3d 690, 709

(2d Cir. 2012) ("[T]he terrorism enhancement is applicable where a defendant acts according to a

plan—whether developed over a long period of time or developed in a span of seconds—with the

object of influencing government conduct or retaliating against a government."); *see also United*

*States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) ("[T]he terrorism enhancement does not

hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation

from their actual implementation.").

Finally, Reffitt's own statements confirm that he intended for his coercive and intimidating

actions to influence or affect government conduct and to retaliate against it.   He spoke in detail

about his intent to stop legislators from performing their constitutional and statutory duties to

certify the Electoral College vote by "drag[ging] lawmakers out of the Capitol by their heels with

their heads hitting every step."   Mem. Op. (May 4, 2022) (ECF No. 148), at 8.   Just prior to his

attack, he made clear his aim to "rip every [member of Congress], Republican, Democrat, the fuck

out of there, because the republic of the people owns that fucking building," and to "get rid of them

motherfuckers and start over."   Govt. Ex. 1B20.2.1 at 25:45.

And Reffitt's objective was not only to stop Congress from performing its constitutional

duty, but also, as he later described to his son on a recording, to "carry a weapon and take over the

---

[18]  An upward departure based on weapons is discussed in the following Section.   And while
U.S.S.G. § 3B1.5(2)(A) provides for a two-level increase if the defendant was convicted of a crime
of violence and the offense involved the use of body armor, *see* Govt. Ex. 1B1 (Spartan Armor
Systems black plate carrier, with ceramic plates capable of stopping rifle rounds), none of the four
counts of conviction for his actions on January 6 qualifies as a crime of violence under 18 U.S.C.
§ 16.

Congress." Govt. Ex. 217. While at the Ellipse before heading to the Capitol on January 6, Reffitt repeatedly told others around him, as recorded on his helmet camera, that he was going to take over the Capitol by, in part, physically removing the legislators who were working inside.

Those statements demonstrate that Reffitt sought to affect—that is, obstruct—Congress by stopping the certification proceeding while also retaliating against Congress for what he perceived to be a fraudulent presidential election. Reffitt thus evinced an intent both to influence and affect government conduct through intimidation and coercion and to retaliate against government conduct. That is so even if there is evidence that Reffitt made other "inconsistent statements," held "many false beliefs," had "incoherent" political motivations, or if he characterizes his statements as "mere venting." *Van Haften*, 881 F.3d at 544-45. And Reffitt's many statements expressing his intent fit "within a context of plans" that "implicate government interests" even if any one statement, alone, would be insufficient. *United States v. Wright*, 747 F.3d 399, 410 (6th Cir. 2014).

It is clear from Reffitt's conduct, including his express and implied intent, that Reffitt sought not just to stop Congress, but also to physically attack, remove, and replace the legislators who were serving in Congress. This is a quintessential example of an intent to both influence and retaliate against government conduct through intimidation or coercion.

An upward departure is therefore warranted under Note 4(A).[19] Under the Guidelines text for Section 3A1.4, when the defendant has committed an enumerated federal crime of terrorism or

---

[19] An upward departure is equally appropriate under U.S.S.G. § 5K2.0, which would account for Reffitt's "intent to frighten, intimidate, and coerce" federal lawmakers in manner that is not otherwise accounted for in the Guidelines. *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008); *see id.* at 1112-14 (upholding 12-level upward departure under Section 5K2.0 after the

the defendant's conduct was intended to promote such an offense, the sentencing court must increase the offense level by 12 levels[20] and place the defendant in criminal history category VI. *See* U.S.S.G. § 3A1.4(a) & (b).   Given the severity of Reffitt's conduct and the circumstances in which that conduct occurred, a significant upward departure pursuant to Note 4(A) would be appropriate.[21]

## 2.    Upward Departure for Inadequate Grouping and Weapons

The background commentary under U.S.S.G. § 3D1.4 notes that there are circumstances in which the grouping analysis to determine the combined offense level for multiple groups "could produce adjustments for the additional counts that are inadequate."   The commentary further explains that "[s]ituations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines."   U.S.S.G. § 3D1.4 bkgd. cmt; *see also United States v. Pitts*, 973 F. Supp. 576, 582 (E.D. Va. 1997) (departing upward by two levels based on inadequacy of grouping when defendant had "two separate and distinct periods of espionage activity—one actual and one attempted"), *aff'd*, 176 F.3d 239 (4th Cir. 1999); *United States v. Rowbal*, 105 F.3d 667, *2 (9th Cir. 1996) (unpublished) (affirming a two-level upward departure on the ground that the defendant's punishment, under the grouping rules, was not sufficiently increased).

---

district court concluded that Section 3A1.4 did not apply).

[20] U.S.S.G. § 3A1.4(a) states that the offense level should be "increase[d] by 12 levels; but if the resulting offense level is less than level 32, increase to level 32."

[21] Under Note 4, this Court "may not exceed the top" of the Guidelines range that would have resulted if the adjustment in Section 3A1.4's text applied.   U.S.S.G. § 3A1.4, cmt. n.4.   As such, if the Court adopts the PSR's offense level of 31, the maximum upward departure results in an offense level of 43.

This case presents the unusual situation in which an upward departure is warranted because the grouping analysis provided an "inadequate scope" to punish the additional firearms-related crimes for which Reffitt was convicted—Counts One (Civil Disorder, Transporting Firearm) and Three (Restricted Grounds with a Firearm).

The Guidelines analyses for Counts One and Three reflect Reffitt's culpability for possession of weapons in furtherance of those offenses.   However, due to the grouping analysis, those adjustments for possession of weapons have no impact on the total offense level for Group One (which is dictated by the offense level for Count Two).

Similarly, an upward departure under Section 5K2.6 may be warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."   Here, Reffitt used multiple weapons to obstruct Congress as charged in Count Two, yet the possession of those weapons is not reflected by any increase in the total offense level.

The total Guidelines offense level of 31 (or 33, as the government submits it should be) reflects only Reffitt's obstruction of the official proceeding.   It does not reflect any additional increase for the facts that (a) Reffitt had a handgun with him when he confronted officers and led the crowd up the stairs at the Capitol (which was an express jury finding by virtue of its choice to convict Reffitt of Count Three); (b) Reffitt transported his AR-15-style semi-automatic rifle from Texas into the District of Columbia and left it assembled in his car in Georgetown; or (c) that, under U.S.S.G. § 1B1.3(a)(1)(A) and (B), Reffitt is responsible for Rocky Hardie's transportation of his own handgun and AR-15 semi-automatic rifle into the District of Columbia, including Hardie's carrying of his own loaded handgun onto restricted Capitol grounds and leaving the rifle assembled in the car in Georgetown.

43

The jury returned guilty verdicts on Counts One and Three based on Reffitt's possession and use of firearms. The defendant's transportation of multiple firearms into the District of Columbia, and his possession of a handgun on Capitol grounds while confronting the Capitol Police constitute conduct far more dangerous and serious than the current Guidelines calculation reflects. The Court should depart upward to reflect the seriousness of those separate offenses.

Courts of appeals have affirmed upward departures for firearms possession under § 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense. *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).[22] The same premise holds true here: Reffitt's transportation and possession of firearms in furtherance of his obstruction of the congressional proceeding means that the Court should depart upward from the obstruction Guideline to account for the added dangerousness and seriousness of Reffitt's criminal conduct, especially because under the grouping analysis there results an "inadequate scope for ensuring appropriate additional punishment for the additional [firearms] crimes." U.S.S.G. § 3D1.4, bkgd. cmt.

---

[22] The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds). Many Guidelines provide a two-level increase if a firearm was possessed. *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright). Others provide a three-level increase for the same characteristic. *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

## V.        SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Some of the factors this Court

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and

characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the

offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities

among defendants with similar records who have been found guilty of similar conduct, §

3553(a)(6).   In this case, as described below, all of the Section 3553(a) factors weigh in favor of

a lengthy term of incarceration.

### A.        Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a criminal offense unparalleled in

American history.   It represented a grave threat to our democratic norms; indeed, it was one of

the only times in our history when the building was literally occupied by hostile forces.   By its

very nature, the attack defies comparison to other events.   While each defendant should be

sentenced based on his or her individual conduct, each person who participated in the breach of

the Capitol and interfered with or assaulted law enforcement officers on January 6 did so under

the most extreme of circumstances, to which their conduct directly contributed.

Reffitt played a critical role in the attack on the Capitol.   He came to our nation's capital

with a plan to physically and violently remove the legislators, some of whom he threatened by

name, from inside the Capitol building and take over the Congress.   He intended to use his firearm

and flexicuffs—backed by the hundreds of rioters in the mob behind him—to accomplish his ends.

### B.      Reffitt's History and Characteristics

While Reffitt has two prior arrests and one prior conviction, his criminal history is relatively minor, as reflected in his criminal history score of I.   However, Reffitt not only played a central role in the attack on the Capitol, but he also planned and recruited others for future violence and attacks, illegally possessed a firearm silencer, and pointed a gun at his wife's head. Moreover, he continues to agitate for future violence and resistance, as demonstrated in his letters and communications from the jail.

Reffitt's leadership role in the Texas Three Percenter militia enhances his dangerousness. He performed vetting for the militia, hosted militia gatherings at his house, and was so close with the leader of the statewide militia that when that leader was taken in for questioning by law enforcement, he relied on Reffitt to disseminate the message and "purge" the militia's chats on Telegram.   Reffitt used the militia to recruit others to his cause, discussing both with other members and new recruits whom he met while attacking the Capitol the need to engage in future violence.   And Reffitt used the militia to try to circumvent firearms laws, telling others about a ruse of collecting firearms under his "TTP Security" business.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[23]   As with the nature and circumstances of the offense,

---

[23] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

this factor supports a lengthy sentence of incarceration.   Reffitt's criminal conduct, directly interfering with three law enforcement officers and corruptly obstructing an official proceeding, is the epitome of disrespect for the law.   And, of course, his obstruction of justice for threatening to harm his teenage children if they turned him in to the FBI both confirms and shows additional disrespect for the law.

When Reffitt entered the Capitol grounds and confronted the Capitol Police on the West Front stairs, it was abundantly clear that lawmakers, and the law enforcement officers who were sworn to protect them, were under siege.   Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger.   The rule of law was not only disrespected; it was under attack that day.   A lesser sentence would suggest to the general public and to other rioters that attempts to obstruct official government proceedings and interfere with police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### 1.   General Deterrence

A significant sentence here is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong because Reffitt engaged in acts of violence that were intended to influence the government through intimidation or coercion—acts that have been defined, by statue, as domestic terrorism.   *See* 18 U.S.C. § 2331(5).

Moreover, the violence at the Capitol on January 6 was calculated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, 21-cr-188-RDM (Sentencing Hearing, July 19, 2021) Tr. 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6] for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."   *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   And it is important to convey to future rioters and would-be mob participants that their actions will have consequences.   This is especially true for leaders and planners like Reffitt.   There is possibly no greater factor that this Court must consider.

### 2.    Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   Reffitt has expressed no remorse or contrition.   To the contrary, almost every action he has taken since January 6 points to a man girding for another battle—and a violent one at that.   Reffitt's own statements about attacking Facebook and the mainstream media, and about how what he did on January 6 was only the "preface" or "beginning," demonstrates that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Reffitt and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases.   To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, by the government's count, only six Capitol Riot defendants have been sentenced for convictions under § 1512.[24]   None had a firearm on the Capitol grounds.   None transported an AR-15 semi-automatic rifle into the District.   None had an aggravating role in the offense, as Reffitt did when he successfully recruited Hardie into his scheme and supervised his criminal conduct.   None played as central a role as Reffitt in

---

[24] *United States v. Paul Hodgkins*, 21-cr-118-RDM; *United States v. Jacob Chansley*, 21-cr-003-RCL; *United States v. Duke Wilson*, 21-cr-345-RCL; *United States v. Matthew Miller*, 21-cr-75-RDM; *United States v. Greg Rubenacker*, 21-cr-193-BAH; *United States v. Scott Kevin Fairlamb*, 21-cr-120-RCL.

overwhelming officers and showing the mob the way forward at the outset of the riot.   None expressed the same intent as Reffitt to violently take over Congress.   None was a member of a militia group dedicated to achieving political goals through violent acts.   None had a sentencing guidelines range that was nearly as high as Reffitt's.   And because none of the other defendants was convicted after trial, all of those defendants, by definition, expressed at least some acceptance of responsibility.   Reffitt, on the other hand, is defiant that he is a political prisoner and yearns for the world to adopt his view that "January 6th was a historical day in this country," as he wrote in his "1/6ers" manifesto.

None of the potential comparators resembles Reffitt in any meaningful respect.   Consider the sentences imposed on Scott Fairlamb and Greg Rubenacker for reference.   Fairlamb pled guilty to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was sentenced to 41 months incarceration.   Fairlamb entered through the Senate Wing Door, brandishing a police baton, about one minute after the initial breach.   He assaulted a law enforcement officer while inside the Capitol and made statements after the riot suggesting he was proud of his actions.   Notably, several mitigating factors were present in Fairlamb's case that are not present here: he showed sincere remorse for his actions, and he was also one of the first defendants to accept responsibility for a felony charge in a Capitol riot case.   *Fairlamb*, Case No. 21-cr-120, Sent. Tr. at 37.

Rubenacker pled guilty (without a plea agreement) to all ten counts in a superseding indictment, including felony counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and was sentenced to 41 months of incarceration.   Rubenacker was one of the first people to breach the Capitol,

entering the Senate Wing Doors within 60 seconds of the initial breach of the building.   Inside, he and other rioters chased a police officer through part of the Capitol.   And he remained in the Capitol for over an hour.

Both Fairlamb and Rubenacker pled guilty and expressed some level of remorse or acceptance of responsibility.   And neither of these defendants played anything close to the central role that Reffitt played, carrying a firearm, megaphone, and flexicuffs, and wearing body armor and a handgun, encouraging and showing the mob of rioters below the way to overwhelm the outnumbered Capitol Police officers on the landing below the Senate Wing Door.   In this way, it was Reffitt's unique actions igniting the crowd of rioters that allowed Fairlamb and Rubenacker to access the building through the Senate Wing Door.

A sentence of 15 years of incarceration for Reffitt does not result in an unwarranted disparity with any other previously sentenced Capitol riot defendant.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214

(codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[25] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. § 3663(b); 18 U.S.C. § 3663A(b). Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[26] *United States v. Gushlak*,

---

[25] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA. *United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012).

[26] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir.

2019) (estimating the restitution figure is permissible because "it is sometimes impossible to

determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237,

1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that

amount is "by nature an inexact science" such that "absolute precision is not required") (citation

omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v.

United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in

18 U.S.C. § 2259 that the court's job is to "assess as best it can from available evidence the

significance of the individual defendant's conduct in light of the broader casual process that

produced the victim's losses . . . cannot be a precise mathematical inquiry").

      The statutes also differ in significant respects.  As noted above, the VWPA is a

discretionary restitution statute that permits, but does not require, the sentencing court to impose

restitution in any case where a defendant is convicted under Title 18 or certain other offenses in

Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the

VWPA, the sentencing court must take account of the victim's losses, the defendant's financial

resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353

F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted

above, the MVRA applies only to certain offenses, such as a "crime of violence," 18 U.S.C.

§ 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered

a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[27]

Applying these principles to this case leads to the conclusion that Reffitt should be required to pay $2,000 in restitution.   One of the offenses for which he was convicted, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol.   *See* 18 U.S.C. § 3663A(c)(1)(A)(ii), Moreover, Reffitt's four additional convictions under Title 18 fall within the VWPA.   As the evidence at trial showed, Reffitt's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees.   A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Reffitt should be responsible is $2,000.   That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.   And that is the same amount that Chief Judge Howell ordered a § 1512(c)(2) defendant who pled guilty without a plea agreement to pay in restitution.   *See Rubenacker* Sent. Tr. at 145-47 ("[T]he amount of $2,000 is an approximate estimate of the losses for which he is responsible.   And I do find that that is the standard amount that so far . . . for which defendants from January 6th facing and convicted of felony charges are being required to pay.").

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664."   18 U.S.C. § 3663(d); 18 U.S.C.

---

[27] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

§ 3663A(d).   Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.   18 U.S.C. § 3664(h).

Reffitt's crimes on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate.   Attached as Sentencing Exhibits 13, 14, and 15 are letters from each of these three entities, attesting to the pecuniary damages each suffered as a result of the attack on the Capitol on January 6: $1,253,354.01, $547,411.27, and $32,075.00, respectively.   That is a total amount of $1,832,840.28, which does not even account for the damages suffered by the Capitol Police, Metropolitan Police Department, or myriad other law enforcement entities.[28]

Here, Reffitt should be directed to pay $2,000 as an approximate estimate of the losses for which he is responsible.   Reffitt's restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

---

[28] The government estimates that, as of April 5, 2022, the approximate total losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.

## VII.    FINE

Reffitt's felony convictions subject him to a statutory maximum fine of $250,000.   18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).   The government is not seeking a fine in this case.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 15 years on each of Counts Two (Obstruction of an Official Proceeding) and Five (Obstruction of Justice—Hindering Communication Through Force or Threat of Physical Force), 10 years on Count Three (Entering or Remaining in a Restricted Building or Grounds with a Firearm), and 5 years on each of Counts One (Transporting a Firearm in Furtherance of a Civil Disorder) and Four (Obstructing Officers During a Civil Disorder), all to run concurrently with one another.   The government further recommends that the Court impose a term of supervised release of 3 years, restitution of $2,000, and the mandatory $100 special assessment for each of the five counts of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: _____
Jeffrey S. Nestler
Assistant United States Attorney
DC Bar No. 978296
Risa Berkower
Assistant United States Attorney
NY Bar No. 4536538
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
Phone: 202-252-7277
Email: Jeffrey.Nestler@usdoj.gov

## Index of Sentencing Exhibits

1A – Zoom recording between Reffitt, Hardie, and Teer (Jan. 9, 2021)

1B – Transcript of above

2 – Telegram message (Jan. 13, 2021)

3 – Telegram messages (Jan. 9-10, 2021)

4 – Email to Sen. Cruz's office (Aug. 20, 2020)

5 – Telegram message (Feb. 25, 2022)

6 – Twitter message (May 25, 2022)

7 – GiveSendGo (Mar. 25, 2022; June 17, 2022)

8 – New Yorker article (June 6, 2022)

9A – Recording of Agent Hightower's interview of Reffitt (Jan. 16, 2021)

9B – Transcript of above

10 – ATF reports (June 28, 2021; Aug. 11, 2021)

11A.1 – Excerpt 1 (20:32 to 20:18) of audio recording of *Will Be Wild* podcast (May 9, 2022)

11B.1 – Transcript of above

11A.2 – Excerpt 2 (33:38 to 36:59) of audio recording of *Will Be Wild* podcast (May 9, 2022)

11B.2 – Transcript of above

12 – *United States v. Rubenacker*, Sentencing Hearing Transcript (May 26, 2022)

13 – Architect of the Capitol letter re: restitution (May 26, 2022)

14 – House of Representatives Chief Administrative Officer letter re: restitution (May 25, 2022)

15 – Senate Office of Secretary letter re: restitution (May 25, 2022)