UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-cr-00032 (DLF) |
| GUY REFFITT, | |
| Defendant. | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF RESENTENCING

Guy Wesley Reffitt ("the Defendant" or "Reffitt") led the charge on the West Front of the Capitol building on January 6, 2021, facilitating a breach of the building that lasted hours and threatened the lives of members of Congress and their staff. Reffitt, a member of the Texas Three Percenters militia group, stormed the Capitol on that day armed with a handgun and ready to use it. In Reffitt's own words, he went the Capitol with the intention of "taking the Capitol with everybody fucking else," and "drag[ging] them motherfuckers out kicking and screaming." Govt Ex. 1B20.21. at 16:03. Following the events of January 6, Reffitt threatened the safety of his own children if they turned him into law enforcement.

Reffitt's conduct on January 6 was among the most serious and consequential of all of the rioters charged with crimes stemming from the attack on the Capitol on that day. For his pivotal role in the events of January 6, this Court previously sentenced Reffitt to 87 months of incarceration. At the sentencing hearing, this Court found that the 87-month sentence was sufficient, but not greater than necessary, to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). The same is true today. As this Court has recognized, the Defendant's conduct on January

6 was "more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *See* Memorandum Opinion & Order, ECF No. 182, at 9 (citing *United States v. Murray*, 897 F.3d. 298, 308-09 (D.C. Cir. 2018)). The government agrees. The attack on the West Front of the Capitol precipitated the breach of the Capitol building. Reffitt led that attack, armed with a handgun and in full tactical gear, and then threatened the safety of his own children in the days following. Accordingly, for the reasons set forth herein, the United States requests that this Court depart or vary upwards to sentence Reffitt to 87 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100 per felony and $10 per Class B misdemeanor.

## I.    FACTUAL BACKGROUND

### a.    Reffitt's Role in the January 6, 2021 Capitol Attack

The government refers the Court to the Affidavit in Support of Criminal Complaint filed in this case, ECF No. 1, and the government's Sentencing Memorandum (hereinafter, "Sentencing Memorandum"), ECF No. 158, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election, as well as the Defendant's role in that attack.

Defendant Reffitt's role in the Capitol attack has likewise been well documented. The government refers the Court to its Sentencing Memorandum at pages 5 to 20 for an overview of the relevant facts.

Reffitt, a leader of the Texas Three Percenters militia group, traveled from Texas to Washington, D.C. prepared for battle, and with the intention of stopping the certification of the

2020 Electoral College vote. Reffitt's statements prior to January 6 made his intent clear: he sought to "take over" Congress and the Capitol building, using violent means if necessary.

On the morning of January 6, as he attempted to recruit individuals to effectuate this take over, Reffitt repeated this intention. Over and over, Reffitt expressed his plan to take the Capitol and "drag" or "rip" members of Congress out of the building as he did so. *See* Sentencing Memorandum at 10-11.

In furtherance of his mission, Reffitt brought two guns to Washington, D.C., which he made clear that he would use against members of Congress if necessary. *See* Sentencing Memorandum at 11-12. On January 6, after repeatedly telling protestors at the Ellipse that he intended to take over the Capitol in part by physically removing the legislators inside, Reffitt led the charge of rioters on the West Front of the Capitol, as shown below.



Armed with a .40-caliber handgun and flexicuffs, and fortified with body armor and a helmet, Reffitt confronted three Capitol Police officers on the West Stairs of the Capitol building, just north of the temporary scaffolding that had been erected in preparation for the inauguration. Reffitt led rioters up those stairs, explicitly encouraging, with his words, hand gestures, and actions, the crowd below him to surge forward towards the officers. Those rioters soon succeeded in overwhelming the officers at the top of those steps and taking over the Capitol building – putting the lives of everyone inside in danger.

In the days following January 6, Reffitt's growing concerns about the potential legal implications of January 6 prompted him to take measures to conceal his actions. On January 10, after learning that the Texas Three Percenters' leader had been questioned by Texas law enforcement agents, Reffitt sent messages to several other group members informing them about the leader's questioning, telling them to "[b]e prepared, the Shit is now hitting the fan," and "Start purge of all previous conversations. NOW." Govt. Exhibit 1B4.1 Reffitt took his own advice and deleted a Telegram message thread from his own iPhone. Then, on January 11, Reffitt threatened the lives of his own children: he told his then 18-year-old son and 16-year-old daughter that if they turned him into the FBI, they would be traitors, and traitors get shot. He further told his daughter that if used her cellphone to record him or post anything about him online, he would put a bullet through her phone. Both of his children knew that their father kept firearms in their home.

Reffitt nonetheless maintained that his efforts to take over Congress were justified. On January 13, 2021, Reffitt told his family he "had every constitutional right to carry a weapon and take over the Congress, as we tried to do." Govt. Ex. 217; Sentencing Memorandum at 14.

**b. Reffitt's Post-Sentencing Statements.**

Reffitt has been imprisoned since his trial, and is currently housed in Okahogee Jail in Oklahoma.

Since his trial, Reffitt has supported his wife's efforts as one of the organizers of the "January 6 vigil," a group that seeks the release of people they call the January 6 "hostages" or "political prisoners."[1] Reffitt has called into the "vigil" on several occasions since his initial sentencing. *See, e.g.,* Govt. Resent. Ex. 1.

Reffitt's text messages and calls from jail also indicate that he continues to lack remorse for his actions, and that he views his imprisonment as an injustice.  Reffitt told an acquaintance in a text message, "I'm a very strong Patriot, with fabulous support from Patriot Warriors, as we navigate troubled waters." Govt. Resent. Ex. 2 at 1. On October 10, 2024, after a visit with that same acquaintance, he texted: "I do love the J6 family dynamics. We really are a 'Yuge' family now. We all of a common goal. Save America and the people." *Id*. at 4.

Reffitt's communications further demonstrate that his time in prison has only deepened his sense of pride in his actions on January 6 and that he still considers himself a "patriot" for his crimes. In an October 7, 2024 call, Reffitt boasted about people who praised him for his actions on January 6. He said: "As I walk through this mess of a system that this judicial crap is…I am constantly running up against" people who say things along the lines of, "you were there? That is so badass. I met someone who was there." He continued, "I get a lot of that," and commented, "now it's infamous." Govt. Resent. Exhibit 3 at 8:10. The next day, on a call with his wife, Reffitt

---

[1] *See* Antonio Hitchens, The New Yorker, *The Vigil Keepers of January 6th* (Aug. 12, 2024), https://www.newyorker.com/news/american-chronicles/the-vigil-keepers-of-january-6th.

said, "let's do our jobs as Patriots and fix America's people." Govt. Resent. Ex. 4 at 5:59.

Reffitt also continues to express contempt about the justice system and this Court. For instance, on October 7, 2024, Reffitt texted: "My resentencing date is set for December 2, 2024, and 2pm…hope Trump wins so the court will get off dez nutz." Govt. Resent. Ex. 2 at 2. And when the sentencing hearing was pushed back by four days – at the request of Reffitt's own counsel – Reffitt stated: "They love the mental degradation of the people. A very Communist tactic." *Id*. at 3.

## II.    RELEVANT PROCEDURAL HISTORY

### a.  Conviction and Original Sentence

On March 8, 2022, a jury found Reffitt guilty on all five counts for which he was charged for his conduct on January 6, 2021 and the aftermath:

- Count One: 18 U.S.C. § 231(a)(2) – Civil Disorder

- Count Two: 18 U.S.C. § 1512(c)(2) – Obstruction of an Official Proceeding

- Count Three: 18 U.S.C. § 1752(a)(1), (b)(1)(A) – Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

- Count Four: 18 U.S.C. § 231(a)(3) – Civil Disorder

- Count Five: 18 U.S.C. § 1512(a)(2)(C) – Obstruction of Justice

On August 1, 2022, this Court sentenced Reffitt 87 months in prison. Following the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024), the government dismissed Count Two.

### b.  Defendant Reffitt's Motion for Release

On March 2, 2024, the Defendant filed a motion for release pending appeal. ECF No. 179.

6

In that motion, the Defendant argued that the Court's application of Guidelines Sections 2J1.2(b)(1)(B) and (b)(2) were erroneous under *Brock v. United States*, 94 F.4th 39 (D.C. Cir. 2024), and that therefore his Guidelines range should have been calculated at 30 to 37 months' imprisonment. The Defendant argued that, because he had already served 38 months in prison at the time of his motion, he should be released.

This Court denied the Defendant's motion for three reasons. Memorandum Opinion & Order, ECF No. 182, at 5-11. First, the Court determined that the Defendant had failed to show "by clear and convincing evidence" that he was "not likely to flee or pose a danger to the safety of any other person or the community." 19 U.S.C. § 3143(b)(1)(A). In doing so, the Court stated it "remains skeptical" that "even now Reffitt 'appreciate[s] the wrongfulness of his conduct.'" Memorandum Opinion & Order, ECF No. 182, at 6 (citing ECF No. 179 at 4). Second, the Court determined that his revised offense level, in light of the Circuit's decision in *Brock*, would be 22, corresponding to a revised Guidelines range of 41 to 51 months' imprisonment. *Id*. at 8. Thus, contrary to the Defendant's assertions, the revised range, as calculated by the Court, was not "less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv). And finally, the Court stated that "even after *Brock*, the Court could arrive at the sentence of 87 months' imprisonment by applying the § 3553(a) factors." *Id*. at 9. In doing so, the Court noted that it "continues to believe that an upward variance could be justified in this case," given the seriousness of his conduct, including the fact that he physically threatened his own children. *Id*. at 9-10. This Court further noted that an upward variance would be needed to avoid unwarranted sentencing disparities among defendants, particularly because the potential

disparities posed by *Brock* failed to "reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count," or the "gravity of Reffitt's obstructive conduct." *Id.* at 10.

### c. The Government's Dismissal of Count Two

On June 28, 2024, after the D.C. Circuit remanded this case, the Supreme Court issued an opinion in *Fischer v. United States*, 144 S. Ct. 2176 (2024), holding that Section 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding." The Court explained that, to prove a violation of Section 1512(c)(2), the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information – or attempted to do so. *Id.* at 9, 16.

Pursuant to the *Fischer* decision, the government moved to dismiss Count Two, under which Reffitt was convicted of a violation of 18 U.S.C. § 1512(c)(2).

## III. DEFENDANT REFFITT'S FIRST SENTENCING HEARING

At the Defendant's initial sentencing hearing, the Court calculated the Defendant's Guidelines at level 29. With a criminal history category of I, the Court thus determined the applicable Guidelines range to be 87 to 108 months. The Court sentenced the Defendant to 87 months' imprisonment and three years' supervised release.

### a. The Guidelines Calculation at Reffitt's Initial Sentencing

At the time of the Defendant's initial sentencing, Count Two drove the Court's sentencing calculation. Prior to any grouping analysis, the Guidelines for Count Two were calculated as

follows:

**Count Two: 18 U.S.C. § 1512(c)(2)**
<div style="padding-left:2em">

| | |
|---|---|
| U.S.S.G. § 2J1.2(a) Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) Threat to Obstruct the Administration of Justice | +8 |
| U.S.S.G. § 2J1.2(b)(2) Substantial Interference | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 Obstruction of Justice | +2 |
| **Total** | **29** |

</div>

In accordance with Probation's analysis, the Court grouped Counts One, Two, Three and Five together.[2] Specifically, Counts One, Two and Three grouped together pursuant to Section 3B1.2(b) because they involved the same victim and a common scheme or plan. *United States v. Reffitt*, No. 1:21-cr-00032, Aug. 1, 2022 Sentencing Transcript (hereinafter, "Sentencing Transcript") at 64; 141-42. The Court further assessed that Count Five was also grouped with Count Two pursuant to Note 8 of Section 3C1.1.

At the initial sentencing hearing, the Court determined that an upward departure of the original Sentencing Guidelines Range of 87 to 108 months was not warranted. In particular, the Court expressed concern regarding unwarranted sentencing disparities for similar cases in the January 6 context. Sentencing Transcript at 162:20-24. But in doing so, the Court noted that Reffitt's case was unique given his explicit intention to overthrow Congress and the fact that he carried a firearm to the Capitol. *Id*. at 163. Further, the Court recognized that many aggravating factors weighed in favor of a more significant sentence. First, the Court assessed that Reffitt's possession of a firearm on Capitol grounds was "by far the most aggravating factor related to this

---

[2] As the Parties and the Court discussed at sentencing, the government agreed that Counts One, Two, Three, and Five should be grouped together, but that after that grouping, two points ought to be added based on the obstruction of justice conviction embodied in Count Five.

offense," in addition to being "the factor that makes this case very different than all cases prosecuted to date." Sentencing Transcript at 164:20-23. The Court further considered that Reffitt committed two "obstructive acts" (including that he made "highly disturbing threats to his children"), that he made "many, offensive, highly disturbing statements before, during, and after January 6," that he "bragged to his family about what he did at the Capitol," and that he made reference to potentially collecting firearms under his "TTP Security" business. *Id*. at 166-167.

### i. Applicable Adjustments

At the Defendant's initial sentencing hearing, the Parties addressed a number of potentially applicable adjustments. The Court declined to apply the government's requested adjustments under Sections 3B1.1 and 3C1.1 of the Sentencing Guidelines. The government believes that adjustments under both sections are warranted now that Count Two has been dismissed. In particular, the same concerns about double-counting that the Court expressed at the initial sentencing hearing no longer apply.

First, at the Defendant's initial sentencing hearing, this Court used its discretion in declining to apply the two-point adjustment under Section 3B1.1. In doing so, the Court recognized that the Defendant assumed a role of encouraging people at the Ellipse to go to the Capitol, and that, while at the building, he further encouraged people behind him to storm the building and put himself "out front." Sentencing Transcript at 61:21-23. The Court stated, however, that the fact that Reffitt assumed a "self-appointed" leadership role weighed against the application of the enhancement, and that the enhancement in conjunction with the extensive planning adjustment "overstates what happened here." *Id*. at 61:24 to 62:10. The Court thus recognized that whether or

not to apply the adjustment was a "very close call." *Id*. at 62:12.

The Court further declined to apply the government's requested adjustment under Section 3C1.1. The Court stated that, in its view, that the application of that Guideline "undermines the whole structure of the guidelines," given that the Defendant was convicted of two obstruction charges, although the Court recognized that it was a "tough issue." Sentencing Transcript at 66-67.

### ii.  The Defendant's Allocution

At his initial sentencing hearing, after initially declining to speak, the Defendant belatedly expressed remorse. He said, for instance, "I really do hate what I did," and noted that he "was not thinking clearly." Sentencing Transcript at 146:23-147:3. The Defendant also apologized to the Capitol Police Officers who testified at trial, and noted that he "deeply regret[s] everything." *Id*. at 147:16-17.

Reffitt suggested that he made certain statements after trial, like that he was a "patriot" and "martyr," (stating, for example, "I do this time in chains for my family, and for yours") in an effort to raise money for his family. *Id.* at 148:18-25; Sentencing Memo at 17 (citing Sentencing Exhibit 6). When asked about this by the Court, the Defendant stated that he used "hyperbole," and that his statements were "never meant to be serious on that level." Sentencing Transcript at 150:19-21. He further stated, "I parrot a lot of stuff. I say a lot of stupid shit." *Id*. at 150:22.

The Court noted that the Defendant's contention that his actions were "a big blur" and that he got caught up in the crowd "just doesn't ring true." *Id.* at 151:1-18. The Court also noted that because the Defendant's letter in support of sentencing, ECF No. 157, Att. B, did not express true

remorse, the Defendant's apologies during the hearing "kind of comes across a little half-hearted." Sentencing Transcript at 154:8-16.

As this Court has recognized, the Defendant's apology should be viewed with skepticism. For one, the Defendant's remorse came at the last minute. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). More importantly, and as this Court recognized at the Defendant's initial sentencing hearing, the Defendant made many statements prior to his sentencing that fail to comport with his expressions of remorse. *See* Sentencing Memorandum at 17.

## IV.    GUIDELINES CALCULATION WTHOUT COUNT TWO

The government submits that the appropriate offense level computations for each of Counts One, Three, Four, and Five, prior to any grouping analysis under Part D of Chapter 3 or any departures under Chapter 3, are as follows:

**Count One: 18 U.S.C. § 231(a)(2)**

| | | |
|---|---|---:|
| U.S.S.G. § 2K2.1(a)(7) Base Offense Level | | 12 |
| U.S.S.G. § 2K2.1(b)(1)(A) Number of Weapons | | +2 |
| U.S.S.G. § 2K2.1(b)(6)(B) Connection with Another Felony | | +4 |
| U.S.S.G. § 3B1.1(c) Aggravating Role | | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4 Obstruction of Justice | | +2 |
| | **Total** | **22** |

**Count Three: 18 U.S.C. § 1752(a)(1), (b)(1)(A)**

| | | |
|---|---|---:|
| U.S.S.G. § 2B2.3(a) Base Offense Level | | 4 |

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) Restricted Building or Grounds | | +2 |
| U.S.S.G. § 2B2.3(b)(2) Dangerous Weapon | | +2 |
| U.S.S.G. § 2X1.1 Cross Reference to Count Four | | 10 |
| U.S.S.G. § 2A2.4(b)(1)(B) Dangerous Weapon | | +3 |
| U.S.S.G. § 3B1.1(c) Aggravating Role | | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4 Obstruction of Justice | | +2 |
| | Total | **17** |

**Count Four: 18 U.S.C. § 231(a)(3)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1)(B) Dangerous Weapon | | +3 |
| U.S.S.G. § 3B1.1(c) Aggravating Role | | +2 |
| U.S.S.G. § 3C1.1, cmt. n.4 Obstruction of Justice | | +2 |
| | **Total** | **17** |

**Count Five: 18 U.S.C. § 1512(a)(2)(C)**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) Base Offense Level | | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) Causing or Threatening Injury | | +8 |
| | **Total** | **22** |

## A. Total Offense Level

As calculated by the Court at the Defendant's original sentencing hearing, Counts One, Three, and Five group together. *See* Sentencing Transcript at 141-42; Memorandum Opinion & Order, ECF No. 182, at 8. Counts One and Three group together pursuant to Section 3D1.2(C) because Count One "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count Three. Specifically, as outlined above, "a dangerous weapon (including a firearm) was possessed" under Section 2B2.3(b)(2). Count Five further groups with Count One because Reffitt's Count One conduct was "the offense with respect to which the obstructive conduct" encompassed by Count Five "occurred." U.S.S.G. § 3C1.1, cmt. n.8. Counts One, Three, and Five thus constitute Group One.

Counts Five and One result in the same Guidelines level. Thus, the Guidelines level

calculation for Group One is 22.

Group Two consists of Count Four. Count Four does not group with the other counts under Chapter Three of the Sentencing Guidelines. *See* Second Revised PSR, ECF No. 168, ¶ 43; 61. This Court previously agreed with this analysis. *See* Memorandum Opinion & Order, ECF No. 182, at 8, fn. 2.[3] At the Defendant's initial sentencing hearing, Group Two did not count towards Reffitt's original sentence because Group Two was 9 more levels serious than the group with the highest offense level. U.S.S.G. § 3D1.4(c). Pursuant to the revised calculation, Group Two is now only five levels less serious, and is no longer disregarded. Rather, pursuant to Section 3D1.4(b), one-half unit is added to the total offense level. Group One thus qualifies as one unit, and Group Two qualifies as an additional half-unit, increasing the total offense level by one additional level.

Prior to any departures, the total offense level is thus re-calculated as 23.

## B.  Applicable Enhancements

As outlined in the above calculations, several specific offense characteristics and adjustments apply to the various counts.

## C.  Specific Offense Characteristic For Number of Weapons Under Section 2K2.1(b)(1)(A)

A two-point enhancement is applied under Section 2K2.1(b)(1)(A) where the offense involved three to five separate weapons. Here, the offense involved at least four weapons.

First, Reffitt traveled with an AR-15-style semi-automatic rifle and a Smith & Weston .40

---

[3] Probation changed its grouping analysis in its November 12, 2024 Presentence Investigation Report. *See* ECF No. 190 ¶ 43, 44. The government disagrees that Count 4 groups with the other counts under Section 3D1.2. The harm addressed by Count 4 is separate and distinct from the harms addressed by the other counts.

caliber handgun from his home in Texas to the District of Columbia. Reffitt left his fully assembled rifle in his car in Georgetown while he traveled with his handgun on his person to attack the Capitol building. In addition to his own two firearms, Reffitt instructed Rocky Hardie to bring firearms to Washington, D.C., despite knowing that it was illegal to do so. Like Reffitt, Hardie brought a handgun and an AR-15-style rife to Washington, D.C. The offense thus involved four separate firearms.

At Reffitt's initial sentencing, the government argued that the Reffitt was "responsible under 1B1.3" for these four firearms. Sentencing Transcript at 76; *see also id*. at 78:23-79:2. The Court did not squarely address whether the Section 2K2.1 enhancement applied, as whether adjustment applied would not have affected the ultimate offense level, given the prior cross reference to Count Two.

### D. Specific Offense Characteristic for Dangerous Weapon Possessed and Its Use Threatened Under Section 2A2.4(b)(1)(B)

The Defendant possessed and threatened the use of a firearm of January 6. As Probation recognized in the Second Revised PSR, "the defendant told other individuals at the Ellipse, just before going to the US Capitol, that he was armed, and when one of them asked what he would do if the rioters were met with gunfire form the US Capitol police, the defendant replied that 'a hell rain of fire comes back'; therefore, three levels are added."  ECF No. 168 at 11.

At the initial sentencing hearing, the Court applied the eight-level enhancement under Section 2J1.2(b)(1)(B) because the "offense involved causing or threatening to cause physical injury," finding that the Defendant's "threat at the Ellipse is not too attenuated to his conduct immediately thereafter."  Sentencing Transcript at 38.  The same reasoning applies to this

adjustment, which is made newly relevant following the dismissal of Count Two.  The Defendant

possessed a firearm while at the Ellipse and at the Capitol building, and he "threatened" the use of

the firearm.  Three points are therefore added under Section 2A2.4(b)(1)(B).

### E.  Specific Offense Characteristic for Offense Committed In Connection With Another Felony Under Section 2K2.1(b)(6)(B)

The Defendant "used or possessed any firearm or ammunition in connection with another

felony offense," that is, he possessed a firearm in connection with his efforts to obstruct, impede,

and interfere with law enforcement during a civil disorder under Section 231(a)(3). Therefore, a

four-level enhancement applies under Section 2K2.1(b)(6)(B).

This enhancement applies when the Defendant "possessed or transferred any firearm" with

the "knowledge, intent or reason to believe that it would be used or possessed in connection with

another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The Defendant possessed his own handgun

with the intent and "reason to believe" it would be used as part of his plan to take over obstruct

law enforcement, and ultimately take over the Capitol building. As Rocky Hardie testified at trial,

the Defendant believed that the "the corrupt people" needed to be "dragged out," and "replaced

with people that are patriotic to our country." Trial Transcript at 1109:9-19. The end result of this

was meant to be "that they didn't certify the vote that day." *Id*. at 1111:16-17.  On the morning of

January 6, Reffitt told a Texas Three Percenters leader that he was planning to "do the recon and

then back for weapons hot." Govt. Ex 1B4.3; Sentencing Memorandum at 36.

Reffitt's own statements on the morning of January 6 make clear that 2K2.1 adjustment

applies. For example, before going to the Capitol on January 6, the Defendant told others at the

Ellipse that he was armed. When one of those individuals asked what the Defendant would do if

16

the rioters were met with gunfire from the United States Capitol Police, the Defendant replied that

"a hell rain of fire comes back." In other words, Reffitt intended to use his handgun in furtherance

of his other felonious conduct – to obstruct and impede officers.

**F.  Adjustment For Aggravating Role Under Section 3B1.1.**

Section 3B1.1(c) applies if the defendant was "an organizer, leader, manager, or supervisor

in any criminal activity[.]" That adjustment should apply here to all counts. The Defendant played

a leadership role in the early hours of January 6, while at the Capitol building on January 6, and in

the days following the riot. Specifically:

- Prior to January 6, Reffitt recruited Rocky Hardie to join him on his trip to Washington, D.C. Reffitt arranged travel and instructed Hardie on what to bring to the District, including firearms. At the time, Reffitt held a leadership role in the Texas Three Percenters militia group. *See* Sentencing Memorandum at 46.

- At the Ellipse on the morning of January 6, Reffitt encouraged other individuals to storm the Capitol building. He told other members of the Texas Three Percenters and those gathered near him that he planned to drag Speaker Pelosi out of the Capitol building with her head "hitting every step" on the way down. *Id*. at 5; 40.

- Reffitt was one of the first rioters to rush officers on the West Front of the building. *See* Govt. Ex. 203. He stood on a ledge of the steps on the West Front of the building as hundreds, if not thousands, of other rioters cheered him on.

- Before and after being hit with pepper spray by officer who tried to dispel him, Reffitt encouraged other rioters to charge forward towards the officers. Those rioters followed Reffitt's command and successfully overwhelmed the officers near the top of the stairs leading to the Upper West Terrace. He used a megaphone to direct the crowd to move forward with him.

- Reffitt recognized the power that he had over the crowd. For example, in a message to other members of the Texas Three Percenters, he said, "I was the lead up the Capitol stairs." Govt. Ex. 1B4.1; Sentencing Transcript at 54.

- Following January 6, Reffitt sent messages to several other members of the Texas Three Percenters instructing them to delete evidence of their criminal activity. He

said, "[b]e prepared, the Shit is now hitting the fan," and told members to "Start purge of all previously conversations. NOW." Govt. Ex. 1B4.1 at 9; Sentencing Memorandum at 6.

The facts above make clear that Reffitt assumed a leadership role in the riot. In distinguishing between a leadership role and a mere management role, the Guidelines consider the "exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. n.4. There can be more than one person who qualifies as a leader, *id*., and the enhancement may be applied even if others may have had a larger role. *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006).

At Reffitt's initial sentencing, the Court expressed a concern that the application of the adjustment here was "double-counting," *see* Sentencing Transcript at 60:10, because the Court had previously applied an adjustment for extensive planning on Section 2J1.2(b)(3)(C). There, the Court reasoned: "I've already held him account for an additional two levels for extensive preparation. And I just feel like applying both the role adjustment, as well as the extensive planning adjustment, a four-level swing, overstates what happened here." *Id*. at 62:6-10. At this stage, the same concern over "double-counting" is no longer a relevant consideration because Section 2J1.2, including the adjustment applied by the Court, was applied to Count Two and does not apply to the other remaining counts.

The Court was also concerned by the first and last factors – i.e., whether Reffitt had any actual

decision-making authority on January 6, and whether he had any actual control and authority over others. Notably, not every factor needs to be present for the enhancement to be applied. *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009). With respect to the latter factor, the evidence presented at trial demonstrated that other rioters reacted to Reffitt's statements and actions on January 6, showing that he maintained some degree of control over those individuals. For instance, the crowd cheered Reffitt on as he confronted rioters with a megaphone. Govt Exhibit 200. Then, a small group of people formed behind Reffitt as he continued to push towards the officers. *Id*. at 1:09. Once Reffitt was sprayed in the eyes with pepper spray, the larger crowds cheered as Reffitt continued to signal towards the building. Govt. Ex. 203. Those cheers soon turned to action, as the crowed rushed officers while Reffitt continued to signal towards the crowd to push forward. *See* Govt. Exhibit 202. As Sergeant Flood testified at trial, the Defendant's hand gestures indicate that he was "waiving towards the crowd for them to move forward." Trial Transcript at 1352:1. And once the Defendant made it to the top of the steps, he viewed "his job" as being "done then." Govt Ex. 1B4.6. In other words, the Defendant knew that his role in this riot was as the leader and catalyst, to the incite the crowd and push them forward. Once he completed that mission, the crowd successfully overwhelmed the officers and took over the Capitol building.

Since Reffitt's initial sentencing, other courts in this district have applied the two-level enhancement under Section 3B1.1 for defendants who assumed some leadership or organizational role related to the January 6 riot. Recently, for example, Judge Walton applied Section 3B1.1 in *United States v. William Robert Dunffee*, Case No. 1:23-cr-36. There, the Defendant used a

megaphone to incite rioters to push and breach the barricades on the East Front of the building, performing a similar role on the East Front of the Capitol as Reffitt performed on the West Front. The adjustment should likewise apply here.

### G. Adjustment For Obstruction of Justice Under Section 3C1.1

As the government explained in its original Sentencing Memorandum, ECF No. 158 at 24-28, and at the Defendant's initial sentencing hearing, *see* Sentencing Transcript at 65-68, a two-level adjustment under is warranted under Note 8 of Section 3C1.1.

Comment 8 of Section 3C1.1 provides:

> 8. **Grouping Under §3D1.2(c). –** If the defendant is convicted both of an obstruction offense (*e.g.*, 18 U.S.C. § 3146 (Penalty for failure to appear); 18 U.S.C. § 1621 (Perjury generally)) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

Reffitt threatened his two children with physical violence if they informed the FBI about his criminal conduct on January 6, including his obstruction of the Congressional certification vote on that date. For those threats, Reffitt was convicted in Count Five of "an obstruction offense," i.e., a violation of 18 U.S.C. § 1512(a)(2)(C) – threatening physical force against two persons to prevent communication to a law enforcement officer. He was convicted in Count Three, "the underlying offense," of a violation of 18 U.S.C. § 231(a)(3) – obstructing law enforcement during a civil disorder. Applying Note 8, Reffitt's Count Three offense conduct was "the offense with respect to which the obstructive conduct" in Count Five "occurred."

The adjustment is applicable now that the re-sentencing calculation does not include Count Two. At the Defendant's initial sentencing hearing, the Court declined to apply the two-level adjustment, recognizing that it was within the Court's discretion to interpret when Note 8 ought to be applied. *See* Sentencing Transcript at 67:16-25. The Court specifically expressed concern that "if Mr. Reffitt were convicted of one and only one offense, the obstruction offense, which everyone agrees is the driver here, the guidelines are pretty clear. He wouldn't get two 3C1.1 enhancements for two obstructive acts." *Id*. at 64:1-2. The Court thus found that adding the additional two-level enhancement circumvented the "structure" of the Guidelines. The same concerns no longer apply following the dismissal of Count Two. Now there is significant relevant conduct that is not factored into the Guidelines calculation. Notably, absent this two-level enhancement, the only recognition of the Defendant's obstructive conduct reflected in the Guidelines calculation would be the single point added pursuant to the grouping analysis. Thus, and given the clear language of Note 8, a two-level adjustment is warranted.

## V.    THE GOVERNMENT'S SENTENCING REQUEST

The government has calculated the Defendant's offense level at 23. With a criminal history category of I, the applicable Guidelines range is therefore 46 to 57 months' imprisonment. The government requests that the Court depart or vary upwards and impose a sentence of 87 months, equivalent to the Defendant's original sentence.

### a.  Departures

After determining the Defendant's Guidelines range, a court then considers any departures or variances. See U.S.S.G. § 1B1.1(a)-(c); U.S.S.G. § 1B1.1, cmt., background ("If, after step (c),

the court imposes a sentence that is outside the guidelines framework, such a sentence is considered a 'variance.'"). The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense, or when "national security, public health, or safety was significant endangered." U.S.S.G. § 5K2.7[4]; U.S.S.G. § 5K2.14. In such circumstances, the Court may depart upward to reflect the nature and circumstances of the offense or disruption, or in the case a departure under Section 5K2.7, "the importance of the government function affected." U.S.S.G. § 5K2.7. This Court recently applied Section 5K2.7 in *United States v. Alam*, 1:21-cr-190, and the same application is warranted here.

    In particular, the Guidelines do not capture the magnitude of the Defendant's actions post-*Fischer.* It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this

---

[4] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. *See United States v. Perkins*, 21-CR-147-CJN, Sent. Tr. at 53 ("January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy."). Reffitt's conduct further warrants a departure because he carried a firearm with him to the United States Capitol and urged the crowd forward armed with that firearm. Doing so "significantly endangered" the safety of all of those around him. U.S.S.G. § 5K2.14.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* landscape, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr.

23

9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of *Fischer*, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id*. at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal

conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, when Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*, the court found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Robertson* Sent. Tr. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment (well above the 46-month upper end of the advisory Guidelines range). *See* 1:21-cr-34, Minute Entry dated 9/5/24.

In *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United*

*States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2. From an advisory Guidelines range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

Finally, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after Fischer, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy… His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at p. 49. The court noted that "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide… [and] an upward departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with… an upward variance for the same reasons that are outlined in 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

The seriousness of Reffitt's crime is not adequately captured by the applicable Guidelines range, and therefore an upward departure is appropriate here as well. Like Sparks, Robertson, Dunffee, and Oliveras, Reffitt intended to obstruct the certification of the electoral vote and halt the peaceful transfer of power. But Reffitt's case is particularly egregious because of both his actions and his intent. Unlike many January 6 defendants, Reffitt, from the outset of his planning,

maintained an intention to storm the Capitol building on January 6. *See* Trial Transcript at 1110 (Rocky Hardy's testimony regarding his plans with Reffitt); Sentencing Transcript at 45 (court agreeing with government argument that "[i]t's hard to imagine an offense that was more extensive in scope than what the defendant was trying to accomplish here."). Once there, Reffitt did not intend to obstruct the certification of the electoral vote through protest or by his mere presence. Rather, Reffitt intended to physically remove legislators from the building, using his firearm and flexicuffs, and "take over" Congress. *See* Govt. Ex. 217; Govt Sentencing Memorandum at 10-11. And he intended to target specific people – Speaker Nancy Pelosi and Senator Mitch McConnell. *See* Govt. Ex. 1B20.2.1 at 16:04 ("I just want to see Pelosi's' head hit every fucking stair on the way out…fuck yeah. And Mitch McConnell too."). As this Court has recognized, while the Defendant ultimately did not make it inside the building, it was not for lack of trying. *See* Sentencing Transcript at 167-68 ("Second, he did not enter the Capitol building. But as we've discussed, according to a message he sent Rocky Hardie that day, it appears to the court that it was not for lack of trying. It was, rather, because he had been immobilized eventually with pepper spray after many attempts to pelt him with rubber bullets and pepper spray as well.").

Because the Defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range to 87 months' incarceration, the Defendant's original sentence.

**b.  Departure Under U.S.S.G § 3A1.4**

The Guidelines calculation should reflect the fact that the Defendant's offense was calculated to influence and affect the conduct of government by intimidation and coercion, and to retaliate against government conduct. U.S.S.G. § 3A1.4, cmt. n.4(A). *See* Sentencing Memorandum at 37-42.

At the Defendant's initial sentencing hearing, the Court declined to apply the enhancement under Section 3A1.4, in part out of a concern that the application of Note 4 would prompt unwarranted sentencing disparities, given that the government had not previously sought that departure in other January 6 cases. *See* Sentencing Transcript at 83:15-87:10. That concern no longer applies with the same force as it did at the time of the Defendant's original sentencing. Since that date, courts in this district have applied Section 3A1.4 to defendants in the January 6 context. *See, e.g.*, *United States v. Milstreed*, 1:22-cr-00198; and *United States v. Rubenacker*, 1:21-cr-00193.

In *United States v. Rhodes*, 22-cr-15, Judge Mehta applied Note 4 to the eight defendants convicted of seditious conspiracy and/or conspiracy to obstruct the official proceeding, in varying degrees, ranging from an additional one offense level to an additional six offense levels. There, Judge Mehta noted that "Mr. Rhodes and his compatriots' objective was to affect the conduct of government, specifically Congress, and to do so through intimidation and coercion by means of force, both through the stockpiling of weapons in the event that they needed to be brought across the river—there was an agreement as to that—and then, of course, the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day." 05/25/2023 Sentencing Hearing Tr. 78:19–79:2.

Judge Mehta further elaborated as to the appropriateness of Note 4 enhancement:

> I think the way I get there is the nature of the conduct, and let me be clear . . . . [I]t's a separate and more serious conduct than what's captured by the Guideline. And I say that because the Guideline itself does not necessarily require the level of intimidation and calculation and targeting that the terrorism enhancement—what we will call the terrorism enhancement in the note requires. This is an additional level of calculation. It is an additional level of planning. It is an additional level of purpose. It is an additional level of targeting, in this case, an institution of American democracy at its most important moment, the transfer of power. That's pretty significant. *Id*. at 79:12-25.

The same is true here. The Defendant's own statements make clear that his actions were calculated to advance the goals contemplated by Note 4, *i.e.*, to "influence and affect the conduct of government by intimidation and coercion." U.S.S.G. § 3A1.4, cmt. n. 4(A). Like in *Rhodes*, Reffitt also stockpiled high-powered weapons to be used in furtherance of his crimes: Reffitt and Hardy both had fully assembled AR-15-style rifles in Reffitt's car in Georgetown, ready for use. Indeed, unlike in *Rhodes*, Reffitt actually carried his weapon on his person when he tried to overtake the Capitol building and remove the legislators.

More specifically, the Defendant made repeated and explicit statements contemplating his intent to affect the conduct of government by force, intimidation, or coercion, including but not limited to the following statements:

- "We're going for the Capitol before the day's over with, everybody's coming out kicking and fucking screaming. Fuck 'em." Govt. Ex. 1B20.2.1 at 14:06

- "I'm taking the Capitol with everybody fucking else. We're all going to drag them mother fuckers out kicking and screaming, I don't give a shit. I just want to see Pelosi's head hit every fucking stair on the way out. (Inaudible) Fuck yeah. And Mitch McConnell too. Fuck 'em all. They fucked us too many goddamn years for too fucking long. It's time to take our country back. I think everybody's on the same damn wavelength. And I think we have the numbers to make it happen." *Id.* at 16:03.

- "If we take Congress today and rip every one of them, Republican, Democrat, the fuck out of there, because the republic of the people owns that fucking building. We take 'em out, we go back to the original republic of the people party, consult with the judicial branch, we've got a fucking president, we don't need much more. We just get rid of them motherfuckers and start over." *Id.* at 25:45.

- "I'm packing heat and I'm going to get more heat, and I am going to that fucking building and I am dragging them the fuck out." *Id.* at 27:45.

- When asked what would happen if he or other rioters came under fire from police, Reffitt responded, "a hell rain of fire comes back 'cause every one of my guys are here and I assure you they came in hot." *Id*. at 3:53.

- "I had every constitutional right to carry a weapon and take over Congress, as we tried to do." Govt. Ex. 217 at 2:44.

Reffitt's statements were not mere words. Reffitt extensively planed for weeks ahead of January 6 with the intent of attacking the Capitol building, not just attending the rally at the Ellipse. Specifically, Reffitt recruited Rocky Hardie to join him in December 2020, made travel arrangements, discussed with Hardie the need to bring multiple firearms, and outfitted himself with weapons, body armor, and zip ties. And on January 6, Reffitt remained steadfast in his intent to take over Congress. On the morning of January 6, he expressed that he intended to use his weapons after he did "recon." Govt. Ex. 1B4.3.  After attempting to recruit individuals at the Ellipse, Reffitt, dressed for battle and carrying both a firearm and flexicuffs, made his way towards the Capitol building. There, he led the charge up the steps, advancing towards officers and inciting the crowd as those officers attempted to keep him and the other rioters at bay.

As recognized in *Rhodes*, the nature of this conduct is not fully captured by the Guidelines range. Rather, as in *Rhodes*, there is "separate and more serious conduct" here, specifically

Reffitt's repeated stated attempts to overthrow the government by force, that is not contemplated by the Guidelines. For that reason, a departure e based on Section 3A1.4, Note 4, is warranted.

### c.  Application of Section 3553(a) Factors

After calculating the Guidelines, the Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49, 50. This two-prong "sentencing framework applies both at a defendant's initial sentencing and at any subsequent resentencing after a sentence has been set aside on appeal." *Pepper v. United States*, 562 U.S. 476, 490 (2011) (citing 18 U.S.C. § 3742(g) ("A district court to which a case is remanded ... shall resentence a defendant in accordance with section 3553."), and *Dillon v. United States*, 560 U.S. 817, 828, 827 (2010)). Although "the Supreme Court's decision in *Fischer* may ultimately change the Guidelines recommendation," the Court may still consider a defendant's "serious conduct on January 6th, 2021 in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512." *United States v. Hostetter*, 1:21-CR-392-1- RCL, ECF 507 (July 18, 2024 Order Denying Motion for Release from Custody Pending Appeal) at 4.

Section 3553(a) provides that the Court consider: (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id.*; (C) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Guidelines range is just one of many factors under § 3553(a).

The Guidelines range in the instant case is not an accurate reflection of the harm or gravity unique to the Defendant's attempts to obstruction the certification of the 2020 presidential election, an attempt to undermine American democracy itself. Furthermore, the new guidelines do not adequately take into account this Defendant's conduct (including his statements regarding his intent to use violence on January 6 to overthrow the national legislature), his personal characteristics (including that he previously held a leadership role in the Texas Three Percenters, through which he attempted to organize the illegal possession of firearms and the deletion of relevant evidence) the severity and harm of what happened, and the need for deterrence of this particular defendant (taking into consideration his recent charge for possession of an illegal suppressor and post-January 6 statements indicating his continued disrespect for the legal system).

The Defendant would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[5] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of

---

[5] The D.C. Circuit's decision in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), that certain sentencing enhancements did not apply to Congress's counting and certification of the Electoral College votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work," demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's decision in *Fischer* demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes that many people – including the Defendant here – committed on January 6. *See United States v. Fischer*, 144 S. Ct. 2176, 2195 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("Given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward – even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

### a. An Upward Variance Is Warranted

An upward variance is appropriate when "the defendant's conduct was more harmful or

egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). This Court has already recognized as much here. Memorandum Opinion & Order, ECF No. 182, at 9. In the present case, a variance is warranted because, among other things, the Defendant threatened the physical safety of his own children, "sought to conceal a much gander 'stated purpose' than a typical defendant," and attempted to cover up carrying a firearm on Capitol grounds, including by plotting with fellow Texas Three Percenters. *Id.* at 9. Indeed, "the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings.'" *Id*. at 10-11. In other words, while the Supreme Court's decision in *Fischer* has changed the defendant's advisory Guideline range, it does not require this Court to take a drastically different view of the defendant's conduct. *S e e  Hostetter*, 21-CR-392- RCL, ECF No. 507, at 4-5 ("While the Supreme Court's decision in *Fischer* may ultimately change the Guidelines recommendation for Mr. Hostetter, *Fischer* does not dictate the Court' application of the 18 U.S.C. § 3553(a)factors to Mr. Hostetter's remaining convictions. The Court may still consider Mr. Hostetter's serious conduct on January 6th, 2021 in its entirety").

Other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the defendants' crimes committed on January 6. *See, e.g.*, *United States v. Fonticoba*, 21-CR-368-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the

seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *Hale-Cusanelli*, 21-CR- 37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").

The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But the Circuit recently explained that, for a sentence above the applicable Guidelines range, "the Sentencing Reform Act provides that the district court must state 'the *specific reason* for the imposition of a sentence different from that described [in the Guidelines,]' both orally during the sentencing and on a written form appended to the judgment." *United States v. Iracks*, 106 F.4th 61, 67 (D.C. Cir. 2024) (quoting in part 18 U.S.C. § 3553(c)(2)) (emphasis and alterations in original). Accordingly, the government requests that the Court make specific findings that this Defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *United States* v. *Brown*, 808 F.3d 865, 867, 872 (D.C. Cir. 2015))

The government incorporates the same arguments it made with respect to the Section 3553(a) factors in its original sentencing memorandum. Specifically, for the reasons discussed therein and

below, the nature and circumstances of the offenses, Reffitt's history and characteristics, the need

for the sentence to reflect the seriousness of the offense and promote respect for the law, and the

need for sentence to afford adequate deterrence all weigh in favor of an upward variance here.

### i.  The Nature and Circumstances of the Offense

As described in the government's Sentencing Memorandum at pages 45-46, Reffitt played

a critical role in the attack on the Capitol—and intended to use violence in doing so. Reffitt's

efforts to take over the United States Capitol building during the January 6, 2021 certification of

the Electoral College vote – as opposed to any other building, at any other time – are not

sufficiently captured by the current Guidelines analysis.

Reffitt led a massive portion of the crowd during a riot that nearly succeeded in preventing

the certification vote from being carried out, frustrating the peaceful transition of presidential

power, and throwing the United States into constitutional crisis. He planned for this for weeks, and

intended to do whatever it took – including, if necessary, the use of extreme physical force and

violence – to overthrow Congress. Along the way, Reffitt encouraged others to join him in his

mission. First, in December 2020, he recruited Rocky Hardie. Then, at the Ellipse, he tried to

gather additional supporters. And finally, while at the Capitol building, he stood in front of

hundreds of rioters and urged them to join him in leading a siege of the building.

On January 6, he came armed with a handgun, and stored another one illegally, fully

assembled, in his car in Georgetown. He also instructed Rocky Hardie to bring guns to

Washington, D.C., despite knowing that it was illegal to do so. As evidence of his further disrespect

of firearms laws, he is currently facing charges in the Eastern District of Texas for possession of

an illegal firearm silencer. *See United States v. Reffitt,* Case No. 4:22-cr-289 (E.D. Tex.). And through his close association with the Texas Three Percenters, he told others about a ploy to collect firearms under his "TTP Security" business" as a way to "circumvent" firearms laws.  *See* Sentencing Memorandum at 9-10; Govt. Sentencing Exhibit 1B at 75; Govt. Ex. 1B4.5. On top of all of that, Reffitt has threatened the use of firearms against his own family on multiple occasions, including by pointing a gun at his wife's head and threatening the lives of his children.

After the riot on January 6, Reffitt (1) deleted relevant evidence and encouraged others to do the same; (2) defended and boasted about his actions and the critical role that he played on January 6; and (3) threatened his own children if they turned him into the FBI. Any of these actions, independently, warrants a variance from the Guidelines.

### ii.  Reffitt's History and Characteristics

Reffitt's history and personal characteristics weigh in favor of a significant sentence. As described in the government's initial Sentencing Memorandum, Reffitt's prior conduct is indicative of a willingness to use violence to achieve his goals. Reffitt planned and recruited others for future violent attacks, illegally possessed and firearm silencer, and displayed a willingness to threaten the physical safety of both his children and his wife. *See* Sentencing Memorandum, ECF No. 158, and 6. There is little reason to believe that Reffitt's disposition has changed significantly since his initial sentencing hearing. To the contrary, his most recent communications from jail demonstrate that he not only racks remorse for his actions on January 6, but that he takes pride in them. And as explained in the government's initial Sentencing Memorandum, Reffitt's role in the Texas Three Percenters only enhances his dangerousness. *Id*.

### iii. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Reffitt's criminal conduct on January 6 was the epitome of disrespect for the law and an attack on democracy, as detailed in the departure section. *See also United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### iv. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, like the Defendant's conduct here. The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular Defendant also weighs heavily in favor of a lengthy term of incarceration. Not only did Reffitt extensively plan for and participate in the January 6 insurrection, including by preparing for violence, but he further attempted to cover up his conduct by violently threatening his own children and by encouraging his fellow militiamen to delete incriminating messages. After his trial, the Defendant continued to

seek praise as a martyr of his cause, stating, "I do this time in chains for family, and for yours." Sentencing Exhibit 6; Sentencing Memorandum at 17.

To this day, the Defendant remains an involved member of the cause – championed by his wife – to "free" the January 6 "political prisoners," and continues to express a lack of respect for the judicial system and acceptance of responsibility. In particular, Reffitt's text messages and calls from prison indicate that he continues to lack remorse for his actions, that he views his imprisonment as an injustice and as part of a greater cause, and that he maintains pride in actions on January 6 and his involvement in the community of those who he believes have been wrongly prosecuted for their crimes on that day. On top of all of that, the Defendant is facing another firearms charge in Texas for his possession of an illegal suppresser, even further underscoring his blatant disrespect of the law. This behavior not only suggests that Reffitt is a risk of danger to the community, but it demonstrates that Reffitt's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of espousing the idea of using violence to achieve his political aims.

### v.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants [1] with similar records [2] who have been found guilty of similar *conduct*." (emphasis added).   Although different charges are a legitimate consideration when determining if there are warranted disparities between two sentences, the focus of the judicial inquiry should be on the real underlying conduct.  *See United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020) ("A difference in types of charges is a legitimate consideration when

determining whether there should be a justifiable difference, or disparity, between the sentences of two defendants"); *United States v. Booker*, 543 U.S. 220, 223 (2005) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct underlying the crime of conviction.").  The D.C. Circuit has instructed that "[n]o limitation shall be placed on the information concerning the background, character, and *conduct* of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Rhodes*, 145 F.3d 1375, 1381 (D.C. Cir. 1998) (citing  18 U.S.C. § 3661)  (emphasis added). Courts thus "may still consider [the defendant's] serious conduct on January 6th, 2021, in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512." *Hostetter*, 1:21-CR-392-1-RCL, ECF 507 at 4. Additionally, pre-*Fischer* 1512(c)(2) cases remain reliable comparators because a review of sentences given by district judges in pre-*Fischer* Capitol Siege cases involving 1512(c)(2) convictions confirms that district judges were already appropriately considering and weighing the 18 U.S.C. § 3553(a) factors in their decision-making. When varying, judges considered the importance of the context and the attempts to obstruct the certification. *See, e.g., United States v. Lucas Denney*, 22-cr-70 (RDM), Sent. Tr. at 83 ("I will say that under other circumstances, I might have varied further downward. But I had to temper any basis for varying further downward by the fact that the attacks occurred in the context of an assault on our democracy, an assault on the Capitol, an assault on one of the most sacred events in our nation, and that resulted in injuries, not just to the psychic well being of the officers who were -- endured that assault, but to the nation as a whole."); *United States v.*

*Hunter Seefried*, 21-cr-287 (TNM), Sent. Tr. at 54 ("I have no doubt that the Commission would have intended for this to be applied to a substantial interference with an official proceeding, which is itself more significant than almost any proceeding. And you and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources. Therefore, I intend to vary upwards from the guideline range I've calculated to reflect the substantial interference you and others caused."); *United States v. Gilbert Fonticoba*, 21-cr-638 (TJK), Sent. Tr. at 66-67 ("I'm varying downward given the posture we're in. But I would vary upward significantly to get to 48 months if I only had Count 2, because I think there, again, given the evidence here of the intent the defendant's conceded, the intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence and all the rest and in terms of the specific fact pattern here that that would be my sentence.").

At the Defendant's initial sentencing, the Court noted a lack of comparable cases. Since that sentencing hearing, multiple defendants have been sentenced to comparable amount of time as Reffitt, or longer, for their crimes related to the attack on the Capitol. *See, e.g., United States v. Thomas Webster*, 1:21-cr-208 (120 months' incarceration); *United State v. Kyle Young*, 1:21-cr-291 (86 months' incarceration); *United States v. Albuquerque Cosper Head*, 1:21-cr-291 (90 months' incarceration); *United States v. Kyle Fitzsimons*, 1:21-cr-158 (87 months' incarceration). However, to this day, Reffitt's case remains unique for several reasons, including because relatively few January 6 defendants brought a firearm to the Capitol building or were charged in connection with threats made to other individuals' physical safety following the events of January

6. Further, Reffitt was unique in his role on January 6 – he was the *first* rioter to ascend the West stairs of the Capitol building and to lead rioters towards the officers at the top of those steps.

Recently, Judge Cooper resentenced Thomas Robertson to 72 months' imprisonment following the dismissal of a Section 1512(c)(2) charge. *United Stats v. Robertson*, 1:21-cr-00063, 9/5/2025 Minute Entry for Resentencing. Robertson, like Reffitt, came to the Capitol on January 6 with the clear intent of disrupting the certification of the 2020 presidential election. Also, like Reffitt, he pushed up the stairs, overcoming the officers on the west front. After January 6, Robertson, like Reffitt, deleted relevant evidence.

Reffitt's actions were, in many ways, more serious than Robertson's. For one, Reffitt brought a handgun to the Capitol on January 6, whereas Robertson did not. Reffitt also used explicit and violent language evidencing his intent to physically harm legislators, including as he attempted to recruit others to join him at the Ellipse. And Reffitt led the charge on the West Front, whereas Robertson joined as part of the mob, but not at the helm of it. Further, Reffitt threatened his own children's physical safety following January 6; Robertson did not.

## VI.    CONCLUSION

For the reasons set forth above, and as fully supported by the facts and the law, the United States asks the Court to resentence Guy Reffitt to a sentence of 60 months' incarceration for each of Counts One (Civil Disorder) and Four (Civil Disorder), and 87 months' incarceration on each of Counts Three (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and Five (Obstruction of Justice), all to run concurrently with one another. The United States further asks the Court to reinstate the previously imposed 3-year term of

supervised release, restitution of $2,000, and the mandatory special assessment for each of the counts of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/ Rachel Freeh*
Rachel Freeh
Jeffrey S. Nestler
DC Bar Nos. 176082 and 978296
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
Phone: 202-252-7749
Email: Rachel.freeh@usdoj.gov