# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | **CRIMINAL ACTION NO.** |
| | **)** | |
| **Plaintiff,** | **)** | **1:21-CR-00032-DLF** |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **GUY WESLEY REFFITT,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| _____ | **)** | |

## SENTENCING MEMORANDUM

F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594 (facsimile)
clint@texascrimlaw.com

Attorney for Defendant
Guy Wesley Reffitt

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................2

I.  GUY REFFITT'S BACKGROUND...................................................................3

II.  WHAT GUY REFFITT DID AND DID NOT DO ON JANUARY 6....................8

    A.  What He Did Do..............................................................................................8

    B.  What He Did *Not* Do......................................................................................9

III. LACK OF FIRST STEP ACT CREDIT...............................................................10

IV. RESENTENCING...............................................................................................11

    A.  Sentences Between 60-90 months..................................................................14

    B.  *United States v. Kenneth Thomas*, No. 1:21-CR-00552-DLF    58
    MONTHS............................................................................................................26

    C.  United States v. Thomas Robertson, No. 1:21-CR-00034-CRC    87
    MONTHS RESENTENCED TO 72 MONTHS...................................................26

    D.  Discussion........................................................................................................27

V.  CONCLUSION....................................................................................................29

CERTIFICATE OF SERVICE.....................................................................................31

## SENTENCING MEMORANDUM[1]

Defendant Guy Wesley Reffitt submits this Sentencing Memorandum in order to assist the Court in imposing a sentence in this case that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

## I.  GUY REFFITT'S BACKGROUND

There is a common theme that runs through the various support letters that are attached hereto as Attachments A-I.  In particular, Undersigned Counsel commends to the Court's attention the letter from Mr. Reffitt's daughter Peyton (one of the alleged victims in Count 5 which forms the basis of the new Sentencing Guidelines calculations).  While that letter is lengthy, it does a very insightful job of explaining her father and what led to his offenses on January 6.

Guy Reffitt grew up a victim of physical abuse from his father.  While Mr. Reffitt's mother describes her late husband (Guy's father) as 'pro physical punishment," in her letter to the Court," in actuallity this meant belts, switches and occasionally smacks or fists.[2]   As a result of this abuse, Mr. Reffitt left home at 15 years of age and began working at KFC as a dishwasher and moved in with his older sister.  *See* PSR at ¶ 83.

---

[1]Sections I & II are mostly taken from Mr. Reffitt's original Sentencing Memorandum

[2]As recounted in the PSR, Mr. Reffitt's mother admitted her late husband was "physically abusive to her and to [Guy]."  *See* PSR at ¶ 85.

Mr. Reffitt's wife, Nicole, explains, "Much of Guy's personality comes from the fact that he has been on his own since he was fifteen, and he has had only himself to back himself up." Indeed, she has noted that her husband's "issue in his childhood have caused him to be 'very driven concerning his family....'" *See* PSR at ¶ 88.

Likely because of his childhood, Mr. Reffitt's adult life has centered around providing for his family and one can clearly see that this became his identity. Financially that produced a lot of highs and lows and Mr. Reffitt was often required to spend large periods of time away from his family as a result of his work in the oil industry. At one point, Mr. Reffitt's employment allowed the family to move to Malaysia where, as his daughter, Sarah explains: "My dad not only wanted to show us the wonders of the world, but also to meet different people and experience others' culture. It was one of his proudest achievements, having my siblings and I go to an international school and travel and to be able to allow us to have that experience."

Unfortunately, the oil and gas industry collapsed and first he, and then his family, returned to the United States. Because Guy Reffitt always viewed himself as the family's provider and protector, he tried to shield his children from the tremendous financial stress the oil industry collapse caused the family. As Sarah describes it: "For months we were living on very little money, however dad made sure to make everything as happy as possible. Looking back on it now makes me beyond

4

sad knowing the amount of stress he had on him while smiling and giving us as much as he could....My father has always worked very hard and was feeling that he couldn't provide us with what we needed and that it seemed to him that he could hardly provide the basics."  And, as Peyton describes from a slightly different perspective:

> When we got back, during August of 2016, I recognized that my father was trying to show us that he was doing fine but I could tell he was deeply disappointed in himself and depressed.  (I had noticed at this point he had started to take interest in the election and the Trump Administration, he had rarely ever taken interest in politics before then).

Mr. Reffitt's depression over his believing that he was unable to adequately provide for his family manifested itself in thoughts of suicide.  According to Sarah, by the time COVID hit, "[h]e had thought of killing himself due to being ashamed and in his words, 'a failure.'"

Throughout this period, Guy Reffitt's family noticed that "[h]is mental health was declining."[3] At one point, he tried to start a security company which resulted to his introduction to the Three Percenters in Texas.  Several of the letter writers, some directly and some indirectly, describe a depressed man who believed he was unable to adequately provide for his family (his life's mission), and a man who felt cast aside and marginalized.  Peyton explains:

He always feels like he needs to be doing something purposeful.  When

---

[3]Letter of Sarah Reffitt

he was out of work, he would either be looking into what he could do to build a security business to sustain our family and be a business owner or he was falling down the rabbit hole of political news and online banter. He can't stand seeing injustice in the world or in the lives of his loved ones. These qualities he has about him I believe put him in a position where he has been subjected to wholeheartedly putting his faith into a leader with the attributes of President Trump. I could really see how my fathers [sic.] ego and personality fell to his knees when President Trump spoke, you could tell he listened to Trump's words as if he was really truly speaking to him....Constantly feeding polarizing racial thought. Trump didn't speak to his supporters as individuals but more as a group of one, as though the group were [sic.] somehow more important than the individual. As if all individual citizens outside of this group were another group of one. This contradicts the aspects of our genetic makeup that every human being is unique, this basis that our whole idea of freedom is based upon. I wish my father had his guard up against these verbal booby traps into which he has been led, he should have analyzed this verbiage and made more rational decisions that day.

Sarah's long-term boyfriend, Cole Mitchell, appears to truly hit the nail on the head when he describes a marginalized, underemployed individual who went to Washington, D.C. on January 6 in a quixotic hope of wanting to be part of "something bigger."

There are also character traits of Guy Reffitt that are consistently described in the support letters. First, that he is bombastic and hyperbolic but not dangerous. As Sarah explains, "[a]lthough some of his language sounds alarming, if you knew him you would know that he talks with a lot of hyperbole and exaggeration, but really what he means is much more of an understatement." Second, that Guy Reffitt "never

hesitates to assist people whom he may not [even] know personally" and that "[h]e finds joys in making others' lives easier;" with Sarah describing her father as "selfless."[4]  In a passage which Undersigned Counsel personally believes speaks volumes because Sarah did not likely realize its true significance when she was composing it, she writes:

> He is considered a second dad by many of my friends.  He always opened his home to me and my brother and sisters' friends who may have stressed or troubled lives at their own home.  I had a fair share of friends who were not comfortable in their own house, whether it was neglect, abuse or they didn't' have a safe space.  My dad wanted them to know that they always have a safe space in his home and made sure they always felt welcome.

As noted in the Presentence Report, Mr. Refitt is in Criminal History Category I, and his criminal history is limited to a deferred adjudication on a misdemeanor for unlawfully carrying a weapon almost two decades ago (at age 21) and a 2009 conviction for Driving While Intoxicated where he successfully completed probation. *See* PSR at ¶¶ 70-72.

Perhaps, Peyton Reffitt summarized it all best when she writes "[i]f I did not know my father so personally I would have perceived this all so differently, from the outside looking in."[5]  Again, her letter speaks volumes regarding her personal

---

[4]Letter of Sarah Reffitt

[5]To the PSR writer:

observations about her father that transcend her father's actions on January 6, 2021.

## II.  WHAT GUY REFFITT DID AND DID NOT DO ON JANUARY 6

In imposing a sentence that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553, it is imperative that a distinction be made between what the government alleges that Guy Reffitt did and what he did *not* do in relation to the events of January 6.

### A.  What He Did Do

Guy Reffitt and Rocky Hardie did drive from Texas to Washington, D.C.  Guy Reffitt brought with him an AR-15 and a .40 caliber handgun.  *See* PSR at ¶ 20.  He and Mr. Hardie attended President Trump's speech at the Ellipse.  *See* Trial Tr. at 1138-39.  As Mr. Hardie described it in his testimony, "[t]he President said hey, you know, I'd like a million people to show up and I said, well, I think maybe I need to be counted."  *Id*. at 1105.

During the speech, President Trump urged those in attendance to march on the Capitol, where he knew the electoral votes were being counted, and Mr. Reffitt did

---

[Peyton] stated the following, "He's a great father and a good man.  He's always been very protective over the family.  He's really smart and like [sic,] to be in control in the house."  She noted that she was upset over [his] actions and felt that he "crossed a line" but noted that she was "not scared or frightened of him.

PSR at ¶ 90.

so.[6]  He possessed a handgun in a holster, wore a tactical helmet and bulletproof armor, and had zip ties.  *See* Trial Tr. at 1130, 1135; PSR at 22.  At some point, after arriving at the Capitol, he climbed the staircase on the west side and refused to retreat when ordered to do so by the police and continued to do so after being hit by "less than-lethal projectiles."  *See* PSR at ¶¶ 22-23.  He also appears to have waved forward other individuals in the crowd.  *See* Gov't Trial Ex. 205.[7]  Eventually, while others pushed past the police and entered the Capitol building, Mr. Reffitt retreated down the staircase which he initially climbed.  *Id*.  Mr. Reffitt's entire time on the staircase and the *first* landing on top of the staircase was approximately 44 minutes.  *Id*.

Prior to arriving at the Capitol, Mr. Reffitt made physical threats against House Speaker Pelosi that, while certainly concerning, appear to be hyperbolic.  *See* PSR at ¶21.  Then, upon returning to Texas, he urged two of his children not to turn him in to the FBI and told them "traitors get shot," and he threatened to "put a bullet through" his daughter's phone.  *Id*. at ¶ 25.

### B.  What He Did *Not* Do

First, unlike hundreds of the rioters, Mr. Reffitt never entered the Capitol.

---

[6]ABC News, *This is what Trump told supporters before many stormed Capitol Hill* (Jan. 7, 2021) accessed at https://abcnews.go.com/Politics/trump-told-supporters-stormed-capitol-hill/story?id=75110558

[7]Of course it almost goes without saying that nothing different would have happened on January 6 had Mr. Reffitt not waved.

Second, unlike many rioters *including many who received lesser sentences than Mr. Reffitt*, Mr. Reffitt never assaulted police officers nor anybody else.

Third, Mr. Reffitt never removed his handgun from his holster.

Fourth, Mr. Reffitt left the AK-47 he brought from Texas in his vehicle in Georgetown and did not bring it to the Capitol.

Fifth, while Mr. Reffitt's paranoid statements to two of his children are not to be condoned, he never gave any indication he would actually harm his children. Indeed, his wife has stated that, while she was understandably "disturbed" by her husband's "extreme" statements to his children, she did not believe that he would ever act on those statements. *See* Criminal Complaint [Doc. 1-1] at ¶ 26. Similarly, one of his daughters told law enforcement that she did not believe her father to be a true threat to anybody in the family. *Id*. at ¶ 30. Moreover, in her letter to this Court, Peyton writes, "I never felt threatened, my father doesn't threaten me. I rather get annoyed about his dramatic way of speech that often uses outdated references and recitations." Peyton's letter also describes the government's decision not to call her as a witness at trial when they learned "I wasn't going to benefit their narrative."

### III.  LACK OF FIRST STEP ACT CREDIT

Mr. Reffitt was previously incarcerated in Washington, D.C. under very onerous conditions that were discussed at length in the Sentencing Memorandum

submitted in connection with his first sentencing hearing. It was not until four months after Mr. Reffitt was initially sentenced in this case that the government elected to prosecute Mr. Reffitt in the Eastern District of Texas for an alleged silencer found during the search of his home that was conducted in connection with his arrest case almost two years earlier.

As a result of the sentence imposed in the instant case, Mr. Reffitt was not eligible for pretrial release in the Eastern District of Texas case. Nevertheless, this became a Catch-22 because the Eastern District of Texas case prevented him from being held in a BOP facility where he could participate in mental health counseling and other BOP programs. Significantly, not being in a BOP facility prevented him from being eligible to have the custody portion of his sentence significantly reduced under the First Step Act.

In sum, unlike most sentences imposed in connection with the January 6 cases, Mr. Reffitt will not received the benefit of First Step Act credits to effectively reduce the sentence.

## IV.  RESENTENCING

At his original sentencing, Mr. Reffitt's sentencing guideline range was 87-108 months imprisonment and the Court ultimately sentenced him to 87 months imprisonment. *See* PSR at ¶ 68. Upon remand, the sentencing guideline range is 41-

51 months imprisonment. Undersigned Counsel has no doubt that the government will urge the Court to ignore the change to the sentencing guideline range and urge the Court to upward vary by 36 months and reimpose an 87-month imprisonment sentence. Nevertheless, for the reasons set forth below, Undersigned Counsel submits that the Court should again impose a sentence consistent with the imprisonment range set forth by the United States Sentencing Guidelines and, in any event, should *not* impose a sentence greater than 58 months imprisonment.

While the Court is, of course, not bound by the Sentencing Guidelines after *Koon*, to simply reimpose the same sentence in this case despite a significant change in the Guidelines is really a statement that the Sentencing Guidelines no longer matter and that appeals in multi-count cases and/or appeals of guideline determinations are a waste of time. Moreover, as noted by the United States Court of Appeals for the District of Columbia,"[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023), quoting, *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).[8]

---

[8]The government itself acknowledged this principle at Mr. Reffitt's original sentencing:

MR. NESTLER: Yes. The government believes -- and if we're talking about the application of 3553(a)(6) and unwarranted sentencing disparities, the D.C. Circuit is clear that the best way to guard against unwarranted sentencing disparities is by sentencing within a guideline range.

As discussed extensively at Mr. Reffitt's initial sentencing hearing, Undersigned Counsel is cognizant of the great efforts made by the judges of the United States District Court for the District of Columbia to avoid unnecessary sentencing disparities among sentences imposed upon January 6 defendants. *See* 18 U.S.C. § 3353(7). Mr. Reffitt's initial sentencing was one of the early January 6 sentencings. Nevertheless, since that time, there have been countless January 6 sentencings, including at least one felony resentencing after *Fischer* and *Brock*. Indeed, the Court now has a robust collection of cases with which to compare the original 87-month sentence in this case. Such a comparison would show that a sentence between 41-51 months is, indeed, appropriate and that a sentence in excess of that range is inconsistent with Title 18's parsimony clause.

Undersigned Counsel was able to identify 13 cases where a defendant was sentenced to between 60-90 months imprisonment after electing a trial (*i.e.* none of those involved defendants who received credit for acceptance of responsibility). Among that group and *unlike Mr. Reffitt's case*, 11 of the cases involved defendants who physically assaulted one or officers.[9] This, of course, is in contrast to Mr. Reffitt

---

[9] In one of the other two cases, the defendant attempted to cut off the electrical power to the Capitol building and "[s]et [the] chain of events in motion" that led to a rioter being fatally shot while trying to gain entrance to the House Chamber. In the other, the defendant repeatedly offered his combat knife to other rioters and was also front and center outside the House Chamber when the rioter was fatally shot.

who did not assault any officers.  In 10 of the 13 cases, the defendant, *unlike Mr. Reffitt*, testified at trial and in each case the government alleged that the respective defendant testified falsely.

In addition to those 13 cases, Undersigned Counsel was able to identify a relevant sentence by this Court of 58 months in *United States v. Kenneth Thomas*, No. 1:21-CR-00552-DLF.   That case, which the Court is obviously familiar with, involved a defendant armed with a deadly weapon (a jackknife) who assaulted at least four officers and who testified falsely at trial.

Finally, Undersigned Counsel was able to identify one felony case where a defendant was resentenced following a remand based upon *Fischer* and *Brock*. There, the sentence was reduced by 15 months following remand.  *See United States v. Thomas Robertson*, No. 1:21-CR-00034-CRC.  That case involved the assault of two officers using a baton and the destruction of evidence following January 6.[10]

### A.  Sentences Between 60-90 months

1) <u>United States v. Patrick McCaughey</u>, No. 1:21-CR-00040-TNM
**90 MONTHS**

●Traveled from Connecticut to Washington.  He scaled the inaugural scaffolding and entered the Lower West Terrace tunnel and participated in a "heave-ho" push by dozens of rioters against the police line

---

[10]The summaries below are derived from the government's sentencing memorandums in the respective cases.

defending the door to the Capitol building.

●He gained control of a police riot shield and headed to the front of the mob in the tunnel.  He used his stolen shield to **push against** an officer for over two minutes, trapping the officer against the door frame while another rioter **assaulted** the officer. The officer almost lose consciousness.



●Then, he used his shield to lash out at another officer, **landing blows** on the officer's arms as the officer attempted to close the tunnel door.

●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.


2) _United States v. Salvador Sandoval_, No. 1:21-CR-00195-CKK
**88 MONTHS**

●While inside the Rotunda, he obstructed several MPD officers. For example, he **pushed** the arm of one MPD officer into the air as the officer battled the mob in the Rotunda.

●Shortly thereafter, he **grabbed** the riot shield of an MPD officer, eventually **ripping** it from her hands and leaving her and her weapons

exposed to the mob.

●Then, he entered the vestibule between the Rotunda and the Rotunda Doors where he **forcibly assaulted** other officers.

●He **attacked** one officer by **pushing** him from the side, nearly toppling him over into the mosh pit of rioters.



●Next, he attempted to **forcibly remove** the riot shield from an officer by forcibly pulling on it.


3) *United States v. Steven Cappuccio*, No. 1:21-CR-00040-TNM
**85 MONTHS**

●At the Lower West Terrace tunnel, he forcefully **yanked** an officer's gas mask away from the officer's face in vigorous, quick movements, causing the officer's head and neck to be jerked in various directions. During this attack, he jeered, "How do you like me now, fucker?!"  He then grabbed the officer's riot baton out of his hands and **struck** the officer in the head with it as the officer screamed and pleaded for help. He then handed off the baton to another rioter so it could continue to be used as a weapon.

●The government referred to the attack as "sadistic cruelty."



●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

4) <u>*United States v. Shane Jenkins*</u>, No. 1:21-CR-00245-APM
**84 MONTHS**

●Traveled from Houston, TX to Washington with a tomahawk axe and, during the riot, he was the first to **smash** a window next to the Lower West Terrace tunnel using that tomahawk axe.  As described by the government:

> "It is difficult to overstate the significance of Jenkins' actions at this location.  As the first to attack this window, Jenkins crossed a line that had previously not been crossed at the LWT—he had attacked the Capitol itself.  In doing so, he also inspired others to do the same, and to make further progress on the job he had started. Ultimately, the success of this effort would considerably exacerbate the level of violence around the tunnel, as well as the amount of theft and property destruction in multiple hideaway offices behind the window."

●As he climbed the steps leading to the tunnel, he grabbed one of the riot shields other rioters had stolen from officers and carried it with him. He **hurled** 9 different objects at the officers. Among these objects was a solid wooden desk drawer. In addition to the desk drawer, he **threw** a flagpole, a metal walking stick, and a broken wooden pole with a spear-like point on one end which he **launched** like a javelin.



5) _United States v. Christopher Grider_, No. 1:21-CR-00022-CKK
**83 MONTHS**

●He assisted other rioters in **dismantling** police barricades. With the help of at least two other rioters, he lifted a bike rack and carried it down the stairs, turning it into a ladder that he and other rioters used to climb onto a wide stone railing adjoining the stairs.

●**Stole** a case of bottled water being used by officers.

●Entered the Capitol building through the Senate Wing Door at 2:14 p.m., less than two minutes after the Capitol building was first breached at that location. Once inside, he zeroed in on a utility panel, where he tried to **cut power** to the Capitol building.

● As he and other rioters tried to breach the House Chamber, he repeatedly offered up his hard black helmet to be used by the rioters as a weapon.

● At the Speaker's Lobby he again offered up his helmet which was then used to break a window. He "[s]et [the] chain of events in motion" that lead to a rioter being killed outside the Speaker's Lobby trying to gain access to the House chamber through that window.

● He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

6) _United States v. Joseph Padilla_, No. 1:21-CR-00214-JDB
**78 MONTHS**

● Traveled from Tennessee to Washington, D.C. and wore a N95-style mask and a set of scuba goggles on his face.

● Repeatedly yelled to officers that they were "traitors" and **pushed** metal barricades into officers.

● Attacked one officer in the lower west terrace tunnel by throwing a metal flag pole into the officer's face.

● He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

7) _United States v. Joseph Gietzen_, No. 1:21-CR-00116-CJN
**72 MONTHS**

● Traveled from North Carolina and engaged in **assaults** on officers.

● At the West Plaza, having put on the helmet, goggles, and knee pads, he moved to the front of the crowd where he assaulted officers by pushing and pulling against officers' bodies and shields.

● He **assaulted** another officer by shoving him.

●He **assaulted** another officer trying to rip off the officer's gas mask.

●He **attacked** another officer with a pole jabbing the officer through gaps in the officer's protective clothing.

●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

8) <u>*United States v. John Sullivan*</u>, No. 1:21-CR-0078-RCL
**72 MONTHS**

●Prior to traveling to the Capitol from Utah, he published online a 17-minute instructional video on how to dress for a protest, which included dressing in all black with a ballistic vest and carrying weapons for protection. During the video, he showed his Smith & Wesson M&P Knife—the one he would ultimately bring to the Capitol.



●Upon reaching the West Front he used his megaphone to rally the crowd, saying things to the police like: "You guys work for us. Fuck you," "If we don't get it, we're burning this shit down," and "Who do you protect? Who do you serve?"

●After entering the Capitol, he was at the front when the mob went through two sets of doors, to the House Chamber Main Door.

●As the rioters tried to break the window to gain access to the House Chamber, he shouted, "I have a knife," He then displayed the Smith & Wesson M&P from the earlier video.

●Next, he headed toward the Speaker's Lobby and pushed his way to the front of the crowd and, once again, offered up his knife for the rioters proclaiming, "Let me through, I have a knife."

●He encouraged the to break down the door and soon thereafter one protestor was shot and killed trying to go through the door's window.

●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony. He even went so far as denying he possessed the knife.


9) _United States v. Audrey Southard-Rumsey_, No. 1:21-CR-00387-APM **72 MONTHS**

●Was "one of the first and main agitators" at the East front steps of the Capitol.

●She maneuvered her way toward the front of the mob and was one of the first 20 rioters to enter the building through the Capitol Rotunda Doors and then she headed right to the House Chamber and was one of the first to arrive at that location.



● There, she screamed at the officers and tried to enlist the crowd to attack and move forward.

● One officer testified that she was the worst of the worst. **"On a scale of 1 to 10, with 10 being the worst, she was a 10 plus."** She yelled, "Tell Pelosi we're coming for that bitch!" and "Tell fucking Pelosi we're coming for her, fucking traitorous cunt!" She pointed at an employee of the House Sergeant at Arms who stood had come forward and yelled, "fuck you, you little pussy."

● She was directing the crowd where to push to breach the House Chamber telling officers, "Last breath, last bullet. What's it gonna be?"

● She pressed a flagpole against one officer's chest and, with her face close to his, she yelled, "you're a traitor to our country! All of them are traitors." Using the flagpole, she pushed it into one set of doors, which flung open, and back toward a second set of doors, which led directly to the House Chamber.

● Then, within earshot of the Chamber, she yelled, "Pelosi, we're coming for you, socialist cunt, we know where you live!"

●After being pushed back to the Rotunda, she **grabbed** at an officer's baton while telling him, "you're an asshole.  You're going to get your ass kicked."

●She then tried to **grab** another officer's baton and **grabbed** another officer's shoulder.

●After all of this, she blamed the damage to the Capitol on "Antifa."

●She, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

10) <u>*United States v. Ronald McAbee*</u>, No. 1:21-CR-00035-RC
**70 MONTHS**

●Came to Washington, D.C. with a knife, brass knuckles and wearing a "three percent" shirt.

●While in the Capitol Tunnel Archway, he assisted others in **beating** an officer with weapons, including a flagpole and a police baton.

●Pulled another officer off the police line by **dragging** him by his thigh.

●**Struck** twice at another officer using his hands when that officer attempted to assist the officer he had been dragging.

●Ultimately, he dragged the one officer down steps and he stayed on top of the officer allowing the officer to be **struck** with objects and **sprayed** with chemicals after his gas mask was forcibly removed.  The officer had a laceration to his head that required staples to close, contusions to his elbow, a concussion and "goose eggs" on his head, and extreme pain from being sprayed in the face with the chemical irritant.

●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony

11) <u>*United States v. Vincent Gillespie*</u>, No. 1:22-CR-00060-BAH
**68 MONTHS**

●Came from Massachusetts and, while he was in the Capitol tunnel with a mob, "used police riot shields, controlling different police riot shields at different points in time, both offensively to push his way forward to the police line to get into the Capitol, and defensively, to prevent the police from fending him off.

●Used two hands to **grab** an MPD officer by the arm to **yank** him toward the mob.  While he restrained the officer, another rioter assaulted the officer by **beating** the officer with a crutch.

●Screamed at the officers defending the Capitol that they were "traitors" and committing "treason."

●Later told the media that his intent was to help "own" the Capitol building for a few days.

●He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

12) <u>*United States v. Jeffrey Sabol*</u>, No. 1:21-CR-0035-RC
**63 MONTHS**

●After traveling from Colorado, he was in the "front line of rioters confronting the police."

●Tried to rip off a helmet-visor of an officer.

●While another officer was on the ground, he reached for the officer's baton, **grabbed** it, and  **ripped** it out of his hands. He used such force in **stealing** the baton that the officer's torso was lifted up and forward. That officer was not able to return to full duty until July 2021.

●**Grabbed** another officer by his baton, then by the helmet and the neck of his ballistic vest, and **dragged** him down a set of steps in a prone

position into a crowd of rioters where that officer was **beat with weapons**.



●After the fact, he microwaved laptops and hard drives and dropped his cell phone into a body of water in order to destroy evidence.

13) *United States v. George Todd*, No. 1:22-CR-00166-BAH
**60 MONTHS**

●Entered the Capitol with a makeshift flag pole

●Yelled at officers attempting to defend the Capitol: "I swear to God, I'll hip toss your ass into the fuckin' crowd, mother fucker!"

●When it appeared that he was going to strike an officer with his flagpole while inside the Capitol, another officer tried to prevent that from happening by trying to grab the flagpole from him and the two struggled over the flagpole. By **fighting** that officer from taking his weapon, that officer **suffered a cut so deep that it exposed a tendon** and caused that officer to immediately retreat from the Rotunda and to

leave the Capitol. The officer received seven stitches and missed 9 days of work.

● **Physically assaulted** another officer after he left the Capitol as he was calling a group of officers defending the Capitol "pedophiles."

● He, unlike Mr. Reffitt, **testified** at trial and offered false testimony.

## B. *United States v. Kenneth Thomas*, No. 1:21-CR-00552-DLF 58 MONTHS

● While armed with a jackknife, attacked the West Terrace of the Capitol.

● Harassed police officers repeatedly calling them "traitors."

● **Assaulted** one police officer by "**punch[ing]** him and/or violently push[ing] him."

● **Assaulted** yet another officer by "**punch[ing]** him and/or violently push[ing] him."

● "[L]ead the charge in what became a battle to push back against the officers as they attempted to clear the Terrace.

● **Assaulted** a *third* officer and encouraged other rioters to push that officer.

● **Assaulted** a *fourth* officer by **body-checked** him and then, grabbed the baton of the officer and **body-checking** him for a second time.

● He, unlike Mr. Reffitt, **testified** at trial and offered false testimony

## C. *United States v. Thomas Robertson*, No. 1:21-CR-00034-CRC 87 MONTHS *RESENTENCED* TO 72 MONTHS

● The Defendant was a sworn police officer.

●He was armed with a baton-stick and a gas mask.

●He **struck** two separate officers with his baton and attempted to prevent officers from defending the encroaching mob.

●He was in the first wave of rioters to advance to the Upper West Terrace

●He entered the Capitol as part of the "first wave" and proceeded to its Crypt banging his baton

●Only after he believed that the rioters succeeded in stopping the election certification, did he leave.

●Afterward, posted on social media: "If you are too much of a coward to risk arrest, being fired, and actual gunfire to secure your rights, you have no words to speak I value.  Enjoy your feel good protests and fame. I'll simply accept a 'Thank you' for the very blanket of freedom that you live and sleep under."

●After the fact he destroyed his phone and a co-defendant's phone that had relevant evidence of their actions on January 6.

**D.  Discussion**

While Mr. Reffitt certainly committed serious offenses, it is almost impossible to justify a sentence greater than the sentences imposed in the cases described above.

While it is true that Mr. Reffitt brought a gun to the Capitol building, the gun remained holstered.  In comparison, in many of the above cases, the defendants *used* weapons (albeit not a gun) to physically assault officers.  One assault was so bad that the government labeled it "sadistic cruelty" (defendant sentenced to 85 months).

Another was so bad the officer was out of work for six months (defendant sentenced to 63 months) and another was so bad it caused a cut so severe that it exposed the officer's tendon (defendant sentenced to 60 months).

While Mr. Reffitt was one of the earlier ones to climb the West side stairs (but certainly not the first one), mostly all of the above cases involved defendants who took the lead in connection with attacks on the various Capitol locations.  Moreover, as far as defendants go on a scale of 1 to 10, with 10 being the worst, Mr. Reffitt certainly could not be characterized as "10 plus" as was the defendant sentenced to 72 months.

Mostly all the cases described above involved the type of bombastic language used by Mr. Reffitt, although in several instances that language was even more reprehensible.

Most all of the cases involved significant planning and traveling from great distances with others.  At least one involved creating an instructional video for the "protestors" (defendant sentenced to 72 months).

While the Court and the government at the original sentencing questioned whether Mr. Reffitt truly accepted responsibility for his actions, all of the above cases (except two) involved defendants who not only did not accept responsibility but committed perjury regarding their actions at trial.

While an "apples to oranges" comparison is sometimes difficult, comparing gradations is more straightforward. Such comparisons are also made easier the second time around now that so many January 6 defendants have been sentenced. Moreover, the need to avoid unwarranted disparities, demands such comparisons.

In sum, while Undersigned Counsel disagreed at the time, Mr. Reffitt's original sentence may have seemed appropriate when there were less comparisons to be made. Now, however, no such explanation case can support such a disparate sentence. At this juncture, it is simply impossible to justify a sentence for Mr. Reffitt that is greater than, or even equal to, the sentences for those that used weapons on January 6 or to the sentences for those that engaged in serious assaults on the officers defending the Capitol.

## V. CONCLUSION

Based upon the foregoing, Undersigned Counsel respectfully suggests that the Court should again **impose a sentence consistent with the imprisonment range set forth by the United States Sentencing Guidelines and, in any event, should not impose a sentence greater than 58 months imprisonment.** Such a sentence is, in fact, sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

Respectfully submitted,


/s/ F. Clinton Broden
F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594 (facsimile)
clint@texascrimlaw.com

Attorney for Defendant
Guy Wesley Reffitt

## **CERTIFICATE OF SERVICE**

I, F. Clinton Broden, certify that on November 22, 2024, I caused a copy of the

above document to be served via electronic filing on all counsel of record.

/s/ F. Clinton Broden
F. Clinton Broden